United States District Court
Southern District of Texas
**ENTERED**
June 04, 2024
Nathan Ochsner, Clerk

23-cUNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **OCTEVIA WAGNER,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:23-CV-02886** |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM & ORDER**

This action arises out of a series of incidents that occurred in the Harris County Jail resulting in the death or serious injury of 27 detainees. Before the Court is Defendant's Motion to Dismiss, ECF No. 21. For the reasons that follow, the Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART.**

## I.      BACKGROUND[1]

This case involves a series of disturbing occurrences in which 27 pre-trial detainees at the Harris County Jail ("the Jail") died or suffered serious injury. The action is brought by a combination of the detainees themselves and the representatives of the deceased detainees' estates against Defendant Harris County. All Plaintiffs assert § 1983 claims for unconstitutional conditions of confinement and failure to train or supervise. Seventeen Plaintiffs also allege violations of the Americans with Disability Act ("ADA") and the Rehabilitation Act ("RA"). In asserting unconstitutional conditions of confinement, Plaintiffs identify five problematic policies or customs: (1) overcrowding and understaffing, (2) failure to properly observe and monitor

---

[1] Although Defendant denies these allegations, at this stage all well-pleaded factual allegations are accepted as true. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

detainees, (3) denial of adequate medical care, (4) institutionalization of excessive force by officers against detainees, and (5) encouraging a culture of violence amongst detainees. All Plaintiffs bring claims pursuant to the first policy, and most bring claims pursuant to the second. They allege claims under the third, fourth, and fifth policies in various permutations. With respect to the failure-to-train allegations, Plaintiffs identify training failures related to providing medical care, observation and monitoring, handling violence among detainees, and avoiding excessive force.

Now before the Court is Defendant's Motion to Dismiss. [2] ECF No. 21. Plaintiffs have responded, ECF No. 26, and Defendant has replied, ECF No. 32. Because the similarity of the incidents is at issue in Defendant's Motion, the Court will briefly summarize the facts of each detainee's experience at the Jail.

**Jacoby Pillow:** Pillow was initially placed in the Jail on a misdemeanor charge. ECF No. 20 ¶ 50. Right before he was set to be released on bond, he was involved in an altercation with officers at the Jail, which culminated in multiple officers beating Pillow. *Id.* ¶¶ 51-53. Several officers placed their weight onto Pillow's chest and back, which prevented him from breathing while they assaulted him. *Id.* ¶ 53. This incident caused Pillow to sustain blunt force trauma to his head, back, and extremities. *Id.* Despite his severe injuries the Jail cleared him to return to his holding cell, where he was later found unresponsive. *Id.* ¶¶ 54-57. Jail staff did not check on Pillow for several hours while he was in the holding cell. *Id.* ¶ 56. He died shortly thereafter, and an autopsy found that his death was caused by the compression and blunt force trauma he sustained during the assault. *Id.* ¶ 58.

**Bryan Johnson:** Shortly after entering the Jail, several officers asked Johnson to leave his cell so they could investigate a potential fight between detainees. *Id.* ¶ 62. As he was exiting the

---

[2] There are also two Intervenor-Plaintiffs who bring similar claims against Harris County. Although Defendant has moved to dismiss those claims as well, those motions are not yet ripe. ECF Nos. 43, 44.

2

cell, the officers pushed Johnson, causing him to stumble. *Id.* The officers then tackled Johnson to the ground and beat him for several minutes before placing him in restraints. *Id.* Afterwards, the officers did not take him to the Jail's clinic, instead placing him in a holding cell. *Id.* ¶ 63. They returned several hours later and again beat Johnson. *Id.* Despite sustaining injuries to his wrists and right leg as well as facial bruising, Johnson was not taken to the clinic until several days later, at which time the clinic completed a cursory examination of him. *Id.* ¶ 64. Following the incident, Johnson had difficulty breathing, and he was eventually prescribed an inhaler. *Id.* ¶ 65. Officers confiscated his inhaler, denying him access to his prescribed treatment. *Id.* Johnson died several weeks later after the injuries inflicted by the officers caused complications with his existing heart and lung conditions. *Id.* ¶ 68. In the week before his death, he reported difficulty breathing and requested medical attention, but the Jail ignored his requests and failed to treat his condition. *Id.* ¶ 67-68.

**Evan Ermayne Lee:** Lee entered the Jail with known medical conditions including high blood pressure, diabetes, manic depression, schizophrenia, anxiety, and bipolar disorder. *Id.* ¶ 72. Throughout his time at the Jail, medication for these conditions was frequently denied or delayed. *Id.* ¶ 73. He was eventually beaten by another detainee, during which Jail staff failed to intervene. *Id.* ¶ 75. Despite suffering visible head injuries, he was not seen by the Jail clinic until two days after the assault. *Id.* ¶ 76. The clinic provided no treatment or diagnostic testing related to his head injuries. *Id.* A week later, Lee was found disoriented. *Id.* ¶ 77. He was transported to a hospital, where it was discovered that the beating had caused blunt force trauma and multiple brain bleeds. *Id.* Shortly thereafter he was ruled braindead, and he died two days later. *Id.* ¶ 78.

**William Curtis Barrett:** Barrett was likewise assaulted during his time in the Jail, resulting in significant head trauma and visible head wounds. *Id.* ¶ 85. He was not provided with

3

sufficient treatment or a medical evaluation related to his head wounds. *Id.* ¶ 86. Despite his head injuries, the Jail failed to monitor him, and he was found unresponsive on his cell floor three days later. *Id.* ¶ 87. He then died as a result of the blunt force trauma to his head. *Id.* ¶ 88.

**Kevin Leon Smith, Jr.:** Smith entered the Jail with an unspecified medical condition for which Plaintiffs allege he was denied treatment. *Id.* ¶ 91-92. Several months later, he suffered a medical emergency in his cell. *Id.* ¶ 93. Due to the lack of monitoring, other detainees had to notify Jail staff of the incident. *Id.* Despite the gravity of the situation, clinic staff stood around joking about an unrelated topic for several minutes instead of responding to the incident in a timely fashion. *Id.* ¶ 94. When they reached Smith's pod, they encountered 5-6 officers idly standing around Smith's bunk. *Id.* ¶ 95. Although Smith was unresponsive, the officers did not provide CPR or other emergency life saving measures because they thought he was faking his medical emergency. *Id.* Smith was eventually placed on a backboard and brought to the clinic. *Id.* ¶ 96. Part of a way through this transit to the clinic, an officer finally began chest compressions but refused to let anyone give mouth-to-mouth breaths or provide a breathing apparatus. *Id.* At the clinic, an AED was retrieved, but could not be used because it had not been charged. *Id.* The clinic, which serves the entire Jail, had only one AED. *Id.* Smith was declared dead later that day. *Id.* ¶ 97. The clinic subsequently falsified records as to when lifesaving measures began. *Id.* ¶ 106.

**Ramon Thomas:** Like Smith, Thomas was found by other detainees on the floor of his cell suffering from a medical emergency. *Id.* ¶ 105. The detainees called for help for several minutes with no response from the officers. *Id.* When officers did respond, they failed to conduct CPR or other lifesaving measures. *Id.* ¶ 106. As was the case with Smith, clinic staff falsified records describing when life saving measures began. *Id.* Thomas was eventually taken to the

hospital where he died from blunt force trauma and asphyxiation, presumably caused by another detainee. *Id.* ¶ 106-107.

**Nathan Henderson:** Immediately prior to being brought to the Jail, Henderson was in the hospital with a stab wound to his abdomen, which had become infected. *Id.* ¶ 110-11. Although he was still being treated for the infection and had not been cleared to leave the hospital, he was transferred to the Jail and placed in a single cell. *Id.* ¶ 111. While Henderson was prescribed antibiotics for the infection, the Jail regularly failed to provide him with his medication. *Id.* ¶ 112. A week after being transferred to the Jail, Henderson died as a result of the infection and the Jail's failure to treat it. *Id.* ¶¶ 114-15.

**Deon Peterson:** Peterson was admitted to the Jail with a known history of heart disease and high blood pressure. While there, he complained of left arm pain, but did not receive any medical intervention. *Id.* ¶ 120. He later complained of chest pain and difficulty breathing. *Id.* ¶ 121. He was summarily assessed by the clinic before being sent back to his cell without any treatment. *Id.* ¶ 122. He returned to the clinic when his symptoms continued, where he passed out while waiting to be seen by staff. *Id.* ¶ 123. Later that day, Peterson passed away due to an issue with his heart. *Id.* ¶ 124.

**Gary Wayne Smith:** Smith entered the Jail with a kidney disorder that required medication, consistent treatment, and continuous observation. *Id.* ¶ 128. He was placed in a cell did not allow for such observation. *Id.* ¶ 129. During his short detention at the Jail, he was transported to the hospital numerous times related to this kidney condition. *Id.* ¶ 130. However, he still did not receive the medication or constant monitoring that his condition required. *Id.* ¶ 130, 132. A month after arriving at the Jail, he was found unresponsive in his cell and later declared deceased. *Id.* ¶ 131.

**Kristan Smith:** Smith entered the Jail with diabetes and blood pressure problems, which required regular doses of insulin and blood pressure medication, respectively. *Id.* ¶ 135. The Jail did not provide Smith with her medications on a timely basis, and sometimes did not provide them at all. *Id.* ¶ 136. Other detainees eventually found her unresponsive in her cell. *Id.* ¶¶ 137-38. She later died from diabetes-related complications, which resulted from the Jail's failure to provide her medication. *Id.* ¶ 139.

**Robert Wayne Fore:** Fore's intake records reflect that he had suicidal ideations and mental health issues, which required him to be classified as "at risk" and treated in a mental health facility. *Id.* ¶¶ 143-44. Instead, he was placed in a single cell and was not put on suicide watch. *Id.* ¶ 144. Other detainees informed officers that Fore had threatened to hurt himself, including on the morning of his death. *Id.* Yet, he was still not placed on suicide watch, nor did officers adequately monitor him under county policies. *Id.* ¶¶ 144-45. He eventually hung himself in his cell and was declared deceased. *Id.* ¶¶ 145-46.

**Michael Griego:** While at the Jail, Griego was attacked by several other detainees. *Id.* ¶ 152. Although officers observed the incident, they did not interfere or provide aid until after the beating had stopped and Griego was unconscious. *Id.* ¶ 153. As a result of the beating and the officer's lack of intervention, Griego sustained severe head trauma that subsequently led to his death. *Id.* ¶¶ 154-55.

**Jeremy Garrison:** Garrison was beaten by several detention officers during his time at the Jail. *Id.* ¶ 161. Although he reported the incident, he received no update on the Jail's investigation, nor does it appear the Jail took any disciplinary actions against the officers. *Id.* About a month later, he was again pepper sprayed and beaten by several officers in the dayroom after Garrison asked to speak with the officers' sergeant. *Id.* ¶ 162-66. This beating resulted in a "Hangman's

fracture" to his neck, which required immediate surgery. *Id.* ¶ 168. Garrison's treating physician remarked that he was lucky not to have been paralyzed given the severity of his neck trauma. *Id.* Aside from his neck injury, Garrison suffered extreme bruising, head trauma, lacerations to multiple areas of his body, loss of consciousness, visual changes, and loss of strength in and use of his right hand. *Id.* ¶ 169. Immediately after the beating, officers attempted to conceal evidence from the incident. *Id.* ¶ 166. Instead of taking pictures or otherwise documenting the blood on the floors and walls of the dayroom, they immediately cleaned the space, destroying evidence of the incident. *Id.* Several detainees attempted to provide witness statements, but officers refused to take their statements. *Id.*

**Zachery Johnson:** Johnson was attacked by another detainee at the Jail, causing injury to his face and body. *Id.* ¶ 175. Officers did not interfere with the attack or otherwise act to prevent it. *Id.* A few days later, Johnson was assaulted by several officers, which caused him to lose consciousness multiple times. *Id.* ¶ 177. Johnson subsequently suffered from seizures, of which he had no prior history. *Id.* The officers' beating also left him with a brain bleed and a fractured skull, neck, spine, and ribs. *Id.* ¶ 180. Despite these extensive and painful injuries, the Jail clinic failed to provide sufficient treatment after either event. *Id.* ¶ 176, 178. Johnson did not receive adequate medical care for these life-threatening injuries until he was released from the Jail some days later. *Id.* ¶¶ 180-81.

**Kenneth Richard**: When Richard entered the Jail, he had a known history of anxiety requiring medication. *Id.* ¶¶ 184-85. The Jail failed to provide Richard with his medication on a regular basis. *Id.* ¶ 185. He complained to his mother over the Jail phone of the poor conditions in the Jail. *Id.* ¶ 186. During a visit to the clinic, officers placed Richard in handcuffs and leg shackles, which they had not done during prior visits. *Id.* ¶ 187. Two officers then escorted Richard to a

specific holding cell that is well-known among detainees for being a location where officer beatings frequently occur. *Id.* ¶ 188. There, the officers told Richard not to complain to his mother anymore. *Id.* ¶ 188. Four additional officers arrived in the cell, and they began to beat Richard, who was still shackled. *Id.* ¶ 189. After Richard fell to the ground, they stomped and kicked him. *Id.* ¶ 189. Unconscious, Richard was transported to the hospital with severe head injuries, injuries to his back and chest, blurred vision, memory loss, numbness in his extremities, and loss of skin around his wrists and ankles. *Id.* ¶ 190. His injuries were so severe that he had to be intubated during treatment. *Id.* ¶ 191.

**Jeremiah Anglin**: Anglin suffers from schizophrenia yet was placed in the general population instead of the mental health ward. *Id.* ¶¶ 194-95. Like others, he appears to have been denied regular medication for his condition. *Id.* ¶ 196. While at the Jail, he was handcuffed and beaten by officers. *Id.* ¶ 197. Due to this assault, he lost six teeth, endured significant head swelling, and had to have multiple screws placed in his mouth to repair the damage. *Id.* ¶¶ 198-99.

**Harrell Veal:** Like other detainees, Veal required medication for a blood pressure condition, which the Jail did not provide to him on a regular basis. *Id.* ¶ 204. While at the Jail, Veal was attacked from behind by unknown assailants who punched and kicked Veal numerous times in the back, chest, and head. *Id.* ¶ 206. As a result, Veal sustained broken ribs, a bruised back, and numerous broken bones in and around his head, which required him to have a metal plate installed in his head and undergo an eye socket reconstruction procedure. *Id.* ¶¶ 205-06. During another incident, Veal was being escorted in handcuffs by an officer. *Id.* ¶ 203. Once out of view of security cameras, the officer forced Veal's arms and hands into a contorted position and applied pressure, injuring Veal's wrists, shoulders, and back. *Id.*

**John Coote:** After another detainee had threatened him, Coote attempted to get moved to a different housing unit in the Jail. *Id.* ¶ 210. Under the guise of attempting to speak to Coote about his concerns, officers brought Coote to a vestibule area without cameras. *Id.* ¶¶ 210-11. There, multiple officers sprayed him with pepper spray, wrestled him to the ground, and assaulted him. *Id.* ¶¶ 212-13. He was then taken to the clinic for his injuries, where escorting officer falsely told the clinician that Coote was injured by another detainee. *Id.* ¶ 214. At the clinic, Coote received substandard care for his facial bruising, broken nose, difficulty breathing, and memory loss. *Id.* Coote was later assaulted twice by different groups of detainees, resulting in a broken foot, a broken nose, a bruised shoulder, a swollen face, and brain trauma. *Id.* ¶ 215-17. Officers failed to intervene in either incident. *Id.* Coote was subsequently involved in an altercation with officers in which the officers slammed Coote against a concrete wall and floor before punched him multiple times. *Id.* ¶ 219.

**Tramell Morelle:** Morelle was beaten by seven other detainees. *Id.* ¶ 224. Officers stood by and watched the fight but did not intervene in any way. *Id.* Morrelle sustained a broken jaw from the assault, which required surgery and the installation of two metal plates to hold his jaw in place. *Id.* ¶ 225.

**Bernard Lockhart:** On the day Lockhart was booked into the Jail, an officer grabbed Lockhart's arm, wrenched it behind his back, and slammed his face against the wall. *Id.* ¶ 230. He then dragged Lockhart into a holding cell. *Id.* Additional officers came into the cell and began beating Lockhart. *Id.* ¶ 231. He sustained several injuries including a torn rotator cuff. *Id.* The Jail refused to provide him adequate medical treatment, and he could not obtain the necessary surgery to repair his torn rotator cuff until he was released from the Jail almost a year later. *Id.*

**Ryan Twedt:** Twedt suffers from bipolar disorder, as well as depression and anxiety, all of which require medication. *Id.* ¶ 234. The Jail regularly delayed or denied Twedt the necessary medication to treat his disorders. *Id.* ¶ 235. Without his medication, Twedt's actions became erratic, and he was involved in an altercation with another detainee. *Id.* ¶ 236. The officer responding to the incident threatened Twedt, stating that, if he was ever moved to the 6th floor of the facility, the officers would "beat his ass." *Id.* ¶ 237. Twedt was eventually transferred to the 6th floor. *Id.* ¶ 238. After his transfer, the officers ordered Twedt's two cellmates to leave the cell. *Id.* ¶ 240. They then handcuffed Twedt, slammed him against the wall and ground, and then beat him while he was shackled. *Id.* In doing so, the officers broke one of Twedt's fingers, bruised his ribs, and caused lacerations to his head. *Id.* ¶ 241. Because the clinic would not provide proper medical care, Twedt's broken finger has healed improperly, and he still suffers from short-term memory loss. *Id.* ¶¶ 242-43.

**Antonio Radcliffe:** Radcliffe was serving food to detainees along with two detention officers when one detainee attacked him. *Id.* ¶ 248. The officers did not interfere with the assault or attempt to prevent it. *Id.* After the assault, Radcliffe complained of head pain and a possibly broken jaw, but the Jail clinic forced him to return to his work serving detainees food. *Id.* ¶ 249. He was eventually taken to the hospital, where he underwent surgery that involved installing several metal plates around his jaw. *Id.* ¶ 250.

**Zachary Zepeda:** Zepeda was attacked by other detainees. *Id.* ¶ 255. Officers did not intervene in the assault. *Id.* He was brought to the hospital with skull fractures, brain and spine bleeds, facial bruising, a broken eye socket, and a spinal compression fracture. *Id.* ¶ 256. When his mother later visited him at the Jail, she reported seeing one of the guards drag Zepeda by his leg across the room, despite the fact Zepeda's severe injuries were still healing. *Id.* ¶ 258.

10

**Jaquez Moore:** Moore had a known history of epileptic seizures when he entered the Jail. *Id.* ¶ 262. As the Jail was aware, Moore takes medication to control his seizures. *Id.* ¶ 263. The Jail often withheld this medication from him as punishment. *Id.* Several other detainees attacked Moore while he was at the Jail, resulting in numerous injuries and causing a seizure. *Id.* ¶¶ 263-65. Moore was left lying on the floor for roughly thirty minutes before Jail staff responded to the incident. *Id.* ¶ 265. Instead of taking him to the clinic, he was placed in a holding cell streaked with feces. *Id.* ¶ 266. He was eventually taken the clinic, where he was placed in a different holding cell for over eight hours. *Id.* ¶ 267. In lieu of any testing or evaluation of his injuries, he received a drink to restore his electrolytes and a small amount of pain medicine. *Id.* Moore was subsequently attacked by other detainees several more times and observed that the officers routinely waited until the assaults were over before intervening. *Id.* ¶ 268. As a result, he acquired injuries to his head and eye, and now endures partial memory loss. *Id.* ¶¶ 269-71. Some of these injuries went untreated for weeks, as the medical kiosk on his floor was broken indefinitely and officers routinely ignored his requests for treatment. *Id.* ¶ 271.

**Taylor Euell:** As Euell was waiting in line to be processed, an officer grabbed a bag containing Euell's paperwork from him. *Id.* ¶¶ 276-77. When Euell asked for it back, the officer slammed Euell's face against the wall, injuring Euell's eye. *Id.* ¶ 277. He also broke Euell's hand in the process of placing handcuffs on him. *Id.* When Euell attempted to obtain medical treatment for his injuries, the officer threatened to assault him if he told anyone about what had happened. *Id.* ¶ 278. The clinic did not properly treat his broken hand, causing the bone to grow back improperly. *Id.* Euell entered the Jail with known medical conditions that require regular medication to prevent seizures. *Id.* ¶ 275. Euell was constantly denied his medication, causing him to have a breakthrough seizure. *Id.* ¶ 280. Instead of providing emergency care, the officers

responding to his seizure claimed he was faking it and stomped on his wrists and ankles. *Id.* ¶ 281. Later, Euell reported to officers that another detainee had threatened to sexually assault him. *Id.* ¶ 282. The officers ignored this report and chose not to transfer him to a different unit, conduct additional observations, or otherwise attempt to prevent the assault. *Id.* The other inmate did eventually try to sexually assault Euell. *Id.* ¶ 283. Euell attempted to defend himself, resulting in a physical altercation where Euell walked away with a broken nose and impaired vision in his good eye. *Id.* Euell received no medical treatment for these injuries. *Id.* ¶ 284. His nose has healed improperly, causing a visible deformity. *Id.*

**Christopher Young:** Young "fell" while in the Jail bathroom. *Id.* ¶¶ 289-92. It is common practice in the Jail to report assaults at the hands of detainees or officers as "falls" in order to avoid retribution. *Id.* Young was not discovered until sometime later, when another detainee mentioned that he was lying on the floor in the bathroom. *Id.* ¶ 289, 293. The assault caused severe facial fractures, a lacerated ear, and loss of vision in one eye, and Young was subsequently hospitalized for almost a month. *Id.* ¶ 290.

**Dylan Perio:** When Perio was booked into the Jail, he reported to officers that he has HIV, which requires regular medication. *Id.* ¶ 297. The Jail denied him access to medication for almost a year, causing a relapse in his condition. *Id.* ¶ 298. Perio's numerous requests for medical attention related to his HIV symptoms were ignored, as were his subsequent complaints that prison officials were failing to provide him medical attention. *Id.* ¶ 299. Eventually, a medic at the Jail informed Perio that his organs were beginning to shut down because he was not getting the proper medication, placing him at risk of death. *Id.* ¶ 300. Although the Jail's medical staff intervened at that juncture, Perio must live with the irreversible damage to his body caused by the denial of medication and treatment. *Id.*

## II.    MOTION TO DISMISS STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering such a motion, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004); *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A pleading need not contain detailed factual allegations but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted).

## III.    ANALYSIS

### a.  Claim 1: Unconstitutional Conditions of Confinement

Plaintiffs contend that the conditions of confinement in the Jail violate the Constitution. Specifically, they take issue with the Jail's (1) overcrowding and understaffing, (2) failure to properly observe and monitor detainees, (3) denial of medical care to detainees, (4) institutionalization of excessive force by officers against detainees, and (5) encouragement of violence amongst detainees.

#### i.  Conditions of Confinement Versus Episodic Acts or Omissions

Defendant argues that Plaintiffs' claims concern episodic acts or omissions of individual Jail employees, not conditions of confinement. Thus, the Court must first determine whether Plaintiffs' claims can be brought under a conditions-of-confinement theory.

"The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989).

"When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission." *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019). The former entails "attacks on general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644 (5th Cir. 1996). Meanwhile, the latter involves "a particular act or omission of one or more officials" where "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

The boundary between these two categories is more porous than it may appear at first glance. To state a claim under a conditions-of-confinement theory, a plaintiff must point to "a rule or restriction" in place at the jail, or "otherwise demonstrate the existence of an identifiable intended condition or practice." *Hare*, 74 F.3d at 645. While a condition of confinement "is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges,

disciplinary segregation," it can also be "an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare,* 74 F.3d at 645).

Accordingly, the question of which theory applies is a context-specific inquiry. Consider, for example, a jail's alleged failure to provide medication to detainees. Where such a failure is an isolated incident perpetrated by a particular official, that claim might be properly classified as an episodic act or omission. In contrast, where the denial of medication is sufficiently widespread, it may constitute a condition of confinement. Categorization as either an episodic act or a condition is not dependent on the type of conduct (e.g., failure to provide medical care, failure to prevent detainee violence, failure to monitor detainees, etc.), but instead flows from how pervasive the challenged conduct is. *See Hare*, 74 F.3d at 643-45 (describing how the failure to provide medical care and the failure to protect detainees from violence can fall into either category depending on the context); *see also Shepherd*, 591 F.3d at 453 (allowing claims to proceed under conditions theory because the plaintiff "presented extensive independent evidence on the jail's treatment of inmates with chronic illness. This evidence included a comprehensive evaluative report commissioned by the County, the DOJ report, affidavits from employees of the jail and its medical contractor attesting to the accuracy and applicability of the reports, and a plethora of additional documentary evidence.").

The distinction between the two theories is of practical importance. An episodic act claim has a subjective deliberate indifference requirement, which means that the plaintiff must show that the officer had "actual knowledge of the substantial risk . . . and responded with deliberate indifference." *Hare*, 74 F.3d at 650; *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir.

1997). In contrast, conditions claims are adjudicated under the standard articulated in *Bell v. Wolfish,* 441 U.S. 520 (1979), which allows courts to "assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Flores*, 124 F.3d at 738. Therefore, no showing of deliberate indifference is required. *See Hare*, 74 F.3d at 643.

Here, Plaintiffs allegations of pervasive misconduct are properly brought under a conditions-of-confinement theory. As was the case in *Shepherd*, Plaintiffs have cited to extensive evidence suggesting the relevant conduct is ubiquitous in the Jail, including a series of Texas Commission on Jail Standards ("TCJS") reports identifying that the Jail is not compliant with minimum jail standards, a 2009 report from the DOJ analyzing the conditions in the Jail, statements from Sheriff Gonzales and former Jail employees noting serious issues in the Jail, and dozens of descriptions incidents similar to those experienced by Plaintiffs. This evidence is parsed in more detail in the context of whether there is a custom or policy attributable to Harris County. At this stage, it suffices to say that the allegations go beyond mere isolated incidents of misconduct perpetrated by individual officers, and instead suggest a set of *de facto* policies in place at the Jail. In sum, the Jail's deficiencies related to providing medical care, monitoring detainees, permitting excessive force, encouraging detainee violence, and allowing overcrowding and understaffing are "sufficiently extended or pervasive . . . to prove an intended condition or practice." *Hare*, 74 F.3d at 645. This is in accord with other courts' findings that a conditions claim is appropriate under similar circumstances. *See, e.g.*, *Shepherd*, 591 F.3d at 453 (inadequate medical care and understaffing of guards and medical personnel); *Parker v. Carpenter*, 978 F.2d 190 (5th Cir. 1992) (failure to protect detainee from other detainee violence and failure to provide medical care); *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (failure to protect inmates from

violence and sexual assault at the hands of other inmates); *Sabbie v. Sw. Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at *112 (E.D. Tex. Mar. 6, 2019) (failure to provide medical care, excessive force against detainees, and failing to properly monitor detainees); *Cheek v. Nueces Cnty.*, No. 2:13-CV-26, 2013 WL 4017132, at *7 (S.D. Tex. Aug. 5, 2013) (understaffing medical providers); *Palo v. Dallas Cnty.*, No. CIV.A. 305CV0527-D, 2007 WL 2140590, at *5 (N.D. Tex. July 26, 2007) (inadequate medical care); *see also Garza*, 922 F.3d at 633-34 ("Prior conditions cases have concerned . . . impositions on inmates' lives like overcrowding . . . .").

Defendant argues that, because there were individual Jail employees involved in each of the alleged incidents, these claims must be brought under an episodic-acts-or-omission theory. Not so. Any policy inherently must be implemented by individual actors. That is, there will always be a specific individual who was the one who did not provide the necessary medication, who placed too many detainees in a facility, or who took away a detainee's mail privileges. If the existence of an individual actor sufficed to convert a conditions-of-confinement claim into an episodic-act-or-omission claim, the doctrines would functionally collapse into each other. Thus, the Court finds Defendant's argument unavailing. Plaintiffs' claims are properly brought under a conditions theory. *See Palo*, 2007 WL 2140590, at *4 ("[T]he presence *vel non* of the individual actors does not alter the fundamental nature of the claim.").

## ii. Constitutional Violation

In order to state a claim for unconstitutional conditions of confinement, Plaintiffs must first allege a constitutional violation. "Because a state may not punish a pretrial detainee, conditions of confinement for such an inmate that amount to 'punishment' violate the Constitution." *Duvall v. Dallas Cnty.*, 631 F.3d 203, 206 (5th Cir. 2011). A condition constitutes punishment when there

is an "absence of any legitimate penological or administrative goal." *Shepherd*, 591 F.3d at 454. Accordingly, the relevant test is whether the condition that is alleged to be the cause of the constitutional violation has a "reasonable relationship to a legitimate governmental interest." *Duvall*, 631 F.3d at 207; *Bell v. Wolfish*, 441 U.S. 520 (1979). Unlike in the context of episodic acts or omissions, there is no deliberate indifference requirement. *Duvall*, 631 F.3d at 207.

Defendant's sole argument on this front is that Plaintiffs have not shown the Jail employees acted with subjective deliberate indifference. These arguments are unpersuasive, as Plaintiffs do not need to show deliberate indifference for a conditions claim. *See Duvall*, 631 F.3d at 207; *Hare*, 74 F.3d at 644; *Shepherd*, 591 F.3d at 454-55. Because Defendant does not contend that the policies serve a legitimate governmental objective, the Court will proceed under the assumption that they do not. *See JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (argument waived for inadequate briefing).

### iii.  Municipal Liability

Plaintiffs must next show that they have met the requirements for municipal liability set out in *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978).[3] To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Here, the only element Defendant disputes is whether there was an official policy.

---

[3] It is somewhat unclear to what extent *Monell* applies in conditions-of-confinement cases. At times, the Fifth Circuit has assessed whether *Monell*'s preconditions are met in such cases. *See Duvall*, 631 F.3d at 209. In other instances, there is no mention of *Monell*. *See Shepherd*, 591 F.3d at 455. Ultimately, it is unclear how much *Monell* adds in this context. *Monell*'s mandate that there be an official policy that was the moving force behind the constitutional violation seems roughly equivalent to the standard that applies in conditions cases, namely that there be "a rule or restriction" which "caused the violation of [the plaintiff's] constitutional rights." *Duvall*, 631 F.3d at 207. Nonetheless, the Court applies *Monell* here because both parties argue under a *Monell* framework.

Defendant makes two arguments related to the custom or policy requirement. First, it asserts that the policies identified are too vague. Defendant is correct that "[t]he description of a policy or custom . . . cannot be conclusory." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997). However, Plaintiffs need only plead "the specific topic of the challenged policy" to satisfy this requirement. *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 844 (S.D. Tex. 2011). Plaintiffs have done so, as they've identified five specific customs at issue: (1) insufficient monitoring of detainees; (2) inadequate medical care; (3) institutionalized use of excessive force against detainees; (4) encouragement of violence amongst detainees; and (5) systemic understaffing and overcrowding. This requirement has been met. Defendant fails to identify any authority holding that similarly specific descriptions of challenged policies are insufficient.

Second, Defendant contends that Plaintiffs have not alleged a pattern of similar incidents that would suggest the existence of a municipal policy or custom. An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (citation and quotation marks omitted). "To find a municipality liable for a policy based on a pattern, that pattern 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (internal citations omitted).

A plausible pattern "requires similarity and specificity; [p]rior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 810 (5th Cir. 2017) (quoting *Peterson*, 588 F.3d at

850) (cleaned up).  The similarity requirement "should not be exaggerated," but the prior acts must "be fairly similar to what ultimately transpired." *Id.*

Additionally, with respect to numerosity, "[t]he number of incidents and other allegations necessary to establish a pattern representing a custom, on a motion to dismiss, varies." *Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2017) (citation omitted). "Other than requiring more than one incident by non-policymakers, neither the Fifth Circuit nor the Supreme Court [has] set a specific number of incidents that is required for a plausible claim of municipal liability under a custom or practice." *Edwards v. Oliver*, No. 3:17-CV-01208-M-BT, 2019 WL 4603794, at *7 (N.D. Tex. Aug. 12, 2019), *report and recommendation adopted*, No. 3:17-CV-01208-M-BT, 2019 WL 4597573 (N.D. Tex. Sept. 23, 2019) (citation omitted). Significantly, courts do not apply a strict numerical threshold but instead look at the incidents in context. *See, e.g.*, *Vess v. City of Dallas*, No. 3:21-CV-1764-D, 2022 WL 2277504, at *10-11 (N.D. Tex. June 23, 2022). "Where the violations are flagrant or severe," a shorter pattern of conduct can demonstrate that "diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984).

Plaintiffs offer the following to support the existence of a set of municipal policies: (1) descriptions of the 27 incidents at issue in this suit, which bear varying degrees of similarity to each other; (2) details of of 36 prior incidents at the Jail involving detainees who are not parties to the present action; (3) a 2009 DOJ report detailing deficiencies at the Jail; (4) 13 TCJS reports noting the Jail's non-compliance with minimum jail standards; (5) statements from Sheriff Gonzales and prior Jail employees about the systemic issues in the Jail; and (6) statistics to show the prevalence of violence at the Jail. The Court finds that this evidence of similar incidents is sufficient to plead the existence of the policies or customs Plaintiffs allege.

20

**Failure to Provide Medical Care:** Plaintiffs claim that the Jail fails to provide detainees with medical care and mental health care. When it does, Plaintiffs further allege, the care rendered is often untimely or severely inadequate. Among Plaintiffs, there are numerous similar incidents where detainees entered the Jail with known medical conditions yet were denied the medication needed to treat those conditions. Likewise, Plaintiffs pled a number of similar incidents where detainees did not receive adequate evaluation, testing, monitoring and treatment after being beaten by officers or other detainees. Plaintiffs are not the only ones to endure this; their Complaint describes how several non-party detainees similarly were denied medication for known conditions or were denied treatment for serious injuries.[4] This denial of care has had uniformly disastrous outcomes for the detainees, often resulting in prolonged injuries, new chronic conditions, or death.

Moreover, Plaintiffs cite to several TCJS reports from the past decade in which the Jail was found to have improperly denied medical care after it was requested or where an individual died or was seriously injured because the Jail withheld their medication. ECF No. 20 ¶¶ 380-83, 413-20, 450-70 (describing TCJS reports from March 11, 2016; December 9, 2020; December 19, 2022; and March 8, 2023). This accords with the findings from the 2009 DOJ report[5] assessing

---

[4] Defendant makes a novel argument that factual allegations in other lawsuits against a municipality cannot be the source of similar incidents to support the existence of a policy or custom unless those suits resulted in a finding of liability. The Court is aware of no such rule, nor would the adoption of one be wise. A hypothetical elucidates the absurdity of this argument. Suppose, for example, a municipality adopts an unwritten policy of authorizing the use of excessive force during arrests. One hundred people are then arrested under perfectly identical circumstances, and they are subject to the same exact type of excessive force during their arrests. Now assume they all bring § 1983 claims against the municipality. Under Defendant's proposed rule, all of their claims must be dismissed, because none can show a prior case in which the municipality was found liable for the excessive force. Despite the existence of 99 other identical events, they are unable to plead the existence of a custom or policy! As this hypothetical suggests, Defendant's proposed rule would make it functionally impossible to bring a *Monell* claim over an unwritten policy. That is to say, when a municipality adopts an unconstitutional unwritten policy, there will be no way for the first claim challenging it to succeed, which in turn prevents subsequent claims from proceeding. Thus, Defendant's proposed rule must be soundly rejected.

[5] Defendant contends that the DOJ report cannot help substantiate the existence of Plaintiffs' alleged policies. In doing so, Defendant makes much of this Court's findings in *Inaimi v. Harris Cnty.*, No. 4:21-CV-01832, 2022 WL 901556, at *3 (S.D. Tex. Mar. 25, 2022). There the Court dismissed a *Monell* claim

conditions at the Jail, which found the medical care to be severely lacking: "[W]e also conclude that certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming." *Id.* ¶ 317 (quoting DOJ report at 2). The report went on to find that the inadequate medical care was "serious enough to place detainees at an unacceptable risk of death or injury." *Id.* ¶ 319 (quoting DOJ report at 3). Combined, these allegations suggest a sustained pattern of substandard medical care that is sufficiently pervasive to constitute municipal policy.

**Institutionalization of Excessive Force Against Detainees:** Plaintiffs assert that the Jail has a policy or custom of permitting officers at the Jail to use excessive force against detainees. Plaintiffs' allegations sufficiently support the existence of such a policy. Plaintiffs have alleged numerous incidents of officers using excessive force unprovoked, in retaliation for detainees reporting other issues in the Jail, or in response to perceived slights. Not only did multiple Plaintiffs make allegations along these lines, but their pleadings also identify several third parties who have been subject to similar incidents of officer violence in the Jail. These excessive force incidents

---

that was predicated primarily on the 2009 DOJ report as well as allegations of 3,000 excessive force complaints in Harris County since 2015. *Id.* The Court found that, without any allegations of incidents similar to that suffered by the plaintiff, the DOJ report and statistics were insufficient to support the existence of a municipal policy. *Id.* Specifically, the Court noted that the examples in the DOJ report involved different factual scenarios than those at hand in *Inaimi*, and that the plaintiff had not described any of the factual details surrounding the 3,000 excessive force complaints. In contrast, Plaintiffs in the instant case have provided ample examples of misconduct from the last few years to supplement their allegations. Further, the examples from the DOJ report more closely map to the allegations here than they did in *Inaimi*, making the report more probative with respect to the existence of a municipal policy. Moreover, to the extent that Defendant takes issue with the age of the DOJ report, the Court finds this argument unpersuasive. In the report were Plaintiffs' sole piece of evidence, its age might make it insufficient to suggest the existence of a municipal policy. However, Plaintiffs have provided substantial allegations suggesting that the deficiencies identified in the report have been ongoing in the past several decades. Because the report is combined with Plaintiffs' other evidence, its age in fact makes it quite useful in showing that the alleged constitutional violations "have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Davidson*, 848 F.3d at 396 (internal citations omitted).

involve various permutations of a set of similar themes. Some common elements include taking detainees to isolated areas without cameras, slamming detainees against walls, restraining detainees with handcuffs, using closed fist strikes and kicks, and failing to properly document the force used. The excessive force incidents are also of similar severity, as most of the incidents alleged involved some combination of broken bones and substantial head injuries, resulting in lasting injury or death.

These accounts again are in accord with the findings of the DOJ report, which concluded that the Jail's "systemic deficiencies" exposed "detainees to harm or risk of harm from excessive use of force." *Id.* ¶¶ 317, 336 (quoting DOJ report at 1, 15). The DOJ's investigation "found significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors," causing "serious concerns about the use of force at the Jail." *Id.* ¶¶ 334-35 (quoting DOJ report at 15). The DOJ report also noted that the Jail lacked "a minimally adequate system for deterring excessive use of force." *Id.* ¶ 333 (quoting DOJ report at 14). The ongoing, and possibly worsening, nature of this problem is born out in the statistics Plaintiffs allege in their pleadings. The Jail has been home to an increasing proportion of the use of force incidents resulting in bodily injury across Texas. In 2022, the Harris County Jail had more incidents where officers' use of force against detainees caused bodily harm than every other county jail in Texas combined. *Id.* ¶ 372. At the time the Complaint was filed, the Jail was on track to again eclipse use of force in other counties in 2023. *Id.* In combination with the numerous similar incidents of excessive force alleged in the Complaint, this documentation suggests an ongoing municipal custom of allowing Jail officers to use excessive force against detainees with impunity.

**Promulgation of a Culture of Violence Amongst Detainees:** Plaintiffs contend that the Jail has a policy or practice of facilitating violence among detainees. This occurs through officer's failure to intervene in ongoing assaults, to respond to requests of detainees who report violence, and to rectify known blind spots in the Jail's security system. Numerous Plaintiffs in this suit have pled that they were assaulted by other detainees in view of officers who did not intervene or act to prevent the incident. Others allege that they reported to Jail officials that they had been threatened by other detainees, only to find they were left to their fate. More still were assaulted in known blind spots. These accounts are again supplemented by those of non-party detainees, many of whom similarly claim that they were assaulted by other detainees in the view of officers, in known blind spots, or after reporting threats of violence to Jail officials.

This phenomenon is not new. The 2009 DOJ report found that the Jail lacked "an adequate plan for managing a large and sometimes violent detainee population." *Id.* ¶ 333. Sheriff Gonzalez acknowledged the ongoing detainee violence in 2016, stating, "[Jail leadership has] got to end this culture that quickly leads to physical altercation." *Id.* ¶ 344. And, in 2020, 2021, and 2022, there were more detainee assaults in the Harris County Jail than in all other Texas county jails combined. *Id.* ¶ 367. The Jail was on track to maintain this record in late 2023 when the Complaint was filed. *Id.* Detainee violence has not gone unnoticed by the TCJS, and was discussed in one of the reports of non-compliance. *Id.* ¶¶ 432-440 (describing TCJS report from December 7, 2021). These allegations suffice to plead the existence of a municipal policy encouraging detainee violence.

**Failure to Observe and Monitor:** Next, Plaintiffs allege that the Jail has a policy of failing to properly observe and monitor detainees through face-to-face checks and video monitoring of known blind spots that are scenes of repeated violence. They also allege that Jail employees inaccurately report and document observation of detainees.

The Jail's scant monitoring practices have been documented extensively in a series of TCJS reports. Several reports describe how detainee suicides were facilitated by the Jail's failure to meet TCJS standards for face-to-face contact with detainees at regular intervals. *See Id.* ¶¶ 384-90, 396-412 (describing reports issued on February 21, 2017; December 19, 2017; and August 23, 2018). Likewise, other TCJS reports note that the Jail has "on a routine basis" failed to adequately monitor detainees in the 30-minute or 60-minute intervals that minimum jail standards require. *Id.* ¶¶ 413-40, 456-76, 479-83 (describing reports from December 9, 2020; April 6, 2021; December 7, 2021; March 8, 2023; April 17, 2023; and August 28, 2023). TCJS also noted that officers were falsely documenting that they had completed observations that they had not actually conducted. *Id.* ¶ 464 (describing report from March 8, 2023).

This policy of inadequate monitoring is reflected in accounts of Plaintiffs and third-party detainees. Many allege incidents where they were assaulted by other detainees because of the Jail's failure to conduct observations with the required frequency. In other instances, detainees experiencing medical emergencies were not discovered for extended periods of time because Jail staff were failing to sufficiently monitor them. In several others, detainees were able to commit suicide because of the Jail's inadequate monitoring.[6]

Despite the repeated notices of non-compliance, and the myriad similar incidents arising from this insufficient monitoring, the Jail has failed to alter its inadequate monitoring practices. This dereliction suffices to suggest the existence of a municipal policy of inadequate observation of detainees.

---

[6] Only one Plaintiff's injury results from a detainee's suicide. However, the Complaint alleges numerous similar incidents of third-party detainee suicides that sufficiently resemble each other to satisfy the similarity and numerosity requirements. *See, e.g.*, ECF No. 20 ¶¶ 488-541, 827-37, 846-854 (describing six detainee suicides that were facilitated by the Jail's poor monitoring practices).

**Systemic Understaffing and Overcrowding:** Compounding all of these issues, Plaintiffs claim, is the Jail's policy of routinely understaffing the Jail relative to the number of detainees. This understaffing and overcrowding facilitates the violence amongst detainees and officers, impedes access to medical care, and inhibits adequate monitoring of detainees.

The systemic understaffing and overcrowding is, again, discussed in TCJS reports cited in the Complaint. As multiple reports have observed, the Jail has repeatedly failed to employ sufficient staff to meet minimum standards. *See id.* ¶¶ 432-40, 456-70, 479-83 (describing reports from December 7, 2021; March 8, 2023; August 28, 2023). The failure to comply with minimum ratio of officers to detainees was also discussed at TCJS board meetings on August 3, 2023, and November 2, 2023. *Id.* ¶¶ 477-78, 484-86. The reports go on to describe the connection between the Jail's understaffing and the other pervasive issues in the Jail: "Minimal staffing has a direct impact on the ability to provide a safe and secure environment for inmates and jail staff in areas such as enforcing inmate rules, ensuring inmates clean housing areas, provide for sufficient staff to support housing officers and has possibly contributed to an increase in inmate on inmate assaults and inmate on staff assaults." *Id.* ¶ 435 (quoting TCJS report); *see also id.* ¶ 436 ("It is the professional opinion of the members of the inspection team that the lack of sufficient staffing has contributed to the heightened level of tension and inmate hostility at the Harris County Jail System that was experienced during the course of this inspection." (quoting TCJS report)).

Those involved with the operations of the Jail have likewise noted the staffing issues. A former detention officer at the Jail, J. Valdiviez, publicly described how his pod was understaffed and how detainees who were supposed to be escorted at all times were often left unattended. *Id.* ¶¶ 890-93. Another former Jail employee, identified as Sergeant Jane Doe, also detailed how the Jail failed to adequately assign staff to detainees who were supposed to be escorted at all times. *Id.*

¶¶ 897-900. Similarly, in February 2023, two anonymous former Jail employees did an interview with a local news station in which they chronicled "[t]he crisis in the Harris County Jail," and described "the overcrowded conditions." *Id.* ¶¶ 903-07. These issues are similarly recounted in the resignation letter of former Assistant Chief of Detentions Shannon Herklotz. *Id.* ¶¶ 908-10. Herklotz, the head of the Jail, resigned in early 2023, and delineated the systemic challenges with overcrowding and understaffing he observed over the course of his employment. *Id.*

Statements from Sheriff Gonzalez mirror those made by other Jail officials. At a TCJS quarterly meeting on November 2, 2023, Sheriff Gonzalez admitted that the Jail was not in compliance with TCJS minimum standards. *Id* ¶ 484. Specifically, he stated that the Jail could not meet the minimum officer to detainee ratio required by TCJS due to overcrowding and understaffing, which continued to worsen as the number of vacant officer positions grew. *Id* ¶ 485. Gonzalez has made similar statements regarding the Jail's chronic overcrowding and understaffing in other forums, noting that "this is not a new problem." *See id.* ¶¶ 348-49. The 2009 DOJ report confirms his assessment, similarly detailing how the Jail's overcrowding "impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise detainees in a safe manner. How the Jail handles inmate supervision and violence illustrates some of the complexities associated with overcrowding." *Id.* ¶ 337 (quoting DOJ report at 17). Plaintiffs have sufficiently pled the existence of a longstanding municipal policy of overcrowding and understaffing the Jail.

Viewed in their totality, Plaintiffs' allegations suggest an odious pattern of disregard for the basic human dignity of the detainees under the Jail's care. With respect to each individual policy challenged, Plaintiffs have provided an abundance of evidence to supplement their allegations that these disquieting practices are pervasive. In fact, this evidence far surpasses that

which has been found sufficent in other cases. *See, e.g.*, *Feliz v. El Paso Cnty.*, 441 F. Supp. 3d 488, 498-99 (W.D. Tex. 2020) (finding one TCJS report and one analogous incident sufficient to support allegations of an unconstitutional policy on summary judgment); *Bartee v. Harris Cnty.*, No. 4:16-CV-2944, 2018 WL 8732519, at *5 (S.D. Tex. Mar. 5, 2018) (holding allegations of similar instances of use of force in Harris County Jail, evidence from the 2009 DOJ report, the Sheriff's statements during a press conference, and statements from a Jail employee were sufficient to allege the existence of a policy of permitting excessive force); *Ettinoffe v. Sheikh*, No. 4:21-CV-02646, 2022 WL 5200084, at *6 (S.D. Tex. Oct. 4, 2022) (finding statistics of officer use of force as well as allegations of 48 instances of excessive force, at least two of which involved similar maneuvers, sufficed to allege the existence of a policy of excessive force). Despite Defendant's entreaties, the Court cannot ignore what Plaintiffs allegations clearly assert: the Jail has a policy or custom of permitting excessive force against detainees, failing to provide medical care, promoting violence amongst detainees, failing to monitor detainees, and understaffing and overcrowding the Jail. Defendant's Motion to Dismiss is **DENIED** with respect to Plaintiffs conditions-of-confinement claims.

### b.  Claim 2: Failure to Train

Plaintiffs' failure-to-train theory requires pleading that "1) the [county] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur City*, 245 F.3d 447, 459 (5th Cir. 2001)). Each element is discussed in turn.

**Training Deficiencies:** "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Plaintiffs allege several specific training deficiencies. Plaintiffs first contend that Harris County failed to adequately train Jail officials on handling and preventing detainee violence and responding to requests for aid and protection from detainees. ECF No. 20 ¶ 1084. Specifically, they take issue with the fact that Harris County's training allegedly encourages officers not to interfere with detainee fights until after the fight is over, encourages officers not to act preemptively to prevent fights between detainees, and in fact advises officers to encourage detainees to fight to resolve their own conflicts. *Id.* Further, Plaintiffs contend that Harris County's training does not properly instruct employees on the observation and monitoring of detainees. *Id.* ¶ 1085. In particular, they claim Harris County employees are not sufficiently trained to comply with minimum jail standards on observation, to conduct complete cell checks, to monitor detainees while they are in areas with no video cameras, to observe the video cameras that do exist, or to accurately document reports pertaining to observation and cell checks. *Id.* Finally, Plaintiffs allege training failures related to providing medication and medical treatment to detainees. *Id.* ¶ 1086. They state that Harris County officials were not adequately trained on providing medication, responding to requests for medical care, conducting tests or analysis related to detainees' injuries, accurately documenting detainees' medical care, and observing and monitoring detainees with known medical issues. *Id.* These allegations are suitably specific to identify what training failures exist. *See Samuel v. City of Houston*, No. 4:22-CV-02900, 2023 WL 6444888, at *10 (S.D. Tex. Sept. 29, 2023) (compiling examples of sufficiently specific failure-to-train allegations).

**Causation:** Plaintiffs also must plead a causal link between the alleged training failures and the injuries endured. Defendant makes a conclusory assertion that Plaintiffs have not met this standard, but does not identify any specific pleading deficiency. The Court finds that the facts alleged are sufficient to infer causation. For example, Plaintiffs allege that officers are trained not to interfere in detainee fights until after they are over, which directly mirrors multiple Plaintiffs' allegations that officers stood by and watched them be assaulted by another detainee without intervening. Similarly, Plaintiffs allege that officers are not properly trained on providing medication to detainees, resulting in a number of Plaintiffs failing to receive necessary medications. Plaintiffs' other failure-to-train allegations are likewise intuitively related to the injuries pled, satisfying the causation element.

**Deliberate indifference**: Finally, Plaintiffs must plead facts suggesting that "the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). "'[A] pattern of similar constitutional violations by untrained employees is ordinarily' required to show deliberate indifference." *Pena*, 879 F.3d at 623 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). As described in the context of conditions of confinement, Plaintiffs provide ample evidence of such a pattern. Plaintiffs have pled a series of similar incidents arising from the purported training failures. These allegations are supported by evidence suggesting the long running nature of the issues at hand, including the 2009 DOJ report and the dozen or so TCJS notices of non-compliance, both of which describe training deficiencies similar to those Plaintiffs have alleged. Further, Plaintiffs' Complaint describes public statements from Sheriff Gonzalez where he admits to the need for more training. *See* ECF No. 20 ¶ 344 (transcribing a statement

from Sheriff Gonzalez about the Jail: "I think here recently there was another civil rights lawsuit of an inmate that was beaten so severely it required reconstructive facial surgery. So the culture needs to change. . . . We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in . . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well. Make sure that we are creating opportunities to learn better de-escalation techniques, so things don't get out of control, but it starts with leadership. We've got to end this culture that quickly leads to physical altercation . . . ."); *see also id.* ¶ 343-353 (detailing other statements from Sheriff Gonzalez regarding issues in the Jail). Plaintiffs also allege statistics showing that disturbing prevalence of violence in the Jail over the past several years. *Id.* ¶¶ 367-72. Combined, these facts are more than sufficient to suggest Harris County was deliberately indifferent to the need for improved training. Accordingly, Defendant's Motion to Dismiss Plaintiffs' failure-to-train claim is **DENIED**.

### c.   Claim 3: ADA and RA Violations

Plaintiffs bring claims for disability discrimination under the Title II of the ADA and § 504 of the RA. Specifically, they assert that "Harris County intentionally discriminated against Plaintiffs because of their mental and physical disabilities by failing to provide medications timely, by failing to modify medical care in accordance with their physical condition, by failing to modify observation and monitoring requirements, by failing to remove disabled individuals from the general population, and by failing to use proper techniques in handling detainees with disabilities." ECF No. 20 ¶ 1179.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because § 504 of the RA closely tracks the language of the ADA, the Fifth Circuit generally analyzes ADA and RA claims in tandem. *See Estate of A.R. v. Muzyka*, 543 F. App'x 363, 364 (5th Cir. 2013); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). To plead a disability discrimination claim under the ADA and RA, Plaintiffs must allege: (1) that they are qualified individuals within the meaning of the Acts; (2) that they were excluded from participation in, or denied benefits of, services, programs, or activities for which Harris County is responsible, or were otherwise discriminated against by Harris County; and (3) that such exclusion, denial of benefits, or discrimination was by reason of their disabilities. *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020).

Because Plaintiffs' ADA and RA claims hinge upon the Jail's failure to provide adequate medical care, their claims must be dismissed. The Fifth Circuit has been clear that "[t]he ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[7] *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012) (citation and quotation marks omitted); *see also Hale v. Harrison Cnty. Bd. of Supervisors*, 8 F.4th 399, 404 n.1 (5th Cir. 2021) (same). This stems from the fact that "[t]he ADA does not set out a standard of care for medical treatment." *Walls v. Texas Dep't of Crim. Just.*, 270 F. App'x 358, 359 (5th Cir. 2008). As a result,

---

[7] In contrast, the Fifth Circuit has found the denial of mobility aids can constitute a denial of reasonable accommodations under the ADA because that denial prevents an individual from accessing services within the facility. *See Cadena v. El Paso County*, 946 F.3d 717, 725 (5th Cir. 2020). Although "the ADA does not typically provide a remedy for negligent medical treatment," the denial of mobility aids is distinguishable because "mobility aids have been characterized by the Supreme Court and the Second Circuit as disability accommodations." *Id.* at 726. Thus, while providing mobility aids could be logically classified as a type of medical care, it is distinct in that mobility uniquely impacts a detainee's ability to access other facility services.

a jail's general failure to provide detainees with competent medical care cannot support an ADA or RA claim unless there is some "indication that [the plaintiff] was treated differently because of his disability." *Nottingham*, 499 F. App'x at 377. District courts have relatively consistent in their application of this rule, generally dismissing ADA or RA claims based solely on the denial of medical care. *See, e.g.*, *Thomas v. Anciso*, No. 2:22-CV-00254, 2023 WL 4666629, at *3 (S.D. Tex. July 20, 2023); *Thomas v. Samuel*, No. 2:22-CV-00158, 2023 WL 1529544, at *2 (S.D. Tex. Feb. 2, 2023); *Smith Est. of Hawkins v. Harris Cnty.*, No. CV H-15-2226, 2019 WL 12117217, at *8 (S.D. Tex. Feb. 25, 2019), *aff'd sub nom. Smith v. Harris Cnty.*, 956 F.3d 311 (5th Cir. 2020); *Salcido v. Harris Cnty.*, No. CV H-15-2155, 2018 WL 4690276, at *54 (S.D. Tex. Sept. 28, 2018); *Doe v. Harris Cnty.*, No. CV H-16-2133, 2017 WL 4402590, at *29 (S.D. Tex. Sept. 29, 2017).

At heart, each of Plaintiffs' allegations of disability discrimination concern the Jail's failure to provide medical care. At times this is explicit, such as when Plaintiff alleges that the Defendant violated the ADA "by failing and refusing to provide [the detainees their] medications consistently," ECF No. 20 ¶¶ 1184, 1191, 1198, 1210, 1217, 1225, 1281, 1287; "by failing and refusing to provide [detainees] with [their] medications and medical care," *id.* ¶¶ 1232, 1246, 1260, 1268, 1275; and "by failing and refusing to provide [the detainees] with full testing and evaluation for [their] physical injuries," *id.* ¶¶1191, 1204, 1210, 1225, 1232, 1238, 1246, 1260, 1268, 1281, 1287, 1293. Elsewhere the Complaint addresses more specific issues related to medical care, such as the Jail's failure to conduct medical tests or evaluations, *id.* ¶¶ 1191, 1204, 1210, 1225, 1232, 1238, 1246, 1260, 1268, 1281, 1287, 1293, failure to create a full treatment program, *id.* ¶¶ 1184, 1191, 1210, 1225, 1232, 1246, 1260, 1268, 1275, 1281, failure to complete more frequent observations to determine if a medical condition was worsening, *id*. at ¶ 1184, and failure to place detainees in specialized mental health facilities, *id.* at ¶¶ 1246, 1251, 1260, 1268, among other

things. Each of these allegations relates to the Jail's failure to provide adequate medical care, and are not cognizable under the ADA or RA. *See Nottingham*, 499 F. App'x at 377; *Hale*, 8 F.4th at 404 n.1; *Walls*, 270 F. App'x at 359.

To be sure, the claims regarding the Jail's substandard medical care are egregious. While they suggest the Jail acted with alarming disregard for the detainees' wellbeing, they do not create an inference of intentional discrimination against detainees with disabilities. Likewise, there's no indication that the detainees were denied accommodations that caused disabled detainees to have "an unequal ability to use and enjoy the facility compared to individuals who do not have a disability." *Providence Behavioral Health v. Grant Rd. Pub. Utility Dist.*, 902 F.3d 448, 459 (5th Cir. 2018). Accordingly, Plaintiffs' ADA claims are **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

Defendant's Motion to Dismiss is **GRANTED** with respect to Plaintiffs' ADA and RA claims, which are **DISMISSED WITH PREJUDICE.** The Motion is **DENIED** with respect to Plaintiffs' conditions-of-confinement and failure-to-train claims.

**IT IS SO ORDERED.**

Signed at Houston, Texas on June 4, 2024.

Keith P. Ellison
United States District Judge