United States District Court
Southern District of Texas
**ENTERED**
October 07, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **OCTEVIA WAGNER**, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 4:23-CV-2886** |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM & ORDER**

This action arises out of a series of incidents that occurred in the Harris County Jail resulting in the death or serious injury of 29 detainees. Before the Court is Defendant's Motion to Dismiss Plaintiff-Intervenor Chandra Jenkins's Complaint, ECF No. 43, and Defendant's Motion to Dismiss Plaintiff-Intervenor Ana Garcia's Complaint. For the reasons that follow, Defendant's Motion to Dismiss Plaintiff-Intervenor Chandra Jenkins's Complaint is **GRANTED IN PART** and **DENIED IN PART**, and Defendant's Motion to Dismiss Plaintiff-Intervenor Ana Garcia's Complaint is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND[1]

This case involves a series of disturbing occurrences in which 29 pre-trial detainees at the Harris County Jail ("the Jail") died or suffered serious injury. The original action was brought by a combination of the detainees themselves and the representatives of the deceased detainees' estates against Defendant Harris County. Plaintiffs asserted § 1983 claims for unconstitutional conditions of confinement and failure to train or supervise along with claims for violations of the Americans with Disability Act ("ADA") and the Rehabilitation Act ("RA"). Defendant filed a

---

[1] Although Defendant denies these allegations, at this stage all well-pleaded factual allegations are accepted as true. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

Motion to Dismiss Plaintiff-Intervenors' Amended Complaint. ECF No. 21. On June 4, 2024, the Court granted the Motion to Dismiss with respect to Plaintiffs' ADA and RA claims and denied the Motion with respect to Plaintiffs' conditions-of-confinement and failure-to-train claims. ECF No. 51.

Ana Garcia filed a Motion to Intervene in the lawsuit, asserting that her son, Kevin Alexander Sanchez-Trejo, died while in the custody of the Jail. ECF No. 17. Chandra Jenkins also filed a Motion to Intervene, asserting that her son, Dequon Buford, was repeatedly sexually assaulted by fellow prisoners and denied medical care while detained in the Jail. ECF No. 34. On April 15, 2024, the Court granted the pending Motions to Intervene and ordered the clerk to file Plaintiff-Intervenors' complaints. ECF No. 40.

Plaintiff-Intervenor Garcia brought § 1983 claims for unconstitutional conditions of confinement, for failure to train or supervise, and for survivorship and wrongful death. ECF No. 41. Plaintiff-Intervenor Jenkins brought § 1983 claims for unconstitutional conditions of confinement and for failure to train or supervise along with ADA and RA claims. ECF No. 42.

On May 7, 2024, Defendant filed a Motion to Dismiss Ana Garcia's complaint, ECF No. 44, and a Motion to Dismiss Chandra Jenkins's complaint, ECF No. 43. For both pending Motions, Plaintiff-Intervenors have responded, ECF No. 59 and 63, and Defendant has replied, ECF No. 69 and 70. Now before the Court are the Motions to Dismiss. ECF No. 43, 44.

## II.    MOTION TO DISMISS STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering such a motion, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004); *Bustos v. Martini Club Inc.*, 599 F.3d 458,

461 (5th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A pleading need not contain detailed factual allegations but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted).

## III.    ANALYSIS

As Defendant acknowledges in its replies, the pending Motions to Dismiss are "substantially similar" to the Motion to Dismiss Plaintiff-Intervenors' First Amended Complaint. ECF No. 69, 70. The Court therefore applies the same analysis from its prior Memorandum and Order on Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint.

### a.   Claim 1: Unconstitutional Conditions of Confinement

Plaintiff-Intervenors Garcia and Jenkins contend that the conditions of confinement in the Jail violate the Constitution. They both take issue with the Jail's (1) overcrowding and understaffing, (2) failure to properly observe and monitor detainees, and (3) denial of medical care to detainees. These three claims mirror claims raised by the original Plaintiffs in their First Amended Complaint. In addition, Garcia challenges the Jail's (4) disparate staff security and screening policies and (5) policy of housing detainees outside Harris County.

#### i.   Conditions of Confinement Versus Episodic Acts or Omissions

Defendant argues that Plaintiff-Intervenors' claims concern episodic acts or omissions of individual Jail employees, not conditions of confinement. ECF No. 43 at 4-6; ECF No. 44 at 5-7.

3

Thus, the Court must first determine whether Plaintiff-Intervenors' claims can be brought under a conditions-of-confinement theory.

"The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989).

"When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission." *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019). The former entails "attacks on general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644 (5th Cir. 1996). Meanwhile, the latter involves "a particular act or omission of one or more officials" where "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

The boundary between these two categories is more porous than it may appear at first glance. To state a claim under a conditions-of-confinement theory, a plaintiff must point to "a rule or restriction" in place at the jail, or "otherwise demonstrate the existence of an identifiable intended condition or practice." *Hare*, 74 F.3d at 645. While a condition of confinement "is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation," it can also be "an unstated or *de facto* policy, as evidenced by a pattern

of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare,* 74 F.3d at 645).

Accordingly, the question of which theory applies is a context-specific inquiry. Consider, for example, a jail's alleged failure to provide medication to detainees. Where such a failure is an isolated incident perpetrated by a particular official, that claim might be properly classified as an episodic act or omission. In contrast, where the denial of medication is sufficiently widespread, it may constitute a condition of confinement. Categorization as either an episodic act or a condition is not dependent on the type of conduct (e.g., failure to provide medical care, failure to prevent detainee violence, failure to monitor detainees, etc.), but instead flows from how pervasive the challenged conduct is. *See Hare*, 74 F.3d at 643-45 (describing how the failure to provide medical care and the failure to protect detainees from violence can fall into either category depending on the context); *see also Shepherd*, 591 F.3d at 453 (allowing claims to proceed under conditions theory because the plaintiff "presented extensive independent evidence on the jail's treatment of inmates with chronic illness. This evidence included a comprehensive evaluative report commissioned by the County, the DOJ report, affidavits from employees of the jail and its medical contractor attesting to the accuracy and applicability of the reports, and a plethora of additional documentary evidence.").

The distinction between the two theories is of practical importance. An episodic act claim has a subjective deliberate indifference requirement, which means that the plaintiff must show that the officer had "actual knowledge of the substantial risk . . . and responded with deliberate indifference." *Hare*, 74 F.3d at 650; *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997). In contrast, conditions claims are adjudicated under the standard articulated in *Bell v.*

*Wolfish,* 441 U.S. 520 (1979), which allows courts to "assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Flores*, 124 F.3d at 738. Therefore, no showing of deliberate indifference is required. *See Hare*, 74 F.3d at 643.

Here, Plaintiff-Intervenors' allegations of pervasive misconduct are properly brought under a conditions-of-confinement theory. As was the case in *Shepherd*, Plaintiff-Intervenors have each cited to extensive evidence suggesting the relevant conduct is ubiquitous in the Jail, including a series of Texas Commission on Jail Standards ("TCJS") reports identifying that the Jail is not compliant with minimum jail standards, a 2009 report from the DOJ analyzing the conditions in the Jail, statements from Sheriff Gonzales and former Jail employees noting serious issues in the Jail, statistics on assaults, use of force, and deaths at the Jail, and descriptions of dozens of other incidents similar to those alleged in their complaints. ECF No. 41 at ¶¶ 36-64, 69-70; ECF No. 42 at ¶¶ 42-134, 138. This evidence is parsed in more detail in the context of whether there is a custom or policy attributable to Harris County. At this stage, it suffices to say that the allegations go beyond mere isolated incidents of misconduct perpetrated by individual officers, and instead suggest a set of *de facto* policies in place at the Jail. In sum, the Jail's deficiencies related to providing medical care, monitoring detainees, and allowing overcrowding and understaffing are "sufficiently extended or pervasive . . . to prove an intended condition or practice." *Hare*, 74 F.3d at 645. This is in accord with other courts' findings that a conditions claim is appropriate under similar circumstances. *See, e.g.*, *Shepherd*, 591 F.3d at 453 (inadequate medical care and understaffing of guards and medical personnel); *Parker v. Carpenter*, 978 F.2d 190 (5th Cir. 1992) (failure to protect detainee from other detainee violence and failure to provide medical care); *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (failure to protect inmates from

6

violence and sexual assault at the hands of other inmates); *Sabbie v. Sw. Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at *112 (E.D. Tex. Mar. 6, 2019) (failure to provide medical care, excessive force against detainees, and failing to properly monitor detainees); *Cheek v. Nueces Cnty.*, No. 2:13-CV-26, 2013 WL 4017132, at *7 (S.D. Tex. Aug. 5, 2013) (understaffing medical providers); *Palo v. Dallas Cnty.*, No. CIV.A. 305CV0527-D, 2007 WL 2140590, at *5 (N.D. Tex. July 26, 2007) (inadequate medical care); *see also Garza*, 922 F.3d at 633-34 ("Prior conditions cases have concerned . . . impositions on inmates' lives like overcrowding . . . ."). Therefore, Plaintiff-Intervenors' claims are properly brought under a conditions theory.

### ii. Constitutional Violation

In order to state a claim for unconstitutional conditions of confinement, Plaintiff-Intervenors must first allege a constitutional violation. "Because a state may not punish a pretrial detainee, conditions of confinement for such an inmate that amount to 'punishment' violate the Constitution." *Duvall v. Dallas Cnty.*, 631 F.3d 203, 206 (5th Cir. 2011). A condition constitutes punishment when there is an "absence of any legitimate penological or administrative goal." *Shepherd*, 591 F.3d at 454. Accordingly, the relevant test is whether the condition that is alleged to be the cause of the constitutional violation has a "reasonable relationship to a legitimate governmental interest." *Duvall*, 631 F.3d at 207; *Bell v. Wolfish*, 441 U.S. 520 (1979). Unlike in the context of episodic acts or omissions, there is no deliberate indifference requirement. *Duvall*, 631 F.3d at 207.

Defendant's sole argument on this front is that Plaintiff-Intervenors have not shown the Jail employees acted with subjective deliberate indifference. These arguments are unpersuasive, as Plaintiff-Intervenors do not need to show deliberate indifference for a conditions claim. *See*

*Duvall*, 631 F.3d at 207; *Hare*, 74 F.3d at 644; *Shepherd*, 591 F.3d at 454-55. Because Defendant does not contend that the policies serve a legitimate governmental objective, the Court will proceed under the assumption that they do not. *See JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (argument waived for inadequate briefing).

### iii.  Municipal Liability

Plaintiff-Intervenors must next show that they have met the requirements for municipal liability set out in *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978).[2] To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Here, the only element Defendant disputes is whether there was an official policy.

Defendant makes two arguments related to the custom or policy requirement. First, it asserts that the policies identified are too vague. ECF No. 43 at 9, ECF No. 44 at 7. Defendant is correct that "[t]he description of a policy or custom . . . cannot be conclusory." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997). However, Plaintiff-Intervenors need only plead "the specific topic of the challenged policy" to satisfy this requirement. *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 844 (S.D. Tex. 2011). Plaintiff-Intervenors have done so, as they've identified specific customs at issue. Both Garcia and Jenkins have identified (1) insufficient monitoring of detainees; (2) inadequate medical care; and (3) systemic understaffing and overcrowding. Garcia

---

[2] It is somewhat unclear to what extent *Monell* applies in conditions-of-confinement cases. At times, the Fifth Circuit has assessed whether *Monell*'s preconditions are met in such cases. *See Duvall*, 631 F.3d at 209. In other instances, there is no mention of *Monell*. *See Shepherd*, 591 F.3d at 455. Ultimately, it is unclear how much *Monell* adds in this context. *Monell*'s mandate that there be an official policy that was the moving force behind the constitutional violation seems roughly equivalent to the standard that applies in conditions cases, namely that there be "a rule or restriction" which "caused the violation of [the plaintiff's] constitutional rights." *Duvall*, 631 F.3d at 207. Nonetheless, the Court applies *Monell* here because both parties argue under a *Monell* framework.

has additionally identified (4) disparate staff scrutiny and security and (5) housing detainees outside Harris County. The specificity requirement has been met. Defendant fails to identify any authority holding that similarly specific descriptions of challenged policies are insufficient.

Second, Defendant contends that Plaintiff-Intervenors have not alleged a pattern of similar incidents that would suggest the existence of a municipal policy or custom. ECF No. 43 at 10, ECF No. 44 at 8. An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009) (citation and quotation marks omitted). "To find a municipality liable for a policy based on a pattern, that pattern 'must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (internal citations omitted).

A plausible pattern "requires similarity and specificity; [p]rior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 810 (5th Cir. 2017) (quoting *Peterson*, 588 F.3d at 850) (cleaned up). The similarity requirement "should not be exaggerated," but the prior acts must "be fairly similar to what ultimately transpired." *Id.*

Additionally, with respect to numerosity, "[t]he number of incidents and other allegations necessary to establish a pattern representing a custom, on a motion to dismiss, varies." *Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2017) (citation omitted). "Other than requiring more than one incident by non-policymakers, neither the Fifth Circuit nor the Supreme Court [has] set a specific number of incidents that is required for a plausible claim of municipal liability under

a custom or practice." *Edwards v. Oliver*, No. 3:17-CV-01208-M-BT, 2019 WL 4603794, at *7 (N.D. Tex. Aug. 12, 2019), *report and recommendation adopted*, No. 3:17-CV-01208-M-BT, 2019 WL 4597573 (N.D. Tex. Sept. 23, 2019) (citation omitted). Significantly, courts do not apply a strict numerical threshold but instead look at the incidents in context. *See, e.g.*, *Vess v. City of Dallas*, No. 3:21-CV-1764-D, 2022 WL 2277504, at *10-11 (N.D. Tex. June 23, 2022). "Where the violations are flagrant or severe," a shorter pattern of conduct can demonstrate that "diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984).

Plaintiff-Intervenors offer the following to support the existence of a set of municipal policies: (1) descriptions of the incident at issue in their complaints; (2) descriptions of the 27 incidents at issue in Plaintiff's First Amendment Complaint, which bear varying degrees of similarity to each other; (3) details of prior incidents at the Jail involving detainees who are not parties to the present action; (4) a 2009 DOJ report detailing deficiencies at the Jail; (5) 13 TCJS reports noting the Jail's non-compliance with minimum jail standards; (6) statements from Sheriff Gonzales and prior Jail employees about the systemic issues in the Jail; and (7) statistics to show the prevalence of violence at the Jail. The Court finds that this evidence of similar incidents is sufficient to plead the existence of three of the policies or customs Plaintiff-Intervenors allege.

**Failure to Provide Medical Care:** Plaintiff-Intervenors claim that the Jail fails to provide detainees with medical care and mental health care. When it does, Plaintiff-Intervenors further allege, the care rendered is often untimely or severely inadequate. Among Plaintiffs and Plaintiff-Intervenors, there are numerous similar incidents where detainees entered the Jail with known medical conditions yet were denied the medication needed to treat those conditions. Likewise, Plaintiff-Intervenors pled a number of similar incidents where detainees did not receive adequate

evaluation, testing, monitoring and treatment after being beaten by officers or other detainees. Plaintiffs and Plaintiff-Intervenors are not the only ones to endure this; the Complaints describe how several non-party detainees similarly were denied medication for known conditions or were denied treatment for serious injuries.[3] This denial of care has had uniformly disastrous outcomes for the detainees, often resulting in prolonged injuries, new chronic conditions, or death.

Moreover, Plaintiff-Intervenors cite to several TCJS reports from the past decade in which the Jail was found to have improperly denied medical care after it was requested or where an individual died or was seriously injured because the Jail withheld their medication. ECF No. 41 ¶¶ 46, 51, 63 (describing TCJS reports from March 11, 2016; December 4, 2020; December 19, 2022; and March 8, 2023); ECF No. 42 ¶¶ 66-67, 91-92, 107-09, 116-18 (same). This accords with the findings from the 2009 DOJ report[4] assessing conditions at the Jail, which found the medical care

---

[3] Defendant makes a novel argument that factual allegations in other lawsuits against a municipality cannot be the source of similar incidents to support the existence of a policy or custom unless those suits resulted in a finding of liability. The Court is aware of no such rule, nor would the adoption of one be wise. A hypothetical elucidates the absurdity of this argument. Suppose, for example, a municipality adopts an unwritten policy of authorizing the use of excessive force during arrests. One hundred people are then arrested under perfectly identical circumstances, and they are subject to the same exact type of excessive force during their arrests. Now assume they all bring § 1983 claims against the municipality. Under Defendant's proposed rule, all of their claims must be dismissed, because none can show a prior case in which the municipality was found liable for the excessive force. Despite the existence of 99 other identical events, they are unable to plead the existence of a custom or policy! As this hypothetical suggests, Defendant's proposed rule would make it functionally impossible to bring a *Monell* claim over an unwritten policy. That is to say, when a municipality adopts an unconstitutional unwritten policy, there will be no way for the first claim challenging it to succeed, which in turn prevents subsequent claims from proceeding. Thus, Defendant's proposed rule must be soundly rejected.

[4] Defendant contends that the DOJ report cannot help substantiate the existence of Plaintiff-Intervenors' alleged policies. In doing so, Defendant makes much of this Court's findings in *Inaimi v. Harris Cnty.*, No. 4:21-CV-01832, 2022 WL 901556, at *3 (S.D. Tex. Mar. 25, 2022). There the Court dismissed a *Monell* claim that was predicated primarily on the 2009 DOJ report as well as allegations of 3,000 excessive force complaints in Harris County since 2015. *Id.* The Court found that, without any allegations of incidents similar to that suffered by the plaintiff, the DOJ report and statistics were insufficient to support the existence of a municipal policy. *Id.* Specifically, the Court noted that the examples in the DOJ report involved different factual scenarios than those at hand in *Inaimi*, and that the plaintiff had not described any of the factual details surrounding the 3,000 excessive force complaints. In contrast, Plaintiff-Intervenors in the instant case have provided ample examples of misconduct from the last few years to supplement their allegations. Further, the examples from the DOJ report more closely map to the allegations here than they did in *Inaimi*, making the report more probative with respect to the existence of a municipal policy.

to be severely lacking: "[W]e also conclude that certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of detainee deaths related to inadequate medical care, described below, is alarming." ECF No. 41 ¶ 40 (quoting DOJ report at 2); ECF No. 42 ¶ 47 (same). The report went on to find that the inadequate medical care was "serious enough to place detainees at an unacceptable risk of death or injury." ECF No. 41 ¶ 40 (quoting DOJ report at 3); ECF No. 42 ¶ 48 (same). Combined, these allegations suggest a sustained pattern of substandard medical care that is sufficiently pervasive to constitute municipal policy.

**Failure to Observe and Monitor:** Next, Plaintiff-Intervenors allege that the Jail has a policy of failing to properly observe and monitor detainees through face-to-face checks and video monitoring of known blind spots that are scenes of repeated violence. They also allege that Jail employees inaccurately report and document observation of detainees.

The Jail's scant monitoring practices have been documented extensively in a series of TCJS reports. Several reports describe how detainee suicides were facilitated by the Jail's failure to meet TCJS standards for face-to-face contact with detainees at regular intervals. ECF No. 41 ¶¶ 47, 49-50 (describing reports issued on February 21, 2017; December 19, 2017; and August 23, 2018); ECF No. 42 ¶¶ 68-69, 75-80, 81-85 (same). Likewise, other TCJS reports note that the Jail has "on a routine basis" failed to adequately monitor detainees in the 30-minute or 60-minute intervals that minimum jail standards require. ECF No. 41 ¶¶ 51-52, 54, 63-64 413-40, 456-76, 479-83

---

Moreover, to the extent that Defendant takes issue with the age of the DOJ report, the Court finds this argument unpersuasive. In the report were Plaintiff-Intervenors' sole piece of evidence, its age might make it insufficient to suggest the existence of a municipal policy. However, Plaintiff-Intervenors have provided substantial allegations suggesting that the deficiencies identified in the report have been ongoing in the past several decades. Because the report is combined with Plaintiff-Intervenors' other evidence, its age in fact makes it quite useful in showing that the alleged constitutional violations "have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Davidson*, 848 F.3d at 396 (internal citations omitted).

(describing reports from December 4, 2020; April 6, 2021; December 7, 2021; March 8, 2023; April 17, 2023; and August 28, 2023); ECF No. 42 ¶¶ 86-92, 100-01, 105-09, 111-21, 126 (same). TCJS also noted that officers were falsely documenting that they had completed observations that they had not actually conducted. ECF No. 41 ¶¶ 63 (describing report from March 8, 2023); ECF No. 42 ¶¶ 111-119 (same).

This policy of inadequate monitoring is reflected in accounts of Plaintiffs, Plaintiff-Intervenors, and third-party detainees. Many allege incidents where they were assaulted by other detainees because of the Jail's failure to conduct observations with the required frequency. In other instances, detainees experiencing medical emergencies were not discovered for extended periods of time because Jail staff were failing to sufficiently monitor them. In several others, detainees were able to commit suicide because of the Jail's inadequate monitoring.

Despite the repeated notices of non-compliance, and the myriad similar incidents arising from this insufficient monitoring, the Jail has failed to alter its inadequate monitoring practices. This dereliction suffices to suggest the existence of a municipal policy of inadequate observation of detainees.

**Systemic Understaffing and Overcrowding:** Compounding all of these issues, Plaintiff-Intervenors claim, is the Jail's policy of routinely understaffing the Jail relative to the number of detainees. This understaffing and overcrowding facilitates the violence amongst detainees and officers, impedes access to medical care, and inhibits adequate monitoring of detainees.

The systemic understaffing and overcrowding is, again, discussed in TCJS reports cited in the Complaints. As multiple reports have observed, the Jail has repeatedly failed to employ sufficient staff to meet minimum standards. ECF No. 41 ¶¶ 54, 63-64 (describing reports from December 7, 2021; March 8, 2023; August 28, 2023); ECF No. 42 ¶¶ 105-09, 111-21, 126 (same).

The failure to comply with minimum ratio of officers to detainees was also discussed at the TCJS board meeting on August 3, 2023. ECF No. 42 ¶¶ 122-25.

Those involved with the operations of the Jail have likewise noted the staffing issues. Sheriff Gonzalez has made statements regarding the Jail's chronic overcrowding and understaffing, noting that "this is not a new problem." ECF No. 41 ¶¶ 56-59; ECF No. 42 ¶¶ 128-31. The 2009 DOJ report confirms his assessment, similarly detailing how the Jail's overcrowding "impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise detainees in a safe manner. How the Jail handles inmate supervision and violence illustrates some of the complexities associated with overcrowding." ECF No. 41 ¶ 44 (quoting DOJ report at 17). Plaintiff-Intervenors have sufficiently pled the existence of a longstanding municipal policy of overcrowding and understaffing the Jail.

**Disparate Staff Scrutiny and Security Screening:** In addition to these three shared conditions of confinement claims, Plaintiff-Intervenor Garcia alleges that the Jail has a policy of not applying the same level of scrutiny and security screenings to all jail staff members. Garcia alleges that this custom allows Jail staff to bring drugs, including fentanyl and heroin, into the Jail for sale and distribution.

Garcia cites to a local news article from 2023 about fentanyl-related deaths in the Jail. ECF No. 41 ¶ 34. The article describes the fentanyl overdose deaths of two detainees in the Jail and the statement of a local attorney suggesting that jail staff may be bringing drugs into the Jail. *Id.* The article also quotes Cynthia Cole, the executive director of a Houston labor union that represents about 40% of the workers at the Jail, who said that staff were frustrated because "They're supposed to be under all the same rules and how those rules apply, but a lot of individuals are more

scrutinized." *Id.* Finally, Garcia describes the experience of her son and another detainee who both died from drug overdoses inside the Jail.

However, the news article and description of the two tragic deaths cannot establish an official policy of disparate staff security screenings. The drug overdoses are not sufficient evidence of the "specific violation in question," namely disparate security practices, especially because Garcia does not allege that the drugs came from jail staff who underwent inadequate screenings. *Hicks-Fields*, 860 F.3d at 810. It is also unlikely that the two overdoses can satisfy the numerosity requirement for an official policy, and Garcia does not provide any additional information about the prevalence of illicit drugs in the Jail. Therefore, Garcia has not sufficiently pled the existence of a municipal policy of disparate staff screening procedures.

**Housing Outside of Harris County:** Finally, Plaintiff-Intervenor Garcia alleges that the Jail has a policy of transferring prisoners to facilities outside of Harris County and the State of Texas. All of the evidence marshalled in Garcia's Complaint relates to the Harris County Jail, and she does not cite to any evidence of this alleged transfer policy. Further, even if Garcia had established the existence of the policy, it would not be related to her claims because her son died at Harris County Jail. *See Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (ruling that the alleged policy must be causally connected to the plaintiff's claim and injuries). Plaintiff-Intervenor Garcia has not sufficiently pled the existence of an official policy of transferring detainees.

Viewed in their totality, Plaintiff-Intervenors' allegations suggest an odious pattern of disregard for the basic human dignity of the detainees under the Jail's care. With respect to the three policies they both challenge, Plaintiff-Intervenors have provided an abundance of evidence to supplement their allegations that these disquieting practices are pervasive. In fact, this evidence far surpasses that which has been found sufficient in other cases. *See, e.g.*, *Feliz v. El Paso Cnty.*,

441 F. Supp. 3d 488, 498-99 (W.D. Tex. 2020) (finding one TCJS report and one analogous incident sufficient to support allegations of an unconstitutional policy on summary judgment); *Bartee v. Harris Cnty.*, No. 4:16-CV-2944, 2018 WL 8732519, at *5 (S.D. Tex. Mar. 5, 2018) (holding allegations of similar instances of use of force in Harris County Jail, evidence from the 2009 DOJ report, the Sheriff's statements during a press conference, and statements from a Jail employee were sufficient to allege the existence of a policy of permitting excessive force); *Ettinoffe v. Sheikh*, No. 4:21-CV-02646, 2022 WL 5200084, at *6 (S.D. Tex. Oct. 4, 2022) (finding statistics of officer use of force as well as allegations of 48 instances of excessive force, at least two of which involved similar maneuvers, sufficed to allege the existence of a policy of excessive force).

Despite Defendant's entreaties, the Court cannot ignore what Plaintiff-Intervenors allegations clearly assert: the Jail has a policy or custom of failing to provide medical care, failing to monitor detainees, and understaffing and overcrowding the Jail. Defendant's Motion to Dismiss is denied with respect to Plaintiff-Intervenor Jenkins's conditions-of-confinement claims. Defendant's Motion to Dismiss is denied with respect to Plaintiff-Intervenor Garcia's first three conditions-of-confinement claims but granted on her fourth and fifth claims of disparate staff security policies and housing detainees outside Harris County.

### b. Claim 2: Failure to Train

Plaintiff-Intervenors' failure-to-train theory requires pleading that "1) the [county] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Pena*,

879 F.3d at 623 (quoting *Thompson v. Upshur City*, 245 F.3d 447, 459 (5th Cir. 2001)). Each element is discussed in turn.

**Training Deficiencies:** "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Plaintiff-Intervenors allege several specific training deficiencies. Plaintiff-Intervenors first contend that Harris County failed to adequately train Jail officials on the observation and monitoring of detainees. ECF No. 41 ¶ 78; ECF No. 42 ¶ 147. In particular, they claim Harris County employees are not sufficiently trained to comply with minimum jail standards on observation, to conduct complete cell checks, to monitor detainees while they are in areas with no video cameras, to observe the video cameras that do exist, or to accurately document reports pertaining to observation and cell checks. ECF No. 41 ¶ 78; ECF No. 42 ¶ 148. Next, Plaintiff-Intervenors allege training failures related to providing medication and medical treatment to detainees. ECF No. 41 ¶ 78; ECF No. 42 ¶ 149. They state that Harris County officials were not adequately trained on providing medication, responding to requests for medical care, conducting tests or analysis related to detainees' injuries, accurately documenting detainees' medical care, and observing and monitoring detainees with known medical issues. ECF No. 41 ¶ 78. These allegations are suitably specific to identify what training failures exist. *See Samuel v. City of Houston*, No. 4:22-CV-02900, 2023 WL 6444888, at *10 (S.D. Tex. Sept. 29, 2023) (compiling examples of sufficiently specific failure-to-train allegations).

**Causation:** Plaintiff-Intervenors also must plead a causal link between the alleged training failures and the injuries endured. Defendant makes a conclusory assertion that Plaintiff-Intervenors have not met this standard but does not identify any specific pleading deficiency. The Court finds that the facts alleged are sufficient to infer causation. For example, Plaintiff-Intervenors allege that

officers are not properly trained on providing medication to detainees, resulting in a number of Plaintiffs and Plaintiff-Intervenors failing to receive necessary medications. Plaintiff-Intervenors' other failure-to-train allegations are likewise intuitively related to the injuries pled, satisfying the causation element.

**Deliberate indifference**: Finally, Plaintiff-Intervenors must plead facts suggesting that "the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). "'[A] pattern of similar constitutional violations by untrained employees is ordinarily' required to show deliberate indifference." *Pena*, 879 F.3d at 623 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). As described in the context of conditions of confinement, Plaintiff-Intervenors provide ample evidence of such a pattern. Plaintiff-Intervenors have pled a series of similar incidents arising from the purported training failures. These allegations are supported by evidence suggesting the long running nature of the issues at hand, including the 2009 DOJ report and the dozen or so TCJS notices of non-compliance, both of which describe training deficiencies similar to those Plaintiff-Intervenors have alleged. Further, Plaintiff-Intervenors' Complaint describes public statements from Sheriff Gonzalez where he admits to the need for more training. *See* ECF No. 41 ¶ 57; ECF No. 41 ¶ 128 (transcribing a statement from Sheriff Gonzalez about the Jail: "We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in . . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well…it starts with leadership. We've got to end this culture."); *see also* ECF No. 41 ¶ 58-59; ECF No. 42 ¶ 129-30

(detailing other statements from Sheriff Gonzalez regarding issues in the Jail). Combined, these facts are more than sufficient to suggest Harris County was deliberately indifferent to the need for improved training. Accordingly, Defendant's Motion to Dismiss Plaintiff-Intervenor Jenkins's and Plaintiff-Intervenor Garcia's failure-to-train claims is denied.

### c. Claim 3: ADA and RA Violations

Plaintiff-Intervenor Jenkins bring claims for disability discrimination under the Title II of the ADA and § 504 of the RA. Specifically, Jenkins asserts that "Harris County's intentional discrimination against Dequon Buford was because of his physical and mental disabilities. This was perpetuated through failing to provide medication timely or with the correct dosage, failing to modify observation and monitoring requirements, placing Dequon Buford into general population, failing to remove Dequon Buford from general population, and failing to use proper techniques in handling Dequon Buford." ECF No. 42 ¶ 156.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because § 504 of the RA closely tracks the language of the ADA, the Fifth Circuit generally analyzes ADA and RA claims in tandem. *See Estate of A.R. v. Muzyka*, 543 F. App'x 363, 364 (5th Cir. 2013); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). To plead a disability discrimination claim under the ADA and RA, Plaintiff-Intervenor must allege: (1) that he is a qualified individual within the meaning of the Acts; (2) that he was excluded from participation in, or denied benefits of, services, programs, or activities for which Harris County is responsible, or were otherwise discriminated against by Harris County; and (3) that such exclusion,

denial of benefits, or discrimination was by reason of his disabilities. *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020).

Because Plaintiff-Intervenor's ADA and RA claims hinge upon the Jail's failure to provide adequate medical care, their claims must be dismissed. The Fifth Circuit has been clear that "[t]he ADA is not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[5] *Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012) (citation and quotation marks omitted); *see also Hale v. Harrison Cnty. Bd. of Supervisors*, 8 F.4th 399, 404 n.1 (5th Cir. 2021) (same). This stems from the fact that "[t]he ADA does not set out a standard of care for medical treatment." *Walls v. Texas Dep't of Crim. Just.*, 270 F. App'x 358, 359 (5th Cir. 2008). As a result, a jail's general failure to provide detainees with competent medical care cannot support an ADA or RA claim unless there is some "indication that [the plaintiff] was treated differently because of his disability." *Nottingham*, 499 F. App'x at 377. District courts have relatively consistent in their application of this rule, generally dismissing ADA or RA claims based solely on the denial of medical care. *See, e.g., Thomas v. Anciso*, No. 2:22-CV-00254, 2023 WL 4666629, at *3 (S.D. Tex. July 20, 2023); *Thomas v. Samuel*, No. 2:22-CV-00158, 2023 WL 1529544, at *2 (S.D. Tex. Feb. 2, 2023); *Smith Est. of Hawkins v. Harris Cnty.*, No. CV H-15-2226, 2019 WL 12117217, at *8 (S.D. Tex. Feb. 25, 2019), *aff'd sub nom. Smith v. Harris Cnty.*, 956 F.3d 311 (5th Cir. 2020); *Salcido v. Harris Cnty.*, No. CV H-15-2155, 2018 WL 4690276, at

---

[5] In contrast, the Fifth Circuit has found the denial of mobility aids can constitute a denial of reasonable accommodations under the ADA because that denial prevents an individual from accessing services within the facility. *See Cadena v. El Paso County*, 946 F.3d 717, 725 (5th Cir. 2020). Although "the ADA does not typically provide a remedy for negligent medical treatment," the denial of mobility aids is distinguishable because "mobility aids have been characterized by the Supreme Court and the Second Circuit as disability accommodations." *Id.* at 726. Thus, while providing mobility aids could be logically classified as a type of medical care, it is distinct in that mobility uniquely impacts a detainee's ability to access other facility services.

*54 (S.D. Tex. Sept. 28, 2018); *Doe v. Harris Cnty.*, No. CV H-16-2133, 2017 WL 4402590, at *29 (S.D. Tex. Sept. 29, 2017).

At heart, each of Plaintiff-Intervenor's allegations of disability discrimination concern the Jail's failure to provide medical care. At times this is explicit, such as when Plaintiff-Intervenor alleges that the Defendant violated the ADA "by failing and refusing to provide him with timely medications and/or appropriate dosages," ECF No. 42 ¶¶ 163, and by failing "to provide Mr. Buford with full and comprehensive testing and evaluation," *id* ¶ 165. Elsewhere the Complaint addresses more specific issues related to medical care, such as the Jail's failure to create a comprehensive treatment program, *id.* ¶ 163, among other things. Each of these allegations relates to the Jail's failure to provide adequate medical care, and they are not cognizable under the ADA or RA. *See Nottingham*, 499 F. App'x at 377; *Hale*, 8 F.4th at 404 n.1; *Walls*, 270 F. App'x at 359.

To be sure, the claims regarding the Jail's substandard medical care are egregious. While they suggest the Jail acted with alarming disregard for the detainees' wellbeing, they do not create an inference of intentional discrimination against detainees with disabilities. Likewise, there's no indication that the detainees were denied accommodations that caused disabled detainees to have "an unequal ability to use and enjoy the facility compared to individuals who do not have a disability." *Providence Behavioral Health v. Grant Rd. Pub. Utility Dist.*, 902 F.3d 448, 459 (5th Cir. 2018). Accordingly, the Court finds that Jenkins's ADA and RA claims should be dismissed with prejudice.

### d.   Claim 4: Wrongful Death and Survivorship

Finally, Plaintiff-Intervenor Garcia brings wrongful death and survivorship claims under § 1983. The Fifth Circuit has consistently held that § 1983 remedies would fail if a decedent's cause of action did not survive death, so § 1983 incorporates state wrongful death and survivorship

statutes. *Brazier v. Cherry*, 293 F.2d 401, 403 (5th Cir. 1961); *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 390 (5th Cir. 1992). The Fifth Circuit later clarified that "both the wrongful death claim of plaintiffs themselves and survival claims of the decedent are available under § 1983 if state law authorizes those claims." *De Paz v. Duane*, 858 Fed. Appx. 734, 737 (5th Cir. 2021). After analyzing Texas Civil Practice and Remedy Code § 71.004(a) which governs wrongful death actions and Texas Civil Practice and Remedy Code § 71.021(b) which governs survival actions, the Fifth Circuit held, "as incorporated through § 1988, civil rights plaintiffs in Texas may recover for their own injuries and the injuries of a deceased person resulting from the constitutional violations of government actors if the plaintiffs are the surviving spouse, children, parents, heirs, legal representatives, or estate of the deceased." *Id.* at 737-38. Since Plaintiff-Intervenor Garcia is decedent's surviving mother, she meets this threshold to bring § 1983 claims for wrongful death and survivorship.

Defendant makes two arguments for the dismissal of these claims. First, Defendant argues that it has Eleventh Amendment "immunity from state law claims of wrongful death and survivorship." ECF No. 44 at 14. However, Plaintiff-Intervenor Garcia's claims are clearly § 1983 claims, not pure state law claims. *See* ECF No. 41 ¶¶ 85, 89. In addition, the Eleventh Amendment does not bar § 1983 claims against municipalities. *Monell*, 436 U.S. at 691, n.54. Therefore, the Defendant does not have immunity from the wrongful death and survivorship claims.

Second, Defendant argues that Plaintiff-Intervenor Garcia does not have standing to bring a wrongful death claim because the only proper plaintiff would be a representative of the decedent's estate.  ECF No. 44 at 15-16. "Pursuant to 42 U.S.C. § 1988, we must look to the state wrongful death statute to determine who has standing to bring a wrongful death claim under § 1983." *Aguillard v. McGowen*, 207 F.3d 226, 231 (5th Cir. 2000). Texas Civ. Prac. & Rem.

Code. § 71.004(c) states that, if the wrongful death claim is not brought within three calendar months of the death of the injured party, "his executor or administrator shall bring and prosecute the action." The Texas Supreme Court has interpreted the statute to mean that, three months after the death, the executor or administrator "is the only possible party plaintiff." *In re Bridgestone Americas Tire Operations, LLC,* 459 S.W.3d 565, 574 (Tex. 2015). Since the lawsuit was filed on April 16, 2024, more than three months after the death of Sanchez-Trejo on February 12, 2022, Plaintiff-Intervenor Garcia does not have standing to bring the wrongful death claim in her individual capacity. She can only bring the claim if she is the executor of her son's estate. The Court therefore finds that Plaintiff-Intervenor Garcia's wrongful death claim should be dismissed without prejudice.

## IV.     CONCLUSION

Defendant's Motion to Dismiss Plaintiff-Intervenor Chandra Jenkins's Complaint is **GRANTED** with respect to Jenkins's ADA and RA claims, which are **DISMISSED WITH PREJUDICE**. The Motion is **DENIED** with respect to Jenkins's conditions-of-confinement and failure-to-train claims.

Defendant's Motion to Dismiss Plaintiff-Intervenor Ana Garcia's Complaint is **GRANTED** with respect to her conditions-of-confinement claims related to disparate staff scrutiny and housing outside of Harris County, which are **DISMISSED WITH PREJUDICE**. The Motion is also **GRANTED** with respect to her wrongful death claim which is **DISMISSED WITHOUT PREJUDICE**. The Motion is **DENIED** with respect to Garcia's remaining condition-of-confinement claims, failure-to-train claims, and survivorship claims.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 7th day of October, 2024.

Keith P. Ellison
United States District Judge