IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| OCTEVIA WAGNER, et al. | § | CIVIL ACTION NO.: 4-23-CV-02886 |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY TEXAS | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF-INTERVENOR CHANDRA JENKINS AS ATTORNEY IN FACT
FOR DEQUON BUFORD RESPONSE IN OPPOSITION TO DEFENDANT
HARRIS COUNTY'S NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT
AND MOTION TO SEVERE [DOC. 131]**

*/s/ Taylor McCray Hunter*
Taylor McCray Hunter
TX State Bar No. 24106123
taylor@thehunterlaw.com
**Hunter Law Corporation, PC**
**Texas Office**
4131 North Central Expressway
Suite 900 Dallas, Texas 75204
(214) 206 – 1200
(214) 206 – 1220 (facsimile)

*/s/ Thomas Lyons, Jr.*
Thomas Lyons, Jr.
Pro Hac Vice
Kevin Green
Fed. No. 3737219
**Consumer Justice Center, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
(651) 770 – 9707 (Phone)
(651) 704 – 0907 (Facsimile)

***Counsel for Plaintiff-Intervenor***

i

## TABLE OF CONTENTS

I.    STATEMENT ON THE ISSUE ..................................................................1

II.   RELEVANT BACKGROUND AND SUMMARY OF ARGUMENT .............1

    A.  Rule 56 Motion for Summary Judgment Standards…………….…………….5

    B.  The Honorable Court has already ruled that Plaintiff-Intervenor's allegations are properly brought under a conditions of confinement theory……………..7

    C.  Defendant's failure to designate a Prison Rape Elimination Act ("PREA") Compliance Manager for over two years is a macro level staffing, supervision, and training failure and condition of confinement violating Defendant's policy and PREA National Standards. Because of this Plaintiff has suffered serious harm and permanent damages and injuries……………………………………8

    D.  PREA Investigator Guerrero is unqualified. Despite this, he was the lead investigator for all rape and sexual assaults regarding Mr. Buford…………………………………………………………………………...19

    E.  Buford's medical is replete with diagnoses of rape and sexual assault……….24

    F.  Summary judgment should be denied because a material issue of disputed fact exists as to the denial of medical care claim and Defendant's conditions of confinement regarding classification, supervision, training, observation, staffing, and monitoring underlying Plaintiff's § 1983 lawsuit………………27

    G.  Plaintiff's claims survive…...…………………………………………………...36

III.  NATURE AND STAGE OF THE PROCEEDING ....................................45

IV.   RELEVANT LEGAL STANDARD ........................................................46

V.    LAW AND ARGUMENT.......................................................................50

    A.  The § 1983 claims survive ……………………………………………………...50

    B.  The conditions of confinement analysis........................................................54

    C.  Failure to train, observe, monitor, and supervise ………………………….......58

    D.  Failure to protect and provide medical care…………………..………………..63

VI.   CONCLUSION AND PRAYER...........................................................64

## **TABLE OF AUTHORITIES**

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 W.S. 144, 167-68 (1970) .................................................. 43

*Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) ................................................ 8

*Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) ........................................................... 6, 47

*Austin v Kroger Texas, L.P.,* 864 F.3d 326, 335 & n.10 (5th Cir. 2017) .............................. 6

*Axip Energy Servs., LP v. CSI Acquisition Co. LLC*, 2021 U.S. Dist. LEXIS 196549 *1
(S.D. Tex. 2021) .................................................................................................................... 48

*Ayala v. Fisher Homes*, 2020 U.S. Dist. LEXIS 116059 *3 (S.D. Tex. 2020) ..................... 49

*Bartee v. Harris Cnty.*, No. 4:16-CV-2944, 2018 WL 8732519, at *5
(S.D. Tex. Mar. 5, 2018) ....................................................................................................... 53

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 409 (1997) ................ 62

*Bell v. Wolfish,* 441 U.S. 520 (1979)) .................................................................................... 52

*Brown v. Tarrant County, 985 F.3d 489 (5th Cir. 2021)* .................................................. 42, 50

*Cardner v. Home Depot U.S.A., Inc.*, 561 F. Supp. 2d 640, 643 (E.D. Tex. 2006) ............. 47

*Castaneda v. Flores*, No. 5:05-CV-0129, 2007 WL 1671742, at *2-3 (S.D. Tex. June 8,
2007) ...................................................................................................................................... 47

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................................. 6, 48

*Cheek v. Nueces Cnty., No. 2:13-CV-26, 2013 WL 4017132 (S.D. Tex. Aug. 5, 2013)* .......... 8

*City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, n. 10 (1989) ......................................... 62

*Corbett v. Allstate Vehicle & Prop. Ins. Co.*, 2019 U.S. Dist. LEXIS 240482 *3
(S.D. Tex. 2019) .................................................................................................................... 48

*Corporativo Grupo R v. Marfield Ltd.*, 2021 U.S. Dist. LEXIS 218630 *2-3

(S.D. Tex. 2021) ................................................................................................. 49

*Epps v. Mem'l Hermann Hosp.*, 2016 U.S. Dist. LEXIS 184794 *7 (S.D. Tex. 2016) .......... 49

*Ettinoffe v. Sheikh,* No. 4:21-CV-02646, 2022 WL 5200084, at *4-5

(S.D. Tex. Oct. 4, 2022) ....................................................................... 43, 52, 53

*Feliz v. El Paso Cnty.,* 441 F. Supp. 3d 488, 498–99 (W.D. Tex. 2020)…………………...53

*Flores v. Cnty. of Hardeman, Tex.,* 124 F.3d 736, 738 (5th Cir. 1997) ............................... 52

*Garcia v. Prof'l Contract Servs.*, 938 F.3d 236, 240 (5th Cir. 2019) ............................ 48, 50

*Garza v. City of Donna,* 922 F.3d 626, 633-34 (5th Cir. 2019) ................................. 8, 51, 58

*Gros v. City of Grand Prairie, Tex.,* 34 F. App'x. 150, at *6 (5th Cir. 2002) ...................... 58

*Hare v. City of Corinth,* 74 F.3d 633, 645 (5th Cir. 1996) .................................... 9, 50, 51, 52

*Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224 (5th Cir. 2016) ........................................ 49

*Hicks-Fields v. Harris Cnty., Texas,* 860 F.3d 803, 810 (5th Cir. 2017) ........................ 43, 52

*Int'l Ship Repair & Marine Servs. v. Great Lakes Dredge & Dock Co., LLC*, 2022 U.S. Dist.

LEXIS 23555 *2 (S.D. Tex. 2022) ..................................................................... 48

*John v. Louisiana (Bd. of Trustees)*, 757 F.2d 698, 708 (5th Cir. 1985) .............................. 48

*JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 ................................ 3

*LegacyRG, Inc. v. Harter*, 705 F. App'x 223, 230 (5th Cir. 2017) ...................................... 49

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ........................................................ 48

*Masson v. New Yorker Magazine, Inc.* (1991

501 US 596, 521-522, 111 S.Ct. 2419, 2435 ......................................................... 36

*M.D. v. Abbott,* 907 F.3d 237, 255 (5th Cir. 2018) ................................................... 44, 45, 53

*Monell v. Department of Soc. Svcs.*, 436 U.S. 658, 690-91 (1978)...... 2, 42, 43, 50, 52, 54, 62

*Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) ...................................... 49

*Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) ............................ 49

*Palo v. Dallas Cnty.*, No. CIV.A. 305CV0527-D, 2007 WL 2140590, at *5
(N.D. Tex. July 26, 2007) ........................................................................................... 8

*Parker v. Carpenter*, 978 F.2d 190 (5th Cir. 1992) ................................................... 8

*Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) ………………………52

*Perez v. Collier*, 2021 U.S. App. LEXIS 27011 *7 (5th Cir. 2021)…………………………49

*Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009)…………………….43, 52

*Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001) …………………………53

*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000) ............................. 49

*Roberts v. City of Shreveport*, 397 F.3d 287,293 (5th Cir. 2005) ........................................ 58

*Royal Surplus Lines Insurance Company v. Brownsville Independent School District*, 404 F.
Supp. 2d 942, 948 (S.D. Tex. 2005) ................................................................... 47

*Sabbie v. Sw. Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at
*112 (E.D.) Tex. Mar. 6, 2019) ....................................................................... 8

*Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2017) ...................................... 53

*Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010) ..................................... 58

*Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718-721 (W.D. Tex. 2015) ................................ 58

*Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997) ........................................................... 51

*Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) ............................ 1, 8, 9, 10, 51

*Smith v. Linthicum*, 2021 U.S. Dist. LEXIS 86400 *14 (S.D. Tex. 2021)…………………..50

*Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)……………..52

*St. Paul Mercury Insurance Co. v. Williamson*, 224 F.3d 425, 440 (5th Cir. 2000)………...47

*Swinford v. Coil Tubing Tech., Inc.*, 2022 U.S. Dist. LEXIS 184952 *4 (S.D. Tex. 2022)…48

*Trautmann v. Cogema Mining, Inc*., No. 5:04-CV-117, 2007 WL 1577652, at *3 (S.D. Tex.
May 30, 2007) …………………………………………………………………………………47

*Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019)………..50

**Statutes**

42 U.S.C. § 1983 ........................................................................... 27, 42, 43, 46, 50

Americans With Disabilities Act of 1990 Title II, 42 U.S.C. § 12131, et seq ................ 45, 46

Rehabilitation Act of 1973 Section 504, 29 U.S.C. § 794, et seq .......................................... 46

**Federal Rules**

Fed. R. Civ. P. 30(b)(6) ……………………………………………………………… 30, 56

**Code of Federal Regulations Part 115 – Prison Rape Elimination Act National Standards**

PREA §115.21 .................................................................................................... 26, 30

PREA §115.22(a) ...................................................................................................... 18

PREA §115.41 ............................................................................................. 15, 32, 33, 34

PREA §115.42 .................................................................................................. 34, 35

PREA §115.67 ......................................................................................................... 15

PREA §115.71 ......................................................................................................... 15

PREA §115.86 ......................................................................................................... 15

PREA §115.89 ......................................................................................................... 15

## <u>TABLE OF EXHIBITS</u>

**Exhibit "1"**    Statutory Durable Power of Attorney

**Exhibit "2"**    Affidavit of Aristeo Villanueva – Custodian of Records The Harris Health System

**Exhibit "3"**    Harris Health System Medical Records

**Exhibit "4"**    Direct Questions to be Propounded to Witness and Affidavit of Jacqueline Strum – Custodian of Records HCA Houston Healthcare North Cypress

**Exhibit "5"**    HCA Houston Healthcare North Cypress medical records

**Exhibit "6"**    Plaintiff Chandra Jenkins' Second Supplemental Disclosures

**Exhibit "7"**    Declaration of Hayden Smith, Ph.D.

**Exhibit "7A"** Curriculum Vitae of Hayden Smith, Ph.D.

**Exhibit "7B"** Expert Report of Hayden Smith, Ph.D.

**Exhibit "8"**    Declaration of M.K. Hamza, PhD, LP, MSM, MCSPham, ABMP

**Exhibit "8A"** Curriculum Vitae of M.K. Hamza, PhD, LP, MSM, MCSPham, ABMP

**Exhibit "8B"** Expert Report of M.K. Hamza, PhD, LP, MSM, MCSPham, ABMP

**Exhibit "9"**    HCSO – Prison Rape Elimination Act 2023 Annual Report

**Exhibit "10"** Deposition of HCSO Katrina Camacho

**Exhibit "11"** Deposition of HCSO Mark Garcia

## I.     STATEMENT ON THE ISSUE

1.   Is Harris County entitled to summary judgment and to severe the claims of Plaintiff Intervenor Chandra Jenkins as attorney-in-fact of Mr. Buford? (No).

## II.     RELEVANT BACKGROUND AND SUMMARY OF ARGUMENT

2.   With all favorable inferences to nonmovant, Chandra Jenkins' claims should survive and Defendant's Motion for Summary Judgment ("MSJ") should be denied.

3.   Plaintiff-Intervenor Ms. Jenkins has sued Harris County, Texas, as attorney in fact for her son, Mr. Buford, a mentally disabled man who was repeatedly raped and physically assaulted while incarcerated in the Harris County Jail. For purposes of this Response, Mr. Buford will be referred to as the "Plaintiff" instead of his mother.

4.   Mr. Buford is one of 29 inmates or former inmates of the Harris County Jail who are Co-Plaintiffs in this case. All 29 Plaintiffs allege the same two claims.

5.   First, that "conditions-of-confinement" in the jail violated the Constitution. Specifically, they all take issue with the jail's (1) overcrowding and understaffing, (2) failure to properly observe and monitor detainees, (3) denial of medical care to detainees, (4) institutionalization of excessive force by officers against detainees, and (5) encouragement of violence amongst detainees.  As this Court aptly observed when denying Defendant's motion to dismiss this claim:

> "As was the case in *Shepherd,* Plaintiffs have cited to **extensive evidence** suggesting the relevant conduct is ubiquitous in the Jail, including a series of Texas Commission on Jail Standards ("TCJS") reports identifying that the Jail is not compliant with minimum jail standards, a 2009 report from the DOJ analyzing the conditions in

1

the Jail, statements from Sheriff Gonzales and former Jail employees noting serious issues in the Jail, and dozens of descriptions incidents similar to those experienced by Plaintiffs." (Emphasis added).

**[ECF No. 84 at page 6].**

6.  Other than drive up the cost of litigation for Plaintiffs, there is no rational basis to relitigate this matter as a "no evidence" motion for summary judgement when the Court has determined that "extensive evidence" is already in the record. The motion is facially defective and should be denied out of hand.

7.  Second, all Plaintiffs claim, under *Monell*, that Harris County's failure to properly train and supervise its jail personnel caused constitutional violations and injuries. Again, this Court held that "ample evidence" in support of this claim is likewise already in the record:

> "As described in the context of conditions of confinement, Plaintiffs provide **ample evidence** of such a pattern. Plaintiffs have pled a series of similar incidents arising from the purported training failures. These allegations are supported by evidence suggesting the long running nature of the issues at hand, including the 2009 DOJ report and the dozen or so TCJS notices of non-compliance, both of which describe training deficiencies similar to those Plaintiffs have alleged. Further, Plaintiffs' Complaint describes public statements from Sheriff Gonzalez where he admits to the need for more training." (Emphasis added).

**[ECF No. 84 at page 18].**

8.  As before, there is no justifiable basis for bringing a "no evidence" MSJ considering DOJ and TCJS reports exist that are chalk full of evidence and there is Defendant's own admission that it failed to properly train. As with "conditions-of-confinement", Defendant's

2

no evidence motion for summary judgment on failure to train/supervise likewise ignores past findings of the Court and should be denied on its face.

9.    As noted in the section on "Legal Standards" herein, if there was some particular element of either claim that Defendant wanted to argue  fell outside the "ample and extensive" evidentiary ambit of the DOJ and TCJS reports, then it was incumbent on Defendant under the rules to identify that for both Plaintiff and the Court. Defendant, however, filed a borderline incomprehensible motion that even with a generous reading only puts two matters properly before the Court:   1) Is there truly "no evidence" that Defendant acted with "deliberate indifference" in honoring its duty to protect Mr. Buford from being raped and assaulted and 2) is there truly "no evidence" that Defendant was "deliberately indifferent" in the provision of medical care? **[ECF No. 131 at page 9].**  Notably, even if the Court were to agree on both points (and it should not), this would hardly dispose of all claims in this case.

10. Beyond these two issues, Defendant remaining briefing purports to attack Plaintiff's "condition of confinement" and "episodic act" theories without identifying which elements of either one it contends lack genuine issues of material fact.  Indeed, Defendant's briefing abruptly stops after short presentations of caselaw and legal standards and is completely devoid of citations to the evidence or effort to show the absence of genuine issues of material fact. **[ECF No. 131 at pg. 10-13].** Because Defendant's briefing does not contend which elements of Plaintiff's claims lack genuine issues of material fact any arguments relating to same should be waived for inadequate briefing. *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601. **[ECF No. 84 at pg. 8].**

11. Thus, the Court should deny summary judgement here due to the movant's failure to shift any burden to the nonmovant.  In other words, Defendant's motion fails on its face,

3

requiring no further inquiry into the issues presented.

12. Finally, Plaintiff objects to Defendant pursuing summary judgment against him separately and in advance of seeking summary judgment against the other 28 Plaintiffs in this case as it unfairly burdens him with adducing and marshalling summary judgment evidence relevant to the facts of those 28 other cases that would be relevant and material to his own.

13. Further to this point, discovery is still ongoing in these cases and its inherently unjust to preemptively claim "no evidence" exists prior to the close of discovery.

14. Despite this, on June 26, 2025, Plaintiff served Second Supplemental Disclosures identifying additional persons with knowledge of relevant facts and producing additional medical records, schooling records, and expert materials. **[Exhibit 6].**

15. Although Plaintiff's expert disclosures are not due until October 10, 2025, Plaintiff produced these materials on June 26, 2025, and attaches them here in response to Defendant's MSJ to unequivocally demonstrate to the Court and defense counsel how misguided the MSJ is and as further evidence in support of denying Defendant's MSJ.

16. As the Court is aware, 27 of the other Plaintiffs in this lawsuit are represented by lawyers from the Ben Crump firm.  Especially as all Co-Plaintiffs in this case have claimed nearly identical "conditions-of-confinement" claims, hiving off Mr. Buford in advance of his cohorts was no doubt a litigation strategy designed to force a summary judgment ruling prior to the introduction of responsive evidence that will be favorable to Mr. Buford from the other cases, evidence that Mr. Buford would incorporate by reference into his own summary judgment defense.

17. There is no equitable or legal justification for disadvantaging Mr. Buford in this manner, so at the very least he respectfully requests that the Court hold off on deciding

summary judgment until such time as he has equal access to the same marshalling of evidence that the 27 Crump-represented plaintiffs will have vis-à-vis each other and that evidence of Plaintiff-Intervenor Ana Garcia.

18. In this regard, Plaintiff is taking the preliminary step of citing to the 279-page Second Amended Complaint filed by the 27 Crump-represented plaintiffs periodically throughout this Response. **[ECF No. 122].** Plaintiff also cites to his own Complaint **[ECF No. 42]** and the Court's prior ruling as to the motion to dismiss relating to both Plaintiff-Intervenors **[ECF No. 84].** The citations demonstrate the evidentiary offerings, many of which include excerpts from regulatory and investigatory reports, media articles, and court filings in other cases that the Court may consider under judicial notice.

19. As the Court has no doubt already familiarized itself with those documents in deciding 12(b)6 motions to dismiss, Mr. Buford will not overburden the record by repeating the voluminous contents verbatim but respectfully incorporates it in full by reference.

### A. Rule 56 Motion for Summary Judgment Standards

20. The starting point in any discussion of relevant legal standards related to the "no evidence" motion for summary judgment must be whether such procedural vehicle exists in federal court and, if so, how it operates because this very Defendant is of the opinion that it mimics the sweeping reach of the "no evidence" motion in the Texas Rules of Civil Procedure. Defendant plants its flag in this position by representing to the Court that "[s]uch a dispositive motion can be sustained with conclusory assertions." **[ECF 131 at pg. 2].**

21. Yet, the very case Defendant relies on for this dubious proposition states the complete opposite:

> "*Ashe* highlights an important distinction—while it is true that a movant **cannot support a motion for summary judgment with a conclusory assertion** that the nonmovant has no evidence to support his case, a movant may support a motion for summary judgment **by pointing out that there is no evidence to support a specific element** of the nonmovant's claim. *See Celotex*, 477 U.S. at 322-23. The movant in *Ashe* did not point to **a specific element** on which the nonmovant had the burden of proof at trial and allege that there was insufficient evidence to prove that element at trial."

*Austin v Kroger Texas, L.P.,* 864 F.3d 326, 335 & n.10 (5th Cir. 2017) (emphasis added). Defendant is therefore mistaken that the 5th Circuit precedent condones sustaining "no evidence" motions on conclusory statements that no evidence exists for an entire claim— movants who do that do not meet their burden.  Put differently, Defendant doesn't simply utter the magic words "no evidence" and thereby trigger a requirement that Mr. Buford put on his case in chief.

22. Instead, Defendant was required to pinpoint for both the Court and Mr. Buford exactly which elements it contends lack evidence and then explain using the record why they believe that to be true.  As noted earlier, they only did this for two elements:  1) the existence of "deliberate indifference" related to Defendant's duty to protect Mr. Buford and 2) the existence of "deliberate indifference" related to denial of medical care to Mr. Buford.  Defendant fails to do anything of the sort in pages 10-13 of its motion where Defendant argues against the existence of "conditions-of-confinement" and "episodic acts." **[ECF No. 131 at pgs. 10 – 13].**

6

23. Fatally for summary judgment, even the two cases where Defendant did pinpoint the "no evidence" element, it did so over an element that does not exist for that cause of action. Further, Defendant should be aware of this problem because this Court expressly held this to be true already: "Defendant's sole argument on this front is that Plaintiff-Intervenors have not shown the Jail employees acted with subjective deliberate indifference. These arguments are unpersuasive, as Plaintiff-Intervenors do not need to show deliberate indifference for a conditions claim." **[ECF No. 84 at pg. 7].**

24. For all of these reasons and those set forth herein, the Court should deny Defendant's motion for summary judgment.

### B.  The Honorable Court has already ruled that Plaintiff-Intervenor's allegations are properly brought under a conditions of confinement theory

25. "This case involves a series of disturbing occurrences in which 29 pre-trial detainees at the Harris County Jail ("the Jail") died or suffered serious injury." **[ECF No. 84 at pg. 1].**

26. From the start, Defendant has contended that Plaintiff-Intervenor's claims concern episodic acts or omissions of individual Jail employees, not conditions of confinement. **[ECF No. 84 at pg. 3; see also ECF No. 43 at 4-6; ECF No. 44 at 5-7].**

27. However, as the Court noted in its opinion[1] regarding Defendant's motion to dismiss as to Plaintiff-Intervenors: "Here, Plaintiff-Intervenors' allegations of pervasive misconduct are properly brought under a conditions-of-confinement theory." **[ECF No. 84 at pg. 6].**

28. In issuing its opinion, the Court found that Plaintiff-Intervenors (including Chandra Jenkins as attorney in fact for Mr. Buford) pleaded sufficient evidence to demonstrate

---

[1] On June 4, 2024, the Court granted the Motion to Dismiss with respect to the Crump Law Firm Plaintiffs' ADA and RA claims and denied the Motion with respect to Plaintiffs' conditions-of-confinement and failure to train claims. **ECF No. 51.**

conditions of confinement claim in accordance with other courts' findings that a conditions claim is appropriate under similar circumstances. *See, e.g.*, *Shepherd*, 591 F.3d at 453 (inadequate medical care and understaffing of guards and medical personnel); *Parker v. Carpenter*, 978 F.2d 190 (5th Cir. 1992) (failure to protect detainee from other detainee violence and failure to provide medical care); *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986) (failure to protect inmates from violence and sexual assault at the hands of other inmates); *Sabbie v. Sw. Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463, at *112 (E.D. Tex. Mar. 6, 2019) (failure to provide medical care, excessive force against detainees, and failing to properly monitor detainees); *Cheek v. Nueces Cnty.*, No. 2:13-CV-26, 2013 WL 4017132, at *7 (S.D. Tex. Aug. 5, 2013) (understaffing medical providers); *Palo v. Dallas Cnty.*, No. CIV.A. 305CV0527-D, 2007 WL 2140590, at *5 (N.D. Tex. July 26, 2007) (inadequate medical care); *see also Garza v. City of Donna,* 922 F.3d 626, 633-34 (5th Cir. 2019) ("Prior conditions cases have concerned . . . impositions on inmates' lives like overcrowding . . . ."). **[ECF No. 84 at pgs. 6 – 7].**

29. Therefore, Mr. Buford's claims are properly brought under a conditions theory.

### C. Defendant's failure to designate a Prison Rape Elimination Act ("PREA") Compliance Manager for over two years is a macro level staffing, supervision, and training failure and condition of confinement violating Defendant's policy and PREA National Standards. Because of this Plaintiff has suffered serious harm and permanent damages and injuries.

30. As this Court previously held, "Plaintiff-Intervenors have pled a series of similar incidents arising from the purported training failures. These allegations are supported by evidence suggesting the long running nature of the issues at hand, including the 2009 DOJ report and the dozen or so TCJS notices of non-compliance, both of which describe training

deficiencies similar to those Plaintiff-Intervenors have alleged. Further, Plaintiff-Intervenors' Complaint describes public statements from Sheriff Gonzalez where he admits to the need for more  training." **[ECF 84 at pg. 18].**

31. To state a claim under a conditions-of-confinement theory, a plaintiff must point to "a rule or restriction" in place at the jail, or "otherwise demonstrate the existence of an identifiable intended condition or practice." *Hare v. City of Corinth,* 74 F.3d 633, 645 (5th Cir. 1996). While a condition of confinement "is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation," it can also be "an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare,* 74 F.3d at 645). **[ECF No. 84 at pgs. 4 – 5].**

32. In ruling that the claims presented by Plaintiff-Intervenor Chandra Jenkins as attorney in fact for Mr. Buford were conditions of confinement the Court used the following example in determining the categorization of episodic act vs. conditions of confinement.

> *Accordingly, the question of which theory applies is a context-specific inquiry. Consider, for example, a jail's alleged failure to provide medication to detainees. Where such a failure is an isolated incident perpetrated by a particular official, that claim might be properly classified as an episodic act or omission. In contrast, where the denial of medication is sufficiently widespread, it may constitute a condition of confinement.*

**[ECF No. 84 at pg. 5].**

33. Applying this framework to the vacancy of Defendant's PREA Compliance Manager since May 2023 (as more detailed herein and in the expert report of Dr. Hayden Smith) the

systemic failure to have this position filled is not a mere isolated incident perpetrated by a particular individual. Rather, this is a pervasive *de-facto* policy with sweeping consequences.

34. From June 2023 to December 2023 there were a total of 29 reports of sexual abuse (inmate on inmate) occurring at 701 N San Jacinto St. and 54 reports of sexual abuse (inmate on inmate) occurring at 1200 Baker Street. **[Exhibit 9 at slides 7 and 9 of 13].**

35. Of the 83 reports of sexual abuse (inmate on inmate) occurring at 701 N San Jacinto St. and 1200 Baker Street from June 2023 to December 2023, only one was "substantiated." While 35 were "unsubstantiated" and 47 were "unfounded." **[Id.]**

36. The legitimacy of each PREA investigation relating to the 83 reports of sexual abuse (inmate on inmate) occurring from June 2023 to December 2023 (including Mr. Buford) is materially relevant question of fact for the jury because at all relevant times the PREA Compliance Manager position was vacant (and still is vacant). Accordingly, the veracity of Defendant's findings—unsubstantiated, substantiated, and unfounded—lacks credibility due to the understaffing and training shortfalls caused by the PREA Compliance Manager vacancy. Because of this widespread failure the implementation and training relating to PREA standards and Defendant's own standard operating procedures are entirely absent, materially affecting inmate outcomes, including the medical and mental healthcare (or lack thereof provided after a PREA allegation) and the investigations undertaken by Defendant and its agents.

37. "Here, Plaintiff-Intervenors' allegations of pervasive misconduct are properly brought under a conditions-of-confinement theory. As was the case in *Shepherd*, Plaintiff-Intervenors have each cited to extensive evidence suggesting the relevant conduct is ubiquitous in the Jail, including a series of Texas Commission on Jail Standards ("TCJS") reports identifying that the Jail is not compliant with minimum jail standards, a 2009 report from the DOJ analyzing

the conditions in the Jail, statements from Sheriff Gonzales and former Jail employees noting serious issues in the Jail, statistics on assaults, use of force, and deaths at the Jail, and descriptions of dozens of other incidents similar to those alleged in their complaints. **[ECF No. 84 at pg. 6; see also ECF No. 41 at ¶¶ 36-64, 69-70; ECF No. 42 at ¶¶ 42-134, 138].**

38. The conditions-of-confinement within Defendant's jail is an ongoing and known rampant problem that Defendant's policymaker has had actual knowledge of for years. The failure to maintain a PREA Compliance Manager for over two years is sufficiently widespread and constitutes a condition of confinement.  This macro level staffing and training failure is not a mere isolated incident and therefore rises to a *de facto* policy that is ripe for analysis and adjudication under a conditions of confinement theory (as previously recognized by the Court).

39. The public statements made by Sheriff Gonzales in 2016 are incorporated herein by reference. **[ECF No. 42 ¶¶ 128 – 131; ECF No. 122 ¶¶ 344 – 352].**

40. As the Court has previously noted, Sheriff Gonzales as policymaker for Harris County has previously publicly stated, "We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in . . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well…it starts with leadership. We've got to end this culture." **[ECF No. 84, pg. 18; see also ECF No. 41 ¶ 129; ECF No. 42 ¶ 128; ECF No. 122 ¶ 346].**

41. Further, during the debate Sheriff Gonzales referenced a 2015 Texas Commission on Jail Standards finding where Harris County was non-compliant for refusing to provide Medical treatment to a patient on four (4) different occasions. Mr. Gonzales further stated that this "is nothing new," and that it was a culture where "something should have been done" because that

could "be your daughter, your granddaughter [or] could have been one of our loved ones." **[ECF No. 42 ¶ 129].** Notably, this non-compliance and refusal to provide treatment on four different occasions involved a mental health patient[2]. **[ECF No. 122 ¶ 347].**

42. Sheriff Gonzales continued that if proper treatment and access would have been provided for another detainee, "then I don't think she would have spent 27 days inside that jail being beaten not only by an inmate but by a deputy as well." "[T]his is nothing new this is a culture. . .something should have been done rather then just letting her be in [the Jail] beaten by a deputy and by an inmate and come out worse than what she went in. . . .."**[ECF No. 122 ¶ 348].** These are the same moving forces behind Mr. Buford's constitutional deprivations.

43. Another example of the "breakdowns in leadership" that has "led to an atmosphere" of "deference" is the June 2, 2015, Terry Goodwin incident. **[ECF No. 42 ¶ 138].** Defendant's Sheriff openly admitted to these breakdowns in leadership and the atmosphere of deference that was created. Officers, supervisors, medical staff and the head of the jail knew for weeks about Goodwin's conditions of confinement. Defendant, however, did not begin an investigation into this until almost a year after Goodwin was discovered by a whistleblower. **[ECF No. 42 ¶ 138].** Similarly, Mr. Buford was heavily shackled following his reports of rape and sexual assault. From October 2, 2023, to October 18, 2023, Mr. Buford was heavily restrained and heavily shackled in a punitive manner following reports of sexual assault and rape. During this 16-day period Mr. Buford was shackled with heavy restraints for 23 hours a day in isolation (total of 368 hours). This deteriorated his mental condition and further demonstrates the unconstitutional conditions of confinement and denial of medical care the

---

[2] Mr. Buford has a documented history of mental illness as set forth herein and in the expert report of Dr. Hamza.

moving forces of which is Defendant's deliberate indifference. The only reason Mr. Buford was transferred on October 18, 2023, is because the General Counsel of the Harris County Public Defender's Officer, Sarah Wood, got personally involved. **See also ¶¶ 106, 11, and 121 herein.** The conditions of confinement arising from the Terry Goodwin matter is clearly still pervasive and was the moving force behind Plaintiff's harms.

44. A lack of properly structured leadership and severe staffing shortages directly contributed to the harm Mr. Buford experienced. Sherrif Gonzales as policymaker has had actual knowledge that leadership issues and staffing shortages have been widespread  and that "employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well… it starts with leadership. We've got to end this culture." **[ECF No. 42 at ¶ 128; see also ECF No. 122 at ¶ 346].**

45.  Despite PREA requirements for designated oversight, no active PREA Compliance Manager was in place during Mr. Buford's incarceration. This absence led to inconsistencies in screening, classification, and investigative protocols, delaying necessary interventions that could have mitigated his risk. **[Dr. Smith expert report, Exhibit 7B at page 48 of 49].**

46.  Staffing shortages also impeded investigative integrity, directly affecting the handling of Mr. Buford's allegations. The 2023 Annual Jail Inspection Report confirms that inadequate staffing obstructed critical jail functions, including security rounds, classification reviews, and investigative procedures. **[Id.]** Officers conducted observations from control stations instead of interacting with inmates directly, severely weaking supervision effectiveness. Required security rounds for vulnerable populations—including those classified as assaultive, suicidal, or mentally ill—were delayed by up to two hours, contracting mandated oversight standards.

**[Id].**

47.  These deficiencies resulted in procedural breakdowns that severely impacted Mr. Buford's safety and limited intervention following his sexual abuse reports. This includes the representation of Ms. Camacho as PREA Compliance Manager responsible for meeting key PREA standards, while her actual duties were spread to other work roles and Camacho testifying that she was never truly assigned to this role. **[Id].**

48.  Defendant materially misleads the Court in stating Katrina Camacho "was the PREA Manager for the HCSO Detention Command" at the time of the claims made by Buford in 2023. **[ECF No. 131 at ¶12 and ¶40].** In fact, Officer Camacho left her role as PREA Compliance Manager in May 2023, four months before Mr. Buford's first rape is alleged to occur. **[Exhibit 10 at 21:06-13 and 196:10-16].** Officer Camacho testifying on March 24, 2025: *"As of today, they still haven't found another PREA manager."* **[Id. at 20:13-14].**

49. Defendant's policy, custom, and practice of failing to designate a Prison Rape Elimination Act ("PREA") compliance manager for over two years is a macro level staffing and supervision failure that violates Defendant's policy and PREA National Standards.

50. Defendant's absence of a PREA manager for over two years is a systematic failure that is an embedded custom, policy, and practice resulting in fundamental correctional failures within Harris County Jail including PREA implementation, training, supervision, and investigation. Because of this, Mr. Buford suffered immense constitutional harms for which Ms. Jenkins as his attorney-in-fact seeks damages on Mr. Buford's behalf. **[Exhibit 1].**

51. As set forth in the expert report of Dr. Hayden Smith[3] at page 19: "[R]ecords indicate

---

[3] Exhibit 7B

a misrepresentation of PREA compliance leadership within HCSO during the period relevant to Mr. Buford's allegations. HCSO facility reports reference Katrina Camacho as the PREA Compliance Manager, implying that she held direct responsibility for compliance oversight. However, in her deposition (p. 196), Camacho contradicts this designation, stating:

> *There was not one. I was only assisting them until they get a new one. So in May 2023, I received the re-entry and education manager position. They were interviewing for my position. I don't believe they ever found anyone.*

52. Officer Camacho's testimony confirms that no formally designated PREA Compliance Manager was in place during September and October 2023, despite Defendant's documents listing Officer Camacho in that role. The absence of an appointed manager meant that critical oversight functions—including incident reviews, classification monitoring, investigative coordination, and staff training—were either inconsistently applied or entirely lacking. **[Dr. Smith expert report, Exhibit 7B at page 20 of 49].**

53. Under HCSO Policy 740, the PREA Compliance Manager is responsible for:

- Ensuring compliance with PREA screening and classification protocols to prevent abuse (§115.41)
- Monitoring retaliation risks and responding to inmate safety concerns (§115.67)
- Overseeing timely investigative responses and ensuring proper documentation of allegations (§115.71)
- Conducting sexual abuse incident reviews and recommending corrective actions (§115.86)
- Maintaining accurate records and ensuring PREA data retention compliance (§115.89)

**[Dr. Smith expert report, Exhibit 7B at page 20 of 49].**

54. The lack of a formally designated PREA Compliance Manager during Mr. Buford's incarceration period raises serious concerns regarding HCSO's ability to enforce institutional safeguards against sexual abuse. Additionally, without a designated compliance official,

PREA investigations, protective housing placements, and retaliatory monitoring lacked necessary leadership oversight contributing to documented procedural failures across multiple standards. This misrepresentation of compliance leadership within HCSO and the absence of a PREA Compliance Manger during a critical timeframe suggest significant gaps in adherence to both federal PREA requirements and internal policy mandates under HCSO Policy 740. **[Id. at page 20 of 49].**

55. The non-existence of a PREA Compliance Manager relative to Mr. Buford's rapes and sexual assaults are further aggravated by the fact that Defendant repeatedly identifies Katrina Camacho within its internal documents as the PREA Manager[4], despite Officer Camacho testifying that this is untrue. [**See ECF No. 131–4 at pages 13, 19 and 30 compared to Officer Camacho's testimony at 196:10–16].**

56. Defendant's internal documentation identifying Officer Camacho as the PREA Compliance Manger at the time of Mr. Buford's allegations[5] is inconsistent with Officer Camacho's testimony. Therefore, Defendant is either intentionally falsifying documentation to cover up the fact that a PREA Compliance Manager has been non-existent for over two years, or Defendant's customs, policies, and practices regarding PREA are so egregious that Defendant and its agents genuinely do not know who the PREA Compliance Manager is.

57. Relative to the falsification of internal documents, Officer Mark Garcia has testified that during his nine years working as a detention officer for Harris County, that he has actual

---

[4] Defendant continues referring to Officer Camacho as the PREA Compliance Manager within its motion for summary judgment. This is refuted by Plaintiff for reasons set forth herein and supporting exhibits.

[5] Plaintiff alleges that Mr. Buford was raped on September 25, 2023, and September 27, 2023. [ECF No. 42 at ¶ 17]. On September 28, 2023, Mr. Buford's mother, Chandra Jenkins, reports the sexual assaults. [*Id*. at ¶ 18]. Plaintiff also alleges Buford was assaulted upon transfer to the sixth floor of Harris County Jail in November 2023. [*Id*. at ¶ 164].

knowledge of other detention officers submitting false paperwork. **[Exhibit 11 at 120:19-123:13].** Although Officer Garcia denies that falsifying documents are part of Defendant's policy **[Exhibit 11 at 122:7–9]**, the evidence demonstrates that Defendant's custom is to repeatedly falsify documents identifying Officer Camacho as the PREA Compliance Manager.

58. The falsification of records is consistent with the June 4, 2009, DOJ report finding that (and placing Harris County on notice that) physicians and nurses routinely completed paperwork incorrectly, stating that evaluations were done when they were omitted entirely. **[ECF No. 42, Pg. 14 ¶ 50].**

59. Defendant's custom of falsely identifying Officer Camacho as the PREA Compliance Manager at the time of Mr. Buford's allegations highlights the materiality of this genuine disputed fact because without Officer Camacho's designation in this staffing role, Defendant has to admit its lack of compliance with its own policies and those set forth in PREA.

60. Said differently, Defendant is reliant upon the custom of falsely identifying Officer Camcho as the PREA Compliance Manager, because without such falsification Defendant would have to admit its *de-facto* custom of maintaining a vacancy in the PREA Compliance Manager role for over two years violates internal policies and the federal PREA regulations.

61. The lack of PREA Compliance Manager is an inherently dangerous custom, policy and practice that allows sexual assaults and rapes to occur within the inmate population, causing widespread injury—including to Mr. Buford—for which Ms. Jenkins has filed this lawsuit.

62. At all stages relative to Mr. Buford (incidents, investigations, and litigation) Defendant materially misrepresents that Officer Camacho was the PREA Compliance Manager. Such material misrepresentation is Defendant's custom and has been its widespread custom and practice since Officer Camacho left her role as PREA Compliance Manager in May 2023.

63. The absence of a PREA Compliance Manager constitutes an unconstitutional condition of confinement and was the moving force behind the injuries and harms to Mr. Buford.

64. Mr. Buford alleges that he was raped and sexually assaulted on September 25, 2023 and September 27, 2023. These are two distinct dates and events and the expectation and legal requirement are that each would be investigated independently. However, this is not what occurs and is yet another example of Defendant's widespread custom and practice of non-compliance with PREA resulting in substantial harm to detainees, including Mr. Buford.

65. PREA Standard, 28 CFR § 115.22(a) mandates that all allegations of sexual abuse and sexual harassment must be subjected to an administrative or criminal investigation. This requirement ensures that reports are properly documented, assessed, and pursued to determine accountability and appropriate remedial actions. **[Dr. Smith expert report, Exhibit 7B at page 31 of 49].**

66. Despite this clear directive, the documentation shows that Defendant did not fulfill its obligation to investigate all allegations of sexual abuse independently and thoroughly. Records indicate that two separate reports of sexual assault occurring on September 25, 2023, and September 27, 2023, were consolidated into a single PREA report, effectively reducing the scope of inquiry into multiple incidents. This approach contradicts PREA's intent, which demands that each allegation be fully investigated. **[Id].**

67. Defendant's failure to conduct distinct administrative or criminal investigations into both allegations constitutes a significant procedural lapse. Consolidating multiple incidents into a single report undermines the investigative process, compromises transparency, and weakens institutional accountability. These omissions highlight systemic deficiencies in reporting practices and demonstrate noncompliance with PREA's fundamental safeguards

designed to protect vulnerable inmates from harm. **[Id]**.

68. Defendant failed to uphold critical protections under PREA, exposing Mr. Buford to systemic deficiencies across classification, monitoring, investigations, and data retention. These failures placed him at a heightened risk, demonstrating broader institutional shortcomings in oversight, accountability, and compliance with federally mandated safeguards. **[Dr. Smith expert report, Exhibit 7B at page 48 of 49]**.

69. Mr. Buford's experience highlights an institutional pattern of neglect, demonstrating systemic failures in classification, supervision, investigations, and record retention—all directly impacting his safety and ability to access protection, security, and appropriate time relevant treatment. **[Id]**.

### D. PREA Investigator Guerrero is unqualified. Despite this, he was the lead investigator for all rape and sexual assaults regarding Mr. Buford.

70. Defendant presents Investigator Guerreo's PREA interview of Mr. Buford attempting to demonstrate to the Court its good faith efforts relative to the "investigations." **[Exhibit 3 to ECF 131]**. However, in 2023 investigator Guerrero was not to be handling sexual assault allegation investigations, despite the fact he handled Mr. Buford's. **[Exhibit 10 Officer Camacho's testimony at 156:8–19; see also ECF 131-10 at page 19 of 47]**.

71. This reiterates the staffing and training issues relative to the conditions of confinement and creates yet another material issue of fact as to the illegitimacy of the investigations undertaken in 2023 as to Mr. Buford and other inmates and the harm occurring therefrom.

72. Defendant's actions and omissions of designating unqualified Investigator Guerrero as lead investigator relating to Mr. Buford resulted in a denial of medical care and a deprivation

of constitutional rights. Investigator Guerrero claims that on September 29, 2023, he spoke with Mr. Buford and that Mr. Buford is "fine." **[ECF 131-5 at page 53 of 99].** When asked by Detention Officer T.M. Alvares if Mr. Buford was taken to the hospital, Investigator Guerrero states "He was not taken to the hospital but he was seen at medical for evaluation and a psych referral was made." **[Id].** Investigator Guerrero's actions in failing to timely provide Buford the appropriate level of medical care does not comport with PREA.  Investigator Guerrero's placement as lead investigator is caused by Defendant's policies, practices, and customs relating to the understaffing and failure to train relative to the conditions of confinement.

73. Defendant's employees agree that investigator Guerrero is unqualified and should not have been handling such sexual abuse investigations in 2023. **[Exhibit 10 Officer Camacho's testimony at page 156:8–19].**  Despite this, Investigator Guerrero was Defendant's lead investigator as to Mr. Buford's investigation. This results in Defendant denying Mr. Buford medical care for approximately 23 hours after Defendant receives notice on September 28, 2023, of Mr. Buford's sexual assault and rape allegations.

74. Although Investigator Guerrero was unqualified and Defendant's employees acknowledge this, Defendant's custom and practice is to ignore such facts and allow Investigator Guerrero to conduct interviews and investigations of victims, like Mr. Buford[6].

75. This further demonstrates the systematic unconstitutional conditions of confinement wherein Defendant is understaffed and undertrained, Defendant does not have a PREA Compliance Manager overseeing its operations, and Defendant acknowledges that it has

---

[6] Officer Lila Millan emails Officer Katrina Camacho  on 10/2/2023 stating: "This was a sexual assault that apparently you had Guerrero go and interview. This inmate was not sent to the hospital at that time, but only the clinic. Guerrero checked on him on Friday morning again, and he stated he was fine and it was not a sexual assault. This time we have another report from him, but **my understanding is that Guerrero is not to handle sexual assault allegations.** Do I have him go back again to interview this new claim?" (emphasis added). **[ECF 131-4 at page 15 of 31].**

unqualified officers conducting crucial sexual assault and rape investigations but is deliberately indifferent to the same. This embedded custom and practice resulted in a significant delay of Mr. Buford obtaining medical care following his reports of sexual assault and rape in September 2023. This embedded custom and practice also results in illegitimate PREA investigations for all detainees.

76. Investigative failures further compounded the harm Buford endured. His allegations were misclassified under a minor offense code instead of one reflecting sexual assault, undermining the seriousness of the claims and restricting the scope of inquiry. **[Dr. Smith expert report, Exhibit 7B at page 48 of 49].**

77. Defendant alleges that "Buford's first PREA allegation was brought to the attention of Jail Staff on 9/28/2023 but Buford disavowed it almost right away." **[ECF 131 ¶ 32].** Defendant omits, however, that an entirely unqualified individual, Investigator Guerrero, was spearheading the investigation. This is because of staffing issues and lack of PREA oversight resulting in unqualified individuals being placed into an investigative role.

78. In citing that Mr. Buford "disavowed" the allegations, Defendant also fails to account for Mr. Buford's comorbidities and how such risks and mental acuity affected his outcomes while incarcerated. This is further aggravated because Mr. Buford was left to rot in jail for 23 hours without receiving the proper level of medical attention after reporting the September 2023 rapes. These resulting unconstitutional harms were caused by Defendant's conditions of confinement relative to the placement of unqualified individuals into investigative roles and lack of PREA oversight, training, supervision, and monitoring.

79. Accordingly, it is not the case that Mr. Buford "disavowed" his reports of rape and sexual assault, rather Defendant failed to act in an expeditious and lawful manner as it relates

to providing medical care to Mr. Buford or undertaking the investigation following his reports and allegations of sexual assault and rape. Moreover, the systematic failures attributable to the screening and classification process in failing to recognize the severity of Mr. Buford's mental and physical limitations placed him in a severe position of vulnerability throughout his incarceration.

80. Defendant presents the declaration of Dr. Mills[7] who simply writes off Mr. Buford as an individual who presents with "delusions and hallucinations" and has had multiple refusals of medication to treat his schizophrenia. **[ECF 144-2 at page 2].**

81. Contrasting this, Plaintiff presents the declaration and expert report of Dr. Hamza who states that Mr. Buford's combination of a well below intellectual functioning, well below learning abilities, and impaired executive functions contributed to a wide range of challenges, including but not limited to non-adherence to treatment and increased vulnerability to exploitation, victimization, or involvement with the legal system due to poor reasoning and decision-making abilities. **[Dr. Hamza expert report, Exhibit 8B at page 10 of 36].**

82. Dr. Hamza further concluding that Mr. Buford's dysfunctions and resulting vulnerabilities were consistently evident throughout his medical and mental health history, as well as in his patterns of communication—most notably in his inability to effectively process or respond to traumatic experiences. For example, his failure to report a sexual assault in a coherent, timely, or logical manner underscored significant impairments in his ability to recognize, articulate, and appropriately react to such events. These limitations are deeply rooted in Mr. Buford's neurocognitive and psychiatric impairments. **[Id].**

---

[7] Plaintiff disputes Dr. Mills' qualifications to provide opinions as to the neurological, psychological, neurocognitive, and/or neuropsychological symptomology relating to Mr. Buford and reserves all rights.

83. From a neuropsychological standpoint, the convergence of these deficits resulted in a pervasive dysregulation of the cognitive-emotional-behavioral triad. Marked executive dysfunction—reflected in poor cognitive flexibility and impaired problem-solving—interacted with compromised reality testing and emotional instability, often leading to heightened internal confusion, agitation, or social withdrawal. In addition, his limited intellectual capacity significantly restricted his ability to comprehend his condition, engage meaningfully in treatment planning, or effectively communicate critical needs, particularly in high-stress or crisis situations. **[Id].**

84. Functionally, Mr. Buford is expected to operate at approximately a $6^{th} – 7^{th}$ grade academic level. **[Dr. Hamza expert report, Exhibit 8B at page 12 of 36].** While Mr. Buford's neurological testing indicates an even lower level of comprehension. For example, his performance on the Sentence Comprehension subtest is comparable to the average score of students in the standardization sample who were in the 7th month of Grade 1. **[Dr. Hamza expert report, Exhibit 8B at page 19 of 36].**

85. As evidence to its motion, Defendant presents the purported recorded transcript of investigator Guerrero from September 29, 2023, at 10:03 a.m. **[ECF 131-8 lines 10-14].**

> *Investigator Guerrero: Okay. I – I spoke with you yesterday and I'm just doing a follow-up, like making sure that you're okay, and you stated that nothing sexual happened to you, right?*
>
> *Mr. Buford: No.*

86. The above does nothing more than demonstrate that Investigator Guerreo was capable of asking an inmate (who had been repeatedly raped and sexually abused and has the sentence comprehension of a first grader) a leading question. The interview then ends one minute later at 10:04 a.m. This investigation is entirely inadequate from a top-down level and reinforces

Plaintiff's evidence and allegations of unconstitutional conditions of confinement. Again, Defendant did not have a PREA Compliance Manager at the time of this investigation and still does not. Instead, Defendant sent an unqualified employee to conduct one minute of verbal investigation for an inmate with significant neurocognitive deficits. This is egregious.

### E. Buford's medical records are replete with diagnoses of rape and sexual assault. Therefore, summary judgment should be denied because a material issue of disputed fact exists as to the allegations of rape and sexual assault.

87. Because of his experiences and the conditions of confinement Mr. Buford endure while incarcerated at Defendant's 1200 Baker Street Jail, he has been diagnosed with (i) rape (ii) exposure to disaster, war, or other hostilities-event related accident (iii) posttraumatic stress disorder and (iv) adult sexual abuse by nonspouse or nonpartner. **[Dr. Hamza expert report, Exhibit 8B at page 4 of 36].**

88. Diagnoses of rape are also set forth within Harris Health System medical records. **[Harris Health System Medical Records, Exhibit 3 at page 200 of 307].**

89. The business records affidavit of Harris Health System's custodian of record, Ariseto Villanueva, further validates the accuracy of these medical records and that said documents are kept in the regular course of business and that it was the regular course of business of Harris Health System for an employee or representative of Harris Health System with knowledge of the act, event, condition, opinions, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. **[Affidavit of Aristeo Villanueva – Custodian of Records The Harris Health System, Exhibit 2].**

90. A key word search of the term "rape" within the Harris Health records demonstrates fifty-one separate references to rape. Moreover, Mr. Buford's Harris Health System medical

records consistently evidence an indication and diagnosis history of rape in adulthood. **[Exhibit 3 at pages 151, 152, 158, 159, 160, 166, 167, 181, 182, 183, 187, 188, 189, 193, 194, 195, 200, 206, 225, 226, 232, 233, 234, 240, 241, 249, 250, and 251 of 307].**

91. The Harris Health System medical records further expressly state: "Hx of anal rape while in prison…" **[Exhibit 3 at page 249 of 307].**

92. Because of the prison rapes, Mr. Buford has suffered chronic diarrhea, abdominal pain, and frequent bowel movements every time he eats. **[Exhibit 3 at page 202 of 307].**

93. On 9/29/2023, Mr. Buford presents endorsing rectal and penile pain and blood in his rectum. **[Exhibit 3 at Pages 279 and 283 of 307].**

94. Diagnoses of sexual assault are also set forth within the HCA Houston Healthcare North Cypress ("HCA") medical records. HCA's custodian of records, Jacqueline Sturm, executed under penalty of perjury both direct questions to be propounded to the witness and an affidavit of medical records. **[Exhibit 4].**

95. The affidavit and direct question responses demonstrate the trustworthiness of the medical records and that said medical records are kept in the regular course of business and that it was the regular course of business of HCA for an employee or representative of HCA with knowledge of the act, event, condition, opinions, or diagnosis recorded to make the record or to transmit information thereof to be included in such record. **[Exhibit 4].**

96. A key word search of the term "sexual assault" within the HCA records demonstrates seventeen separate references to sexual assault. Moreover, Mr. Buford's HCA medical records evidence the physicians at HCA determined to a reasonable degree of medical probability that Mr. Buford presented with clinical indications of sexual assault, chest pain due to sexual assault, abdominal and rectal pain. **[HCA medical records, Exhibit 5 at pages 151, 153, 155,**

**160, 165, 166, 171, 172, 173, 180, and 183 of 299].**

97. In stark contrast, Defendant produces the declaration of Dr. Mills who concludes that "There is no evidence in the medical records provided that he was denied health care." **[ECF 144-2 at page 2].** Dr. Mills also opining that "Since the inmate patient refused examination by a Sexual Assault Nurse Examiner at Ben Taub Hospital there is no corroborating objective evidence that the patient was sexually assaulted." **[Id].**

98. Defendant's attempt to argue that because Mr. Buford refused a SANE examination no objective evidence of sexual assault exists is misguided and does not consider the findings, opinions, and diagnoses of Mr. Buford's medical providers. Additionally, at all relevant times during his evaluation on 9/29/2023 at Harris Health, Mr. Buford was under direct surveillance of HCSO Officers McClallaind and Cervantes <u>and</u> shackled. [**Exhibit 3 at pages 285 and 288 of 307].**

99. The decision to shackle and directly monitor Mr. Buford during his SANE examination, despite his no-risk status and absence of aggressive behavior, directly violates PREA's requirements for privacy, therapeutic care, and restrained use only under documented exigent circumstances. The decision to shackle and directly monitor Mr. Buford is a stark violation of the requirements for a private, trauma informed setting pursuant to PREA Standard 28 CFR § 115.21. **[Dr. Smith expert report, Exhibit 7B at page 32 of 49].**

100. Dr. Mills' declaration also omits any reference to the HCA or Harris Health records. Notably, these records were produced in discovery to defense counsel and available for Dr. Mills to review. It is evident that Dr. Mills' opinions are incomplete and/or cherry-picked and that he did not review the objective medical records from treating providers at HCA or Harris Health who determined to a reasonable degree of medical probability that an

appropriate diagnosis of Mr. Buford included anal rape while in prison and sexual assault.

101.   These material omissions go directly to the heart of Plaintiff's allegations. The discrepancies and omissions with Dr. Mills' declaration creates highly relevant disputed issues of material fact and areas of inquiry that a reasonable jury could rely upon in determining that Mr. Buford was raped and sexually assaulted while in Defendant's jail.

102.  From a neurobiological perspective, trauma of this nature can disrupt emotional regulation, compromise hippocampal functioning, impair memory encoding and retrieval, and dysregulate limbic system activity. For Mr. Buford, these alterations have likely intensified existing impairments in executive control, emotional stability, and perception of safety. As a result, his ability to process trauma, report distress, or seek support is severely compromised, leaving him highly vulnerable to re-traumatization and systemic neglect. **[Dr. Hamza expert report, Exhibit 8B at page 12 of 36].**

F.   **Summary judgment should be denied because a material issue of disputed fact exists as to the denial of medical care claim and Defendant's conditions of confinement regarding classification, supervision, training, observation, staffing, and monitoring underlying Plaintiff's § 1983 lawsuit.**

103.  Defendant cannot legitimately argue that there is no evidence that Mr. Buford was denied medical care while in the Harris County Jail. Rather there is extensive evidence demonstrating denial of medical care in violation of § 1983 and a punitive response to Mr. Buford reporting the sexual assaults and rapes.

104.  The historically deplorable conditions and nature of Harris County Jail grew to such a degree that The Department of Justice ("DOJ") was forced to investigate Harris County for violations of constitutional rights as early as March 2008. **[ECF No. 42, Pg. 13 ¶ 47].**

105.  The 2009 DOJ investigation concluded in part:

> *Certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards.*

**[ECF No. 42, Pg. 14 ¶ 47 (citing the June 4, 2009 DOJ Report)].**

106.  Those DOJ findings further identified severe deficiencies and failures including: "[T]he Jail fails to provide consistent and adequate care for detainees with serious chronic medical conditions. . . .These deficiencies, in themselves and when combined with the problems in medical record-keeping and quality assurance discussed below, are serious enough to place detainees at an unacceptable risk of death or injury." **[ECF No. 42, Pg. 14 ¶ 48 (citing the June 4, 2009 DOJ Report)].**

107.  Because of crowding, administrative weaknesses, and resource limits, the Jail does not provide constitutionally adequate care to meet the serious medical needs of detainees with chronic illness. **[ECF No. 42,Pg. 14 ¶ 49 (citing the June 4, 2009 DOJ Report)].**

108.  The DOJ further found (placing Harris County on notice that) there were problems with "chronic care assessments" and "in the assessment of detainees receiving medications." **[ECF No. 42,Pg. 14 ¶ 51 (citing the June 4, 2009 DOJ Report)].**

109.  The DOJ's findings further illustrate that Harris County's care (or lack thereof) as to detainees with mental illnesses was especially deficient. The DOJ finding that Harris County had at least 2,000 detainees in need of psychotropic medications. **[DOJ Report at 9].** Instead of having specialized housing for those with mental illnesses, the detainees were typically kept in general population or a few single cells or dormitories. ***Id.***

110.  As Mr. Buford is an individual with a complex medical and mental health history he fits squarely within the class of detainees whom Defendant has had actual knowledge of the intolerable, deficient and unconstitutional conditions since the DOJ published its report.

111.  In terms of these unconstitutional conditions of confinement, there are documented failures concerning detainees with complex mental health histories. Like Mr. Buford these detainees suffered serious injuries (some death) because of the conditions of confinement relating to lack of medical care, failure to screen, protect, observe, monitor, and train.

- **Israel Lizano Iglesias**: Defendant did not immediately screen Iglesias for serious medical or mental health concerns. Instead, Iglesias was placed in a holding cell. During which time, Defendant did not properly observe Iglesias. Ultimately, Iglesia died while in custody. **[ECF 42 at pg. 38 of 73]**

- **Terry Goodwin**: Locked in cell for two months without observations. Mental and physical conditions deteriorated, Mr. Goodwin suffered serious injuries. **[ECF 42 at pg. 32 of 73]**

- **William Curtis Barrett:** Placed into a single person cell despite his known mental health issues and the known damage that solitary confinement can have on the psychological disposition of detainee with his disability. Later assaulted by other inmates, sustaining serious injuries and damages. **[ECF 42 at pg. 52 of 73]**

- **Jeremiah Anglin:** Defendant was aware of his serious medical and mental condition (i.e., schizophrenia). Even though Defendant knew that Anglin had known mental disabilities, Defendant put Anglin in the general population of the jail instead of in the mental health ward. Because of this he was assaulted suffering injuries and harms. **[ECF 42 at pg. 56 of 73]**

- **Ramon Thomas:** Thomas was extremely vulnerable to bullying and abuse and bullied to the point where Thomas' family requested that he be placed in the mental health section of the jail. Although Thomas's mental disability required continuous observation and care to ensure his safety Defendant placed him on the sixth floor which lacked measures to provide sufficient observation and monitoring. He ultimately died in custody. **[ECF 42 at pg. 63 of 73]**

- **Dominga Treviño Barrera**: Defendant knew that Barrera had serious medical and mental health conditions. Defendant, however, failed to adequately provide Barrea with medical attention. Barrera died in custody. **[ECF 42 at pg. 64 of 73]**

The foregoing are strikingly similar to the claims asserted by Plaintiff and the facts that have been uncovered regarding Plaintiff during the course of this lawsuit. In this context, both a 30(b)(6) representative and the deposition of Sherriff Gonzales have yet to be scheduled. Given the Court's recent ruling as to the motion to stay being denied as moot, Plaintiff anticipates these depositions will be noticed in the future.

112.  Each of the foregoing are strikingly similar to the claims asserted by Mr. Buford that are supported by the evidence currently in the record[8].

113.  PREA Standard, 28 CFR § 115.21, requires agencies follow a uniform, DOJ-adapted evidence protocol that maximizes the collection and preservation of physical evidence; offer every-sexual abuse victim a no-cost forensic medical examination by a SANE/SAFE or similarly qualified clinician (with youth-appropriate adaptations); ensure victims have the option to be accompanied by a confidential victim advocate during exams and interviews; and document all efforts to secure qualified examiners and advocacy services. **[Dr. Smith expert report, Exhibit 7B at page 32 of 49].**

114.  In line with this standard, facilities must offer all victims of sexual abuse access to a forensic medical examination "as expeditiously as possible" and follow the U.S. DOJ's National Protocol for Sexual Assault Medical Forensic Examinations. In this case, nearly 23 hours elapsed between the 2:27 PM report on 9/28 and the ~1:00 PM transport on 9/29.  That delay falls well outside both PREA's intent and community best practices (which interpret "as

---

[8] As of the date of submitting this response, Plaintiff has yet to notice a 30(b)(6) representative for Harris County. Furthermore, the deposition of Sherriff Gonzales has yet to be scheduled. Lastly, the jail inspection has yet to occur. Given the Court's recent ruling as to the motion to stay being denied as moot, Plaintiff anticipates these depositions will be noticed in the future. Regardless, Plaintiff believes enough evidence is currently in the record to overcome the no evidence motion for summary judgment presented by Defendant and requests Defendant's motion is denied.

expeditiously as possible" (to mean within hours, not a fully day). Such a lapse risks loss of

critical forensic evidence, undermines victim safety, and constitutes non-compliance with the

PREA mandate for an "expeditious" response. **[Id].**

115. The constitutional harm and denial of medical care is heightened by the fact that the

DOJ previously found (placing Harris County on notice that) the "makeshift emergency room"

was insufficient to meet the needs of the thousands of detainees within the Jail. The DOJ

further found (placing Harris County on notice that):

- Requesting medical care was insufficient because of crowding, staffing limitations
  and problematic practices.

- Some of these practices include having inadequate oversight for detainee requests
  for medical care and significant delays in responding to medical requests.

- Harris County has the same trend of deleting medical requests after being processed
  with no confirmation or follow-up to confirm that the medical issue had been resolved.

**[ECF No. 42, Pg. 15 ¶ 52 (citing the June 4, 2009 DOJ Report)].**

116.  Moreover, Mr. Buford was shackled and placed under direct officer surveillance

throughout his hospital exam—even though he had no history of aggression, violence, or self-

harm ideation during incarceration and had been formally screened as "no risk" for homicide

or suicide—practices that directly violate PREA's requirements for privacy, therapeutic care,

and restrained use only under documented exigent circumstances. **[Id].**

117.  Defendant's nearly 23-hour delay in transporting Mr. Buford for a forensic medical

examination represents a significant breach of PREA's mandate for prompt, evidence-

preserving care and places the alleged victim's rights and safety at risk. The decision to shackle

and directly monitor Mr. Buford during his examination, despite his no-risk status and absence

of aggressive behavior, is a stark violation of the requirements for a private, trauma-informed

setting. **[Id].**

118.    Defendant's failure to provide Mr. Buford timely medical care following the reports of sexual assault and rape in September 2023 is further exacerbated by his risk factors and Defendant's failure to properly classify Mr. Buford during intake and screening.

119.    PREA Standard, 28 CFR § 115.41 controls the screening for risk of victimization and abusiveness. The documented failures in Mr. Buford's intake, classification, and housing placement reveal clear lapses in adhering to PREA standards and established correctional policies. The absence of proper screening, risk assessment, and timely reassessment combined with inconsistencies in documentation illustrates a systematic failure to safeguard an inmate who exhibited multiple vulnerabilities. These omissions significantly increased Mr. Buford's risk of victimization, contradicting mandated protections and procedural requirements. The lack of corrective action or adequate response further underscores a concerning disregard for inmate safety and established PREA protocols. **[Dr. Smith expert report, Exhibit 7B at page 24 of 49].**

120.    The below documented[9] PREA violations and procedural failures committed by Defendant relating to intake and classification include but are not limited to the following:

- **Failure to conduct mandated PREA screening**

    - PREA standard § 115.41(a) requires intake screenings for victimization and abusiveness risk.

    - No documented PREA screening was conducted within 72 hours of Mr. Buford's arrival (§ 115.41(b))

    - PREA assessments must use an objective screening instrument (§ 115.41(c)), but classification officers relied on subjective perceptions (Exhibit 10 Officer Camacho deposition pages 177 – 178)

---

[9] See Dr. Smith expert report, Exhibit 7B at pages 24-25 of 49.

- **Inconsistent reassessment practices**

  o PREA standards § 115.41(e – g) require reassessment within 30 days and additional screenings upon risk changes.

  o Basic County Corrections Course (BCCC) extends reassessments to 30-90 days, limiting effectiveness in a high-turnover jail setting.

- **Inadequate implementation of classification policies**

  o Policy 903.5 mandates PREA interviews to determine vulnerability and special housing needs.

  o No available records indicate Mr. Buford was classified according to these standards.

- **Failure to separate inmates at risk**

  o Policy 903.13 states that vulnerable inmates shall not be housed in general population or predator housing

  o Lack of documented classification raises concerns regarding housing assignments

- **Deficient intake documentation**

  o Acknowledgment form confirming receipt of educational materials and screening responses is signed "B.H." rather than Mr. Buford's name (JE 000014).

  o Absence of documented risk assessment scores or custody reassessment raises procedural concerns.

- **Multiple unmet PREA criteria for risk of victimization**

  o Mr. Buford met several risk factors under PREA § 115.41(d), including:

  o Mental health conditions (schizophrenia, bipolar disorder, anxiety).

  o Physical vulnerability (weight loss, anemia, learning difficulty).

  o Prior incarcerations and exclusively nonviolent criminal history.

- o Lack of documented screening on sexual orientation, prior victimization, and self-perceived vulnerability.

- **Failure to ensure appropriate housing and monitoring**

  - o No records indicate an appropriate custody assessment, classification review, or reassignment based on increased risk.

  - o Absence of protective measures despite documented vulnerabilities

121.   The intake documentation signed "B.H." rather than Mr. Buford is consistent with the June 4, 2009 DOJ report finding that the medical record keeping was so inadequate that issues as to legibility and accuracy were so prevalent that the DOJ made a finding that the notes were illegible containing "factually inaccurate documentation." **[ECF No. 42, Pg. 15 ¶ 54 (citing the June 4, 2009 DOJ Report)].**

122.   PREA Standard, 28 CFR § 115.42 provides standards for using a risk screening at intake and throughout incarceration to protect the safety of inmates. The standard includes:

> **§ 115.42(a). The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive; and §115.42(b) The agency sha;; make individualized determinations about how to ensure the safety of each inmate.**

123.   Despite these directives, there is no evidence that screening information was utilized to classify Mr. Buford appropriately at booking and intake. He exhibited multiple risk factors that should have precluded placement in general population, including documented mental health concerns, prior institutionalization, physical vulnerabilities, and an exclusively nonviolent criminal history. Failure to utilize screening information effectively increased Mr. Buford's risk of victimization, contradicting PREA's fundamental safeguards. **[Dr. Smith expert report, Exhibit 7B at page 26 of 49].**

124.  A properly administered screening tool should have identified these concerns and resulted in an assignment with increased supervision and monitoring. In accordance with PREA guidelines, a high-risk classification for Mr. Buford would have necessitated frequent security checks—such as 30-minute face-to-face observations with officer documentation—to ensure his safety.  However, the absence of these measures highlights a failure in risk assessment implementation, exposing Mr. Buford to heightened dangers that could have been prevented through appropriate classification and intervention. **[Id].**

125.  Mr. Buford's neurocognitive and psychiatric impairments should have been identified during intake and screening so that he could have been properly classified and housed.  His neurocognitive and psychiatric impairments should have also been flagged during each sexual assault and rape investigation undertaken by Defendant. Rather, Defendant writes Mr. Buford off as an individual who lacks credibility, is a poor historian, and "disavowed" the allegations of sexual assault and rape right away. This is line with Defendant's *de-facto* policies, customs, and practices regarding denial of medical care as evidenced from the 2009 DOJ reports.

126.  Defendant's failure to identify and classify Mr. Buford based upon his neurocognitive and psychiatric impairments is yet another example of Defendant's unconstitutional customs, policies, and practices related to the conditions of confinement.

127.  PREA Standard, 28 CFR § 115.42, required Defendant to establish guidelines for utilizing risk screening information to protect inmates throughout their incarceration. The standard mandating that risk assessments results must inform housing, work, education, and program placements to ensure separation between inmates at high risk of victimization and those with a propensity for sexual abusiveness. Additionally, agencies are required to make individualized determinations on how best to ensure each inmate's safety. **[Dr. Smith expert**

report, Exhibit 7B at page 26 of 49].

128.  Despite these directives, there is no evidence that screening information was utilized to classify Mr. Buford appropriately at booking and intake. He also exhibited multiple risk factors that should have precluded placement in general population, including documented mental health concerns, prior institutionalization, physical vulnerabilities, and an exclusively nonviolent criminal history. Failure to utilize screening information effectively increased Mr. Buford's risk of victimization, contradicting PREA's fundamental safeguards. **[Id].**

129.  For these reasons and those outlined within the supporting exhibits, Plaintiff's unconstitutional denial of medical care claim survives.

### G.  Plaintiff's claims survive.

130.  Plaintiff presents a genuine dispute of material facts that ultimately must be decided by a jury. Defendant's summary judgment cannot be granted because reasonable inferences from such evidence raises a genuine dispute as to the material facts underlying Plaintiff's lawsuit. As the United States Supreme Court has held, where words or conduct may be interpreted in several ways, one supporting the motion and one controverting it, summary judgment must be denied. *Masson v. New Yorker Magazine, Inc*. (1991) 501 US 596, 521-522, 111 S.Ct. 2419, 2435.

131.  Defendant has materially misrepresented Officer Camacho's designation as PREA Compliance Manager at every turn relative to Mr. Buford. Defendant has further alleged that no evidence exists relative to Mr. Buford's claims of sexual assault and rape, denial of medical care and conditions of confinement. Defendant now asks for the extraordinary remedy of summary judgment, arguing that Plaintiff has no evidence. Meeting it, in contrast, Plaintiff

comes forth with (a) the expert report of Dr. Smith, (b) Declaration of Dr. Smith, (c) the expert report of Dr. Hamza, (d) Declaration of Dr. Hamza, (e) deposition of Officer Camacho, and (f) deposition of Officer Garcia.

132.    Additionally, Plaintiff presents medical records from Harris Health **[Exhibit 3]**, HCA **[Exhibit 5]**, and the Harris County Sheriff's Office criminal justice command PREA annual report for 2023. **[Exhibit 9].** This document is found on Defendant's website at the following link: https://harriscountyso.org/JailInfo/inmatePREA

133.    Notably, the public transparency and PREA annual reports end after 2023, coinciding with the departure of Officer Camacho as PREA Compliance Manager in May 2023.

134.    The failure to continue publishing PREA annual reports is a direct violation of PREA at CFR § 115.88(c)) and Defendant's non-delegable duties relating to same. **[See also, Exhibit 9 at slide 6 of 13].** This further demonstrates Defendant's *de-facto* custom, policy, and practice of failing to comply with PREA standards.

135.    Because Defendant has not had a PREA Compliance Manager since May 2023, each and every PREA investigation that has been undertaken since that time is unlawful and fails to comply with federal law governing PREA.

136.    From June 2023 to December 2023 there were a total of 29 reports of sexual abuse (inmate on inmate) occurring at 701 N San Jacinto St. and 54 reports of sexual abuse (inmate on inmate) occurring at 1200 Baker Street. **[Exhibit 9 at slides 7 and 9 of 13].**

137.    Of the 83 reports of sexual abuse (inmate on inmate) occurring at 701 N San Jacinto St. and 1200 Baker Street from June 2023 to December 2023, only one was "substantiated." While 35 were "unsubstantiated" and 47 were "unfounded." **[Id.]**

138.    The legitimacy of each PREA investigation relating to the 83 reports of sexual abuse

(inmate on inmate) occurring from June 2023 to December 2023 (including Mr. Buford) is a fact question for the jury because at all relevant times the PREA Compliance Manager position was vacant (and still is vacant). Accordingly, the veracity of Defendant's findings relative to the determination of unsubstantiated, substantiated, and unfounded lacks credibility due to the material staffing shortfall (PREA Compliance Manager vacancy). Because of this staffing issue the implementation and training relating to PREA standards and Defendant's own standard operating procedures are entirely absent, materially affecting inmate outcomes.

139.   The commonality of each of these 83 reports of sexual abuse (inmate on inmate) occurring from June 2023 to December 2023 (including Mr. Buford) is that each investigation was performed without a PREA Compliance Manager. Therefore, on its face each investigation is invalid failing to comply with federal law governing PREA. Additionally, 83 separate reports occurring in a six-month period without a PREA Compliance Manager and therefore no oversight is sufficiently widespread to constitute a condition of confinement.

140.   Defendant contends in its motion that "Despite Counsel's quibbling about the details of how the response to the PREA allegation was effectuated, the fact remains that the allegation was investigated pursuant to policy…" **[ECF 131 at ¶ 43].** As discussed, *supra*, the only policy Defendant is effectuating is one of unconstitutional conditions of confinement.

141.   Defendant's conditions of confinement relating to PREA and the investigations of Mr. Buford is so unconstitutional that the General Counsel of the Harris County Public Defender's Office, Sarah Wood, got personally involved. **[ECF 131-2 at page 17 of 74].**

142.   On October 17, 2023, Ms. Wood sends an email to HCSO Major Lynette Anderson and  HCSO Assistant Chief Phillip Bosquez stating:

> *My understanding is that Mr. Buford was placed in administrative*

> *separation for his own protection because he reported being sexually*
> *assaulted while in custody. Our investigator visited him today and is*
> *concerned because he was heavily shackled with extra security*
> *precautions like they do with murder defendants. I'm told this is having*
> *a very negative effect on his mental illness (he's in mental health court).*
> *He's in for state jail felonies and has no violent history. Is he being*
> *treated as a security threat due to his PREA outcry? Or perhaps there*
> *was a mistake, or some disciplinary that isn't listed?*

**[ECF 131-2 at page 17 of 74].**

143.    The next day Officer Camacho sends an email stating: "At no time should we shackle and handcuff someone because of a PREA outcry. This is a form of punishment. Can Buford be relocated somewhere else where he is not shackled?" **[ECF 131-2 at page 16 of 74].**

144.    From October 2, 2023, to October 18, 2023, Buford was housed in administrative separation. **[ECF 144-1 at ¶ 11 and ¶ 16].** CJC-219 is Defendant's separation policy and states that "inmates shall be allotted one (1) hour per day for time out of their cells." **[ECF 131-6 at page 31 of 41].** CJC-219 also requires that "all purple-band administrative disciplinary separation inmates shall be handcuffed and secured with leg irons, with the handcuffs (double locked) behind their back, prior to leaving their designated cellblock. **[ECF 131-6 at page 32 of 41].** From October 2, 2023, to October 18, 2023, Mr. Buford was heavily restrained and heavily shackled in a punitive manner following reports of sexual assault and rape. During this 16-day period Mr. Buford was shackled with heavy restraints for 23 hours a day in isolation. This deteriorated his mental condition and further demonstrates the unconstitutional conditions of confinement and denial of medical care.

145.    The conditions of confinement also resulted in Mr. Buford being classified as purple band from October 2, 2023, to October 18, 2023. This distinction is material in nature because "Purple stripe are vulnerable victimization individuals and purple band are individuals who

are housed for disciplinary reasons, for high profile cases, for -- it could be a number of things.
But those are usually your individuals that are shackled and handcuffed on a daily basis."
**[Exhibit 10 Officer Camacho's testimony at 203:9–16].**

146.   Following the email from General Counsel Sarah Wood, Detention Sergeant
Michael Beaudion sends an email to Officers Joshua Rankin and Shounda Bower directing
that classification change Mr. Buford's status to purple stripe. **[ECF 131-10** at page 4 of 47].

147.   This directive of course only came following the unusual circumstance of the general
counsel for the public defender's office, Sarah Wood, raising concerns of heavy shackling.

148.   From October 2, 2023, to October 18, 2023—a total of sixteen days—Mr. Buford is
held in isolation, heavily restrained and shackled for 23 hours a day. This is a systematic policy
failure. Had Defendant complied with PREA and lawfully maintained a PREA Compliance
Manager at all relevant times, then this improper classification would not have occurred. Had
a qualified PREA investigator been involved then this would not occur.

149.   Even more egregious is the fact that Mr. Buford's placement to a floor that requires
heavy restraints and his classification as solid purple occurs again following Mr. Buford's
November 5, 2023, PREA allegation. The unqualified investigator, Guerreo, is once again
assigned as the lead investigator for this case. On November 8, 2023, investigator Guerrero
conducts an interview stating: "I, Investigator A. Guerrero interviewed Inmate Buford in 2-J-
2 in his cell due to him not being able to come out. Inmate Buford is a "solid purple" band due
to his protection…" **[ECF 131-4 at page 23 of 47].**

150.   The fact that Mr. Buford was not able to come out of his cell and the fact that he was
classified as solid purple instead of purple stripe is concerning. This further demonstrates the
unconstitutional conditions of confinement, inadequate training, staffing, and supervision

relative to Defendant's PREA implementation and lack of knowledge relating to the same.

151.   The unsworn declaration of Major Ruth McClanahan confirms that Mr. Buford was housed in administrative separation from 11/5/2023 to 11/14/2023.**[ECF 144-1 at ¶ 19 and ¶ 21].** The unsworn declaration, however, claims that Mr. Buford was placed in victimization vulnerable housing. While that might have been the intent, this does not align with Investigator Guerrero's statement that Mr. Buford is a "solid purple" band. **[ECF 131-4 at page 23 of 31].**

152.   As Officer Camacho testified "solid purple"  is for individuals with disciplinary issues, high profile cases, and require shackles and handcuffing on a daily basis. **[Exhibit 10 Officer Camacho's testimony at page 203:9–16].**

153.   Accordingly, the unsworn declaration of Major Ruth McClanahan might state that Mr. Buford was placed in victimization vulnerable housing, but in reality he was placed into isolated confinement, unable to leave his cell, and heavily restrained. This is punitive.

154.   Mr. Buford faced these conditions of confinement for a total of 25 days. Following his reports of sexual assault and rape, Mr. Buford was housed in isolation, improperly classified, heavily restrained, and heavily shackled for a total of 575 hours. When asked about this at deposition Officer Camacho fails to provide a coherent response, unable to do basic math and accept that Mr. Buford was housed in isolation requiring heavy restraints per floor policy for 25 days, 23 hours a day following his reports of sexual assault and rape. **[Exhibit 10 Officer Camacho's testimony at 199:10-202:08].**

155.   It is evident that Defendant's policy custom, and practice regarding the PREA investigations as it relates to Mr. Buford arises to unconstitutional conditions of confinement. Specifically, the evidence demonstrates that Defendant has still not appointed a PREA Compliance Manger to replace the vacancy left by Officer Camacho in May 2023. This alone

creates a material issue of disputed fact that overcomes summary judgment.

156.    The evidence also demonstrates that an unqualified investigator (Guerrero) controlled the investigations relating to Buford, and that Defendant's employees knew that Guerrero was unqualified but proceeded, nonetheless. Additionally, Mr. Buford was improperly classified at the time of intake and transferred in a punitive manner following his reports of rape and sexual assault.  Defendant attempts to frame this as victimization vulnerable rehousing; however, Mr. Buford was placed into a solid purple band, heavily restrained/shackled, and isolated for 23 hours a day for a total of 25 days during incarceration.

157.    This is obviously a punitive response to Mr. Buford's PREA allegations, ultimately drawing the attention of the public defender's general counsel. In short, this is more than "quibbling", the actions and omissions arise to unconstitutional conditions of confinement.

158.    Taken in the aggregate, this evidence corroborates Plaintiff's version of events. With that evidence, a jury could find Defendant liable on Plaintiff's § 1983 claims of conditions of confinement and denial of medical care. Therefore, Defendant's motion should be denied.

159.    Plaintiff's § 1983 claims should survive. Under § 1983, municipalities can be liable for "deprivations of federally protected rights caused by action taken pursuant to official municipal policy of some nature." *Brown v. Tarrant Cnty., Texas,* 985 F.3d 489, 497–98 (5th Cir. 2021) (internal quotations omitted). Therefore, the elements for such a claim under *Monell* and its progeny are (1) an official policy; (2) promulgated by an official policymaker; and (3) the policy was the moving force behind the constitutional violation. *Id*. In this context, an "official policy" can either be a "policy statement formally announced by an official policymaker" or a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well

settled as to constitute a custom that fairly represents municipal policy." *Id*.

160.   Pursuant to *Monell* and its progeny, the Supreme Court held that municipalities may be sued and held liable for their actions or omissions where the governing body implements a decision that is promulgated by that body's leaders, including instances where constitutional deprivations are the result of governmental "custom," even without formal approval of the governing body. *Monell v. Department of Soc. Svcs.*, 436 U.S. 658, 690-91 (1978) (quoting Mr. Justice Harlan, who stated, "Congress included customs and practices [in § 1983] because of the persistent and widespread discriminatory practices of state officials. . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.*, 398 W.S. 144, 167-68 (1970)).

161.   Evidence of a widespread practice can be demonstrated by alleging a pattern of fairly similar, specific, and numerous incidents. *Ettinoffe v. Sheikh,* No. 4:21-CV-02646, 2022 WL 5200084, at *4-5 (S.D. Tex. Oct. 4, 2022).

162.   In these cases, "[t]he similarity requirement 'should not be exaggerated,' but the prior acts must 'be fairly similar to what ultimately transpired.'" *Id.* (quoting *Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803, 810 (5th Cir. 2017); *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009)) (cleaned up)). While the other incidents should be fairly similar, they do not need to be identical. *Id*. at *11–13.

163.   Here, Plaintiff's allegations in this case are not conclusory. Furthermore, the policies Plaintiff identifies are interrelated and therefore, this interrelation heightens the impact these policies have on one another. In fact, Plaintiff's Complaint describes how understaffing and overpopulation at the Jail directly affects jailers' ability to conduct adequate face-to-face

observations and monitoring. **(ECF No. 42 at ¶¶ 34, 67, 76, 77, 83, 86, 89, 99, 102 and 106.**
See also the pattern of incidents **ECF No. 42 ¶ 137** regarding: Terry Goodwin, Vincent Young, Maytham Alsaedy, Debora Ann Lyons, Natividad Flores, Wallace Harris, David Perez, Israel Lizano Iglesias, Jaquaree Simmons, Rory Ward, Jr., Fred Harris, Matthew Shelton, Simon Peter Douglas, Gillbert Allen Nelson, Kristan Smith, Benjamin Pierce, Robert Wayne Fore, Jim Franklin Lagrone, Damien Lavon Johnson, Arlen Ashley Bates, Victoria Margaret Simon, Alan Christopher Kerber, Michael Griego, Adael Gonzales Garcia, Christopher Young, Fabien Cortez, Alfred Rios, Kenneth McZeal, and Dominga Treviño Barrera).

The understaffing, lack of adequate observation, non-existence of a PREA Compliance Manger, and custom of intentionally and repeatedly misrepresenting that Defendant has a PREA Compliance Manager then impacts Defendant's ability to provide detainees with adequate medical care, supervision, and monitoring. Thus, because the policies Plaintiff identifies inevitably impact one another, this Court should consider them in the aggregate. *M.D. v. Abbott,* 907 F.3d 237, 255 (5th Cir. 2018).

164.   Here, the Texas Commission on Jail Standards March 8, 2023, report found that Defendant continues to be non-compliant with the minimum observation requirements, and that the jail staff, on a "routine basis" (custom), exceeded the minimum observation requirements for detainees (like Buford) that required thirty-minute intervals. The Texas Commission on Jail Standards March 8, 2023, report stating in part:  **[ECF No. 42 ¶ 114].**

> **Additionally, observation records for area where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were exceeded by staff on a routine basis by 1 minute to 2 hours 9 minutes.**

165.   The above findings demonstrating that the most vulnerable of detainees, like Mr.

Buford, were being routinely observed in a manner of non-compliance. The Texas Commission on Jail Standards also found that "staffing was not sufficient to perform the required functions" despite Harris County's documentation that alleged that they did have enough staff. **[ECF No. 42 ¶ ¶ 115-116].**

166.   The understaffing, lack of adequate observation, non-existence of a PREA Compliance Manger, and custom of intentionally and repeatedly misrepresenting that Defendant has a PREA Compliance Manager then impacts Defendant's ability to provide detainees with adequate medical care, supervision, and monitoring.

167.   Because the policies Plaintiff identifies inevitably impact one another, this Court should consider them in the aggregate. *M.D. v. Abbott,* 907 F.3d 237, 255 (5th Cir. 2018). For these reasons, the Court should analyze Plaintiff's claims under a conditions of confinement theory and based upon the arguments and evidence presented herein deny Defendant's MSJ.

### III.     NATURE AND STAGE OF THE PROCEEDING

168.   This case involves a series of disturbing occurrences in which 29 pre-trial detainees at the Harris County Jail ("the Jail") died or suffered serious injury. **[ECF No. 84].** The Wagner Plaintiffs originally filed suit against Defendant in August 2023 arising from repeated incidents occurring within the Harris County Jail, resulting in the death or injury of twenty-seven (27) detainees. **[ECF No. 1].** In response, Defendant moved to dismiss the Wagner Plaintiffs' claims **[ECF No. 21]** and also moved to sever each of the claims into 27 separate lawsuits. **[ECF No. 22].** The Court granted Defendant's motion to dismiss in part, dismissing the Wagner Plaintiffs claims for denial of medical care under the Americans with Disabilities Act and Rehabilitation Act, but denying Defendant's motion as to the Wagner Plaintiffs' section

1983 claims alleging conditions-of-confinement and failure to train claims. **[ECF No. 51 at 34].** The Court also denied Defendant's motion to sever. **[ECF No. 40 at 7, 10].**

169.    Plaintiff-Intervenor Ana Garcia filed a Motion to Intervene in the lawsuit, asserting that her son, Kevin Alexander Sanchez-Trejo, died while in custody of the Jail. **[ECF No. 17].** Plaintiff-Intervenor Chandra Jenkins filed a Motion to Intervene, asserting that her son, Mr. Buford, was repeatedly sexually assaulted by fellow prisoners and denied medical care while detained in the Jail. **[ECF No. 34].** On April 15, 2024, the Court granted the Motions to Intervene ordering the clerk to file Plaintiff-Intervenors' complaints. **[ECF No. 40].**

170.    On October 7, 2024, the Court granted Defendant's motion to dismiss in part, dismissing Jenkins' claims for denial of medical care under the Americans with Disabilities Act and Rehabilitation Act, but denying Defendant's motion as to Jenkins' section 1983 claims alleging conditions-of-confinement and failure to train claims. **[ECF No. 84 at 23].**[10]

171.    Defendant filed the instant no-evidence motion for summary judgment and motion to severe on April 20, 2025, only as to the claims of Plaintiff-Intervenor Chandra-Jenkins ("Jenkins"). **[ECF No. 131].** On May 6, 2025, Defendant filed a first supplemental motion, including additional exhibits and evidence. **[ECF 144].** After the Court granted a series of unopposed extensions, Jenkins files this response. On June 13, 2025, the Court entered an Order granting Plaintiff's motion for leave to file to exceed the page limits. **[ECF 171].**

---

[10] The Court granted in part and denied in part Defendant's motion to dismiss as to Ana Garcia. ECF No. 84 at 23.

## IV.    RELEVANT LEGAL STANDARD

172.    A "no-evidence" motion for summary judgment…is a pleading that may be filed in state court, but not federal court. *Casteneda v. Flores*, No. 5:05-CV-0129, 2007 WL 1671742, at *2-3 (S.D. Tex. June 8, 2007).

173.    The moving party must refer to the record to show that there is no genuine issue of material fact in order to make summary judgment proper in federal court. *Trautmann v. Cogema Mining, Inc.*, No. 5:04-CV-117, 2007 WL 1577652, at *3 (S.D. Tex. May 30, 2007) ("[I]t is an inescapable deduction of controlling case law that strict adherence to the federal [summary judgment] standard, and only the federal standard, is the correct approach."); *Cardner v. Home Depot U.S.A., Inc.*, 561 F. Supp. 2d 640, 643 (E.D. Tex. 2006) ("A no evidence motion for summary judgment is only available in the Texas state courts. Accordingly, the court will apply the appropriate federal standard to the Defendant's motion for summary judgment.") (internal citation omitted); *Royal Surplus Lines Insurance Company v. Brownsville Independent School District*, 404 F. Supp. 2d 942, 948 (S.D. Tex. 2005) ("[T]he concept of a 'no evidence' summary judgment neither accurately describes federal law nor has any particular import in . . . federal summary judgment procedure."). A defendant's motion for summary judgment will fail when the defendant's brief consists of only conclusory statements that the record lacks evidence as to the elements of a claim. See *St. Paul Mercury Insurance Co. v. Williamson*, 224 F.3d 425, 440 (5th Cir. 2000); *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

174.    Summary judgment is proper if "the pleadings, depositions and answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party bears the burden, as an initial matter, of showing the district court that there is an absence of evidence to support the non-moving party's case. *Id*. If the moving party fails to meet this initial burden, the motion must be denied regardless of the nonmoving party's response. *Id.* Then, and only then, does the burden of production shift to the plaintiff to produce evidence of factual dispute. *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994).

175.   Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Swinford v. Coil Tubing Tech., Inc.*, 2022 U.S. Dist. LEXIS 184952 *4 (S.D. Tex. 2022) (Bennett, A.). A "genuine issue of material fact… precludes summary judgment." *Int'l Ship Repair & Marine Servs. v. Great Lakes Dredge & Dock Co., LLC*, 2022 U.S. Dist. LEXIS 23555 *2 (S.D. Tex. 2022) (Bennett, A.).

176.   A dispute is genuine where the evidence is such that a jury could return a verdict for the nonmoving party. *Corbett v. Allstate Vehicle & Prop. Ins. Co.*, 2019 U.S. Dist. LEXIS 240482 *3 (S.D. Tex. 2019) (Bennett, A.). A disputed fact is material if it can potentially affect the suit's outcome under the governing law. *Garcia v. Prof'l Contract Servs.*, 938 F.3d 236, 240 (5th Cir. 2019).

177.   The movant bears the initial burden of identifying portions of the record it believes demonstrate the absence of such a genuine issue of material fact, and if the moving party fails to meet this initial burden, the motion for summary judgment must be denied regardless of the nonmovant's response. *Axip Energy Servs., LP v. CSI Acquisition Co. LLC*, 2021 U.S. Dist. LEXIS 196549 *1 (S.D. Tex. 2021) (Bennett, A.). If the moving party fails, summary judgment must be denied. *John v. Louisiana (Bd. of Trustees)*, 757 F.2d 698, 708 (5th Cir. 1985).

178.   On summary judgment, the facts and the inferences to be drawn from the evidence should be viewed in the light *most favorable to the nonmovant*.[11] Furthermore, the court is not permitted to make credibility determinations nor weigh any evidence.[12]   Rather, the court "must disregard all evidence favorable to the moving party that the [fact finder] is not *required* to believe"[13] when ruling on a motion for summary judgment.

179.   Moreover, Fed. R. Civ. P. 56 imposes no duty on a district court "to shift through the record in search of evidence" supporting a motion for summary judgment. *Ayala v. Fisher Homes*, 2020 U.S. Dist. LEXIS 116059 *3 (S.D. Tex. 2020) (Bennett, A.). If and only if that initial burden is met, then the "party resisting summary judgment succeeds simply by showing that a material fact issue exists and requires trial by a fact finder." *Corporativo Grupo R v. Marfield Ltd.*, 2021 U.S. Dist. LEXIS 218630 *2-3 (S.D. Tex. 2021) (Bennett, A.). A mere "self-serving affidavit may be enough to create a factual dispute" if it is "made under penalty of perjury." *Perez v. Collier*, 2021 U.S. App. LEXIS 27011 *7 (5th Cir. 2021); *see also Epps v. Mem'l Hermann Hosp., 2016 U.S. Dist. LEXIS 184794 *7 (S.D. Tex. 2016) (Bennett, A.)* (denying summary judgment where plaintiff filed an affidavit that was "self-serving in part").

180.   The "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Corporativo* *3 (S.D. Tex. 2021) (Bennett, A.). In deciding whether such a fact issue has been created, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). All reasonable inferences

---

[11] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

[12] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[13] *LegacyRG, Inc. v. Harter*, 705 F. App'x 223, 230 (5th Cir. 2017) (citing *Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224 (5th Cir. 2016)).

in favor of the nonmoving party. *Garcia v. Prof'l Contract Servs.*, 938 F.3d 236, 240 (5th Cir. 2019); *see also Smith v. Linthicum*, 2021 U.S. Dist. LEXIS 86400 *14 (S.D. Tex. 2021) (Bennett, A.). The facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion. *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019).

## V.    LAW AND ARGUMENT

### A. DEFENDANT'S NO EVIDENCE MSJ SHOULD BE DENIED BECAUSE THERE IS EVIDENCE OF DISPUTED MATERIAL FACTS RELATED TO PLAINTIFF-INTERVENOR'S § 1983 CLAIMS.

#### i.    The § 1983 Claims Survive

181.    Under § 1983, municipalities can be liable for "deprivations of federally protected rights caused by action taken pursuant to official municipal policy of some nature." *Brown v. Tarrant Cnty., Texas,* 985 F.3d 489, 497–98 (5th Cir. 2021) (internal quotations omitted). Therefore, to state a claim under *Monell* and its progeny, a plaintiff must allege (1) an official policy; (2) promulgated by an official policymaker; and (3) the policy was the moving force behind the constitutional violation. *Id*. In this context, an "official policy" can either be a "policy statement formally announced by an official policymaker" or a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id*.

182.    "The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth,* 74 F.3d 633, 639 (5th Cir. 1996). In the context of *Monell* liability, the cause of the

Constitutional violation is classified as either a condition of confinement or as an episodic act or omission. *Garza v. City of Donna,* 922 F.3d 626, 632 (5th Cir. 2019). Conditions of confinement claims involve "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644 (5th Cir. 1996). Therefore, a condition of confinement "is usually the manifestation of an explicit policy or restriction," however, it can also be "an unstated or de facto policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare,* 74 F.3d at 645). In contrast, claims based on "a particular act or omission of one or more officials," generally involve "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor." *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997).

183.  Therefore, the issue of which theory will apply to a plaintiff's claim will depend on the context of each specific case. This analysis does not depend on the type of conduct at issue, but rather, how pervasive that conduct is alleged to be. *See Hare*, 74 F.3d at 643-45 (recognizing that either theory could apply to the failure to provide medical care and to protect detainees from violence and thus, identifying which theory should apply will depend on the facts of each specific case).[14]

184.  The distinction between the two theories is most salient with regard to the element of intent and knowledge. A conditions claim allows courts to "assume, by the municipality's

---

[14] *See also Shepherd,* 591 F.3d at 453 (categorizing claims as conditions of confinement because the plaintiff "presented extensive independent evidence on the jail's treatment of inmates with chronic illness.")

promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Flores v. Cnty. of Hardeman, Tex.,* 124 F.3d 736, 738 (5th Cir. 1997) (applying the standard articulated in *Bell v. Wolfish,* 441 U.S. 520 (1979)). Therefore, evidence of deliberate indifference is not necessary to state a conditions of confinement claim, however, it is required for claims based on episodic acts and omissions. *See Hare,* 74 F.3d at 643. Under this standard, a plaintiff must allege that "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* at 650.

185.   In the context of *Monell* liability, an "official policy" can either be a "policy statement formally announced by an official policymaker" or a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Tarrant Cnty.,* 985 F.3d at 497–98. Evidence of a widespread practice can be demonstrated by alleging a pattern of fairly similar, specific, and numerous incidents. *Ettinoffe* at *4-5 (S.D. Tex. Oct. 4, 2022).

186.   In these cases, "[t]he similarity requirement 'should not be exaggerated,' but the prior acts must 'be fairly similar to what ultimately transpired.'" *Id.* (quoting *Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803, 810 (5th Cir. 2017); *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009)) (cleaned up)). While the other incidents should be fairly similar, they  do not need to be identical. *Id.* at *11–13.

187.   Regarding specificity, the "description of a policy or custom and its relationship to the underlying constitutional violation ... cannot be conclusory; it must contain specific facts." *Id.* (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018);

*Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

188.   Finally, with respect to numerosity, the number of incidents and other allegations necessary to establish a pattern representing a custom, varies. *Saenz v. City of El Paso*, 637 F. App'x 828, 832 (5th Cir. 2017) (citation omitted). However, courts have found sufficient numerosity when a plaintiff has alleged as little as two similar incidents. *See Feliz v. El Paso Cnty.,* 441 F. Supp. 3d at 498–99 (W.D. Tex. 2020) (recognizing sufficient allegations of policy based on one TCJS report and one prior lawsuit).

189.   Furthermore, a plaintiff can employ a number of methods to establish a pattern or practice, including directing the Court's attention to other lawsuits involving the municipality, statistics, a few similar incidents, reports from governmental agencies including the DOJ and the TCJS, statements from the Sheriff, and statements of other County employees. *Ettinoffe* at *5 (S.D. Tex. Mar. 5, 2018).

190.   Furthermore, Defendant's policies should be analyzed in the aggregate. *M.D. v. Abbott,* 907 F.3d 237, 255 (5th Cir. 2018). Harris County claims that these policies should be disaggregated because "they express no single municipal policy but only a series of adversarial conclusions." *Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001).

191.   Here, Plaintiff's allegations in this case are not conclusory. Furthermore, the evidence presented by Plaintiff and incorporated herein within the exhibits demonstrates that Defendant's policies, practices, and customs are interrelated and therefore, this interrelation heightens the impact these policies have on one another. In fact, Plaintiff's evidence and argument, *supra*, demonstrates how understaffing, failure to monitor, supervise, and train directly affects Defendant's inability to comply with both internal standard operating procedures and federal PREA guidelines.  Plaintiff's evidence further

demonstrates how these inherent failures are widespread and reoccurring in nature. The understaffing, lack of adequate observation, failure to train, failure to supervise, and failure to monitor then impacts Defendant's ability to provide detainees with adequate medical care. Thus, because the policies Plaintiff identifies inevitably impact one another, this Court should consider them in the aggregate. *M.D.,* 907 F.3d at 255.

### ii.    Conditions of confinement analysis[15].

192.    This Court has already recognized the claims of the Crump Law Firm Plaintiffs are based on Defendant's conditions of confinement. **[ECF No. 51].** Likewise, the Court has held that the claims of Plaintiff-Intervenor Ana Garica and Plaintiff-Intervenor Chandra Jenkins are based on the general conditions and practices of the Jail as a whole, not episodic acts and omissions. **[ECF No. 84].** When denying Defendant's motions to dismiss, this Court recognized that "Plaintiff-Intervenor's allegations of pervasive misconduct are properly brought under a conditions-of-confinement theory," because "Plaintiffs have cited to extensive evidence suggesting the relevant conduct is ubiquitous in the Jail[.]" **[ECF No. 84 at 6].** Despite this ruling, Defendant asserts the same argument with regard to Mr. Buford's claims alleging that Plaintiff has no evidence and that summary judgment is proper. However, as set forth herein, Mr. Buford has asserted *Monell* claims based on the general conditions and practices of the Jail as a whole and produces sufficient evidence to overcome

---

[15] Because Plaintiff's claims are not based on the episodic acts and omissions theory, a showing of deliberate indifference is not required. However, pleading in the alternative and without waiving argument to same even if one were to assume that Plaintiff's claims were based on an episodic acts and omissions theory, Plaintiff's evidence demonstrates that each person acted with subjective deliberate indifference to Plaintiff's known rights, and further that each act or omission was a result of an official policy and practice that was adopted and maintained with objective deliberate indifference. Because the Court has already ruled that Plaintiff's claims are properly brought under a conditions of confinement theory, Plaintiff need not address the episodic acts and omissions theory of liability. Should the Court request further or additional briefing on this issue, Plaintiff reserves all rights to supplement the same.

Defendant's MSJ under a conditions of confinement theory and analysis.

193.   In particular, here Plaintiff's complaint and supporting evidence expressly describes specific conditions, customs, and restrictions that are ubiquitous throughout the jail. In addition to the facts related to Mr. Buford's own claim, the complaint also alleges that over twenty-nine individual Plaintiffs asserted claims against Harris County in this suit, based on over seventy additional incidents, evidence, and testimonies showing those conditions. These claims do not challenge the conduct of a specific jailer or other actor, but rather, demonstrate Plaintiff was subjected to unconstitutional conditions of confinement.

194.   As more detailed herein and in the expert report of Dr. Hayden Smith the systemic failure to have the PREA Compliance Manager position filled is not a mere isolated incident perpetrated by a particular individual. Rather, this is a pervasive *de-facto* policy with sweeping consequences. The failure to maintain a PREA Compliance Manager for over two years is sufficiently widespread and constitutes a condition of confinement.  From June 2023 to December 2023 there were a total of 29 reports of sexual abuse (inmate on inmate) occurring at 701 N San Jacinto St. and 54 reports of sexual abuse (inmate on inmate) occurring at 1200 Baker Street. **[Exhibit 9 at slides 7 and 9 of 13].**

195.   The legitimacy of each PREA investigation relating to the 83 reports of sexual abuse (inmate on inmate) occurring from June 2023 to December 2023 (including Mr. Buford) is highly questionable because at all relevant times the PREA Compliance Manager position was vacant (and still is vacant). This macro level staffing and training failure is not a mere isolated incident and therefore rises to a *de facto* policy.

196.   Accordingly, the veracity of Defendant's findings relative to the determination of unsubstantiated, substantiated, and unfounded lacks credibility due to the material staffing

and training shortfalls caused by the PREA Compliance Manager vacancy. Because of this widespread failure the implementation and training relating to PREA standards and Defendant's own standard operating procedures are entirely absent, materially affecting inmate outcomes, including the medical and mental healthcare (or lack thereof provided after a PREA allegation) and the investigations undertaken by Defendant and its agents.

197.   As the Court notes, Sheriff Gonzales as policymaker for Harris County has previously publicly stated, "We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in . . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well…it starts with leadership. We've got to end this culture." **[ECF No. 84, pg. 18; see also ECF No. 41 ¶ 129; ECF No. 42 ¶ 128; ECF No. 122 ¶ 346].**

198.   Further, during the debate, Sheriff Gonzales referenced a 2015 Texas Commission on Jail Standards finding where Harris County was non-compliant for refusing to provide Medical treatment to a patient on four (4) different occasions.

199.   As set forth herein, the deposition of Sheriff Gonzales has yet to take place. Given the Court's recent ruling on the mootness of Defendant's motion to stay Plaintiff anticipates that 30(b)(6) deposition(s) and the deposition of Sheriff Gonzales are forthcoming. While Plaintiff asserts that Defendant's no-evidence motion for summary judgment should be denied, it is worth noting this additional highly relevant deposition discovery is forthcoming.

200.   Sheriff Gonzales continued that if proper treatment and access would have been provided for another detainee, "then I don't think she would have spent 27 days inside that jail being beaten not only by an inmate but by a deputy as well." "[T]his is nothing new this

is a culture. . .something should have been done rather then just letting her be in [the Jail] beaten by a deputy and by an inmate and come out worse than what she went in. . . ..."**[ECF No. 122  ¶ 348].**

201.   Applying this framework to the claims of Buford, he faced these conditions of confinement from the very moment he entered the jail when he was inappropriately classified from intake.  Thereafter he was repeatedly raped and sexually assaulted. He was then placed into isolation, heavily restrained, and heavily shackled for twenty-five days for a total of 575 hours. **[Exhibit 10 Officer Camacho's testimony at 199:10-202:08].**

202.   As if this wasn't enough, following his initial PREA allegation nearly 23 hours elapsed between the 2:27 PM report on 9/28 and the ~1:00 PM transport on 9/29 before he was taken to a hospital and offered a sexual assault medical forensic examination. **[Dr. Smith expert report, Exhibit 7B at page 32 of 49].**

203.   It is evident that neither Defendant nor its policymaker, Sheriff Gonzales, have cured the unconstitutional conditions of confinement that have been documented since at least the 2009 DOJ report and were further acknowledged by Sheriff Gonzales' public statements in 2015.   Moreover, like Mr. Buford the detainees identified at pages 34-35 herein suffered serious injuries (some death) because of the conditions of confinement relating to lack of medical care, failure to screen, protect, observe, monitor, and train.

204.   As Mr. Buford is an individual with a complex medical and mental health history he fits squarely within the class of detainees whom Defendant has had actual knowledge of the intolerable, deficient and unconstitutional conditions since the DOJ published its report. For these reasons and those outlined herein and within the supporting exhibits, Plaintiff's unconstitutional conditions of confinement and denial of medical care claims survive.

### iii.    Failure to train, observe, monitor and supervise

205.    For liability to attach based on an inadequate training claim, a plaintiff must allege

with specificity how a particular training program is defective. *Roberts v. City of Shreveport*,

397 F.3d 287,293 (5th Cir. 2005). As discussed herein and the evidentiary support, Plaintiff

demonstrates Defendant's failure to adequately train, observe, monitor, and supervise.

206.    To state this claim, a plaintiff must allege that (1) a municipality has adopted

inadequate training and supervision policy procedures, (2) acted with deliberate indifference

in doing so, and (3) the inadequate policies directly caused the plaintiff's injury. *Sanders–*

*Burns v. City of Plano,* 594 F.3d 366, 381 (5th Cir. 2010).[16] To prevail on this claim, it

should be clear "the highly predictable consequence" of not screening, training, or

supervising officers is that they "would apply force in such a way that the Fourth

Amendment rights of [citizens] were at risk." *Peterson*, 588 F.3d at 849-850 (5th Cir. 2009).

207.    A court infers deliberate indifference "either from (i) a pattern of constitutional

violations or, absent proof of a pattern, from (ii) showing a single incident with proof of the

possibility of recurring situations that present an obvious potential for violation of

constitutional rights." *Garza*, 922 F.3d at 637-38 (internal quotation omitted).

208.    Here, Plaintiff can point to evidence that supports each element of this claim. First,

Plaintiff has alleged several facts that identify the specific topic of the challenged training

policy. *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718-721 (W.D. Tex. 2015)

209.    Harris County's repeated failures to adhere to minimum jail standards, its

misrepresentations of staffing compliance, and the attempts to "stretch the standards" rather

---

[16] *See also Gros v. City of Grand Prairie, Tex.*, 34 F. App'x. 150, at *6 (5th Cir. 2002) (per curiam) (requiring a plaintiff to prove deliberate indifference for hiring, training, and supervision claims).

than implement corrective measures reveal an institutional pattern of disregard for inmate safety and regulatory compliance. **[Dr. Smith expert report, Exhibit 7B at page 19 of 49].**

210.   As a threshold matter, it is a fundamental failure for Defendant to have a vacancy at the PREA Compliance Manager position for over two years. This macro-level staffing issue creates widespread conditions of confinement and inadequate PREA training.

211.   The lack of a formally designated PREA Compliance Manager during Buford's incarceration raises serious concerns regarding HCSO's ability to enforce institutional safeguards against sexual abuse. Additionally, without a designated compliance official, PREA investigations, protective housing placements, and retaliatory monitoring lacked necessary leadership oversight, contributing to documented procedural failures across multiple standards. This misrepresentation of compliance leadership within HCSO and the absence of a PREA Compliance Manager during a critical timeframe suggest significant gaps in adherence to both federal PREA requirements and internal policy mandates under HCSO Policy 740. **[Dr. Smith expert report, Exhibit 7B at page 20 of 49].**

212.   Additionally, the documented failures in Buford's intake, classification, and housing placement reveal clear lapses in adhering to PREA standards and established correctional policies. The absence of proper screening, risk assessment, and timely reassessment—combined with inconsistencies in documentation—illustrates a systematic failure to safeguard an inmate who exhibited multiple vulnerabilities. **[Dr. Smith expert report, Exhibit 7B at page 24 of 49].**

213.   There is no evidence that screening information was used to classify Buford appropriately at booking and intake. He exhibited multiple risk factors that should have precluded placement in general population, including documented mental health concerns,

prior institutionalization, physical vulnerabilities, and an exclusively nonviolent criminal history. Failure to utilize screening information increased Buford's risk of victimization, contradicting PREA's fundamental safeguards. A properly administered screening tool should have identified these concerns resulting in an assignment with increased supervision and monitoring. **[Dr. Smith expert report, Exhibit 7B at page 26 of 49].**

214.   Plaintiff also demonstrates that "The Texas Commission on Jail Standards (TCJS) has repeatedly identified systematic failures within Harris County Jail, citing noncompliance with essential regulatory standards that directly impact inmate safety, classification, supervision, and medical care. These violations, documented across multiple Annual Jail Reports and Special Inspections, provide clear evidence of Harris County's inability to meet minimum jail standards, despite repeated interventions from the Texas Jail Commission. **[Dr. Smith expert report, Exhibit 7B at page 18 of 49].**

215.   On August 10, 2023, Harris County Sheriff's Office (HCSO) officials appeared before the Texas Jail Commission to address ongoing deficiencies, including custody deaths, overcrowding, intake delays, and supervision failures. During this hearing, Assistant Chief Phillip Bosquez admitted that HCSO was "stretching the standards to cover areas that aren't built into them," signaling a deliberate effort to sidestep procedural requirements of meeting minimal requirements. **[Id.]**

216.   Months earlier, during the February 13-17, 2023, inspection of Harris County Jail, the Texas Jail Commission issued findings that further exposed the facility's inability to adhere to minimum standards. These failures included delays in classification and housing assignments for inmates requiring mental health evaluations, with some inmates held in processing beyond the mandated 48-hour limit—some exceeding 70 hours before being

assigned housing. A key contributing factor to classification delays were insufficient staffing, which resulted in inmates awaiting placement for extended periods due to clerical bottlenecks and inadequate personnel coverage. **[Id.]**

217.   Supervision failures were also noted, as face-to-face observations regularly exceeded required time limits, ranging from 1 minute up to 2 hours and 9 minutes. For Mr. Buford, this lack of proper supervision meant increased vulnerability to harm, retaliation, and neglect, reinforcing the broader institutional failures affecting his incarceration. Additionally, staffing shortages were cited as a contributing factor to these lapses, with floor rosters revealing insufficient personnel coverage, contradicting earlier claims by HCSO that staffing levels were adequate. **[Dr. Smith expert report, Exhibit 7B at page 19 of 49].**

218.   A lack of properly structed leadership and severe staffing shortages directly contributed to the harm Mr. Buford experienced. Despite PREA requirements for designated oversight, no active PREA Compliance Manager was in place during Mr. Buford's incarceration. This absence led to inconsistencies in screening, classification, and investigative protocols, delaying necessary interventions that could have mitigated his risk. Following his documented sexual abuse allegations, he remained in general population for four days, violating classification guidelines and exposing him to continued danger. Required observation logs were not produced, and mandated monitoring standards were ignored, further reinforcing systematic lapses in supervision that left Mr. Buford vulnerable. **[Dr. Smith expert report, Exhibit 7B at page 48 of 49].**

219.   Staffing shortages also impeded investigative integrity, directly affecting the handling of Mr. Buford's allegations. The 2023 Annual Jail Inspection Report confirms that inadequate staffing obstructed critical jail functions, including security rounds, classification

reviews, and investigative procedures. Officers conducted observations from control stations instead of interacting with inmates directly, severely weakening supervision effectiveness. Required security rounds for vulnerable populations—including those classified as assaultive, suicidal, or mentally ill—were delayed by up to two hours, contradicting mandated oversight standards. **[Id]**.

220. These deficiencies resulted in procedural breakdowns that severely impacted Mr. Buford's safety and limited intervention following his sexual abuse reports. This includes the representation of Officer Camacho as a PREA Compliance Manager responsible for meeting key PREA standards, while her actual duties were spread to other work roles and Officer Camacho testified that she was never truly assigned to this role. **[Id]**.

221. The United State Supreme Court has noted that when a training program fails to prevent constitutional violations, policy makers are eventually put on notice that the training is inadequate. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 409 (1997) (discussing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, n. 10 (1989)). After that, "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees" can serve as evidence of deliberate indifference sufficient to support *Monell* liability. *Id*. Furthermore, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id*.

### iv.    Failure to protect and provide medical care

222. Plaintiff claims that Defendant fails to provide detainees with medical care and mental health care. When Defendant does, the care rendered is untimely or severely

inadequate. Mr. Buford, like many other detainees, entered Defendant's jail with preexisting mental and physical conditions requiring treatment and medication. Similarly, Mr. Buford like many other detainees did not receive adequate evaluation, testing, monitoring and treatment after being repeatedly raped and sexually assaulted by other detainees.

223.    Upon each allegation of sexual assault, Mr. Buford received a punitive response, specifically, placement in a correctional setting where shackles were mandated. This punitiveness continued when Mr. Buford experienced delays in receiving a medical evaluation following his initial allegations of sexual assault, where he consequently received medical treatment while shackled and under the direct observation of a correctional officer. **[Dr. Smith expert report, Exhibit 7B at page 48 of 49].**

224.    Buford's experience highlights an institutional pattern of neglect, demonstrating systemic failures in classification, supervision, investigations, and record retention—all directly impacting his safety and ability to access protection, security, and appropriate time relevant treatment. **[Dr. Smith expert report, Exhibit 7B at page 49 of 49].**

225.    As discussed, *supra*, Buford, faced unconstitutional conditions of confinement from the very moment he entered the jail when he was inappropriately classified from intake. Thereafter he was repeatedly raped and sexually assaulted. He was then placed into isolation, heavily restrained, and heavily shackled for twenty-five days for a total of 575 hours. **[Exhibit 10 Officer Camacho's testimony at 199:10-202:08].**

226.    Following his initial PREA allegation nearly 23 hours elapsed between the 2:27 PM report on 9/28 and the ~1:00 PM transport on 9/29 before he was taken to a hospital and offered a sexual assault medical forensic examination. **[Dr. Smith expert report, Exhibit 7B at page 32 of 49].**

227.  It is evident that neither Defendant nor its policymaker, Sheriff Gonzales, have cured the unconstitutional conditions of confinement that have been documented since at least the 2009 DOJ report and were further acknowledged by Sheriff Gonzales' public statements in 2015.  Moreover, like Mr. Buford the detainees identified at pages 34-35 herein suffered serious injuries (some death) because of the conditions of confinement relating to lack of medical care, failure to screen, protect, observe, monitor, and train.

228.  As Mr. Buford is an individual with a complex medical and mental health history he fits squarely within the class of detainees whom Defendant has had actual knowledge of the intolerable, deficient and unconstitutional conditions since the DOJ published its report. For the reasons outlined herein and within the supporting exhibits, Plaintiff's unconstitutional conditions of confinement of failure to protect and denial of medical care claims survive.

## VI.    CONCLUSION AND PRAYER

WHEREFORE, Plaintiff-Intervenor Chandra Jenkins prays that the Honorable Court deny the Motion for Summary Judgment [ECF 131] of Defendant Harris County Texas and that Defendant Harris County Texas take nothing from it.

*Signature on next page*

**Respectfully Submitted,**

*/s/ Taylor McCray Hunter*
Taylor McCray Hunter
TX State Bar No. 24106123
taylor@thehunterlaw.com
**Hunter Law Corporation, PC**
**Texas Office**
4131 North Central Expressway
Suite 900 Dallas, Texas 75204
(214) 206 – 1200
(214) 206 – 1220 (facsimile)

*/s/ Thomas Lyons, Jr.*
Thomas Lyons, Jr.
Pro Hac Vice
Kevin Green
Fed. No. 3737219
**Consumer Justice Center, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
(651) 770 – 9707 (Phone)
(651) 704 – 0907 (Facsimile)

***Counsel for Plaintiff-Intervenor***
***Chandra Jenkins***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record via email and/or other means in accordance with the Federal Rules of Civil Procedure, on this the 30th day of June 2025.

*/s/ Taylor McCray Hunter*
Taylor McCray Hunter