**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WAGNER et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY, TEXAS, | § | CIVIL ACTION NO: |
| | § | 4:23-cv-02886 |
| *Defendant,* | § | |
| | § | Jury Requested |
| and | § | |
| | § | |
| ANA GARCIA, | § | |
| | § | |
| *Plaintiff-Intervenor.* | § | |

_____

**PLAINTIFF-INTERVENOR ANA GARCIA'S RESPONSE**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. 169]**
_____

M. OBAID SHARIFF
Federal I.D. No. 2827312
Texas Bar No. 24091135
BYRON BOEING
Federal ID No. 592378
Texas Bar No. 24040538
**THE SHARIFF LAW FIRM, PLLC**
2500 West Loop South, Ste 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
mshariff@sharifflawfirm.com

***Attorneys for Plaintiff-Intervenor Ana Garcia***

i

## I.     TABLE OF CONTENTS

I.     TABLE OF CONTENTS ................................................................... ii

II.    TABLE OF AUTHORITIES .............................................................. iv

III.   SUMMARY OF EXHIBITS ............................................................... vi

IV.    NATURE AND STAGE OF PROCEEDING ...................................... 1

VI.    SUMMARY OF ARGUMENT ............................................................ 2

VII.   STATEMENT OF FACTS ................................................................. 3

      A.     DEFENDANT RAN A DANGEROUS, CHRONICALLY UNDERSTAFFED, VIOLENT JAIL THAT IGNORED REPEATED WARNINGS OF SANCHEZ'S SUICIDAL IDEATIONS AND BLOODY URINATION THAT WAS NOT PROPERLY TREATED FOR DAYS, IF NOT WEEKS ............. 3

      B.     DEFENDANT CONFINED SUICIDAL HIGH-RISK DETAINEE SANCHEZ IN AN ISOLATED 7th FLOOR 'OBSERVATION' CELL UNDER CHRONIC UNDERSTAFFING, IGNORED WARNING SIGNS OF MENTAL CRISIS VISIBLE BY CAMERA, AND CONDUCTED RECKLESS MERE BARCODE SCAN 'ROUNDS' WITHOUT ACTUALLY CHECKING ON INMATES, CREATING DEADLY CONDITIONS ........ 11

      C.     SANCHEZ BEGGED FOR HELP AS HE VISIBLY DETERIORATED, YET LIGHTEN AND STEWART IGNORED IT— EITHER BECAUSE THEY SAW HIS EMERGENCY AND CHOSE TO DO NOTHING, OR BECAUSE THEY NEVER ACTUALLY LOOKED INTO HIS CELL DUE TO THE JAIL'S CUSTOM AND PRACTICE OF BARCODE-ONLY 'ROUNDS' THAT REPLACE REAL WELFARE CHECKS AID .................................... 17

      D.     CHRONIC UNDERSTAFFING ON THE 7TH FLOOR FORCED DETENTION OFFICER UNG INTO MANDATORY OVERTIME, LEADING TO RUSHED, NON-OBSERVATIONAL ROUNDS WHERE HE MERELY SCANNED BARCODES INSTEAD OF CONDUCTING REQUIRED FACE-TO-FACE INMATE WELFARE CHECKS ................. 26

      E.     AFTER HOURS OF BEING IGNORED, SANCHEZ IS FINALLY FOUND AND DESPITE OVER 40 MINUTES OF DESPERATE LIFE-SAVING EFFORTS BY NURSES AND EMS, HE DIED IN DEFENDANT'S CARE 27

VIII.  RELEVANT STANDARD ................................................................. 31

IX.    LAW AND ARGUMENT .................................................................. 32

      A.     THERE ARE SUFFICIENT FACTS FROM WHICH A REASONABLE JURY COULD FIND SANCHEZ'S CONSTITUTIONAL RIGHTS, LIKE THE OTHER PLAINTIFFS, WERE VIOLATED SEVERAL TIMES OVER ................................................................................ 32

**i.    A REASONABLE JURY COULD FIND THAT THE DEFENDANT VIOLATED ALL OF THE PLAINTIFFS' AND INTERVENORS' CONSTITUTIONAL RIGHTS TO BASIC HUMANE CONDITIONS** ................................................................ 32

**ii.    DEFENDANT VIOLATED SANCHEZ'S RIGHT TO REASONABLE MEDICAL CARE FOR HIS SERIOUS CONDITIONS THAT INCLUDED BLOODY URINE AND A BLOODY HEAD** ................ 33

**iii.    DEFENDANT VIOLATED THE CONSTITUTION BY BEING DELIBERATELY INDIFFERENT TO A KNOWN SUICIDE RISK** ................................................................ 36

**B.    THE CONDITIONS OF CONFINEMENT CLAIM SURVIVES** ................ 37

**i.    OVERCROWDING / UNDERSTAFFING CONDITION SURVIVES** ................................................................ 38
**ii.    IMPROPER OBSERVATION CONDITION CLAIM SURVIVES** .. 40
**iii.    MEDICAL CARE DENIAL CONDITION CLAIM SURVIVES** ...... 42

**C.    THE ALTERNATIVE EPOSIDIC ACTS CLAIM SURVIVES** ................... 44
**i.    THE DEFENDANT HAD SUBJECTIVE AWARENESS AND KNOWLEDGE OF THE INVOLVED RISKS** ................... 45
**ii.    THE DEFENDANT DISREGARDED THE KNOWN RISKS** ......... 47

**D.    THE _MONELL_ CLAIM SURVIVES** ................................................ 50
**i.    THE POLICY / CUSTOM ELEMENT** ................................ 51
**ii.    THE POLICYMAKER ELEMENT** ................................ 52
**iii.    MOVING FORCE** ................................................ 53

**E.    THE FAILURE TO TRAIN CLAIM SURVIVES** ................................ 54
**i.    THERE WAS A FAILURE TO TRAIN LIGHTEN / STEWART** ... 55
**ii.    THERE IS A CAUSAL CONNECTION** ................................ 57
**iii.    THERE WAS DELIBERATE INDIFFERENCE** ................................ 58

**F.    THE FAILURE TO SUPERVISE CLAIM SURVIVES** ................................ 59
**i.    THERE WAS A FAILURE TO SUPERVISE** ................................ 60
**ii.    THERE WAS A CAUSAL CONNECTION** ................................ 61
**iii.    THERE WAS DELIBERATE INDIFFERENCE** ................................ 61

**G.    THE MOTION TO SEVER MUST BE DENIED AS WELL** ................ 62

**X.    CONCLUSION AND PRAYER** ................................................ 63

## II.    TABLE OF AUTHORITIES

**Supreme Court of the United States**

*Bell v. Wolfish*, 441 U.S. 520 (1979) ........................................................................ 37

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................... 33, 45, 46, 48

*Helling v. McKinney*, 509 U.S. 25 (1993).............................................................. 32

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).................................... 3, 50, 51, 53

**United States Court of Appeals for the Fifth Circuit**

*Austin v. City of Pasadena*, 74 F.4th 312 (5th Cir. 2023) ................................... 34, 35

*Austin v. Kroger Tex., L.P.*, 864 F.3d 326 (5th Cir. 2017) ...................................... 31

*Bishop v. Arcuri*, 674 F.3d 456 (5th Cir. 2012) ................................................... 50

*Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000)............................................ 59

*Converse v. City of Kemah*, 961 F.3d 771 (5th Cir. 2020) .................................... 36, 48

*Cope v. Coleman Cnty.*, 2024 U.S. App. LEXIS 15549 (5th Cir. 2024) ................................ 31, 35

*Doe v. Taylor Indep. School Dist.*, 15 F.3d 443 (5th Cir. 1994)............................... 60

*Duvall v. Dallas County Tex.*, 631 F.3d 203 (5th Cir. 2011)................................... 37

*Dyer v. Houston*, 964 F.3d 314 (5th Cir. 2020) .................................................. 35

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006) ................................................ 34

*Gates v. Cook*, 376 F.3d 323 (5th Cir., 2025)................................................... 46

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) .................................... 32, 33, 35, 36

*Harris v. Cockrell,* 84 Fed. Appx. 438 (5th Cir. 2004)........................................ 34

*Hulsey v. Bishop*, 2024 U.S. App. LEXIS 28201 (5th Cir. 2024) ................................ 45, 46, 48

*Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000) ...................... 36

*James v. Smith*, 2025 U.S. App. LEXIS 22384 (5th Cir. 2025) ................................ 32, 34, 46, 49

*McCoy v. Energy XXI GOM, L.L.C.*, 695 Fed. Appx. 750 (5th Cir. 2017) ....................... 31, 32, 50

*Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493 (5th Cir. 2022)................................. 50, 51, 52

*Shepherd v. Dallas County*, 591 F.3d 445 (5th Cir. 2009) .................................... 37, 51

*Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022) ................................................ 34

*Smith v. Brenoettsy*, 158 F.3d 908 (5th Cir. 1998) ........................................... 60

*St. Maron Props., L.L.C. v. City of Houston*, 2023 U.S. App. LEXIS 22044 (5th Cir. 2023)...... 51

*Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001) .................................... 34

*Turner v. Upton County*, 915 F.2d 133 (5th Cir. 1990)........................................ 52

*Tuttle v. Sepolio*, 2023 U.S. App. LEXIS 12834 (5th Cir. 2023) .............................. 62

*Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993) ......................................... 32

**US District Court, Honorable Judge Keith P. Ellison Presiding**

*Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 (S.D. Tex. 2018) (Ellison, K.)... 50, 51, 52, 53

*Heckford v. City of Pasadena*, 2021 U.S. Dist. LEXIS 114573 (S.D. Tex. 2021) (Ellison, K) ... 53

*Howell v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 137088 (S.D. Tex. 2024) (Ellison, K.) 38, 44, 51, 52, 55, 58, 59

*Louzi v. Fort Bend Cty.*, 2020 U.S. Dist. LEXIS 154775 * 9 (S.D. Tex. 2020) (Ellison, K.) 36, 51

*McCollum v. Livingston*, 2017 U.S. Dist. LEXIS 19602 (S.D. Tex. 2017) (Ellison, K.) 31, 32, 34, 46

*Releford v. City of Houston*, 2016 U.S. Dist. LEXIS 167749 (S.D. Tex. 2016) (Ellison, K.)...... 51

*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 182546 (S.D. Tex. 2024) (Ellison, K.) ("*Wagner III*") ................................................................................. 1, 37, 38, 40, 42, 51, 55

*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 68793 (S.D. Tex. 2024) (Ellison, K.) ("*Wagner I*") ................................................................................. 1, 3, 62, 63

*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 98779 (S. D. Tex. 2024) (Ellison, K.) ("*Wagner II*") ................................................................................. 1, 37, 38, 51, 55

*Wagner v. Harris Cnty.*, 2025 U.S. Dist. LEXIS 58331 (S.D. Tex. 2025) (Ellison, K.) ("*Wagner IV*") ................................................................................. 1, 3, 62, 63

*Wynn v. Harris Cty.*, 556 F. Supp. 3d 645 (S.D. Tex. 2021) (Ellison, K.) ................................... 32

**Other United States District Courts**

*Carter v. Benavides*, 2007 U.S. Dist. LEXIS 14904 (S.D. Tex. 2007)......................................... 34

*Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 (S.D. Tex. 2018) (Lake, S.)............. 32, 34

**Federal Rules of Civil Procedure**

Fed. R Civ. P. 8(d) ................................................................................................................... 45

Fed. R. Civ. P. 12(b)(6).................................................................................................................. 1

Fed. R. Civ. P. 21 ......................................................................................................................... 62

Fed. R. Civ. P. 54(b) ..................................................................................................................... 63

Fed. R. Civ. P. 56 ........................................................................................................................... 1

Fed. R. Civ. P. 56(a) ................................................. 2, 38, 40, 42, 45, 47, 50, 51, 55, 58, 59, 60, 61

Fed. R. Civ. P. 56(d) ................................................................................................................. 1, 52

Fed. R. Civ. P. 8(d) ................................................................................................................... 2, 44

### III.    SUMMARY OF EXHIBITS

Exhibit 1 - Ana Garcia Declaration, 2025-10-16;

   Exhibit 1A - Photographs [GARCIA-000008 to 9];

   Exhibit 1B - Video, Kevin Working [GARCIA-000012];

   Exhibit 1C - Recorded Inmate Audio Call;

   Exhibit 1D - Inmate Call Transcript;

   Exhibit 1E - Recorded Inmate Audio Call;

   Exhibit 1F - Inmate Call Transcript;

   Exhibit 1G - Recorded Inmate Audio Call;

   Exhibit 1H - Inmate Call Transcript;

   Exhibit 1I - Recorded Inmate Audio Call;

   Exhibit 1J - Inmate Call Transcript;

   Exhibit 1K - Inmate Cell Video, 2022-02-11 to 2022-02-12;

   Exhibit 1L - Burial Expense Invoice;

Exhibit 2 - Theodore Stamatakos Declaration, 2025-03-01;

Exhibit 3 - Sanchez Medical Record [000063 to 000384];

Exhibit 4 - Sanchez AFIS Search, 20-04-09 [TXR 000037 to 000038];

Exhibit 5 - Medical Screening, 2021-11-21 [TXR 000080 to 000083]

Exhibit 6 - Initial Custody Assessment [TXR 000050 to TXR 000051];

Exhibit 7 - Incident Report, 2021-12-17 [TXR 000471 to TXR 000472];

Exhibit 8 - Inmate Transfer Tracking Sheet [000419 to 000420];

Exhibit 9 - Separation Cell Out-Time Log [TXR 000116]

Exhibit 10 - Sergeant Love Inmate Saenz Recorded Interview;

Exhibit 11 - Isais Saez Sworn Statement, 2023-01-06 [IA 000047 to 48];

Exhibit 12 - Pod Video, Level 1 at 2022-02-11 at 6:15 to 8 PM;

Exhibit 13 - Pod Video, Level 2 at 2022-02-11 at 6:15 to 8 PM;

Exhibit 14 - Pod Video, Level 1 at 2022-02-11 at 6:15 to 8 PM;

Exhibit 15 - Rounds Activity Report, 2022-02-11 and 12 [IA 000016 to 17];

Exhibit 16 - Pod Video, Level 1 2022-02-11 at 11 PM to 2022-02-12 3 AM;

Exhibit 17 - Pod Video, Level 1 at 2022-02-12 at 3 to 7:30 AM;

Exhibit 18 - Pod Video, Level 1 at 2022-02-12 at 7:30 to 8 AM;

Exhibit 19 - Pod Video, Level 1 2022-02-12 at 5 AM to 8 AM;

Exhibit 20 - Pod Video, Level 2 at 2022-02-12 at 5 to 8 AM;

Exhibit 21 - Pod Video, Level 1 at 2022-02-11 at 8 to 9:45 PM;

Exhibit 22 - Pod Video, Level 1 at 2022-02-11 at 9:45 to 11 PM;

Exhibit 23 - Pod Video, Level 2 at 2022-02-11 at 8 to 11 PM;

Exhibit 24 - Pod Video, Level 1 at 2022-02-11 at 8 to 11 PM;

Exhibit 25 - Incident Report, 2022-02-12 [IA 000002 to 000012];

Exhibit 26 - Incident Investigation Report [TXR 000506 to 513]

Exhibit 27 - Houston Fire Department EMS Report [TXR 000120 to 139];

Exhibit 28 - Defendant Memo, 2022-02-12 [TXR 000008];

Exhibit 29 - Sergeant Love Lighten Interview Video, 2023-01-23;

Exhibit 30 - DeUndra Lighten Sworn Statement, 2023-01-23;

Exhibit 31 - Sergeant Love Lighten Interview Video, 2023-01-27;

Exhibit 32 - DeUndra Lighten Sworn Statement, 2023-01-27;

Exhibit 33 - Sergeant Love Stewart 1st Interview Part 1, 2023-01-23;

Exhibit 34 - Jazminn Stewart Sworn Statement, 2023-01-23;

Exhibit 35 - Jazminn Stewart 1st Interview Part 2, 2023-01-23

Exhibit 36 - Sergeant Love Stewart 2nd Interview

Exhibit 37 - Jazminn Stewart Sworn Statement, 2023-01-27;

Exhibit 38 - Defendant Memo, 2023-03-02 [IA 000055 to 59];

Exhibit 39 - Garcia Funeral Signature Release [000017];

Exhibit 40 - HCIFS Investigator Death Report [000012 to 000015];

Exhibit 41 - Inmate Kiosk Request, 2022-01-22 [OR 000034];

Exhibit 42 - Photograph, Cell Camera Above Door;

Exhibit 43 - Photographs, Luke 5:31 on the Wall;

Exhibit 44 - Photographs, Head / Face Blood;

Exhibit 45 - Photographs, Medical Clinic;

Exhibit 46 - Photographs, Intubated;

Exhibit 47 - Photographs, IVs into Sanchez's Arm;

Exhibit 48 - Photographs, AED Pads;

Exhibit 49 - TCJS, Special Inspection Report, 2018-08-23;

Exhibit 50 - TCJS, Special Inspection Report, 2019-02-12;

Exhibit 51 - TCJS, Jail Inspection Report, 2020-12-04;

Exhibit 52 - TCJS, Jail Inspection Report, 2021-11-15;

Exhibit 53 - TCJS, Notice of Noncompliance, 2023-04-17;

Exhibit 54 - TCJS, Notice of Noncompliance, 2023-08-28;

Exhibit 55 - Dr. Hayden P. Smith Declaration, 2025-06-12;

Exhibit 56 - DO DeUndra Lighten Deposition Transcript, 2025-03-27;

Exhibit 57 - DO Jazminn Stewart Deposition Transcript, 2025-08-15;

Exhibit 58 - Sergeant Christina Love Deposition Transcript, 2025-08-14;

Exhibit 59 - Major Cedrick Collier Deposition Transcript, 2025-08-14;

Exhibit 60 - PREA Manager Katrina Camacho Deposition Transcript, 2025-03-24;

Exhibit 61 - Detention Officer Mark Garcia Deposition, 2025-3-5;

Exhibit 62 - Inmate Death Reporting Form [OR 000053 to 54];

Exhibit 63 - DeUndra Lighten Incident Listing Report [000001]

Exhibit 64 - Jazminn Stewart Incident Listing Report [000001]

Exhibit 65 - Andrew Chhieng Ung Incident Listing Report [IHR 000001]

Exhibit 66 - Randal Williams Incident Listing Report [IHR 000004]

Exhibit 67 - Antonio Barrera III Incident Listing Report [IHR 000001]

Exhibit 68 - Texas DPS Rangers Report [TXR 000001 to 9]

Exhibit 69 - Texas DPS Rangers Supplements [TXR 000010 to 16]

Exhibit 70 - Officer Patrick Allen Deposition Transcript, 2025-07-15;

Exhibit 71 - Officer Alex Conrad Deposition Transcript, 2025-07-15;

Exhibit 72 - Officer Candelario Garcia Deposition, 2025-02-11;

Exhibit 73 - Officer Jin De Guzman Deposition, 2025-03-06;

Exhibit 74 - Plaintiff Jeremy Garrison Deposition, 2025-01-13;

Exhibit 75 - Plaintiff John Coote Deposition, 2025-01-27;

Exhibit 76 - Officer Don Lee Rivera, 2025-03-13;

Exhibit 77 - Officer Maxim Scott Herman, 2025-03-14;

Exhibit 78 - Sergeant Quinton Sneed Deposition, 2025-04-14;

Exhibit 79 -  Officer Slade Gomez Deposition, 2025-03-13;

Exhibit 80 - Officer Elias Ortuno Deposition, 2025-02-11;

Exhibit 81 - Plaintiff Antonio Radcliff Deposition, 2025-01-15;

Exhibit 82 - Officer Yannis Ramos Deposition, 2025-04-10;

Exhibit 83 - Plaintiff Taylor Euell Deposition, 2025-04-03;

Exhibit 84 - Sergeant Richard Torres Deposition, 2025-03-06;

Exhibit 85 - Plaintiff Tramell Morelle Deposition, 2025-04-16;

Exhibit 86 - Plaintiff Taylor Euell Deposition, 2025-04-03;

Exhibit 87 - Plaintiff Ryan Twedt Deposition, 2025-04-02;

Exhibit 88 - Defendant's Responses to PI Garcia's 3rd ROGs, 2025-02-18; and

Exhibit 89 – Photograph of Deceased Sanchez Covered With Sheet.

## IV.    NATURE AND STAGE OF PROCEEDING

1.    This Court has issued four opinions in this case.[1]  In *Wagner I*, Plaintiff-Intervenor **ANA GARCIA** ("Garcia"), the mother of deceased pre-trial detainee Kevin Sanchez ("Sanchez"), was permitted to intervene into this lawsuit against Defendant **HARRIS COUNTY** ("Defendant").   In *Wagner II & III*, the Plaintiffs and Intervenors' claims survived 12(b)(6) dismissal.  In *Wagner IV*, this Court ruled that, first, the Defendant was not entitled to protection from the discovery of documents related to a pattern of incidents at the jail, and second, that it would not be reconsidering its ruling denying severance.  *Id.*, 24-28, *9-14.

2.    After *Wagner IV*, in her 2nd Motion to Compel, Garcia moved to compel her Requests for Production # 3 to 4, 7, 19, 25 to 32, 56 to 69.  *See* Doc. 199.  Those issues have been fully briefed and are ripe for decision.  But Defendant has filed a summary-judgment motion against Garcia.  *See* Doc. 169.  In addition to here responding to the parts she can with the evidence she currently has, Garcia here has also contemporaneously filed a 3rd Motion to Compel seeking to compel her Requests for Production # 70 to 60 and a 56(d) Motion to Defer or Deny.

## V.    STATEMENT OF ISSUES

3.    Upon each part of each claim that the Defendant has specifically identified that it is moving for Fed. R. Civ. P. 56 summary judgment, has it shown— with all favorable inferences to nonmovant Garcia's favor— that there are no genuine issues of material fact such that it is entitled to the extraordinary remedy of summary judgment as a matter of law?  (No).

---

[1] *See* Doc. 40 [*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 68793 (S.D. Tex. 2024) (Ellison, K.) ("*Wagner I*")], Doc. 51 [*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 98779 (S. D. Tex. 2024) (Ellison, K.) ("*Wagner II*")], Doc. 84 [*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 182546 (S.D. Tex. 2024) (Ellison, K.) ("*Wagner III*")], and Doc. 120 [*Wagner v. Harris Cnty.*, 2025 U.S. Dist. LEXIS 58331 (S.D. Tex. 2025) (Ellison, K.) ("*Wagner IV*")].

1

4. Having already been denied severance and reconsideration of that ruling, is the Defendant now entitled to it even though it has presented no new case law or specifically cited to any new evidence whatsoever in its renewed request for severance? (No).

## VI.     SUMMARY OF ARGUMENT

5. Defendant's summary-judgment motion fails both procedurally and substantively. Procedurally, it never satisfied Fed. R. Civ. P. 56(a)'s threshold requirement because it does not identify, with specificity, the claims or elements or parts of those upon which summary judgment is specifically sought. Instead, the Defendant offers sweeping, conclusory assertions that "no constitutional tort has been committed," without tying its arguments to the actual elements of Garcia's claims. Even if technically sufficient, Garcia can raise constitutional violation fact issues.

6. Substantively, genuine disputes of material fact permeate every element of every claim. Defendant, however, would ask this Court to ignore an extensive evidentiary record— including internal reports, videos, sworn deposition testimony from detention officers, Plaintiff detainees and other recorded inmate witnesses, Texas Commission on Jail Standards ("TCJS") findings, and expert testimony— that demonstrates a dangerous jail environment plagued by chronic understaffing, a culture of barcode-only "rounds," ignoring medical emergencies, and deliberate indifference to known suicide risks. With all of that, each of Garcia's claims survive:

    a. **Constitutional violations occurred**, including the denial of basic humane conditions, denial of timely medical care, and deliberate indifference to a known suicide risk, all in violation of the Fourteenth Amendment;

    b. **Conditions of confinement claims survive** since the record shows systemic (1) chronic understaffing/overcrowding, (2) failures to monitor, and (3) systemic denials of medical care— none of which the Defendant ha specifically moves against, and even if it had, there is evidence of;

    c. **Episodic acts claims survive**, pursued in the Fed. R. Civ. P. 8(d) alternative, these contain  issues of fact on whether Detention Officers Jazminn Stewart ("Stewart"), DeUndra Lighten ("Lighten"), and Andrew

    Ung ("Ung") actually observed Sanchez's distress and chose to ignore it—
    or failed to observe him at all because of the above listed customs;

d.  ___Monell___ **liability survives** because either Defendant has refused discovery
  on a pattern of incident's necessitating Garica's 56(d) motion or because
  Garcia can show the same the _Moore_ and _Shepard_ way through ground-
  level detention officer testimony about the customs;

e.  **Failure to train and supervise claims survive** because the Defendant
  placed untrained and inexperienced officers on the 7th Floor under the
  supervision of a supervisor, _i.e._, Sergeant Randall Williams, who was found
  to be failing to supervise right before Sanchez's death; and

f.  **The renewed motion to sever must again be denied** because this Court
  has already rejected the Defendant's repeated requests for it in _Wagner I_
  and _Wagner IV_, and the Defendant here presents nothing on it.

Thus, viewing the facts in the light most favorable to Garcia, this record is the definition of a triable

case.  At minimum, the evidence shows conflicting testimony, credibility issues, and competing

factual narratives— all of which are, respectfully, for a jury to decide at trial.

## VII.  STATEMENT OF FACTS

### A.  DEFENDANT RAN A DANGEROUS, CHRONICALLY UNDERSTAFFED, VIOLENT JAIL THAT IGNORED REPEATED WARNINGS OF SANCHEZ'S SUICIDAL IDEATIONS AND BLOODY URINATION THAT WAS NOT PROPERLY TREATED FOR DAYS, IF NOT WEEKS

  7.  Defendant runs a jail, which its detainees testified and described as "_the worst…_

_jail [they've] ever been in_," the dirtiest, unsanitary place ever, "_a brutal place_" where it is "_like,_

_martial law_" every day, and they do not care about the inmates at all.[2]  In addition, the TCJS has

repeatedly identified several conditions in Defendants' jail which amount to systematic failures

within Defendant's Jail, citing noncompliance with essential regulatory standards that directly

impact inmate safety, classification, supervision and medical care.  Ex. 55, Pg. 58 ¶ 1.

---

[2] Ex. 10 (35:40 to 35:44); Ex. 81, Pg. 55:13-19, 98-99, 102:20; Ex. 86, Pg. 82:4-5, 108:9-12

8.    These conditions and violations are documented across multiple Jail Reports and Special Inspections, providing evidence of Defendant's inability to meet minimum standards despite repeated notice of the same, and all of these failures reinforce concerns that its supervision protocols were routinely violated, leaving at-risk inmates without protective oversights, and these gaps represent noncompliance with both federal mandates and the Defendant's own internal policies, undermining detention facility safeguards intended to protect inmates.[3]  For example,

   a.    On August 23, 2018, the TCJS put Defendant on notice that the Defendant was not properly observing its inmates.  Ex. 49.

   b.    On February 12, 2019,  the TCJS put Defendant on notice that it was not properly identifying suicidal inmates.  Ex. 50.

   c.    Between November 30 to December 4, 2020, the TCJS put Defendant on notice that it was still not properly observing its inmates.  Ex. 51.

   d.    Between November 15 to 17, 2021, the TCJS again put Defendant on notice that it was still not properly observing inmates, and its understaffing practices were not acceptable.[4]

   e.    On April 17, 2023, the TCJS again found that Defendant was still not properly observing its inmates.  Ex. 53.

   f.    On August 28, 2023, the TCJS found that Defendant was still not properly observing its inmates, and continued to have unacceptable staffing.[5]

And, in between those time periods, back on April 9, 2020, Defendant came to learn that Sanchez was suicidal.[6]  Thereafter, on November 21, 2021, Defendant was reminded of that when it performed a Medical Screening showing that Sanchez had attempted suicide.[7]  And, on December 27, 2021, Sanchez told Defendant that he was tempted to hang himself.[8]

---

[3] Ex. 55, Pg. 58 ¶ 1, 71 ¶ 2, 8
[4] Ex. 52, Pg. 1-2
[5] Ex. 54, Pg. 1-2
[6] Ex. 4, Pg. 1-2
[7] Ex. 5, Pg. 2 # 12
[8] Ex. 7, Pg. 2; Ex. 8, Pg. 2; Doc. 169, Pg. 7 (12/27/2021)

4

9.    As Investigating Sergeant Love testified, when such suicidal tendencies are known, an inmate must be observed more frequently and closely than just every hour.[9]  And, it was thus brought to the 7th Floor supervisor, Sergeant Randall Williams' attention.[10]  As background, this now shut-down 7th floor was known as the "*Gladiator Floor*" where you are lucky to survive it.[11]

10.    Six (6) months before Sergeant Williams got that notice of Sanchez's suicidal proclivity, Defendant's Captain Paul Croas, on August 10, 2021, put everybody on notice the that "*the jail*" was "*failing numerous State Jail Compliance issues*," and Sergeant Williams publicly responded with "*a negative undertone of [Defendant's] staffing issues*'"[12]  After which, on August 12, 2021, Defendant had been so understaffed that Sergeant Williams himself had to perform detention officer rover duties.[13]  Then, on August 13, 2021, Defendant wrote:

> "*As a **supervisor**… **Williams is failing to provide** the necessary **supervision** to his personnel… a **pattern exists**, which shows **he failed** to perform and discharge his duties professionally and **consistently**, which tends to bring discredit upon… the Sheriff's Office. **He is** ailing to assume responsibility or to exercise diligence, proper demeanor… intelligence, and interest in the discharge of these duties, which could be deemed negligent or **incompetent**.*"  *See* Ex. 66, Pg. 4-5 [IHR 00004 to 5]

That said, on the understaffing point as well, as Detention Officer Alex Conrad testified:  "*there [were] far too many officers working 16-hour shifts that [were] incredibly stressed.*"[14]  The other Plaintiffs have testified about the understaffing they have witnessed as well as well.[15]  And, even Plaintiff-Intervenor Jenkins' jail expert noted this condition/custom as well.[16]

---

[9] Ex. 58, Pg. 55:13-20; 6:10-12, 89:12-14; Ex. 59, Pg. 57:23-58:6
[10] Ex. 8, Pg. 2 [000240]
[11] Ex. 75, Pg. 13:19
[12] Ex. 66,  Pg. 4 [IHR 00004]; Ex. 76, Pg. 38:2-5; Ex. 79, Pg. 159:1-3
[13] Ex. 66, Pg. 5 [IHR 00005]
[14] Ex. 71, Pg. 8:6-13, 42:8-10
[15] Ex. 75, Pg. 107:9-20, 109:10-11, 19-20, 111:14-18, 112:13; Ex. 81, Pg. 57:9-10, 97:8. 102:1-4
[16] Ex. 55, Pg. 60 ¶ 1, 68 ¶ 6

11.     In fact, he further testified, the above-described conditions of confinement and failures are, in part, attributable to understaffing/overcrowding.[17]  Such things obstruct the ability to properly conduct inmate supervision which jeopardize the safety and security of incarcerated individuals.[18]  And, there is a direct link between such conditions and noncompliance with relevant jail standards and an inmate <u>suicide</u>, which highlights the consequences of failing to conduct required face-to-face observations.  Ex. 55, Pg. 59 ¶ 2.  Moreover, such broader failures in supervision and oversight created an environment where vulnerable inmates were subject to systematic neglect, and, Defendant's repeated failure to adhere to minimum standards, its misrepresentation of staffing compliance, and attempts to "*stretch the standards*" rather than implement corrective measures reveal an institutional pattern of disregard.[19]

12.     Even Defendant's deposed detention officers themselves testified that the jail is so overcrowded and understaffed, such that conditions are dangerous and unsafe.[20]  They have also testified that fewer detention officers than what is needed are provided to cover observation needs, which means staff has to constantly be running and cannot physically perform required face-to-face observations.[21]  According to them, with officers working sixteen (16) hour shifts every single day, they get tired, stress piles up, bodies are physically rundown, and inmates suffer as those needing medical care are more likely overlooked.[22]  And that it was quite common for Defendant to overload its roving detention officer with the number of cells that they had to cover each hour,

---

[17] Ex. 55, Pg. 58 ¶ 3, 61 ¶ 2, 78 ¶ 6, 78 ¶ 1-2
[18] Ex. 55, Pg. 70 ¶ 7, 78 ¶ 8
[19] Ex. 55, Pg. 59 ¶ 2-3
[20] Ex. 56, Pg. 40:9-10, 18-21, 40:23 to 31:2, 5-8, 41:12-15; Ex. 57, Pg. 9:5-8, 13:4-5, 8-9, 37:6-11, 38:10-13, 45:4-8, 61:23-24, 62:3-5, 63:13-16, 64:20-65:2, 65:9-12, 72:15-18, 73:6, 74:24-75:2, 115:16-21, 116:12-14, 22-25, 117:12-14, 117:22-118:2, 122:5-9, 150-10-13
[21] Ex. 57, Pg. 17:18-19, 17:24 to 18:1, 127:4-5
[22] Ex. 57, Pg. 72:16-18, 29-22, 9-11.

force them to work overtime without prior notice, and totally run them down like workhorses.[23] And, they certainly did bring all that to Defendant's attention multiple times to no avail.[24]

13.    All of that said, after his suicidal outcry, Sanchez was referred to the clinic where he was only very "*briefly*" seen.[25]    The kinds of mental health professionals who could have actually then helped Sanchez, after all, did not work in the infirmary.[26]    And, so Sanchez was just sent back to his jail cell.  After which, on December 30 or 31, he called his mother, Garcia.[27]    At the time, she thought it was a call from the Defendant informing her that her son had died.[28]

14.    Each time, Garcia received a call from the jail, she thought this, and this time, she told that to Sanchez.[29]    In the call, Sanchez also told his mother that he had just gotten beaten up at Defendant's jail.[30]    Such, as it turns out, was rather common, as several detention officers and Plaintiffs, including Detention Officers Garcia, Rivera, Herman, and Gomez and Plaintiffs Antonio Radcliff, Tramell Morelle, Taylor Euell, and Ryan Twedt have all testified in this case, such detainee-on-detainee fights were extremely frequent and, more staffing was needed to prevent these. [31]    Further compounding matters, as Plaintiff Taylor Euell testified, the staff that is there

---

[23] Ex. 57, Pg. 18:13-15, 21:3-8, 65:6, 80:5-11, 19-22
[24] Ex. 38:10-13, 39:15-16, 61:23-24, 143:7-12, 150:14-16.
[25] Ex. 3, Pg. 17 (000079), 49 (000111); Doc. 169, Pg. 7 (12/28/2021)
[26] Ex. 73, Pg. 35:16-18
[27] Ex. 1, Pg. 2 ¶ 5; Ex. 1C (8:00-8:06, 14:20-14:34); Ex. 1D at Pg. 8:2-6, 13:18-19; Ex. 39, Pg. 1
[28] Ex. 1, Pg. 2 ¶ 5
[29] Ex. 1, Pg. 2 ¶ 5; Ex. 1C (Min. 02:55 to 3:02), Ex. 1D at Pg. 3:17-18
[30] Ex. 1, Pg. 2 ¶ 6; Ex. 1C (Min. 3:44 to 3:50); Ex. 1D, Pg. 4:11-13
[31] Ex. 72, Pg. 66:9-17; Ex. 74, Pg. 150:23-24; Ex. 76, Pg. 132:10-21; Ex. 77, Pg. 49:12-116, 113:17-114:3; Ex. 78, Pg. 19:14-18, 37:24; Ex. 79, Pg. 73:14-74:3, 75:18-19, 76:24-76:2, 5-9; Ex. 81, Pg. 14:14-19, 21:17-19, 22:23-23:22. 23:25-24:3, 24:4-15, 30:17-21, 57:9-10, 97:8; Ex. 82, Pg. 5:11-22; Ex. 83, Pg. 54:19-25; Ex. 85, Pg. 33:1-34:8, 42:18-43:4, 43:14-20:22, 44:24-45:14, 48:8-11; Ex. 86, Pg. 83:25-84:7, 84:22-85:6, 86:11-15, 86:22 to 87:3, 115:22-24, 115:22-24, 119:6-9; Ex. 87, Pg. 21:23-22:7

more often than not does not intervene.[32]  Just the opposite, as Plaintiff John Coote testified, these detention officers joke that these inmate-inmate fights are the highlights of their day.[33]

15.     But, back to the phone call, however, Sanchez further told his mother, Ana Garcia, that his injuries included a red, swollen eyebrow and lip.[34]  This caused her to further worry about her son's safety.[35]  And, while the summary judgment motion asserts that Sanchez was thereafter a clinic no show on January 6, 7, and 28 [Doc. 169], this could be, in part, because, like Plaintiff John Coote, Sanchez, too, was scared to death that he would get assaulted again.[36]  And, as Plaintiff Taylor Euell testified, the officers there will sometimes smack or slam you there as well.[37]  In other words, the conditions, respectfully, at this jail are simply just not humane in the least.

16.     That said, in between those dates, on January 22, 2022, Sanchez had accessed a kiosk and wrote that he needed medical attention; but, as Plaintiff Tramell Morelle testified, you "*type*" your medical request into these kiosks, "*and hopefully they will come back to you*."[38]  Yet, access to these kiosks, however, is not always possible and, even if they are made available, as PREA Manager Katrina Camacho testified, they do not always work.[39]  And, as Plaintiff Jeremy Garrison testified, submitting a request does not mean that Defendant has the escort staff to actually take an inmate to the clinic.[40]  This is because Defendant is so understaffed that sometimes it does not have the detention officers to escort inmates to the medical clinic.[41]

---

[32] Ex. 86, pg. 115:25-116:4
[33] Ex. 75, Pg. 191:3-7
[34] Ex. 1, Pg. 2 ¶ 6; [Ex. 1C (Min. 4:18 to 4:30); Ex. 1D at Pg. 5:1-2
[35] Ex. 1, Pg. 2 ¶ 6
[36] Ex. 75, Pg. 113:24-113:25, 167:2-7, 17, 192:13-15
[37] Ex. 86, Pg. 121:6-13, 122:8-9
[38] Ex. 41, Pg. 1 [OR 000034], Ex. 85, Pg. 62:14-20; Ex. 86, Pg. 54:55:1
[39] Ex. 60, Pg. 62:10-63:4; Ex. 75, Pg. 180, Pg. 20-25, 190:12-15
[40] Ex. 74, 169:16-170:5
[41] Ex. 76, Pg. 104:22-105; Ex. 77, Pg. 95:19-96:23

17.     Despite that, nine (9) days later, on February 1, 2022, Sanchez was finally taken to go to the clinic, where he was advised that he had "***blood urine and painful urination***."[42]  Waiting so long to even get to the clinic was common because, as Plaintiffs Intervenor Jenkins' expert and Plaintiffs John Coote, Tramell Morelle, Taylor Euell, and Ryan Twedt have all testified, inmate medical care is not provided timely enough, if at all.[43]  The latter, for example, begged for medical treatment for his eye in 2022, never got it, and now has to live his life with blurry vision.[44]  And, they do not treat inmates humanly there either, as Plaintiff Taylor Euell testified they told him to not "*eat… so many tacos*" because of his "*skin color*."  Ex. 86, Pg. 66:2-9.

18.     In any event, while the description of Sanchez's presenting complaint and history of Sanchez's illness is sparse, a urinary tract infection is typically characterized by intense burning with urination and gross blood in the urine, and a comprehensive physical examination, focusing on the abdominal/flank and genitourinary areas, for such symptoms was not performed, but should have been. Ex. 2, Pg. 2-3 ¶ 5, 9.  Indeed, no urine sample was sent for culture and sensitivity to a lab for identification of the bacterial organism causing the infection, and doing such would have helped guide antibiotic treatment of the infection.  Ex. 2, Pg. 3 ¶ 11.

19.     As background, the work-up of a urinary tract infection should include a radiographic study of the upper urinary tract, either a kidney ultrasound or a CT Scan of the abdomen/pelvis, and a telescope introduced through the urethra to inspect it and the bladder, but no such things were performed here. Ex. 2, Pg. 4 ¶ 12.  On top of that, Sanchez was not given a follow-up appointment with medical personnel, which, as Plaintiffs Jeremy Garrison and John

---

[42] Ex. 3, Pg. 11 [000073], 62 [000124], 300 [000362]; Ex. 40, Pg. 3 ¶ 4 [AR 000014]
[43] Ex. 55, Pg. 73 ¶ 4, Ex. 75, Pg. 192:10-12; Ex. 86, Pg. 35:6-11, 53:22-54:3, 64:15-22, 65:7-13, 90:14-18; Ex. 87, Pg. 19:17-23, 20:23-21:3, 24:15-18, 37:4-10
[44] Ex. 86, Pg. 65:7-13

Coote testified, was common.[45]  That said, Sanchez had not been scheduled for radiographic studies or for further work-up of the blood in urine or the burning urinating that he experienced. Instead, like Plaintiff Antonio Radcliff, they sent him away and did not take him seriously.[46]  Given so, Sanchez was released and placed not under any medical observation.  Ex. 2, Pg. 3 ¶ 7, 4 ¶ 16.

20.    That said, when untreated, a urinary tract infection, like the one Sanchez had, is not properly treated, it can rapidly spread to the kidneys, cause infection, and result in increased unbearable pain, and in some cases, kidney failure and urosepsis, *i.e.*, an infection entering the bloodstream, and, here, after this, Sanchez continued to complain of an inordinate amount of pain, and there is no evidence that his complaints were ever adequately addressed, which, as Plaintiffs John Coote and Taylor Euell both testified, it is not easy to get the medicines you need at this jail, and the Defendant does not always properly hand out medications to inmates.[47]

21.    In February 2022, Sanchez called his mother and said: "*I'm unwell.  I'm not well,*" and "*When I urinate, I get a great pain after urinating… And, I think blood came out*."[48]  Sanchez added that he thought he had kidney stones.[49]  And, he further said that he had gone to the clinic for several hours but they would not help him, and this is confirmed by jail records.[50]

22.    After this, Sanchez phoned a male friend.  Ex. 1, Pg. 2 ¶ 10.  During that recorded jail phone call, the male friend asked, "*What's wrong?*" and Sanchez responded, "***Dick infection. I'm pouring out blood, man.  When I pee, I pour blood.  I'm rotting from the male organ***."[51] Given so, it is medically more likely than not that the burning with urination that Sanchez was

---

[45] Ex. 2, Pg. 3-4;    Ex. 74, Pg. 97:23-98-11, 102:11-12, 138:19-139:6; Ex. 75, Pg. 166:22-167:1
[46] Ex. 2, Pg. 3 ¶ 7; Ex. 81, Pg. 44:7-45:4, 47:22-48:9, 48:12-14, 48:16-20, 49:6-10
[47] Ex. 2, Pg. 4 ; Ex. 75, Pg. 163:19-164:3; Ex. 86, Pg. 45:11-46:12
[48] Ex. 1, Pg. 2 ¶ 8; Ex. 1E (Min. 16:45 to 17:03); Ex. 1F, Pg. 16:6, 8-14; Ex. 2, Pg. 3 ¶ 8
[49] Ex. 1, Pg. 2 ¶ 8; Ex. 1E (Min. 17:03 to 17:13); Ex. 1F, Pg. 16:17-18
[50] Ex. 1, Pg. 2 ¶ 8; Ex. 1E (17:14 to 17:39); Ex. 1F, Pg. 16:18 to 17:6; Ex. 3, Pg. 11 [000073].
[51] Ex. 1, Pg. 2 ¶ 10; Ex. 1G (Min. 6:12 to 6:33) and Ex. 1H, Pg. 7:8-13

experiencing had progressed to unbearable burning, kidney infection, and increased pain.  Ex. 2, Pg. 4 ¶ 15.  The pain may have likely spread from his urinary tract (urethra) in the penis, up to his kidneys, causing unbearable sensation and pain, especially when urinating.  Ex. 2, Pg. 4 ¶ 15.

23.    After this, Sanchez then called his mother and told her that the Defendant had not yet taken him to a doctor, and that he did not know if he had a "*stone*" or something else causing his pain but that everybody at the jail was telling him that he needed a doctor since he was obviously sick.[52]  But, at that point, the automated system interrupted the call, and said that there was one minute left.[53]  With that final minute, Sanchez's last words to his mother were: "*I love you so much.  I miss you*" and she responded "*Me too… I love you so much, and I miss you*" after which he added "***my heart tells me that I'm going to hug you again****, all right?*" and he ended with: "***I love you****.*"[54]  And, after this, Sanchez continued to experience pain.[55]

**B.    DEFENDANT CONFINED SUICIDAL HIGH-RISK DETAINEE SANCHEZ IN AN ISOLATED 7th FLOOR 'OBSERVATION' CELL UNDER CHRONIC UNDERSTAFFING, IGNORED WARNING SIGNS OF MENTAL CRISIS VISIBLE BY CAMERA, AND CONDUCTED RECKLESS MERE BARCODE SCAN 'ROUNDS' WITHOUT ACTUALLY CHECKING ON INMATES, CREATING DEADLY CONDITIONS**

24.    Since February 2, 2022, Sanchez, as a high risk inmate, was housed in that solitary lower-level corner cell on Floor 7, Cellblock C, which contains "*observation*" pods where, for twenty-three (23) hours a day, its inmates are in their cells with one (1) hour of separate pod time.[56]

---

[52] Ex. 1, Pg. 2 ¶ 11, 13, 3 ¶ 12-13; Ex. 1I (3:33 to 3:40, 4:21 to 4:40, 7:57 to 8:23, 20:19 to 20:24, 20:41 to 20:47); Ex. 1J, Pg. 4:7-9, 5:2-10, 8:10-17, 20:8-9, 16-19)

[53] Ex. 1, Pg. 3 ¶ 13; Ex. 1I (Min. 20:47 to 20:50); Ex. 1J, Pg. 20:19

[54] Ex. 1, Pg. 3 ¶ 14; Ex. 1I (Min. 21:15 to 21:25, 21:43 to 21:45); Ex. 1J, Pg. 21:5-6, 7-10, 21

[55] Ex. 2, Pg. 3 ¶ 8, 4 ¶ 16

[56] Ex. 9, Pg. 1 [TXR 000116]; Ex. 11, Pg. 1 ¶ 5; Ex. 29 (Min. 6:13 to 6:21); Ex. 30, Pg. 2 ¶ 4 [IA 000019]; Ex. 33 (Min. 17:42 to 17:46, 24:33 to 24:41, 17:32 to 17:38); Ex. 34, Pg. 2 ¶ 3 [IA 000034]; Ex. 40, Pg. 3 ¶ 3 [AR 000014]; Ex. 56, Pg. 27:7-9, 13-15, 28:1, 60:24-61:1, 68:24-69:2, 123:16-18; Ex. 58, Pg. 119:7-9; Ex. 59, Pg. 23:5-10; *see also* Doc. 169, Ex. 1D [OR 000004]; Ex. 62, Pg. 2 [OR 000054]; Ex. 68, Pg. 3 [TXR 000003]; Ex. 69, Pg. 2 [TXR 000011]

A pod is a cluster of cells, and the pod that Sanchez's cell was in had two (2) levels to it, with only the few cells on the first level having cameras inside.[57] And, Sanchez was lucky to have that, because as Plaintiff Jeremy Garrison testified, this jail at times got so overcrowded that inmates like himself did not get proper beds and had to sleep on the floor.[58] And, as Plaintiff Taylor Euell testified that he had seen "*numerous times*" that there were "*[m]ore people than there are beds*."[59]

25.    All of that said, as Sergeant Preston Wong testified, the single-person cells, like the one Sanchez received, are used for when detainees are having a crisis and can be observed more often.[60] But, as Detention Officer Mark Garcia testified, suicidal inmates, like Sanchez, were supposed to receive padded cells.[61] But here, the cell video does not show him to have been placed into one. Ex. 1K. In any case, the mental and medical crisis Sanchez was having led him to write the following on his cell's wall: "*Luke 5:31.* ***People who are well do not need a <u>doctor</u>, but only those who are <u>sick</u>. I have not come to call respectable people to repent, but outcasts***" was fittingly written on to Sanchez's cell's wall. Ex. 43, Pg. 1-4. That was very fitting since he was not well and so sick that he was urinating blood but Defendant had cast him out of the clinic.

26.    That said, such erratic behavior should have been easily discovered, since Sanchez's cell had a fisheye 360-degree camera with full visibility that feed directly into the Cellblock 7C Pod Control Center ("PCC") which had at least two (2) monitors, one of which has four (4) smaller screens that could view inside any first floor cell at any time and automatically

---

[57] Ex. 1K; Ex. 29 (18:10 to 18:12); Ex. 31 (Min. 29:27 to 29:46); Ex. 40, Pg. 3 ¶ 3 [AR 000014]; Ex. 42; Ex. 32, Pg. 2 ¶ 2 [IA 000031]; Ex. 56, Pg. 21:8-9; Ex. 57, Pg. 20:10-13, 45:13-14
[58] Ex. 74, Pg. 45:21-48:15
[59] Ex. 86, Pg. 107:24-108:2
[60] Ex. 83, Pg. 21:6-9.
[61] Ex. 61, Pg. 66:18-22.

did so when a cell's door was opened from the PCC.[62]  As long tenured jail supervising Sergeant Quinton Sneed testified, he "*always liked to have two*" detention officers in the PCC because "*two set of eyes are better than one*," and he is not sure "*why*" another "*supervisor*" would just "*put one officer*" in the PCC.[63]  And, even though each cell's camera may have a black toilet privacy box, according to Investigating Sergeant Love, you could still see Sanchez when he sat there in this case.  Ex. 58, Pg. 102:14.  Such a camera exists in a cell, if, for example, an inmate is suicidal.[64]

27.     Defendant's officers, however, do not like such observation cameras, and have placed post it notes on them seeking for them to be removed.[65]  That said, on February 11, 2022, at 6:05 PM, from the PCC, Detention Officer Fausat Emiola ("Emiola") asked Sanchez if he wanted his 1-hour out time, and he answered, "*Yes*," and so, from 6:05 PM to 7:04 PM, he had out-time, used the telephone and visited with inmate Isaias Saenz, Sanchez's friend who was housed just a few doors down from Sanchez.[66]  Investigating Sergeant Christina Love ("Love") later described Saenz as credible.[67]  He told her that later that night/morning, Sanchez tried to get the guard's attention because he was not feeling well, but they ignored his screams for help.[68]

---

[62] Ex. 32, Pg. 2 ¶ 2 [IA 000031]; Ex. 31 (Min. 9:23 to 9:30, 18:59 to 19:08); Ex. 56, Pg. 46:10-14, 58:4-8, 91:3-8, 91:23 to 92:4, 17-19, 96:21-25, 113:6-10; Ex. 37, Pg. 26:9-11; Ex. 57, Pg. 26:3-5; Ex. 58, Pg. 119:15-18; Ex. 59, Pg. 22:4-7, 52:13-17, 52:23-25; Ex. 70, Pg. 28:16-29:17; Ex. 70, Pg. 44:21-45:6; Ex. 78, Pg. 25:10-15; Ex. 80, Pg. 46:1-12; Ex. 88, Pg. 8 # 18
[63] Ex. 78, Pg. 15:11-14, 26:8-17, 27:2-3
[64] Ex. 56, Pg. 58:23-59:1.
[65] Ex. 70, Pg. 17:1-18.
[66] Ex. 25, Pg. 25 [IA 000012]; Ex. 38, Pg. 1 [IA 000055]; Ex. 9, Pg. 1 [TXR 000116]; Ex. 10 (Min. 5:14 to 5:15, 5:39 to 5:40, 5:58 to 6:07, 8:58 to 9:12, 9:32 to 9:3511:17 to 11:22, 17:17 to 17:23, 26:05 to 26:12, 26:21 to 26:23, 34:09 to 34:17); Ex. 11, Pg. 1 ¶ 5
[67] Ex. 58, Pg. 64:13-18, 107:22-25
[68] Ex. 10 (Min. 16:10 to 16:13, 31:57 to 31:59, 32:54 to 33:04); Ex. 58, Pg. 64:1-2, 108:4-6

28.    In any case, at 6:45 PM, Lighten came to relieve an overtime Emiola and work the

PCC.[69]  Some 7th Floor detention officers voluntarily work overtime, because they will otherwise

be forced to do so.[70]  And, if they do not, they are disciplined, like 7th Floor Detention Officer

Maxim Herman.[71]  That said, while this was not Lighten's usual assignment, he was needed there

because there were just not "*enough people to work*" at the jail, and that fact made Lighten's job

"*difficult*" such that he became unable to "*pay… proper attention*" to each inmate via the PCC

individual cell camera system.[72]  Nevertheless, Lighten had been assigned to the PCC with the

expectation that a secondary detention officer would be his rover to do rounds.[73]

29.    As background, a round is when an officer goes around and observes inmates, make

sure they are safe, and it entails a fair amount of walking, and a rover assists with "*rounds,

detention officer reliefs, any medical issues with the inmates, or any other issues that may arise in

the pods*" like picking up trash and being called to disturbances/incidents, but, when "*you have

one person*" solely doing this work for "*multiple other spots to do rounds, then it's kind of tough.*"[74]

At the very least, however, as former 2021/2022 7th Floor Detention Officers Slade Gomez, Elias

Ortuno, and Yannis Ramos testified, "*rounds are*" ideally at least "*for making sure nobody is dead,

hurt*" or "*passed out… [somewhere] not on their bed*" or to see if there is "*[b]lood on the floor*"

---

[69] Ex. 25, Pg. 11 [IA 000012]; Ex. 29 (Min. 5:42 to 5:55); Ex. 30, Pg. 2 ¶ 4 [IA 0000019]; Ex. 31 (Min. 1:24 to 1:34, 50:44 to 50:49, 51:09 to 51:24); Ex. 38, Pg. 2 ¶ 5 [IA 000056]; Ex. 56, Pg. 66:2-8, 14, 67:5-14, 68:5-14, 69:25; Ex. 57, Pg. 80:5-11, 19-22, 122:19-24
[70] Ex. 57, Pg. 21:3-8; Ex. 77, Pg. 7:24-18:12, 35:20-21; Ex. 82, Pg. 25:6
[71] Ex. 77, 42:3-7, 16-19
[72] Ex. 29 (Min. 1:40 to 1:45, 15:59 to 16:07); Ex. 30, Pg. 3 ¶ 3; Ex. 32, Pg. 2 [IA 000031]; Ex. 56, Pg. 68:15-17
[73] Ex. 29 (Min. 6:26 to 6:33); Ex. 30, Pg. 2 ¶ 4 [IA 000019]; Ex. 56, Pg. 70:7-19; *see also* Ex. 70, Pg. 33:15-34:6
[74] Ex. 29 (Min. 1:45 to 1:50); Ex. 34, Pg. 2 ¶ 1 [IA 000034]; Ex. 56, Pg. 15:14-16, 18:18, 19:15-25, 20:1-8, 20:14-17, 20:20 to 21:2, 28:11-15, 45:20-46:1; Ex. 57, Pg. 14:21-23, 46:15-47:5, 92:16; Ex. 58, Pg. 26:11-12; Ex. 59, Pg. 22:15-17; Ex. 70, Pg. 33:15-34:6; Ex. 76, Pg. 86:1-7; Ex. 78, Pg. 28:11-17; Ex. 79, Pg. 34:17-35:5; Ex. 82, Pg. 14:3-19, 17:8-23

or if "*they haven't moved*" and in a while and "*are alive*" and "*breathing*" like if they are sleeping

if the "*blanket, like, raised a little bit.*"[75]

30.    That said, before this, late rounds, had become a problem for the Defendant.[76]  As

did sleeping on the job.  *Infra*.  And so, back in 2015, Defendant had placed barcodes throughout

the jail, and had instructed its officers to just go scan them with a device.[77]  This, however, was

not supposed to be a substitute for actually looking into cells during rounds, but it became one.

Ex. 83, Pg. 37:5-11.  Indeed, as Detention Officer Gomez added but, on the 7th floor, we just scan

barcodes for 2 to 3 minutes and take "*just a quick glance.*"[78]  Which is consistent with what

borrowed Lighten "*sergeant say*" should be "*barely*" done which is what he did.[79]

31.    In any case, the staffing requirements for this pod were "*one pod officer and one

rover,*" but, instead of that, because Defendant was short-staffed, Stewart was assigned to be the

rover for more than one (1) cell block.[80]  And, that day, she could have been working since as early

as 2 PM for a sixteen (16) hour shift.[81]  This overloaded her with the amount of cells she needed

to cover, and it was unrealistic to expect her or any other officer put in this situation to perform all

of their job functions properly.[82]  And, this certainly was not the first and only time fewer detention

officers were provided than were needed, but instead was quite common.[83]

---

[75] Ex. 79, Pg. 35:17-21, 36:9-13, 37:15-18; Ex. 80, Pg. 44:3-20, 47:8-11; Ex. 82, Pg. 17:24-18
[76] Ex. 71, Pg. 8:16-17; Ex. 76, Pg. 16:20-21, 23:25-24:20-22, 37:9-17; Ex. 77, Pg. 17:22-18:12, 44:7-11, 45:8-10; Ex. 79, Pg. 38:22-39:3, 53:25-54:1
[77] Ex. 56, Pg. 47:10-12, 48:3-8, 49:7-11, 50:23-25, 51:7, 51:13-19, 53:2-3; Ex. 57, Pg. 16:9-18; Ex. 58, Pg. 23:7-12, 90:9-12; Ex. 59, Pg. 21:13-20; Ex. 60, Pg. 189:10-15; Ex. 70, Pg. 27:1-5, 49:8-12; Ex. 80, Pg. 44:14-16; Ex. 83, Pg. 27:8-25
[78] Ex. 79, Pg. 35:17-21, 35:23-24, 36:6-7, 37:15-18
[79] Ex. 29 (18:28 to 18:37); Ex. 56, Pg. 84-85; Ex. 57, Pg. 24:18-19, 25:11-12, 25:11-12, 51:22-23
[80] Ex. 34, Pg. 2 ¶ 1; Ex. 34 (18:55 to 19:02, 23:50 to 23:53); Ex. 56, Pg. 71:15-22, 78:5-7; Ex. 57, Pg. 15-17, 18:2-4, 46:8-10, 103:21-22, 116:12-14, 122:19-24, 123:3-10, 136:18
[81] Ex. 57, Pg. 102:22-24, 103:3-5, 14, 119:6-7, 146:10
[82] Ex. 57, Pg. 18:4-12, 47:23-48:2.
[83] Ex. 57, Pg. 17:18-19, 18:13-15

32.     At 7:02 PM, Sanchez went to go talk to Saez, and then returned to his cell with no issues and without incident where he then could be seen in the large half-body size unobstructed easily looked through window next to his green cell door.[84]

33.     At 8:20:28 PM, Stewart entered the Pod for rounds.[85]  And, without properly looking into each cell to make a suitable face-to-face observation of each inmate, Stewart instead merely went to scan barcodes.[86]  In this Pod 7C, there are eight (8) total, four (4) on each of the two levels.[87]  And, Defendant's focus is more on whether the scans are timely made, instead of whether the face-to-face observation rounds are properly conducted.[88]  And, for twelve (12) hours, Stewart's job was to scan these on her assigned cell blocks.  Ex. 57, Pg. 20:16-20:20.

34.     According to Defendant's Major Cedrick Collier, Defendant had gotten into the routine of doing subpar rounds, and even 7th Floor Detention Officer Rover Don Lee Rivera testified that "*it is common*" for observation rounds to be done by "*not looking into each cell window and observing the inmate*."[89]  And so, during this and other rounds, Stewart and the other 7th Floor officers could have looked more thoroughly into the cells, but did not do so.[90]  Instead, they did her rounds like they had been shown by other officers they had shadowed.[91]

---

[84] Ex. 9, Pg. 1 # 25; Ex. 10 (11:17 to 11:22, 13:38 to 13:45, 26:05 to 26:12); Ex. 11, Pg. 1 ¶ 5; Ex. 12 (47:38 to 48:48); Ex. 13 (46:13 to 48:29); Ex. 14 (46:26 to 48:58); Ex. 25, Pg. 6, 11; Ex. 29 (7:18 to 7:22); Ex. 30, Pg. 2-3; Ex. 38, Pg. 1-2; Ex. 56, Pg. 20-25; Ex. 57, Pg. 35; Ex. 58, Pg. 24; Ex. 59, Pg. 24, 32

[85] Ex. 21 (Min. 20:55); Ex. 23 (Min 20:53); Ex. 24 (Min. 20:29)

[86] Ex. 21 (20:55 to 22:06); Ex. 23 (20:53 to 21:53); Ex. 24 (20:29 to 21:52); Ex. 36 (6:44 to 6:50); Ex. 56, Pg. 124-125; Ex. 57, Pg. 96-97; Ex. 59, Pg. 14:3-5, 21-22, 28:11-18, 20; Ex. 64

[87] Ex. 56, Pg. 53:7-25, 54:1-10, 121:24-122:9; Ex. 57, Pg. 19:4, 20:13-16, 23:8-15

[88] Ex. 57, Pg. 19:20-20:5, 49:12-15, 51:16-18

[89] Ex. 59, Pg. 57:6-8; Ex. 76, Pg. 130:14-23

[90] Ex. 33 (Min. 26:01 to 26:16); Ex. 36 (Min. 6:19 to 6:24); Ex. 57, Pg. 51:15-16, 74:21-22, 96:6-7, 96:16-17; Ex. 58, Pg. 59:23-60:1

[91] Ex. 57, Pg. 85:16-19

35.     As background, the correct way to do rounds is to obtain "*a firsthand evaluation of the inmates' attitudes and temperament by visually observing*" them, and to observe "*the physical, mental, and emotional condition of each inmate to detect signs of distress or need for medical, psychological, or other special services*."[92]   And, if this is not done, inmates can get hurt, be denied medical care, and die.[93]   And, in this case, the staffing/overcrowding conditions at the jail made doing rounds properly impossible at the ground level.[94]   That said, each floor has a supervisor, and it is ultimately that person's responsibility to make sure rounds are done correctly.[95]   And, here that was Sergeant Williams, an employee, Defendant knew to be incompetent.  *Supra*.  In any case, at 8:21 PM, Stewart's round was completed.  Ex. 15, Pg. 1.

36.     At 9:16:01 PM, Stewart again entered the Pod for rounds.[96]   Without properly looking into each cell to make a suitable face-to-face observation of each inmate, she merely went to the posted barcodes.[97]   At 9:18 PM, her round was completed.  Ex. 15, Pg. 1.

37.     At 10:09:36 PM, Stewart again entered the Pod for rounds.[98]   Without properly looking into each cell to make a suitable face-to-face observation of each inmate, she instead just merely went to scan the barcodes.[99]   At 10:10 PM, her round was completed.  Ex. 15, Pg. 1.

   C.     **SANCHEZ BEGGED FOR HELP AS HE VISIBLY DETERIORATED, YET LIGHTEN AND STEWART IGNORED IT— EITHER BECAUSE THEY SAW HIS EMERGENCY AND CHOSE TO DO NOTHING, OR BECAUSE THEY NEVER ACTUALLY LOOKED INTO HIS CELL DUE TO THE**

---

[92] Ex. 38. Pg. 3-4; Ex. 56, Pg. 36-38, 120-121; Ex. 37, Pg. 31:11-18; Ex. 58, Pg. 22:23-25, 33:3-8; Ex. 59, Pg. 24:5-8, 33:6-8; Ex. 83, Pg. 40:18-41:1, 57:19-23; Ex. 88, Pg. 4, 6
[93] Ex. 56, Pg. 41:17-21, 41:23-42:9, 43:3-6, 54:17-23
[94] Ex. 57, Pg. 31:20-32:1.
[95] Ex. 59, Pg. 29:13-15, 30:12
[96] Ex. 21 (Min. 1:16:28); Ex. 23 (Min. 1:16:35); Ex. 24 (Min. 1:15:29)
[97] Ex. 15, Pg. 1; Ex. 21 (1:16:28 to 1:19:20); Ex. 23 (1:16:35 to 1:19:06); Ex. 24 (1:15:29 to 1:19:01); Ex. 56, Pg. 124-125; Ex. 57, Pg. 96-97; Ex. 59, Pg. 14, 28; Ex. 64
[98] Ex. 22 (Min. 22:11); Ex. 23 (Min. 2:10:07); Ex. 24 (Min. 2:09:37)
[99] Ex. 22 (22:11 to 23:47); Ex. 23 (2:10:07 to 2:11:21); Ex. 24 (2:09:36 to 2:20); Ex. 56, Pg. 124-125; Ex. 57, Pg. 96-97; Ex. 59, Pg. 14:3-5, 21-22, 28:11-18, 20; Ex. 64

### JAIL'S CUSTOM AND PRACTICE OF BARCODE-ONLY 'ROUNDS' THAT REPLACE REAL WELFARE CHECKS AID

38. At 10:59 PM, Sanchez ingested a substance that the Defendant had failed to keep out of the jail.[100] He then walked to the intercom, pressed it, and said, "*Hey, that's it for me.*"[101] As background, when an inmate pushes such a call button, it beeps the PCC, and opens up a microphone and speakers for communication with the PCC.[102] But, as Plaintiffs John Coote and Ryan Twedt testified, the detention officers usually do not pay any attention to intercom requests anyway.[103] That said, following this, Sanchez started to feel the effects of a substance he had ingested.[104] Given so, at 11:04:50 PM, in pain, he went to go lie down, and then stood up, walked towards his cell's window and held his face in pain. Ex. 1K (Min. 4:50 to 4:49, 5:06 to 5:12).

39. At 11:06:04 PM, Sanchez then looked in the mirror, and then, with a crying facial expression, he looked at the ceiling in pain.[105] At 11:06:27, with second thoughts, he then turned to face the window, put both his arms out to the side, went up right next to the window, and yelled: "***Help me, help me.  I don't feel good.***"[106] He would yell that for several hours.[107]

40. Meanwhile, at 11:06:17 PM, Stewart and began scanning the barcode next to Sanchez's large cell. [108] And, at this time, clearly in distress, Sanchez was at his window yelling, "***Help me, help me.  I don't feel good***."[109] But Stewart just walked away since her goal was to

---

[100] Ex. 1K (0:01 to 0:38); Ex. 31 (12:05 to 12:25); Ex. 36 (4:05 to 4:20); Ex. 38, Pg. 2 ¶ 3; Ex. 59, Pg. 47:15-17, 48:11-13, 49:3-4
[101] Ex. 1K (Min. 0:51 to 0:58); Ex. 29 (Min. 26:27 to 26:32)
[102] Ex. 70, Pg. 50-51; Ex. 75, Pg. 82; Ex. 82, Pg. 15, 48, 111; Ex. 87, Pg. 25-26, 31-32
[103] Ex. 75, Pg. 82:2-9; Ex. 87, Pg. 32:7-11
[104] Ex. 10 (Min. 15:29-15:36, 16:10 to 16:13, 31:02 to 31:13); Ex. 36 (Min. 5:08 to 5:17)
[105] Ex. 1L (Min. 6:06 to 6:08, 6:20 to 6:23).
[106] Ex. 1K (Min. 6:27 to 7:33); Ex. 10 (Min. 16:10 to 16:13, 31:57 to 31:59)
[107] Ex. 10 (Min. 32:54 to 33:04)
[108] Ex. 16 (6:20-6:35); Ex. 15; Ex. 36 (6:29); Ex. 56, Pg. 118; Ex. 57, Pg. 21; Ex. 58, Pg. 28-29
[109] Ex. 1K (Min. 6:27 to 7:33); Ex. 10 (Min. 16:10 to 16:13, 31:57 to 31:59, 32:53 to 32:52)

merely scan all of the barcodes, after which she left the pod at 11:08 PM.[110]  Such an uncaring attitude towards inmates' medical needs is not uncommon at this jail.[111]

41.    At that same 11:08 PM time, without ever pulling his pants down, Sanchez then sat on the toilet and then leaned back, looked outside his cell's large unobstructed window and tried to signal his neighboring inmates and the PCC for help with his left arm.[112]  Still seated, Sanchez then rocked back and forth as if he had immense abdominal pain, then made a circular help motion with his left arm towards the window, and then with his right arm, made another circular come here help motion.[113]  With this, at least a neighboring inmate got the point that Sanchez did not feel good.[114]  And, between 11 or 12 at night, he kept pushing his cell's button to get the PCC's attention.[115]  But the officers did not come down and instead ignored the situation.[116]

42.    Meanwhile, with his pants still on, Sanchez then leaned forward on the toilet, then leaned back and raised his left foot slightly off the ground.[117]  His shadow shows continued help hand gestures to the window and camera.[118]  Then, Sanchez leaned all the way forward so that his torso and head were parallel to the floor as he was still seated on the toilet with his pants on, and he looked down, crying as his hand wiped away the tears (his shadow on the floor implies it).[119]

---

[110] Ex. 16 (Min. 6:36 to 7:02, 7:59 to 8:08
[111] Ex. 74, Pg. 130:15-7 (evidencing another detention officer saying "*I don't give a f\*ck about your neck*" to Plaintiff Jeremy Garrision).
[112] Ex. 1K (8:27 to 9:57, 10:01 to 10:26); Ex. 10 (15:29-15:36, 31:57 to 31:59, 32:25 to 32:30); Ex. 11, Pg. 2 ¶ 2; Ex. 38, Pg. 2; Ex. 56, Pg. 110-111; Ex. 57, Pg. 96; Ex. 58, Pg. 24, 58, 82, 109
[113] Ex. 1K (Min. 10:26 to 19:39)
[114] Ex. 10 (Min. 31:00 to 31:02); Ex. 11, Pg. 2 ¶ 2
[115] Ex. 10 (14:56 to 15:01, 15:42 to 15:47, 30:29 to 30:39, 31:02 to 32:07, 34:50 to 34:58); Ex. 11, Pg. 2 ¶ 2; Ex. 58, Pg. 64:1-2
[116] Ex. 10 (Min. 15:15 to 15:22, 31:10 to 32:17, 34:58 to 35:02)
[117] Ex. 1K (Min. 10:38 to 11:00); Ex. 58, Pg. 101:12-15
[118] Ex. 1K (11:00 to 12:00)
[119] Ex. 1K (Min. 12:00 to 12:15)

And, after this, Sanchez then leaned forward in pain with his face down, and used his left hand to wipe away tears, and he then continued to lean forward with his face down in pain.[120]

43.    Then, for many minutes, from 11:16:03 PM to 11:21:48 PM, Sanchez sat on the toilet with his pants on and the back of his head over the toilet, looking clearly distressed.[121] During which time, he screamed in distress that he was going to die:[122]



*See* Ex. 1K (Min. (23:21:48); Ex. 88, Pg. 3 # 9

Then, at 11:21:48 PM, with his pants on, Sanchez fell sideways, perpendicularly arched over the toilet with his the left side of his head/face hit the floor, causing him to bleed.[123]

44.    When a medical emergency like this occurs, as Defendant's Sergeant Preston Wong testified at his deposition, seconds, minutes, and hours matter when it comes to getting these

---

[120] Ex. 1K (Min. 12:47 to Min. 15:21)
[121] Ex. 1K (Min. 16:05 to 21:32); Ex. 58, Pg. 39:23-40:2
[122] Ex. 10 (Min. 32:41 to 32:52)
[123] Ex. 1K (21:32 to 24:00); Ex. 10 (33:05 to 33:10); Ex. 37, Pg. 2 ¶ 3; Ex. 38, Pg. 2 ¶ 3; Ex. 44, Pg. 1-6; Ex. 57, Pg. 71; Ex. 58, Pg. 40-43, 57, 118, Ex. 59, Pg. 49;

detainees medical attention.[124]  And later, when watching it all on video, Investigating Sergeant Love reacted: "*oh my god*,"[125] "*how in god's creation did nobody see that?*"[126]  Love further summarized the hours of inside cell footage as having "*foot movement here or there*" over the course of the night.[127]  And, in that position, Sanchez would yell for help for several hours.[128]  But, no detention officer "*wanted to help*" Sanchez, which, as Saez told Love, was "*messed up*."[129]

45.    At 12:01 AM, Stewart then entered the Pod for rounds, and she hurried towards Sanchez's cell, where the barcode was and scanned it.[130]  At this point, a jury will have to decide between two (2) versions of events, both favorable to Garcia.[131]  In the first, according to Stewart, she "*observed*" Sanchez "*inside the cell*"[132] saw that he was "*slumped,*"[133] but walked away with subjective deliberate indifference.  *Infra*.  In the second, Stewart also swore that she "*did not look in the cell to check on the well-being of… Sanchez*,"[134] and that more staffing and better training would have enabled her to properly see him at this time.[135]  While Love doubts the first version, she confessed that she does not have personal knowledge as to what specifically Stewart saw or heard herself.[136]  And, since the video does not conclusively establish what Stewart saw or heard herself, it should be up to a jury to decide from the two (2) different possible fact patterns.

---

[124] Ex. 83, Pg. 40:18-41:1
[125] Ex. 37 (Min. 18:13 to 18:14)
[126] Ex. 37 (Min. 11:22 to 11:27); Ex. 58, Pg. 11:23-12:3, 18:10-11, 42:22-43:1, 21-25
[127] Ex. 31 (Min. 13:29 to 13:38)
[128] Ex. 10 (Min. 32:54 to 33:04)
[129] Ex. 10 (Min. 16:23 to 16:26, 16:33 to 16:36, 17:22 to 17:25)
[130] Ex. 16 (1:01:04-1:01:14); Ex. 15, Pg. 1; Ex. 37 (6:38 to 6:42, 10:04-10:44); Ex. 57, Pg. 21-22
[131] Ex. 58, Pg. 62:20-63:7; Ex. 59, Pg. 15:4-5
[132] Ex. 24, Pg. 2 ¶ 4 [IA 000034]; Ex. 36 (Min. 1:26 to 1:31, 7:49 to 7:58); Ex. 58, Pg. 114:14-18
[133] Ex. 35 (Min. 22:48 to 22:52); Ex. 58, Pg. 63:8-10, 117:10-14, 124:25-125:1
[134] Ex. 37, Pg. 2 ¶ 3 (IA 000045); Ex. 58, Pg. 56:15-57:7, 62:19-22, 125:3-5; Ex. 64
[135] Ex. 57, Pg. 69:1-8, 72:4-7; Ex. 58, Pg. 125:3-5
[136] Ex. 58, Pg. 99:23-100:17, 114:9-18

46.    In any case, Stewart then hurried along to scan the next barcode.[137]    In front of Saez's cell, an inmate briefly got Stewart's attention.[138]    He put her on notice of the Sanchez emergency, but she did not pay him attention and ended up "*blowing him off*."[139]    Moreover, she called him crazy, and then pointed up to the next level, indicating that she had to timely complete her rounds.[140]    Having been trained in "*resuscitation and stuff*," Stewart later confessed that she "*could have*" saved Sanchez at this time.[141]    But, instead, at 12:02 AM, she left the pod.[142]

47.    At 12:56:40 AM, Stewart entered for rounds and without properly looking into each cell to make a suitable face-to-face observation of each inmate, she just merely scanned the barcodes, and according to Stewart herself she "*observed*" Sanchez "*inside the cell*" and got "*a visual on him*," but, instead of helping him, her round was completed at 12:58 AM.[143]

48.    Meanwhile, Lighten was in the PCC on "*phone for a while*" with another PCC detention officer who was elsewhere having "*trouble staying awake*,"  and they were "*just having a conversation*."[144]    As background, two (2) weeks earlier, on January 29, 2022, 7th Floor Detention Officer Antonio Barrea "*had fallen asleep*" while *"on duty"* in the PCC with "*his cell phone in his hand,*" and having such a personal phone is a policy violation.  Ex. 67, Pg. 4.  That said, on the day Sanchez died, Lighten too was on his personal phone as well.[145]    These were among the reasons Lighten came up with as to why he not "*paying attention*" in the PCC "*at the time*."[146]

---

[137] Ex. 16 (Min. 1:01:13 to 1:01:22)
[138] Ex. 16 (Min. 1:01:40 to 1:02:04)
[139] Ex. 10 (Min. 15:47 to 15:53, 30:43 to 31:02, 31:02 to 32:07); Ex. 11, Pg. 2 ¶ 2
[140] Ex. 10 (Min. 32:07 to 33:10); Ex. 16 (Min. 1:02:02 to 1:02:03)
[141] Ex. 16 (Min. 26:42 to 26:50)
[142] Ex. 15; Ex. 16 (Min. 1:03:08 to 1:03:10)
[143] Ex. 15; Ex. 16 (1:56:44-1:59:06); Ex. 24, Pg. 2; Ex. 33 (12:05 to 26:08); Ex. 56, Pg. 124-125; Ex. 57, Pg. 22, 96-97; Ex. 58, Pg. 29; Ex. 59, Pg. 14, 28; Ex. 64
[144] Ex. 31 (Min. 20:02 to 20:35, 21:56 to 21:59, 22:02 to 22:14)
[145] Ex. 31 (Min. 21:19 to 21:23, 22:22:30 to 22:39, 27:35 to 27:40)
[146] Ex. 31 (Min. 25:15 to 25:20, 25:32 to 25:39)

49.     Just prior to 1:44 AM, as Stewart had been "*so busy*" rover for multiple pods, her legs ached, and so, she asked Lighten to do her rounds and handed him the device.[147]  But Lighten did not sign Stewart out of the device, because they were short-staffed that he just did not have enough time to do so.[148]  In any case, at 1:44 AM, Lighten entered the Pod to do rounds.[149]

50.     According to Lighten, as far as rounds go, his "*sergeant say*" just to "*take a quick glance*" and "*barely do that*" and so he did that with the focus being on just scanning the barcodes.[150]  Timely "*rounds*" and scanning the "*barcode*" take "*priority*" *over making sure somebody's okay*" or going to "*help*" people even when you "*hear someone's in trouble*."  Ex. 29 (Min. 32:35 to 32:37).  Despite those directives, a round should take probably 10 to 15 minutes.[151]

51.     At 1:44 AM, without properly looking into each cell to make suitable face-to-face observations of each inmate, Lighten instead just went to scan the barcodes.[152]  He can be seen on the video jogging.[153]  Later, Lighten confessed that he did "**notice… a couple people hear [Sanchez] yelling and everything, but [he himself] didn't give it a straight oh, let me look inside.**"[154]  Instead, he "*completed the round… [as] quickly [as he could] to get it done*," and "*felt the pressure of trying to complete [this] round… as quickly as possible to prevent late rounds*."[155]

---

[147] Ex. 24 (19:15 to 19:17); Ex. 25, Pg. 6; Ex. 29 (7:46-7:57); Ex. 30, Pg. 2; Ex. 34 (19:17 to 19:31, 28:29 to 28:32); Ex. 56, Pg. 78; Ex. 57, Pg. 132:13-14; Ex. 58, Pg. 34
[148] Ex. 26, Pg. 6; Ex. 29 (12:59-13:16, 22:48-23:01); Ex. 30, Pg. 3; Ex. 34, Pg. 2 ¶ 4; Ex. 33 (27:51-27:58, 28:15-28:17); Ex. 35 (4:37-5:03, 14:26-14:33); Ex. 36 (14:05-14:11); Ex. 38, Pg. 2; Ex. 58, Pg. 33-34: Ex. 35, Pg. 5-10; Ex. 57, Pg. 116
[149] Ex. 16 (2:44:26); Ex. 32, Pg. 2; Ex. 33 (38:45-38:59); Ex. 36 (14:06-14:12); Ex. 38, Pg. 2; Ex. 57, Pg. 22; Ex. 58, Pg. 30, 115
[150] Ex. 29 (18:28-18:37); Ex. 56, Pg. 84-85; Ex. 57, Pg. 24-25, 51
[151] Ex. 29 (24:28-24:36); Ex. 57, Pg. 46; Ex. 58, Pg. 25; Ex. 59, Pg. 32
[152] Ex. 16 (2:44:26-2:45:57); Ex. 32, Pg. 2 ¶ 3; Ex. 38, Pg. 2 ¶ 4; Ex. 56, Pg. 86:7-10, 98:25-99:1, 12-15, 22-24; Ex. 59, Pg. 14:3-5, 21-22, 28:11-18, 20; Ex. 63
[153] Ex. 16 (Min. 2:44:29 to 2:44:35); Ex. 31 (Min. 15:23 to 16:15); Ex. 56, Pg. 127:11-12
[154] Ex. 29 (Min. 13:58 to 14:06)
[155] Ex. 25, Pg. 6 [IA 000007]; Ex. 29 (Min. 8:16 to 8:44); Ex. 30, Pg. 2 [IA 000019]; Ex. 31 (Min. 2:10 to 2:40); Ex. 56, Pg. 84:9-11

Moreover, he added that he "*did not check on the welfare of each inmate as [he] should have*."[156] In any case, at 1:45 AM, this round was completed, meaning it only took him a minute and a half.[157]  During which, in the PCC, Stewart did not bother to look at the camera monitors at all.[158]

52.    At 2:39 AM, Stewart entered the Pod for rounds.[159]  There is a fact issue on whether Stewart actually looked into the cell at this time.  *Infra*.  Some evidence indicates she may not have done so.[160]  Other evidence, including her own confession, indicates that it looks like she did.[161] In any case, at 2:40 AM, her round was completed.  Ex. 15, Pg. 1.

53.    At 3:36 AM, Detention Stewart entered the Pod for rounds.[162]  Again, there is a fact issue here.  *Infra*.  Some evidence indicates that without properly looking into each cell individually to make a suitable face-to-face observation of each inmate, Stewart just merely went to scan the barcodes.[163]  On the other hand, according to Stewart, she "*observed*" Sanchez "*inside the cell*."[164]  In any case, a minute later, at 3:37 AM, her round was completed.  Ex. 15, Pg. 1.

54.    Just prior to 4:34 AM, Lighten opened his PCC door, got Stewart's attention, and said, "*Hey, can I get a restroom break?*" and Stewart responded with yes if Lighten would "*cover this round*," and during it, he could go get a snack too.[165]  Then, at 4:34 AM, Lighten entered the Pod to rounds, but did not sign Stewart out of the scanning device.[166]  And, without properly

---

[156] Ex. 30, Pg. 3 ¶ 6 [IA 000020]; Ex. 32, Pg. 2 ¶ 3
[157] Ex. 15, Pg. 1; Ex. 56 (Min. 128:4-7)
[158] Ex. 57, Pg. 132:16-19, 133:9-11
[159] Ex. 16 (3:39:23); Ex. 36 (15:46-16:03); Ex. 57, Pg. 22-23; Ex. 58, Pg. 30-31, 115
[160] Ex. 16 (3:39:23-3:41:03); Ex. 37, Pg. 2 ¶ 4
[161] Ex. 24, Pg. 2 ¶ 4 [IA 000034]; Ex. 36 (Min. 6:12 to 6:14)
[162] Ex. 17 (Min. 30:33); Ex. 36 (Min. 13:31 to 13:37); Ex. 57, Pg. 23:5-6
[163] Ex. 17 (30:33-32:14); Ex. 56, Pg. 124-125; Ex. 57, Pg. 96-97; Ex. 59, Pg. 14, 21-22, 28; Ex. 64
[164] Ex. 24, Pg. 2
[165] Ex. 57, Pg. 37:20-38:5, 132:13-14
[166] Ex. 17 (1:28:41); Ex. 29 (12:59-13:16, 22:48-23:01); Ex. 30, Pg. 3; Ex. 35 (4:37-5:03, 14:26-14:33); Ex. 33 (38:59-39:03); Ex. 38, Pg. 2; Ex. 56, Pg. 86; Ex. 57, Pg. 23; Ex. 58, Pg. 33-24, 115-116; Ex. 63

looking into each cell individually to make a suitable face-to-face observation of each inmate, Lighten rushed to just merely went to scan the barcodes.[167]  And, at 4:35 AM, his round was completed while Stewart did not at the cameras while in the PCC covering for Lighten.[168]

55.    At 4:48:17 AM, breakfast was brought to the cellblock and passed out by an inmate trustee, and from the PCC, Lighten opened one cell door at a time for that inmate.[169]  But, before he did, he "*looked at the camera*" of inside each cell."[170]  Which means that Lighten "*noticed…* *Sanchez*."[171]  And, at 4:49:12 AM, with the door unlocked, the inmate slid breakfast into Sanchez's cell.[172]  If this inmate trustee had seen something, he probably did not say or help Sanchez, because like Plaintiff Antonio Radcliff who once was just being "*a regular human being*" and had "*helped a man that was on the floor*" passed out from "*fentanyl*" whose "*face*" and "*body*" were "*blue*" when "*medical staff*" and "*COs*" were "*not*" there, he too might have lost his trustee food job for rendering aid.[173]  That said, the trustee went on passing out food to the others.[174]

56.    At 5:30:01 AM, Stewart entered the Pod for rounds.[175]  Once more, there is a fact issue as to what she personally saw or heard.  *Infra*.  Some evidence indicates that, without properly looking into each cell to make a suitable face-to-face observation of each inmate, she instead just

---

[167] Ex. 17 (1:28:41-1:29:53); Ex 31 (17:44-18:04); Ex. 38, Pg. 2; Ex. 56, Pg. 98-99, 115; Ex. 56, Pg. 8-11; Ex. 57, Pg. 96-97; Ex. 58, Pg. 31; Ex. 59, Pg. 14, 28; Ex. 63
[168] Ex. 15, Pg. 1; Ex. 57, Pg. 132:16-19, 133:9-11
[169] Ex. 25, Pg. 6; Ex. 17 (1:42:45-1:43:30); Ex. 29 (4:49-5:05, 8:44 to 8:56); Ex. 30, Pg. 30; Ex. 31 (4:53 to 4:59); Ex. 56, Pg. 90; Ex. 81, Pg. 17-18
[170] Ex. 25, Pg. 6; Ex. 29 (8:58-9:06) Ex. 30, Pg. 30; Ex. 31 (5:05-5:09); Ex. 30 (6:41-6:48); Ex. 56, Pg. 90; Ex. 57, Pg. 40-41
[171] Ex. 25, Pg. 6; Ex. 29 (9:06 to 9:10); Ex. 30, Pg. 30; Ex. 31 (5:46 to 5:50); Ex. 56, Pg. 90-91
[172] Ex. 1K (5:49:12-5:49:14); Ex. 17 (1:43:36-1:43:40)
[173] Ex. 81, Pg. 103:21-104:23, 106:2-18
[174] Ex. 17 (Min. 1:43:40 to 1:44:23)
[175] Ex. 17 (Min. 2:24:29); Ex. 19 (Min. 15:09); Ex. 20 (Min. 15:30); Ex. 56, Pg. 132:20-23

merely went to scan the barcodes.[176]  Other evidence indicates that she "*observed*" Sanchez "*inside the cell*."[177]  But, at 5:31 AM, her round was complete.  Ex. 15, Pg. 1.

> **D.    CHRONIC UNDERSTAFFING ON THE 7TH FLOOR FORCED DETENTION OFFICER UNG INTO MANDATORY OVERTIME, LEADING TO RUSHED, NON-OBSERVATIONAL ROUNDS WHERE HE MERELY SCANNED BARCODES INSTEAD OF CONDUCTING REQUIRED FACE-TO-FACE INMATE WELFARE CHECKS**

57.    At 6:00 AM, Lighten was relieved from duty.[178]  Meanwhile, because of "*no staffing*," Defendant forced Ung "*to stay without notice for four additional hours*" of overtime.[179]  Such forced overtime due to understaffing had become common, and it is this 7th floor that is chronically understaffed.[180]  At the start of 2022, "*there [were] far too many officers working 16-hour shifts that are incredibly stressed*."[181]  7th Floor 2022 Detention Officer and Rover Don Lee Rivera testified that overtime was such "*a common thing*" that he worked them every week.[182]

58.    At 6:18:07 AM, Ung entered the Pod  and without looking into each cell to make a suitable face-to-face observation, he just merely went to scan the barcodes and at 6:19 AM his round was completed.[183]  Then, at 7:14:28 AM, Ung again entered the Pod.  And, again, without looking into each cell to make a suitable face-to-face observation, he instead just went to the barcodes. [184] And, at 7:15 PM, his round was completed, and he left.  Ex. 15, Pg. 1.

---

[176] Ex. 17 (2:24:29-2:26:24); Ex. 19 (15:09-16:54); Ex. 20 (15:30-16:46); Ex. 56, Pg. 124-125, 132-123; Ex. 57, Pg. 96-97; Ex. 59, Pg. 14, 21-22, 28; Ex. 64
[177] Ex. 24, Pg. 2 ¶ 4 [IA 000034]
[178] Ex. 29 (Min. 9:27 to 9:32); Ex. 30, Pg. 3 ¶ 1; Ex. 56, Pg. 90:22-24
[179] Ex. 25, Pg. 9 [IA 0000010]; Ex. 30 (Min. 10:33 to 11:06); Ex. 57, Pg. 80:5-11, 19-22
[180] Ex. 25, Pg. 9; Ex. 30 (10:33 to 11:06); Ex. 57, Pg. 18, 21; Ex. 71, Pg. 8, 42; Ex. 72, Pg. 6, 69 Ex. 77, Pg. 22, 34; Ex. 79, Pg. 58-59, 66, 171; Ex. 82, Pg. 82-83
[181] Ex. 71, Pg. 8:6-13, 42:8-10; *see also* Ex. 72, Pg. 6:17-22, 69:6-8
[182] Ex. 76, Pg. 9:2-3, 16:20-21, 32:24-33:4, 50:18-19, 85:1-7
[183] Ex. 15; Ex. 17 (3:12:36-3:14:03); Ex. 19 (1:03:14-1:04:35); Ex. 20 (1:03:20-1:04:25); Ex. 25, Pg. 9; Ex. 57, Pg. 23:21-25; Ex. 58, Pg. 53; Ex. 59, Pg. 14; Ex. 65
[184] Ex. 17 (4:08:55-4:10:16); Ex. 19 (1:59:34-2:00:47); Ex. 20 (1:59:39 to 2:00:41); Ex. 25, Pg. 1; Ex. 58, Pg. 53; Ex. 59, Pg. 14, 21-22, 28; Ex. 65

### E.    AFTER HOURS OF BEING IGNORED, SANCHEZ IS FINALLY FOUND AND DESPITE OVER 40 MINUTES OF DESPERATE LIFE-SAVING EFFORTS BY NURSES AND EMS, HE DIED IN DEFENDANT'S CARE

59.    At 7:35 AM, Sergeant Ronald Reyes and Sergeant Dustin Tunello entered the pod and recognized the obvious emergency.[185]  Which is similar to when, in also 2022, Kevin Leon Smith, represented in this lawsuit by beneficiary Plaintiff Tracy Woodson-Smith, was discovered after several hours of having a medical emergency, as well, and leaders like Sergeant Preston Wong were not critical about how such inadequate rounds were performed in that year.[186]

60.    At 7:38 AM, Tunello used his iPhone to call Sergeant Randall Williams. [187]  In other words, he used a device that should not have been on the floor to begin with to call the very same supervising sergeant that had been told Sanchez was suicidal whom Defendant had previously written into his file was incompetent at supervising the floor.  *Supra*.  And, Williams came with three (3) other officers.[188] And, then two (2) more arrived.[189]

61.    According to Ung, those "*multiple rovers and sergeants*" later confessed that they just "*saw*" Sanchez "*laying across the cell toilet*."[190]  One of them, Detention Officer Osvaldo Garcia, observed that Sanchez "*appeared to be unconscious*" and "*was lying in a resting position with his back across the toilet and his upper body toward the back of the cell*."[191]  Another, Detention Officer Bruce Hayes says he saw the "*unconscious*" Sanchez "*slumped over the toilet, lying on his backside*."[192]  Moreover, Williams himself recounted seeing the "*buttocks and lower*

---

[185] Ex. 18 (5:50-6:19); Ex. 19 (2:21:34-2:22:02); Ex. 25, Pg. 7-9, 11; Ex. 26, Pg. 3-6; Ex. 38, Pg. 1; Ex. 58, Pg. 83:8; Ex. 62, Pg. 2; Ex. 68, Pg. 1-2; Ex. 69, Pg. 1-2; Ex. 40, Pg. 1, 3
[186] Ex. 83, Pg. 50:11-54:2, 67:23-68:3
[187] Ex. 18 (7:09-7:35); Ex. 19 (2:22:48-2:23:15); Ex. 25, Pg. 10
[188] Ex. 18 (Min. 7:50 to 8:02); Ex. 19 (Min. 2:23:35 to 2:23:52)
[189] Ex. 18 (Min. 8:24 to 8:29); Ex. 19 (Min. 2:24:07 to 2:24:13)
[190] Ex. 25, Pg. 9 [IA 000010]
[191] Ex. 25, Pg. 4 [IA 000005]
[192] Ex. 25, Pg. 5 [IA 000006]

*back of... Sanchez... to be resting on the toilet seat; and back of his head, as well as the heels of his feet [appearing] to be in contact with the floor surface.*"[193]   After which, Williams finally "*inquire[d]... whether or not medical staff members had been summoned*" but no "*one seemed to know.*"[194]   This, at a time when seconds, minutes and hours actually matter.  *Supra.*

62.    That said, at 7:42:36 AM, Nurses Ericka Johnson and Jalessea Cofield arrived, and Nurse Johnson lifted Sanchez off of the toilet, and commenced life-saving measures including CPR which would last for at least the next twenty-minutes while Nurse Johnson ran to call 911.[195]



*See* Ex. 1K (Time: 7:42:56); Ex. 88, Pg. 8 # 19

Having called 911, Nurse Cofield then came running back.[196]  And, at 7:45 AM, the Houston Fire Department was dispatched.[197] Meanwhile, both Nurse Johnson and Cofield continued performing

---

[193] Ex. 25, Pg. 10 [IA 1000011]
[194] Ex. 25, Pg. 10 [IA 1000011].
[195] Ex. 1K (8:42:51-8:43:03); Ex. 18 (11:58-12:16); Ex. 19 (2:27:40-2:27:56); Ex. 25, Pg. 3, 7, 9-10; Ex. 26, Pg. 2-3, 5; Ex. 27, Pg. 3, 11; Ex. 38, Pg. 1
[196] Ex. 18 (Min. 12:51 to 12:57); Ex. 19 (Min. 2:28:32 to 2:28:40).
[197] Ex. 40, Pg. 3 ¶ 4 [AR 000014].

28

life-saving measures such as CPR chest compressions on Sanchez while he was on the stretcher.[198] After this, with extreme urgency, they then pushed Sanchez's stretcher out of Cellblock 7C.[199]

63.    Nurses Johnson and Cofield then took Sanchez to the clinic "*for further medical treatment*" and to "*receive further care*" while performing chest compressions along the way.[200] They arrived on or before 7:48:55 AM.[201]  While there is no video of it,[202] in a continued effort to save his life, they intubated Sanchez, gave him IVs, and continued chest compressions.[203] Meanwhile, Fire Department Engine # 9, Medic # 9 and Ambulance Supervisor #17  arrived at 7:54 AM.[204]  At the time, CPR was still in progress  [Ex. 27, Pg. 2], and it continued CPR for **another twenty-three (23) minutes** inside the clinic.[205]  In this moment, there was "*no rigor or lividity… seen anywhere on [Sanchez's body]*."[206]  And, when "*the Houston Fire Department EMS personnel arrived and then they took over the CPR procedures*."  Ex. 25, Pg. 10 [IA 000011].   At 7:58:51 AM, Sanchez's heart rate was 98.  Ex. 27, Pg. 12 [TXR 000131].  But with Sanchez's heart failing, EMS affixed AED pads to him and used them.[207]

64.    At 8:19 AM, however, Doctor John Lu pronounced Sanchez dead and Sanchez was then covered with a white sheet. [208]   After which, a guilty Defendant confessed to EMS that

---

[198] Ex. 19 (2:28:49-2:29:07); Ex. 25, Pg. 3, 7, 10; Ex. 62, Pg. 2; Ex. 68, Pg. 3
[199] Ex. 18 (13:16-13:34); Ex. 10 (14:08-14:14, 14:34-14:36, 33:18-33:32); Ex. 11, Pg. 2 ¶ 2; Ex. 19 (2:29:06-2:29:13); Ex. 25, Pg. 2; Ex. 62, Pg. 2
[200] Ex. 25, Pg. 2-3, 7, 9; Ex. 26, Pg. 3, 5-6; Ex. 27, Pg. 11; Ex. 40, Pg. 3; Ex. 68, Pg. 1-2; Ex. 69, Pg. 1-2
[201] Ex. 27, Pg. 3 [TXR 000122]; Ex. 45
[202] Ex. 46; Ex. 47; Ex. 78, Pg. 34:13-14
[203] Ex. 25, Pg. 2 [IA 000003]; Ex. 27, Pg. 3 [TXR 000122]; Ex. 68, Pg. 1 [TXR 000001]
[204] Ex. 26, Pg. 4 [TXR 000509]; Ex. 62, Pg. 2 [OR 000054]
[205] Ex. 26, Pg. 4 [TXR 000509]; Ex. 62, Pg. 2 [OR 000054]
[206] Ex. 27, Pg. 11 [TXR 000130]; Ex. 40, Pg. 3 [AR 000014]
[207] Ex. 48, Pg. 1-4; Ex. 68, Pg. 2 [TXR 000002]
[208] Ex. 25, Pg. 8; Ex. 26, Pg. 3-4, 5; Ex. 27, Pg. 11; Ex. 38, Pg. 1; Ex. 62, Pg. 2; Ex. 68, Pg. 1-2; Ex. 69, Pg. 1-2, 4; Ex. 89

Sanchez had been "*peeing blood two days ago but [had not] been sent out by clinic staff to the ER to see a doctor*."[209]   Later, when Defendant Major Collier was asked at his deposition if Defendant had any particular responsibility for this inmate's death, he responded that "*we failed to make the proper rounds*" and we had gotten "*in the routine of doing subpar rounds*."[210]

65.    That said, at 11:10 AM, inmate Saenz requested to tell Sanchez's story.[211]   At 11:21 AM, Texas Ranger Wesley Doolittle arrived on the scene to hear it.  Ex. 68, Pg. 2 [TXR 000002].  And, when the cellblock was immediately thereafter searched, no contraband or narcotics were found.[212]  Later that day, Detention Officer Yvonne Coleman wrote Lieutenants John Martin and Eric Templeton a memo stating that, at least, the "*rounds were on time*."[213]

66.    At some point thereafter, Defendant's Lieutenant Buccini gathered Lighten, Stewart, and a Sergeant, and when Lighten heard Sanchez had died from "*drugs*," he "*started laughing*." [214]   And, kind of "*sarcastic about it*," the sergeant asked Stewart if she had thought it was odd that Sanchez was in the same position every time she walked by, which prompted her to callously respond with an attitude that she "*was not a doctor*."[215]  Despite that, Lieutenant Buccini told them all not to worry, because of "*the fact that everything was done on time*."[216]

67.    On February 23, 2022, Defendant's Sheriff's Office Chaplain Natasha Young and Texas Ranger Doolittle telephoned Garcia and told her that her son died. [217]   In that instance, her

---

[209] Ex. 27, Pg. 11 [TXR 000130]
[210] Ex. 59, Pg. 56:4-7, 57:6-8
[211] Ex. 25, Pg. 8 [IA 000009]
[212] Ex. 25, Pg. 7-8, 11 [IA 000008 to 10], Ex. 26, Pg. 4, 6 [TXR 000510, 12]
[213] Ex. 28; Ex. 57, Pg. 19:20-20:5
[214] Ex. 29 (19:48 to 20:35); Ex. 33 (29:38 to 29:51)
[215] Ex. 34, Pg. 2 ¶ 6; Ex. 33 (40:11 to 401:00); Ex. 35 (17:41 to 17:54, 21:16 to 21:25), Ex. 37, Pg. 2; Ex. 36 (5:58-6:13, 17:14-17:29); Ex. 58, Pg. 58-59, 63
[216] Ex. 33 (Min. 28:18 to 29:31).
[217] Ex. 1, Pg. 3 ¶ 16; Ex. 68, Pg. 4 [TXR 000004]; Ex. 69, Pg. 4 [TXR 000013]

body went cold, her hands shook uncontrollably, she could not catch her breath, and she collapsed to the floor, screaming, because the pain of those words pierced deeper than anything she had ever known, and the thought that she would never again hear her son's voice, hold him in her arms, or see his smile, left her hollow, and torn out a piece of her forever.  Ex. 1, Pg. 3 ¶ 16.  After which, she spent $8,735.00 to have her son cremated at Artega Funeral Home. [218]

## VIII.   RELEVANT STANDARD

68.      Summary judgments are lethal weapons that, when inappropriately granted, can rob a litigant of his rightful day in court.[219]  They are governed by Fed. R. Civ. P. 56which a movant to "*identify… each claim… or part of each claim… on which summary judgment is sought*."  The moving party has the initial burden of showing that judgment is appropriate.[220]  And a movant cannot discharge that burden with just conclusory assertions that there is no evidence to support a case.[221]  Rather, it must point to specific elements to make that argument.  *Id*.  And, when a party does not, it cannot be entitled to judgment on that which has not been identified.[222]

69.      Moreover, summary judgments may only be granted where a movant has shown that there is no genuine issue of material fact as any material fact and the movant is entitled to judgment as a matter of law.[223]  A fact is material where its resolution would affect the outcome, and an issue is genuine if the evidence is sufficient for a jury to return a verdict for the nonmovant.[224]  And, "the burden of proving the nonexistence of material disputes" is on the

---

[218] Ex. 1, Pg. 3 ¶ 17; Ex. 1L; Ex. 39, Pg. 1 [000017]
[219] *Sanderson v. Shelter Mut. Ins. Co.*, 2015 U.S. Dist. LEXIS 154128 *3 (W.D. Lou. 2015)
[220] *McCollum v. Livingston*, 2017 U.S. Dist. LEXIS 19602 *19 (S.D. Tex. 2017) (Ellison, K.)
[221] Doc. 182, Pg. 13 (citing *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 & fn 10 (5th Cir. 2017))
[222] *Chavez v. Jefferson Cnty.*, 2024 U.S. Dist. LEXIS 237327 *21-22 (E.D. Tex. 2024)
[223] *McCoy v. Energy XXI GOM, L.L.C.*, 695 Fed. Appx. 750, 754 (5th Cir. 2017)**;** *Cope v. Coleman Cnty.,* 2024 U.S. App. LEXIS 15549 (5th Cir. 2024)
[224] *McCollum*, *19

movant.[225]  To assess whether that burden has occurred, all facts must be viewed in the light most favorable to the nonmovant, and all reasonable inferences must be drawn to her favor.[226]  In that, courts are precluded from weighing credibility, and may not choose between two contradictory statements made by the exact same witness or defendant.[227]

## IX.    LAW AND ARGUMENT

### A.    THERE ARE SUFFICIENT FACTS FROM WHICH A REASONABLE JURY COULD FIND SANCHEZ'S CONSTITUTIONAL RIGHTS, LIKE THE OTHER PLAINTIFFS, WERE VIOLATED SEVERAL TIMES OVER

70.    Defendant's summary-judgment motion only directly challenges the constitutional injury elements.[228]  Which means that, if Garcia can show one, the motion must be denied.  Here, respectfully, can raise a genuine issue of material fact upon at least three.

### i.    A REASONABLE JURY COULD FIND THAT THE DEFENDANT VIOLATED ALL OF THE PLAINTIFFS' AND INTERVENORS' CONSTITUTIONAL RIGHTS TO BASIC HUMANE CONDITIONS

71.    The rights of a pretrial detainee flow from the procedural and substantive due process guarantees of the Fourteenth Amendment.[229]  When the State takes a person into custody and holds them involuntarily the Constitution imposes numerous corresponding duties to assume responsibility for that person's safety and general well-being.[230]  Even the Defendant and its deposed Major Ceddrick Collier have admitted the same.[231]  The ultimate constitutional duty in this context is to assume some responsibility for the safety and general well-being of persons

---

[225] *James v. Smith*, 2025 U.S. App. LEXIS 22384 *24 (5th Cir. 2025)

[226] *Cope*, *8; *McCollum*, *20

[227] *McCoy v. Energy XXI GOM, L.L.C.*, 695 Fed. Appx. 750 , 754 (5th Cir. 2017)

[228] Doc. 169, Pg. 8 ¶ 14, 9 ¶ 24, 13 ¶ 54, 16 ¶ 74, 19 ¶ 91

[229] Doc. 41, Pg. 29-30 ¶ 65 (citing *Hare*, 639); *Valencia v. Wiggins*, 981 F.2d 1440, 1443-45 (5th Cir. 1993); *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *102 (S.D. Tex. 2018), *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.); *Savage*, *11

[230] Doc. 41, Pg. 30 ¶ 66 (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993))

[231] Doc. 169, Pg. 14 ¶ 63; Ex. 59, Pg. 46:7-10

whose state-occasioned confinement renders them unable to fend for themselves.[232]  And, here, as a pretrial detainee, Sanchez could not fend for himself, which therefore imparted upon Defendant the duty to assume some responsibility for his safety and general well-being.  *Supra*.  Under which, the denial of humane conditions where a detainee faced a substantial risk of serious harm and that was disregarded via a failure to take reasonable measures to abate it is actionable.[233]

72.    Here, the Defendant failed to assume that responsibility for Sanchez's safety and general well-being and denied him and the other detainees basic humane conditions.  *Supra*.  Prior to Sanchez's incidents, the TCJS had put Defendant on notice that it was not properly observing its inmates, identifying suicidal inmates, and that its understaffing practices were just **not** acceptable.  *Supra*.  And, here, because it was understaffed/overcrowded, the Defendant failed to protect Sanchez from its frequent inmate-on-inmate violence, provide him with adequate timely medical care for his serious bloody urine, suicidal ideations, and ignored that known risk by not giving him a padded cell, timely proper observations, and stood around in a crowd on the day he died asking if somebody had yet called medical.  *Supra*.  Hence, as a whole, a jury could find Defendant violated Sanchez's general right to safety, general well-being and basic humane conditions.  And, therefore, the summary judgment motion must be denied on this point.

ii.    **DEFENDANT VIOLATED SANCHEZ'S RIGHT TO REASONABLE MEDICAL CARE FOR HIS SERIOUS CONDITIONS THAT INCLUDED BLOODY URINE AND A BLOODY HEAD**

73.    In addition to overarching general constitutional rights to safety, general well-being, and basic humane conditions, the Defendant also admits "*a person in jail custody has a constitutional right of access to reasonable medical care*."[234]  To that point, as a matter of law,

---

[232] Doc. 41, Pg. 30 ¶ 66 (citing *Hare*, 644  (5th Cir. 1996))
[233] *Farmer v. Brennan*, 511 U.S. 825, 848 (1994) (vacating summary judgment).
[234] Doc. 169, Pg. 13 ¶ 58; *Farmer*, 833

Sanchez had a right to have his serious medical needs met and to be protected from the above-described condition or practices that show deliberate indifference to his civil rights.[235]   As background, deliberate indifference is defined as a failure to act where jail officials have knowledge of a substantial risk of serious harm to an inmate's health or safety.[236]

74.    But Defendant's motion has in no way questioned whether Sanchez's conditions amounted to serious medical needs, and thus cannot be granted on such grounds.[237]  But, even if Defendant had, as Garcia pled in her complaint, a serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.[238]  Examples of that include an inmate's bloody stools[239] or an inmate lying in a pool of blood.[240] And here, the evidence shows both of those things.  *Supra*.

75.    That said, as Garcia pled in her Complaint, when jail officials refuse to treat such an inmate, ignore their complaints, intentionally treat them incorrectly, or engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs, the Constitution has been violated.[241]  More specifically, if an inmate suffers as a consequence of the jail staff's wanton disregard of his medical needs, the Due Process Clause of the Fourteenth Amendment has been violated.[242]  To that point, the purpose of requiring state jail officials to provide medical care to a pretrial detainee like Sanchez is to prevent the detainee from suffering

---

[235] *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022); *Thompson*, 457

[236] *McCollum*, *32

[237] *James v. Smith*, 2025 U.S. App. LEXIS 22384 *26 (5th Cir. 2025)

[238] Doc. 41, Pg. 30 ¶ 66 (citing *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022) and *Salcido*, *104

[239] *Harris v. Cockrell,* 84 Fed. Appx. 438, 439 (5th Cir. 2004)

[240] *Carter v. Benavides*, 2007 U.S. Dist. LEXIS 14904 *9 (S.D. Tex. 2007)

[241] Doc. 41, Pg. 31 ¶ 66 (citing *Easter*, 464 (5th Cir. 2006)); *James*, *21

[242] Doc. 41, Pg. 31 ¶ 67 (citing *Austin v. City of Pasadena*, 74 F.4th 312, 327 (5th Cir. 2023), *Dyer*, 380, and *Thompson*, 457)

further physical pain or harm.[243]  Given so, a delay in medical care violates the Constitution when it has been done with deliberate indifference that results in substantial harm.[244]

76.    Here, in the weeks/days before Sanchez died, the evidence shows him to be in excruciating pain while urinating blood, a serious medical condition that went without adequate treatment for quite a period of time.  *Supra*.  To be exact, there was a documented kiosk cry for medical attention that went unattended for days and phone calls in between that time period, in which he stated the physical stress under which his body was under during that time period.  *Supra*. When he was finally taken, an understaffed clinic made him wait even further for hours and failed to provide adequate treatment.  *Supra*.  After which, Sanchez telephoned friends and family on recorded lines, telling about his bleeding genital agony.  *Supra*.  And then, a Luke 5:31 bible verse was carved into his wall about how people who are sick need doctors.  *Supra*.  Hence, a jury could find Defendant liable for unconstitutionally denying or delaying medical care.

77.    Separately, Defendant also violated the Constitution by failing to promptly provide Sanchez with medical care on the day that he died.  *Supra*.  As a matter of law, promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency constitutes unconstitutional conduct.[245]  And here, Lighten (and Stewart when he took breaks) should have seen the emergency on the PCC video on the monitors.  *Supra*.  They both have given sworn statements from which a reasonable jury could find that they noticed or saw Sanchez while he was having the obvious emergency.  *Supra*.  And, Ung walked by it as well.  *Supra*.

---

[243] Doc. 41, Pg. 31 ¶ 67 (citing *Hare*, 644)
[244] Doc. 41, Pg. 31 ¶ 67 (citing *Austin v. City of Pasadena*, 74 F.4th 312, 327 (5th Cir. 2023) and *Dyer v. Houston*, 964 F.3d 314, 327 (5th Cir. 2020))
[245] *Cope*, *11

78.     During this, as the credible Inmate Saez told investigating Sergeant Love, the detention officers were told of the emergency and ignored it. *Supra*. And then, when Sanchez was finally discovered, arched perpendicularly over the toilet with his pants still on, and his head in a pool of blood, several detention officers and sergeants just stood around asking each other if a medical team had been called instead of performing the life-saving measures that the medical team would attempt for the next forty (40) minutes. *Supra*. That level of effort does not go into somebody who is already long dead; no, Sanchez was alive. *Supra*. And, the Defendant violated the Constitution by permitting him to suffer for hours as his head bled. *Supra*. Indeed, Investigating Sergeant Love confessed that in the hours of cell video, she saw that Sanchez's legs moved, and the inmate she interviewed said he screamed for hours. *Supra*. Hence, a jury could find Sanchez was denied medical care on the day he died as well and suffered for hours.

### iii.     DEFENDANT VIOLATED THE CONSTITUTION BY BEING DELIBERATELY INDIFFERENT TO A KNOWN SUICIDE RISK

79.     Defendant also violated the Constitution by being deliberately indifferent to a known suicide risk. *Infra*. Defendant, however, says this is not a suicide case. *See* Doc. 169, Pg. 15 ¶ 71. But a jury could find otherwise. *Infra*. That matters because the Fifth Circuit has repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide.[246] And, jail officials violate this right if they have gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference.[247]

80.     And, here, Defendant's internal records show that it had long known that Sanchez was suicide risk, Sanchez had just told Defendant that he was going kill himself,  was only very

---

[246] *Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020) (citing *Hare*); *Louzi v. Fort Bend Cty.*, 2020 U.S. Dist. LEXIS 154775 *15 (S.D. Tex. 2020) (Ellison, K.)
[247] *Converse*, 775 (citing *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000))

briefly send him to an understaffed clinic who did nothing for him in this regard, then threw him into a solitary live camera video feed cell which Defendant did not then properly monitor after he wrote on the wall a Luke 5:31 bible verse about the sick needing doctors, and intercom-ed them that was it for him.  *Supra*.  After which, across two (2) shifts and at least three (3) staff members over several hours, either failed to properly timely observe him or saw him and chose to do nothing.  *Supra*.  In either case, because Sanchez was a known suicide risk, the Defendant violated the Constitution in either scenario.  Hence, Defendant violated the Constitution in a number of ways**.**

### B.     THE CONDITIONS OF CONFINEMENT CLAIM SURVIVES

81.     Garcia's first claim is an unconstitutional condition of confinement one.  *Wagner III*, *7-12.  To show it, she need only point to a rule or restriction, or otherwise demonstrate the existence of an identifiable intended condition or practice.[248]  Such can be "an unstated de facto policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice.[249]  And, such claims are adjudicated under *Bell v. Wolfish*, 441 U.S. 520 (1979) standard, which allows courts to "assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation."[250]  The state, after all, may not punish a pretrial detainee, and so, conditions of confinement for such an inmate that amount to punishment violate the Constitution.[251]

---

[248] *Wagner II*, *25; *Wagner III*, *8
[249] *Wagner II*, *25 (quoting *Shepherd*, 452); *Wagner III*, *8 (same)
[250] *Wagner II*, *27; *Wagner III*, *10
[251] *Wagner II*, *30 (citing *Duvall v. Dallas County Tex.*, 631 F.3d 203, 206 (5th Cir. 2011)); *Wagner III*, *12 (same)

82.    The test is for whether the alleged conditions violate the Constitution concerns whether they have a reasonable relationship to a legitimate governmental interest.[252] Consequentially, Garcia is not required to show deliberate indifference.  *Wagner II*, 27 & 30.  That said, here, this Honorable Court expressly told Defendant that Garcia has specifically raised the following conditions: (1) overcrowding and understaffing, (2) failure to properly observe and monitor detainees, and (3) denials of medical care to detainees.  *Wagner III*, *7.  None of which the Defendant has here specifically identified as "the part of" the "claim" upon "which summary judgment is sought."  *See* Fed. R. Civ. P. 56(d).  Instead, after copying the same legal summary from the summary-judgment motion against Intervenor Jenkin's claims, Defendant has only asserted that it is "*obvious that there is no constitutional tort*."  *Compare* Doc. 131, Pg. 10-13 ¶ 58-71 *to* Doc. 169, Pg. 16-19 ¶ 76-91.  Garcia, however, has already raised a fact issue on this element above.  *Supra*.  In an abundance of caution, however, Garcia nonetheless below addresses the other element as it relates to the evidence on each of the relevant conditions.  *Infra*.

### i.    OVERCROWDING / UNDERSTAFFING CONDITION SURVIVES

83.    Since the Defendant's summary-judgment motion has not specifically identified the understaffing/overcrowding "part of" the conditions of confinement "claim" as the "*part*" on "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).[253]  *Supra*.  In an abundance of caution, however, Garcia here argues why there are issues of fact on it in the event that fatal failure is overlooked.

84.    To start, the summary judgment record here already includes Jenkins' jail expert already testifying that the conditions of Defendant jail included an understaffing/overcrowding

---

[252] *Wagner II*, *30; *Wagner III*, *12; *Howell v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 137088 (S.D. Tex. 2024) (Ellison, K.) (denying dismissal of conditions claim)
[253] *Compare Wagner III*, *7 *to* Doc. 169 generally.

customs that led to improper observations, medical care denials, and overlooking of suicide risks that jeopardized the safety and security of incarcerated individuals like Sanchez. *Supra*.

85.      Separately, the evidence also shows that six (6) months before Sanchez's death, in August 2021, Defendant's Captain Croas put everybody on notice that the jail was failing numerous state jail compliance issues, and Sergeant Williams publicly responded with a negative undertone about the staffing issues and was disciplined for so whistleblowing about it publicly. *Supra*. Then, in November 2021, the TCJS had put Defendant on notice that its understaffing practices were not acceptable. *Supra*. Hence, a jury could find such a custom existed.

86.      On top of that, as Plaintiff Jeremey Garrison experienced and testified, Defendant might not always have the staff to escort an inmate to the medical clinic. *Supra*. And, here we see a nine (9) day delay from when Sanchez requested medical care and when he was seen for his blood urine. *Supra*. After which, Lighten testified that he was made to work the 7th floor on the day Sanchez died because it was understaffed. And, as Detention Officer Yannis Ramos and others have testified, it is the 7th floor that is almost always the floor most understaffed. *Supra*. Hence, the delay in medical care could have been because of the understaffing condition/custom.

87.      Separately, Lighten and Stewart testified that they were under the pressures of understaffing/overcrowding when they did their rounds. *Supra*. Which is consistent with Sergeant Quinten Sneed's testimony that he likes to have two (2) officers in the PCC, not one. *Supra*. Adding further, Ung wrote into his report that he had been forced into the overtime; many other detention officers testified that this was customary and negatively affects performance. *Supra*. Hence, a jury could find that said custom was the moving force behind Sanchez's injuries.

88.      Indeed, as Detention Officer Alex Conrad testified, "*there are far too many officers working 16-hour shifts,*" like Ung, "*that are incredibly stressed*." *Supra*. And, this is made worse

by the summary judgment evidence in the form of detention officer and inmate testimony, which shows the jail to have been overcrowded. *Supra*. Thus, a reasonable jury could find that Lighten, Stewart, and Ung's felt the pressures of that understaffing/overcrowding custom on the day that Sanchez died, and really, it is the Defendant who should be held responsible and liable for fostering those conditions of confinement for which there was no legitimate purpose.

### ii.    IMPROPER OBSERVATION CONDITION CLAIM SURVIVES

89.    Since Defendant's summary-judgment motion has not specifically identified the improper observation custom "part of" the conditions of confinement "claim" as the "part" on "which summary judgment is sought," summary judgment should not issue upon it for this fatal failure. *See* Fed. R. Civ. P. 56(a).[254] *Supra*. In an abundance of caution, however, Garcia here argues why there are issues of fact on it in the event that technical failure is overlooked.

90.    Again, to start, the summary judgment record already included Jenkins' jail expert testifying that this has been documented across multiple Annual Jail Reports and Special Inspections, but to be more specific, Defendant was told by the TCJS: (1) in August 2018 that it was not properly observing inmates, (2) in February 2019 that it was not properly identifying suicidal inmates to observe, (3) in December 4, 2020 that it was still not properly observing inmates, and (4) in November 2021 that it was still not properly observing inmates. *Supra*.

91.    Moreover, on January 29, 2022, 7th Floor Detention Officer Antonio Barrea fell asleep while on PCC duty; and Lighten testified that, two (2) weeks later, on the day Sanchez died, he had to be on the phone trying to keep the other PCC awake instead of monitor Sanchez. *Supra*. Separately, there is considerable testimony about late rounds. *Supra*. To be exact,

---

[254] *Compare* <u>*Wagner III*</u>, *7 *to* Doc. 169 generally

according to Love, she is aware of at least ten (10) failure to conduct proper rounds incidents.[255] And, according to Collier, he is aware of three (3) or four (4) more.[256] And, several detention officers at their deposition testified to having had performed late rounds. *Supra*.

92.     In addition thereto, the evidence shows a leadership and training overemphasis on timely bar code scanned rounds at the expense of whether they are performed correctly. *Supra*. To be exact, Lighten testified that his sergeant told him just to take a quick glance and barely do that before scanning the barcode, which is consistent with Detention Officer Gomez's testimony as well. *Supra*. And, Stewart testified he did her observations rounds just like she had recently seen the detention officers she shadowed during training do theirs. *Supra*. And, we see Ung on video improperly doing rounds as well, without looking into cells. *Supra*.

93.     Indeed, before Sanchez died, no supervisor ever told their detention officers, "*Hey, you're not doing [the face-to-face observations] right*" or anything like that.[257] Instead, the sergeants actively said "*say*" go "*take a quick glance*" and "*barely do that*" but make sure to timely scan the bar codes.[258] Hence, timely "*rounds*" and scanning the "*barcode*" appear to have taken "*priority over making sure somebody's okay*" or going to "*help*" people even when you "*hear someone's in trouble*."[259] All of which is not surprising considering the repeated TCJS notices to Defendant that it was customarily not properly observing detainees. *Supra*.

94.     Hence, given the leadership directives, faulty shadowing training, and the fact that three (3) officers across two (2) different shifts can all be seen to do observation rounds improperly, a reasonable jury could find that there was such a custom, especially where the TCJS

---

[255] Ex. 58, Pg. 21:13-21
[256] Ex. 59, Pg. 19:12-19, 24:17-22
[257] Ex. 57, Pg. 24:18-19, 25:11-12
[258] Ex. 29 (Min. 18:28 to 18:37); Ex. 56, Pg. 84:17-20, 85:12-14, 17.
[259] Ex. 29 (Min. 32:35 to 32:37)

kept putting the Defendant on notice that it was failing repeatedly to properly observe inmates. Thus, respectfully, this part of this element of the conditions claim survives.

### iii.    MEDICAL CARE DENIAL CONDITION CLAIM SURVIVES

95.     Since the Defendant's summary-judgment motion has not specifically identified the medical failures custom "part of" the conditions of confinement "claim" as the "*part*" on "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).[260]  *Supra*.  In an abundance of caution, however, Garcia here argues why there are issues of fact on it in the event that technical failure is overlooked.

96.     To start, Plaintiff Intervenor Jenkins' jail expert testified that, after reviewing all of the documents, Defendant's noncompliance with state jail standards appeared to have negatively impacted overall detainee medical care.  Ex. 55, Pg. 58 ¶ 1.  As that condition of confinement relates to Sanchez's claims specifically, on the ground level, the evidence shows he was denied adequate, timely medical care for his bloody urine for weeks/days, and for the medical emergency featuring his bloody head that he had for hours prior to the date upon which he died.

97.     Indeed, Stewart expressly testified that she saw these negative detainees' medical care impacts herself on her shifts.[261]  Moreover, the evidence shows that Sanchez made a kiosk request about his painful, bloody urination that was not met for nine (9) days.  *Supra*.  Which is consistent with Plaintiff Tramell Morelle and Jeremy Garrison's deposition testimony on the subject.[262]  And, there is even testimony from PREA Manager Katrina Camacho that these kiosks do not always work, which would explain why there are not more unmet requests.[263]

---

[260] *Compare Wagner III*, *7 *to* Doc. 169 generally
[261] Ex. 57, Pg. 54:15-21, 72:16-18, 29-22, 9-11.
[262] Ex. 74, 169:16-170:5  Ex. 85, Pg. 62:14-20; Ex. 86, Pg. 54:55:1;
[263] Ex. 60, Pg. 62:10-63:4

98.     Additionally, there is considerable sworn testimony from numerous detainees that medical care was not provided for their serious medical needs.[264]   Plaintiff Ryan Twedt, for example, begged for medical treatment for his eye in 2022, never got it, and now has to live his life with blurry vision.[265]   Plaintiffs Jeremy Garrison and John Coote testified, it was common for the Defendant's clinic to not follow up with medical care after visits.[266]   And, Plaintiffs John Coote and Taylor Euell both testified, it is not easy to get the medicines you need at this jail, and the Defendant does not always properly hand it medication to inmates.[267]   And, respectfully, discovery upon this specific issue is not yet complete, and there are still months left in it.

99.     Moreover, prominently written on Sanchez's cell wall was "*Luke 5:31.  **People who are well do not need a <u>doctor</u>, but only those who are <u>sick</u>.  I have not come to call respectable people to repent, but outcasts**"* was fittingly written on to Sanchez's cell's wall after he went untreated for his painful, bloody urination.  *See* Ex. 43, Pg. 1-4.  And, there is evidence that, across two (2) shifts, Stewart, Lighten, and Ung did see a distressed Sanchez or heard about it from other inmates, and did nothing in accord with the custom.  *Supra*.

100.    And, even though a trustee passing out breakfast may have also seen Sanchez, if this inmate trustee had seen something, he probably did not say or help Sanchez, because like Plaintiff Antonio Radcliff who once was just being "*a regular human being*" and had "*helped a man that was on the floor*" passed out from "*fentanyl*" whose "*face*" and "*body*" were "*blue*"

---

[264] Ex. 55, Pg. 73 ¶ 4, Ex. 75, Pg. 192:10-12; Ex. 86, Pg. 35:6-11, 53:22-54:3, 64:15-22, 65:7-13, 90:14-18; Ex. 87, Pg. 19:17-23, 20:23-21:3, 24:15-18, 37:4-10
[265] Ex. 86, Pg. 65:7-13
[266] Ex. 2, Pg. 3 ¶ 7, 4 ¶ 14, Ex. 74, Pg. 97:23-98-11, 102:11-12, 138:19-139:6; Ex. 75, Pg. 166:22-167:1
[267] Ex. 2, Pg. ¶ 8; Ex. 75, Pg. 163:19-164:3; Ex. 86, Pg. 45:11-46:12

when "*medical staff*" and "*COs*" were "*not*" there, he too might have lost his trustee food job for rendering aid.[268]  Hence, Defendant had fostered a culture where it was okay not to render aid.

101.    Further supporting that is the fact that, after Sanchez was finally discovered, Sergeant Williams asked the seven (7) present officers "*whether or not medical staff members had been summoned*" but no "*one seemed to know*."[269]  Thus, with so many detention officers and sergeants having done nothing, standing around in the context of several other incidents where care was denied, such as Sanchez's own blood urination incidents and those of the other Plaintiffs, a reasonable jury could find this failure to provide medical care custom.

### C.    THE ALTERNATIVE EPOSIDIC ACTS CLAIM SURVIVES

102.    Garcia has a live episodic acts claim that was pled and is being pursued in the express Fed. R. Civ. P. 8(d) alternative.[270]  Which, in short, while Lighten/Stewart testified that they did not see Sanchez after they testified that they had seen him, a reasonable jury could choose to believe the version of events where they saw Sanchez and did not act. *Supra*.  As background, an episodic acts or omissions claim challenges a particular act or omission of one or more officers, just like those where an actor or actors are usually interposed between the detainee and municipality.[271]  Indeed, any harmful act perpetrated by a particular official or officials, in isolation, may be classified as an episodic act or omission.[272]

103.    According to Defendant, the elements for it are (1) a constitutional injury, (2) a jail official's subjective awareness that plaintiff was exposed to a substantial risk of harm and nevertheless acted with deliberate indifference to that risk of harm, and (3) the harm suffered was

---

[268] Ex. 81, Pg. 103:21-104:23, 106:2-18
[269] Ex. 25, Pg. 10 [IA 1000011]
[270] Doc. 41 Pg. 71-72 ¶ 81-83
[271] *Howell*, *16
[272] *Howell*, *16-17

proximately caused by the deliberate indifference of one or more custodial employees. *See* Doc. 169, Pg. 17-18. Upon the first, as established above, Sanchez's Fourteenth Amendment due process guarantees were violated many times over, since he was not kept safe, denied medical care for his serious medical needs, and was not protected from a known risk of suicide. *Supra*.

104. The next two elements concern deliberate indifference. *Infra*. To establish deliberate indifference, a plaintiff need only show that jail officials both (1) knew the detainee faced a substantial risk of serious harm, and (2) disregarded that risk by failing to take reasonable measures to abate it.[273] And, upon each, a reasonable jury could find for Garcia.

### i.    THE DEFENDANT HAD SUBJECTIVE AWARENESS AND KNOWLEDGE OF THE INVOLVED RISKS

105. Since the Defendant's summary-judgment motion did not specifically identify the subjective awareness element as a "part of" the episodic acts "claim" on "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure. *See* Fed. R. Civ. P. 56(a). At most, the Defendant's only specific argument is that it is supposedly "*obvious that there is no constitutional tort that has been committed*." *See* Doc. 131, Pg. 12-13 ¶ 63-71. In an abundance of caution, however, Garcia here argues why there are genuine issues of fact upon that part of this claim in the event that that fatal technical failure is overlooked.

106. As background, the first element of a Fed. R Civ. P. 8(d) episodic acts claim concerns awareness, and it requires subjective knowledge of the risk.[274] And, to prove that an official was subjectively aware of a substantial risk of harm, a plaintiff does not need to produce direct evidence of the official's knowledge.[275] Rather, the requisite knowledge can be inferred

---

[273] *Hulsey v. Bishop*, 2024 U.S. App. LEXIS 28201 *13 (5th Cir. 2024) (citing *Farmer*, 847); *Savage*, *35-37
[274] *Hulsey,* *13 (citing *Farmer*, 837)
[275] *Hulsey,* *13

from circumstantial evidence.[276]  For instance, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious.[277]  And, plaintiffs do not need to show that the defendant was aware of the specific source of harm suffered.[278]

107.    Here, first, the suicide risk was obvious.  *Supra*.  To start, Defendant had been on notice that Sanchez was suicidal since at least April 2020.[279]  After which, the evidence shows that Defendant was reminded of it in November and December 2021.[280]  The latter of which was a direct statement that he would try to kill himself, which was brought to Sergeant Randall Williams' attention, who the Defendant later found had failed to perform and discharge his duties.[281]  Moreover, Sanchez was placed in a solitary cells which had twenty-four seven (24/7) inside-the-cell live video footage to the PCC, which not all cells on the 7th Floor possess.  *Supra*.

108.    Second, Sanchez's painful blood urination for days was a serious medical need that was obvious.  *Supra*.  Having been painfully urinating blood, Sanchez had even submitted a medical kiosk request for medical attention that took nine (9) days for him to actually get seen by the clinic.  *Supra*.  After which, so desperate was Sanchez that "*Luke 5:31*.  **People who are well do not need a <u>doctor</u>, but only those who are <u>sick</u>.  I have not come to call respectable people to repent, but outcasts**" was fittingly written on to his cell's wall.  Ex. 43, Pg. 1-4.  All the which should have made it obvious to the Defendant that Sanchez's bleeding genitals needed a doctor.

109.    Third, the medical emergency too was obvious.  *Supra*.  To be clear, the evidence shows that Sanchez was perpendicularly arched over the toilet with a bleeding head on the ground,

---

[276] *Hulsey,* *13 (5th Cir. 2024) (citing *Farmer*, 842); *Savage*, *37 (citing *Gates v. Cook*, 376 F.3d 323 (5th Cir., 2025)); *McCollum*, *31
[277] *James*, *22; *Hulsey*, *13; *Farmer*, 842
[278] *Hulsey*, *13 (citing *Farmer*, 843)
[279] Ex. 4, Pg. 1-2
[280] Ex. 5, Pg. 2 # 12; Ex. 7, Pg. 2; Ex. 8, Pg. 2; *see also* Doc. 169, Pg. 7 (12/27/2021)
[281] Ex. 8, Pg. 2 [000240]; Ex. 66, Pg. 4-5 [IHR 00004 to 5]

with his pants yelling for help for hours, which was an obvious medical emergency.  *Supra*.  And, even Defendant's Investigating Sergeant Love testified, "***oh my god,***"[282] "***how in god's creation did nobody see that?***" when she reviewed the several hours of cell video.[283]   It, after all, was a visual sight so obvious that anybody should have recognized that Sanchez needed help.  *Supra*.

110.    As Ung described it, Sanchez was " Sanchez "*laying across the cell toilet.*"[284]  As Detention Officer Osvaldo Garcia described it, Sanchez "*appeared to be unconscious*" and "*was lying in a resting position with his back across the toilet and his upper body toward the back of the cell.*" [285]  As Detention Officer Bruce Hayes testified Sanchez was "*unconscious*" and "*slumped over the toilet, lying on his backside.*"[286] And, as Sergeant Williams described it, the "*buttocks and lower back of… Sanchez… to be resting on the toilet seat; and back of his head, as well as the heels of his feet [appearing] to be in contact with the floor surface.*"[287]  Hence, anybody who had seen or heard Sanchez's yells would have found his need for medical help to be obvious.

111.    Thus, the obviousness requirement is met in three different ways.

**ii.    THE DEFENDANT DISREGARDED THE KNOWN RISKS**

112.    Since the Defendant's summary-judgment motion did not specifically identify the disregard of known risk element as a "part of" the episodic acts "claim" on "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  At most, the Defendant's only specific argument is that it is supposedly "*obvious that there is no constitutional tort that has been committed.*"  *See* Doc. 131, Pg. 12-13 ¶

---

[282] Ex. 37 (Min. 18:13 to 18:14)
[283] Ex. 37 (Min. 11:22 to 11:27); Ex. 58, Pg. 11:23-12:3, 18:10-11, 42:22-43:1, 21-25
[284] Ex. 25, Pg. 9 [IA 000010]
[285] Ex. 25, Pg. 4 [IA 000005]
[286] Ex. 25, Pg. 5 [IA 000006]
[287] Ex. 25, Pg. 10 [IA 1000011]

63-71. In an abundance of caution, however, Garcia here argues why there are genuine issues of fact upon that part of this claim in the event that that fatal technical failure is overlooked.

113.    That said, as background, the second element, disregard of the risk, means that prison officials who actually knew of a substantial risk to inmate health and safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.[288] The Supreme Court has explained that plaintiffs need not show that a prison official acted or failed to act believing that harm actually would befall the inmate; it is enough that the official acted or failed to act despite his or her knowledge of a substantial risk of serious harm.[289] Deliberate indifference is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.[290]

114.    And, here, first, the summary judgment evidence shows that 7th Floor Supervising Sergeant Williams was explicitly put on notice of Sanchez's suicide risk, a mere month before Sanchez died.[291] And, it also shows that while Sanchez was placed into a solitary twenty-four-seven (24/7) round-the-clock observation cell, that housing unit did not have the required padded cells, nor was it observed every thirty (30) minutes as was required. *Supra*. And, after this, Defendant found Williams to have failed to discharge his duties as a supervisor.[292]

115.    Second, the evidence also shows that Defendant was explicitly put on notice of the Defendant's painful blood urination and did absolutely nothing for it. *Supra*. As a reminder, it took nine (9) full days for him to even be taken to the clinic, where he thereafter had to wait for several hours, after which nothing whatsoever was done. *Supra*. And thereafter, despite having

---

[288] *Hulsey,* *13 (citing *Farmer*, 844)
[289] *Hulsey,* *13 (citing *Farmer*, 842)
[290] *Hulsey*, *13 (citing *Converse, 777*)
[291] Ex. 8, Pg. 2 [000240]
[292] *See* Ex. 66, Pg. 4-5 [IHR 00004 to 5]

been made expressly aware of it, the Defendant "did not monitor… whatsoever" Sanchez's blood urination situation.[293]  And, on the day Sanchez died, the Defendant even confessed to the EMS to EMS that Sanchez had been "*peeing blood two days ago but [had not] been sent out by clinic staff to the ER to see a doctor*."[294]  Hence, a jury could find that Defendant had just let Sanchez suffer.

116.    Third, a reasonable jury may choose to believe Stewart sworn statements made under the penalty of perjury that she had *observed*" Sanchez "*inside the cell*"[295] saw that he was "*slumped*"[296]  And, a reasonable jury may also chose to believe that Lighten's confession that he did "**notice… a couple people hear [Sanchez] yelling and everything, but [he himself] didn't give it a straight oh, let me look inside**."[297]  And, that reasonable jury could also believe Lighten's statement that he "*noticed… Sanchez,*"[298] when he unlocked the cell door for the breakfast trustee. *Supra.*  And, a jury could find detainee Saez, who had testified that Sanchez yelled for help but was ignored by the guards, to be credible, like Investigating Sergeant Love had.  *Supra.*

117.    What was in the cell was such an "'**oh my god**"[299] and "**how in god's creation did nobody see that?**"[300] type of obvious emergency which, if Lighten and Stewarts' sworn statements imply that they must have seen when looking inside those cells at the specific times that they did, a reasonable jury could find that these officials failed to act despite knowledge of a substantial risk of serious harm in the form of doing nothing when seeing a perpendicularly slumped and arched over the toilet detainee with pants still on and bleeding head on the ground.  *Supra.*

---

[293] *James*, *21
[294] Ex. 27, Pg. 11 [TXR 000130]
[295] Ex. 24, Pg. 2 ¶ 4 [IA 000034]; Ex. 36 (Min. 1:26 to 1:31, 7:49 to 7:58); Ex. 58, Pg. 114:14-18
[296] Ex. 35 (Min. 22:48 to 22:52); Ex. 58, Pg. 63:8-10, 117:10-14, 124:25-125:1
[297] Ex. 29 (Min. 13:58 to 14:06)
[298] Ex. 25, Pg. 6; Ex. 29 (9:06-9:10); Ex. 30, Pg. 30; Ex. 31 (5:46 to 5:50); Ex. 56, Pg. 90-91
[299] Ex. 37 (Min. 18:13 to 18:14)
[300] Ex. 37 (Min. 11:22 to 11:27); Ex. 58, Pg. 11:23-12:3, 18:10-11, 42:22-43:1, 21-25

118.    Given so, a jury therefore could find two (2) possible fact patterns, both of which are favorable to Garcia.  *Supra*.  Namely, a jury could find, as explained above, that Sanchez was the victim of a condition of confinement on which Lighten/Stewart did not see him because they were not supervised/trained to properly make observations.  *Supra*.  Or, second, that as they testified or wrote in their wrote, that they did see him, and which other evidence shows must imply that they had to have seen the medical emergency and did absolutely nothing for it.  *Supra*.  And, because, as a matter of law, courts are precluded at the summary judgment stage from weighing credibility even when a witness's own statements contradict themselves,[301] a jury will need to decide which of the two versions of events occurred because the video evidence is inconclusive.  *Supra*.  It, after all, shows that Stewart/Lighten could have seen him, but also that they might not have.  *Supra*.  And that sort of question, respectfully, is best suited for the jury at trial to decide.

### D.    THE *MONELL* CLAIM SURVIVES

119.    Garcia's next claim is a *Monell* one.[302]   Since the motion did not specifically identify the *Monell* claim as one upon "which summary judgment is sought," judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  In an abundance of caution, however, Garcia here argues why there are genuine issues of fact upon that part of this claim in the event that that fatal technical failure is overlooked.  As background, as Garcia pled and this Honorable Court has previously written in this case, the elements for it are (1) an official policy, (2) promulgated by the municipal policymaker, (3) that was the moving force behind a constitutional violation.[303]   And, here, there is a genuine issue of material fact upon each.

---

[301] *McCoy*, 754 (reversing summary judgment where a court chose one version of a witness's version of events over another one by that exact same witness that contradicted it)
[302] Doc. 41, Pg. 9-66 ¶ 28-70
[303] *See* Doc. 41, Pg. 9 ¶ 29 (citing *Moore*, 509, *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012), *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *7-8 (S.D. Tex. 2018) (Ellison, K.), *Releford*

i.     **THE POLICY / CUSTOM ELEMENT**

120.     Defendant's summary-judgment motion did not specifically identify the custom, policy or practice element as a "part of" the _Monell_ § 42 USC 1983 "claim" on "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure. _See_ Fed. R. Civ. P. 56(a).  But, even if it had, there is a genuine issue of fact upon it.

121.     As Garcia pled, there are at least three (3) ways to establish to show these: (1) written policy statements, ordinances, or regulations, (2) a widespread practice that is so common and well-settled as to constitute a custom that fairly represents policy[304], or (3) even a single decision may constitute municipal policy where the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim.[305]

122.     With the second, there are at least two (2) ways to show the second.  _Infra_.  The first is the familiar pattern of incidents approach for which Garcia has a Fed. Civ. P. 56(d) motion, and the second is the _Shepherd v. Dallas County_, 591 F.3d 445, 452 (5th Cir. 2009) and _Moore v. LaSalle Mgmt. Co._, 41 F.4th 493, 509-15 (5th Cir. 2022) ways where reports and detention officer testimony could establish it.  _Id_.  Of which, here, there is considerable evidence.  _Supra_.

123.     That said, this Honorable Court, as this Court has previously written, those customs and policies at issue in this lawsuit are (1) insufficient monitoring of detainees, (2) inadequate medical care, and (3) systemic understaffing and overcrowding.  _Wagner III_, *14.  And nowhere in Defendant's summary judgment motion has it expressly moved for dismissal on the express

---

_v. City of Houston_, 2016 U.S. Dist. LEXIS 167749 *9 (S.D. Tex. 2016) (Ellison, K.)); _Wagner II_, *30-31; _Wagner III_, *13; _Howell_, *7; _Louzi v. Fort Bend Cty._, 2020 U.S. Dist. LEXIS 154775 (S.D. Tex. 2020) (Ellison, K.)
[304] _Louzi v. Fort Bend Cty._, 2020 U.S. Dist. LEXIS 154775 *11 (S.D. Tex. 2020) (Ellison, K.) (denying dismissal of jail suicide case)
[305] Doc. 43, Pg. 10 ¶ 30 (citing _St. Maron Props., L.L.C. v. City of Houston_, 2023 U.S. App. LEXIS 22044 *7 (5th Cir. 2023) and _Bartee_, *8

ground that there is no evidence on any of those specific three parts of the § 1983 _Monell_ custom, policy or practice element. _Supra_. But, even if it had, fact issues have been raised on these customs in the preceding section, the _Shepherd_ and _Moore_ ways through detention officer and inmate sworn deposition testimony and TJCS and Jenkins' expert report. _Supra_. And, even if not, Sanchez has contemporaneously filed a Fed. R. Civ. P. 56(d) motion since discovery is not complete on this.

### ii.    THE POLICYMAKER ELEMENT

124.    The Defendant has also not expressly contested this element.[306] But, even if it had, as stated in Garcia's complaint, a policymaker is an individual or individuals who takes the place of the governing body in a designated area of government administration.[307] In Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the Sheriff has been elected.[308] Here, that individual is Harris County Sheriff Ed Gonzalez.[309]

125.    And, he delegated the ground-level running of the jail to others.[310] Those leaders, like Major Ceddrick Collier, admitted that the jail had gotten into the practice of doing subpar inmate observations, and, as Sergeant Williams wrote in an email blast that the jail is understaffed. And, those leaders knowing put an incompetent— their words— Sergeant Randall Williams, in charge of the chronically understaffed 7th Floor and known suicide risk Sanchez. _Supra_. And, they emphasized timely rounds over proper rounds to newcomers like Stewart, who had not even been to jail school, and told Lighten just to take quick glances and barely do that. _Supra_. And, the denials of medical care, understaffing, and failure to observe customs are so widespread that

---

[306] _Howell_, *12
[307] Doc. 41 Pg. 12 ¶ 36 (citing _Zarnow v. City of Wichita Falls Tex._, 614 F.3d (5th Cir. 2010))
[308] _Howell_, *12 (citing _Turner v. Upton County_, 915 F.2d 133 (5th Cir. 1990))
[309] _Howell_, *12; _Bartee_, *9 (S.D. Tex. 2018); Ex. 57, Pg. 76:18-20.
[310] _Moore_, 510

Defendant's former detention officers have been more than happy to testify about the same. *Supra*. Which means that Defendant's policymaker has had to know about them and acquiesced.

### iii.    MOVING FORCE

126.    As Garcia pled in her complaint, for moving force purposes, a plaintiff need only show that the municipal action or inaction was taken with the requisite degree of culpability and that there was a direct causal link between such and the deprivation of federal rights.[311]   A plaintiff meets the culpability showing if the municipality adopted a policy with deliberate indifference to the "known or obvious consequences" that a constitutional violation would result.[312]   Here, Garcia's theory of causation is glaringly obvious: she alleges and shows with evidence a failure to observe/monitor, failure to provide medical care, and systematic understaffing and overcrowding customs, and shows evidence that Sanchez was a victim of those customs.[313]   And, as detailed above, the evidence raises fact issues regarding the same as causing Sanchez's injuries.  *Supra*

127.    To start, on observation custom, Major Collier was specifically asked at his deposition if Defendant had any particular responsibility for this inmate's death, he responded that "*we failed to make the proper rounds*" and we had gotten "*in the routine of doing subpar rounds*." Ex. 59, Pg. 56:4-7, 57:6-8.  And, Stewart herself testified that had she not followed that subpar, improper observation barcode scanning custom, she could have possibly aided Sanchez.  Ex. 57, Pg. 98:9-11.  Moreover, Lighten testified that he was on the phone in the PCC trying to keep others awake since one of them had been caught sleeping on the job two weeks earlier.  *Supra*.  Hence, a jury could find the staffing custom to have been a moving force.

---

[311] Doc. 41, Pg. 68 ¶ 31 (citing *Bartee*, *9)
[312] *Bartee*, *9
[313] *Heckford v. City of Pasadena*, 2021 U.S. Dist. LEXIS 114573 *15 (S.D. Tex. 2021) (Ellison, K) (denying dismissal of *Monell* claims)

128.    On the understaffing custom, Detention Officer Yannis Ramos and others have testified, it is the 7th floor that the one that is always understaffed. *Supra*. Sergeant Quinten Sneed testified at his deposition that he likes to have two (2) officers in the PCC, not one, but here, only one officer, Lighten, staffed the PCC, and he was busy trying to keep the other PCC officers awake via phone. *Supra*. Moreover, Lighten was only assigned there because of understaffing. *Supra*. And, Stewart herself testified that more staffing would have helped and would have led to a different result.[314]    Additionally, Ung made it a point to write in his report that he had been forced into a customary sixteen (16) overtime shift because of understaffing. *Supra*. And, several detention officers have testified from firsthand experienced that this understaffing and forced overtime custom negatively impairs their observation skills. Hence, a reasonable jury could find that the understaffing custom was a moving force behind Sanchez's injuries.

129.    Finally, on the failure to provide medical care custom, with the Luke 5:31 cry for medical attention written on Sanchez's cell's wall, the Defendant felt so guilty about having denied him medical care for his painful blood urination for days that it confessed to EMS that Sanchez had been "*peeing blood two days ago but [had not] been sent out by clinic staff to the ER to see a doctor*."[315]    Which is just like when the story is told in the sworn testimony of the numerous other detainees in this case, except for the fact that Sanchez died.[316]    Hence, a jury could find that this custom, too, was a moving force behind his injuries, such that judgment should be denied.

### E.    THE FAILURE TO TRAIN CLAIM SURVIVES

---

[314] Ex. 57, Pg. 63:6-7, 69:1-8, 74:24-75:2
[315] Ex. 27, Pg. 11 [TXR 000130]
[316] Ex. 55, Pg. 73 ¶ 4, Ex. 75, Pg. 192:10-12; Ex. 86, Pg. 35:6-11, 53:22-54:3, 64:15-22, 65:7-13, 90:14-18; Ex. 87, Pg. 19:17-23, 20:23-21:3, 24:15-18, 37:4-10

130.    Garcia's next claim is a failure to train one.[317]  Upon it, Defendant only asserts that "*Plaintiff will undoubtedly urge a 'failure to train claim*'."  *See* Doc. 169, Pg. 15 ¶ 68.  But Defendant's summary-judgment motion does not specifically identify what specific "part of" that "claim," if any, that "summary judgment is sought."  *See* Fed. R. Civ. P. 56(a).  But, even if it had not made that technical fatal failure, there are still genuine issues of fact upon it.  Indeed, as this Honorable Court has previously written in this case, the elements are (1) a failure to train, (2) a causal connection between that failure and the alleged violation of plaintiff's rights, and (3) that failure constituted deliberate indifference to the plaintiff's constitutional rights.[318]  And, the evidence, respectfully, raises a genuine issue of material fact upon each of these elements.

### i.    THERE WAS A FAILURE TO TRAIN LIGHTEN / STEWART

131.    Since Defendant's passing allusion to the failure to train claim [Doc. 169, Pg. 15] did not specifically identify the first element "part of" the failure to train "claim" as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  But, even if the Defendant had, there is a genuine issue of fact upon it.  Starting with Lighten, he had just graduated from high school and had only worked for six (6) months at an Amazon.com warehouse.[319]  Then, without any law enforcement experience, he joined a Defendant who he does not recall provided him with any training whatsoever with respect to correctly doing rounds to make sure inmates are safe.[320]  In other words, in this key respect, the Defendant provided him with no training whatsoever.

---

[317] Doc. 41, Pg. 69-71 ¶ 76-80
[318] *Wagner II*, *45; *Wagner III*, *25; *Howell*, *13
[319] Ex. 56, Pg. 8:9-15, 23:9-4
[320] Ex. 56, Pg. 38:10-18

132.    The training that was provided, however, including the shadowing of detention officers who performed inmate observations incorrectly.  *Infra*.  Indeed, as the several detention officers have testified, Defendant trains its detention officers by having them shadow other detention officers.[321]  This type of learning, however, does not come from sergeants, lieutenants or captains, and after it, new detention officers immediately go straight to working on their assigned floors.[322]  To that point, Stewart testified that she did her observation rounds just like she had seen her shadowed detention officers improperly do them.[323]  In other words, a reasonable jury could find this to be a specific defect in the Defendant's training protocols.

133.    That said, just like Lighten, Stewart also had no prior jail experience.[324]  She even testified, new people, like her and Lighten at the time, do not know anything or what they are doing.[325]  And that she had only just gotten her associate's degree from the College of the Mainland in Texas City, and had just been hired.[326]  And, at most, she had just attended Defendant's orientation, where they only taught her self-defense, how to pepper spray, write reports, and gave her a provisional license, and at the time of the incident, she had not even been to jail school yet.[327]  And, that orientation is not adequate to prepare officers like her to do things the right way.[328]  After that, there was no test whatsoever for her or Lighten before they could work in the jail, much less

---

[321] Ex. 56, Pg. 12:15-22; *see also* Ex. 57, Pg. 66:16-67:1, 85:16-19, 90:10-11, 20-23, 91:3-4, 93:16-18; Ex. 70, Pg. 12:9-10; Ex. 72, Pg. 9:14-23, 68:17-21; Ex. 73, Pg. 12:21-13:7; Ex. 76, Pg. 21, 22-22:18; Ex. 77, Pg. 28:16-19; Ex. 78, Pg. 13:16-14:4; Ex. 79, Pg. 21:23-22:4, 22:23-23:17; Ex. 80, Pg. 10:25-11:8; Ex. 82, Pg. 12:8-10; Ex. 83, Pg. 14:4-7
[322] Ex. 79, Pg. 24:5-10, 24:15-18
[323] Ex. 57, Pg. 85:16-19
[324] Ex. 57, Pg. 89:24-90:2
[325] Ex. 57, Pg. 39:19-20, 148:9-11.
[326] Ex. 57, Pg. 8:24-9:4, 10:16-22, 87:19-21
[327] Ex. 57, Pg. 11:13-14, 18-21, 21:12-13, 12:4-5, 12-13, 90:2-4; Ex. 71, Pg. 8:6-13; Ex. 80, Pg. 12:5-9
[328] Ex. 57, Pg. 66:2-11, 88:3-5, 12, 23-24

one on how to do rounds correctly.[329]  Hence, the untrained Stewart should not have been on the floor performing a task that she had not yet learned from jail school to do correctly.

134.    The focus at orientation and shadowing was entirely on rounds not being late, rather than teaching detention officers how to perform them properly.[330]  In fact, within Defendant, "*[e]verybody*," including "*[s]eargeants, lieutenants, captains, majors*," the focus is entirely on no late rounds rather than on if "*you're not doing it right.*"[331]  And, as former 7th Floor Detention Officer Elias Ortuno's deposition revealed, this approach was so ineffective and instilled the wrong way of doing things into its officers that the training now has new workers go from orientation to the academy for a month and a half to learn the right way to do things before shadowing current employees.  Ex. 80, Pg. 14:12-15.  Moreover, as Detention Officer Jin De Guzman testified, there was nothing in "*any training*" concerning "*breaking the culture of speed.*"[332]  A culture that even former 7th Floor Detention Officer Ortuno and medical supervising Sergeant Richard Torres agrees should be broken.[333]  Hence, a jury could find for Garcia on the first element.

### ii.    THERE IS A CAUSAL CONNECTION

135.    Since Defendant's passing allusion to the failure to train claim [Doc. 169, Pg. 15] did not specifically identify the second element "part of" the failure to train "claim" as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  Indeed, the Defendant does not raise any

---

[329] Ex. 78, Pg. 13:3-7,
[330] Ex. 57, Pg. 51:15-16, 68:4-9, 92:7-8
[331] Ex. 29 (Min. 32:35 to 32:37); Ex. 57, Pg. 24:18-19, 25:11-12, 25:11-12, 51:22-23
[332] Ex. 73, Pg. 84:8-13, 85:15-19
[333] Ex. 80, Pg. 70:1-6; Ex. 84, Pg. 70:23-71:9

argument as to causation.[334]  But, even if the Defendant had, there is a genuine issue of fact upon it such that summary judgment must be denied.

136.    Defendant, after all, so obviously knows the above-described training protocols were flawed that now, after the incident, new hires go to jail school before being put out on the floor, as Stewart was on the date Sanchez died.  Ex. 80, Pg. 14:22-15:5.  That said, the evidence here also shows that Lighten and Stewart were not trained how to perform proper face-to-face observation rounds, did not perform, instead kept walking past the known suicide risk Sanchez, and permitted him to suffer from a medical emergency for hours.  *Supra*.  And, according to Stewart herself, with better training, there would have been a different outcome on the night Sanchez died.  Ex. 57, Pg. 69:1-8.  Hence, there was a causal connection between the specific training failures and the harm that resulted, and as such, judgment should be denied.

### iii.    THERE WAS DELIBERATE INDIFFERENCE

137.    Since Defendant's passing allusion to the failure to train claim [Doc. 169, Pg. 15] did not specifically identify the third deliberate indifference element "part of" the failure to train "claim" as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  But, even if the Defendant had, there is a genuine issue of fact upon it.  As background, to establish deliberate indifference, a plaintiff need only demonstrate that the need for more or different training was obvious, and the inadequacy so likely resulted in violations of constitutional rights that the policymakers could reasonably have been said to have been deliberately indifferent.[335]

---

[334] *Howell*, *15
[335] *Howell*, *14

138.    Here, like in <u>Brown v. Bryan County</u>, 219 F.3d 450, 458 (5th Cir. 2000), Defendant was aware of Stewart and Lighten's youth and inexperience, along with the highly predictable risk of injury.  Back in 2016, Defendant's Sheriff Ed Gonzalez himself even remarked that further training was needed and yet did nothing after that.[336]  And, it is so pervasive that even the inmates know that the 7th-floor officers are not properly trained.[337]  That said, as several detention officers have testified, the whole point of face-to-face observation rounds is to make sure nobody's dead, dying, passed out somewhere not on their bed, has not moved in a while, and there is no blood on the floor.[338]  To do it properly is to make a firsthand evaluation of each inmate's attitude, temperament by visually observing their physical, mental, and emotional states to detect potential signs of distress, needs for medical attention, and/or other special services.[339]  And, if this is not done, the obvious consequence is that inmates can get hurt, be denied medical care, and die.[340] Hence, respectfully, a jury could find for Garcia on the final deliberate indifference element.

## F.    THE FAILURE TO SUPERVISE CLAIM SURVIVES

139.    Garcia's next claim is a failure to supervise one.  *See* Doc. 41, Pg. 67-69 ¶ 71-75. Since the Defendant's summary-judgment motion has not specifically identified this failure to supervise "claim" as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  *Supra*.  In an abundance of caution, however, Garcia here argues why there are genuine issues of material fact on each element of the failure to supervise claim in the event that a fatal failure is overlooked.

---

[336] <u>Howell</u>, *15; Ex. 57, Pg. 78:9-14
[337] Ex. 75, Pg. 109:23-110:2, 112:14
[338] Ex. 79, Pg. 35:17-21, 37:15-18, 36:9-13; Ex. 80, Pg. 44:3-10, 17-20, 47:8-11; Ex. 82, Pg. 17:24-18:13, 18:14-18
[339] Ex. 38. Pg. 3-4; Ex. 56, Pg. 36-38, 120-121; Ex. 37, Pg. 31; Ex. 58, Pg. 22, 33; Ex. 59, Pg. 24, 33; Ex. 83, Pg. 40-41, 57; Ex. 88, Pg. 4, 6
[340] Ex. 56, Pg. 41:17-21, 41:23-42:9, 43:3-6, 54:17-23

140.     As Garcia pled, the elements for a failure to supervise claim include: (1) the sheriff failed to supervise, (2) a causal connection between that failure to supervise and the violation of the plaintiff's rights, and (3) such failure to supervise or train amounted to gross negligence or deliberate indifference.[341]   To that end, the Fifth Circuit has never required that a supervisory official be warned of the precise act that the subordinate official subsequently commits; rather, all that the Fifth Circuit (and the Supreme Court) requires is that supervisory officials just be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists.[342]

### i.      THERE WAS A FAILURE TO SUPERVISE

141.     Defendant's summary-judgment motion did not specifically identify the first element as a "part of" the failure to supervise "claim" (or even that claim at all) as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure.  *See* Fed. R. Civ. P. 56(a).  But, even if it had, there is a genuine issue of fact upon it.

142.     To start, when Sanchez was found unresponsive, the first person the discovering officers called was 7th Floor Supervising Sergeant Randal Williams.[343]   Right before this, Defendant had found that "*[a]s a supervisor*" was "*incompetent*" and there was "*a pattern exists*" to show it.[344]  But beyond just him, within Defendant, "*[e]verybody*," including "*[s]eargeants, lieutenants, captains, majors*," the focus is entirely on no late rounds rather than on if "*you're not doing it right.*"[345]   In fact, even Lighten himself stated that his "*sergeant say*" just take a "*quick glance*" and "*barely do that*" when timely scanning the barcodes.[346]  And, this is consistent with

---

[341] Doc. 41, Pg. 67, Pg. 67 ¶ 72 (citing <u>Doe</u>, 452)
[342] <u>*Smith v. Brenoettsy*</u>, 158 F.3d 908, 912 (5th Cir. 1998)
[343] Ex. 18 (7:09 to 7:35); Ex. 19 (2:22:48 to 2:23:15); Ex. 25, Pg. 10 [IA 000011]
[344] Ex. 66, Pg. 4-5 [IHR 00004 to 5]
[345] Ex. 29 (32:35 to 32:37); Ex. 57, Pg. 24:18-19, 25:11-12, 25:11-12, 51:22-23
[346] Ex. 29 (18:28 to 18:37); Ex. 56, Pg. 84-85; Ex. 57, Pg. 24:18-19, 25:11-12, 25:11-12, 51:22-23

the quick, ineffective glance technique that 7th Floor Detention Officer Gomez testified at his deposition.[347] And, it is the one seen in the videos in the summary judgment record across two (2) shifts and three (3) officers, namely Stewart, Lighten and Ung performing with impunity. *Supra*. Hence, a reasonable jury could find that these 7th-floor officers were not properly supervised.

### ii.    THERE WAS A CAUSAL CONNECTION

143.    Defendant's motion did not specifically identify the second element as a "part of" the failure to supervise "claim" (or even that claim at all) as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure. *See* Fed. R. Civ. P. 56(a). But, even if it had, there is a genuine issue of fact upon it. Indeed, the evidence shows Defendant's internal notes from right before Sanchez's incident, reading that 7th Floor Supervising Sergeant Williams was not supervising his detention officers and that a pattern exists. *Supra*. They, after all, were falling asleep on the job, having late rounds, and not doing the face-to-face observations properly. *Supra*. And, on the date of Sanchez's death, every single officer, Stewart, Lighten, and Ung, is not doing proper face-to-face observations with total impunity. *Supra*. Hence, there is a causal connection between the failure to supervise them and their walking past known suicide risk, Sanchez and permitting him to suffer for hours. Thus, respectfully, a reasonable jury could find for Garcia on this second element.

### iii.    THERE WAS DELIBERATE INDIFFERENCE

144.    Defendant's summary-judgment motion did not specifically identify the third deliberate indifference element as a "part of" the failure to supervise "claim" (or even that claim at all) as one upon "which summary judgment is sought," summary judgment should not issue upon it for this technical fatal failure. *See* Fed. R. Civ. P. 56(a). But, even if it had, there is a

---

[347] Ex. 79, Pg. 35:17-21, 35:23-24, 36:6-7, 37:15-18

genuine issue of fact upon it.  According to the deposed detention officers, the point of proper face-to-face observations is to make sure nobody's dead, dying, passed out somewhere not on their bed, has not moved in a while, and there is no blood on the floor.[348]

145.    Moreover, according to Defendant's high-ranking Major Ceddrick Collier, whether a detention officer has actually looked inside each cell is entirely based on the honor system, even though each floor has a supervisor whose job it is to make sure rounds are done correctly.[349]  He added that the Defendant's supervision practices permitted detention officers to get into the habit of doing subpar rounds.  Ex. 59, Pg. 57:6-8.  Which was rather predictable since supervising sergeants like Sergeant Wong were never critical about how rounds were performed in the 2022, like when Plaintiff Keon Smith died and was not discovered for several hours.[350]  And, Sergeant Randall Williams, who is documented as failing to specifically supervise the 7th Floor, was placed in charge of it on the day Sanchez died, and is the first one called by the discovery officers.  *Supra*.  Hence, Defendant knew about its failure-to-supervise "infractions, but did nothing to correct them."[351] Thus, respectfully, a jury could find that the Defendant was deliberately indifferent.

### G.    THE MOTION TO SEVER MUST BE DENIED AS WELL

146.    Defendant again seeks severance, this time without citing caselaw or evidence.  *See* Doc. 169, Pg. 19 ¶ 92.  Fed. R. Civ. P. 21 governs severance.  *Wagner I*, *5; *Wagner IV*, *11.  Claims should be joined where they arise out of the same transaction, occurrence, or series of the same, and when there is a common question of law or fact linking all claims.  *Wagner I*, *5; *Wagner IV*, *11.  And, that analysis should be guided by the Supreme Court's "strongly encouraged"

---

[348] Ex. 79, Pg. 35-37; Ex. 80, Pg. 44:3-10, 17-20, 47:8-11; Ex. 82, Pg. 17:24-18:13, 18:14-18
[349] Ex. 59, Pg. 29:13-15, 30:12, 33:9-14
[350] Ex. 83, Pg. 50:11-54:2, 67:23-68:3
[351] *Compare to* *Tuttle v. Sepolio*, 2023 U.S. App. LEXIS 12834 *11 (5th Cir. 2023)

preference for "entertaining the broadest possible scope of action consistent with fairness to the parties, joinder of claims, parties and remedies." *Wagner I*, *5; *Wagner IV*, *11.

147.    For the first prong, there need only be "some connection" or "logical relationship" between the claims. *Wagner I*, *6. And claims that arise out of the same transactions or occurrences when there is a pattern or policy of behavior, regardless of the differences amongst the plaintiffs' individual claims. *Wagner I*, *6. Here, all of the Plaintiff's claims all arise from the same set of policies of the Defendant's Jail of overcrowding/understaffing, failure to train/supervise, and properly observe/monitor detainees. *Wagner I*, *6. And, the evidence presented above shows understaffing, improper observation, and failure to provide medical care that affected all plaintiffs and intervenors. *Supra*. Next, as to the second prong, a common question of law or fact, the test does not require the claims to be identical, and the presence of a single question of law or fact is sufficient. *See Wagner I*, *7. And, again, here, the evidence shows jail conditions and customs around the same time period affecting all named parties. *Supra*.

148.    Nonetheless, Defendant asserts that, if its summary judgment be granted, that Garcia's claims be severed and become final and appealable. *See* Doc. 169, Pg. 19 ¶ 92. As an initial matter, as explained above, summary judgment should not issue. *Supra*. But, even if it were, this would be governed by Fed. R. Civ. P. 54(b), and there has been no showing or specific argument that an express determination of no just reason for delay should be made. *Id*. And, therefore, respectfully, Defendant's request should not be granted on grounds it did not present.

## X.    CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff-Intervenor Ana Garcia respectfully requests that the Honorable Court deny Defendant Harris County's Motion for Summary Judgment [Doc. 169], and that the Defendant take nothing from it.

Respectfully submitted,

THE SHARIFF LAW FIRM

By: _____

**M. Obaid Shariff**
Federal I.D. No. 2827312
Texas Bar No. 24091135
**Byron Boeing**
Federal ID No. 592378
Texas Bar No. 24040538
2500 West Loop South, Ste 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
mshariff@sharifflawfirm.com
**ELECTRONIC SERVICE VIA:**
eservice@sharifflawfirm.com

**ATTORNEYS FOR PLAINTIFF
INTERVENOR ANA GARCIA**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WAGNER et al. | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | CIVIL ACTION NO: |
| v. | § | 4:23-cv-02886 |
| | § | |
| HARRIS COUNTY, TEXAS, | § | Jury Requested |
| | § | |
| *Defendant.* | § | |

**CERTIFICATE OF SERVICE**

--------------------------------------------------------------------X

TO:    Clerk of the Court

    I hereby certify that on the date of this filing, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and/or via email on all counsels of record.

_____
M. Obaid Shariff
*Attorney for the Intervenor*

65