EXHIBIT 55
CONFIDENTIAL

IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTICT
OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| OCTEVIA WAGNER, et al. | § | CIVIL ACTION NO.: 4-23-CV-02886 |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY TEXAS | § | |
| | § | |
| Defendant. | § | |
| | § | |

## DECLARATION OF HAYDEN P. SMITH, PhD

1.    My name is Hayden P. Smith. I am over the age of 21 and competent to make this declaration. The facts stated herein are based upon my personal knowledge and are true and correct.

2.    I am a professor of Criminology & Criminal Justice at the University of South Carolina. As part of my professorship, I teach on subject matter including Prison Rape Elimination Act ("PREA") and mental illness occurring in corrections.

3.    I have a Master of Arts degree in Criminal Justice and a Ph.D. in Public Affairs (Cognate Areas: Criminal Justice & Public Health), both from the University of Central Florida. I have conducted research on correctional policies and customs for the past twenty years. My record of publication includes 5 books and 98 peer-reviewed publications on Criminal Justice, many of which deal with the policies, practices, training, and customs of correctional agencies.

4.    I have published nine empirical peer reviewed journal articles on the Prison Rape Elimination Act. One of my publications is regarding the Prison Rape Elimination Act ("PREA"),

Smith, H. P. (2020). Evaluating the implementation of the Prison Rape Elimination Act (PREA): A 'lesson learned' approach. *Evaluation & Program Planning, 83,* 1-8.

5. For eight years, I served as the state program evaluator for the implementation of PREA into 26 prisons in the South Carolina Department of Corrections (SCDC).

6. I have written 7 technical reports on the implementation, assessment, and measurement of PREA for the South Carolina Department of Corrections (SCDC) that is actively in use to develop PREA policies, practices, and training.

7. My expertise in mental health within corrections includes but is not limited to published books, book chapters, peer review journal publications, technical reports for correctional agencies, state and federal funded grants, academic conference presentations, invited keynote presentations, higher education instruction including but not limited to: on staff as professor at South Carolina University, supervising Ph.D. dissertations, masters' levels theses, graduate directed studies, and honor theses.

8. A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit A to my declaration. I attest that Exhibit A is a true and correct copy of my Curriculum Vitae.

9. I am familiar with the lawsuit filed by Ms. Jenkins as attorney in fact for Mr. Buford. I have been retained by counsel for Ms. Jenkins as attorney in fact for Mr. Buford to provide opinions relating to the facts underlying this lawsuit, including but not limited to evaluating Harris County's policies, practices, customs, training, staffing, and institutional behaviors as it relates to PREA and the allegations set forth in the lawsuit.

10. Part of my retention involved reviewing case file materials relating to Mr. Buford and the underlying lawsuit. The materials that I have reviewed to date are as follows:

- Jenkins' complaint (ECF No. 42)
- Confidentiality order (ECF No. 80)

CONFIDENTIAL

- Answer to Jenkins' complaint (ECF No. 88)
- Court's prior scheduling order (ECF No. 103)
- Court's third scheduling order (ECF No. 127)
- Haynes & Wilson – Power of attorney
- Haynes & Wilson – HIPPA power of attorney
- Jail/booking records and medical records (bates 000001 – 000245)
- Harris County PREA Policy CJC-116
- Harris County Separation Policy CJC-219
- Harris County Inmate Observation Policy CJC-220
- Policy 903.05 classification new-house JPC intake and dress out (post orders)
- Policy 903.13 PREA & LGBTI (classification post orders)
- PREA investigation records (bates PREA 000001 – 000031)
- Operational records (bates OR 000001 – 000045)
- Inmate housing history relating to Buford (bates JR 000246)
- Prisoner movement record relating to Buford (bates JR 000247)
- Jenkins' initial disclosures and document production (bates Jenkins 0001 – 0039)
- The Harris Health System medical records (bates Jenkins 0040 – 0357)
- Defendant's initial disclosures
- Exhibit A – Defendant's initial disclosures
- Detention command policies & procedures
- Functional capacity reports for the following dates: 08/10/2021; 01/23/2022; 02/12/2022; 03/11/2022; 03/18/2022; 04/08/2022; 05/20/2022; 05/24/2022; 06/28/2022; 09/29/2022; 11/13/2022; 11/20/2022; 12/24/2022; 01/03/2023; 01/10/2023; 01/31/2023; 02/01/2023; 02/02/2023; 02/07/2023; 02/08/2023; 02/10/2023; 02/11/2023; 02/13/2023; 04/19/2023; 04/23/2023; 04/27/2023; 05/18/2023; 05/20/2023; 06/06/2023; 06/07/2023; 06/11/2023; 07/01/2023; 07/30/2023; 07/31/2023; 08/05/2023; 08/25/2023; 08/27/2023; 10/1/2023;
- TCJS letter dated 01/17/2018
- TCJS inspection report regarding dates of inspection 11/26/2018 – 11/30/2018
- TCJS inspection report regarding dates of inspection 09/30/2019 – 10/04/2019
- TCJS inspection report regarding dates of inspection 11/30/2020 – 12/04/2020
- TCJS letter dated 04/13/2021
- TCJS inspection report regarding dates of inspection 01/10/2022 – 01/14/2022
- TCJS inspection report regarding dates of inspection 02/13/2023 – 02/17/2023
- TCJS special inspection report regarding dates of inspection 04/17/2023
- 2022 annual TCJS inspection report
- ABLE training (bates 000001 – 000062)
- Archived CJC SOPs (bates 000001 – 000975)
- Basic County Corrections Course (bates 000001 – 000554)
- DC SOPs [Active] (bates 000001 – 001168)
- ICAT/De-Escalation Training Materials (bates 000001 – 000151)
- Jail FTO Program Training Materials (bates 000001 – 000014)
- Wager Lawsuit System Policies (bates 000001 – 000251)
- Harris County Commissioners Court document dated 12/05/2023 (File # 23 – 6994)

CONFIDENTIAL

- HCSO Inmate-Handbook (Rev. March 2012)
- HCSO Inmate-Handbook (Rev. March 2013)
- HCSO Inmate-Handbook (Rev. August 2017)
- HCSO Inmate-Handbook (Rev. December 2018)
- HCSO Inmate-Handbook (Rev. April 2021)
- HCSO Inmate-Handbook (Rev. to V eff 03-2024)
- Forensic Center of Excellence ("TXFNE") medical records
- Deposition transcript and Exhibits 1 – 21 relating to HCSO Katrina Camacho
- Major Ruth McClanahan declaration (ECF No. 144-1)
- John G. Mills, DO, MS, MPH summary of medical records (ECF No. 144-2)
- Candice D. Kelley declaration (ECF No. 131-1)
- Letter of Representation and Preservation of Evidence (12/18/2023)
- Defendants' No Evidence Motion for Summary Judgment and Motion to Severe
- Transcribed PREA interview conducted by Investigator Gurrero (09/29/2023)
- Part 115 – Prison Rape Elimination Act National Standards. Authority 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 15601 – 15609. Displaying the eCFR in effect on 6/15/2023. https://www.ecfr.gov/on/2023-06-15/title-28/chapter-I/part-115

11.     My opinions based upon review of the case file materials provided to date are set forth in my report attached hereto to my declaration. I attest Exhibit B is a true and correct copy of my report, and the opinions and information therein are fully incorporated to my declaration.

CONFIDENTIAL

## UNSWORN DECLARATION UNDER 28 U.S.C. § 1746

I hereby certify, under penalty of perjury, that the foregoing declaration along with supporting Exhibits A and B is true and correct. I further verify that my attached report is an authentic, true and correct copy of my report in this case and the opinions and conclusions therein are my professional opinions and conclusions. I declare under penalty of perjury under the laws of the United States of America that my forgoing statements are true and correct. I am over the age of twenty-one years, I have not been convicted of a felony or crime involving moral turpitude, and I am in all ways qualified and competent to make the statements contained within this declaration. The statements contained herein are true and correct and I am authorized to make them. The statements contained within this declaration are based upon my own personal knowledge and relate to matters in which I personally participated or which I personally observed.

Hayden P. Smith PhD

6/12/2025

Date Signed

# EXHIBIT 7A

# HAYDEN P. SMITH, Ph.D.

Department of Criminology and Criminal Justice
University of South Carolina
Columbia, SC 29208
SmithHP@mailbox.sc.edu
Phone: 803.777.6538        Fax: 803.777.9600

## ACADEMIC & RESEARCH POSITIONS HELD

**Spring 2021 - Present**
**Professor**
Department of Criminology & Criminal Justice
University of South Carolina, Columbia

**Fall, 2022 - Present**
**Affiliated Investigator**
Rural and Minority Health Research Center
University of South Carolina, Columbia

**Fall 2019 - Present**
**Affiliate Faculty Member**
Public Opinion Research Laboratory
University of North Florida

**Spring 2013 - Present**
**Associate Professor**
Department of Criminology & Criminal Justice
University of South Carolina, Columbia

**Fall 2008 - Fall 2012**
**Assistant Professor**
Department of Criminology & Criminal Justice
University of South Carolina, Columbia

**Fall 2007 - Spring 2008**
**Visiting Assistant Professor**
Department of Criminology & Criminal Justice
University of South Carolina, Columbia

**Spring 2007 - Fall 2007**
**Instructor**
Department of Criminal Justice
Chicago State University, Chicago

**Fall 2006 - Spring 2007**
**Instructor**
Department of Criminal Justice

Loyola University, Chicago Loop

## EDUCATION

**Ph.D.**     **UNIVERSITY OF CENTRAL FLORIDA**     **Orlando, FL**
2007     **Public Affairs (Cognate Areas: Criminal Justice, Public Health)**
        Dissertation: *Social Pathological Sources of Poor Community Health*
        Chairperson: Thomas Wan, Ph.D.

**M.A.**     **UNIVERSITY OF CENTRAL FLORIDA**     **Orlando, FL**
2003     **Criminal Justice**

**B.A.**     **UNIVERSITY OF WOLLONGONG**     **AUSTRALIA**
1992     **Education**

## AREAS OF INTEREST

Mental Illness & the Criminal Justice System
Suicide & Self-Injurious Behaviors in Corrections
Officer Safety and Well-Being
Prison Rape Elimination Act (PREA)
Standards of Care
Program Evaluation

## BOOKS & BOOK CHAPTERS

**2025**     Smith, H.P. *Corrections in Crisis: Learning from the 2018 Lee Prison Riot.* Cognella: Solana Beach, CA (ISBN-13: 978-1-7935-8266-9).

**2025**     Smith, H.P., Viglione, J., & Taxman, F. *Community Corrections: An Intersectional Approach.* Cognella: Solana Beach, CA (ISBN-13: 979-8-8233-5933-7).

**2024**     Smith, H.P. *Criminal Justice and Mental Health: An Evidence Based Approach.* Kendall Hunt: Dubuque, IA. (ISBN-13: 979-8-3851-0729-2). Second Edition.

**2023**     Smith, H.P. *Promoting Wellness and Resiliency in Correctional Officers.* Routledge: London. (ISBN: 978-1-032-40702-9).

**2022**     Smith, H.P. *Criminal Justice and Mental Health: An Evidence Based Approach.* Kendall Hunt: Dubuque, IA. (ISBN-13: 978-1-7924-9007-1).

**2016**     Smith, H.P. *Criminal Justice and Public Health.* Routledge Publications: New York. (ISBN-13: 978-1138928251 / ISBN-10: 978-1138928251).

**2014**   Smith, H.P., & Adams, K. Chapter Three "Phenomenological and Existential Approaches to Crime and Corrections" pp. 37-52 in *Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment*. Edited by Polizzi, D., Braswell, M., & Draper, M.  Carolina Academic Press, Durham, NC. (2nd Edition) (ISBN-13: 978-1611632866 / ISBN-10: 978-1611632862).

**2009**   Smith, H.P., & Adams, K. Chapter Three "Phenomenological and Existential Approaches to Crime and Corrections" pp. 37-52 in *Transforming Corrections: Humanistic Approaches to Corrections and Offender Treatment*. Edited by Polizzi, D., & Braswell, M. Carolina Academic Press, Durham, NC.

**2008**   Smith, H.P. *Social Pathogenic Sources of Poor Community Health: The Intersection of Criminal Justice and Public Health Systems*.  VDM Verlag Publications: New York. (ISBN-13: 978-3639108200 ISBN-10: 978-3639108205).

## REFEREED PUBLICATIONS

**\* = denotes student co-author.**

**98.**   **2025**   Ferdik, F.A, McNeely, S., & Smith, H.P.
"Beyond the Prison Walls: The Influence of Visitation on Reincarceration."
Submitted at *Journal of Criminal Justice.*

**97.**   **2025**   Smith, H.P., & Ferdik, F.A
"Correctional Officer Health: An Urgent Call for Engagement."
Submitted at *International Journal of Prisoner Health.*

**96.**   **2025**   Smith, H.P.
"Understanding the Lee Prison Riot Through the Nation-as-Family Framework."
Submitted at *British Journal of Criminology.*

**95.**   **2025**   Smith, H.P.
"Meet Me at the Rock: The Behavioral Patterns of Collective Violence in Prison."
Submitted at *American Journal of Criminal Justice.*

**94.**   **2025**   Ferdik, F. A., Smith, H.P., Gooch, L., & Boyd, C.
"Combining Yoga with Expressive Writing to Improve Incarcerated Person's Health: A Randomized Waitlist Control Design."
Accepted & Forthcoming at *Justice, Opportunities, and Rehabilitation.*

**93.**   **2025**   Smith, H.P.
"Boiling a Frog: Adaptation and Surviving a Prison Riot."
Submitted at *Punishment & Society.*

**92.**   **2025**   Dunton, C.A., Smith, H.P., & Ferdik, F.A
"Rape does not happen like that anymore: Addressing Focal Concerns surrounding Sexual Violence among Incarcerated Persons."

**Page 3**

*Criminal Justice Studies,* Online First.

**91.**    **2025**    Smith, H.P., & Chueng, Y.*
"Beyond Faith: Evaluating the Efficacy of Character-Based Units in Promoting
Prosocial Behavior Among Incarcerated Individuals."
*Criminal Justice Studies, 37, 371-386.*

**90.**    **2025**    Ferdik, F.A., Smith, H.P., & Fix, R.
"To Seek or Not to Seek: Researching Determinants of Police Personnel
Intentions to Seek Counseling."
Submitted at *The Journal of Police and Criminal Psychology.*

**89.**    **2025**    Fix, R., Ferdik, F.A., & Smith, H.P.
"Promoting Physical and Mental Wellness in Police: Insights from Sworn and
Civilian Personnel."
Submitted at *Police Practice and Research.*

**88.**    **2025**    Smith, H.P., Fix, R., & Ferdik, F.A.
"Innovating Wellness: Police Perspectives on Strategies to Improve Access and
Engagement."
*Criminal Justice & Behavior, 52, 571-590.*

**87.**    **2025**    King, S., Smith, H.P., & Ferdik, F.A.
"Incarcerated Women and Mental Illness: An Interpretative Phenomenological
Analysis (IPA)."
*Crime & Delinquency,* Online First.

**86.**    **2025**    Ferdik, F.A., Frogge, G., Cooney, M., & Smith, H.P.,
"Contact matters: Determining the Effects of Political Orientations on
Satisfaction with the Police by Contact with the Police."
*Policing: An International Journal, 48, 303-320.*

**85.**    **2025**    Ferdik, F.A., Smith, H.P., Ensley, X., & Youngs, J.
"Disrupting the Drug-Crime Nexus: A Quasi-Experimental Evaluation of a
Substance Abuse Treatment Program."
Submitted at *Psychology, Crime & Law.*

**84.**    **2025**    Ferdik, F.A. & Smith, H.P. & Cochran Tanner, J.*
"Testing the effects of a servant leadership intervention using a cluster
randomized experiment."
*Justice Quarterly,* Online First.

**83.**    **2025**    Smith, H.P., & Ferdik, F.A.
"Administrative Perspectives: A Qualitative Study of Correctional Administrator
impressions of a Train-The-Trainer Model for the Prison Rape Elimination
Act."
*Crime & Delinquency,* Online First.

82.    2025    Smith, H.P., & Ferdik, F.A.
"Using a Peer-Led Trainer Model to Improve the Effectiveness of The Prison Rape Elimination Act."
*Crime & Delinquency,* Online First.

81.    2025    Crouch, E., Smith, H.P., & Andersen, T.
"Rural-Urban Differences in Bullying Perpetration and Victimization Using a National Sample."
*Journal of Rural Mental Health*, 49, 1-9.

80.    2025    Moghimi, E., Keller, K*., Thampinathan, S., Cipolli, W., & Smith, H.P.
"An Examination of Tweets posted before and after enactment of Twitter's Suicide and Self-Harm Policy: A Content Analysis Study."
Accepted & Forthcoming at *Exploration of Digital Health Technologies*.

79.    2025    Smith, H.P., Ferdik, F.A., & Cochran Tanner, J.
"A Multivariate Examination of Correctional Population Orientations toward the Prison Rape Elimination Act."
Revise & Resubmit at *Psychology, Crime, and Law.*

78.    2025    Shadmanfaat, S., Kabiri, S., Wellen, H*., Smith, H.P., Cochran, J., & Yousefvand, S.
"COVID-19 Misbehavior during the Lockdown in Iran: An Extension of Situational Action Theory."
*International Criminology, 5, 1-11.*

77.    2025    Dunton, C.A., Smith, H.P., & Ferdik, F.A
"The Unintended Effects of PREA in Women's Prisons:  Weaponization, Bullying, and Compulsory Heterosexuality."
*Crime & Delinquency,* Online First.

76.    2025    Kabiri, S., Sharepour, M., Howell, C.J., Wellen, H*., Smith, H.P., Cochran, J.K. Shadmanfaat, M., & Andersen, T.S.
"Violations of Emergent Norms regarding COVID-19 Mitigation and Social Hygiene: An Application of Agnew's General Theory of Crime."
*Crime & Delinquency*, Online First

75.    2024    King, S., & Smith, H.P.
"Reexploring Female Pathways to Incarceration: Assessing the Role of Mental Illness."
*International Journal of Offender Therapy and Comparative Criminology, 68, 1438-1461.*

74.    2024    Ferdik, F.A., Gist, J.T., & Smith, H.P.
"Correctional Officer Responses to Workplace Trauma: Refining the Vicarious Trauma Toolkit."
*Criminal Justice & Behavior, 51, 1275-1294.*

**Page**
**5**

73.   2024   Shadmanfaat, S., Kabiri, S., <u>Smith, H.P.</u>, Cochran, J., Andersen T., & Maddahi, J.
"Coaching and Doping: A Test of Situational Action Theory."
*Journal of Drug Issues, 54, 521-541.*

72.   2024   Crouch, E., Andersen, T., & <u>Smith, H.P.</u>
"Adverse Childhood Experiences and Positive Childhood Experiences among
Military Children."
*Military Medicine, 189, e1072-e1079.*

          Showcased In REACH: Military Research and Outreach
          *https://aub.ie/MilitaryREACH-Crouch2023*

71.   2024   Ferdik, F.A., <u>Smith, H.P.</u>, & Dunton, C.A.
"A Mixed-Methodological Inquiry of Correctional Population Responses
towards the Prison Rape Elimination Act."
*Criminal Justice & Behavior, 51, 1032-1053.*

70.   2024   Slade, K., <u>Smith. H.P.</u>, Adam, P., & Baguley, T.
"Re-Examining the Dual Harm Framework: An Assessment using International
Data."
*Psychology, Crime & Law, 30, 758-772.*

69.   2024   <u>Smith, H.P.</u> & Dunton, C.A.
"The Prison Rape Elimination Act (PREA). Snitching, Sexuality, and Normalizing
Deviance."
*International Journal of Offender Therapy and Comparative Criminology, 68, 849-866.*

68.   2024   <u>Smith, H.P.</u>, Ticknor, B., & Sitren, A.H.
"Virtual Reality in Criminal Justice: Exploring the Role of Emotion in Student
Learning".
*Journal of Educators Online, 21, 4.*

67.   2023   <u>Smith, H.P.</u>
"The Vexing Dilemma of Character Based Units (SBU's) in Prison."
*Federal Probation, 87, 29-32.*

66.   2023   <u>Smith, H.P.</u>, Slade, K., Ferdik, F., Potter, A., & Baguley, T.
"Sentinel Events in Prison: Surveillance of Dual-Harming Incarcerated
Populations."
*Journal of Offender Rehabilitation, 63, 1-20.*

65.   2023   King, S., & <u>Smith, H.P.</u>
"Reexamining Modified Labeling Theory:  A Sample of Incarcerated Women
with Mental Illness."
*Criminal Justice & Behavior, 50, 1565-1583.*

64.  2023  Kabiri, S., Shadmanfaat, S., Perkins, R., Wellen, H*., Howell, C.J., Cochran, J.K & <u>Smith, H.P.</u>
"Aggressive Spectators in Sporting Milieus: A Test of Situational Action Theory."
*Global Crime, 24, 195-214.*

63.  2023  Kabiri, S., Shadmanfaat, S., Stevens-Andersen, T., Rotzinger, Y*., Howell, C.J., <u>Smith, H.P.</u>, & Cochran, J.K.
"Personal Control and Antisocial Coaching: A Test of Self-Control and Control Balance Theories."
*Deviant Behavior, 44, 738-751.*

62.  2023  <u>Smith, H.P.</u>, Ferdik, F., Dunton, C., & Bolaji, Q*.
"An Assessment of Knowledge, Support, And Behavior Surrounding the Implementation of the Prison Rape Elimination Act".
*Criminal Justice & Behavior, 50, 1016–1034.*

61.  2023  Dunton, C.A., <u>Smith, H.P.</u>, & Ferdik, F.A.
"Examining Correctional Administrator Perceptions of the Prison Rape Elimination Act (PREA)".
*Prison Service Journal, 264, 28-36.*

60.  2023  Gist, J., Ferdik, F.V., & <u>Smith, H.P.</u>
"A Qualitative Inquiry into the Sources of Resilience found among Correctional Officers working in Maximum-Security Prisons."
*Criminal Justice Policy Review, 34, 291-315.*

59.  2022  Steele, M*., Power, J., & <u>Smith, H.P.</u>
"Online Non-Suicidal Self-Injury: The Applicability of The Four Function Model."
*Issues in Mental Health Nursing, 43, 808-817.*

58.  2022  <u>Smith, H.P.</u>
"Correctional Pedagogy: Reflexivity and Student Prison Tours."
Published Peer Reviewed Proceedings of Research World International Conference on Arts, Education and Social Science, Washington, DC, 21st-22[nd] April 2022.

57.  2022  <u>Smith, H.P.</u>, Ferdik, F.S., Crawford, A*., & Radcliffe, S.
"An Evaluation of a Yoga Program for Correctional Administrators and Officers."
*Journal of Offender Rehabilitation, 61, 37-60.*

56.  2022  Crouch, E., <u>Smith, H.P.</u>, & Stevens-Andersen, T.
"An Examination of Caregiver Incarceration, Positive Childhood Experiences, and School Success."

*Children and Youth Services Review, 133, 1-8.*

55.    2022    <u>Smith, H.P.</u> & Cipolli, W.
"The Instagram/Facebook ban on graphic self-harm imagery: A sentiment analysis and topic modeling approach."
*Policy & Internet, 14, 170-185.*

54.    2021    Kabiri, S., Shadmanfaat, S., <u>Smith, H.P.</u>, & Cochran, J.K.
"Aggression in Soccer Fan's: A Test of Akers' Social Learning Theory."
*Deviant Behavior, 42, 1582-1595.*

53.    2021    <u>Smith. H. P.</u>
"Introduction to the Special Edition on Correctional Officer Wellness and Resiliency."
*Criminal Justice Studies: A Critical Journal of Crime, Law, and Society, 34, 353-360.*

Guest Editor of Special Edition devoted to articles on correctional officer wellness and resiliency. Entire Special Edition can be found here: *Criminal Justice Studies: A Critical Journal of Crime, Law, and Society, 34(4), 353-497.*

52.    2021    <u>Smith, H.P.</u>
"The Role of Virtual Reality in Criminal Justice Pedagogy: An Examination of Mental Illness occurring in Corrections."
*Journal of Criminal Justice Education, 32, 252-271.*

51.    2021    Brine, K., Power, J., Nolan, A., & <u>Smith, H.P.</u>
"A Qualitative Study of Success in Post-Release Federal Offenders with Mental Health Issues."
*Journal of Correctional Health Care, 27, 40-50.*

50.    2021    <u>Smith, H.P.</u>
"Inmate and Correctional Officer Perceptions of the Prison Rape Elimination Act (PREA): A Thematic Analysis."
*Journal of Crime & Justice, 44, 213-225.*

49.    2021    Power, J., <u>Smith, H.P.</u>, & Brown, S. L.
"The Brief COPE: A Factorial Structure for Incarcerated Adults."
*Criminal Justice Studies, 34, 215-234.*

48.    2021    Sitren, A., <u>Smith, H.P.</u>, Stevens-Andersen, T., & Bookstaver, M.*
"Jail Visitation: An Assessment of Alternative Modalities."
*Criminal Justice Policy Review, 32, 284-299.*

47.    2020    <u>Smith, H.P.</u>
"Evaluating the Implementation of the Prison Rape Elimination Act (PREA): A 'Lessons Learned' Approach."
*Evaluation & Program Planning, 83, 1-8.*

46.    2020    Kabiri, S., Shadmanfaat, S., Smith, H.P., & Choi, J.
"Soccer Players' Antisocial Behavior: Using an Integrated Mediation Model of Personal Control and Social Learning Theories."
*Social Science Quarterly, 101, 1090-1114.*

45.    2020    Kabiri, S., Shadmanfaat, S., Winterdyk, J., Smith, H.P., & O'Dwyer, L.
"Illegal Sports Gambling on Sports: A Mediation Model of General Strain Theory."
*Criminal Justice Studies, 33, 354-372.*

44.    2020    Shadmanfaat, S., Kabiri, S., Smith, H.P., & Cochran, J.K.
"A Social Learning Model of Antisocial Coaching Behavior."
*International Journal of Offender Therapy & Comparative Criminology, 64, 860-879.*

43.    2020    Shadmanfaat, S., Kabiri, S., Smith, H.P., & Cochran, J.K.
"A Longitudinal Study of Iranian Fan's Cyberbullying: The Utility of Social Learning Theory."
*Deviant Behavior, 64, 860-879.*

42.    2020    Crouch, E., Beeson, S., Strompolis, M., & Smith, H.P.
"Examining the Prevalence of Adverse Childhood Experiences among Juvenile Offenders."
*Journal of Applied Juvenile Justice Services, 1, 41-56.*

41.    2019    Smith, H.P.
"The Role of 360-Degree Cameras, Augmented Reality, and Virtual Reality in Sociology & Criminology: The Future of Innovation."
*Published Peer Reviewed Proceedings of Research World International Conference, Sydney, Australia, 5th-6th June 2019.*

40.    2019    Smith, H.P., Kaminski, R.M., Power, J. & Slade, K.
"Self-Harming Behaviors in Prison: A Comparison of Suicidal Processes, Self-Injurious Behaviors, and Mixed Events."
*Criminal Justice Studies, 32, 264-286.*

39.    2019    Smith, H.P. & Smith, H.
"A Qualitative Assessment of a Dog Program for Youth Offenders in an Adult Prison."
*Public Health Nursing, 36, 507-513.*

38.    2019    Smith, H.P.
"A Rescue Dog Program in Two Maximum Security Prisons: A Qualitative Study."
*Journal of Offender Rehabilitation, 54, 305-326.*

37.    2019    Smith, H.P., Power, J., Usher, A. M., Sitren, A.H., & Slade, K.

"Working with Prisoners who Self-Harm: A Qualitative Study on Stress, Denial of Weakness, and Encouraging Resilience in a Sample of Correctional Staff."
*Criminal Justice and Mental Health, 19, 7-17.*

36.     2019     Smith, H.P., Sitren, A.H., & King, S.*
"'A Call to Action' – Mental Illness and Self-Injurious Behavior occurring in Jails and Prisons."
*Journal of Health and Human Services, 41, 16-44.*

35.     2017     Ferdik, F., & Smith, H.P.
"Correctional Officer Safety and Wellness Literature Synthesis."
U.S. Department of Justice, Office of Justice Programs, National Institute of Justice. Available from: https://www.ncjrs.gov/pdffiles1/nij/250484.pdf

34.     2017     Sitren, A., & Smith, H.P.
"Teaching Criminal Justice Online: Current Status and Important Considerations."
*The Journal of Criminal Justice Education, 28, 352-367.*

33.     2016     Power, J., Gobeil, R., Beaudette, J.N., Ritchie, M.B, Brown, S.L., & Smith, H.P.
"Childhood Abuse, Non-Suicidal Self-Injury, and Suicide Attempts: An Exploration of Gender Differences in Incarcerated Adults."
*Suicide and Life-Threatening Behavior, 46, 745-751.*

32.     2016     Power, J., & Smith, H.P.
"Examining Nock and Prinstein's Four-Function Model with Offenders Who Self-Injure."
*Personality Disorders: Theory, Research, and Treatment, 7, 309-314.*

31.     2016     Power, J., Smith, H.P., & Trestman, R.J.
"What to do with the Cutters?" – Best Practices for Offender Self-Injurious Behaviors."
*Criminal Justice Studies, 29, 57-76.*

30.     2016     Ferdik, F*., & Smith, H.P.
"Maximum Security Correctional Officers: An Exploratory Investigation into their Social Bases of Power."
*American Journal of Criminal Justice, 41, 498-521.*

29.     2016     Smith. H.P.
"Self-Injurious Behavior in Prison: A Case Study."
*International Journal of Offender Therapy and Comparative Criminology, 60, 228-243.*

28.     2015     Smith, H.P.
"The Meaning of the Cut: A Phenomenological Inquiry into Prisoner Self-Injury."
*Justice Quarterly, 32, 500-531.*

27.    2015    <u>Smith, H.P.</u> & Power, J.
"Applying the Dual-Taxonomy of Offending to Self-Injury: Do Offenders Exhibit Life-Course-Persistent Self-Injurious Behavior?"
*Victims & Offenders: An International Journal of Evidence-based Research, Policy, and Practice, 10, 179-213.*

26.    2014    Ferdik, F**\***., <u>Smith, H.P.,</u> & Applegate, B.K.
"The Role of Emotional Dissonance and Job Desirability in Predicting Correctional Officer Turnover Intentions".
*Criminal Justice Studies: A Critical Journal of Crime, Law, and Society, 27, 323-343.*

25.    2014    Power, J., & <u>Smith, H.P.</u>
"Themes Underlying Self-Injurious Behavior in Prison: Gender Convergence and Divergence."
*Journal of Offender Rehabilitation, 53, 273-299.*

24.    2014    <u>Smith. H. P.</u>
"Criminal Justice & Public Health."
*Criminal Justice Studies: A Critical Journal of Crime, Law, and Society, 27, Issue 1.*

Guest Editor of Special Edition devoted to articles that focus on issues pertaining to the intersection of criminal justice and public health systems.

23.    2013    <u>Smith, H.P.</u>
"Reinforcing Experiential Learning in Criminology: Definitions, Rationales, and Missed Opportunities Concerning Prison Tours in the United States."
*Journal of Criminal Justice Education, 24, 50-67.*

22.    2012    Rojek, J., Alpert, G.P., & <u>Smith, H.P.</u>
"The Utilization of Research by the Police."
*Police Practice and Research: An International Journal, 13, 329-341.*

21.    2012    Rojek, J., <u>Smith, H.P.</u>, & Alpert, G.P.
"The Prevalence and Characteristics of Police Practitioner-Researcher Partnerships."
*Police Quarterly, 15, 241-261.*

20.    2012    Kaminski, R.M., Rojek, J., <u>Smith, H.P.,</u> & Alpert, G.P.
"Correlates of Foot Pursuit Injuries in the Los Angeles County Sheriff's Department."
*Police Quarterly, 15, 177-196.*

19.    2012    Rojek, J., Alpert, G.P., & <u>Smith, H.P.</u>
"Examining Officer and Citizen Accounts of Police Use of Force Incidents."
*Crime & Delinquency, 58, 301-327.*

18.    2012    Doty, S**\***., <u>Smith, H.P.,</u> & Rojek, J.

**Page**
**11**

"Self-Injurious Behaviors in Corrections: Informal Social Control and Institutional Responses in a State Prison System."
*Victims & Offenders: An International Journal of Evidence-based Research, Policy, and Practice 7, 30-52.*

17.    2011    Smith, H.P., & Alpert, G.P.
"Joint Policing: Third Parties and the Use of Force."
*Police Practice & Research: An International Journal, 12, 136-147.*

16.    2011    Smith, H.P., & Kaminski, R. J.
"Self-Injurious Behaviors in U.S. Prisons: Findings from a National Survey."
*Criminal Justice & Behavior, 38, 26-41.*

15.    2010    Smith, H.P., Hutson, H.R., Alpert, G.P., & Strote, J.
"Reporting the Use of Force Injuries by Law Enforcement Officers in the Emergency Department."
*Annals of Emergency Medicine, 56, 4, 424-425*

*"In Reply"* published *Annals of Emergency Medicine* (2011), *57, 543-544.*

14.    2010    Smith, H.P., & Kaminski, R.J.
"Inmate Self-Injurious Behaviors: Distinguishing Characteristics within a Retrospective Study."
*Criminal Justice & Behavior, 37, 81-96.*

13.    2010    Smith, H.P., Koons-Witt, B.A., & Meade, B**.
"Demystifying Prisons through the use of Experiential Learning."
*Corrections Compendium, 35, 1-20.*

12     2009    Smith, H. P., Meade, B., & Koons-Witt, B. A.
"The Utility of the Correctional Tour: Student Perceptions and the Propensity for Academic Growth."
*Journal of Criminal Justice Education*, 20, 292-311.

11.    2009    DeHart, D.D., Smith, H.P., & Kaminski, R.J.
"Institutional Responses to Self-Injurious Behavior among Inmates."
*Journal of Correctional Health Care, 15, 129-141.*

10.    2009    Smith, H.P., Applegate, B.K., Sitren, A.H., & Fariello-Springer, N.
"The Limits of Individual Control? Perceived Officer Power and Probationer Compliance."
*Journal of Criminal Justice, 37, 3, 241-247.*

       2014    Reprinted in "Organization and Management in the Criminal Justice System" (pp 505-517), Matthew J. Giblin (Ed.). Thousand Oaks, CA: Sage.

9.     2009    Sitren, A.H., Smith, H.P., Applegate, B.K., & Gould, L.A.

"Jail Visitation: An Assessment of Organizational Policy and Information Availability."
*Southwest Journal of Criminal Justice, 5, 3, 207-220.*

8.  2009    Fariello-Springer, N., Applegate, B.K., <u>Smith, H.P.</u>, & Sitren, A.H.
"Exploring the Determinants of Probationers Perceptions of Their Supervising Officers."
*Journal of Offender Rehabilitation, 48, 210-227.*

7.  2009    Applegate, B.K., <u>Smith, H.P.</u>, Fariello-Springer, N., & Sitren, A.H.
"From the Inside: The Meaning of Probation to Probationers."
*Criminal Justice Review, 34, 1, 80-95.*

Runner up for the 2009 James L. Maddex, Jr. Paper of the Year Award.

6.  2008    <u>Smith, H.P.</u>, & Bohm, R.M.
"Beyond Anomie: Alienation and Crime."
*Critical Criminology: An International Journal, 16, 1, 1-15.*

5.  2006    Knepper, H., Sitren, A.H, & <u>Smith, H.P.</u>
"Government and Governance: An Examination and Synthesis of Two Public Administration Concepts and their Relevance for Public Administration Students."
*Public Affairs Review, 6, 7-20.*

4.  2006    Myers, S., <u>Smith, H.P.</u>, & Martin, L.L.
"Conducting Best Practices Research in Public Affairs."
*International Journal of Public Policy, 1, 367-378.*

3.  2006    <u>Smith, H.P.</u>
"Violent Crime and Victim Compensation: Implications for Social Justice."
*Victims & Offenders: An International Journal of Evidence-based Research, Policy, and Practice, 21, 3, 309-324.*

2.  2005    Wan, T.H., Ho, P.S., Chen, A., Kulzhanova, A., & <u>Smith, H.P.</u>
"Factors Influencing Breast Cancer Preventive Practices of Older Women in Almaty, Kazakhstan."
*Journal of Central Asian Health Service Research, 4, 3-10.*

1.  2005    Martin, L.L., <u>Smith, H.P.</u>, & Phillips, W.
"Bridging Town and Gown through Innovative University-Community Partnerships."
*The Innovation Journal, 10, 1-17.*

## AWARDS AND HONORS

**2020**    Showcase Award: Acceptance into the 2020 ADEIL Course Showcase: Criminal Justice and Mental Health (CRJU 426). ADEIL: Association for Distance Education and Independent Learning.

**2020**    Distinguished Course Award: For Excellence in Accessibility and Innovative use of Technology: Criminal Justice and Mental Health (CRJU 426). ADEIL: Association for Distance Education and Independent Learning.

**2018-20** Ambassador, Incubator for Teaching Innovation, University of South Carolina.

**2017-**    Affiliate Member, Public Opinion Poling Laboratory, University of North Florida.

**2015**    Two Thumbs Up Award from the Office of Student Disability Services.

**2012**    Two Thumbs Up Award from the Office of Student Disability Services.

**2003-06** University of Central Florida Presidential Award.


## MEDIA

**2025**    January 21st. A 13-year-old's brutal murder, the teen girls who were arrested and what parents can learn. USA Today. Reporter: Rachel Hale.

**2024**    November 21st. 2 boys drowned and a deception that gripped the nation: Why the Susan Smith case is still intensely felt 30 years later. CNN. Reporters: Emma Tucker.

**2024**    April 4th. Richland County leaders promise upgrades to Alvin S. Glenn are coming, will address SC code violations. WIS Columbia, SC. Reporters: Ashley Jones and Maggie Brown.

**2023**    November 13th. 'We have what appears to be the implosion of a jail system': 14 inmates charged following Alvin S. Glenn Detention Center riot. WMBF Myrtle Beach-Florence News; FOX Carolina News. Reporter: Ashley Jones.

**2023**    March 18th. An overcrowded Upstate jail is among SC's deadliest. One man's family wants answers. Post and Courier, Greenville, SC. Reporter: Christian Boschult.

**2022**    October 27. Fact check: Examining inmate suicides in Bristol County. The New Bedford Light. Reporters: Arthur Hirsch and Eleonora Bianchi.

**2022**    June 5th. Ex-Columbia gang members team with police to ask. Post and Courier, Charleston, SC. Reporter: Jessica Holdman.

**2022**    June 4th. Ex-Columbia gang members working in neighborhoods to encourage restraint amid shootings spike. Post and Courier, Charleston, SC. Reporter: Jessica Holdman.

**2021**    November 29th. Rates for criminals reoffending drops to 25-year low in South Carolina. Produced by Eleanor Tambone for WLTX, Columbia, South Carolina.

**2021**    September 15th. Murdaugh Case Updates Analysis. Produced by Danae Bucci for WJLC, Savannah, Georgia.

**2021**    July 8th. Freddy Owens Death Penalty Looming Closer. Produced by Eleanor Tambone for WLTX, Columbia, South Carolina.

**2021**    July 8th. Execution by Firing Squad: Constitutional Issues. Produced by Eleanor Tambone for WLTX, Columbia, South Carolina.

**2021**    May 24th. Inmates with Mental Illness and South Carolina Criminal Justice. Produced by Jared Kofsky. Interviewed for WCSC-TV Live 5 News by Michal Higdon, Charleston, South Carolina.

**2021**    May 19th. South Carolina Bill Allows the use of a Firing Squad for Death Penalty. Produced by Chloe Salsameda for WJBF, Augusta, Georgia.

**2021**    May 14th. Sheriff releases the Jamal Sutherland Case Videos. Produced by Jared Kofsky. Interviewed for WCSC-TV Live 5 News by Carter Coyle, Charleston, South Carolina.

**2021**    May 13th. The Jamal Sutherland Case and South Carolina Criminal Justice. Produced by Jared Kofsky. Interviewed for WCSC-TV Live 5 News by Kaitlin Stansell, Charleston, South Carolina.

| 2021 | April 28th. The Death Penalty Bill in South Carolina. Produced by Adam Mintzer for WIS/WCSC, Columbia, South Carolina. |
|------|-----|
| 2021 | April 18th. The Lee Prison Riot and South Carolina Prison Culture. Produced by Jaquial Durham for Amazon Prime. Washington, DC. |
| 2021 | March 23rd. Boulder, Colorado: Mass Shooting. Produced by Eleanor Tambone for WLTX, Columbia, South Carolina. |
| 2021 | June 13th. Defend the Police. Produced by Shawn Cabbagestalk for WJBF, Anchor/Aiken, South Carolina. |

## NON-REFEREED PUBLICATIONS

**2020**   Wiser, L., & Smith, H.P.
"The Terrorist Watchlist and Firearms"
*Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law*
Editor: Jaclyn Schildkraut.
(3rd Edition, 2022)

**2014**   Smith, H.P.
"Aristotle (Virtue Ethics)",
*SAGE Encyclopedia of Criminal Justice Ethics*
Editor:  Bruce A. Arrigo.

**2012**   Smith, H.P.
"Unnecessary Surgery",
*SAGE Encyclopedia of White-Collar and Corporate Crime* (2nd Edition)
Editor: Salinger, L. M., & Golson, J. G.

**2011**   Smith, H.P., Dames, M., Hanna, C., & Alpert, G.
"Drug Policy of the Commonwealth of the Bahamas",
*SAGE Reference Project Encyclopedia of Drug Policy.*
Editors Kleiman, M., Hawdon, J., & Golson, J.G.

**2008**   Smith, H.P.
"Public Health and Criminal Justice",
*SAGE Reference project 21st Century Criminology: A Reference Handbook.*
Volume 2, Editor J. Mitchell Miller. pp 851-860.

**2008**   Smith, H.P., & DeHart, D. D.
"Training of Victim Service Providers",
*SAGE Reference project: Encyclopedia of Victimology and Crime Prevention.*
Editors Fisher, B. S., & Lab, S. P.

**2004**   Smith, H.P.
Book review. "The Death Penalty: An American History," by Stuart Banner.
*Florida Historical Quarterly*, Spring Edition.

## GRANT EXPERIENCE

2023   Co-Principal Investigator
       Andersen, T., & Smith, H.P.
       Understanding How Mentoring Can Disrupt the School-to-Prison Pipeline and Promote
       Positive Youth Development.
       Funded by the National Science Foundation (NSF).
           Fund amount: $403,569.

2019   Principal Investigator
       Smith, H.P.
       Innovative Technology Course Design: Criminal Justice Virtual Reality and Experiential
       Learning in Criminal Justice.
       Blended/Online Course Development Grant Program
       Funded by the College of Arts & Sciences, University of South Carolina.
           Fund amount: $7,918.

2018-20   Ambassador
          Smith, H.P.
          Ambassador: Incubator for Teaching Innovation
          College of Arts & Sciences
              Fund amount: $10,000.

2018   Principal Investigator
       Smith, H.P.
       Prison Reentry Programs in the United States.
       Social Science Award
       Funded by the Office of the Provost, University of South Carolina.
           Fund amount: $16,064.

2017   Researcher
       Ferdik, F., & Smith, H.P.
       Corrections White Paper: Correctional Officer Safety and Wellness
       Available from: https://nij.gov/topics/corrections/institutional/pages/correctional-officer-
       safety-wellness.aspx
       NIJ: National Institute of Justice Research
           Fund amount: $10,000.

2012   Co-Principal Investigator
       Alpert, G.P., Rojek, J., & Smith, H.P.
       Evidence Based Solutions to Reduce Law Enforcement Officer Vehicular Crashes
       (12200-FA19).
       Funded by the National Institute of Justice.
           Fund amount: $342,226.

2012   Co-Principal Investigator
       Smith, H.P.

Separation of HIV Infected Prison Inmates: Perceptions and Clinical Outcomes
(1R01HD074488-01).
Funded by the National Institutes of Health, Bethesda, MD.
  Fund amount: $1,627,952.
(Note: Funding approved but rescinded because agency changed inmate housing policy
making the study impossible to conduct).

2012        Principal Investigator
            Smith, H.P.
            Mental Health & Criminal Justice Systems.
            Distributed Learning Grant Program.
            Funded by the Office of the Provost, University of South Carolina.
              Fund amount: $6,723.

2011-13    Co-Principal Investigator
            Alpert, G.P., Rojek, J., & Smith, H. P.
            Evidence based solutions to reduce law enforcement vehicular crashes.
            Funded by the National Institute of Justice.
              Fund amount: $79,415.

2011        Co-Principal Investigator
            Pitner, R., Wiggins, E. L., & Smith, H. P.
            Mapping neighborhoods for crime and ownership.
            Social Sciences Grant. Funded by the University of South Carolina.
              Fund amount: $19,984.

2009-13    Research Associate
            Alpert, G.P., Rojek, J, & Smith, H.P.
            Building Bridges between Police Researchers and Practitioners: Agents of Change in a
            Complex World.
            Funded by the National Institute of Justice.
              Fund amount: $335,000.

2007        Principal Investigator
            Smith, H.P., & Kaminski, R.J.
            *Identifying and Managing Self-Injurious Behaviors (SIBs) in Correctional Settings.*
            Funded by the Department of Criminology and Criminal Justice, University of South
            Carolina.
              Fund amount: $10,000.

2005         Research Associate
            Martin, L.L, Nelson, J., Myers, S., Phillips, W., & Smith, H.P.
            Dr. Lawrence L. Martin, PI.
            Program Evaluation: *Orange County Central Receiving Center Phase 2: Review of Best Practices in
            Community Mental Health and Substance Abuse Services.*
            Funded by the Florida Department of Children and Families and by Orange County
            Government.
              Fund amount: $25,000.

**Page
17**

2004        Research Associate
            Martin, L.L, Wang, S., Nelson, J., Phillips, W., Trottier, T., & Smith, H.P.
            Dr. Lawrence L. Martin, PI.
            Program Evaluation: *A Path Analysis of Children in Out-of-Home Care: Orange and Osceola Counties.*
            Funded by the Florida Department of Children and Families and Family Services of Metro Orlando.
                Fund amount: $25,000.

2003        Research Associate
            Martin, L.L, Nelson, J., Myers, S., Phillips, W., & Smith, H.P.
            Dr. Lawrence L. Martin, PI.
            Program Evaluation: *Review of the Orange County Central Receiving Center.*
            Funded by the Florida Department of Children and Families and by Orange County Government.
                Fund amount: $25,000.


## TECHNICAL REPORTS
**\* = denotes student co-author.**

2022        Smith, H.P.
            Strategic Report: *Academy of Hope Program.*
            Report prepared for administrators at the Lee Correctional Institution, Bishopville, South Carolina.

2020        Smith, H.P., & Crawford, A.L. *
            Program Evaluation: *A Program Evaluation of a Yoga Class for Correctional Administrators and Correctional Officers.*
            Report prepared for Dorchester County Detention Center (DDC) Cambridge, Maryland.

2016        Smith, H.P., King, S*., Renner, M*., & Gist, J*.
            Program Evaluation: *The SCDC PREA Demonstration Project*
            Report prepared for South Carolina Department of Corrections (SCDC).

2016        Smith, H.P.
            Program Evaluation: *Character Based Units (CBU's): Strategic Plan.*
            Report prepared for South Carolina Department of Corrections (SCDC).

2015        Smith, H.P.
            Program Evaluation: *Staff and Inmates Perceptions of the Prison Rape Elimination Act: Final Report.*
            Report prepared for South Carolina Department of Corrections (SCDC) as part of PREA: Prison Rape Elimination Act.

2015        Smith, H.P.
            Program Evaluation: *Prison Rape Elimination Act Climate Survey: A Survey of Staff and Inmates at Four Prison Facilities in the South Carolina Department of Corrections System.*

**Page
18**

Report prepared for South Carolina Department of Corrections (SCDC) as part of PREA: Prison Rape Elimination Act.

**2015** Smith, H.P.
Program Evaluation: *Train the Trainers: Just Detention International/SCDC Training Report Using the PREA Standards to Create a Safer SCDC: A Workshop for Agency Administrators.*
Report prepared for South Carolina Department of Corrections (SCDC) as part of PREA: Prison Rape Elimination Act.

**2015** Smith, H.P.
Program Evaluation: *Getting to Zero: OP-21.12 and Your Role in Addressing Inmate Sexual Abuse.*
Report prepared for South Carolina Department of Corrections (SCDC) as part of PREA: Prison Rape Elimination Act.

**2015** Smith, H.P.
Program Evaluation: *Using the PREA Standards to Create a Safer SCDC: A Workshop for Agency Administrators.*
Report prepared for South Carolina Department of Corrections (SCDC) as part of PREA: Prison Rape Elimination Act.

**2015** Smith, H.P.
Program Evaluation: *Character Based Units (CBU's): Final Report.*
Report prepared for South Carolina Department of Corrections (SCDC).

**2014** Smith, H.P.
Program Evaluation: *An Examination of the Management Information Notes System: The Prevalence and Manifestation of Sexual Violence in South Carolina Department of Corrections.*
Report prepared for South Carolina Department of Corrections (SCDC) as part of PREA: Prison Rape Elimination Act.

**2014** Ferdik, F.V.**\***, & Smith, H.P.
Report: *Evaluating the Risk Perceptions of Correctional Officers employed in Maximum Security Facilities.*
Report prepared for South Carolina Department of Corrections (SCDC).

**2013** Ferdik, F.V.**\***, Smith, H.P., & Applegate, B.K.
Report: *An Assessment of Job Satisfaction among South Carolina Correctional Officers.*
Report prepared for South Carolina Department of Corrections (SCDC).

**2010** Rojek, J., Kaminski, R.J., Smith, H.P., & Cooney, M**\***.
Report: *South Carolina Law Enforcement Census, 2010.*
Report prepared for the Bureau of Justice Statistics: Law Enforcement Management and Statistics (LEMAS).

**2009** Kaminski, R.J., Smith, H.P., & DeHart, D.D.
*Report: National Survey of Self-Injurious Behaviors in Prison, 2008.*
Report prepared for state prison agencies within the United States.

**2007** Rojek, J., Kaminski, R.J., Smith, H.P., Smith, M.R., & Thigpen, C**\***.

---

Report: *South Carolina Law Enforcement Census*.
Report prepared for the Bureau of Justice Statistics: Law Enforcement
Management and Statistics (LEMAS).

2007   Smith, H.P., Kaminski, R.J. & DeHart, D.D.
Report: *Self-Injurious Behaviors: Perceptions of South Carolina Correctional Mental Health Staff*.
Report prepared for the South Carolina Department of Corrections.

2005   Martin, L.L, Nelson, J., Myers, S., Phillips, W., & Smith, H.P.
Program Evaluation: *Orange County Central Receiving Center Phase 2: Review of Best Practices in Community Mental Health and Substance Abuse Services*.
Funded by the Florida Department of Children and Families and by Orange County
Government. Fund amount: $25,000, Dr. Lawrence L. Martin, PI.

2004   Martin, L.L, Wang, S., Nelson, J., Phillips, W., Trottier, T., & Smith, H.P.
Program Evaluation: *A Path Analysis of Children in Out-of-Home Care: Orange and Osceola Counties*.
Funded by the Florida Department of Children and Families and Family Services of Metro
Orlando. Fund amount: $25,000, Dr. Lawrence L. Martin, PI.

2003   Martin, L.L, Nelson, J., Myers, S., Phillips, W., & Smith, H.P.
Program Evaluation: *Review of the Orange County Central Receiving Center*.
Funded by the Florida Department of Children and Families and by Orange County
Government. Fund amount: $25,000; Dr. Lawrence L. Martin, PI.


### *CONFERENCE PRESENTATIONS*

2025   Fix, R. L., Mooney, H. E., Ferdik, F., & Smith, H. P. (Accepted Paper & Presentation).
*Health equity among incarcerated individuals and prison staff: A participatory research approach*.
American Psychology-Law Society Conference, San Juan, Puerto Rico.

2023   Gist, J., Ferdik, F., & Smith. H.P.  (Presentation). Coping with Stress within the Correctional
Environment: Recommendations from Line Staff. American Society of Criminology, Las
Vegas, NV.

2019   Gist, J., Smith. H.P., & Sitren, A (Presentation). *Jail Visitation: A Study of Practical
Considerations using Visitor Perspectives*. American Society of Criminology, San Francisco, CA.

2019   King, S., & Smith. H.P. (Presentation). *An Examination of the Meaning of Mental Illness in a
Sample of Female Prison Inmates*. American Society of Criminology, San Francisco, CA.

2016   Smith, H.P., & Kaminski, R.M. (Presentation). *Fatal Encounters between the Police and Persons with
Serious Mental Illness*. American Society of Criminology, New Orleans, LA.

2016   Sitren, A.H, & Smith. H.P. (Presentation). *Teaching Criminology and Criminal Justice Online: Current
Status, Best Practices, and Important Considerations*. Southern Criminal Justice Association, 2016
Annual Meeting, Savannah, GA.

**2015**   Gist, J., Ferdik, F., <u>Smith. H.P.</u>, & Sitren, A. (Presentation). *The Influence of Strain on Law Enforcement Legitimacy Evaluations.* Southern Criminal Justice Association, 2015 Annual Meeting, Charleston, SC.

**2014**   Ferdik, F., <u>Smith. H.P.</u>, & Applegate, B.K. (Presentation). *Turnover Intent in the Correctional Setting: An analysis of attrition rates.* Academy of Criminal Justice Sciences, 2014 Annual Meeting, Philadelphia, P.A

**2010**   Applegate, B.K., & <u>Smith, H.P.</u> (Presentation) *Exercising Control in the Jail: Perceived Sources of Power and Officers' Readiness to Use Force.* American Society of Criminology, San Francisco, CA.

**2009**   <u>Smith, H.P.</u> (Poster) *Self-Injurious Behaviors within incarcerated populations.* Assuring Equity Through Health and Health Care Reform Conference, New York, NY.

**2009**   Noble, J., Alpert, G., & <u>Smith, H.P.</u> (Presentation) *Officer Created Jeopardy in American Law Enforcement.* Academy of Criminal Justice Sciences, Boston, MA.

**2008**   <u>Smith, H.P.</u>, Kaminski, R.M., DeHart, D.D., Camp, A., & Gantt, H. (Poster) *Self-Injurious Behaviors in Corrections: Preliminary Results from a National Survey.* American Society of Criminology, St. Louis, MO.

**2008**   Meade, B., <u>Smith, H.P.</u>, & Koons-Witt, B. A. *The Utility of the Correctional Tour: Student Perceptions and the Propensity for Academic Growth.* (Presentation) American Society of Criminology, Atlanta, GA.

**2007**   Applegate, B.K., <u>Smith, H.P.</u>, Sitren, A.H., & Springer, N. (Presentation) *The Meaning of Probation to Probationers.* American Society of Criminology, Atlanta, GA.

**2007**   <u>Smith, H.P.</u>, Applegate, B.K., Sitren, A.H., & Springer, N. (Presentation) *Probation Officer Power: Perceived Bases and Impact on Probationer Compliance.* Academy of Criminal Justice Sciences, Seattle, WA.

**2006**   Springer, N., Applegate, B.K., <u>Smith, H.P.</u>, & Sitren, A.H. (Presentation) *Women, Men and Cross-Gender Supervision: Probationers' views of their officer.* American Society of Criminology, Los Angeles, CA.

**2006**   Sitren, A.H., <u>Smith, H.P.</u>, Applegate, B.K., & Gould, L. (Presentation) *Jail visitation: An assessment of organizational policy and information availability.* Southern Criminal Justice Association, Charleston, SC.

**2005**   <u>Smith, H.P.</u> (Poster) *The Distribution of the Best Quality Health Systems in the United States: 1997-2003.* ESRI Health GIS Conference, Chicago, IL.

**2005**   Knepper, H., <u>Smith, H.P.</u>, & Sitren, A.H. (Presentation) *The Implications of Government and Governance in the Classroom: A Comparison and Integration of Concepts for Public Administration Educators.* Teaching Public Administration Conference, Destin, FL.

**2004**    Smith, H.P., & Myers, S. (Poster) *The Orange County Central Receiving Center (CRC) A Review of Best Practices in Community Mental Health & Substance Abuse Services.* Public Affairs Research and Practice: Policy Research Dilemmas and Scientific Solutions, Orlando, FL.

**2004**    Myers, S., Smith, H.P., & Martin, L.L. (Presentation) *Conducting Best Practices Research in Public Affairs.* Public Affairs Research Conference, Orlando, FL.

## *TRAININGS & INVITED PRESENTATIONS*

**2025**    Propel AI. Certificate of Completion.
            Propel AI. University of South Carolina.

**2025**    Smith, H.P.
            *Addressing Self-Injurious Behaviors in the Florida Department of Corrections.*
            Presentation for Secretary Dixon and the Executive Staff of the Florida Department of Corrections. (April 24th, 2025). Tallahassee, Florida. Florida Department of Corrections.

**2024**    Smith, H.P.
            *What is evidence-based programming?*
            Presentation for the Wardens Meeting on evidence-based programming. The audience included the entire Warden workforce for the South Carolina state prison system. *(June 20th, 2024).* South Carolina Department of Corrections.

**2024**    Instructor: Steve Campbell.
            Use of Force and Restraints in Jails/Corrections (*May 20th, 2024*).
            Legal and Liability Risk Management Institute.

**2024**    Smith, H.P.
            *Building Resilience, Adapting to Challenges, and Embracing Change.*
            Keynote speaker for the Wisconsin Department of Corrections workforce on the topic of officer resilience, health, and wellbeing. *(April 11th, 2024).* Wisconsin DOC MAT and Harm Reduction Conference.

**2021**    Smith, H.P. & Ho, K.
            *Promoting Wellness and Resiliency in Correctional Staff.*
            Webinar for 1,200 correctional staff and administrators on the topic of officer wellness and resiliency. *(Feb 2nd, 2021).* National Institute of Corrections (NIC). Available from https://nicic.gov/promoting-wellness-and-resiliency-correctional-staff

**2021**    Smith, H.P.
            *Solving the Dilemma of Self-Injurious Behavior in the Incarcerated Population.*
            Webinar for 700 correctional staff and administrators on the topic of inmate self-injurious behaviors. *(May 27th, 2021).* National Institute of Corrections (NIC). Available from https://nicic.gov/solving-dilemma-self-injurious-behavior-incarcerated-population

**2020**    Smith, H.P.
            *Publish or Perish: A Guide on How to Publish.*

Presentation to The USC Criminology & Criminal Justice Graduate Student Association. *(Fall, 2020)*

**2020**  Smith, H.P.
*The Eisenhower Matrix: Time Management for Academicians, Students, and Staff.*
Presentation to The Center for Teaching Excellence (CTE), University of South Carolina. *(Spring, 2020)*

**2019**  Smith, H.P.
*Experiential Student Learning: The Utilization of 360 Degree Cameras for Innovative Pedagogy.*
Presentation to Oktoberfest: A Celebration of Teaching, University of South Carolina. *(Fall, 2019)*

**2019**  Smith, H.P.
*Innovative Teaching: Classroom Planning and Practices.*
Presentation to The USC Criminology & Criminal Justice Graduate Student Association. *(Fall, 2019)*

**2019**  Smith, H.P.
*Time Management. How to Manage your Time to be a Successful Graduate Student.*
Presentation to The USC Criminology & Criminal Justice Graduate Student Association. *(Spring, 2019)*

**2014**  Smith, H.P.
*Staff Training for the Self-Injurious Behaviours Unit.*
Training development and implemented for correctional officers at the South Carolina Department of Corrections.

**2011**  Alpert, G., Koons-Witt, B.K., & Smith, H.P.
*How to Prepare for the Job Market: Insights from a USC Search Committee.*
Presentation to the USC Criminology & Criminal Justice Graduate Student Association. Columbia, SC.

**2011**  Smith, H.P.
*Prisoner Reentry: Issues concerning HIV/AIDS and community health.*
Training of South Carolina Department of Health & Environmental Control *(DHEC)*: STD/HIV Division.

**2010**  Applegate, B.K., Smith, H.P., & Koons-Witt, B. (2010)
*Corrections symposium: Special populations in corrections.*
Presentation to The USC Criminology & Criminal Justice Graduate Student Association. Columbia, SC.

**2010**  Smith, H.P.
*Self-Injurious Behaviors Occurring in South Carolina.*
Training and report provided to 85 mental health professionals working for the South Carolina Department of Corrections.

**2010**  Smith, H.P.

*Self-Injurious Behaviors in Corrections: An Ongoing Dilemma.*
Presentation to The USC Criminology & Criminal Justice Graduate Student Association.

**2009**   Smith, H.P.
*Smart Investment or Buying on Credit? The Need for Jail Diversion Programs in South Carolina.*
Presentation to Carolinians Combating Poverty and American Criminal Justice Association.

## TEACHING EXPERIENCE

Spring 2025: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)

Fall 2024: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (32)

Summer 2024: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (33)

Spring 2024: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (34)
  CRJU 426J – Criminal Justice and Mental Health – Online Course (undergraduate) (36)

Fall 2023: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 791 - Criminal Justice and Mental Health – Online Course (graduate) (13)

Spring 2023: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (40)
  CRJU 426J – Criminal Justice and Mental Health – Online Course (undergraduate) (39)

Fall 2022: University of South Carolina, Department of Criminology and Criminal Justice
  Sabbatical Semester

Summer 2022: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (25)

Spring 2022: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (50)
  CRJU 426J – Criminal Justice and Mental Health – Online Course (undergraduate) (56)

Fall 2021: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J -  Criminal Justice and Mental Health – Online Course (undergraduate) (41)
  CRJU 814 - Research Design in Criminology & Criminal Justice (graduate) (14)

Summer 2021: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (24)

Spring 2021: University of South Carolina, Department of Criminology and Criminal Justice
  CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (40)

CRJU 591J – Criminological Case Studies – Online Course (undergraduate) (27)

Fall 2020: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (31)
CRJU 591J – Criminological Case Studies – Online Course (undergraduate) (30)

Summer 2020: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (25)

Spring 2020: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)
CRJU 312J – Corrections – Online Course (undergraduate) (80)

Fall 2019: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (29)

Summer 2019: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)

Spring 2019: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)

Fall 2018: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)
CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (29)

Summer 2018: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (27)
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (28)

Spring 2018: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 714  -  Ethics in Criminal Justice – Online Course (graduate) (7)
CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (32)

Fall 2017: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (30)
CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (28)

Summer 2017: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (25)

Spring 2017: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (51)
CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (31)

Fall 2016: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (30)
CRJU 703  -  Research Methods (graduate) (8)

Summer 2016: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (15)

Spring 2016: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (51)
      CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (27)

Fall 2015: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 426J  -  Criminal Justice and Mental Health – Online Course (undergraduate) (24)
      CRJU 591J  -  Criminological Case Studies – Online Course (undergraduate/graduate) (28)

Summer 2015: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 312  -  Corrections (undergraduate) (20)

Fall 2014: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 426  -  Criminal Justice and Mental Health – Online Course (undergraduate) (31)
      CRJU 703  -  Research Methods (graduate) (6)

Summer 2014: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 312  -  Corrections (undergraduate) (18)
      CRJU 494  -  Internships (undergraduate) (2)

Spring 2014: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 312  -  Corrections (undergraduate) (80)
      CRJU 494  -  Internships (undergraduate) (21)
      CRJU 794  -  Internships (graduate) (1)

Fall 2013: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 494  -  Internships (undergraduate) (20)
      CRJU 794  -  Internships (graduate) (1)

Summer 2013: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 312  -  Corrections (undergraduate) (15)
      CRJU 494  -  Internships (undergraduate) (8)

Spring 2013: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 732  -  Correctional Policy (undergraduate) (10)
      CRJU 494  -  Internships (undergraduate) (24)
      CRJU 794  -  Internships (graduate) (1)

Fall 2012: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 494  -  Internships (undergraduate) (17)
      CRJU 794  -  Internships (graduate) (1)
      CRJU J426  -  Criminal Justice and Mental Health (online) (18)

Summer 2012: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 494  -  Internships (undergraduate) (10)
      CRJU 794  -  Internships (graduate) (3)

Spring 2012: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 491   -   Corrections (undergraduate) (80)
      CRJU 494   -   Internships (undergraduate) (15)
      CRJU 794   -   Internships (graduate) (4)

Fall 2011: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 591P -  Special Topic: Criminal Justice & Public Health (undergraduate) (50)
      CRJU 494   -   Internships (undergraduate) (1)
      CRJU 794   -   Internships (graduate) (1)

Summer 2011: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 591M - Special Topic: Criminal Justice & Public Health (undergraduate/graduate) (24)

Spring 2011: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 591C - Sex Crimes (upper undergraduate) (50)

Fall 2010: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 341   -  Sociology of Crime (undergraduate) (62)

Summer 2010: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 591A - Ethics & Social Justice (undergraduate) (17)

Spring 2010: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 591C - Sex Crimes & Criminal Justice (undergraduate) (52)
      CRJU 741 - Sociology of Crime (graduate) (10)

Fall 2009: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 341 - Sociology of Crime (undergraduate) (50)
      CRJU 341 - Sociology of Crime (undergraduate) (46)

Summer 2009: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 491M - Ethics & Criminal Justice (undergraduate) (23)
      CRJU 491P - Criminal Justice & Public Health (undergraduate) (28)

Spring 2009: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 341 - Sociology of Crime (undergraduate) (50)
      CRJU 741 - Criminology (graduate) (12)

Fall 2008: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 341 - Sociology of Crime (undergraduate) (142)
      CRJU 591C - Sex Crimes (undergraduate) (49)

Summer 2008: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 591E -Social Justice & Ethics (undergraduate) (27)

Spring 2008: University of South Carolina, Department of Criminology and Criminal Justice
      CRJU 231 - Corrections (undergraduate) (51)
      CRJU 341 - Sociology of Crime (undergraduate) (36)

CRJU 591H - Special Topic: Criminal Justice & Public Health (undergraduate/graduate) (47)

Fall 2007: University of South Carolina, Department of Criminology and Criminal Justice
CRJU 231 - Corrections (undergraduate) (23)
CRJU 491 - Special Topic: Criminal Justice & Public Health (undergraduate) (10)
CRJU 524 - Victimization (undergraduate) (28)

Spring 2006: Chicago State University, Department of Criminal Justice
CJ 350/350G - Research Design in Criminal Justice (undergraduate/graduate)

Fall 2006: Loyola University, Chicago
CRMJ 402 - Theory and Research in Crime and Delinquency (graduate)

## PROFESSIONAL DEVELOPMENT

**2019            Oktoberfest: A Celebration of Teaching        Columbia, SC**
1-day conference symposium focused on sharing best practices in teaching. Includes workshops on topics ranging from active learning and online course development to critical thinking and integrative learning. Hosted by the Center for Teaching Excellence at the University of South Carolina.

**2018            Virtual Environments Boot Camp            Columbia, SC**
5-day training on utilizing 360 cameras, augmented reality and virtual reality technologies in the classroom.

**2009            Social Network Analysis                    Lexington, KY**
5-day training on social network analysis hosted by Links: International Center for Research on Social Networks in Business. Hosted by Steve Borgetti.

**2008            Qualitative Data Analysis                    St. Louis, MO**
Workshop on qualitative research methodology training and development of scholarly projects that use novel approaches. Hosted by Drs Peter and Patricia Adler.

**2002            Crime Analysis Certification                Orlando, FL**
Data management and crime mapping software utilized in conjunction with the theoretical aspects of crime pattern analysis in order to develop crime prevention strategies.

## SERVICE

### Student Based Service: Graduate Level

### PhD Level

#### Dissertations - Chair

**2020**    Gist, Jon. *Fostering Resilience in Correctional Staff*. Department of Criminology & Criminal Justice, University of South Carolina.

2020    King, Sarah. *An Examination of the Meaning of Mental Illness in a Sample of Female Prison Inmates*. Department of Criminology & Criminal Justice, University of South Carolina.

2015    Ferdik, Frank. Dissertation topic: *Examining Correlates of Correctional Officer Risk Perceptions and Decision-Making: An Exploratory Investigation*. Department of Criminology & Criminal Justice, University of South Carolina.

### Dissertations – Committee Member

2016    Zhang, Gary. *Situational Crime Prevention: Examining the Seven Measures of School Crime*. Department of Criminology & Criminal Justice, University of South Carolina.

2015    Anderson, Joi. *Vocational Readiness: The Effect of Pre-Prison and Incarceration-Based Trauma on Cognitive Appraisals and Self-Perceptions of Incarcerated Women*. Department of Social Work, University of South Carolina.

2014    Miller, Riane. *Adultification in Juvenile Corrections: A Comparison of Juvenile and Adult Officers*. Department of Criminology & Criminal Justice, University of South Carolina.

2012    Allen, Andrea. *Police-citizen encounters: Evidence from ethnographic, qualitative, and quantitative research*. Department of Criminology & Criminal Justice, University of South Carolina.

## Masters Level

### Masters Theses – Chair

2020    Crawford, Alyssa. *MPH Practical Experience Project*. Supervisor and Chair of Internship. Southern New Hampshire University, Master of Public Health Program.

2012    Powell, Kathryn. *Reflections on an Internship with the South Carolina Law Enforcement Division*. Department of Criminology & Criminal Justice, University of South Carolina.

2010    Doty, Steven. *A Qualitative Analysis of the Etiology, Manifestation, and Institutional Responses to Self-Injurious Behaviors in Prison*. Department of Criminology & Criminal Justice, University of South Carolina.

### Masters Theses – Committee Member

2014    Gatens, Allyson. *Mapping Crime near the USC Campus: An Environmental Perspective*. Department of Criminology & Criminal Justice, University of South Carolina.

2011    Ouellette, Heather M. *Criminologist's Opinions on Correctional Rehabilitation*. Department of Criminology & Criminal Justice, University of South Carolina.

### Graduate Directed Study (CRJU 792)

2023    Kirkley, Kaitlin. *Inmate-Led Reentry Mentorship Programs*. (Fall, 2023)

2017    Kingston, Jonathan. *Hubert Blalock's Racial Threat Theory and it's Relevancy to the Criminal Justice System*. (Spring, 2017 – Fall, 2017)

2017    Kinder, Brandon. *Procedural Justice: Its Impact on the Criminal Justice System*. (Fall, 2016 - Spring, 2017)

2017    Renner, Marion. *Serial Homicide: An Investigation of Historical Antecedents*. (Summer, 2017)

**2016**    Renner, Marion. *An Assessment of PREA: The Prison Rape Elimination Act.* (Fall, 2016)
**2011**    Freidman, Joshua. *Interview Strategies for Mentally Ill Inmates.*
**2009**    Hawkins, Sharron. *Victim Impact Statements.*
**2009**    Doty, Steven. *The Evolution of Serial Homicide as a Social Construct.*
**2009**    Boggs, Brett. *An Assessment of Police Practices & Use of Force.*
**2008**    Anderson, Joi. *African-American Communities, Women & Children, and Pathways to Re-entry Success.*

### Student Based Service: Undergraduate Level

#### Directed Undergraduate Honors Thesis (CRJU 499) – Chair

**2020**    Reed, Spencer. *Vocational Programs and Recidivism Rates in Richland County, South Carolina. (Fall 2019-Spring 2020).*
**2018**    Huffman, Paige. *A Synthesis of the Literature on Deadly Encounters Between Mentally Ill Suspects and Police. (Fall, 2017 - Spring, 2018).*
**2012**    Britt, Megan. *The Evolution of the Serial Killer as a Social Construct. (Spring 2012 - Fall, 2012)*
**2011**    Agrawal, Millie. *Examination of Female Specific Criminal Pathways and Self-Injurious Behaviors in Prison.*

#### Directed Undergraduate Honors Thesis (CRJU 499) – Committee Member

**2021**    Wallace, Douglas Jack. *Implications of Rapid Weight Loss on Competitive Success in Amateur Brazilian Jiu-Jitsu.*

**2020**    Jamison, Elise. *Who Lives, Who Dies, Who Tells Your Story: An Analysis of the Impact of Race, Gender, and Circumstance on Homicide Reporting in South Carolina News. (Fall 2019-Spring 2020).*

#### Independent Study (CRJU 399)

**2019**    Finley, Haley. *A Policy Analysis of Rehabilitation Programs in Prison. (Fall, 2019).*
**2019**    Peavey, Colin. *The Development of Virtual Reality in the Classroom. (Fall, 2019).*
**2019**    Pineda, Sarah. *Correctional Programs and Recidivism. A Synthesis of the Literature. (Fall, 2019).*
**2019**    Snelson, Katherine. *Pedagogical Strategies for Criminology and Criminal Justice. (Fall, 2019).*
**2019**    Singletary, Marvisha. *The Intersection of Race & Class and its Impact on Correctional Systems. (Fall, 2019).*
**2019**    Grube, Natalie. *Motherhood in Prison. A Review. (Summer, 2019).*
**2018**    Baratta, Jordan. *Analysis of Criminal Justice Policies. (Spring, 2018).*
**2016**    Waters, William. *Law Enforcement Policies. (Fall, 2016).*
**2016**    Lee, Juliana. *Mentally Ill Offenders: An Assessment of the Literature. (Fall, 2016).*
**2015**    Frishcosy, Brantley. *Research Involving the Homicide of Police Officers II. (Spring, 2015).*
**2015**    Frishcosy, Brantley. *Research Involving the Homicide of Police Officers I. (Fall, 2015).*
**2015**    Steadman, Sheltanya. *Correctional Theory and Data II. (Spring, 2015).*
**2014**    Greene, Diamoney. *Institutional Corrections: A Study of Jails. (Fall, 2014).*
**2014**    Steadman, Sheltanya. *Correctional Theory and Data. (Fall, 2014).*
**2012**    Brown, Gerard. *Police Encounters with Mentally Ill Suspects. (Fall, 2012).*

**2012**  Cannerella, Joseph. *Reflections on an Internship with a criminal law firm.*
**2011**  Furgess, Frank. *Research Methodologies in Social Science.*
**2011**  Davis, Carmen. *Gender Themes in Self-Injurious Behaviors.*
**2010**  Zornes, Michelle. *Protecting the Rights of Vulnerable Populations.*
**2009**  Anderson, Lakeysha. *Filicide: Incidence and Implications.*
**2009**  Mansour, Suzanna. *What is a serial killer?*
**2009**  Metrius, Erick. *Child Abuse and Adult Criminality.*

### Other Activities

**2023**  <u>Senior Exhibition</u>: Heathwood Hall Episcopal High School: Ms. Kiana Lee. *Where have all the Serial Killers Gone? The Media's Influence on Society' Perception of Crime.*

**2019**  <u>Senior Exhibition</u>: Heathwood Hall Episcopal High School: Ms. Doretha Faith Robertson. *History of Race and its Impact on the Prison System.*

**2008**  <u>Discovery Day</u>: Ms. Kris Bales Mini-Grant and Poster Presentation: *Sexual Assault: Results of the International Crime Victimization Survey (ICVS).* Student Award Amount = $500.

## University / Department/ Unit Service:

### Department of Criminology and Criminal Justice, University of South Carolina

| | |
|---|---|
| **2025** | Two Professional Instructor Hires (Chair) |
| **2024** | Comprehensive Exams Grading Committee (Masters) |
| **2023** | Bridge to Faculty Academic Hire, Committee Member |
| **2023** | Comprehensive Exams Grading Committee (Masters) |
| **2023-** | Undergraduate Director |
| **2021-2022** | T&P Co-Chair |
| **2019-2022** | Senate Representative. |
| **2018-Current** | Virtual Environments Interest Group, Member. |
| **2010-Current** | PhD Comprehensive Exam Committee, Committee Member. |
| **2008-Current** | MA Comprehensive Exam Committee, Committee Member. |
| **2016-Current** | CRJU Undergraduate Program Committee, Committee Member. (previously 2008-2010) |
| **2018-Current** | Ph.D. Student Brownbag: Active Learning and Mentorship |
| **2016-Current** | Faculty Mentor, Dr. Christi Metcalfe. |
| **2010-Current** | CRJU Graduate Program Committee, Committee Member. |
| **2014-Current** | Tenure & Promotion Annual Review Committee, Committee Member. |
| **2010-Current** | Undergraduate Faculty Committee |
| **2015-Current** | CAS Criminology and Criminal Justice Unit Committee for T&P. |
| **2016-Current** | Post-Tenure Review (PTR) Committee, Committee Member. |
| **2016-2017** | Graduate Faculty Committee |
| **2013-2016** | Senate Representative. |

| | |
|---|---|
| **2013-2014** | Director. HIV Working Group. Department of SC Health & Environmental Control (SCDEC). |
| **2012** | Faculty Advisor for Undergraduate Students |
| **2012** | Hiring Committee for Four (4) Faculty Positions, Member. |
| **2012** | Hiring Committee for Instructor Position, Member. |
| **2011-2014** | Center for Management of Risk Behavior, Assistant Director. |
| **2011-2014** | Criminal Justice Internship, Director. |
| **2010-2013** | Department Media Acquisition, Liaison. |
| **2011** | Hiring Committee for Assistant & Associate Positions, Member. |

### University / College of Arts & Sciences

| | |
|---|---|
| **2024-2025** | Propel AI Program |
| **2021-2023** | Distributed Learning Advisory Board |
| **2020-** | Alumni Associate, Incubator for Teaching Innovation |
| **2020** | Garnet Apple Award for Teaching Innovation |
| **2019-** | Gamecock Design Challenge Day |
| **2019-** | USC Connect CEIL/GLD Faculty Fellow (Provost Office) |
| **2019-2020** | Provost Social Science Research Grant, Reviewer |
| **2019-** | Fulbright Scholar Campus Evaluator |
| **2018-2020** | Teaching Ambassador, Incubator for Teaching Innovation |
| **2018** | Gamecock Training Day, Host |
| **2017-2018** | Carolina Core Online: Teaching Innovation Grants, Grant Reviewer. |
| **2016-2017** | Carolina Core Online: Teaching Innovation Grants, Grant Reviewer. |
| **2016-2017** | SPARC Graduate Research Grant, Grant Reviewer. |
| **2012-2014** | USC United Way Ambassador. |
| **2009-2014** | Alpha Phi Sigma: Assistant Advisor. |

### National / Criminology Service:

| | |
|---|---|
| **2021** | **Featured Speaker Presentation: The Criminology Consortium Annual Meeting**<br>Using Virtual Reality in the Criminal Justice Classroom<br>The Criminology Consortium Annual Meeting<br>Presentation date: Friday, October 22nd, 20221 |
| **2020-Current** | **Editorial Staff of** *Journal of Psychology and Psychotherapy Research*<br>Board Member. |
| **2017-Current** | **Affiliate Member, Public Opinion Research Laboratory**<br>Public Opinion Research Laboratory, University of North Florida. |
| **2015-Current** | **South Carolina Correctional Association**<br>Board of Directors & Education Advisor. |

| 2017-2021 | **Editorial Staff of** *American Journal of Criminal Justice* <br> Board Member. |
|---|---|
| 2016-Current | **Editorial Staff of** *Journal of Collateral Consequences and Reentry* <br> Board Member. |
| 2013-Current | **Editorial Staff of** *Criminal Justice Studies* <br> Advisory Board Member. |
| 2010-2011 | **Academy of Criminal Justice Sciences (ACJS)** <br> Publications Committee. |
| 2007-2009 | **Southern Criminal Justice Association (SCJA)** <br> Nominations and Elections Committee. <br> Local Arrangements Committee. |

## Ad Hoc Reviewer

Article reviewer for the following academic journals: American Journal of Criminal Justice, Criminal Justice & Behavior, Crime, Law and Social Change, Criminal Justice Studies, Health Promotion International, International Journal of Offender Therapy and Comparative Criminology, International Journal of Public Policy, Journal of Collateral Consequences and Reentry, Journal of Criminal Justice, Journal of Criminal Justice and Popular Culture, Journal of Criminal Justice Education, Journal of Forensic Psychiatry and Psychology, Journal of Offender Rehabilitation, Journal of Criminal Justice Education, Justice Quarterly, Police Practices & Research, Victims and Offenders, & Violence and Victims

Textbook & Book Reviewer for the following publishers: Sage, Oxford, Jones & Bartlett, McGraw-Hill, Routledge, & Thomas Wadsworth.

## Professional Affiliations

American Society of Criminology (ASC)
      Division of Sentencing & Corrections
Academy of Criminal Justice Sciences (ACJS)
American Correctional Association (ACA)
American Public Health Association (APHA)

# EXHIBIT 7B

CONFIDENTIAL

# Hayden P. Smith

3006 Monroe St., Columbia South Carolina 29205 USA

June 12, 2025

## PRELIMINARY REPORT

RE: Wagner, et al. Plaintiffs, and Ana Garcia. Plaintiff and Chandra Jenkins, As Attorney in Fact for Dequon Buford Plaintiff – Intervenor, v. Harris County Texas Defendant. Civil Action No.: 4-23-CV-02886

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

 I, Hayden P. Smith, declare that the following statements are based on a thorough, independent analysis of the records provided by Attorney Taylor Hunter. My opinions, as set forth herein, represent a factual synthesis of the information contained in these records and are derived from my professional expertise to a reasonable degree of certainty. Should I be presented with additional materials that could alter the basis of my analysis, I reserve the right to revise my conclusions accordingly.

 My current position is Professor of Criminology and Criminal Justice at the University of South Carolina. I have a Master of Arts degree in Criminal Justice and a Ph.D. in Public Affairs (Cognate Areas: Criminal Justice & Public Health), both from the University of Central Florida. I have conducted research on correctional policies and customs for the past twenty years. My record of publication includes 5 books and 98 peer-reviewed publications on Criminal Justice, many of which deal with the policies, practices, training, and customs of correctional agencies.

 I have written articles dealing specifically with inmates with mental illness, correctional procedures, violence occurring in corrections, jail diversion and reentry programs, best practices for correctional officers, and correctional officer safety, wellness, and resiliency. In addition to my academic experience, I have been awarded federal, state, and local grants to investigate various aspects of corrections. Specifically, I have been awarded grants from the National Institute of Justice, the research arm of the U.S. Department of Justice. For eight years, I served as the state program evaluator for the implementation of the Prison Rape Elimination Act (PREA) into 26 prisons in the South Carolina Department of Corrections (SCDC). I have also provided training, publications, and expertise for the National Institute of Corrections (NIC) and for state correctional agencies. I have evaluated various correctional programs, including though not limited to, inmates engaging in self-injurious behaviors and violence, character-based units, PREA standards, jail diversion, and best practices in corrections.

1

CONFIDENTIAL

I base the statements contained herein on the totality of my specialized knowledge in the field of correctional policies, practices, and customs. My knowledge and experience of correctional policies, practices and customs has developed during my 20 years of involvement in correctional systems in various capacities as a criminologist, researcher, consultant, evaluator, and trainer. My examination of the elements of this case embodies the fundamental methodology that I employ in my professional evaluations of correctional agencies as a consultant when performing research work with the National Institute of Justice (NIJ), National Institute of Corrections (NIC), and evidence-based peer-reviewed articles. My opinions herein are provided with a reasonable degree of professional certainty within the fields of correctional policies, practices, training, and supervision. I have attached a copy of my curriculum vitae. I reserve the right to amend this information in the event that further information is provided.

## MATERIALS REVIEWED

- Jenkins' Complaint
- Confidentiality Order
- Answer to Jenkins' Complaint
- Current scheduling order
- HIPAA power of attorney re Jenkins and Buford
- POA documents re Jenkins and Buford
- PREA investigation produced by Defendant (PREA 000001 – 000031)
- Harris County PREA policy
- Inmate housing history produced by Defendant (JR 000246)
- Prisoner movement relating to Buford produced by Defendant (JR 000247)
- Buford Operational records produced by Defendant (OR 000001 – 000021)
- Buford Operational records produced by Defendant (OR 000022 – 000045)
- Buford jail and medical records produced by Defendant (JR 000001 – 000245)
- Jenkins records produced via initial disclosures (Jenkins 0001 – 0039)
- Jenkins medical records produced to Defendant on 3/10/2025 (Jenkins 0040 – 0357)
- Jenkins initial disclosures
- 2022 annual TCJS inspection report
- Harris County's initial disclosures
- Detention command policies & procedures
- Functional capacity reports
- TCJS reports
- Training materials
  - Basic county corrections course
  - Active bystander for law enforcement
  - De-escalation techniques
  - Jail FTO program
- HCSO Jails Functional Capacity Reports (01/23/2022-08/27/2023)
- 2019: Texas Commission on Jail Standards: Annual Jail Report.
- 2020: Texas Commission on Jail Standards: Annual Jail Report.
- 2022: Texas Commission on Jail Standards: Annual Jail Report.

2

CONFIDENTIAL

- 2023: Texas Commission on Jail Standards: Annual Jail Report.
- 2023: Texas Commission on Jail Standards: Special Inspection Report.
- Texas Jail Commission Meeting. (August 10, 2023). https://youtu.be/Ivex-CJKcyY
- HCSO Inmate Handbook.
- BCCC. Basic County Corrections Courses. (00001-000555).
- Inmate Handbook. HCSO.
- 2022 PREA Annual Report. HCSO.
- 2023 PREA Annual Report. HCSO.
- Katrina B Camacho. Deposition. (03/24/2025).
- Letter of Representation and Preservation of Evidence. (12/18/2023).
- Declaration By Major Ruth McClanahan Regarding Timeline of Inmate Dequon Buford [Spn 03177353] Stay in the Harris County Jail In 2023.
- 28 U.S.C. §1746 Declaration by Candice D. Kelley Authenticating Records Produced in Discovery Regarding Dequon Buford [SPN 03177353]
- John G. Mills, DO, MS, MPH. Summary of Medical Records Pertaining to Inmate Dequon Buford [SPN 03177353]
- Defendant Harris County's Rule 56 No Evidence Motion for Summary Judgment and Motion to Sever Claims by Inmate Dequon Buford [SPN 03177353] And His Caretaker Chandra Jenkins.
- Transcribed PREA Interview with Dequon Buford. Conducted by Investigator Guerrero. Friday, September 29, 2023.
- HCA Medical Records. Jenkins 000594-000899.
- TXFNE Forensic Center of Excellence Records. Jenkins. (November 26, 2023).
- Harris Health Records. Jenkins 0040-0357.

- Harris County Sheriff's Office: CJC-116 PREA ~ Prison Rape Elimination Act
- Harris County Sheriff's Office: CJC-219 Separation Policy
- Harris County Sheriff's Office: CJC-220 PREA ~ Inmate Observation
- Policy 903.05: Classification New-House JPC Intake and Dress Out (POST ORDERS)
- Policy 903.13 PREA & LGBTI (CLASSIFICATION POST ORDERS)

- PART 115—Prison Rape Elimination Act National Standards. Authority: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 15601-15609. Displaying the eCFR in effect on 6/15/2023. https://www.ecfr.gov/on/2023-06-15/title-28/chapter-I/part-115

CONFIDENTIAL

### Arrest and Booking (June 12, 2023)

On June 12, 2023, Mr. Dequon Buford was booked and housed in the Harris County Jail, located in Houston, Texas. A Harris County Sheriff's Office Jail Card (JR00003) shows the offender was charged with Burglary of a Building (6/12/2023). A medical/mental health clinic note from June 13, 2023, states that a screening was conducted by medical staff and provided to classification (JR000004). A follow-up medical/mental health clinic note (June 17, 2023) indicates a complete MHC assessment.

Medical documentation confirms that Mr. Buford was diagnosed with schizophrenia, anemia, vitamin D deficiency, iron deficiency, anxiety, and bipolar I disorder. His family medical history includes Crohn's disease, schizophrenia, bipolar disorder, and hypertension (JR000072; JR000121; JR000122; JR000140). Mr. Buford also had a prior psychiatric hospital placement (JR000117) and a documented learning difficulty (PL000005).

Mr. Buford remained incarcerated until November 14, 2023. According to his Inmate Housing History Report, his placement in the jail followed this sequence:

- JA09-1-A-1-01R (6/13/2023–6/13/2023)
- JA09-5-F-2-03B (6/13/2023–9/20/2023)
- JA09-3-C-1-05J (9/20/2023–10/02/2023)
- JA09-2-K-1-01L (10/02/2023–10/18/2023)
- JA09-6-E-2B-01C (10/18/2023–11/05/2023)
- JA09-2-J-2-01G (11/05/2023–11/14/2023)

## Table 1: Prisoner Movement History. Buford, Dequon.

| Booking Date/Time | Release Date/Time | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 06/12/23 03:45 | 11/14/23 20:34 | | | | | | | |
| Facility | Floor | Pod | Cell | Bed | Date/Time Moved | Date/Time Vacated | Assigning Officer | Reason |
| JA09 | 2 | J | 2 | 01G | 11/05/23 18:01 | 11/14/23 20:34 | OJO, OLUFEMI | |
| JA09 | 6 | E | 2B | 01C | 10/18/23 14:14 | 11/05/23 18:01 | RANKIN, JOSHUA | |
| JA09 | 2 | K | 1 | 01I | 10/02/23 10:33 | 10/18/23 14:14 | ALICEA, TRINIDY | Initial Housing |
| JA09 | 3 | C | 1 | 05J | 09/20/23 08:26 | 10/02/23 10:33 | RANKIN, JOSHUA | Administrative |
| JA09 | 5 | F | 2 | 03B | 06/13/23 23:04 | 09/20/23 08:26 | DE LA PENA, IRVIN | Initial Housing |
| JA09 | 1 | A | 1 | 01R | 06/13/23 03:56 | 06/13/23 23:04 | BROWN, TELISA | |

4

CONFIDENTIAL

### First PREA Sexual Assault Report (September 28, 2023)

Mr. Buford was processed on June 13, 2023 (JA09-1-A-1-01R) and subsequently spent nearly three months housed in general population (JA09-5-F-2-03B) from June 13, 2023, to September 20, 2023. On September 20, 2023, he was moved to JA09-3-C-1 (JR000247) and then relocated to the third floor of 1200 Baker Street on the same day (JA09-3-C-1-05J) (JR000247). This location was described as a north hallway "cell block" (Camacho deposition, p. 131).

During visitation on September 28, 2023, staff were notified by Mr. Buford's family that he had experienced two sexual assaults. These reports included two distinct notifications of sexual assault by other inmate(s), occurring on September 25, 2023, and September 27, 2023 (see Buford Complaint; also see Camacho deposition, p. 167 and p. 194).

An incident report filed by Investigator McCutcheon (PREA000029-00030), dated October 6, 2023, states, "It was explained to me he was sexually assaulted approximately twice in 3C1 by the same inmate during an 8-day span."

Additionally, an email from Tran Alvares (HCSO), dated October 4, 2023, sent to Camacho, Diaz, Elizondo, Hudson, and Ince (all HCSO), noted:

"Investigator Guerrero—The family states Inmate Buford's mother visited today and gave him the confidence to identify the inmates that allegedly raped him. He advised his family the rape happened on two different occasions, by two inmates, and two other inmates stood guard. I'm not sure if this concern is closed on your end, but I advised the family I would relay this information to PREA for addressing" (PL000059).

An inmate care concern report was generated September 28, 2023, and sent to numerous HCSO email accounts with the following statement  from Mr. Buford's mother (PL000061):

Yes this is Chandra Jenkins I went to see my son today and he has told me that he has been raped in jail yesterday my son is schizophrenic he take medication and I don't understand. How did this happen to my son? I want to press charges on these guys in this jail because my son is traumatized he is scared. They said they going to kill him in jail and no one is protecting my son. I am very angry for y'all. Did not do anything to help my son in this predicament I am streaming for help. This is what you do in a jail house. That is what the security guard is supposed to be for. I love my son. I cannot protect him in there, but I can't protect him out here and I need answers for my son. They have took my son manhood away from him in a jail that he supposed to be protective for.

An incident report by Deputy Doss Incident Case Number: 2309-10719, Date / Time reported: 9/28/2023 states that he responded to a reported PREA violation:

On Thursday, September 28, 2023, I, Deputy A. Doss, Unit number 11T12, Badge# 2059, was assigned to the Harris County Sheriff's Office, Detention Operations, at the 1200 Baker Street Jail. While on duty, I was advised of an incident involving an

5

CONFIDENTIAL

inmate at the 1200 Baker Street Jail stating he was raped by other inmates. At approximately 14:27 hours, a visitor named Chandra Jenkins came to the Visitation Control Center window after completing her visit. At this time Ms. Jenkins informed me that while visiting her son, Inmate Dequon Buford (Systematic Person Number (SPN) 03177353) informed her that he had been raped by 2 inmates last night in his cellblock. Ms. Jenkins informed me that she informed the Detention Officers and the Sergeant on the third floor. Upon learning this information, Detention Sergeant A. Dariah and Lieutenant J. Wheeler where (sic) notified of what all was said. PREA Investigator A. Guerrero (EIN 158547) went to the third floor to speak with Inmate Buford. An OMS report was generated, see OMS 23-0928-143 for reference.

An Incident Report (23-0928-168) by Officer Ashaye (JR000040) lists Today's Date: 10/2/23 10:49; Incident Occurred (sic): 9/28/23 15:45; Incident Reported: 9/28/23 16:58; Date Recorded: 09/28/2023 17:04; Housing Location at Time of Incident:JA09-3-C-1-05J states:

On Thursday, September 28, 2023, I, Detention Office O. Ashaye (EIN 157834), was assigned to the 3rd floor FCC of the Harris County Sheriff Office 1200 Baker Street Facility on the First Watch. At approximately 1545 hours, I was informed by Sergeant A. Dariah that inmate Buford, Dequon (SPN 03177353) informed his family member during visitation that he was sexually assaulted yesterday, Wednesday, September 27, 2023. The family member requested to speak with the floor supervisor, Sergeant A. Dariah. Upon speaking with Sergeant Dariah, the family member confirmed inmate Buford's allegation. Sergeant Dariah contacted PREA manager K. Camacho and informed her of the situation, and she contacted PREA investigator A. Guerrero. A. Guerrero interviewed inmate Buford, and she determined that inmate Buford was unresponsive and confused. However, inmate Buford was escorted to the 4200 clinic for evaluation, and a psych referral will be generated. Classification Detention Officer B. Cousey (EIN: 144695) was notified (sic) of this info report.

An incident report by Officer Nwosu (JR000030) Incident Todays' Date: 10/02/2023: report: September 29, 2023, Incident ID: 23-0929-382, Incident Reported: 9/29/2023 14:39, Incident Occurred: 9/29/23 12:40

On Friday, September 29, 2023, I, Detention Officer K. Nwosu (EIN 163116) was assigned to third floor C-pod of the Harris County Sheriff's Office at 1200 Baker Street Detention Facility in Houston, Texas. At approximately 12:40 hours, I was notified by Sergeant R. Craddock (Badge #287) to generate a hospital run Info report on Inmate Dequon Buford (SPN: 03177353). Inmate Wenzel was taken to the hospital due to a PREA outcry. Inmate Buford l was transported via an ambulance to Ben Tub Hospital. Wenzel was referred to the hospital by L. Mallari M.D. Buford was escorted to the hospital by Deputy Daetron McClelland (EIN: 139191). Classification Detention Officer B. Dotson (EIN: 154733) was notified of this informational report.

CONFIDENTIAL

### Harris Health Medical Examination (September 29, 2025)

Mr. Buford was transported to the hospital on September 29, 2023. Officer Nwosu's incident report (9/29/2023, 2:43 PM) states, "I was notified by Sergeant R. Craddock (Badge #287) to generate a hospital run Info report on Inmate Dequon Buford (SPN: 03177353)." The incident report also includes a PREA outcry made by another inmate, Wenzel, and confirms that classification officer Dotson was notified of the report.

During the hospital visit, Dr. Thuyen Nguyen documented the following assessment (Jenkins 0040-0357):

"Sexual assault (sent from jail for SANE eval; per note claims being penetrated in back, 2 days ago per report). PMH of D1B, schizophrenia, anxiety presenting to BTEC w/ c/o sexual assault. Refusing to discuss assault at this time. Refusing SANE nursing eval at this time. Doesn't want to report possible assault. Endorsing rectal & penile pain."

During this medical assessment Mr. Buford complained of rectal pain and hemorrhoids (Harris Health Medical record, p. 288), and endorsed "rectal and penile pain" (p. 290). This same medical assessment states that Mr. Buford had experienced rectal pain for two days, and Dr. Nguyen "saw a little bit of blood per rectum" (Harris Health Medical record, p. 294).

A 1.56pm note (Q 4 hours) states that Mr. Buford was in security restraints, with direct visual surveillance by Sheriff McClallaind (#3570), with shackles placed on Mr. Buford's right ankle (Harris Health Medical record, p. 296). A 1.57p.m. note states that Mr. Buford was screened for homicide and suicide risks and showed no risk of either. A 6.00pm note (Q 4 hours) states that Mr. Buford was in security restraints, with direct visual surveillance by Officer Cervantes (#1578), with shackles on his right ankle and left ankle (Harris Health Medical record, p. 299). The use of security restraint and direct surveillance is further document in Harris Health Medical record, (p. 304). At 6.46pm Mr. Buford was released from Harris Health and to the custody of HCSO.

An email from Mr. Buford's brother, Joe Jenkins, dated October 2, 2023, and sent to Julie Diaz (HCSO) (PL000004), states:

"He is traumatized from what happened to him, but if you see him in person, he might look OK to you because he's trying to look like he's OK in front of the other inmates so he won't look weak. But he really needs help from the prison system—he's traumatized inside his head, and he really needs help."

**First Administrative Separation (October 2, 2023 – October 18, 2023)**

An email from Trans Alvares (October 2, 2023: 9.49am) documents that Mr. Buford's family had reported on the previously Friday the following concerns: "Reported being raped, family is requesting Admin Sep Housing; Needs assistance using the phone due to Mental Health issues; Inmates are possibly stealing commissary" (JR000043). The email adds:

> Lt Bower- IAD is requesting that Inmate Buford, Dequon be placed in Admin Sep due to the allegations.
> Sgt Powell- Could you please have a welfare check conducted and possibly have a staff member assist him with making a call, and address the concerns of inmates stealing his commissary.
> Harris Center- The family states he suffers with Mental Health issues that need to be addressed.

On October 2, 2023, at 10.13am Classification Lieutenant Shonda Bowers responded via email (JR000042): "Please medically clear Inmate Buford for Admin Sep housing and transfer. Add an Alert to indicate his Admin Sep housing is because of an IAD request due to PREA allegations. Please advise if you have any questions." On October 2, 2023, at 10.46am Officer Alves responded via email (JR000042): "PLACED IN ADMIN SEP DUE TO PREA OUTCRY PER LT. BOWER INMATE BUFORD, DEQUON 03177353 JO09-2K1."

An Administrative Separation Review Sheet dated October 2, 2023 (JR000033), indicates Cellblock location: JA09-2K1-I, and housed by T. Alicia. The reason for separation is listed as "MOVED TO ADMIN SEP DUE TO PREA OUTCRY PER LT BOWER" with the handwritten notation of "Xfer to (05) per Major L. Anderson." Also noted is recommended restraints: YES per floor policy. The date released is October 18, 2023 , and released to: 6E213 OIC.

On October 17, 2023, (4.03pm) - Sarah Wood (General Counsel of Harris County Public Defender's Office; see JR000017) emailed the following to HCSO officers.

> My understanding is that Mr. Buford was placed in administrative separation for his own protection because he reported being sexually assaulted while in custody. Our investigator visited him today and is concerned because he was heavily shackled with extra security precautions like they do with murder defendants. I'm told this is having a very negative effect on his mental illness (he's in mental health court). He's in for state jail felonies and has no violent history. Is he being treated as a security threat due to his PREA outcry? Or perhaps there was a mistake, or some disciplinary that isn't listed?

Lynette Anderson emailed Joash Butler and Katrina Camacho (October 17, 2023: 4.39pm) to ask for a response to the two listed questions (JR000017). The following morning (October 18, 2023: 8.51am) Camacho responded: "At no time should we shackle and handcuff someone because of a PREA outcry. This is a form of punishment. Can Buford be relocated somewhere else where he is not shackled?" Anderson's email response is "He will need to be moved" (October 18, 2023,: 8.59am). At 11.06am, October 18, 2023, Detention and Classification Sergeant Michael Beaudion writes, "please see below. Change inmate to purple stripe".

CONFIDENTIAL

**First PREA Investigation (October 19, 2023)**

A Harris County Sheriff's Officer PREA investigation report (2309-10719) includes an incident/investigation report dated September 28, 2023, with the crime incident listed as Sexual Assault PC22.011 Adult W/OBJ (PREA000002-000012). The report lists Officer/ID# DOSS, A. (JSIU, JUN) (S17148); Invest ID# SMALL, P. R. (GINV, PREA) (S29752); Supervisor: BARROW, J. A. (HOUS) (S27926). The narrative states, "On this date 09/28/2023 I Deputy A. Doss, responded to a call at 1200 Baker St about a possible PREA incident involving an inmate." The investigative narrative (PR000007) states:

> At approximately 14:27 hours, a visitor named Chandra Jenkins came to the Visitation Control Center window after completing her visit. At this time Ms. Jenkins informed me that while visiting her son, Inmate Dequon Buford (Systematic Person Number (SPN) 03177353) informed her that he had been raped by 2 inmates last night in his cellblock. Ms. Jenkins informed me that she informed the Detention Officers and the Sergeant on the third floor. Upon learning this information, Detention Sergeant A. Dariah and Lieutenant J. Wheeler where notified of what all was said. PREA Investigator A. Guerrero (EIN 158547) went to the third floor to speak with Inmate Buford. An OMS report was generated, see OMS 23-0928-143 for reference.

The investigation report also lists the following incident report suspect list (PR000008): Name: Unknown, DOB 01/01/1935, Age 88, Race B, Sex M.

An incident report by Investigator Guerrero dated (PREA000027-00028) October 4, 2023,

> On September 28th, 2023, I, Investigator A. Guerrero interviewed Inmate Buford in the interview room located on the Third floor of the 1200 Jail. Inmate Buford was identified by his Harris County armband. The following is a synopsis of his statement which may not be in sequence as stated: I introduced myself to Inmate Buford and advised him my reason of being there. I asked him to explain to me what occurred. Inmate Buford stated that while he was in his bunk he noticed a bump on his neck which is visible on his right side of his neck. I asked him what was wrong and he stated that the bump showed up 2 days ago and think someone touched him and he got germs. I asked him if anything sexual happened and he stated "no" I then asked him that what was the initial PREA outcry he made and he stated that he told the Detention Officers that the incident happened over 2 months ago. According to his family member, the family member said that Buford claimed he got raped last night. I asked Buford if he knew times and dates but was unable to provide that information. Inmate Buford stated on recording that nothing sexual happened. I ended the interview and escorted him back to his pod.
> On the date of September 28th, 2023, after speaking with Inmate Buford he said that he's okay for now.
> It should be noted, Inmate Buford was spoken to and that statements were documented and recorded. Buford was sent back to his pod to 3-C-1.

9

An email from Investigator Guerrero dated September 29, 2023, to Tran Alvares (HCSO) states, "Good morning, I have spoken to Inmate Buford yesterday and again today this morning and he stated that he is fine. A report has been made by me and a recording of me interviewing him as well. Thank you" (PL000060).

An incident report by Investigator McCutcheon (PREA000029-00030) dated October 6, 2023, states,

On Friday, October 6, 2023, I, Investigator K. McCutcheon interviewed, Inmate Dequon Buford, SPN# 03177353 in reference a possible Sexual Assault. I informed Inmate Buford I was assigned to investigate his sexual assault allegations. I asked Inmate Buford if he had been sexually assaulted and he stated, "No". I asked Inmate Buford was he aware of what his mom complained about and he stated, "yes the assault". I asked Inmate Buford to elaborate on the assault his mom was speaking of and he replied, "the sexual assault on 3rd floor". I reiterated to Inmate Buford I wanted to speak to him in regards to that assault and he stated it happened approximately 4 days ago in 3C1 in one of the individual cells. He expressed he was sexually assaulted during the nighttime hours by Inmate Jenkins a black male but didn't know his first name. Inmate Buford was observed staring off into space at times and mumbling his words. It was explained to me he was sexually assaulted approximately twice in 3C1 by the same inmate during an 8 day span. I used the OMS system and pulled up the cellblock housing sheets but did not see an Inmate by the last of Jenkins to ever be housed with Inmate Buford thus fur in Harris County. It is believed Inmate Buford possibly suffers from Mental Health issues and provided no information for a thorough investigation. Several welfare checks was conducted on Inmate Buford for his well-being.

An incident report by Investigator Guerrero dated (PREA000029) dated October 19, 2023, states,

On several occasions I've spoken with Inmate Buford's mom in reference to his alleged Sexual Assault. It wasn't until (sic) I spoke with his mom that I learned he named her as the suspect who sexually assaulted him while in his sleep inside his cell. His mother informed me she spoke with a Deputy Lee which is a black male at the 1200 operations unit and provided that Deputy with information. It was told to me Deputy Lee went to his cell to interview him where he identified (sic) three males as the suspects who raped him. It should be noted Detention Officer Lee who assist the 1200 operations is a while (sic) male who's not a Deputy. She also stated she was informed there was a report in the system where Buford identified the inmates. It should be noted as of October 19, 2023, there's no report or information about Inmate Buford identifying anyone. Detention Officer Lee informed me he never spoke to an inmates parent about him being sexually assaulted and he's never spoke with an Inmate about an alleged Sexual Assault as well. It should be noted Inmate Buford suffers from mental health issues as his mother stated he's been poisoned several years which caused him to lose his mind. There were no supportive evidence provided or no sifficient (sic) evidence to support the allegations/investigation. This case will be closed and deemed, UNSUBSTANTIATED due to no supporting information and no camera footage of the alleged incident.

10

CONFIDENTIAL

A November 20, 2023, supplement list the case status as closed and Investigator Deleon (S29854). The supplement states:

> On November 17, 2023, I, Deputy I. De Leon unit 45N30 was dispatched to HCA North Cypress medical hospital located at 21214 Northwest Freeway in Harris County, Texas in reference to a Sexual Assault type call.
>
> Upon arrival, I made contact with the reporting party, Registered nurse Brittany Kerster who advised her patient was sexually assaulted. Nurse Kerster advised a SANE exam was completed by SANE nurse Veronica Villanueva on November 17, 2023.
>
> I made contact with black male Dequon who was identified by his Illinois Driver`s license as Dequon Buford (DOB: 02/22/1995). Mr. Buford stated he was sexually assaulted by 5 males in the Harris County Jail. Mr. Buford advised he reported the incident while serving his time in jail. He also stated the incident occurred approximately three weeks ago from November 17, 2023.
>
> I then made contact with black female Chandra who was identified by her Illinois Identification Card as Chandra Jenkins (DOB: 08/26/1974). Ms. Jenkins stated she was Mr. Buford`s mother and advised she helped him report the incident. Ms. Jenkins stated her son is diagnosed with Schizophrenia and advised she wish to help provide information. She then stated she was advised by the Harris County Jail, Mr. Buford was able to positively identify the suspect(s) and a SANE exam was completed while Mr. Buford served his time in jail. Ms. Jenkins stated the reason for the hospital visit was due to Mr. Buford complaining of abdominal pain. Ms. Jenkins stated the incident occurred on November 04, 2023 and then recanted her statement and advised she was unsure when the incident occurred.

A supplement report by Investigator Small, dated April 25, 2024 (PR000011), lists the case status from September 28, 2023, as closed. Investigator Small writes,

> "At approximately 0918 hours, I contacted the Harris County Institute of Forensic Sciences to check the status of Inmate Buford's DNA analysis. I spoke with Manager Anna Timanova and provided her the case number. Ms. Timanova advised she did not have any record of DNA being submitted attached to the case number. I provided Ms. Timanova with Dequon Buford's name. Ms. Timanova advised she did not have any record of DNA being submitted for Dequon Buford." The report concludes, "At this time, the case is open pending further investigation."

A supplement report by Investigator Small, dated April 29, 2024 (PR000012), lists the case status from September 28, 2023, as closed. The report states, "On Monday, April 29, 2024, I, Deputy P. Small 11I13, conducted a follow-up investigation in reference to this case. I've yet to receive a phone call back from the victim or the victim's lawyer at this time. This case will be closed due to the victim's unwillingness to cooperate with the investigation."

An email dated October 2, 2023, sent from Lila Millan (HCSO) to Katrina Camcho (HCSO) (PR000015) states:

> This was a sexual assault that apparently you had Guerrero go and interview. This inmate was not sent to the hospital at that time, but only the clinic. Guerrero checked on him on Friday morning again, and he stated he was fine and it was not a sexual assault. This time we have another report from him, but my understanding is that Guerrero is not to handle sexual assault allegations. Do I have him go back again to interview this new claim?

An email from Ketrik McCutcheon (HCSO) to Lila Millan (HCSO) and Andrew Geurrero (HCSO) dated October 19, 2023 (PREA000031) states:

> Dequon Buford case still appears to be a MHMRA welfare check. He's state he wasn't sexually assaulted and then stated his mom sexually assaulted him. His mom appears to be MHMRA or fabricating allegations. The main report, guerrero's welfare check supplement and my 2 welfare check supplements are attached. MHMRA/WELFARE CHECK

### Second PREA Sexual Assault Report (November 5, 2023)

On November 5, 2023 (5.18pm), an incident report (23-1105-364) completed by Officer Oliver (J000052) states,

> On November 5, 2023, I Detention Officer C. Oliver (EIN 135667) was assigned to 1st Shift A Team on the 6th Floor of the Harris County Jail Facility located at 1200 Baker Street. At Approximately 16:43hrs, I Detention Officer C. Oliver was contacted by Sergeant A. Dariah requested that I write an information Report on Inmate Allen, Michael (SPN 02379727). Inmate Buford alleged that Inmate Allen, Michael (SPN 02379727) "had "groped "him by "slapping him on his buttocks". Inmate Allen will be written up for violation of Code 2104, 'Sexual Conduct' of the Harris County Inmate's Handbook. Inmate Buford was escorted out of 6E28 and placed on the third floor holding cell upon completion of this report. Sergeant A. Dariah (EIN 139167) and Classification Detention Officer B. Causey (EIN 144695) were notified of the incident.

A follow up report (23-1105-392) by Officer Castenada (November 5, 2023: 8.23pm) states (J000053):

> On November 5, 2023 I, Detention Sergeant O. Castaneda Badge #214 was assigned as a supervisor on the 6th floor in the 1200 Baker Street Detention Facility, Night watch, C-Team.
>
> At approximately 1801 hrs. I was notified by Lieutenant H. Quiroz via email about an "inmate care and concern" regarding an Inmate housed out of 6E1B by the name of Dequon Buford SPN 03177353. The care and concern was sent by Inmate Buford's mother, Chandra Jenkins, and reads as followed: "My Son was placed on the 6th Floor

12

CONFIDENTIAL

after he was raped by 3 men now since he was placed on the 6th Floor four gay man been taken my Son food his family been ordering him these four gay men that look like women told my Son he have to suck there's dick my son is afraid in very quiet no way he's supposed to been placed on a Floor full of gay man that dress like women he supposed to been placed on a floor where he is isolated from all inmates for his safety and protection or placed around inmates that's been raped like him not around gay men that looks like women can you please have my son Dequon Buford placed in protective, custody isolated from all inmates please for his safety & protection.

Prior to my investigation, Inmate Buford had been removed from 6E2B along with his property and placed in the third floor holdover by Detention Sergeant A. Dariah. Sergeant Dariah had spoken to Inmate Buford's mother during visitation. She informed Sergeant Danah, Inmate Buford had told her he was being asked to perform sexual acts by an inmate who was later identified by Inmate Buford as Michael Allen (SPN 02379727) (OMS report # 23-1 105-364). Inmate Buford also stated he was groped by Inmate Allen in the same report.

At approximately 1850 hrs, I spoke to Inmate Buford while he was in the third floor holdover. I asked Inmate Buford what issues he was having in 6E2B. Inmate Buford informed me his commissary was being stolen by another Inmate. I continued to ask inmate Buford if he had ever been sexually abused, touched, raped, of felt uncomfortable while inside 6E2B. Inmate Buford slated (sic) to me he has never been raped or touched while inside the cell block, but he was asked to perform oral sex by another inmate who he had already identified to Sergeant Dariah as Michael Allen SPN 02379727. I asked Sergeant Dariah if Inmate Buford had complained about missing Commissary to him. Sergeant Dariah informed me when he escorted Inmate Buford out of the 6E2B cell block, Inmate Buford only had his linen and mat with him. Sergeant Dariah told Inmate Buford to grab his commissary bag too, but Inmate Buford told him he doesn't have one.

I informed Inmate M. Allen he was being charged with violation of rule #2104 SEXUAL CONDUCT/PREA of the Harris County Inmate Handbook which states," No inmate shall kiss or hug another person; expose his or her breast(s), buttocks or genitals in any manner: or make any sexual comments that may be offensive to another person. This includes but is not limited to: sexual harassment, unwelcome sexual advances, proposals or request for sexual favors, verbal
comments, gestures, demeaning references to gender, voyeurism or actions of a derogatory or offensive sexual nature.

Inmate Allen was issued his confirmation of service and was given a chance to write a statement. Classification Detention Officer B. Causey EIN 144695 was notified of this incident. Sergeant Dariah has notified PREA about Inmate Allen.

A disciplinary note for inmate Michael Allen (November 5, 2023: 5.55pm) states: "keep inmate separate from Mr. Buford" (JR000054).

### Second Administrative Separation (November 5, 2023 – November 14, 2023)

An email from Officer Ojo (November 5, 2023L 10.42pm) to Brandi Hawkins@harrishealth.org states (JR000055), "The following inmate has been placed in Admin Sep due to a Report to Keep this Inmate separate from another inmate in Victimization Vulnerable Housing. INMATE BUFORD DEQUON SPN 03177253 JA09— 2J2 -01G."

An Administrative Separation Review Sheet dated November 5, 2023 (JR000047), indicates Cellblock location: 09-2J2-01G, and housed by O. Ojo. The reason for separation is listed as "REASON FOR SEPARATION: VICTIMIZATION VULNERABLE HOUSING REPORT INCIDENT # 23-1105-364 ADMIN SEP DUE TO KEEP SEPARATE IN VItIMIZATION (sic) VULNERABLE HOUSING" with the POS "6" code of 16. Also noted is recommended restraints: YES per floor policy. The date released is November 14, 2023 , and released to: ATW.

### Second PREA Investigation (November 10, 2023)

An incident report dated December 26, 2023, at 12.02pm, (JR000056-JR000060) states that Michael Allen's charge of (2104 Sexual Conduct – Minor) was in "reviewed" status. Under the Inmate Handbook 2104 is defined as:

(2104) SEXUAL CONDUCT/PREA:

No inmate shall kiss or hug another person; expose his or her breast(s), buttocks or genitals in any manner; or make any sexual comment that may be offensive to another person. This includes but is not limited to: sexual harassment, unwelcome sexual advances, proposals or requests for sexual favors, verbal comments, gestures, demeaning references to gender, voyeurism or actions of a derogatory or offensive sexual nature.

The same report states that Mr. Buford's allegation was closed/dismissed due to "ATW released on 11/14/2023 20:38." The investigation component of this report (incident ID 23-1105-392) recorded November 10, 2023, 3.41pm identifies PREA Investigator A. Guerrero as the report writer (JR000056-JR000060). Investigator Guerrero writes about the following face to face interview on November 7, 2023, with inmate Allen:

On November 7th, 2023, I, Investigator A. Guerrero interviewed Inmate Allen in the interview room located on the sixth floor of the 1200 Jail. Inmate Allen was identified by his Harris County armband. The following is a synopsis of his statement which may not be in sequence as stated: I introduced myself to Inmate Allen and advised him my reason of being there. I asked him to explain to me what occurred. Inmate Allen stated that he was only trying to help Buford in the pod because he didn't have commissary and needed help. Allen stated that he was the only one who was helping Buford in the pod because the other inmates were trying to take advantage of Buford. Allen stated that she tried to take Buford off of his Psych medication because Allen stated that it allowed Buford to understand and help Buford on understanding what was going around him. Allen also stated that he tried to help "bathe" Inmate Buford because he wasn't able to bathe himself. Allen also stated that he would braid Buford's hair

14

CONFIDENTIAL

because it was messed up and tried to keep it nice for him. All stated that Buford said thank you for helping me.

Investigator Guerrero writes about the following face-to-face interview on November 8, 2023, with inmate Allen:

> On November 8th, 2023, I, Investigator A. Guerrero interviewed inmate Buford in 2-J-2 in his cell due to him not being able to come out. Inmate Buford is a "solid purple" band due to his protection. However, he is located on the second floor of the 1200 Jail. Inmate Buford was identified by his Harris County armband. The following is a synopsis of his statement which may not be in sequence as stated: I introduced myself to Inmate Buford and advised him my reason of being there. I asked him to explain to me what occurred. Inmate Buford stated that he was sexually harassed by a person named "Tameka" and not by an inmate. I asked what time did this incident happen and Inmate Buford stated at night. I asked if he had any witnesses and he stated "no".

The case conclusion states,

> It should be noted, Inmate Buford was spoken to and to see how he was doing, He was transferred from JAO9 6-E-2B to 2-J-2. It should also be noted that Inmate Buford was interviewed by a PREA Investigator, I, A. Guerrero. After viewing video footage, there was no evidence or times that the incident occurred. At this time, the PREA Unit has come to a conclusion that this case will be closed and deemed, UNSUBSTANTIATED. Unsubstantiated allegation means an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

An incident report dated December 26, 2023, at 12.02pm, (JR000061-JR000063) states that Michael Allen's charge of (2104 Sexual Conduct – Minor) was closed/dismissed due to, "lacks evidence." The same report states that Mr. Buford's allegation was closed/dismissed due to "ATW released on 11/14/2023 20:38."

An incident report dated June 20, 2024, at 3.54pm, (JR000071-JR000072) states that Michael Allen's charge of (2104 Sexual Conduct – Minor) was closed/dismissed due to, "lacks evidence." The same report states that Mr. Buford's allegation was closed/dismissed due to "ATW released on 11/14/2023 20:38."

An incident report dated June 20, 2024, at 3.54pm, (JR000066-JR000070) states that Michael Allen's charge of (2104 Sexual Conduct – Minor) was closed/dismissed due to, "ATW Released on 01/24/2024 08:45." The same report states that Mr. Buford's allegation was closed/dismissed due to "ATW released on 11/14/2023 20:38.

15

CONFIDENTIAL

## Harris County and Post-Release Medical Records

### During Incarceration in Harris County

Mr. Buford's medical records for services received from Harris County reflect repeated contact between June 13, 2023 and November 14, 2023 (JR000073–JR000245). These records include multiple statements regarding sexual assault. For example, on September 29, 2023, medical documentation states:

> "Dequon Buford is a 28-year-old male with a history of schizophrenia, vitamin D deficiency, iron deficiency anemia, rectal pain, and external hemorrhoids. He presents to the clinic as a hospital return for rectal pain and external hemorrhoids."
> — electronically signed by Tran, Tanesha M, NP, on September 29, 2023 at 9:35 PM.

On October 29, 2023, Mr. Buford reported a PREA allegation, stating that the incident occurred at 2:00 AM. The documentation notes:

> "Appears to hesitate to speak but claims being penetrated in the back. PREA Case #2309-10719 started here in jail. He will be sent via ambulance to Ben Taub to be seen by a SANE nurse. He is accepted by Dr. Lehnhardt, K, at Ben Taub."
> — electronically signed by Mallari, Lowie C, NP, on October 29, 2023 at 12:30 PM.

On October 31, 2023, medical records document an alleged assault with the statement:

> "Chief Complaint: alleged assault (October 31, 2023, 08:05). Supposedly, one month ago was sexually assaulted. Denies fever."
> — electronically signed by Kaspar, Thomas, MD.

Furthermore, on November 14, 2023, medical documentation includes a follow-up visit with an HIV affiliate for "Assault follow-up from October 31, 2023." Additional records from the Harris Center show that on October 3, 2023 the patient was poorly groomed, had dirty clothing, numerous scabs on his face and torso, and had lost 19 pounds of body weight since June 13, 2023. Mental health notes (e.g., from October 12, 2023, JR000113) indicate that bi-weekly mental health rounds were conducted to monitor adherence to prescribed psychotropic medications.

### After Release: SANE Examination Findings

Following his release from Harris County Jail on November 14, 2023, Mr. Buford continued to seek medical treatment (see Jenkins 0001-0357). Medical visits include, but are not limited to:

- November 18, 2023 – notations of anal pain and constipation;
- November 18, 2023 – photographs document red marks or bites on his body days after release;
- November 20, 2023 – medical notes state, "Patient states that he is not doing well, was charged with burglary, was locked up, was raped in jail, just bonded out last week." Another note states, "Patient alleged he was sexually assaulted in jail in June 2023.";
- March 11, 2024 – medical documentation includes, "Complaints of chronic diarrhea for months, was raped in prison, and since then has been having frequent bowel movements every

16

CONFIDENTIAL

time he eats, with occasional fecal incontinence." Buford reported rectal pain and fecal incontinence.

• March 15, 2024 – Medical note states History of Rape in Adulthood (ICD-10 Code: Z91.410). (3/15/2024) (Harris Health Medical Records, p. 162).

On November 17, 2023 at Ben Taub Hospital, a SANE exam was performed. This examination documented multiple healing abrasions: one lesion measured 1.4 cm by 8 cm; another measured 1.5 cm by 7.5 cm; a third measured 0.1 cm by 3 cm; a fourth area measured 1 cm by 8 cm; and a cluster of abrasions measured 2.5 cm by 7 cm. When questioned regarding the origins of these injuries, the patient repeatedly stated, "I don't know." Forensic photographs obtained by the Center of Forensic Excellence (TXFNE Photos) on November 17, 2023, using measurement overlays such as OPTIRECTILINEAR® and ACTILINEAR®, objectively validated these findings. These findings, together with additional forensic documentation—including the Medical Forensic Chart, Standing Delegated Orders, Consent forms, Chain-of-Custody records, and DFSA documentation—were integrated into his overall clinical evaluation and multidisciplinary management.

17

CONFIDENTIAL

## OPINIONS & CONCLUSIONS

The Texas Commission on Jail Standards (TCJS) has repeatedly identified systemic failures within Harris County Jail, citing noncompliance with essential regulatory standards that directly impact inmate safety, classification, supervision, and medical care. These violations, documented across multiple Annual Jail Reports and Special Inspections, provide clear evidence of Harris County's inability to meet minimum jail standards, despite repeated interventions from the Texas Jail Commission.

On August 10, 2023, Harris County Sheriff's Office (HCSO) officials appeared before the Texas Jail Commission to address ongoing deficiencies, including custody deaths, overcrowding, intake delays, and supervision failures. During this hearing, Assistant Chief Phillip Bosquez admitted that HCSO was "stretching the standards to cover areas that aren't built into them," signaling a deliberate effort to sidestep procedural requirements instead of meeting minimal requirements. The discussion repeatedly returned to the issue of overcrowding, with officials acknowledging that excessive inmate populations and inadequate staffing had resulted in systemic noncompliance. The February 13–17, 2023, Jail Inspection Report further reinforced these concerns, documenting severe overcrowding that forced inmates classified as requiring protective custody into general population due to space shortages, placing them at heightened risk of harm.

Bosquez was asked directly why Harris County had been found noncompliant four separate times between 2022 and 2023, failing to meet basic operational standards. He attributed these failures to 'COVID-19-related challenges, staffing shortages, and high turnover rates," yet inspection reports and regulatory findings indicate long-standing deficiencies predating the pandemic. Instead of corrective action, HCSO leadership has adjusted compliance interpretations rather than enforcing structural improvements, allowing institutional failures to persist unchecked.

Following this hearing, the Texas Jail Commission reminded HCSO officials that the jail remained under a remedial order, requiring staffing improvements and regulatory compliance to meet minimum standards. Harris County Jail was instructed to submit a corrective report at the November commission meeting. Mr. Buford remained incarcerated at Harris County Jail during the time of this hearing, meaning that the documented failures discussed before the commission directly impacted his conditions of confinement.

Months earlier, during the February 13–17, 2023, inspection of Harris County Jail, the Texas Jail Commission issued findings that further exposed the facility's inability to adhere to minimum standards. These failures included delays in classification and housing assignments for inmates requiring mental health evaluations, with some inmates held in processing beyond the mandated 48-hour limit—some exceeding 70 hours before being assigned housing. A key contributing factor to classification delays was insufficient staffing, which resulted in inmates awaiting placement for extended periods due to clerical bottlenecks and inadequate personnel coverage. Harris County's failure to meet minimum staff ratios under Texas Commission on Jail Standards § 275.4 further exacerbated these delays, forcing improper placements that exposed inmates to unsafe housing conditions. Mr. Buford, who required proper classification and placement based on risk factors, was subjected to these same systemic failures, delaying necessary safeguards and exposing him to a facility already failing to meet minimum requirements.

18

CONFIDENTIAL

Supervision failures were also noted, as face-to-face observations regularly exceeded required time limits, ranging from 1 minute up to 2 hours and 9 minutes. For Mr. Buford, this lack of proper supervision meant increased vulnerability to harm, retaliation, and neglect, reinforcing the broader institutional failures affecting his incarceration. Additionally, staffing shortages were cited as a contributing factor to these lapses, with floor rosters revealing insufficient personnel coverage, contradicting earlier claims by HCSO that staffing levels were adequate.

Further, the 2023 Special Inspection Report established a direct link between noncompliance and an inmate suicide, highlighting the consequences of failing to conduct required face-to-face observations. While Mr. Buford was not directly connected to this incident, the broader failures in supervision and oversight created an environment where vulnerable inmates—including those reporting sexual abuse or requiring protective measures—were subjected to systemic neglect.

Harris County's repeated failure to adhere to minimum jail standards, its misrepresentation of staffing compliance, and the attempts to "stretch the standards" rather than implement corrective measures reveal an institutional pattern of disregard for inmate safety and regulatory compliance. The following sections will examine specific violations of federal and state standards, detailing the procedural lapses that contributed to the documented failures within HCSO and the impact on vulnerable detainees such as Mr. Buford, as evidenced by both inspection reports and expert analysis.

### § 115.11 Zero Tolerance of Sexual Abuse and Sexual Harassment and PREA Coordinator

PREA standard 115.11 mandates zero tolerance for sexual abuse and harassment within correctional facilities, requiring policies and oversight mechanisms to prevent, detect, and respond to such incidents. Additionally, it requires the designation of a PREA Coordinator with sufficient authority to oversee compliance efforts.

> **115.11(a) The agency shall have a written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining the agency's strategies and responses to prevent, detect, and respond to such conduct.**

> **115.11(b) The agency shall employ or designate an upper-level agency-wide PREA coordinator with sufficient authority to develop, implement, and oversee agency efforts to comply with the PREA standards in all of its facilities.**

Despite these requirements, records indicate a misrepresentation of PREA compliance leadership within HCSO during the period relevant to Mr. Buford's allegations. HCSO facility reports reference Katrina Camacho as the PREA Compliance Manager, implying that she held direct responsibility for compliance oversight. However, in her deposition (p. 196), Camacho contradicts this designation, stating:

> There was not one. I was only assisting them until they get a new one. So in May 2023, I received the re-entry and education manager position. They were interviewing for my position. I don't believe they ever found anyone.

CONFIDENTIAL

This statement confirms that no formally designated PREA Compliance Manager was in place during September and October 2023, despite HCSO documents listing Camacho in that role. The absence of an appointed manager meant that critical oversight functions—including incident reviews, classification monitoring, investigative coordination, and staff training—were either inconsistently applied or entirely lacking. Under HCSO Policy 740, the PREA Compliance Manager is responsible for:

- Ensuring compliance with PREA screening and classification protocols to prevent abuse (115.41).

- Monitoring retaliation risks and responding to inmate safety concerns (115.67).

- Overseeing timely investigative responses and ensuring proper documentation of allegations (115.71).

- Conducting sexual abuse incident reviews and recommending corrective actions (115.86).

- Maintaining accurate records and ensuring PREA data retention compliance (115.89).

The lack of a formally designated PREA Compliance Manager during Mr. Buford's incarceration period raises serious concerns regarding HCSO's ability to enforce institutional safeguards against sexual abuse. Additionally, without a designated compliance official, PREA investigations, protective housing placements, and retaliatory monitoring lacked necessary leadership oversight, contributing to documented procedural failures across multiple standards. This misrepresentation of compliance leadership within HCSO and the absence of a PREA Compliance Manager during a critical timeframe suggest significant gaps in adherence to both federal PREA requirements and internal policy mandates under HCSO Policy 740.

### Opinion: § 115.11 Zero Tolerance of Sexual Abuse and Sexual Harassment and PREA Coordinator

The absence of a formally designated PREA Compliance Manager within HCSO during Mr. Buford's incarceration period represents a fundamental breakdown in institutional accountability. Compliance leadership is essential in ensuring adherence to federal protections against sexual abuse, and the documented misrepresentation of leadership within HCSO undermines the credibility of its compliance framework. Without a clear oversight structure, procedural failures were allowed to persist unchecked, exposing vulnerable inmates to heightened risks.

Facility records list Katrina Camacho as the PREA Compliance Manager; however, her deposition (p. 196) confirms that she did not formally hold this role and was merely assisting until a new coordinator was appointed. The misrepresentation of staffing leadership contributed to systemic procedural failures, including classification lapses, improper monitoring, and deficiencies in investigative oversight. This staffing gap meant that key responsibilities—such as screening for risk factors (§ 115.41), monitoring retaliation (§ 115.67), and ensuring proper investigative procedures (§

20

CONFIDENTIAL

115.71)—lacked structured oversight. Without a designated PREA Coordinator, continuity in compliance efforts was compromised, directly affecting inmate protection measures.

Additionally, the contradiction between official HCSO reports listing Camacho as the PREA Compliance Manager and her deposition statement that no such role was actively filled highlights inconsistencies in administrative transparency. PREA mandates require active oversight, yet HCSO's failure to maintain leadership continuity resulted in gaps in screening, classification, retaliation monitoring, and investigative procedures. Staffing shortages documented in Texas Commission on Jail Standards reports further reinforce broader institutional weaknesses, including delayed classification assessments, failures in victim protection protocols, and insufficient investigative response time.

The failure to designate a compliance manager during this period severely impacted HCSO's ability to protect inmates from abuse and retaliation, enforce timely investigative responses, and ensure policy adherence. The absence of qualified leadership impaired decision-making related to sexual abuse reports, allowing systemic issues to persist unchecked. These deficiencies not only obstructed compliance with federally mandated safeguards but also exposed vulnerable inmates to heightened risks without appropriate institutional intervention.

### § 115.41 Screening for Risk of Victimization and Abusiveness.

PREA standard 115.41(a) mandates that all inmates shall be assessed during an intake screening and upon transfer to another facility to determine their risk of being sexually abused by other inmates or sexually abusive toward other inmates. There is currently no evidence indicating that Mr. Buford received a PREA screening during intake or within 72 hours of arrival at the facility (§ 115.41(b)). PREA standard 115.41(c) further requires that **"such assessments shall be conducted using an objective screening instrument."**

The Basic County Corrections Course (BCCC) references the "key components of an objective jail classification system" (Slide 9). Despite the established rationale for objective screening instruments, Officer Camacho described risk factors as subjective and dependent on the perception of the staff member conducting the screening process.

Camacho states (deposition, p. 177-178),

Q Someone like Dequon, who's -- he's relatively small. He's got documented medical and mental health issues. Does he present a higher PREA risk factor?
A Now, that would depend on the individual who's classifying him at the time because it's about what the individual who's doing the questionnaire perceives.
Q And that questionnaire, is that done at the intake process?
A Yes.
Q At Harris County?
A Yes. By classification.
Q Okay. So even though there's a questionnaire, there's still a subjective element of the officer or employee who's doing the questionnaire?
A It could be.

21

CONFIDENTIAL

PREA standards 115.41(e–g) require an initial screening that includes inquiries about histories of prior institutional abuse. A reassessment for risk of victimization must occur within 30 days of an inmate's arrival at the facility. Additionally, any significant change in risk level due to a referral, request, incident of sexual abuse, or new information relevant to the inmate's vulnerability must prompt further reassessment.

The Basic County Corrections Course (BCCC) materials (Slides 9–12) generally align with these expectations but extend the reassessment window to 30–90 days. This adjustment has limited utility in a jail setting where inmate turnover is high. BCCC materials (Slides 9–12) state:

**1. Intake Screening - to be completed immediately on all inmates admitted for purposes of identifying any medical, mental health, or other special needs that require placing inmates in special housing units.**
**2. Initial Custody Assessment - to be completed on all newly admitted inmates prior to housing assignments to determine custody levels.**
**3. Custody Reassessment/Review - a custody reassessment shall be conducted within 30-90 days of the Initial Custody Assessment and immediately upon any disciplinary action and/or change in legal status that would affect classification. A documented classification review to determine the necessity for a complete reassessment shall be conducted every 30-90 days thereafter.**

Policy 903.05 Classification New-House JPC Intake and Dress Out (POST ORDERS) contains the following procedures:

**12. Staff will then proceed within OMS to the PREA (Prison Rape Elimination Act) portion of the interview. The responses to these questions are designed to determine the inmate's victimization vulnerability and predatory factors. Clicking "yes" or "no" will designate the inmate for that type of special management housing within OMS.**

**13. Inmates designated as being vulnerable, predatory, or child predators will be separated from the general population and placed into protective special management housing.**

**14. The interview will then move into the Point Additive System portion of the screening tools.**
**i. This part allows the interviewer to assign a LOS (level of security), based on points that are accumulated utilizing current and past charges.**
**ii. The inmate's past behavioral history while incarcerated at the HCSO is a factor within this process.**
**iii. As points are assessed, the process objectively determines an inmate's LOS, as well as other potential special management housing requirements. Those factors help the staff to determine the appropriate housing assignment for that inmate.**

22

CONFIDENTIAL

Policy  903.13 PREA & LGBTI (CLASSIFICATION POST ORDERS) states:

**F. Inmates identified as victimization vulnerable SHALL NOT be housed in GP or Predator housing. PREA Predator inmates SHALL NOT be housed in GP or Victimization vulnerable housing.**

The acknowledgment form, which documents that an inmate received an education pamphlet, policies and procedures, an inmate handbook, and a PREA brochure during intake, also states that the inmate provided responses to staff questions during the screening process and understood their housing assignment (whether protective custody or general population). However, the form is signed simply as "B.H." and does not reflect the name Dequon Buford (JE000014).

Beyond this apparent documentation issue, no PREA screening tool, risk assessment scores, or custody reassessment/reviews have been provided for review. This lack of records is concerning, as Mr. Buford met multiple criteria outlined in PREA standard 115.41(d) for risk of sexual victimization.

**(1) Whether the inmate has a mental, physical, or developmental disability;**
**(2) The age of the inmate;**
**(3) The physical build of the inmate;**
**(4) Whether the inmate has previously been incarcerated;**
**(5) Whether the inmate's criminal history is exclusively nonviolent;**
**(6) Whether the inmate has prior convictions for sex offenses against an adult or child;**
**(7) Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;**
**(8) Whether the inmate has previously experienced sexual victimization;**
**(9) The inmate's own perception of vulnerability; and**
**(10) Whether the inmate is detained solely for civil immigration purposes**

Mr. Buford had schizophrenia, anemia, Vitamin D deficiency, iron deficiency, anxiety, and bipolar 1 disorder, and a family history of Crohn's disease, schizophrenia, bipolar disorder, and hypertension. Mr. Buford also had a previous placement for psychiatric treatment in hospital and a learning difficulty (115.41 (d)(1). Mr. Buford was 28 years of age during July 12, 2023 (115.41) (d)(2). Mr. Buford had a slight build, being approximately 6 feet tall and weighing 150 pounds at intake, before subsequently losing 19 pounds during his incarceration period (115.41) (d)(3). Mr. Buford had previous incarcerations as documented on his intake paperwork (115.41 (d)(4), and this criminal history was exclusively nonviolent (115.41) (d)(5). There is no evidence that a screening tool was used to ask Mr. Buford: whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming (115.41) (d)(7), whether the inmate has previously experienced sexual victimization (115.41) (d)(8), and the inmate's own perception of vulnerability (115.41) (d)(9).

23

CONFIDENTIAL

**Opinion:** § 115.41 Screening for Risk of Victimization and Abusiveness.

The documented failures in Mr. Buford's intake, classification, and housing placement reveal clear lapses in adhering to PREA standards and established correctional policies. The absence of proper screening, risk assessment, and timely reassessment—combined with inconsistencies in documentation—illustrates a systemic failure to safeguard an inmate who exhibited multiple vulnerabilities. These omissions significantly increased his risk of victimization, contradicting mandated protections and procedural requirements. The lack of corrective action or adequate response further underscores a concerning disregard for inmate safety and established PREA protocols. This includes the following:

**PREA Violations and Procedural Failures:**

- **Failure to conduct mandated PREA screening**
    - PREA standard 115.41(a) requires intake screenings for victimization and abusiveness risk.
    - No documented PREA screening was conducted within 72 hours of Mr. Buford's arrival (§ 115.41(b)).
    - PREA assessments must use an objective screening instrument (§ 115.41(c)), but classification officers relied on subjective perceptions (Camacho deposition, p. 177-178).

- **Inconsistent reassessment practices**
    - PREA standards 115.41(e–g) require reassessment within 30 days and additional screenings upon risk changes.
    - Basic County Corrections Course (BCCC) extends reassessments to 30-90 days, limiting effectiveness in a high-turnover jail setting.

- **Inadequate implementation of classification policies**
    - Policy 903.05 mandates PREA interviews to determine vulnerability and special housing needs.
    - No available records indicate Mr. Buford was classified according to these standards.

- **Failure to separate inmates at risk**
    - Policy 903.13 states that vulnerable inmates shall not be housed in general population or predator housing.
    - Lack of documented classification raises concerns regarding housing assignments.

24

CONFIDENTIAL

- **Deficient intake documentation**
    - o Acknowledgment form confirming receipt of educational materials and screening responses is signed "B.H." rather than Mr. Buford's name (JE000014).
    - o Absence of documented risk assessment scores or custody reassessment raises procedural concerns.
- **Multiple unmet PREA criteria for risk of victimization**
    - o Mr. Buford met several risk factors under PREA standard 115.41(d), including:
    - o Mental health conditions (schizophrenia, bipolar disorder, anxiety).
    - o Physical vulnerability (weight loss, anemia, learning difficulty).
    - o Prior incarcerations and exclusively nonviolent criminal history.
    - o Lack of documented screening on sexual orientation, prior victimization, and self-perceived vulnerability.

- **Failure to ensure appropriate housing and monitoring**
    - o No records indicate an appropriate custody assessment, classification review, or reassignment based on increased risk.
    - o Absence of protective measures despite documented vulnerabilities.

25

CONFIDENTIAL

## § 115.42 Use of Screening Information.

PREA standard 115.42 provides standards for using a risk screening at intake and throughout incarceration to protect the safety of inmates. The standard includes:

**115.42 (a) The agency shall use information from the risk screening required by § 115.41 to inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive; and 115.42   (b) The agency shall make individualized determinations about how to ensure the safety of each inmate.**

## <u>Opinion</u>: § 115.42 Use of Screening Information.

PREA standard 115.42 establishes guidelines for utilizing risk screening information to protect inmates throughout their incarceration. The standard mandates that risk assessment results must inform housing, work, education, and program placements to ensure separation between inmates at high risk of victimization and those with a propensity for sexual abusiveness (§ 115.42(a)). Additionally, agencies are required to make individualized determinations on how best to ensure each inmate's safety (§ 115.42(b)).

Despite these directives, there is no evidence that screening information was utilized to classify Mr. Buford appropriately at booking and intake. He exhibited multiple risk factors that should have precluded placement in general population, including documented mental health concerns, prior institutionalization, physical vulnerabilities, and an exclusively nonviolent criminal history. Failure to utilize screening information effectively increased Mr. Buford's risk of victimization, contradicting PREA's fundamental safeguards.

A properly administered screening tool should have identified these concerns and resulted in an assignment with increased supervision and monitoring. In accordance with PREA guidelines, a high-risk classification for Mr. Buford would have necessitated frequent security checks—such as 30-minute face-to-face observations with officer documentation—to ensure his safety. However, the absence of these measures highlights a failure in risk assessment implementation, exposing Mr. Buford to heightened dangers that could have been prevented through appropriate classification and intervention.

CONFIDENTIAL

## § 115.13 Supervision and Monitoring.

PREA standard 115.43 is aimed at reinforcing adequate supervision and monitoring of inmates to reduce risk of sexual victimization.

**115.43 (d)  states that if vulnerable detainees are identified pursuant to the screening required by § 115.141, security staff shall provide such detainees with heightened protection, to include continuous direct sight and sound supervision, single-cell housing, or placement in a cell actively monitored on video by a staff member sufficiently proximate to intervene, unless no such option is determined to be feasible.**

**HCSO Detention Command Standard Operating Procedures.
CJC-220 Inmate Observation**

Prison Rape Elimination Act (PREA) Standard 115.13-Supervision and Monitoring has a specific linkage to CJC-220 item 12 which states:

**a. Watch Commanders and/or Division Commanders will also make unannounced inspections for the specific purpose of preventing sexual violence in accordance with Prison Rape Elimination Act (PREA) Standard 115.13-Supervision and Monitoring.
b. The rounds will be documented in Corretrak or on the CJCF-220d ~ Pod Control Center Visual Jail Check Log.**

- There is no documentation provided that indicates Mr. Buford received unannounced inspections from Watch Commanders and/or Division Commanders during his incarceration. No CJCF-220d ~ Pod Control Center Visual Jail Check Log has been produced.

**HCSO Detention Command Standard Operating Procedures.
CJC-220 Inmate Observation**

Meeting the PREA standard of 115.13 Supervision and Monitoring rests largely on standard operating procedure CJC-220 which guides observation, behaviors, and documentation of correctional staff. HCSO failed to meet this standard for Mr. Buford in his different placements in the jail. This includes general population, administrative separation, and placement in protective restraints.

**General Population: CJC-220 states  (701 Jail / 1200 Jail / 711 Jail / 1307 Jail, JPC) - Inmates confined in General Population dormitory style cellblocks should be observed by facility personnel and times between observations will not exceed sixty (60) minutes.** These observations will be documented as they occur. All rounds will be electronically documented using the Corretrak digital observation application. If Corretrak is not available, use Criminal Justice Command Form CJCF-220d ~ Pod Control Center Visual Jail Check Log.

27

CONFIDENTIAL

- There is no documentation provided that indicates Mr. Buford received at minimum sixty minutes checks while he was in general population. No CJCF-220d ~ Pod Control Center Visual Jail Check Log has been produced.

**Administrative Separation:** CJC-220 defines a separation cell as a special purpose cell designed to accommodate one (1) inmate. The cell minimally contains one (1) bunk, mirror, toilet, lavatory, table, and seat. This cell is used to house inmates requiring protection or whose behavior requires close supervision. Mr. Buford was placed on separation status on two occasions, that is, October 2-October 18, 2023, and November 5-November 14, 2023. During these placements the following should have occurred per CJC-220: Inmates housed or placed in a separation cell will be observed at irregular intervals not to exceed every thirty (30) minutes. All rounds will be electronically documented using the Corretrak digital observation application. If Corretrak is not available, use Criminal Justice Command Form CJCF-219a ~ Daily Observation Log . See III,I, below for instructions on completing and posting form CJCF—219a ~ Daily Observation Log.

- There is no documentation provided that indicates Mr. Buford received at minimum thirty minute checks while he was in administrative separation. No CJCF-219a ~ Daily Observation Log has been produced.

**Protective Restraints:** CCJ-200 states that restraints will be considered "protective restraints" when they are applied as a protective measure to inmates exhibiting behavior indicating that they are a danger to themselves or others. Staff members will observe inmates placed in restraints for violent behavior at irregular intervals. The observations will be documented and will not exceed fifteen (15) minute intervals. These observations will be documented as they occur (This is not applicable to normal operational security procedures (handcuffing after a fight, transportation purposes, etc.). All rounds will be electronically documented using the Corretrak digital observation application. If Corretrak is not available use Criminal Justice Command CJCF-219a ~ Daily Observation Log. CJCF-239 ~ Application of Protective Restraints Observation Log will be located on or near the cell door anytime an inmate is placed in protective restraints. Mr. Buford was placement on separation status where per policy restraints were required on two occasions, that is, October 2-October 18, 2023, and November 5-November 14, 2023. Also note notification October 17, 2023, (4.03pm) - Sarah Wood (General Counsel of Harris County Public Defender's Office; see JR000017) of Mr. Buford being "heavily shackled with extra security precautions like they do with murder defendants" while on separation status.

- There is no documentation provided that indicates Mr. Buford received at minimum fifteen minute checks while he was in restraints. No CJCF-239 ~ Application of Protective Restraints Observation Log has been produced.

28

CONFIDENTIAL

HCSO Detention Command Standard Operating Procedures also provide guidelines on the required documentation need for inmate observations (p. 001149-001150) which includes the following:

> **3.) The assigned "Pipe" shall be used to record inmate observation rounds, as required by the Criminal Justice Command Inmate Observation Policy (CJC-220), to wit: "*Inmates housed or placed in a separation or detoxification* cell shall be observed at irregular intervals not to exceed every twenty-five (25) minutes."**
>
> **7.) After the end of each shift, employees shall deliver the Pipe to the on duty supervisor for data transfer of the pipe to the designated downloader, and at any other time deemed necessary by the floor supervisor.**
>
> **8.) If, at any time, the "Pipe" should malfunction, not perform as expected, or becomes lost or misplaced the on-duty floor supervisor shall immediately contact the HCSO Guard1 liaison.**
>
> **9.) Unless the employee has reported a discrepancy to his/her supervisor at or before the end of his/her shift, employees having used a "Guard1 Plus" wand to document observation rounds shall be considered as having indicated the information is true and accurate to the best of their knowledge, as per Criminal Justice Command policy CJC-220 III.D.6.f, to wit: "…staff members assigned to the respective area shall sign the form for their respective watch indicating the information is true and accurate to the best of their knowledge."**
>
> **10.) The designated HCSO Guard1 liaison shall provide unless instructed otherwise, daily reports in an electronic format to the 1200 Division Commander indicating:**
> > **a. Time Between Rounds**
> > **b. Time of Actual of Round**

- There is no documentation provided that indicates Mr. Buford received supervision and monitoring that documents the Time Between Rounds and Time of Actual of Round during his incarceration.

## Opinion: § 115.13 Supervision and Monitoring

PREA standard 115.13 mandates adequate supervision and monitoring of inmates to reduce the risk of sexual victimization. Compliance with this standard is reinforced by HCSO Detention Command Standard Operating Procedures, specifically CJC-220 Inmate Observation, which outlines observation requirements for different housing classifications.

Despite these directives, there is no documentation indicating that Mr. Buford received mandated levels of supervision throughout his incarceration, including general population monitoring, administrative separation checks, and protective restraint observations. The absence of required logs—such as the CJCF-220d ~ Pod Control Center Visual Jail Check Log, CJCF-219a ~ Daily Observation Log, and CJCF-239 ~ Application of Protective Restraints Observation Log—raises concerns about procedural failures in ensuring the safety of inmates.

29

CONFIDENTIAL

The 2023 Annual Jail Inspection Report confirms that routine observation rounds were delayed by up to 2 hours and 9 minutes in areas housing inmates classified as assaultive, suicidal, or mentally ill. These delays directly contradict PREA standard 115.13, which mandates continuous sight and sound protection for vulnerable detainees. Additionally, staff shortages led officers to conduct required observations from control stations instead of physically engaging with inmates, severely impairing direct supervision and inmate monitoring.

Further inspection findings indicate that staff were observed scanning QR codes at control stations without leaving their posts, falsely documenting inmate observations that did not occur. These failures reinforce concerns that HCSO's supervision protocols were routinely violated, leaving at-risk inmates—including Mr. Buford—without mandated protective oversight.

HCSO procedures require inmates in general population to be observed at intervals not exceeding sixty minutes; however, no documentation confirms that Mr. Buford received these scheduled checks. Similarly, administrative separation requires observations at irregular intervals not exceeding thirty minutes, but there is no evidence that these checks occurred. Furthermore, protective restraints mandate observation intervals of no more than fifteen minutes, yet no documentation verifies adherence to these requirements.

Additionally, Watch Commanders and Division Commanders are required to conduct unannounced inspections to prevent sexual violence, but no records indicate these inspections took place during Mr. Buford's incarceration. The absence of supervision and monitoring data—including required reports on Time Between Rounds and Time of Actual Round—further underscores systemic deficiencies in inmate protection.

The inspection report also documented staffing shortages, which contributed to failures in direct supervision and procedural compliance. Specifically, inspectors found that:

- On the 3rd floor, only 13 officers were present when 14 were required to supervise 659 inmates.
- On the 4th floor, only 13 officers were present when 15 were required to oversee 684 inmates.

These staffing shortages obstructed the ability to properly conduct inmate supervision, leading to delays in security rounds, late or skipped observations, and procedural inconsistencies that jeopardized the safety and security of incarcerated individuals.

The lack of oversight and documentation regarding required rounds, monitoring, and supervision strongly suggests a failure to meet PREA's established standards, exposing inmates—including Mr. Buford—to heightened risks. These gaps represent noncompliance with both federal mandates and HCSO's own internal policies, undermining detention facility safeguards intended to protect vulnerable detainees.

30

### § 115.22 Policies to Ensure Referrals of Allegations for Investigations.

PREA standard 115.22(a) mandates that all allegations of sexual abuse and sexual harassment must be subjected to an administrative or criminal investigation. This requirement ensures that reports are properly documented, assessed, and pursued to determine accountability and appropriate remedial actions.

Despite this clear directive, the documentation shows that HCSO did not fulfill its obligation to investigate all allegations of sexual abuse independently and thoroughly. Records indicate that two separate reports of sexual assault occurring on **September 25, 2023, and September 27, 2023** were consolidated into a single PREA report, effectively reducing the scope of inquiry into multiple incidents. This approach contradicts PREA's intent, which demands that each allegation be fully investigated.

Further, reports from **Investigator McCutcheon (PREA000029-00030, October 6, 2023) and an email from Tran Alvares (HCSO, October 4, 2023)** reference PREA reporting protocols, yet there is no evidence that these reports resulted in separate, comprehensive investigative actions. Officer Camacho's deposition further suggests procedural inconsistencies regarding classification and risk assessment, raising concerns about whether adequate safeguards were applied in response to these reports.

- HCSO failed to meet the standard of completing administrative or criminal investigations into all allegations of sexual abuse.

### <u>Opinion</u>: Policies to Ensure Referrals of Allegations for Investigations.

HCSO's failure to conduct distinct administrative or criminal investigations into both allegations constitutes a significant procedural lapse. Consolidating multiple incidents into a single report undermines the investigative process, compromises transparency, and weakens institutional accountability. These omissions highlight systemic deficiencies in reporting practices and demonstrate noncompliance with PREA's fundamental safeguards designed to protect vulnerable inmates from harm.

31

CONFIDENTIAL

### § 115.21 Evidence Protocol and Forensic Medical Examinations

Under 28 CFR § 115.21 (PREA Standard 115.21) requires agencies to follow a uniform, DOJ-adapted evidence protocol that maximizes the collection and preservation of physical evidence; offer every sexual-abuse victim a no-cost forensic medical examination by a SANE/SAFE or similarly qualified clinician (with youth-appropriate adaptations); ensure victims have the option to be accompanied by a confidential victim advocate during exams and interviews; and document all efforts to secure qualified examiners and advocacy services

In line with this standard, facilities must offer all victims of sexual abuse access to a forensic medical examination "as expeditiously as possible" and follow the U.S. DOJ's National Protocol for Sexual Assault Medical Forensic Examinations. In this case, nearly 23 hours elapsed between the 2:27 PM report on 9/28 and the ~1:00 PM transport on 9/29. That delay falls well outside both PREA's intent and community best practices (which interpret "as expeditiously as possible" to mean within hours, not a full day). Such a lapse risks loss of critical forensic evidence, undermines victim safety, and constitutes non-compliance with the PREA mandate for an "expeditious" response.

Moreover, Mr. Buford was shackled and placed under direct officer surveillance throughout his hospital exam—even though he had no history of aggression, violence, or self-harm ideation during incarceration and had been formally screened as "no risk" for homicide or suicide—practices that directly violate PREA's requirements for privacy, therapeutic care, and restrained use only under documented exigent circumstances.

### Opinion: Evidence Protocol and Forensic Medical Examinations

HCSO's nearly 23-hour delay in transporting Mr. Buford for a forensic medical examination represents a significant breach of PREA's mandate for prompt, evidence-preserving care and places the alleged victim's rights and safety at risk. The decision to shackled and directly monitor Mr. Buford during his examination, despite his no-risk status and absence of aggressive behavior, is a stark violation of the requirement for a private, trauma-informed setting.

32

CONFIDENTIAL

## § 115.43 Protective Custody.

Mr. Buford was placed on involuntary separation status where per policy restraints were required on two occasions, that is, October 2-October 18, 2023, and November 5-November 14, 2023. These two placements into involuntary segregated housing are subsumed under PREA standard 115.43 Protective Custody.

**HCSO Detention Command Standard Operating Procedures.**
**CJC-116 PREA ~ Prison Rape Elimination Act**

**(a) Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers. If a facility cannot conduct such an assessment immediately, the facility may hold the inmate in involuntary segregated housing for less than 24 hours while completing the assessment.**

- Mr. Buford's allegation of two sexual assaults documented by HCSO staff on September 28, 2023, contained numerous referrals to HCSO classifications. However, his transfer to another setting did not occur until October 2, 2023, thus placing him at increased risk for four days.

- Mr. Buford was placed in involuntary segregated housing on two occasions October 2-October 18, 2023, and November 5-November 14, 2023, with no justification for available alternatives that could separate him from alleged abusers. This included placement in a segregated unit where policy required the use of restraints for a period of 16 days and 9 days (far higher than the 24 hours standard).

**(b) Inmates placed in segregated housing for this purpose shall have access to programs, privileges, education, and work opportunities to the extent possible. If the facility restricts access to programs, privileges, education, or work opportunities, the facility shall document:**
**(1) The opportunities that have been limited;**
**(2) The duration of the limitation; and**
**(3) The reasons for such limitations.**

- Mr. Buford's placement in involuntary administrative separation mandated that "inmates shall be allotted one hour per day for time out of their cells." There is no documentation that Mr. Buford was allowed out of his cell more than the required one hour per day, nor any documents of his continued access to programs, privileges, education, or work opportunities.

33

**(d) If an involuntary segregated housing assignment is made pursuant to paragraph (a) of this section, the facility shall clearly document:**
**(1) The basis for the facility's concern for the inmate's safety; and**
**(2) The reason why no alternative means of separation can be arranged.**

- There is no documentation justifying why no alternative means of separation could have been arranged for Mr. Buford.

**HCSO Detention Command Standard Operating Procedures.**
**CJC-219: Separation Policy**

Mr. Buford was placed in involuntary segregated housing on two occasions October 2-October 18, 2023, and November 5-November 14, 2023. Per the CJC-291 policy:

**6. Recordkeeping**
**a. The records to be noted on the Separation Cell Out-Time Log (Criminal Justice Command Form ~ CJCF-219 ~ Separation Out-Time Log) will include how the inmate spends his/ her allocated out-time. The following are some examples:**
**i. Reading ~ record "19" on log,**
**ii. Exercising ~ record "9" on log,**
**iii. Visiting other inmates ~ record "25" on log,**
**iv. Telephone ~ record "23" on log.**

- There is no documentation supporting adherence to minimum standards for record-keeping.

**HCSO Detention Command Standard Operating Procedures.**
**CJC-219: Separation Policy**

Mr. Buford was placed in involuntary segregated housing on two occasions October 2-October 18, 2023, and November 5-November 14, 2023, and per documents this required the use of restraints. It is unknown whether Mr. Buford was restrained while inside his cell placement and/or whether Mr. Buford was restrained during escort. However, a notification October 17, 2023, (4.03pm) by Sarah Wood (General Counsel of Harris County Public Defender's Office; see JR000017) states that Mr. Buford was "heavily shackled with extra security precautions like they do with murder defendants" while on separation status.

These differences are linked to when Mr. Buford was placed on and removed from: purple-band, other purple-band, or purple-striped status, which dictates if handcuffing and leg irons are required or some other practice (000164). Officer Camacho (deposition, p. 236) confirms that Mr. Buford should not have been placed in administrative separation due to a PREA allegation, nor should he have been shackled and handcuffed as a result of the allegation. Officer Camacho (deposition, page 236) stated that placement in administrative separation and being shackled was a punitive institutional response to a PREA allegation.

34

CONFIDENTIAL

## Opinion: § 115.43 Protective Custody.

PREA standard 115.43 establishes guidelines for the use of involuntary segregated housing to protect vulnerable inmates. Facilities are required to assess all available alternatives before placing an inmate in segregation (§ 115.43(a)) and, if no alternative exists, document the justification for such placement. Additionally, facilities must ensure that segregated inmates retain access to programming, privileges, and educational opportunities (§ 115.43(b)). Despite these mandates, there is no evidence that Harris County Sheriff's Office (HCSO) adhered to these standards in Mr. Buford's case.

Following two documented sexual assault allegations on September 25 and September 27, 2023, Mr. Buford's transfer did not occur until October 2, 2023, leaving him exposed to increased risk for four days. His subsequent placements in involuntary segregation on October 2–October 18, 2023, and November 5–November 14, 2023, did not include documentation justifying why no alternative housing arrangements were made. This failure contradicts the requirement that inmates at high risk for victimization should only be segregated after thorough assessment of available alternatives. Additionally, Mr. Buford was held in restraints for 16 days and 9 days, far exceeding the 24-hour threshold outlined in PREA standards.

Furthermore, segregated inmates must retain access to programs, privileges, education, and work opportunities. There is no documentation verifying that Mr. Buford received more than the mandated one hour per day outside his cell, nor records confirming access to rehabilitative programs. The required Separation Cell Out-Time Log (CJCF-219) for tracking activities such as phone use, exercise, or visitation has not been provided, indicating deficiencies in recordkeeping and compliance with established segregation policies.

HCSO procedures also mandate clear justification for involuntary segregation assignments, including documentation of the basis for safety concerns and the lack of alternative placement (§ 115.43(d)). No records have been produced explaining why Mr. Buford's segregation was necessary or why alternative protective measures were unavailable.

Adding to concerns, an October 17, 2023, notification from Sarah Wood (General Counsel, Harris County Public Defender's Office) described Mr. Buford as "heavily shackled with extra security precautions like they do with murder defendants" while in segregation. Officer Camacho's deposition (p. 236) confirms that administrative separation and the use of shackles were punitive institutional responses to a PREA allegation, in direct contradiction to PREA standards prohibiting retaliation against inmates reporting sexual abuse.

The absence of required documentation, excessive restraint periods, delays in transfer following victimization reports, and failure to provide access to rehabilitative programs demonstrates noncompliance with PREA § 115.43. These procedural lapses increased Mr. Buford's risk, further exposing systemic deficiencies in inmate protection and classification practices within HCSO facilities.

35

CONFIDENTIAL

## § 115.67 Agency Protection against Retaliation.

PREA standard 115.67 aims to protect inmates from retaliation following a PREA allegation. This centers on the following:

**115.67 (a) The agency shall establish a policy to protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff, and shall designate which staff members or departments are charged with monitoring retaliation.**

- Following two allegations of sexual abuse, and despite not exhibiting any aggressive, suicidal, or homicidal impulses or behaviors, Mr. Buford was placed in involuntary segregated housing that required per floor policy the use of restraints.
- Even after being notified by external counsel and officer Camacho of the inappropriateness of "heavily shackled with extra security precautions like they do with murder defendants status during the October 2-October 18, 2023, housing, Mr. Buford was returned to placement in separation housing with restraints required per floor policy following his second documented sexual assault allegation (October 2, 2023). After 16 days of placement in separation housing PREA Manager Camacho wrote, "At no time should we shackle and handcuff someone because of a PREA outcry. This is a form of punishment." Mr. Buford inability to leave his cell during involuntary separation was noted by Investigator Guerrero during his investigation.
- Officer Camacho (deposition) acknowledges that these two placements were inappropriate, and that PREA should never be used as a tool of punitiveness. Officer Camacho (deposition, p. 109) states, 'Shackling someone after making a PREA allegation or PREA outcry is a punitive response if that individual is not being aggressive or volatile.

**115.67 (b) The agency shall employ multiple protection measures, such as housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates or staff who fear retaliation for reporting sexual abuse or sexual harassment or for cooperating with investigations.**

- Following the documented September 28, 2023, with Mr. Buford's allegation of experiencing two sexual assaults (September 25, 2023, and September 27, 2023) he was left in general population for four days awaiting reclassification to alternative housing. While an investigation report also lists the following suspect list (PR000008): Name: Unknown, DOB 01/01/1935, Age  88, Race B, Sex M – there is no related documentation that Mr. Buford was immediately separated from this individual, or any other identified alleged offenders.

36

**115.67 (c) For at least 90 days following a report of sexual abuse, the agency shall monitor the conduct and treatment of inmates or staff who reported the sexual abuse and of inmates who were reported to have suffered sexual abuse to see if there are changes that may suggest possible retaliation by inmates or staff, and shall act promptly to remedy any such retaliation. Items the agency should monitor include any inmate disciplinary reports, housing, or program changes, or negative performance reviews or reassignments of staff. The agency shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.**

- There is no documentation of a compliance manager, along with classification, monitoring the conduct and treatment of Mr. Buford following his sexual abuse allegations. While Officer Camacho acknowledges that Mr. Buford's placement in separation was inappropriate, this report came from external counsel (rather than her monitoring Mr. Buford in the role of PREA Manager. Moreover, continued monitoring for retaliation would have negated a second placement in separation that required the use of restraints.

### Opinion: § 115.67 Agency Protection against Retaliation.

PREA standard 115.67 establishes mandatory protections for inmates who report sexual abuse or cooperate with investigations. Agencies must ensure that such individuals are shielded from retaliation, implement multiple protective measures, and monitor their well-being for at least 90 days following an allegation. Despite these requirements, records indicate that Mr. Buford faced punitive actions rather than protective measures following his reports of sexual abuse, demonstrating institutional failures in retaliation monitoring and oversight.

After alleging two instances of sexual assault on September 25 and September 27, 2023, Mr. Buford was left in general population for four additional days, exposing him to continued risk before alternative housing arrangements were made. There is no documented justification for this delay, nor evidence that identified suspects—including one referenced in the investigation report (PR000008)—were immediately separated from Mr. Buford.

Further, Mr. Buford was placed in involuntary segregated housing with restraints on two occasions (October 2–October 18, 2023, and November 5–November 14, 2023), despite no indication of aggressive, suicidal, or violent behavior warranting such treatment. PREA Manager Camacho later wrote, "At no time should we shackle and handcuff someone because of a PREA outcry. This is a form of punishment," confirming the inappropriate nature of his placement. Camacho also acknowledged that "shackling someone after making a PREA alleged allegation or PREA outcry is a punitive response if that individual is not being aggressive or volatile" (deposition, p. 109).

HCSO's staffing deficiencies further contributed to failures in responding to retaliation risks following Mr. Buford's allegations. The 2023 Annual Jail Inspection Report notes that floor rosters revealed insufficient staffing levels during inspections, contradicting previous reports that claimed staffing levels were adequate. Inspectors found that:

CONFIDENTIAL

- On the 3rd floor, only 13 officers were present when 14 were required to supervise 659 inmates.
- On the 4th floor, only 13 officers were present when 15 were required to oversee 684 inmates.

These shortages directly impacted the facility's ability to swiftly reassign inmates facing heightened victimization risks, effectively delaying protective custody decisions and exposing inmates to ongoing retaliation.

Additionally, HCSO's failure to ensure proper retaliation monitoring was compounded by operational deficiencies due to staffing shortages. The 2023 Annual Jail Inspection Report states that essential tasks—including inmate transportation, medication distribution, and meal supervision— were not performed according to minimum jail standards, leaving gaps in inmate safety measures. These deficiencies allowed vulnerable inmates, including Mr. Buford, to be placed in punitive segregation settings without adequate institutional review, reinforcing concerns about staffing-related procedural lapses that directly impacted inmate protection.

Failure to monitor at-risk inmates following reports of sexual abuse and other vulnerability indicators was not limited to retaliation risks but extended to general oversight lapses. Inspection records show that officers failed to document required security rounds, with instances where PREA-designated detainees were placed in units without heightened observation protocols. These gaps demonstrate a failure to comply with mandated protections under PREA § 115.67, leaving vulnerable inmates without necessary supervision safeguards.

PREA standards require continuous monitoring for at least 90 days following an allegation to detect and prevent retaliatory actions (§ 115.67(c)). There is no evidence that a compliance manager or classification officer monitored Mr. Buford's treatment during this period. Instead, concerns about retaliation were raised externally by legal counsel rather than through internal oversight. Effective monitoring would have flagged his inappropriate separation placements and negated the need for further punitive segregation.

Assistant Chief Bosquez's repeated use of "stretching the standards" aligns with HCSO's failure to ensure proper retaliation monitoring following Mr. Buford's PREA allegations. PREA §115.67(c) mandates a 90-day monitoring period to prevent retaliatory actions, yet there is no documented oversight of Buford's treatment during this timeframe. Instead of implementing necessary protective measures, HCSO's personnel shortages and procedural lapses allowed unjustified punitive segregation to persist, reinforcing concerns that institutional interpretations were adjusted to meet basic compliance metrics rather than to ensure inmate protections.

Additionally, the 2023 Annual Jail Inspection Report highlights documented failures in staff coverage, which directly impacted oversight mechanisms. Inspectors found that:

- Officers conducted face-to-face observations from control stations instead of physically engaging with inmates, impeding direct supervision.
- Rounds were consistently late or skipped due to staff shortages, impacting timely investigative assessments and procedural compliance.

38

CONFIDENTIAL

These staffing failures further demonstrate HCSO's reliance on procedural errors, as confirmed by Bosquez's admission that compliance standards were stretched rather than properly enforced.

The absence of immediate separation from alleged perpetrators, unjustified segregation with restraints, failure to conduct oversight, and documented admissions from officials acknowledging punitive treatment collectively demonstrate HCSO's noncompliance with PREA retaliation protections, reinforcing institutional negligence in safeguarding vulnerable inmates.

### § 115.71 Criminal and Administrative Agency Investigations.

PREA standard 115.71 addresses the processes surrounding criminal and administrative agency investigations. It includes the following:

**(a) When the agency conducts its own investigations into allegations of sexual abuse and sexual harassment, it shall do so promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports.**

Mr. Buford's October 2, 2023, report of sexual assault by inmate Michael Allen contains reference to physical contact. This physical contact is reinforced by Michael Allen's statement that he assisted Mr. Buford with bathing. Physical contact is affirmed by Officer Olivers incident report (PREA000020) which states,

> At Approximately 16:43hrs, I Detention Officer C. Oliver was contacted by Sergeant A. Dariah requested that I write an information Report on Inmate Allen, Michael (SPN 02379727) Inmate Buford alleged that Inmate Allen, Michael (SPN 02379727) "had "groped" him by "slapping him on his buttocks". Inmate Allen will be written up for violation of Code 2104, 'Sexual Conduct' of the Harris County Inmate's Handbook.

Physical contact is also document in a follow up report (23-1105-392) by Officer Castenada (November 5, 2023: 8.23pm) states (J000053): "he was being asked to perform sexual acts by an inmate who was later identified by Inmate Buford as Michael Allen (SPN 02379727) (OMS report # 23-1 105-364). Inmate Buford also stated he was groped by Inmate Allen in the same report."

However, 2014 Sexual Conduct is a minor offense defined by a lack of physical contact by the alleged offender.

(2104) SEXUAL CONDUCT/PREA:

No inmate shall kiss or hug another person; expose his or her breast(s), buttocks or genitals in any manner; or make any sexual comment that may be offensive to another person. This includes but is not limited to: sexual harassment, unwelcome sexual advances, proposals or requests for sexual favors, verbal comments, gestures, demeaning references to gender, voyeurism or actions of a derogatory or offensive sexual nature.

CONFIDENTIAL

Correctional officer training and policy would dictate the application of major code 1109 engaging in sexual acts/PREA.

(1109) ENGAGING IN SEXUAL ACTS/PREA:

No inmate shall take part in any sexual act to include but not limited to: sexual assault, sexual abuse, sexual intercourse, masturbation of oneself or another, anal sex, oral sex or manipulation or stimulation of any person's private parts. The touching, directly or through the clothing, of the genitalia, breasts, inner thighs or buttocks of another person.

- Mr. Buford's investigative process October 2, 2023, originated with the incorrect application of code 2104 which is a minor offense when information in the incident report indicates code 1109, which is a form of sexual assault or sexual abuse (and a major offense).

  **(c) Investigators shall gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data; shall interview alleged victims, suspected perpetrators, and witnesses; and shall review prior complaints and reports of sexual abuse involving the suspected perpetrator.**

  **(g) Criminal investigations shall be documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and attaches copies of all documentary evidence where feasible.**

- Mr. Buford's documented September 28, 2023 sexual assault allegation produced an investigative process that merged two reported events (September 25, 2023, and September 27, 2023) into a single alleged sexual assault. Additionally, the PREA investigation surrounding the September 28, 2023 documents contain no reference to correctional officers on duty at the time of the allegation or their insight or observations, no notification of what cameras and video footage were viewed by investigators, no time periods for footage reviewed of the areas where Mr. Buford was location when the allegations were to have occurred, and no reported names of witnesses interviewed (e.g., cell mates, etc). Beyond the report of one 88-year-old male inmates on a suspect list (PR00008) there is no information of whether a person matching this description was housed in the area at the same time of Mr. Buford. There are no descriptions or statements made by Mr. Buford regarding the number of alleged offender/s or any related demographic information. There is also no statement that Mr. Buford had been immediately separated from his alleged offender/s.

40

- Provided is one single page transcript dated September 29, 2023, by Investigator Guerrero where he asked a single leading question, "you stated that nothing sexual happened to you, right?" Beyond this one document, no audio or video recording's by PREA investigators were provided in relation to the two alleged sexual assaults documented on September 28, 2023, and interviews between Investigator Guerrero and Mr. Buford. PREA Manager Camacho states that audio recordings of Investigator Guerro and Mr. Buford exist (deposition, page 135) but they have not been provided.

- Mr. Buford's document October 2, 2023, report of alleged sexual assault includes Investigators interview of Mr. Buford eight days later (October 8, 2023) and in his cell as separation placement restricted his movement. Mr. Buford reported that the sexual assault occurred "at night", and Investigator Guerrero states that he viewed "video footage" however no details are provided of what cameras were viewed, for what period, and what was observed during this time period.

- An email dated October 2, 2023, from Lila Millan (HCSO) questions the engagement of Officer Guerreo in PREA investigations, while he was serving as the primary and most involved investigator in Mr. Buford's allegations. Millan writes, "This time we have another report from him (i.e., Buford), but my understanding is that Guerrero is not to handle sexual assault allegations. Do I have him go back again to interview this new claim?".

**(e) The credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as inmate or staff. No agency shall require an inmate who alleges sexual abuse to submit to a polygraph examination or other truth-telling device as a condition for proceeding with the investigation of such an allegation.**

- An incident report by Officer McCutcheon refers to Mr. Buford mother, Chandra Jenkins, who reported alleged sexual assaults to HCSO as such, "His mom appears to be MHMRA or fabricating allegations." No justification or documentation is provided to support the notion that Chandra Jenkins was experiencing mental health issues and/or fabrication allegations, and that her credibility should be questioned or challenged.

**(j) The departure of the alleged abuser or victim from the employment or control of the facility or agency shall not provide a basis for terminating an investigation.**

41

- After the September 28, 2023 allegations of sexual assault, a supplement incident report by Investigator Small dated April 25, 2024 (PR000011) states the case was listed as closed and he was inquiring to the status of DNA evidence. The report concludes, "At this time, the case is open pending further investigation." Four days later (April 29, 2024) Investigator Small states the case is closed due to not receiving "a phone call back from the victim or the victim`s lawyer at this time"

- After the November 5, 2023 allegation of sexual assault there were three investigation points that states the investigation was closed/dismissed due to Mr. Buford being released from custody on November 14, 2023 while also citing a lack of evidence. This includes  (1) December 26, 2023, at 12.02pm, (JR000061-JR000063) "ATW released on 11/14/2023 20:38." (2) June 20, 2024, at 3.54pm, (JR000071-JR000072) "ATW released on 11/14/2023 20:38." (3) "ATW released on 11/14/2023 20:38. The June 20, 2024, at 3.54pm, (JR000066-JR000070) also states that Michael Allen's charge of (2104 Sexual Conduct – Minor) was closed/dismissed due to, "ATW Released on 01/24/2024 08:45."

### Opinion: § 115.71 Criminal and Administrative Agency Investigations.

PREA standard 115.71 establishes clear requirements for agencies to conduct prompt, thorough, and objective investigations into all allegations of sexual abuse and sexual harassment. This includes gathering and preserving evidence, conducting comprehensive interviews, documenting findings, and ensuring that investigations are not prematurely terminated due to inmate release or staff departure.

Despite these mandates, records from the Harris County Sheriff's Office (HCSO) indicate systemic failures in investigative procedures. Documentation shows that Mr. Buford's October 2, 2023, report of sexual assault was misclassified under Code 2104 (Sexual Conduct – Minor) instead of Code 1109 (Engaging in Sexual Acts – Major), despite clear references to physical contact in statements made by both Mr. Buford and the alleged perpetrator, Michael Allen. Correctional officer training and policy dictate that physical contact should result in a major offense classification, yet HCSO failed to apply the correct investigative standards, minimizing the seriousness of the allegation.

Additionally, HCSO failed to comply with § 115.71(c), which requires investigators to gather and preserve physical and testimonial evidence. The September 28, 2023, allegations of sexual assault were merged into a single incident instead of being investigated separately, limiting the scope of inquiry. Investigators omitted documentation of correctional officers on duty at the time, failed to specify which cameras were reviewed, did not clarify the time periods analyzed, and neglected to list witnesses interviewed. An investigation transcript from September 29, 2023, includes only a single leading question, "You stated that nothing sexual happened to you, right?" reflecting a lack of objectivity in the inquiry.

42

CONFIDENTIAL

HCSO also failed to adhere to § 115.71(e), which prohibits credibility assessments based solely on an individual's status. An incident report by Investigator McCutcheon refers to Mr. Buford's mother, Chandra Jenkins, as potentially fabricating allegations, stating, "His mom appears to be MHMRA or fabricating allegations." No supporting documentation justifies this characterization, undermining the integrity of the investigative process.

Further, the departure of Mr. Buford from custody was used as justification for closing investigations, violating § 115.71(j). While an April 25, 2024, report by Investigator Small stated that the case remained open pending further investigation, just four days later (April 29, 2024), Small closed the case due to a lack of response from Mr. Buford or his legal representative. Similarly, investigations into the November 5, 2023, sexual assault allegation were dismissed following Mr. Buford's release on November 14, 2023, despite PREA mandates prohibiting termination of an investigation due to inmate release.

These investigative failures—misclassification of offenses, omission of key evidence and documentation, questionable credibility assessments, and premature case closures—demonstrate HCSO's fundamental noncompliance with PREA requirements. The handling of Mr. Buford's allegations reflects institutional shortcomings in conducting thorough inquiries, maintaining transparency, and ensuring investigative integrity.

Furthermore, the PREA Annual Report from HCSO provides additional insight into the broader investigative trends at 1200 Baker St. Inmate-to-inmate sexual abuse incidents in 2022 totaled 47, with none substantiated, while 2023 saw 87 reported cases, with only 2 substantiated—equating to a substantiated rate of 1.49%. This rate falls well below the national average of substantiated allegations of sexual victimization in adult correctional facilities, which consistently ranged from 6% to 11% between 2013 and 2020 (Buelher & Kottke-Weaver, 2024). The significant discrepancy in substantiation rates raises further concerns regarding HCSO's approach to sexual abuse investigations, indicating broader institutional failures in assessing, documenting, and addressing incidents appropriately.

43

CONFIDENTIAL

## § 115.86 Sexual Abuse Incident Reviews.

PREA standard 115.86 provides guidelines related to sexual abuse incident reviews.

**(a) The facility shall conduct a sexual abuse incident review at the conclusion of every sexual abuse investigation, including where the allegation has not been substantiated, unless the allegation has been determined to be unfounded.**
**(b) Such review shall ordinarily occur within 30 days of the conclusion of the investigation.**
**(c) The review team shall include upper-level management officials, with input from line supervisors, investigators, and medical or mental health practitioners.**

- Mr. Buford's documented September 28, 2023, and October 2, 2023, sexual assault allegations were deemed unsubstantiated and thus required a sexual abuse incident review within 30 days of the conclusion of the investigation. PREA Manager Camacho (deposition, p. 194) states that she is unaware if any sexual abuse incident reports for the documented September 28, 2023, reports (i.e., September 25, 2023, and September 27, 2023). Additionally, there was no sexual abuse incident review provided for the documented October 2, 2023, allegation. Officer Camacho (deposition, page 196) was asked, "In September 2023, who was the PREA compliance manager?" and she responded, "There was not one. I was only assisting them until they get a new one. So in May 2023, I received the re-entry and education manager position. They were interviewing for my position. I don't believe they ever found anyone."

- A sexual abuse incident review would contain input from management, investigators, and medical/mental health practitioners to examine group dynamics surrounding the alleged event (including mental health status of the inmate), physical barriers, staffing levels, monitoring technology, recommendations for improvements, and submission of the report to the facility head and PREA compliance manager. There is no documentation that any sexual abuse incident reviews regarding Mr. Buford were completed.

### Opinion: § 115.86 Sexual Abuse Incident Reviews.

The failure to conduct sexual abuse incident reviews at Harris County Sheriff's Office (HCSO) reflects systemic lapses in investigative oversight, documentation, and compliance with PREA mandates. PREA standard 115.86 requires facilities to conduct sexual abuse incident reviews following every investigation, including cases deemed unsubstantiated, unless unfounded. These reviews must be completed within 30 days and include upper-level management officials, line supervisors, investigators, and medical or mental health practitioners to assess deficiencies and recommend corrective actions.

Despite these requirements, records indicate that no sexual abuse incident reviews were conducted for Mr. Buford's allegations documented on September 28, 2023, and October 2, 2023. PREA Manager Camacho (deposition, p. 194) stated she was unaware of any incident review related to the September 28 allegations and confirmed that no designated PREA compliance manager was in

44

CONFIDENTIAL

place during this period (deposition, p. 196). The absence of structured oversight directly contributed to critical lapses in documentation, investigative follow-through, and implementation of corrective actions, reinforcing institutional negligence in addressing sexual abuse allegations.

Additionally, staffing shortages and oversight failures exacerbated HCSO's failure to conduct mandatory incident reviews. The 2023 Annual Jail Inspection Report highlights that inadequate staffing prevented essential jail functions, including timely investigative procedures and security rounds. Inspectors found that:

- Officers conducted face-to-face observations from control stations instead of physically engaging with inmates, impeding direct supervision.
- Observation records for areas with inmates classified as assaultive, suicidal, or mentally ill were routinely exceeded by up to 2 hours and 9 minutes, contradicting mandated PREA oversight requirements.
- Rounds were routinely late or skipped due to staff shortages, impacting timely investigative assessments and procedural compliance.

A proper review process would have included evaluations of group dynamics surrounding the incident, the inmate's mental health status, physical facility barriers, staffing levels, monitoring technology, and recommendations for corrective action. Findings should have been formally submitted to the facility head and the PREA compliance manager to uphold institutional accountability. However, the failure to conduct these mandated sexual abuse incident reviews eliminated an essential safeguard, preventing the facility from identifying procedural failures and implementing corrective measures.

HCSO's misrepresentation of PREA compliance staffing further exacerbated investigative deficiencies. Camacho's deposition (p. 196) confirms that no formally designated PREA Compliance Manager was present during Mr. Buford's incarceration, leaving compliance functions unstructured and hindering the ability to assess risk factors, review investigative findings, and recommend policy corrections. The absence of qualified leadership contributed to classification failures (§ 115.41), supervision lapses (§ 115.13), and investigative inconsistencies (§ 115.71), leaving systemic procedural deficiencies unaddressed.

The lack of mandated incident reviews, failure to address staffing shortages, and oversight lapses collectively undermine institutional accountability and raise serious concerns about HCSO's ability to safeguard inmates and enforce federal protections against sexual abuse.

### § 115.89 Data Storage, Publication, and Destruction.

PREA standard 115.89 addresses the requirements of data storage, publication, and destruction.

**(a) The agency shall ensure that data collected pursuant to § 115.87 are securely retained.**
**(b) The agency shall make all aggregated sexual abuse data, from facilities under its direct control and private facilities with which it contracts, readily available to the public at least annually through its Web site or, if it does not have one, through other means.**
**(c) Before making aggregated sexual abuse data publicly available, the agency shall remove all personal identifiers.**
**(d) The agency shall maintain sexual abuse data collected pursuant to § 115.87 for at least 10 years after the date of the initial collection unless Federal, State, or local law requires otherwise.**

- An email from Attorney Taylor Hunter to Sheriff Gonzalez sent December 15, 2023 (EML2_000218), states, "Hello, Please see the attached. I trust this will be forwarded to the appropriate channel within Harris County to assure compliance with Federal Law. Do not hesitate to contact my office with any questions. Best, Taylor Hunter, Attorney and Counselor". A response dated December 18, 2023, from Kimberly Lee (HCSO) to Ron Cherry (HCSO), Cristal Vazquez (HCSO) states, "Good afternoon, Please see the attached request from Attorney Taylor Hunter regarding Defendant Dequon Buford SPN 03177353." This includes materials, "as used herein, documents, electronically stored information, ESI, and tangible things are defined by Federal Rules of Civil Procedure 34" (Camacho deposition, p. 253). No materials have been provided that display video footage of Mr. Buford's incarceration period, particularly footage of his location during the repeated alleged sexual assaults.

### Opinion: § 115.89 Data Storage, Publication, and Destruction.

PREA standard 115.89 mandates that agencies securely retain sexual abuse data, publish aggregated reports annually, and maintain investigative records for at least 10 years. Additionally, personal identifiers must be removed before making data publicly available.

Despite these requirements, there is no evidence that Harris County Sheriff's Office (HCSO) provided video footage related to Mr. Buford's incarceration period or his alleged sexual assaults, despite formal requests from legal counsel. An email from Attorney Taylor Hunter to Sheriff Gonzalez on December 15, 2023, explicitly calls for compliance with federal law, yet the response from Kimberly Lee (HCSO) on December 18, 2023, does not indicate whether the requested materials—such as electronically stored information, ESI, or tangible records—were provided. Camacho's deposition (p. 253) references Federal Rules of Civil Procedure 34, reinforcing the legal obligation to produce such records.

The absence of properly designated compliance oversight within HCSO raises significant concerns about adherence to PREA data retention mandates. The misrepresentation of staffing roles contributed to failures in investigative documentation, missing video evidence, and incomplete

46

CONFIDENTIAL

reporting of sexual abuse incidents. Without structured compliance leadership, HCSO lacked the necessary oversight to ensure timely responses to data requests and secure retention of critical investigative materials. Attorney Taylor Hunter's request for compliance with Federal Rules of Civil Procedure 34 was met with procedural delays, reinforcing concerns that staffing deficiencies directly impacted the facility's ability to securely retain and produce evidence as required by PREA § 115.89.

Additionally, HCSO failed to meet the requirement (§ 115.89(b)) to publish aggregated sexual abuse data annually. There is no indication that complete investigative records, including facility-wide incidents, were retained for public disclosure. The failure to produce video footage, lack of confirmation regarding record retention, and apparent gaps in publicly available sexual abuse data reflect institutional noncompliance, obstructing transparency and investigative integrity. The absence of compliance in securing and publishing records further highlights significant gaps in federally mandated protections related to sexual abuse data handling.

Without properly structured oversight, HCSO's failure to adhere to data retention protocols undermines its credibility in ensuring federal compliance and protecting inmate rights. The facility's inability to produce comprehensive records suggests systemic weaknesses in investigative transparency, reinforcing broader failures in procedural accountability.

CONFIDENTIAL

## CONCLUSION

The Harris County Sheriff's Office (HCSO) failed to uphold critical protections under the Prison Rape Elimination Act (PREA), exposing Mr. Buford to systemic deficiencies across classification, monitoring, investigations, and data retention. These failures placed him at heightened risk, demonstrating broader institutional shortcomings in oversight, accountability, and compliance with federally mandated safeguards.

A lack of properly structured leadership and severe staffing shortages directly contributed to the harm Mr. Buford experienced. Despite PREA requirements for designated oversight, no active PREA Compliance Manager was in place during Mr. Buford's incarceration. This absence led to inconsistencies in screening, classification, and investigative protocols, delaying necessary interventions that could have mitigated his risk. Following his documented sexual abuse allegations, he remained in general population for four days, violating classification guidelines and exposing him to continued danger. Required observation logs were not produced, and mandated monitoring standards were ignored, further reinforcing systemic lapses in supervision that left Mr. Buford vulnerable.

Upon each allegation of sexual assault, Mr. Buford received a punitive response, specifically placement in a correctional setting where shackles were mandated. This punitiveness continued when Mr. Buford experienced delays in receiving a medical evaluation following his initial allegations of sexual assault, where he consequently received medical treatment while shackled and under the direct observation of a correctional officer.

Staffing shortages also impeded investigative integrity, directly affecting the handling of Mr. Buford's allegations. The 2023 Annual Jail Inspection Report confirms that inadequate staffing obstructed critical jail functions, including security rounds, classification reviews, and investigative procedures. Officers conducted observations from control stations instead of interacting with inmates directly, severely weakening supervision effectiveness. Required security rounds for vulnerable populations—including those classified as assaultive, suicidal, or mentally ill—were delayed by up to two hours, contradicting mandated oversight standards. These deficiencies resulted in procedural breakdowns that severely impacted Mr. Buford's safety and limited intervention following his sexual abuse reports. This includes the representation of Mrs. Camacho as a PREA Compliance Manager responsible for meeting key PREA standards, while her actual duties were spread to other work roles and Camacho stated that she was never truly assigned to this role.

Investigative failures further compounded the harm he endured. His allegations were misclassified under a minor offense code instead of one reflecting sexual assault, undermining the seriousness of the claims and restricting the scope of inquiry. HCSO failed to conduct independent reviews of separate incidents, consolidating multiple reports into single investigations that diluted the evidence and prevented meaningful accountability. Despite legal requests, video footage documenting Mr. Buford's housing and movement was not provided, and investigative documentation—including witness statements, facility surveillance analysis, and evidence retention records—remained incomplete or missing. The absence of sexual abuse incident reviews eliminated a crucial safeguard meant to ensure institutional accountability and protect survivors from further harm.

48

CONFIDENTIAL

HCSO also failed to comply with PREA's data retention and publication requirements, obstructing transparency and investigative integrity in Mr. Buford's case. The facility did not maintain secure records, publish aggregated sexual abuse data, or ensure public accessibility of investigative findings. Staffing shortages exacerbated this issue, as inadequate personnel and a lack of structured oversight prevented timely responses to critical records requests and compliance with PREA's mandates on documentation handling.

Mr. Buford's experience highlights an institutional pattern of neglect, demonstrating systemic failures in classification, supervision, investigations, and record retention—all directly impacting his safety and ability to access protection, security, and appropriate time relevant treatment.

**Printed Name:** _HAYDEN SMITH_

**Signature:** _[signature]_

**Date:** _6/12/2025_

## REFERENCES

Buehler, E. D., & Kottke-Weaver, S. (2024). Sexual victimization reported by adult correctional authorities, 2019-2020—Statistical tables (NCJ 308553). U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

49