## Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION
3   WAGNER, et al.        )(
          Plaintiffs      )(
4                         )(
                          )(
    VS.                   )(   CIVIL ACTION NO.
5                         )(   4:23-CV-02886
    HARRIS COUNTY, TEXAS  )(
6         Defendant       )(   (Jury Requested)
                          )(
7   and                   )(
                          )(
8   ANA GARCIA and CHANDRA )(
    JENKINS                )(
9       Plaintiff-Intervenors )(
    _____
10
11            ORAL DEPOSITION OF
            SERGEANT CHRISTINA LOVE
12            AUGUST 14, 2025
    _____
13
14        ORAL DEPOSITION OF SERGEANT CHRISTINA LOVE,
15   produced as a witness at the instance of the
16   Plaintiff-Intervenor Ana Garcia, taken in the
17   above-styled and numbered cause on AUGUST 14, 2025,
18   between the hours of 10:14 A.M. and 1:32 P.M., reported
19   stenographically by JODY McWHORTER, Certified Court
20   Reporter No. 6095, in and for the State of Texas,
21   remotely via Zoom in the City of Houston, State of
22   Texas, pursuant to the Federal Rules of Civil Procedure
23   and any provisions stated on the record or attached
24   therein.
25
```

## Page 2

```
1                    APPEARANCES
2
3   COUNSEL FOR DEFENDANT HARRIS COUNTY, TEXAS:
4      MUSTAPHA NYALLAY  (via Zoom)
       DENTON NAVARRO RODRIGUEZ BERNAL SANTEE
5      & ZECH, PC
       549 North Egret Bay Blvd., Suite 200
6      League City, Texas  77573
       mmnyallay@rampagelaw.com
7
8
    COUNSEL FOR PLAINTIFF-INTERVENOR ANA GARCIA:
9
       BYRON W. BOENIG  (via Zoom)
10     THE SHARIFF LAW FIRM, PLLC
       2500 West Loop South, Suite 300
11     Houston, Texas  77027
       bboenig@sharifflawfirm.com
12     eservice@sharifflawfirm.com
13
14
15                     INDEX
16
                                              PAGE
17
    Appearances ...................................  2
18
    SERGEANT CHRISTINA LOVE
19  Examination by Mr. Boenig .....................  5
    Examination by Mr. Nyallay ....................  85
20  Examination by Mr. Boenig ..................... 116
    Examination by Mr. Nyallay .................... 121
21  Examination by Mr. Boenig ..................... 124
22  Reporter's Certificate ........................ 126
23  Attached to the end of the transcript:  Stipulations
24
25
```

## Page 3

```
1                      EXHIBITS
2
3   NUMBER  DESCRIPTION                         PAGE
4     1    Images ...............................  23
5    *2    Video ................................  29
6    *3    Video ................................  29
7    *4    Video ................................  30
8    *5    Video ................................  30
9    *6    Video ................................  30
10   *7    Video ................................  31
11   *8    Video ................................  31
12   *9    Video ................................  31
13   *10   Video ................................  31
14    11   Image ................................  38
15    12   Image ................................  39
16    13   Image ................................  40
17    14   Image ................................  41
18    15   Image ................................  43
19    16   Image ................................  --
20    17   Image ................................  44
21    18   Employee Sworn Statement, Jazminn
            Stewart 01/27/2023 ...................  52
22
      19   Employee Sworn Statement, Jazminn
23          Stewart, 01/23/2023 ..................  53
24
25
```

## Page 4

```
1                EXHIBITS (Continued)
2
3   NUMBER  DESCRIPTION                         PAGE
4    20    Employee Sworn Statement, Deundra
           Lighten, 01/23/2023 ..................  71
5
6    21    Images ...............................  82
7    22    Employee Sworn Statement, Deundra
           Lighten, 01/27/2023 .................. 109
8
9
10                  DEFENSE EXHIBITS
11
    NUMBER  DESCRIPTION                         PAGE
12
     *1    Video ................................ 109
13
14
    * REPORTER'S NOTE:  Video Exhibits were not provided by
15    Counsel as of the date of production of this
      transcript and are not attached.
16
17
18
19
20
21
22
23
24
25
```



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
5–8

Page 5

1    THE REPORTER:  We are on the record at
2   10:14 A.M.  Counsel have agreed to waive Federal Rule
3   30(b)(5).  I will now swear in the witness.
4        (Witness sworn)
5        SERGEANT CHRISTINA LOVE,
6   having been duly sworn, testified as follows:
7            EXAMINATION
8   BY MR. BOENIG:
9    Q.  Good morning, Sergeant Love.  How are you?
10    A.  I'm good.  How are you?
11    Q.  Doing fine.  Are you comfortable with me
12   addressing you as Sergeant Love, or would you prefer to
13   be addressed another way?
14    A.  No, that's fine.
15    Q.  Okay.  Have you ever given a deposition before?
16    A.  No.
17    Q.  Okay.  I'm going to go over a couple of the
18   rules and guidelines that I hope are going to make it
19   easier --
20    A.  Okay.
21    Q.  -- and clearer, okay?
22    A.  Okay.
23    Q.  First thing, you're doing a great job.
24   Everything needs to be verbal because the court
25   reporter is taking everything down, and when I say

Page 6

1   that, clear yeses and noes and things of that nature.
2   Uh-huhs and huh-uhs, they don't reflect well on the
3   written record, so if I ask you is that a yes or a no,
4   I'm not being rude or anything.  I'm just trying to get
5   a clean record, okay?
6    A.  Okay, understood.
7    Q.  The next thing, I'm going to try very hard to
8   ask good, clear questions, but there's going to be
9   occasions that I'm going to fail at that, just quite
10   honestly.  So if there's anything you don't understand,
11   I would ask that you simply state I'm not sure what the
12   question is or I don't understand, and ask me to
13   rephrase, okay?
14    A.  Okay.
15    Q.  By the same token, can we agree that if you
16   answer my question, you understood my question?
17    A.  Correct, yes.
18    Q.  Okay.  So again, this is just to make it clear,
19   we're on the record later that if you answered a
20   question it is implied that you understood it, okay?
21    A.  Understood.
22    Q.  The next thing, and again you're doing very
23   good at this, we have one court reporter and we have
24   three people that she's taking a record of, so it's
25   very important that we are respectful to each other,

Page 7

1   allowing each person to finish their question or their
2   answer.  If we start to talk over each other, I may say
3   something about that.  More than likely the court
4   reporter will remind us, hey, guys, stop over-talking.
5    A.  Okay.
6    Q.  But if that goes on, that's what's happening,
7   all right?
8    A.  Okay.
9    Q.  The last thing, there is a very good chance
10   throughout the course of this that your counsel will
11   make what's called an objection, form.  That is for the
12   record.  It is for the Judge to review later.  It
13   doesn't mean you don't answer the question.
14    A.  Okay.
15    Q.  If there's a question that he doesn't want you
16   to answer, he's going to be very specific on that.  So
17   if you hear an objection form, he's doing his job,
18   doing what he needs to do, but if you go ahead and
19   answer the question it will keep things flowing a bit
20   easier.
21    A.  Okay.
22    Q.  Next thing, this is not an interrogation.  If
23   at any point you need to take a break, just ask, hey,
24   I'd like to take a break.
25    A.  Okay.

Page 8

1    Q.  And we can do that at any reason for any time.
2    A.  Okay.
3    Q.  The only thing I will ask is that if a question
4   has been asked you answer the question and then we take
5   the break.
6    A.  Okay.
7    Q.  Are there any medications or anything you are
8   on today that would impact your ability to testify?
9    A.  No.
10    Q.  And is there anything at all that would impact
11   your ability to testify truthfully today?
12    A.  No.
13    Q.  And you do understand that the oath that you
14   were just given is the same oath in front of a court of
15   law, has the same binding effects as far as perjury and
16   things of that name?
17    A.  Yes.
18    Q.  Okay, great.  Just so you kind of know what's
19   going to go on, I'm going to do a little background
20   history on what we're looking at.
21    A.  Okay.
22    Q.  We're going to do a little bit of your
23   background history and then we'll get into the
24   incident, okay?
25    A.  Okay.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
9–12

Page 9

1    Q. Can you state your name for the record?
2    A. Christina Love.
3    Q. And Sergeant Love, what is your current
4  position and rank within the Harris County sheriff's
5  office?
6    A. Sergeant in the Financial Crimes Unit.
7    Q. Sergeant in financial crimes?
8    A. Yes.
9    Q. And is this different from what you were doing
10  in February of 2022?
11    A. Yes.
12    Q. In February of 2022, what was your rank and
13  position?
14    A. I was a sergeant investigator in the Internal
15  Affairs Division.
16    Q. In 2022, the incident that we're talking about,
17  it looks like it began on February 11th and there was a
18  final conclusion on February 12th, 2022. How long had
19  you been a sergeant for Internal Affairs at that point?
20    A. Four years.
21    Q. And when did you leave the IAD and go to the
22  financial crimes unit?
23    A. It was the end of June of 2025, so very
24  recently.
25    Q. And is there a reason that you left positions

Page 10

1  or changed?
2    A. No. I was an investigator and I had been there
3  almost seven years and that's a long tenure for an
4  investigator, so it was just kind of a rotation type
5  thing.
6    Q. Was it a promotion or just a rotation?
7    A. Just a rotation. No, I'm still a sergeant. I
8  was considered an investigator over there, a sergeant.
9  I was not an administrative sergeant like I am over
10  here now.
11    Q. Before you became a sergeant, what is your
12  background as far as how long had you been with the
13  sheriff's department, what were the jobs you did,
14  things of that nature?
15    A. I've been with the sheriff's office for about
16  25-1/2 years now. Prior to my promotion I was a deputy
17  on patrol, and I was on patrol for about -- I want to
18  say about 11 -- I'm sorry, about eight years or so
19  before I promoted to sergeant.
20    Q. When you were promoted to sergeant, was your
21  first position with Internal Affairs, investigations?
22    A. No, actually, I stayed on patrol as a sergeant
23  for about three and a half years.
24    Q. Today we're going to be talking about a lot of
25  things that went on in the Harris County Sheriff's

Page 11

1  Office as far as detention officers. Do you have any
2  background or experience at all as a detention officer?
3    A. Yes, but it was back in 2000, so it's been over
4  20 years since I've been in a jail environment working.
5    Q. For how long did you perform duties as a
6  detention officer?
7    A. Approximately like a year and a half, I think,
8  before I went to the academy.
9    Q. What is the difference in qualifications
10  between somebody that is a detention officer and
11  someone that's actually gone through the academy and
12  become a sheriff that route?
13    A. A detention officer -- well, I can only speak
14  for when I went through it. We had a month long
15  training class. It was called jail school. We learned
16  the policies and procedures of the jail and things that
17  we had to do.
18        As far as a deputy, that was a six-month,
19  back then, academy where you learn all the statutes and
20  Penal Code and Code of Criminal Procedure and things
21  like that to get certified to be a peace officer.
22    Q. And how many -- let me rephrase that.
23        Today we're here about Kevin Sanchez, who
24  passed away while in custody on February 12th, 2022.
25    A. Okay.

Page 12

1    Q. You were one of the investigators on this,
2  correct?
3    A. Correct.
4    Q. Okay. At that point in time in 2022, how many
5  investigations had you done as far as the jail was
6  involved? And whether it's a custodial death, whether
7  it's a situation where there was an assault or officer
8  misconduct, how much had you reviewed and investigated
9  in the jail back in 2022?
10    A. Oh, goodness gracious. I honestly don't know
11  an exact number. I mean, I wouldn't be able to tell
12  you an exact number. I can't even get back into the
13  systems that I used to be able to. I don't have access
14  to them anymore.
15    Q. Okay. Do you feel like it was a lot of
16  investigations?
17    A. You mean just in 2022 or from the time I was
18  there?
19    Q. From the time you became an investigative
20  officer for the Internal Affairs, how many jail related
21  issues did you investigate? And if you can give me a
22  ballpark or how many a month, how many a year, anything
23  like that.
24    A. I mean, I'm trying to think. I would say --
25  honestly, I don't really know. I hate to put a number



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
13–16

Page 13

1 on it because I'm not exactly sure. I mean, the
2 majority of our cases were from the jail environment
3 more than any other thing that we ever got.
4   Q. So the bulk of your workload was related to
5 jail type cases?
6   A. Typically, yes, it was.
7   Q. And one thing that you did very good here, and
8 let me just throw this out here, if there is something
9 that you do not know or do not remember, this isn't a
10 memory test. We're talking about something that
11 happened three years ago.
12   A. Okay.
13   Q. So just like you did, indicate that hey, I'm
14 not sure. We're looking for the best answer you can
15 give, and by all means qualify it, okay?
16   A. Okay, perfect.
17   Q. Before you started doing investigations in the
18 jail did you do anything to update your knowledge about
19 what the current jail policies and procedures and
20 things like that were?
21   A. No, because each case, you know, could be
22 different, so there were different policies that would
23 come into play, so we would look for the policies that
24 applied to that specific case. So we wouldn't go
25 through the entire policy of the jail, so --

Page 14

1   Q. So my understanding, and I don't want to put
2 words in your mouth, but basically when you had an
3 investigation you would look at what policies apply,
4 you would review those in the context of what you're
5 investigating and prepare in that way as far as
6 policies; is that accurate?
7   A. Correct.
8   Q. Okay. Do you know how many of the cases you've
9 investigated involved the death of a detainee while
10 they were in custody?
11   A. Not very many. I would say five or less.
12   Q. Investigating the deaths of detainees, you said
13 five, and it sounds like you were there about seven,
14 eight years?
15   A. Uh-huh.
16   Q. So this wasn't a common thing?
17   A. No. We had a specific person that investigated
18 the death in custodies.
19   Q. Okay. And that was not you?
20   A. Correct.
21   Q. Who was that that investigated the detainee
22 deaths?
23   A. That was Jeffrey Vickery.
24   Q. Do you have any knowledge on why Jeffrey
25 Vickery did not investigate Mr. Sanchez's case?

Page 15

1   A. If there was policy violations found throughout
2 the death investigation, we would do what was called a
3 spinoff investigation to address those policies
4 violated. And that's what happened in this case.
5   Q. So were you investigating the policy violations
6 related to the death? Was that what your -- were you
7 doing a spinoff investigation?
8   A. Correct.
9   Q. Okay. Can you tell me what the purpose of the
10 Internal Affairs Division is?
11   A. To basically uphold our policies and procedures
12 and make sure they're being followed by staff.
13   Q. So would it be accurate to say what you
14 investigate is allegations of policies and procedures
15 or allegations of some type of breaking of the law of
16 either an officer or the staff related to the jail or
17 something like that? Is that accurate?
18   A. We are strictly policy and procedure. We don't
19 do criminal investigations.
20   Q. And if it was determined that there was some
21 type of criminal act at the death of a detainee, would
22 that be turned over to a different department to
23 investigate?
24   A. Yes. We had at that time a relationship with
25 HPD and the Texas Rangers, so they would also respond

Page 16

1 to any death that we had in the jail. And it would be
2 a rotation type basis, between those two agencies, who
3 actually worked the case.
4   Q. And were there standard people that did the
5 investigations or was that just the agency and whoever
6 they assigned to it?
7   A. Yeah, it was just the agency and whoever they
8 assigned.
9   Q. We've talked a little bit about the different
10 people that got involved. Can you tell me what the
11 procedure is when there is a detainee death in custody?
12 What are the steps that happen? Someone's died, what's
13 the first thing that occurs?
14   A. As far as Internal Affairs or the whole entire
15 process?
16   Q. Like the whole entire process as you understand
17 it.
18   A. As I understand it, once jail personnel -- they
19 call medical, who will respond, whichever medical that
20 is. It's sometimes Houston Fire Department. Sometimes
21 the inmates get taken to a hospital for further
22 treatment and pass away there, or sometimes it's in the
23 jail. So then it's up to a supervisor to call watch
24 command, who in turn will call whoever is on call for
25 the Internal Affairs for that specific time. And then



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
17–20

Page 17

1  we would get the call that we need to go do a
2  preliminary investigation on that. And that would
3  require us to get inmate information, a report number,
4  the condition of the inmate. We would take a couple of
5  pictures for Deputy Vickery's file, but he would gather
6  all the additional information that was needed from
7  either HPD or the Rangers and he -- so we would provide
8  him just that preliminary information.
9      Q. Deputy Vickery, his full-time job was involved
10  in investigating deaths while in custody of detainees?
11     A. Correct. He's the only one over there that did
12  that, yes.
13     Q. Okay. And so there was nothing else he did;
14  that was 100 percent of what his job was?
15     A. Correct.
16     Q. And was he involved in the investigation of
17  Mr. Sanchez?
18     A. Yes. I know he did the initial death
19  investigation and got all the medical paperwork. I
20  don't know what his process is because he does that.
21  We just provide him with the preliminary information
22  and he gets the rest of it.
23     Q. Okay. At some point you became involved in
24  this, and you indicated it was a spinoff on a policy
25  type situation from Deputy Vickery, or I'm sorry --

Page 18

1  yeah, Deputy Vickery's investigation. It's identified
2  that there's a policy issue?
3      A. Yes.
4      Q. And that's how you got involved?
5      A. Correct.
6      Q. Okay. How far into the investigation was it
7  before you got involved? Were you there as soon as the
8  death occurred, was it a couple weeks later? Do you
9  know?
10     A. It happened in February. I think I got the
11  case in May of that same year, 2022.
12     Q. So going back to kind of -- we've talked about
13  who's notified and everything. Is there a timeline for
14  response from each of these units? You said the
15  supervisor has to call the watch command. Is that
16  immediate?
17     A. Yes.
18     Q. Okay. And then watch command contacts IAD. Is
19  that also immediate?
20     A. Yes.
21     Q. And then the preliminary investigation starts.
22  How soon does that happen?
23     A. Immediately, also.
24     Q. So is Deputy Vickery showing up at the jail?
25  If it occurred in custody while in the jail, is he

Page 19

1  showing up there at the time the initial investigation
2  is going on, or is anything started before that?
3      A. He doesn't make every one. It honestly depends
4  on who's on call for that specific week, so that's who
5  responds. So it could be different people for
6  different weeks.
7      Q. And how quickly after it's identified that
8  someone's passed does IAD respond? Is it the same day?
9      A. Yes.
10     Q. Same hour?
11     A. Same say. As soon as we get the call from
12  watch command and our supervisor was notified, they
13  would call us and we would immediately respond. So it
14  was an immediate situation.
15     Q. Do you know who was the initial super -- I'm
16  sorry -- the initial investigator in Mr. Sanchez's
17  death?
18     A. I do not, no.
19     Q. Was that not part of your investigation when
20  you were trying to figure out what was going on? Did
21  you review any of the initial documents?
22     A. I guess I'm not understanding the question,
23  because Vickery was the one who initially gets all this
24  and puts it together. So he would be the one that
25  would have all the information and then we only get

Page 20

1  involved when he determines policy stuff has been
2  violated.
3      Q. And anytime a policy where you're actually
4  looking at potential to discipline a detention officer,
5  that's when you get involved or when the spinoff gets
6  involved?
7      A. Correct.
8      Q. Okay. In your time doing this, looking at all
9  this, how often is there a situation where a detainee
10  is either injured in custody or passes away in custody
11  that it involves a failure to properly monitor? In
12  your experience, how often did that occur?
13         MR. NYALLAY: Objection to form.
14     A. I wouldn't be able to provide that information
15  because not every inmate death is a result of a use of
16  force incident or something like that.
17     Q. I'm not asking about use of force. I'm asking
18  failure to monitor.
19         MR. NYALLAY: Objection to form.
20     A. Yeah, as far as that, I wouldn't know, because
21  each is a case-by-case basis. So that's not always the
22  case in each situation.
23     Q. How many investigations have you done into
24  policy violations that related to failure to monitor,
25  failure to properly do rounds, monitor video, things of



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
21–24

Page 21

1  that nature?

2  MR. NYALLAY: Objection to form.

3  A. I wouldn't be able to give you an exact number.

4  I do not know.

5  Q. I understand you can't give an exact number.

6  Is it more than ten?

7  MR. NYALLAY: Objection to form.

8  THE WITNESS: I'm sorry?

9  Q. That was just his objection, form. You can

10  answer.

11  A. Okay. I didn't understand, I'm sorry.

12  Can you repeat the question? I'm sorry.

13  Q. In your time as an investigative officer for

14  IAD, okay, how many times have you investigated a

15  scenario personally that involved either a failure to

16  conduct proper rounds or failure to properly monitor

17  the video of an inmate?

18  And my question was -- I understood you

19  did not know exactly how many. I asked was it,

20  ballpark, more than ten or less than ten.

21  A. I would say probably around ten, possibly more.

22  Q. And that would have been over the entire time

23  you were there in IAD, correct?

24  A. Yes.

25  Q. Do you know if you saw more of those in the

Page 22

1  beginning of your time there, the end of your time

2  there, or was it spread across?

3  A. It was spread across.

4  Q. Okay. Turning to the incident that we're here

5  about with Kevin Sanchez, do you recall the

6  investigation?

7  A. Yes.

8  Q. And my understanding, looking at what you did,

9  there was a Jazminn Stewart that was investigated.

10  A. Yes.

11  Q. There was also a Deputy Lighten that was

12  investigated. Did you interview both of those people?

13  A. Yes.

14  Q. When you started to do your investigation on

15  the policy violation, did you update yourself on what

16  the rules were regarding making proper rounds, doing

17  proper observation, observing the video, things of that

18  nature?

19  A. Yes.

20  Q. And what is your recollection of what the rules

21  were at that point in time regarding making rounds,

22  observing the video, checking on inmate well-being?

23  A. They had to do a round every hour and they were

24  to physically look into each cell and check the

25  well-being of the inmate in each individual cell.

Page 23

1  Q. So when they do the rounds, I've seen the

2  videos here and we'll go over them here in a bit, where

3  they appear to be using some type of object to scan

4  things.

5  A. Uh-huh.

6  Q. What is that?

7  A. I can't remember the exact name of it, but

8  that's -- the device that they use -- CorreTrak is what

9  it's called. It's a device that they use to scan the

10  QR code that is periodically put throughout each cell.

11  So each cell has a separate QR code that they have to

12  scan to complete their round.

13  Q. Now, is this a scan on each cell or is it a

14  scan within a pod? How is that set up?

15  A. I believe -- I'm not 100 percent sure. I don't

16  think it's on each cell. I believe it's within the

17  pod.

18  Q. For the purposes of trying to identify exactly

19  what we're talking about, I'm going to show you an

20  exhibit that I'm going to designate as Exhibit 1 for

21  the purposes of this deposition, okay. I'm going to do

22  it through a shared screen, so give me just a second

23  here.

24  A. Okay.

25  (Deposition Exhibit No. 1 introduced)

Page 24

1  Q. Okay. Can you see that exhibit here?

2  A. Yes.

3  Q. And I am going to assert to you that in the top

4  photograph here, this is Kevin Sanchez, okay?

5  A. Okay.

6  Q. And he is entering his cell after his free

7  time.

8  A. Okay.

9  Q. So when we're looking at his cell, we're

10  talking about the top right corner of the screen,

11  correct?

12  A. Yes.

13  Q. And do each of these cells have a viewing

14  window? Can you describe what that viewing window

15  looks like?

16  A. I believe that they do. I've never worked in

17  the jail here, so I -- but it's a small

18  rectangular-shaped window for each cell door that they

19  should be able to use to look in to check the

20  well-being of the inmate.

21  Q. Are there any other windows? I'm going to go

22  back and share that again. My apologies, I shouldn't

23  have turned it off.

24  As we're looking here on the bottom

25  picture on this Exhibit 1 here, you can tell that the



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
25–28

Page 25

1  door is open.  As he's going in up here on top, it
2  appears that that door closes.  Is this another window
3  here?
4      A.  Honestly, I'm not sure.  It may be.  Some of
5  those cells, depending on where they're housed, they
6  may have bigger windows on them.  I know medical, I
7  think does, so it's possible.
8      Q.  Thank you.  Now, you indicated that the policy
9  was to look at each individual at the same time they're
10  doing the CorreTrak scans, correct?
11      A.  Yes.
12      Q.  In your opinion as an investigator and someone
13  that looked at the policies, how much time should an
14  average round take on this particular pod?  And we're
15  in Pod 7C.  It's two levels.  I'm not sure how many
16  inmates are in here, but I do know that they are solo
17  and they're evidently on a 23-hour lockdown.
18      A.  Correct.
19      Q.  So in your experience and your background, how
20  much time do you believe it should take to do a round
21  in these cells?
22          MR. NYALLAY:  Objection to form.
23      A.  I would -- honestly, I don't know.  I would
24  guess and say five to ten minutes, because you're
25  having to check and go upstairs and downstairs.  So

Page 26

1  depending on how many inmates that is, I mean, I think
2  that's a reasonable time to do it.
3      Q.  And there's also videos in each of the cells,
4  correct?
5      A.  I believe so, yes.
6      Q.  Is there an officer that is always watching
7  those videos, or is that the same person making the
8  rounds?  How do those things relate to each other?  Who
9  is responsible for what?
10      A.  It could be the same person assigned to that
11  pod or it could be they have -- each floor has rovers
12  that pretty much go from cell to cell and help out when
13  needed.  So if they need help with rounds or if they
14  need relief to go to the restroom or eat or something
15  like that, that's where the rovers come into play.  So
16  it could have been -- it could be a different person
17  that's watching that at any given point in time during
18  their shift.
19      Q.  Are the videos continuously monitored?
20      A.  That, I don't know.  Do you mean like recorded,
21  or monitored by the detention officer?
22      Q.  Having someone that's actually watching the
23  videos.
24      A.  No.
25      Q.  How often is someone monitoring those videos?

Page 27

1      A.  I have no idea.
2      Q.  Okay.  And do you know on this particular floor
3  on the monitoring of the videos how it was set up as
4  far as the screen or anything of that nature?
5      A.  I believe I asked one of them, one of the
6  detention officers I talked to, and I think they said
7  one of the screens, if I remember, was divided into
8  fours and then it constantly rotated about every ten
9  seconds to different views.  So it was a rotating
10  camera system.
11      Q.  I will go over that point later.  In your notes
12  and in one of the statements, I will say it appeared
13  that that is exactly correct on the top floor.
14      A.  Okay.
15      Q.  But the bottom floor had a constant monitoring.
16  Even though it was split up on the screen, each cell
17  was constantly monitored.  Does that ring a bell at
18  all?
19      A.  No, I just remember the --
20      Q.  In other words, there wasn't a rotation.
21      A.  Okay.
22      Q.  I'm sorry?
23      A.  I just remember the four-screen that he told me
24  about, or I don't remember what --
25      Q.  That's not a problem.  We'll cover that later.

Page 28

1      A.  Okay.
2      Q.  What I'm going to do now for the purposes of
3  trying to keep this from going way long --
4      A.  Okay.
5      Q.  -- I'm going to go through a series of exhibits
6  that are video clips that are of the rounds being done
7  this night.  I want you to watch them all, rather than
8  question you on each video clip.  I just think it will
9  go faster and I think you'll be able to see exactly
10  what I'm asking, okay?
11      A.  Okay.
12      Q.  So I'm going to run through nine video clips
13  here.
14      A.  Okay.
15      Q.  And I want you to watch each of them.  I will
16  tell you in advance that these clips are of the
17  officers making the rounds, doing their CorreTrak
18  check, so you know what you're kind of looking for,
19  okay?
20      A.  Okay.
21      Q.  Okay.  Can you see the screen there?
22      A.  Yes.
23      Q.  Okay.  And I will tell you that this is the
24  first round, and we're going to make this Exhibit 2 for
25  the purposes of this deposition.



SERGEANT CHRISTINA LOVE                                August 14, 2025
WAGNER vs HARRIS COUNTY, TEXAS                                    29–32

Page 29

1      (Deposition Exhibit No. 2 introduced)
2      Q. I'm going to play that now.
3          (Video playing)
4      Q. Did you recognize that officer?
5      A. I believe that's Jazmmin Stewart.
6      Q. I'm sorry?
7      A. I said I believe that's Detention Officer
8  Jazminn Stewart.
9      Q. Okay. I'm going to stop it here because the
10  only thing we see from this point is she comes down and
11  goes out the door.
12     A. Okay.
13     Q. Does this look like one of the videos you
14  reviewed when you were investigating the policy issues?
15     A. Yes.
16     Q. And my apologies. There's just not a faster
17  way to get through these.
18     A. I understand.
19     Q. I'm sorry, but we'll get them through as
20  quickly as we can.
21     A. Okay.
22     Q. This one is at 1:01 A.M. on February 12th.
23        (Deposition Exhibit No. 3 introduced)
24           (Video playing)
25     Q. Is this also Officer Stewart?

Page 30

1      A. Yes.
2      Q. And the gentleman out here, is this one of the
3  inmates?
4      A. I would assume so.
5      Q. This cell is a 23-hour lockdown cell. What
6  does that mean?
7      A. It means that they stay in their cell for 23
8  hours out of the day and they're let out for one hour
9  sometime throughout the day.
10     Q. Going to Exhibit No. 4. For purposes of the
11  deposition here, this is -- I'm sorry, this is at
12  12:56. The other one was at 12:01.
13     A. Okay.
14        (Deposition Exhibit No. 4 introduced)
15           (Video playing)
16     Q. And again do you recognize this is Officer
17  Stewart?
18     A. Yes.
19     Q. This will be Exhibit 5, 1:44 on the 12th.
20        (Deposition Exhibit No. 5 introduced)
21           (Video playing)
22     Q. Do you recognize this officer?
23     A. Yes. That's Lighten.
24     Q. 2:39 on the 12th. This will be Exhibit 6.
25        (Deposition Exhibit No. 6 introduced)

Page 31

1          (Video playing)
2      Q. This will be Exhibit 7.
3         (Deposition Exhibit No. 7 introduced)
4      Q. And this last one was Officer Stewart again?
5      A. Yes.
6          (Video playing)
7      Q. This will be Exhibit 8.
8         (Deposition Exhibit No. 8 introduced)
9          (Video playing)
10     Q. And this is Officer Lighten again, correct?
11     A. Yes.
12     Q. 4:34 in the morning. Exhibit 9.
13        (Deposition Exhibit No. 9 introduced)
14           (Video playing)
15     Q. And this is Officer Stewart at 5:30 in the
16  morning?
17     A. Yes.
18     Q. And we're almost there.
19     A. That's fine.
20     Q. And this will be Exhibit 10.
21        (Deposition Exhibit No. 10 introduced)
22           (Video playing)
23     Q. Do you recognize this officer?
24     A. No, I don't.
25     Q. Is it fair to say that this is not Officer

Page 32

1  Lighten or Officer Stewart?
2      A. Yes, that would be fair to say.
3      Q. I will tell you this is the first morning check
4  after a shift change.
5      A. Okay.
6      Q. Stop the share.
7          Okay. You reviewed policies and
8  procedures prior to doing your investigation here. Can
9  you tell me what was wrong with each of those clips
10  that you just watched? Let me take a step back
11  before I qualify something there for you. Is it fair
12  to say that each of those individuals conducted their
13  rounds in pretty much the same method?
14        MR. NYALLAY: Objection to form.
15     A. Yes.
16     Q. And can you tell me what was wrong with the way
17  they did those wrongs versus policy?
18     A. They did not look into each individual cell and
19  make sure to check on the welfare of the inmate.
20     Q. And approximately how long did they spend doing
21  their round in each of the bottom cell there or the
22  bottom pod there?
23        MR. NYALLAY: Objection to form.
24     A. I would say maybe 15, 20 seconds.
25     Q. And did it appear that they did anything more



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
33–36

Page 33

1  than scan the CorreTrak?
2     A.  No.
3     Q.  What were the rules for properly conducting a
4  round in accordance with sheriff's policy at the time
5  this event occurred?
6     A.  They were to be conducted one per hour and to
7  physically look into each cell to make sure the inmate
8  was okay.
9     Q.  And if one of these rounds was late, was there
10 an adverse effect on the person doing the round?
11    A.  From what I was told, yes.  Now, what that
12 would be, I don't know.
13    Q.  And what was considered an improper round or a
14 late round?
15    A.  If it was not within the 60-minute timeframe of
16 the previous one.
17    Q.  Do you remember reviewing the CorreTrak logs
18 during the time from about I guess around 11:00 in the
19 evening until around 6:00 in the morning as far as who
20 was logged in showing they were doing the rounds?
21    A.  Yes, I believe so.
22    Q.  Was there any indication that that was not done
23 properly, that an officer doing the round was not
24 properly logged in?
25    A.  Yes.

Page 34

1     Q.  And what is your recollection of that?
2     A.  During the log it was Ms. -- Detention Officer
3  Stewart that was logged into the device, but on two of
4  those rounds you could see Detention Officer Lighten
5  conducted the rounds.
6     Q.  Did you determine a reason why Officer Lighten
7  was doing those rounds?
8     A.  Yes.  Because Detention Officer Stewart said
9  her leg hurt.
10    Q.  Her leg hurt how?
11    A.  I don't know.  That's all she said.
12    Q.  Did you see any indication on the video that
13 she was limping or having a problem walking through her
14 round?
15    A.  No.
16       MR. NYALLAY:  Objection to form.
17    Q.  If an officer is going to sub in and do a round
18 for another detention officer, what is the policy?
19 What's supposed to happen?
20    A.  The one that is signed into the CorreTrak
21 device has to sign out so the other person can sign
22 into it with their information.
23    Q.  Now, we just watched a whole night of rounds
24 for three different officers, all in the same pod,
25 different shifts.  Is it fair to say they were all

Page 35

1  conducting their rounds in the same manner?
2       MR. NYALLAY:  Objection to form.
3     A.  Yes.
4     Q.  And is it fair to say that the way they were
5  conducting those rounds was not consistent with policy?
6       MR. NYALLAY:  Objection to form.
7     A.  Yes.
8     Q.  On the CorreTrak log, did you review those at
9  the time you investigated Mr. Sanchez's death?
10    A.  Yes.
11    Q.  And can you tell me what information is
12 available on that CorreTrak log?
13    A.  Ooh.  I know their name is on it and some kind
14 of identifying number, but I'm not sure which number
15 they used to sign onto it.
16    Q.  Does it show the time that each of the QRC
17 codes are basically scanned?
18    A.  Yes.
19    Q.  So if somebody was looking at one of these logs
20 and they saw the time between scans was than a minute
21 to complete the whole thing, that would be an
22 indication that this was not being done correctly,
23 right?
24       MR. NYALLAY:  Objection to form.
25    A.  Yes.

Page 36

1     Q.  Do you know if anyone had ever reviewed the
2  logs prior for this particular pod and these particular
3  officers to see how they were doing their scans?
4       MR. NYALLAY:  Objection to form.
5     A.  I do not.
6     Q.  And whose responsibility would it have been to
7  go back and look at the logs to determine if rounds
8  were being conducted correctly, or was anyone
9  responsible?
10    A.  I don't know.
11    Q.  In investigating this, you didn't feel that was
12 important to determine?
13    A.  No, only because at that point it mattered who
14 was doing the rounds when this particular incident
15 happened.  It could be -- I don't know if each
16 supervisor on a shift does that.  I'm not familiar with
17 how they do that.
18    Q.  Your testimony is that if you have access to
19 these logs and you can review these logs, you can look
20 at it and tell how much time each of the rounds is
21 taking, correct?
22       MR. NYALLAY:  Objection to form.
23    A.  I don't want to answer yes to that because I
24 have not seen that paper in years, so I don't remember
25 what all is on it.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
37—40

Page 37

1    Q.  You do recall there being a time that the round
2  is being conducted, though, right?
3    A.  Yes.
4    Q.  And a time that each scan occurs, correct?
5    A.  Yes.
6    Q.  And the time of day that scan happened?
7    A.  Yes.
8    Q.  Do you know if the CorreTrak logs have any way
9  to evaluate them?  In other words, is it just a log and
10  printout, or is it a program that you can go and you
11  can look at the data, or do you know?
12    A.  You mean as far as investigative wise, or to
13  the jail personnel?
14    Q.  As far as your investigation --
15    A.  Okay.
16    Q.  -- were you able to access the CorreTrak logs
17  and were you able to do any review from a digital
18  standpoint, or was it just a printout or a screen that
19  showed the times?
20        MR. NYALLAY:  Objection to form.
21    A.  I believe when I got this case it had the
22  printout in it already.
23    Q.  Did you do anything to verify the accuracy of
24  the printout?
25    A.  No.

Page 38

1    Q.  Did you review the logs in conjunction with the
2  videos?
3    A.  Yes.
4    Q.  And that's where you determined that Officer
5  Stewart was still logged in through all of the evening
6  logs, or evening checks, correct?
7    A.  Actually, Deputy Vickery is the one who found
8  all this information initially.
9    Q.  I'm going to go through a set of video captures
10  to try to understand and determine what certain things
11  are within the cell, how the setup is done, okay?
12    A.  Okay.
13    Q.  Okay.  Can you see that screen there?
14    A.  Yes.
15    Q.  And do you know -- it appears his hands are on
16  this little plate right here.  What is that?  Do you
17  know?
18    A.  I do not know.  Yeah, I don't know what that
19  is.
20    Q.  This is going to be Exhibit 11.
21        (Deposition Exhibit No. 11 introduced)
22    Q.  And just going back on that, I'll say that was
23  at 22:13:35 on February 11th, so it would have been
24  10:13, correct?
25    A.  Yes.

Page 39

1    Q.  Now, this is a picture of the cell.  Again a
2  video capture.  Is this a true representation of how
3  this looks or is this skewed off in any way because of
4  where the video is?  And is it a square cell or does it
5  have a -- come to a point?  How is it set up?
6    A.  They're all square, as far as I know, unless --
7  if he possibly was on a corner one it may have been
8  shaped a little differently.
9    Q.  Okay.  And there's a black mark in here.
10    A.  Yes.
11    Q.  What is that black mark about?
12    A.  It's to protect their privacy when they're
13  using the restroom.
14    Q.  This is going to be No. 12.
15        (Deposition Exhibit No. 12 introduced)
16    Q.  And you say to protect their privacy.  Is it
17  accurate to say that this is a toilet attached to the
18  sink here?
19    A.  Yes.
20    Q.  In monitoring the inmates, do you know what an
21  officer looks for as far as the video in the cell?
22    A.  I do not.
23    Q.  And on this particular picture would you agree
24  that you can tell he's sitting upright?  And this is
25  again at 23:16.  He appears to be sitting upright on

Page 40

1  the toilet, correct?
2    A.  Yes.
3    Q.  And looking at the distance of his foot from
4  the wall and knowing what these little containers are,
5  would it be accurate to say it's a little over two feet
6  from his foot right here to wherever the wall is over
7  here?
8        MR. NYALLAY:  Objection to form.
9    A.  I don't know.
10    Q.  Would you agree, though, that there is at least
11  some level of space here when he's sitting up on the
12  toilet?
13    A.  Yes.
14    Q.  This is at 23:21.  It's going to be No. 13.
15        (Deposition Exhibit No. 13 introduced)
16    Q.  Okay.  At this point here it appears he's no
17  longer sitting up entirely straight, correct?
18    A.  Yes.
19    Q.  And you can see his foot lifted off the ground
20  and you can see it's moved a significant amount over
21  towards the wall.  Is that accurate?
22    A.  Yes.
23    Q.  Would this have been something an officer could
24  have or should have observed if they were observing the
25  video?



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
41—44

Page 41

1      MR. NYALLAY:  Objection to form.
2    A.  Yes.
3    Q.  That was a yes?
4    A.  Yes.
5    Q.  This will be No. 14.
6      (Deposition Exhibit No. 14 introduced)
7    Q.  Again, just looking at the differences in times
8  here, this is 36, this is approximately ten seconds
9  later.
10   A.  Okay.
11   Q.  Can you tell what's happening in this picture
12 here?
13   A.  It appears that he's leaning to the side more.
14   Q.  All right.  And again we see this foot is much
15 closer to the wall over here, correct?
16   A.  Yes.
17   Q.  Would it have been possible for him to have his
18 foot closer to the wall if he wasn't leaning to the
19 side like this, if he had been sitting upright?
20     MR. NYALLAY:  Objection to form.
21   A.  Yeah, I -- I don't know.
22   Q.  Let me ask you this.  Would it have been normal
23 for him to be sitting upright on that toilet and have
24 his foot off to the right over that way?
25     MR. NYALLAY:  Objection to form.

Page 42

1    A.  I would say no.
2    Q.  Do you know, when the officers were trained as
3  far as monitoring these videos, if there's anything
4  they're supposed to look for or to pay attention to?
5    A.  I do not.
6    Q.  Okay.  This is at 23:22:03, and I believe you
7  can see an arm up here?
8    A.  Yes.
9    Q.  Foot over here, again really close to the wall?
10   A.  Yes.
11   Q.  Is he basically laid across the toilet at this
12 point?
13   A.  Yes.
14   Q.  I see a hand, an arm up here and I see a foot
15 over here.
16   A.  Yes.
17   Q.  Is that a normal way for somebody to utilize
18 those facilities?
19     MR. NYALLAY:  Object to form.
20   A.  I wouldn't know about restroom habits of
21 inmates, but -- so I don't know how to answer that.
22   Q.  If you had been observing this video and you
23 had watched this little series of things occur, would
24 it have been something that you believe should have
25 gone and been investigated and checked in the cell?

Page 43

1    A.  Yes.
2      MR. NYALLAY:  Objection to form.
3    Q.  I'm sorry?
4    A.  Yes.
5    Q.  This will be 15.
6      (Deposition Exhibit No. 15 introduced)
7    Q.  So at 23:22, again this is the same area.  You
8  see the foot raised off the ground, you see the hand up
9  here on the other side of the sink?
10   A.  Yes.
11   Q.  Do you see all that?
12   A.  Yes.
13   Q.  So based on this photograph here, does it
14 appear that he's turned to the side, leaning across
15 this way and his foot out the other way, that he's
16 basically perpendicular to this sink at this point?
17   A.  Yes.
18   Q.  And do you believe that would be a normal
19 scenario or situation?
20   A.  No.
21   Q.  Do you believe seeing something like this would
22 have caused you, as a detention officer in your time
23 there, to go and investigate?
24     MR. NYALLAY:  Objection to form.
25   A.  Yes.

Page 44

1    Q.  Do you believe that Officer Stewart and/or
2  Officer Lighten should have gone and investigated this
3  scenario?
4    A.  Yes.
5      MR. NYALLAY:  Objection to form.
6    Q.  And the next will be 17.
7      (Deposition Exhibit No. 17 introduced)
8    Q.  And this is where he has been found.  You'll
9  see the time on there is 7:43 in the morning.
10   A.  Yes.
11   Q.  Looking at everything that you've looked at,
12 with the scenario starting back at 11-ish on the 11th,
13 can you think of any reason it would have taken until
14 7:00 in the morning for him to be discovered?
15   A.  No.
16     MR. NYALLAY:  Objection to form.
17   Q.  Let me rephrase that.  Is there any reason it
18 should have taken that long?
19   A.  No.
20   Q.  Would you agree, having watched those videos,
21 that at least on that shift and the shift that followed
22 for that jail cell that it was a practice through at
23 least this shift to not really look at the inmates or
24 check on them?
25     MR. NYALLAY:  Objection to form.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
45–48

Page 45

1    A. Yes.
2    Q. That's a yes?
3    A. Yes.
4    Q. Do you know if, in addition to Officer Lighten
5    and Officer Stewart, if there was any other remedial
6    things that were done to address the fact that rounds
7    weren't being properly done?
8        MR. NYALLAY: Objection to form.
9    A. No.
10   Q. You have no idea of anything --
11   A. I do not know.
12   Q. Did you make any recommendations for any
13   changes or identify anything you said, hey, this seems
14   to be a systemic problem rather than an individual
15   problem?
16       MR. NYALLAY: Objection to form.
17   A. No.
18   Q. When you began your investigation of this, can
19   you tell me steps you went through? What did you
20   review, what did you request to look at? What did you
21   access in determining how your investigation was going
22   to go forward?
23   A. Some of the documents were already included
24   because Deputy Vickery had gotten them. I looked at
25   the jail report that they did and completed in regards

Page 46

1    to this. I looked at video, I looked at the CorreTrak
2    round sheet, and I eventually ended up speaking with
3    both of the detention officers that were still
4    employed. One of them had resigned and didn't
5    cooperate with the investigation.
6    Q. Do you remember who that was?
7    A. I think his name was Ung, U-N-G.
8    Q. Is it possible that was the officer that made
9    that first morning round?
10   A. It's possible, yes.
11   Q. When you got to the point that you determined
12   that you were going to be interviewing each of these
13   officers, what information did you pull on each
14   individual officer?
15   A. We pulled their information sheet with the
16   sheriff's office that just shows their contact
17   information and their -- should be their current
18   assignment. I also pulled their -- I run a criminal
19   history check on them just to see if there's anything
20   that shows up. That's just standard procedure for
21   Internal Affairs.
22       That's pretty much it as far as what I
23   pull before I bring them in to talk to them.
24   Q. Did you look into their past incidents or any
25   other disciplinary history prior to talking to them?

Page 47

1    A. No.
2    Q. Why not?
3    A. That doesn't determine anything that happens on
4    my end. That more comes into play during the -- when
5    the case is presented to the disciplinary committee.
6    Q. So it's not until it gets to the disciplinary
7    committee that they look at other past incidents or
8    things that may reflect on the officers' patterns of
9    behavior, correct?
10       MR. NYALLAY: Objection to form.
11   A. Correct.
12   Q. So you didn't do anything to determine if she
13   had had other incidences -- when I say her, that
14   Officer Stewart had not had other incidences where she
15   either failed to perform her duty or used excessive
16   force or anything like that?
17       MR. NYALLAY: Objection to form.
18   A. No.
19   Q. Basically it's a basic information sheet, name,
20   contact, where they're currently assigned; you pull a
21   criminal history?
22   A. Uh-huh.
23   Q. How often does it come up when you pull a
24   criminal history that somebody actually has a history?
25   A. I'm thinking. There's been a couple of

Page 48

1    occasions where people have had something in their
2    history show up, but it's not often.
3    Q. Those occasions, is that something that's
4    happened since they've become an officer or something
5    that predated their time as an officer?
6    A. Predated.
7    Q. And how would that get through the hiring
8    process, that somebody with a criminal history could
9    still be hired?
10   A. I don't know the process of hiring and the
11   background procedures anymore. I don't know.
12   Q. So at what point is the background, their HR
13   file, their reviews, at what point is that looked at
14   when evaluating a potential violation of policies?
15   A. As far as their -- okay. Can you repeat that?
16   At what point is what looked at?
17   Q. You indicated that you do a very basic
18   informational check about the officer that you're
19   investigating.
20   A. Correct.
21   Q. You don't look at their HR file, you don't look
22   at their discipline history, you don't look at what
23   their past reviews are or anything like that?
24   A. Correct.
25   Q. At what point does that information get



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
49–52

Page 49

1  reviewed and looked at in this process?

2      A. I'm not sure that their -- well, their

3  disciplinary is looked at when the case is presented,

4  but I'm not in the room when that takes place.

5      Q. So you don't know?

6      A. No.

7      Q. Would that be something that the personnel

8  office would handle as far as reviewing that and

9  knowing that?

10     A. Yes.

11     Q. As part of your investigation in this, did you

12  review any of the other officers that worked with

13  either Officer Lighten or with Officer Stewart?

14     A. What do you mean, review?

15     Q. Let me rephrase that. Did you speak to any of

16  their coworkers about their work habits, their

17  behaviors, or anything of that nature?

18     A. No.

19     Q. Did you speak with their supervisors regarding

20  what kind of officer they were, what their history was?

21     A. No.

22     Q. Do you believe it's important to determine

23  patterns of behavior when you're investigating somebody

24  that's been accused of wrongdoing?

25         MR. NYALLAY: Objection to form.

Page 50

1      A. No, because each situation could be different,

2  so you can't base it on the same thing that happened

3  the time before. There may have been other factors at

4  play.

5      Q. So if somebody had an unauthorized use of force

6  six times in their past and you're investigating an

7  unauthorized use of force again, you don't care about

8  their past history?

9         MR. NYALLAY: Objection to form.

10     A. I don't have any dealings with their past

11  history. Like I said, that all comes into play when

12  the case is presented as far as the punishment goes.

13     Q. Okay. Who presents that?

14     A. I present the case, but the decision about

15  their disciplinary and their past is made by the majors

16  that sit in on the disciplinary committee for that

17  given day.

18     Q. Based on what you're saying, somebody can have

19  a multitude of situations where they violated some

20  policy, but that's not even reviewed when evaluating

21  how they're doing as an officer, what they did, what

22  was right, what was wrong?

23         MR. NYALLAY: Objection to form.

24     A. That's reviewed when the case is presented to

25  the disciplinary committee. They're the ones that look

Page 51

1  at their previous disciplinary, did they have an issue

2  with the same thing. It's several factors that they

3  look at, but I'm not in the room when that takes place

4  so I'm not 100 percent sure exactly what they look at.

5      Q. But there's nothing that goes into your

6  investigation insofar as I spoke to the supervisor,

7  they've been disciplined X number of times on this; or

8  I've looked at their past and I see that they've had

9  this many different issues where they've had problems?

10     A. Correct.

11     Q. Give me just a second here. I need to pull

12  another document.

13        Can you see the screen?

14     A. Yes.

15     Q. Can you tell me what this is?

16     A. No, I cannot. I don't have anything to do with

17  this.

18     Q. I understand you don't have anything to do with

19  this. Do you know what form this is or what this is

20  related to?

21     A. I do not.

22     Q. Okay. And this is nothing that you looked at

23  in reviewing or preparing for the investigation here?

24     A. No.

25     Q. It does appear that this is part of an internal

Page 52

1  complaint where it does address the issue of what

2  occurred. Would you agree with that?

3      A. Yes.

4      Q. But you have no idea what this form is?

5      A. I believe it's something that Legal does after

6  the fact, but I'm not -- we don't do that.

7         MR. BOENIG: And court reporter, what

8  exhibit am I up to?

9         THE REPORTER: Your last exhibit was 17.

10        MR. BOENIG: This will be 18.

11     (Deposition Exhibit No. 18 introduced)

12     Q. Now, you got several statements from both

13  officers on this, correct? Well, I say both officers.

14  Officer Lighten and Officer Stewart. Is that accurate?

15     A. I got two statements from them.

16     Q. So you got two sworn statements from each of

17  these?

18     A. Yes.

19     Q. You didn't get anything from the other officer

20  that did not cooperate?

21     A. Correct.

22     Q. When you have an officer that doesn't

23  cooperate, is there still an investigation that looks

24  at the videos, the logs, things of that nature?

25     A. Yes. If it's determined that that person was



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
53–56

Page 53

1  involved in what happened, then yes, we would continue
2  to investigate that person.
3      Q.  And do you believe, based on your recollection,
4  that there was an officer that terminated his services
5  and refused to investigate that was involved in this?
6      A.  Yes.
7      Q.  And that was the officer Ung, U-N-G?
8      A.  Yes.
9      Q.  And were there any findings related to Officer
10  Ung.
11      A.  As far as what?
12      Q.  Did you do anything on an investigative report
13  about what you found regarding what Officer Ung did or
14  did not do based on your review of the CorreTrak logs,
15  the videos, and things of that nature?
16      A.  Yes.
17      Q.  And what were your findings or conclusions
18  regarding Detention Officer Ung?
19      A.  I found that he did not complete the rounds in
20  the proper way when he conducted them.
21      Q.  This is going to be Exhibit 19.
22          (Deposition Exhibit No. 19 introduced)
23      Q.  And I will state that this is part of your
24  statement on one of the statements you got from Officer
25  Stewart.

Page 54

1      A.  Okay.
2      Q.  One of the statements she makes here is that up
3  in this area that most inmates were housed in the cell
4  for no more than 14 days.
5          Do you know why that would be?
6      A.  I believe it was a COVID observation tank at
7  that time.
8      Q.  Did it have anything to do with disciplinary
9  issues related to the detainees?
10      A.  I do not know.
11      Q.  Do you know how long Mr. Sanchez had been in
12  this cell at the time he passed?
13      A.  I do not.
14      Q.  Do you recall investigating anything or seeing
15  anything that indicated that Mr. Sanchez had had some
16  medical issues prior to the occurrence or prior to his
17  death?
18      A.  No, I don't.
19      Q.  Do you review anything about the actual
20  detainee when determining if there's a policy
21  violation, or is that just handled by someone else?
22      A.  Yeah, that -- we don't do that.
23      Q.  Who would look into the detainee?
24      A.  The medical staff, when he comes into jail and
25  they do a medical evaluation of them when they come in.

Page 55

1      Q.  So simply his medical staff looks at that,
2  that's not evaluated at all as far as what occurred or
3  how it happened or what was going on or whether or not
4  there should have been an additional level of looking
5  at the person?
6      A.  I do not know the process behind that or who
7  all would do something like that.
8      Q.  If somebody is in medical distress but they
9  don't need to be in the infirmary all the time, is
10  there any change in the way they're monitored or looked
11  at?
12      A.  I do not know.
13      Q.  If anybody has made an outcry or indicated that
14  they might be committing suicide, is there any
15  additional level that's done or anything that's
16  changed?
17      A.  Yes.
18      Q.  What happens there?
19      A.  I believe they are evaluated more frequently or
20  checked on more frequently than every hour.  I want
21  to -- I don't remember or know what the time is now,
22  but they are checked on more frequently than a
23  different inmate.
24      Q.  So if somebody had a medical issue not related
25  to hey, I'm going to kill myself, we don't worry about

Page 56

1  that, you-all never look at it, only medical staff
2  looks at it; if somebody is saying hey, I'm going to
3  hurt myself, then you-all take an additional level and
4  look at it a little bit more?
5          And when I say you-all, I understand
6  you're the investigator.  I'm talking about the
7  detainee officers.
8      A.  I don't know what the actual procedure for that
9  is if an inmate has some type of medical condition,
10  other than if they say they wanted to commit suicide.
11  That's the only thing I know that they check on them
12  more frequently.  I'm not sure if there's another
13  policy or something else they do if there's a medical
14  condition.
15      Q.  Okay.  I want you to look at this big
16  highlighted area here.  I'm going down to right here.
17  It says:  While I conducted the rounds in the cell
18  throughout the night, I did not notice anything odd
19  with Inmate Sanchez-Trejo.  I observed his silhouette
20  inside on the toilet multiple times through the night.
21  He was sitting on the toilet, but he was not slumped
22  over.  I do admit I could have looked better inside his
23  cell to see what he was doing.  No other inmate tried
24  to get my attention in regards to Inmate Sanchez-Trejo.
25  I did not observe anything exchanged -- I'm sorry.  I



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
57–60

Page 57

1  did not observe Inmate Sanchez-Trejo exchange anything
2  with another inmate in the cell.
3        Based on your review of the video, is that
4  a truthful statement?
5      A.  No.  Well --
6      Q.  Because she didn't look into the cell, did she?
7      A.  No.
8      Q.  And there's no way she could have observed a
9  silhouette in the cell without looking into the cell,
10  correct?
11      A.  Correct.
12      Q.  And we've looked at some screenshots that show
13  somewhere around 11:20 or so, he's fallen over, he's
14  got a foot out closer to where the door would be, his
15  arm and his head is up behind that.  If she had done
16  any observation at all, would she have seen that
17  through the cell door?
18      A.  Yes.
19      Q.  Does the observation port in the cell door do
20  anything to block out what's being seen like the video
21  does?
22      A.  Only unless an inmate has that window covered.
23      Q.  And if the inmate covered the window, would
24  that be a problem or an issue?
25      A.  Yes.

Page 58

1      Q.  Would that be allowed to stand?
2      A.  No.
3      Q.  Did you have any indication that Mr. Sanchez
4  had covered up his observation window on his cell?
5      MR. NYALLAY:  Objection, form.
6      A.  No.
7      MR. BOENIG:  What's the basis of your
8  objection on that one?
9      MR. NYALLAY:  She wasn't there.  She does
10  not know.  She --
11      MR. BOENIG:  She investigated it, though.
12      MR. NYALLAY:  Yeah, she did, but she
13  wasn't one of the officers assigned.  She had already
14  stated earlier that she reviewed the videos and the
15  statements, so there's no indication that she had any
16  personal knowledge of what actually happened on --
17      MR. BOENIG:  I understand, thank you.
18      MR. NYALLAY:  Yes.
19      Q.  Going down to this last paragraph on this page:
20  I was asked if I thought it was odd that Inmate
21  Sanchez-Trejo was sitting in the same position every
22  time I walked by his cell.  I told Sergeant Williams
23  that I'm not a doctor.  An inmate could have eaten some
24  bad food or had stomach issues.
25        Does that statement bother you at all as

Page 59

1  far as the attitude that Officer Stewart had regarding
2  her detainees?
3      A.  Yes.
4      Q.  I'm sorry?
5      A.  Yes.
6      Q.  Why does it bother you?
7      A.  Because it comes across as an excuse as to why
8  she didn't do her job.
9      Q.  Does it also seem to be making light of the
10  fact that she walked past somebody that was laid out
11  for six to seven hours?
12      MR. NYALLAY:  Objection to the form.
13      A.  Yes.
14      Q.  In this next one she says I admit that I could
15  have looked into each inmate's cell better when I
16  conducted rounds.  I now make sure and look at each
17  inmate when conducting my rounds.
18        Is that a truthful statement?
19      MR. NYALLAY:  Objection to form.
20      A.  Yes.
21      Q.  I'm sorry?
22      A.  Yes.
23      Q.  Okay.  And I guess, yeah, she could have looked
24  in better, because she didn't look in at all.  Is that
25  accurate?

Page 60

1      A.  Yes.
2      Q.  Now this is part of the statement or the report
3  that was done on her, and there's a set of Pew Codes.
4  What is a Pew Code?
5      A.  It's something that you get, and I don't know
6  the amount, a certain amount of a particular type of
7  incident that it alerts them that you have so many
8  incidents involving, for this, a use of force, and it's
9  just something that would need to be reviewed by one of
10  her supervisors.
11      Q.  Okay.  Now, Officer Stewart had not been
12  working long as a detainee officer at the time this
13  occurred, correct?
14      A.  According to that hire date, no.
15      Q.  And we have a hire date here of 4/12/21?
16      A.  Correct.
17      Q.  And then we have all these incidents on use of
18  force?
19      A.  Yes.
20      Q.  Is that normal, for a detainee officer to have
21  that many incidents in that short a period of time?
22      MR. NYALLAY:  Objection to form.
23      A.  I can't say what's normal or not in the jail
24  environment because, as much contact as I have with
25  inmates, anything is possible.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
61–64

Page 61

1  Q. Does a use of force indicate an improper use of
2  force or just an allegation of a use of force?
3  A. Just that a use of force occurred, not that
4  it's not in the right.
5  Q. And this Pew report, how difficult is that to
6  pull?
7  A. I don't know. I've never pulled a Pew report.
8  Q. Is it fair to say that it is relatively limited
9  on the information you pull about the officers when you
10  do the investigation?
11  MR. NYALLAY: Objection to form.
12  A. It depends on where the investigation leads you
13  as to what you pull.
14  Q. Would there ever be a time you would pull a Pew
15  report?
16  A. No.
17  Q. Do you know how it got included in the summary
18  of the incident hearing?
19  A. I do not.
20  Q. This was not something you pulled?
21  A. Not that I recall, no.
22  Q. Now, this is on January 18th, 2023, signed off
23  on by you. This is telling her not to engage in any
24  unauthorized conversations or relating any information
25  to anybody.

Page 62

1  What is considered an unauthorized
2  conversation?
3  A. Anything involving that case that she's been
4  accused in, she's not allowed to discuss that case with
5  anyone within the sheriff's office unless it's Internal
6  Affairs or me; someone from Internal Affairs or me.
7  Q. Okay. So this limits her ability to talk to
8  anyone else within the sheriff's office other than
9  Internal Affairs?
10  A. Or her attorney, but yes.
11  Q. Okay. What about the Texas Rangers? Is she
12  allowed to talk to them if they're investigating?
13  A. I don't know the process of the -- their
14  investigations. I don't know how they conduct them.
15  Q. Your understanding of this, are they allowed --
16  after being given this warning, are they allowed to
17  talk to investigators from either HPD or the Texas
18  Rangers?
19  A. Yes, I believe they can.
20  Q. This is a second statement and this is again by
21  Officer Stuart. Do you see the second statement there?
22  A. Yes.
23  Q. It says: During the same video, I observed
24  Inmate Sanchez sitting on the toilet and I observed the
25  time when he passed out and was no longer moving, which

Page 63

1  was approximately 11:21. He was no longer sitting
2  upright on the toilet, but he slid over and his legs
3  were to the side and his upper body had fallen over
4  towards the floor.
5  That's rather dramatically different from
6  her first statement, isn't it?
7  A. Yes.
8  Q. In her first statement she said she never
9  observed him being slumped over.
10  A. Correct.
11  Q. If she had reviewed the video or been watching
12  the video, would she have caught it at the time that
13  the incident occurred rather than when it was being
14  reviewed with the supervisor?
15  MR. NYALLAY: Objection to form.
16  A. Yes.
17  Q. I'm sorry?
18  A. She could have, yes.
19  Q. It also indicates she did not look into the
20  cells. Again, that's inconsistent with her first
21  statement, correct?
22  A. Correct.
23  Q. And we still make the same "I'm not a doctor, I
24  don't know"?
25  A. Right.

Page 64

1  Q. There's a statement here that: A black inmate
2  told me that Inmate Sanchez tried to get his attention
3  from his cell because he was not feeling good. The
4  black inmate tried to get the attention of the
5  detention officers in the pod for several hours, but
6  said they never checked on Inmate Sanchez. I do not
7  remember any detention officers coming out of the pod
8  to do rounds on this day.
9  Now, this is actually a statement of a
10  nonemployee, by Isaias Saenz. It's part of the Jazmin
11  Stewart review. Did you speak with this individual?
12  A. Yes.
13  Q. Did you find his statements to be credible?
14  A. Yes.
15  Q. Was there any benefit to him giving this
16  statement or anything that would have improved in his
17  life for giving this statement if it was untrue?
18  A. No.
19  MR. NYALLAY: Objection to form.
20  Q. Did you investigate any at all to determine if
21  what he stated had occurred? Did you review his video,
22  anything like that?
23  A. I sent a letter to the inmate that he had
24  allegedly got this substance from.
25  Q. That's not this individual here?



Page 65

1  A. No, that's someone different.
2  Q. Okay. My question is: He's making a statement
3  that I tried to get detention officers' attention. I
4  tried to do something to help.
5  A. Uh-huh.
6  Q. And they ignored me.
7     My question is: Did you review his video
8  and see if that was an accurate statement or not?
9  A. No.
10  Q. Do you know if anybody reviewed that video?
11  A. I do not.
12  Q. Was there anything in your investigation where
13  you ever determined that someone was trying to do
14  something or that Sanchez had notified the officers
15  that there was a problem?
16  A. No.
17  Q. What was your final determination on this
18  investigation? What violations of policy did you find
19  had occurred?
20  A. The CJC policy for the inmate observation and
21  then the department policy for performance of duties.
22  Q. The first thing you said was the CDC policies
23  or --
24  A. CJC, so it's Criminal Justice Center, yeah.
25  Q. Okay. And is that a set of policies for all

Page 66

1  detainee centers in Texas or is it just for the
2  sheriff's office in Harris County? What's that for?
3  A. Just for the sheriff's office in Harris County.
4  Q. Okay. And then when you say department, how is
5  that different from the CJC?
6  A. So the CJC is going to be what we call the
7  standard operating procedures of that unit. So they
8  have a separate SOP on, as well as to include the
9  department policy.
10  Q. What do the department policies apply to?
11  A. Just violations of department policy, but
12  there's also violations of the operating procedures,
13  which that's what the CJC policy is.
14  Q. In the course of your time as an investigative
15  officer, have you ever noticed any type of patterns as
16  far as what shift is on that is related to failure to
17  properly observe? In other words, is there more in the
18  day, more in the middle, or more in the overnight
19  shift?
20  A. No.
21     MR. NYALLAY: Objection to form.
22  Q. So have you had instances where you observed or
23  investigated a failure to properly observe or monitor
24  occurring on day shifts?
25  A. I don't remember, the other cases that I've

Page 67

1  had, what time of day they were.
2  Q. You don't have anything to do with the
3  disciplinary aspects of this; you're strictly an
4  investigator to determine if a policy has been
5  violated?
6  A. Yes.
7  Q. And in evaluating that, we never look at what
8  the officers have done before, if there was a pattern
9  of behavior, if this is something that occurred once or
10  occurred a dozen times?
11     MR. NYALLAY: Objection, asked and
12  answered.
13  A. No.
14  Q. In this situation here where Officer Stewart
15  and Officer Lighten were disciplined, was anything
16  investigated or looked at regarding their supervisor?
17  A. Not to my knowledge.
18  Q. And on that particular shift overnight is there
19  a supervisor in the jail facility?
20  A. Yes. Well, I don't know, honestly.
21  Q. And this is one pod out of many within the
22  sheriff's detention center, correct?
23  A. Yes.
24  Q. And this was different with the 23-hour
25  lockdown, and your recollection is this was related to

Page 68

1  COVID at that time?
2  A. Yes.
3  Q. Other than Ung, Lighten, and Stewart, do you
4  know of anybody else that was investigated related to
5  the incidence that occurred here?
6  A. No.
7  Q. I remember that you said that Officer Stewart
8  had said she asked Officer Lighten to do her rounds
9  because her leg hurt. Do you remember anything from
10  Officer Lighten regarding the time he was asked to do
11  that, how much time he had to complete the round, or
12  anything like that?
13  A. All I remember is that the rounds were getting
14  close to being late.
15  Q. In your understanding, there would have been
16  some type of disciplinary issue if the round had been
17  late; is that accurate?
18  A. Not accurate. I don't know what happens if
19  they're late.
20  Q. Do you know if it's reported or not or it's an
21  issue at all?
22     MR. NYALLAY: Objection to form.
23  A. I know that it's recorded in the device if it's
24  late. As far as what happens after that, I'm not for
25  certain.



Page 69

1   Q.  Looking at that CorreTrak, did you observe any
2   of the rounds being late on this particular incident?
3   A.  No.
4   Q.  Give me just a second here.  I want to pull up
5   Officer Lighten's statement and see if there's anything
6   we need to talk about there.
7   A.  Okay.
8   Q.  When we're talking about coverage of rovers and
9   things of that nature, generally how many officers are
10  assigned to a pod?
11  A.  One to two.  It depends on the pod.
12  Q.  All right.  So there are times when there's
13  just one officer observing the entire pod, doing the
14  rounds, observing the video, et cetera?
15  A.  As far as the rounds go, from my understanding
16  that's where the rovers come in.  The rovers will do
17  the rounds if there's one person in the cell.  But as
18  far as the other duties, yes.
19  Q.  For the rovers, are they assigned one pod or
20  multiple pods?
21  A.  I don't know.  To the floor, is my
22  understanding.  I don't know if they get subdivided
23  from that.
24  Q.  I'm sorry, say that again?
25  A.  I said they're assigned to the particular

Page 70

1   floor, but I don't know if they are subdivided into
2   certain pods to cover for that night.  I don't know.
3   Q.  So where this particular pod was located, which
4   is 7C, I believe, how many other pods were on that same
5   floor?
6   A.  I do not know.
7   Q.  Did anything in your investigation indicate
8   that there was improper staffing on the evening of
9   Mr. Sanchez's death?
10          MR. NYALLAY:  Objection to form.
11  A.  No.  I don't know what the proper staffing is
12  for that pod.
13  Q.  So in your investigation looking at policies
14  and such, you didn't look at a problem that maybe there
15  wasn't enough officers; you just looked at the
16  individuals?
17  A.  Correct.
18  Q.  Who would know what the proper staffing levels
19  were for each of these pods?
20  A.  One of the supervisors in the jail would know
21  that.
22  Q.  Would any of the supervisors know generally for
23  each of the pods or would it be the supervisor for a
24  certain area or certain floor?
25  A.  Whoever is assigned to that floor should know

Page 71

1   how many are supposed to be in that pod.
2   Q.  And do the supervisors set staffing levels, or
3   is that set at a higher level than that?
4   A.  Yeah, I believe that's a higher level.
5   Q.  I'm sharing Mr. Lighten's sworn statement.
6   This will be Exhibit No. 20.
7       (Deposition Exhibit No. 20 introduced)
8   Q.  Do you see this statement here?
9   A.  Yes.
10  Q.  He says this type of cell -- we're talking
11  about the 7C pod, 23-hour lockdown -- requires a
12  minimum of two people to operate properly to conduct
13  interior security rounds.  On this particular day I was
14  assigned alone, with the expectation that secondary
15  detention officers would cover the pods, including 7C,
16  as a rover so security rounds could be completed.
17      So this indicates there should have been
18  at least two officers, correct?
19  A.  Correct.
20  Q.  Down here he says:  I didn't get a clear visual
21  of Inmate Sanchez to judge what he was doing on the two
22  occasions I walked inside of cell block 7C1.  I was
23  advised there was not much time remaining for the
24  rounds to be completed in 7E pod, so I felt the
25  pressure of trying to complete my rounds as quickly as

Page 72

1   possible to prevent late rounds for 7E.
2       Did you in your investigation get a
3   determination or establish a thought on why on these
4   two instances where Officer Lighten was doing reviews
5   he felt like he didn't have time or he was pressured
6   for time?
7   A.  No, I did not.
8   Q.  Did you not feel that was important in
9   establishing why he felt that way as far as whether or
10  not a policy had been violated?
11  A.  Well, if there was an issue, there is something
12  they can enter in that device that would say why the
13  round was late.
14  Q.  I looked at the camera on the bottom tier for
15  each cell door that I clicked on to open.
16      Now, is this a camera in what they call
17  the command center, or what are we talking about there?
18  A.  I would assume so.  To my knowledge there's no
19  other cameras accessible but inside the --
20  Q.  So the only place to monitor these cameras is
21  in the command center?  There's no camera you can look
22  into the cell while you're going by the cell?
23  A.  Correct.
24  Q.  The last statement here:  The two times I
25  conducted the rounds in 7C pod I had to hurry to



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
73—76

Page 73

1  complete them because they were going to be late.  This
2  is why I did not sign Detention Officer Stewart out of
3  the CorreTrak system and sign myself into it, because
4  it would have taken too long or taken too much time and
5  the rounds would have been late.  It is known in the
6  jail that completing CorreTrak rounds on time is very
7  important and late rounds are unacceptable under any
8  circumstances.
9        Is this inconsistent with what your
10  understanding is that there could have been a reason
11  put in?
12     A.  Yes.
13     Q.  And he indicates he did not check on the
14  welfare of each inmate as he should have because it
15  would have caused the rounds to be late, so he didn't
16  check in the manner he was supposed to.
17        In your investigation, did you determine
18  any reason why it would have been difficult for either
19  Officer Lighten or Officer Stewart to complete the
20  rounds properly?
21     A.  No.
22     Q.  During the time that Officer Stewart and/or
23  Officer Lighten were not doing rounds, where would they
24  have been?
25     A.  I would assume they would be in the central

Page 74

1  command center, which is the office type area that's
2  attached to the pod.
3     Q.  Does each pod have its own center?
4     A.  Yes.
5     Q.  And other than the detention officers on duty,
6  is there anyone else assigned there?
7     A.  Assigned there?  I mean, throughout the night
8  other people could go in there, meaning like
9  supervisors could go in there or other detention
10  officers, depending on what they may need.
11     Q.  And in investigating this and looking at this,
12  looking at policies, do you believe that supervisors
13  regularly check on the command centers in each of the
14  floors that they're responsible for?
15     A.  I don't know what the requirements are for them
16  to do that.
17     Q.  But you didn't talk to the supervisor related
18  to this floor as far as what occurred that night or
19  what they saw; is that accurate?
20     A.  Yes.
21     Q.  You've indicated that you don't pull a lot of
22  information when you're doing an investigation because
23  you're not worried about past issues or anything of
24  that nature, correct?
25     A.  Correct.

Page 75

1     Q.  That doesn't happen until there's actually a
2  disciplinary decision that's been made, and then that's
3  handled by a different department?
4     A.  Yes.
5     Q.  And what department is that?
6     A.  I can't even call it a department, because when
7  the case is presented by the investigator it is to
8  three -- three majors, and they're the ones who decide
9  based on that person's disciplinary past what the
10  appropriate punishment is for the present case.
11     Q.  And are these majors, do they have a particular
12  unit or a particular assignment?  What is -- how are
13  they set up?
14     A.  They -- from my understanding, it's on a
15  rotational basis.  So every month it's different
16  majors, and then if one can't make it there will be one
17  to fill in, so it changes.  But it's majors assigned to
18  patrol, jail, investigations, all over the department.
19     Q.  So the majors rotate in and rotate out of this
20  position?
21     A.  Not the major position, just the disciplinary.
22  When they hear the cases, they rotate on a monthly,
23  from my understanding, basis on that.
24     Q.  And is there a name for that particular duty or
25  the particular group that's handling that duty?

Page 76

1     A.  No.
2     Q.  What is your understanding or your knowledge
3  about what information is pulled when they're making
4  that decision, or do you know?
5        MR. NYALLAY:  Objection to form.
6     A.  The only thing I believe that they look at is
7  past incidents in their disciplinary.
8     Q.  How do they get that information?  Where do
9  they pull it from?
10     A.  It's actually pulled by our clerks that are
11  over in Internal Affairs.
12     Q.  So if an officer's been investigated, it's
13  being sent for review by the majors to determine a
14  disciplinary action; at that point in time a clerk
15  within the IAD pulls the information on the officer?
16     A.  It's actually pulled before the case is
17  presented.
18     Q.  Okay.
19     A.  But it's included.
20     Q.  And when that information is pulled, do you
21  know what all information is pulled?
22     A.  It's just cases that they've had disciplinary
23  on in the past.  Other than that, I don't know.
24     Q.  Do they pull anything -- and I understand
25  disciplinary.  Do they pull the HR file?



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
77–80

Page 77

1   A. I don't know.
2   Q. Do they pull their evaluations?  In other
3   words, if they've been a stellar officer and this is
4   the first time, do they look at that?
5   A. I don't know.
6   Q. But this information is available to the IAD
7   investigative unit when they're putting together a case
8   and presenting it?
9   A. What information?
10  Q. The information about the officer, their
11  background history as far as their disciplinary
12  history?
13  A. You can look up their previous cases, but we
14  normally don't really look at that.  It doesn't come
15  into play for our -- in our aspect of the
16  investigation.  That's more for the --
17  Q. I understand that, and let me try to re-ask
18  this question.
19       In the IAD there is an ability to pull
20  certain disciplinary history on anybody you're
21  investigating?
22  A. Yes.
23  Q. And is that a difficult process or something
24  that's done every time you're presenting something?
25  A. It's not a difficult process.

Page 78

1   Q. And do you know what database or what form or
2   where that information is being pulled from?
3   A. IAPro.
4   Q. I'm sorry?
5   A. It's IAPro is the program.
6   Q. Is that an IAD specific program?
7   A. Yes.
8   Q. Okay.  And you're not sure what all information
9   they pull from to get a report on that; is that
10  accurate?
11  A. No.  We don't -- we no longer do that, the
12  clerks do, so I don't know what all they pull for that.
13  Q. Do you know the clerk that pulled the
14  information on Officer Lighten and Officer Stewart for
15  this investigation?
16  A. No, I don't.
17  Q. That information is not pulled until you've
18  decided that there's a potential disciplinary issue,
19  correct?
20  A. No, it's pulled prior to the case being
21  presented, or right around that time, to the
22  disciplinary committee.
23  Q. I understand that.  Is every case you
24  investigate presented to the disciplinary --
25  A. No.

Page 79

1   Q. -- committee?
2   A. No.
3   Q. So if it's never presented to the disciplinary
4   committee, there's nothing ever pulled as far as past
5   background of the officer?
6   A. Correct.
7   Q. In reviewing the footage and everything for
8   this evening, is that something you have to pull from
9   another unit, request from some other department, or
10  how do you get that information?  How do you get those
11  videos?
12  A. Now there are detention officers assigned over
13  there that pull a lot of our video for us.
14  Q. Do you know how many detention officers are
15  assigned?
16  A. I believe it's three now.
17  Q. When you make a request for video related to
18  something like this, how long does it take you to get
19  that information?
20  A. Usually by the time the case is assigned to us
21  the video's already been put in there.
22  Q. Other than the videos, is there anything else
23  that you request from the detention officers?  And
24  again what I'm looking for, you stated that they have
25  three detention officers that will pull the videos.

Page 80

1  Are there detention officers assigned to do other
2  things?  Do these three people pull other issues or
3  information, or is it just the video?
4   A. Just the video usually, yeah.
5   Q. Have you ever had a problem obtaining the
6  records that you needed to complete your investigation?
7   A. No, not that I can think of.
8   Q. Have you ever had extensive delays in trying to
9  get the information associated with an investigation?
10  A. No.
11  Q. Do you know if there's ever been any evaluation
12  about claims of failure to supervise or claims of other
13  misconduct as they relate to each other?  In other
14  words, have they ever conducted an analysis that
15  correlates hey, this person's had a bunch of
16  unauthorized use of force and they're also not
17  evaluating?  Have they ever evaluated that at all that
18  you're aware of?
19       MR. NYALLAY:  Objection to form.
20  A. Not that I'm aware of.
21  Q. Do you know what discipline actions were taken
22  against Officer Stewart?
23  A. Yes.  She received days off and a probationary
24  period.
25  Q. Have you ever seen anything that made you



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
81–84

Page 81

1  recommend that, hey, maybe you-all should change your
2  policy because of a reoccurring pattern of behavior?
3      A.  Not that I can think of.
4          MR. NYALLAY:  How much longer do you have
5  to go, Counsel, just for --
6          MR. BOENIG:  Maybe 30 minutes.  Would you
7  like to take a break?
8          MR. NYALLAY:  You know, I wanted to
9  maybe -- maybe whenever you're doing we can take a
10  break and I'll come back and ask some questions.  How
11  much longer you may need?
12         MR. BOENIG:  I need about 30 minutes.
13         MR. NYALLAY:  Oh, 30 more minutes to go?
14         MR. BOENIG:  I'll be done by, you know,
15  12:30, 12:40.
16         MR. NYALLAY:  Okay.
17         THE WITNESS:  Can we just take a quick
18  break?
19         MR. BOENIG:  We can do that.
20         THE REPORTER:  Off record at 12:08.
21         (Recess taken)
22         THE REPORTER:  We are back on the record
23  at 12:23.
24     Q.  I'm going to share one more exhibit for you.
25  This will be Exhibit 21 for the purposes of this

Page 82

1  deposition.
2         (Deposition Exhibit No. 21 introduced)
3      Q.  Do you see that screen there?
4      A.  Yes.
5      Q.  And this first page here, this is Mr. Sanchez,
6  he's sitting upright.  The time is 23:08, correct?
7      A.  Yes.
8      Q.  And that would 11:08 P.M. on February 11th,
9  2022?
10     A.  Yes.
11     Q.  Now, in this next one, which is an hour later,
12  at 12:08 on February 12th, at this point, based on the
13  other videos and everything you've seen, he's already
14  laid across the seat, correct?
15     A.  Yes.
16     Q.  All right.  And then we go to 1:08.  Same
17  position, nothing significantly different from an hour
18  before; is that accurate?
19     A.  Yes.
20     Q.  And then 2:08, same thing.  3:08, same thing.
21  4:08, same thing.  5:08, same position.  6:08, again
22  same position.
23         In this time, three different officers
24  have gone and done their CorreTrak rounds, correct?
25     A.  Yes.

Page 83

1      Q.  7:08, same position.  And at 7:42 something
2  happens here.  Do you know who actually found or
3  determined that Mr. Sanchez was laid over on the
4  toilet?
5      A.  I do not remember.
6      Q.  Do you know if it was a supervisor, a detention
7  officer or what?
8      A.  I believe it was a supervisor.
9      Q.  Would you agree that if anybody was properly
10  monitoring this system, that having over seven hours of
11  somebody in the exact same position that you see here
12  should have keyed somebody in that there was a problem?
13         MR. NYALLAY:  Objection to form.
14     A.  Yes.
15     Q.  Okay.  I'm going to wrap up here.  In your
16  preparation for today's deposition, did you review any
17  documents, Sergeant Love?
18     A.  Yes.  I reviewed my case summary and the
19  reports from the jail.
20     Q.  And was there anything different in your case
21  summary than the documents I've shown you today or
22  presented to you?
23     A.  No.
24     Q.  Is your case summary more extensive than what
25  we've talked about here today?

Page 84

1      A.  No.
2      Q.  Do you believe there's any changes that the
3  sheriff's department should implement to prevent
4  another incident like this one?
5          MR. NYALLAY:  Objection to form.
6      A.  Yes.
7      Q.  What do you believe should be done differently?
8      A.  Inmates should be monitored per policy and
9  potentially the video, having -- or seeing that in the
10  pod control center would definitely help, as well.
11     Q.  Do you believe that there's any way that this
12  could have been missed if the officers were actually
13  doing their job?
14     A.  No.
15         MR. NYALLAY:  Objection to form.
16     Q.  Any other recommendations for improving officer
17  compliance with observation?
18     A.  No.
19         MR. NYALLAY:  Objection to form.
20     Q.  Is there anything else that you believe would
21  be important for the jury to know in evaluating this at
22  the time it goes to trial?
23     A.  No.
24     Q.  Have you understood all my questions?
25     A.  Yes.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
85–88

Page 85

1    Q. Have you answered them all truthfully?
2    A. Yes.
3    Q. Have I been polite to you?
4    A. Yes.
5    Q. Thank you, and thank you for appearing for
6  today's deposition.
7         MR. BOENIG: I will pass the witness.
8         EXAMINATION
9  BY MR. NYALLAY:
10    Q. I will be asking a couple of questions.
11        MR. NYALLAY: But as an aside, Counsel,
12  are you going to be the one taking the next deposition
13  at 1:00?
14        MR. BOENIG: I believe the next one will
15  go a little quicker. It's more question-based than it
16  is exhibit-based, but if you want to start it a little
17  bit later, after you wrap up, that's fine.
18        MR. NYALLAY: Yeah. Again, I'm just
19  making sure that we don't go too far over. But, yes,
20  let me get into it.
21    Q. Sergeant Love, how are you doing today?
22    A. I'm good. How are you?
23    Q. I'm doing very well. I'm going to be asking
24  you a couple of followup questions about some of the
25  things that has been discussed today.

Page 86

1    A. Okay.
2    Q. Let me ask all this stuff from the bottom, you
3  know, last-in, first-out sort of method.
4         You indicated just now that you would
5  recommend some changes to the Harris County Sheriff's
6  inmate observation. So what particular changes would
7  you recommend?
8    A. That the detention officers are actually, you
9  know, observing these inmates per the policy, and to
10  make sure that that's being enforced, and that could
11  mean supervisors showing up to the pods more, checking
12  in on things more, something along that nature.
13    Q. Okay. When you said the policy change, does
14  the Harris County Sheriff's have a policy of observing
15  inmates, the rounds requirement that you went through
16  earlier, the inmates -- that officers are required to
17  perform rounds at least once every hour?
18    A. Yes.
19    Q. Would you say that is enough as far as to
20  encourage officers to be able to observe the inmates?
21  Would that be enough if officers were actually doing
22  rounds once every hour?
23    A. I believe so, if they're doing them properly.
24    Q. Right. And when you say properly, I mean,
25  these are usually officers, and you're not suggesting

Page 87

1  that the Harris County Sheriff, Ed Gonzalez, should be
2  inside those pods himself and making sure that these
3  officers are actually doing -- looking through those
4  windows to see these inmates? That's not what you're
5  suggesting, are you?
6    A. No.
7    Q. Okay. And you mentioned earlier in your
8  investigation that you found out that there were some
9  policy violations, correct?
10    A. Yes.
11    Q. What are those policies that you found that
12  were violated?
13    A. It was performance of duties and the CJC policy
14  for inmate observation.
15    Q. Okay. And that violation was based on the fact
16  that those two officers failed to look through the
17  windows to make sure that -- to see the inmates,
18  correct?
19    A. Correct.
20    Q. Okay. So would that be enough mechanism put in
21  place by Harris County to make sure that officers are
22  actually doing their job if -- if this is possible that
23  they could be investigated?
24    A. Okay, I'm not understanding your question, I'm
25  sorry.

Page 88

1    Q. Let me rephrase it. I know that's a bad
2  question.
3         My question is, the fact that the Harris
4  County Sheriffs has someone like you in internal
5  division that actually can go back and review these
6  statements and recommend disciplinary actions, would
7  you say that is sufficient for -- to encourage officers
8  to actually do their jobs?
9    A. No. Even a type of situation that, when I was
10  on patrol, we had to view ten videos from our squad per
11  month. It was just a spot check type of a thing to
12  make sure everybody was doing what they were supposed
13  to be doing. So something like that could be put into
14  play, you know, by the supervisors on the floor.
15    Q. And when you say something like that, are you
16  taking into account the complexity of the jail setting?
17    A. No, because it's been so long since I've been
18  in the jail environment that a lot has changed.
19    Q. Okay. So you say that a lot has changed since
20  the last time you were -- because I know you mentioned
21  earlier that the last time you were a deputy officer
22  was over 20 years ago, correct?
23    A. The last time I worked in a jail, yes, was over
24  20 years ago. Yeah.
25    Q. So from that time to now, you would say a lot



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
89–92

Page 89

1  has changed?
2     A. Yes.
3     Q. Would you say it has changed for the better or
4  the worse?
5     A. For the -- for the better.
6     Q. Okay. And is the round requirements every hour
7  one of those changes that you would say?
8     A. It would honestly probably depend on the cell,
9  who's housed in there. Is it general population? You
10  know, a lot of factors come into play for that.
11    Q. Exactly. Because I remember you mentioned
12  earlier that when -- if an inmate is on suicide watch
13  so he may get more rounds than the general population?
14    A. Correct.
15    Q. Would that be one of the changes that you have
16  seen over the last 20 years?
17    A. Yes.
18    Q. You mentioned a lot of opinions earlier of
19  these officers. Clearly they were doing their rounds
20  and they prioritized the timeliness of their round
21  versus the accuracy. Would you say that?
22    A. Yes.
23    Q. Would you say that the timeliness of their
24  rounds are probably quite important also?
25    A. Yes.

Page 90

1     Q. Okay. And why so?
2     A. They just need that documented every hour. As
3  far as what happens after it's not or the severity of
4  that, I don't know.
5     Q. And we saw earlier on the cell itself, so you
6  have a thing that you called the CorreTrak that they
7  scan the little barcode up there?
8     A. Yes.
9     Q. Are those barcodes assigned to every inmate or
10  is it like for just the floor? What is it like?
11    A. I don't know for sure. I don't believe it's
12  for every individual. I believe it's for just the pod.
13    Q. Okay. And you were asked earlier about the
14  timeliness or how long it should be taking an officer
15  to conduct a round.
16    A. Uh-huh.
17    Q. Is that dependant on anything, any other
18  factors, like the number of inmates on that floor
19  actually?
20    A. It could be. It could be the -- is there an
21  inmate fight, are they serving food. I mean, there's a
22  lot -- are they deploying for visitation or medical or
23  court. I mean, there's a lot of things that come into
24  play with that.
25    Q. In this particular case where it was night, so

Page 91

1  at night around 11:00 P.M., what is usually expected?
2     A. Not a whole lot at that time. I mean, usually
3  it's lights out and time to sleep.
4     Q. Okay. You said lights out, okay. So --
5     A. Or they typically turn the cell lights out or
6  the pod, so, you know, it's a little darker.
7     Q. Okay. So would you say that a normal person
8  conducting rounds at 11:00 P.M. would probably have an
9  expectation that the inmate, someone in that particular
10  housing area, may be asleep?
11    A. Yes.
12    Q. Okay. And in this case we saw that a lot of
13  these officers -- I mean, you were asked earlier -- let
14  me go back a little bit.
15        You were asked earlier how long do you
16  expect that an officer will take to conduct a round.
17  You have estimated between five to ten minutes?
18    A. Uh-huh.
19    Q. Have you ever actually ever conducted a round
20  by yourself?
21    A. Yes.
22    Q. And that was 20 years ago or after that?
23    A. No, 20 years ago. Yeah.
24    Q. Okay. And of course you would know that a lot
25  has changed since that time? You actually acknowledged

Page 92

1  that?
2     A. Yes.
3     Q. So on the floor you said one of the things that
4  would -- factors that would be considered in
5  determining how long someone takes in conducting their
6  round would be how many inmates are actually housed on
7  that particular floor?
8     A. Yes.
9     Q. So on that floor, do you know how many inmates
10  were housed on this particular floor at the time of
11  this incident?
12    A. I do not.
13    Q. So does that mean that your estimate of about
14  five to ten minutes may not be quite accurate?
15    A. It could be not accurate, yes.
16    Q. Okay. And we saw those officers, and yes, they
17  seem to have done the rounds quite quickly?
18    A. Yes.
19    Q. And is it possible that it may be because there
20  were fewer inmates on that floor at that time?
21    A. It could be, yes.
22    Q. Okay. Do you know how long those officers had
23  actually been working on that floor before this inmate
24  passed, passed out around 11:00 P.M.?
25    A. No.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
93–96

Page 93

1    Q.  What time does the shift usually start?  I'm
2  assuming they were on the night shift.
3    A.  Now it is -- day shift is 6:00 A.M. to 6:00
4  P.M. and night shift is 6:00 P.M. to 6:00 A.M.  There's
5  only two shifts now.  There's not a third.
6    Q.  So that means that these two officers that were
7  assigned to that building would have been there roughly
8  since 6:00 P.M. of that evening?
9    A.  Correct.
10    Q.  Okay.  So you would say that if they had been
11  there since 6:00 P.M. and this guy, the first time he
12  was seen on the cell -- on the -- on the toilet, we saw
13  that it was around 10-something or 11:00?
14    A.  Yes.
15    Q.  So that means they had actually seen this guy
16  for at least four hours before he's passing out?
17    A.  Yes.
18    Q.  During your investigation, did you come across
19  anything that would raise any suspicion that this guy
20  would have required more watch than regular?
21    A.  No.
22    Q.  Okay.  We saw some videos earlier and during
23  the investigation did you come across any videos or any
24  documentation that this inmate actually obtained
25  contraband that night?

Page 94

1    A.  Yes.
2    Q.  Is contraband a controlled substance in the
3  jail setting?
4    A.  Contraband could be a controlled substance, it
5  could be an item that they're not allowed to have.  It
6  could be several things.
7    Q.  Okay.  And are you aware that this particular
8  inmate was actually overdosed by some drug that he
9  obtained?
10    A.  That was alleged --
11    MR. BOENIG:  Form.
12    A.  -- at that time, yes.
13    Q.  Okay.  Did you have any reason to believe that
14  this inmate did not consume any controlled substance
15  while in jail?
16    A.  No.
17    MR. BOENIG:  Form.
18    Q.  Those controlled substances, did you have --
19  during your investigation, did you find out that they
20  were given to him by any officers?
21    A.  No.
22    Q.  Okay.  And I don't want us to waste too much
23  time, because a lot of these documents you've already
24  seen earlier, so I'll just reference to them.
25    MR. NYALLAY:  And Counsel, if my reference

Page 95

1  to them is not clear, please let me know.
2    Q.  So you saw some documents, a lot of documents
3  today, and you know that part of those documents you
4  saw was the statement from Officer Lighten, correct?
5    A.  Yes.
6    Q.  And you also saw the statement from Officer
7  Stewart?
8    A.  Yes.
9    Q.  Okay.  So part of the investigation, part of
10  your investigation, part of your statement, let's say,
11  of that building was a 23-hour lockdown, correct?
12    A.  Yes.
13    Q.  Was it 23?
14    A.  Yes.
15    Q.  So does that mean that -- what happens to the
16  one hour difference?
17    A.  They would get out of their cell one hour
18  within that 23-hour period.
19    Q.  Okay.  So during your investigation, do you
20  remember seeing any videos of this particular inmate
21  obtaining something while in the dayroom on that day?
22    A.  I don't recall that video particularly.
23    Q.  Okay.
24    MR. NYALLAY:  Counsel, if we can stipulate
25  that that video does exist, or I will have to take some

Page 96

1  minutes to dig it up.
2    MR. BOENIG:  I'm sorry, I didn't
3  understand you.
4    MR. NYALLAY:  There's some videos that you
5  can see this particular inmate obtaining something
6  while he was in the dayroom and he took that thing to
7  his cell block, cell room.  I don't know if it's pod or
8  how they call it, a cell room that he was in.  I mean,
9  if we can stipulate that that video exists.  If not, I
10  will have to dig it up and that may take a little time.
11    MR. BOENIG:  I'm still not sure what
12  you're asking me about right now.  Please forgive me,
13  sir, I'm hard of hearing and your accent is such that
14  it's making it very hard for me to determine what
15  you're saying.  No disrespect there, I'm just not sure
16  I understand.
17    MR. NYALLAY:  No, 100 percent.  I'm sorry
18  about that.  I remember you mentioning that during the
19  hearing at the courthouse last time.
20    No, my question was we can stipulate that
21  that video exists that the image was obtaining some
22  substance, and we can also stipulate that the video
23  exists of him consuming that substance while he was in
24  his cell.
25    MR. BOENIG:  I'm not going to stipulate to



SERGEANT CHRISTINA LOVE                              August 14, 2025
WAGNER vs HARRIS COUNTY, TEXAS                        97–100

Page 97

1  anything, no, sir.
2        MR. NYALLAY:  Okay.  You'll have to pardon
3  me for a few minutes, sir.  I'll look it up.
4        MR. BOENIG:  I will stipulate that the
5  autopsy found that he did have an overdose of fentanyl
6  and I believe heroin or something to that effect in his
7  system.  I can stipulate to that.
8        MR. NYALLAY:  Okay.
9     Q.  Are you aware of that, Sergeant Love?
10    A.  Yes.
11    Q.  Did you come across that information during
12  your investigations?
13    A.  No.
14    Q.  If he did overdose on fentanyl that led to his
15  demise, would that have influenced your investigation
16  in any way?
17    A.  No.
18    Q.  And that was because your investigation was
19  focused on the officers, to see whether or not they did
20  anything wrong during that night?
21    A.  Correct.
22    Q.  I have a couple of videos here that I may have
23  to show you.  These videos are quite large so it will
24  take a little bit of time to download.
25        MR. BOENIG:  Sorry, was there a question

Page 98

1  there?
2        MR. NYALLAY:  No, no, it wasn't a
3  question.  It was just a statement.
4        MR. BOENIG:  Are you passing the witness?
5        MR. NYALLAY:  No, no, I'm not.  I'm not
6  passing the witness yet.  I'm looking for the video
7  to --
8        MR. BOENIG:  Okay.
9        MR. NYALLAY:  I think we can -- while the
10  video is downloading, let me continue with my
11  questioning.
12    Q.  Sergeant Love, while the video is downloading
13  let me ask you this question.  You had stated that the
14  officers improperly conducted their rounds.  I don't
15  know if I understood it earlier.  Did you say it was a
16  systemic problem or an individual problem?
17    A.  No, it's an individual problem.
18    Q.  So that means that other officers do in fact
19  conduct their rounds properly?
20    A.  Yes.
21    Q.  Okay.  And during your investigations you were
22  asked whether you were required or whether at any
23  time looked at any other prior incidents or prior
24  practice.  Is that something that you generally look
25  into while you're conducting your investigations of

Page 99

1  this sort?
2        MR. BOENIG:  Objection, form; asked and
3  answered.
4     A.  No, because it's not really relevant to our
5  investigation.
6     Q.  Okay.  So prior incidents, for example, if
7  these officers may have failed to do their rounds in
8  the past or if these officers' general practice is to
9  rush through their rounds, that would not be something
10  that is important in investigating this specific
11  incident?
12    A.  Right.
13    Q.  Is that what you're saying?
14    A.  Correct.
15    Q.  And you had stated earlier that that would be
16  something that would be considered at a later stage, at
17  the disciplinary stage, if you so recommended?
18    A.  Yes.
19    Q.  In this case, were these officers recommended
20  for disciplinary action?
21    A.  Yes.
22    Q.  Referring you to the statement from Officer
23  Stewart earlier, in her statement she had stated that
24  she sort of saw the inmate's, you know, what is it,
25  like an image or silhouette of an image in the cell,

Page 100

1  and you had stated that based on the video that that
2  was not true.  Do you recall that?
3     A.  Yes.
4     Q.  Do you have any personal knowledge to say that?
5  Were you on the floor?
6     A.  No.
7     Q.  Okay.  So would you say you -- is it fair to
8  say you don't really have any direct personal knowledge
9  as to whether she may have seen the silhouette of this
10  inmate like peripherally or --
11        MR. BOENIG:  Objection, form.
12    A.  Correct.
13    Q.  So that means you probably do not have personal
14  knowledge to say that, to say whether or not the
15  officer's statement in this report about her seeing the
16  silhouette was wrong?
17    A.  Yeah, I have no knowledge of that.
18    Q.  Okay.  You were asked some other questions
19  about the videos, I think the videos in the control
20  room --
21    A.  Yes.
22    Q.  -- that were used to monitor the inmates.  Are
23  those videos in every cell?
24    A.  I do not know.
25    Q.  Okay.  So if you went in the control room and



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
101–104

Page 101

1  you had -- because I have had a chance to actually
2  visit the cell and had a chance to look at some of
3  these things. So when you're in there, when you're in
4  the control pod, do you have access to see -- are there
5  any dark areas in the room other than the toilet that
6  you would not be able to see from the control pod
7  videos?
8      A.  The shower facility, like how are the showers.
9  Those are the only two things that I can recall.
10     Q.  And those are for privacy reasons, correct?
11     A.  Yes.
12     Q.  And so in this case that this inmate was
13  sitting on the toilet -- and you saw the videos
14  earlier, right?
15     A.  Yes.
16     Q.  While he was sitting on the toilet, if you were
17  in the control room looking at those videos, you would
18  probably not be able to make out exactly what he's
19  doing on the toilet?
20         MR. BOENIG:  Objection, form.
21     A.  Correct.
22     Q.  That is because there's a black box there that
23  it's actually meant for you to not see them while
24  they're sitting on the toilet?
25         MR. BOENIG:  Objection, form.

Page 102

1      A.  Correct.
2      Q.  Is the black box on the camera, on the video,
3  is it meant to prevent officers in the control room or
4  anyone viewing the video like on a cell from seeing
5  someone who is using the toilet?
6      A.  It's made to protect the privacy of them
7  sitting on the toilet.
8      Q.  That's correct.
9      A.  So, yes.
10     Q.  So that means if someone were in the control
11  room and looking at the camera and saw somebody sitting
12  on the toilet, they may not be able to actually see
13  them sitting on the toilet?
14     A.  No, you can see them sitting on the toilet.
15     Q.  You can't see what they are doing on the
16  toilet?
17     A.  Correct.
18     Q.  All right.  Because I saw the video and you can
19  see the black box, you can see -- and there's the time
20  when it seemed like when he sort of leaned back, now
21  you can see his feet?
22     A.  Correct.
23     Q.  Okay.  And then you had testified earlier that
24  those videos or the cameras do not have like a still
25  camera that is watching this particular individual

Page 103

1  24/7?
2      A.  Are you meaning in the pod control center?
3      Q.  Yes.
4      A.  Okay.  From my understanding, no, that's not --
5  they rotate.
6      Q.  Okay, they rotate.  So every ten minutes this
7  camera shows up, this camera shows up, captures what is
8  happening, then it moves onto the next?
9      A.  Correct.  I don't know the timeframe of that,
10  but yes.
11     Q.  Okay.  So except if you noticed something
12  particularly or something was to be brought to your
13  attention, then you would have to go on and check on
14  the camera itself so that you can observe what is
15  really happening?
16         MR. BOENIG:  Objection, form.
17     A.  Yes.
18     Q.  Is it -- let me rephrase my question.  So if
19  those ten seconds rotating cameras show up and you have
20  a reason to believe something is going on, what would
21  you do about that?
22     A.  I would go check on the inmate.
23     Q.  Okay.  With the camera, if you were in the
24  control room?  So you --
25     A.  Try to look at it on camera first and then go

Page 104

1  down there.
2      Q.  Okay.  So when you testified earlier that
3  because of the black box that may inhibit an officer
4  that is watching these rotating cameras -- and it's not
5  really watching.  Is the officer in the control
6  room only watching --
7         MR. BOENIG:  Objection, form.
8      A.  No.
9      Q.  What is the officer in the control room doing?
10     A.  Sometimes they're answering the phone,
11  sometimes they're looking things up on the computer,
12  sometimes they're getting phone calls from the main
13  floor, the floor control center, so it depends on the
14  time of day what's going on in those pods.
15     Q.  Okay.
16     A.  So they could have been getting phone calls,
17  another D.O. could have been calling them.  It's hard
18  to say.
19     Q.  All right.  So if an inmate were to overdose on
20  some illegal drug in jail, would that be the
21  responsibility of the watching officers?
22     A.  Yes.
23     Q.  If an inmate that is in an individual cell was
24  to get themselves overdosed from a drug that they
25  illegally obtained without the knowledge of the



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
105–108

Page 105

1  officers, would that be the responsibility of those
2  officers?
3      A. No.
4      Q. Okay. So during the investigation, did you
5  come up with anything that would give those officers a
6  reason that this inmate obtained some sort of illegal
7  drug?
8      A. No.
9      Q. Is fentanyl a controlled substance in Harris
10  County Jail?
11      A. Yes.
12      Q. Now, you were shown some documentation on the
13  Pew document where there was a history of Officer
14  Stewart involved in quite a few uses of force.
15      A. Uh-huh.
16      Q. Do you recall that?
17      A. Yes.
18      Q. Okay. Is the use of force a strange occurrence
19  in jail?
20      A. No.
21      Q. In this particular case that you were
22  investigating, did it involve any use of force?
23      A. No.
24      Q. So since it did not involve a use of force,
25  does reviewing any use of force documents or prior

Page 106

1  history of use of force help in your investigation of
2  whether or not a policy was violated in this particular
3  case?
4      A. No.
5      Q. Okay. So is it fair to say that the prior
6  history of this particular individual has no bearing on
7  your investigation of this policy violation matter?
8      A. Correct.
9      Q. Okay. The fact that Officer Stewart had been
10  involved in about six use of force -- in about six or
11  more uses of force within the first year of her
12  employment with Harris County Jail, was that a strange
13  occurrence based on your experience in the jail?
14      A. No.
15      Q. Okay. And we saw a statement from you earlier
16  where you advised the officers that were being
17  investigated to refrain from discussing the topic of
18  the investigation with anyone. Do you recall that?
19      A. Yes.
20      Q. Okay. Is that a regular occurrence when
21  somebody is under investigation, to ask them to refrain
22  from discussing the matters involved in the
23  investigation?
24      A. Yes.
25      Q. And is that because you want to maintain the

Page 107

1  integrity of the investigation?
2      A. Correct.
3      Q. Like you said earlier, even though you advised
4  them to refrain from communicating to others about the
5  ongoing investigations, they are still allowed to speak
6  with other law enforcement agencies, correct?
7      A. Yes.
8      Q. And did that actually happen in this case? Did
9  they talk to the HPD or other investigating --
10      A. I don't know.
11          (Technical difficulties)
12      Q. I will ask you for a second time.
13      A. Okay.
14      Q. Yeah. My question was, if in fact there were
15  being approached by other law enforcement agencies or
16  investigators who were investigating this particular
17  case, they would have had the go-ahead to actually
18  speak with those officers, right?
19      A. Yes.
20      Q. Correct?
21      A. Yes.
22      Q. Okay. We saw a statement earlier from someone
23  named Isaias Saenz. Do you recall that statement that
24  was presented to you earlier from the other attorney?
25      A. Yes.

Page 108

1      Q. And in that statement it appears that that
2  officer was stating that some inmate had told them
3  that, you know, the inmate in question here,
4  Mr. Sanchez, had tried to complain about something to
5  the officers. Do you recall that?
6      A. Yes.
7      Q. Is it unusual for inmates to lie to officers in
8  jail?
9      A. No.
10      Q. What was your conclusion from the investigation
11  again?
12      A. What was my what?
13      Q. Your conclusion from the investigation.
14      A. Oh, that all three detention officers violated
15  policy.
16      Q. By?
17      A. By not conducting their rounds properly.
18      Q. Okay. How often do you find a policy violation
19  of that nature in other cases that you have
20  investigated?
21      A. Not -- at least from what I've investigated, it
22  happened, but it wasn't a common occurrence.
23      Q. Okay. I want to show you some video here.
24          (Video playing)
25      Q. Can you see my screen?



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
109–112

Page 109

1    A.  Yes.
2    Q.  This appears to be a video of the now deceased
3  Mr. Sanchez.  This video is from February 11th.  This
4  was around 23:02, so around 11:00 P.M.  What does he
5  appear to be doing in this video?
6    A.  Dancing.
7    Q.  Yeah.  Did you ever review this particular
8  video during your investigation?
9    A.  Yes.
10    Q.  Does it appear that he has any medical issue
11  that he may have complained of earlier?
12        MR. BOENIG:  Objection, form.
13    A.  No.
14    Q.  This is a fairly long video, so I'm going to
15  try to skip through it.
16        Does anything look out of the ordinary in
17  this video?
18    A.  No.
19        MR. NYALLAY:  Court reporter, please mark
20  this as Defense Exhibit 1.
21        (Defense Exhibit No. 1 introduced)
22    Q.  Let me try to skip through it to see anything
23  different.
24        So here you see him sit on the toilet?
25    A.  Yes.

Page 110

1    Q.  Seems like he sat on the toilet around 23:08.
2        And from this video would this say, if
3  someone was in the control panel, this is what they
4  would be looking at?
5    A.  Correct.
6    Q.  So even now that we -- we can see that he's
7  sitting on the toilet, but we can't really see his
8  whole body.  Is that correct?
9    A.  Correct.
10    Q.  So if somebody were in the control panel, this
11  is what exactly they would be looking at?  They
12  wouldn't be able to see his full body sitting on the
13  toilet?
14    A.  Right.
15    Q.  So the fact that someone is sitting on the
16  toilet make someone to not take a closer look?
17    A.  What is the question, sorry?
18    Q.  My question is, if you were in the control
19  panel where you are seeing these ten-second rotating
20  screenshots --
21    A.  Okay.
22    Q.  -- and you see someone sitting on the toilet,
23  would you want to stop by and actually look further why
24  they're sitting on the toilet?
25    A.  No.

Page 111

1    Q.  Was using the toilet an abnormal thing that
2  would raise an alarm for someone to actually stop and
3  lock?
4    A.  No.
5    Q.  It appears that this video is about over --
6  this is actually the video of the entire night, so it's
7  a seven-hour video, so obviously we're not going to sit
8  here and watch all of it, so I'm going to try to close
9  it out now and see if I can find something else that
10  might -- because I believe we have some other videos
11  where we can see him ingesting the substance.  That's
12  what I was trying to get us to see.
13        This started after the whole ingestion
14  process.  Yeah, okay.  I'll close this out and see if I
15  can get another one.  Let's see.
16        A lot of these videos are too long, so I
17  think I'll try to wrap up.  The reason I was showing
18  you these videos is to see that, you know, if an
19  individual is sitting on the toilet and you are the
20  officers in the control room, you know, using the
21  toilet would not really be an activity that would raise
22  an alarm; is that correct?
23    A.  Correct.
24    Q.  Okay.  And would you say the same thing about
25  an officer who is making rounds once every hour?

Page 112

1    A.  What's the question?
2    Q.  The question is, if an officer were making
3  rounds once every hour and somehow in their peripheral
4  they see someone sitting on the toilet, would that make
5  them to go in and look, or would that make them to move
6  forward, to keep going?
7        MR. BOENIG:  Objection, form.
8    A.  I would assume to keep going.
9    Q.  Okay.  So in this case we saw the image where
10  he was sitting, on the video, and like you were shown
11  earlier by the good attorney here, we saw that he was
12  on the toilet several hours long, and then --
13    A.  (Moving head up and down).
14    Q.  Say yes so the court reporter can take note of
15  it.  She has to --
16    A.  Yes.
17    Q.  Okay.  So you can see him sitting on the
18  toilet.  And how often were these officers actually
19  making their rounds?
20    A.  Once within every hour.
21    Q.  Okay.  So if you are coming once every hour and
22  you sort of briefly see someone in your peripheral
23  sitting on the toilet, would that raise any alarm to
24  you?
25    A.  Yes, if it was every hour it would.



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
113–116

Page 113

1    Q. But we also saw that there were two different
2  officers, mainly, that worked that night?
3    A. Right.
4    Q. We saw the first round was taken by Officer
5  Stewart. Do you recall that?
6    A. Yes.
7    Q. Okay. So she came the first hour. She saw him
8  sitting on the toilet?
9    A. Yes.
10       MR. BOENIG: Objection, form.
11    Q. Or she would be able to see him on the toilet
12  at the time, correct?
13    A. Yes.
14    Q. Was he sitting on the toilet during the first
15  round that that officer made?
16    A. I don't remember the exact time her round was
17  made.
18    Q. But the first time the officer came to do the
19  round, was the inmate on the toilet? Do you recall
20  seeing that?
21    A. Yes.
22    Q. Okay. So she came the first time and did a
23  round?
24    A. Yes.
25    Q. And she went back?

Page 114

1    A. Right.
2    Q. The second round was done by another officer
3  who did not do the first round?
4       MR. BOENIG: Objection, form; stating
5  evidence that's incorrect with the record. It wasn't
6  until the fourth round that Officer Lighten did it.
7  She did the first three rounds.
8       MR. NYALLAY: Okay.
9    Q. So if that is the case, okay, sorry about that.
10  So if she did the rounds multiple times, she comes the
11  first time and this inmate appeared to have been
12  sitting on the toilet, correct?
13    A. Correct.
14    Q. Okay. Then an hour later she comes back. We
15  don't know whether or not she saw it. In her statement
16  she says she saw his silhouette, correct?
17       MR. BOENIG: Objection, form.
18    A. Correct.
19    Q. And then she proceeded?
20    A. Correct.
21    Q. Okay. Then she came back the third time,
22  correct?
23    A. Correct.
24    Q. And she proceeded after that?
25    A. Correct.

Page 115

1    Q. And then Officer Lighten came the fourth round?
2    A. Correct.
3    Q. Correct?
4    A. Yes.
5    Q. And he had not been on this floor all night
6  long?
7    A. Right.
8    Q. So would you say if -- that nothing would have
9  seemed out of the ordinary to see this inmate sitting
10  on the toilet?
11    A. It may not have, yeah.
12    Q. And that is because he had not seen the last
13  two, three hours?
14    A. Right.
15    Q. Okay. And then Officer Stewart came again a
16  fifth round, I believe.
17    A. Correct.
18    Q. And she proceeded also after that?
19    A. Yes.
20    Q. And then after that Officer Lighten came again?
21    A. Yes.
22       MR. BOENIG: Incorrect statement of the
23  evidence. Officer Stewart did rounds five and six.
24  Officer Lighten did round seven.
25       MR. NYALLAY: Okay.

Page 116

1    Q. So then after that five and six rounds that was
2  done by Officer Stewart, so we saw Officer Lighten came
3  at round seven?
4    A. Yes.
5    Q. So you would say that he did two rounds?
6    A. Yes.
7    Q. That were separated by two hours?
8    A. Yes.
9    Q. So if an individual was sitting on the toilet
10  two hours ago, would that be something that's out of
11  the ordinary?
12    A. No.
13       MR. NYALLAY: No further questions. I
14  pass the witness.
15       MR. BOENIG: Are you passing the witness?
16       MR. NYALLAY: Yes, yes.
17       MR. BOENIG: Okay.
18       EXAMINATION
19  BY MR. BOENIG:
20    Q. A couple of followups here. There was much
21  made about looking at this person on the toilet and
22  things of that nature. Your evaluation wasn't just
23  based on the speed of the video, correct?
24    A. Correct.
25    Q. Was it also based on the fact that not a single



SERGEANT CHRISTINA LOVE                                    August 14, 2025
WAGNER vs HARRIS COUNTY, TEXAS                                    117–120

Page 117

1    officer looked at any of the cell in any of those
2    videos?
3        A. Correct.
4        Q. So even if they're scanning, that doesn't mean
5    they looked at the individual in each cell, correct?
6        A. Correct.
7        Q. And you saw no indication that anybody ever
8    looked into the cell that Mr. Sanchez was in, correct?
9        A. Correct.
10       Q. There was also a statement that Officer Stewart
11   had indicated that she saw him on the toilet and did
12   not see him slumped over. That was in her initial
13   statement, correct?
14       A. Yes.
15       Q. She recanted that in her second sworn
16   statement, didn't she, and acknowledged that she did
17   not observe him at all?
18       A. Yes.
19           MR. NYALLAY: Objection; asked and
20   answered.
21           MR. BOENIG: You brought up the question
22   again, sir.
23       Q. How often is it when you're doing an
24   investigation, Sergeant Love, that an officer or a
25   group of officers will be less than truthful until

Page 118

1    presented with actual evidence of what occurred?
2            MR. NYALLAY: Objection to form.
3        A. How often? That's hard to say. Does it
4    happen, yes.
5        Q. Did it happen in this instance?
6        A. Yes.
7        Q. There was also much said about the fact that he
8    was sitting on the toilet. Do you recall approximately
9    the time he falls over in our previous videos?
10       A. Approximately, yes.
11       Q. Okay. And was that time around 11:15, 11:16?
12       A. Yes.
13       Q. Okay. So there is a block on the video that
14   does obscure your view some, but it's still clear that
15   his feet are out one way and his arm's up in the other
16   direction and there's actually video of him falling
17   over, correct?
18       A. Correct.
19       Q. And when you showed those videos to Officer
20   Stewart, she then acknowledged that she had not seen or
21   observed him at all, correct?
22           MR. NYALLAY: Objection, form.
23       A. Correct.
24       Q. And if anybody had looked into the cell rather
25   than just the video, would they have seen him fallen

Page 119

1    over?
2        A. Yes.
3            MR. NYALLAY: Objection to form.
4        Q. I'm going to go back to Exhibit 22 because
5    there was also talk about rotating cameras, and I will
6    share with you that this is Officer Lighten's
7    statement. The cell in question where Mr. Sanchez is
8    is on the bottom floor, correct?
9        A. Yes.
10       Q. The other monitor shows different views of the
11   dayroom and inside each cell located on the bottom
12   floor. The top floor did not have individual cameras
13   and that one would rotate.
14           So isn't it accurate that the actual cell
15   that Mr. Sanchez was in had a constant monitoring of
16   the cell rather than a rotation like they did on the
17   top floor?
18       A. Yes.
19           MR. NYALLAY: Objection, form.
20           MR. BOENIG: What's your objection, the
21   basis of your objection, sir?
22           MR. NYALLAY: I'll ask a followup
23   question. Just go ahead. Fine.
24       Q. In observing the behavior of Mr. Sanchez before
25   he slumps over, gets on the toilet and slumps over, is

Page 120

1    that a consistent behavior for inmates or is that
2    something unusual, the way he was rubbing his head,
3    dancing around, things of that nature?
4            MR. NYALLAY: Objection to form.
5        A. That's not unusual.
6        Q. That's what?
7        A. That's not unusual.
8        Q. Okay. If -- I'll take that down, sorry.
9            On the CorreTrak system, it was pretty
10   clear there were only a couple of scans that were done
11   on the floor that we observed, correct?
12       A. Correct.
13       Q. And those scans were not done over each cell,
14   correct?
15       A. Correct.
16       Q. If it had been required that they scan either a
17   code on each cell window, would that have been more
18   likely to make sure they observed what was inside the
19   cell?
20           MR. NYALLAY: Objection, calling for
21   speculation.
22       A. Yeah, I mean, I don't know. Should it, yes,
23   but would it, I don't know.
24       Q. But what you did observe, what your
25   investigation found was that you had three different



Page 121

1  individuals on two different shifts and none of them
2  looked in the cell, correct?
3      A.  Correct.
4          MR. BOENIG:  I'll pass the witness.
5          EXAMINATION
6  BY MR. BOENIG:
7      Q.  Just a couple more questions, Sergeant Love.
8  About the statement from Officer Stewart, I believe I
9  noticed that Officer Stewart had written a statement
10  immediately following the incident, correct?
11      A.  Yes.
12      Q.  And there was one after you started your
13  investigation that she went back and wrote, correct?
14      A.  Yes.
15      Q.  And did she write that second statement after
16  she had watched those videos that we just went over?
17      A.  Yes.
18      Q.  So to say whether her statement in the first
19  report that she prepared versus after going and
20  watching videos of the incident that she did not
21  observe at the time of writing the first statement,
22  would you say that is untruthful?
23      A.  No.
24      Q.  And why is that?
25      A.  Because she didn't see the videos of the actual

Page 122

1  incident until she was shown them, so --
2      Q.  Okay.  So that means there's not enough basis
3  for you to agree that her statement -- that
4  inconsistency in her statement was --
5          MR. BOENIG:  Objection, form.  Also a
6  misstatement of the evidence.
7      Q.  Correct?
8      A.  Okay, I'm sorry, can you repeat the question?
9          MR. BOENIG:  Objection, form and a
10  misstatement of the evidence.
11      Q.  My question is, she prepared the first
12  statement of the incident that she reported in her
13  report?
14      A.  Correct.
15      Q.  Then after your investigation, she had the
16  chance to review videos that showed her things that she
17  had not seen before?
18      A.  Correct.
19      Q.  Would you expect that there would be changes in
20  those two separate statements?
21      A.  There could be, yes.
22      Q.  Okay.  And would that be something that's
23  untruthful or is this something that's based on new
24  information?
25      A.  Based on new information.

Page 123

1      Q.  And also there's a question that you just were
2  asked about, about the camera that is that was in
3  Mr. Sanchez's cell, that according to the attorney here
4  he said the camera was still; that means they were on
5  at all times, it was not rotating?
6      A.  Correct.
7      Q.  Okay.  But are there in fact so many other
8  cameras in the control panel?
9      A.  Yes.
10      Q.  Okay.  So does that mean that the officer in
11  the control panel is not only assigned to watching --
12  was not only assigned to watching Mr. Sanchez's cell?
13      A.  Correct.
14      Q.  You were asked about -- and we saw those videos
15  earlier that I showed you where Mr. Sanchez, you know,
16  was dancing and shaking -- you know, walking, and I
17  asked you about it didn't look out of the ordinary,
18  correct?
19      A.  Correct.
20      Q.  And then later on we saw him scratching his
21  head and it seemed like he was scratching his body?
22      A.  Yes.
23      Q.  And you were just asked about it and you said
24  that looks out of the ordinary, correct?
25      A.  That that looked out of the ordinary?

Page 124

1      Q.  No, him scratching his head, did that seem
2  abnormal?
3      A.  No.
4      Q.  Okay.  So does him scratching his head or
5  scratching his body, would that be due to -- I mean, I
6  know you're not a medical doctor, but now that you
7  found out that he was actually overdosed on some drug,
8  would that be some of the reaction to that kind of
9  drug?
10      A.  I honestly -- I don't know.  I don't know what
11  drug reactions are to those particular narcotics.
12      Q.  Okay.  But in a normal jail routine you
13  wouldn't expect an inmate, except an inmate that
14  something is wrong with, to be just scratching his
15  body, his head?
16      A.  Right.
17      Q.  Profusely?
18      A.  Correct.
19      Q.  Okay.
20          MR. NYALLAY:  No further questions.
21          EXAMINATION
22  BY MR. BOENIG:
23      Q.  Last question for you.
24      A.  Okay.
25      Q.  On Ms. Stewart's first statement she indicated



SERGEANT CHRISTINA LOVE
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025
125–126

Page 125

1    she had observed inside the cell, correct?

2    A. Yes.

3    Q. On her second statement she acknowledged that

4    she had not, correct?

5    A. Correct.

6    Q. So those statements are inconsistent and the

7    first statement was untruthful, correct?

8    A. Correct.

9            MR. NYALLAY: Objection, form.

10           MR. BOENIG: Pass the witness.

11           MR. NYALLAY: No further questions.

12           THE REPORTER: All right. Before we go

13   off the record, this deposition was conducted pursuant

14   to Federal Rules, other than 30(b)5 was waived. Are

15   there any further stipulations for the record?

16           MR. BOENIG: (Shaking head).

17           MR. NYALLAY: (Shaking head).

18           THE REPORTER: No?

19           MR. BOENIG: None for me.

20           THE REPORTER: I can see you-all shaking

21   your heads, but --

22           MR. NYALLAY: No.

23           THE REPORTER: All right. Off record at

24   1:32 P.M.

25           (Deposition concluded)

Page 126

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION
3    WAGNER, et al.           )(
                              )(
4        Plaintiff            )(
                              )(
5    VS.                      )(  CIVIL ACTION NO.
                              )(  4:23-CV-02886
6    HARRIS COUNTY, TEXAS     )(
                              )(  (Jury Requested)
7        Defendant            )(
                              )(
8    and                      )(
                              )(
9    ANA GARCIA and CHANDRA    )(
     JENKINS                  )(
10      Plaintiff-Intervenors )(
11              REPORTER'S CERTIFICATE
12       I, JODY McWHORTER, Certified Court Reporter,
     certify that the witness, SERGEANT CHRISTINA LOVE, was
13   duly sworn by me, and that the deposition transcript is
     a true and correct record of the testimony given by the
14   witness on AUGUST 14, 2025, and that the deposition was
     reported by me in stenograph and was subsequently
15   transcribed under my supervision.
16       Pursuant to Federal Rule 30(5)(e)(2), a review
     of the transcript was not requested.
17
         I FURTHER CERTIFY that I am not a relative,
18   employee, attorney or counsel of any of the parties,
     nor a relative or employee of such attorney or counsel,
19   nor am I financially interested in the action.
20       WITNESS MY HAND on this the 22nd day of
     August, 2025.
21
22
     _____
     JODY McWHORTER, Texas CSR 6095
23   Expiration Date:  07-31-25
     Bryant & Stingley, Inc., CRN No. 41
24   PO Box 3420
     Harlingen, Texas  78551
25   (956) 428-0755
```

