**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION
 3   WAGNER, et al.          )(
            Plaintiffs       )(
 4                           )(
     VS.                     )(   CIVIL ACTION NO.
 5                           )(   4:23-CV-02886
     HARRIS COUNTY, TEXAS    )(
 6       Defendant           )(   (Jury Requested)
                             )(
 7   and                     )(
                             )(
 8   ANA GARCIA and CHANDRA  )(
     JENKINS                 )(
 9       Plaintiff-Intervenors )(

10   _____

11                   ORAL DEPOSITION OF
                     MAJOR CEDRICK COLLIER
12                   AUGUST 14, 2025

13   _____

14        ORAL DEPOSITION OF MAJOR CEDRICK COLLIER,
15   produced as a witness at the instance of the
16   Plaintiff-Intervenor Ana Garcia, taken in the
17   above-styled and numbered cause on AUGUST 14, 2025,
18   between the hours of 2:58 P.M. and 4:33 P.M., reported
19   stenographically by JODY McWHORTER, Certified Court
20   Reporter No. 6095, in and for the State of Texas,
21   remotely via Zoom in the City of Houston, State of
22   Texas, pursuant to the Federal Rules of Civil Procedure
23   and any provisions stated on the record or attached
24   therein.
25
```

**Page 2**

```
 1                         APPEARANCES
 2
 3      COUNSEL FOR DEFENDANT HARRIS COUNTY, TEXAS:
 4
           MUSTAPHA NYALLAY   (via Zoom)
 5         DENTON NAVARRO RODRIGUEZ BERNAL SANTEE
           & ZECH, PC
 6         549 North Egret Bay Blvd., Suite 200
           League City, Texas  77573
 7         mmnyallay@rampagelaw.com
 8
        COUNSEL FOR PLAINTIFF-INTERVENOR ANA GARCIA:
 9
           BYRON W. BOENIG   (via Zoom)
10         THE SHARIFF LAW FIRM, PLLC
           2500 West Loop South, Suite 300
11         Houston, Texas  77027
           bboenig@shariflawfirm.com
12         eservice@shariflawfirm.com
13
14                          INDEX
15                                                 PAGE
     Appearances ..................................   2
16
     MAJOR CEDRICK COLLIER
17   Examination by Mr. Boenig ....................    3
     Examination by Mr. Nyallay ...................   49
18   Examination by Mr. Boenig ....................   61
     Reporter's Certificate .......................   64
19
20   Attached to the end of the transcript:  Stipulations
21
                              EXHIBITS
22
23   NUMBER  DESCRIPTION                             PAGE
24    1    Report Re:  Officer Stewart ............   11
25
```

**Page 3**

 1   THE REPORTER: We are on the record at
 2   2:58 P.M. Counsel have agreed to waive Federal Rule
 3   30(b)(5). I will now swear in the witness.
 4       (Witness sworn)
 5       MAJOR CEDRICK COLLIER,
 6   having been duly sworn, testified as follows:
 7       EXAMINATION
 8   BY MR. BOENIG:
 9   Q. Good afternoon, sir. How are you?
10   A. Good afternoon.
11   Q. My name is Byron Boenig and I represent a
12   plaintiff by the name of Ana Garcia related to the
13   death of Kevin Sanchez while in custody with Harris
14   County. So you understand who I am, correct?
15   A. Yes, sir.
16   Q. Okay. And I'm going to go over a couple of
17   guidelines here to try to make this go a little bit
18   quicker. Please understand that I'm going to try to
19   ask good clear questions, but if I mess up, just tell
20   me that you don't understand the question and to
21   rephrase it.
22   A. Yes, sir.
23   Q. Also, everything needs to be verbal. We have a
24   court reporter here that's taking everything down.
25   Things like uh-huhs and huh-uhs don't reflect well on

**Page 4**

 1   the record, so if I ask if that's a yes or a no, no
 2   disrespect involved. I'm just trying to get a good
 3   clean record, okay?
 4   A. Yes, sir.
 5   Q. Can we agree that if you answer one of my
 6   questions you understood the question?
 7   A. Say again, sir?
 8   Q. That if you answer a question that I have
 9   asked, can we agree that you understood that question?
10   A. Yes, sir.
11   Q. And again, if you don't understand, just ask me
12   to rephrase.
13       This is also not a memory test. This
14   happened back in 2022. If there's anything you don't
15   remember or that you need to qualify, please do so.
16   Just state, you know, I don't recall or I don't
17   remember, or you can say I think it was about this. I
18   just want to make sure we keep it clean, keep it
19   accurate, okay?
20   A. Yes, sir.
21   Q. Have you ever given a deposition before?
22   A. No, sir.
23   Q. Okay. There may be occasion that your attorney
24   will do something called objection, form. That is for
25   the record for the Judge to rule on later. Doesn't



Page 5

1  mean you can't answer. Just keep rolling, it will make
2  this go a little bit quicker. He's a fine attorney.
3  If there's something that he believes you should not
4  answer he will object in a manner to say objection and
5  don't answer that. Fair enough?
6     A. Yes, sir.
7     Q. It's also not an endurance contest. If at any
8  point in time you need to take a break, just say hey,
9  I'd like to take a break. The only thing I would ask
10 is that if there's a question that's been asked, that
11 you answer that question and then we'll take the break.
12 Does that work?
13    A. Yes, sir.
14    Q. Can you please state you full name for the
15 record?
16    A. Cedrick Hiram Collier.
17    Q. And I'm sorry, what was the first name again?
18    A. Cedrick, C-E-D-R-I-C-K.
19    Q. Cedrick, okay. And do you prefer to be
20 addressed as Major Collier, Mr. Collier, Cedrick? How
21 would you prefer to be addressed?
22    A. Whatever is easier for you. Doesn't matter.
23    Q. I'll probably just call you Major. That's how
24 I've thought about you through all of this, so that
25 will just make it easier.

Page 6

1     A. Yes, sir.
2     Q. How long have you served as a major in Harris
3  County?
4     A. Approximately three years.
5     Q. So were you relatively new when you were
6  responsible for the disciplinary proceedings in the
7  Sanchez matter?
8     A. Yes, sir.
9     Q. And prior to I guess getting promoted to major,
10 did you hold other positions within the Harris County
11 Sheriff's Office?
12    A. Yes, sir.
13    Q. What was your starting position and how long
14 ago was that?
15    A. 1997, deputy sheriff.
16    Q. And then what's the normal path of progression?
17 Is it sheriff then sergeant and then major or are there
18 other breaks in there?
19    A. Deputy, sergeant, lieutenant, and I went from
20 lieutenant to major.
21    Q. How many majors are there within the sheriff's
22 department?
23    A. Ten.
24    Q. What is your chain of command and scope of
25 authority within the sheriff's office?

Page 7

1     A. My chain of command is Assistant Chief Suarez,
2  Chief Deputy Tony Diaz, to Sheriff Ed Gonzalez. My
3  responsibility is Homeland Security Special
4  Enforcement.
5     Q. And how many people do you have reporting to
6  you?
7     A. Approximately 450.
8     Q. In a previous deposition of Sergeant Love, she
9  indicated that the majors rotate through disciplinary
10 proceedings. Can you explain how that works?
11    A. So the majors rotate through the ADC on a
12 monthly basis. So you'll have three majors and a chief
13 hear the disciplinary reviews that's presented by
14 Internal Affairs or the bureau that's doing the
15 investigation.
16    Q. All right. So it's a constant rotation, the
17 way this goes, correct?
18    A. Correct.
19    Q. Do you recall the incident with Kevin Sanchez
20 and being involved in that disciplinary proceeding?
21    A. Vaguely, yes.
22    Q. Okay. Have you reviewed any documents or
23 reports or anything like that preparing for your
24 testimony today?
25    A. Just a video, just a portion of it, to -- to

Page 8

1  bring it back to memory, yes.
2     Q. Now, do you get yourself involved when you're
3  in this position where you're doing any of the
4  investigation or are you just reviewing what the
5  investigating officers have provided?
6     A. Just reviewing what the investigating officers
7  provided to the ADC committee.
8     Q. And when you're making a decision when it comes
9  to the disciplinary action, I've been told by Sergeant
10 Love that IAD has a very limited amount that they look
11 into an officer's history and background. They
12 basically look at current job and they don't look at
13 any other HR discipline or anything like that.
14        What all do you review in your role as a
15 major on one of these disciplinary boards when it comes
16 time to make a decision about a disciplinary action?
17    A. What's presented to the committee is their
18 previous disciplinary committee history, the Pews,
19 their evaluations, and other write-ups that they might
20 have been involved in or uses of --
21    Q. What was the first -- sorry. What was the
22 first item you mentioned?
23    A. Their -- I'm not sure. They look at the
24 previous write-ups they might have had, the Pew
25 reviews, early warning --



Page 9

1  Q. Pews?
2  A. Pews, yes, sir. So the write-ups, other issues
3  they might have been involved in, uses of forces and
4  things such as that.
5  Q. Serious incident reports?
6  A. Say that again.
7  Q. Do you review serious incident reports related
8  to the officer?
9  A. If it's presented through an ADC, yes.
10  Q. But it sounds like you actually do a fairly --
11  A. I'll just say evaluations, yes.
12  Q. So you do a fairly comprehensive job of looking
13  at who this officer is, not just at the events that are
14  being brought before you for discipline, correct?
15  A. So we look at everything that internal -- the
16  investigator presents to us. All that's in a packet.
17  It's standardized, so they have all the evaluations,
18  their -- the disciplinary write-ups they might have
19  had, anything that's germane to the case, previous use
20  of forces and things such as that, but it's -- pretty
21  standard practice on every case should be the same.
22  Q. All right. And who provides you with the HR,
23  the evals, the Pews reports? Where does all that come
24  from?
25  A. The investigator.

Page 10

1  Q. Okay. I'm a little bit confused because I
2  deposed your investigator this morning and she says she
3  doesn't pull any of that information as she's doing a
4  report.
5  A. Well, it's presented during the case. It's in
6  the case file. So I might be mistaken. So once the
7  file is presented -- and you know, you might be right.
8  The IAD that chairs the committee, they have -- they
9  have all those files pulled up. So the investigator
10  will present their case, but the employee -- the
11  employee or the accused's files would also be preloaded
12  for the ADC to make their recommendation based on the
13  employee's previous history. So those files are
14  uploaded. The investigator may not have that stuff.
15  Q. Would you agree looking at an employee's
16  history and what their background is is important when
17  determining the nature of any disciplinary action when
18  there's been a claim that they violated the policy?
19  A. Sure.
20  Q. And have you ever had difficulty obtaining
21  those records on any individual that's before the
22  disciplinary board?
23  A. I've never had to try to obtain them.
24  Q. You just know that it's provided to you at the
25  time that you're ready to review?

Page 11

1  A. Correct.
2  Q. And you believe it's not the investigator, but
3  somebody within IAD that pulls all that other
4  information and puts it together in a packet?
5  A. It would be the -- the ADC committee would have
6  all that ready. And not only that, they have all the
7  policy violations there on the ready for us to review
8  if we see something that's also germane to the case.
9  So they have all the policies that may or may not have
10  been violated, the employee's Pews evaluations and all
11  that stuff, yes.
12  Q. I'm going to show you something that's been --
13  that I'm going to present as Exhibit 1 in this
14  deposition.
15      (Deposition Exhibit No. 1 introduced)
16  Q. See the screen up there?
17  A. Yes, sir.
18  Q. Okay. Do you recognize this report or are you
19  familiar with this report?
20  A. It looks familiar. I mean, it looks like
21  something we would have here.
22  Q. Would this be a report that's in that package
23  that you're talking about?
24  A. It looks like it may be.
25  Q. It also appears that the disciplinary action's

Page 12

1  actually listed in there. Could this be something
2  that's post decision? Did you-all --
3  A. Yes.
4  Q. I'm sorry?
5  A. Yes.
6  Q. Okay. What is your recollection about the
7  events that resulted in Kevin Sanchez's death and
8  Ms. Stewart and Officer Lighten's disciplinary action?
9  Do you have a recollection of the events?
10  A. I just know the circumstances, that it was what
11  appeared to be a drug overdose --
12  Q. Okay.
13  A. -- of some sort of substance.
14  Q. And were any determinations made on how that
15  was obtained or how the individual got the drugs?
16  A. I don't have that knowledge.
17  Q. Now, your actual disciplinary board had to do
18  with alleged policy violations by Officer Lighten,
19  Officer Stewart, and I believe one other officer; is
20  that correct?
21  A. Correct.
22  Q. Do you remember what policy violations were
23  involved in this?
24  A. Not right offhand, no, I don't.
25  Q. You said you watched some videos. Do you



Page 13
1  recall what was in those videos that you watched?
2      A. Just a segment of the video. I didn't watch
3  the whole entirety.
4      Q. Was it a video of the cell, a video of the
5  rounds, a video of officers? What was it a video of?
6      A. It was a video of the cell, and the cell was
7  empty at the point I saw it. It refreshed my memory of
8  what it was about.
9      Q. Now, in this form right here that we just
10 talked about, we have allegations of violation of
11 policy, sustained, and it says, Synopsis: Violated
12 Harris County Sheriff's Office by failing to look at
13 and evaluate each inmate during observational rounds,
14 which later resulted in the death investigation of an
15 inmate.
16         Does that bring up any memories for you
17 about how this happened or what went down?
18     A. Yes, sir.
19     Q. Okay. And do you remember what the allegations
20 were associated with the failure to supervise or
21 failure to do your observational rounds? Do you
22 remember what --
23     A. Just as stated.
24     Q. Can you tell me what your recollection is?
25     A. Just as -- I'm sorry, go ahead. Repeat, sir.

Page 14
1      Q. Can you tell me what your recollection is of
2  how the officers violated this policy?
3      A. Just as is stated there, failure to
4  individually look at the inmate that was in the cell to
5  observe the inmate's well-being.
6      Q. And did you ever look at the observational
7  rounds at the time you-all were making a decision on
8  this? Even if you don't remember what it is today, do
9  you remember looking at the rounds and how the officers
10 conducted the rounds?
11     A. Not to my knowledge, sir. I can't say I
12 remember seeing the video where he actually observed.
13 I'm not saying I didn't, but had I ruled on it, I'm
14 sure I did, but it was determined that he didn't look
15 inside the cell, but I don't remember seeing the video.
16     Q. Do you remember anything in your investigation
17 related to CorreTrak, logging into that system or the
18 use of that system in conducting the rounds?
19     A. Very vaguely.
20     Q. What do you vaguely remember?
21     A. That the rounds were completed, but it was --
22 it was hastily done, more or less.
23     Q. I'm sorry, it was what?
24     A. Hastily done. They didn't look inside the
25 cell.

Page 15
1      Q. So you say hastily done. Do you recall whether
2  the officers actually looked into the cells or they
3  were just doing the CorreTrak scan?
4      A. From what I remember, I'm not sure if he got
5  eyes on the inmate or not, but I do remember him going
6  to that area.
7      Q. In using the CorreTrak system, are you aware,
8  does each cell have a place to scan or is it for each
9  pod, and how many places in the pod get scanned?
10     A. They're all different.
11     Q. Okay. Do you recall where this incident
12 happened, at what pod it was in?
13     A. No, sir.
14     Q. And if I told you 7C, would you know anything
15 about that pod or how it was set up or what was going
16 on?
17     A. No, sir.
18     Q. Did you review any of the policies of the
19 sheriff's office at the time you did the disciplinary
20 evaluation?
21     A. No, sir. The policy is -- the policy is what
22 it is. That was a part of the information that was
23 presented through an ADC.
24     Q. Okay. So you reviewed it as part of the
25 package, you didn't do an independent review outside;

Page 16
1  is that accurate?
2      A. Correct.
3      Q. It appears that for Officer Stewart she had
4  120 hours suspension and 180 days probation. Is that a
5  major disciplinary action, a minor disciplinary action,
6  or somewhere in between?
7      A. Like I say, it's -- it's a progressive
8  discipline, so you also have to take into consideration
9  had he been disciplined before. So if he had been
10 disciplined before we could increase the discipline
11 that's handed out. So it may not be actual -- they
12 could have -- two people could have created the same
13 thing, but one person has been disciplined before, they
14 will get a much harsher penalty than the other person,
15 if that makes sense.
16     Q. Makes perfect sense and I appreciate that. My
17 question is, is 120 hours and 180-day probation, is
18 that a minimum type fine or a minimum type action, a
19 middle of the road action, or a major action,
20 regardless of how it got to that?
21     A. Those are hours, so that's like a -- that's
22 like a two-week -- how many hours did you say it was?
23     Q. 120 hours?
24     A. Yeah, that's --
25     Q. So three weeks.



Page 17
1  A. Yes. That's on the higher end, I would say.
2  Q. So is that considered a lot?
3  A. I would say yes.
4  Q. And the probationary period, is that relatively
5  standard or does that increase or go down depending on
6  the nature of the violation?
7  A. That's standard.
8  Q. Okay. So the amount of time is a better
9  indication of how serious the violation -- well, the
10 violation and their history is reflected in their
11 disciplinary action, correct?
12 A. Yes, sir.
13 Q. And, I'm sorry, you may have answered this
14 question. What is your primary area of responsibility?
15 A. Special Enforcement, Homeland Security. It's
16 the tactical SWAT, helicopters, our marine division.
17 Q. All right. And this rotating thing that you do
18 for disciplinary actions as a major, is there any
19 training you get for that or how does that work?
20 A. There's no training for it. It's just being
21 a -- it's a supervisory responsibility as a major. At
22 this rank you would have seen a lot and probably
23 investigated quite a few policy violations, so you'll
24 have two or three majors in there that would talk about
25 the policy violation and they look at the person's

Page 18
1  history and come up with a reasonable conclusion as far
2  as what's going to be handed out.
3  Q. Is that a decision that is made jointly between
4  the majors and the chief, or is there some person that
5  has more authority or less authority as far as
6  determining what that punishment is going to be?
7  A. It's generally made between the majors and the
8  chief as the overseer of the chair of the committee.
9  Q. So the majors basically make a decision of what
10 they think is right and the chief's just there as a
11 fallback in case something's outside of what they feel
12 is correct? Is that accurate?
13 A. The chief is the chair. And there could be two
14 majors and a captain at this point, but the three will
15 give the verdict, and the chief is the chair.
16 Q. What are the authorities and responsibilities
17 of the chair?
18 A. To write up the findings and present it back to
19 Internal Affairs and Legal for them to issue it to the
20 employee.
21 Q. In your time as a major, how often have you
22 been involved in a disciplinary action involving
23 failure to properly observe or monitor an inmate?
24    MR. NYALLAY: Objection to form. You may
25 answer, Major.

Page 19
1  A. None at all.
2  Q. Sorry?
3  A. I said none at all. I haven't worked in that
4  environment.
5  Q. I understand. My question, so I make sure
6  we're on the same page here, you've done a number of
7  these rotations as far as being part of the
8  disciplinary board, correct?
9  A. I thought you was talking about actuality
10 investigating.
11 Q. No, sir. I'm talking about in your role as one
12 of the three majors and/or captains, how many times
13 have you been involved in handing out or evaluating the
14 disciplinary action that involved failure to observe or
15 failure to properly monitor an inmate?
16    MR. NYALLAY: Objection to form.
17 A. Maybe three or four times, maybe.
18 Q. So three or four times over three years?
19 A. Maybe, yes.
20 Q. How many times a year are you on one of these
21 committees or boards for disciplinary action?
22 A. Three months out of the year. Maybe about
23 three months out of the year, and that's once a week,
24 normally on Thursdays.
25 Q. I'm sorry, say that again.

Page 20
1  A. Normally on Thursdays, every Thursday each
2  month, so I would say about three months.
3  Q. Okay. So basically if you've been there three
4  years, you do three months out of every year, over nine
5  months that you were responsible, there were three to
6  four times that you had this type of incident?
7  A. Possibly, yes.
8  Q. Other than your role on one of these boards for
9  discipline, you don't have anything at all related to
10 responsibilities or duties within the detention center
11 or the jail, correct?
12 A. That's correct.
13 Q. If you're on one of these boards, at what point
14 are you made aware that there has been an allegation of
15 a policy violation? Is it anywhere before the
16 investigation is done or does it happen only after the
17 investigation is complete?
18 A. Repeat that question, sir.
19 Q. When are you first made aware that there is an
20 incident with an alleged policy violation? Is it
21 during the course of the investigation or is it after
22 the investigation is complete and presented?
23 A. You're not presented until the investigator
24 walks into the room and starts presenting the case.
25 There's no prior knowledge.




Page 21

1  Q. So you have no prior knowledge of anything that
2  happened, how it occurred, what went down?
3     A. No, sir.
4     Q. As a major are you involved in any shape, form
5  or fashion if there is an inmate death while in
6  custody?
7     A. No, sir.
8     Q. Do you remember anything about the background
9  of either Officer Lighten or Officer Stewart related to
10 this incident when you did your review? Do you
11 remember anything about their background?
12    A. No, sir.
13    Q. Do you know anything about how the CorreTrak
14 program works?
15    A. Very little.
16    Q. What is your understanding of how it works?
17    A. It's a handheld device that has to be in close
18 proximity of the -- I guess it's like a QR code in a
19 certain area of the cell, and it has to be acknowledged
20 every 30 minutes --
21           (Interruption)
22    A. -- hold on one second.
23        For the rounds to be accurate. It's more
24 or less an electronic log of accountability.
25    Q. Do you know anything about the monitoring of

Page 22

1  the videos of the inmates while they're in custody?
2     A. Yes, sir.
3     Q. Can you tell me what you know about that?
4     A. Each housing area is set up with monitors and
5  cameras that are linked to the control center where a
6  deputy or detention officer is sitting monitoring each
7  pod for activities and the well-being of the inmates.
8     Q. For each of these pods for any given shift, how
9  many detention officers are in that pod?
10    A. At least one at all times, and if something
11 arises, they have to summon a rover to come over to
12 relieve them or to take care of the situation or to
13 address the situation that may be occurring.
14    Q. What would a rover be?
15    A. That's a person, a deputy or detention officer
16 that is not actually assigned to that area but is
17 available to multiple pods upon request.
18    Q. If there's only one officer assigned, they
19 can't monitor both the video and make a round; is that
20 accurate?
21    A. That's correct. They can't -- you can't leave
22 the pod to do the rounds inside of the cells, that's
23 correct.
24    Q. The pod that they were in is what they called a
25 23-hour lockdown and one hour of time out. Do you know

Page 23

1  what the reason for that type of setup is, why somebody
2  would be in that situation in the jail?
3     A. That sounds like a single-man cell or a
4  single-person cell.
5     Q. It is a single-person cell that we're talking
6  about here. Why would they be locked down for 23
7  hours?
8     A. Multiple reasons. Could be a high profile
9  person, could be a person that's a keep separate, or a
10 person that's high risk or either a danger to others or
11 a person -- I don't know, just -- that's a few reasons
12 why, but for the most part it's keep separate or either
13 high profile person that can't be with others.
14    Q. And when you say keep separate, are you talking
15 about keeping separate from other inmates?
16    A. Correct.
17    Q. So if you were in one of these type of cells,
18 how easy would it be for you to have interactions with
19 another inmate?
20    A. Only maybe the floor worker that may be passing
21 by that volunteered to clean up, or you can have sound
22 contact from the one next door, you may not have sight,
23 or you may have sight with across the door, but their
24 only communication is just sound mainly, because they
25 can't really see each other and they definitely can't

Page 24

1  have physical contact.
2     Q. And do each of the cell doors have an
3  observation window?
4     A. Yes.
5     Q. And is part of your duty when you're doing a
6  round to look into that window and see what's going on
7  with the inmate in there?
8     A. That's correct.
9     Q. Is it a violation of the policy to fail to do
10 that each hour to determine the inmate's well-being?
11    A. That's correct.
12    Q. And how often have you overseen disciplinary
13 actions where that issue has been the issue before the
14 disciplinary board, a failure to actually look in the
15 cell and check the well-being of the individual?
16    A. Repeat that question, sir.
17    Q. How many times have you sat on the board where
18 the failure to properly observe the inmate on the
19 rounds was the reason for the disciplinary action?
20    A. One, to my knowledge, and that would be this
21 one. I don't remember one off the top of my head, but
22 I know I've -- we've probably heard a few of them, but
23 the most relevant one would be this one that you speak
24 of.
25    Q. To the best of your knowledge, has there been



Page 25

1  any problems that you're aware of where there was a
2  pattern where people didn't do proper observations in
3  the jail?
4     A. Not a pattern. It was just maybe discovered
5  through the supervisor that the rounds may not have
6  been accurate or a little slow or self-reported.
7     Q. How would a supervisor make that determination?
8     A. Just quality control, just checking.
9     Q. Okay. What would he check?
10    A. The times.
11    Q. You say the times. The times on the CorreTrak,
12 the times on videos? What are we talking about?
13    A. Well, the CorreTrak will actually indicate it.
14 It will flag it if you're not making the rounds
15 properly.
16    Q. How does CorreTrak identify you're not properly
17 making rounds?
18    A. It will alert that they weren't -- it's a
19 system, so if it's not proper it's going to alert the
20 supervisor that it's off.
21    Q. And what kind of things would indicate an
22 improper round? Is it just late? Is it how quick the
23 rounds are done? What does it evaluate?
24    A. If it's late.
25    Q. If late. So as long as the rounds are done

Page 26

1  timely, nobody ever looks at what's going on with the
2  inspections of the cells or the walk-arounds?
3     A. I wouldn't say that.
4     Q. On the CorreTrak system, do you know, does it
5  show the time that each scan is done?
6     A. Yes.
7     Q. Would it show the total time that it took to
8  scan that floor?
9     A. It would tell you the time between the
10 different CorreTraks, the different locations.
11    Q. Is there a way to pull a report and look at
12 that time, or is it just something that you have to
13 review the log, or do you know?
14    A. No, all of that is kept. It's logged.
15    Q. So you have to review the log?
16    A. Each CorreTrak pad is logged. I mean, it's
17 logged in. It tells you everything that you've done
18 that day, every round that you made and when you made
19 the rounds.
20    Q. Okay. And do you know -- that log I'm sure is
21 getting pulled from some type of computer program
22 that's tracked all of this. Is there a way to do
23 research on times, dates and things, checking -- you
24 know, for instance, can you log in and say what was the
25 time each inspection or round was done?

Page 27

1     A. Yes.
2     Q. Or do you have to physically look at the log to
3  figure that out?
4     A. That's the same question. Do you want to say
5  it again?
6     Q. Does the CorreTrak system have any type of
7  computer access or keyboard access where you can like
8  pull a report?
9     A. It can give you a report, yes, sir.
10    Q. And can that report use different numbers or
11 factors? In other words, can you look at what time
12 each round was done, how long between each of the
13 scans, things of that nature, or do you have to
14 physically look at the printout to figure that out?
15    A. I'm not sure how you can pull the information
16 from CorreTrak, but it would definitely be logged in
17 there. I don't know if you can run a clear report to
18 get what you're looking for, but definitely you can
19 physically look at it, but I don't know if you can pull
20 the report. I've never delved that far into it.
21    Q. I will assert to you that based on the
22 investigative material that I've looked at, or
23 findings, that there was at least eight different times
24 with three different officers where basically they went
25 through and scanned the CorreTrak but never once looked

Page 28

1  into any of the cells. Is that your recollection of
2  what happened on this event, or do you remember?
3         MR. NYALLAY: Objection to form. You may
4  answer, Major.
5     A. The question again, sir?
6     Q. I basically stated what my review of the
7  investigative materials have shown and the videos have
8  shown. I was asking if that's accurate with your
9  recollection, as well.
10        What I have seen is there are
11 approximately eight rounds done between 11:06 on the
12 11th and somewhere around 7:00 A.M. on the 12th, and in
13 each of those rounds three different officers basically
14 went through and scanned each of the CorreTrak things
15 and it was very quick, no time to look inside the cells
16 or anything like that. Is that your recollection of
17 what occurred in this incident or do you remember?
18    A. Yes, sir.
19    Q. Yes, sir, that's what you remember?
20    A. They didn't observe the inmate, yes.
21    Q. Did you find it concerning that you had three
22 different officers on two different shifts that all
23 conducted their rounds in the same manner that were
24 inconsistent with policy?
25    A. Yes, sir.



Page 29

1  Q. Were there any recommendations made to correct
2  or modify your policy to try to prevent that type of
3  incident in the future?
4  A. Can you say that again?
5  Q. Did anyone within the disciplinary board make a
6  recommendation that, hey, we're seeing this happen with
7  three different officers, two different shifts. We
8  should change the policy somehow.
9      Did anything like that happen?
10  A. Not policy change, but more or less reaffirm
11  that the rounds are being done properly, and role
12  calls. That was the finding.
13  Q. On each of these pods, is there a supervisor
14  for each pod, each floor? How does that work?
15  A. Per floor.
16  Q. And approximately how many pods are on each
17  floor?
18  A. I don't have that knowledge. I don't know that
19  answer.
20  Q. Do you know how many pods were on the floor
21  where Kevin Sanchez was being kept?
22  A. No, sir.
23  Q. Do you know if anything was brought up or
24  anything reviewed regarding the supervisor of that
25  floor and his observation of the detention officers and

Page 30

1  whether or not they were correctly performing their
2  rounds?
3  A. Not to my knowledge. I don't remember.
4  Q. And if the supervisor is not looking at this,
5  is there anybody else that would catch it if they
6  weren't properly reviewing or properly monitoring
7  inmates, doing their rounds properly?
8  A. Repeat that question, sir.
9  Q. Other than the supervisor, is there anyone that
10  would catch if there was a problem in the way the
11  rounds were being performed?
12  A. It would be the supervisor's responsibility.
13  Q. So there's no other independent monitoring or
14  anything else that's looked at; the supervisor is
15  responsible for the floor, the supervisor is
16  responsible for those officers and making sure they do
17  it right?
18  A. And the CorreTrak alerting if the rounds were
19  done late.
20  Q. What happens if a round is late?
21  A. The officer is brought in and questioned, asked
22  about it, and he would have to give a reason why it
23  wasn't conducted properly.
24  Q. Do you recall in this particular incident that
25  Officer Lighten had not logged out Officer Stewart and

Page 31

1  logged himself in before doing the rounds?
2  A. No, sir, I don't. I don't particularly
3  remember the names and the actions each took. I just
4  remember the policy violation.
5  Q. Other than reviewing to see if a round is late,
6  do you know of any other reviews that the supervisor
7  does of the CorreTrak log?
8  A. No, sir.
9      What was that question again?
10  Q. My question was, other than the timing of
11  whether or not they were late or on time, was there
12  anything else the CorreTrak is used to evaluate?
13  A. Well, CorreTrak actually puts the officer in
14  the area of the inmates just to make sure they're okay,
15  and it also brings them into the area, so -- to make
16  sure everything is good in the area, so it's -- I mean,
17  that's the whole idea of CorreTrak.
18  Q. All right. Does it do anything or is anything
19  looked at regarding how much time is taken to do a
20  round, or simply whether or not it's done?
21  A. I'm not sure, sir.
22  Q. Do you have any idea or knowledge of
23  approximately how long it takes to do a proper round
24  and inspecting each cell and checking on each
25  individual detainee?

Page 32

1      MR. NYALLAY: Objection to form. Go ahead
2  and answer, major.
3  A. The question again, sir?
4      MR. BOENIG: Court reporter, could you
5  read that question back?
6      THE REPORTER: Sure.
7      (Question read by reporter)
8  A. That varies. If it's a two-level cell, or if
9  it's a single cell, double-door lockdown, you have to
10  open up one door to go into another door. It varies.
11  Q. Would you agree that there's a certain amount
12  of time that's required to actually look in and check
13  the well-being of the inmate?
14  A. Yes, sir.
15  Q. And I've looked at a lot of videos and there
16  tends to be a black-out square around where the toilet
17  area is.
18  A. Correct.
19  Q. And that's accurate on all the videos at the
20  jail, correct?
21  A. Correct.
22  Q. Is there anything in the observation window or
23  the way a cell is set up that blocks out or makes it
24  where you cannot see the inmate?
25  A. No, sir.



Page 33
1  Q. And is that why it's important to look inside
2  the cells?
3  A. Yes, sir.
4  Q. What policy ensures that the officers actually
5  observe the inmate on each of their rounds?
6  A. I don't know the policy, per se, but you're
7  supposed to look inside to make sure the inmate's in
8  good health.
9  Q. So there's a requirement to do so. Is there
10 anything done to verify that it's done properly?
11 A. That you signed off saying that you observed
12 the inmate.
13 Q. Okay. So it's basically an honor system?
14 A. I would say yes.
15 Q. In your time as a major, in any interactions
16 you've had with the detention officers and officers in
17 general, has it been your experience that the officers
18 will stick together and look out for each other?
19 A. No, sir.
20 Q. I'm sorry?
21 A. No, sir.
22 Q. So it would be your anticipation that if a
23 detention officer saw another one not conducting their
24 rounds properly, they would tell somebody?
25 A. Yes, sir.

Page 34
1  Q. And in this situation where you had three
2  different officers over two different shifts all
3  conducting it in the same manner, does that appear to
4  be a situation where that might be happening across the
5  board on that floor?
6     MR. NYALLAY: Objection to form. Go ahead
7  and answer, Major.
8  A. The question again, sir.
9  Q. In a situation like we have here, where you
10 have three different officers across two different
11 shifts and all of them failed to actually observe the
12 inmates, would you see that as a systemic problem or an
13 individual-focused problem?
14    MR. NYALLAY: Objection.
15 Q. Is somebody in the room with you, sir?
16 A. No, someone passed by my window and tried to
17 get my attention. Sorry.
18 Q. Okay.
19 A. Do you want to ask that -- I'm sorry. I think
20 I see it as a -- as an individual problem.
21 Q. Even though there's multiple different
22 officers, multiple different shifts, and they're all
23 doing the same thing?
24 A. Yes, sir.
25    MR. NYALLAY: Objection to form.

Page 35
1  Q. After -- and I think I've asked this before. I
2  want to make sure I'm clear on this. After you-all did
3  a review on this, was there any discussion about the
4  fact that, hey, we've got a floor here that seems to
5  have a problem, because you have three different
6  officers that are apparently covering for each other
7  and not doing their shift duties properly?
8     MR. NYALLAY: Objection to form.
9  Q. Was anything looked at that at all?
10 A. Did he say something, I'm sorry?
11    THE WITNESS: Do I have to answer?
12    MR. NYALLAY: Yes.
13 Q. My question is, at the time you looked at
14 this --
15 A. No, I heard your question. I was just -- I
16 didn't know I was supposed to answer. I thought he
17 said something.
18    But, yes, we did say that there needs to
19 be a roll call to make sure these rounds are done
20 properly. We had that conversation.
21 Q. You say a roll call. What is that?
22 A. That means that shift and that supervisor, that
23 group needs to have -- needs to be reiterated as far as
24 the proper procedures of conducting rounds.
25 Q. And do you know why the supervisor for that

Page 36
1  floor was never questioned or disciplined when he had
2  three different officers under his responsibility that
3  all did this and it resulted in the death of a
4  detainee?
5     MR. NYALLAY: Objection to form.
6  A. No, sir.
7     MR. NYALLAY: You may answer, Major.
8  A. No, sir.
9  Q. All right. On the CorreTrak logs, is it
10 integrated with the video monitoring system? In other
11 words, when you want to look at a CorreTrak, at what
12 happened, is it easy to just pull the video with that
13 or are they on separate systems?
14 A. They're on separate systems.
15 Q. Is there any difficulty in obtaining either the
16 videos or the CorreTrak log?
17 A. I would say not.
18 Q. Do you remember, in making your decision on
19 Officer Stewart and Officer Lighten, what their history
20 was like? Did they have a good set of evaluations, a
21 poor set of evaluations, somewhere in between, any
22 other disciplinary history, things of that nature?
23 A. No, sir, I don't remember.
24 Q. In your experience, how often does somebody
25 have to have a policy violation before they're looking



Page 37

1 at things like being terminated?
2   A. It depends on the severity of the incident.
3   Q. Explain that to me. What type of incident
4  might require an immediate termination, what kind would
5  be a slap on the hand?
6   A. An incident where there is negligence and
7  there's serious bodily injury or death, or a use of
8  force that's clearly a policy violation, or a use of
9  force where there's someone that's handcuffed or
10 detained that's struck, or incidents where someone is
11 struck in the head or in the upper -- above the
12 shoulders. Those types of incidents are deemed zero
13 tolerance.
14   Q. So we obviously had a policy violation on this
15 one, it obviously resulted in a death, but no one was
16 terminated, were they?
17         MR. NYALLAY: Objection, asked and
18 answered.
19   Q. You can still answer.
20   A. Repeat the question, sir.
21   Q. You have a situation where everybody's agreeing
22 a policy was violated, correct?
23   A. Correct.
24   Q. And we're talking about Kevin Sanchez's death.
25   A. Yes, sir.

Page 38

1   Q. I think that qualifies as a serious injury,
2  correct?
3   A. Yes, sir.
4   Q. Why was that not a zero tolerance issue? Why
5  was no one terminated related to this incident?
6   A. I would only assume because of the substance
7  that was -- that was taken by the -- by the inmate that
8  caused the death.
9   Q. Okay. So was any determination made on whether
10 or not Mr. Sanchez would have passed away if the rounds
11 had been properly done and it had been identified that
12 he was in the situation he was in within an hour or so
13 of when it happened rather than eight hours later?
14   A. I don't have that information, sir.
15   Q. Do you remember anything being odd or off about
16 this particular investigation and Mr. Sanchez's death?
17   A. Just the substance was introduced to him and
18 that he was in a -- a separation cell, how it got
19 there.
20   Q. And you found that odd why?
21   A. Because he was in a separation cell by himself.
22   Q. And that would make it very difficult for him
23 to interact with other inmates, correct?
24   A. Somewhat, yes, sir.
25   Q. And would it be your anticipation that in that

Page 39

1  particular scenario if there was a passing of
2  contraband or things of that nature, one of the
3  detention officers would have seen something?
4   A. I don't know how he got the substance. I don't
5  know if it came from court, a clinic visit, or his time
6  out in the dayroom, maybe left there by another inmate.
7  That really raised my eyebrows as far as how and when
8  it was passed to him and how it got there.
9   Q. Who all presented this particular case to you
10 when it was -- the investigation was done? Do you
11 remember who the presenting officer was?
12   A. No, sir, I don't.
13   Q. Do you remember if a roll call occurred after
14 this incident regarding the things we talked about on
15 making sure proper rounds were done?
16   A. No, sir.
17   Q. Do you feel a roll call announcement should
18 have been done?
19   A. Yes, sir. Those are recommendations that we do
20 at the -- at the end of the review of the case.
21        I'm trying to turn my light on, I'm sorry.
22   Q. That's okay. I had an office setup like that,
23 too. I know how frustrating it can get.
24        In this particular case, who made the
25 final decision on the disciplinary? Was it the three

Page 40

1  majors?
2   A. It would be the three majors and then it goes
3  before a Loudermill where the case would be heard by an
4  individual major with just the attorney and the
5  employee, and then that major will make -- either lower
6  the punishment or raise it or sustain what was issued
7  out.
8   Q. I've seen paperwork that it appears that you
9  were the major signing off on the disciplinary actions
10 for Jazminn Stewart. Do you remember that?
11   A. I'm sorry, no.
12   Q. If you don't, that's fine.
13        Associated with this case, do you remember
14 if there was ever an involvement of a union rep or
15 anything like that for the officers?
16   A. No, sir.
17   Q. No, sir, you don't recall, or no, sir, there
18 wasn't?
19   A. I don't recall. I know the name Jazminn
20 Stewart, I just can't put a -- can't put a name with
21 the face or incident.
22   Q. Do you personally know of any corrective
23 measures that were ever implemented after this
24 incident?
25   A. I didn't follow up, no, sir.



Page 41
1  Q. Do you believe anything could have been done to
2  prevent this incident?
3  A. Just not being -- the substance being
4  introduced into the facility would definitely prevent
5  it, but -- and just the proper rounds to -- to check on
6  the inmate's well-being.
7  Q. Is it possible that if a proper round had been
8  done and this had been discovered within the time that
9  it happened initially that there would have been a
10 different outcome?
11      MR. NYALLAY: Objection, speculative. You
12 may answer, Major.
13 A. It possibly could have helped.
14 Q. At the time you investigated this, was anything
15 brought up regarding staffing levels at the jail?
16 A. You say investigate. I didn't investigate.
17 Q. Let me rephrase my question. My apologies. I
18 caught that afterwards.
19      At the time you did this disciplinary
20 hearing, was anything brought up about staffing levels
21 at the jail?
22 A. No, sir.
23 Q. There was never a concern issued about the
24 number of officers available and their ability to do
25 their proper rounds?

Page 42
1  A. Not during the ADC hearing, no, sir.
2  Q. Are the officers given a chance to talk at
3  their disciplinary hearing or is it just a presentation
4  of evidence through the IAD or investigator?
5  A. Just a presentation of the evidence. They get
6  a chance to talk at the Loudermill which is after the
7  ADC presentation. At the Loudermill they have an
8  opportunity to speak directly to a single major and the
9  legal team with their presence -- the legal team
10 present.
11 Q. Do you remember having any conversations with
12 anyone related to this as a sole major where it was
13 just you talking to one of the people that was accused
14 of wrongdoing?
15 A. No, sir.
16 Q. Do officers tend to be assigned to one location
17 within the jail or do they float throughout it, or do
18 you know?
19 A. Normally, a typical floor, if they're normally
20 assigned to a particular floor and sometimes they may
21 be assigned to the same pod frequently, it's possible.
22 Q. Making sure I understand this, generally
23 they're assigned to a floor and they maintain
24 themselves on that floor as far as their schedule.
25 Depending on how it's set up, it may be even more

Page 43
1  narrowed down, not only the floor but the pod?
2  A. That's possible, yes, sir.
3  Q. Have you ever had any indication that the
4  CorreTrak log was inaccurate or had been manipulated in
5  any way?
6  A. No, sir.
7  Q. Do you believe anything should have been
8  changed in the policies and procedures to address the
9  incident that you reviewed here in Kevin Sanchez's
10 death?
11      MR. NYALLAY: Objection to form.
12 A. After every incident --
13 Q. I'm sorry?
14 A. I thought he told me to stop.
15      MR. NYALLAY: Any objection, you can still
16 go ahead and answer unless I say otherwise. You may
17 proceed, Major.
18 A. So after every incident --
19 Q. Do you need the question again?
20 A. (Moving head up and down).
21 Q. Do you personally believe that anything should
22 have been changed in the policies, procedures, or how
23 things were done after doing this review of Kevin
24 Sanchez's death? Is there anything at all you feel
25 should have been changed in policies and procedures?

Page 44
1  A. After every incident there is a recommendation
2  and that's written up by the chair to send back to the
3  bureau or the -- with the investigator, but the things
4  that were in place as far as the CorreTrak rounds were
5  good. That procedure is good.
6       There should have been a better -- I guess
7  at some point to where the contraband got into that
8  area, there should have been a better search or
9  something at some point. Where we broke down there, I
10 don't know. We don't know if that came from court,
11 clinic, dayroom or whatever, but somehow the substance
12 got to that young man that he ingested. So if they
13 could have prevented that, that would have been
14 helpful, as well.
15 Q. Do you remember, was a recommendation written
16 up after this incident?
17 A. I'm not sure, but I'm sure we discussed it, as
18 is common practice, of how to prevent and do things
19 better. It's kind of akin to if someone had an
20 accident, we refer them to --
21 Q. I'm sorry, say that again?
22 A. Kind of akin to if someone has an accident we
23 refer them to defensive driving and they write it down
24 and they make their recommendation.
25 Q. Do you believe in this particular incident that



Page 45

1  the failure to monitor in Mr. Sanchez's death was more
2  an issue of not following the policy, or the existence
3  of the policies as they were written?
4         MR. NYALLAY:  Objection to form.
5     Q.  You can answer, sir.
6     A.  The bigger issue is the substance, the
7  ingestion, the consumption of the drug.  Had it not
8  been for the drug, the rounds would have still been
9  late, but he wouldn't have been dead.  But the bigger
10 issue is the introduction of contraband into the cell.
11 Had that not been there, yeah, we would have had policy
12 violation of failure to observe, but he would have
13 still been with us.  But the consumption of the drug is
14 what caused the death.
15    Q.  Is there anything that you would have
16 recommended to ensure in the future the observational
17 rounds were done correctly?
18    A.  Yes, just to observe the rounds.  I mean, to
19 observe the person in the cell and their well-being.
20    Q.  But we've seen in this situation where you had
21 multiple officers violate a policy that you say was in
22 existence.  What could be done to ensure the officers
23 are doing their job?  Is it greater supervision?  Is
24 there some other type of policy or procedure that needs
25 to be put in place?  How do you make sure that going

Page 46

1  forward in the future these officers are doing correct
2  rounds and observing the individuals in their cell?
3     A.  We just have to do our job.  I mean, we can --
4  we can put a lot of things --
5     Q.  When an individual --
6     A.  I'm sorry, go ahead.
7     Q.  When an individual is being detained in Harris
8  County, is Harris County responsible for their
9  well-being?
10    A.  Yes, sir.
11    Q.  And at the time they're being detained, they
12 have no real freedom, so anything and everything they
13 do is controlled by Harris County, correct?
14        MR. NYALLAY:  Objection to form.
15    Q.  Is that correct?
16    A.  No, sir.
17    Q.  Okay.  So you have somebody in a lockdown cell
18 23 hours a day.  What control do they have over their
19 life and what they're doing?
20    A.  What they ingest is one thing.  Everything else
21 is on us, but we -- we are obligated to give them food,
22 shelter, and a place to sleep while they wait for their
23 hearing, but to ingest something that's illegal,
24 that's -- that's a -- that's on them.  That's something
25 that they made a decision, a bad decision to do.  They

Page 47

1  shouldn't have -- it shouldn't have been there, granted
2  that, but --
3     Q.  Let's talk -- let's talk about that.  He
4  obtained this while he was in custody, correct?
5     A.  Correct.  Yes, sir.
6     Q.  So was it the jail's responsibility to make
7  sure that contraband didn't get introduced to the
8  inmates?
9         MR. NYALLAY:  Objection to form.
10    Q.  You can answer the question, sir.
11    A.  We don't know where the contraband came from.
12 It could have been him that brought it.
13    Q.  Okay.  He had been in custody for a number of
14 months and he was in a lockdown.  Even if he brought it
15 in himself, wouldn't it be the jail's responsibility to
16 make sure he's not bringing any contraband in?
17    A.  Yes, sir.
18    Q.  And is it also the jail's responsibility to, to
19 the extent possible, eliminate contraband being
20 available to its detainees?
21        MR. NYALLAY:  Objection to form.
22    Q.  You can still answer, sir.
23    A.  So the contraband, there lies the question, and
24 I struggle with that.  He's in a single-man cell.  Was
25 this something that he ingested, imported in his cell

Page 48

1  and passed it and then ingested it again as a drug?  I
2  don't know, but there again, we don't do cavity
3  searches and people do consume things to conceal it.
4  And did he pass this at a later date and then consume
5  it as a stimulant or a drug?  I don't know.  But there
6  lies the question.  How did he get it if he's in a
7  single-man cell?
8     Q.  I will tell you that there is an allegation
9  that another inmate provided him the drugs.  Whether
10 that's true or not, I don't know, but would it have
11 been the jail's responsibility to make sure that other
12 inmates aren't providing drugs to their fellow inmates?
13    A.  Yes, sir.
14        MR. NYALLAY:  Objection to form.
15    Q.  And would you agree, at least in this
16 situation, somehow, someplace, some way the jail failed
17 to ensure that Mr. Sanchez did not get ahold of this
18 substance?
19        MR. NYALLAY:  Objection to form.
20    Q.  You can still answer the question, sir.
21    A.  I'm not really clear on the question.
22    Q.  Let me try to rephrase it.
23        Would you agree that if Kevin Sanchez got
24 the substance that he ingested from another inmate,
25 that somewhere policies, procedures, or the actual



Page 49

1  performance of those policies and procedures failed?
2       MR. NYALLAY: Objection.
3    A. He got the substance, yes. We failed to keep
4  him from getting the substance.
5    Q. And would you agree that if for an eight-hour
6  period Mr. Sanchez was laid out across the toilet unit
7  with his feet towards the door and his head towards the
8  bed, that is something that should have been observed
9  and looked into?
10   A. Yes, sir.
11   Q. Have you understood my questions, sir?
12   A. Yes, sir.
13   Q. Have I been polite to you?
14   A. Yes, sir.
15   Q. And have you answered all the questions
16  truthfully?
17   A. Yes, sir.
18       MR. BOENIG: I will pass the witness.
19              EXAMINATION
20  BY MR. NYALLAY:
21   Q. All right, Major Collier, I will be asking a
22  few followup questions. Would you like to take a quick
23  break, or are you able to continue?
24   A. Just to get some water.
25       MR. NYALLAY: Let's take a five-minute

Page 50

1  break.
2       THE REPORTER: Off record, 4:07.
3          (Recess taken)
4       THE REPORTER: We're on the record at 4:12
5  P.M.
6    Q. Hello, Major. I'll be asking you a few
7  followup questions today about some of the things that
8  have been covered here.
9       You were asked earlier whether you
10  reviewed the policy that was potentially violated in
11  this case before doing your investigation or
12  disciplinary hearing. Is it a normal, is it a regular
13  thing to review the policy before actually listening or
14  hearing the investigator's report.
15   A. No, sir.
16   Q. And you had stated earlier that when you have a
17  case like this you review the -- a lot of information
18  which includes the accused officer's history, correct?
19   A. Yes, sir.
20   Q. In this case, did you happen to review the
21  history of the two officers that were in the
22  disciplinary action?
23   A. It's standard procedure, so I would assume we
24  did.
25   Q. Did you find any information that would have --

Page 51

1  any information about these particular officers failing
2  to perform proper rounds previously?
3    A. Not to my knowledge. Not to my memory.
4    Q. Okay. In reviewing, you also mentioned that
5  prior violations of other policies are some of the
6  things that the disciplinary committee that you headed
7  would consider in determining the appropriate
8  disciplinary action, correct?
9    A. Right.
10   Q. Okay. In this case, you have stated that
11  Officer Stewart was placed on 120 hours probationary
12  period, correct?
13   A. That's what was stated, yes, sir.
14   Q. Okay. And at the time of that investigation
15  and the documents you reviewed, was that an appropriate
16  disciplinary action for the incident involved?
17   A. I would say yes.
18   Q. Okay. And just now you were asked a question
19  about -- but I don't know if you understood that
20  question very well. I did not. So was the
21  disciplinary action that the officers received, was it
22  because of them failing to properly conduct their
23  rounds or it was because an inmate died?
24   A. Because they failed to properly conduct their
25  rounds.

Page 52

1    Q. Okay. Because I wanted to clarify that.
2       And then you were asked another question
3  about monitoring the videos in the facility, and I know
4  that you said -- were you ever a deputy officer
5  yourself?
6    A. Yes, sir.
7    Q. Okay. And I know that may have been a long
8  time ago. Correct?
9    A. Correct.
10   Q. Okay. So when it comes to the videos in the
11  control room, how do the videos usually work? How are
12  they? What do they look like?
13   A. If you can imagine an office in the center of
14  four rooms with glass on all sides, so you have the
15  monitor in front of you and then you can also
16  physically look 360 degrees around you and see the
17  individual pods.
18   Q. So are the cameras or the videos that the
19  officer -- and you have stated earlier an officer is
20  always assigned to be inside of the control panel,
21  correct?
22   A. Correct; yes, sir.
23   Q. And that officer has access to the videos from
24  the cameras in the cells?
25   A. Correct.



MAJOR C. COLLIER  
WAGNER vs HARRIS COUNTY, TEXAS  
August 14, 2025  
53–56

Page 53
1   Q. Okay. And they are watching the videos. I
2 mean, you stated earlier that you reviewed some of
3 these videos before today. So in watching some of the
4 videos that we got, there are some of them that have
5 black spots somewhere by the toilet area. Are you
6 familiar with that?
7   A. Yes, sir.
8   Q. And what are those black spots for?
9   A. Those generally are for if a person was in the
10 shower, it would cover their -- or the toilet, for sure
11 for the toilet it would cover up their private areas,
12 about where their private areas would be, or if they're
13 in the shower it would cover that area of the body that
14 you can't watch a monitor and just observe someone
15 using the restroom or showering.
16   Q. Okay. So you would say that black spot is
17 generally for privacy purposes?
18   A. Privacy, yes.
19   Q. Okay. So would that black area sort of affect
20 an officer who is in the control panel that happened to
21 be looking at the cameras from the cell?
22   A. Yes.
23   Q. If someone was sitting on the toilet?
24   A. Yes, correct.
25   Q. And the inmates, we learned earlier that the

Page 54
1 inmates here were under 23-hour lockdown, correct?
2   A. Correct.
3   Q. So that means they have an hour of dayroom time
4 every day?
5   A. Yes, sir.
6   Q. So during that hour of dayroom time, what does
7 that look like?
8   A. It depends on the area. Sometimes it may be
9 more than one inmate in that area or it may be where
10 they're kept separate and it's just that individual
11 inmate that's allowed in the day area.
12   Q. Okay.
13   A. But it's a common area that's used by multiple
14 inmates from different separation cells.
15   Q. So they are allowed to move around while
16 they're in the dayroom, correct?
17   A. Yes.
18   Q. And during that time they may or may not be
19 able to obtain things from other inmates who may
20 actually be in the cell?
21   A. Well, they could probably move around to the
22 front -- they can't physically touch the other inmates,
23 but stuff could be passed, like slid under the doors or
24 left at the dayroom table, stuff like that.
25   Q. Okay. In this case, during your review of the

Page 55
1 documents involved in your disciplinary process, did
2 you -- what was the cause of this particular inmate's
3 death that you came across?
4   A. The ingestion of an unknown substance.
5   Q. Okay. Is there any information that that
6 unknown substance was passed to him by an officer?
7   A. Not to my knowledge.
8   Q. Okay. Are those unknown substances illegal in
9 the jail setting?
10   A. Everything is illegal except what's given to
11 him as far as from the clinic or from the kitchen.
12   Q. And you have stated earlier and we all agree
13 that these officers involved failed to do proper
14 rounds, correct?
15   A. Correct.
16   Q. But without the inmate ingesting the controlled
17 substance -- and I believe the medical report said it
18 was a fentanyl overdose. Without that, without the
19 inmate actually consuming that substance, would you say
20 that the inmate would have still been with us today?
21     MR. BOENIG: Objection, form.
22   A. Yes.
23   Q. Okay. So you were asked earlier about what
24 responsibility do you feel that the officers or even
25 the sheriff's department had in the death of this

Page 56
1 particular inmate. What would you say to that as far
2 as responsibility for this inmate's situation?
3   A. Can you repeat that question, sir?
4   Q. Yeah. My question is, do you feel that Harris
5 County or the officers involved had any particular
6 responsibility or involvement in this inmate's dying?
7   A. We failed to make the proper rounds.
8   Q. Okay. So --
9   A. As far as the consumption of the substance, how
10 he got it, we don't know, I don't know, but that was a
11 bad decision on their part to consume an illegal
12 substance. And, yes, we failed to keep the substance
13 out of the jail, but the consumption of it was solely
14 on the inmate.
15   Q. Okay. Have you ever been involved in another
16 case where an inmate -- in a similar case like this
17 which involved an inmate ingesting or overdosing
18 themselves on a controlled substance?
19   A. Not to my knowledge.
20   Q. So that means -- would you say that an overdose
21 on a controlled substance leading to an inmate's death,
22 that's not a regular occurrence in the jail?
23   A. It's not.
24   Q. Did this inmate die because of a use of force?
25   A. No.



MAJOR C. COLLIER  
WAGNER vs HARRIS COUNTY, TEXAS

August 14, 2025  
57–60

Page 57
1  Q. And you were asked earlier about the officers
2  involved failure to conduct proper rounds, whether or
3  not the failure was a systemic issue of the sheriff's
4  department or whether it was an individual issue. What
5  did you say?
6  A. I think that probably got in the routine of
7  doing subpar rounds and it bled over to the night
8  shift.
9  Q. Okay. And you were asked about any policy
10 recommendations that you and your team may have done
11 after the disciplinary investigation in this case. Did
12 you think there was anything wrong particularly with
13 Harris County policies surrounding how rounds are
14 conducted?
15     MR. BOENIG: Objection, form.
16 A. No.
17 Q. And why is that? Do you recall what the policy
18 on the rounds are?
19 A. I think it's one round every hour or every 30
20 minutes.
21 Q. Okay.
22 A. I've been out of the system for awhile.
23 Q. Okay. Yeah, I understand. I think that's
24 correct. You know, I have reviewed some documents also
25 and it seems like -- and earlier we spoke with Sergeant

Page 58
1  Christina Love and I think she discussed that in some
2  areas, depending on whether the inmate is on suicide
3  watch or some other case, you know, where you would
4  have more frequent rounds, but in the general
5  population it's generally one round per hour.
6  A. Yes.
7  Q. Is that correct?
8  A. Yes, sir.
9  Q. Have you ever been a part of any other
10 investigation or disciplinary proceeding involving a
11 similar case that we are talking about today?
12 A. Only once, where an inmate hung himself in the
13 jail.
14 Q. Okay.
15 A. And in that case we -- there was clearly a
16 video and things such as that. The family made the
17 outcry that he was beaten and this, that and the other,
18 and we allowed the family to see the video and the
19 actions that the inmate took, to quell the suspicion of
20 wrongful doing.
21 Q. Okay. As far as contrabands in jail, is that a
22 strange occurrence in the jail setting, to have
23 contrabands, for inmates to have contrabands?
24 A. A drug, yes. Anything that's not allowed, like
25 if something is fashioned into something that it's not

Page 59
1  intended to be, it's considered contraband, but drugs
2  and stuff like that, yes, this is -- this is rare.
3  Q. Okay. And who would you say the ultimate
4  responsibility is on to avoid an overdose?
5     MR. BOENIG: Objection, form.
6  Q. Answer, please.
7  A. The ultimate responsibility is on the person
8  that's going to consume it, but it's still our
9  responsibility to keep drugs out of the jail.
10 Q. Okay.
11 A. Sheriff's office.
12 Q. And in this case during your investigation you
13 said you found out that this inmate somehow obtained an
14 illegal drug, correct?
15 A. I'll caution you, I didn't investigate it.
16 Q. No, no, yes. Not investigation. During your
17 review of the documents, investigation records.
18 A. It was passed to the inmate by someone else or
19 something that he, I don't know, got somehow.
20 Q. But somehow he got some illegal drug?
21 A. Correct.
22 Q. And that illegal drug was the ultimate cause of
23 his death, is that correct, the ingestion of that drug?
24     MR. BOENIG: Objection.
25 A. Yes, sir.

Page 60
1  Q. And whether or not, you know, those rounds were
2  actually conducted properly and him being discovered in
3  time, you cannot tell whether he would have died anyway
4  because of that overdose, correct?
5     MR. BOENIG: Objection, form.
6  A. Correct.
7  Q. Can you repeat that answer?
8  A. Correct.
9  Q. Let me rephrase the question.
10    Is there a reason to believe that even if
11 he would have been discovered in time he would not have
12 died because of that overdose?
13    MR. BOENIG: Objection, form.
14 A. I wouldn't know.
15 Q. Okay. Do you have any information as to what
16 time this inmate actually passed, passed away?
17 A. Can you repeat that question, sir?
18 Q. Do you have any information as to what time
19 this inmate may have actually passed away?
20 A. I don't remember. No, sir.
21 Q. Okay. So that means even though that there was
22 a statement earlier that the inmate may have passed out
23 on the toilet for hours before he was discovered, you
24 would not really know whether he must have already been
25 dead if he was discovered in the second hour, for



Page 61

1  example?
2  A. I wouldn't know.
3  Q. So that means we don't really know or you don't
4  know whether a proper round would have actually saved
5  his life at all?
6      MR. BOENIG: Objection, form.
7  Q. Do you know?
8  A. No, sir.
9  Q. So what would you say is more important; is it
10 conducting the rounds on time or conducting them
11 properly?
12 A. Properly.
13 Q. Did you say properly?
14 A. Yes, sir.
15 Q. And you had mentioned earlier that on the
16 CorreTrak if the round is late it will show that the
17 round is late, correct?
18 A. Correct.
19 Q. All right.
20     MR. NYALLAY: No further questions.
21     MR. BOENIG: One real quick followup
22 question here.
23           EXAMINATION
24 BY MR. BOENIG:
25 Q. You indicated that you believe completing the

Page 62

1  rounds properly is more important than completing them
2  on time, correct?
3  A. Correct.
4  Q. And we've discussed that the CorreTrak just
5  looks and sees at the time rounds are done, correct?
6  A. Correct.
7  Q. Is there any type of program, any type of other
8  system that ensures that the rounds are completed
9  properly?
10 A. Just observation of the inmate.
11 Q. Observation of who?
12 A. The inmate.
13 Q. But the inmate's not completing the rounds, the
14 officer is completing the rounds, correct?
15 A. Correct.
16 Q. So if you want to make sure the round is
17 completed correctly, who should you be observing?
18 A. The officers should be observing the inmate.
19 Q. I understand that.
20 A. Right.
21 Q. My question, though, sir, is what is done to
22 ensure that the officer is actually completing the
23 round correctly and just not on time?
24     MR. NYALLAY: Objection, asked and
25 answered.

Page 63

1  Q. You can still answer, sir.
2  A. So the CorreTrak rounds is -- it monitors if
3  it's done on time. It's the officer's obligation to do
4  it properly.
5  Q. So the answer to my question there, is there is
6  nothing other than depending on the officer to do it
7  correctly that ensures that the round is properly done?
8      MR. NYALLAY: Objection to form.
9  A. Yes, sir.
10     MR. BOENIG: I have no further questions.
11 Pass the witness.
12     MR. NYALLAY: No further questions.
13     MR. BOENIG: Thank you, sir, and thank you
14 for your time today.
15     THE REPORTER: Okay. Real quick, this was
16 pursuant to Federal Rules. Are there any further
17 stipulations?
18     MR. NYALLAY: No, ma'am.
19     THE REPORTER: And Mr. Nyallay, do you
20 need copies of transcripts for both depositions today?
21     MR. NYALLAY: Yes, please.
22     THE REPORTER: All right. We're off the
23 record at 4:33 P.M.
24     (Deposition concluded)
25

Page 64

```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
                  HOUSTON DIVISION
WAGNER, et al.              )(
                            )(
     Plaintiff              )(
                            )(
VS.                         )(   CIVIL ACTION NO.
                            )(   4:23-CV-02886
HARRIS COUNTY, TEXAS        )(
                            )(   (Jury Requested)
     Defendant              )(
                            )(
and                         )(
                            )(
ANA GARCIA and CHANDRA      )(
JENKINS                     )(
   Plaintiff-Intervenors    )(
           REPORTER'S CERTIFICATE
```

I, JODY McWHORTER, Certified Court Reporter, certify that the witness, MAJOR CEDRICK COLLIER, was duly sworn by me, and that the deposition transcript is a true and correct record of the testimony given by the witness on AUGUST 14, 2025, and that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

Pursuant to Federal Rule 30(5)(e)(2), a review of the transcript was not requested.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 22nd day of August, 2025.

_____
JODY McWHORTER, Texas CSR 6095
Expiration Date: 07-31-25
Bryant & Stingley, Inc., CRN No. 41
PO Box 3420
Harlingen, Texas 78551
(956) 428-0755