EXHIBIT 60

1              IN THE UNITED STATES DISTRICT

2            COURT FOR THE SOUTHERN DISTICT

3               OF TEXAS HOUSTON DIVISION

4    _____

5    WAGNER, et al.,

6            Plaintiffs,

7       and                          Civil Action No.

8    ANA GARCIA,                     4-23-CV-02886

9            Plaintiff,

10      and

11   CHANDRA JENKINS, as Attorney in

12   Fact for DEQUON BUFORD,

13           Plaintiff-Intervenor,

14      and

15   HARRIS COUNTY TEXAS,

16           Defendant.

17   _____

18       VIDEOTAPED DEPOSITION OF KATRINA CAMACHO

19   DATE:        Monday, March 24, 2025

20   TIME:        10:51 a.m.

21   LOCATION:    Harris County Attorney's Office

22                1019 Congress Street

23                Houston, TX 77002

24   OFFICIATED BY: Aneesa Norwood

25   JOB NO.:     7243002

                                        Page 1

APPEARANCES

ON BEHALF OF PLAINTIFF–INTERVENOR CHANDRA JENKINS:

TAYLOR HUNTER, ESQUIRE

Hunter Law Corporation

4131 North Central Expressway, Suite 900

Dallas, TX 75204

thunter@thehunterlaw.com

(214) 206-1200

ON BEHALF OF DEFENDANT HARRIS COUNTY TEXAS:

MUSTAPHA NYALLAY, ESQUIRE

Denton Navarro Rodriguez Bernal Santee & Zech, P.C.

North Egret Bay Boulevard, Suite 200

League City, TX 77573

mmnyallay@rampagelaw.com

(832) 632-2102

ALSO PRESENT:

Dan Lapeyrouse, Videographer

---

E X H I B I T S (Cont'd)

NO.    DESCRIPTION    PAGE

Plaintiff:

Exhibit 9    Disciplinary Sanctions Form 11/5/2023    146

Exhibit 10    Incident Report Note - IS23-11O5-364    147

Exhibit 11    Incident Report - 11/5/2023    150

Exhibit 12    PREA Incident 392    152

Exhibit 13    PREA Email 0000015    158

Exhibit 14    PREA Email 0000013    162

Exhibit 15    Inmate Housing History    182

Exhibit 16    Harris County SOP    189

Exhibit 17    Email 10/10/2023    191

Exhibit 18    Harris County Standard Operating Procedure    201

Exhibit 19    Photos - Email 00298    207

Exhibit 20    Photos - 272-274    245

Exhibit 21    Email 12/15/2023    247

---

I N D E X

EXAMINATION:    PAGE

By Mr. Hunter    7

By Mr. Nyallay    213

By Mr. Hunter    244

By Mr. Nyallay    255

E X H I B I T S

NO.    DESCRIPTION    PAGE

Plaintiff:

Exhibit 1    Confidential Email Form Sarah Wood    104

Exhibit 2    Email 10/18/2023, Page 15 of 245    107

Exhibit 3    Email 10/18/2023, Page 16 of 245    108

Exhibit 4    Classification Admin Review Sheet 10/02/2023    112

Exhibit 5    Disciplinary Sanctions Form 9/28/23    125

Exhibit 6    Harris County Texas Sheriff's Department Incident Report - 230928168    126

Exhibit 7    Incident Report Note, IS23-11O5-392    136

Exhibit 8    Classification Admin Review Sheet 11/05/2023    140

---

P R O C E E D I N G S

THE VIDEOGRAPHER:  We're now on the record.  The clerk may make a statement.

THE OFFICER:  Good morning, everyone. My name is Aneesa Norwood.  I'm the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 10:51 a.m.

This is the deposition of Katrina Camacho taken in the matter of Wagner, et al. vs. Harris County, Texas on Monday, March 24, 2025.

I'm a notary authorized to take acknowledgements and administer oaths in Texas. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recordings of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation

1          of such.
2          This proceeding will be recorded via
3  video technology by Dan Lapeyrouse.
4          At this time, will everyone in
5  attendance please identify yourself for the record?
6          MR. HUNTER:  Good morning.  This is
7  Taylor Hunter appearing on behalf of the noticing
8  party, Plaintiff Chandra Jenkins, as Attorney in Fact,
9  for Dequon Buford.
10         MR. NYALLAY:  This is Mustapha Nyallay,
11 attorney for Defendant Harris County.
12         MS. CAMACHO:  This is Katrina Camacho,
13 currently re-entry and education manager, former PREA
14 manager at the Harris County Sheriff's Office.
15         THE OFFICER:  Thank you.  Hearing no
16 objections, I will now swear in the witness.
17         Please raise your right hand.
18 WHEREUPON,
19         KATRINA CAMACHO,
20 called as a witness and having been first duly sworn
21 to tell the truth, the whole truth, and nothing but
22 the truth, was examined and testified as follows:
23         THE OFFICER:  All right.  Thank you.
24         Counsel may now proceed.
25         MR. HUNTER:  Thank you.

1     A   Okay.
2     Q   He's videotaping down there.  He's listening
3  and can hear everything we're saying.
4     A   Okay.
5     Q   There's a screen behind you.  And the intent
6  of today's deposition is not just to get your
7  testimony today --
8     A   Uh-huh.
9     Q   -- but also to use it at trial.  Okay?
10    A   Okay.
11    Q   Do you understand that?
12    A   I understand.
13    Q   And you understand that's why we're taking
14 everything down, including both through the court
15 reporter -- well, she's taking down the conversation
16 and then we're also videotaping it.  Do you understand
17 that?
18    A   Understood.
19    Q   Okay.  Can I have your full name?
20    A   Katrina Bonita Camacho.
21    Q   Have you ever gone by any other names?
22    A   Katrina Bonita Gray.
23    Q   Understand, we are here today in connection
24 with a federal court lawsuit that's pending in the
25 Southern District Of Texas.  And Harris County's been

1          EXAMINATION
2  BY MR. HUNTER:
3     Q   Good morning, ma'am.
4     A   Good morning.
5     Q   My name's Taylor.  I'm going to be taking
6  your deposition today.  Okay?
7     A   Okay.
8     Q   So thank you for your time.  I guess some
9  just housekeeping things before we get going.
10    A   Okay.
11    Q   So that screen in front of you, I might be
12 showing you some Exhibits during the deposition.
13 Okay?
14    A   Okay.
15    Q   Right now it's a blank sheet.  Nothing's up
16 there.  Your attorney can see the same documents on
17 that screen.
18    A   Okay.
19    Q   And then if there's any discrepancies or
20 questions about them, he will ask me.
21    A   Okay.
22    Q   Otherwise, I'll be showing you things
23 throughout the deposition.
24    A   Okay.
25    Q   We also have a videographer here.

1  named a defendant in that lawsuit.  Do you understand
2  that?
3     A   Understood.
4     Q   Okay.  All right.  So look, today is not a
5  exercise in terms of an inquisition or an
6  interrogation.  Okay?
7     A   Uh-huh.
8     Q   It's going to be very conversational.  If at
9  any point you need to take a break, just say, "Hey
10 Taylor, can I take a break?"  Five, ten --
11    A   Mm-hmm.
12    Q   -- whatever you need.  You need some water.
13 It's going to be fairly easygoing.  It's just going to
14 be a question and answer session.  Does that make
15 sense?
16    A   Understood.
17    Q   All right.  Now, I will say that this is the
18 only time I'll get to talk to you at any point during
19 the lawsuit.
20    A   Okay.
21    Q   So it might be -- seem like I'm asking a lot
22 of questions, or we're here for a long time, but it's
23 because this is the only opportunity that I'll
24 actually get to speak to you --
25    A   Okay --

1    Q    -- at all during the litigation.  Does that
2  make sense?
3    A    Makes sense.
4    Q    Okay.  All right.  Can I have your date of
5  birth?
6    A    October 6, 1979.
7    Q    Okay.  And place of birth?
8    A    Houston, Texas.
9    Q    Okay.
10    A    Mm-hmm.
11    Q    And you're a native Houstonian?
12    A    I am.
13    Q    All right.  What's your current address?
14    A    643 Autumnwood Street, Houston, Texas 77013.
15    Q    In terms of your testimony today, is there
16  anything that will prevent you from giving your best
17  testimony today?
18    A    No.
19    Q    All right.  So no prescription drugs?  No
20  alcohol?
21    A    No.
22    Q    Okay.  You got enough rest last night?
23    A    Yes.
24    Q    All right.  That makes one of us.  Is this
25  your first deposition?

Page 10

1    A    It is.
2    Q    All right.  And have you ever testified at
3  all?
4    A    No.
5    Q    All right.
6    A    I've been subpoenaed before, but usually
7  it's rectified before we go to trial, so.
8    Q    Meaning the case settles or something like
9  that?
10    A    Whatever happens, whether it's settled, or
11  they have enough testimony.  Whatever it may be.
12    Q    All right.  So you've been -- it's your
13  understanding, while employed, you've been given like
14  a notice of deposition or perhaps an attorney's called
15  you and said, "Hey" --
16    A    Correct.
17    Q    -- "I've received a notice of deposition."
18  But today's your actual first time showing up and
19  testifying?
20    A    Yes.
21    Q    All right.  You understand you're under the
22  oath of penalty of perjury today?
23    A    Yes.
24    Q    And the testimony you give today has the
25  same force and effect as it would if you were

Page 11

1  testifying in court.  Do you understand that?
2    A    Yes.
3    Q    All right.
4    A    This is court to me.
5    Q    All right.  Very good.  If I ask you a
6  question, and you provide a response, I'm going to
7  take that to mean that you understood my question.
8    A    Okay.
9    Q    Is that fair?
10    A    That's fair.
11    Q    If I ask either a bad question, or you don't
12  understand it, could you say, "I don't understand," or
13  "Could you rephrase?"
14    A    Most definitely.
15    Q    All right.  Did you review any materials to
16  prepare for today?
17    A    I reviewed the case.
18    Q    And what did you review?
19    A    Just the PREA case that was done by
20  Investigator Andrew Guerrero and Investigator Kedrick
21  McCutcheon.
22    Q    Okay.
23    A    Mm-hmm.
24    Q    Besides that case information, did you
25  review anything else?

Page 12

1    A    No.
2    Q    How long did you review that case
3  information for?
4    A    Maybe a hour, hour and a half.
5    Q    And when did you do that?
6    A    Last week.
7    Q    Did you speak with Officer Guerrero to
8  prepare for today?
9    A    No.  He's no longer an investigator and
10  neither is Kedrick McCutcheon.
11    Q    Did you speak with either of those
12  individuals to prepare for today?
13    A    I have not.
14    Q    Okay.  Is Officer Guerrero still employed
15  with Harris County?
16    A    He is.  He just recently came back from the
17  BPOC, which is the basic peace officer.  So he is -- I
18  think he's working at the joint processing center.
19    Q    Okay.  And what about Mr. Kedrick --
20    A    Kedrick McCutcheon?
21    Q    Yeah.  Kedrick.
22    A    He also still works there, but he now works
23  in operations.
24    Q    Okay.  But they're still technically
25  employees of Harris County --

Page 13

4 (Pages 10 - 13)

1    A   Correct.
2    Q   -- under Harris County's control?
3    A   Correct.
4    Q   All right.  All right.  Besides folks from
5    Denton Navarro, the defense firm --
6    A   Mm-hmm.
7    Q   -- or in-house Harris County attorneys --
8    A   Mm-hmm.
9    Q   -- did you meet with anybody?
10   A   No.
11   Q   Okay.  I take it you met with some of your
12   attorneys to discuss today's proceedings, though?
13   A   Correct.
14   Q   All right.  And you understand those
15   conversations are privileged attorney client?
16   A   Correct.
17   Q   All right.  Good deal.  Did you review any
18   materials with your attorneys?
19   A   Probably the materials that we're probably
20   going over today.  I'm guessing that's probably what
21   it was.  It's nothing but just the materials that was
22   in the case -- the PREA case itself.
23   Q   All right.  Did you review the PREA case
24   with your attorneys?
25   A   Yes.

Page 14

1    Q   All right.  Did you make any notes during
2    that meeting?
3    A   No notes.  Just verifying that everything
4    was in the file.  That's it.
5    Q   Okay.  And we'll get to all that stuff, so.
6    A   Okay.
7    Q   Kind of the way that these things work is
8    it's almost like getting to know somebody.
9    A   Mm-hmm.
10   Q   So we're going to start with your
11   background, do some generalities, and then get
12   specific.  You understand I represent the family,
13   Chandra Jenkins, the mother, and Dequon Buford, the
14   son.
15   A   Yes.
16   Q   All right.  And I guess just for purposes --
17   we're throwing out PREA because we both know what it
18   means.  But what is PREA?  That acronym, what does it
19   actually stand for?
20   A   Prison Rape Elimination Act.
21   Q   Okay.  And is that a federal law?
22   A   It's a federal standard that was enacted in
23   2003.
24   Q   All right.  In terms of your educational
25   background, I understand you're from Houston.  Did you

Page 15

1    go to high school around here?
2    A   I went to Barbara Jordan High School for
3    Careers.
4    Q   Okay.
5    A   Mm-hmm.
6    Q   And after you graduated from Barbara Jordan
7    High School for Careers, where did you go?
8    A   Mm-hmm.  I had some college in San Jacinto
9    College North, and I'm currently in college right now.
10   Q   You stay busy?
11   A   I do.  I stay very busy.
12   Q   What are you currently studying?
13   A   Criminal justice and sociology.
14   Q   Okay.
15   A   Mm-hmm.
16   Q   And then when you were at San Jacinto the
17   first time, what were you studying?
18   A   Nursing.
19   Q   Nursing.
20   A   Mm-hmm.
21   Q   Did you ever complete the nursing degree?
22   A   I did not.  I did all my prerequisites but
23   then ended up starting working for the sheriff's
24   office.
25   Q   Okay.  And when did you start working for

Page 16

1    the sheriff's office?
2    A   2005, December 19th.
3    Q   December 19th.
4    A   Mm-hmm.
5    Q   And who's your current employer?
6    A   Harris County Sheriff's Office.
7    Q   All right.  So you're going to have a
8    20-year anniversary this year?
9    A   Correct.
10   Q   All right.  Congrats.
11   A   Thanks.
12   Q   Who's your current supervisor?
13   A   Major Lynette Anderson.
14   Q   And who is Major Lynette Anderson's
15   supervisor?
16   A   The sheriff.
17   Q   And who is that?
18   A   Ed Gonzales.
19   Q   Okay.  Do you know if Lynette also reports
20   to Assistant Chief Phillip Bosquez?
21   A   She does.  She does.  That's her direct
22   before Sheriff Gonzalez.  Correct.
23   Q   All right.  So you report to Officer Lynette
24   Anderson.
25   A   Mm-hmm.

Page 17

5 (Pages 14 - 17)

1    Q   Lynette Anderson reports to Chief Assistant
2  Phillip Bosquez, and Bosquez reports to Sheriff
3  Gonzalez?
4    A   Correct.
5    Q   Okay.  During the PREA, Prison Rape
6  Elimination Act, investigation relating to
7  Mr. Buford --
8    A   Mm-hmm.
9    Q   -- was Sheriff Gonzalez involved in any
10  capacity to your knowledge?
11    A   No.
12    Q   Okay.  Was Chief Assistant Phillip Bosquez
13  involved in any capacity relating to the PREA
14  investigation of Mr. Buford?
15    A   No.  Not to my knowledge, no.
16    Q   Was Officer Lynette Anderson involved in any
17  capacity relating to the PREA investigation of
18  Mr. Buford?
19    A   No.  She wasn't even my major then.
20    Q   Besides Officers McCutcheon and Officers
21  Guerrero --
22    A   Mm-hmm.
23    Q   -- are you aware of any other Harris County
24  Sheriff's Office employees who were involved in the
25  PREA investigation of Mr. Buford?

*Page 18*

1    A   Other than -- and it -- it probably was some
2  staff that took him to the county hospital when he did
3  his SANE exam.  So there may have been some
4  transportation deputies who were involved or -- but
5  other than that, no.
6        Someone who actually was involved in the
7  investigation is probably going to be just Andrew
8  Guerrero, Kedrick McCutcheon.  The other investigator
9  is Patrice Small, and she's actually still a PREA
10  investigator.
11    Q   Is that P-A-T-R-I-C-E?
12    A   Mm-hmm.  P-A-T-R-I-C-E Small, S-M-A-L-L.
13    Q   All right.  And I believe earlier, when you
14  first started testifying, you brought up your current
15  role as, I believe, re-entry?
16    A   Uh-huh.  Re-entry and education.
17    Q   All right.  And so can you just tell me what
18  your official title is?
19    A   Re-entry and education manager.
20    Q   Okay.
21    A   Mm-hmm.
22    Q   And did you kind of gravitate towards that
23  role, or how did you find yourself in that position?
24    A   Well, when I was conducting PREA, I was also
25  connecting with a lot of the community partners

*Page 19*

1  outside of the jail.  And so when the re-entry manager
2  position came up, I applied for it.
3    Q   Okay.  And how long have you been in that
4  position?
5    A   Since May 2023.
6    Q   So in addition to being the re-entry, I
7  guess, program specialist, you also have a PREA role;
8  correct?
9    A   I no longer have a PREA role.
10    Q   Okay.  When did your PREA role end?
11    A   So they didn't hire anyone immediately, so I
12  was still making sure that investigations were being
13  completed.  As of today, they still haven't found
14  another PREA manager, but one of the lieutenants is
15  now managing all PREA investigations.
16    Q   And who is the lieutenant who commands all
17  PREA investigations as of today?
18    A   Detention Lieutenant Shaun Ward.
19    Q   Is that S-H-A-W-Y-N or --
20    A   It's S-H-A-U-N Ward, W-A-R-D.
21    Q   Okay.  How long has Detention Officer Shaun
22  Ward been the PREA manager for Harris County?
23    A   Oh, I'm not sure exactly how long.  I'd have
24  to ask him, but I know I did assist him back in
25  January with a -- a PREA audit because it was his

*Page 20*

1  first one.  But he's -- he's been in that -- in that
2  role for at least -- I'd say at least six months.
3    Q   Were you the PREA manager before Officer
4  Ward?
5    A   Correct.
6    Q   Okay.  And how long were you the PREA
7  manager?
8    A   Since 2013.
9    Q   Until when?
10    A   Until May 2023 when I became re-entry and
11  education manager.  However, I was still assisting in
12  making sure they were at least doing their
13  investigations until they were to get someone.
14    Q   And were you involved in the PREA
15  investigations relating to Mr. Buford?
16    A   We have investigators who actually do the
17  investigations.  So the -- the investigators
18  investigate.  And what I do is make sure that they
19  have went and actually spoken to the individual.  I
20  make sure that if it's a sexual assault, that they go
21  to the clinic, and that the clinic prepares them to go
22  out to the hospital.
23        So my part of it is just managing and making
24  sure that the investigation has been done.  But the
25  actual individual who conducts the investigation is

*Page 21*

1 going to be the PREA investigators, which is Kedrick
2 McCutcheon, Andrew Guerrero, at the time, and Patrice
3 Small was the other investigator. But other than
4 that, those were the only three at the time.
5    Q   Before being hired by Harris County
6 Sheriff's Office, did you have any law enforcement
7 training?
8    A   Before being hired, no.
9    Q   Did you have any law enforcement background?
10    A   While I -- while I was at the sheriff's
11 office, I also became a police officer for Klien ISD.
12    Q   I saw that because I looked on your
13 LinkedIn.
14    A   Oh, okay. Well, okay.
15    Q   You know you got to be prepared. And that
16 was December 2008 to December 2009?
17    A   Yes.
18    Q   Was that like a part-time thing you did
19 while also employed with Harris County Sheriff's
20 Office, or did you take a sabbatical to go do Klien
21 ISD?
22    A   I actually left to go to Klien ISD, mm-hmm.
23    Q   The kids were too much, huh?
24    A   They really were. They really were.
25    Q   Yeah.

Page 22

1    A   They actually begged me to stay, and I was
2 like, "Ooh, I'm going back."
3    Q   All right. So you did the year sabbatical
4 with Klien ISD --
5    A   Mm-hmm.
6    Q   -- December 2008 to December 2009?
7    A   Mm-hmm.
8    Q   All right. So just your kind of timeline of
9 employment, so I have it. 12/19/2005, you're hired by
10 Harris County Sheriff's Office.
11    A   Mm-hmm.
12    Q   Fast forward --
13        THE OFFICER: Is that a yes?
14        MR. HUNTER: Hmm?
15        THE OFFICER: She's saying, "Mm-hmm."
16 Is that a yes?
17        THE WITNESS: Yes.
18 BY MR. HUNTER:
19    Q   Yeah. Yeah. Make sure you say yes instead
20 of uh-huh or shaking your head. Just --
21    A   You weren't finished, so.
22    Q   I know.
23    A   I was --
24    Q   So timeline of employment. You begin in
25 December 19, 2005. That's your first date of

Page 23

1 employment with Harris County Sheriff's?
2    A   Yes.
3    Q   And then December 2008, you say: "Thank
4 you, guys. I'm going to go try Klien ISD out and work
5 in their law enforcement area"?
6    A   Yes.
7    Q   All right. In December 2009, you say:
8 "Thank you very much, Klien ISD. I'm going back to
9 Harris County"?
10    A   Yes.
11    Q   And so since December 2009, you've been with
12 Harris County?
13    A   Yes.
14    Q   And in 2013, you became PREA manager for
15 Harris County?
16    A   Yes.
17    Q   And in May 2023, you left that role, but you
18 were still actively involved in the, I guess, change
19 over to Officer Ward?
20    A   Yes.
21    Q   All right. Before being hired by Harris
22 County Sheriff's Office, did you have a background in
23 jail policies and procedures?
24    A   Not before being hired by the sheriff's
25 office in 2005, no.

Page 24

1    Q   All right. What about -- before being
2 hired, did you have any background in Prison Rape
3 Elimination Act?
4    A   No, because it wasn't even enacted until
5 2003. And we actively started PREA around 2011, '12.
6    Q   Okay.
7    A   Mm-hmm.
8    Q   Well, what were they doing for the eight
9 years that PREA was enacted, and they weren't doing
10 anything?
11    A   So it was enacted by the federal -- I mean,
12 the federal standards were enacted, but it hadn't
13 started yet being implemented.
14    Q   So the Harris County Sheriff's Office
15 started rolling out their PREA implementation around
16 2011?
17    A   Mm-hmm. 2011, 2012.
18    Q   And that's about eight or nine years after
19 it was actually enacted?
20    A   Correct. And that would probably be for
21 most correctional facilities.
22    Q   Do you know that as a fact? Have you spoken
23 to any other correctional facilities --
24    A   Yes. I even have a federal PREA auditor
25 that you could speak with.

Page 25

7 (Pages 22 - 25)

1    Q   Who's that?
2    A   His name is Ian Rachal.
3    Q   Okay.
4    A   And he'll tell you that most of the
5  individuals started around probably 2011, 2012.
6    Q   How do you spell the last name?
7    A   R-A-C-H-A-L.
8    Q   Ian Rachal?
9    A   Mm-hmm.
10    Q   And is that the third-party consulting
11  company that Harris County Sheriff's Office hires to
12  do its audits?
13    A   Correct.
14    Q   How long have you guys been hiring
15  Mr. Rachal?
16    A   Well, you have to do a -- a PREA audit on
17  each jail. So I would say since around -- if you go
18  to the sheriff's office website, it'll show you our
19  first audit. That would be the first time we utilized
20  him.
21    Q   Okay. Do you know when the first audit was?
22    A   I'm not sure of the year. I'd have to check
23  on the website.
24    Q   All right. Do you see your screen?
25    A   Yes.

Page 26

1    Q   Do you see that?
2    A   Correct.
3    Q   All right. And that shows you're the
4  facility PREA compliance manager?
5    A   Yes, in 2019.
6    Q   All right. Let's see. All right. Okay.
7  All right. So going back to your kind of beginning
8  stages of employment. You become employed in 2005,
9  and then I assume you undergo some type of training
10  and education when you became employed?
11    A   For?
12    Q   In 2005 for Harris County?
13    A   Yes. When I first came on as an employee
14  with the Harris County Sheriff's Office, I was an
15  actual detention officer.
16    Q   Okay. And how long were you a detention
17  officer?
18    A   Until I went to the police academy to become
19  a peace officer.
20    Q   Do you --
21    A   I believe that's in 2008 or 9. It's been a
22  long time ago. Not sure.
23    Q   Okay. So you were a detention officer for
24  about three or four years?
25    A   Mm-hmm. In 2005. I may have been a

Page 28

1    Q   All right. So that --
2        MR. HUNTER:  Do you see it, Counsel?
3        MR. NYALLAY:  Yes.
4        MR. HUNTER:  Thanks.
5  BY MR. HUNTER:
6    Q   So this looks like it's a prison rape
7  elimination audit report dated October 15, 2019. Do
8  you see that?
9    A   Yes.
10    Q   And then do you see the individual we've
11  been discussing, Ian Rachal?
12    A   Yes.
13    Q   Okay. And is that his company, Lachari
14  Consulting LLC?
15    A   Yes.
16    Q   All right. And you see Sheriff Gonzalez's
17  name there?
18    A   Yes.
19    Q   All right. Does Sheriff Gonzalez, to your
20  knowledge, does he oversee any activities relating to
21  the audit?
22    A   No.
23    Q   Okay. All right. And then here's your name
24  right here.
25    A   Mm-hmm.

Page 27

1  detention officer for a little longer than that.
2    Q   Let's see. All right. Is that you?
3    A   Well, that is me.
4    Q   All right. You have LinkedIn?
5    A   I do. I don't go on it often, but yes.
6    Q   Is this a -- I'll scroll down, but -- it's a
7  eight-page document. Does this look like a true and
8  accurate representation?
9    A   Yes.
10    Q   Okay. And then there's your experience
11  there.
12    A   Mm-hmm.
13    Q   Some of it listed. Let's see if I can keep
14  it. All right. So there's the peace officer for
15  Klien.
16    A   Mm-hmm.
17    Q   It shows you're a detention officer here
18  from December 2005 to July 2013. Does that sound
19  right?
20    A   That sounds right. Because after I came
21  back from Klien, I -- I remained a detention officer.
22    Q   Okay.
23    A   Mm-hmm.
24    Q   And then you also had another position here,
25  detention command purchasing order?

Page 29

8 (Pages 26 - 29)

1    A  I was -- I was still a detention officer,
2  though.  That was just -- I was -- because detention
3  officers can move in different spots.  They don't have
4  to be just working the control centers.  So I was
5  doing purchasing.
6    Q  Okay.
7    A  Mm-hmm.
8    Q  All right.  As a detention officer, were you
9  required -- once it became enacted and Harris County
10  started implementing it --
11    A  Mm-hmm.
12    Q  -- were you required, as a detention
13  officer, to complete Prison Rape Elimination Act
14  training?
15    A  So when I was a detention officer, there was
16  not PREA training yet.  There wasn't PREA training
17  until I came on as the PREA manager.  That's when
18  training began.
19    Q  Okay.  And what was the reason that there
20  was a gap in no training?
21    A  Because it just wasn't -- it wasn't -- it
22  wasn't being implemented yet at the sheriff's office.
23    Q  Okay.  And when you use, I guess,
24  implementing, does that mean taking the federal
25  standard, Federal PREA law, and making it like --

Page 30

1    A  Mm-hmm.
2    Q  -- a standard operating procedure within the
3  CJCs?  Is that what you mean?
4    A  Correct.  So there wasn't -- there wasn't
5  training yet for -- for new hires.  Of course, you
6  still had some form of retraining that's related to
7  PREA because you still had sexual harassment policies.
8  You still had sexual misconduct policies.
9        And I think it was like sexual staff --
10  staff misconduct or -- but they don't even -- I think
11  they're even -- they're named different in everything
12  now.  So there was some form, but there was not an
13  actual PREA training yet until I came on as the PREA
14  manager.
15    Q  Were you the individual responsible for
16  creating the PREA training program?
17    A  It was Captain Taylor and I.  Captain
18  Taylor's no longer working for the sheriff's office.
19  He's since retired -- a long time ago.  But Captain
20  Taylor, myself, and staff members from the academy,
21  Harris County Academy.
22    Q  Okay.
23    A  And they helped to put it online, and it was
24  an eight-hour course, and it's still an eight-hour
25  course that they take online.

Page 31

1    Q  Okay.  And when you say "they," is that
2  detention officers or --
3    A  That's Harris County Sheriff's Office staff.
4  If they work the jail, they take that training.
5    Q  You can get some water.
6    A  It's mandatory.
7    Q  You can get some water.
8    A  No, I'm fine.
9    Q  Okay.  So any staff's required to take a
10  eight-hour training on PREA?
11    A  Online.
12    Q  All right.  And when did you and Officer
13  Taylor, to the best of your recollection -- when was
14  that timeframe that you guys were creating that
15  training program and implementing that?
16    A  I'll say probably around 2013, '14.
17    Q  And then in terms of how you went about
18  doing that --
19    A  Mm-hmm.
20    Q  It doesn't sound like a small undertaking.
21  So what sources of information were you pooling from
22  to create that program?
23    A  Most of it was pulled from the actual PREA
24  standards.  It's 44 standards that you have to abide
25  by.  So most of it was pulled through there.  Even the

Page 32

1  Harris County Sheriff's Office PREA Policy D116 was
2  pulled from the PREA standards.
3    Q  Okay.
4    A  And it kind of mirrors all 44 standards.
5    Q  Okay.  All right.  When you say "it mirrors
6  it" -- so Harris County, you, and Officer Taylor --
7    A  Mm-hmm.
8    Q  -- you looked at the Code of Federal
9  Regulation, the PREA Act, and you said --
10    A  Correct.
11    Q  -- "We're going to abide by that and
12  implement it into standard operating procedures within
13  Harris County Sheriff's Office"?
14    A  Yes.  Officer -- Officer -- well, Captain --
15  former Captain Taylor, he actually created the D116
16  PREA policy, and he made sure that the policy related
17  to each standard.
18    Q  All right.  And Harris County is required to
19  follow PREA?
20    A  Correct.  So the federal standards are one
21  of those things where if you don't follow it, you will
22  be -- you will lose funding, like grant funding.  So
23  it's -- it's not a - a thing where you will be
24  punished by law, but if you do not attempt to follow
25  the PREA standards, you could possibly lose grant

Page 33

9 (Pages 30 - 33)

1 funding.
2    Q    Okay. While in your role as PREA manager
3 from 2013 to May 2023 --
4    A    Mm-hmm.
5    Q    -- were you aware of any instance in which
6 Harris County lost grant money because of failing to
7 comply with PREA?
8    A    No.
9    Q    Okay. In terms of when you first became
10 PREA manager in 2013 --
11    A    Mm-hmm.
12    Q    -- did you undergo any specific training for
13 that role?
14    A    Yes. So I actually -- while being the PREA
15 manager, there are a couple of things that I did. I
16 actually went to an internal affairs division -- a
17 one-week course, which kind of just details how to do
18 investigations.
19        Because when I first became the PREA
20 manager, I did not have investigators assigned to the
21 jail. The investigators were actually sex crimes
22 investigators, which is a different bureau.
23        And so I had to make sure that sexual abuse,
24 sexual harassment, and all -- well, the penetration
25 cases were forwarded to the actual sex crimes bureau.

1 that consist of?
2    A    So when you say "consist of," what do you
3 mean? Like --
4    Q    Sure. I'll rephrase it.
5    A    Okay.
6    Q    When you're instructing them, is it like
7 driver's education or school where you're like up
8 there lecturing and -- or how would you instruct them?
9    A    It would be in person.
10    Q    Okay.
11    A    Mm-hmm.
12    Q    And if it was for new hires, is it like one
13 little segment on their new-hire education, or is it a
14 full day dedicated to PREA, or what --
15    A    It's two hours.
16    Q    Two-hour course?
17    A    Uh-huh.
18    Q    All right.
19    A    Because the new hires -- it's like a -- a
20 two-week course. So you have different sections of
21 the Harris County Sheriff's Office coming in and
22 giving a class.
23        So in that first day, they may have maybe
24 four different instructors coming in and teaching
25 something. Then the next day, they'll have more

1 And then the other ones were investigated by myself
2 that were not criminal.
3        So I had to make sure that I could -- knew
4 how to do investigations. I had to take, of course,
5 sexual harassment courses and the staff misconduct
6 courses that we had on our site. And that's basically
7 it.
8        And just -- once I got the PREA auditor, any
9 questions came up that I could not get out of the
10 standards, I made sure I contact him and asked him
11 about different PREA situations. But other than that,
12 PREA's one of those things where it's never ending.
13    Q    Right.
14    A    There's always something that you're going
15 to learn even if you're there years and years and
16 years.
17    Q    Okay. While you were employed as the PREA
18 manager, did you undergo, like, yearly education on
19 the Prison Rape Elimination Act?
20    A    Yes. Well, I actually was the instructor
21 for the new hires, contractors. So I actually gave
22 this training, like, on a weekly basis if needed. The
23 same training that the academy created.
24    Q    And when you would do the instruction as the
25 PREA manager for new hires or contractors, what would

1 instructors coming in and teaching something. Then
2 the next day --
3    Q    Okay. Did you teach that course -- or not
4 course. Strike that. Were you an instructor for new
5 hires on PREA from -- throughout the entire time you
6 were a PREA manager?
7    A    I was a TCO instructor and -- by the -- by
8 the state. So I was an instructor when needed. So
9 for the new hires, when they needed me to come out and
10 do it -- when the academy needed me to come out and do
11 it, I would do it.
12        And I would also do it sometimes for
13 contractors if they were not getting it through their
14 PowerPoint that was offered. If we had some Harris
15 Health employees who needed it, I would conduct it for
16 them as well.
17    Q    Okay. And you did that for approximately a
18 decade?
19    A    Probably not an entire decade because I
20 didn't get my instructor license when I first started.
21 I'd have to look at the year of my instructor license
22 to let you know when I started.
23    Q    Okay. Would you -- safe to say at least
24 five years?
25    A    Yes.

1    Q   Okay. So some timeframe between when you
2 started and five years. It could be six? It could be
3 seven?
4    A   Correct.
5    Q   Okay. At any point in time during those
6 years that you're doing instruction --
7    A   Mm-hmm.
8    Q   -- did you ever take PREA events that were
9 occurring in the jail and think, "How can I take that
10 event, apply it to the instruction, and make the
11 practices better for Harris County to where we're
12 implementing PREA and advancing its goals"?
13    A   Are you saying, did I utilize scenarios
14 sometimes for classroom events? Is that what you're
15 asking?
16    Q   Correct.
17    A   Yes. Yes. You -- I mean, for it to be a
18 real example for them -- because it's something that
19 may happen to the individuals who work in the jail,
20 yes. You need to take scenarios, without giving
21 individuals' names or years or when it happened, and
22 put it in the classroom and say, "If this happened,
23 what would you do?"
24        And then let them know that this is what
25 happened and, "How would you have done something
                                                Page 38

1 better?" And, "What could you have done better?"
2 "What are some clues you can look for if this was to
3 happen in the future?" "Who would you contact?"
4 "Would this person go to medical?" "Would this person
5 not go to medical?" So just different questions.
6    Q   Okay. Do you recall any specific instances
7 of something that actually occurred at the jail that
8 you then took to the training and trained on it?
9    A   I can't think of anything specific right
10 now, but yes. There have been scenarios that I've
11 utilized from incidents that -- that have happened.
12 But I can't think of, like, a specific one right now.
13    Q   All right. So in addition to the new hires
14 completing their two-hour course with you, were those
15 individuals also required to complete the eight-hour
16 online PREA training?
17    A   So after the new hires come on, and they get
18 that training, then they have to do their PREA
19 training every other year.
20    Q   Okay.
21    A   Mm-hmm.
22    Q   All right. So they do two hours and then
23 they don't do anything else for a year or two years?
24    A   I would say one year.
25    Q   Okay.
                                                Page 39

1    A   So they're -- they get that training and
2 then they have to do the other training. And then
3 every other year after that, they have to do the
4 training.
5    Q   Okay. And that's like a online video module
6 program?
7    A   It is. It's eight hours.
8    Q   And you were one of the individuals who
9 created that?
10    A   It was -- yes. I was the actual person
11 talking in the -- the video, talking to the staff
12 member from the academy.
13    Q   Okay. Does Harris County still use that
14 video slide?
15    A   I believe so, but I would have to check to
16 be sure.
17    Q   Okay.
18    A   But I believe they do.
19    Q   If we were to ask for a copy of that, would
20 they be able to get that?
21    A   I'm sure they would.
22    Q   In terms of the eight-hour PREA video --
23    A   Mm-hmm.
24    Q   -- are you aware of Harris County employees
25 who, you know, just fast forward through that video?
                                                Page 40

1 They don't give a rats about it. They just fast
2 forward it and do the modules?
3    A   I don't think you can fast forward through
4 it.
5    Q   It's not one of those where you can just
6 play a video and --
7    A   No.
8    Q   -- come back to it and take a test?
9    A   No.
10    Q   Okay.
11    A   You have to -- you have to go through it.
12 You have to -- like, it won't let you go past it.
13    Q   Okay.
14    A   There's actually a video training for
15 inmates as well.
16    Q   Okay. Did you participate in creating the
17 inmate training video?
18    A   The first one, but they no -- no longer use
19 that one. It's -- there's now another one.
20    Q   All right. In terms of the training video
21 for Harris County Sheriff's Office employees, when
22 they complete the eight-hour training, are they given
23 a certificate? Okay.
24    A   Yes.
25    Q   All right. And going now to inmates,
                                                Page 41

11 (Pages 38 - 41)

1  besides the inmate training video, is there any other
2  PREA brochures or paperwork that are given to inmates
3  upon intake?
4       A   Yes.  So there is an inmate brochure that
5  they get when they first enter.  They should get it
6  once they get to classification.  There's also a PREA
7  questionnaire that they have to answer in
8  classification.  It's about ten questions.  And then
9  there's the inmate orientation video that they'll see
10  while they're in receiving before they even make it to
11  the floors.
12       Q   Did you participate in the creation of the
13  inmate brochure?
14       A   The initial ones, yes.  But there are new --
15  there have been new ones since then.
16       Q   What about the PREA questionnaire?
17       A   The PREA questionnaire is something that is
18  on the offender management system.  So those are your
19  classification staff members who are asking those
20  questions?
21       Q   Say that again?
22       A   The questions that are answered are through
23  the offender management system, and those questions
24  are answered through the classification staff.  The
25  ten questions that are asked -- asking actually

Page 42

1  come out of the PREA standards.
2       Q   Okay.  Do you know what those ten questions
3  are?
4       A   Not off my -- top of my head, but they are
5  in the PREA standards.
6       Q   And when you say "the PREA standards," you
7  mean the Prison Elimination Act that was actually
8  signed into law by George Bush?
9       A   Correct.  Correct.
10       Q   Okay.  President George Bush, I guess.
11       A   Yes.
12       Q   Okay.  And the orientation videos that they
13  get before going to the floors, you initially
14  participated in the creation of those; is that true?
15       A   Initially, yes.
16       Q   They --
17       A   We actually had the Moss Group come out and
18  they -- actually, it was an actual production and
19  Houston Area Women's Center was also involved in it.
20       Q   Is that M-O-S-K?
21       A   M-O-S-S.
22       Q   Oh, Moss Group.
23       A   Yes.
24       Q   What are they?
25       A   So the Moss Group is like a correctional

Page 43

1  advocacy group, and they create trainings, and they
2  assist with production, such as that -- when it comes
3  to sexual abuse in correctional facilities.
4       Q   When did Moss Group come out to help create
5  the orientation video for inmates?
6       A   I'm not sure.  I have to look at the year.
7  It's been years ago.
8       Q   Okay.  Was that while you were PREA manager?
9       A   That was while I was PREA manager, yes.
10       Q   Okay.  Okay.
11       A   But that -- there's a whole other video now.
12  There's an updated video.
13       Q   All right.  So I think we've kind of gone
14  through it all, but I just want to clarify.  In terms
15  of the Prison Rape Elimination Act, PREA --
16       A   Mm-hmm.
17       Q   -- the rules of the road where Harris County
18  and its employees get the source of knowledge that
19  controls on PREA.  Okay?
20       A   Okay.
21       Q   So you obviously have PREA itself, the
22  federal legislation; right?
23       A   Yes.
24       Q   And then you have internal standard
25  operating procedures, the CJCs that implement PREA?

Page 44

1       A   Yes.
2       Q   Other than those two, are there any other --
3       A   So staff members also get -- they have a
4  brochure for contractors and employees as well.
5  It's -- it's on the Harris County Sheriff's Office
6  website.
7           Our contractors and volunteers who come in,
8  they also have to sign off knowing that -- that
9  they've -- understand the brochure and that they've --
10  they're familiar with the PREA standards.  So there is
11  a acknowledgement form for them as well.
12           And then there's also an acknowledgement
13  form for human resources to conduct background checks
14  every five years on their employees.  And that's it.
15  So everything is on the Harris County Sheriff's Office
16  website, even the forms, the brochures, the posters,
17  the flyers.
18       Q   Okay.  All right.  So back to kind of the
19  rules of the road for PREA.
20       A   Mm-hmm.
21       Q   Some of the things that we've been talking
22  about would be internal education.  Is that another
23  source where Harris County gets the PREA -- what
24  controls for PREA is through its own internal
25  education?

Page 45

12 (Pages 42 - 45)

1    A   Yes.  So the new hires and then you have the
2  online for current staff.
3    Q   Are there ever external education sources
4  where, say, a third party comes in and provides
5  education to Harris County or --
6    A   Not that I'm aware of, unless they are
7  investigators or -- so I know the investigators do
8  some -- get some form of outside training, and they
9  also train with sex crimes.  And I do know, right now,
10  that the sheriff's office is looking into getting an
11  external LGBTQI individual to teach.  But that's it.
12  I'm not aware of anything else.
13    Q   Okay.  All right.  And then, obviously, we
14  have the internal training --
15    A   Mm-hmm.
16    Q   -- that we went over.  So really is it four
17  sources of information that Harris County looks to in
18  terms of what governs -- in terms of PREA itself, the
19  standard operating procedures, internal education, and
20  internal trainings?
21    A   So I would say the PREA standards and CJC
22  116 are going to be your sources for not only
23  reviewing the standards, but also when it comes to
24  training.  Because any training that's performed are
25  taken from either the standards or the policy.

Page 46

1  County Sheriff's Office employees to shackle and
2  handcuff an individual following a PREA allegation?
3    A   No.
4    Q   Are you aware of any Harris County internal
5  education programs where shackling and handcuffing an
6  individual, following a PREA allegation, is acceptable
7  standard?
8    A   No.
9    Q   Are you aware of any Harris County internal
10  trainings where shackling and handcuffing an
11  individual, following a PREA allegation, is acceptable
12  standard?
13    A   No.
14    Q   Okay.  Do you agree that shackling and
15  handcuffing an individual after a PREA allegation is
16  unacceptable?
17        MR. NYALLAY:  Objection.  Form.
18  BY MR. HUNTER:
19    Q   You may answer.
20    A   So I think that depends on the actual
21  situation of the individual at the time.  In the -- is
22  the individual being violent?  Is the individual
23  aggressive?  So simply because an individual has been
24  shackled after a PREA incident does -- does not give
25  you the full picture of actually what the actions

Page 48

1    Q   Okay.  So all of those things that we kind
2  of touched on earlier, brochures, questionnaires, the
3  videos, all of that is --
4    A   All those relate to either the standards or
5  the policy.
6    Q   Okay.  So those documents are created,
7  essentially, by looking at the PREA legislation and --
8  the PREA law and then -- you take the PREA law, and
9  you make the CJCs?
10    A   Yes.
11    Q   And then you take PREA law CJCs, and you
12  make all these brochures and videos and trainings?
13    A   Yes.
14    Q   Okay.  So then Harris County understands
15  that it's required to follow PREA through all these
16  different trainings in the way that it's
17  implementing --
18    A   Correct.
19    Q   -- the standards?  All right.  Are you aware
20  of any PREA legislation that directs a jail to shackle
21  and handcuff an individual following a PREA
22  allegation?
23    A   No.
24    Q   All right.  Are you aware of any internal
25  standard operating procedure that directs Harris

Page 47

1  of -- of the person is.
2        So if a staff member feels like their life
3  is in danger or feels like someone else's safety is
4  going to be violated, then an individual will be
5  shackled.  So I'd have to know the facts on why the
6  individual was shackled after the PREA incident and
7  what their actions were at the time.
8    Q   What if you have a nonviolent inmate who
9  makes a PREA allegation or is a victim identified in a
10  PREA allegation and that individual's shackled and
11  handcuffed?
12    A   If a person is being nonviolent at the time
13  of a PREA investigation -- I mean PREA incident --
14  alleged incident, and they are being shackled, they
15  should not be shackled.
16    Q   All right.  Are you able to provide a
17  definition of PREA?
18    A   I can give you my definition of PREA.  I
19  can't give you the verbatim, but it probably going to
20  be pretty close.
21    Q   All right.  Let's hear it.
22    A   All right.  So PREA is the Prison Rape
23  Elimination Act enacted in 2003 to address the rights
24  of individuals in a correctional facility, whether it
25  be a jail, prison, lockup, and it addresses sexual

Page 49

13 (Pages 46 - 49)

1 abuse and sexual harassment in jail facilities and
2 includes inmate on inmate and staff on inmate
3 incidents.
4    Q   Good.  That's a pretty solid definition.
5    A   Okay.  Thank you.
6    Q   Is PREA used to eliminate sexual assault
7 within jails?
8    A   It is used to deter and attempt to eliminate
9 sexual abuse and harassment in correctional
10 facilities, yes.
11   Q   Is PREA also used for purposes of reporting
12 sexual assault and sexual allegations, rape, and
13 things of that nature?
14   A   Yes.  Yes.
15   Q   All right.  Is PREA also used to understand
16 common reactions to sexual abuse and rape?
17   A   What do you mean?
18   Q   Does the PREA legislation or the Harris
19 County Sheriff's CJCs -- operating procedures that
20 they implemented using PREA --
21   A   Mm-hmm.
22   Q   -- do either of those two, I guess, bodies
23 of information, are those used to assist Harris County
24 Sheriff's Office employees with how individuals react
25 to a sexual assault, a sexual abuse, being raped?

Page 50

1    A   Yes.
2    Q   And how?
3    A   So the reason for the policy is so the staff
4 members can make sure that they are implementing the
5 PREA standards.  That's the reason why it was taken
6 from the PREA standards because the Harris County
7 Sheriff's Office wants their staff members to know all
8 the standards and to abide by them.
9    Q   Okay.  All right.  Besides elimination,
10 deterrence, prevention, reporting, and the last
11 subject that we talked about, is PREA used for
12 anything else?
13   A   To keep inmates safe.  It is utilized to
14 protect, detect, deter, and attempt to eliminate any
15 sexual abuse and sexual harassment in the facilities.
16   Q   Would you agree that PREA isn't just about
17 sexuality, it's about safety?
18   A   Correct.
19   Q   All right.  And is one of the overarching
20 goals of PREA inmate safety?
21   A   Yes.
22   Q   Can you describe, generally, the housing
23 assignment process following a PREA allegation?
24   A   The housing assignment following a PREA
25 allegation?  So classification is over housing

Page 51

1 assignments, and they are the ones who reclassify
2 individuals after any incident.  So they would be
3 probably a better person to talk to.
4    But I can tell you that the PREA standards
5 suggest that the individual is always separated from
6 the person that was involved in the PREA incident with
7 them.
8    Q   Okay.  So can you explain -- it's almost
9 like a tripartite relationship, and what I mean by
10 that is three parties.  So you have yourself, PREA
11 manager.
12   A   Yes.
13   Q   You have Officer Guerrero, McCutcheon, and
14 the third individual whose name escapes me right now.
15   A   Small.
16   Q   Small.
17   A   Mm-hmm.
18   Q   Officer Small.  And then you have
19 classification.
20   A   Yes.
21   Q   So how do those three -- how do those work
22 in terms of, "Hey, we have a PREA allegation."
23   A   Mm-hmm.
24   Q   "We need to follow the PREA standards, and
25 you know, we have to always get them removed from the

Page 52

1 harm."
2    A   Correct.
3    Q   So how do PREA manager, investigators, and
4 classification, how did y'all co-mingle doing what
5 needs to be done?
6    A   So the investigators also have a policy of
7 their own that they have to follow.  So you have --
8 you have the -- the allegation.  That's your first
9 thing.  You get an allegation.  You can get an
10 allegation multiple ways.
11   You can get an allegation through an
12 incident report.  You can get an allegation through
13 the PREA hotline.  You can get an allegation through a
14 supervisor who has been made aware of the allegation.
15 You can get an allegation by way of third party.
16 Third party could be an attorney.  It could be a
17 parent.  It could be a spouse, a partner.
18   So all those different ways you can get an
19 allegation.  Once the allegation is received, then the
20 PREA investigators will make contact with the alleged
21 victim.  They will then speak with the victim and do
22 their -- their investigation -- start their initial
23 investigation.
24   Depending on what the individual says -- say
25 the individual says they were penetrated.  If they say

Page 53

14 (Pages 50 - 53)

1  they were penetrated, then now the investigator will
2  have that individual immediately go to the clinic.
3      Q   Okay.
4      A   If it's not penetration, then the initial
5  investigation will then start with speaking to the
6  inmate. The inmate now goes back to their housing
7  area. Usually, they've already been relocated, once
8  they've made a PREA outcry, to another housing area.
9  So now the investigator goes back and starts the rest
10 of their investigation.
11     Q   Okay. Do you know who in classification is
12 tasked with assuring that Harris County is compliant
13 with PREA when having to rehouse people or inmates?
14     A   That's going to be your classification
15 supervisors.
16     Q   Okay. Do you know --
17     A   There are multiple.
18     Q   Do you know who the classification
19 supervisors are at 1200 Baker Street?
20     A   I know that the lieutenant is Shonda Bowers
21 [ph] at this moment. And then one of the sergeants is
22 Michael Beaudoin.
23     Q   Okay. All right. Are you aware of what
24 number -- standard operating procedures govern that
25 housing assignment process following a PREA

Page 54

1      A   Yes.
2      Q   If there's not, then they're eventually
3  rehoused. And is that decision to rehouse -- who is
4  the ultimate decision maker on that? Is it the PREA
5  manager, the PREA investigator, or classification?
6      A   Classification.
7      Q   Okay. All right. Is there ever a time, in
8  your ten years as PREA manager, where you had a
9  discrepancy where a PREA victim or somebody who made a
10 PREA allegation was housed inappropriately, and you
11 and classification spoke about that?
12     A   There has been probably a couple of times
13 when I've spoken to classification. Because I either
14 believe an individual needed to be moved or an
15 individual may be in -- you know, safety may be not
16 what I believe it should be.
17         Not saying that it was -- I -- I took extra
18 measures to make sure individuals were safe if I knew
19 that they -- especially when they come to me directly
20 and -- and say, "Hey, I feel like I need to be moved,
21 or I feel like this is happening." So yes, there have
22 been times.
23     Q   Okay. Did that happen with Mr. Buford?
24     A   I -- I know that there was an email with me
25 with classification, not necessarily about the move,

Page 56

1  allegation?
2      A   What do you mean?
3      Q   Well, is there anything besides the D116
4  PREA policy that would --
5      A   I believe that classification may have their
6  own procedure as well, but I can't be for sure.
7      Q   Okay. And either officer --
8      A   But either one of them will be able to give
9  it to you if they have one.
10     Q   And that's Bowers [ph] and how do you say
11 the other?
12     A   Beaudoin.
13     Q   Beaudoin.
14     A   Mm-hmm.
15     Q   I almost wanted to call him Officer Boodan,
16 but --
17     A   Oh, my God.
18     Q   -- I won't do that. Okay. So in terms
19 of -- we have an allegation.
20     A   Mm-hmm.
21     Q   PREA investigator goes over and contacts the
22 victim?
23     A   Yes.
24     Q   If there is a event where it's penetration,
25 they immediately go to the medical clinic?

Page 55

1  but about him being shackled.
2      Q   There was. Did you review that email before
3  today?
4      A   Yes.
5      Q   All right. In terms of the -- just to put a
6  pin in it. On the classification, when you have an
7  allegation, the investigator goes out. Is there a
8  standard operating procedure or some legislation in
9  PREA that mandates the PREA manager, the PREA
10 investigator, and classification set a meeting and
11 then decide jointly where to move an inmate --
12     A   Mm-hmm.
13     Q   -- or does it solely rest with
14 classification?
15     A   No. It -- it -- because classification are
16 the individuals who classify where individuals are
17 housed, it's classification. Now, that does not mean
18 that I can't input to give them what I suggest or what
19 I believe needs to happen because, at the time, I was
20 the PREA manager.
21         So there have been several instances where
22 I've reached out to classification and believed either
23 someone needed to be moved or something needed to be
24 handled differently.
25     Q   Okay. Are you aware that in the federal

Page 57

15 (Pages 54 - 57)

1  court lawsuit -- so I represent one plaintiff.
2     A   Okay.
3     Q   I'll tell you.  And I think there's, like,
4  35, maybe, total.  Thirty to thirty-five in this one
5  lawsuit.  Okay?
6     A   Okay.
7     Q   And I'm what's called a plaintiff
8  intervener.  I just represent Ms. Jenkins and
9  Mr. Buford.
10     A   Okay.
11     Q   There's another plaintiff intervener.  Their
12  attorneys aren't here.  And then there's, like I said,
13  a large number of plaintiffs with another firm.  Are
14  you aware that in the various lawsuits, overcrowding
15  has been alleged as a condition of confinement at
16  Harris County Jail that's causing issues?
17     A   No, I was not aware.  I have not been given
18  the -- I don't know -- the only thing I was told is
19  that -- about Buford.  I don't know anything about the
20  other things.
21     Q   Okay.  So in your role as PREA manager --
22     A   Mm-hmm.
23     Q   And we're talking about classification here.
24  How have you seen, if at all, overcrowding at Harris
25  County's jail, specifically 1200 Baker Street where
                                                    Page 58

1  Mr. Buford was?
2     A   Mm-hmm.
3     Q   How has overcrowding affected how to rehouse
4  folks who make a PREA allegation?
5           MR. NYALLAY: Objection.  Form.
6           THE WITNESS:  I don't believe that -- I
7  think that the -- the housing situation is -- is a
8  situation.  But if you have a PREA allegation, you're
9  moved automatically.
10        Because we have enough -- enough
11  individuals, even if there's a -- the -- an area that
12  is full, you can swap that individual with someone
13  else so that the individual will not be housed in the
14  same area where they had a PREA incident.
15  BY MR. HUNTER:
16     Q   Okay.  What did you mean when you said the
17  housing situation is a situation?
18     A   I mean, if the housing situation is a
19  situation, like -- it's -- it's been in the public
20  before where they have been saying that we're over
21  housed.  Right now, we are not because we have
22  individuals that are out -- so we haven't been
23  overcrowded.
24        But when it comes to PREA, there's not going
25  to be a time where someone is going to be sitting in a
                                                    Page 59

1  cell block, and they've been -- they have a PREA
2  incident, and they're going to stay there because of a
3  overcrowding situation.  Because you're going to be
4  immediately relocated regardless.
5     Q   Okay.  Could overcrowding create a situation
6  where you have somebody make a PREA allegation, and
7  due to overcrowding, they're having -- they're forced
8  to be transferred to a floor that has mandatory
9  restraints?
10           MR. NYALLAY: Objection.  Form.
11           THE WITNESS:  No.
12  BY MR. HUNTER:
13     Q   What about understaffing?  How have you
14  seen, if at all, understaffing, lack of folks employed
15  there, affect how to reclassify and rehouse somebody
16  who makes a PREA allegation?
17     A   That still --
18           MR. NYALLAY: Objection.
19  BY MR. HUNTER:
20     Q   You can answer.
21     A   That still should not -- that should not
22  affect how an individual is housed after a PREA
23  allegation.
24     Q   And why should it not?  Doesn't mean it does
25  or doesn't, but why should that not affect it?
                                                    Page 60

1     A   It should not affect it because if you have
2  a PREA allegation, and you need to be relocated from
3  the individual that was involved in a PREA allegation
4  with you, you simply reclassify the individual to
5  another housing area.  If you have to remove someone
6  to do that, so be it.  But they will be relocated.
7     Q   Okay.  In terms of the -- back to the
8  allegation -- incident reporting, are the incidents --
9  is one way incidents are reported using kiosks?
10     A   Yes.
11     Q   Okay.  And are you familiar with the inmate
12  kiosk system at 1200 Baker Street?
13     A   I'm familiar with the -- the kiosk system
14  itself, yes.  In the kiosk system, you can report to
15  medical.  You can report to classification.  You can
16  report to PREA.  You can report to re-entry and
17  education.  You can report to medical.  You can report
18  to, I think, inmate records.  A few other things.  So
19  they have connection with a lot of different
20  departments.
21     Q   Okay.  And can you just explain to us -- is
22  the kiosk system, the inmate kiosk system, is that
23  essentially the main mechanism for how inmates are
24  supposed to communicate with the jail staff, through
25  the kiosk system?  Is it required that they use that
                                                    Page 61

16 (Pages 58 - 61)

1  to communicate?
2      A   It's not required that they use that.  It is
3  a -- a source of communication, but they can actually
4  go up to the officer and speak to the officer.  We
5  have some jails that are direct supervision where the
6  detention officer is inside.  They can speak to them
7  like that.  And then the other ones are indirect
8  supervision, so they can go up to the window, and they
9  can speak to the individual.
10     Q   Okay.  During your employment since December
11  19, 2005, up to today --
12     A   Mm-hmm.
13     Q   Have you ever been made aware of complaints
14  by inmates about the kiosk system being broken or
15  down?
16         MR. NYALLAY:  Object to the form.
17  BY MR. HUNTER:
18     Q   You can answer.
19     A   Okay.
20         MR. NYALLAY:  Yeah.
21         THE WITNESS:  So yes, I've heard of
22  individuals stating that it's been not working in the
23  past.  Usually, we have -- the kiosks are run by
24  Securus system, and we actually have Securus staff
25  members that are at the jail.

Page 62

1         So just like any other electronics,
2  sometimes it goes down and the Securus staff members
3  will go and repair it.  And if it can't be repaired,
4  they will make sure that they replace it.
5  BY MR. HUNTER:
6      Q   Is that S-E-C-U-R-I-S?
7      A   S-E-C-U-R-U-S.
8      Q   Okay.  And that's like the third-party IT
9  company for the kiosk system?
10     A   For our kiosk system.  For our phone system.
11     Q   What about video cameras?
12     A   Video cameras too.
13     Q   The IT department, I will call them.  All
14  right.  Are you aware of if the kiosk being broken or
15  needing repaired is a prevalent issue at the 1200
16  Baker Street jail?
17     A   I'm not aware.
18         MR. NYALLAY:  Objection.  Form.
19  BY MR. HUNTER:
20     Q   You can answer.
21     A   I'm not aware.
22     Q   Okay.  Do you know if the kiosks are broken
23  often at the 1200 Baker Street Jail?
24         MR. NYALLAY:  Objection to form.
25         THE WITNESS:  I'm not aware.  I don't

Page 63

1  work at 1200.
2  BY MR. HUNTER:
3      Q   Okay.  Do you know if the kiosks need
4  repaired often at 1200 Street Baker?
5         MR. NYALLAY:  Objection.  Form.
6         THE WITNESS:  I'm not aware.
7  BY MR. HUNTER:
8      Q   Who would be the best person to ask these
9  questions to?
10     A   That would probably be the Securus person.
11     Q   Who's that?
12     A   The -- I have the -- I know her first name.
13  I know her last name, but I don't know how to spell
14  it.
15     Q   Can you --
16     A   Her first name is Sally and her last name
17  starts with a Z.
18     Q   How do you say it?
19     A   I always just call her Miss Sally 'cause I
20  don't know how to pronounce it.
21     Q   Is she an employee of Harris County or
22  Securus?
23     A   No.  She works for Securus.
24     Q   Okay.
25     A   And the -- the onsite person's name is

Page 64

1  Leticia.
2      Q   What's Ms. Leticia's last name?
3      A   I believe it's Garcia.  I'm not sure.
4      Q   Is Ms. Garcia a Securus or Harris County?
5      A   She's also Securus.
6      Q   Okay.  All right.  So in terms of -- I'll
7  just ask, you know, maybe a softball question.  In
8  terms of any questions I might have about the PREA
9  kiosks and, you know, maintenance, repairs, is it safe
10  to say that you would have no knowledge of that and
11  those would be better directed to either Ms. Sally or
12  Ms. Garcia --
13     A   Correct.
14     Q   -- at Securus?
15     A   Correct.
16     Q   All right.  Do you know if -- did you
17  provide PREA training to Sally and Ms. Garcia?
18     A   Ms. Garcia for sure.  That had to have been
19  a long time ago.  Ms. Sally does not come to the
20  jails.  Not on the Securus side.  She only comes to
21  the executive side.  She's more like an executive
22  supervisor, so she wouldn't need PREA training.
23     Q   Okay.  But you did provide PREA training to
24  Ms. Garcia?
25     A   I believe so, but it's been a while --

Page 65

17 (Pages 62 - 65)

1    Q   Okay.
2    A   -- ago.  A very long time ago.
3    Q   Would you expect Ms. Garcia, since she
4  underwent PREA training, to know that one of the goals
5  of PREA is to assist with reporting PREA allegations
6  within the jail?
7        MR. NYALLAY:  Objection.  Speculation.
8  BY MR. HUNTER:
9    Q   Do you know?  Can you answer it?
10   A   I'm not sure.  If -- when she -- and when
11  she did it, I'm sure that was in there, but I don't
12  know if -- I -- I don't know if she knows, you know,
13  by just saying that now because that would be a
14  question you'd have to ask her.
15   Q   Right.  You would have expected the PREA
16  training that you implemented and created to have
17  information about how PREA -- one of the goals and how
18  to effectuate that goal is reporting?
19   A   Yes.  Yes.
20   Q   Okay.  And then you gave that training, or a
21  version thereof, to Leticia Garcia, who's a Securus
22  employee who deals with the kiosks?
23   A   I -- I believe so, but it's been years ago.
24   Q   Okay.
25   A   It's been years ago.

Page 66

1    Q   All right.  And what I'm really getting at
2  is, if Ms. Garcia is a Securus employee, she's given
3  PREA training.  She understands the kiosk has a PREA
4  function --
5    A   Mm-hmm.
6    Q   -- and she knows that reporting is one of
7  the goals PREA's trying to effectuate.  But when the
8  kiosk is down, or it needs maintenance, it might seem
9  like a little thing, but if that's how they report
10  PREA --
11   A   I believe Ms. --
12   Q   -- than it's a bigger deal than it is.
13   A   I believe Ms. Leticia's goal is -- is to fix
14  it, period.  Just to repair it.  Her -- I -- I believe
15  her focus is going to be on repairing the issue,
16  repairing the actual equipment.  Now, you would have
17  to talk to her to know what she's thinking when she's
18  doing it.
19       But yeah.  I'm -- I'm sure her -- she's just
20  trying to make sure that it's repaired immediately.
21  Because it has functions for everything, not only
22  PREA, but for medical and for dental and for
23  chaplaincy.  So anything.  Everything is on there.  So
24  she's just trying to fix ASAP.
25   Q   Can you clarify for us -- and I think it's

Page 67

1  unique to Harris County, but you can tell me.  Why
2  does Harris County use the word outcry instead of
3  allegation when describing PREA?
4        MR. NYALLAY:  Objection the form.
5        THE WITNESS:  I'm not sure, because
6  when you say "Harris County," I wouldn't say that
7  everybody that works in Harris County only utilizes
8  the word outcry.  Because there have been times where
9  reports are written, and it says alleged allegation.
10  So outcry is not the only word that's utilized.
11  BY MR. HUNTER:
12   Q   Okay.  And were you the first PREA manager
13  for Harris County?
14   A   Yes.
15   Q   Where did the word outcry spur from?
16  Because it's not in the legislation.
17   A   I'm not sure.
18   Q   Just became a thing?
19   A   I guess, but -- but I know for a fact that
20  outcry is not the only word utilized to describe PREA.
21  And usually, it's alleged allegation.
22   Q   Okay.  And that's per the Prison Rape
23  Elimination Act statute and laws --
24   A   No.
25   Q   -- is allegation, not outcry?

Page 68

1    A   Allegation is utilized in the PREA
2  standards, yes.
3    Q   There's no outcry in there?
4    A   Not that I believe.  I don't -- I don't
5  believe it is.
6    Q   So even though you were the PREA manager
7  from 2013 to May 2023, you don't know where outcry
8  spurred from?
9    A   I do not.
10       MR. NYALLAY:  Objection.  Asked and
11  answered.
12       MR. HUNTER:  It's a little bit
13  different of a question actually, but --
14  BY MR. HUNTER:
15   Q   All right.  So should you include multiple
16  PREA events in one report?
17   A   It depend on if -- if the report is --
18  is pertaining to the same person.  And are those
19  allegations that the investigator are displaying, or
20  is it the same type of behavior?
21       So it depends on the investigator and how
22  they are putting the events in their investigation.
23  Are they putting those events in their investigation
24  because this is a behavior -- a similar behavior or
25  repetitive behavior.  So it depends on who the

Page 69

18 (Pages 66 - 69)

1  investigator is investigating and why they are putting
2  it in there.
3     Q   Okay.  But that's -- you're saying depending
4  on the investigator --
5     A   And the investigation.
6     Q   Okay.
7     A   Mm-hmm.
8     Q   And the investigation, but does the PREA
9  legislation allow for multiple events to be captured
10  in one report?
11     A   It does not say that it cannot be.
12     Q   Okay.  Well, are you aware of any PREA law
13  that allows Harris County to include multiple PREA
14  events within one report?
15     A   Am I -- say it again.
16     Q   Are you aware of any Prison Rape Elimination
17  Act provision --
18     A   Mm-hmm.
19     Q   -- that allows for Harris County to include
20  multiple PREA events in one report?
21     A   The PREA standard says we must investigate
22  thoroughly.
23     Q   Okay.  But are you aware -- the question's a
24  little different, understanding you have to
25  investigate thoroughly.  But are you aware of any law

1  being in one report.  Do you recall that line of
2  questioning?
3     A   Yes.
4     Q   All right.  And you responded to one of
5  those questions with depends on the investigator.  And
6  then you also discussed how you believe that there's
7  nothing within the Prison Rape Elimination Act
8  legislation that doesn't forbid Harris County from
9  putting multiple reports -- PREA events in one report.
10  Is that an accurate description of summarizing that
11  testimony?
12     A   Correct.
13     Q   All right.  Are you aware of any standard
14  operating procedures within Harris County that allows
15  for Harris County to include multiple PREA events
16  within one report?
17     A   I don't think there is a PREA standard that
18  gives a number of how many or what can be put in a
19  PREA report.
20     Q   Would PREA itself have any regulations on
21  what --
22     A   The standard?
23     Q   Yes.
24     A   I don't believe there's a standard that has
25  a number of -- when you're doing a report, what can be

1  within PREA that allows for Harris County to include
2  multiple PREA events within one report?
3     A   I'm aware that PREA standards state that we
4  are to investigate any sexual assault, any sexual
5  abuse, any sexual harassment.  I'm not aware of any
6  PREA standard that says we cannot put multiple
7  incidents in one report if it's not about the same
8  individual.
9     Q   I'm trying to see if I can find it.
10        THE OFFICER:  And, Counsel, when you
11  finish your line of questioning, can we take a break?
12        MR. HUNTER:  Yeah.  We can go right
13  now.
14        THE VIDEOGRAPHER:  Okay.  This is now
15  the end of video one of Katrina Camacho.  We're off
16  the record.  The time is 12:14.
17        (Off the record.)
18        THE VIDEOGRAPHER:  We're now back on
19  the record.  Video two of Katrina Camacho.  The time
20  is 12:22.
21  BY MR. HUNTER:
22     Q   All right.  Welcome back, ma'am.  We're here
23  again after a little short break.  Okay?  I believe
24  right before we took a break, we were talking about
25  PREA reporting, and specifically, multiple PREA events

1     Q   Each PREA allegation should be investigated
2  though; correct?
3     A   Correct.
4     Q   All right.
5     A   Correct.
6     Q   And should those be investigated
7  independently?
8     A   Yes.  If there are incidents that are
9  totally different and a -- a different individual, we
10  shouldn't be putting PREA cases together where there
11  is a -- a whole different alleged victim and a whole
12  different alleged suspect.  But --
13     Q   Should you report different inmates' PREA
14  events in one report?
15     A   No.
16     Q   Should an inmate who reports a PREA
17  allegation or PREA outcry be kept in the same location
18  of the jail?
19     A   If the alleged suspect has been separated
20  from the individual, then yes, the individual can
21  remain where they are at.  However, if that alleged
22  suspect is still in the same area, then no.
23     Q   And do you get your guidance from that from
24  PREA --

1    A   Yes.
2    Q   -- legislation?
3    A   Because all individuals have to be
4    separated.
5    Q   Following a PREA allegation, how soon
6    thereafter should an investigation begin?
7    A   As soon as possible.
8    Q   Is there an actual timeframe for that?
9    A   If it is involving penetration, within 72
10   hours.  If it's not penetration, say it's a -- say
11   it's an allegation, and we get it through a grievance,
12   we have to make sure that we -- we have to make sure
13   that we complete the individual -- I mean, the -- the
14   investigation within a 14-day period.  And the other
15   investigations are all as -- just as soon as possible.
16        But when it comes to penetration, those are
17   your most important ones that have -- like, because
18   you have to make sure that the DNA is given and has
19   been given to the medical examiner's office.  So those
20   are 72 hour.
21   Q   Is that -- the 72 hours, when it's a
22   penetration event, is that to complete or begin?
23   A   Begin.
24   Q   And what is the time limit for completing?
25   A   There is not a time limit in the standards

1    for completing.  However, you do need to provide
2    updates on -- just provide an update if you're -- if
3    it hasn't been completed.  But there's -- other
4    than -- I -- I know there's something in the standards
5    that says that if it hasn't been completed, I believe,
6    within a 60-day period, that it needs to be updated on
7    why it hasn't been completed yet.
8        And there are incidents where they will not
9    be completed if they're -- especially if they're
10   involving penetration because of the evidence being in
11   the medical examiner's office and the medical examiner
12   office having it.  And it -- they may not be finished
13   with it.  So they just have to update it and say,
14   "Hey, this is why this is not updated."
15   Q   All right.  Do you have any familiarity with
16   the video surveillance system at 1200 Baker Street?
17        MR. NYALLAY:  Objection.  Form.
18   BY MR. HUNTER:
19   Q   I mean, is that a topic that you can speak
20   to?  Do you have any knowledge of that topic?
21   A   I don't.  That would be Securus.
22   Q   Securus?
23   A   Mm-hmm.  They're over anything dealing with
24   phones, video system, kiosk system.
25   Q   Would classification at Baker Street also

1    have an idea of where the video surveillance is?
2    A   No.
3    Q   Do you have any knowledge of where the video
4    cameras are physically placed within 1200 Baker Street
5    jail?
6    A   No.
7    Q   Okay.  Who's the best person to ask the
8    these questions -- technical questions about layout of
9    video surveillance?
10   A   Leticia.
11   Q   Okay.  Leticia Garcia?
12   A   Yes.
13   Q   All right.  Do you recall watching any
14   videos as it relates to Mr. Buford's PREA allegations?
15   A   No.
16   Q   Did you request to review any videos?
17   A   Not that I can recall.  That would be more
18   of an investigator's request.
19   Q   And to maintain compliance with PREA, in
20   terms of undertaking a good faith effort to
21   investigate, would you expect a Harris County
22   investigator to review any videos relative to a PREA
23   allegation?
24   A   Yes.
25   Q   And if they don't review all videos, then

1    they're not following the standard procedure set forth
2    in PREA.  Is that true?
3    A   Right.  If they are aware of a video, and
4    they do not view that video intentionally, yes.  They
5    will not be following the standards.  Now, if they're
6    not aware of a video, then that's a different story.
7    Q   The PREA investigators should determine if
8    videos exist?
9    A   Correct.
10   Q   Okay.  And there's actually legislation in
11   PREA about videos and how videos can be -- video
12   surveillance can be used to reduce rapes and sexual
13   assaults?
14   A   Correct.  But most of the standard that is
15   on the video surveillance in PREA standards is not for
16   the investigation portion.  It's to make sure that
17   video cameras are installed in the correctional
18   facilities for that purpose.
19   Q   Yeah.  So there's mentions, within the PREA
20   legislation, PREA law, about the need for video
21   monitoring --
22   A   Yes.
23   Q   -- in terms of reducing, preventing,
24   deterring, all of those goals PREA's trying to
25   effectuate?

1    A   Yes.
2    Q   Okay.  And then those investigators, PREA
3   investigators, who are trained on PREA itself through
4   at least an eight-hour video once every year, would be
5   aware that the PREA legislation contains language
6   about video monitoring and how those can be used to
7   reduce and effectuate goals of PREA?
8    A   The PREA legislation or the PREA standards?
9    Q   The PREA standards.
10    A   Okay.  So in the PREA standards, it -- it
11   does not -- it does not give a direct instruction to
12   PREA investigators on -- when it comes to video
13   surveillance.  It's -- it's not geared towards them.
14   The -- the standard that is talking about video
15   monitoring is for the purpose of making sure it's
16   installed in the correctional facilities.
17    However, yes, the PREA investigators are to
18   make sure that they are giving a thorough
19   investigation to make sure that if there is video
20   involved in an alleged incident, they are to view it.
21    Q   What is the difference between a PREA
22   criminal investigation and a PREA administrative
23   investigation?
24    A   A criminal investigation means that the
25   individual is being investigated for a crime that is

Page 78

1   the investigator has chosen.  So if there's a case,
2   and the individual is saying they were sexually
3   harassed -- and when they go to do an investigation,
4   the alleged victim says, "While I was sleeping, I
5   believe somebody touched me on my leg or touched me on
6   my foot."  Now that becomes administrative
7   investigation because it's not a criminal
8   investigation.
9    So we can't investigate it criminally, but
10   we can still investigate it administratively.  And we
11   can pull video if there's video.  We can pull -- we
12   can talk to witnesses.  You know, we can still do all
13   of that.  So it'll still be investigated.
14    Q   And is that -- when something's investigated
15   administratively, is that through the PREA
16   investigators, and those are Officer Small, Officer
17   Guerrero and Officer McCutcheon?
18    A   Currently, Small.  Investigator McCutcheon
19   and Investigator -- Investigator Guerrero are no
20   longer in PREA.  So there are new investigators now.
21   I'm not sure who they are 'cause I'm no longer in
22   PREA.
23    Q   All right.  So you don't know who they are?
24    A   No.
25    Q   Okay.

Page 80

1   criminal, and that they can be charged with, and the
2   district attorney's office can file a charge.
3    Administrative usually is either a case that
4   is an in-house.  When I say "in-house," like an
5   internal -- an internal charge.  So you have your
6   inmate handbook that has internal charges for
7   individuals who are in the jail and have done
8   something where they cannot necessarily have a
9   criminal charge.
10    And then you also have those cases where the
11   individual can get a case, and it can go to internal
12   affairs for their portion because a staff member's
13   involved.  But it may not be a criminal allegation.
14   So again, an internal policy was -- something may have
15   been violated and not necessarily district attorney's
16   office being involved to actually file a charge.
17    Q   Is every allegation of sexual abuse or
18   sexual harassment within Harris County jails
19   investigated?
20    A   Every allegation that is reported to PREA,
21   yes.
22    Q   And are each of those investigated
23   administratively?
24    A   Each one will be investigated
25   administratively or criminally, deciding on which one

Page 79

1    A   Lieutenant Ward would be able -- able to
2   answer that.
3    Q   Okay.  But in 2023, when you were kind of in
4   that period where you're out of --
5    A   Mm-hmm.
6    Q   -- PREA manager, but you're still
7   assisting --
8    A   Mm-hmm.
9    Q   -- those three folks that I just named,
10   those were the PREA investigators?
11    A   Yes.
12    Q   So I guess relative to my client,
13   Mr. Buford -- clients, Ms. Jenkins and Mr. Buford, the
14   three PREA investigators, who were tasked with being
15   Harris County PREA investigators in 2023, were
16   Officers Guerrero, McCutcheon, and Small?
17    A   Yes.
18    Q   And you were the PREA manager --
19    A   Yes.  And there was a --
20    Q   -- until Officer Ward?
21    A   Yes.  And then there was a PREA clerk as
22   well.
23    Q   Who's that?
24    A   Her name is Lila Milan.  So she was over
25   the -- over entering all of the cases in -- into the

Page 81

21 (Pages 78 - 81)

1 database, but she since passed.
2 Q  I'm sorry.
3 A  Yeah.
4 Q  I'm sorry to hear that.  Do you know who the
5 clerk is now?
6 A  I do not know who the clerk is now.
7 Q  Okay.  Did you assist -- so you have the
8 three investigators in 2023 that we just discussed?
9 A  Yes.
10 Q  In terms of the trainings, just generally
11 for PREA investigators, did Harris County and you --
12 did you assist Harris County in making a training
13 section that talks about the burden of proof when
14 doing a criminal investigation in a administrative
15 investigation?
16 A  No.
17 Q  And why did you not do that?
18 A  I -- I did not do that part because I no
19 longer -- I'm a peace officer.  So someone who is
20 connected to a peace officer would have to do that.
21 So it would be sex crimes, who they -- sex crimes who
22 they train with before they actually start doing PREA
23 investigations.  So they train with them for a certain
24 amount of time.  And then the person who helped to
25 write theirs was probably Captain Taylor, but he's not
Page 82

1 How do you assure, and Harris County assure through
2 its trainings, that those individuals can
3 differentiate the burden of proof?
4 A  You can't ever assure.  You can give them
5 the training and make sure -- and -- and make sure
6 that they have the training and that they're -- and --
7 and give them what they need to be able to make an
8 objective decision.
9 The goal is to make sure that they're always
10 objective, but we don't know what anyone is thinking.
11 We would -- we would hope and believe that every
12 individual who is trained on being objective is -- is
13 being objective.
14 Q  All right.  Is Officer Ward the PREA
15 coordinator -- the current PREA coordinator?
16 A  Yes.
17 Q  Is PREA coordinator and PREA manager, are
18 those used interchangeably or --
19 A  PREA coordinator and PREA manager are
20 actually two different positions.
21 Q  Okay.
22 A  We have not had a PREA coordinator since
23 Captain Taylor.
24 Q  Okay.
25 A  A PREA manager and PREA coordinator is a
Page 84

1 here anymore.
2 Q  Are you aware of any trainings or education
3 that Harris County provides to its PREA investigators
4 in terms of discussing how, for an administrative
5 investigation, the burden of proof is a preponderance
6 of the evidence, and when it's a criminal
7 investigation, it's obviously beyond a reasonable
8 doubt.  Is there trainings or education --
9 A  That's PREA standards.
10 Q  Okay.
11 A  Yes.
12 Q  So the PREA investigators, in 2023, that
13 were in that role when the allegations that Mr. Buford
14 and Ms. Jenkins are making, they would've been trained
15 on the burden of proof when it's criminal and
16 administrative?
17 A  Yes.
18 MR. NYALLAY:  Objection to form.
19 BY MR. HUNTER:
20 Q  Okay.  How do you assure that the human
21 element of subjectivity is removed from the
22 investigator when they're going about their
23 business -- and let's say they're doing a criminal
24 PREA investigation -- and then there's a
25 administrative outcryer -- administrative allegation.
Page 83

1 perfect world, but as long as you have one or the
2 other, you are good according to the -- our PREA
3 auditor.  That's a question that we've had multiple
4 times.  And --
5 Q  And that PREA auditor's first name's Ian,
6 last name Rachal?
7 A  Yes.
8 Q  Okay.  Does Officer Ward -- is he the PREA
9 manager for both 1200 Baker Street, 701 North San
10 Jacinto, and the Joint Processing Center?
11 A  Yes, he is.
12 Q  Okay.  And there's no PREA coordinator
13 whatsoever to assist?
14 A  No.  He's it.
15 Q  Okay.
16 A  He's it.  He's going to be everything right
17 now.  I believe there was another -- well, there was
18 another supervisor there who was acting as the
19 manager.  I'm not sure if she's still there or not.
20 Her name is Sergeant Quintana.
21 Q  Does Harris County assure that each facility
22 has developed a staffing plan that provides for
23 adequate levels of staffing to protect inmates against
24 sexual abuse?
25 A  Yes.  There is an individual over staffing
Page 85

22 (Pages 82 - 85)

1  plans.  That would be Lieutenant Buntyn.  He creates
2  staffing plans.
3      Q   Lieutenant who?
4      A   Buntyn.  B-U-N-T-Y-N.
5      Q   Okay.  Are you aware of any upgrades to the
6  1200 Baker Street facility relating to video
7  monitoring systems to reduce blind spots to be
8  compliant with PREA?
9      A   Yes.  A couple of years ago, I believe, they
10 upgraded the cameras and added more cameras.  Fisk
11 Electric was over there.
12     Q   Who?
13     A   Fisk Electric.
14     Q   Okay.  When was that?
15     A   I'm not sure, but it's pretty recent.  Maybe
16 just like the last two years or something like that.
17     Q   Okay.  Do you have any further information
18 about that?
19     A   No.
20     Q   Okay.  And do you know if that was
21 specifically to upgrade and reduce blind spots as it
22 relates to PREA?
23     A   I know that --
24         MR. NYALLAY:  Objection.
25 //

Page 86

1      A   Normal spelling, yes.
2      Q   I guess with the Y?
3      A   Yes.
4      Q   Oh, yeah.  Ricky what?
5      A   Carter.
6      Q   Carter.  Okay.
7      A   Yes.
8      Q   All right.  And is he a detention officer
9  or --
10     A   No.  He works with Fisk Electric.
11     Q   He's an employee of Fisk?
12     A   Yes.
13     Q   Okay.
14     A   Yes.
15     Q   Okay.  So Harris County knew, at the 1200
16 Baker Street jail, since you were a PREA manager that
17 the blind spots existed there?
18         MR. NYALLAY:  Objection to form.
19         THE WITNESS:  I can answer?
20 BY MR. HUNTER:
21     Q   Yeah.
22         MR. NYALLAY:  You can answer.
23         THE WITNESS:  Okay.
24         I'm not sure that Harris County Sheriff
25 itself was aware, but because it's an older jail, we

Page 88

1  BY MR. HUNTER:
2      Q   You can answer.
3      A   I know that the additional cameras were
4  to -- some of them were for blind spots.  Some may be
5  for other reasons, but there were additional cameras
6  added at 1200 jail.
7      Q   Do you know where?
8      A   I do not.
9      Q   How do you know that some of the additional
10 cameras were added for blind spots?
11     A   Well, they have been trying to get those
12 cameras up for a while, so that's a project that
13 started while I was the PREA manager.  And so I think
14 it -- it finally got up once -- they -- they probably
15 actually had some up while I was still there and then
16 added more to while I -- when -- once I left.  But
17 yes, that's a project that they -- they've been
18 working on for a while.
19     Q   Do you know when the Fisk Electric video
20 upgrade project was completed?
21     A   I do not.  I can give you the name of the
22 individual who may be able to give it to you.
23     Q   Who's that?
24     A   Ricky Carter.
25     Q   Is it Ricky normal spelling or --

Page 87

1  made sure to take the precaution to get with Fisk
2  Electric to see where cameras needed to be added.
3  BY MR. HUNTER:
4      Q   Did you ever meet with any folks from Fisk,
5  whether Mr. Carter or any other individuals from
6  there, and point out particular blind spots that you
7  said, "Hey, we should put a camera there because it's
8  a PREA risk, and we need to eliminate the blind spots
9  to be compliant with PREA"?
10         MR. NYALLAY:  Objection.
11 BY MR. HUNTER:
12     Q   You can answer.
13     A   Years ago, there was a list that was created
14 for blind spots.  Years ago.
15     Q   How many years?
16     A   I'm not sure.  It's been -- it's been over
17 probably at least six or seven years ago.
18     Q   Six or seven years?
19     A   Yes.
20     Q   Was that a list for --
21     A   For blind -- for blind spots in -- in 701
22 and 1200 jails.
23     Q   You knew my question.  All right.  Did you
24 participate in creating that list?
25     A   I did.

Page 89

23 (Pages 86 - 89)

1    Q   Who else did?
2    A   Captain Taylor and compliance inspection
3 deputies.  They've either since retired or are no
4 longer there.  And one was William Huddleston.
5 Another one was Gregory Brush.  None of them are there
6 anymore.
7    Q   Okay.  And was your role in helping create
8 that list of blind spots for 701 and 1200 Baker
9 Street -- you assisted while you were in the role of
10 PREA manager?
11   A   I believe I assisted while being a PREA
12 manager and before being a PREA manager.
13   Q   And Officer Taylor was the PREA coordinator.
14 And he was in that capacity when helping create that
15 list?
16   A   Yes.
17   Q   Okay.  Who was that list given to?
18   A   At the time, the list was given to our
19 special detail deputies.
20   Q   And do you know who that is?
21   A   That would've been Clayton Doucet.
22   Q   And part of that creation of that list was
23 directly related to blind spots in PREA?
24   A   Yes.
25   Q   Okay.  And are you aware of what PREA's

Page 90

1    A   It's only one document.
2    Q   Will you make sure not to shred it?
3    A   Yes.  Yes.  I will make sure not to shred
4 it.
5    Q   Okay.  If it's only one document, are you
6 able to recite, by heart, any of the blind spots that
7 are on that one page?
8    A   No, sir.  Because what it is -- it's like
9 a -- a -- like it says, like, 701 jail then it'll
10 have the areas where it's needed.  And then 1200 will
11 have another column and then the areas where they're
12 needed.  So that's how it's --
13   Q   Okay.  And did you --
14   A   And I'm sure there probably were some
15 additional ones since I've done it, but --
16   Q   When did you make that list?
17   A   It's been a while ago.  My list was -- is
18 probably going to be maybe seven to ten years ago.
19 It's been a while.
20   Q   Do you know if Officer Shaun Ward has a
21 similar list?
22   A   No, because the cameras are now up.
23   Q   Do you know of any other folks who had a
24 list of blind spots on a document?
25   A   No.

Page 92

1 retention policies are for documents relating to PREA?
2    A   Ten years.
3    Q   And you said that list was created six or
4 seven years ago?
5    A   Yes.
6    Q   So that's within ten years?
7    A   Yes.
8    Q   So if I ask Harris County for a copy of that
9 list, they should have it, or they won't be --
10       MR. NYALLAY:  Objection.
11 BY MR. HUNTER:
12   Q   -- in compliance with PREA then, will they?
13       MR. NYALLAY:  Objection to form.
14 BY MR. HUNTER:
15   Q   You can answer.
16   A   I'm not sure who would have the list, but
17 I -- I do know that I still have a list of the blind
18 spots.
19   Q   A physical copy?
20   A   Yes.
21   Q   Where do you keep that?
22   A   In my county folder.
23   Q   Will you do me the courtesy of maintaining
24 that county folder during the pendency of this case so
25 I can ask for copies of those documents?

Page 91

1    Q   And did you create that list specifically
2 because of PREA?
3    A   Yes.
4    Q   Did you participate in planning discussions
5 with Fisk Electric as it relates to facility upgrades
6 and how the upgrades can best comply with PREA?
7       MR. NYALLAY:  Objection.
8 BY MR. HUNTER:
9    Q   You can answer.
10   A   No, I was only instructed to assist in
11 creating the blind spot list.
12   Q   Aside from the blind spot list that you
13 created, were you ever tasked with creating other
14 lists to either upgrade or assure compliance with PREA
15 as it relates to the actual physical facility at 1200
16 Baker or 701?
17   A   No, sir.  That would've been more Captain
18 Taylor and sometimes Lieutenant Buntyn, who is the
19 person who's over the staffing plan and stuff like
20 that.  So they would do more of those type of
21 functions.
22   Q   Okay.  In addition to the blind spot list,
23 did you, by chance, create a similar list with
24 isolation spots identified within either 1201 -- or
25 701 or 1200 Baker Street?

Page 93

24 (Pages 90 - 93)

Page 94

1  MR. NYALLAY: Objection. Counsel, if
2  we can please try to keep the questions that relates
3  to Ms. Camacho's investigation --
4  MR. HUNTER: No, we're not. She's
5  here. That's not what we're doing.
6  MR. NYALLAY: I understand.
7  MR. HUNTER: She's the PREA manager.
8  She was for ten years, so --
9  MR. NYALLAY: Yes.
10  MR. HUNTER: -- these are within the
11  scope of her knowledge. She just testified about a
12  blind spot list --
13  MR. NYALLAY: Yes.
14  MR. HUNTER: -- that she has seven or
15  ten years ago. So I'm not stipulating to that.
16  MR. NYALLAY: I understand. When we
17  ask questions about --
18  MR. HUNTER: There weren't --
19  MR. NYALLAY: -- the electricity
20  company; she's not here as representative -- as a
21  corporate representative of Harris County.
22  MR. HUNTER: Yeah, no. These are -- I
23  understand that she's not a 30(b)(6) deponent today.
24  MR. NYALLAY: That's correct. That's
25  correct. Yes.

Page 95

1  MR. HUNTER: Because we haven't issued
2  our 30(b)(6) topics.
3  MR. NYALLAY: That's correct.
4  MR. HUNTER: And whether it's going to
5  be -- when we do, that's our decision. So yeah.
6  BY MR. HUNTER:
7  Q  I mean, you -- I'll ask you like this. How
8  about this? You understand you're here today
9  individually; you're not a corporate representative?
10  A  Yes.
11  Q  Okay. Do you know what a corporate
12  representative even is?
13  A  No.
14  Q  Okay. Well, you're here as yourself.
15  A  Okay.
16  Q  You're not here -- you're an employee of the
17  company; right? Or Harris County?
18  A  Yes.
19  Q  You're an employee, but you're not here
20  today as a corporate representative. You're here
21  individually as an employee of the defendant that I've
22  sued on behalf of my clients. Does that make sense?
23  A  So I'm not here as the -- I'm -- I'm here as
24  an employee of Harris County Sheriff's Office;
25  correct?

Page 96

1  Q  Correct.
2  A  Okay. Okay.
3  MR. NYALLAY: I think my issue is,
4  you're not here to speak on behalf of things that you
5  did not specifically do in relation to Mr. Buford's
6  PREA outcry. That's my issue.
7  If she's speaking --
8  MR. HUNTER: The thing is, though,
9  we're not here just specifically related to
10  Mr. Buford.
11  MR. NYALLAY: That is correct, but --
12  MR. HUNTER: So --
13  MR. NYALLAY: -- if you're asking
14  about --
15  MR. HUNTER: -- we're entitled to her
16  full knowledge of PREA.
17  MR. NYALLAY: That's correct. But
18  if -- you're asking about issues of electricity,
19  electrical companies, and things like that, so
20  that's --
21  MR. HUNTER: I think I'm entitled to
22  it. She clearly has knowledge of that.
23  MR. NYALLAY: But that isn't making her
24  as a corporate representative, speaking on behalf of
25  Harris County and --

Page 97

1  MR. HUNTER: She's individually --
2  MR. NYALLAY: Right.
3  MR. HUNTER: She's individually talking
4  about her personal knowledge.
5  MR. NYALLAY: Yes.
6  MR. HUNTER: So I'm going to keep
7  asking my questions. You can -- there won't be
8  stipulations to objections.
9  MR. NYALLAY: No. I'll object, you
10  know, when I need to. Please go ahead.
11  MR. HUNTER: Thank you.
12  BY MR. HUNTER:
13  Q  Okay. In terms of the 1200 Baker Street
14  jail, as a PREA manager, did you ever, as a PREA
15  manager, go to that location or conduct any sort of
16  survey to identify isolation spots at that facility,
17  1200 Street?
18  A  What is the difference between a isolation
19  spot and a blind spot?
20  Q  So a blind spot -- that's all within PREA;
21  right? So we'll just go directly to the PREA here.
22  We'll pull it up. Let's see. All right. So this is
23  28 CFR 115.13, supervision and monitoring for PREA.
24  Do you see that in front of you, ma'am?
25  A  Yes.

1    Q   All right.  So subsection A5 says "All
2  components of the facility's physical plant, including
3  blind spots or areas where staff or inmates may be
4  isolated."  Do you see that?
5    A   Yes.
6    Q   So having reviewed the legislation, does
7  that assist in terms of what I mean by blind spots in
8  isolation, or are you still --
9    A   So blind spots -- so it's saying where the
10  blind spots are, but are areas where staff or inmates
11  may be isolated.  Okay.  So basically it's still
12  asking for blind spots.
13    Q   Okay.  So as PREA manager when being tasked
14  with assuring compliance with PREA --
15    A   Mm-hmm.  Mm-hmm.
16    Q   -- then do you essentially believe that
17  blind spots and isolation are synonymous?  They're
18  synonyms?
19    A   I do believe that blind spots are where
20  inmates can be found isolated or hiding or can be
21  covered from.  So yes.  And that's why that list was
22  created, for blind spots.
23    Q   All right.  As the former PREA manager, are
24  you aware of Harris County taking into consideration
25  the composition of inmate population when calculating
Page 98

1  be in possession or custody or control of them to be
2  compliant with PREA?
3    A   Yes.  If those -- if records existed, yes.
4    Q   Okay.  Do you know where those records would
5  be maintained?
6    A   No.
7    Q   Is there a separate entity, besides Securus,
8  who deals with records retention for Harris County?
9    A   I'm not sure.  That would be more of a
10  command staff question when it comes to those type of
11  records.
12    Q   And as you sit here today, do you know who
13  the best person I should direct those questions to at
14  command staff?
15    A   Lieutenant Buntyn.
16    Q   And is that the individual whose name you
17  spelled earlier?  It's like B-U --
18    A   N-T-Y-N.  First name Brent.
19    Q   Brent Buntyn?
20    A   Yes.
21    Q   Okay.  So line of questioning about records
22  retention, those would very likely be better directed
23  to command staff as opposed to PREA?
24    A   Yeah.  Correct.  When it -- yes.  When it
25  comes to, like, staffing plans and anything dealing
Page 100

1  staffing levels and determining the need for video
2  monitoring in the context of protecting inmates
3  against sexual abuse?
4        MR. NYALLAY:  Objection to form.
5  BY MR. HUNTER:
6    Q   You can answer.
7    A   I do believe that when staffing plans are
8  developed by command staff that PREA is looked at and
9  the number of staff are looked at.  The number of
10  inmates are looked at.  Yes.
11    Q   Do you know if Harris County maintains
12  records demonstrating how it considers the composition
13  of the inmate population for calculating staffing
14  levels and determining the need for video monitoring
15  in the context of protecting inmates against sexual
16  abuse?
17        MR. NYALLAY:  Objection.
18  BY MR. HUNTER:
19    Q   Do you know?
20    A   I'm not sure.
21    Q   Okay.  But again, PREA mandates that there's
22  a retention policy of ten years; right?
23    A   Yes.
24    Q   So if records were to exist, and they're at
25  least not ten years old, Harris County would have to
Page 99

1  with the buildings and anything dealing with
2  retention.  When it comes to adding anything on or
3  building anything, for whatever purpose it may be,
4  that's going to be command staff.
5    Q   Okay.  All right.  What is administrative
6  segregation?
7    A   Administrative segregation is a term used
8  for classification purposes for individuals who have
9  been separated from general population, are -- and/or
10  in individual housing.
11    Q   What is administrative separation?
12    A   Administrative separation is an individual
13  who is housed individually.
14    Q   If you were to explain it to the jury, how
15  would you tell the jury what the difference between
16  administrative segregation and administrative
17  separation is?
18        MR. NYALLAY:  Objection.  Asked and
19  answered.
20        MR. HUNTER:  No, she hasn't.  She
21  hasn't asked that question.
22  BY MR. HUNTER:
23    Q   What is the difference between
24  administrative segregation and administrative
25  separation?  I just want to know what the difference
Page 101

26 (Pages 98 - 101)

1  is.
2      A   That's more of a classification question.  I
3  don't believe there is a difference, but that's --
4  an answer that classification can most definitely
5  give.
6      Q   And why do you not believe there's a
7  difference?
8      A   Just like with the word outcry and the word
9  allegation.  It's just a different word to use.  I do
10 not believe that it's a difference.
11     Q   Do you know if the Harris County uses
12 administrative segregation and administrative
13 separation interchangeably?
14     A   I'm not sure.  I've always utilized
15 administrative separation, but I'm not sure.
16     Q   Okay.  As it relates to Mr. Buford, in
17 October 2023 --
18     A   Mm-hmm.
19     Q   -- was he placed into administrative
20 segregation?
21     A   I have to look back at the case to see if he
22 was placed there, and if so, why.
23     Q   Okay.  And you reviewed the case for about
24 an hour a week ago; right?
25     A   Mm-hmm.

Page 102

1      Q   Two hours?  To me, in my review of the
2  documents, it looked like Mr. Buford was filing a PREA
3  allegation in September 2023.
4      A   Yes.
5      Q   He should have been placed in administrative
6  separation, but he was actually placed into
7  administrative segregation with violent inmates.  Is
8  that your understanding?
9      A   No.
10     Q   Okay.  What's your understanding?
11     A   Again, administrative separation,
12 administrative segregation, I'm not sure they mean
13 different things.  I need to be sure that Mr. Buford's
14 separation of any kind was -- he was separated because
15 of the PREA allegation and not for another unknown
16 reason.  Because all individuals who are involved in a
17 PREA allegation are not necessarily placed in
18 administrative separation.
19     Q   Was Mr. Buford treated as a security threat
20 due to his September 2023 PREA outcry?
21     A   I don't believe he was placed in
22 administrative separation or viewed as a security
23 threat because of a PREA allegation.
24     Q   Do you recall -- I know it's been some time,
25 but do you recall, on October 17, 2023, Major Lynette

Page 103

1  Anderson forwarding you an email from Sarah Wood,
2  who's the general counsel of the Harris County Public
3  Defender's Office?
4      A   I believe I remember reading that last week.
5      Q   Okay.  Do you remember receiving that email
6  in real time back in October of 2023?
7      A   It's been a while.  So I mean, if it's
8  there, I -- I received it.  Because it's been over two
9  years, I don't remember.  But if it's there, I
10 received it.
11     Q   Yeah.  And you said -- I think testified
12 moments ago, you also reviewed that email that was
13 forwarded from your supervisor --
14     A   Yes.
15     Q   -- from Counsel Sarah Wood.  You reviewed
16 that as part of your prep for today?
17     A   Yes.  I do remember viewing something with
18 Major Lynette Anderson's -- she wasn't a major then.
19 She was a -- a lieutenant.
20     Q   Okay.
21     A   Mm-hmm.
22     Q   Let me find this.  So this is going to be
23 Plaintiff's Exhibit 1.
24         (Plaintiff Exhibit 1 was marked for
25         identification.)

Page 104

1      A   Okay.
2      Q   And this is page 17 of 245 of the documents
3  produced by Harris County in this case.  It's marked
4  confidential under the party's protective order with
5  the court.  And it has a Bates stamp of JR 000017.
6  Okay.  Can you see that in front of you, ma'am?
7      A   I can.
8      Q   All right.  And just take the time to review
9  it and then we'll ask some questions about it.  But
10 specifically, I just want to confirm, Lynette Anderson
11 forwarded you and a Mr. Butler and said, "Can either
12 of you answer the questions below?"
13     A   Mm-hmm.
14     Q   And the email she forwarded was from Sarah
15 Wood, the general counsel at the Harris County Public
16 Defender's Office.  Is that true?
17     A   Yes.
18     Q   All right.  So go ahead and just read that
19 to refresh your recollection.
20     A   Okay.  Okay.  All right.
21     Q   Do you see the portion of that email where
22 General Counsel asks Major Lynette Anderson and
23 Assistant Chief Phillip Bosquez, if Mr. Buford is
24 being treated as a security threat due to his PREA
25 outcry?

Page 105

27 (Pages 102 - 105)

1    A   I do read that, yes.  I read that.
2    Q   All right.  And do you see the portion of
3  the email, Jenkins Exhibit 1, where it says the
4  general counsel's "Investigator visited him" --
5  Buford -- "today and is concerned because he was
6  heavily shackled with extra security precautions like
7  they do with murder defendants"?
8    A   I did read that, yes.
9    Q   And do you also see where it said that
10  "That's having a very negative effect on his mental
11  illness, and he's in mental health court"?
12    A   Yes.
13    Q   After receiving that email, do you recall
14  how you responded?
15    A   I believe I actually reached out to
16  classification after this email.
17    Q   If I showed you the email, would that help?
18    A   Yes.
19    Q   All right.  I got it.  I will confirm.  All
20  right.  So we'll just go back.  So the email we were
21  just talking about was from October 17 --
22    A   Yes.
23    Q   -- 2023.  And then on October 18, 2023, at
24  8:51 in the morning, you responded.  Do you see that?
25    A   Yes.

Page 106

1    Q   All right.  And this will be Plaintiff's
2  Exhibit 2, just page 245 -- or page 16 of 245.
3  Jenkins Exhibit 2.
4        (Plaintiff Exhibit 2 was marked for
5         identification.)
6        Does this look like a true and accurate
7  representation of the email you sent on October 18th?
8    A   Yes, it does.
9    Q   All right.  And is this the email you were
10  referring to about reaching out to classification, or
11  is this your response to Lynette Anderson?
12    A   This is -- it usually has something where
13  something is sent from and -- let's see.  So I'm
14  guessing that was to -- she was lieutenant at that
15  time, Lieutenant Anderson.
16    Q   Okay.
17    A   But it looks like -- if you go up,
18  Lieutenant Bower's name is there.
19    Q   Yep.
20    A   So she's the classification person.  So that
21  means I had to -- okay.  All of these are a
22  classification individuals.
23    Q   All right.
24    A   So.
25    Q   So this is page 15.

Page 107

1    A   Okay.  So yes, this is a response to --
2    Q   And then 16.
3    A   Okay.
4    Q   You see that?
5    A   Yep.  So if you go back, it was -- it was
6  sent to Lieutenant Bowers, who was classification,
7  Lieutenant Anderson.  She was lieutenant at the time.
8  And then it was copied Joash Butler, who was a
9  lieutenant, and Michael Beaudoin, who is still the
10  sergeant in classification.
11    Q   Okay.  And we'll go ahead and mark the
12  document that we're talking about right now as Jenkins
13  Exhibit 3.
14        (Plaintiff Exhibit 3 was marked for
15         identification.)
16    A   Okay.
17    Q   It's page 15 of 245.  And that was the email
18  in which you responded to classification?
19    A   Correct.
20    Q   Okay.  So going back to Exhibit 2, what do
21  you say here?
22    A   "At no time should we shackle and handcuff
23  someone because of an outcry.  This is a form of
24  punishment.  Can Buford be relocated somewhere else
25  where he is not shackled"?

Page 108

1    Q   Okay.  So on October 18, 2023, you believed
2  Mr. Buford was being punished?
3        MR. NYALLAY:  Objection.
4        THE WITNESS:  This was me letting them
5  know that he is not to be shackled at any time.
6  Because the individual I read on the other email was
7  stating that he requested to be in admin separation.
8        So with him requesting to be in admin
9  separation, we shouldn't have been shackling him.
10  It's not like he was there because of bad behavior or
11  because he was volatile.  It was because he requested
12  to be in admin separation.
13  BY MR. HUNTER:
14    Q   Would you agree that shackling someone after
15  a PREA allegation is a punitive response?
16        MR. NYALLAY:  Objection.  Form.
17  BY MR. HUNTER:
18    Q   You can answer.
19    A   Shackling someone after making a PREA
20  alleged allegation or a PREA outcry is a punitive
21  response if that individual is not being aggressive or
22  volatile.
23    Q   Back to Plaintiff's Exhibit 1.  Do you see
24  anything in Sarah Woods' email to Lynette Anderson and
25  Assistant Chief Philip Bosquez where there's an

Page 109

28 (Pages 106 - 109)

Veritext Legal Solutions
800-336-4000

Pg. 29

1    indication that Mr. Buford was being volatile or
2    violent and, therefore, needed to be heavily shackled
3    like a murder defendant?
4        A   No, sir.  He's -- her email does not have
5    anything in there that states that he was being
6    volatile.  However, her email is also kind of
7    suggestive because everyone who is in jail for murder
8    is not in admin separation or shackled.
9        Q   Have you reviewed this document ever?
10       A   No.  This is a classification document.
11       Q   It's two pages.  So did you review this as
12   part of preparing for today?
13       A   No, I did not.
14       Q   Did you review this as part of anything
15   relating to Buford's PREA allegation in September
16   2023?
17       A   No.
18       Q   Okay.  Have you seen a document like this
19   before?
20       A   I have not because I don't work in -- well,
21   we have transferred -- we -- we do -- deal more with
22   transfer sheets.  Administrative separation review
23   sheets would be something classification deals with
24   internally.  It's not anything that anyone else would
25   see unless you're in classification.

Page 110

1    Q   Do you know, is this document used to
2    determine housing?
3        A   I'm not sure.  It's classification.
4        Q   Okay.  Do you see here, though, where it
5    says "Recommended restraints," and it says "Yes"?
6        A   Yes.
7        Q   Okay.  Do you know what that means?
8        A   It means they recommend restraints.
9        Q   And what are restraints?
10       A   Restraints would probably be either shackles
11   or handcuffs.
12       Q   Okay.  And this relates to my client,
13   Mr. Buford; right?
14       A   Yes.
15       Q   And the date in the right corner is October
16   2, 2023?
17       A   Correct.
18       Q   Okay.  And it says "He's released from
19   separation 10/18/2023"?
20       A   Correct.
21       Q   So from October 2, 2023, until October 18,
22   2023, this document indicates that it was recommended
23   Mr. Buford be restrained during that period?
24           MR. NYALLAY:  Objection.
25           THE WITNESS:  It looks like this

Page 111

1    document is telling me he was released from separation
2    on October 18th.  And the reason for separation was
3    because he moved to admins sep due to the PREA outcry.
4    But this -- I guess after October 18th, once we spoke
5    to classification, was when they released him to
6    general population, which is 6E2B.
7    BY MR. HUNTER:
8        Q   We'll mark this two-page document as Exhibit
9    4 to Jenkins.
10           (Plaintiff Exhibit 4 was marked for
11           identification.)
12           Okay.  But again, the date in the right
13   corner is October 2nd?
14       A   Yes.
15       Q   And then the date it shows he's released is
16   October 18th; right?
17       A   Correct.
18       Q   And it shows recommended restraints on this
19   document --
20       A   Yes.
21       Q   -- checked?  Okay.  And it's showing him
22   being released on October 18th, which just so happens
23   to correlate with Exhibit 1 here, where the general
24   counsel is sending an email to the chief assistant,
25   Philip Bosquez, about Mr. Buford being heavily

Page 112

1    shackled the day before she sent that?
2        A   Correct.  And -- and Lieutenant Anderson at
3    the time.
4        Q   Right.  Is it normal for the general counsel
5    of Harris County's entire public defender's office to
6    send an email to the chief assistant, Phillip Bosquez,
7    about one individual inmate relating to a PREA event?
8            MR. NYALLAY:  Objection.  Form.
9    BY MR. HUNTER:
10       Q   In your entire career, while PREA manager,
11   did you ever have another instance where the general
12   counsel of Harris County emails the chief assistant
13   about an individual inmate's PREA status and housing
14   after the PREA allegation?
15       A   Harris County Sheriff's Office is an
16   organization where they're pretty open to individuals
17   from other organizations emailing them.  So it's not a
18   surprise that we get emails from individuals, such as
19   Sarah Wood, or any other individual who has some type
20   of concern about a particular inmate.
21       Q   Besides this email, in your ten years as
22   PREA manager, are you aware of any other instances
23   where this happened?
24       A   I'm sure there have been other instances.
25   While I was PREA manager, all -- there were always

Page 113

29 (Pages 110 - 113)

1  instances where an attorney would contact just to
2  check the welfare of an individual. This is not
3  abnormal.
4      Q   It's not abnormal to have the general
5  counsel of the Harris County Public Defender's Office
6  to email the assistant chief, Philip Bosquez, about
7  inmates being heavily shackled following PREA
8  outcries?
9          MR. NYALLAY: Objection to form.
10 BY MR. HUNTER:
11     Q   You can answer.
12     A   So the type of individual that Chief is;
13 he's very open. It is -- it -- with an individual
14 saying they've been shackled, yes. That is a
15 surprise. But it is not a surprise that an individual
16 would reach out to Chief Bosquez or Major Anderson
17 because they are very open to receiving any type of
18 concerns when it comes to inmates at the Harris County
19 Sheriff's Office.
20         MR. NYALLAY: Okay. All right. We'll
21 go back to Exhibit 4 here. Do you know what this
22 medium in handwritten -- right here above 16-admin
23 sep. Do you know what that means?
24     A   I believe that's a classification -- how
25 they classify.

Page 114

1  per Major Lynette Anderson"?
2      A   Yes.
3      Q   So Major Lynette Anderson was able to have
4  Mr. Buford moved; correct?
5      A   Correct.
6      Q   All right. At what point does somebody like
7  a Lynette Anderson have to get involved to get a PREA
8  individual out of -- transferred? Like, at what point
9  does Major Anderson have to get involved with
10 classification to override or make a transfer like
11 this happen?
12         MR. NYALLAY: Objection to form.
13 BY MR. HUNTER:
14     Q   If you know.
15     A   When it comes to Major Anderson, it could be
16 a plethora of things. In this case, Ms. Sarah Wood
17 emailed her directly, so she got involved. But it
18 could come from somewhere else. Usually, when they
19 communicate directly with them, they're going to get
20 involved.
21     Q   When who communicates directly?
22     A   Any outside entity connects with them
23 directly, they're going to make sure that it's looked
24 into.
25     Q   Okay. And certainly if the general counsel

Page 116

1      Q   Do you know what 16-admin sep means?
2      A   I does not. That's a classification code.
3      Q   Do you know where the cell block location,
4  JAO9-2K1 is?
5      A   Yes.
6      Q   Where is that?
7      A   Second floor, 1200 jail. South hallway.
8      Q   Was that one of the locations listed on your
9  blind spot letter that you have inside of your folder
10 at your desk?
11     A   I'm not sure.
12     Q   Do you know what this POS(6) code is?
13     A   No. That -- that's a classification.
14     Q   Do you know who this T. Alicia or Alicia is?
15     A   No. So it had to be someone who worked in
16 classification.
17     Q   Do you know what this handwriting right here
18 says?
19     A   Xfer means transferred.
20     Q   To?
21     A   To 05 per Major Lynette Anderson. Oh, so
22 she was major at the time. Per Major Lynette
23 Anderson. 05 is a vulnerable victimization cell
24 block.
25     Q   So that handwriting says "Transferred to 05

Page 115

1  of the entire public defender's office is emailing,
2  then that's going to get escalated?
3      A   Major Anderson is one of those individuals
4  that if the email come to her, and it's about
5  someone's safety, it -- it wouldn't matter if it was
6  the general counsel or not. If her name is -- if
7  they're -- they're emailing her directly, she's going
8  to get involved.
9      Q   All right. So back to these recommended
10 restraints. The box says "Yes," and it says "Reason,
11 per floor policy." Are you able to speak to that?
12     A   I'm not sure what that is.
13     Q   Okay. Is that a classification issue?
14     A   Has to be, but I'm not sure of that.
15     Q   All right. Does Harris County have the
16 nondelegable duty to protect inmates from retaliation
17 for reporting sexual abuse or sexual harassment?
18     A   Yes.
19         MR. NYALLAY: Object to the form.
20 BY MR. HUNTER:
21     Q   Does PREA have a retaliation mechanism in
22 it?
23     A   Yes.
24     Q   Okay. Yes? I was going to say, it's a bad
25 question, but there's a zero tolerance retaliation --

Page 117

30 (Pages 114 - 117)

1    A    Mm-hmm.
2    Q    -- in PREA; right?
3    A    Yes.
4    Q    And Harris County's required to follow PREA?
5    A    Correct.  The policy was mirrored from the
6    PREA standards.
7    Q    So whether it's PREA standards or the CJCs,
8    Harris County is required to follow those, and there's
9    a zero tolerance retaliation relating to PREA?
10    A    Yes.
11    Q    Okay.
12    A    So I'm not sure what -- 'cause the reason
13    says "Per floor policy," so I'm not sure what that
14    floor policy is.
15    Q    Okay.  All right.  Do you consider placing
16    an inmate into administrative segregation where they
17    are shackled and handcuffed for 15 days retaliation
18    for reporting a PREA?
19        MR. NYALLAY:  Objection.  Form.
20    BY MR. HUNTER:
21    Q    Is it retaliation to put somebody into admin
22    separation for 15 days and shackle and handcuff them?
23        MR. NYALLAY:  Objection.
24    BY MR. HUNTER:
25    Q    When they make a PREA allegation?

Page 118

1        MR. NYALLAY:  You can answer if you
2    know.
3        THE WITNESS:  I'm not sure what their
4    reason was for putting him in admin sep.  Were they
5    placing him there -- because he requested to be placed
6    there.  So if he's requesting to be placed there, I
7    would like to know what the floor policy is when it
8    comes to that particular area.  'Cause there could be
9    a policy that says that area has to be shackled.
10    So I'm not sure what their reasoning
11    was for placing him in shackles, especially when they
12    requested him to be there.  So I need to know what
13    the -- because they put "Reason, per floor policy."
14    So I need to know what the floor policy is to be able
15    to actually answer that.
16    BY MR. HUNTER:
17    Q    All right.  Was Mr. Buford shackled and
18    handcuffed off and on for 15 days, in October 2023,
19    after a PREA allegation?
20        MR. NYALLAY:  Objection to form.
21        THE WITNESS:  I can only tell you that
22    he was shackled from the 17th email that she gave
23    where she said a counsel -- Counsel went to go see
24    him, and then on the 18th, we took him out.
25    //

Page 119

1    BY MR. HUNTER:
2    Q    But also, going back to Exhibit 4, it shows
3    he was moved on October 2nd --
4    A    Mm-hmm.
5    Q    -- and released on October 18th.
6    A    Yes.
7    Q    And the floor policy is "Recommended
8    restraints, yes."  Do you see that?
9    A    Recommended.  Doesn't say that he has them
10    on every day.  I would have to actually pull video and
11    see that he have those restraints on every day.
12    Q    Well, it's funny because we've been asking
13    for videos, and Harris County's attorney says that
14    none exist.  Do you believe that no videos would exist
15    about Buford?
16        MR. NYALLAY:  Objection.
17        THE WITNESS:  I believe that.
18    BY MR. HUNTER:
19    Q    Why do you believe that?
20    A    Because after 180 days, the videos are
21    obsolete.
22    Q    Well, Mr. Buford was involved in a PREA
23    allegation; right?
24    A    Yeah.  Well -- yes, he was involved in a
25    PREA allegation, but he also, several times, stated

Page 120

1    that he wasn't involved in a PREA allegation.
2    Q    Okay.  But he at least reported having been
3    involved in a PREA allegation; right?
4    A    Yes.
5    Q    Okay.  And the record retention policy on
6    that's ten years?
7    A    The record -- or policy on that is ten
8    years.
9    Q    Okay.
10    A    However, that does not mean that there was
11    any video.
12    Q    All right.  So this is page -- it's the same
13    exhibit.  It's just the second page.
14    A    Okay.
15    Q    Exhibit 4 is two pages.  Do you know what
16    the separation code 512 means?
17    A    No.
18    Q    All right.  If you scroll here, it says
19    "Only housing available due to pending PREA
20    investigation."  Do you see that?
21    A    Yes.
22    Q    So that would mean -- when he was placed
23    into this housing on October 2, 2023, that it was the
24    only housing available to him?
25    A    Yes.  But I read where he said he requested

Page 121

1  it in the email.
2      Q   The housing that he was moved to on October
3  2, 2023, is the only housing that was available to
4  him; correct?
5          MR. NYALLAY: Objection. Form.
6  BY MR. HUNTER:
7      Q   Based on the --
8      A   I'm not sure.
9      Q   -- 512 code here?  If you go to the bottom,
10  it's "Only housing available due to the pending PREA
11  investigation."  Do you see that?
12     A   Yes.
13     Q   Okay.  From October 2nd to October 2023, do
14  you know if Buford was placed onto a floor that
15  requires restraints because the jail's overcrowded?
16     A   No.
17          MR. NYALLAY: Objection.
18  BY MR. HUNTER:
19     Q   And what's the basis -- the factual basis
20  for that answer?
21          MR. NYALLAY: Objection to form.
22  BY MR. HUNTER:
23     Q   You can answer.
24     A   My basis for the response is based off the
25  email that I read with him requesting to be placed in

Page 122

1  classification.
2  BY MR. HUNTER:
3      Q   Well, specifically the PREA element.  As a
4  PREA compliance manager, are you aware of any
5  legislation in PREA or CJC standard operating
6  procedure that requires Harris County to conduct an
7  assessment of all available alternative housing before
8  moving a PREA alleged victim?
9      A   I -- I am aware that we are supposed to
10  separate the victim from the suspect.  Whether it be
11  an inmate, or whether it be a staff member.  Whether
12  we have to move the staff member from the area or
13  whether we have to move the suspect from the area or
14  whether we have to move the victim from -- from the
15  area.  Now, those movements will have to connect with
16  classification to see which is the better move for the
17  facility.  However, they have to be separated.
18     Q   When moving somebody who makes a PREA outcry
19  or PREA allegation, when selecting where to move him
20  or her, is it in the best interest of the facility or
21  the best interest of the inmate in determining where
22  they go?
23     A   It's always the -- the best interest and
24  safety of the individual that is being moved.  So if
25  there's a PREA allegation, and the individual is in

Page 124

1  admin separation and based on him being moved to a GP
2  location.  I don't believe that it had anything to do
3  with overcrowding.
4      Q   So I'll ask the same question, but
5  understaffing.  So from October 2nd to October 18,
6  2023, when Mr. Buford is placed onto a floor that
7  requires restraints, is that because the jail's
8  understaffed, and it was the only place he could go?
9          MR. NYALLAY: Objection to form.
10         THE WITNESS: I'm not able to answer
11  that.
12  BY MR. HUNTER:
13     Q   Okay.
14     A   I'm not sure.
15     Q   Is that a classification question?
16     A   I'm not sure whose question that is.
17     Q   Command center?
18     A   Maybe -- maybe command staff.
19     Q   Okay.  Do you know if -- well, strike that.
20  Under PREA, when looking to move somebody after a PREA
21  allegation, do you -- is the county facility required
22  to assess alternative housing locations, like all
23  available alternatives?
24          MR. NYALLAY: Objection. Form.
25         THE WITNESS: That's more of a

Page 123

1  one -- one general population area, if we have to move
2  that individual to an entire -- an entire building, as
3  long as they are placed in another general population
4  that is not close to the suspect -- alleged suspect.
5      Q   In terms of your personal knowledge of being
6  a PREA investigator, and as well as your knowledge
7  relating to Mr. Buford specifically?
8      A   I've never been a PREA investigator.
9      Q   PREA manager.  Strike that.  Are you aware
10  of any time, from October 2nd to October 18, 2023,
11  where an assessment was performed by Harris County to
12  identify alternative housing locations consistent with
13  PREA?
14     A   I'm not sure.  Other than that document you
15  just showed me.
16     Q   And that would be Exhibit 4?
17     A   Yes.  So that -- anything like that, that
18  would be classification.
19     Q   I'm going to go to -- all right.  So this is
20  Exhibit 5.  That is JR 000035.  It's a Bates label.
21          (Plaintiff Exhibit 5 was marked for
22          identification.)
23          Have you ever seen this before?
24     A   No.  But it says "Disciplinary sanctions."
25  So this form is probably something from disciplinary

Page 125

32 (Pages 122 - 125)

1  and grievance.
2      Q   Do you know why it says disciplinary
3  sanctions relating to Mr. Buford?
4      A   That's -- so disciplinary sanctions doesn't
5  necessarily mean disciplinary because it -- the charge
6  says "Info," which means they weren't charged with
7  anything.  He wasn't charged with anything.  So he
8  wasn't disciplined.
9          But disciplinary sanctions is -- just the
10  word that is utilized when speaking of the actual
11  system.  That any report is kept internally.  But both
12  of these state info only.  So he was not charged with
13  anything.
14     Q   Okay.  And so the first one on the first row
15  here, the date's 9/28/23, info (23-0928-168).  Does
16  that -- is that the identifier for a PREA incident
17  number relating to Mr. Buford?
18     A   That's an identifier for an OMS, which means
19  an incident within the OMS system.
20     Q   And what is OMS?
21     A   OMS stands for Offender Management System.
22     Q   Okay.  All right.  So this is going to be
23  Exhibit 6.
24         (Plaintiff Exhibit 6 was marked for
25             identification.)

Page 126

1      It's an incident report that's been produced
2  by a defense counsel.  JR 000040 is the Bates label on
3  the first page and 41 is on the second.  It's a
4  two-page document.  Have you seen this before, ma'am?
5      A   Yes.
6      Q   Okay.  Did you review this as part of your
7  prep?
8      A   Yes.
9      Q   All right.  So can you see it fine and well
10  on your screen over there?
11     A   Yes.
12     Q   Okay.  So if you look at the incident ID
13  here -- you see that?
14     A   Yes.
15     Q   23-0928-168.  So that's the same number as
16  this one right here?
17     A   Correct.
18     Q   Okay.  So is it normal to have, on a
19  disciplinary sanctions page, info about a PREA?
20         MR. NYALLAY:  Objection.
21  BY MR. HUNTER:
22     Q   -- investigation?
23         MR. NYALLAY:  Objection.  Form.
24         THE WITNESS:  So when we -- when PREA
25  investigations -- or when something is created with a

Page 127

1  PREA allegation, it first has to come from the floor.
2  So this is not the actual PREA investigator.  This is
3  like the initiation.  This is the actual detention
4  officer or officer who was on the floor with the
5  individual who has to report what has been given to
6  them.
7  BY MR. HUNTER:
8      Q   But why would they call it a disciplinary
9  sanction when it's a PREA allegation?
10     A   Because anything that is written inside of
11  the offender management system is -- there's not like
12  a different -- like a -- a different system for them
13  to get in.  That would be -- that would be done by the
14  actual PREA investigators.
15     Q   Okay.
16     A   They would be doing it in a different
17  system.  But the actual individual who is on the
18  floor, this is how they report, and this is how they
19  keep up with what is going on on the floors.
20     Q   Okay.
21     A   Yeah.
22     Q   All right.  So back to Exhibit 6 here.
23     A   Okay.
24     Q   Let's see.  The reporting officer, who is
25  that?

Page 128

1      A   Reporting officer's -- that's -- that's
2  going to be the detention officer.  That's the person
3  that's working the floor.  That's the person who's
4  writing this report.
5      Q   Okay.  Do you know who that individual is as
6  it relates to this incident report?
7      A   No.  That -- this person is the -- the
8  person reporting.
9      Q   Okay.
10     A   The initial report.
11     Q   What about the supervisor here, Dariah?
12     A   That would be the floor supervisor for
13  the -- for the individual who's reporting.
14     Q   Okay.  Are you -- do you see the incident
15  location there?
16     A   Yes.
17     Q   And what does that say?
18     A   JA09-3 visitation.
19     Q   And what does that signify?
20     A   Third floor visitation area at 1200.
21     Q   Okay.  So is that the incident where the
22  rape or sexual assault occurred, or where it was
23  reported?
24     A   Reported.
25     Q   Okay.  And then that would be consistent

Page 129

33 (Pages 126 - 129)

1 also because it was Dequon's mother, Chandra, who
2 actually reported this; correct?
3     A   Correct.
4     Q   All right.  And then that goes back to some
5 of your testimony earlier.  When an allegation's
6 created, it could come from a third party, like a
7 parent, a spouse, or an attorney?
8     A   Correct.
9     Q   All right.  Let's see.  Let's see.  Do you
10 know -- okay.  See here, where it says "Involvement:
11 S," right here on the left?
12     A   Yes.
13     Q   Do you know what that means?
14     A   I would have to ask -- I mean, not
15 classification -- disciplinary.  I'm -- I'm going -- I
16 want to say singular, but I'm not sure.  That would be
17 a question I have to ask disciplinary.
18     Q   And then it says "PREA: Y."  What does that
19 mean?
20     A   Yes.  Is it a PREA.
21     Q   Okay.  And then "Medical: Yes"?
22     A   Yes.  That means he's seen medical.
23     Q   All right.  And then what about "Mental
24 health filed"?
25     A   Yes.  That means a mental health referral
Page 130

1 occurred?
2     A   Yes.
3     Q   All right.  Where it says "Force:  N" -- do
4 you see that.
5     A   Okay.
6     Q   Let me back up here.
7     A   Oh.
8     Q   Do you see that?
9     A   Force, no.
10     Q   All right.  How does that determine, do you
11 know?
12     A   That would be determined by however the
13 inmate responded.
14     Q   So it's subjective reporting from the
15 victim.  That's how it's determined if force was used
16 or not?
17     A   The individual who wrote this report; I'm
18 not sure how they asked.  'Cause I need to, I guess,
19 be able to read the report.  So depending on what the
20 individual said to the inmate and how the inmate
21 responded to them is why they have that in there.
22     Q   Okay.  Let's see.  Do you recall if on
23 September 28, 2023, if Sergeant Dariah contacted you
24 about the sexual assault that Chandra Jenkins reported
25 occurring to her son, Dequon?
Page 132

1 was filed with Harris Center.
2     Q   Okay.  And then "The housing location at
3 time of incident"?
4     A   Yes.
5     Q   JA09-3-C-1-05J?
6     A   Yes.
7     Q   Where is that at Baker?
8     A   Third floor, 1200 Baker Street.
9     Q   Okay.
10     A   North hallway.
11     Q   Was the north hallway listed on your sheet
12 of blind spots --
13     A   I'm not sure.
14     Q   -- that I will be requesting?
15     A   I am not sure.
16     Q   All right.
17     A   So 3-C-1 is not in the hallway.  3-C-1 is an
18 actual pod area.  Like a housing area, but it's
19 located on the north hall.
20     Q   So is that a pod area, like a communal area?
21 It's not a cell?
22     A   Yes.  It's a cell.  It's a -- a cell block.
23     Q   A cell block.  Okay.
24     A   Yes.
25     Q   And that's where it's alleged to have
Page 131

1     A   I believe that Supervisor Dariah connected
2 the PREA unit.  There's an actual email that can --
3 that will go out.
4     Q   Okay.  All right.  So this is page two of
5 the same exhibit.  And let me see.  Right here
6 "Sergeant Dariah contacted PREA manager, K.
7 Camacho" --
8     A   Okay.
9     Q   -- "and informed her of the situation, and
10 she contacted PREA Investigator A. Guerrero."
11     A   Mm-hmm.
12     Q   Do you see that?
13     A   I do.
14     Q   Does that refresh your recollection on being
15 contacted by Sergeant Dariah about this sexual assault
16 from 9/28?
17     A   If it says he contacted me, then yes, he
18 contacted me.
19     Q   Okay.  Do you remember what Sergeant Dariah
20 told you when contacting you?
21     A   I do not.  We have about 4 to 500 sexual
22 abuses and harassments a year, so I -- I wouldn't be
23 able to tell you exactly what was said.
24     Q   All right.  After being contacted, did you
25 then contact PREA Investigator Guerrero?
Page 133

34 (Pages 130 - 133)

1    A   Yes.
2    Q   Okay.  And based on this document, does it
3  appear that Guerrero interviewed Buford and determined
4  that Buford was unresponsive and confused?  Do you see
5  that?
6    A   I would rather look at the actual
7  investigator's report instead of looking at this
8  report.  Because I don't know how the reporting
9  officer came up with what Guerrero was thinking.  And
10  Guerrero was not a she.  Guerrero was -- is a he.
11    Q   Okay.  So fair to say that this record is
12  not accurately reflecting some of the facts relating
13  to this incident?
14         MR. NYALLAY:  Objection.  Objection to
15  form.
16  BY MR. HUNTER:
17    Q   For instance, the gender of one of the
18  individuals involved is incorrect?
19    A   So the reporting officer's, I'm guessing, a
20  she.  So they're either talking about Guerrero and --
21  or themselves.  "She determined that Inmate Buford was
22  unresponsive and confused.  Inmate Buford was escorted
23  to the 1200 clinic for evaluation, and a psych
24  referral will be generated."  So I'm not -- I'm not
25  sure.  You'd have to ask Ashaye -- Ashaye.

Page 134

1         MR. HUNTER:  All right.  Well, he needs
2  to take a -- we're going to take a break because he
3  has to change the video out.
4         MR. NYALLAY:  What's the exhibit
5  number for this one?
6         MR. HUNTER:  This will be Exhibit 6.
7         MR. NYALLAY:  Six.  Okay.
8         MR. HUNTER:  Yeah.
9         THE VIDEOGRAPHER:  All right.  This is
10  now the end of video two of Katrina Camacho.  Off the
11  record.  The time is approximately 1:50.
12         (Off the record.)
13         THE VIDEOGRAPHER:  Now on the record.
14  Video three of Katrina Camacho.  The time is 2:11.
15  BY MR. HUNTER:
16    Q   Okay.  Do you know if Investigator Guerrero
17  reviewed any video footage relating to the PREA
18  allegations of Dequon Buford?
19    A   I'm not sure if there was video.
20    Q   And what's your reasoning for that?
21    A   'Cause I remember it being audio, and I also
22  remember Buford not being able to have enough like --
23  kind of just like general, when it happened.  And one
24  day, it was a couple of weeks and then -- he -- he
25  gave several stories.

Page 135

1         He gave several stories.  He gave several
2  quantity of individuals that -- that were involved.
3  And then he also stated that it didn't happen.  I
4  don't believe there was any video.
5    Q   What audio are you referring to?
6    A   There is audio of -- of Guerrero actually
7  interviewing Buford.
8    Q   And you were the -- when this was happening,
9  you were no longer in the PREA manager role, but you
10  were still working in that role transitioning it to
11  Officer Ward; correct?  Or to Shaun Ward?
12    A   Well, just trying to transition to whoever
13  was going to be the PREA person.
14    Q   Okay.  In September 2023, had it been
15  decided that Shaun Ward was going to become the PREA
16  manager?
17    A   No.
18    Q   Okay.  So let's see.  Go to -- so this is
19  going to be Exhibit 7.  It's Bates stamped JR 000059.
20         (Plaintiffs Exhibit 7 was marked for
21         identification.)
22         And so, ma'am, what I want to show you
23  here -- so this is a -- it looks like an investigation
24  or a little incident note.  And specifically, right
25  here "After viewing video footage, there was no

Page 136

1  evidence or times that the incident occurred."  Do you
2  see that?
3    A   Yes.
4    Q   All right.  So you testified that there was
5  no video footage, but this document shows that there
6  was.
7    A   It says "After viewing video footage, there
8  was no evidence or times that the incident occurred,"
9  which means he didn't find anything on the video.
10    Q   But he still reviewed video?
11    A   Yes.  You can review video and still there
12  be no video 'cause there's nothing on the video.  So
13  that means that -- that the alleged incident didn't
14  occur during the -- the duration and times that -- or
15  date that he said it happened because there was
16  nothing to justify it.
17    Q   And this relates to the incident occurring
18  11/5/2023.  Do you see that?
19    A   Yes.
20    Q   And the incident ID is 23-1105-392?
21    A   Yes.
22    Q   Okay.  So there was at least video footage
23  reviewed.  There might not have been any video footage
24  on it as it relates to the November 5, 2023, incident.
25  Some video footage was reviewed.  True?

Page 137

35 (Pages 134 - 137)

1    A    Correct.
2    Q    All right.
3    A    According to this, yes.
4    Q    Okay.  In terms of Ms. Jenkins reporting
5  Dequon's sexual assaults --
6    A    Mm-hmm.
7    Q    -- did you ever speak with Ms. Jenkins?
8    A    I'm not sure if I spoke with her, but I do
9  remember several inmate care concerns from her even
10  before the alleged incident.
11    Q    Okay.  And what specifically do you recall?
12    A    I recall her not wanting him in general
13  population and wanting him in a admin separation area.
14    Q    Okay.  Anything else?
15    A    No.
16    Q    Did you ever speak with Mr. Buford directly
17  about his PREA allegations?
18    A    I don't remember.
19    Q    Do you have any opinions on if Mr. Buford
20  understood and had a sense of reality when he was in
21  jail?
22        MR. NYALLAY:  Objection to form.
23        You can answer.
24        THE WITNESS:  I'm -- that's more of a
25  medical question.  Someone who deals with mental

1  health daily.  I do remember my investigators stating
2  that the individual was exhibiting some type of
3  behavior that they believed to be a mental health
4  concern, which is why the referral was completed on
5  Mr. Buford.
6  BY MR. HUNTER:
7    Q    Do you recall if at any point during the
8  PREA allegations of Mr. Buford, whether September 2023
9  or November 2023 -- do you know if he was ever hearing
10  voices?
11    A    Yes.  I do remember the investigators
12  mentioning that he was hearing voices.  And also, I
13  remember them doing the psych referral because of it.
14    Q    Do you understand Mr. Buford to be
15  schizophrenic?
16    A    I remember reading in one of the inmate care
17  concerns, his mother, Chandra, stating he was
18  schizophrenic.
19    Q    How has Harris County meant to protect and
20  achieve the PREA goals when it relates to somebody
21  who's schizophrenic and a mental health concern?
22    A    We investigate everyone the same way,
23  whether mentally ill or not.  A report is still
24  completed and an investigation is still completed.
25  However, we also make sure that if any mental health

1  signs are viewed, that we do that mental health
2  referral.  Because we're not mental health, and we do
3  have a very large mental health facility inside of the
4  jail.  So we always make sure we do those referrals.
5    Q    Let's go to -- this is going to be Exhibit
6  8.  It's JR 47-48 is the Bates label.
7        (Plaintiff Exhibit 8 was marked for
8        identification.)
9        All right.  Have you ever seen this document
10  before?
11    A    No.  This is a classification document.
12    Q    And this is similar to the other document we
13  looked at earlier, but it's a different date.  And
14  this is November 5, 2023.  Do you see that?
15    A    Yes.
16    Q    Okay.  Then again, it relates to Mr. Buford.
17  This cell block location 09-2J2-01G, do you know where
18  that is?
19    A    Yes.
20    Q    Where is that?
21    A    That's 1200 jail, south hall.
22    Q    Do you recall if the south hall was one of
23  the areas of concern in your document with the -- that
24  you keep at the county on blind spots?
25    A    Oh, I'm not sure.

1    Q    Okay.  All right.  And so this shows that
2  Mr. Buford was placed into this administrative
3  separation on November 5th and released on 11/14.  Do
4  you see that?
5    A    Yes.
6    Q    And is released ATW; does that mean released
7  all the way?
8    A    Yes.
9    Q    Like he's -- he's removed from jail.  He's
10  released from jail?
11    A    Correct.
12    Q    Okay.  So on the 14th of November, 2023,
13  he's released from jail; right?
14    A    Yes.
15    Q    Mr. Buford?  All right.  So where it says
16  "Reason for separation, victimization vulnerable
17  housing," what does that mean?
18    A    Victimization vulnerable housing means that
19  this individual's at a high risk of being victimized.
20  So victimization vulnerable housing is usually on the
21  sixth floor, and it's just a -- a housing area where
22  the individuals are able to be -- still be in a -- a
23  general population styled area.  They're still able to
24  do everything as general population, but it's an area
25  where you know the individuals are at a higher risk of

1  being sexually victimized.
2      Q   Is the sixth floor also where the majority
3  of transgenders are housed at Baker Street?
4      A   LGBTQI community are housed all over the
5  jails.  So sixth floor, you're going to have
6  transgenders inside of a vulnerable victimization cell
7  block because they either report, as a classification,
8  that they want to be there, or the classification
9  staff member who was interviewing them believes that
10  they're at a higher risk of being sexually victimized
11  so places them there.  But it only holds 24
12  individuals.  And so LGBTQI community are housed in
13  every jail everywhere.
14     Q   The sixth floor only houses 24 individuals?
15     A   Vulnerable victimization.
16     Q   Okay.
17     A   Mm-hmm.
18     Q   Within the sixth floor?
19     A   Within the sixth floor.
20     Q   Okay.  Is that recommended restraints box
21  checked again?
22     A   Yes.
23     Q   All right.  And again, it says "Per floor
24  policy"?
25     A   Yes.
                                              Page 142

1      Q   All right.  So on November 5, 2023, based on
2  this document, Harris County transfers Mr. Buford to a
3  floor with recommended restraints --
4      A   Mm-hmm.
5      Q   -- and he's released on November 14, 2023?
6      A   Yes.
7      Q   Do you know who within Harris County made
8  the decision to place Mr. Buford onto this floor that
9  required restraints?
10     A   That would probably be a classification
11  supervisor.
12     Q   All right.  All right.  So this is page two
13  of the same exhibit.  This 30-day assessment column
14  here?
15     A   Yes.
16     Q   What is that about?
17     A   So --
18     Q   If you know.
19     A   I'm not sure why they have 30-day assessment
20  completed, but I do know that classification has to
21  assess individuals, some more than others.  Just like,
22  for instance, with LGBTQI, if they make any type of
23  complaint or feel that they need to be reclassified,
24  then classification has to reassess them.  So I'm --
25  because of this individual being a victimization
                                              Page 143

1  vulnerable inmate, I believe the 30-day assessment is
2  because he was placed in 2J2.
3      Q   Okay.  And then do you see the separation
4  code again, the 512?
5      A   Yes.
6      Q   And then that correlates to this down here,
7  where 512 "Only housing available due to pending PREA
8  investigation"?
9      A   Yes.
10     Q   Okay.  So again, from November 5, 2023, to
11  November 14, 2023, Mr. Buford's placed into
12  restraints -- on a floor with restraints?
13     A   Yes.
14     Q   All right.  Do you know, from November 5th
15  to November 14, 2023, if Mr. Buford was placed onto
16  that floor that requires restraints because the Baker
17  Street jail was overcrowded?
18         MR. NYALLAY:  Objection.  Form.
19         THE WITNESS:  I'm not sure.
20  BY MR. HUNTER:
21     Q   You're not sure?
22     A   I'm not sure.
23     Q   Do you know why, from November 5th to
24  November 14, 2023, Mr. Buford was placed onto a floor
25  that requires restraints?
                                              Page 144

1          MR. NYALLAY:  Objection.  Form.
2  BY MR. HUNTER:
3      Q   Do you know?
4      A   I'm not sure.
5      Q   Okay.  Did Harris County conduct an
6  assessment of all available alternative housing
7  locations before placing Mr. Buford into the
8  victimization vulnerable housing from November 5th to
9  November 14th?
10         MR. NYALLAY:  Objection to form.
11         THE WITNESS:  That would be a
12  classification question.
13  BY MR. HUNTER:
14     Q   As it relates to what PREA requires and
15  what's set forth in the standard operating procedures,
16  Harris County was required to assess available
17  alternative housing locations; correct?
18         MR. NYALLAY:  Objection.
19         THE WITNESS:  Harris County was
20  required to make sure, if it was a PREA incident, to
21  relocate the individual from their alleged suspect.
22  BY MR. HUNTER:
23     Q   And part of that location and part of PREA
24  requires conducting an assessment of all available
25  alternative housing locations?
                                              Page 145

37 (Pages 142 - 145)

1     A   That's a classification -- that's a
2   classification response.
3     Q   So you don't know?
4     A   No.
5     Q   All right.  Okay.  This will be Exhibit 9.
6         (Plaintiff Exhibit 9 was marked for
7         identification.)
8     A   Mm-hmm.
9     Q   It's JR -- Bates labeled JR 049.  So this
10  looks like the similar document that we went through
11  earlier, but for 9/28, 9/29.  This is for 11/5.  Okay?
12    A   Okay.
13    Q   Again, it says "Disciplinary sanctions" and
14  then charges:  "Victim sexual conduct (364).  Victim
15  sexual conduct (392)."  Do you know -- if looking at
16  this document, if you know -- I mean, was Dequon
17  sanctioned, or is this just -- it says that?
18    A   I've never -- I've never seen this victim
19  sexual conduct 364 or victim sexual conduct 392.  I
20  don't believe he was sanctioned, especially if it's
21  saying victim in -- in front of it.
22    Q   Okay.  So I believe that the codes there
23  that are in parentheses correlate to a further PREA
24  investigation relating to the November 5th.  Is that
25  your understanding?

Page 146

1         THE OFFICER:  Okay.
2         MR. HUNTER:  JR 52, the Bates.
3   BY MR. HUNTER:
4     Q   Okay.  Let's see.  All right.  Can you
5   review this document, ma'am?  This is Exhibit 10.
6     A   Okay.  Okay.
7     Q   All right.  What is the -- in the top left
8   corner, it says "Incident type, disciplinary."  Why is
9   it referring to that?  Because -- why is it referring
10  to Mr. Buford's PREA allegation as disciplinary?
11    A   Because the individual that was involved in
12  the allegation was disciplinary.
13    Q   Okay.  And having reviewed this document,
14  what were Mr. Buford's allegations?
15    A   That he was groped and -- by -- by the
16  individual slapping him on the buttocks.
17    Q   Okay.  And specifically, was that inmate on
18  inmate or was that a detention officer on Mr. Buford
19  or --
20    A   That would be inmate on inmate.
21    Q   And that inmate is Inmate Allen?  Michael
22  Allen?
23    A   Correct.
24    Q   Okay.  Where it says "Incident status,
25  approved," what does that mean?

Page 148

1     A   No.
2     Q   Okay.  And --
3     A   361, 392 doesn't have anything to do with
4   the PREA investigators.
5     Q   Well, the only reason I say that -- I'm
6   saying the PREA incident.  Okay.  So here, 11/5/23,
7   "Victim of sexual conduct (364)."
8     A   Okay.
9     Q   So if we go to Exhibit 10, which is page 52,
10  the incident ID is 23-1105-364.
11    A   Okay.
12    Q   So --
13    A   So it's the ONS number.
14    Q   Okay.  So --
15    A   After -- after the ONS number.
16    Q   -- that 364 is the last three of the ONS
17  number.
18    A   Okay.
19    Q   Does that make sense?
20    A   Yeah.  That makes sense.
21        THE OFFICER:  And you said that was
22  Exhibit 10?
23        MR. HUNTER:  Yeah.  Exhibit 10.
24        (Plaintiff Exhibit 10 was marked for
25        identification.)

Page 147

1     A   That means the floor supervisor who works
2   this floor approved the report from reporting Officer
3   C. Oliver.
4     Q   Okay.  And then -- let's see.  The incident
5   location here, JA09-6-E-2B, is that where the incident
6   occurred or where it was reported?
7     A   That's where the incident occurred.
8     Q   Okay.  And are you familiar with where that
9   is within 1200 Baker?
10    A   Yes.
11    Q   Where is that?
12    A   This is the actual vulnerable victimization
13  cell block on the sixth floor of 1200, on the north
14  hallway.
15    Q   Are you aware if that location was listed on
16  your document that set forth where blind spots were?
17    A   I'm not sure.
18    Q   This E1 question mark under medical, where
19  it says:  "E1?  No," what does that mean?
20    A   E1 relates to a staff member.  E1 is a form
21  that staff members fill out when they are injured
22  during an incident.  So it was no because no staff
23  members were involved.
24    Q   Okay.  And so on this document, relating to
25  the November 5, 2023, PREA outcry, "Mental health

Page 149

38 (Pages 146 - 149)

**Page 150**

```
 1  filed," nothing's listed.  Why would nothing be listed
 2  for somebody who's like Buford, and it's known he has
 3  mental health --
 4          MR. NYALLAY:  Objection to form.
 5  Objection to form.
 6  BY MR. HUNTER:
 7      Q    You can answer.
 8      A    It's because in this particular time or
 9  incident, the individual was not displaying mental
10  illness, was not having any type of abnormal behavior.
11  The individual actually made a report with the
12  detention officer stating someone did something to
13  them.  This wasn't an incident where the -- where a
14  mental health referral needed to be filed.
15      Q    Okay.  Did Officer Dariah contact you on
16  November 5, 2023, relating to Mr. Buford's PREA
17  allegations as to inmate Michael Allen?
18      A    I'm not sure.
19      Q    Okay.  Let's see.  Okay.  This is going to
20  be Exhibit 11.  It's three pages.
21          (Plaintiff Exhibit 11 was marked for
22           identification.)
23      A    Okay.
24      Q    JR 61 through 63.
25      A    Mm-hmm.
```

**Page 151**

```
 1      Q    All right.  And this is an incident report
 2  relating to the 11/5/2023 PREA allegation of
 3  Mr. Buford.  Do you see that, ma'am?
 4      A    Yes.
 5      Q    Okay.  And this is the one we were just
 6  talking about relating to inmate on inmate, and it
 7  was -- Michael Allen was the charged party?
 8      A    Yes.
 9      Q    And Mr. Buford was the victim?
10      A    Yes.
11      Q    All right.  Do you see here, where it says
12  "I contacted PREA Manager K. Camacho and informed her
13  of the situation"?
14      A    Yes.
15      Q    All right.  So having reviewed that, does
16  that refresh your recollection that Officer Dariah
17  contacted you?
18      A    Yes.
19      Q    Okay.  Do you see here, where Mr. Buford's
20  family member informed Harris County that an inmate in
21  his cell block had asked him to perform a sexual act
22  with him?  Do you see that?
23      A    Yes.
24      Q    All right.  So again, Chandra Jenkins is
25  having to report PREA events on behalf of her son,
```

**Page 152**

```
 1  Dequon.  Is that what's occurring here?
 2      A    I'm not sure if it was her or not 'cause
 3  they don't have her name in here.
 4      Q    Okay.  But it's a family member and then
 5  it's -- a female family member reporting it because it
 6  says "She informed me that."
 7      A    Yes.
 8      Q    Do you see that?
 9      A    I do.
10      Q    All right.  So a female family member of
11  Buford, very likely his mom, was the one reporting
12  this PREA event for November 5, 2023.  Do you see
13  that?
14      A    I do.
15      Q    All right.  Okay.  So we'll go back to this
16  page 49, which was Exhibit 9.  Do you see the victim's
17  sexual conduct 392?
18      A    Yes.
19      Q    All right.  And so that correlates to
20  another PREA incident investigation document.  I'll
21  pull that one up.  Find it.  Okay.  So this will be
22  Exhibit 12.  This is JR 53 produced by defense
23  counsel.
24          (Plaintiff Exhibit 12 was marked for
25           identification.)
```

**Page 153**

```
 1          Okay.  I'm going to zoom in here.
 2      A    Thank you.
 3      Q    So you can read it.  Trust me, I couldn't
 4  either.  So just take your time and read that to
 5  yourself.
 6      A    Okay.
 7      Q    Have you completed --
 8      A    Not yet.
 9      Q    -- your review?
10      A    Okay.
11      Q    All right.  Having reviewed that document,
12  the Exhibit 12, does that appear to be a true and
13  accurate representation of this incident information
14  sheet?
15      A    Yes.
16      Q    All right.  So you discussed Ms. Jenkins,
17  Chandra Jenkins, who's obviously Dequon's mom, in some
18  of the interactions you had with her through the care
19  concerns that she was reporting.
20          So if you see here, it says "The care
21  concern" -- "the caring concern was sent by Inmate
22  Buford's mother, Chandra Jenkins, is read as follows."
23  Can you just read that care concern into the record?
24      A    Yes.  "My son was placed on the sixth floor
25  after he was raped by three men.  Now, since he was
```

1  placed on the sixth floor, four gay man been taking my
2  son food his family been ordering him.  These four gay
3  men that look like women told my son he have to suck
4  their dick.  My son is afraid and very quiet.
5          "No way he's supposed to been placed on a
6  floor full of gay men that dress like women.  He's
7  supposed to been placed on a floor where he is
8  isolated from all inmates for his safety and
9  protection or placed around inmates that's been raped
10  like him, not around gay men that looks like women.
11         "Can you please have my son, Dequon Buford,
12  placed in protective custody, isolated from all
13  inmates, please, for his safety and protection."
14     Q    Okay.  So in reading that, it's your
15  understanding that Ms. Jenkins is alleging, on behalf
16  of Mr. Buford, as well as Mr. Buford, I guess I should
17  say, that on one occasion, he was raped by three men?
18     A    Yes.  She's alleging that her son was raped
19  by three men.
20     Q    And then she's also alleging, now,
21  discrepancies on the sixth floor with four other
22  individuals there and sexual misconduct.  Is that
23  correct?
24     A    Correct.
25     Q    Okay.  Were you involved in any capacity, as

Page 154

1  kind of PREA manager ad hoc -- because you weren't in
2  that position anymore but nobody was -- to
3  substantiate the legitimacy of these claims by Jenkins
4  and Buford?
5          MR. NYALLAY:  Objection.  Form.
6          THE WITNESS:  I would never be the one
7  substantiating or unsubstantiating those claims.  That
8  would be the PREA investigation.
9  BY MR. HUNTER:
10     Q    Well, I understand the PREA investigator,
11  and that goes back to earlier today when we talked
12  about kind of the tripartite between PREA manager,
13  PREA investigator, and classification.
14     Q    Mm-hmm.
15     Q    But were you involved, as PREA manager in
16  any capacity, relating to these allegations of Jenkins
17  and Buford saying that Buford was raped by three men
18  on multiple occasions and then transferred to the
19  sixth floor where he was again being abused sexually
20  by folks on that floor?
21     A    No.
22     Q    And why weren't you?
23     A    That wouldn't be something that I would be
24  doing.  That's an investigator.  My job is to make
25  sure it is investigated.

Page 155

1     Q    But you had no role in determining PREA
2  compliance when there's these pretty egregious
3  allegations being made?
4     A    The investigators are instructed to
5  investigate thoroughly.  If there was some validity to
6  the allegations, they would be able to make sure
7  whether those were factual or not.
8     Q    Okay.  All right.  In 2023, was Officer
9  Andrew Guerrero handling sexual assault allegation
10  investigations?
11     A    No, he wasn't, but there were times where he
12  did the initial interview.  And if -- like, if a --
13  the peace officers are doing investigations in other
14  jails, and the individual needed to be looked at right
15  then or needed to be talked to right then, yes.  There
16  are times when he would do an initial investigation.
17     Q    And did he conduct an initial investigation
18  for Mr. Buford's September '23 PREA outcry?
19     A    Yes.
20     Q    All right.  So this was already introduced,
21  Exhibit 3, and it says "Change inmate to purple
22  stripe."  Do you see that?
23     A    Yes.
24     Q    And is that a classification issue?
25     A    It is.

Page 156

1     Q    Okay.  Do you know what purple stripe
2  signifies?
3     A    Unless they've changed it, purple stripe
4  were your vulnerable victimizations inmates.
5     Q    Okay.  All right.  And so this email is
6  sent, and it looks like it's one of the
7  classifications folks.  Is that Michael --
8     A    That's the sergeant.
9     Q    Yeah.  Sergeant.  And then he's sending it
10  to Rankin and Bower?
11     A    Yes.
12     Q    Are all those classification folks?
13     A    All classification supervisors.
14     Q    Okay.  All right.  And this is sent on
15  October 18th saying "Change him to victim
16  vulnerablezation, color purple."  Right?
17     A    Mm-hmm.
18     Q    On October 18th?
19     A    Mm-hmm.
20     Q    And that was after he was shackled from
21  October 2nd till October 18th.  And they say "Change
22  him to purple."
23     A    Purple stripe.
24     Q    Purple stripe.
25     A    Because there -- there is a solid purple as

Page 157

40 (Pages 154 - 157)

1 well.
2    Q   Okay.  Let's see.  Okay.  So this is going
3 to be Exhibit 13, PREA 000015 is the Bates.
4        (Plaintiff Exhibit 13 was marked for
5        identification.)
6        And what I want to ask -- let's see.  Have
7 you reviewed the document in front of you, ma'am?
8    A   Yes.
9    Q   Okay.  And it says "Guerrero is not to
10 handle sexual assault allegations."  Do you see that?
11   A   Correct.
12   Q   All right.  But he handled this one relating
13 to Buford though?
14   A   Correct.  'Cause he's only doing the initial
15 investigation.  The person who was actually assigned
16 this was Deputy McCutcheon, who is the investigator
17 for this one.
18   Q   But this --
19   A   And he assisted.
20   Q   The email though from Lily --
21   A   Lila.
22   Q   Lila Millan --
23   A   Yes.
24   Q   -- to you, says that Guerrero's not to
25 handle sexual assault allegations whatsoever.  But he

Page 158

1 still contributed on this one relating to Buford; is
2 that true?
3    A   Yes.  But what she put in there was not
4 factual.
5    Q   Well, how do you know what she was thinking
6 when she wrote that email?
7    A   Because I was her supervisor.
8    Q   Because it looks like, in reviewing this
9 email, that Guerrero -- Investigator Andrew Guerrero
10 was involved in handling the sexual assault
11 allegations for Buford, and Guerrero shouldn't have
12 been able to do that whatsoever.  It wasn't allowed.
13   A   That's not correct.
14   Q   That's what this document shows.
15   A   I'm sure that's what it says, but that's not
16 correct.
17   Q   Okay.  And Officer -- is it Milan?
18   A   She's not an officer.  She's a clerk.
19   Q   Okay.  Clerk Milan, she's since passed;
20 right?
21   A   Yes.
22   Q   All right.  So even though Officer
23 Guerrero -- or Investigator Guerrero was not to handle
24 sexual assault allegations, he was interviewing
25 Mr. Buford relating to his September 2023 PREA

Page 159

1 allegation involving claims of repeated rapes by
2 multiple inmates?
3    A   So when it comes to sexual assaults, when I
4 stated for -- for him not to handle sexual assaults,
5 it had -- it has nothing to do with him not being able
6 to.  It was because he was a detention officer.
7        So he was held to doing interviews, not
8 actually presenting the SANE exams and collecting the
9 evidence and sending it to the medical examiner's
10 offices.  So that's what that means.  That means that
11 he is not allowed to handle anything dealing with
12 evidence.
13   Q   Okay.  Are you aware of any PREA law on how
14 Harris County is to determine when a family member is
15 fabricating PREA allegations?
16        MR. NYALLAY:  Objection.
17        THE WITNESS:  When a family member is?
18 BY MR. HUNTER:
19   Q   Yep.  You heard me right.
20   A   No.
21   Q   Are you aware of any Harris County standard
22 operating procedure on how Harris County and its
23 employees are to determine when a family member is
24 fabricating PREA allegations?
25   A   No.

Page 160

1    Q   Okay.  Are there any PREA laws on how Harris
2 County and its employees are to determine when an
3 inmate is fabricating PREA allegation?
4    A   Yes.
5    Q   Are you aware of any Harris County standard
6 operating procedures on how Harris County and its
7 employees are to determine when an inmate is
8 fabricating PREA allegation?
9    A   Yes.
10   Q   All right.  What are the PREA laws that
11 Harris County's supposed to look to to determine when
12 an inmate is fabricating?
13   A   Okay.  So PREA standards say that if we are
14 aware of someone fabricating a PREA allegation that we
15 can report the incident.  However, there have -- there
16 has never been an occasion where I have, or my
17 investigators have filed charges on someone for
18 fabricating.
19        And the reason being so is because Captain
20 Taylor, who was the PREA coordinator at times, did not
21 want to deter individuals from still making PREA
22 allegations and reporting incidents.
23   Q   Did you ever create any internal trainings
24 for Harris County to train its employees on how to
25 determine when a family member is fabricating PREA

Page 161

41 (Pages 158 - 161)

1  allegations?
2      A    No.  Because a staff member should -- would
3  not be doing that.  It would only be a PREA
4  investigator who would even be looking into that.  But
5  there's no policy or procedures for -- in PREA -- for
6  families fabricating.
7      Q    Are you aware, in this case, that Officer
8  Guerrero came to the conclusion that he believed
9  Mr. Buford and Ms. Jenkins were fabricating?
10     A    Was that Guerrero or McCutcheon?  I believe
11  that was McCutcheon.
12     Q    Okay.  Let's look.
13     A    Below.
14     Q    Okay.  Yeah.  So strike that.  It was
15  McCutcheon.  So this will be Exhibit 14.  PREA 31 is
16  the Bates.
17          (Plaintiff Exhibit 14 was marked for
18          identification.)
19      Have you reviewed this, ma'am?
20     A    Yes.
21     Q    All right.  What -- strike that.  What does
22  MHMRA mean?
23     A    That is a acronym for mental health --
24  that's the old acronym for -- it's now Harris Center.
25  So that's just the acronym for MHMRA.

1      Q    Okay.  So Officer McCutcheon sends an email
2  on October 19, 2023, one day after Mr. Buford is
3  removed from being heavily shackled, and the email
4  states, in part, "His mom appears MHMRA or fabricating
5  allegations."  Do you see that?
6      A    I do.
7      Q    Did you speak to McCutcheon, Officer
8  McCutcheon, about why he sent that email?
9      A    I did.
10     Q    And why did he type that?
11     A    He believed the inmate to be mentally ill,
12  and that's why the referral was done.  And I --
13  Guerrero also did his supplement welfare check.
14  However, I actually spoke to him about the email
15  period.  For whatever reason, he didn't send it to me,
16  but I just didn't like the way the email was worded.
17      So he was okay to believe that the inmate
18  needed to -- needed an MHMRA referral at the time, but
19  it was just -- that -- the email seemed a little bit
20  opinionated for me.  So I -- I don't like opinions
21  when it comes to things of that nature.
22     Q    Okay.  So you believe that this email's more
23  ground in opinion than fact?
24     A    Well, because the MHMRA referral was just
25  completed when this email was done, and the entire

1  investigation had not been completed yet.  So yes,
2  there were multiple -- multiple incidents of the
3  individual and the mother with different allegations.
4  But you can't make a conclusion until the complete
5  report is done.
6      Q    Harris County doesn't train employees to
7  determine if a family member's fabricating a PREA
8  allegation; right?
9      A    No.
10     Q    Okay.
11     A    Not in PREA.
12     Q    All right.
13     A    Now, maybe sex crimes or someone else has
14  a --
15     Q    Right.
16     A    -- policy, but --
17     Q    Do you believe that Chandra Jenkins was
18  fabricating PREA allegations?
19     A    I believe she was telling us whatever her
20  son was telling her.
21     Q    And she actually has to serve as Dequon's
22  advocate because of all of his mental health issues;
23  right?
24     A    Correct.
25     Q    I think earlier, I asked some specific

1  questions about the actual complaint or the lawsuit
2  that I drafted and, obviously, you said you hadn't
3  reviewed that.
4      A    No.
5      Q    So I'll just kind of go through some of the
6  allegations and see what your knowledge is on that --
7  personal knowledge based on the capacity you're
8  testifying in today.
9      So the first incident that Dequon's alleging
10  in the lawsuit is a PREA incident occurring September
11  25, 2023, wherein Mr. Buford was beaten and raped by
12  three inmates.  Are you aware of that?
13     A    Yes.  We read that earlier.
14     Q    Okay.  And he actually further claims that
15  inmates put a sheet over the light and camera, forced
16  him face down into a pillow, and raped him one by one?
17     A    Not aware of that.
18     Q    Okay.  Do you know if that was ever
19  discussed with Officer Guerrero, that specific
20  statement?
21     A    I'm not aware.
22     Q    Okay.  Do you know if any video footage from
23  September 25th, relating to the floor that Mr. Buford
24  was housed on, existed?
25     A    I'm not aware.

1    Q    Okay.  And again, the potential person to
2  direct that request would be to either your attorney's
3  office or Securus, the video people?  Do they do the
4  video retention?
5    A    Correct.
6    Q    Okay.
7    A    But I believe video is obsolete after 180
8  days.
9    Q    Okay.  But you don't know if it's saved on a
10  cloud or something?
11    A    I'm not sure.  I don't know.
12    Q    Okay.  As it relates to the lawsuit itself
13  and what Mr. Buford alleges, are you aware that Dequon
14  claims that two days later, on September 27, 2023, he
15  was raped again by fellow inmates?
16        MR. NYALLAY:  Objection to form.
17        THE WITNESS:  I'm not aware.
18  BY MR. HUNTER:
19    Q    And then as to November 2023, Mr. Buford
20  reports another sexual assault, this time occurring on
21  the sixth floor?
22    A    Yes.  That's what we just read.
23    Q    And that goes to Inmate Allen; right?
24    A    Correct.
25    Q    And he was actually charged?

Page 166

1    Q    Okay.  So there was two different reports,
2  one relating to September 25th and one relating to
3  September 27th?
4    A    Correct.
5    Q    Okay.  And the only reason those even became
6  known is because of Dequon's mom, Chandra, reporting
7  that?
8    A    Yes.  That's what it had on there.
9    Q    Okay.  So without Chandra, none of the
10  investigations would've occurred?
11    A    Not unless he reported it.
12    Q    Okay.  A mentally -- potentially mentally
13  ill or mentally unstable person reporting that?
14    A    He reported it to his mother.
15    Q    A son and a mom have a very special
16  relationship though; right?
17        MR. NYALLAY:  Objection.
18  BY MR. HUNTER:
19    Q    Does a mom and a son have a more special
20  relationship than an inmate and a detention officer?
21    A    It depends on who the son and mother is.
22    Q    Could you -- from having dealt with the case
23  as it was in --
24    A    Mm-hmm.
25    Q    -- Harris County's office, do you believe

Page 168

1    A    Correct.
2    Q    Okay.  Should every PREA allegation be
3  investigated?
4    A    Yes.
5    Q    Should every PREA allegation be investigated
6  individually?
7        MR. NYALLAY:  Objection to form.
8        THE WITNESS:  Depends on the -- again,
9  depends on whether it is the same individual, same
10  incidents.  It could be supplemented.
11  BY MR. HUNTER:
12    Q    So here, the first PREA incident occurring
13  September 25th, the second one occurring September
14  27th --
15    A    Yes.
16    Q    -- and those both being on the same floor,
17  same individuals, is that, in your eyes, or the
18  county's eyes, okay to investigate them at the same
19  time or --
20    A    No.  They had --
21    Q    I just want to know --
22    A    They had different reports.
23    Q    They did.
24    A    So if it had different reports, it was two
25  different investigations.

Page 167

1  Chandra and Dequon have a genuine relationship?
2        MR. NYALLAY:  Objection to form.
3        THE WITNESS:  I'm not sure, but I do
4  know that she was concerned.  She wrote several inmate
5  care concerns, even before this, because she wanted
6  him in isolation.  I'm not sure why she wanted him in
7  isolation before any incidents appeared.
8  BY MR. HUNTER:
9    Q    All right.  So Harris County was required to
10  conduct an administrative PREA investigation relating
11  to the September 25, 2023, allegations of rape
12  occurring to Dequon?
13    A    There was actually a criminal investigation
14  completed as well.
15    Q    Okay.  What was the result of the criminal
16  investigation?
17    A    I have to go back and read the last one.
18  I'm not sure.
19    Q    Do you know if anybody was charged?
20    A    I don't believe so.
21    Q    Do you know if the September 25, 2023,
22  allegations were substantiated on an administrative
23  level?
24    A    I don't believe so.
25    Q    Do you believe that Harris County collected

Page 169

43 (Pages 166 - 169)

1  accurate and uniform data relating to Dequon's
2  September 25, 2023, allegations of rape?
3      A   Yes.
4      Q   Okay.  And Harris County's required to
5  follow PREA relating to records retention; right?
6      A   Yes.
7      Q   All right.  That's CFR 115.89.  You probably
8  don't -- offhand, do you know that?
9      A   That's supervision and monitoring.  Is that
10 what it is?
11     Q   No.
12     A   No.  Data storage.
13     Q   Data storage.
14     A   Yeah.
15     Q   Yeah.  Harris County has to follow that
16 right there in front of you.
17     A   Mm-hmm.
18     Q   Okay.  That's CFR 115.89?  All right.  And
19 of course, that retention policy's ten years; right?
20     A   Yes.  I believe sheriff's office had that
21 retention policy before PREA was even thought of.
22 They -- they already had a retention policy.
23     Q   Okay.  As it relates to the September 27,
24 2023, allegations, did Harris County conduct an
25 administrative investigation relating to Dequon's rape

Page 170

1  allegations from that date?
2      A   There was a criminal investigation.
3      Q   Who was in charge of that?
4      A   Investigator McCutcheon.
5      Q   Did you assist him?
6      A   No.
7      Q   Did you review those records to prepare for
8  today?
9      A   I'm not sure.
10     Q   And of course, Harris County is required to
11 maintain any of those records relating to that
12 criminal investigation?
13     A   Yes.
14     Q   And they would have them currently because
15 it's within the ten years mandated by PREA?
16     A   Yes.
17     Q   Do you know the findings of the criminal
18 investigation relating to the September 27th?
19     A   I'm not sure.  I have to read it.
20     Q   Okay.  Do you know, as you sit here today,
21 why the September 27, 2023, incident was investigated
22 criminally?
23     A   Anything where an individual is claiming
24 they are sexually assaulted is investigated criminally
25 because it involves penetration.

Page 171

1      Q   But the September 25, 2023, was not?
2      A   It was.
3      Q   Both were investigated criminally?
4      A   Yes.
5      Q   Okay.  And that's because both involved
6  claims of penetration by Mr. Buford?
7      A   Correct.
8      Q   Okay.  And Harris County was required to
9  collect accurate and uniform data relating to the
10 September 27, 2023, allegations; right?
11     A   Correct.
12     Q   All right.  As it relates to the November
13 2023 sexual assault allegations that we went through
14 earlier, was that only an administrative
15 investigation, or was there also a criminal?
16     A   Is that the one with Alan?
17     Q   Yes.
18     A   That was administrative.
19     Q   Okay.  During your employment with Harris
20 County, have you ever known of detention officers to
21 complete paperwork showing that they completed all
22 their observations when in reality they did not?
23         MR. NYALLAY:  Objection to form.
24         THE WITNESS:  I'm not sure about that.
25 //

Page 172

1  BY MR. HUNTER:
2      Q   At any time during employment, have you ever
3  known of another detention officer to complete
4  paperwork saying that they did all their work, and
5  they didn't do it?
6      A   No.  I've been a detention officer before,
7  and I -- I've always completed my work.
8      Q   So you've never heard of other detention
9  officers completing a document, whether it's for
10 monitoring, staffing, observing, and then saying, "Oh,
11 I did it all," but they really didn't?
12         MR. NYALLAY:  Objection.  Asked and
13 answered.
14 BY MR. HUNTER:
15     Q   They just submit it?
16         MR. NYALLAY:  Objection.  Asked and
17 answered.
18 BY MR. HUNTER:
19     Q   Are you aware that, in this case -- this big
20 lawsuit, I've deposed a detention officer, and he said
21 that he was aware of detention officers doing that?
22         MR. NYALLAY:  Objection to form.
23         THE WITNESS:  Well, he work -- he
24 probably works the floor.  I don't work the floor.
25 //

Page 173

44 (Pages 170 - 173)

BY MR. HUNTER:
Q   Would it -- does that surprise you that the paperwork's not completed accurately, or they're almost fraudulently completing stuff?
          MR. NYALLAY:  Objection to form.
          THE WITNESS:  I would say that there are individuals everywhere that do something wrong and some that do some right.  So who am I to say that he's wrong for what he's saying?  He's actually working the floors, so.
BY MR. HUNTER:
Q   But certainly enough, bad individuals can create bad policies?
          MR. NYALLAY:  Objection to form.
BY MR. HUNTER:
Q   Right?
A   Can create bad policies?
Q   Yeah.
A   When it comes to our detention officers, they don't create any policies.
Q   Bad practices.  Bad customers?
A   Oh, most definitely.  Because --
Q   Okay.  All right.  What external support services are offered to inmates who have a PREA allegation?

Page 174

A   So we have adult protective services on their phones, and they can contact them for free.  We have Houston Area Women's Center on their phones, and they can contact it for free.  And then, of course, we have the PREA hotline, but that's internal.
Q   What about for people with mental deficits or cognitive deficits?  What external support services are provided to them, for instance, if they struggle to use a telephone?
A   So they have the Harris Center.  So for instance, like with Mr. Buford, when the referral is done, someone from the Harris Center is supposed to come and connect with them.  They will assess them and either figure out what is going on.  If the individual needs more assistance.  If the individual needs to be relocated to a mental health area.  So Harris Center is in our jail -- in all jails.
Q   Harris Center is physically at 1200 Baker?
A   Yes.  Yes.
Q   Okay.  Are those people -- do you know if they're employees of Harris County?
A   No, they are not.
Q   Okay.  It's my understanding that there's like a work sharing agreement.  Do you have any knowledge of that?

Page 175

A   I do not.
Q   Okay.  Do you know what -- like who -- what section of the jail I would need to even talk to about that?
A   I would say it would probably be Major Anderson.
Q   Okay.  All right.  Aside from the support services that we just discussed, does Harris County offer rape crisis services?
A   When you say rape crisis -- well, that's Houston Area Women's Center.  But when you say -- would you be looking for another one outside of there?
Q   I'm just asking.
A   Oh, Houston Area Women's Center is a rape crisis center.
Q   Okay.  And do they offer for men and women?
A   And domestic violence.  Yes.  For men and women.
Q   Okay.  All right.
A   And they can contact it from their phones, and it will connect them to the actual helpline for them.
Q   What are PREA risk factors?
A   PREA risk factors are those ten questions that I was telling you about earlier.  That the --

Page 176

that classification have to ask the individuals when they are getting ready to classify them when they first come in.
          So there are ten questions.  Those questions ask anywhere from is the individual small in stature?  Is the individual -- does the individual perceived to be LGBTQI?  Has the individual been a predator in the past?  Has the individual been sexually victimized in the past?  So those are --
Q   Someone like Dequon, who's -- he's relatively small.  He's got documented medical and mental health issues.  Does he present a higher PREA risk factor?
A   Now, that would depend on the individual who's classifying him at the time because it's about what the individual who's doing the questionnaire perceives.
Q   And that questionnaire, that is done at the intake process?
A   Yes.
Q   At Harris County?
A   Yes.  By classification.
Q   Okay.  So even though there's a questionnaire, there's still a subjective element of the officer or employee who's doing the questionnaire?

Page 177

45 (Pages 174 - 177)

1   A   It could be.
2   Q   How do you remove the human error out of
3 that?
4        MR. NYALLAY:  Objection to form.
5        THE WITNESS:  I'm not sure.
6 BY MR. HUNTER:
7   Q   How does PREA instruct you to train to
8 remove the error out of that?
9   A   So there is actually -- there was actually a
10 gender classification PowerPoint for classification
11 individuals.
12   Q   Is that a PowerPoint you created?
13   A   No.  It was former Schmidt and LGBTQI
14 advocate, Lou Weaver, who created it.
15   Q   Do you have any knowledge of how long the
16 intake process for inmates -- well, strike that.  Do
17 you have any knowledge of how the intake process
18 generally happens for inmates?
19   A   I do not.
20   Q   Okay.  Is that classification?
21   A   Yes.
22   Q   All right.
23   A   Oh, it's my iPad.  I'm like, I'm getting all
24 the phones, and it's not even --
25   Q   No worries.

Page 178

1   A   Okay.
2   Q   All right.  Are you aware of whether or not,
3 within 30 days of intake, if there's a comprehensive
4 education on sexual abuse provided to the inmates?
5   A   Yes.  There's actual -- an actual
6 comprehensive PREA orientation in releasing.  I'm
7 sorry.  In receiving, not releasing.
8   Q   Okay.  All right.  So fair to say, if I were
9 to ask a line of questioning about how housing
10 classifications determined, those questions would be
11 better directed to folks in classification?
12   A   Yes.
13   Q   For instance, Officer Bower, Shonda?
14   A   Yes.
15   Q   Okay.  Are you aware of -- so you have the
16 PREA investigation, but I believe there's a sexual
17 incident review, or some other layer within PREA, that
18 after you conclude the actual investigation --
19   A   Mm-hmm.
20   Q   -- a further incident review has to be done
21 within 30 days of closing that investigation.  Are you
22 aware of that?
23   A   I am aware of that.
24   Q   Okay.  Do you know if that 30-day -- let's
25 call it the 30-day post review --

Page 179

1   A   Mm-hmm.
2   Q   -- was done as to all of Mr. Buford's PREA
3 outcry?
4   A   I'm not sure.
5   Q   But it's a requirement of PREA; right?
6   A   Yes.  In most cases, it is a -- a
7 requirement.  Yes.
8   Q   So then Harris County was bound to complete
9 doing that as it relates to Buford?
10   A   If -- it depends on how his -- it's only
11 required if it's substantiated or unsubstantiated.
12 If -- I'm -- I'm sorry.  If it was -- yeah,
13 substantiated or unsubstantiated.  If it was
14 unfounded, it is not required.
15   Q   Okay.  So here, it's my understanding that
16 Buford's claims were unsubstantiated.
17   A   Mm-hmm.
18   Q   So then there would've been a post-incident
19 review -- a further post-incident review for each of
20 those then?
21   A   Yes.  If all of them were unsubstantiated,
22 correct.
23   Q   Okay.  And Harris County would be in
24 possession of those documents?
25   A   Yes.

Page 180

1   Q   Okay.  Did you have any role in completing
2 the post-incident reviews?
3   A   I did not because I wasn't aware they were
4 unsubstantiated.
5   Q   What did you believe they were?  Did you
6 have any knowledge of what they were?
7   A   I believed them to be unfounded, if I --
8   Q   What's the difference?
9   A   Oh, the difference between unsubstantiated
10 and unfounded, unfounded is when you don't have any
11 evidence.  Unfounded is when the investigator, who was
12 investigating, is unable to come up with time periods,
13 unable to come up with, like, periods of time.  So if
14 there are multiple things that the investigator is
15 unable to come up with, then an -- a thorough
16 investigation cannot be done.  So it's unfounded.
17   Q   Okay.  In terms of Buford's inmate housing
18 history, do you have any personal knowledge of that?
19   A   No.
20   Q   Okay.  Who would be -- would that be
21 classification?
22   A   Yes.
23   Q   Okay.  Do you have knowledge of the floors,
24 though, at 1200 Baker Street from having worked there?
25   A   Yes, I do have knowledge of the floors.

Page 181

Page 182

1    Q   All right.
2    A   Yes.
3    Q   So let's see.  So this is Exhibit 15, the
4    inmate housing history.
5            (Plaintiff Exhibit 15 was marked for
6            identification.)
7    A   Okay.
8    Q   JR 246.  So this is directly relating to
9    Mr. Buford, okay, Dequon?
10   A   Okay.
11   Q   You see his name up there?
12   A   Yes.
13   Q   And then what does SPN mean?
14   A   That's your personal number.
15   Q   Yeah.
16   A   So that's -- like, if you were to ever come
17   back to jail, you'd still have that number.
18   Q   Okay.  So it's like a social security?
19   A   Yes.  For jail, yes.
20   Q   It's a unique identifier?
21   A   Yes.
22   Q   Okay.  So specifically, we're going to be
23   just looking at the top part, from June 13, 2023,
24   until he was released, 11/14.  Okay?
25   A   Okay.

Page 183

1    Q   Are you with me?
2    A   I'm with you.
3    Q   So this 1A here, is that just the -- kind of
4    the intake floor at 1200?
5    A   That's medical, first floor.
6    Q   Okay.  So floor 1, pod A, that's his medical
7    when he arrived?
8    A   First arrived, yes.
9    Q   Okay.  And so then he's moved to F5.  Do you
10   see that?
11   A   5F2.
12   Q   5F2.
13   A   Correct.
14   Q   And that's from June 13, '23, till September
15   2023.  Do you see that?
16   A   Correct.
17   Q   What is 5F?
18   A   5F2 is 5th floor, F pod, second side.  So
19   1200, 5th floor, F pod, second side.
20   Q   Okay.  Do you know if that location 5F2 is
21   listed in the document that has the blind spots?
22   A   Oh, I'm not sure.
23   Q   Okay.
24   A   And that is a general population cell block.
25   Q   Okay.  All right.  So going up to the next

Page 184

1    one, 3C1, from September 20th till October 2nd?
2    A   Yes.
3    Q   What does that floor signify or --
4    A   That is also a general population cell block
5    area.  It is 3rd floor, C pod, one side.
6    Q   Who's housed there?
7    A   General population.
8    Q   Okay.  Do you know how it's determine which
9    inmates to put in there or --
10   A   That would be classification.
11   Q   Okay.  And then while he's in the general
12   population, he has the PREA allegations of September
13   25th and 2020 -- September 25, 2023, and September 27,
14   2023; correct?
15   A   Correct.
16   Q   All right.  And that was reported by
17   Ms. Jenkins and a PREA incident is then opened up on
18   September 29th.  Is that true?
19   A   Correct.
20   Q   All right.  And then he's not moved until
21   October 2nd.  Do you see that?
22   A   Yes.
23   Q   All right.  So that's almost a week later
24   after the first PREA outcry of September 25th?
25   A   Correct.  But that doesn't mean that the

Page 185

1    suspect or whoever it was -- is this with -- I'm
2    trying to figure out the -- that was 9/20 -- October
3    2nd, was that with Alan, or is that after Alan?
4    Q   Alan was in November.
5    A   November.
6    Q   So.
7    A   So when was the allegation brought to the
8    attention of the floor supervisor?
9    Q   The 28th.
10   A   Okay.
11   Q   Did not moving Mr. Buford sooner expose him
12   to further risk of rape and sexual assault as it
13   relates to his stay on 3C?
14        MR. NYALLAY:  Objection to form.
15   BY MR. HUNTER:
16   Q   You can answer if you know.
17   A   I'm not sure.
18   Q   All right.  So going to the next one, floor
19   2K.  That's from 10/2 to 10/18/23.  Where is 2K?
20   A   2K is on the second floor of 1200, south
21   side hallway.
22   Q   Are you aware of any video cameras being
23   over there?
24   A   I believe there are video cameras in every
25   cell block at 1200.

47 (Pages 182 - 185)

1    Q   What do you base that off of?
2    A   Just knowing when we had to conduct
3 investigations, and investigations having to pull
4 video footage.
5    Q   Okay. All right. And then 6E 10/18 to
6 11/5/23. What is 6E?
7    A   6E2B is your vulnerable victimization cell
8 block at the Harris County Sheriff's Office. That is
9 going to be your cell block where you will have
10 individuals who meet that -- that risk factor. Those
11 questions that you're talking about.
12   Q   Yep.
13   A   So if the individual is small in stature, if
14 the individual has stated they have been sexually
15 harassed or sexually abused before, if the inmate
16 states they need protective custody, or if the inmate
17 is perceived to be at high risk of being sexually
18 victimized by the classification specialist, then
19 this -- the individual will be placed in this area.
20   Q   Okay. All right. And then the last one, 2J
21 from 11/5 to 11/14. What is that?
22   A   That is a -- an administration separation
23 cell block. It is located on the second floor of 1200
24 on the south side. It is actually right across from
25 2K1.
                                              Page 186

1    Q   All right. Okay. So still looking at this
2 Exhibit 15. The floor -- right here, where I'm trying
3 to highlight, the floor 3C 9/20 to 10/2. Is that the
4 location where Mr. Buford alleges to have been raped
5 by three men on September 25, 2023?
6    A   I'm not sure.
7    Q   Do you know what the -- on the right side,
8 it shows a reason. Some of them are answered. Some
9 aren't. And specifically, this one says
10 "Administrative."
11   A   That's classification reasons.
12   Q   Okay. So what is initial housing versus
13 administrative?
14   A   I'm not sure.
15   Q   Okay. So it's a classification question?
16   A   It is.
17   Q   All right. Okay. Are you aware of any
18 evidence to suggest that Buford was violent and needed
19 to be shackled when he was placed into administrative
20 separation or administrative segregation?
21        MR. NYALLAY: Objection. Form.
22        THE WITNESS: I'm not sure.
23 BY MR. HUNTER:
24   Q   Are you aware of any evidence to suggest
25 that Dequon was going to harm himself or others and
                                              Page 187

1 needed to be shackled when placed in administrative
2 separation?
3        MR. NYALLAY: Objection. Form.
4        THE WITNESS: I'm not sure.
5 BY MR. HUNTER:
6    Q   Can PREA ever be used in a punitive manner?
7        MR. NYALLAY: Objection to form.
8        THE WITNESS: No.
9 BY MR. HUNTER:
10   Q   There's no legislation in PREA that allows
11 it to be used punitively, is there?
12   A   If the inmate is falsifying.
13   Q   But certainly, it shouldn't be used to then
14 shackle and place somebody in handcuffs?
15   A   No.
16   Q   Is it true that part of the entire ethos of
17 PREA is to prevent and support reporting?
18   A   Correct.
19   Q   If I had questions about inmate movements
20 within the jail, would that be better directed to
21 classification?
22   A   Yes.
23   Q   Okay. What about if I had questions on --
24 actually, I think you could probably answer this. All
25 right. So this is Exhibit 16.
                                              Page 188

1        (Plaintiff Exhibit 16 was marked for
2        identification.)
3        It's a 15-page document. It's Harris County
4 Standard Operating Procedure CJC-220.
5    A   Mm-hmm.
6    Q   Are you familiar with this policy?
7    A   Inmate observation. I'm -- I'm sure it has
8 something to do with the detention officers on the
9 floor.
10   Q   Okay. Do you have any knowledge of what
11 this CoreTrack System is?
12   A   The CoreTrack System is the electronic way
13 they scan. That's how -- that's how they monitor
14 supervision within the -- the cell blocks. They don't
15 do it on paper. They do it with a scanner.
16   Q   The detention officers?
17   A   Yes.
18   Q   Okay. So it's a data -- almost like a data
19 tool to track --
20   A   To track --
21   Q   -- observations?
22   A   Yes.
23   Q   Okay. All right. And is it something
24 that's done contemporaneously? So a detention officer
25 will be walking, scan into the CoreTrack digital
                                              Page 189

48 (Pages 186 - 189)

1  observation app, and it will upload?
2      A   Yes.
3      Q   Okay.  All right.  Let's see.  Let me see
4  where it is.  All right.  So this is discussing the
5  observation of inmates placed in protective
6  restraints.  Do you have any knowledge about this, or
7  is this more of a detention officer?
8      A   I do not.  That's more of a detention
9  officer or a housing supervisor.
10     Q   Okay.  Let's see.
11         THE OFFICER:  And, Counsel, if you have
12  stopping point here shortly.
13         MR. HUNTER:  Yeah.  We can take a break
14  here and then I'll look at my outline.  We'll go off
15  the record.
16         THE VIDEOGRAPHER:  This is now the end
17  of video three of Katrina Camacho.  We're off the
18  record.  The time is 3:35.
19         (Off the record.)
20         THE VIDEOGRAPHER:  We're now on the
21  record.  Video four of Katrina Camacho.  The time is
22  3:44.
23  BY MR. HUNTER:
24     Q   All right, ma'am.  What you're looking at
25  there is page 11 and 12 of Exhibit 16.  And

Page 190

1  specifically, that relates to the Prison Rape
2  Elimination Act Standard 115.13, supervision and
3  monitoring, as codified within Harris County CJC --
4  Standard Operating Procedure CJC 220.  Is this one of
5  the examples in which PREA is used and implemented
6  into Harris County's standard operating procedures?
7      A   Yes.  Number 12A and 13 are within the PREA
8  standards where you will not announce when command is
9  coming to do rounds.
10     Q   Okay.  And it also shows that those rounds
11  will be documented in the CoreTrack?
12     A   Correct.
13     Q   Okay.  So there would be documents of that?
14     A   Yes.
15     Q   Okay.  We've discussed a little bit about
16  Lieutenant Bower.  She is an individual who works in
17  classification?
18     A   Mm-hmm.
19     Q   Okay.
20     A   Yes.  She is.
21     Q   All right.  So this is Exhibit 17.  It is --
22  JR 42 is the Bates.
23         (Plaintiff Exhibit 17 was marked for
24         identification.)
25         And this is an email dated October 10, 2023,

Page 191

1  from Lieutenant Bower.  Okay?
2      A   Okay.
3      Q   Do you see that?
4      A   Yes.
5      Q   And just read the body of the email there.
6      A   "Detention Officer Alicea, please medically
7  clear inmate Buford for admin sep housing and
8  transfer.  Add an alert to indicate his admin sep
9  housing is because of an IAD request due to PREA
10  allegations."
11     Q   What is an IAD request?
12     A   Internal Affairs Division.
13     Q   All right.  And who are they?
14     A   Internal Affairs Division conducts
15  administrative investigations when staff are involved.
16     Q   Okay.  So why would they be getting involved
17  here relating to Mr. Buford's PREA allegations?
18     A   I'm not sure.
19     Q   Is it routine, custom, and practice for the
20  internal affairs division to get involved in PREA
21  allegations?
22     A   Yes.
23         MR. NYALLAY:  Objection to form.
24  BY MR. HUNTER:
25     Q   Go ahead.

Page 192

1      A   If staff is involved.
2      Q   But only if staff's involved?
3      A   I'm not sure.
4      Q   Okay.  Perhaps it's a better question for
5  Lieutenant Bower since she wrote the email?
6      A   Yes.
7      Q   Some of these folks on the email chain here
8  have the Harris Center --
9      A   Mm-hmm.
10     Q   -- email and then some have the
11  sheriffhctx.net.  That kind of goes back to that work
12  sharing agreement between the two entities; right?
13         MR. NYALLAY:  Objection to form.
14         THE WITNESS:  I'm not sure, but I know
15  if it's -- it's a Harris Center email, that means they
16  work for Harris Center.
17  BY MR. HUNTER:
18     Q   Okay.  Do you know if Harris County and the
19  Harris Center share information with one another about
20  inmate's medical and mental health?
21         MR. NYALLAY:  Objection to form.
22     A   I'm not sure.
23     Q   Okay.  All right.  So as it relates to --
24  you testified a bit about the sexual incident reviews
25  earlier in terms of --

Page 193

49 (Pages 190 - 193)

1     A    Mm-hmm.
2     Q    Those are required to be performed within 30
3  days of conclusions of PREA investigations?
4     A    Yes.
5     Q    So does an incident review exist relating to
6  Mr. Buford's 9/25/23 rape allegations?
7     A    I'm not sure.
8     Q    Does an incident review exist relating to
9  Buford's 9/27/23 rape allegations?
10    A    I'm not sure.
11    Q    Does an incident review exist relating to
12 Buford's November 2023 sexual assault allegations?
13    A    I'm not sure.
14    Q    Who would be sure, if you know?
15    A    Whoever closed out the criminal
16 investigations. I can't remember. I'm not sure if
17 Lila was over there then. I believe she was, but --
18    Q    Have you ever participated in a sexual
19 incident review -- the review that's done within 30
20 days of the conclusion of an investigation?
21    A    Yes.
22    Q    How many have you participated in?
23    A    Oh, I'm not sure.
24    Q    Best estimate?
25    A    I'm not sure. I would have to go back and

1  sexual incident reviews -- for instance, if physical
2  barriers enabled the abuse that Dequon's alleging,
3  would you have any answer to that?
4     A    I would not.
5         MR. NYALLAY: Objection to form.
6  BY MR. HUNTER:
7     Q    No, you wouldn't? It'd be speculation for
8  you?
9     A    It would be.
10    Q    Okay. In September 2023, who was the PREA
11 compliance manager?
12    A    There was not one. I was only assisting
13 them until they get a new one. So in May 2023, I
14 received the re-entry and education manager position.
15 They were interviewing for my position. I don't
16 believe they ever found anyone.
17    Q    Sure. So part of the reason I ask is, PREA
18 requires that these 30-day sexual incident reviews get
19 done.
20    A    Mm-hmm.
21    Q    And they require that a completed report be
22 provided to the facility head and the PREA compliance
23 manager.
24    A    Mm-hmm.
25    Q    So if there's no PREA compliance manager,

1  look at them.
2     Q    Would you say over a hundred?
3     A    No.
4     Q    Over 50?
5     A    Not sure, but not over a hundred. Because
6  you only do them on the ones that are -- the ones that
7  are substantiated and -- you wouldn't do it on the
8  ones that are unfounded.
9     Q    Okay.
10    A    And most of the cases are -- you're going to
11 have more cases that are unfounded than substantiated
12 or unsubstantiated.
13    Q    Okay. As part of its sexual incident
14 review, is Harris County required to determine if an
15 area in the facility where the incident allegedly
16 occurred had physical barriers that enabled the abuse?
17        MR. NYALLAY: Objection to form.
18 BY MR. HUNTER:
19    Q    You can answer.
20    A    I'm not sure, but there are different
21 questions on the -- that review.
22    Q    Okay. Do you have any knowledge about the
23 sexual incident reviews relating to Mr. Buford?
24    A    No.
25    Q    So if I were to ask any questions about the

1  who are those completed sexual incident reviews --
2     A    Mm-hmm.
3     Q    -- turned into?
4     A    Well, I'd have to go back and check to see
5  if there were unsubstantiated and -- and substantiated
6  reports for that time period.
7     Q    Okay. So --
8     A    And if -- and if they were turned in, they
9  still have several supervisors they could be turned
10 into.
11    Q    Yeah, but the PREA itself requires it be
12 turned into the PREA compliance manager, not a
13 supervisor.
14    A    Mm-hmm.
15    Q    So how can Harris County comply with PREA
16 when they don't even have a PREA compliance manager?
17    A    So the standard state it has to be turned
18 into a PREA compliance manager?
19    Q    Mm-hmm. Okay. It's my understanding in
20 reading it. Were you ever given a completed report
21 relating to the post-incident investigation of the
22 9/25/2023 PREA incident?
23    A    A completed report?
24    Q    Relating to the post-incident review?
25    A    No.

1    Q    Okay.
2    A    Not that -- not that I recall.
3    Q    Were you provided a completed report for the
4  post-incident review of the 9/27/2023 PREA?
5    A    I believe it was still open.
6    Q    Okay.  When do you believe that one to have
7  closed?
8    A    I'm not sure.  I'd have to go and look.
9    Q    Okay.  And currently, there's still no PREA
10  compliance manager; right?
11    A    That would be Lieutenant Ward.
12    Q    Is he a PREA --
13    A    And Sergeant Quintana.
14    Q    Okay.  Are you aware if Mr. Buford underwent
15  a forensic inspection by a sexual assault nurse or
16  forensic examiner following his 9/25/23 rape
17  allegations?
18        MR. NYALLAY:  Objection to form.
19        THE WITNESS:  I'm not sure.
20  BY MR. HUNTER:
21    Q    Do you know -- this is just asking if you
22  know -- if he underwent a forensic inspection by a
23  SANE following the September 27th rape allegations?
24    A    I'm not sure.
25        MR. NYALLAY:  Objection to form.

1  BY MR. HUNTER:
2    Q    Okay.  Do you know if any data was
3  collected?
4        MR. NYALLAY:  Objection to form.
5        THE WITNESS:  I know a report was
6  written -- a criminal report was created, but I'm not
7  sure about the hospital transport, and I would have to
8  review the complete file.
9  BY MR. HUNTER:
10    Q    I got to find my exhibit.  All right.  Okay.
11  Here.  All right.  So this date is 10/2/23; right?
12    A    Yes.
13    Q    And then the date released from separation's
14  10/18/23?
15    A    Yes.
16    Q    Okay.  So 10/2 to 10/18, how many days is
17  that?
18    A    Sixteen.
19    Q    Okay.  And then here, 11/5 to 11/14 --
20    A    Mm-hmm.
21    Q    -- that's the date he's placed and the date
22  he separated; right?
23    A    Yes.
24    Q    How many days is that?
25    A    Nine.

1    Q    All right.  So what's 9 plus 16?
2    A    Twenty-five.
3    Q    Okay.  So that's 25 days where Mr. Buford's
4  housed on a floor requiring restraints?
5        MR. NYALLAY:  Objection to form.
6  BY MR. HUNTER:
7    Q    You can answer.
8    A    Again, like the -- one of the previous
9  questions, I would have to view video to know that he
10  was restrained all that time.
11    Q    Well, we would love to have the video, but
12  Harris County says none exists, so.
13    A    Exactly.  So I can't answer that.
14    Q    Well, can you answer this?  If 9 plus 16
15  equal 25, and the documents show, per floor policy,
16  restraints are recommended, then for 25 days,
17  Mr. Buford was housed on a floor where restraints were
18  recommended.  Is that true?
19        MR. NYALLAY:  Objection to form.
20        THE WITNESS:  I need to know the floor
21  policy.  I need to know that floor policy.
22  BY MR. HUNTER:
23    Q    I'm just asking a basic question about 25
24  days and whether there were 25 days in where he was
25  housed on a floor that recommended restraints.  It's

1  yes or no.
2    A    I don't know if the floor recommended these
3  restraints because this is a classification document.
4  They're saying the reason is per floor policy, so I
5  need to know what the floor policy is.
6    Q    Okay.  This is Exhibit 18, Harris County's
7  Standard Operating Procedure CJC 219, separation
8  policy.
9        (Plaintiff Exhibit 18 was marked for
10  identification.)
11        Are you familiar with this document, ma'am?
12    A    I know that we have a separation policy,
13  yes.
14    Q    Okay.  And so -- and as it relates to
15  Buford, he was placed in this, administrative
16  separation; correct?
17    A    Correct.
18    Q    All right.  And that's "The assignment of an
19  inmate to a special housing unit, usually a separation
20  or single cell, when staff determines that such close
21  custody is needed for the safety of inmates or staff
22  for the security of the facility or to promote order
23  in the facility."
24        And so from October 2nd to October 18th, and
25  then again on 11/5 to 11/14, Mr. Buford was placed in

51 (Pages 198 - 201)

administrative separation. Is that true?
2    A   Correct. According to the classification
3 document.
4    Q   All right. So looking at page 2. Let's
5 see. So it says "Inmates shall be allotted one hour
6 per day for time out of their cells." Do you see
7 that?
8    A   Yes.
9    Q   All right. So for 25 days, Mr. Buford was
10 only allotted one hour per day out of his cell? Based
11 on this policy and based on his classification
12 documents that you've testified.
13    A   I'm not sure, again, because I don't know
14 the floor policy. And I do know that there have been
15 times, in K pod, where individuals -- or in individual
16 program areas, but it was also, at one time, a -- like
17 a medical admin separation area. So the individuals
18 were not locked down for 23 hours a day. So that's
19 why I need to to know the floor policy because
20 different cell blocks change at different times.
21    Q   All right. And then page 3 here. It says
22 "All purple band, administrative disciplinary
23 separation inmate shall be handcuffed and secured with
24 the leg irons, with the handcuffs double locked behind
25 their back, prior to leaving their designated cell."
Page 202

1    A   He was not a purple band. He was a purple
2 stripe. That's E -- letter E.
3    Q   Okay. Okay. Well, purple stripe -- he was
4 changed to purple stripe on the 19th of October. Do
5 you recall that?
6    A   I do not.
7    Q   Find it.
8    A   Was he a purple band initially?
9    Q   What's the difference between purple stripe
10 and purple band?
11    A   Purple stripe are vulnerable victimization
12 individuals and purple band are individuals who are
13 housed for disciplinary reasons, for high profile
14 cases, for -- it could be a number of things. But
15 those are usually your individuals that are shackled
16 and handcuffed on a daily basis.
17    Q   But again, earlier, we had a exhibit where
18 the general counsel from the public defender's office
19 is placed on notice of alleged heavy shackling
20 occurring to Mr. Buford.
21        MR. NYALLAY: Objection.
22 BY MR. HUNTER:
23    Q   Right?
24    A   Correct.
25    Q   Okay. All right. And so it would seem that
Page 203

1 these were the conditions of confinement relating to
2 Mr. Buford if the Harris County General Counsel is
3 being placed on notice of heavy shackling while
4 he's --
5    A   She sent an email based on her counsel
6 seeing something on a specific day. So I don't know
7 if that was happening daily.
8    Q   Okay. Would classification know if the
9 secured with leg irons and heavy shackling was daily
10 during those 25 days?
11        MR. NYALLAY: Objection to form.
12        THE WITNESS: They would not.
13 BY MR. HUNTER:
14    Q   Who would know?
15    A   The individuals working the floor and
16 working the pod.
17    Q   Okay. And would there be video cameras?
18    A   There are video cameras in every cell block.
19    Q   And those, you believe, may only back up for
20 180 days?
21    A   I believe so.
22    Q   Okay. How does the PREA standard, in terms
23 of evidence retention for ten years, how does that
24 play a part with the video systems? When you know
25 there's PREA allegations going on --
Page 204

1    A   Mm-hmm.
2    Q   -- is there a checks and balance system to
3 say, "Hey, you now need to store those videos for ten
4 years because they're related to a PREA outcry"?
5        MR. NYALLAY: Objection. Form.
6        THE WITNESS: So I do know that if
7 there's a criminal investigation and the individuals
8 have video, they are uploaded.
9 BY MR. HUNTER:
10    Q   Okay. So whenever there's a criminal
11 investigation relating to a PREA allegation, those
12 videos are uploaded?
13    A   Mm-hmm.
14        MR. NYALLAY: Objection.
15        MR. HUNTER: Okay.
16        THE WITNESS: If there is any video, it
17 will be uploaded, yeah.
18 BY MR. HUNTER:
19    Q   And it would be retained for ten years
20 then --
21        MR. NYALLAY: Objection. Form.
22 BY MR. HUNTER:
23    Q   -- consistent with PREA?
24        MR. NYALLAY: Objection. Form.
25        THE WITNESS: It will always be in
Page 205

52 (Pages 202 - 205)

1  there.
2        MR. HUNTER:  All right.  All right.
3  Thank you, ma'am.
4        THE WITNESS:  You're welcome.
5        MR. HUNTER:  Pass the witness.  Or
6  actually, I take that back.  Sorry.  One more
7  question.  We're not done.
8        MR. NYALLAY:  You're welcome to ask
9  after -- when I --
10       MR. HUNTER:  It's going to be real
11 quick.
12       MR. NYALLAY:  Okay.
13       MR. HUNTER:  Sorry.  Just take it
14 back --
15 BY MR. HUNTER:
16    Q    All right.  Do you see these, ma'am?
17    A    Yes.
18    Q    All right.  So these are like still shots
19 of -- here's Mr. Buford.  He's in the back here.
20    A    Yes.
21    Q    He's the second individual right here.  Did
22 you recognize him?
23    A    Yes.
24    Q    Okay.  So that's my client, Dequon.  And
25 this is showing third floor in FCC hallway.  You see
Page 206

1  that?
2    A    Yes.
3    Q    All right.  So that's the third floor, the
4  north hallway, or do you know what that means?
5    A    No.  This is not the north or the south.
6  This is the control center hall.
7    Q    Okay.  And is this -- does this appear --
8  well, both of these, and these are Bates labeled Email
9  000298.  It's going to be Exhibit 19.
10       (Plaintiff Exhibit 19 was marked for
11       identification.)
12       Do these appear to be still shots of CCTV
13 video footage?
14       MR. NYALLAY:  Objection to form.
15       THE WITNESS:  I'm not sure what CCTV
16 video footage is.
17 BY MR. HUNTER:
18    Q    All right.  Strike that.  What are these?
19    A    These --
20       MR. NYALLAY:  Objection to form.
21       MR. HUNTER:  Are you kidding me,
22 Counsel?  She can answer what that is.
23       MR. NYALLAY:  She did not take those
24 pictures.  She did not control the videos.  That they
25 are -- so.
Page 207

1        MR. HUNTER:  Have fun getting that to
2  fly in court.
3        MR. NYALLAY:  I mean, you know?
4  BY MR. HUNTER:
5    Q    You have knowledge of the camera system
6  within Harris County?
7    A    I am aware of what the title is on here.
8    Q    Okay.  And I believe you've also testified
9  that every floor at the 1200 Baker Street has video
10 cameras on it; right?
11    A    Correct.  Yes.
12    Q    So you have knowledge of the videos systems
13 and --
14    A    I'm aware of -- yes.  The --
15    Q    All right.  What is 3CC?
16    A    That's third floor control center.
17    Q    Okay.  Where is that located?
18    A    That is located near the -- near the floor
19 control center on the third floor.  That's why it says
20 "3CC."  If you look in the left corner, it says "Third
21 floor north, FCC hallway."  That's where it's located.
22    Q    Okay.  And you see here, for the first one,
23 this looks like -- in the left corner, you can press
24 play, and you can rewind and fast forward.  Do you see
25 that?
Page 208

1    A    Yes.
2    Q    All right.  So this is a still shot of video
3  footage; is that what I'm looking at?
4    A    Yes.
5    Q    It's a still shot.  Is Dequon Buford in that
6  still shot?
7    A    He is in front of the FCC.
8    Q    Okay.
9    A    Walking towards the north hall pod.
10    Q    So Mr. Buford is in a still shot in this
11 Exhibit that's marked as Exhibit 19?
12    A    Yes.
13    Q    Okay.  And similarly, in the bottom one --
14 we'll zoom in.  Is this -- appear to be Mr. Buford as
15 well right here?
16    A    I can't tell if that's him or not.
17    Q    Okay.
18    A    It's so blurry.
19    Q    But you're confident that Mr. Buford is seen
20 in this top one, though; correct?
21       MR. NYALLAY:  Objection.  Asked and
22 answered.
23       THE WITNESS:  That is someone that
24 looks like Mr. Buford.
25 //
Page 209

53 (Pages 206 - 209)

BY MR. HUNTER:
2    Q   Okay.  All right.  All right.  And the
3  subject line of where this -- this was an attachment
4  to an email, I guess.  It's Inmate Buford, and it has
5  his SPN number, 03177353.  Do you see that?
6    A   Yes.
7    Q   All right.  And that's his unique
8  identifier; right?
9    A   Yes.
10    Q   Okay.  So Harris County is emailing these
11  still video shots of Mr. Buford when they're
12  investigating the PREA allegation on October -- 2023;
13  right?
14    A   This is the first time I seen this email,
15  so.
16    Q   Right here?  You see the date it was sent?
17    A   Yes.
18    Q   So is it fair to say Harris County employees
19  are emailing still video shots of Mr. Buford on
20  October 2, 2023?
21    A   These are two supervisors, so yes.
22    Q   So yes?
23    A   Yes.  According to this, it looks like an
24  email sent -- communication between two supervisors.
25    Q   Okay.  So when we ask Harris County for

Page 210

1  videos, they say none exists.  So obviously that's
2  false?
3    A   What day is this?
4    Q   This is --
5    A   October 2nd.  So it only lasts 180 days, so
6  it wouldn't be there anymore.
7    Q   But if they were doing a criminal PREA
8  investigation and bound by PREA, then they were
9  required to retain this stuff for ten years.
10    MR. NYALLAY:  Objection to form.
11  BY MR. HUNTER:
12    Q   Correct?
13    A   Not correct.
14    Q   So Harris County does not follow PREA
15  guidance when it comes to retention?
16    A   These are two -- these are -- these are two
17  supervisors who -- looks like -- maybe -- they're
18  doing a medical evaluation 'cause the inmate was
19  involved in a PREA complaint.  Okay.  So the PREA
20  investigators were doing the actual PREA
21  investigation.
22    And again, if they did not see any details
23  of a PREA incident that Mr. Buford spoke of, there
24  wouldn't be any video to that.  Because this is not
25  inside of the pod where he is stating that he was

Page 211

1  sexually assaulted allegedly.  This is where the floor
2  control center is.  This is not the area where he's
3  alleging to even be sexually assaulted.
4    Q   But it still shows a still shot of video
5  footage of Mr. Buford?
6    A   Yes.
7    Q   Okay.  And it's interesting because they use
8  this phrase here "the situation is more" -- "this
9  situation is more indicative of a communication lapse
10  rather than deliberate negligence."  Do you see that?
11    A   Correct.
12    Q   Okay.
13    A   That's the proper --
14    Q   Are you familiar with the phrase deliberate
15  negligence is?
16    A   No.  I'm not sure why they even used that,
17  but you would have to ask those two supervisors.
18    MR. HUNTER:  It's similar to the phrase
19  deliberate indifference in a constitutional case such
20  as the one we're prosecuting.  It's interesting they
21  would use that.  All right.  Now I'm actually done.
22  Thank you, ma'am.
23    THE WITNESS:  You're welcome.
24    MR. NYALLAY:  Thank you.
25  //

Page 212

1    EXAMINATION
2  BY MR. NYALLAY:
3    Q   All right.  Ms. Camacho, I'll be asking a
4  few follow-up questions.
5    A   Okay.
6    Q   Just for us to clarify some things that
7  you've already spoke about today.  Actually, I'm going
8  to start from this last picture.  Did you ever get a
9  chance to meet Mr. Buford in person personally?
10    A   I did not.
11    Q   Okay.  So does that mean you may not be able
12  to identify whether or not he's actually the person in
13  the picture?
14    A   That's a true statement.
15    Q   Yes.  Okay.  And also, in the email that was
16  just shown to you, it appears that that email was sent
17  on October 2, 2023?
18    A   Yes.
19    Q   And it appears that Mr. Buford's PREA cry
20  out was sometime in September, I believe, of that
21  year?
22    A   Yes.
23    Q   Okay.  So that means that picture -- whether
24  picture is videos -- are still captured from the
25  video -- may have been taken within a month of the

Page 213

1  initial PREA outcry?
2    A   Yes.
3        MR. HUNTER: Objection.
4        MR. NYALLAY: All right.
5        MR. HUNTER: Form.
6  BY MR. NYALLAY:
7    Q   And you said that as far as the PREA
8  investigation is concerned, there's a ten-year sort of
9  preservation requirement for investigations?
10   A   Correct.
11   Q   Okay. So would you say the ten-year
12 requirement for preservation is the same as the video
13 retention policy by the Harris County Sheriff's
14 Office?
15   A   Elaborate.
16   Q   Is it a separate retention requirement for
17 PREA than the Harris County technology video retention
18 policy?
19   A   Yes. It would not be the same.
20   Q   So you would say that when this picture --
21 this still picture was taken a month from the date of
22 the incident.
23   A   Okay.
24   Q   You --
25       MR. HUNTER: Misstates facts. It was
                                                Page 214

1  today about Mr. Buford being heavily restrained or
2  shackled.
3    A   Yes.
4    Q   What do you understand from the word heavily
5  shackled?
6    A   I just understand that he -- when -- when
7  you say "heavily," that means he has handcuffs and leg
8  irons on.
9    Q   What is the difference between being
10 shackled and being heavily shackled? Is there any
11 difference --
12   A   There's no difference.
13   Q   -- in your mind?
14   A   And not in my mind. There's no difference.
15   Q   And you were asked earlier about some
16 documents. To save time, I'm not going to have to
17 bring -- you know, I don't want to bring them back up
18 and end up being here for another four, five more
19 hours. And it appears that Mr. Buford was placed in
20 the victim -- how do you call it? Is it
21 victimization --
22   A   Vulnerable victimization.
23   Q   Victimization.
24   A   I know. It's a tongue twister.
25   Q   Yes. So what is that unit?
                                                Page 216

1  four days.
2        MR. NYALLAY: Yeah. Four days. Right.
3  BY MR. NYALLAY:
4    Q   Four days from the date of the incident.
5    A   Okay.
6    Q   So if it was taken four days from the date
7  of the incident -- so that will still be within the
8  180-days video retention policy requirement by the
9  Harris County Sheriff's Office?
10   A   Yes.
11   Q   So that means the fact that a video may or
12 may not be available two years from the time of the
13 incident will not really have any impact on that
14 video --
15   A   Correct.
16   Q   -- or the picture?
17   A   Correct.
18   Q   Okay. And then we heard you say a lot this
19 afternoon that you're not sure. You know, do you --
20 when you use the word you're not sure, do you mean you
21 don't know or --
22   A   It means I don't know.
23   Q   Okay. I just want to clarify that.
24   A   Okay.
25   Q   Now, there's been a lot of conversation
                                                Page 215

1    A   So again, the vulnerable victimization unit,
2  it -- it was created because of PREA. It is for
3  individuals who are at a high risk of being sexually
4  victimized. Classification makes the determination on
5  who is housed in vulnerable victimization.
6    Q   Okay.
7    A   It could be an individual who -- who
8  experienced a PREA allegation while they were at the
9  jail, or it could be a individual who experienced a
10 PREA allegation at another facility.
11   Q   Okay.
12   A   It could be someone who's small in stature.
13 It could be someone who is considered more feminine.
14   Q   Okay.
15   A   It could be someone who has requested to be
16 in vulnerable victimization.
17   Q   Okay.
18   A   So it -- it can be an individual who is
19 perceived to be at a higher risk of being sexually
20 victimized by a classification specialist.
21   Q   Yes.
22   A   So it could be multiple reasons.
23   Q   So would you say the victimization unit is
24 like a protective unit --
25   A   It is.
                                                Page 217

                                                55 (Pages 214 - 217)

1    Q   -- for high risk individuals?
2    A   Yes.
3    Q   Okay.  I mean, based on the emails that was
4  shown to you this afternoon, it wasn't really clear as
5  to whether Mr. Buford was -- been restrained
6  throughout the time he was in that unit.
7    A   Correct.
8    Q   Is that correct?
9    A   Correct.
10    Q   So are individuals who are placed in the
11  victimization unit, are they shackled and restrained
12  throughout their stay there?  If they're going to be
13  there for weeks or months, they're going to be
14  restrained throughout that time?
15    A   No.  They are not restrained in vulnerable
16  victimization.
17    Q   Okay.  And you had mentioned earlier that
18  before you became -- before you got promoted or maybe
19  changed your position to the PREA unit, you had done
20  some detention work yourself?
21    A   Correct.
22    Q   Okay.  So would you say that an individual
23  being restrained, prior to being escorted to the unit,
24  is a normal process in prison -- in jail, depending on
25  the circumstances?

Page 218

1    A   -- other behavior.
2    Q   Okay.  But the fact that he was -- he may
3  have been shackled, we're not sure there was a -- it
4  was recommended for him to be restrained?
5    A   Mm-hmm.
6    Q   We are not sure the extent of that
7  restraint.  We've not seen any video.  Have you seen
8  any videos of him being in actual restraints?
9    A   I have not.
10    Q   So I have not seen any videos of him being
11  in restraint while he was being escorted or while he
12  was in the victimization unit.  But the fact that he
13  may or may not have been restrained, or it may have
14  been recommended for him to be restrained, does not
15  mean that he was actually restrained throughout the
16  state in that victimization unit?
17    A   Oh, that's not correct.  It does not --
18  that's why I said that the -- the floor policy needs
19  to be looked at because I'm not sure if he was
20  actually restrained all of those days.
21    Q   Right.  Just from your general knowledge or
22  experience with the prison -- the jail settings, is
23  there ever any situation where someone has been locked
24  up somewhere, and they're still, at the same time, in
25  restraints, shackles, and hand restraint at all times?

Page 220

1    A   Depending on the circumstances.  So an
2  individual who usually is a solid purple band --
3    Q   Okay.
4    A   -- and housed in an admin separation area
5  would be.
6    Q   So in the case of the PREA investigation in
7  this case -- so when the individual made the report,
8  and is it a standard procedure to get -- before I go
9  there.  It appears that he may have been shackled to
10  be escorted to maybe a clinic.  Was that for his own
11  protection, or was that part of a retaliation for him
12  making an outcry?
13    A   I believe it was due to the individual being
14  in admin separation.
15    Q   Okay.
16    A   I think that is what happened.
17    Q   Okay.  So what does that mean?  Is it
18  because he's a threat to other people?  Because I
19  understand that in prison, sometimes you can be
20  restrained because they want to protect you from other
21  people.
22    A   Well, I'm not sure of his behavior when
23  it's -- doesn't come to PREA.  When it doesn't have to
24  deal with PREA.  I would have to review his --
25    Q   Okay.

Page 219

1    A   Yes.  There are admin separation cell blocks
2  where individuals are shackled every time they come
3  out.
4    Q   While they're in there, also, it doesn't --
5    A   Not while they're in there.
6    Q   Okay.
7    A   They -- they're shackled once they come out.
8    Q   Okay.  Because my understanding is that -- I
9  don't know if maybe I misunderstood it.  You would --
10  been asked earlier whether he was -- been shackled
11  throughout the 20 something days he was in the
12  administrative separation unit.
13    A   No.  So if an individual is inside of a
14  admin separation, even if they have to be shackled
15  when they come out, they are not shackled during --
16    Q   While being in there.
17    A   -- being in housing.
18    Q   Okay.  So I just wanted to clarify that.
19    A   Okay.
20    Q   Because it appears that the emphasis was him
21  being shackled while he is inside.
22    A   No, no.  That -- that would be a -- not only
23  a medical issue, that would be a safety issue to
24  others.  So no.  There are no shackles while they're
25  in housing.  The shackles and handcuffs are for when

Page 221

56 (Pages 218 - 221)

1  they come out.
2      Q   When they're coming out.  Okay.  Because I
3  wanted to clarify that.
4      A   Yes.
5      Q   Because I don't think that came out very
6  well during your --
7      A   Oh, okay.
8      Q   And also, you've been asked a lot of
9  questions about inmate housing and classification this
10  afternoon.  Do you currently work as -- I don't know
11  how they call the people who does that work.
12      A   Classification.
13      Q   Classification officer or something.  Do you
14  work as that?
15      A   I've never worked in classification.
16      Q   So that means you will not really be able to
17  testify intelligibly about the thoughts that goes into
18  why somebody's been classified as --
19      A   Correct.
20          MR. HUNTER:  Form.
21  BY MR. NYALLAY:
22      Q   Okay.  And now I want you to walk me
23  through -- walk us through -- from the initial PREA
24  outcry or allegation that was made by Mr. Buford, I
25  want you to walk us through that process.  What

1      A   -- interview.
2      Q   Okay.  And were there any -- because I
3  remember we saw it in one of the exhibit.  I don't
4  want us to go back digging in it, but in there, it
5  says he met with -- you know, the exhibit where he had
6  said that somebody touched his buttocks.  I don't know
7  if you remember that.
8      A   So that was the November one.
9      Q   Yes.  So part of that -- I believe there was
10  a part where the officer stated -- whoever was
11  investigating stated that it appears that the inmate,
12  Mr. Buford, was confused or something?
13      A   Yes.  That was Deputy McCutcheon.
14      Q   Okay.  So when the investigation was done --
15  and I remember, also, you had mentioned earlier that
16  there was a point where Mr. Buford refused to actually
17  having been harassed at any point?
18      A   Yes.
19      Q   Okay.  So when an inmate have made a report
20  or an allegation of a sexual harassment, then that
21  same inmate goes again and take their word back, is
22  that a normal -- is that something that you've come
23  across in the past?
24      A   Yes.  We have come across that occasionally
25  where the inmate, once they've been moved somewhere or

1  happened?  What was the stages that it went through?
2      A   So the mother called.  And so the mother
3  called, and once the mother called, the floor
4  supervisor got the initial allegation.
5      Q   Okay.
6      A   So once the floor supervisor got the initial
7  allegation, then the supervisor then called the PREA
8  unit.
9      Q   Okay.
10      A   Once the PREA unit is called, then an
11  investigator will go out and talk to the individual.
12      Q   Okay.
13      A   And get the initial interview.
14      Q   Okay.  At what point do you get involved?
15      A   Once the -- once the PREA unit is notified,
16  I assign the investigator to go and make contact with
17  the individual.
18      Q   Okay.  And in this case, were there any
19  investigators assigned to it?
20      A   Yes.  That was Deputy McCutcheon.
21      Q   Okay.  McCutcheon.  I believe Officer
22  Guerrero.  Is that the name?
23      A   So Andrew Guerrero was the person who did
24  the initial --
25      Q   The initial investigation.

1  once we talk to them, they're like, "Nope."  Sometime
2  they'll say nothing happened.  Sometime they'll say,
3  "I don't want to do an investigation."
4      Q   Okay.
5      A   And we can't force them to.
6      Q   So in this case, when Mr. Buford told the
7  investigator that, in fact, he had not, you know, been
8  sexually harassed or raped in any ways --
9      A   Mm-hmm.
10      Q   So did that have an impact on your
11  investigation at all?
12          MR. HUNTER:  Objection.  Form.
13  BY MR. NYALLAY:
14      Q   Go ahead.
15      A   Most definitely.  Once an individual recants
16  the allegation, it has an impact on the investigation.
17      Q   Okay.  Is there any reason why you would
18  think that an inmate would make the initial outcry in
19  the first place?
20      A   I mean, there could be several reasons.  An
21  inmate can make an outcry because they believe
22  something has happened to them.  An inmate can make an
23  outcry sometimes because they don't like where they're
24  housed at.
25      Q   Okay.

57 (Pages 222 - 225)

1    A    An inmate can make an outcry because they
2  possibly owe someone something.
3    Q    Okay.
4    A    An inmate can make an outcry because they
5  want to be moved to a different location.
6    Q    Okay.
7    A    There's several reasons.
8    Q    Okay.  So just -- so it's not always the
9  case that the inmates have actually been sexually
10  harassed?
11    A    Correct.
12    Q    Okay.  Of course, it's one of the many
13  reasons?
14    A    Yes.  Yes.
15    Q    Okay.  So in this case, the first
16  investigator spoke to Mr. Buford, and Mr. Buford said
17  in fact he was never raped or harassed?
18    A    Correct.
19    Q    And there was a point in one of the
20  emails -- I don't know if you remember it -- where
21  Mr. Buford -- where it said he was confused.  It
22  appears that Mr. Buford had actually accused his own
23  mother of the sexual harassment?
24    A    Correct.
25    Q    Okay.  And you said earlier, the

Page 226

1    Q    Okay.  And usually when the conclusion is
2  unsubstantiated, what does that -- what impact does
3  that have on the overall investigation?
4    A    That's the final decision.
5    Q    Okay.
6    A    Once they make that decision, it's closed.
7    Q    Okay.  And in one of those emails that were
8  pointed to you earlier -- I believe that is in Exhibit
9  7, number JR 000059 -- it says that, at some point, he
10  was being referred to mental health or psych
11  evaluation.
12    A    Yes.
13    Q    Was that ever done?
14    A    Yes.
15    Q    Okay.  Was there ever anything about his
16  mental health?
17    A    Once we send it to mental health, then they
18  take over.
19    Q    Okay.  So do you think if an inmate has a
20  mental health condition, would that have an impact on
21  his understanding of things?  Would that have an
22  impact on the investigation of his allegations of a
23  potential PREA violation?
24    A    It's --
25        MR. HUNTER: Objection.  Form.

Page 228

1  victimization unit is located in the 1200 block;
2  correct?
3    A    Correct.
4    Q    Okay.  So after the investigator -- or the
5  initial investigator, Guerrero, made the
6  investigation, or maybe even after -- what's the name
7  of the other investigator?
8    A    McCutcheon.
9    Q    McCutcheon.
10    A    Mm-hmm.
11    Q    Did he arrive at any conclusion?  What was
12  the conclusion, if any?
13    A    I need to read the conclusion to make sure
14  I'm saying the right thing.
15    Q    Okay.
16    A    I need to read the investigation.
17    Q    Did they find any evidence?  Did they --
18    A    There was no evidence ever found.
19    Q    Okay.  In one of the emails that were
20  pointed out to you earlier, I saw something about
21  unsubstantiated.  What does that mean?
22    A    Unsubstantiated means they cannot come up
23  with a conclusion.
24    Q    Okay.
25    A    If the -- if it has happened.

Page 227

1  BY MR. NYALLAY:
2    Q    Go ahead, please.
3    A    It sometimes does.
4    Q    Okay.
5    A    It depends on who the -- what the case is.
6  I mean, who the individual is.  The outcome of the
7  investigation.
8    Q    Okay.
9    A    What was said during the investigation by
10  the person.  Things of that nature.
11    Q    Yeah.  But in a case where, specifically, an
12  inmate, on multiple occasions, have made allegations
13  of a PREA violation, and that same inmate, when
14  someone have actually gone to him and try to speak to
15  him and investigate, and he takes it back.  He said he
16  was never harassed or never raped or never touched
17  even?
18    A    Correct.
19    Q    And then the inmate was -- been referred for
20  a mental health evaluation.  Will that sort of have
21  any impact on the investigation as a whole?
22    A    The investigation is still investigated
23  thoroughly.
24    Q    Yes.
25    A    We still go through the same thing as a --

Page 229

58 (Pages 226 - 229)

1   an investigation with someone who we're not referring
2   to mental health.
3       Q.  Okay.
4       A.  But we do have to look at those type of
5   facts.
6       Q.  Okay.  Okay.  I know you did not do the
7   actual investigation, but what are some of the factors
8   that you consider, in your PREA investigations, when
9   you refer an inmate or an individual to a mental --
10  what are some of the things that you would see that
11  makes you be like --
12      A.  Well, one of the first things that we, of
13  course, would have -- well, I could say what I
14  would've did.  One of the first things I would have
15  looked at was the -- the numerous emails coming from
16  the mother with her saying that her son had a mental
17  health issue.
18          And with him not being in general
19  population, you want to make sure that you contact
20  mental health so he can get whatever medication is --
21  that he needs or if he needs to be housed in mental
22  health.
23      Q.  Okay.
24      A.  So you make sure you contact them for that.
25      Q.  Okay.
                                                    Page 230

1   actually shackled, but I do remember the -- that email
2   and me reaching out to the lieutenant.
3   BY MR. NYALLAY:
4       Q.  Okay.  And there was one -- in that email,
5   you reached out to lieutenant, and you told him that,
6   you know, Mr. Buford should not be shackled?  Should
7   be protected?
8       A.  Correct.
9       Q.  So your response to that email was -- what
10  made you respond to -- you told the -- to the initial
11  email that way?
12      A.  Well, what made me respond to the initial
13  email that way is just my experience within PREA and
14  also my experience with the PREA auditor and always
15  making sure that the individual is protected first.
16  And what happens with alleged victims sometimes is
17  that they are unintentionally put in positions that
18  they should not be.
19      Q.  At any time, before you sent the email --
20  before that email, did you verify to see whether
21  Mr. Buford was actually being shackled as alleged by
22  the public defender?
23      A.  I'm not sure.  I don't believe I have
24  because the -- the public defender sent it straight to
25  Major Anderson.  And once she told me --
                                                    Page 232

1       A.  And then, after the initial meet with the
2   investigator, and the investigator saying that he was
3   seen talking to himself.  And then, on one occasion,
4   where the individual is blaming his mother for being
5   sexually assaulted.
6       Q.  Right.
7       A.  All of those would go into --
8       Q.  Okay.  Okay.  So probably raise suspicion of
9   a potential mental health condition?
10      A.  Correct.
11      Q.  Okay.  And the email that you referred to
12  from the mother -- I mean, it's not from the mother.
13  I think from the public defender, I believe.
14      A.  Okay.
15      Q.  That referred to Mr. Buford being
16  shackled --
17      A.  Mm-hmm.
18      Q.  -- in a way.  And I know you were not
19  copied.  Were you copied in that email?
20      A.  I was not.
21      Q.  Okay.  You were being asked earlier as to
22  whether Mr. Buford was actually shackled.  Was he
23  actually shackled that you know?
24          MR. HUNTER:  Objection.  Form.
25          THE WITNESS:  I'm not sure if he was
                                                    Page 231

1       Q.  So the fact that your response to the email
2   was -- you know, after the public defender sent the
3   email --
4       A.  Mm-hmm.
5       Q.  -- that Mr. Buford was being shackled, and
6   you responded.  So that was just -- would you say that
7   is just an advisory role that you were playing,
8   like --
9       A.  Correct.
10      Q.  Okay.
11      A.  Most definitely.
12      Q.  Not because you -- we are for sure that he's
13  been shackled?
14      A.  Correct.
15      Q.  Okay.  Let's see.  And in one of those
16  documents that were presented to you earlier --
17      A.  Mm-hmm.
18      Q.  -- there was -- I believe the code was 512.
19  Is it 512 or 514?  I'm not sure.
20      A.  Oh, the classification code?
21      Q.  The classification code.  But that one
22  specifically referred to -- I think the meaning of
23  that code was that's the only housing available due to
24  PREA.  So what does that mean?
25      A.  I'm not sure.  You have to ask
                                                    Page 233

59 (Pages 230 - 233)

1  classification.
2     Q   Okay. Is that code referring to the
3  vulnerability unit?
4         MR. HUNTER: Form.
5         THE WITNESS: I'm not sure.
6  BY MR. NYALLAY:
7     Q   Okay. All right. But when -- on that
8  document that he was being referred to -- be placed to
9  that unit --
10    A   Mm-hmm.
11    Q   -- and with that code 512, do you know what
12 unit that he was actually moved to?
13    A   I believe that's the one where he was moved
14 to 6E2B.
15    Q   Yes. And is that the vulnerability unit?
16    A   Yes.
17    Q   Okay. So would you say that the 512 or 514
18 code actually refers to the vulnerability unit? I
19 mean, I know you said earlier you don't do -- you
20 don't work in classification.
21    A   Yeah. I'm not sure what classification
22 means, but yeah, that's where he was moved to
23 vulnerability victimization.
24    Q   You don't know what it means when he said
25 that the consequence of that statement is that he was

Page 234

1  placed in the vulnerability unit?
2     A   Yes.
3     Q   Okay. And you had said earlier -- you had
4  agreed to opposing -- to Mr. Hunter's statement
5  earlier that if an individual who reports PREA
6  allegations has been shackled, that could be
7  considered as punitive?
8     A   Correct.
9     Q   Okay. So when you agreed to that, what was
10 your mind -- what was going on in your mind with that?
11 What do you -- what was going on in your mind to agree
12 to that? Do you mean that he's been -- did you say
13 that could be considered punitive if he's been in the
14 cell for more than 25 days with shackle and hand
15 restraint on him? Is that what you were thinking, or
16 you were thinking that if he's been escorted with hand
17 restraint on? Is that what you're referring to?
18        MR. HUNTER: Form.
19 BY MR. NYALLAY:
20    Q   Clarify, please.
21    A   Just thinking that -- individuals who've
22 made PREA allegations, we try our best to not place
23 them in admin separation and to try to place them in
24 other general population cell blocks or vulnerable
25 victimization cell blocks. So when they do end up in

Page 235

1  an admin separation cell block, they should not be
2  shackled and handcuffed.
3     Q   Okay. So when you say that could be
4  considered punitive -- so you mean if he was in the
5  admin separation cell block, while in there, and at
6  the same time being shackled -- so that's what you
7  understood from that question?
8         MR. HUNTER: Form.
9  BY MR. NYALLAY:
10    Q   Is that what you understood from the
11 question?
12    A   No.
13    Q   Okay. What did you understand?
14    A   My understanding was that even when he
15 was -- my -- even when he was taken out that he should
16 not have been shackled. Now, him being in the admin
17 separation cell block, there's a possibility that that
18 cell block shackles and handcuffs individuals when
19 they come out.
20    Q   Right.
21    A   However, in his case, I don't believe that
22 he should have been because it was a PREA case.
23    Q   Right. But I know you had stated earlier
24 that -- I know you had worked as a detention officer
25 previously.

Page 236

1     A   Yes.
2     Q   But you have not done that for almost a
3  decade?
4     A   Correct. Over a decade.
5     Q   Right. So that -- will that mean that you
6  were not really quite familiar or too familiar with
7  that part of the policies in Harris County --
8     A   Correct.
9     Q   -- as far as, you know, at what point an
10 inmate -- like the kind of policy that a detention
11 officer would have to be dealing with?
12    A   Correct.
13    Q   Okay. So you may have to actually look at
14 the policy of the -- detention policy on that
15 particular thing in order for you to be able to say
16 something more intelligible on that?
17    A   Correct.
18    Q   Okay. So that means it's possible that even
19 though he may be a PREA case, but if the policy -- the
20 existing policy of that unit is that every inmate who
21 has been escorted has to be hand restrained?
22    A   Correct.
23    Q   Okay. The reason why I'm asking this
24 because I've spoken to a lot of detention officers
25 throughout this case.

Page 237

60 (Pages 234 - 237)

1   A   Yes.
2   Q   And some of these things keep occurring.
3   Okay.  Okay.  So your understanding is that if he's in
4   admin separation unit, and while he's in that unit and
5   being shackled at the same time, that would be
6   considered punitive?
7   A   Correct.
8   Q   Okay.  But if that is not the case, then
9   that could not be punitive --
10      MR. HUNTER:  Form.
11  BY MR. NYALLAY:
12  Q   -- as far as you know?
13      MR. HUNTER:  Form.
14      THE WITNESS:  As far as I know, yes.
15  BY MR. NYALLAY:
16  Q   Yes.
17  A   Correct.
18  Q   Let's see.  Do you have any knowledge of
19  whether, at any time of the PREA investigation,
20  Mr. Buford was being treated as a security threat?
21  A   No.
22  Q   Okay.  Is it commonplace for individuals who
23  make a PREA allegation to be treated as a security
24  threat?
25  A   No.

1   involved in your -- did you prepare the list for your
2   own personal --
3   A   No.  It was being prepared because command
4   staff wanted additional cameras.
5   Q   Additional cameras.
6   A   Mm-hmm.
7   Q   Do you have -- do you know whether those
8   blind spots were actually ever, you know, stuck with
9   the cameras, security cameras?
10  A   I'm not sure if the blind spots that we
11  listed, but I do know additional cameras have been
12  placed.
13  Q   Okay.  And do you remember when those
14  cameras were placed?
15  A   Maybe just the last few years.
16  Q   Okay.  And you would say that was before
17  Mr. Buford's allegations?
18  A   Yes.  Yes.
19  Q   And you were asked earlier about the number
20  of allegations that could be in the PREA report.  And
21  you had stated that the PREA guidelines itself do not
22  require or limit any particular allegations.  You
23  know, can you clarify that for us, please?
24  A   So a individual, such as Mr. Buford, who has
25  several allegations, has been known to have several --

1   Q   Okay.  What does security threat mean to
2   you?
3   A   Security threat means an individual who's
4   maybe a -- a escape risk or volatile against staff
5   members or other inmates or a -- a danger to
6   themselves.  Those are security threats to me.
7   Q   Okay.  Throughout the investigation of
8   Mr. Buford's PREA allegation, was he ever considered
9   to be any of those things you just stated?
10  A   Not to my knowledge.
11  Q   Okay.  So that means there's no reason for
12  him to be treated as one?
13  A   Correct.
14  Q   Okay.  And you don't have no reason to
15  believe that he was being treated as one?
16  A   No.
17  Q   Okay.  Now, you had stated earlier that you
18  prepared some list of blind spots where there could be
19  potential cameras.  How long ago since you prepared
20  those lists?
21  A   It's been years ago.
22  Q   Two years ago?  Five years ago?  Ten years
23  ago?
24  A   Over -- I'd say over five years.
25  Q   Okay.  So what was the circumstances

1   several different, I guess I would say, stories.
2   Like, sometimes he -- he comes back, and he'll say
3   something and then he'll recant and all of that.
4   Those are important factors when doing an
5   investigation.
6   Q   Okay.
7   A   You list the different dates if it's the
8   same person and -- and somehow -- and sometimes that
9   is what allows you to come up with your finding.
10  Because of the history of the individual that you're
11  investigating.
12  Q   Okay.  So you would say that -- like in this
13  case, similar, there was an outcry, I believe, in
14  September, and there was another one in November, is
15  it?
16  A   Yes.
17  Q   So you would say it would make sense to
18  include allegations from the same individual --
19  A   Yes.
20  Q   -- in preparing your reports?
21  A   Most definitely.
22  Q   Okay.  Let's see.  There was a lot of
23  questions earlier about security --
24  A   Mm-hmm.
25  Q   -- including the security cameras and stuff.

1  Just to clarify, you do not work -- you do not do
2  security work at --
3      A  I do not.
4      Q  -- the jail?
5      A  I do not.
6      Q  Okay.  So that means you may actually not be
7  able to say something outside of just common
8  observation?
9      A  Correct.
10     Q  Okay.  Did you ever get to watch any videos
11 of Mr. Buford at any time?
12     A  I have not.
13     Q  Okay.  So as far as the PREA investigation
14 itself is concerned -- and you had walked me through
15 this earlier.  That when an individual makes an
16 allegation, you have the -- seem like an initial
17 investigation's conducted?
18     A  Yes.
19     Q  In this case, which was conducted by
20 Mr. Guerrero?
21     A  Yes.
22     Q  Then he found out that Mr. Buford was
23 changing his statements it seemed like.
24     A  Yes.
25     Q  At one point, he said he was being touched

Page 242

1      A  Okay.
2      Q  And you said earlier that means they
3  probably not -- have enough evidence --
4      A  Correct.
5      Q  -- to prove whether or not the incidents
6  actually occurred?
7      A  Yes.  Correct.
8      Q  So after that conclusion, did anything else
9  happen as far as the PREA allegations or
10 investigations are concerned?
11     A  Not that I'm aware of.
12     Q  Okay.  Since the conclusion of that case --
13 of that allegations or investigations, have you spoken
14 to anyone about -- anything about this particular
15 investigation?
16     A  I have not.
17        MR. NYALLAY:  Okay.  All right.  No
18 further questions.  So thank you.
19        THE WITNESS:  Mm-hmm.
20            EXAMINATION
21 BY MR. HUNTER:
22     Q  I've got a few follow up and then we'll be
23 done unless he has further follow up.  I know it's
24 been a long day.
25     A  Okay.

Page 244

1  on the buttocks, and he was being harassed.  Then at
2  another time, he said that did not happen.  And at
3  some point, he said he was being -- he alleged that
4  his sexual allegation, sexual harassment, or whatever
5  happened was by his mother?
6      A  Yes.
7      Q  And at some point, during Officer Guerrero's
8  investigations or during -- McCutcheon, you said,
9  investigation --
10     A  Mm-hmm.
11     Q  -- they found that Mr. Buford appeared to be
12 confused?
13     A  Yes.
14     Q  Okay.  And then they recommended that he
15 actually go to medical or psych for psych evaluation,
16 and that was done?
17     A  Correct.
18     Q  Okay.  And then the actual investigations
19 concluded to be -- what was the actual conclusion of
20 the investigation?
21     A  I have to go back and look.
22     Q  Okay.  All right.  Let's see.  And I said
23 earlier that the statements that I read, and that I
24 think you went through earlier, says that his
25 allegations were unsubstantiated.

Page 243

1      Q  It's not lost on me.  We've all have got
2  families and things to go do.  So just a couple more
3  exhibits.  So this is going to be Exhibit 20.
4         (Plaintiff Exhibit 20 was marked for
5              identification.)
6         It's three photo -- still shots of --
7  whoops.  Sorry.  Three still shots of the videos
8  produced by Harris County.  And the Bates is Email 1,
9  272, 273, and 274.  All right.  All right.  Do you see
10 this first one here, ma'am?
11     A  I do.
12     Q  All right.  Is that -- do you see Dequon
13 Buford in that photograph?
14     A  I see someone who could be Dequon Buford.
15 He looks like him.
16     Q  And who is that?
17     A  The individual with the --
18     Q  Okay.  The computer's not cooperating.  And
19 do you see the language above -- it's under the
20 attachment line.  There's a sentence or two at the
21 top.  Do you see that?
22     A  I do.
23     Q  Does it say "Inmate Buford"?
24     A  It does.
25     Q  All right.  And then the end says -- well,

Page 245

62 (Pages 242 - 245)

1  the second sentence says "The paper in my hand is the
2  printout pass-on I gave to Sergeant Sneed regarding
3  the narrative of Inmate Buford's situation." Is that
4  correct?
5      A  Yes.  That's --
6      Q  All right.  So Buford would be discussing --
7  Mr. Dequon Buford, who's seen in this still video shot
8  here?
9      A  [No audible response.]
10     Q  Is that yes?
11     A  Yes.  That's what the email says.
12     Q  All right.  And this still video shot's from
13 the third floor, elevator lobby, CAB 3-6.  Do you see
14 that?
15     A  I do.
16     Q  Okay.  And then the date that this was sent
17 out is October 2, 2023.  Do you see that?
18     A  Yes.
19     Q  All right.  So again, here's a video of
20 Buford, the still shot version of it, while he's in
21 Harris County Jail; right?
22     A  Yes.  That's what the email says.
23     Q  Okay.  Going to the next one.  Do you see
24 the sentence there where it says "Inmate Buford
25 heading to the clinic"?

Page 246

1      And this is actually an email that I sent
2  that's been produced to me.  And it's Email 2, 000218
3  is the Bates, and this was sent December 15, 2023.  Do
4  you see that?
5      A  Yes.
6      Q  And that's me sending my letter of
7  representation and preservation of evidence to Harris
8  County.  Do you agree?
9      A  Yes, I agree.
10     Q  Okay.  And that date that I sent that was
11 December 15, 2023; right?
12     A  Yes.
13     Q  Okay.  And then on December 18th, a Victoria
14 Jimenez of Harris County sent an email to Ron Cherry,
15 Cristal Vazquez, or Vazquez, saying:  "Good afternoon.
16 Please see the attached request from Attorney Taylor
17 Hunter regarding Defendant Dequon Buford, SPN
18 03177353."  Do you see that?
19     A  Yes.
20     Q  All right.  And so Harris County is
21 acknowledging receipt of my letter of representation
22 and preservation of evidence as of December 18, 2023.
23 Is that true?
24     A  I'm not sure.  This is -- this is like
25 central records, and this -- this has nothing to do

Page 248

1      A  Yes.  I see that sentence.
2      Q  Okay.  So this document Email 1, 000273
3  appears to be a still video shot of Mr. Buford heading
4  to the clinic; is that correct?
5      A  Yes.  That's what the email says.
6      Q  And it's located first floor, FCC main hall;
7  is that what it says in the left hand corner?
8      A  Yes, that's what it says.
9      Q  Okay.  And then the last one, Email 1, 274
10 "Inmate Buford returning from the clinic."  Do you see
11 that?
12     A  Yes.
13     Q  All right.  And that's, again, first floor,
14 FCC main hall?
15     A  Yes.
16     Q  All right.  So in that last still shot video
17 and the second still shot of the video, the date that
18 those were sent is October 2, 2023; right?
19     A  Correct.
20     Q  Okay.  And that's for both of them?
21     A  Correct.
22     Q  Okay.  And so the last exhibit is going to
23 be Exhibit 21.
24         (Plaintiff Exhibit 21 was marked for
25          identification.)

Page 247

1  with PREA.  So I'm guessing if that's what you're
2  saying that happened that -- Victoria Jimenez is no
3  longer here.  Ron Cherry is no longer here, so.
4      Q  But they were there and employed as of
5  December 18th; right?
6      A  But I can't answer that for you 'cause I
7  don't work over there with them.  I don't work in
8  central records.  Yes, you're showing me this email.
9  It's -- I don't -- I can only tell you what the email
10 says.
11     Q  Okay.  Well, I mean, I wrote the letter in
12 the email, so.
13     A  Yeah.
14     Q  Does it appear to be a letter of
15 representation and preservation of evidence from my
16 office to the Harris County on December 15th --
17         MR. NYALLAY:  Objection.
18 BY MR. HUNTER:
19     Q  -- 2023?
20         MR. NYALLAY:  Objection to form.
21 BY MR. HUNTER:
22     Q  You can answer it.
23     A  I see an email between you and -- that's not
24 the sheriff's email, but I see a email between you
25 and -- Lieutenant Lee is a -- she's a Lee -- a

Page 249

63 (Pages 246 - 249)

1 lieutenant for the sheriff's office.
2     Q    Then you see internal correspondence on
3 December 18th of Harris County employees saying, "Hey,
4 we received this letter from Mr. Hunter, and it's
5 regarding Mr. Buford"?
6         MR. NYALLAY: Objection to form.
7         THE WITNESS: I think you need them
8 here to answer that for you, since they're the ones
9 who sent it.
10 BY MR. HUNTER:
11    Q    I'm just asking what the document shows. Is
12 it an email from --
13    A    It seems to be an email.
14    Q    Okay.
15    A    Yes.
16    Q    Okay. And in the ordinary custom of Harris
17 County, you guys email each other internally; right?
18    A    Yes, internally, yes.
19    Q    You email your employees, fellow employees?
20 Okay.
21    A    Correct. But that's not like a email from
22 the sheriff's office. Ours looks completely
23 different. So I'm guessing this is probably an email
24 from your email where you emailed us, because ours
25 doesn't look like this.
                                               Page 250

1 so --
2     Q    Do we need to go back to Exhibit 20? There
3 is videos of --
4     A    That's not 3C1.
5     Q    Do you see Mr. Buford in a still shot --
6     A    That's not --
7     Q    -- of the video?
8         THE OFFICER: I apologize. We're
9 talking over each other just a bit.
10         THE WITNESS: Oh, I'm sorry.
11         That's not 3C1.
12 BY MR. HUNTER:
13    Q    Do you see a still shot video of Mr. Buford
14 in Exhibit 20?
15    A    Yes.
16    Q    Okay.
17    A    I see someone who looks like him, yes.
18    Q    Okay. And so what I'm saying is, the
19 preservation of evidence letter that I sent --
20    A    Yes.
21    Q    -- was sent on December 15th. And so 180
22 days before December 15th would be June 15, 2023?
23    A    So is this the actual letter?
24    Q    No. That's the email. You don't really
25 need to see the letter, but if you want to see it, I
                                               Page 252

1     Q    Okay. And what I'm getting at is those
2 videos at Harris County's 1200 Baker Street, you've
3 testified they are maintained for 180 days. Is that
4 true?
5     A    Yes.
6         MR. NYALLAY: Objection.
7         THE WITNESS: A hundred and -- 180
8 days.
9 BY MR. HUNTER:
10    Q    Okay. That's the retention policy on all
11 videos at the Baker Street jail?
12         MR. NYALLAY: Objection to form.
13         THE WITNESS: I believe so.
14 BY MR. HUNTER:
15    Q    Okay. So I sent a preservation of evidence
16 letter dated December 15, 2023.
17    A    Mm-hmm.
18    Q    And Harris County's acknowledging it on
19 December 18, 2023.
20    A    Correct.
21    Q    In my preservation of evidence letter, I'll
22 attest to you, I said "All evidence relating to
23 Federal Rule of Civil Procedure 34." That would
24 encompass videos. Okay?
25    A    If there was video. Like if there is no --
                                               Page 251

1 can show it to you.
2     A    I mean, I just want to see what the letter
3 says to see how it's worded because you keep -- you
4 keep saying video. And if there was an investigation,
5 and there was no video to be found, then you wouldn't
6 have a video.
7     Q    Okay. So the magic language is right here.
8 "As used herein, documents, electronically stored
9 information, ESI, and tangible things are defined by
10 Federal Rules of Civil Procedure 34." Do you see that
11 part of the letter?
12    A    Yes.
13    Q    Okay. So that's me basically putting Harris
14 County on notice to preserve all of the evidence
15 responsive and identified in FRCP 34. Okay?
16    A    Okay.
17    Q    And the date of this letter is December 15,
18 2023. Do you see that?
19    A    Yes.
20    Q    So Harris County, on that date, should have
21 known to retain all video within 180 days of that
22 letter.
23         MR. NYALLAY: Objection.
24         THE WITNESS: So when you say "all
25 video," all video regarding the PREA allegation;
                                               Page 253

64 (Pages 250 - 253)

```
 1  correct?
 2  BY MR. HUNTER:
 3      Q   Mr. Buford.
 4      A   So you want -- you wanted all video
 5  everywhere he went?
 6      Q   Yeah.  Because if they're going to show up
 7  and defend that he wasn't shackled because there's no
 8  video, then yes, we're entitled to that.  Show me the
 9  video where he's either shackled or not shackled.
10      A   Got you.
11      Q   You're on notice that 180 days from December
12  15th would be June 15th, and so --
13      A   Mm-hmm.
14      Q   -- you should have all of the videos from
15  June 15th to at least December 15th; right?  They
16  should have at least saved all that; right?
17      A   So I -- I can only tell you about the PREA
18  part of the video and that there was no video to get.
19  So that's why, when you keep saying that, I'm going
20  back to the PREA investigation.
21      Q   Yeah.
22      A   And that there's no -- there -- there wasn't
23  any video to be had, so.
24      Q   Well, I'm just -- really, this whole line of
25  questioning is because you have knowledge of the 180
```

```
 1      Q   And he tries to present to you that
 2  Mr. Buford was the person in those pictures.
 3      A   Correct.
 4      Q   I wanted to ask whether you saw any shackle
 5  on Mr. Buford in any of those pictures that we just
 6  seen this afternoon?
 7      A   I did not.
 8          MR. NYALLAY:  No further question.
 9  Thank you.
10          THE OFFICER:  Oh, is that it?
11          MR. NYALLAY:  Yeah.
12          THE OFFICER:  All right.  Mr. Mustapha,
13  would you like a copy of the transcript?
14          MR. NYALLAY:  Yes, please.
15          THE OFFICER:  All right.  Yes.
16          And would you like to read and sign
17  today?
18          THE WITNESS:  I'm sorry?
19          THE OFFICER:  I apologize.  Would you
20  like to read and sign today, Ms. Camacho?
21          THE WITNESS:  Read and sign?
22          THE OFFICER:  Go over your testimony
23  today -- today, maybe make any like spelling or any --
24          THE WITNESS:  Oh, no.  I'm --
25          THE OFFICER:  No.
```

```
 1  days on the videos --
 2      A   Mm-hmm.
 3      Q   -- within the whole jail, not just PREA.
 4      A   Okay.
 5      Q   And I'm trying to establish a timeline that
 6  I sent a letter on December 15, 2023, putting a hard
 7  stop to preserve all evidence, including video --
 8      A   Mm-hmm.
 9      Q   -- footage, still shots, anything responsive
10  to Federal Rules of Civil Procedure, and Harris County
11  is now, in this litigation, saying no videos exist
12  despite the fact they were on notice.
13      A   Okay.
14      Q   Does that make sense?
15      A   Yes.  It makes sense what you're saying
16  there.
17          MR. HUNTER:  Okay.  No further
18  questions.
19              EXAMINATION
20  BY MR. NYALLAY:
21      Q   Just one last question, Ms. Camacho.
22      A   Yes.
23      Q   Mr. Hunter has shown you a couple of
24  pictures this afternoon.
25      A   Uh-huh.
```

```
 1          THE WITNESS:  I'm fine.
 2          THE OFFICER:  Okay.
 3          THE VIDEOGRAPHER:  All right.  This is
 4  now the end of video four of Katrina Camacho.  We're
 5  off the record.  The time is approximately 5:06.
 6          (Signature waived.)
 7          (Whereupon, at 5:06 p.m., the
 8          proceeding was concluded.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF DEPOSITION OFFICER

1  
2  I, ANEESA NORWOOD, the officer before whom
3  the foregoing proceedings were taken, do hereby
4  certify that any witness(es) in the foregoing
5  proceedings, prior to testifying, were duly sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a qualified
8  transcriptionist; that said digital audio recording of
9  said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in the
16  outcome of this action.
17  April 7, 2025
18  *Aneesa D Norwood*
    ANEESA NORWOOD
19  Notary Public in and for the
20  State of Texas
21
22
23
24
25
Page 258

CERTIFICATE OF TRANSCRIBER

1  
2  I, MEAGAN SWEETEN, do hereby certify that
3  this transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise in                           his action.
13  April 7, 202
14
15  MEAGAN SWEETEN
16
17
18
19
20
21
22
23
24
25
Page 259

1  Wagner, Et Al. v. Harris County Texas
2  Katrina B Camacho Job No. 7243002
3  E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Katrina B Camacho                    Date
25
Page 260

1  Wagner, Et Al. v. Harris County Texas
2  Katrina B Camacho 7243002
3  ACKNOWLEDGEMENT OF DEPONENT
4  I, Katrina B Camacho, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Katrina B Camacho                    Date
13  *If notary is required
14  SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25
Page 261

66 (Pages 258 - 261)

1  mmnyallay@rampagelaw.com
2           April 7, 2025
3  RE: Wagner, Et Al. v. Harris County Texas
4  DEPOSITION OF: Katrina B Camacho 7243002
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11      The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14      According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18              Yours,
19              Veritext Legal Solutions
20
21
22
23
24
25
                                        Page 262

Veritext Legal Solutions
800-336-4000

**[& - 16]**

**&**

**&**   2:12

**0**

**0000013**   4:11
**0000015**   4:10
**000015**   158:3
**000017**   105:5
**000035**   125:20
**000040**   127:2
**000059**   136:19
  228:9
**000218**   248:2
**000273**   247:2
**000298**   207:9
**00298**   4:17
**02886**   1:8
**03177353**   210:5
  248:18
**049**   146:9
**05**   115:21,23,25
**09-2j2-01g**
  140:17

**1**

**1**   3:11 104:23
  104:24 106:3
  109:23 112:23
  131:17,17
  183:6 245:8
  247:2,9
**1-05j**   131:5
**10**   4:6 147:9,22
  147:23,24

  148:5 191:25
**10/02/2023**
  3:15
**10/10/2023**
  4:14
**10/18**   186:5
  199:16
**10/18/2023**
  3:12,13 111:19
**10/18/23**
  185:19 199:14
**10/2**   185:19
  187:3 199:16
**10/2/23**   199:11
**1019**   1:22
**104**   3:11
**107**   3:12
**108**   3:13
**10:51**   1:20 5:7
**11**   4:8 150:20
  150:21 190:25
**11/05/2023**
  3:24
**11/14**   141:3
  182:24 186:21
  199:19 201:25
**11/5**   146:11
  186:21 199:19
  201:25
**11/5/2023**   4:5,8
  137:18 151:2
**11/5/23**   147:6
  186:6

**112**   3:15
**115.13**   97:23
  191:2
**115.89**   170:18
**115.89.**   170:7
**116**   46:22
**12**   4:9 25:5
  152:22,24
  153:12 190:25
**12/15/2023**
  4:19
**12/19/2005**
  23:9
**1200**   54:19
  58:25 61:12
  63:15,23 64:1
  64:4 75:16
  76:4 85:9 86:6
  87:6 88:15
  89:22 90:8
  92:10 93:15,25
  97:13,17 115:7
  129:20 131:8
  134:23 140:21
  149:9,13
  175:18 181:24
  183:4,19
  185:20,25
  186:23 208:9
  227:1 251:2
**1201**   93:24
**125**   3:17
**126**   3:20

**12:14**   71:16
**12:22**   71:20
**12a**   191:7
**13**   4:10 158:3,4
  182:23 183:14
  191:7
**136**   3:22
**14**   4:11 32:16
  74:14 143:5
  144:11,15,24
  162:15,17
**140**   3:24
**146**   4:5
**147**   4:7
**14th**   141:12
  145:9
**15**   3:12 4:12
  27:7 107:25
  108:17 118:17
  118:22 119:18
  182:3,5 187:2
  189:3 248:3,11
  251:16 252:22
  253:17 255:6
**150**   4:8
**152**   4:9
**158**   4:10
**15th**   249:16
  252:21,22
  254:12,12,15
  254:15
**16**   3:13 4:13
  107:2 108:2
  114:22 115:1

Page 1

**[16 - 24]**

188:25 189:1
190:25 200:1
200:14
**162**  4:11
**17**  4:14 103:25
105:2 106:21
191:21,23
**17th**  119:22
**18**  4:15 106:23
109:1 111:21
123:5 125:10
201:6,9 248:22
251:19
**180**  120:20
166:7 204:20
211:5 215:8
251:3,7 252:21
253:21 254:11
254:25
**182**  4:12
**189**  4:13
**18th**  107:7
112:2,4,16,22
119:24 120:5
157:15,18,21
201:24 248:13
249:5 250:3
**19**  4:17 23:25
62:11 163:2
207:9,10
209:11
**191**  4:14
**1979**  10:6

**19th**  17:2,3
203:4
**1:50**  135:11
**1a**  183:3

**2**

**2**  3:12 107:2,3
107:4 108:20
111:16,21
121:23 122:3
202:4 210:20
213:17 246:17
247:18 248:2
**20**  4:18 17:8
221:11 245:3,4
252:2,14
261:15
**200**  2:13
**2003**  15:23
25:5 49:23
**2005**  17:2
23:25 24:25
28:8,12,25
29:18 62:11
**2008**  22:16
23:6 24:3
28:21
**2009**  22:16
23:6 24:7,11
**201**  4:16
**2011**  25:5,16,17
26:5
**2012**  25:17
26:5

**2013**  21:8
24:14 29:18
32:16 34:3,10
69:7
**2019**  27:7 28:5
**2020**  184:13
**2023**  20:5
21:10 24:17
34:3 69:7 81:3
81:15 82:8
83:12 102:17
103:3,20,25
104:6 106:23
106:23 109:1
110:16 111:16
111:21,22
119:18 121:23
122:3,13 123:6
125:10 132:23
136:14 137:24
139:8,9 140:14
141:12 143:1,5
144:10,11,15
144:24 149:25
150:16 152:12
156:8 159:25
163:2 165:11
166:14,19
169:11,21
170:2,24
171:21 172:1
172:10,13
182:23 183:15
184:13,14

187:5 191:25
194:12 196:10
196:13 210:12
210:20 213:17
246:17 247:18
248:3,11,22
249:19 251:16
251:19 252:22
253:18 255:6
**2025**  1:19 5:10
258:17 259:13
262:2
**206-1200**  2:8
**207**  4:17
**20th**  184:1
**21**  4:19 247:23
247:24
**213**  3:4
**214**  2:8
**219**  201:7
**220**  189:4
191:4
**23**  156:18
183:14 202:18
**23-0928-168**
126:15 127:15
**23-1105-364**
147:10
**23-1105-392**
137:20
**230928168**  3:20
**24**  1:19 5:10
142:11,14

[244 - 7]

| | | | |
|---|---|---|---|
| **244** 3:5 | **2:11** 135:14 | 147:16 | 233:18,19 |
| **245** 3:12,13 | **2b** 149:5 | **392** 4:9 146:15 | 234:11,17 |
| 4:18 105:2 | **2j** 186:20 | 146:19 147:3 | **514** 233:19 |
| 107:2,2 108:17 | **2j2** 144:2 | 152:17 | 234:17 |
| **246** 182:8 | **2k** 185:19,19 | **3:35** 190:18 | **52** 147:9 148:2 |
| **247** 4:19 | 185:20 | **3:44** 190:22 | **53** 152:22 |
| **25** 165:11 | **2k1** 186:25 | **3c** 185:13 187:3 | **5:06** 257:5,7 |
| 169:11,21 | **2nd** 112:13 | **3c1** 184:1 252:4 | **5f** 183:17 |
| 170:2 172:1 | 120:3 122:13 | 252:11 | **5f2** 183:11,12 |
| 184:13 187:5 | 123:5 125:10 | **3cc** 208:15,20 | 183:18,20 |
| 200:3,15,16,23 | 157:21 184:1 | **3rd** 184:5 | **5th** 141:3 |
| 200:24 202:9 | 184:21 185:3 | | 144:14,23 |
| 204:10 235:14 | 201:24 211:5 | **4** | 145:8 146:24 |
| **255** 3:6 | | **4** 3:14 112:9,10 | 183:18,19 |
| **25th** 165:23 | **3** | 114:21 120:2 | |
| 167:13 168:2 | **3** 3:13 108:13 | 121:15 125:16 | **6** |
| 184:13,24 | 108:14 131:17 | 133:21 | **6** 3:18 10:6 |
| **27** 166:14 | 131:17 156:21 | **4-23** 1:8 | 94:23 95:2 |
| 170:23 171:21 | 202:21 | **41** 127:3 | 115:12 126:23 |
| 172:10 184:13 | **3-6** 246:13 | **4131** 2:5 | 126:24 128:22 |
| **272** 245:9 | **30** 94:23 95:2 | **42** 191:22 | 135:6 |
| **272-274** 4:18 | 143:13,19 | **44** 32:24 33:4 | **60** 75:6 |
| **273** 245:9 | 144:1 179:3,21 | **47-48** 140:6 | **61** 150:24 |
| **274** 245:9 | 179:24,25 | **49** 152:16 | **63** 150:24 |
| 247:9 | 194:2,19 | **5** | **632-2102** 2:16 |
| **27th** 167:14 | 196:18 | **5** 3:16 125:20 | **643** 10:14 |
| 168:3 171:18 | **31** 162:15 | 125:21 137:24 | **6e** 186:5,6 |
| 198:23 | **32410** 258:17 | 140:14 143:1 | **6e2b** 112:6 |
| **28** 97:23 | **34** 251:23 | 144:10 149:25 | 186:7 234:14 |
| 132:23 | 253:10,15 | 150:16 152:12 | **7** |
| **28th** 185:9 | **35** 58:4 | **50** 195:4 | **7** 3:3,21 136:19 |
| **29820** 259:14 | **361** 147:3 | **500** 133:21 | 136:20 228:9 |
| **29th** 184:18 | **364** 4:7 146:14 | **512** 121:16 | 258:17 259:13 |
| | 146:19 147:7 | 122:9 144:4,7 | 262:2 |

[701 - actually]

**701** 85:9 89:21
90:8 92:9
93:16,25
**72** 74:9,20,21
**7243002** 1:25
260:2 261:2
262:4
**75204** 2:6
**77002** 1:23
**77013** 10:14
**77573** 2:14

**8**

**8** 3:23 140:6,7
**832** 2:16
**8:51** 106:24

**9**

**9** 4:4 28:21
146:5,6 152:16
200:1,14
**9/20** 185:2
187:3
**9/25/2023**
197:22
**9/25/23** 194:6
198:16
**9/27/2023**
198:4
**9/27/23** 194:9
**9/28** 133:16
146:11
**9/28/23** 3:17
126:15

**9/29** 146:11
**900** 2:5

**a**

**a.m.** 1:20 5:7
**a5** 98:1
**abide** 32:24
33:11 51:8
**ability** 258:10
259:7
**able** 40:20
49:16 55:8
81:1,1 84:7
87:22 92:6
116:3 117:11
119:14 123:10
132:19 133:23
135:22 141:22
141:23 156:6
159:12 160:5
213:11 222:16
237:15 242:7
**abnormal**
114:3,4 150:10
**above** 114:22
245:19 261:7
262:5
**absent** 5:15
**abuse** 34:23
44:3 50:1,9,16
50:25 51:15
71:5 79:17
85:24 99:3,16
117:17 179:4

195:16 196:2
**abused** 155:19
186:15
**abuses** 133:22
**academy** 28:18
31:20,21 35:23
37:10 40:12
**acceptable** 48:6
48:11
**accuracy** 262:8
**accurate** 29:8
72:10 107:6
153:13 170:1
172:9 258:9
259:5
**accurately**
134:12 174:3
**accused** 226:22
**achieve** 139:20
**acknowledge...**
45:11,12 261:3
**acknowledge...**
5:12
**acknowledging**
248:21 251:18
**acronym** 15:18
162:23,24,25
**act** 15:20 18:6
25:3 30:13
33:9 35:19
43:7 44:15
49:23 68:23
70:17 72:7
151:21 191:2

**acting** 85:18
**action** 1:7
258:12,16
259:8,12
**actions** 48:25
49:7
**actively** 24:18
25:5
**activities** 27:20
**actual** 11:18
21:25 28:15
31:13 32:23
34:25 40:10
43:18 48:20
67:16 74:8
93:15 126:10
128:2,3,14,17
131:18 133:2
134:6 149:12
165:1 176:21
179:5,5,18
211:20 220:8
230:7 243:18
243:19 252:23
**actually** 9:24
15:19 19:6,9
21:16,19 22:22
23:1 25:19
33:15 34:14,16
34:21 35:20,21
39:7 41:14
42:25 43:7,17
43:18 48:25
62:3,24 69:13

Page 4

[actually - allegation]

77:10 79:16
82:22 84:20
87:15 103:6
106:15 119:15
120:10 130:2
136:6 150:11
158:15 160:8
163:14 164:21
165:14 166:25
169:13 174:9
178:9,9 186:24
188:24 206:6
212:21 213:7
213:12 220:15
220:20 224:16
226:9,22
229:14 231:22
231:23 232:1
232:21 234:12
234:18 237:13
240:8 242:6
243:15 244:6
248:1
**ad** 155:1
**add** 192:8
**added** 86:10
87:6,10,16
89:2
**adding** 101:2
**addition** 20:6
39:13 93:22
**additional** 87:3
87:5,9 92:15
240:4,5,11

**additionally**
5:15
**additions** 261:6
**address** 10:13
49:23
**addresses**
49:25
**adequate** 85:23
**admin** 3:14,23
109:7,8,12
110:8 114:22
115:1 118:21
119:4 123:1
138:13 192:7,8
202:17 219:4
219:14 221:1
221:14 235:23
236:1,5,16
238:4
**administer**
5:12
**administration**
186:22
**administrative**
78:22 79:3
80:6 82:14
83:4,16,25,25
101:5,7,11,12
101:16,16,24
101:24 102:12
102:12,15,19
103:5,7,11,12
103:18,22
110:22 118:16

141:2 169:10
169:22 170:25
172:14,18
187:10,13,19
187:20 188:1
192:15 201:15
202:1,22
221:12
**administrativ...**
79:23,25 80:10
80:15
**admins** 112:3
**adult** 175:1
**advancing**
38:12
**advisory** 233:7
**advocacy** 44:1
**advocate**
164:22 178:14
**affairs** 34:16
79:12 192:12
192:14,20
**affect** 60:15,22
60:25 61:1
**affected** 59:3
**afraid** 154:4
**afternoon**
215:19 218:4
222:10 248:15
255:24 256:6
**aggressive**
48:23 109:21
**ago** 28:22
31:19 44:7

65:19 66:2,2
66:23,25 86:9
89:13,14,17
91:4 92:17,18
94:15 102:24
104:12 239:19
239:21,22,22
239:23
**agree** 5:13,17
48:14 51:16
109:14 235:11
248:8,9
**agreed** 235:4,9
**agreement**
175:24 193:12
**agreements**
262:14
**ahead** 97:10
105:18 108:11
192:25 225:14
229:2
**al** 1:5 5:9 260:1
261:1 262:3
**alan** 172:16
185:3,3,4
**alcohol** 10:20
**alert** 192:8
**alicea** 192:6
**alicia** 115:14
115:14
**allegation**
47:22 48:2,6
48:11,15 49:9
49:10 51:23,25

**[allegation - answer]**

| | | | |
|---|---|---|---|
| 52:22 53:8,9 | **allegations** | 145:21 203:19 | 107:15 108:7 |
| 53:10,11,12,13 | 50:12 66:5 | 232:16,21 | 109:24 113:2 |
| 53:14,15,19,19 | 69:19 76:14 | 243:3 | 114:16 115:21 |
| 55:1,19 56:10 | 83:13 135:18 | **allegedly** | 115:23 116:1,3 |
| 57:7 59:4,8 | 138:17 139:8 | 195:15 212:1 | 116:7,9,15 |
| 60:6,16,23 | 148:14 150:17 | **alleges** 166:13 | 117:3 176:6 |
| 61:2,3,8 68:3,9 | 155:16 156:3,6 | 187:4 | 232:25 |
| 68:21,25 69:1 | 158:10,25 | **alleging** 154:15 | **anderson's** |
| 73:2,18 74:5 | 159:11,24 | 154:18,20 | 17:14 104:18 |
| 74:11 76:23 | 160:15,24 | 165:9 196:2 | **andrew** 12:20 |
| 79:13,17,20 | 161:22 162:1 | 212:3 | 19:7 22:2 |
| 83:25 102:9 | 163:5 164:3,18 | **allen** 148:21,22 | 156:9 159:9 |
| 103:3,15,17,23 | 165:6 169:11 | 150:17 151:7 | 223:23 |
| 109:15,20 | 169:22 170:2 | 166:23 | **aneesa** 1:24 5:5 |
| 110:15 113:14 | 170:24 171:1 | **allotted** 202:5 | 258:2,18 |
| 118:25 119:19 | 172:10,13 | 202:10 262:15 | **anniversary** |
| 120:23,25 | 184:12 192:10 | **allow** 70:9 | 17:8 |
| 121:1,3 123:21 | 192:17,21 | **allowed** 159:12 | **announce** |
| 124:19,25 | 194:6,9,12 | 160:11 | 191:8 |
| 128:1,9 148:10 | 198:17,23 | **allows** 70:13,19 | **answer** 9:14 |
| 148:12 151:2 | 204:25 228:22 | 71:1 72:14 | 42:7 48:19 |
| 156:9 160:1 | 229:12 235:6 | 188:10 241:9 | 60:20 62:18 |
| 161:3,8,14 | 235:22 240:17 | **alternative** | 63:20 66:9 |
| 164:8 167:2,5 | 240:20,22,25 | 123:22 124:7 | 81:2 87:2 |
| 174:25 185:7 | 241:18 243:25 | 125:12 145:6 | 88:19,22 89:12 |
| 205:11 210:12 | 244:9,13 | 145:17,25 | 91:15 93:9 |
| 217:8,10 | **alleged** 49:14 | **alternatives** | 99:6 102:4 |
| 222:24 223:4,7 | 53:20 58:15 | 123:23 | 105:12 109:18 |
| 224:20 225:16 | 68:9,21 73:12 | **amount** 82:24 | 114:11 119:1 |
| 238:23 239:8 | 73:13,20,22 | **ana** 1:8 | 119:15 122:20 |
| 242:16 243:4 | 78:20 80:4 | **anderson** 17:13 | 122:23 123:10 |
| 253:25 | 109:20 124:8 | 17:24 18:1,16 | 138:23 150:7 |
| **allegation's** | 125:4 131:25 | 104:1 105:10 | 185:16 188:24 |
| 130:5 | 137:13 138:10 | 105:22 107:11 | 195:19 196:3 |

[answer - attached]

| | | | |
|---|---|---|---|
| 200:7,13,14 | apply 38:10 | 101:18,21 | 143:13,19 |
| 207:22 249:6 | approved | 132:18 151:21 | 144:1 145:6,24 |
| 249:22 250:8 | 148:25 149:2 | 164:25 173:12 | assign 223:16 |
| answered | approximately | 173:16 209:21 | assigned 5:5 |
| 42:22,24 69:11 | 37:17 135:11 | 216:15 221:10 | 34:20 158:15 |
| 101:19 173:13 | 257:5 | 222:8 231:21 | 223:19 |
| 173:17 187:8 | april 258:17 | 240:19 | assignment |
| 209:22 | 259:13 262:2 | asking 9:21 | 51:23,24 54:25 |
| anybody 14:9 | area 24:5 43:19 | 38:15 42:19,25 | 201:18 |
| 169:19 | 54:7,8 59:11 | 96:13,18 97:7 | assignments |
| anymore 83:1 | 59:14 61:5 | 98:12 120:12 | 52:1 |
| 90:6 155:2 | 73:23 119:8,9 | 176:13 198:21 | assist 20:24 |
| 211:6 | 124:12,13,15 | 200:23 213:3 | 44:2 50:23 |
| apologize 252:8 | 125:1 129:20 | 237:23 250:11 | 66:5 82:7,12 |
| 256:19 | 131:18,18,20 | asks 105:22 | 85:13 93:10 |
| app 190:1 | 131:20 138:13 | assault 21:20 | 98:7 171:5 |
| appear 134:3 | 141:21,23,24 | 50:6,12,25 | assistance |
| 153:12 207:7 | 175:3,16 | 71:4 129:22 | 175:15 |
| 207:12 209:14 | 176:11,14 | 132:24 133:15 | assistant 17:20 |
| 249:14 | 184:5 186:19 | 156:9 158:10 | 18:1,12 105:23 |
| appeared 169:7 | 195:15 202:17 | 158:25 159:10 | 109:25 112:24 |
| 243:11 | 212:2 219:4 | 159:24 166:20 | 113:6,12 114:6 |
| appearing 6:7 | areas 92:10,11 | 172:13 185:12 | assisted 90:9 |
| appears 163:4 | 98:3,10 140:23 | 194:12 198:15 | 90:11 158:19 |
| 213:16,19 | 202:16 | assaulted | assisting 21:11 |
| 216:19 219:9 | arrive 227:11 | 171:24 212:1,3 | 81:7 196:12 |
| 221:20 224:11 | arrived 183:7,8 | 231:5 | assume 28:9 |
| 226:22 247:3 | asap 67:24 | assaults 77:13 | assure 83:20 |
| appended | ashaye 134:25 | 138:5 160:3,4 | 84:1,1,4 85:21 |
| 261:7 | 134:25 | assess 123:22 | 93:14 |
| applicable 5:21 | aside 93:12 | 143:21 145:16 | assuring 54:12 |
| 262:7,14 | 176:7 | 175:13 | 98:14 |
| applied 20:2 | asked 35:10 | assessment | attached |
| | 42:25 69:10 | 124:7 125:11 | 248:16 262:10 |

Page 7

[attached - based]

262:12
**attachment**
210:3 245:20
**attempt** 33:24
50:8 51:14
**attendance** 6:5
**attention** 185:8
**attest** 251:22
**attorney** 1:11
6:8,11 7:16
14:15 53:16
114:1 120:13
130:7 248:16
258:14 259:10
**attorney's** 1:21
11:14 79:2,15
166:2
**attorneys** 14:7
14:12,18,24
58:12
**atw** 141:6
**audible** 246:9
**audio** 135:21
136:5,6 258:8
259:3
**audit** 20:25
26:16,19,21
27:7,21
**auditor** 25:24
35:8 85:3
232:14
**auditor's** 85:5
**audits** 26:12

**authorized**
5:11
**automatically**
59:9
**autumnwood**
10:14
**available**
121:19,24
122:3,10
123:23 124:7
144:7 145:6,16
145:24 215:12
233:23 262:6
**aware** 18:23
34:5 40:24
46:6,12 47:19
47:24 48:4,9
53:14 54:23
57:25 58:14,17
62:13 63:14,17
63:21,25 64:6
70:12,16,23,25
71:3,5 72:13
77:3,6 78:5
83:2 86:5
88:25 90:25
98:24 113:22
124:4,9 125:9
149:15 160:13
160:21 161:5
161:14 162:7
165:12,17,21
165:25 166:13
166:17 173:19

173:21 179:2
179:15,22,23
181:3 185:22
187:17,24
198:14 208:7
208:14 244:11

| **b** |

**b** 3:8 4:1 86:4
94:23 95:2
100:17 260:2
260:24 261:2,4
261:12 262:4
**back** 13:16
20:24 23:2
24:8 28:7
29:21 41:8
45:18 54:6,9
61:7 71:18,22
102:21 104:6
106:20 108:5
108:20 109:23
114:21 117:9
120:2 128:22
130:4 132:6
152:15 155:11
169:17 182:17
193:11 194:25
197:4 202:25
204:19 206:6
206:14,19
216:17 224:4
224:21 229:15
241:2 243:21

252:2 254:20
**background**
15:11,25 22:9
24:22 25:2
45:13
**bad** 12:11
109:10 117:24
174:12,13,17
174:21,21
**baker** 54:19
58:25 61:12
63:16,23 64:4
75:16,25 76:4
85:9 86:6
88:16 90:8
93:16,25 97:13
131:7,8 142:3
144:16 149:9
175:18 181:24
208:9 251:2,11
**balance** 205:2
**band** 202:22
203:1,8,10,12
219:2
**barbara** 16:2,6
**barriers** 195:16
196:2
**base** 186:1
**based** 122:7,24
123:1 134:2
143:1 165:7
202:10,11
204:5 218:3

Page 8

[basic - bower]

| | | | |
|---|---|---|---|
| **basic** 13:17 | 59:6 65:3,25 | 162:8 163:11 | 131:12 140:24 |
| 200:23 | 66:23 67:11,13 | 181:7 | 149:16 183:21 |
| **basically** 35:6 | 67:14 69:4,5 | **believes** 142:9 | 239:18 240:8 |
| 98:11 253:13 | 71:23 72:6,24 | **bernal** 2:12 | 240:10 |
| **basis** 35:22 | 75:5 80:5 | **best** 10:16 | **block** 60:1 |
| 122:19,19,24 | 84:11 85:17 | 32:13 64:8 | 115:3,24 |
| 203:16 | 86:9 90:11 | 76:7 93:6 | 131:22,23 |
| **bates** 105:5 | 98:16,19 99:7 | 100:13 124:20 | 140:17 142:7 |
| 125:20 127:2 | 102:3,6,10 | 124:21,23 | 149:13 151:21 |
| 136:19 140:6 | 103:21 104:4 | 194:24 235:22 | 183:24 184:4 |
| 146:9 148:2 | 106:15 114:24 | 258:10 259:6 | 185:25 186:8,9 |
| 158:3 162:16 | 120:14,17,19 | **better** 38:11 | 186:23 204:18 |
| 191:22 207:8 | 123:2 133:1 | 39:1,1 52:3 | 227:1 236:1,5 |
| 245:8 248:3 | 136:4 144:1 | 65:11 100:22 | 236:17,18 |
| **bay** 2:13 | 146:20,22 | 124:16 179:11 | **blocks** 189:14 |
| **beaten** 165:11 | 162:10 163:17 | 188:20 193:4 | 202:20 221:1 |
| **beaudoin** 54:22 | 163:22 164:17 | **beyond** 83:7 | 235:24,25 |
| 55:12,13 108:9 | 164:19 166:7 | **big** 173:19 | **blurry** 209:18 |
| **began** 30:18 | 168:25 169:20 | **bigger** 67:12 | **bodies** 50:22 |
| **begged** 23:1 | 169:24,25 | **birth** 10:5,7 | **body** 192:5 |
| **beginning** 28:7 | 170:20 179:16 | **bit** 69:12 | **bonita** 8:20,22 |
| **behalf** 2:2,10 | 181:5 185:24 | 163:19 191:15 | **boodan** 55:15 |
| 6:7 95:22 96:4 | 194:17 196:16 | 193:24 252:9 | **bosquez** 17:20 |
| 96:24 151:25 | 198:5,6 204:19 | **blaming** 231:4 | 18:2,2,12 |
| 154:15 | 204:21 208:8 | **blank** 7:15 | 105:23 109:25 |
| **behavior** 69:20 | 213:20 219:13 | **blind** 86:7,21 | 112:25 113:6 |
| 69:24,24,25 | 223:21 224:9 | 87:4,10 88:17 | 114:6,16 |
| 109:10 139:3 | 225:21 228:8 | 89:6,8,14,21,21 | **bottom** 122:9 |
| 150:10 219:22 | 231:13 232:23 | 90:8,23 91:17 | 209:13 |
| 220:1 | 233:18 234:13 | 92:6,24 93:11 | **boulevard** 2:13 |
| **believe** 19:13 | 236:21 239:15 | 93:12,22 94:12 | **bound** 180:8 |
| 19:15 28:21 | 241:13 251:13 | 97:19,20 98:3 | 211:8 |
| 40:15,18 55:5 | **believed** 57:22 | 98:7,9,10,12,17 | **bower** 157:10 |
| 56:14,16 57:19 | 109:1 139:3 | 98:19,22 115:9 | 179:13 191:16 |

Veritext Legal Solutions
800-336-4000

**[bower - camacho]**

192:1 193:5
**bower's** 107:18
**bowers** 54:20
55:10 108:6
**box** 117:10
142:20
**bpoc** 13:17
**break** 9:9,10
71:11,23,24
135:2 190:13
**brent** 100:18
100:19
**bring** 216:17
216:17
**brochure** 42:4
42:13 45:4,9
**brochures** 42:2
45:16 47:2,12
**broken** 62:14
63:14,22
**brought** 19:14
185:7
**brush** 90:5
**buford** 1:12 6:9
15:13 18:7,14
18:18,25 21:15
56:23 58:9,19
59:1 81:13,13
83:13 96:10
102:16 103:2
103:19 105:23
106:5 108:24
109:2 110:1
111:13,23

112:25 116:4
119:17 120:15
120:22 122:14
123:6 125:7
126:3,17 134:3
134:4,21,22
135:18,22
136:7 138:16
138:19 139:5,8
139:14 140:16
141:2,15 143:2
143:8 144:15
144:24 145:7
148:18 150:2
151:3,9 152:11
154:11,16,16
155:4,17,17
158:13 159:1
159:11,25
162:9 163:2
165:11,23
166:13,19
172:6 175:11
180:9 182:9
185:11 187:4
187:18 192:7
195:23 198:14
200:17 201:15
201:25 202:9
203:20 204:2
206:19 209:5
209:10,14,19
209:24 210:4
210:11,19

211:23 212:5
213:9 216:1,19
218:5 222:24
224:12,16
225:6 226:16
226:16,21,22
231:15,22
232:6,21 233:5
238:20 240:24
242:11,22
243:11 245:13
245:14,23
246:6,7,20,24
247:3,10
248:17 250:5
252:5,13 254:3
256:2,5
**buford's** 76:14
96:5 103:13
110:15 144:11
148:10,14
150:16 151:19
153:22 156:18
180:2,16
181:17 192:17
194:6,9,12
200:3 213:19
239:8 240:17
246:3
**building** 101:3
125:2
**buildings** 101:1
**buntyn** 86:1,4
93:18 100:15

100:19
**burden** 82:13
83:5,15 84:3
**bureau** 34:22
34:25
**bush** 43:8,10
**business** 83:23
**busy** 16:10,11
**butler** 105:11
108:8
**buttocks**
148:16 224:6
243:1

**c**

**c** 2:1 5:1 19:11
19:12 26:7
63:6,7 131:5
131:17,17
149:3 184:5
**cab** 246:13
**calculating**
98:25 99:13
**call** 55:15
63:13 64:19
128:8 179:25
216:20 222:11
**called** 6:20
11:14 58:7
223:2,3,3,7,10
**camacho** 1:18
5:9 6:12,12,19
8:20 71:15,19
133:7 135:10

Page 10

Veritext Legal Solutions
800-336-4000

**[camacho - charge]**

135:14 151:12
190:17,21
213:3 255:21
256:20 257:4
260:2,24 261:2
261:4,12 262:4
**camacho's** 94:3
**camera** 89:7
165:15 208:5
**cameras** 63:11
63:12 76:4
77:17 86:10,10
87:3,5,10,12
89:2 92:22
185:22,24
204:17,18
208:10 239:19
240:4,5,9,9,11
240:14 241:25
**capacity** 18:10
18:13,17 90:14
154:25 155:16
165:7
**captain** 31:17
31:17,19 33:14
33:15 82:25
84:23 90:2
93:17 161:19
**captured** 70:9
213:24
**care** 138:9
139:16 153:18
153:20,23
169:5

**career** 113:10
**careers** 16:3,7
**caring** 153:21
**carter** 87:24
88:5,6 89:5
**case** 11:8 12:17
12:19,24 13:2
14:22,22,23
79:3,11 80:1
91:24 102:21
102:23 105:3
116:16 162:7
168:22 173:19
212:19 219:6,7
223:18 225:6
226:9,15 229:5
229:11 236:21
236:22 237:19
237:25 238:8
241:13 242:19
244:12
**cases** 34:25
73:11 79:10
81:25 180:6
195:10,11
203:14
**cause** 64:19
80:21 118:12
119:8 132:18
135:21 137:12
152:2 158:14
211:18 249:6
**causing** 58:16

**cctv** 207:12,15
**cell** 60:1 115:3
115:23 131:21
131:22,22,23
140:17 142:6
149:13 151:21
183:24 184:4
185:25 186:7,9
186:23 189:14
201:20 202:10
202:20,25
204:18 221:1
235:14,24,25
236:1,5,17,18
**cells** 202:6
**center** 13:18
43:19 85:10
123:17 131:1
162:24 175:3
175:10,12,16
175:18 176:11
176:14,15
193:8,15,16,19
207:6 208:16
208:19 212:2
**centers** 30:4
**central** 2:5
248:25 249:8
**certain** 82:23
**certainly**
116:25 174:12
188:13
**certificate**
41:23 258:1

259:1
**certified** 5:18
262:16
**certify** 258:4
259:2
**cfr** 97:23 170:7
170:18
**chain** 193:7
**chance** 93:23
213:9
**chandra** 1:11
2:2 6:8 15:13
130:1 132:24
139:17 151:24
153:17,22
164:17 168:6,9
169:1
**change** 24:18
135:3 156:21
157:15,21
202:20 260:4,7
260:10,13,16
260:19
**changed** 157:3
203:4 218:19
**changes** 261:6
262:9
**changing**
242:23
**chaplaincy**
67:23
**charge** 79:2,5,9
79:16 126:5
171:3

Page 11

[charged - color]

charged   79:1
  126:6,7,12
  151:7 166:25
  169:19
charges   79:6
  146:14 161:17
check   26:22
  40:15 114:2
  163:13 197:4
checked   112:21
  142:21
checks   45:13
  205:2
cherry   248:14
  249:3
chief   17:20
  18:1,12 105:23
  109:25 112:24
  113:6,12 114:6
  114:12,16
chosen   80:1
circumstances
  218:25 219:1
  239:25
city   2:14
civil   1:7 251:23
  253:10 255:10
cjc   46:21 124:5
  189:4 191:3,4
  201:7
cjcs   31:3 44:25
  47:9,11 50:19
  118:7

claiming
  171:23
claims   155:3,7
  160:1 165:14
  166:14 172:6
  180:16
clarify   44:14
  67:25 213:6
  215:23 221:18
  222:3 235:20
  240:23 242:1
class   36:22
classification
  3:14,23 42:6,8
  42:19,24 51:25
  52:19 53:4
  54:11,14,18
  55:5 56:5,6,11
  56:13,25 57:6
  57:10,14,15,17
  57:22 58:23
  61:15 75:25
  101:8 102:2,4
  106:16 107:10
  107:20,22
  108:6,10,18
  110:10,23,25
  111:3 112:5
  114:24 115:2
  115:13,16
  116:10 117:13
  123:15 124:1
  124:16 125:18
  130:15 140:11

142:7,8 143:10
  143:20,24
  145:12 146:1,2
  155:13 156:24
  157:12,13
  177:1,22
  178:10,10,20
  179:11 181:21
  184:10 186:18
  187:11,15
  188:21 191:17
  201:3 202:2,11
  204:8 217:4,20
  222:9,12,13,15
  233:20,21
  234:1,20,21
classifications
  157:7 179:10
classified
  222:18
classify   57:16
  114:25 177:2
classifying
  177:15
classroom
  38:14,22
clayton   90:21
clear   192:7
  218:4
clearly   96:22
clerk   5:3 81:21
  82:5,6 159:18
  159:19

client   14:15
  81:12 111:12
  206:24
clients   81:13
  95:22
clinic   21:21,21
  54:2 55:25
  134:23 219:10
  246:25 247:4
  247:10
close   49:20
  125:4 201:20
closed   194:15
  198:7 228:6
closing   179:21
cloud   166:10
clues   39:2
code   33:8 115:2
  115:12 121:16
  122:9 144:4
  233:18,20,21
  233:23 234:2
  234:11,18
codes   146:22
codified   191:3
cognitive   175:7
collect   172:9
collected
  169:25 199:3
collecting
  160:8
college   16:8,9,9
color   157:16

**[column - conduct]**

**column** 92:11
143:13
**come** 37:9,10
39:17 41:8
43:1,17 44:4
45:7 56:19
65:19 116:18
128:1 130:6
175:13 177:3
181:12,13,15
182:16 219:23
221:2,7,15
222:1 224:22
224:24 227:22
236:19 241:9
**comes** 44:2
46:4,23 59:24
65:20 74:16
78:12 100:10
100:25 101:2
114:18 116:15
119:8 160:3
163:21 174:19
211:15 241:2
**coming** 36:21
36:24 37:1
191:9 222:2
230:15
**command**
29:25 99:8
100:10,14,23
101:4 123:17
123:18 191:8
240:3

**commands**
20:16
**common** 50:16
242:7
**commonplace**
238:22
**communal**
131:20
**communicate**
61:24 62:1
116:19
**communicates**
116:21
**communication**
62:3 210:24
212:9
**community**
19:25 142:4,12
**companies**
96:19
**company** 26:11
27:13 63:9
94:20 95:17
**complaint**
143:23 165:1
211:19
**complaints**
62:13
**complete** 16:21
30:13 39:15
41:22 74:13,22
164:4 172:21
173:3 180:8
199:8 261:8

**completed**
20:13 75:3,5,7
75:9 87:20
139:4,24,24
143:20 153:7
163:25 164:1
169:14 172:21
173:7 174:3
196:21 197:1
197:20,23
198:3
**completely**
250:22
**completing**
39:14 74:24
75:1 173:9
174:4 181:1
**compliance**
28:4 76:19
90:2 91:12
93:14 98:14
124:4 156:2
196:11,22,25
197:12,16,18
198:10
**compliant**
54:12 86:8
89:9 100:2
**comply** 34:7
93:6 197:15
**components**
98:2
**composition**
98:25 99:12

**comprehensive**
179:3,6
**computer's**
245:18
**concern** 113:20
139:4,21
140:23 153:21
153:21,23
**concerned**
106:5 169:4
214:8 242:14
244:10
**concerns**
114:18 138:9
139:17 153:19
169:5
**conclude**
179:18
**concluded**
243:19 257:8
**conclusion**
162:8 164:4
194:20 227:11
227:12,13,23
228:1 243:19
244:8,12
**conclusions**
194:3
**condition** 58:15
228:20 231:9
**conditions**
204:1
**conduct** 37:15
45:13 97:15

Page 13

**[conduct - correct]**

| | | | |
|---|---|---|---|
| 124:6 145:5 | connects | contacting | copies 91:25 |
| 146:14,15,19 | 116:22 | 133:20 | copy 40:19 |
| 146:19 147:7 | consequence | contacts 55:21 | 91:8,19 256:13 |
| 152:17 156:17 | 234:25 | contains 78:5 | 262:16 |
| 169:10 170:24 | consider | contemporan... | coretrack |
| 186:2 | 118:15 230:8 | 189:24 | 189:11,12,25 |
| conducted | consideration | context 99:2,15 | 191:11 |
| 242:17,19 | 98:24 | contractors | corner 111:15 |
| conducting | considered | 35:21,25 37:13 | 112:13 148:8 |
| 19:24 145:24 | 217:13 235:7 | 45:4,7 | 208:20,23 |
| conducts 21:25 | 235:13 236:4 | contributed | 247:7 |
| 192:14 | 238:6 239:8 | 159:1 | corporate |
| confident | considers 99:12 | control 14:2 | 94:21 95:9,11 |
| 209:19 | consist 36:1,2 | 30:4 100:1 | 95:20 96:24 |
| confidential | consistent | 207:6,24 | corporation |
| 3:11 105:4 | 125:12 129:25 | 208:16,19 | 2:4 |
| confinement | 205:23 | 212:2 | correct 11:16 |
| 58:15 204:1 | constitute 5:25 | controls 44:19 | 14:1,3,13,16 |
| confirm 105:10 | constitutional | 45:24 | 17:9,22 18:4 |
| 106:19 | 212:19 | conversation | 20:8 21:5 |
| confused 134:4 | consulting | 8:15 215:25 | 25:20 26:13 |
| 134:22 224:12 | 26:10 27:14 | conversational | 28:2 31:4 |
| 226:21 243:12 | cont'd 4:1 | 9:8 | 33:10,20 38:4 |
| congrats 17:10 | contact 35:10 | conversations | 38:16 43:9,9 |
| congress 1:22 | 39:3 53:20 | 14:15 | 47:18 51:18 |
| connect 124:15 | 114:1 133:25 | cooperating | 53:2 65:13,15 |
| 175:13 176:21 | 150:15 175:2,4 | 245:18 | 72:12 73:3,4,6 |
| connected | 176:20 223:16 | coordinator | 77:9,14 94:24 |
| 82:20 133:1 | 230:19,24 | 84:15,15,17,19 | 94:25 95:3,25 |
| connecting | contacted | 84:22,25 85:12 | 96:1,11,17 |
| 19:25 | 132:23 133:6 | 90:13 161:20 | 100:24 108:19 |
| connection | 133:10,15,17 | copied 108:8 | 111:17,20 |
| 8:23 61:19 | 133:18,24 | 231:19,19 | 112:17 113:2 |
| | 151:12,17 | | 116:4,5 118:5 |

**[correct - county's]**

| | | | |
|---|---|---|---|
| 122:4 127:17 | 261:8 | 20:22 22:5,19 | 140:24 143:2,7 |
| 130:2,3,8 | **correctional** | 23:10 24:1,9 | 145:5,16,19 |
| 136:11 138:1 | 25:21,23 43:25 | 24:12,15,22 | 151:20 160:14 |
| 141:11 145:17 | 44:3 49:24 | 25:14 26:11 | 160:21,22 |
| 148:23 154:23 | 50:9 77:17 | 28:12,14 30:9 | 161:2,5,6,24 |
| 154:24 158:11 | 78:16 | 31:21 32:3 | 164:6 169:9,25 |
| 158:14 159:13 | **corrections** | 33:1,6,13,18 | 170:15,24 |
| 159:16 164:24 | 261:6 | 34:6 36:21 | 171:10 172:8 |
| 166:5,24 167:1 | **correlate** | 38:11 40:13,24 | 172:20 175:21 |
| 168:4 172:7,11 | 112:23 146:23 | 41:21 44:17 | 176:8 177:21 |
| 180:22 183:13 | **correlates** | 45:5,15,23 | 180:8,23 186:8 |
| 183:16 184:14 | 144:6 152:19 | 46:5,17 47:14 | 189:3 191:3 |
| 184:15,19,25 | **corresponden...** | 48:1,4,9 50:19 | 193:18 195:14 |
| 188:18 191:12 | 250:2 | 50:23 51:6 | 197:15 200:12 |
| 201:16,17 | **counsel** 6:24 | 54:12 58:16 | 204:2 208:6 |
| 202:2 203:24 | 27:2 71:10 | 64:21 65:4 | 210:10,18,25 |
| 208:11 209:20 | 94:1 104:2,15 | 68:1,2,6,7,13 | 211:14 214:13 |
| 211:12,13 | 105:15,22 | 70:13,19 71:1 | 214:17 215:9 |
| 212:11 214:10 | 112:24 113:4 | 72:8,14,15 | 237:7 245:8 |
| 215:15,17 | 113:12 114:5 | 76:21 79:18 | 246:21 248:8 |
| 218:7,8,9,21 | 116:25 117:6 | 81:15 82:11,12 | 248:14,20 |
| 220:17 222:19 | 119:23,23 | 83:3 84:1 | 249:16 250:3 |
| 226:11,18,24 | 127:2 152:23 | 85:21 88:15,24 | 250:17 253:14 |
| 227:2,3 229:18 | 190:11 203:18 | 91:8,22,24 | 253:20 255:10 |
| 231:10 232:8 | 204:2,5 207:22 | 94:21 95:17,24 | 260:1 261:1 |
| 233:9,14 235:8 | 258:11,14 | 96:25 98:24 | 262:3 |
| 237:4,8,12,17 | 259:7,10 | 99:11,25 100:8 | **county's** 8:25 |
| 237:22 238:7 | **counsel's** 106:4 | 102:11 104:2 | 14:2 58:25 |
| 238:17 239:13 | **county** 1:15,21 | 105:3,15 | 113:5 118:4 |
| 242:9 243:17 | 2:10 3:18 4:13 | 113:12,15 | 120:13 161:11 |
| 244:4,7 246:4 | 4:15 5:10 6:11 | 114:5,18 | 167:18 168:25 |
| 247:4,19,21 | 6:14 13:15,25 | 117:15 118:8 | 170:4 191:6 |
| 250:21 251:20 | 14:7 17:6 | 123:21 124:6 | 201:6 251:2,18 |
| 254:1 256:3 | 18:23 19:2 | 125:11 139:19 | |

Page 15

[couple - days]

couple  34:15
  56:12 86:9
  135:24 245:2
  255:23
course  31:5,24
  31:25 34:17
  35:4 36:16,20
  37:3,4 39:14
  170:19 171:10
  175:4 226:12
  230:13
courses  35:5,6
court  1:2 8:14
  8:24 12:1,4
  58:1 105:5
  106:11 208:2
courtesy  91:23
covered  98:21
create  32:22
  44:1,4 60:5
  90:7,14 93:1
  93:23 161:23
  174:13,17,20
created  33:15
  35:23 40:9
  47:6 66:16
  89:13 91:3
  93:13 98:22
  127:25 130:6
  178:12,14
  199:6 217:2
creates  86:1
creating  31:16
  32:14 41:16

89:24 93:11,13
creation  42:12
  43:14 90:22
crime  78:25
crimes  34:21
  34:25 46:9
  82:21,21
  164:13
criminal  16:13
  35:2 78:22,24
  79:1,9,13 80:7
  82:14 83:6,15
  83:23 169:13
  169:15 171:2
  171:12,17
  172:15 194:15
  199:6 205:7,10
  211:7
criminally
  79:25 80:9
  171:22,24
  172:3
crisis  176:9,10
  176:15
cristal  248:15
cry  213:19
current  10:13
  17:5,12 19:14
  46:2 84:15
currently  6:13
  16:9,12 80:18
  171:14 198:9
  222:10

custody  100:1
  154:12 186:16
  201:21
custom  192:19
  250:16
customers
  174:21
cv  1:8

d

d  3:1 5:1 20:20
d116  33:1,15
  55:3
daily  139:1
  203:16 204:7,9
dallas  2:6
dan  2:19 6:3
danger  49:3
  239:5
dariah  129:11
  132:23 133:1,6
  133:15,19
  150:15 151:16
data  170:1,12
  170:13 172:9
  189:18,18
  199:2
database  82:1
date  1:19 10:4
  23:25 111:15
  112:12,15
  137:15 140:13
  171:1 199:11
  199:13,21,21

210:16 214:21
  215:4,6 246:16
  247:17 248:10
  253:17,20
  260:24 261:12
date's  126:15
dated  27:7
  191:25 251:16
dates  241:7
day  36:14,23
  36:25 37:2
  74:14 75:6
  113:1 120:10
  120:11 135:24
  143:13,19
  144:1 163:2
  179:24,25
  196:18 202:6
  202:10,18
  204:6 211:3
  244:24 261:15
days  118:17,22
  119:18 120:20
  166:8,14 179:3
  179:21 194:3
  194:20 199:16
  199:24 200:3
  200:16,24,24
  202:9 204:10
  204:20 211:5
  215:1,2,4,6,8
  220:20 221:11
  235:14 251:3,8
  252:22 253:21

Page 16

254:11 255:1
**deal** 14:17
67:12 110:21
219:24
**dealing** 75:23
100:25 101:1
160:11 237:11
**deals** 66:22
100:8 110:23
138:25
**dealt** 168:22
**decade** 37:18
37:19 237:3,4
**december** 17:2
17:3 22:16,16
23:6,6,25 24:3
24:7,11 29:18
62:10 248:3,11
248:13,22
249:5,16 250:3
251:16,19
252:21,22
253:17 254:11
254:15 255:6
**decide** 57:11
**decided** 136:15
**deciding** 79:25
**decision** 56:3,4
84:8 95:5
143:8 228:4,6
**declare** 261:4
**dedicated**
36:14

**deemed** 261:6
**defend** 254:7
**defendant** 1:16
2:10 6:11 9:1
95:21 110:3
248:17
**defendants**
106:7
**defender**
231:13 232:22
232:24 233:2
**defender's**
104:3 105:16
113:5 114:5
117:1 203:18
**defense** 14:5
127:2 152:22
**deficits** 175:6,7
**defined** 253:9
**definitely** 12:14
102:4 174:22
225:15 233:11
241:21
**definition**
49:17,18 50:4
**degree** 16:21
**deliberate**
212:10,14,19
**demonstrating**
99:12
**dental** 67:22
**denton** 2:12
14:5

**department**
3:19 63:13
**departments**
61:20
**depend** 69:17
177:14
**depending**
53:24 70:3
132:19 218:24
219:1
**depends** 48:20
69:21,25 72:5
167:8,9 168:21
180:10 229:5
**deponent** 94:23
261:3
**deposed** 173:20
**deposition** 1:18
5:8,23 7:6,12
7:23 8:6 10:25
11:14,17 258:1
262:4
**deputies** 19:4
90:3,19
**deputy** 158:16
223:20 224:13
**dequon** 1:12
6:9 15:13
132:25 135:18
146:16 152:1
154:11 166:13
169:1,12
177:10 182:9
187:25 206:24

209:5 245:12
245:14 246:7
248:17
**dequon's** 130:1
138:5 153:17
164:21 165:9
168:6 170:1,25
196:2
**describe** 51:22
68:20
**describing** 68:3
**description** 3:9
4:2 72:10
**designated**
202:25
**desk** 115:10
**despite** 255:12
**detail** 90:19
**details** 34:17
211:22
**detect** 51:14
**detention** 20:18
20:21 28:15,16
28:23 29:1,17
29:21,25 30:1
30:2,8,12,15
32:2 62:6 88:8
128:3 129:2
148:18 150:12
160:6 168:20
172:20 173:3,6
173:8,20,21
174:19 189:8
189:16,24

Page 17

**[detention - doing]**

190:7,8 192:6
218:20 236:24
237:10,14,24
**deter**  50:8
51:14 161:21
**determination**
217:4
**determine**  77:7
111:2 132:10
160:14,23
161:2,7,11,25
164:7 184:8
195:14
**determined**
132:12,15
134:3,21
179:10
**determines**
201:20
**determining**
99:1,14 124:21
156:1
**deterrence**
51:10
**deterring**  77:24
**developed**
85:22 99:8
**dick**  154:4
**difference**
78:21 97:18
101:15,23,25
102:3,7,10
181:8,9 203:9
216:9,11,12,14

**different**  30:3
31:11 34:22
35:11 36:20,24
39:5 47:16
53:18 61:19
69:13 70:24
73:10,10,12,13
73:14 77:6
84:20 102:9
103:13 128:12
128:12,16
140:13 164:3
167:22,24,25
168:1 195:20
202:20,20
226:5 241:1,7
250:23
**differentiate**
84:3
**differently**
57:24
**digging**  224:4
**digital**  189:25
258:8 259:3
**direct**  17:21
62:5 78:11
100:13 166:2
**directed**  65:11
100:22 179:11
188:20
**directly**  56:19
90:23 97:21
116:17,19,21
116:23 117:7

138:16 182:8
**directs**  47:20
47:25
**disciplinary**
3:16 4:4
125:24,25
126:2,4,5,9
127:19 128:8
130:15,17
146:13 148:8
148:10,12
202:22 203:13
**disciplined**
126:8
**discrepancies**
7:19 154:21
**discrepancy**
56:9
**discuss**  14:12
**discussed**  72:6
82:8 153:16
165:19 176:8
191:15
**discussing**
27:11 83:4
190:4 246:6
**discussions**
93:4
**displaying**
69:19 150:9
**distict**  1:2
**district**  1:1
8:25 79:2,15

**division**  1:3
34:16 192:12
192:14,20
**dna**  74:18
**document**  29:7
92:1,5,24
108:12 110:9
110:10,18
111:1,22 112:1
112:8,19
125:14 127:4
134:2 137:5
140:9,11,12,23
143:2 146:10
146:16 148:5
148:13 149:16
149:24 152:20
153:11 158:7
159:14 173:9
183:21 189:3
201:3,11 202:3
234:8 247:2
250:11
**documented**
177:11 191:11
**documents**
7:16 47:6 91:1
91:25 103:2
105:2 180:24
191:13 200:15
202:12 216:16
233:16 253:8
**doing**  21:12
25:8,9 30:5

Page 18

**[doing - email]**

32:18 38:6
53:4 67:18
72:25 82:14,22
83:23 94:5
128:16 139:13
155:24 156:13
158:14 160:7
162:3 173:21
177:16,25
180:9 211:7,18
211:20 241:4
**domestic**
 176:17
**double** 202:24
**doubt** 83:8
**doucet** 90:21
**drafted** 165:2
**dress** 154:6
**driver's** 36:7
**drugs** 10:19
**due** 60:7
 103:20 105:24
 112:3 121:19
 122:10 144:7
 192:9 219:13
 233:23
**duly** 6:20 258:5
**duration**
 137:14
**duty** 117:16

**e**

**e** 2:1,1 3:1,8 4:1
 5:1,1 19:11,12

63:6,7 149:5
 203:2,2 260:3
 260:3,3
**e1** 149:18,19,20
 149:20
**earlier** 19:13
 47:2 100:17
 130:5 140:13
 146:11 155:11
 164:25 165:13
 172:14 176:25
 193:25 203:17
 216:15 218:17
 221:10 224:15
 226:25 227:20
 228:8 231:21
 233:16 234:19
 235:3,5 236:23
 239:17 240:19
 241:23 242:15
 243:23,24
 244:2
**easygoing** 9:13
**ed** 17:18
**education** 6:13
 19:16,19 21:11
 28:10 35:18
 36:7,13 45:22
 45:25 46:3,5
 46:19 48:5
 61:17 83:2,8
 179:4 196:14
**educational**
 15:24

**effect** 11:25
 106:10
**effectuate**
 66:18 67:7
 77:25 78:7
**effort** 76:20
**egregious**
 156:2
**egret** 2:13
**eight** 25:8,18
 29:7 31:24,24
 32:10 39:15
 40:7,22 41:22
 78:4
**either** 12:11
 13:11 46:25
 47:4 50:22
 55:7,8 56:13
 57:22 65:11
 79:3 90:3
 93:14,24
 105:11 111:10
 134:20 142:7
 153:4 166:2
 175:14 254:9
**elaborate**
 214:15
**electric** 86:11
 86:13 87:19
 88:10 89:2
 93:5
**electrical** 96:19
**electricity**
 94:19 96:18

**electronic**
 189:12
**electronically**
 253:8
**electronics**
 63:1
**element** 83:21
 124:3 177:24
**elevator** 246:13
**eliminate** 50:6
 50:8 51:14
 89:8
**elimination**
 15:20 18:6
 25:3 27:7
 30:13 35:19
 43:7 44:15
 49:23 51:9
 68:23 70:16
 72:7 191:2
**else's** 49:3
**email** 3:11,12
 3:13 4:10,11
 4:14,17,19
 56:24 57:2
 104:1,5,12
 105:14,21
 106:3,13,16,17
 106:20 107:7,9
 108:17 109:6
 109:24 110:4,6
 112:24 113:6
 113:21 114:6
 117:4 119:22

Page 19

[email - evidence]

122:1,25 133:2
157:5 158:20
159:6,9 163:1
163:3,8,14,16
163:19,25
191:25 192:5
193:5,7,10,15
204:5 207:8
210:4,14,24
213:15,16
231:11,19
232:1,4,9,11,13
232:19,20
233:1,3 245:8
246:11,22
247:2,5,9
248:1,2,14
249:8,9,12,23
249:24,24
250:12,13,17
250:19,21,23
250:24 252:24
**email's** 163:22
**emailed** 116:17
  250:24
**emailing**
  113:17 117:1,7
  210:10,19
**emails** 113:12
  113:18 218:3
  226:20 227:19
  228:7 230:15
**emphasis**
  221:20

**employed**
  11:13 13:14
  22:19 28:8,10
  35:17 60:14
  249:4 258:11
  258:14 259:8
  259:11
**employee** 28:13
  64:21 66:22
  67:2 88:11
  95:16,19,21,24
  177:25 258:13
  259:10
**employees**
  13:25 18:24
  37:15 40:24
  41:21 44:18
  45:4,14 48:1
  50:24 160:23
  161:2,7,24
  164:6 175:21
  210:18 250:3
  250:19,19
**employer** 17:5
**employment**
  23:9,24 24:1
  28:8 62:10
  172:19 173:2
**enabled** 195:16
  196:2
**enacted** 15:22
  25:4,9,11,12,19
  30:9 49:23

**encompass**
  251:24
**ended** 16:23
**enforcement**
  22:6,9 24:5
**enter** 42:5
**entering** 81:25
**entire** 37:5,19
  113:5,10 117:1
  125:2,2 163:25
  188:16
**entities** 193:12
**entitled** 96:15
  96:21 254:8
**entity** 100:7
  116:22
**entry** 6:13
  19:15,16,19
  20:1,6 21:10
  61:16 196:14
**equal** 200:15
**equipment**
  67:16
**errata** 262:10
  262:12,13
**error** 178:2,8
**es** 258:4
**escalated** 117:2
**escape** 239:4
**escapes** 52:14
**escorted**
  134:22 218:23
  219:10 220:11
  235:16 237:21

**esi** 253:9
**especially**
  56:19 75:9
  119:11 146:20
**esquire** 2:3,11
**essentially** 47:7
  61:23 98:16
**establish** 255:5
**estimate**
  194:24
**et** 1:5 5:9 260:1
  261:1 262:3
**ethos** 188:16
**evaluation**
  134:23 211:18
  228:11 229:20
  243:15
**event** 38:10
  55:24 74:22
  113:7 152:12
**events** 38:8,14
  69:16,22,23
  70:9,14,20
  71:2,25 72:9
  72:15 73:15
  151:25
**eventually** 56:2
**everybody** 68:7
**evidence** 75:10
  83:6 137:1,8
  160:9,12
  181:11 187:18
  187:24 204:23
  227:17,18

Page 20

**[evidence - fails]**

244:3 248:7,22
249:15 251:15
251:21,22
252:19 253:14
255:7
**evidentiary**
5:22
**exactly** 20:23
133:23 200:13
**exam** 19:3
**examination**
3:2 7:1 213:1
244:20 255:19
**examined** 6:22
**examiner** 75:11
198:16
**examiner's**
74:19 75:11
160:9
**example** 38:18
**examples** 191:5
**exams** 160:8
**executive** 65:21
65:21
**exercise** 9:5
**exhibit** 3:11,12
3:13,14,16,18
3:21,23 4:4,6,8
4:9,10,11,12,13
4:14,15,17,18
4:19 104:23,24
106:3 107:2,3
107:4 108:13
108:14,20

109:23 112:8
112:10,23
114:21 120:2
121:13,15
125:16,20,21
126:23,24
128:22 133:5
135:4,6 136:19
136:20 140:5,7
143:13 146:5,6
147:9,22,23,24
148:5 150:20
150:21 152:16
152:22,24
153:12 156:21
158:3,4 162:15
162:17 182:3,5
187:2 188:25
189:1 190:25
191:21,23
199:10 201:6,9
203:17 207:9
207:10 209:11
209:11 224:3,5
228:8 245:3,4
247:22,23,24
252:2,14
**exhibiting**
139:2
**exhibits** 7:12
245:3
**exist** 77:8 99:24
120:14,14
194:5,8,11

255:11
**existed** 88:17
100:3 165:24
**existing** 237:20
**exists** 200:12
211:1
**expect** 66:3
76:21
**expected** 66:15
**experience**
29:10 220:22
232:13,14
**experienced**
217:8,9
**explain** 52:8
61:21 101:14
**expose** 185:11
**expressway** 2:5
**extent** 220:6
**external** 46:3
46:11 174:23
175:7
**extra** 56:17
106:6
**eyes** 167:17,18

**f**

**f** 183:18,19
**f5** 183:9
**fabricating**
160:15,24
161:3,8,12,14
161:18,25
162:6,9 163:4

164:7,18
**face** 165:16
**facilities** 25:21
25:23 44:3
50:1,10 51:15
77:18 78:16
**facility** 28:4
49:24 85:21
86:6 93:5,15
97:16 123:21
124:17,20
140:3 195:15
196:22 201:22
201:23 217:10
**facility's** 98:2
**fact** 1:12 6:8
25:22 68:19
163:23 215:11
220:2,12 225:7
226:17 233:1
255:12
**factor** 177:13
186:10
**factors** 176:23
176:24 230:7
241:4
**facts** 49:5
134:12 214:25
230:5
**factual** 122:19
156:7 159:4
**failing** 34:6
**fails** 262:15

[fair - floor]

| | | | |
|---|---|---|---|
| **fair** 12:9,10 | 44:22 57:25 | **finish** 71:11 | **floor** 60:8 |
| 134:11 179:8 | 251:23 253:10 | **finished** 23:21 | 115:7 117:11 |
| 210:18 | 255:10 | 75:12 | 118:13,14 |
| **fairly** 9:13 | **feel** 56:20,21 | **firm** 14:5 58:13 | 119:7,13,14 |
| **faith** 76:20 | 143:23 | **first** 6:20 10:25 | 120:7 122:14 |
| **false** 211:2 | **feels** 49:2,3 | 11:18 16:17 | 123:6 128:1,4 |
| **falsifying** | **fellow** 166:15 | 19:14 21:1 | 128:18 129:3 |
| 188:12 | 250:19 | 23:25 26:19,19 | 129:12,20 |
| **familiar** 45:10 | **female** 152:5 | 26:21 28:13 | 131:8 141:21 |
| 61:11,13 149:8 | 152:10 | 34:9,19 36:23 | 142:2,5,14,18 |
| 189:6 201:11 | **feminine** | 37:20 41:18 | 142:19,23 |
| 212:14 237:6,6 | 217:13 | 42:5 53:8 | 143:3,8 144:12 |
| **familiarity** | **figure** 175:14 | 64:12,16 68:12 | 144:16,24 |
| 75:15 | 185:2 | 85:5 100:18 | 149:1,2,13 |
| **families** 162:6 | **file** 15:4 79:2 | 126:14,14 | 153:24 154:1,6 |
| 245:2 | 79:16 199:8 | 127:3 128:1 | 154:7,21 |
| **family** 15:12 | **filed** 130:24 | 165:9 167:12 | 155:19,20 |
| 151:20 152:4,5 | 131:1 150:1,14 | 177:3 183:5,8 | 165:23 166:21 |
| 152:10 154:2 | 161:17 | 184:24 208:22 | 167:16 173:24 |
| 160:14,17,23 | **filing** 103:2 | 210:14 225:19 | 173:24 183:4,5 |
| 161:25 164:7 | **fill** 149:21 | 226:15 230:12 | 183:6,18,19 |
| **far** 214:7 237:9 | **final** 228:4 | 230:14 232:15 | 184:3,5 185:8 |
| 238:12,14 | **finally** 87:14 | 245:10 247:6 | 185:18,20 |
| 242:13 244:9 | **financially** | 247:13 | 186:23 187:2,3 |
| **fast** 23:12 | 258:15 259:11 | **fisk** 86:10,13 | 189:9 200:4,15 |
| 40:25 41:1,3 | **find** 19:23 71:9 | 87:19 88:10,11 | 200:17,20,21 |
| 208:24 | 104:22 137:9 | 89:1,4 93:5 | 200:25 201:2,4 |
| **fcc** 206:25 | 152:21 199:10 | **five** 9:10 37:24 | 201:5 202:14 |
| 208:21 209:7 | 203:7 227:17 | 38:2 45:14 | 202:19 204:15 |
| 247:6,14 | **finding** 241:9 | 58:4 200:2 | 206:25 207:3 |
| **federal** 8:24 | **findings** 171:17 | 216:18 239:22 | 208:9,16,18,19 |
| 15:21,22 25:11 | **fine** 32:8 127:9 | 239:24 | 208:21 212:1 |
| 25:12,24 30:24 | 257:1 | **fix** 67:13,24 | 220:18 223:3,6 |
| 30:25 33:8,20 | | | 246:13 247:6 |

**[floor - further]**

247:13

**floors** 42:11
43:13 128:19
174:10 181:23
181:25

**fly** 208:2

**flyers** 45:17

**focus** 67:15

**folder** 91:22,24
115:9

**folks** 14:4 59:4
60:14 81:9
89:4 92:23
155:20 157:7
157:12 179:11
193:7

**follow** 33:19,21
33:24 47:15
52:24 53:7
118:4,8 170:5
170:15 211:14
213:4 244:22
244:23

**following** 47:21
48:2,6,11
51:23,24 54:25
74:5 77:1,5
114:7 198:16
198:23

**follows** 6:22
153:22

**food** 154:2

**foot** 80:6

**footage** 135:17
136:25 137:5,7
137:22,23,25
165:22 186:4
207:13,16
209:3 212:5
255:9

**forbid** 72:8

**force** 11:25
132:3,9,15
225:5

**forced** 60:7
165:15

**foregoing**
258:3,4 259:4
261:5

**forensic** 198:15
198:16,22

**form** 3:11,16
4:4 31:6,12
45:11,13 46:8
48:17 59:5
60:10 62:16
63:18,24 64:5
68:4 75:17
83:18 88:18
91:13 99:4
108:23 109:16
113:8 114:9
116:12 117:19
118:19 119:20
122:5,21 123:9
123:24 125:25
127:23 134:15

138:22 144:18
145:1,10
149:20 150:4,5
155:5 166:16
167:7 169:2
172:23 173:22
174:5,14 178:4
185:14 187:21
188:3,7 192:23
193:13,21
195:17 196:5
198:18,25
199:4 200:5,19
204:11 205:5
205:21,24
207:14,20
211:10 214:5
222:20 225:12
228:25 231:24
234:4 235:18
236:8 238:10
238:13 249:20
250:6 251:12

**former** 6:13
33:15 98:23
178:13

**forms** 45:16

**forth** 77:1
145:15 149:16

**forward** 23:12
40:25 41:2,3
208:24

**forwarded**
34:25 104:13

105:11,14

**forwarding**
104:1

**found** 20:13
98:20 196:16
227:18 242:22
243:11 253:5

**four** 28:24
36:24 46:16
154:1,2,21
190:21 215:1,2
215:4,6 216:18
257:4

**fraudulently**
174:4

**frcp** 253:15

**free** 175:2,4

**front** 7:11
97:24 105:6
146:21 158:7
170:16 209:7

**full** 8:19 36:14
48:25 59:12
96:16 154:6

**fun** 208:1

**function** 67:4

**functions** 67:21
93:21

**funding** 33:22
33:22 34:1

**funny** 120:12

**further** 86:17
146:23 165:14
179:20 180:19

Page 23

**[further - going]**

| | | | |
|---|---|---|---|
| 185:12 244:18 | **generally** 51:22 | 79:11 80:3 | **going** 7:5,9 9:8 |
| 244:23 255:17 | 82:10 178:18 | 97:10,15,21 | 9:13,13 12:6 |
| 256:8 258:13 | **generated** | 105:18 106:20 | 14:20 15:10 |
| 259:9 | 134:24 | 107:17 108:5 | 17:7 19:7 22:1 |
| **future** 39:3 | **genuine** 169:1 | 108:11 114:21 | 23:2 24:4,8 |
| **g** | **george** 43:8,10 | 119:23 122:9 | 28:7 33:11 |
| **g** 5:1 | **getting** 15:8 | 123:8 124:22 | 35:14 41:25 |
| **gap** 30:20 | 37:13 46:10 | 125:19 133:3 | 43:13 46:22 |
| **garcia** 1:8 65:3 | 67:1 177:2 | 136:18 140:5 | 49:4,19 54:14 |
| 65:4,12,17,18 | 178:23 192:16 | 147:9 152:15 | 59:24,25 60:2 |
| 65:24 66:3,21 | 208:1 251:1 | 165:5 169:17 | 60:3 67:15 |
| 67:2 76:11 | **give** 11:24 41:1 | 190:14 192:25 | 83:22 85:16 |
| **gay** 154:1,2,6 | 48:24 49:18,19 | 194:25 197:4 | 92:18 95:4 |
| 154:10 | 55:8 57:18 | 198:8 219:8 | 97:6 101:4 |
| **geared** 78:13 | 78:11 84:4,7 | 223:11,16 | 104:22 108:20 |
| **gender** 134:17 | 87:21,22 102:5 | 224:4 225:14 | 116:19,23 |
| 178:10 | **given** 11:13 | 229:2,25 231:7 | 117:2,7,24 |
| **general** 101:9 | 41:22 42:2 | 243:15,21 | 120:2 125:19 |
| 104:2 105:15 | 58:17 67:2 | 245:2 252:2 | 126:22 128:19 |
| 105:22 106:4 | 74:18,19 90:17 | 256:22 | 129:2 130:15 |
| 112:6,23 113:4 | 90:18 128:5 | **goal** 66:18 | 135:2 136:13 |
| 113:11 114:4 | 197:20 261:9 | 67:13 84:9 | 136:15,19 |
| 116:25 117:6 | **gives** 72:18 | **goals** 38:12 | 140:5 142:5 |
| 125:1,3 135:23 | **giving** 10:16 | 51:20 66:4,17 | 150:19 153:1 |
| 138:12 141:23 | 36:22 38:20 | 67:7 77:24 | 158:2 175:14 |
| 141:24 183:24 | 78:18 | 78:7 139:20 | 182:22 183:25 |
| 184:4,7,11 | **go** 11:7 16:1,7 | **god** 55:17 | 185:18 186:9 |
| 203:18 204:2 | 21:20,21 22:20 | **goes** 54:6,9 | 187:25 195:10 |
| 220:21 230:18 | 22:22 24:4 | 55:21 57:7 | 204:25 206:10 |
| 235:24 | 26:17 29:5 | 63:2 130:4 | 207:9 213:7 |
| **generalities** | 39:4,5 41:11 | 155:11 166:23 | 216:16 218:12 |
| 15:11 | 41:12 54:2 | 193:11 222:17 | 218:13 235:10 |
| | 55:25 62:4,8 | 224:21 | 235:11 245:3 |
| | 63:3 71:12 | | 246:23 247:22 |

Page 24

[going - harassment]

254:6,19
**gonzales**    17:18
**gonzalez**    17:22
    18:3,9 27:19
**gonzalez's**
    27:16
**good**    5:4 6:6
    7:3,4 12:5
    14:17 50:4
    76:20 85:2
    248:15
**govern**    54:24
**governs**    46:18
**gp**    123:1
**graduated**    16:6
**grant**    33:22,25
    34:6
**gravitate**    19:22
**gray**    8:22
**gregory**    90:5
**grievance**
    74:11 126:1
**groped**    148:15
**ground**    163:23
**group**    43:17,22
    43:25 44:1,4
**guerrero**    12:20
    13:7,14 18:21
    19:8 22:2
    52:13 80:17,19
    81:16 133:10
    133:25 134:3,9
    134:10,10,20
    135:16 136:6

156:9 158:9
159:9,9,11,23
159:23 162:8
162:10 163:13
165:19 223:22
223:23 227:5
242:20
**guerrero's**
    158:24 243:7
**guess**    7:8 15:16
    20:7 24:18
    30:23 43:10
    50:22 68:19
    81:12 88:2
    112:4 132:18
    154:16 210:4
    241:1
**guessing**    14:20
    107:14 134:19
    249:1 250:23
**guidance**    73:24
    211:15
**guidelines**
    240:21
**guys**    24:4 26:14
    32:14 250:17

|  h  |
| :---: |

**h**    3:8 4:1 20:19
    20:20 26:7
    260:3
**half**    13:4
**hall**    131:19
    140:21,22

207:6 209:9
247:6,14
**hallway**    115:7
    131:10,11,17
    149:14 185:21
    206:25 207:4
    208:21
**hand**    6:17
    220:25 235:14
    235:16 237:21
    246:1 247:7
**handbook**    79:6
**handcuff**    47:21
    48:2 108:22
    118:22
**handcuffed**
    49:11 118:17
    119:18 202:23
    203:16 236:2
**handcuffing**
    48:5,10,15
**handcuffs**
    111:11 188:14
    202:24 216:7
    221:25 236:18
**handle**    158:10
    158:25 159:23
    160:4,11
**handled**    57:24
    158:12
**handling**    156:9
    159:10
**handwriting**
    115:17,25

**handwritten**
    114:22
**happen**    38:19
    39:3 56:23
    57:19 116:11
    136:3 243:2
    244:9
**happened**
    38:21,22,25
    39:11 113:23
    135:23 137:15
    219:16 223:1
    225:2,22
    227:25 243:5
    249:2
**happening**
    56:21 136:8
    204:7
**happens**    11:10
    112:22 178:18
    232:16
**harassed**    80:3
    186:15 224:17
    225:8 226:10
    226:17 229:16
    243:1
**harassment**
    31:7 34:24
    35:5 50:1,9
    51:15 71:5
    79:18 117:17
    224:20 226:23
    243:4

Page 25

**[harassments - hire]**

| | | | |
|---|---|---|---|
| **harassments** 133:22 | 88:15,24 91:8 94:21 95:17,24 | 214:17 215:9 237:7 245:8 | **hearing** 6:15 139:9,12 |
| **hard** 255:6 | 96:25 98:24 | 246:21 248:7 | **heart** 92:6 |
| **harm** 53:1 187:25 | 99:11,25 100:8 102:11 104:2 | 248:14,20 249:16 250:3 | **heavily** 106:6 110:2 112:25 |
| **harris** 1:15,21 | 105:3,15 113:5 | 250:16 251:2 | 114:7 163:3 |
| 2:10 3:18 4:13 | 113:12,15 | 251:18 253:13 | 216:1,4,7,10 |
| 4:15 5:10 6:11 | 114:5,18 | 253:20 255:10 | **heavy** 203:19 |
| 6:14 8:25 | 117:15 118:4,8 | 260:1 261:1 | 204:3,9 |
| 13:15,25 14:2 | 120:13 124:6 | 262:3 | **held** 160:7 |
| 14:7 17:6 | 125:11 131:1 | **he'll** 26:4 241:2 | **help** 44:4 |
| 18:23 20:22 | 139:19 143:2,7 | 241:3 | 106:17 |
| 22:5,19 23:10 | 145:5,16,19 | **head** 23:20 | **helped** 31:23 |
| 24:1,9,12,15,21 | 151:20 160:14 | 43:4 196:22 | 82:24 |
| 25:14 26:11 | 160:21,22 | **heading** 246:25 | **helping** 90:7,14 |
| 28:12,14 30:9 | 161:1,5,6,11,24 | 247:3 | **helpline** 176:21 |
| 31:21 32:3 | 162:24 164:6 | **health** 37:15 | **hereto** 258:15 |
| 33:1,6,13,18 | 168:25 169:9 | 106:11 130:24 | 259:11 261:7 |
| 34:6 36:21 | 169:25 170:4 | 130:25 139:1,3 | **hey** 9:9 11:15 |
| 37:14 38:11 | 170:15,24 | 139:21,25 | 52:22 56:20 |
| 40:13,24 41:21 | 171:10 172:8 | 140:1,2,3 | 75:14 89:7 |
| 44:17 45:5,15 | 172:19 175:10 | 149:25 150:3 | 205:3 250:3 |
| 45:23 46:5,17 | 175:12,16,18 | 150:14 162:23 | **hiding** 98:20 |
| 47:14,25 48:4 | 175:21 176:8 | 164:22 175:16 | **high** 16:1,2,7 |
| 48:9 50:18,23 | 177:21 180:8 | 177:12 193:20 | 141:19 186:17 |
| 51:6 54:12 | 180:23 186:8 | 228:10,16,17 | 203:13 217:3 |
| 58:16,24 64:21 | 189:3 191:3,6 | 228:20 229:20 | 218:1 |
| 65:4 68:1,2,6,7 | 193:8,15,16,18 | 230:2,17,20,22 | **higher** 141:25 |
| 68:13 70:13,19 | 193:19 195:14 | 231:9 | 142:10 177:12 |
| 71:1 72:8,14 | 197:15 200:12 | **hear** 8:3 49:21 | 217:19 |
| 72:15 76:21 | 201:6 204:2 | 82:4 | **highlight** 187:3 |
| 79:18 81:15 | 208:6 210:10 | **heard** 62:21 | **hire** 20:11 |
| 82:11,12 83:3 | 210:18,25 | 160:19 173:8 | 36:13 |
| 84:1 85:21 | 211:14 214:13 | 215:18 | |

[hired - hunter]

| | | | |
|---|---|---|---|
| **hired** 22:5,8 | 81:5,8 98:15 | 36:16 39:14,15 | 141:18,20,21 |
| 23:9 24:21,24 | 98:15 102:18 | 40:22 41:22 | 144:7 145:6,8 |
| 25:2 | 102:25 104:21 | 74:20 78:4 | 145:17,25 |
| **hires** 26:11 | 105:13 118:1 | 102:24 202:5 | 179:9 181:17 |
| 31:5 35:21,25 | 120:4 133:11 | 202:10 | 182:4 187:12 |
| 36:12,19 37:5 | 138:6 142:17 | **hours** 36:15 | 190:9 192:7,9 |
| 37:9 39:13,17 | 143:4 146:8 | 39:22 40:7 | 201:19 221:17 |
| 46:1 | 150:25 155:14 | 74:10,21 103:1 | 221:25 222:9 |
| **hiring** 26:14 | 157:17,19 | 202:18 216:19 | 233:23 |
| **history** 4:12 | 168:24 170:17 | **house** 14:7 79:4 | **houston** 1:3,23 |
| 181:18 182:4 | 179:19 180:1 | 79:4 | 10:8,14 15:25 |
| 241:10 | 180:17 189:5 | **housed** 56:10 | 43:19 175:3 |
| **hmm** 9:11 | 191:18 193:9 | 57:17 59:13,21 | 176:11,14 |
| 10:10 12:23 | 194:1 196:20 | 60:22 101:13 | **houstonian** |
| 14:6,8 15:9 | 196:24 197:2 | 142:3,4,12 | 10:11 |
| 16:5,8,15,20 | 197:14,19 | 165:24 184:6 | **huddleston** |
| 17:4,25 18:8 | 199:20 205:1 | 200:4,17,25 | 90:4 |
| 18:22 19:12,21 | 205:13 220:5 | 203:13 217:5 | **huh** 8:8 9:7 |
| 22:22 23:5,7 | 225:9 227:10 | 219:4 225:24 | 19:16 22:23 |
| 23:11,14,15 | 231:17 233:4 | 230:21 | 23:20 36:17 |
| 25:7,17 26:9 | 233:17 234:10 | **housekeeping** | 255:25 |
| 27:25 28:25 | 240:6 241:24 | 7:9 | **human** 45:13 |
| 29:12,16,23 | 243:10 244:19 | **houses** 142:14 | 83:20 178:2 |
| 30:7,11 31:1 | 251:17 254:13 | **housing** 4:12 | **hundred** 195:2 |
| 32:19 33:7 | 255:2,8 | 51:22,24,25 | 195:5 251:7 |
| 34:4,11 36:11 | **hoc** 155:1 | 54:6,8,25 59:7 | **hunter** 2:3,4 |
| 38:7 39:21 | **holds** 142:11 | 59:17,18 61:5 | 3:3,5 6:6,7,25 |
| 40:23 44:16 | **hope** 84:11 | 101:10 111:2 | 7:2 23:14,18 |
| 45:20 46:15 | **hospital** 19:2 | 113:13 121:19 | 27:2,4,5 48:18 |
| 50:21 52:17,23 | 21:22 199:7 | 121:23,24 | 59:15 60:12,19 |
| 55:14,20 57:12 | **hotline** 53:13 | 122:2,3,10 | 62:17 63:5,19 |
| 58:22 59:2 | 175:5 | 123:22 124:7 | 64:2,7 66:8 |
| 62:12 67:5 | **hour** 13:4,4 | 125:12 131:2 | 68:11 69:12,14 |
| 70:7,18 75:23 | 31:24,24 32:10 | 131:18 141:17 | 71:12,21 75:18 |

Page 27

**[hunter - incident]**

| | | | |
|---|---|---|---|
| 83:19 87:1 | 198:20 199:1,9 | 158:5 162:18 | 51:4 |
| 88:20 89:3,11 | 200:6,22 | 182:6 189:2 | **important** |
| 91:11,14 93:8 | 203:22 204:13 | 191:24 201:10 | 74:17 241:4 |
| 94:4,7,10,14,18 | 205:9,15,18,22 | 207:11 245:5 | **inappropriately** |
| 94:22 95:1,4,6 | 206:2,5,10,13 | 247:25 | 56:10 |
| 96:8,12,15,21 | 206:15 207:17 | **identified**  49:9 | **incident**  3:19 |
| 97:1,3,6,11,12 | 207:21 208:1,4 | 93:24 253:15 | 3:21 4:6,8,9 |
| 99:5,18 101:20 | 210:1 211:11 | **identifier** | 48:24 49:6,13 |
| 101:22 109:13 | 212:18 214:3,5 | 126:16,18 | 49:14 52:2,6 |
| 109:17 112:7 | 214:25 222:20 | 182:20 210:8 | 53:12 59:14 |
| 113:9 114:10 | 225:12 228:25 | **identify**  6:5 | 60:2 61:8 |
| 116:13 117:20 | 231:24 234:4 | 97:16 125:12 | 78:20 126:16 |
| 118:20,24 | 235:18 236:8 | 213:12 | 126:19 127:1 |
| 119:16 120:1 | 238:10,13 | **illness**  106:11 | 127:12 129:6 |
| 120:18 122:6 | 244:21 248:17 | 150:10 | 129:14,21 |
| 122:18,22 | 249:18,21 | **immediately** | 131:3 134:13 |
| 123:12 124:2 | 250:4,10 251:9 | 20:11 54:2 | 136:24 137:1,8 |
| 127:21 128:7 | 251:14 252:12 | 55:25 60:4 | 137:13,17,20 |
| 134:16 135:1,6 | 254:2 255:17 | 67:20 | 137:24 138:10 |
| 135:8,15 139:6 | 255:23 | **impact**  215:13 | 145:20 147:6 |
| 144:20 145:2 | **hunter's**  235:4 | 225:10,16 | 147:10 148:8 |
| 145:13,22 | **i** | 228:2,20,22 | 148:24 149:4,5 |
| 147:23 148:2,3 | | 229:21 | 149:7,22 150:9 |
| 150:6 155:9 | **iad**  192:9,11 | **implement** | 150:13 151:1 |
| 160:18 166:18 | **ian**  26:2,8 | 33:12 44:25 | 152:20 153:13 |
| 167:11 168:18 | 27:11 85:5 | **implementati...** | 161:15 165:9 |
| 169:8 173:1,14 | **idea**  76:1 | 25:15 | 165:10 167:12 |
| 173:18 174:1 | **identification** | **implemented** | 171:21 179:17 |
| 174:11,15 | 104:25 107:5 | 25:13 30:22 | 179:20 180:18 |
| 178:6 185:15 | 108:15 112:11 | 50:20 66:16 | 180:19 181:2 |
| 187:23 188:5,9 | 125:22 126:25 | 191:5 | 184:17 193:24 |
| 190:13,23 | 136:21 140:8 | **implementing** | 194:5,8,11,19 |
| 192:24 193:17 | 146:7 147:25 | 30:10,24 32:15 | 195:13,15,23 |
| 195:18 196:6 | 150:22 152:25 | 38:12 47:17 | 196:1,18 197:1 |

Page 28

**[incident - inmate]**

| | | | |
|---|---|---|---|
| 197:21,22,24 | 47:21 48:2,6 | 217:18 218:22 | 202:15,17 |
| 198:4 211:23 | 48:11,15,21,22 | 219:2,7,13 | 203:12,12,15 |
| 214:22 215:4,7 | 48:22,23 49:4 | 221:13 223:11 | 204:15 205:7 |
| 215:13 | 49:6 52:5,14 | 223:17 225:15 | 217:3 218:1,10 |
| **incidents** 39:11 | 53:24,25 54:2 | 229:6 230:9 | 221:2 235:21 |
| 50:3 61:8,9 | 56:14,15 59:12 | 231:4 232:15 | 236:18 238:22 |
| 71:7 73:9 75:8 | 59:13 60:22 | 235:5 239:3 | **info** 126:6,12 |
| 161:22 164:2 | 61:3,4 62:9 | 240:24 241:10 | 126:15 127:19 |
| 167:10 169:7 | 71:8 73:10,21 | 241:18 242:15 | **information** |
| 244:5 | 73:21 74:13 | 245:17 | 12:24 13:3 |
| **include** 69:15 | 78:25 79:11 | **individual's** | 32:21 46:17 |
| 70:13,19 71:1 | 80:2 84:12 | 49:10 141:19 | 50:23 66:17 |
| 72:15 241:18 | 85:25 87:22 | **individually** | 86:17 153:13 |
| **includes** 50:2 | 100:16 101:10 | 95:9,21 97:1,3 | 193:19 253:9 |
| **including** 8:14 | 101:12 109:6 | 101:13 167:6 | **informed** 133:9 |
| 98:2 241:25 | 109:21 113:7 | **individuals** | 151:12,20 |
| 255:7 | 113:13,19 | 13:12 26:5 | 152:6 |
| **incorrect** | 114:2,12,13,15 | 38:19,21 39:15 | **initial** 42:14 |
| 134:18 | 116:8 124:24 | 40:8 49:24 | 53:22 54:4 |
| **independently** | 124:25 125:2 | 50:24 52:2 | 129:10 156:12 |
| 73:8 | 128:5,17 129:5 | 56:18 57:16,16 | 156:16,17 |
| **indicate** 192:8 | 129:13 132:17 | 59:11,22 62:22 | 158:14 187:12 |
| **indicates** | 132:20 139:2 | 74:3 79:7 84:2 | 214:1 222:23 |
| 111:22 | 143:25 145:21 | 89:5 101:8 | 223:4,6,13,24 |
| **indication** | 148:11,16 | 103:16 107:22 | 223:25 225:18 |
| 110:1 | 150:9,11 | 113:16,18 | 227:5 231:1 |
| **indicative** | 156:14 164:3 | 117:3 134:18 | 232:10,12 |
| 212:9 | 167:9 171:23 | 136:2 141:22 | 242:16 |
| **indifference** | 175:14,15 | 141:25 142:12 | **initially** 43:13 |
| 212:19 | 177:5,6,6,7,8 | 142:14 143:21 | 43:15 203:8 |
| **indirect** 62:7 | 177:14,16 | 154:22 161:21 | **initiation** 128:3 |
| **individual** | 186:13,14,19 | 167:17 174:7 | **injured** 149:21 |
| 21:19,25 27:10 | 191:16 202:15 | 174:12 177:1 | **inmate** 4:12 |
| 31:15 46:11 | 206:21 217:7,9 | 178:11 186:10 | 41:17 42:1,4,9 |

Veritext Legal Solutions
800-336-4000

**[inmate - interviewing]**

42:13 49:8
50:2,2,2 51:20
54:6,6 57:11
61:11,18,22
73:17 79:6
98:25 99:13
113:7,20
118:16 124:11
124:21 132:13
132:20,20
134:21,22
138:9 139:16
144:1 148:17
148:18,20,20
148:21,21
150:17 151:6,6
151:20 153:21
156:21 161:3,7
161:12 163:11
163:17 166:23
168:20 169:4
181:17 182:4
186:15,16
188:12,19
189:7 192:7
201:19 202:23
210:4 211:18
222:9 224:11
224:19,21,25
225:18,21,22
226:1,4 228:19
229:12,13,19
230:9 237:10
237:20 245:23

246:3,24
247:10
**inmate's**
  113:13 193:20
**inmates**   41:15
  41:25 42:2
  44:5 51:13
  54:13 61:23
  62:14 73:14
  85:23 98:3,10
  98:20 99:2,10
  99:15 103:7
  114:7,18
  117:16 154:8,9
  154:13 157:4
  160:2 165:12
  165:15 166:15
  174:24 178:16
  178:18 179:4
  184:9 190:5
  201:21 202:5
  226:9 239:5
**input**   57:18
**inquisition**   9:5
**inside**   62:6
  115:9 128:10
  140:3 142:6
  211:25 221:13
  221:21
**inspection**   90:2
  198:15,22
**installed**   77:17
  78:16

**instance**   34:5
  113:11 134:17
  143:22 175:8
  175:11 179:13
  196:1
**instances**   39:6
  57:21 113:22
  113:24 114:1
**instruct**   36:8
  178:7
**instructed**
  93:10 156:4
**instructing**
  36:6
**instruction**
  35:24 38:6,10
  78:11
**instructor**
  35:20 37:4,7,8
  37:20,21
**instructors**
  36:24 37:1
**intake**   42:3
  177:19 178:16
  178:17 179:3
  183:4
**intelligible**
  237:16
**intelligibly**
  222:17
**intended**   5:20
**intent**   8:5
**intentionally**
  77:4

**interactions**
  153:18
**interchangea...**
  84:18 102:13
**interest**   124:20
  124:21,23
**interested**
  258:15 259:12
**interesting**
  212:7,20
**internal**   34:16
  44:24 45:22,24
  46:14,19,20
  47:24 48:4,9
  79:5,5,6,11,14
  161:23 175:5
  192:12,14,20
  250:2
**internally**
  110:24 126:11
  250:17,18
**interrogation**
  9:6
**intervener**   58:8
  58:11
**intervenor**   1:13
  2:2
**interview**
  156:12 223:13
  224:1
**interviewed**
  134:3
**interviewing**
  136:7 142:9

Page 30

[interviewing - is23-11o5]

| | | | |
|---|---|---|---|
| 159:24 196:15 | 127:22 136:23 | 156:13 167:25 | 80:16,20 81:10 |
| **interviews** | 139:24 144:8 | 168:10 186:3,3 | 81:14,15 82:8 |
| 160:7 | 146:24 152:20 | 192:15 194:3 | 82:11 83:3,12 |
| **introduced** | 155:8 156:16 | 194:16 214:9 | 128:14 139:1 |
| 156:20 | 156:17 158:15 | 230:8 243:8,18 | 139:11 147:4 |
| **investigate** | 164:1 169:10 | 244:10,13 | 156:4 161:17 |
| 21:18 70:21,25 | 169:13,16 | **investigator** | 211:20 223:19 |
| 71:4 76:21 | 170:25 171:2 | 12:20,20 13:9 | **involved** 18:9 |
| 80:9,10 139:22 | 171:12,18 | 19:8,10 22:3 | 18:13,16,24 |
| 156:5 167:18 | 172:15 179:16 | 54:1,9 55:21 | 19:4,6 21:14 |
| 229:15 | 179:18,21 | 56:5 57:7,10 | 24:18 43:19 |
| **investigated** | 181:16 194:20 | 69:19,21 70:1 | 52:6 61:3 |
| 35:1 73:2,7 | 197:21 205:7 | 70:4 72:5 | 78:20 79:13,16 |
| 78:25 79:19,22 | 205:11 211:8 | 76:22 80:1,18 | 103:16 116:7,9 |
| 79:24 80:13,14 | 211:21 214:8 | 80:19,19 83:22 | 116:17,20 |
| 155:25 167:3,5 | 219:6 223:25 | 106:4 125:6,8 | 117:8 120:22 |
| 171:21,24 | 224:14 225:3 | 128:2 133:10 | 120:24 121:1,3 |
| 172:3 229:22 | 225:11,16 | 133:25 135:16 | 134:18 136:2 |
| **investigating** | 227:6,16 228:3 | 155:10,13,24 | 148:11 149:23 |
| 70:1 181:12 | 228:22 229:7,9 | 158:16 159:9 | 154:25 155:15 |
| 210:12 224:11 | 229:21,22 | 159:23 162:4 | 159:10 172:5 |
| 241:11 | 230:1,7 238:19 | 171:4 181:11 | 192:15,16,20 |
| **investigation** | 239:7 241:5 | 181:14 223:11 | 193:1,2 211:19 |
| 18:6,14,17,25 | 242:13 243:9 | 223:16 225:7 | 223:14 240:1 |
| 19:7 21:24,25 | 243:20 244:15 | 226:16 227:4,5 | **involvement** |
| 49:13 53:22,23 | 253:4 254:20 | 227:7 231:2,2 | 130:10 |
| 54:5,10 69:22 | **investigation's** | **investigator's** | **involves** 171:25 |
| 69:23 70:5,8 | 242:17 | 76:18 134:7 | **involving** 74:9 |
| 74:6,14 77:16 | **investigations** | **investigators** | 75:10 160:1 |
| 78:19,22,23,24 | 20:12,15,17 | 21:16,17 22:1 | **ipad** 178:23 |
| 80:3,7,8 82:14 | 21:13,15,17 | 34:20,21,22 | **irons** 202:24 |
| 82:15 83:5,7 | 34:18 35:4 | 46:7,7 53:3,6 | 204:9 216:8 |
| 83:24 94:3 | 74:15 82:23 | 53:20 77:7 | **is23-11o5** 4:6 |
| 121:20 122:11 | 127:25 156:10 | 78:2,3,12,17 | |

[is23-11o5-392 - klien]

**is23-11o5-392**
3:22
**isd** 22:11,21,22
23:4 24:4,8
**isolated** 98:4
98:11,20 154:8
154:12
**isolation** 93:24
97:16,18 98:8
98:17 169:6,7
**issue** 63:15
67:15 96:3,6
117:13 156:24
221:23,23
230:17
**issued** 95:1
**issues** 58:16
96:18 164:22
177:12
**it'd** 196:7
**it'll** 26:18 80:13
92:9

**j**

**ja09-3** 129:18
131:5
**ja09-6** 149:5
**jacinto** 16:8,16
85:10
**jail** 20:1 24:23
26:17 32:4
34:21 38:9,19
39:7 47:20
49:25 50:1

58:16,25 61:24
62:25 63:16,23
66:6 73:19
76:5 79:7 87:6
88:16,25 92:9
97:14 110:7
115:7 138:21
140:4,21 141:9
141:10,13
142:13 144:17
175:17 176:3
182:17,19
188:20 217:9
218:24 220:22
242:4 246:21
251:11 255:3
**jail's** 122:15
123:7
**jails** 50:7 62:5
65:20 79:18
89:22 142:5
156:14 175:17
**january** 20:25
**jao9-2k1** 115:4
**jenkins** 1:11
2:2 6:8 15:13
58:8 81:13
83:14 106:3
107:3 108:12
112:9 132:24
138:4,7 151:24
153:16,17,22
154:15 155:3
155:16 162:9

164:17 184:17
**jimenez** 248:14
249:2
**joash** 108:8
**job** 1:25 155:24
260:2
**joint** 13:18
85:10
**jointly** 57:11
**jordan** 16:2,6
**jr** 105:5 125:20
127:2 136:19
140:6 146:9,9
148:2 150:24
152:22 182:8
191:22 228:9
**july** 29:18
**june** 182:23
183:14 252:22
254:12,15
**jury** 101:14,15
**justice** 16:13
**justify** 137:16

**k**

**k** 43:20 133:6
151:12 202:15
**katrina** 1:18
5:8 6:12,19
8:20,22 71:15
71:19 135:10
135:14 190:17
190:21 257:4
260:2,24 261:2

261:4,12 262:4
**kedrick** 12:20
13:10,19,20,21
19:8 22:1
**keep** 29:13
51:13 91:21
94:2 97:6
128:19 140:24
238:2 253:3,4
254:19
**kept** 73:18
126:11
**kidding** 207:21
**kids** 22:23
**kind** 15:7 19:22
23:8 28:7 33:4
34:17 44:13
45:18 47:1
81:3 103:14
110:6 135:23
155:1,12 165:5
183:3 193:11
237:10
**kiosk** 61:12,13
61:14,22,22,25
62:14 63:9,10
63:14 67:3,8
75:24
**kiosks** 61:9
62:23 63:22
64:3 65:9
66:22
**klien** 22:11,20
22:22 23:4

**[klien - league]**

| | | | l |
|---|---|---|---|
| 24:4,8 29:15 29:21 | 115:12,14,17 116:14 119:2,7 119:12,14 121:15 122:14 123:19 126:2 129:5 130:10 130:13 132:11 134:8 135:16 139:9 140:17 141:25 143:7 143:18,20 144:14,23 145:3 146:3,15 146:16 157:1 159:5 165:18 165:22 166:9 166:11 167:21 169:4,19,21 170:8 171:17 171:20 175:20 176:2 179:24 183:20 184:8 185:16 187:7 193:14,18 194:14 198:21 198:22 199:2,5 200:9,20,21 201:2,5,12 202:13,14,19 204:6,8,14,24 205:6 207:4 208:3 215:19 215:21,22 216:17,24 | 221:9 222:10 224:5,6 225:7 226:20 230:6 231:18,23 232:6 233:2 234:11,19,24 236:23,24 237:9 238:12 238:14 240:7,8 240:11,23 244:23 | **l** 19:12,12 26:7 |

**knew** 35:3 56:18 88:15 89:23

**know** 15:8,17 17:19 20:24 22:15 23:22 25:22 26:21 37:22 38:24 40:25 43:2 46:7,9 49:5 51:7 52:25 54:11,16,18,20 56:15,24 58:18 58:19 63:22 64:3,12,13,13 64:20 65:7,9 65:16 66:4,9 66:12,12,12 67:17 68:19 69:7 75:4 80:12,23 82:4 82:6 84:10 86:20,23 87:3 87:7,9,19 90:20 91:17 92:20,23 95:11 97:10 99:11,19 100:4,12 101:25 102:11 103:24 109:5 111:1,7 114:21 114:23 115:1,3

**knowing** 45:8 186:2

**knowledge** 18:10,15 27:20 44:18 65:10 75:20 76:3 94:11 96:16,22 97:4 125:5,6 165:6,7 175:25 178:15,17 181:6,18,23,25 189:10 190:6 195:22 208:5 208:12 220:21 238:18 239:10 254:25 258:10 259:6

**known** 150:2 168:6 172:20 173:3 240:25 253:21

**knows** 66:12 67:6

**l** 19:12,12 26:7

**label** 125:20 127:2 140:6

**labeled** 146:9 207:8

**lachari** 27:13

**lack** 60:14

**language** 78:5 245:19 253:7

**lapeyrouse** 2:19 6:3

**lapse** 212:9

**large** 58:13 140:3

**lasts** 211:5

**law** 2:4 15:21 22:6,9 24:5 30:25 33:24 43:8 47:8,8,11 70:12,25 77:20 160:13

**laws** 5:22 68:23 161:1,10

**lawsuit** 8:24 9:1,19 58:1,5 165:1,10 166:12 173:20

**lawsuits** 58:14

**layer** 179:17

**layout** 76:8

**league** 2:14

**[learn - look]**

| | | | |
|---|---|---|---|
| **learn** 35:15 | **letting** 109:4 | **line** 71:11 72:1 | **located** 131:19 |
| **leaving** 202:25 | **level** 169:23 | 100:21 179:9 | 186:23 208:17 |
| **lecturing** 36:8 | **levels** 85:23 | 210:3 245:20 | 208:18,21 |
| **lee** 249:25,25 | 99:1,14 | 254:24 260:4,7 | 227:1 247:6 |
| **left** 22:22 24:17 | **lgbtqi** 46:11 | 260:10,13,16 | **location** 1:21 |
| 87:16 130:11 | 142:4,12 | 260:19 | 73:18 97:15 |
| 148:7 208:20 | 143:22 177:7 | **linkedin** 22:13 | 115:3 123:2 |
| 208:23 247:7 | 178:13 | 29:4 | 129:15 131:2 |
| **leg** 80:5 202:24 | **license** 37:20 | **list** 89:13,20,24 | 140:17 145:23 |
| 204:9 216:7 | 37:21 | 90:8,15,17,18 | 149:5,15 |
| **legal** 262:19 | **lieutenant** | 90:22 91:3,9 | 183:20 187:4 |
| **legislation** | 20:16,18 54:20 | 91:16,17 92:16 | 226:5 |
| 44:22 47:7,20 | 81:1 86:1,3 | 92:17,21,24 | **locations** 115:8 |
| 50:18 57:8 | 93:18 100:15 | 93:1,11,12,22 | 123:22 125:12 |
| 68:16 70:9 | 104:19 107:14 | 93:23 94:12 | 145:7,17,25 |
| 72:8 74:2 | 107:15,18 | 98:21 239:18 | **locked** 202:18 |
| 77:10,20 78:5 | 108:6,7,7,9 | 240:1 241:7 | 202:24 220:23 |
| 78:8 98:6 | 113:2 191:16 | **listed** 29:13 | **lockup** 49:25 |
| 124:5 188:10 | 192:1 193:5 | 115:8 131:11 | **long** 9:22 13:2 |
| **legitimacy** | 198:11 232:2,5 | 149:15 150:1,1 | 20:3,21,23 |
| 155:3 | 249:25 250:1 | 183:21 240:11 | 21:6 26:14 |
| **leticia** 65:1 | **lieutenants** | **listening** 8:2 | 28:16,22 31:19 |
| 66:21 76:10,11 | 20:14 | **lists** 93:14 | 65:19 66:2 |
| **leticia's** 65:2 | **life** 49:2 | 239:20 | 85:1 125:3 |
| 67:13 | **light** 165:15 | **litigation** 10:1 | 178:15 239:19 |
| **letter** 115:9 | **likely** 100:22 | 255:11 | 244:24 |
| 203:2 248:6,21 | 152:11 | **little** 29:1 36:13 | **longer** 13:9 |
| 249:11,14 | **lila** 81:24 | 67:9 69:12 | 20:9 29:1 |
| 250:4 251:16 | 158:21,22 | 70:24 71:23 | 31:18 41:18 |
| 251:21 252:19 | 194:17 | 136:24 163:19 | 80:20,21 82:19 |
| 252:23,25 | **lily** 158:20 | 191:15 | 90:4 136:9 |
| 253:2,11,17,22 | **limit** 74:24,25 | **llc** 27:14 | 249:3,3 |
| 255:6 | 240:22 | **lobby** 246:13 | **look** 9:4 29:7 |
| | | | 37:21 39:2 |

**[look - manager]**

| | | | |
|---|---|---|---|
| 44:6 102:21 | 237:24 241:22 | **magic** 253:7 | 92:16 95:22 |
| 107:6 127:12 | **lou** 178:14 | **main** 61:23 | 116:10,23 |
| 134:6 154:3 | **love** 200:11 | 247:6,14 | 118:25 139:25 |
| 161:11 162:12 | **lynette** 17:13 | **maintain** 76:19 | 140:4 143:22 |
| 190:14 195:1 | 17:14,19,23 | 171:11 | 145:20 147:19 |
| 198:8 208:20 | 18:1,16 103:25 | **maintained** | 155:24 156:6 |
| 230:4 237:13 | 104:18 105:10 | 100:5 251:3 | 164:4 223:16 |
| 243:21 250:25 | 105:22 107:11 | **maintaining** | 225:18,21,22 |
| **looked** 22:12 | 109:24 115:21 | 91:23 | 226:1,4 227:13 |
| 33:8 99:8,9,10 | 115:22 116:1,3 | **maintains** | 228:6 230:19 |
| 103:2 116:23 | 116:7 | 99:11 | 230:24 238:23 |
| 140:13 156:14 | | **maintenance** | 241:17 255:14 |
| 220:19 230:15 | **m** | 65:9 67:8 | 256:23 |
| **looking** 46:10 | **m** 19:12 43:20 | **major** 17:13,14 | **maker** 56:4 |
| 47:7 123:20 | 43:21 | 18:19 103:25 | **makes** 10:3,24 |
| 134:7 146:15 | **ma'am** 7:3 | 104:18,18 | 49:9 60:16 |
| 162:4 176:12 | 71:22 97:24 | 105:22 114:16 | 124:18 147:20 |
| 182:23 187:1 | 105:6 127:4 | 115:21,22,22 | 217:4 230:11 |
| 190:24 202:4 | 136:22 148:5 | 116:1,3,9,15 | 242:15 255:15 |
| 209:3 | 151:3 158:7 | 117:3 176:5 | **making** 20:12 |
| **looks** 27:6 | 162:19 190:24 | 232:25 | 21:12,23 30:25 |
| 46:17 107:17 | 201:11 206:3 | **majority** 142:2 | 78:15 82:12 |
| 111:25 136:23 | 206:16 212:22 | **make** 5:3 9:14 | 83:14 96:23 |
| 146:10 154:10 | 245:10 | 10:2 15:1 | 109:19 161:21 |
| 157:6 159:8 | **made** 33:16 | 21:18,20 23:19 | 219:12 232:15 |
| 208:23 209:24 | 35:10 53:14 | 34:23 35:3 | **man** 154:1 |
| 210:23 211:17 | 54:8 56:9 | 38:10 42:10 | **management** |
| 245:15 250:22 | 62:13 89:1 | 47:9,12 51:4 | 42:18,23 |
| 252:17 | 143:7 150:11 | 53:20 56:18 | 126:21 128:11 |
| **lose** 33:22,25 | 156:3 219:7 | 59:4 60:6 63:4 | **manager** 6:13 |
| **lost** 34:6 245:1 | 222:24 224:19 | 67:20 74:12,12 | 6:14 19:19 |
| **lot** 9:21 19:25 | 227:5 229:12 | 74:18 77:16 | 20:1,14,22 |
| 61:19 215:18 | 232:10,12 | 78:18,19 84:5 | 21:3,7,11 |
| 215:25 222:8 | 235:22 261:5 | 84:5,7,9 92:2,3 | 24:14 28:4 |

Veritext Legal Solutions
800-336-4000

[manager - meet]

30:17 31:14
34:2,10,15,20
35:18,25 37:6
44:8,9 52:11
53:3 56:5,8
57:9,20 58:21
68:12 69:6
81:6,18 84:17
84:19,25 85:9
85:19 87:13
88:16 90:10,12
90:12 94:7
97:14,15 98:13
98:23 113:10
113:22,25
124:4 125:9
133:6 136:9,16
151:12 155:1
155:12,15
196:11,14,23
196:25 197:12
197:16,18
198:10
**managing**
20:15 21:23
**mandated**
171:15
**mandates** 57:9
99:21
**mandatory**
32:6 60:8
**manner** 5:23
188:6

**march** 1:19
5:10
**mark** 108:11
112:8 149:18
**marked** 104:24
105:3 107:4
108:14 112:10
125:21 126:24
136:20 140:7
146:6 147:24
150:21 152:24
158:4 162:17
182:5 189:1
191:23 201:9
207:10 209:11
245:4 247:24
**materials** 12:15
14:18,19,21
**matter** 5:9
117:5
**mccutcheon**
12:21 13:10,20
18:20 19:8
22:2 52:13
80:17,18 81:16
158:16 162:10
162:11,15
163:1,7,8
171:4 223:20
223:21 224:13
227:8,9 243:8
**meagan** 259:2
259:15

**mean** 12:7
25:11 30:24
31:3 36:3
38:17 43:7
49:13 50:17
52:9 55:2
57:17 59:16,18
60:24 74:13
75:19 95:7
98:7 103:12
104:7 121:10
121:22 126:5
130:14,19
141:6,17
146:16 148:25
149:19 162:22
182:13 184:25
208:3 213:11
215:20 218:3
219:17 220:15
225:20 227:21
229:6 231:12
233:24 234:19
235:12 236:4
237:5 239:1
249:11 253:2
**meaning** 11:8
233:22
**means** 5:24
15:18 78:24
107:21 111:7,8
114:23 115:1
115:19 121:16
126:6,18

130:13,22,25
137:9,13
141:18 149:1
160:10,10
193:15 207:4
213:23 215:11
215:22 216:7
222:16 227:22
234:22,24
237:18 239:3
239:11 242:6
244:2
**meant** 139:19
**measures** 56:18
**mechanism**
61:23 117:21
**medical** 39:4,5
55:25 61:15,17
67:22 74:19
75:11,11
130:21,22
138:25 149:18
160:9 177:11
183:5,6 193:20
202:17 211:18
221:23 243:15
**medically**
192:6
**medication**
230:20
**medium** 114:22
**meet** 14:9 89:4
186:10 213:9
231:1

Page 36

**[meeting - month]**

| | | | |
|---|---|---|---|
| **meeting** 15:2 | 231:9 | **mm** 9:11 10:10 | 194:1 196:20 |
| 57:10 | **mentally** | 12:23 14:6,8 | 196:24 197:2 |
| **member** 40:12 | 139:23 163:11 | 15:9 16:5,8,15 | 197:14,19 |
| 49:2 124:11,12 | 168:12,12,13 | 16:20 17:4,25 | 199:20 205:1 |
| 142:9 149:20 | **mentioned** | 18:8,22 19:12 | 205:13 220:5 |
| 151:20 152:4,5 | 218:17 224:15 | 19:21 22:22 | 225:9 227:10 |
| 152:10 160:14 | **mentioning** | 23:5,7,11,15 | 231:17 233:4 |
| 160:17,23 | 139:12 | 25:7,17 26:9 | 233:17 234:10 |
| 161:25 162:2 | **mentions** 77:19 | 27:25 28:25 | 240:6 241:24 |
| **member's** | **met** 14:11 | 29:12,16,23 | 243:10 244:19 |
| 79:12 164:7 | 224:5 | 30:7,11 31:1 | 251:17 254:13 |
| **members** 31:20 | **mhmra** 162:22 | 32:19 33:7 | 255:2,8 |
| 42:19 45:3 | 162:25 163:4 | 34:4,11 36:11 | **mmnyallay** |
| 51:4,7 62:25 | 163:18,24 | 38:7 39:21 | 2:15 262:1 |
| 63:2 149:21,23 | **michael** 54:22 | 40:23 44:16 | **module** 40:5 |
| 239:5 | 108:9 148:21 | 45:20 46:15 | **modules** 41:2 |
| **men** 153:25 | 150:17 151:7 | 50:21 52:17,23 | **mom** 152:11 |
| 154:3,6,10,17 | 157:7 | 55:14,20 57:12 | 153:17 163:4 |
| 154:19 155:17 | **milan** 81:24 | 58:22 59:2 | 168:6,15,19 |
| 176:16,17 | 159:17,19 | 62:12 67:5 | **moment** 54:21 |
| 187:5 | **millan** 158:22 | 70:7,18 75:23 | **moments** |
| **mental** 106:10 | **mind** 216:13,14 | 81:5,8 98:15 | 104:12 |
| 106:11 130:23 | 235:10,10,11 | 98:15 102:18 | **monday** 1:19 |
| 130:25 138:25 | **mingle** 53:4 | 102:25 104:21 | 5:10 |
| 139:3,21,25 | **mirrored** 118:5 | 105:13 118:1 | **money** 34:6 |
| 140:1,2,3 | **mirrors** 33:4,5 | 120:4 133:11 | **monitor** 189:13 |
| 149:25 150:3,9 | **misconduct** | 138:6 142:17 | **monitoring** |
| 150:14 162:23 | 31:8,10 35:5 | 143:4 146:8 | 77:21 78:6,15 |
| 164:22 175:6 | 154:22 | 150:25 155:14 | 86:7 97:23 |
| 175:16 177:12 | **misstates** | 157:17,19 | 99:2,14 170:9 |
| 193:20 228:10 | 214:25 | 168:24 170:17 | 173:10 191:3 |
| 228:16,17,20 | **misunderstood** | 179:19 180:1 | **month** 213:25 |
| 229:20 230:2,9 | 221:9 | 180:17 189:5 | 214:21 |
| 230:16,20,21 | | 191:18 193:9 | |

Veritext Legal Solutions
800-336-4000

**[months - nonviolent]**

| | | | |
|---|---|---|---|
| **months** 21:2 218:13 | **multiple** 53:10 54:17 69:15 70:9,13,20 71:2,6,25 72:9 72:15 85:3 155:18 160:2 164:2,2 181:14 217:22 229:12 | **narrative** 246:3 | 187:18 188:1 201:21 |
| **morning** 5:4 6:6 7:3,4 106:24 | | **native** 10:11 | **needing** 63:15 |
| **moss** 43:17,22 43:25 44:4 | | **nature** 50:13 163:21 229:10 | **needs** 53:5 57:19 67:8 75:6 135:1 175:15,15 220:18 230:21 230:21 |
| **mother** 15:13 130:1 139:17 153:22 164:3 168:14,21 223:2,2,3 226:23 230:16 231:4,12,12 243:5 | | **navarro** 2:12 14:5 | |
| | **murder** 106:7 110:3,7 | **near** 208:18,18 | |
| | **mustapha** 2:11 6:10 256:12 | **necessarily** 56:25 79:8,15 103:17 126:5 | **negative** 106:10 |
| | **n** | **necessary** 261:6 | **negligence** 212:10,15 |
| **move** 30:3 56:25 57:11 123:20 124:12 124:13,14,16 124:19 125:1 | **n** 2:1 3:1 5:1 20:19,20 86:4 86:4 100:18,18 132:3 | **need** 9:9,12,12 38:20 52:24 56:20 61:2 64:3 65:22 75:1 77:20 84:7 89:8 97:10 99:1,14 103:13 119:12 119:14 132:18 143:23 176:3 186:16 200:20 200:21 201:5 202:19 205:3 227:13,16 250:7 252:2,25 | **neither** 13:10 258:11 259:7 |
| | | | **never** 35:12 125:8 146:18 146:18 155:6 161:16 173:8 222:15 226:17 229:16,16,16 |
| **moved** 56:14 56:20 57:23 59:9 112:3 116:4 120:3 122:2 123:1 124:24 183:9 184:20 224:25 226:5 234:12 234:13,22 | **name** 5:5 8:19 26:2,6 27:17 27:23 52:14 64:12,13,16,16 64:25 65:2 81:24 85:6,20 87:21 100:16 100:18 107:18 117:6 152:3 182:11 223:22 227:6 | | **new** 31:5 35:21 35:25 36:12,13 36:19 37:4,9 39:13,17 42:14 42:15 46:1 80:20 196:13 |
| | | **needed** 35:22 37:8,9,10,15 56:14 57:23,23 89:2 92:10,12 110:2 150:14 156:14,15 163:18,18 | **night** 10:22 |
| **movements** 124:15 188:19 | **name's** 7:5 85:5 | | **nine** 25:18 199:25 |
| **moving** 124:8 124:18 185:11 | **named** 9:1 31:11 81:9 | | **nondelegable** 117:16 |
| | **names** 8:21 38:21 | | **nonviolent** 49:8 49:12 |

**[nope - objection]**

nope 225:1
normal 87:25
  88:1 113:4
  127:18 218:24
  224:22
north 2:5,13
  16:9 85:9
  131:10,11,19
  149:13 207:4,5
  208:21 209:9
norwood 1:24
  5:5 258:2,18
notarize 262:11
notary 5:11
  258:19 261:13
  261:19
note 3:21 4:6
  136:24 262:9
noted 261:7
notes 15:1,3
nothing's 7:15
  150:1
notice 11:14,17
  203:19 204:3
  253:14 254:11
  255:12
noticing 6:7
notified 223:15
november
  137:24 139:9
  140:14 141:3
  141:12 143:1,5
  144:10,11,14
  144:15,23,24

145:8,9 146:24
149:25 150:16
152:12 166:19
172:12 185:4,5
194:12 224:8
241:14
number 54:24
  58:13 72:18,25
  99:9,9 126:17
  127:15 135:5
  147:13,15,17
  182:14,17
  191:7 203:14
  210:5 228:9
  240:19
numerous
  230:15
nurse 198:15
nursing 16:18
  16:19,21
nyallay 2:11
  3:4,6 6:10,10
  27:3 48:17
  59:5 60:10,18
  62:16,20 63:18
  63:24 64:5
  66:7 68:4
  69:10 75:17
  83:18 86:24
  88:18,22 89:10
  91:10,13 93:7
  94:1,6,9,13,16
  94:19,24 95:3
  96:3,11,13,17

96:23 97:2,5,9
99:4,17 101:18
109:3,16
111:24 113:8
114:9,20
116:12 117:19
118:19,23
119:1,20
120:16 122:5
122:17,21
123:9,24
127:20,23
134:14 135:4,7
138:22 144:18
145:1,10,18
150:4 155:5
160:16 166:16
167:7 168:17
169:2 172:23
173:12,16,22
174:5,14 178:4
185:14 187:21
188:3,7 192:23
193:13,21
195:17 196:5
198:18,25
199:4 200:5,19
203:21 204:11
205:5,14,21,24
206:8,12
207:14,20,23
208:3 209:21
211:10 212:24
213:2 214:4,6

215:2,3 222:21
225:13 229:1
232:3 234:6
235:19 236:9
238:11,15
244:17 249:17
249:20 250:6
251:6,12
253:23 255:20
256:8,11,14

**o**

o 5:1 43:20,21
oath 11:22
oaths 5:12
object 62:16
  97:9 117:19
objection 5:15
  48:17 59:5
  60:10,18 63:18
  63:24 64:5
  66:7 68:4
  69:10 75:17
  83:18 86:24
  88:18 89:10
  91:10,13 93:7
  94:1 99:4,17
  101:18 109:3
  109:16 111:24
  113:8 114:9
  116:12 118:19
  118:23 119:20
  120:16 122:5
  122:17,21

**[objection - officer]**

| | | | |
|---|---|---|---|
| 123:9,24 | **observations** | 111:15,21,21 | 75:11,12 79:2 |
| 127:20,23 | 172:22 189:21 | 112:2,4,13,16 | 79:16 95:24 |
| 134:14,14 | **observing** | 112:22 119:18 | 104:3 105:16 |
| 138:22 144:18 | 173:10 | 120:3,5 121:23 | 113:5,15 114:5 |
| 145:1,10,18 | **obsolete** 120:21 | 122:2,13,13 | 114:19 117:1 |
| 150:4,5 155:5 | 166:7 | 123:5,5 125:10 | 166:3 168:25 |
| 160:16 166:16 | **obviously** | 125:10 157:15 | 170:20 186:8 |
| 167:7 168:17 | 44:21 46:13 | 157:18,21,21 | 203:18 214:14 |
| 169:2 172:23 | 83:7 153:17 | 163:2 184:1,21 | 215:9 249:16 |
| 173:12,16,22 | 165:2 211:1 | 185:2 191:25 | 250:1,22 |
| 174:5,14 178:4 | **occasion** | 201:24,24 | **officer** 5:4 6:15 |
| 185:14 187:21 | 154:17 161:16 | 203:4 210:12 | 6:23 13:7,14 |
| 188:3,7 192:23 | 231:3 | 210:20 211:5 | 13:17 17:23 |
| 193:13,21 | **occasionally** | 213:17 246:17 | 18:16 20:21 |
| 195:17 196:5 | 224:24 | 247:18 | 21:3 22:11 |
| 198:18,25 | **occasions** | **offender** 42:18 | 23:13,15 24:19 |
| 199:4 200:5,19 | 155:18 229:12 | 42:23 126:21 | 28:15,17,19,23 |
| 203:21 204:11 | **occur** 137:14 | 128:11 | 29:1,14,17,21 |
| 205:5,14,21,24 | **occurred** 39:7 | **offer** 176:9,16 | 30:1,8,13,15 |
| 207:14,20 | 129:22 132:1 | **offered** 37:14 | 32:12 33:6,14 |
| 209:21 211:10 | 137:1,8 149:6 | 174:24 | 33:14 52:13,18 |
| 214:3 225:12 | 149:7 168:10 | **offhand** 170:8 | 55:7,15 62:4,4 |
| 228:25 231:24 | 195:16 244:6 | **office** 1:21 6:14 | 62:6 71:10 |
| 249:17,20 | **occurring** 38:9 | 16:24 17:1,6 | 80:16,16,17 |
| 250:6 251:6,12 | 132:25 137:17 | 18:24 22:6,11 | 81:20 82:19,20 |
| 253:23 | 152:1 165:10 | 22:20 23:10 | 84:14 85:8 |
| **objections** 6:16 | 166:20 167:12 | 24:22,25 25:14 | 88:8 90:13 |
| 97:8 | 167:13 169:12 | 26:11,18 28:14 | 92:20 128:4,4 |
| **objective** 84:8 | 203:20 238:2 | 30:22 31:18 | 128:24 129:2 |
| 84:10,12,13 | **october** 10:6 | 32:3 33:1,13 | 134:9 136:11 |
| **observation** | 27:7 102:17 | 36:21 41:21 | 147:21 148:1 |
| 189:7 190:1,5 | 103:25 104:6 | 45:5,15 46:10 | 148:18 149:2 |
| 242:8 | 106:21,23 | 48:1 50:24 | 150:12,15 |
| | 107:7 109:1 | 51:7 74:19 | 151:16 156:8 |

[officer - okay]

| | | | |
|---|---|---|---|
| 159:17,18,22 | 222:7 233:20 | 51:9 52:8 54:3 | 110:18 111:4,7 |
| 160:6 162:7 | 252:10 256:10 | 54:11,16,23 | 111:12,18 |
| 163:1,7 165:19 | 256:24 | 55:7,18 56:7 | 112:12,21 |
| 168:20 173:3,6 | **okay** 7:6,7,10 | 56:23 57:25 | 114:20 116:25 |
| 173:20 177:25 | 7:13,14,18,21 | 58:2,5,6,10,21 | 117:13,24 |
| 179:13 189:24 | 7:24 8:1,4,9,10 | 59:16 60:5 | 118:11,15 |
| 190:7,9,11 | 8:19 9:4,6,20 | 61:7,11,21 | 121:2,5,9,14 |
| 192:6 222:13 | 9:25 10:4,7,9 | 62:10,19 63:8 | 122:13 123:13 |
| 223:21 224:10 | 10:22 12:8,22 | 63:22 64:3,24 | 123:19 126:14 |
| 236:24 237:11 | 13:14,19,24 | 65:6,23 66:1 | 126:22 127:6 |
| 243:7 252:8 | 14:11 15:5,6 | 66:20,24 68:12 | 127:12,18 |
| 256:10,12,15 | 15:21 16:4,14 | 68:22 70:3,6 | 128:15,20,23 |
| 256:19,22,25 | 16:25 17:19 | 70:12,23 71:14 | 129:5,9,14,21 |
| 257:2 258:1,2 | 18:5,12 19:20 | 71:23 76:7,11 | 129:25 130:10 |
| **officer's** 129:1 | 20:3,10,21 | 77:10 78:2,10 | 130:21 131:2,9 |
| 134:19 | 21:6 22:14,14 | 80:25 81:3 | 131:23 132:5 |
| **officers** 18:20 | 25:6 26:3,21 | 82:7 83:10,20 | 132:22 133:4,8 |
| 18:20 30:3 | 27:13,23 28:6 | 84:21,24 85:8 | 133:19 134:2 |
| 32:2 81:16 | 28:16,23 29:10 | 85:12,15 86:5 | 134:11 135:7 |
| 156:13 172:20 | 29:22 30:6,19 | 86:14,17,20 | 135:16 136:14 |
| 173:9,21 | 30:23 31:22 | 88:6,13,15,23 | 136:18 137:22 |
| 174:19 189:8 | 32:1,9 33:3,5 | 90:7,17,25 | 138:4,11,14 |
| 189:16 237:24 | 34:2,9 35:17 | 92:5,13 93:22 | 140:16 141:1 |
| **offices** 160:10 | 36:5,10 37:3 | 95:11,14,15 | 141:12 142:16 |
| **official** 19:18 | 37:17,23 38:1 | 96:2,2 97:13 | 142:20 144:3 |
| **officiated** 1:24 | 38:5 39:6,20 | 98:11,13 99:21 | 144:10 145:5 |
| **oh** 20:23 22:14 | 39:25 40:5,13 | 100:4,21 101:5 | 146:5,11,12,22 |
| 43:22 55:17 | 40:17 41:10,13 | 102:16,23 | 147:2,6,8,11,14 |
| 88:4 115:21 | 41:16,23 43:2 | 103:10 104:5 | 147:18 148:1,4 |
| 132:7 140:25 | 43:10,12 44:8 | 104:20 105:1,6 | 148:6,6,13,17 |
| 173:10 174:22 | 44:10,10,19,20 | 105:20,20 | 148:24 149:4,8 |
| 176:14 178:23 | 45:18 46:13 | 107:16,21 | 149:24 150:15 |
| 181:9 183:22 | 47:1,6,14 | 108:1,3,11,16 | 150:19,19,23 |
| 194:23 220:17 | 48:14 50:5 | 108:20 109:1 | 151:5,19 152:4 |

Page 41

**[okay - operating]**

| | | | |
|---|---|---|---|
| 152:15,21 | 190:3,10 | 226:3,6,8,12,15 | **older**  88:25 |
| 153:1,6,10 | 191:10,13,15 | 226:25 227:4 | **oliver**  149:3 |
| 154:14,25 | 191:19 192:1,2 | 227:15,19,24 | **oms**  126:18,19 |
| 156:8 157:1,5 | 192:16 193:4 | 228:1,5,7,15,19 | 126:20,21 |
| 157:14 158:2,2 | 193:18,23 | 229:4,8 230:3 | **once**  30:9 35:8 |
| 158:9 159:17 | 195:9,13,22 | 230:6,6,23,25 | 42:6 53:19 |
| 159:19 160:13 | 196:10 197:7 | 231:8,8,11,14 | 54:7 78:4 |
| 161:1,13 | 197:19 198:1,6 | 231:21 232:4 | 87:14,16 112:4 |
| 162:12,14 | 198:9,14 199:2 | 233:10,15 | 221:7 223:3,6 |
| 163:1,17,22 | 199:10,16,19 | 234:2,7,17 | 223:10,15,15 |
| 164:10 165:14 | 200:3 201:6,14 | 235:3,9 236:3 | 224:25 225:1 |
| 165:18,22 | 203:3,3,25 | 236:13 237:13 | 225:15 228:6 |
| 166:1,6,9,12 | 204:8,17,22 | 237:18,23 | 228:17 232:25 |
| 167:2,18 168:1 | 205:10,15 | 238:3,3,8,22 | **ones**  35:1 42:14 |
| 168:5,9,12 | 206:12,24 | 239:1,7,11,14 | 42:15 52:1 |
| 169:15 170:4 | 207:7 208:8,17 | 239:17,25 | 62:7 74:17 |
| 170:18,23 | 208:22 209:8 | 240:13,16 | 92:15 195:6,6 |
| 171:20 172:5,8 | 209:13,17 | 241:6,12,22 | 195:8 250:8 |
| 172:19 174:23 | 210:2,10,25 | 242:6,10,13 | **online**  31:23,25 |
| 175:20,23 | 211:19 212:7 | 243:14,18,22 | 32:11 39:16 |
| 176:2,7,16,19 | 212:12 213:5 | 244:1,12,17,25 | 40:5 46:2 |
| 177:23 178:20 | 213:11,15,23 | 245:18 246:16 | **ons**  147:13,15 |
| 179:1,8,15,24 | 214:11,23 | 246:23 247:2,9 | 147:16 |
| 180:15,23 | 215:5,18,23,24 | 247:20,22 | **onsite**  64:25 |
| 181:1,17,20,23 | 217:6,11,14,17 | 248:10,13 | **ooh**  23:2 |
| 182:7,9,10,18 | 218:3,17,22 | 249:11 250:14 | **open**  113:16 |
| 182:22,24,25 | 219:3,15,17,25 | 250:16,20 | 114:13,17 |
| 183:6,9,20,23 | 220:2 221:6,8 | 251:1,10,15,24 | 198:5 |
| 183:25 184:8 | 221:18,19 | 252:16,18 | **opened**  184:17 |
| 184:11 185:10 | 222:2,7,22 | 253:7,13,15,16 | **operating**  4:15 |
| 186:5,20 187:1 | 223:5,9,12,14 | 255:4,13,17 | 31:2 33:12 |
| 187:12,15,17 | 223:18,21 | 257:2 | 44:25 46:19 |
| 188:23 189:10 | 224:2,14,19 | **old**  99:25 | 47:25 50:19 |
| 189:18,23 | 225:4,17,25 | 162:24 | 54:24 57:8 |

Page 42

**[operating - pass]**

| | | | |
|---|---|---|---|
| 72:14 124:5 145:15 160:22 161:6 189:4 191:4,6 201:7 | 73:18 96:6 102:8 103:20 105:25 108:23 109:20 112:3 124:18 149:25 | **p** | **part** 21:23 22:18 82:18 90:22 104:16 110:12,14 127:6 145:23 |

72:14 124:5
145:15 160:22
161:6 189:4
191:4,6 201:7
**operations**
13:23
**opinion** 163:23
**opinionated**
163:20
**opinions**
138:19 163:20
**opportunity**
9:23
**opposed** 100:23
**opposing** 235:4
**order** 29:25
105:4 201:22
237:15
**ordering** 154:2
**ordinary**
250:16
**organization**
113:16
**organizations**
113:17
**orientation**
42:9 43:12
44:5 179:6
**outcome** 229:6
258:16 259:12
**outcries** 114:8
**outcry** 54:8
68:2,8,10,15,20
68:25 69:3,7

73:18 96:6
102:8 103:20
105:25 108:23
109:20 112:3
124:18 149:25
156:18 180:3
184:24 205:4
214:1 219:12
222:24 225:18
225:21,23
226:1,4 241:13
**outcryer** 83:25
**outline** 190:14
**outside** 20:1
46:8 116:22
176:12 242:7
**overall** 228:3
**overarching**
51:19
**overcrowded**
59:23 122:15
144:17
**overcrowding**
58:14,24 59:3
60:3,5,7 123:3
**override**
116:10
**oversee** 27:20
**owe** 226:2
**own** 45:24 53:7
55:6 219:10
226:22 240:2

**p**

**p** 2:1,1 5:1
19:11,12
**p.c.** 2:12
**p.m.** 257:7
**page** 3:2,9,12
3:13 4:2 29:7
92:7 105:2
107:2,2,25
108:17 112:8
121:12,13
127:3,4,19
133:4 143:12
147:9 152:16
189:3 190:25
202:4,21 260:4
260:7,10,13,16
260:19
**pages** 110:11
121:15 150:20
262:12
**paper** 189:15
246:1
**paperwork**
42:2 172:21
173:4
**paperwork's**
174:3
**parent** 53:17
130:7
**parentheses**
146:23

**part** 21:23
22:18 82:18
90:22 104:16
110:12,14
127:6 145:23
145:23 163:4
182:23 188:16
195:13 196:17
204:24 219:11
224:9,10 237:7
253:11 254:18
**participate**
41:16 42:12
89:24 93:4
**participated**
43:14 194:18
194:22
**particular** 89:6
113:20 119:8
150:8 237:15
240:22 244:14
**parties** 5:13,16
52:10 258:12
258:14 259:8
259:11
**partner** 53:17
**partners** 19:25
**party** 6:8 26:10
46:4 53:15,16
63:8 130:6
151:7
**party's** 105:4
**pass** 206:5
246:2

[passed - plaintiff]

passed 82:1
  159:19
past 41:12
  62:23 177:8,9
  224:23
patrice 19:9
  22:2
peace 13:17
  28:19 29:14
  82:19,20
  156:13
penalty 11:22
pendency
  91:24
pending 8:24
  121:19 122:10
  144:7
penetrated
  53:25 54:1
penetration
  34:24 54:4
  55:24 74:9,10
  74:16,22 75:10
  171:25 172:6
people 54:13
  166:3 175:6,20
  219:18,21
  222:11
perceived
  177:6 186:17
  217:19
perceives
  177:17

perfect 85:1
perform 151:21
performed
  46:24 125:11
  194:2
period 67:14
  74:14 75:6
  81:4 111:23
  163:15 197:6
periods 181:12
  181:13
perjury 11:22
permitted 5:20
person 36:9
  39:4,4 40:10
  49:1,12 52:3,6
  64:8,10 69:18
  76:7 82:24
  93:19 100:13
  107:20 129:2,3
  129:7,8 136:13
  158:15 166:1
  168:13 213:9
  213:12 223:23
  229:10 241:8
  256:2
person's 64:25
personal 97:4
  125:5 165:7
  181:18 182:14
  240:2
personally
  213:9

pertaining
  69:18
ph 54:21 55:10
philip 109:25
  112:25 114:6
phillip 17:20
  18:2,12 105:23
  113:6
phone 63:10
phones 75:24
  175:2,3 176:20
  178:24
photo 245:6
photograph
  245:13
photos 4:17,18
phrase 212:8
  212:14,18
physical 91:19
  93:15 98:2
  195:16 196:1
physically 76:4
  175:18
picture 48:25
  213:8,13,23,24
  214:20,21
  215:16
pictures 207:24
  255:24 256:2,5
pillow 165:16
pin 57:6
place 10:7
  123:8 143:8
  188:14 225:19

235:22,23
placed 73:1
  76:4 102:19,22
  103:5,6,17,21
  119:5,6 121:22
  122:14,25
  123:6 125:3
  141:2 144:2,11
  144:15,24
  153:24 154:1,5
  154:7,9,12
  186:19 187:19
  188:1 190:5
  199:21 201:15
  201:25 203:19
  204:3 216:19
  218:10 234:8
  235:1 240:12
  240:14
places 142:11
placing 118:15
  119:5,11 145:7
plaintffs
  136:20
plaintiff 1:9,13
  2:2 3:10 4:3
  6:8 58:1,7,11
  104:24 107:4
  108:14 112:10
  125:21 126:24
  140:7 146:6
  147:24 150:21
  152:24 158:4
  162:17 182:5

**[plaintiff - prea]**

189:1 191:23
201:9 207:10
245:4 247:24
**plaintiff's**
104:23 107:1
109:23
**plaintiffs**  1:6
58:13
**plan**  85:22
93:19
**planning**  93:4
**plans**  86:1,2
99:7 100:25
**plant**  98:2
**play**  41:6
204:24 208:24
**playing**  233:7
**please**  6:5,17
94:2 97:10
154:11,13
192:6 229:2
235:20 240:23
248:16 256:14
**plethora**
116:16
**plus**  200:1,14
**pod**  131:18,20
183:6,18,19
184:5 202:15
204:16 209:9
211:25
**point**  9:9,18
38:5 89:6
116:6,8 139:7

190:12 223:14
224:16,17
226:19 228:9
237:9 242:25
243:3,7
**pointed**  227:20
228:8
**police**  22:11
28:18
**policies**  24:23
31:7,8 91:1
174:13,17,20
237:7
**policy**  33:1,16
33:16 46:25
47:5 51:3 53:6
55:4 79:14
99:22 117:11
118:5,13,14
119:7,9,13,14
120:7 121:5,7
142:24 162:5
164:16 170:21
170:22 189:6
200:15,21,21
201:4,5,8,12
202:11,14,19
214:13,18
215:8 220:18
237:10,14,14
237:19,20
251:10
**policy's**  170:19

**pooling**  32:21
**population**
98:25 99:13
101:9 112:6
125:1,3 138:13
141:23,24
183:24 184:4,7
184:12 230:19
235:24
**portion**  77:16
79:12 105:21
106:2
**pos**  115:12
**position**  19:23
20:2,4 29:24
155:2 196:14
196:15 218:19
**positions**  84:20
232:17
**possession**
100:1 180:24
**possibility**
236:17
**possible**  74:7
74:15 237:18
**possibly**  33:25
226:2
**post**  179:25
180:18,19
181:2 197:21
197:24 198:4
**posters**  45:16
**potential**  166:1
228:23 231:9

239:19
**potentially**
168:12
**powerpoint**
37:14 178:10
178:12
**practice**  192:19
**practices**  38:11
174:21
**prea**  4:9,10,11
6:13 12:19
14:22,23 15:17
15:18 18:5,13
18:17,25 19:9
19:24 20:7,9
20:10,14,15,17
20:22,25 21:3
21:6,14 22:1
24:14 25:5,9
25:15,24 26:16
28:4 30:16,16
30:17,25 31:7
31:13,13,16
32:10,23 33:1
33:2,9,16,19,25
34:2,7,10,14,19
35:8,11,17,25
36:14 37:5,6
38:8,12 39:16
39:18 40:22
42:2,6,16,17
43:1,5,6 44:8,9
44:15,19,21,25
45:10,19,23,24

**[prea - prea]**

| | | | |
|---|---|---|---|
| 46:18,21 47:7 | 78:7,8,8,9,10 | 123:20,20 | 176:24 177:12 |
| 47:8,8,11,15,20 | 78:12,17,21,22 | 124:3,4,5,8,18 | 178:7 179:6,16 |
| 47:21 48:2,6 | 79:20 80:15,20 | 124:19,25 | 179:17 180:2,5 |
| 48:11,15,24 | 80:22 81:6,10 | 125:6,8,9,13 | 184:12,17,24 |
| 49:6,9,10,13,13 | 81:14,15,18,21 | 126:16 127:19 | 188:6,10,17 |
| 49:17,18,22 | 82:11,22 83:3 | 127:24 128:1,2 | 191:5,7 192:9 |
| 50:6,11,15,18 | 83:9,12,24 | 128:9,14 | 192:17,20 |
| 50:20 51:5,6 | 84:14,15,17,17 | 130:18,20 | 194:3 196:10 |
| 51:11,16,20,23 | 84:19,19,22,25 | 133:2,6,10,25 | 196:17,22,25 |
| 51:24 52:4,6 | 84:25 85:2,5,8 | 135:17 136:9 | 197:11,12,15 |
| 52:10,22,24 | 85:12 86:8,22 | 136:13,15 | 197:16,18,22 |
| 53:3,13,20 | 87:13 88:16 | 138:17 139:8 | 198:4,9,12 |
| 54:8,13,25 | 89:8,9 90:10 | 139:20 144:7 | 204:22,25 |
| 55:4,21 56:4,5 | 90:11,12,13,23 | 145:14,20,23 | 205:4,11,23 |
| 56:8,9,10 57:9 | 91:1,12 93:2,6 | 146:23 147:4,6 | 210:12 211:7,8 |
| 57:9,9,20 | 93:14 94:7 | 148:10 149:25 | 211:14,19,19 |
| 58:21 59:4,8 | 96:6,16 97:14 | 150:16 151:2 | 211:20,23 |
| 59:14,24 60:1 | 97:14,20,21,23 | 151:12,25 | 213:19 214:1,7 |
| 60:6,16,22 | 98:13,14,23 | 152:12,20 | 214:17 217:2,8 |
| 61:2,3,16 65:8 | 99:8,21 100:2 | 155:1,8,10,12 | 217:10 218:19 |
| 65:17,22,23 | 100:23 103:2 | 155:13,15 | 219:6,23,24 |
| 66:4,5,5,15,17 | 103:15,17,20 | 156:1,18 158:3 | 222:23 223:7 |
| 67:3,3,10,22 | 103:23 105:24 | 159:25 160:13 | 223:10,15 |
| 68:3,12,20 | 108:23 109:15 | 160:15,24 | 228:23 229:13 |
| 69:1,6,16 70:8 | 109:19,20 | 161:1,3,8,10,13 | 230:8 232:13 |
| 70:12,13,20,21 | 110:15 112:3 | 161:14,20,21 | 232:14 233:24 |
| 71:1,2,3,6,25 | 113:7,10,13,14 | 161:25 162:3,5 | 235:5,22 |
| 71:25 72:9,15 | 113:22,25 | 162:15 164:7 | 236:22 237:19 |
| 72:17,19,20 | 114:7 116:7 | 164:11,18 | 238:19,23 |
| 73:2,11,14,17 | 117:21 118:2,4 | 165:10 167:2,5 | 239:8 240:20 |
| 73:18,25 74:5 | 118:6,7,9,18,25 | 167:12 169:10 | 240:21 242:13 |
| 76:14,19,22 | 119:19 120:22 | 170:5,21 | 244:9 249:1 |
| 77:2,7,11,15,19 | 120:25 121:1,3 | 171:15 174:24 | 253:25 254:17 |
| 77:20 78:2,3,5 | 121:19 122:10 | 175:5 176:23 | 254:20 255:3 |

Page 46

[prea's - prosecuting]

| | | | |
|---|---|---|---|
| **prea's** 35:12 | 251:15,21 | **probably** 14:19 | 259:4 |
| 67:7 77:24 | 252:19 | 14:19,20 19:1 | **proceedings** |
| 90:25 | **preserve** | 19:7 25:20 | 14:12 258:3,5 |
| **precaution** | 253:14 255:7 | 26:5 32:16 | 258:6,9 259:6 |
| 89:1 | **president** 43:10 | 37:19 49:19 | **process** 51:23 |
| **precautions** | **press** 208:23 | 52:3 56:12 | 54:25 177:19 |
| 106:6 | **pretty** 49:20 | 64:10 82:25 | 178:16,17 |
| **predator** 177:7 | 50:4 86:15 | 87:14 89:17 | 218:24 222:25 |
| **prep** 104:16 | 113:16 156:2 | 92:14,18 | **processing** |
| 127:7 | **prevalent** | 111:10 125:25 | 13:18 85:10 |
| **prepare** 12:16 | 63:15 | 143:10 170:7 | **produced** 5:18 |
| 13:8,12 171:7 | **prevent** 10:16 | 173:24 176:5 | 105:3 127:1 |
| 240:1 | 188:17 | 188:24 231:8 | 152:22 245:8 |
| **prepared** 22:15 | **preventing** | 244:3 250:23 | 248:2 |
| 239:18,19 | 77:23 | **procedural** | **production** |
| 240:3 259:3 | **prevention** | 5:21 | 43:18 44:2 |
| **prepares** 21:21 | 51:10 | **procedure** 4:16 | **profile** 203:13 |
| **preparing** | **previous** 200:8 | 31:2 47:25 | **program** 20:7 |
| 110:12 241:20 | **previously** | 55:6 57:8 77:1 | 31:16 32:15,22 |
| **preponderance** | 236:25 | 124:6 160:22 | 40:6 202:16 |
| 83:5 | **printout** 246:2 | 189:4 191:4 | **programs** 48:5 |
| **prerequisites** | **prior** 202:25 | 201:7 219:8 | **project** 87:12 |
| 16:22 | 218:23 258:5 | 251:23 253:10 | 87:17,20 |
| **prescription** | **prison** 15:20 | 255:10 | **promote** |
| 10:19 | 18:5 25:2 27:6 | **procedures** | 201:22 |
| **present** 2:18 | 30:13 35:19 | 24:23 33:12 | **promoted** |
| 177:12 256:1 | 43:7 44:15 | 44:25 46:19 | 218:18 |
| **presented** | 49:22,25 68:22 | 50:19 54:24 | **pronounce** |
| 233:16 | 70:16 72:7 | 72:14 145:15 | 64:20 |
| **presenting** | 191:1 218:24 | 161:6 162:5 | **proof** 82:13 |
| 160:8 | 219:19 220:22 | 191:6 | 83:5,15 84:3 |
| **preservation** | **privileged** | **proceed** 6:24 | **proper** 212:13 |
| 214:9,12 248:7 | 14:15 | **proceeding** 5:6 | **prosecuting** |
| 248:22 249:15 | | 5:19 6:2 257:8 | 212:20 |

Veritext Legal Solutions
800-336-4000

**[protect - rampagelaw.com]**

| | | | |
|---|---|---|---|
| **protect** 51:14 85:23 117:16 139:19 219:20 | **pull** 80:11,11 97:22 120:10 152:21 186:3 | **putting** 69:22 69:23 70:1 72:9 73:11 119:4 253:13 | **questions** 7:20 9:22 35:9 39:5 42:8,20,22,23 42:25 43:2 |
| **protected** 232:7,15 | **pulled** 32:23,25 33:2 | 255:6 | 64:9 65:8 72:5 76:8,8 94:2,17 |
| **protecting** 99:2 99:15 | **punished** 33:24 109:2 | **q** | 97:7 100:13 105:9,12 165:1 |
| **protection** 154:9,13 219:11 | **punishment** 108:24 | **qualified** 258:7 **quantity** 136:2 **question** 9:14 | 176:24 177:4,4 179:10 186:11 188:19,23 |
| **protective** 105:4 154:12 175:1 186:16 190:5 217:24 | **punitive** 109:15 109:20 188:6 235:7,13 236:4 238:6,9 | 12:6,7,11 65:7 66:14 69:13 85:3 89:23 100:10 101:21 | 195:21,25 200:9 213:4 222:9 241:23 244:18 255:18 |
| **prove** 244:5 | **punitively** 188:11 | 102:2 117:25 123:4,15,16 | **quick** 206:11 **quiet** 154:4 |
| **provide** 12:6 49:16 65:17,23 75:1,2 | **purchasing** 29:25 30:5 | 130:17 138:25 145:12 149:18 187:15 193:4 | **quintana** 85:20 198:13 |
| **provided** 175:8 179:4 196:22 198:3 | **purple** 156:21 157:1,3,16,22 157:23,24,25 202:22 203:1,1 | 200:23 206:7 236:7,11 255:21 256:8 | **quite** 237:6 |
| **provides** 46:4 83:3 85:22 | 203:3,4,8,9,10 203:11,12 219:2 | **question's** 70:23 | **r** |
| **provision** 70:17 | **purpose** 77:18 78:15 101:3 | **questioning** 71:11 72:2 100:21 179:9 | **r** 2:1 5:1 19:11 19:12 20:20 26:7 63:6,7 |
| **psych** 134:23 139:13 228:10 243:15,15 | **purposes** 15:16 50:11 101:8 | 254:25 | 260:3,3 |
| **public** 59:19 104:2 105:15 113:5 114:5 | **put** 31:23 38:22 57:5 71:6 72:18 89:7 | **questionnaire** 42:7,16,17 177:16,18,24 177:25 | **rachal** 26:2,8 26:15 27:11 85:6 |
| 117:1 203:18 231:13 232:22 232:24 233:2 258:19 261:19 | 118:21 119:13 159:3 165:15 184:9 232:17 | **questionnaires** 47:2 | **raise** 6:17 231:8 **rampagelaw....** 2:15 262:1 |

Veritext Legal Solutions
800-336-4000

[rankin - records]

| | | | |
|---|---|---|---|
| **rankin** 157:10 | 109:6 121:25 | 260:12,15,18 | **recognize** |
| **rape** 15:20 18:5 | 122:25 132:19 | 260:21 | 206:22 |
| 25:2 27:6 | 153:3,4,22,23 | **reasonable** | **recollection** |
| 30:13 35:19 | 165:13 166:22 | 83:7 | 32:13 105:19 |
| 44:15 49:22 | 169:17 171:19 | **reasoning** | 133:14 151:16 |
| 50:12,16 68:22 | 192:5 227:13 | 119:10 135:20 | **recommend** |
| 70:16 72:7 | 227:16 243:23 | **reasons** 87:5 | 111:8 |
| 129:22 169:11 | 256:16,20,21 | 187:11 203:13 | **recommended** |
| 170:2,25 176:9 | 261:5 262:6,8 | 217:22 225:20 | 111:5,22 |
| 176:10,14 | **reading** 104:4 | 226:7,13 | 112:18 117:9 |
| 185:12 191:1 | 139:16 154:14 | **reassess** 143:24 | 120:7,9 142:20 |
| 194:6,9 198:16 | 197:20 | **recall** 39:6 72:1 | 143:3 200:16 |
| 198:23 | **ready** 177:2 | 76:13,17 | 200:18,25 |
| **raped** 50:25 | **real** 38:18 | 103:24,25 | 201:2 220:4,14 |
| 153:25 154:9 | 104:6 206:10 | 106:13 132:22 | 243:14 |
| 154:17,18 | **reality** 138:20 | 138:11,12 | **record** 5:3,6,7 |
| 155:17 165:11 | 172:22 | 139:7 140:22 | 5:16 6:5 71:16 |
| 165:16 166:15 | **really** 22:24,24 | 198:2 203:5 | 71:17,19 121:5 |
| 187:4 225:8 | 46:16 67:1 | **recant** 241:3 | 121:7 134:11 |
| 226:17 229:16 | 173:11 215:13 | **recants** 225:15 | 135:11,12,13 |
| **rapes** 77:12 | 218:4 222:16 | **receipt** 248:21 | 153:23 190:15 |
| 160:1 | 237:6 252:24 | **received** 11:17 | 190:18,19,21 |
| **rather** 134:6 | 254:24 | 53:19 104:8,10 | 257:5 258:9 |
| 212:10 | **reason** 30:19 | 196:14 250:4 | 259:5 |
| **rats** 41:1 | 51:3,5 103:16 | **receiving** 42:10 | **recorded** 5:23 |
| **reach** 114:16 | 112:2 117:10 | 104:5 106:13 | 6:2 258:6 |
| **reached** 57:22 | 118:12 119:4 | 114:17 179:7 | **recording** |
| 106:15 232:5 | 119:13 141:16 | **recent** 86:15 | 258:8 259:4 |
| **reaching** | 147:5 161:19 | **recently** 13:16 | **recordings** |
| 107:10 232:2 | 163:15 168:5 | **recite** 92:6 | 5:18 |
| **react** 50:24 | 187:8 196:17 | **reclassified** | **records** 61:18 |
| **reactions** 50:16 | 201:4 225:17 | 143:23 | 99:12,24 100:3 |
| **read** 105:18 | 237:23 239:11 | **reclassify** 52:1 | 100:4,8,11,21 |
| 106:1,1,8 | 239:14 260:6,9 | 60:15 61:4 | 170:5 171:7,11 |

Page 49

[records - report]

| | | | |
|---|---|---|---|
| 248:25 249:8 | **regardless**  60:4 | 159:1,25 | **remember** |
| **rectified**  11:7 | **regulation**  33:9 | 165:23 168:2,2 | 104:4,5,9,17 |
| **reduce**  77:12 | **regulations** | 169:10 170:1,5 | 133:19 135:21 |
| 78:7 86:7,21 | 72:20 | 170:25 171:11 | 135:22 138:9 |
| **reduced**  258:7 | **rehouse**  54:13 | 171:18 172:9 | 138:18 139:1 |
| **reducing**  77:23 | 56:3 59:3 | 182:8 192:17 | 139:11,13,16 |
| **refer**  230:9 | 60:15 | 194:5,8,11 | 194:16 224:3,7 |
| **referenced** | **rehoused**  56:3 | 195:23 197:21 | 224:15 226:20 |
| 262:5 | **relate**  47:4 | 197:24 204:1 | 232:1 240:13 |
| **referral**  130:25 | **related**  31:6 | 205:11 251:22 | **remotely**  5:14 |
| 134:24 139:4 | 33:16 90:23 | **relation**  96:5 | **remove**  61:5 |
| 139:13 140:2 | 96:9 205:4 | **relationship** | 178:2,8 |
| 150:14 163:12 | 258:11 259:7 | 52:9 168:16,20 | **removed**  52:25 |
| 163:18,24 | **relates**  76:14 | 169:1 | 83:21 141:9 |
| 175:11 | 86:22 93:5,15 | **relative**  76:22 | 163:3 |
| **referrals**  140:4 | 94:2 102:16 | 81:12 258:13 | **repair**  63:3 |
| **referred**  228:10 | 111:12 129:6 | 259:10 | 67:14 |
| 229:19 231:11 | 137:17,24 | **relatively** | **repaired**  63:3 |
| 231:15 233:22 | 139:20 140:16 | 177:11 | 63:15 64:4 |
| 234:8 | 145:14 149:20 | **released**  111:18 | 67:20 |
| **referring** | 166:12 170:23 | 112:1,5,15,22 | **repairing**  67:15 |
| 107:10 136:5 | 172:12 180:9 | 120:5 141:3,6 | 67:16 |
| 148:9,9 230:1 | 185:13 191:1 | 141:6,10,13 | **repairs**  65:9 |
| 234:2 235:17 | 193:23 201:14 | 143:5 182:24 | **repeated**  160:1 |
| **refers**  234:18 | **relating**  18:6 | 199:13 | **repetitive** |
| **reflecting** | 18:13,17 21:15 | **releasing**  179:6 | 69:25 |
| 134:12 | 27:20 86:6 | 179:7 | **rephrase**  12:13 |
| **refresh**  105:19 | 91:1 110:15 | **relocate**  145:21 | 36:4 |
| 133:14 151:16 | 113:7 118:9 | **relocated**  54:7 | **replace**  63:4 |
| **refused**  224:16 | 125:7 126:3,17 | 60:4 61:2,6 | **report**  3:19,21 |
| **regarding** | 134:12 135:17 | 108:24 175:16 | 4:6,8 17:23 |
| 246:2 248:17 | 146:24 149:24 | **remain**  73:22 | 27:7 53:12 |
| 250:5 253:25 | 150:16 151:2,6 | **remained**  29:21 | 61:14,15,16,16 |
| | 155:16 158:12 | | 61:17,17 67:9 |

Page 50

**[report - retained]**

| | | | |
|---|---|---|---|
| 69:16,17 70:10 | 153:19 161:22 | 33:18 39:15 | 232:9 233:1 |
| 70:14,20 71:2 | 168:6,13 | 47:15 61:25 | 246:9 |
| 71:7 72:1,9,16 | 188:17 | 62:2 118:4,8 | **responsible** |
| 72:19,25 73:14 | **reports**  17:19 | 123:21 143:9 | 31:15 |
| 73:15 126:11 | 18:1,2 68:9 | 145:16,20 | **responsive** |
| 127:1 128:5,18 | 72:9 73:17 | 169:9 170:4 | 253:15 255:9 |
| 129:4,6,10 | 166:20 167:22 | 171:10 172:8 | **rest**  10:22 54:9 |
| 132:17,19 | 167:24 168:1 | 180:11,14 | 57:13 |
| 134:7,8 139:23 | 197:6 235:5 | 194:2 195:14 | **restrained** |
| 142:7 149:2 | 241:20 | 211:9 261:13 | 111:23 200:10 |
| 150:11 151:1 | **represent** | **requirement** | 216:1 218:5,11 |
| 151:25 161:15 | 15:12 58:1,8 | 180:5,7 214:9 | 218:14,15,23 |
| 164:5 196:21 | **representation** | 214:12,16 | 219:20 220:4 |
| 197:20,23 | 29:8 107:7 | 215:8 | 220:13,14,15 |
| 198:3 199:5,6 | 153:13 248:7 | **requires** | 220:20 237:21 |
| 219:7 224:19 | 248:21 249:15 | 122:15 123:7 | **restraint**  220:7 |
| 240:20 | **representative** | 124:6 144:16 | 220:11,25 |
| **reported**  61:9 | 94:20,21 95:9 | 144:25 145:14 | 235:15,17 |
| 79:20 121:2 | 95:12,20 96:24 | 145:24 196:18 | **restraints**  60:9 |
| 129:23,24 | **request**  76:16 | 197:11 | 111:5,8,9,10 |
| 130:2 132:24 | 76:18 166:2 | **requiring** | 112:18 117:10 |
| 149:6 168:11 | 192:9,11 | 200:4 | 120:8,11 |
| 168:14 184:16 | 248:16 | **resources** | 122:15 123:7 |
| **reporter**  5:5 | **requested** | 45:13 | 142:20 143:3,9 |
| 8:15 | 109:7,11 119:5 | **respond**  232:10 | 144:12,12,16 |
| **reporting** | 119:12 121:25 | 232:12 | 144:25 190:6 |
| 50:11 51:10 | 217:15 | **responded**  72:4 | 200:4,16,17,25 |
| 61:8 66:5,18 | **requesting** | 106:14,24 | 201:3 220:8,25 |
| 67:6 71:25 | 109:8 119:6 | 108:18 132:13 | **result**  169:15 |
| 117:17 118:18 | 122:25 131:14 | 132:21 233:6 | **retain**  211:9 |
| 128:24 129:1,8 | **require**  196:21 | **response**  12:6 | 253:21 |
| 129:13 132:14 | 240:22 | 107:11 108:1 | **retained** |
| 134:8,19 138:4 | **required**  30:9 | 109:15,21 | 205:19 |
| 149:2 152:5,11 | 30:12 32:9 | 122:24 146:2 | |

[retaliation - right]

| | | | |
|---|---|---|---|
| **retaliation** | 219:24 | 39:9,12,13,22 | 127:9,16 |
| 117:16,21,25 | **reviewed** 12:17 | 41:20,25 44:13 | 128:22 130:4,9 |
| 118:9,17,21 | 98:6 102:23 | 44:22 45:18 | 130:11,23 |
| 219:11 | 104:12,15 | 46:9,13 47:19 | 131:16 132:3 |
| **retention** 91:1 | 110:9 135:17 | 47:24 49:16,21 | 132:10 133:4,5 |
| 99:22 100:8,22 | 137:10,23,25 | 49:22 50:15 | 133:24 135:1,9 |
| 101:2 121:5 | 148:13 151:15 | 51:9,19 52:14 | 136:24 137:4 |
| 166:4 170:5,19 | 153:11 158:7 | 54:23 56:7 | 138:2 140:9 |
| 170:21,22 | 162:19 165:3 | 57:5 59:21 | 141:1,13,15 |
| 204:23 211:15 | **reviewing** | 63:14 65:6,16 | 142:23 143:1 |
| 214:13,16,17 | 46:23 159:8 | 66:15 67:1 | 143:12,12 |
| 215:8 251:10 | **reviews** 181:2 | 69:15 71:12,22 | 144:14 146:5 |
| **retired** 31:19 | 193:24 195:23 | 71:24 72:4,13 | 148:4,7 151:1 |
| 90:3 | 196:1,18 197:1 | 73:5 75:15 | 151:11,15,24 |
| **retraining** 31:6 | **rewind** 208:24 | 76:13 77:3 | 152:10,15,19 |
| **return** 262:12 | **ricky** 87:24,25 | 80:23 84:14 | 153:11,16 |
| **returning** | 88:4 | 85:16 88:8 | 156:8,14,15,20 |
| 247:10 | **right** 6:17,23 | 89:23 95:17 | 157:5,14,16 |
| **review** 3:14,23 | 7:15 9:4,17 | 97:2,21,22 | 158:12 159:20 |
| 12:15,18,25 | 10:4,13,19,24 | 98:1,23 99:22 | 159:22 160:19 |
| 13:2 14:17,23 | 11:2,5,12,21 | 101:5 102:24 | 161:10 162:21 |
| 57:2 76:16,22 | 12:3,5,15 14:4 | 105:8,18,20 | 164:8,12,15,23 |
| 76:25 103:1 | 14:4,14,17,23 | 106:2,19,20 | 166:23 168:16 |
| 105:8 110:11 | 15:1,16,24 | 107:1,9,23 | 169:9 170:5,7 |
| 110:14,22 | 16:9 17:7,10 | 108:12 111:13 | 170:16,18,19 |
| 127:6 137:11 | 17:23 19:13,17 | 111:15 112:12 | 172:10,12 |
| 148:5 153:9 | 23:3,8 24:7,21 | 112:16 113:4 | 174:8,16,23 |
| 171:7 179:17 | 25:1 26:24 | 114:20,22 | 176:7,19 |
| 179:20,25 | 27:1,16,19,23 | 115:17 116:6 | 178:22 179:2,8 |
| 180:19,19 | 27:24 28:3,6,6 | 117:9,15 118:2 | 180:5 182:1 |
| 194:5,8,11,19 | 28:7 29:2,4,14 | 118:15 119:17 | 183:25 184:16 |
| 194:19 195:14 | 29:19,20 30:8 | 120:23 121:3 | 184:20,23 |
| 195:21 197:24 | 32:12 33:5,18 | 121:12,18 | 185:18 186:5 |
| 198:4 199:8 | 35:13 36:18 | 125:19 126:22 | 186:20,24 |

Veritext Legal Solutions
800-336-4000

**[right - says]**

| | | | |
|---|---|---|---|
| 187:1,2,7,17 | 142:10 176:23 | 63:6,6,7,7 | **saw** 22:12 |
| 188:25 189:23 | 176:24 177:13 | 130:11 260:3 | 224:3 227:20 |
| 190:3,4,24 | 185:12 186:10 | **sabbatical** | 256:4 |
| 191:21 192:13 | 186:17 217:3 | 22:20 23:3 | **saying** 8:3 |
| 193:12,23 | 217:19 218:1 | **safe** 37:23 | 23:15 38:13 |
| 198:10 199:10 | 239:4 | 51:13 56:18 | 56:17 59:20 |
| 199:11,11,22 | **road** 44:17 | 65:9 | 66:13 70:3 |
| 200:1 201:18 | 45:19 | **safety** 49:3 | 80:2 98:9 |
| 202:4,9,21 | **rodriguez** 2:12 | 51:17,20 56:15 | 114:14 146:21 |
| 203:23,25 | **role** 19:15,23 | 117:5 124:24 | 147:6 155:17 |
| 206:2,2,16,18 | 20:7,9,10 21:2 | 154:8,13 | 157:15 173:4 |
| 206:21 207:3 | 24:17 34:2,13 | 201:21 221:23 | 173:10 174:9 |
| 207:18 208:10 | 58:21 83:13 | **sally** 64:16,19 | 201:4 227:14 |
| 208:15 209:2 | 90:7,9 136:9 | 65:11,17,19 | 230:16 231:2 |
| 209:15 210:2,2 | 136:10 156:1 | **san** 16:8,16 | 248:15 249:2 |
| 210:7,8,13,16 | 181:1 233:7 | 85:9 | 250:3 252:18 |
| 212:21 213:3 | **rolling** 25:15 | **sanction** 128:9 | 253:4 254:19 |
| 214:4 215:2 | **ron** 248:14 | **sanctioned** | 255:11,15 |
| 220:21 227:14 | 249:3 | 146:17,20 | **says** 53:24,25 |
| 231:6 234:7 | **rounds** 191:9 | **sanctions** 3:16 | 68:9 70:21 |
| 236:20,23 | 191:10 | 4:4 125:24 | 71:6 75:5 80:4 |
| 237:5 243:22 | **routine** 192:19 | 126:3,4,9 | 92:9 98:1 |
| 244:17 245:9,9 | **row** 126:14 | 127:19 146:13 | 106:3 111:5,5 |
| 245:12,25 | **rule** 251:23 | **sane** 19:3 160:8 | 111:18 115:18 |
| 246:6,12,19,21 | **rules** 5:22 | 198:23 | 115:25 117:10 |
| 247:13,16,18 | 44:17 45:19 | **santee** 2:12 | 117:10 118:13 |
| 248:11,20 | 253:10 255:10 | **sarah** 3:11 | 119:9 120:13 |
| 249:5 250:17 | 262:14 | 104:1,15 | 121:18 125:24 |
| 253:7 254:15 | **run** 62:23 | 105:14 109:24 | 126:2,6 130:10 |
| 254:16 256:12 | **s** | 113:19 116:16 | 130:18 132:3 |
| 256:15 257:3 | | **save** 216:16 | 133:17 137:7 |
| **rights** 49:23 | **s** 2:1 3:8 4:1 5:1 | **saved** 166:9 | 141:15 142:23 |
| **risk** 89:8 | 19:12 20:19,20 | 254:16 | 146:13,17 |
| 141:19,25 | 43:20,21,21 | | 148:8,24 |

Veritext Legal Solutions
800-336-4000

**[says - sense]**

| | | | |
|---|---|---|---|
| 149:19 151:11 | **section** 82:13 | 128:24 129:14 | 253:2,3,10,18 |
| 152:6 153:20 | 176:3 | 130:9,9,10 | **seeing** 204:6 |
| 156:21 158:9 | **sections** 36:20 | 132:4,8,22 | **seem** 9:21 67:8 |
| 158:24 159:15 | **secured** 202:23 | 133:5,12 134:4 | 203:25 242:16 |
| 187:9 200:12 | 204:9 | 136:18 137:2 | **seemed** 163:19 |
| 202:5,21 | **security** 103:19 | 137:18 140:14 | 242:23 |
| 208:19,20 | 103:22 105:24 | 141:4 144:3 | **seems** 250:13 |
| 224:5 228:9 | 106:6 182:18 | 148:4 149:4 | **seen** 58:24 |
| 243:24 245:25 | 201:22 238:20 | 150:19 151:3 | 60:14 110:18 |
| 246:1,11,22,24 | 238:23 239:1,3 | 151:11,19,22 | 125:23 127:4 |
| 247:5,7,8 | 239:6 240:9 | 152:8,12,16 | 130:22 140:9 |
| 249:10 253:3 | 241:23,25 | 153:20 156:22 | 146:18 209:19 |
| **scan** 189:13,25 | 242:2 | 158:2,6,10 | 210:14 220:7,7 |
| **scanner** 189:15 | **securus** 62:24 | 163:5 165:6 | 220:10 231:3 |
| **scenarios** 38:13 | 62:24 63:2 | 182:3,11 | 246:7 256:6 |
| 38:20 39:10 | 64:10,22,23 | 183:10,15 | **segment** 36:13 |
| **schizophrenic** | 65:4,5,14,20 | 184:21 190:3,3 | **segregation** |
| 139:15,18,21 | 66:21 67:2 | 190:10 192:3 | 101:6,7,16,24 |
| **schmidt** 178:13 | 75:21,22 100:7 | 197:4 202:5,6 | 102:12,20 |
| **school** 16:1,2,7 | 166:3 | 206:16,25 | 103:7,12 |
| 36:7 | **see** 7:16 26:24 | 208:22,24 | 118:16 187:20 |
| **scope** 94:11 | 27:2,8,10,16 | 210:5,16 | **selecting** |
| **screen** 7:11,17 | 28:1,6 29:2,13 | 211:22 212:10 | 124:19 |
| 8:5 26:24 | 42:9 71:9 89:2 | 230:10 232:20 | **send** 113:6 |
| 127:10 | 97:22,24 98:4 | 233:15 238:18 | 163:15 228:17 |
| **scroll** 29:6 | 102:21 105:6 | 241:22 243:22 | **sending** 112:24 |
| 121:18 | 105:21 106:2,9 | 245:9,12,14,19 | 157:9 160:9 |
| **second** 115:7 | 106:24 107:13 | 245:21 246:13 | 248:6 |
| 121:13 127:3 | 108:4 109:23 | 246:17,23 | **sends** 163:1 |
| 167:13 183:18 | 110:25 111:4 | 247:1,10 248:4 | **sense** 9:15 10:2 |
| 183:19 185:20 | 119:23 120:8 | 248:16,18 | 10:3 95:22 |
| 186:23 206:21 | 120:11 121:20 | 249:23,24 | 138:20 147:19 |
| 246:1 247:17 | 122:11 124:16 | 250:2 252:5,13 | 147:20 241:17 |
| | 127:9,13 | 252:17,25,25 | 255:14,15 |

Page 54

[sent - shackle]

| | | | |
|---|---|---|---|
| **sent** 107:7,13 | 121:16 123:1 | 157:8,9 198:13 | 79:17,18 85:24 |
| 108:6 113:1 | 138:13 141:3 | 246:2 | 99:3,15 117:17 |
| 153:21 157:6 | 141:16 144:3 | **sergeants** 54:21 | 117:17 129:22 |
| 157:14 163:8 | 186:22 187:20 | **serve** 164:21 | 132:24 133:15 |
| 204:5 210:16 | 188:2 201:7,12 | **services** 174:24 | 133:21 138:5 |
| 210:24 213:16 | 201:16,19 | 175:1,7 176:8 | 146:14,15,19 |
| 232:19,24 | 202:1,17,23 | 176:9 | 146:19 147:7 |
| 233:2 246:16 | 219:4,14 221:1 | **session** 9:14 | 151:21 152:17 |
| 247:18 248:1,3 | 221:12,14 | **set** 57:10 77:1 | 154:22 156:9 |
| 248:10,14 | 235:23 236:1,5 | 145:15 149:16 | 158:10,25 |
| 250:9 251:15 | 236:17 238:4 | **settings** 220:22 | 159:10,24 |
| 252:19,21 | **separation's** | **settled** 11:10 | 160:3,4 166:20 |
| 255:6 | 199:13 | **settles** 11:8 | 172:13 179:4 |
| **sentence** | **september** | **seven** 38:3 | 179:16 185:12 |
| 245:20 246:1 | 103:3,20 | 89:17,18 91:4 | 193:24 194:12 |
| 246:24 247:1 | 110:15 132:23 | 92:18 94:14 | 194:18 195:13 |
| **sep** 112:3 | 136:14 139:8 | **several** 57:21 | 195:23 196:1 |
| 114:23 115:1 | 156:18 159:25 | 120:25 135:25 | 196:18 197:1 |
| 119:4 192:7,8 | 165:10,23 | 136:1,1 138:9 | 198:15 224:20 |
| **separate** 100:7 | 166:14 167:13 | 169:4 197:9 | 226:23 243:4,4 |
| 124:10 214:16 | 167:13 168:2,3 | 225:20 226:7 | **sexuality** 51:17 |
| **separated** 52:5 | 169:11,21 | 240:25,25 | **sexually** 80:2 |
| 73:20 74:4 | 170:2,23 | 241:1 | 142:1,10 |
| 101:9 103:14 | 171:18,21 | **sex** 34:21,25 | 155:19 171:24 |
| 124:17 199:22 | 172:1,10 | 46:9 82:21,21 | 177:8 186:14 |
| **separation** | 183:14 184:1 | 164:13 | 186:15,17 |
| 101:11,12,17 | 184:12,13,13 | **sexual** 21:20 | 212:1,3 217:3 |
| 101:25 102:13 | 184:18,24 | 31:7,8,9 34:23 | 217:19 225:8 |
| 102:15 103:6 | 187:5 196:10 | 34:24 35:5 | 226:9 231:5 |
| 103:11,14,18 | 198:23 213:20 | 44:3 49:25 | **shackle** 47:20 |
| 103:22 109:7,9 | 241:14 | 50:1,6,9,12,12 | 48:1 108:22 |
| 109:12 110:8 | **sergeant** 85:20 | 50:16,25,25 | 118:22 188:14 |
| 110:22 111:19 | 108:10 132:23 | 51:15,15 71:4 | 235:14 256:4 |
| 112:1,2 118:22 | 133:6,15,19 | 71:4,5 77:12 | |

Veritext Legal Solutions
800-336-4000

[shackled - situation]

**shackled** 48:24
49:5,6,10,14,15
57:1 106:6
108:25 109:5
110:2,8 113:1
114:7,14
118:17 119:9
119:17,22
157:20 163:3
187:19 188:1
203:15 216:2,5
216:10,10
218:11 219:9
220:3 221:2,7
221:10,14,15
221:21 231:16
231:22,23
232:1,6,21
233:5,13 235:6
236:2,6,16
238:5 254:7,9
254:9
**shackles**
111:10 119:11
220:25 221:24
221:25 236:18
**shackling** 48:5
48:10,14 109:9
109:14,19
203:19 204:3,9
**shaking** 23:20
**share** 193:19
**sharing** 175:24
193:12

**shaun** 20:18,21
92:20 136:11
136:15
**sheet** 3:14,23
7:15 131:11
153:14 165:15
262:10
**sheets** 110:22
110:23
**sheriff** 17:16,22
18:2,9 27:16
27:19 88:24
**sheriff's** 3:18
6:14 16:23
17:1,6 18:24
22:6,10,19
23:10 24:1,22
24:24 25:14
26:11,18 28:14
30:22 31:18
32:3 33:1,13
36:21 41:21
45:5,15 46:10
48:1 50:19,24
51:7 95:24
113:15 114:19
170:20 186:8
214:13 215:9
249:24 250:1
250:22
**sheriffhctx.net.**
193:11
**shonda** 54:20
179:13

**short** 71:23
**shortly** 190:12
**shot** 209:2,5,6
209:10 212:4
246:7,20 247:3
247:16,17
252:5,13
**shot's** 246:12
**shots** 206:18
207:12 210:11
210:19 245:6,7
255:9
**show** 26:18
136:22 200:15
253:1 254:6,8
**showed** 106:17
125:15
**showing** 7:12
7:22 11:18
112:21 172:21
206:25 249:8
**shown** 213:16
218:4 255:23
**shows** 28:3
29:17 112:15
112:18 120:2
137:5 141:1
159:14 187:8
191:10 212:4
250:11
**shred** 92:2,3
**side** 65:20,21
183:18,19
184:5 185:21

186:24 187:7
**sign** 45:8
256:16,20,21
262:6,11
**signature** 257:6
258:17 259:14
**signed** 43:8
262:17
**signifies** 157:2
**signify** 129:19
184:3
**signs** 140:1
**similar** 69:24
92:21 93:23
140:12 146:10
212:18 241:13
**similarly**
209:13
**simply** 48:23
61:4
**single** 201:20
**singular** 130:16
**sir** 92:8 93:17
110:4
**sit** 100:12
171:20
**site** 35:6
**sitting** 59:25
**situation** 48:21
59:7,8,17,17,18
59:19 60:3,5
133:9 151:13
212:8,9 220:23
246:3

Page 56

[situations - spouse]

situations
   35:11
six   21:2 38:2
   89:17,18 91:3
   135:7
sixteen   199:18
sixth   141:21
   142:2,5,14,18
   142:19 149:13
   153:24 154:1
   154:21 155:19
   166:21
skills   258:10
   259:6
slapping
   148:16
sleeping   80:4
slide   40:14
small   19:9,12
   22:3 32:20
   52:15,16,18
   80:16,18 81:16
   177:5,11
   186:13 217:12
sneed   246:2
social   182:18
sociology   16:13
softball   65:7
solely   57:13
solid   50:4
   157:25 219:2
solutions
   262:19

somebody   15:8
   56:9 60:6,15
   80:5 116:6
   118:21 123:20
   124:18 139:20
   150:2 188:14
   224:6
somebody's
   222:18
someone's
   117:5
something's
   80:14
son   15:14
   132:25 151:25
   153:24 154:2,3
   154:4,11,18
   164:20 168:15
   168:19,21
   230:16
soon   74:5,7,15
sooner   185:11
sop   4:13
sorry   82:2,4
   179:7 180:12
   206:6,13 245:7
   252:10 256:18
sort   97:15
   214:8 229:20
sound   29:18
   32:20
sounds   29:20
source   44:18
   45:23 62:3

sources   32:21
   46:3,17,22
south   115:7
   140:21,22
   185:20 186:24
   207:5
southern   1:2
   8:25
speak   9:24 13:7
   13:11 25:25
   53:21 62:4,6,9
   75:19 96:4
   117:11 138:7
   138:16 163:7
   229:14
speaking   54:5
   96:7,24 126:10
special   90:19
   168:15,19
   201:19
specialist   20:7
   186:18 217:20
specific   15:12
   34:12 39:6,9
   39:12 164:25
   165:19 204:6
specifically
   58:25 71:25
   86:21 93:1
   96:5,9 105:10
   124:3 125:7
   136:24 138:11
   148:17 182:22
   187:9 191:1

229:11 233:22
speculation
   66:7 196:7
spell   26:6 64:13
spelled   100:17
spelling   87:25
   88:1 256:23
spn   182:13
   210:5 248:17
spoke   56:11
   112:4 138:8
   163:14 211:23
   213:7 226:16
spoken   21:19
   25:22 56:13
   237:24 244:13
spot   93:11,12
   93:22 94:12
   97:19,19,20
   115:9
spots   30:3 86:7
   86:21 87:4,10
   88:17 89:6,8
   89:14,21 90:8
   90:23 91:18
   92:6,24 93:24
   97:16 98:3,7,9
   98:10,12,17,19
   98:22 131:12
   140:24 149:16
   183:21 239:18
   240:8,10
spouse   53:17
   130:7

**[spur - strike]**

| | | | |
|---|---|---|---|
| **spur** 68:15 | **standard** 4:15 | **started** 19:14 | 185:13 218:12 |
| **spurred** 69:8 | 15:22 30:25 | 25:5,13,15 | **stenographic** |
| **staff** 19:2 31:9 | 31:2 33:12,17 | 26:5 30:10 | 5:24 |
| 31:10,20 32:3 | 44:24 46:19 | 37:20,22 38:2 | **stipulating** |
| 35:5 40:11 | 47:25 48:7,12 | 87:13 | 94:15 |
| 42:19,24 45:3 | 54:24 57:8 | **starting** 16:23 | **stipulation** |
| 46:2 49:2 50:2 | 70:21 71:6 | **starts** 54:9 | 5:25 |
| 51:3,7 61:24 | 72:13,17,22,24 | 64:17 | **stipulations** |
| 62:24 63:2 | 77:1,14 78:14 | **state** 37:8 71:3 | 97:8 |
| 79:12 98:3,10 | 124:5 145:15 | 126:12 197:17 | **stop** 255:7 |
| 99:8,9 100:10 | 160:21 161:5 | 220:16 258:20 | **stopping** |
| 100:14,23 | 189:4 191:2,4 | **stated** 120:25 | 190:12 |
| 101:4 123:18 | 191:6 197:17 | 136:3 160:4 | **storage** 170:12 |
| 124:11,12 | 201:7 204:22 | 186:14 224:10 | 170:13 |
| 142:9 149:20 | 219:8 | 224:11 236:23 | **store** 205:3 |
| 149:21,22 | **standards** | 239:9,17 | **stored** 253:8 |
| 162:2 192:15 | 25:12 32:24,24 | 240:21 | **stories** 135:25 |
| 193:1 201:20 | 33:2,4,20,25 | **statement** 5:3 | 136:1 241:1 |
| 201:21 239:4 | 35:10 43:1,5,6 | 165:20 213:14 | **story** 77:6 |
| 240:4 | 45:10 46:21,23 | 234:25 235:4 | **straight** 232:24 |
| **staff's** 32:9 | 46:25 47:4,19 | **statements** | **street** 1:22 |
| 193:2 | 51:5,6,8 52:4 | 242:23 243:23 | 10:14 54:19 |
| **staffing** 85:22 | 52:24 69:2 | **states** 1:1 110:5 | 58:25 61:12 |
| 85:23,25 86:2 | 71:3 74:25 | 163:4 186:16 | 63:16,23 64:4 |
| 93:19 99:1,7 | 75:4 77:5,15 | **stating** 62:22 | 75:16,25 76:4 |
| 99:13 100:25 | 78:8,9,10 83:9 | 109:7 139:1,17 | 85:9 86:6 |
| 173:10 | 118:6,7 161:13 | 150:12 211:25 | 88:16 90:9 |
| **stages** 28:8 | 191:8 | **stature** 177:5 | 93:25 97:13,17 |
| 223:1 | **stands** 126:21 | 186:13 217:12 | 131:8 142:3 |
| **stamp** 105:5 | **start** 15:10 | **status** 113:13 | 144:17 181:24 |
| **stamped** | 16:25 53:22 | 148:24 | 208:9 251:2,11 |
| 136:19 | 54:5 82:22 | **statute** 68:23 | **strike** 37:4 |
| **stand** 15:19 | 213:8 | **stay** 16:10,11 | 123:19 125:9 |
| | | 23:1 60:2 | 162:14,21 |

Page 58

[strike - surprise]

178:16 207:18
**stripe** 156:22
  157:1,3,23,24
  203:2,3,4,9,11
**struggle** 175:8
**stuck** 240:8
**studying** 16:12
  16:17
**stuff** 15:5 93:19
  174:4 211:9
  241:25
**styled** 141:23
**subject** 51:11
  210:3
**subjective**
  132:14 177:24
**subjectivity**
  83:21
**submit** 173:15
**subpoenaed**
  11:6
**subscribed**
  261:14
**subsection** 98:1
**substantiate**
  155:3
**substantiated**
  169:22 180:11
  180:13 195:7
  195:11 197:5
**substantiating**
  155:7
**suck** 154:3

**sued** 95:22
**suggest** 52:5
  57:18 187:18
  187:24
**suggestive**
  110:7
**suite** 2:5,13
**summarizing**
  72:10
**supervision**
  62:5,8 97:23
  170:9 189:14
  191:2
**supervisor**
  17:12,15 53:14
  65:22 85:18
  104:13 129:11
  129:12 133:1
  143:11 149:1
  159:7 185:8
  190:9 197:13
  223:4,6,7
**supervisors**
  54:15,19
  157:13 197:9
  210:21,24
  211:17 212:17
**supplement**
  163:13
**supplemented**
  167:10
**support** 174:23
  175:7 176:7
  188:17

**supposed** 61:24
  124:9 154:5,7
  161:11 175:12
  187:24
**sure** 20:12,23
  21:12,18,20,24
  23:19 26:22
  28:22 33:16
  34:23 35:3,10
  36:4 40:16,21
  44:6 51:4 55:6
  56:18 63:4
  65:3,18 66:10
  66:11 67:19,20
  68:5,17 74:12
  74:12,18 77:16
  78:15,18,19
  80:21 84:5,5,9
  85:19 86:15
  88:24 89:1,16
  91:16 92:2,3
  92:14 99:20
  100:9 102:14
  102:15 103:12
  103:13 111:3
  113:24 115:11
  116:23 117:12
  117:14 118:12
  118:13 119:3
  119:10 122:8
  123:14,16
  125:14 130:16
  131:13,15
  132:18 134:25
  135:19 138:8

139:25 140:4
140:25 143:19
144:19,21,22
145:4,20
149:17 150:18
152:2 155:25
156:6 159:15
166:11 169:3,6
169:18 171:9
171:19 172:24
178:5 180:4
183:22 185:17
187:6,14,22
188:4 189:7
192:18 193:3
193:14,22
194:7,10,13,14
194:16,23,25
195:5,20
196:17 198:8
198:19,24
199:7 202:13
207:15 212:16
215:19,20
219:22 220:3,6
220:19 227:13
230:19,24
231:25 232:15
232:23 233:12
233:19,25
234:5,21
240:10 248:24
**surprise** 113:18
  114:15,15

Page 59

[surprise - test]

174:2
**surveillance**
  75:16 76:1,9
  77:12,15 78:13
**survey**  97:16
**suspect**  73:13
  73:20,23
  124:10,13
  125:4,4 145:21
  185:1
**suspicion**  231:8
**swap**  59:12
**swear**  5:13
  6:16
**sweeten**  259:2
  259:15
**sworn**  5:16
  6:20 258:5
  261:14
**synonymous**
  98:17
**synonyms**
  98:18
**system**  42:18
  42:23 61:12,13
  61:14,22,22,25
  62:14,24 63:9
  63:10,10 75:16
  75:24,24
  126:11,19,21
  128:11,12,17
  189:11,12
  205:2 208:5

**systems**  86:7
  204:24 208:12

**t**

**t**  3:8 4:1 19:11
  19:12 86:4
  100:18 115:14
  260:3,3
**take**  5:6,11 9:9
  9:10 12:7
  14:11 22:20
  31:25 32:4,9
  35:4 38:8,9,20
  41:8 47:8,11
  71:11 89:1
  105:8 135:2,2
  153:4 190:13
  206:6,13
  207:23 224:21
  228:18
**taken**  5:9 46:25
  51:5 213:25
  214:21 215:6
  236:15 258:3
  258:12 259:9
**takes**  229:15
**talk**  9:18 52:3
  67:17 80:12
  176:3 223:11
  225:1
**talked**  51:11
  155:11 156:15
**talking**  40:11
  40:11 45:21

58:23 71:24
78:14 97:3
106:21 108:12
134:20 151:6
186:11 231:3
252:9
**talks**  82:13
**tangible**  253:9
**tasked**  54:12
  81:14 93:13
  98:13
**taylor**  2:3 6:7
  7:5 9:10 31:17
  31:20 32:13
  33:6,15 82:25
  84:23 90:2,13
  93:18 161:20
  248:16
**taylor's**  31:18
**tco**  37:7
**teach**  37:3
  46:11
**teaching**  36:24
  37:1
**technical**  76:8
**technically**
  13:24
**technology**  6:3
  214:17
**telephone**
  175:9
**tell**  6:21 19:17
  26:4 52:4 58:3
  68:1 101:15

119:21 133:23
209:16 249:9
254:17
**telling**  112:1
  164:19,20
  176:25
**ten**  9:10 42:8
  42:25 43:2
  56:8 91:2,6
  92:18 94:8,15
  99:22,25
  113:21 121:6,7
  170:19 171:15
  176:24 177:4
  204:23 205:3
  205:19 211:9
  214:8,11
  239:22
**term**  101:7
**terms**  9:5 10:15
  15:24 32:17
  34:9 40:22
  41:20 44:14
  46:18,18 52:22
  55:18 57:5
  61:7 65:6,8
  76:20 77:23
  82:10 83:4
  97:13 98:7
  125:5 138:4
  181:17 193:25
  204:22
**test**  41:8

Page 60

**[testified - time]**

| | | | |
|---|---|---|---|
| **testified** 6:22 | 58:18 67:9 | **third** 26:10 | **till** 157:21 |
| 11:2 94:11 | 68:18 96:8 | 46:4 52:14 | 183:14 184:1 |
| 104:11 137:4 | 227:14 229:25 | 53:15,16 63:8 | **time** 1:20 6:4 |
| 193:24 202:12 | 237:15 | 129:20 130:6 | 7:8 9:18,22 |
| 208:8 251:3 | **things** 7:9,22 | 131:8 206:25 | 11:18 16:17 |
| **testify** 222:17 | 15:7 33:21 | 207:3 208:16 | 22:2,4,18 |
| **testifying** 11:19 | 34:15 35:12 | 208:19,20 | 26:19 28:22 |
| 12:1 19:14 | 45:21 47:1 | 246:13 | 31:19 37:5 |
| 165:8 258:5 | 50:13 58:20 | **thirty** 58:4,4 | 38:5 48:21 |
| **testimony** 8:7 | 61:18 96:4,19 | **thorough** 78:18 | 49:7,12 56:7 |
| 10:15,17 11:11 | 103:13 116:16 | 181:15 | 57:19 59:25 |
| 11:24 72:11 | 163:21 181:14 | **thoroughly** | 65:19 66:2 |
| 130:5 256:22 | 203:14 213:6 | 70:22,25 156:5 | 71:16,19 74:24 |
| 261:8 262:8 | 228:21 229:10 | 229:23 | 74:25 82:24 |
| **texas** 1:3,15 | 230:10,12,14 | **thought** 170:21 | 90:18 103:24 |
| 2:10 3:18 5:10 | 238:2 239:9 | **thoughts** | 104:6 105:8 |
| 5:12 8:25 10:8 | 245:2 253:9 | 222:17 | 107:15 108:7 |
| 10:14 258:20 | **think** 13:18 | **threat** 103:19 | 108:22 109:5 |
| 260:1 261:1 | 31:9,10 38:9 | 103:23 105:24 | 113:3 115:22 |
| 262:3 | 39:9,12 41:3 | 219:18 238:20 | 125:10 131:3 |
| **thank** 6:15,23 | 44:13 48:20 | 238:24 239:1,3 | 135:11,14 |
| 6:25 7:8 24:3,8 | 58:3 59:7 | **threats** 239:6 | 150:8 153:4 |
| 50:5 97:11 | 61:18 67:25 | **three** 22:4 | 163:18 166:20 |
| 153:2 206:3 | 72:17 87:13 | 28:24 52:10,21 | 167:19 173:2 |
| 212:22,24 | 96:3,21 104:11 | 81:9,14 82:8 | 177:15 181:12 |
| 244:18 256:9 | 164:25 188:24 | 135:14 147:16 | 181:13 190:18 |
| **thanks** 17:11 | 219:16 222:5 | 150:20 153:25 | 190:21 197:6 |
| 27:4 | 225:18 228:19 | 154:17,19 | 200:10 202:6 |
| **thehunterlaw....** | 231:13 233:22 | 155:17 165:12 | 202:16 210:14 |
| 2:7 | 243:24 250:7 | 187:5 190:17 | 215:12 216:16 |
| **theirs** 82:25 | **thinking** 67:17 | 245:6,7 | 218:6,14 |
| **thereof** 66:21 | 84:10 134:9 | **throwing** 15:17 | 220:24 221:2 |
| **thing** 22:18 | 159:5 235:15 | **thunter** 2:7 | 232:19 236:6 |
| 33:23 53:9 | 235:16,21 | | 238:5,19 |

**[time - trying]**

242:11 243:2
257:5 262:15
**timeframe**
32:14 38:1
74:8 262:7
**timeline**  23:8
23:24 255:5
**times**  56:12,22
68:8 85:4
120:25 137:1,8
137:14 156:11
156:16 161:20
202:15,20
220:25
**title**  19:18
208:7
**today**  7:6 8:7
8:23 9:4 10:15
10:17 11:22,24
12:16 13:8,12
14:20 20:13,17
57:3 62:11
94:23 95:8,20
100:12 104:16
106:5 110:12
155:11 165:8
171:8,20 213:7
216:1 256:17
256:20,23,23
**today's**  8:6
11:18 14:12
**together**  73:11
**told**  58:18
133:20 154:3

225:6 232:5,10
232:25
**tolerance**
117:25 118:9
**tongue**  216:24
**took**  19:2 39:8
56:17 71:24
119:24
**tool**  189:19
**top**  43:4 148:7
182:23 209:20
245:21
**topic**  75:19,20
**topics**  95:2
**total**  58:4
**totally**  73:10
**touched**  47:2
80:5,5 224:6
229:16 242:25
**towards**  19:22
78:13 209:9
**track**  189:19,20
**train**  46:9
82:22,23
161:24 164:6
178:7
**trained**  39:8
78:3 83:14
84:12
**training**  22:7
28:9 30:14,16
30:16,18,20
31:5,13,16
32:4,10,15

34:12 35:22,23
39:8,16,18,19
40:1,2,4 41:14
41:17,20,22
42:1 46:8,14
46:24,24 65:17
65:22,23 66:4
66:16,20 67:3
82:12 84:5,6
**trainings**  44:1
46:20 47:12,16
48:10 82:10
83:2,8 84:2
161:23
**transcriber**
259:1
**transcript**  5:18
256:13 259:3,5
261:5,8 262:5
262:16
**transcriptionist**
258:8
**transfer**  110:22
116:10 192:8
**transferred**
60:8 110:21
115:19,25
116:8 155:18
**transfers**  143:2
**transgenders**
142:3,6
**transition**
136:12

**transitioning**
136:10
**transport**
199:7
**transportation**
19:4
**treated**  103:19
105:24 238:20
238:23 239:12
239:15
**trial**  8:9 11:7
**tries**  256:1
**tripartite**  52:9
155:12
**true**  29:7 43:14
77:2 105:16
107:6 137:25
153:12 159:2
184:18 188:16
200:18 202:1
213:14 248:23
251:4 258:9
259:5 261:8
**trust**  153:3
**truth**  6:21,21
6:22
**try**  24:4 94:2
229:14 235:22
235:23
**trying**  67:7,20
67:24 71:9
77:24 87:11
136:12 185:2
187:2 255:5

Page 62

**[turned - uploaded]**

**turned** 197:3,8
197:9,12,17
**twenty** 200:2
**twister** 216:24
**two** 36:15,16
36:20 39:14,22
39:23 45:2
50:22 71:19
84:20 86:16
103:1 104:8
110:11 112:8
121:15 127:4
133:4 135:10
143:12 166:14
167:24 168:1
193:12 210:21
210:24 211:16
211:16 212:17
215:12 239:22
245:20
**tx** 1:23 2:6,14
262:13
**type** 28:9 69:20
93:20 100:10
113:19 114:12
114:17 139:2
143:22 148:8
150:10 163:10
230:4
**typewriting**
258:7

**u**

**u** 20:20 63:6,7
63:7 86:4
100:17
**uh** 8:8 9:7
19:16 23:20
36:17 255:25
**ultimate** 56:4
**unable** 181:12
181:13,15
**unacceptable**
48:16
**under** 5:21
11:21 14:2
105:4 123:20
149:18 245:19
**undergo** 28:9
34:12 35:18
**understaffed**
123:8
**understaffing**
60:13,14 123:5
**understand**
5:17 8:11,12
8:13,16,23 9:1
11:21 12:1,12
12:12 14:14
15:12,25 45:9
50:15 94:6,16
94:23 95:8
139:14 155:10
216:4,6 219:19
236:13

**understanding**
11:13 70:24
103:8,10
146:25 154:15
175:23 180:15
197:19 221:8
228:21 236:14
238:3
**understands**
47:14 67:3
**understood**
8:18 9:3,16
12:7 138:20
236:7,10
**undertaking**
32:20 76:20
**underwent**
66:4 198:14,22
**unfounded**
180:14 181:7
181:10,10,11
181:16 195:8
195:11
**uniform** 170:1
172:9
**unintentionally**
232:17
**unique** 68:1
182:20 210:7
**unit** 133:2
201:19 216:25
217:1,23,24
218:6,11,19,23
220:12,16

221:12 223:8
223:10,15
227:1 234:3,9
234:12,15,18
235:1 237:20
238:4,4
**united** 1:1
**unknown**
103:15
**unresponsive**
134:4,22
**unstable**
168:13
**unsubstantiat...**
180:11,13,16
180:21 181:4,9
195:12 197:5
227:21,22
228:2 243:25
**unsubstantiat...**
155:7
**update** 75:2,13
**updated** 44:12
75:6,14
**updates** 75:2
**upgrade** 86:21
87:20 93:14
**upgraded**
86:10
**upgrades** 86:5
93:5,6
**upload** 190:1
**uploaded** 205:8
205:12,17

Page 63

[use - videos]

| | | | |
|---|---|---|---|
| **use** 8:9 30:23<br>40:13 41:18<br>61:25 62:2<br>68:2 102:9<br>175:9 212:7,21<br>215:20<br>**used** 50:6,8,11<br>50:15,23 51:11<br>77:12 78:6<br>84:18 101:7<br>111:1 132:15<br>188:6,11,13<br>191:5 212:16<br>253:8 262:16<br>**uses** 5:20<br>102:11<br>**using** 50:20<br>61:9<br>**usually** 11:6<br>54:7 62:23<br>68:21 79:3<br>107:12 116:18<br>141:20 201:19<br>203:15 219:2<br>228:1<br>**utilize** 38:13<br>**utilized** 26:19<br>39:11 51:13<br>68:10,20 69:1<br>102:14 126:10<br>**utilizes** 68:7 | **v**<br><br>**v** 260:1 261:1<br>262:3<br>**validity** 156:5<br>**various** 58:14<br>**vazquez** 248:15<br>248:15<br>**verbatim** 49:19<br>**verify** 232:20<br>262:8<br>**verifying** 15:3<br>**veritext** 5:6<br>262:12,19<br>**veritext.com.**<br>262:13<br>**version** 66:21<br>246:20<br>**versus** 187:12<br>**victim** 49:9<br>53:21,21 55:22<br>56:9 73:12<br>80:4 124:8,10<br>124:14 132:15<br>146:14,14,18<br>146:19,21<br>147:7 151:9<br>157:15 216:20<br>**victim's** 152:16<br>**victimization**<br>115:23 141:16<br>141:18,20<br>142:6,15<br>143:25 145:8 | 149:12 186:7<br>203:11 216:21<br>216:22,23<br>217:1,5,16,23<br>218:11,16<br>220:12,16<br>227:1 234:23<br>235:25<br>**victimizations**<br>157:4<br>**victimized**<br>141:19 142:1<br>142:10 177:8<br>186:18 217:4<br>217:20<br>**victims** 232:16<br>**victoria** 248:13<br>249:2<br>**video** 6:3 40:5<br>40:11,14,22,25<br>41:6,14,17,20<br>42:1,9 44:5,11<br>44:12 63:11,12<br>71:15,19 75:16<br>75:24 76:1,3,9<br>77:3,4,6,11,15<br>77:17,20 78:4<br>78:6,12,14,19<br>80:11,11 86:6<br>87:19 99:1,14<br>120:10 121:11<br>135:3,10,14,17<br>135:19 136:4<br>136:25 137:5,7 | 137:9,10,11,12<br>137:12,22,23<br>137:25 165:22<br>166:3,4,7<br>185:22,24<br>186:4 190:17<br>190:21 200:9<br>200:11 204:17<br>204:18,24<br>205:8,16<br>207:13,16<br>208:9 209:2<br>210:11,19<br>211:24 212:4<br>213:25 214:12<br>214:17 215:8<br>215:11,14<br>220:7 246:7,12<br>246:19 247:3<br>247:16,17<br>251:25 252:7<br>252:13 253:4,5<br>253:6,21,25,25<br>254:4,8,9,18,18<br>254:23 255:7<br>257:4<br>**videographer**<br>2:19 5:2 7:25<br>71:14,18 135:9<br>135:13 190:16<br>190:20 257:3<br>**videos** 43:12<br>47:3,12 76:14<br>76:16,22,25 |

Page 64

**[videos - window]**

| | | | |
|---|---|---|---|
| 77:8,11,11 | **volatile** 109:11 | 142:8 158:6 | **we've** 27:10 |
| 120:13,14,20 | 109:22 110:1,6 | 161:21 167:21 | 44:13 45:21 |
| 205:3,12 | 239:4 | 215:23 216:17 | 85:3 120:12 |
| 207:24 208:12 | **volunteers** 45:7 | 219:20 222:22 | 191:15 220:7 |
| 211:1 213:24 | **vs** 5:9 | 222:25 224:4 | 245:1 |
| 220:8,10 | **vulnerability** | 225:3 226:5 | **weaver** 178:14 |
| 242:10 245:7 | 234:3,15,18,23 | 230:19 252:25 | **website** 26:18 |
| 251:2,11,24 | 235:1 | 253:2 254:4 | 26:23 45:6,16 |
| 252:3 254:14 | **vulnerable** | **wanted** 55:15 | **week** 13:6 |
| 255:1,11 | 115:23 141:16 | 169:5,6 221:18 | 34:17 36:20 |
| **videotaped** | 141:18,20 | 222:3 240:4 | 102:24 104:4 |
| 1:18 | 142:6,15 144:1 | 254:4 256:4 | 184:23 |
| **videotaping** 8:2 | 145:8 149:12 | **wanting** 138:12 | **weekly** 35:22 |
| 8:16 | 157:4 186:7 | 138:13 | **weeks** 135:24 |
| **view** 77:4 78:20 | 203:11 216:22 | **wants** 51:7 | 218:13 |
| 200:9 | 217:1,5,16 | **ward** 20:18,20 | **welcome** 71:22 |
| **viewed** 103:22 | 218:15 235:24 | 20:22 21:4 | 206:4,8 212:23 |
| 140:1 | **vulnerablezat...** | 24:19 81:1,20 | **welfare** 114:2 |
| **viewing** 104:17 | 157:16 | 84:14 85:8 | 163:13 |
| 136:25 137:7 | **w** | 92:20 136:11 | **went** 16:2 |
| **violated** 49:4 | | 136:11,15 | 21:19 28:18 |
| 79:15 | **w** 20:19,20 | 198:11 | 32:17 34:16 |
| **violation** | **wagner** 1:5 5:9 | **watch** 242:10 | 46:16 119:23 |
| 228:23 229:13 | 260:1 261:1 | **watching** 76:13 | 146:10 172:13 |
| **violence** 176:17 | 262:3 | **water** 9:12 32:5 | 223:1 243:24 |
| **violent** 48:22 | **waived** 257:6 | 32:7 | 254:5 |
| 103:7 110:2 | **walk** 222:22,23 | **way** 15:7 47:16 | **whatsoever** |
| 187:18 | 222:25 | 53:15 61:9 | 85:13 158:25 |
| **visitation** | **walked** 242:14 | 139:22 141:7 | 159:12 |
| 129:18,20 | **walking** 189:25 | 154:5 163:16 | **who've** 235:21 |
| **visited** 106:4 | 209:9 | 189:12 231:18 | **whoops** 245:7 |
| **voices** 139:10 | **want** 44:14 | 232:11,13 | **william** 90:4 |
| 139:12 | 101:25 105:10 | **ways** 53:10,18 | **window** 62:8 |
| | 130:16 136:22 | 225:8 | |

**[witness - years]**

| | | | |
|---|---|---|---|
| **witness** 5:13,16 | **women's** 43:19 | **works** 13:22,22 | 100:24 104:11 |
| 5:17 6:16,20 | 175:3 176:11 | 64:23 68:7 | 120:24 128:21 |
| 23:17 59:6 | 176:14 | 88:10 149:1 | 135:8 147:20 |
| 60:11 62:21 | **wood** 3:11 | 173:24 191:16 | 147:23 157:9 |
| 63:25 64:6 | 104:1,15 | **world** 85:1 | 162:14 170:14 |
| 68:5 88:19,23 | 105:15 113:19 | **worries** 178:25 | 170:15 174:18 |
| 109:4 111:25 | 116:16 | **would've** 83:14 | 180:12 182:15 |
| 119:3,21 | **woods** 109:24 | 90:21 93:17 | 190:13 197:11 |
| 120:17 123:10 | **word** 68:2,8,10 | 168:10 180:18 | 205:17 215:2 |
| 123:25 127:24 | 68:15,20 102:8 | 230:14 | 229:11 234:21 |
| 138:24 144:19 | 102:8,9 126:10 | **write** 82:25 | 234:22 249:13 |
| 145:11,19 | 215:20 216:4 | **writing** 129:4 | 254:6,21 |
| 155:6 160:17 | 224:21 | **written** 5:25 | 256:11 |
| 166:17 167:8 | **worded** 163:16 | 68:9 128:10 | **year** 17:8,8 |
| 169:3 172:24 | 253:3 | 199:6 | 23:3 26:22 |
| 173:23 174:6 | **work** 15:7 24:4 | **wrong** 174:7,9 | 37:21 39:19,23 |
| 178:5 187:22 | 32:4 38:19 | **wrote** 132:17 | 39:24 40:3 |
| 188:4,8 193:14 | 52:21 64:1 | 159:6 169:4 | 44:6 78:4 |
| 198:19 199:5 | 110:20 173:4,7 | 193:5 249:11 | 133:22 213:21 |
| 200:20 204:12 | 173:23,24 | **x** | 214:8,11 |
| 205:6,16,25 | 175:24 193:11 | | **yearly** 35:18 |
| 206:4,5 207:15 | 193:16 218:20 | **x** 3:1,8 4:1 | **years** 25:9,18 |
| 209:23 212:23 | 222:10,11,14 | **xfer** 115:19 | 28:24 35:15,15 |
| 231:25 234:5 | 234:20 242:1,2 | **y** | 35:16 37:24 |
| 238:14 244:19 | 249:7,7 | | 38:2,6,21 |
| 250:7 251:7,13 | **worked** 115:15 | **y** 20:19 86:4 | 39:23 44:7 |
| 252:10 253:24 | 181:24 222:15 | 88:2 100:18 | 45:14 56:8 |
| 256:18,21,24 | 236:24 | 130:18 | 66:23,25 86:9 |
| 257:1 258:4 | **working** 13:18 | **y'all** 53:4 | 86:16 89:13,14 |
| 262:5,7,9,11,15 | 16:23,25 30:4 | **yeah** 13:21 | 89:15,17,18 |
| **witnesses** 80:12 | 31:18 62:22 | 22:25 23:19,19 | 91:2,4,6 92:18 |
| **women** 154:3,6 | 87:18 129:3 | 62:20 67:19 | 94:8,15 99:22 |
| 154:10 176:16 | 136:10 174:9 | 71:12 77:19 | 99:25 104:9 |
| 176:18 | 204:15,16 | 82:3 88:4,21 | 113:21 121:6,8 |
| | | 94:22 95:5 | |

Page 66

**[years - zoom]**

| |
|---|
| 170:19 171:15 |
| 204:23 205:4 |
| 205:19 211:9 |
| 215:12 239:21 |
| 239:22,22,22 |
| 239:24 240:15 |
| **yep** 107:19 |
| 108:5 160:19 |
| 186:12 |

| **z** |
|---|
| **z** 64:17 |
| **zech** 2:12 |
| **zero** 117:25 |
| 118:9 |
| **zoom** 153:1 |
| 209:14 |

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.