EXHIBIT 61

Officer Mark Garcia  *  March 5, 2025

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OCTEVIA WAGNER; et al,           )
                                 )
      Plaintiffs,                )
v.                               )
                                 ) CIVIL ACTION NO:
HARRIS COUNTY, TEXAS,            ) 4:23-cv-02886
                                 )
      Defendant.                 )
v.                               )
                                 )
ANA GARCIA AND CHANDRA           )
JENKINS,                         )
                                 )
      Plaintiff-                 )
      Intervenors.               )

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
OFFICER MARK GARCIA
MARCH 5TH, 2025

*******************************************************


      ORAL AND VIDEOTAPED DEPOSITION OF OFFICER MARK

GARCIA, produced as a witness at the instance of the

Plaintiffs and duly sworn, was taken in the above-styled

and numbered cause on March 5th, 2025, from 10:09 AM to

2:16 PM, before Sara T. Green, CSR, in and for the State

of Texas, reported by computerized stenotype machine, at

the Harris County Attorney's office, 1019 Congress,

Basement, Houston, Texas, pursuant to the Federal Rules

of Civil Procedure.

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:

MR. PAUL A. GRINKE
Ben Crump Law PLLC
5 Cowboys Way, Suite 300
Frisco, Texas  75034
Tel: 972.942.0494
Fax: 972.433.0111
E-mail: paul@bencrump.com

MS. JORDAN A. CARTER      (Via Videoconference)
McCathern, PLLC
3710 Rawlins Street, Suite 1600
Dallas, Texas  75219
Tel: 214.741.2662
E-mail: jcarter@mccathernlaw.com

FOR THE PLAINTIFF-INTERVENORS DEQUON BUFORD AND CHANDRA
JENKINS:
MR. TAYLOR McCRAY HUNTER    (Via Videoconference)
Hunter Law Corporation
4131 N. Central Expressway
Suite 900
Dallas, Texas  75204
Tel: 214.206.1200
E-mail: taylor@thehunterlaw.com

FOR THE DEFENDANT HARRIS COUNTY, TEXAS:

MR. MUSTAPHA M. NYALLAY
Denton Navarro Rodriguez Bernal Santee & Zech PC
549 N. Egret Bay, Suite 200
League City, Texas  77573
Tel: 832.632.2102
E-mail: mmnyallay@rampagelaw.com

ALSO PRESENT:

    Ms. Cyndi Joseph, Videographer

## Page 3

EXAMINATION INDEX
                    PAGE
Appearances                        2
OFFICER MARK GARCIA
    Examination by Mr. Grinke       4
    Examination by Mr. Nyallay     89
    Examination by Mr. Hunter     103
Reporter's Certificate            126

        EXHIBIT INDEX
NO.    DESCRIPTION            PAGE
Exhibit 5    ICAT – De-Escalation      34
             Techniques
             (BATES NUMBERS 000002-003,
             000018–020)

Exhibit 11    Incident Report         41
             (BATES NUMBERS HPD000197-
             000203)

Exhibit 12    Video                   65
             (Remains in possession of
             Mr. Paul Grinke)

Exhibit 13    Video                   84
             (Remains in possession of
             Mr. Paul Grinke)

## Page 4

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning.  We are on the record at 10:09 AM.  Today is March the 5th, 2025.  This is the video recorded deposition of Officer Mark Garcia.  Will counsel please state their appearance and agreements for the record?

MR. GRINKE:  Paul Grinke for plaintiffs.

MR. NYALLAY:  Mustapha Nyallay for defendant.

MR. HUNTER:  Taylor Hunter appearing remotely on behalf of plaintiff's intervenor Chandra Jenkins, as attorney-in-fact for Dequon Buford.

MS. CARTER:  Jordan Carter here on behalf of plaintiffs.

OFFICER MARK GARCIA, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. GRINKE:

Q.  All right.  Officer Garcia, could you state your full name for the record, please?

A.  Mark -- Mark Anthony Garcia.

Q.  Is it okay if I address you today as Officer Garcia?

A.  Yes, that's fine.

Q.  Officer Garcia, we are here today to take your

## Page 5

sworn testimony in a deposition with respect to an incident where Jacoby Pillow died while in custody at the Harris County Jail.

Do you understand that?

A.  Yes, sir.

Q.  And as a result of his death, the family of Jacoby Pillow has filed a lawsuit in federal court against Harris County, making various allegations with respect to his death while in custody.

Do you understand that?

A.  Yes, sir.

Q.  And the purpose of your deposition today is for us to take your sworn testimony with respect to that case, okay?

A.  Yes, sir.

Q.  You're doing a great job so far.  Have you ever given a deposition or given testimony?

A.  No, sir.

Q.  And I don't know -- I don't want to know what you talked about, but I take it you had an opportunity to meet with counsel and your lawyers to -- the county's lawyers to prepare for your deposition today?

A.  Yes, sir.

Q.  I'm certain that they went through kind of how this works and some of the ground rules.  I'll just

## Page 6

1  quickly say, as a reminder, you're doing a great job so
2  far.  The court reporter here is typing out everything
3  we say, question, answer, question, answer, so it's
4  important that we don't talk over each other, okay?
5       In natural conversation, and even today,
6  you're going to know where I'm going with a question and
7  there's a natural tendency to just start answering, and
8  I'll ask you if you'll wait until I get my question out.
9  I'll, likewise, try to let you finish your answer before
10  I move to my next question; is that fair?
11       A.  Yes, sir.
12       Q.  And then, likewise, since the court reporter is
13  typing out our words, it is important that we use words
14  rather than "uh-huh" or "huh-uh."  That's hard for her
15  to take down and it make sense on paper.  And in
16  addition, we need verbal responses instead of head
17  shakes and nods, because, again, that's hard for her to
18  take down; is that fair?
19       A.  Yes, sir.  Sorry.  I'm shaking my head already.
20       Q.  You can nod and answer, but so long as we get a
21  verbal answer we'll be good, okay?
22       A.  Yes, sir.
23       Q.  All right.  Who is your -- are you working
24  right now?
25       A.  No, sir.

## Page 7

1       Q.  You're unemployed?
2       A.  Oh, no, no, no.  I'm sorry.  I meant like --
3       Q.  Today?
4       A.  Yes.
5       Q.  Are you currently employed?
6       A.  Yes, sir.
7       Q.  Okay.  How are you currently employed?
8       A.  I'm a detention officer for the Harris County
9  Sheriff's Office.
10       Q.  How long have you been a detention officer with
11  the Harris County Sheriff's Office?
12       A.  Since 2016.
13       Q.  What is your current title?  Is it just
14  detention officer?
15       A.  Yes, sir.
16       Q.  Okay.  Do you have a supervisory role?
17       A.  No, sir.
18       Q.  And when you started in 2016, was your title
19  also detention officer?
20       A.  Yes, sir.
21       Q.  Have you ever worked at -- as a detention
22  officer at any other jail prior to coming to the Harris
23  County Jail?
24       A.  No, sir.
25       Q.  So this was your first job as a detention

## Page 8

1  officer?
2       A.  Yes, sir.
3       Q.  Describe for the jury what type of training you
4  received, if any, in order to become a detention
5  officer.
6       A.  We went to the academy.  We were there for --
7  honestly, I don't remember exactly the extent.  It was
8  over several weeks.  We went through just, basically,
9  like, TCOLE training for all of that, like, state laws
10  of how facilities run, jail standards, stuff like that.
11       Q.  And were those written materials or just
12  classroom lectures?
13       A.  There was classroom and then there was also
14  some reading material as well, for reading.
15       Q.  And did you have to take any written tests in
16  order to pass that part of the academy?
17       A.  Yes, sir.
18       Q.  I take it you passed?
19       A.  Yes, sir.
20       Q.  Did you pass the first time?
21       A.  Yes, sir.
22       Q.  And then after the academy, what happens next?
23       A.  After the academy you begin on -- basically
24  on-the-job training.  You're assigned an FTO.  Back when
25  I first started, you had several FTOs.  You were with

## Page 9

1  different ones.  You were with one for one week, another
2  one for another week.
3       Q.  FTO, field training officer?
4       A.  Yes, sir.  I'm sorry.
5       Q.  No.  You're doing great.  And then so -- at the
6  time that you came into the Harris County Jail, I think
7  you just said that you did the on-the-job training with
8  multiple FTOs, maybe you were assigned one week to one
9  and another week to another?
10       A.  Yes, sir.
11       Q.  Do you know how many different FTOs there were
12  in all?
13       A.  I honestly -- how many total as in their total
14  FTOs or how many was I assigned to?
15       Q.  How many were you assigned to?
16       A.  I don't recall the actual number.  I know it
17  was at least two, but I don't remember the exact number.
18       Q.  And there being at least two different
19  FTOs during your on-the-job training period, were those
20  FTOs specializing in different areas, such as DCCT or
21  anything like that?  Or they just kind of moved you
22  around to get different viewpoints?
23       A.  I was in -- I had one FTO I know for 701 and
24  then one for 1200.  They were meant for just the
25  different buildings.

1    Q.  Got it.
2    A.  Because of how the buildings are set up.  They
3  are set up differently, so that way you would learn.
4    Q.  Makes sense.  How long is the on-the-job
5  training part with the FTOs?
6    A.  I was with each FTO for -- I don't remember if
7  it was one or two weeks each.  Honestly, I don't.
8    Q.  So one to two weeks each?
9    A.  Yes, sir.
10    Q.  All right.  So we've got the academy and we've
11  got -- which is a few weeks, I think you said?
12    A.  It was several weeks.  I don't remember the
13  exact amount.
14    Q.  You're right.  You said several.  So the
15  academy, several weeks.  Then you've got kind of the
16  on-the-job training with two different -- at least two
17  different FTOs for one to two weeks each.  And then is
18  there -- what happens after that?  Are you fully a
19  detention officer at this point?
20    A.  After that you're -- you're released from the
21  FTO part and you're on a probationary period.
22    Q.  And then what is -- what's going on during the
23  probationary period?
24    A.  You're assigned to whatever assignment you are
25  and you're just under that period.  I don't know exactly

1  what to say to that, other than that part.  I don't
2  really understand it more than that.
3    Q.  Okay.  So would it be fair to say that during
4  the probationary period you were doing your job as a
5  detention officer based on the training you've received
6  thus far, there's just a period of probation where maybe
7  they are watching and just making sure that you
8  understand the procedures and what you're doing as a
9  detention officer?
10    A.  Yes, sir.
11    Q.  You're not limited in your role as a detention
12  officer what you're doing on a day-to-day basis because
13  you're on a probationary period; is that fair?
14    A.  Yes, sir.
15    Q.  Have you ever acted as an FTO?
16    A.  Not per se, no, sir.  It was -- I would
17  sometimes help with the -- say if an FTO wasn't there a
18  day, they would sometimes put me with one, just because
19  I had been there at some point in time.
20    Q.  Let me back up if I could.  Prior to 2016, when
21  you joined the Harris County Sheriff's Office, were you
22  working or what did you do before that?
23    A.  I was in school.
24    Q.  Okay.  Where were you in school?
25    A.  I went to Sam Houston.

1    Q.  And are you talking about high school or
2  college?
3    A.  Sam Houston University.
4    Q.  Sam Houston.  In Huntsville?
5    A.  Yes, sir.
6    Q.  And did you get a degree from Sam Houston?
7    A.  Yes, sir.
8    Q.  What degree did you get?
9    A.  I have a degree in criminal justice.
10    Q.  Criminal justice?
11    A.  Yes, sir.
12    Q.  And you know about what year you obtained that
13  degree?
14    A.  2012.
15    Q.  And then so between 2012, when you obtained
16  your criminal justice degree at Sam Houston, and 2016,
17  when you began in the Harris County Sheriff's Office,
18  what did you do?
19    A.  I worked at a Papa Johns.
20    Q.  Anywhere else?
21    A.  Not that I recall, no, sir.
22    Q.  Have you ever been in the military?
23    A.  No, sir.
24    Q.  Prior to 2016, did you do any type of athletic
25  training?

1    A.  No, sir.
2    Q.  Ever do any boxing training?
3    A.  No, sir.
4    Q.  Ever do any mixed martial arts training?
5    A.  No, sir.
6    Q.  Any type of karate or anything like that?
7    A.  No, sir.
8    Q.  We'll talk a little bit more in detail about
9  the guidelines at the sheriff -- at the Harris County
10  Sheriff's Office for use of force, but let me ask you
11  this:  When you joined the Harris County Sheriff's
12  Office in 2016 and began the academy and the on-the-job
13  training, was that the first time in your career that
14  you had ever received any type of formal training on the
15  use of force and how to administer it?
16    A.  Yes, sir.
17    Q.  From the time that you joined the Harris County
18  Sheriff's Office in 2016 to the present, have you ever
19  been disciplined?
20    A.  Yes, sir.
21    Q.  How many times?
22    A.  One time.
23    Q.  And tell us about that.  What -- what were the
24  facts surrounding it?  What were you disciplined for?
25    A.  It was for the Jacoby Pillow incident.

## Page 14

1    THE REPORTER:  The what?

2    THE WITNESS:  The Jacoby Pillow incident.

3    Q.  (BY MR. GRINKE)  Okay.  And are you talking

4  about the Jacoby Pillow incident on January 3rd, 2023?

5    A.  Yes, sir.

6    Q.  And when did you receive this discipline?

7    A.  I don't know the exact date.

8    Q.  Was it shortly thereafter or was it something

9  recently?

10    A.  This was last year.

11    Q.  Last year?

12    A.  Yes, sir.

13    Q.  Okay.  So sometime in 2024, and I appreciate

14  that you don't remember exact -- the exact dates.  If

15  you don't know, tell me you don't know, but do you have

16  any idea what season in 2024?  Was it winter?  Spring?

17  Summer?  Fall?

18    A.  I don't know exactly when, no.

19    Q.  The last half of 2024?

20    A.  I -- I honestly don't remember exactly when it

21  was, to be honest.

22    Q.  So -- okay.  So this incident occurred January

23  3rd, the beginning of 2023 and you believe your -- you

24  received discipline for the incident sometime in 2024?

25    A.  Yes, sir.

## Page 15

1    Q.  At least a year later?

2    A.  Yes, sir.

3    Q.  And what type of discipline did you receive?

4    A.  I had a suspension.

5    Q.  For how long?

6    A.  I don't remember the exact days, to be exact --

7  to be honest.

8    Q.  Was it less than a week?

9    A.  I believe it was a week.

10    Q.  Was it suspension with pay or without pay?

11    A.  Without.

12    Q.  And what reasons did they give you for the

13  suspension without pay?

14    A.  I'm trying to remember.  It was -- I'm trying

15  to remember the exact wording they used for it.  I don't

16  remember the exact wording for it exactly, but

17  essentially what it was for the placing of Pillow

18  onto the wall a second time.  I don't remember the exact

19  words that were used.

20    Q.  Okay.  And we'll watch the video later on after

21  a break and we can talk about that then.  All right.

22  And I think you said this is the only discipline you've

23  received since you've been with the Harris County

24  Sheriff's Office since 2016?

25    A.  Correct.

## Page 16

1    Q.  Did any other detention officers that were

2  involved in the use of force with Jacoby Pillow receive

3  discipline, that you're aware of?

4    A.  I don't know, to be honest.

5    Q.  And later we are going to run through some

6  videos, at least one.  Let me ask this:  Other than the

7  incident inside the holding cell, where it looks like

8  Mr. Pillow resisted and use of force was administered,

9  did you participate in transporting Mr. Pillow from that

10  cell to the clinic?

11    A.  No, sir.

12    Q.  Did you participate at any point thereafter

13  transporting Mr. Pillow from the clinic to any other

14  cell?

15    A.  No, sir.

16    Q.  So your involvement with the incident with

17  Jacoby Pillow concluded at the time the use of force was

18  administered within the cell and he was transported from

19  there to the clinic?

20    A.  Can you rephrase --

21    Q.  Yeah, that might be a bad question.  I ask bad

22  questions sometimes, so don't feel bad asking me to

23  rephrase it.

24    Your participation in the incident on

25  January 3rd, 2023, with Jacoby Pillow concluded inside

## Page 17

1  that holding cell where use of force was administered?

2    A.  Yes, sir.

3    Q.  You had no further involvement after he was

4  removed from the cell and taken to the clinic or

5  anywhere else, correct?

6    MR. NYALLAY:  Objection.  Asked and

7  answered.

8    Q.  (BY MR. GRINKE)  You can answer.

9    A.  Yes, sir.

10    MR. GRINKE:  I'm trying to help him.

11    Q.  (BY MR. GRINKE)  I ask those questions,

12  Mr. Garcia, because it actually makes your deposition

13  shorter.  I was just figuring out what areas I need to

14  ask you about today.

15    All right.  So we've talked about when you

16  came into the Harris County Sheriff's Office in 2016 and

17  the training that you went through at the academy, the

18  probationary -- I'm sorry, the on-the-job training and

19  then the probationary period.

20    Did you receive any continuing education

21  throughout your time at the Harris County Jail up to the

22  present on any subjects at all?

23    A.  Yes, sir.  We do multiple continuing education

24  that we have to do throughout the TCOLE cycle.

25    Q.  You said the TCOLE cycle?

Page 18

1    A. Yes, sir.
2    Q. Okay. And what is that?
3    A. Texas Commission on Law Enforcement.
4    Q. Are you provided -- or were you provided at any
5    time any documents from the Harris County Sheriff's
6    Office called HCSOs?
7    A. I'm sorry?
8    Q. Were you ever provided any documents from the
9    Harris County Sheriff's Office called HCSO?
10   A. That stands for the Harris County Sheriff's
11   Office.
12   Q. Okay. And then did -- from the HCSO, then, did
13   you -- were you provided written department policies on
14   various subjects?
15   A. They are not -- they are not provided in
16   written form back when I first started. They were
17   online when you were going through FTO training and they
18   were -- you're informed to read them by your FTOs.
19   Q. And then are you tested on your -- you're
20   informed to read them. Are you -- is there a way for
21   the sheriff's office to confirm that you or any other
22   trainee actually read the policies that are available
23   online?
24   A. Typically, the FTOs ask you questions
25   throughout the entire time you're with them about them

Page 19

1    to see if you have an understanding of it.
2    Q. Is there any written test provided on what
3    materials were provided online as far as department
4    policies from the HCSO?
5    A. Not that I can recall.
6    Q. And did you say that these were provided to you
7    during the on-the-job training portion or was it during
8    the academy portion or all throughout?
9    A. I don't remember for the academy, because they
10   focused mainly on TCOLE and jail standards. I -- but
11   during the FTO training is when it's pushed more.
12   That's when your FTO is telling you to read the -- they
13   are called SOPs, which is the standard operating
14   procedures online.
15   Q. Would you say that for your everyday work as a
16   detention officer at the Harris County Jail, that your
17   primary source of training would have been the
18   on-the-job training, or would you say the primary source
19   of training would have been, like, the written materials
20   online?
21   A. It's one thing reading something. It's another
22   thing experiencing it.
23   Q. Fair enough. And so taking that to its logical
24   conclusion, while the written materials are important
25   when you're learning on the job, it's more important --

Page 20

1    or it's more beneficial to you to experience the various
2    scenarios, say, with your FTO and learn how in real life
3    to address those situations?
4        MR. NYALLAY: Objection. Leading.
5    Q. (BY MR. GRINKE) You can -- if he makes an
6    objection, you can answer. He will tell you if he
7    doesn't want you to answer something.
8        MR. NYALLAY: Right.
9        THE WITNESS: Okay.
10       MR. GRINKE: But I am allowed to lead him.
11   A. Can you ask that one more time again?
12   Q. (BY MR. GRINKE) Yeah, if I can remember.
13   Okay. So you testified that --
14       MR. GRINKE: Yeah, can you go back up a
15   little more?
16       THE REPORTER: I can't. Every time it's
17   going to scroll.
18       MR. GRINKE: Okay. Go back up a little bit
19   more. Okay. There it is.
20   Q. (BY MR. GRINKE) Okay. You testified it's one
21   thing to read something, it's another thing experiencing
22   it. And so do you mean by that that it's -- it's more
23   beneficial to learn on the job, because you're
24   experiencing the real life scenarios that you're going
25   to have to address on a day-to-day basis as a detention

Page 21

1    officer?
2    A. I would say it's different for everybody. I'm
3    a visual learner, not a reading learner. Some people
4    can read something and be set on it. I'm more of a
5    visual person. I need to see it demonstrated for it to
6    make -- for it to click for me. So for each individual
7    it would be different.
8    Q. That makes sense. What about, I guess, time
9    spent? During the academy, are you provided written
10   materials? I think you said that there they focus on --
11   was it standards or codes?
12   A. They were focused on the jail standards and the
13   TCOLEs predominantly.
14   Q. And then so at the academy, when they are
15   focusing on jail standards and TCOLEs, is that primarily
16   in writing or just classroom instruction?
17   A. It was both.
18   Q. And that was for a few weeks. And then you
19   jumped right into on-the-job training, correct?
20   A. It was several weeks. I don't remember the
21   exact amount of how much time, but yes, sir.
22   Q. We're now in 2025. Can you tell the jury
23   whether or not, you know, even the day, nine years
24   later, there's still a learning process where you might,
25   you know, confront new scenarios and learn on the job,

## Page 22

1  from either supervisors or your fellow detention
2  officers that, hey, this is an appropriate way to handle
3  a situation?
4          MR. NYALLAY: Objection. Speculation.
5      A.  Yes, because of the fact that, and I've told
6  people this before, that there's never going to be two
7  situations that are exactly the same.  There's
8  thousands, millions of variables that could coincide
9  where you can have a situation that's similar, but just
10  something changes it to make it completely different.
11          There's never going to be the exact same
12  scenario that would happen more than twice, just because
13  of the fact that that's just the way the jail is in
14  general.  The world in general, there's always so many
15  variables.
16      Q.  (BY MR. GRINKE)  And that makes sense.  And so
17  written materials and standards and TCOLE are important,
18  but the majority of what you're learning on how to do
19  your job as a detention officer is on the job as you
20  face each new scenario; is that fair?
21      A.  I'm sorry.  Were you saying that -- that you
22  learn more on the job?  Is that what the question is?
23      Q.  That's what I'm asking you.
24      A.  Yes, sir.  I would say that you have your --
25  the policies that you work with, but things are always

## Page 23

1  evolving which causes policies to change in general,
2  just because there is no way to predict anything.
3  There's always so many different variables and things
4  are always changing.
5      Q.  Fair enough.  If -- I think you called them
6  SOPs, the department policies.  If the department
7  updates a pre-existing policy, do you receive that in
8  writing?
9      A.  We -- they put a notification out on the
10  intranet with a policy update and it highlights any
11  changes that have occurred.
12      Q.  And then is -- are there any safeguards to make
13  sure that detention officers indeed read the updated
14  policies so that they can adhere to them?
15      A.  We typically do what's called a roll call,
16  where if there is a change to a policy, your supervisor
17  informs you of the policy change and then you make a
18  signature to document that you've been informed of it.
19      Q.  Do you recall receiving a notification on the
20  intranet about an updated department policy on
21  de-escalation and response to resistance that was issued
22  December 11, 2024?
23      A.  I don't recall it off the top of my head.
24      Q.  So if you don't recall it off the top of your
25  head, I take it that you could not tell me what was

## Page 24

1  different or new from the previous policy that was dated
2  August 26 of 2021?
3          MR. NYALLAY: Objection.  Asked and
4  answered.
5      A.  Correct, sir.  I don't recall.  I couldn't tell
6  you exactly.  They tend to flow in together.
7      Q.  (BY MR. GRINKE)  So if you don't know what the
8  new policy that was issued December 11th, 2024, says,
9  then for you there's nothing that you can change about
10  your work tactics and behavior while acting as a
11  detention officer, correct?
12      A.  No, sir.  That's not what I said.  What I
13  stated is I don't recall what the exact change was.  It
14  doesn't mean that it -- that I don't know what to do in
15  general.  It's that I don't recall what the exact
16  wording of the change would be.
17      Q.  So forgive me if I want to flesh that out a
18  little bit, but if you don't know what the change was,
19  then how do you alter your behavior if the new policy is
20  calling for a change in behavior?
21          MR. NYALLAY: Objection.
22      A.  The best example I could give you would be
23  you're driving down the street, you're in your
24  neighborhood.  There's a -- there's a stop sign that's
25  always been there, but the stop sign is taken out for

## Page 25

1  some reason.  But you know it's supposed to be there,
2  but no one notified you that the stop sign is gone, but
3  you still stop in general because you know of it.  You
4  just don't know, nor were you -- nor do you know about
5  it.  Does that make sense?
6      Q.  (BY MR. GRINKE)  I follow you.  So from
7  December 11th, 2024, to today, do you recall any
8  meetings with your supervisors or anyone else to go over
9  the updated policy on de-escalation and response to
10  resistance?
11      A.  I don't recall off the top of my head.
12      Q.  Have you seen any of the local news stories
13  where Sheriff Gonzalez gave interviews regarding
14  violence inside Harris County Jail?
15      A.  I saw bits and pieces of the -- what was it
16  called?  I don't remember what news station it was, that
17  did it.  It was -- it was recent, but I don't remember
18  the name of it, nor do I remember the -- the news
19  station that did it, but I do remember seeing something,
20  yes, sir.
21      Q.  And do you recall hearing Sheriff Gonzalez make
22  any comments?
23      A.  I don't recall what comments he made.  I just
24  caught bits and pieces of it.
25      Q.  This might refresh your memory.  Do you recall

Usher Reporting Services
(214) 755-1612

Page 26

1    if Sheriff Gonzalez made any comments that he felt like
2    the department could do better on training to make sure
3    that the use of force at the jail is used at an
4    appropriate level?
5            MR. NYALLAY: Objection. Asked and
6    answered.
7        A. If that's what he said according to you, then I
8    say that's -- I guess that's what he said. I don't
9    recall.
10       Q. (BY MR. GRINKE) Okay. I don't want to put
11   words in your mouth. I just wanted to see if that
12   jogged your memory, okay?
13       A. No, sir, I don't recall it. Like I said, I
14   didn't watch the whole thing entirely. I just saw bits
15   and pieces of it.
16       Q. Do you believe that the Harris County Sheriff's
17   Office could have been doing a better job on training
18   detention officers with respect to the proper use of
19   force?
20           MR. NYALLAY: Objection.
21       A. What I believe is pretty much irrelevant to
22   what the policies are, what the county does on their
23   own, unfortunately, because I'm just an individual
24   detention officer. I have no say on policy or anything
25   like that. So I can't speculate on to that, nor can I

Page 27

1    say what policies should be or what it is.
2        Q. (BY MR. GRINKE) And that's a fair answer and
3    I -- at some point we'll take the deposition of Sheriff
4    Gonzalez and he'll be able to speak as the policymaker.
5            I guess I'm asking you the question, just
6    from your own standpoint as a detention officer going on
7    nine years, working there day to day, experiencing the
8    millions of different potential scenarios, whether you
9    just as a detention officer feel like there's areas
10   where they could have done a better job training
11   detention officers like yourself with respect to the use
12   of force?
13           MR. NYALLAY: Objection. Speculation.
14       A. My -- like I said, sir, my personal opinion is
15   irrelevant when it comes to anything. But as to what
16   you're basically asking, there's always going to be
17   something that's different. The world is always
18   evolving. Policies typically evolve with them. You
19   can't try to future proof for something when you have
20   yet to ever experience it. So you -- typically, they
21   make policies that are based on past actions, because I
22   can't predict the future, nor can you nor could anybody
23   else.
24       Q. (BY MR. GRINKE) If I want to go find a written
25   SOP that addresses the use of closed fist strikes on a

Page 28

1    detainee, which SOP would I go look for?
2        A. It would be under the use of force spectrum.
3        Q. Okay. And where would I find the use of force
4    spectrum?
5        A. It's on the intranet under standard operating
6    procedures.
7        Q. Okay. Do you know which one or is there one
8    that just says use of force?
9        A. They are titled.
10       Q. What is the use of force spectrum?
11       A. It is -- it's hard to describe, honestly.
12   It's -- because even in then, it's explained in the
13   graph. Basically, it's the amount of force is -- that's
14   used in each situation is equivalent to the amount of
15   resistance.
16       Q. What is DCCT?
17       A. That would be the containment team.
18       Q. And what do they do?
19       A. Everything they do, I'm not aware of, to be
20   honest. I'm not part of that, so I don't know exactly
21   everything they do. I just know a couple of the things
22   that they do.
23           The only thing that I know is they
24   typically deal with all the high-profile inmates,
25   inmates that are -- have a history of aggression and

Page 29

1    hostility towards others and -- including officers, or
2    have extremely violent crimes. They perform what are
3    called planned use of forces, which are something that
4    they know with an inmate that they have a history of
5    extreme violence, hostility, aggression, and so they are
6    prepared for in the event that if they have to interact
7    with that inmate or that individual, that they have a
8    plan in which it could possibly lead into a use of
9    force, but it's not always guaranteed, because, again,
10   there's variables and -- that can change anything.
11       Q. Do you know whether or not DCCT performs
12   planned cell extractions?
13       A. Yes, sir. Those are under the plan use of
14   forces that was described a second ago.
15       Q. And are you aware of a specific SOP that
16   addresses planned cell extractions?
17       A. I don't know it per se, because I'm not part of
18   the DCC.
19       Q. Fair enough. So you've never been part of a
20   DCCT?
21       A. No, sir.
22       Q. Do you know if it requires specialized training
23   to become part of the DCCT?
24       A. Yes, sir. They have their own training.
25       Q. And then where are the DCC teams located? Are

Usher Reporting Services
(214) 755-1612

1    they -- is there one on every floor?  Or is there one
2    per building or do you know?
3       A.  I don't know where they are located in the
4    other buildings.  I know at 1200 they are -- I don't
5    want to give away the location of the -- give away
6    facility locations in general.
7       Q.  Yeah, that's fair, for safety reasons.  I guess
8    what I'm trying to figure out is availability of a DCCT
9    team when an issue comes up inside the jail.  Are there
10   more than one?
11      A.  I don't know how many people are on the team,
12   sir.
13      Q.  With the incident involving Jacoby Pillow in a
14   holding cell that we're here to talk about today, would
15   the DCCT team have been an appropriate avenue utilized
16   when trying to extract Mr. Jacoby from his cell?
17      A.  I'm not quite sure, to be honest.
18      Q.  What is CIRT?
19      A.  Crisis intervention training.
20      Q.  And what do they do?  Or is there a group
21   called CIRT or that's just a part of your training?  Or
22   let me make that question -- that's a bad question.
23          Is CIRT just a training program or is there
24   a group that operates under CIRT?
25      A.  You're asking for two different things.

1      Q.  Okay.  Help me.
2      A.  There's CIT, which is crisis intervention
3    training.
4      Q.  Okay.
5      A.  There's CIRT, which is the crisis intervention
6    response team.  Those are two totally different things.
7      Q.  Understood.  Okay.  The one I'm asking about is
8    CIRT, the response team.  What is a response team -- the
9    CIRT for?
10      A.  They typically deal with individuals that are
11   in mental health crisis.
12      Q.  And is the CIRT something that is -- or a team
13   that is available to detention officers such as yourself
14   when you observe a detainee that appears to be having a
15   mental health crisis?
16      A.  Can you ask that one more time?  I'm a little
17   confused.
18      Q.  Sure.  Is the CIRT, that response team, is it
19   available to you as a detention officer to call and ask
20   them and come help when you observe a detainee who is
21   having a mental health crisis?
22         MR. NYALLAY:  Objection.  Asked and
23   answered.
24      A.  I'm not 100 percent sure on their availability,
25   because I'm not part of that team, so I don't know how

1    many people are a part of that.
2      Q.  (BY MR. GRINKE)  Have you ever, in your nine --
3    approximately nine years at the Harris County Jail as a
4    detention officer, have you ever called in a CIRT?
5      A.  I've never personally called them in, no, sir.
6      Q.  Okay.  Have you ever -- have you ever observed
7    a detainee that you thought was going through a mental
8    health crisis?
9      A.  That I thought was going through a mental
10   health crisis or that was proven to go through a mental
11   health crisis?  Because they are -- not everyone has the
12   training to be able to --
13      Q.  Let me ask --
14      A.  -- make that determination.
15      Q.  I'm sorry.  I broke my own rule.  I interrupted
16   you.  I'm sorry.  Have you ever observed a detainee who
17   was going through a mental health crisis?
18      A.  Yes, sir.
19      Q.  And when you observe a detainee who is going
20   through a mental health crisis, describe for the jury
21   what you would typically see to make you come to that
22   conclusion.
23      A.  The jury?
24      Q.  Your sworn testimony here today is something
25   that may be played in front of the jury at trial, and so

1    when I say tell the jury, that's what this is.
2      A.  Okay.  I'm sorry.  I'm just a little confused
3    by that.  Okay.  I'm sorry.  I forgot the question now.
4      Q.  What symptoms or things do you observe in a
5    detainee that leads you to the conclusion that someone
6    is having a mental health crisis?
7      A.  Typically the -- things that come to mind is
8    when they are harming themselves.
9      Q.  Anything else?
10      A.  That's all that can come to mind off the top of
11   my head right now.
12      Q.  When you have observed a detainee going through
13   a mental health crisis, is there anyone else other than
14   a CIRT, such as a mental health professional, that you
15   have called in your time at the jail to come assist with
16   that detainee?
17      A.  Typically, what we would do was take the
18   detainee down to see psych, and they would see the psych
19   mental health providers.
20      Q.  Have you ever had a scenario where you have
21   called someone from psych to come to a cell in order to
22   help address a detainee who is going through a mental
23   health crisis?
24      A.  No, sir.
25      Q.  That's not something that's typically done as

Page 34

1  you've seen in your nine years at the jail?
2       A.  No.  Sorry.  No, sir.  We typically take them
3  down to see mental health.
4       Q.  What do the standard operating procedures
5  provided by the Harris County Sheriff's Office say about
6  de-escalation of a resistant detainee?
7       A.  Word for word?  Because I don't know exactly
8  word for word.
9       Q.  Just tell us your understanding of what they
10 say.
11      A.  Typically, make attempts to de-escalate any
12 situation that could occur, talking with the individual,
13 see if you can de-escalate them in any way possible.
14      Q.  So talking to them.  What about giving them
15 extra time, like a cooling off period?  Have you
16 received -- do the SOPs talk about that?
17      A.  I don't recall exact language to that, no, sir.
18      Q.  I'm going to hand you what has previously been
19 marked as Exhibit 5 in our ongoing list of plaintiff
20 deposition exhibits.
21          (EXHIBIT 5 MARKED)
22      A.  Sorry.  I forgot you got a mike thing.
23      Q.  (BY MR. GRINKE)  Yeah.
24          MR. NYALLAY:  Copy for me, Counsel?
25          MR. GRINKE:  I gave them all to Kelly last

Page 35

1  time.  We had agreed we were just going to keep using
2  the same ones.
3       Q.  (BY MR. GRINKE)  I'll give you a moment to look
4  at this, look through it, and then my next question will
5  just be have you seen this document before?
6       A.  Yes, sir.
7       Q.  All right.  What is this document?
8       A.  This is ICAT training.
9       Q.  Okay.  Which is Integrating Communications
10 Assessment and Tactics, that's ICAT, correct?
11      A.  I believe that's what it stands for, yes, sir.
12      Q.  And I'm looking under course name a little bit
13 below half the page.
14      A.  Oh, yes.
15      Q.  And then this particular ICAT, the subject is
16 De-Escalation Techniques.  Do you see that?
17      A.  Yes, sir.
18      Q.  And at the bottom left-hand corner it says
19 Training Materials?
20      A.  Yes, sir.
21      Q.  Is this something that would have been provided
22 to you during your time at the academy, or is this one
23 of the things that you mentioned that would just be on
24 the intranet that you were encouraged to read?
25      A.  I actually remember going to this ICAT class.

Page 36

1       Q.  Okay.  So this was an actual class that you
2  went through and is kind of, I guess, a written outline
3  for the class, correct?
4       A.  Yes, sir.
5       Q.  All right.  If you flip over, at the bottom
6  right-hand corner, and what I did, I think I just --
7  I've got just selected pages rather than bringing all
8  146 pages of the class, but the third page here it says
9  page 17 of 146 at the bottom right-hand corner.
10          Do you see that?
11      A.  Yes, sir.
12      Q.  Okay.  And so near the bottom, it's in bold, it
13 says "Consider."  Are you with me?
14      A.  Yes, sir.
15      Q.  First bullet point, "These encounters are not
16 easy.  They present many issues and challenges."
17          Did I read that correctly?
18      A.  Yes, sir.
19      Q.  And I think that's kind of what you were
20 alluding to earlier in your deposition, that there's
21 always new challenges and scenarios that you're
22 confronted with; is that fair?
23      A.  Yes, sir.
24      Q.  Okay.  And the next bullet point asks "So, what
25 can we do to help keep everyone safe?"  Correct?

Page 37

1       A.  Yes, sir.
2       Q.  And then under that, and on into the next page,
3  there are some bullet points and it says "Challenging
4  Convention Thinking."  The first one is a conventional
5  thought might be that "We already do this stuff."
6          Do you see that one?
7       A.  Yes, sir.
8       Q.  And if you flip over to the next page, page 18
9  of 146, the next bullet point is the 21-foot rule versus
10 the reactionary gap.
11      A.  Yes, sir.
12      Q.  And then the next bullet point is the
13 conventional thought of "We don't have all day."  Do you
14 see that?
15      A.  Yes, sir.
16      Q.  Can you read the next two lines under that
17 bullet point, "We don't have all day"?
18      A.  "It is important that we" --
19          THE REPORTER:  Read it loudly so I can hear
20 you, okay?
21          THE WITNESS:  Okay.  I'm sorry.
22          THE REPORTER:  "It is important..."
23      A.  "It is important that we break the culture of
24 speed in our profession.  If time is available, why do
25 we rush?"

Page 38

1    Q. (BY MR. GRINKE) Okay. And then if you could
2  read the next two sentences as well, please.
3    A. "In most situations, time is on our side. Use
4  it to get additional resources and assets to the scene."
5    Q. Okay. All right. All right. And you said you
6  recall attending this class?
7    A. Yes, sir.
8    Q. On January 3rd, 2023, when you were having a
9  problem with Mr. Pillow, who was locked inside of a
10  solitary cell, did you use this instruction to
11  understand that time is on your side, there's no need to
12  rush, and you could use the time to get additional
13  resources or assets to the scene?
14    A. Well, this ICAT was previous to that incident.
15    Q. Okay. So this training was before the Jacoby
16  Pillow incident?
17    A. No, sir. I'm sorry. It was after that
18  incident.
19    Q. It was after the incident?
20    A. Yes, sir.
21    Q. Okay. So are you saying this publication was
22  after the incident or when you received -- when you went
23  to the class?
24    A. When I went to the class for this.
25    Q. If you had gone to the class before the Jacoby

Page 39

1  Pillow incident on January 3rd, 2023, would you have
2  utilized this training to not rush, understand time is
3  on your side, and use that time to get additional
4  resources or assets to the scene?
5    MR. NYALLAY: Objection. Calls for
6  speculation.
7    A. I can't speculate to what I would have done in
8  the past, because it's hindsight, sir.
9    Q. (BY MR. GRINKE) Well, I'm not asking you to
10  guess. I'm asking you to tell the jury whether or not
11  you would have utilized this training had you had it
12  before January 3rd of 2023?
13    A. Yes, sir. If I had had the training before
14  that, yes. But, again, it's like I said earlier,
15  policies are forever evolving. You can't predict the
16  future. You can only have policies that react to
17  situations and go from there. I'm not a fortune teller,
18  nor is anyone as far as I know.
19    Q. Fair enough. So because you hadn't had this
20  training before January 3rd of 2023, you relied on your
21  on-the-job training that you'd had for -- since 2016 in
22  order to address the Jacoby Pillow situation; is that
23  fair?
24    MR. NYALLAY: Objection. Form.
25    A. Yes, sir.

Page 40

1    Q. (BY MR. GRINKE) If you turn to the next page
2  of Exhibit 5, it says 19 of 146 at the bottom. There is
3  a bullet point a little over halfway down that says "Not
4  taking action is a 'failure to act.'"
5    Do you see that?
6    A. Yes, sir.
7    Q. So this is another conventional thought that
8  the training course appears to want to address. Can you
9  read the sentence under that bullet point, "Not taking
10  action is a 'failure to act'"?
11    A. "If the subject has committed no crime and is
12  only a harm to themselves, what is the need to force a
13  resolution?"
14    Q. And then the next one, for example, can you
15  read that?
16    A. "For example, why rush into a room when you can
17  take -- when you can talk from the doorway?"
18    Q. Okay. So having read this statement, or taken
19  this training, if the subject has committed no crime and
20  is only a harm to themselves, what is the need to force
21  a resolution? You didn't have the benefit of this
22  training at the time of the Jacoby Pillow incident on
23  January 3rd, 2023, correct?
24    A. Yes, sir.
25    Q. Because this training came after the fact?

Page 41

1    A. Correct.
2    Q. So before -- or at the time of January 3rd,
3  2023, on this aspect, you had to rely on your on-the-job
4  training thus far?
5    MR. NYALLAY: Objection. Form.
6    A. Yes, sir.
7    Q. (BY MR. GRINKE) Okay. I think we've been
8  going about an hour. Let's take a break, if that's okay
9  with you. And then I'm going to try to tee up the video
10  and we can go through that.
11    THE VIDEOGRAPHER: We are going off the
12  record now. The time is 11:09.
13    (Recess from 11:09 AM to 11:35 AM)
14    (EXHIBIT 11 MARKED)
15    THE VIDEOGRAPHER: We are back on the
16  record now. The time is 11:35.
17    Q. (BY MR. GRINKE) All right. We have taken a
18  short break, Officer Garcia. Are you ready to proceed?
19    A. Yes, sir.
20    Q. I've just handed you what I marked as Exhibit
21  Number 11. If you got a second to take a look at it and
22  tell me if you recognize this document.
23    A. Yes, sir.
24    Q. And does this appear to be the incident report
25  for the use of force incident with Jacoby Pillow that

Page 42

1  occurred on January 3rd, 2023?
2      A. Yes, sir.
3      Q. One question before we go through it, and I'm
4  just going to go through your statement.  Your statement
5  appears to be on the final page of this document.  It
6  says page 7 of 7 at the bottom right corner.  Are you
7  with me?
8      A. All right.  Yes, sir.
9      Q. I want to go through your narrative and ask
10  some questions about it, but first, at the very bottom
11  of your narrative, the last paragraph says "It should be
12  noted this is not a finished version.  This is your
13  initial report, subject to change when you have an
14  opportunity to refresh your memory and watch the video."
15      Have you entered any updated or revised
16  narrative to the incident report other than what we're
17  seeing here in this exhibit?
18      A. I don't recall.
19      Q. And I'll just represent to you this is what was
20  produced to us by the lawyers for Harris County, and so
21  if there's some updated version that has different
22  facts, I just want to make sure I'm asking you about the
23  right statement.
24      A. No, I understand.  I honestly don't recall.
25  This was years ago.  I can barely remember what I ate

Page 43

1  for breakfast yesterday.
2      Q. I understand.  Did you have an opportunity to
3  review your statement in preparation for this deposition
4  today?
5      A. I -- he -- they sent me --
6      Q. Don't tell me what they told you or anything.
7  I just want to know did you read this before today to
8  prepare?
9      A. No, sir, because I was given the document to be
10  able to try to read it, but I was unable to log in to
11  it.
12      Q. Understood.
13      A. So I didn't get a chance to read it.
14      Q. Okay.  Just take a moment, and I don't care if
15  we're on the record or off the record, but, Mr. Garcia,
16  I want to give you an opportunity to read your statement
17  again just so it's fresh on your mind, then I'll ask you
18  some questions.
19      MR. GRINKE:  Let's go off the record for a
20  minute so we're not burning tape.
21      THE VIDEOGRAPHER:  We're going off the
22  record now.  The time is 11:38.
23      (Recess from 11:38 AM to 11:40 AM)
24      THE VIDEOGRAPHER:  We are back on the
25  record now.  The time is 11:40.

Page 44

1      Q. (BY MR. GRINKE)  All right.  Officer Garcia, we
2  just took another very quick break to give you an
3  opportunity to read your statement that's contained in
4  Exhibit 11.  And did you have an opportunity to read it?
5      A. Yes, sir.
6      Q. Does this help refresh your memory of the
7  event?
8      A. Yes, sir.
9      Q. And so I'm on page 7 of 7 where your narrative
10  is laid out.  It says, "At approximately 0118 while
11  sitting in the Medical Control Center, I saw Detention
12  Officers Jay Sanchez, Jay Deguzman, N. Tabares and
13  Sergeant Torres on camera attempting to handcuff an
14  inmate later identified as Pillow, Jacoby through the
15  panel."
16      Are you with me?
17      A. Yes, sir.
18      Q. Question:  We've been produced some
19  surveillance video of Mr. Pillow in other cells
20  throughout the jail prior to the incident that you start
21  describing here.  Did you have an opportunity to view
22  Mr. Pillow and his actions before you saw these officers
23  attempting to handcuff Mr. Pillow here?
24      A. Not that I recall.
25      Q. Okay.  So if he was acting erratically before

Page 45

1  in another cell, that's not something that when you
2  became engaged here you had prior knowledge of?  At
3  least not from viewing the videos?
4      A. Not that I saw, no, sir.
5      Q. Did any of the officers that you list here in
6  your report who were trying to handcuff Mr. Pillow tell
7  you when you walked up anything about Mr. Pillow's
8  behavior?
9      A. Not that I can recall.
10      Q. Did you attempt to have any conversations with
11  Mr. Pillow before entering the cell?
12      A. Yes, sir.
13      Q. And in this -- your statement says that you
14  instructed him to -- oh, okay.  Wait, I'll strike that.
15      What conversations or statements did you
16  have with Mr. Pillow before you entered the cell?
17      A. I'm trying to tell him basically to just -- to
18  relax, chill, lay down, because when I arrived they had
19  already attempted to handcuff him and were unsuccessful.
20  And he was -- had the handcuffs already in the cell with
21  him, and I was just trying to tell him to lay down, to
22  chill, relax so that way we could enter, place him in
23  cuffs and then extract him from the cell.
24      Q. What did Mr. Pillow's physical mannerisms look
25  like?  What was he acting like before you opened the

## Page 46

1  door to the cell?  Did he seem agitated?  Did he seem
2  calm?  What would you describe what you saw?
3      A.  Agitated.
4      Q.  And by "agitated," what made you think he
5  looked agitated?
6      A.  He was screaming.  He was hollering.  He was
7  noncompliant with any of the orders given to him.
8      Q.  Do you know why the officers you list in your
9  statement were attempting to remove Mr. Pillow from the
10  cell?
11      A.  At the -- from when I first went, no, I didn't
12  know, simply because I was working the MCC, which is the
13  back of the infirmary.  He was a detainee from the new
14  house, so he would be from the front.  So I didn't know
15  exactly why they were extracting him when I first
16  arrived.  I was under the assumption he was probably
17  going to go see the mental health provider, because
18  typically that's what the new houses are waiting for, to
19  see mental health.  So I didn't know previous to walking
20  over there why they were extracting him.
21          When I got to the cell, that's when I heard
22  them saying that he was going ATW, which was all the
23  way, meaning being released.
24      Q.  So then you came to the understanding that the
25  officers you came to assist were trying to remove

## Page 47

1  Mr. Pillow from his cell because he was being released?
2      A.  Yes, sir.
3      Q.  Fully released?
4      A.  To my understanding, yes.
5      Q.  And when you walked up, did you tell
6  Mr. Pillow, Hey, we're releasing you?
7      A.  I don't recall if I told him that.
8      Q.  Did you hear anyone else tell him that?
9      A.  Yes, sir.
10      Q.  Do you recall which -- or who told him that?
11      A.  I don't recall who told him exactly, because I
12  had heard it when I was walking down -- down the
13  hallway.
14      Q.  And did you hear Mr. Pillow's response to being
15  told he was being released?
16      A.  No, sir, I did not.
17      Q.  But if I understand your testimony, you heard
18  someone telling him, Hey, you're being released.  You
19  need to comply.  When you walked up, you still observed
20  Mr. Pillow acting very agitated and noncompliant,
21  correct?
22      A.  Yes, sir.
23      Q.  Is that something in your mind where someone is
24  being told, Hey, we're releasing you.  We just need to
25  cuff you so we can walk you out, and they still act that

## Page 48

1  upset and combative, is that a signal to you that
2  someone is going through a mental health episode?
3      A.  There is a wide range of emotions people go
4  through.  It's never one set for each situation.  We've
5  had individuals that when they heard they were going ATW
6  jump for joy, scream, be happy, ready to go.  We've had
7  some that were sad that they were leaving.  We've had
8  some individuals literally cry, because they were going
9  ATW before, so there's -- there's no set reaction to it.
10      Q.  Well, I appreciate that, but my question is a
11  little different.  I appreciate the different reactions.
12  Someone jumping with joy and being happy, would you
13  consider that a normal reaction to someone being told
14  they were getting released from jail?
15      A.  Again, like I just stated, sir, there's no
16  normal way per se, because people -- I've experienced
17  multiple different reactions to it.
18      Q.  Okay.
19      A.  I've had people mad that they were getting
20  released.  I've seen people sad and cry about being
21  released.  I've seen people happy about being released.
22  So to say a normal would not be fair.
23      Q.  So my question was Mr. Pillow's response in
24  being highly agitated and combative after being told he
25  was being released, my question is:  Was that a signal

## Page 49

1  to you that he was going through a mental health crisis?
2      MR. NYALLAY:  Objection to form.
3      A.  With -- at the moment, it was just seeing that
4  he was upset.  He was very distraught over it.  But
5  you're asking for hindsight in looking at it now?  Or
6  are you asking in that moment?
7      Q.  (BY MR. GRINKE)  I'm asking, based upon what
8  you observed and what you heard in that moment, was it a
9  signal to you that Mr. Pillow was going through a mental
10  health crisis?
11      A.  At the moment, with what I knew going -- going
12  on, it was -- he was just upset and angry and I didn't
13  know as to why.  As to speak to his mental stability at
14  that moment, I couldn't tell you.
15      Q.  If you had come to a conclusion in your mind
16  upon observing Mr. Pillow's reaction to being told he
17  was being released from jail, if you had come to the
18  conclusion in your own mind that he was going through a
19  mental health crisis, would you have acted any
20  differently than what we read in your narrative here?
21      MR. NYALLAY:  Objection to form.
22      A.  Again, sir, with hindsight and having the ICAT
23  training that I had later down the road, I would say
24  yes.  But at the moment, this was before I had done the
25  ICAT training and done any of that, then I would say no,

Page 50

1  sir.
2      Q. (BY MR. GRINKE)  Fair enough.
3      A. Because I'm not a mental health professional,
4  so I can't state to someone's mental health.
5      Q. And so at the time this happened, January 3rd,
6  2023, you had started at the jail sometime in 2016, so
7  we're going on, I don't know, six years of working with
8  the jail, by that point you hadn't had the benefit of
9  the ICAT training to help identify folks in mental
10  health crisis and training on how to address that?
11      A. Correct.
12      Q. And so for those six years, and at the time of
13  this incident with Jacoby Pillow, you were relying on
14  your on-the-job training primarily in how to address
15  this situation?
16          MR. NYALLAY:  Objection.
17      A. Basically.
18      Q. (BY MR. GRINKE)  All right.  I'm looking back
19  at your narrative.  I'm on the one, two, three, third
20  line.  It says, "They were unsuccessful and inmate
21  Pillow pulled away from the door with the handcuffs in
22  his hand," correct?
23      A. Yes, sir.
24      Q. You walked over to M101 -- was that his cell
25  number?

Page 51

1      A. Yes, sir.  That was the cell number.
2      Q. -- "to assist.  I ordered inmate Pillow to lay
3  face down on the floor to which inmate Pillow refused,"
4  correct?
5      A. Yes, sir.
6      Q. And he refused in a very agitated manner,
7  correct?
8      A. I don't remember exactly.  I just remember him
9  not complying with the order.  I don't remember exactly
10  how, to be honest.
11      Q. Okay.  We'll watch the video.  I just wanted to
12  get through the written part and then we'll watch the
13  video.  Next sentence, "We entered the cell."  I'm
14  sorry.  I skipped a sentence.  "Inmate Pillow took a
15  step away from the door," correct?  Are you with me?
16      A. You skipped a whole other sentence.
17      Q. I backed up.  Oh, you're right.  I did.  "I
18  again ordered inmate Pillow to lay down face down on the
19  floor to which inmate Pillow again refused to comply,"
20  correct?
21      A. Yes, sir.
22      Q. "Then inmate Pillow took a step away from the
23  door," correct?
24      A. Yes, sir.
25      Q. "We entered the cell."  Whose decision was it,

Page 52

1  if you recall, to enter the cell?
2      A. I don't remember.
3      Q. Was there any discussion before entering the
4  cell, like a planning session or here's how let's
5  approach this or anything like that?
6      A. I don't recall.
7      Q. "Upon entering, inmate Pillow attempted to
8  swing at me with a closed fist that I avoided," correct?
9      A. Yes, sir.
10      Q. Have you watched the video of this incident in
11  preparation for your deposition?
12      A. Yes, sir.
13      Q. And did you see in that video inmate Pillow
14  attempt to swing at you with a closed fist and miss?
15      A. Trying to remember.  I don't recall off the top
16  of my head, to be honest.
17      Q. All right.  We'll watch the video.  "Inmate
18  Pillow swung a second time with a closed fist hitting me
19  in my right facial area," correct?
20      A. Yes, sir.
21      Q. "I struck inmate Pillow with my right closed
22  fist in his facial area two times," correct?
23      A. Yes, sir.
24      Q. Can you point me to the written training
25  materials from the Harris County Sheriff's Office with

Page 53

1  respect to the guidelines for when you're allowed to
2  strike someone with a closed fist?
3      A. I'm sorry?
4      Q. Can you point me to the written training
5  materials or SOPs from the Harris County Sheriff's
6  Office that provide the guidelines for when you're
7  allowed to strike a detainee with a closed fist?
8      A. How would I show you if I don't have anything
9  to point at?
10      Q. Well, can you tell me?
11      A. That would be under the use of force spectrum.
12      Q. Even using a closed fist, are you allowed to
13  strike a detainee in the skull?
14      A. The policy on that has since been changed since
15  this event, yes, sir.
16      Q. Okay.  So at the time of the event, you were
17  allowed to?
18      A. Yes, sir.  That was not changed in the use of
19  force spectrum, but I believe so.
20      Q. But now it's your understanding, after this
21  incident, that your instructor -- detention officers are
22  instructed not to use a closed fist strike to a
23  detainee's skull?
24      A. Correct, sir.
25      Q. Are you allowed to use a closed hand strike to

Usher Reporting Services
(214) 755-1612

1  the spine?
2      A.  I -- I don't recall exactly on that one.
3      Q.  Okay.  And you bring up a good point.  I should
4  be asking this.  At the time of the Jacoby Pillow
5  incident, were you allowed to strike a detainee with a
6  closed fist to the spine?
7          MR. NYALLAY:  Objection.  Asked and
8  answered.
9      A.  I do not recall on that.
10     Q.  (BY MR. GRINKE)  Okay.  And so you don't know
11 that one from before or after?
12     A.  I don't remember that one exactly word for word
13 on the spectrum on that one.
14     Q.  Other than the spectrum, have you read any
15 other training materials or SOPs that discuss whether or
16 not you're ever allowed to strike someone with a closed
17 fist to the skull?
18     A.  Other than the SOPs?
19     Q.  Right.
20     A.  Not that I can recall.
21     Q.  Other than the spectrum.
22     A.  The spectrum is in the SOP.
23     Q.  Yes, but --
24     A.  So that would still be part of it.
25     Q.  Yes, I agree.  I'm with you there.  The

1  spectrum is discussed in the SOPs.  But I'm asking in
2  addition to the spectrum, do you recall any other
3  guidelines in the SOPs that talk about whether or not
4  you're allowed to use a closed fist to strike a detainee
5  in the skull or spine?
6          MR. NYALLAY:  Objection.  Asked and
7  answered.
8      A.  Not off the top of my head, no, sir.
9      Q.  (BY MR. GRINKE)  At the time of the Jacoby
10 Pillow incident, was a detention officer allowed to
11 strike a detainee with a closed fist to the groin?
12     A.  The screen just started saying internet
13 connection.  Sorry.  I just noticed it.
14     Q.  Is it still saying it?
15     A.  It just started flashing it.
16     Q.  It looks like we're okay.
17         MR. GRINKE:  Taylor Hunter, can you still
18 hear us?
19         MR. HUNTER:  Yes.
20         MR. GRINKE:  Okay.  Thank you.
21     A.  Sorry I interrupted.
22     Q.  (BY MR. GRINKE)  That's all right.  At the time
23 of the Jacoby Pillow incident, were detention officers
24 allowed by their training to strike a detainee with a
25 closed fist to the groin?

1      A.  To the where?
2      Q.  Groin.
3      A.  Groin?
4      Q.  Uh-huh.
5      A.  Okay.  I'm sorry.  Honestly, I don't -- I
6  honestly don't know.  I don't think I've ever actually
7  heard that come up, to be honest.
8      Q.  At the time of the Jacoby Pillow incident, were
9  detention officers allowed to use a closed fist strike
10 to a detainee's face?
11     A.  At the time of the incident?
12     Q.  Yeah.
13     A.  At the time of the incident, I don't believe it
14 was ever mentioned in -- in the -- in any of the use of
15 force spectrums or the SOPs.
16     Q.  But from what I've seen in the videos, one of
17 the tools the detention officers did use, prior to and
18 at the time of the Jacoby Pillow incident, was to use a
19 closed fist strike to the face.
20     A.  Wait.  So what was the --
21     Q.  At the time of the Jacoby Pillow incident, it
22 was typical for detention officers to use closed fist
23 strikes to the face when administering force.
24         MR. NYALLAY:  Objection.  Form.
25     A.  When meeting the same -- when meeting the

1  amount of force -- or resistance.  I'm sorry.
2      Q.  (BY MR. GRINKE)  At the time you began to
3  administer force to Jacoby Pillow when you entered the
4  cell, did you first attempt any primary force options?
5      A.  I'm sorry.  I'm a little confused by the
6  question.
7      Q.  Okay.  I'm just reading from the training
8  materials.  When you entered the cell and began
9  administering force to Mr. Pillow, before you
10 administered force such as a closed fist strike to the
11 face, did you try physical restraint?
12     A.  The -- when we entered the cell, he immediately
13 began swinging.  It's difficult when that's occurring.
14 I don't know if you've ever had someone swing at you
15 before.
16     Q.  So your testimony is that if someone takes a
17 swing at a detention officer, then the detention officer
18 is immediately authorized to use closed fist strikes to
19 the face in response?
20         MR. NYALLAY:  Objection to form.
21     A.  No.  What I said was it's difficult in that
22 situation.  It's -- I can't speculate for every officer
23 in every situation, because every situation is
24 different.  Just like I explained earlier, there's
25 variables going on that changes any type of situation

Page 58

1  whatsoever.
2      Q.  (BY MR. GRINKE)  Did -- when you began
3  administering force to Jacoby Pillow, did you attempt
4  pressure point control tactics?
5      A.  Not that I can recall off the top of my head.
6      Q.  When you began administering force to
7  Mr. Pillow, did you attempt joint locking techniques?
8      A.  Wait.  Rephrase it.  Can you ask that again?
9  I'm sorry.  I was confused.
10     Q.  When administering force to Jacoby Pillow,
11 before you utilized closed fist strikes to the face, did
12 you attempt joint locking techniques?
13     A.  Not that I recall, because immediately, like I
14 said, when I entered he immediately started.  I didn't
15 exactly catch his hand in mid-air, if that's what you
16 mean.  Because a joint lock would require me to grab a
17 joint.
18     Q.  When you began administering force to
19 Mr. Pillow, before using closed fist strikes to the
20 face, did you attempt elbow or forearm strikes to
21 Mr. Pillow, to Mr. Pillow's elbow and forearms?
22     A.  I don't recall.
23     Q.  Did you attempt strikes to Mr. Pillow's knees?
24     A.  I don't recall.
25     Q.  Back to your statement.  When you -- before you

Page 59

1  entered the cell, did you ask for or suggest that a
2  mental health professional be called to assist?
3      A.  I don't recall.  I don't remember the exact
4  conversation.
5      Q.  Whether or not anyone suggested it, we see in
6  the video there was no mental health professional
7  present when you entered the cell; is that correct?
8      A.  Correct.
9      Q.  Before you entered the cell, did you and your
10 fellow officers discuss contacting DCCT to come do a
11 planned extraction from the cell?
12     A.  Not that I recall.
13     Q.  Okay.  I'm about midway through the first
14 paragraph.  I think the last sentence I read was "Inmate
15 Pillow swung a second time with a closed fist hitting me
16 in my right facial area."  Are you with me?  I'm on the
17 sixth line of the first paragraph.
18     A.  Yes, sir.
19     Q.  It begins, "Inmate Pillow swung a second time
20 with a closed fist hitting me in my right facial area."
21 Are you with me now?
22     A.  Yes, sir.
23     Q.  Next sentence, "I struck inmate Pillow with my
24 right closed fist in his facial area two times,"
25 correct?

Page 60

1      A.  Yes, sir.
2      Q.  "I took a hold of inmate Pillow by the back of
3  his neck and shoulder area in order to pull him forward
4  from the wall and downwards towards the floor," correct?
5      A.  Yes, sir.
6      Q.  "Inmate Pillow moved forward, but we were
7  unable to get him on the floor," correct?
8      A.  Yes, sir.
9      Q.  "Inmate Pillow continued to be combative,
10 resisting and ignoring orders to place his hands behind
11 his back," correct?
12     A.  Yes, sir.
13     Q.  A few lines down, you mention that "Inmate
14 Pillow went to the floor face down but had his arms
15 under his chest area."  Do you see that?
16     A.  Yes, sir.
17     Q.  Did you or another detention officer have your
18 knee on Mr. Pillow's neck?
19     A.  No, sir, not that I recall.
20     Q.  Did you or a fellow detention officer have your
21 knee on his back?
22     A.  No, sir, not his back.
23     Q.  Did you or a fellow detention officer have a
24 knee on Mr. Pillow at all in order to restrain him?
25     A.  I -- it wasn't a knee per se.  It was the -- I

Page 61

1  had my leg on his shoulder.
2      Q.  Is it physically difficult when an inmate is
3  forcibly taken down face first, with their hands pinned
4  underneath their chest, is it physically difficult for a
5  detainee to comply with a request to give up their
6  hands?
7      A.  I'm sorry?
8      Q.  When a detainee is taken down face first as
9  described in this narrative --
10     A.  I think we lost somebody.
11     Q.  That's okay.  They may jump on or off.  If a
12 detainee such as Mr. Pillow is taken down face first, as
13 is reported in your narrative, by force, and that their
14 hands are pinned underneath their chest when they are
15 face down, is it physically difficult for the detainee
16 to give up their hands since they have been pinned to
17 the floor with their hands underneath them?
18     A.  I've -- there's been several -- sorry, several
19 instances where this similar situation has occurred and
20 they've put their arms around their backs, yes, sir.
21     Q.  But can it be physically difficult for a
22 detainee to comply with a request to put their hands
23 behind their back when they've been brought forcibly to
24 the floor face down and then someone has their leg on
25 top of them or sitting on top of them and their hands

Page 62

1    are pinned under their chest?  Is it possible that that
2    would make it difficult for the detainee to comply?
3        A. I can't speculate to that.
4            MR. NYALLAY:  Objection.  Speculation.
5        A. Sorry.
6        Q. (BY MR. GRINKE)  Did you administer closed fist
7    strikes to Mr. Pillow while he was down on the ground?
8        A. When he was on the ground, when he rolled
9    over -- he managed to roll over onto his side and he hit
10   me in the face with the handcuff, I remember striking
11   him.
12       Q. And did you have the assistance of other
13   detention officers at that time?
14       A. Yes, sir.
15       Q. And it wasn't a -- certainly against your
16   on-the-job training to use a closed fist strike to a
17   detainee after they've been forced to the ground?
18       A. I'm sorry?
19       Q. It wasn't against your on-the-job training thus
20   far to use a closed fist strike to a detainee who had
21   already been brought to the ground?
22           MR. NYALLAY:  Objection.  Form.
23       A. I'm a little confused by the question.
24       Q. (BY MR. GRINKE)  When you used closed fist
25   strikes to Mr. Pillow after he had been brought to the

Page 63

1    ground, were you violating any of your training to date?
2        A. No, sir, because he was still being combative
3    and hostile and still continuing to assault.
4        Q. With someone who is struggling in such a manner
5    and under such trauma, how do you ensure that you're not
6    putting your knee on someone's neck?
7        A. You put it in the proper place to ensure that.
8        Q. And can the detainee continue to move around
9    after you put your knee in the proper place?
10       A. Yes, sir, it's still possible.
11       Q. Where is the proper place?
12       A. Typically, it's right at the shoulder.
13       Q. So the first time Mr. Pillow made contact with
14   you, according to your narrative, he struck you in the
15   right facial area one time.  You hit him back in the
16   face two times, correct?
17       A. Yes, sir.
18       Q. The second time he struck your face, while he
19   was down on the ground struggling, one time, you hit him
20   back in the face three times, correct?
21       A. I honestly don't recall it off the top of my
22   head.
23       Q. It's on the --
24       A. Yes, sir, but that's -- that's what -- yes.
25       Q. Did you ever punch Mr. Pillow with a closed

Page 64

1    fist after handcuffs were finally put on him?
2        A. Not that I can recall.
3        Q. Was there ever any discussion before you guys
4    entered the cell, Hey, this guy is getting released.
5    He's very agitated.  Something is going on.  Let's just
6    give him some time before we enter the cell and try to
7    handcuff him?
8        A. Not that I can recall.
9        Q. Okay.  And then if I remember, there's a lot of
10   these, you did not -- after Mr. Pillow was restrained,
11   you did not personally escort him to the clinic,
12   correct?
13       A. Correct.
14       Q. Or anywhere else that day.  Was that the last
15   time you saw him after he left the cell?
16       A. Was that the last time I saw him?
17       Q. Yes.
18       A. No, sir.
19       Q. When did you see him again?
20       A. The last time I saw him was when I returned
21   back to the jail to grab my belongings and I was leaving
22   to go home, and I walked past a cell that he was in.
23       Q. And what did you see?
24       A. I'm sorry?
25       Q. And what did you see when you saw him in the

Page 65

1    cell?
2        A. He was just at the door.
3        Q. He was standing at the door?
4        A. Yes, sir.
5        Q. What time was that?
6        A. I don't recall the time.
7        Q. Is that something that would be on a
8    surveillance video, based on your knowledge?
9        A. I'm assuming so.  I don't know, to be exact --
10   to be honest.
11       Q. Okay.  Now I'm going to log into this Zoom.
12   And if we can make a note, I will mark this video as
13   Exhibit 12.  Bear with me just a minute.
14           (EXHIBIT 12 MARKED)
15       A. Do we still need the paper?
16       Q. (BY MR. GRINKE)  No.  Well, you can keep it
17   handy if you need to, as we watch the video.  Okay.
18   We're good there.  Okay.  We're getting there.  Okay.
19           Officer Garcia, I've pulled up a video.
20   And there's a few videos that I'd like to go through
21   with you.  These have been produced to us by Harris
22   County, okay?
23       A. Yes, sir.
24       Q. This video has been identified as the video
25   where the use of force was administered on Mr. Pillow,

Usher Reporting Services
(214) 755-1612

Page 66

```
 1   and I'm going to just kind of run through portions of
 2   it.  It's 16 minutes, so I'm not going to watch all 16,
 3   but I'll pause here and there and ask you questions,
 4   okay?
 5       A.  Yes, sir.
 6       Q.  It takes a second to get going.
 7           (Video playing.)
 8       Q.  (BY MR. GRINKE)  Okay.  In those first few
 9   seconds, it looks to me -- in this video, as we're
10   looking where Mr. Pillow is standing, is he standing at
11   the door to the cell?
12       A.  He's in the door frame, yes, sir.
13       Q.  Is that a padded cell?
14       A.  Yes, sir.
15       Q.  And what's the purpose of a padded cell?
16       A.  That cell is used for several different
17   reasons.
18       Q.  What's it primarily used for?
19       A.  We typically use it for either an inmate who is
20   actively suicidal, we use it also as a separation cell,
21   because we don't have any separation cells on the first
22   floor.  Those are the main two reasons.
23       Q.  Do you know why Mr. Pillow had been placed in
24   this padded cell?
25       A.  He was there from when we first came on.  And
```

Page 67

```
 1   from my understanding, he was placed in there for
 2   separation.
 3       Q.  And do you know why he was placed in there for
 4   separation?
 5       A.  They -- I -- to be 100 percent, I don't -- I
 6   don't remember the exact details as to why.  I just
 7   remember them stating that he was being -- he was
 8   hostile and aggressive.
 9       Q.  Did anyone state whether they -- he was in a
10   padded cell because he appeared to be having a mental
11   health episode?
12       A.  Not that I recall.
13       Q.  What you just watched in the first few seconds
14   of this video, he's rubbing his face, he's rubbing his
15   legs.  Does he appear just in those first few seconds of
16   this video to be having a mental health episode?
17       A.  He looks like someone who is just agitated at
18   the moment.
19       Q.  Just minorly agitated?
20       A.  I mean, typically, with people that are just --
21   I mean, you can just be agitated for anything or just
22   uncomfortable.  I don't want to speculate to his state
23   of mind, because I don't know it.  I'm not him.
24       Q.  And you don't recall any written training
25   materials or SOPs that you received that gave you things
```

Page 68

```
 1   to look out for to determine if a detainee is having a
 2   mental health episode?
 3           MR. NYALLAY:  Objection.  Form.
 4       A.  Can you -- can you ask that one more time,
 5   because I'm a little confused?
 6       Q.  (BY MR. GRINKE)  Yeah.  You don't -- you're
 7   telling me you can't get into his mind and all of that,
 8   and I'm asking you as a detention officer who at the
 9   time had been on the job for six years, approximately
10   six years, you don't recall any written training
11   materials that help you know what to look for to
12   identify someone who is having a mental health episode?
13       A.  Well, there hasn't been enough time to go
14   with -- to be able to see enough to go with that.  I
15   mean, you could go with anyone could be having a mental
16   issue, and there are several markers you could go based
17   off of.  But without having multiple things to work
18   with, it's hard to determine in the, what is that, four,
19   five seconds you've shown.
20       Q.  And we'll go through the rest of that video,
21   but my question is a little different.  I'm asking about
22   training, not this video.  Do you recall what are the
23   markers that you should look for to identify someone who
24   is having a mental health episode, according to your
25   training?
```

Page 69

```
 1       A.  With training that I've had previous to this or
 2   before previous to this?
 3       Q.  Previous to this.
 4       A.  Or after this?
 5       Q.  Previous to this.
 6           MR. GRINKE:  I'm sorry.
 7       A.  Previous to this incident, I didn't have a lot
 8   of mental health training per se, so I wouldn't have
 9   been able to tell you anything that much on to it.
10       Q.  (BY MR. GRINKE)  Fair enough.  Okay.  I'm going
11   to hit play again.
12           (Video playing.)
13       Q.  (BY MR. GRINKE)  Can you tell what Mr. Pillow
14   is doing right now in the video?
15       A.  It appears he's at the door or at the -- the
16   pan hole.
17       Q.  Let me pause it.  Do you see the debris in the
18   corner of the cell in the bottom left-hand corner?
19       A.  Yes, sir.
20       Q.  Do you know what that is?
21       A.  It -- I can't tell honestly from here.
22       Q.  Is debris like that supposed to be left in a
23   cell per jail standards?
24       A.  It could have been from his dinner trays.  I
25   couldn't tell you exactly, to be honest.
```

18  (Pages 66 to 69)

Page 70

1  Q. Do you think that that debris is something that
2  Mr. Pillow brought into the cell with him or was handed
3  to him while he was in there?  Or you don't know one way
4  or the other?
5  A. I -- I wouldn't know, sir.
6  (Video playing.)
7  Q. (BY MR. GRINKE) I'm going to keep the video
8  playing.  I'm just going to speed it up just a little
9  bit and then we'll slow it down.  Okay.  What does it
10  appear Mr. Pillow is doing at this point in the video at
11  2 minutes and 23 seconds?
12  A. Looks like he's got his back to the door.
13  Q. Does this look like the part where he's putting
14  his hands back to get the handcuffs on?
15  A. It's possible.
16  Q. And just for reference on the record, when I
17  say 2 minutes and 23 seconds, the timestamps, I'm giving
18  them on the actual video playing itself from the video
19  player.  There is a timestamp at the -- on the actual
20  video of 1:09 AM, correct?
21  A. Yes, sir.
22  Q. And that sounds about right?  According to your
23  memory, it happened about 1:09 AM?
24  A. I believe so, yes, sir.
25  Q. Do you know how long Mr. Pillow had been

Page 71

1  detained at the Harris County Jail by the time this
2  incident happened?
3  A. No, sir.
4  Q. Do you know what he was in there for?
5  A. No, sir.
6  Q. Okay.  Now it looks like he's turning.  Does it
7  appear that he's got one hand towards the pan tray and
8  one out?
9  A. It would appear so, yes, sir.
10  Q. Okay.  Now, I just paused it.  Did it look like
11  he was -- he's still got his left hand to the pan tray
12  and it looks like he's struggling a bit there, correct?
13  I can back it up.
14  A. Yeah, he's got one arm out, correct.
15  (Video playing.)
16  Q. (BY MR. GRINKE) And then it looks like he's
17  kind of trying to pull his left arm out?
18  A. I can't really tell exactly.
19  Q. Okay.  I've frozen the video at 3 minutes and
20  46 seconds on the video timestamp on the video player.
21  At this point, does it appear, tracking your narrative,
22  where Mr. Pillow has a handcuff on one arm and -- his
23  left arm and he has now yanked his arm free with the
24  handcuff attached to it?
25  A. Yes, sir.

Page 72

1  (Video playing.)
2  Q. (BY MR. GRINKE) Okay.  I don't know if it was
3  your narrative or one of the other detention officers,
4  I'm going to back it up, does it appear that Mr. Pillow
5  then takes the open end of the handcuffs and also
6  attaches it to his left arm?
7  A. I can't tell.
8  Q. Okay.  Do you have a recollection one way or
9  the other whether he attached that open end of the
10  handcuffs to his arm along with the closed one?
11  A. I don't remember.
12  (Video playing.)
13  Q. (BY MR. GRINKE) Four minutes 45 seconds on the
14  video, are you able to tell or do you recall what's
15  transpiring at this point?  Is Mr. Pillow talking to you
16  guys through the door?
17  A. It would appear so, but as to -- I don't
18  remember it.
19  Q. All right.  We got to the point of the video,
20  right about 5 minutes 12 seconds on the video player
21  stamp.  The timestamp on the video as produced is
22  Tuesday January 3rd, 2023, 1 minute -- or, I'm sorry,
23  1:12 AM, correct?
24  A. Yes, sir.
25  Q. Okay.

Page 73

1  (Video playing.)
2  Q. (BY MR. GRINKE) Okay.  And is this -- I've
3  frozen the video again.  Is this you in the video or a
4  fellow detention officer?
5  A. I believe that's me.
6  Q. Were you the first detention officer inside the
7  cell?
8  A. I believe so.
9  (Video playing.)
10  Q. (BY MR. GRINKE) I backed it up ten seconds.  I
11  wanted to see, did you push Mr. Pillow when you opened
12  the door?
13  A. I don't recall, to be honest.
14  Q. It looked to me that when you came in, I can
15  back it up again, it looked -- and I'll actually slow it
16  down a little bit more.
17  (Video playing.)
18  Q. (BY MR. GRINKE) When you're entering, it looks
19  like you have your arms extended out towards Mr. Pillow,
20  but let's watch the video.  Did you see that?
21  A. Yes, sir.  My arms are up, yes, sir.
22  Q. Okay.  And it looked like you had your arms up
23  to Mr. Pillow's chest and then he, likewise, responded
24  with his arms outstretched towards you, correct?
25  A. I don't recall the exact, like, per se, the

## Page 74

1  exact reasons for everything on that one. Like, I don't
2  know. I could have -- I don't want to speculate.
3      Q. Okay. I don't want you to guess. We're just
4  looking at what we see on the video. I'm going to back
5  this up again. So he pushes in, and then what I want to
6  you -- I'm going to just let it play and you tell me
7  when is the first time in this video that he swings at
8  you? Was that it?
9      A. Yes, sir.
10          (Video playing.)
11      Q. (BY MR. GRINKE) Do it one more time, and this
12  is regular speed.
13          (Video playing.)
14      Q. (BY MR. GRINKE) And then it looks like
15  Mr. Pillow has his arms around you at this point in the
16  video, 5:24?
17      A. Yes, sir.
18      Q. And then three other detention officers come to
19  your assistance, correct?
20      A. Yes, sir.
21      Q. And I just paused it at 5:25. We saw you make
22  a closed fist strike to Mr. Pillow?
23      A. I think so.
24          (Video playing.)
25      Q. (BY MR. GRINKE) And then there's another

## Page 75

1  detention officer on the right who also just performed
2  two closed fist strikes on Mr. Pillow?
3      A. I believe so. I'm not 100 percent sure.
4      Q. I'll back it up.
5          (Video playing.)
6      Q. (BY MR. GRINKE) Did you see that? It might
7  have been three.
8          (Video playing.)
9      Q. (BY MR. GRINKE) So there's another detention
10  officer on the right there, up next to the wall, that
11  administered three closed fist strikes, correct?
12      A. It would appear so, yes, sir.
13          (Video playing.)
14      Q. (BY MR. GRINKE) Okay. And then at 5:29 on the
15  video player, the detention officer on the right makes
16  another closed fist strike, and then it appeared that
17  you administered a knee kick to Mr. Pillow; is that
18  correct?
19      A. Yes, sir.
20      Q. And you administer the knee kick while you are
21  -- what are you holding there? His shoulders?
22      A. I'm not 100 percent sure.
23      Q. And the knee kick was administered to his face?
24      A. I don't recall.
25          (Video playing.)

## Page 76

1      Q. (BY MR. GRINKE) Okay. So the orientation is,
2  at this point, his rear end is kind of facing the right,
3  the officer on the right, his head is up towards you,
4  correct?
5      A. Yes, sir.
6          (Video playing.)
7      Q. (BY MR. GRINKE) So you administered two right
8  knee kicks to Mr. Pillow, and I think in the second one
9  we can actually see you strike his head, correct?
10      A. I'm not 100 percent sure. I can't tell.
11          (Video playing.)
12      Q. (BY MR. GRINKE) Okay. Right there, at 5:37 on
13  the video player timestamp, there are four detention
14  officers holding Mr. Pillow and you administer a right
15  punch closed fist strike to Mr. Pillow, correct?
16      A. I missed it. I'm sorry. I looked down for a
17  second.
18      Q. That's okay.
19          (Video playing.)
20      Q. (BY MR. GRINKE) Did you see that?
21      A. Yes, sir.
22      Q. So we've got three detention officers holding
23  Mr. Pillow up while you administer a right-hand closed
24  fist strike to Mr. Pillow, correct?
25      A. Yes, sir.

## Page 77

1          (Video playing.)
2      Q. (BY MR. GRINKE) And then it looks like an
3  officer to your left, at 5:42, administered another
4  closed hand strike to Mr. Pillow, correct?
5      A. I can't -- I couldn't tell, to be honest.
6          (Video playing.)
7      Q. (BY MR. GRINKE) We'll do it again. Was that
8  you again?
9      A. I -- I can't tell, to be honest, sir.
10      Q. Okay. All right. Now, at 5:48 Mr. Pillow
11  appears to have been taken to the ground, correct?
12      A. Yes, sir.
13      Q. There are four of you on top of him? Wait.
14  Five. Five of you on top of him, correct?
15      A. Yes, sir, it looks like it.
16          (Video playing.)
17      A. Well, not all on top, but I see what you're
18  saying, yes, sir.
19      Q. (BY MR. GRINKE) Back to that 5:58 [sic], I'm
20  going to let it play and then tell me if this is the
21  point where while Mr. Pillow is on the ground you
22  punched him again.
23          (Video playing.)
24      Q. (BY MR. GRINKE) Do you have your full body
25  weight on Mr. Pillow at this point?

Page 78

1    A. No, sir. I don't think so.
2    Q. Is there another officer that has their full
body weight on Mr. Pillow?
4    A. I don't know, sir.
5        (Video playing.)
6    Q. (BY MR. GRINKE) Okay. There it was. All
7 right. At 6:38 on the video player timestamp, I backed
8 it up ten seconds, but at 6:37, 6:38, while Mr. Pillow
9 is down on the ground with four detention officers, it
10 looks like you take two or three more punches to
11 Mr. Pillow's head, correct?
12    A. I can't tell, sir, strikes or -- it could be
13 strikes, it could be -- honestly, I don't know, sir. I
14 -- I can't speculate to it off the top of my head. I
15 could easily just be just trying --
16        THE REPORTER: Put your hand down, please.
17 "I could easily..."
18    A. I'm sorry. I could easily be trying to grab
19 his arm and pull it out. I don't remember exactly.
20        (Video playing.)
21    Q. (BY MR. GRINKE) The gentleman -- I paused it
22 at 7:15 -- the gentleman -- the detention officer who is
23 up against the back wall, is he on top of Mr. Pillow?
24    A. I don't know, sir.
25    Q. Where is Mr. Pillow in relation to that

Page 79

1 gentleman?
2    A. I honestly don't know, sir.
3    Q. Is he on the floor?
4        MR. NYALLAY: Objection. Asked and
5 answered.
6    A. I don't know. I'm assuming. I don't know.
7    Q. (BY MR. GRINKE) You can't tell in this freeze
8 frame if Jacoby Pillow is on the floor?
9        MR. NYALLAY: Objection. Form.
10    A. There is a bunch of people. Again, if you want
11 me to assume, I can't assume anything, though.
12    Q. (BY MR. GRINKE) I'm not asking you to assume.
13 I'm just saying when you're looking at this freeze
14 frame, you're saying you can't tell whether Mr. Pillow
15 is on the floor with you guys on top of him?
16    A. I -- I don't know if anyone is on top of him at
17 this moment. I would say he's on the floor, but I can't
18 assume it.
19        (Video playing.)
20    Q. (BY MR. GRINKE) Okay. There at 7:36 it looked
21 like you gave him more strikes to the head with your
22 left arm, correct? I'll play it again if you need me
23 to.
24        (Video playing.)
25    A. I can't tell you if they are strikes, sir. I

Page 80

1 don't know.
2    Q. (BY MR. GRINKE) You can't tell if that's a
3 strike?
4    A. No, sir, I can't tell. I could easily be
5 trying to just keep grabbing his arm and trying to pull
6 it out. I can't tell.
7    Q. Okay. At 7:52, did that look like another
8 strike with your left hand to the head?
9    A. Again, sir, I do not know. I can't tell.
10    Q. Okay. I'll keep playing.
11        (Video playing.)
12    Q. (BY MR. GRINKE) At 8:26 it appears you gave
13 him another head strike with the right hand, correct?
14    A. I can't tell, sir. I can't see it.
15        (Video playing.)
16    Q. (BY MR. GRINKE) At 8:39 on the video, are
17 your -- are your knees on Mr. Pillow or are they on the
18 ground? Do you recall?
19    A. I don't recall.
20        (Video playing.)
21    Q. (BY MR. GRINKE) And I read in the narratives,
22 one of your fellow detention officers hurt their knee,
23 correct?
24    A. Yes, sir. I believe so.
25    Q. And that's who is being helped up right there,

Page 81

1 correct?
2    A. Yes, sir, I believe so.
3    Q. Okay. I'm going to back this up ten seconds.
4 At 9:30 on the timestamp, two detention officers are
5 going to leave the cell. Now, at 9:38, do you see
6 Mr. Pillow's body on the ground?
7    A. Yes, sir.
8    Q. And there are three detention officers on top
9 of him, correct?
10    A. Yes, sir.
11    Q. And your left knee appears to be on
12 Mr. Pillow's -- the back of his neck, doesn't it?
13    A. I can't tell, sir.
14    Q. How much do you weigh, sir?
15    A. At this time, I don't know.
16    Q. How much do you weigh now?
17    A. I don't know. I haven't weighed myself.
18        (Video playing.)
19    Q. (BY MR. GRINKE) Okay. And then one of the
20 three officers who had remained, it looks like they left
21 the cell. Do you recall is this where I read in the
22 narratives where an officer went to go get some leg
23 restraints?
24    A. I believe so.
25    Q. Do you recall if Mr. Pillow is talking to y'all

Usher Reporting Services
(214) 755-1612

Page 82

1  at this point, at 10:22 in the video?
2      A.  I don't remember.
3      Q.  I'm going to pause.  Now we're at 10:48 on the
4  video player timestamp, and it appears you are still up
5  against the back wall.  Mr. Pillow is on the floor, his
6  hands are tied behind his back with handcuffs and your
7  knee continues to be on the back of his neck, correct?
8      A.  I don't believe it's on his neck, sir.
9          (Video playing.)
10     Q.  (BY MR. GRINKE)  Okay.  At 11:38 it looks like
11  you've rolled Mr. Pillow over.  You just watched that
12  part.  Did it look like he was saying something to you
13  or you were saying something to him at that time?
14     A.  I don't recall, sir.
15     Q.  Okay.
16         (Video playing.)
17     Q.  (BY MR. GRINKE)  Okay.  Did you just hit him
18  again?
19     A.  No, sir.
20     Q.  To the face?
21     A.  I think I'm trying to pick him up, but I don't
22  recall, to be honest, and I don't want to speculate.
23     Q.  I'll play it again a little bit slower.
24         (Video playing.)
25     Q.  (BY MR. GRINKE)  All right.  I'm going to back

Page 83

1  this up ten seconds.  Okay.  So then you grab him by the
2  shoulder, the clothes of his shoulder, correct?
3      A.  It would appear so, yes, sir.
4      Q.  You pick him up.  Then at 11:42 he's up against
5  the wall.  Did you slam Mr. Pillow into the wall from
6  behind while he was handcuffed?
7      A.  I pushed him up against the wall, yes, sir.
8      Q.  Is that the part that you were disciplined for?
9      A.  Yes, sir.
10         (Video playing.)
11     Q.  (BY MR. GRINKE)  And then by 11:47 on the video
12  player timestamp, Mr. Pillow has been escorted out of
13  the cell, correct?
14     A.  Yes, sir.
15     Q.  And your testimony was that you didn't have any
16  other interaction with Mr. Pillow after this?
17     A.  Correct.
18     Q.  Other than seeing him in his cell when you
19  walked back by later to get your belongings?
20     A.  Yes, sir.
21     Q.  But you did not interact with him at that time,
22  correct?
23     A.  No, sir.
24     Q.  Okay.  Oh, wait.  Okay.  Actually, while I've
25  got the player up, I'm -- I want to look at just maybe

Page 84

1  one, maybe two other videos with you.  I know you're not
2  in them, but I just want to ask you about kind of
3  protocol.
4      A.  Wait.  You want to show videos that I'm not in?
5      Q.  Yeah.
6      A.  But you're asking -- okay.
7          (Video playing.)
8      Q.  (BY MR. GRINKE)  Okay.  Here is what I want to
9  ask about.  And to be clear for the record, you're not
10  in this video, or my understanding is that you're not,
11  but I'll ask you that, do you see yourself in this
12  freeze frame at this moment?
13     A.  Honestly, it's so small, I can't tell.  I don't
14  think so.  It's 7:00-something in the morning, so I
15  doubt it.
16     Q.  Okay.
17     A.  I work night shifts, so...
18     Q.  Right.  It's my understanding that you are not
19  in this video.  I just wanted to be clear about that.
20  But as we see in this video that I'll mark as Exhibit
21  13 --
22         (EXHIBIT 13 MARKED)
23     Q.  (BY MR. GRINKE)  I'll represent to you again
24  these were videos that were produced for Mr. Pillow by
25  Harris County.

Page 85

1          (Video playing.)
2      Q.  (BY MR. GRINKE)  It appears that Mr. Pillow is
3  being drug around the hallways and left laying on the
4  floor.  Do you see that?
5      A.  Yes, sir.
6      Q.  My question is:  After someone has been
7  involved in a serious physical confrontation and a
8  serious use of force by detention officers at the Harris
9  County Jail, is this the typical protocol on how
10  detainee's are dragged around the floor?
11         MR. NYALLAY:  Objection.  Speculation.
12     A.  I don't know the circumstances for this
13  situation, sir.  This is 7:00-something in the morning,
14  so I don't know.  I wasn't there.
15     Q.  (BY MR. GRINKE)  Yeah, I appreciate that you
16  are not there.  I'm not asking you to testify about what
17  was going on at this moment.  I'm asking you because
18  I've got, I don't know, probably 20 videos of him being
19  drug from cell to cell and place to place, just being
20  drug on the floor by his clothes and just plopped down
21  on the floor.  And my question is:  Have you seen anyone
22  else being transported around the jail like that?
23         MR. NYALLAY:  Objection.  Asked and
24  answered.
25     A.  Again, sir, I do not know.  I can't speak to

22  (Pages 82 to 85)

1 every situation if I'm not personally there.
2    Q. (BY MR. GRINKE) If I can -- respectfully
3 timeout. My question is: Have you seen detainees being
4 drug around the floor like this in other instances other
5 than what I'm showing you now?
6    A. I mean, I've --
7       MR. NYALLAY: Objection. Form.
8    A. Sorry. I didn't mean to --
9    Q. (BY MR. GRINKE) You're fine.
10    A. I've seen individuals that have been -- they
11 are being moved and they're refusing to go and we're
12 having to pull them to get them to the location they
13 need to go to. And the entire time they're refusing to
14 go, they are -- they are throwing their weight on the
15 ground to where we have to pick them up, lift them up
16 and carry them. We've had to put them in wheelchairs
17 and then wheelchair them somewhere. We've had to --
18 we've done multiple things like that, so...
19    Q. And thank you for that. And I'm not trying to
20 pin you down on Mr. Pillow. I know you weren't there
21 for this part. I guess that's kind of what I was
22 wondering when I watched these videotapes is the man has
23 been through a very, very serious physical altercation.
24 He's been taken to the clinic. And then rather than use
25 a wheelchair to move him to where the detention officers

1 want to put him next, they just drag him around?
2    A. Like I said, I can't speculate to them, because
3 I don't know what all the circumstances are at that
4 moment. So I don't want to say anything that I wasn't
5 there, so I wouldn't know.
6       (Video playing.)
7    Q. (BY MR. GRINKE) Now, they've just dropped him
8 on the ground here in the hallway. Does it look like
9 he's moving around trying to resist at this point?
10    A. Again, I don't know, sir. It -- he appears
11 just to be there.
12    Q. He's not getting up and trying to run away.
13 He's not trying to get up on his knees or anything?
14    A. It would not appear so.
15    Q. Okay. Okay. Thank you for that.
16    Q. Did we lose somebody?
17    Q. Those are other lawyers and they hop on and
18 off, just listening in.
19    A. I just saw that it went from two to one
20 persons.
21    Q. Do you have an understanding now that Jacoby
22 Pillow ultimately died inside the Harris County Jail?
23    A. Yes, sir.
24    Q. Do you know his cause of death?
25    A. No, sir.

1       MR. NYALLAY: Objection.
2    Q. (BY MR. GRINKE) I'm just about finished. I'm
3 going through my papers here.
4       With respect to dealing with a disruptive
5 inmate, do you recall any standard -- or SOPs that you
6 reviewed to give you guidance?
7    A. With -- at the time of this incident or --
8    Q. Yeah. Before this incident.
9    A. Before the incident, it was a matter of just --
10 it was speak with them, attempt to get them to comply
11 with orders, and that was about it.
12    Q. Okay. Were you taught to recognize a person's
13 delusions or hallucinations are real to him or her?
14       MR. NYALLAY: Objection to form.
15    A. Again, before this incident?
16    Q. (BY MR. GRINKE) Yes.
17    A. To -- wait. Was the question -- was the
18 question to believe that their delusions are to them?
19    Q. No. Do you recall any training on attempts to
20 diffuse a situation, and as part of that that you should
21 recognize that a person's delusions or hallucinations
22 are real to him?
23    A. To them?
24    Q. Right. To them.
25    A. Okay.

1    Q. Not to you.
2    A. I want to make sure --
3    Q. Yeah.
4    A. -- I understood the question. To know that
5 it's -- that they believe in the delusions?
6    Q. Correct.
7    A. Okay. Prior to this incident, I don't recall.
8    Q. Okay. Officer Garcia, I'm going to pass the
9 witness and I thank you for giving your time today.
10    A. Yes, sir.
11       EXAMINATION
12 BY MR. NYALLAY:
13    Q. Officer Garcia, I have a couple of questions,
14 questions for you.
15       You spoke earlier about the policy updates
16 that, according to counsel, was dated on December 11,
17 2024. You have said that --
18       THE REPORTER: Can you speak up just a
19 little bit for me?
20       MR. NYALLAY: Yes.
21       THE REPORTER: Thanks. "You have said
22 that..."
23    Q. (BY MR. NYALLAY) Yes. I'm referring to policy
24 updates that was dated on December 11, 2024. You stated
25 that you remembered the policy being published, right?

Page 90

1    A. That I remember them being published?
2    Q. Yeah, that the policy was available.
3    A. Yes, sir.
4    Q. Okay. You stated that you do not recall the
5 specific facts of the policy?
6    A. Correct.
7    Q. So the fact that you don't recall the policy
8 today, does that mean you did not incorporate that
9 policy said in the circumstances that we're
10 reviewing today?
11    A. This was after the situation that had occurred,
12 the incident.
13    Q. Right.
14    A. So the policy was changed after that incident
15 had occurred.
16    Q. So when that policy changed, did you
17 incorporate that policy in your day-to-day activities as
18 a detention officer?
19    A. Yes, sir.
20    Q. Are you a trained mental health professional?
21    A. No, sir.
22    Q. So does that mean that you do not have the
23 professional training to provide opinion on somebody's
24 mental state?
25    A. I don't have credentials for it, no, sir.

Page 91

1    Q. Did you ever receive any de-escalation
2 training?
3    A. Yes, sir.
4    Q. Would you say that training was implemented
5 before you guys decided to enter Mr. Jacoby's cell?
6    A. We had the de-escalation training prior -- I'm
7 sorry, previous -- after the incident had occurred. So
8 with hindsight, with the training I've had after that,
9 we could have done more, yes.
10    Q. Well, so you stated earlier when -- before you
11 started working for the county you had to go through
12 several weeks of training, right?
13    A. Yes, sir.
14    Q. Part of that training you had what you call
15 TCOLE training?
16    A. Yes, sir.
17    Q. Did that training include anything about
18 de-escalation?
19    A. Not that I recall. It was mainly to do with
20 just state standards with facilities and stuff like
21 that.
22    Q. Okay.
23    A. But to that, what conversations they -- I don't
24 want to speculate, because I wasn't there, any attempts
25 to talk to him previous to me being there, I'm unaware.

Page 92

1 I don't know. I wasn't there for it.
2    Q. I want to talk about the video, same videos
3 that --
4       THE REPORTER: Hold on. I can't hear you.
5       MR. NYALLAY: Yeah. Sorry.
6    Q. (BY MR. NYALLAY) In the video opposing counsel
7 earlier talked about the three strikes that you stated
8 in your statement that you administered to Mr. Jacoby,
9 right?
10    A. Yes, sir.
11    Q. Okay. So I want to talk about the training,
12 use of force training. Does use of force training
13 permit using force, that kind of force, to gain
14 compliance from a resisting inmate?
15    A. When --
16       MR. GRINKE: Form.
17    A. I'm sorry. To equal the resistance itself.
18    Q. (BY MR. NYALLAY) So as we saw on the video
19 when you first -- you're the first person to enter the
20 cell, and we clearly saw that Mr. Jacoby took a swing at
21 you. So what was going on in your mind at that time?
22    A. I honestly don't remember.
23    Q. Was there any time when you were afraid that
24 this inmate may try to hit you again?
25    A. I mean, that's -- that's with any incident.

Page 93

1 There's always the chance of being hit, swung on or
2 anything at any given point in time in the jail in
3 general.
4       I mean, I get -- I get told I'm going -- by
5 several inmates every day, I'm going to beat your ass
6 up -- I'm sorry. I don't mean to cuss, but I'm trying
7 to quote exactly. You know, I'm going to whoop your
8 ass. Open this door, I'll whoop your ass, anything like
9 that. There's threats of violence every day that we
10 deal with. So the potential of it is every single day.
11       So to say that is there a chance it's going
12 to happen? 100 percent there's a chance. There's never
13 not a chance of anything not happening. That's just the
14 environment of the jail in general is that anything is
15 possible. There's never going to be the same thing any
16 one day -- any day of the week. You're more than likely
17 not going to experience the same day more than once.
18    Q. Yes. My question was: As we saw when you
19 entered the cell -- was that a holding cell? We have
20 the image of it. So we saw when you entered, he took a
21 swing at you. That is different from a general
22 expectation that you are in a violent environment.
23 Obviously, you can expect that someone can assault you
24 or threat of force, but when someone actually swung at
25 you and you avoided it the first time and then caught

Page 94

1  you the second time, so would you say that's a different
2  situation than just having a general expectation?
3      A. I mean, if you've already been swung on once,
4  then, yes. There's always the -- you're expecting it to
5  continue -- that it's going to continue, yes, if that
6  was the question. I'm sorry.
7      Q. Yes. Yes, that was the question.
8      A. I wasn't 100 percent sure.
9      Q. Yes, that was the question. Okay. And you
10 said earlier it's based on a policy that Harris County
11 Jail's standard operating procedures that an officer is
12 allowed to use the necessary force that is required to
13 gain compliance; is that correct?
14         MR. GRINKE: Form.
15     A. Sorry. Yes, sir, to meet the resistance.
16     Q. (BY MR. NYALLAY) Okay. So opposing counsel
17 asked you earlier about whether you were disciplined,
18 and you indicated that the part of this use of force
19 that you were disciplined for was after the inmate had
20 already been placed in hand restraints and leg
21 restraints, when you sort of pushed him in the wall.
22 That's part of it. That's what you were disciplined
23 for, correct?
24     A. Yes, sir.
25     Q. I want to talk about the last video that was

Page 95

1  shown to you when the inmate, it appears that he was on
2  the floor. So the fact that you were not there that
3  morning, would that inhibit you saying anything about
4  that video? Would you be able to testify to that video?
5      A. No, sir.
6          MR. GRINKE: Form.
7      A. Because I wasn't there. I don't feel
8  comfortable talking to a situation that I'm not there
9  for.
10     Q. (BY MR. NYALLAY) Okay.
11     A. Because I don't know all the circumstances
12 surrounding the situation.
13     Q. And you had also testified that prior to this
14 particular use of force, you had not had any prior
15 contact with Mr. Jacoby?
16     A. Not that I recall.
17     Q. And after that incident, you were not involved
18 in escorting to the infirmary or bringing him back to
19 the cell?
20     A. No, sir. Immediately following this incident,
21 I was taken to the hospital because of -- I was being --
22 because I got struck in the face with the handcuffs.
23     Q. Okay. So who struck you in the face?
24     A. Mr. Pillow.
25     Q. Can you describe that situation?

Page 96

1      A. What do you mean?
2      Q. Can you describe the scenario where he struck
3  you in the face?
4      A. When he struck me in the face?
5      Q. Yes.
6      A. It was when he managed to roll over onto his
7  side, when we were trying to pull his arm out, and he
8  managed to roll over and he swung and hit me in the face
9  with the handcuff.
10     Q. The reason why I'm asking is because that was
11 not too apparent from the video, because it seemed like,
12 you know, he was on the floor and we don't really see
13 too much of what was happening on the floor, since we
14 have four other officers plus you that were there. So
15 that's why I'm asking you what happened.
16     A. Yes, sir.
17     Q. So when you went to the hospital, what did they
18 say? Did you have any bruises, any fractures as a
19 result of this?
20     A. They took X-rays and all that. Honestly, they
21 never -- I didn't get any answers for anything. They
22 just -- after they went through everything, they
23 released me and sent me home with some pain medication.
24     Q. And we also saw in the video that one other
25 officer had to be escorted out because of his leg. What

Page 97

1  happened to his leg, do you know?
2      A. I don't know his medical history exactly, but
3  from my understanding from what I was told was he had a
4  knee injury.
5      Q. That was from the use of force situation?
6      A. Yes, sir. To what extent, I don't 100 percent
7  know. And I don't want to go with what I just heard
8  from word of mouth, because he no longer works for the
9  county, so I don't know.
10     Q. Yes. So the reason why I'm asking is that
11 another officer other than you was injured by this -- by
12 Mr. Pillow during this use of force scenario?
13     A. Yes, sir.
14     Q. Would you say prior to yourself and other
15 officers entering the cell to gain compliance from
16 Mr. Pillow, would you say you -- someone -- you or
17 someone had already told him to, you know, put his hands
18 behind his back to be restrained and to be escorted out
19 of the cell?
20     A. When I -- they were already attempting to put
21 the handcuffs on him to take him out of the cell to take
22 him to releasing.
23     Q. So what happened, because it appears that he
24 did put his hands in the pan tray? Is that how you
25 recall it?

## Page 98

1    A. It's called a pan hole.
2    Q. Pan hole. And it seemed like he had handcuffs
3  on one of his wrists and he brought it back. So what
4  was going on in your guys' mind at that time when he
5  yanked the --
6    A. That was before I arrived, so I'm not 100
7  percent sure what was going on with them, nor do I want
8  to speculate what is going on in their minds, because
9  they are their own people. I don't know.
10    Q. And you said you had that disciplinary action
11  that you received because of your action was about three
12  day -- a week or two suspension?
13    A. I don't recall the exact number, to be honest.
14    Q. Would you say about two days? Three days?
15  Four days?
16    A. I honestly don't remember. I know it was -- it
17  took an entire work week.
18    Q. Okay.
19    A. But I don't remember the exact amount of days,
20  to be exact. And I don't want to say something and it
21  be wrong, because I don't honestly remember the whole...
22    Q. Do you remember anything that was being said at
23  the time that you guys entered the jail where Mr. Pillow
24  was?
25    A. I'm sorry?

## Page 99

1    Q. Do you remember anything that was said at the
2  time? Was it insulting or threatening force? I know it
3  was in the heat of the moment, but do you remember any
4  sort of threat of force while you guys entered the
5  prison -- in the jail where he was staying?
6    A. From Mr. Pillow?
7    Q. Yes.
8    A. I honestly did not interact with him that I can
9  recall, so I'm not sure.
10    Q. Because you know how in the jail, it's
11  almost -- you guys are almost accustomed to being
12  cursed?
13    A. Yes, sir. And it's honestly to the point where
14  you hear it and you're just numb to it in general,
15  because you hear it so often. I mean, you're still on
16  guard, because it can happen, but we hear it every day,
17  so it's not different.
18    Q. Would you say an inmate behind closed
19  door yelling at you, insulting you or threatening you
20  force, that's different from an inmate who is
21  actually -- who have a weapon, a hand restraint? Is
22  that considered a weapon?
23    MR. GRINKE: Form.
24    A. Yes, sir.
25    THE REPORTER: What was your answer?

## Page 100

1    THE WITNESS: I'm sorry. Yes, sir.
2    Q. (BY MR. NYALLAY) So would you say an inmate
3  that is behind closed door that is just threatening
4  force is a different situation from an inmate who is
5  actually face to face with you and has something that
6  you consider a weapon he could use against you? Would
7  you say it's a different situation?
8    MR. GRINKE: Form. You can answer.
9    A. Okay.
10    Q. (BY MR. NYALLAY) I mean, you don't have to
11  think too hard about it.
12    A. I'm confused by the question.
13    Q. Yes. Someone who is behind closed door is
14  threatening you, Hey, I'm going to get you, I'm going to
15  whoop -- whoop, blah, blah, blah.
16    A. Okay.
17    Q. Would you say that is different from someone
18  who is actually right in front of you --
19    A. Yes, sir.
20    Q. -- who has a weapon?
21    A. Yes, sir. I'm sorry. I was confused by that.
22    Q. I understand. Sometimes I find it hard to...
23    At any time during the use of force, did
24  you have your knee directly on Mr. Pillow while he was
25  on the floor?

## Page 101

1    A. Did I have my knee directly on him?
2    Q. Yes.
3    A. I had my -- my leg. It wasn't, like, my knee
4  per se.
5    Q. In your statement here, you had stated that
6  this was not the final version, the finished version.
7  Did you ever get a chance --
8    THE REPORTER: This was not the what? I
9  heard you said that this was a --
10    MR. NYALLAY: Was not a finished version.
11    Q. (BY MR. NYALLAY) Did you ever get a chance to
12  revise the version that we have here?
13    A. I don't remember. It was a year and -- two
14  years ago. I can't recall that far back, to be honest.
15  And, again, I was struck in the head with the handcuffs,
16  so...
17    Q. Did you suffer any concussion from that?
18    MR. GRINKE: Form. And objection.
19  Nonresponsive.
20    A. I honestly don't know.
21    Q. (BY MR. NYALLAY) Did you get any time off
22  because of being struck in the head by an inmate?
23    A. I didn't have time off, but I had -- if I
24  recall correctly, I called in, I think, the next couple
25  of days, because, like, I was having headaches and

## Page 102

1  sensitivity to the light.
2      Q. And do you recall how long that lasted?
3      A. I don't, no, sir.
4      Q. After that incident, have you been involved in
5  any other use of force situation?
6      A. I don't -- I don't know, to be honest. I'm not
7  100 percent sure.
8      Q. Prior to the incident, were you involved in
9  any?
10     A. I believe so, yes, sir.
11     Q. Would you say that use of force situation on
12 that day had anything to do with Mr. Pillow's death?
13         MR. GRINKE: Form.
14     A. I don't know. I'm sorry.
15     Q. (BY MR. NYALLAY) No.
16     A. I don't know. I don't want to speculate,
17 because I honestly don't know.
18     Q. After the use of force, did you and the other
19 officers discuss anything concerning the use of force?
20     A. After that -- after that use of force, I went
21 to the hospital. And when I came back from the
22 hospital, everyone was already gone.
23     Q. So you never discussed it with anybody else?
24     A. Not -- not immediately after that, no, sir.
25     Q. All right.

## Page 103

1         MR. NYALLAY: No more questions. Reserve.
2         MR. HUNTER: I've got some questions,
3  unless, Paul, do you have follow-ups?
4         MR. GRINKE: I've got a couple follow-ups.
5         THE REPORTER: Y'all, can we take a quick
6  break before we start the next examination?
7         MR. GRINKE: How long do you have, Hunter?
8         MR. HUNTER: I don't know. Maybe 10 to 15
9  minutes, depending on --
10        MR. GRINKE: Okay. We can take a break.
11        THE VIDEOGRAPHER: We are going off the
12 record now. The time is 1:22.
13     (Recess from 1:22 PM to 1:43 PM)
14        THE VIDEOGRAPHER: We are back on the
15 record now. The time is 1:43.
16        EXAMINATION
17 BY MR. HUNTER:
18     Q. Good afternoon, Officer Garcia. My name's
19 Taylor Hunter. I briefly introduced myself at the
20 outset of your deposition today. My office, as well as
21 my co-counsel, represent a plaintiff-intervenor in this
22 case, Chandra Jenkins as attorney-in-fact for Dequon
23 Buford.
24         Do you understand that?
25     A. Not really, but...

## Page 104

1      Q. I'm an attorney. I represent somebody who is
2  not Jacoby Pillow. How about that?
3      A. Okay. The whole attorney thing and all that's
4  not my area of expertise. I understand you have a
5  plaintiff, I guess, is the right word, or client.
6      Q. Are you familiar with Dequon Buford?
7      A. No, sir. I don't think so.
8      Q. So my questions today will be more tailored
9  towards your knowledge of having been working in the
10 Harris County Jail for I believe you said nine years as
11 a detention officer.
12         During your time employed with Harris
13 County, have you ever been sued individually, whether
14 it's for excessive force or some other tort in the
15 course and scope of your job?
16     A. No, sir, not that I'm aware of.
17     Q. Are you familiar with the relationship between
18 Harris Health and Harris County Jail?
19     A. What do you mean by "relationship"?
20     Q. Well, to my understanding, that there's either
21 a work sharing agreement or some sort of contractual
22 agreement between Harris Health and Harris County Jail,
23 so I just want to know if you have any knowledge of that
24 or what your knowledge is of that relationship?
25     A. No, sir. I don't know their contract or

## Page 105

1  anything.
2      Q. Do you have any knowledge of Harris Health's
3  relationship with Harris County Jail?
4      A. I know there's Harris Health medical staff, but
5  that's all I know. I don't know who is and who is not
6  if...
7      Q. Those medical staff, the Harris Health medical
8  staff, are you -- when you use that term or that
9  phraseology, are you referring to folks who work at the
10 jail?
11     A. They work in the jail, yes, sir.
12     Q. Do you know if they are employees of the jail
13 or if they are employees of Harris Health?
14         MR. NYALLAY: Objection. Form.
15     A. I honestly don't know who they are employed by,
16 to be completely honest, sir.
17     Q. (BY MR. HUNTER) In your day-to-day workflow,
18 when you --
19     A. Can I add one thing to that? I don't know if
20 it will clarify it or not.
21     Q. Sure.
22     A. I know the majority of them -- majority of the
23 medical staff that works at the jail were at the jail
24 before Harris Health -- before I even knew what Harris
25 Health was. So I don't know if they work for Harris

1    Health or if they work for the county, because I've
2    known these people down there for several years.  So I
3    don't know if that helps clarify that or not.
4        Q.  Do you know who at the jail, the personnel who
5    may be better to ask these questions to?
6        A.  No, sir.  I wouldn't be able to tell you to be
7    100 percent.
8        Q.  Who are some of the folks that you're referring
9    to when you said, you know, I know those people down
10    there when you're referring to the Harris Health folks?
11       A.  Just nursing staff that I interact with daily.
12    And that -- yeah, I interact with the nursing staff,
13    with the providers and them daily.
14       Q.  Do you interact with any what I would call
15    administrators, as opposed to medical personnel?
16       A.  Not really, no, sir.  Most of the
17    administrative staff typically comes in during the day.
18    I'm -- I work night shift.
19       Q.  Sir, are you familiar with the acronym PREA?
20       A.  No -- wait.  Are you talking about PREA?
21       Q.  Uh-huh.
22       A.  Yes, sir.
23           THE REPORTER:  Would you state that acronym
24    again?  I'm sorry, Taylor.  What's the acronym?  P-R
25    what?

1        Q.  (BY MR. HUNTER)  PREA.  When you use the word
2    "PREA," are you referring to the Prison Rape Elimination
3    Act?
4        A.  Yes, sir.  Yes, sir.
5        Q.  In your nine years as a detention officer, have
6    you had any training on PREA?
7        A.  Yes, sir.
8        Q.  Can you describe that training on PREA?
9        A.  What do you mean by "describe"?  Can you
10    clarify?
11       Q.  Well, you answered yes, I've had training on
12    PREA.  So what sort of training have you had?
13       A.  Okay.  That's the reason why I was asking,
14    because I was a little confused.  Do you mean
15    specifically or do you mean, like -- because I've had
16    electronic training, where we've had it online where we
17    go to it through the academy, and then we have videos
18    that we watch for training courses, so that's why I'm a
19    little confused.  Is that what you're referring to?
20       Q.  Yeah, so we'll break that down.  As to the
21    academy training, what did that PREA training entail in
22    terms of your academy training?
23       A.  No, no, no.  It's through the academy.  So it's
24    online and you go through the academy's site to be able
25    to access into it.  That's why I was saying to clarify

1    it.
2        Q.  Can you explain, I guess, the other training
3    you've done?  Is all your training online relating to
4    PREA?
5        A.  That I can think of off the top of my head,
6    yes, sir.  That's -- yes, sir.
7        Q.  Is that offered by Harris County Jail for its
8    detention officers or by a third party?
9        A.  I know we go through the academy's online thing
10    when we go through the intranet to do it, so I guess
11    that would mean it's through -- it's for the sheriff's
12    office.  I'm not 100 percent sure, to be honest.
13       Q.  The online training you do, is it you watch
14    some videos and kind of do module training, where you
15    watch videos and then you answer questions at the end of
16    those videos, or can you kind of explain what the actual
17    training videos consist of?
18       A.  Yes, sir.
19       Q.  Is the way that I'm envisioning it, is that how
20    the training is actually done?
21       A.  Yes, sir.
22       Q.  When you do that training, are you in a
23    classroom or is it more of a laissez-faire approach, you
24    can do it on your own terms?
25       A.  I'm not sure what laissez-faire means.

1        Q.  Well, it's probably because Mardi Gras was
2    yesterday.  It's more of a free flow type of way in
3    terms of doing things.  So is it a controlled
4    environment -- a controlled educational environment in
5    which you're watching these videos, or are you doing it
6    on your own terms at, let's say, your house or your
7    lunch break?
8        A.  Oh, okay.  I'm sorry.
9           MR. NYALLAY:  Objection to form.
10       A.  Sorry.  I'm sorry.  I didn't mean --
11       Q.  (BY MR. HUNTER)  You can answer.
12       A.  Typically, what most people do is we do it
13    while we're at work.  If we have an opportunity to do it
14    on the computer, we'll do the training.
15       Q.  So as it relates specifically to you, do you
16    recall if you did that individually on your own while
17    you were working?
18       A.  Yes, sir.
19       Q.  Is that the custom and practice for most of the
20    detention officers?
21       A.  I believe so, but I can't speak to everybody.
22       Q.  You've known other detention officers who have
23    done training, PREA training, in a similar manner as
24    you, which is individually, watching the videos and
25    doing the modules on your own?

1          MR. NYALLAY: Objection. Speculation.
2      A. I've known other individuals doing it on the
3  computer, yes, sir, if that was the question.
4      Q. (BY MR. HUNTER) Specifically while they are on
5  work or while they are taking a break at work?
6      A. Yes, sir.
7      Q. Do you know how many hours of PREA training
8  you're required to complete in an annual year?
9      A. Off the top of my head, no, sir. I don't know
10  the exact number.
11      Q. Do you recall -- well, strike that.
12          When is the last time you did PREA
13  training?
14      A. I honestly don't remember, to be honest.
15      Q. An estimate?
16      A. I don't want to speculate, because I don't
17  recall the exact last time.
18      Q. Today is March 5th, 2025. Have you done PREA
19  training within the last year, March 5th, 2024?
20      A. I haven't done it in this year, no, sir.
21      Q. Did you do it in 2024?
22      A. I'm trying to remember. I don't remember
23  exactly, because I've done multiple different classes
24  and modules and trainings, so I don't remember which
25  ones they were exactly, because I've done multiples for

1  the year.
2      Q. The PREA videos in which you watch while you're
3  doing the modules, are those videos that you can fast
4  forward on your own?
5          MR. NYALLAY: Objection to form.
6      A. I don't recall, to be honest, if those are. I
7  know the majority of the videos you can't -- or majority
8  of the -- the -- I'm sorry, the training modules, you
9  cannot fast forward through them. The only exception to
10  that would be if you're doing it and the computer
11  crashes and it logs as to where you previously were, and
12  it would let you skip it because you have already
13  previously done that section. That's the only exception
14  that I can think of.
15      Q. (BY MR. HUNTER) Have you ever, while doing any
16  of the PREA training, you go to your computer, you set
17  it up and then you let the video run and you don't pay
18  attention to it and you come back and take the module
19  test? Have you ever done that?
20      A. No, sir.
21      Q. Do you know if any other detention officers
22  have ever done that?
23          MR. NYALLAY: Objection to form.
24      A. I don't know, sir.
25      Q. (BY MR. HUNTER) Do you know where I can go and

1  find Harris County Jail's policies on PREA?
2      A. It would be under the SOPs section.
3      Q. Do you know if there is a subsection?
4      A. For PREA? Yes, sir.
5      Q. What is that, sir?
6      A. What is what?
7      Q. What subsection would that be?
8      A. Under PREA. They are labeled.
9      Q. That makes sense.
10      A. All the SOPs are all labeled under what
11  category they cover.
12      Q. Do you know the last time Harris County
13  published new PREA policies within its SOP?
14      A. I don't recall.
15      Q. Within those SOPs, will Harris County's
16  procedures relating to PREA also be within there?
17      A. Yes, sir.
18      Q. In terms of personnel at Harris County Jail, do
19  you know the individual that I could go speak to about
20  the PREA SOPs, the PREA policies, PREA procedures?
21          MR. NYALLAY: Objection to form.
22      A. I don't know the exact person. I know who it
23  had been in the past, but I don't know who it is
24  currently, to be completely honest. I'm not a
25  supervisor. Typically, it's the supervisors that get in

1  contact with the PREAs.
2      Q. (BY MR. HUNTER) Who is the individual that
3  you're thinking of from the past? First and last name.
4      A. I do not know the first name. I just know
5  Camacho was the last name. And it's only due to the
6  fact that I've heard it when a supervisor has made a
7  call for it before, but I can't recall when it was. And
8  I know it's been on the bottom of e-mails for PREA.
9      Q. That circumstance that you just talked about,
10  in terms of a supervisor calling Camacho regarding some
11  PREA, what were the circumstances of that?
12      A. I don't know, sir. I wasn't part of it. I was
13  just -- I was in the office talking with -- I was just
14  in the office in general and they mentioned that someone
15  had to call PREA and they said okay. They said okay and
16  they will call Camacho and that's the only reason I ever
17  associated that name with it.
18      Q. Who were the other folks that in room during
19  that call?
20      A. I --
21      Q. First and last names.
22      A. I don't know, sir. This was years ago and --
23  when I heard that. I knew I wasn't part of it, so I
24  left the office, because I wasn't entitled -- I wasn't
25  part of the whole situation.

## Page 114

1  Q. Who was your supervisor who you overheard
2  saying let's call Camacho?
3  A. I'm trying to remember. This was years ago. I
4  honestly don't remember. I've just always associated
5  just Camacho with PREA because of that. And I remember
6  seeing Camacho's name on the bottom of e-mails about
7  PREA before.
8  Q. Would the name Katrina Camacho ring a bell?
9  A. That might be it. Like I said, I didn't
10  remember the first name. I just knew the last name.
11  Q. Do you know Camacho's official title?
12  A. No, sir.
13  Q. Do you know if Camacho works at the actual jail
14  or does she work at a separate location, physical
15  location, if you know?
16  A. I don't know 100 percent, no, sir. I know they
17  used to have an office at the 701 building, but I don't
18  know if it's still there or not.
19  Q. Where is the 701 building in relation to 1200
20  Baker?
21  A. It is -- in relation or just the address of it?
22  Q. Well, is it in downtown Houston?
23  A. Yes, sir. It's at 701 San Jacinto, which is at
24  the cross street of Baker Street.
25  Q. Are you familiar with Harris County Jail's PREA

## Page 115

1  investigatory unit?
2  A. No, sir.
3  Q. During your nine years as a detention officer,
4  have you ever had any -- any occasion or dealings with
5  the PREA investigatory unit?
6  A. Not that I recall, no, sir.
7  Q. Are you aware if the PREA investigatory unit
8  provides trainings to its detention officers?
9  A. I'm not 100 percent sure, to be honest.
10  Q. Have you ever personally been part of a
11  training related to PREA that was performed by the
12  investigatory unit?
13  A. Not that I recall.
14  Q. Are you aware if the PREA investigatory unit
15  provides written policies to Harris County Jail for its
16  detention officers?
17  A. I'm not sure who writes the policy, sir.
18  Q. Fair to say you have no knowledge of the PREA
19  investigatory unit or its scope of work?
20  A. Yes, sir, I would say that.
21  Q. Do you recall your testimony from earlier this
22  morning that there won't be the same situation in the
23  jail twice?
24  A. Yes, sir.
25  Q. How do you reconcile that testimony when an

## Page 116

1  inmate suffers sexual assaults and rapes on more than
2  one occasion?
3  MR. NYALLAY: Objection to form.
4  A. I don't understand the question.
5  Q. (BY MR. HUNTER) So if an inmate is raped on
6  more than one occasion, would you agree that there's at
7  least similarities between those two occasions, because
8  it's the same inmate involved?
9  A. I wouldn't know, sir, because I -- I wouldn't
10  be able to tell you, because I don't know the
11  circumstances.
12  Q. Well, it's a hypothetical question on whether
13  you agree or not if the same inmate is raped more than
14  once, would there be similarities between those two
15  separate rapes because it's the same inmate involved?
16  MR. NYALLAY: Objection to form.
17  A. Again, sir, I wouldn't know in general,
18  because, I mean, I wouldn't know if it happened either
19  of the cases, so I don't know, sir. And I don't want to
20  speculate.
21  Q. (BY MR. HUNTER) So your testimony is if
22  somebody is raped more than once in the Harris County
23  Jail and it's the same inmate, that's not the same --
24  MR. NYALLAY: Objection.
25  Q. (BY MR. HUNTER) -- situation, even if it's the

## Page 117

1  same person?
2  MR. NYALLAY: Objection. Asked and
3  answered.
4  A. Like I just said, sir, I don't know, because I
5  don't want to speculate because I do not know the
6  situation to it.
7  Q. (BY MR. HUNTER) Rapes and sexual assaults
8  occur within the Harris County Jail on multiple
9  occasions to multiple inmates. Would you agree that a
10  failure of Harris County's policy is reasonably related
11  to those rapes and sexual assaults?
12  MR. NYALLAY: Objection. Form.
13  A. I don't know, sir. I don't write the policies;
14  therefore, I don't know as to whether or not it
15  coincides with it.
16  Q. (BY MR. HUNTER) You don't write the policies,
17  but you're given the policies, correct?
18  A. Yes, sir.
19  Q. And you've read those policies?
20  A. Yes, sir.
21  Q. You're familiar with those policies?
22  A. Familiar with the majority of them, yes, sir.
23  Q. Do you put those policies into practice every
24  day when you go to work?
25  A. Yes, sir.

1      Q.  And you still can't answer that question
2  though?
3      A.  Because you're --
4          MR. NYALLAY:  Objection.
5      A.  It's a hypothetical situation, sir.  I don't
6  know without knowing all the circumstances of the
7  situation.  I don't want to speculate without knowing
8  all the circumstances of it.  I mean, if I were to walk
9  into a room and you see someone hit somebody, I don't
10  know why they hit that person.  I don't want to
11  speculate as to who is right and who is wrong.
12  Therefore, I don't want to speculate into any situation
13  if I'm not part of it, nor do I know anything about it.
14  Does that make sense?  Including the hypothetical
15  situation.
16     Q.  (BY MR. HUNTER)  Do you recall testifying
17  earlier when you were describing the environment of the
18  jail that you said, quote, "anything is possible"?
19     A.  Yes, sir.
20     Q.  So if anything is possible, and you're familiar
21  and you have an understanding of the policies you're
22  supposed to put into practice every day when you go to
23  work, don't you think you should be able to answer these
24  hypotheticals?
25         MR. NYALLAY:  Objection to form.

1      A.  Again, sir, when it's in front of you, you
2  handle it at the situation.  But hypothetically, I don't
3  want to stipulate, because I'm not sure what is going
4  on.  I've never -- I don't want to stipulate into a
5  hypothetical.
6      Q.  (BY MR. HUNTER)  In your nine years as a
7  detention officer at Harris County, have you ever
8  encountered a rape occurring while doing an observation?
9      A.  Not that I recall.
10     Q.  You just can't recall right now?
11     A.  I honestly don't know, sir, off the top of my
12  head.
13     Q.  Well, would you agree that a rape is a pretty
14  traumatic experience?
15     A.  Yes, sir.
16         MR. NYALLAY:  Objection.
17     Q.  (BY MR. HUNTER)  Typically, for human beings,
18  you think traumatic would stick in your memory, right?
19     A.  Again, I don't --
20         MR. NYALLAY:  Objection.
21     A.  I don't -- I wouldn't be able to answer that,
22  sir.
23     Q.  (BY MR. HUNTER)  So is it your testimony that
24  you don't recall, in your nine years, ever observing a
25  rape occurring within the Harris County Jail?

1      A.  Not to the -- not to my knowledge, not off the
2  top of my head.
3      Q.  If rapes and sexual assaults occur within the
4  Harris County Jail on multiple occasions to multiple
5  inmates, would you agree that a failure of Harris
6  County's training is reasonably related to those rapes
7  and sexual assaults occurring?
8          MR. NYALLAY:  Objection to form.
9      A.  Again, sir, I do not want to speculate on
10  anything.
11     Q.  (BY MR. HUNTER)  But, again, you've been given
12  the policies, you've done PREA training, you've worked
13  there for nine years, correct?
14     A.  Yes, sir.
15     Q.  And you still can't answer that question?
16         MR. NYALLAY:  Objection.  Form.
17     A.  Sir, again, like I've said on the other times,
18  I'm not going to speculate on any situation.
19     Q.  (BY MR. HUNTER)  In your nine years working as
20  a detention officer, have you ever been made aware of
21  other detention officers submitting false paperwork,
22  claiming they completed their observation requirements,
23  when in reality they falsified such documents?
24         MR. NYALLAY:  Objection.  Form.
25     A.  I'm sorry.  One more time.

1      Q.  (BY MR. HUNTER)  Have you ever been made aware
2  of other detention officers submitting false paperwork,
3  claiming they completed observation requirements, when
4  in reality they falsified the document?
5          MR. NYALLAY:  Objection.
6      A.  I've heard -- I've heard of it, yes, sir.
7      Q.  (BY MR. HUNTER)  And when you say you've heard
8  of that, what is your understanding of hearing about
9  that?
10         MR. NYALLAY:  Objection.  Speculation.
11     A.  I don't understand your question.
12     Q.  (BY MR. HUNTER)  When I asked the question
13  about your knowledge of other officers submitting false
14  paperwork, you said I've heard of that, true?
15     A.  Yes, sir.  I've heard of individuals doing it
16  before.
17     Q.  All right.  So tell me what you've heard.
18         MR. NYALLAY:  Objection.
19     A.  Exactly what I just stated, sir.  I've heard
20  individuals have done it before.  That's all I've heard.
21     Q.  (BY MR. HUNTER)  In the context of completing
22  mandatory observations?
23         MR. NYALLAY:  Objection.
24     A.  Yes, sir, like I just said.
25     Q.  (BY MR. HUNTER)  Have you heard of detention

## Page 122

1   officers falsifying any other documents?
2     A. Not to my knowledge, off the top of my head,
3   no, sir.
4     Q. Is falsifying observation documents part of
5   Harris County's procedure?
6     A. No, sir.
7     Q. Is there any procedure Harris County has
8   whereby they allow their detention officers to falsify
9   documents?
10     MR. NYALLAY: Objection.
11     A. Not that I'm aware of.
12     Q. (BY MR. HUNTER) You would agree falsifying
13   observation documents is not a good thing, right?
14     MR. NYALLAY: Objection.
15     A. Correct.
16     Q. (BY MR. HUNTER) And if multiple officers are
17   falsifying documents, that can create the culture where
18   that's acceptable; is that true?
19     MR. NYALLAY: Objection. Form.
20     A. I wouldn't speculate on other officers, sir.
21     Q. (BY MR. HUNTER) But you've heard of other
22   officers falsifying documents, right?
23     A. Yes, sir.
24     MR. NYALLAY: Objection. Asked and
25   answered.

## Page 123

1     A. In the past, yes.
2     Q. (BY MR. HUNTER) And if officers are doing
3   that, and other officers know they are doing that, that
4   could create a bad culture where people can get away
5   with falsifying documents; is that correct?
6     MR. NYALLAY: Objection. Asked and
7   answered.
8     A. Again, sir, like I just said, I wouldn't
9   speculate on other officers in general.
10     Q. (BY MR. HUNTER) Falsifying state paperwork is
11   pretty fraudulent, right?
12     A. Yes, sir.
13     Q. You've never done that, right?
14     A. No, sir. Not that I recall.
15     Q. In your nine years as working as a detention
16   officer for Harris County, have you ever been made aware
17   of other detention officers submitting false paperwork
18   claiming the ratio of detention officers to inmates was
19   appropriate, when in reality it was not?
20     MR. NYALLAY: Objection. Form.
21     A. Not that I recall, sir. I don't typically deal
22   with the ratios.
23     Q. (BY MR. HUNTER) Do you know the first and last
24   name of the person presently enrolled in Harris County
25   that deals with the ratios?

## Page 124

1     A. I do not, no, sir.
2     Q. That's all I got. I thank you for your time,
3   Officer. I appreciate it.
4     A. Yes, sir.
5     MR. GRINKE: I'm done. I have no further
6   questions.
7     THE REPORTER: Taylor, before we -- are you
8   finished? I'm sorry. Before we get off the record,
9   would you spell the last name, not Chandra, but the
10   other plaintiff? It's just kind of mumbled when you say
11   it.
12     MR. HUNTER: Yeah. Buford.
13     THE REPORTER: Got it.
14     MR. HUNTER: B-U-F-O-R-D.
15     THE REPORTER: Okay.
16     MR. HUNTER: And then Katrina Camacho is
17   Katrina, C-A-T-R-I-N-A [sic], Camacho, C-A-M-A-N-C-H-O
18   [sic].
19     THE REPORTER: Thank you. One last
20   question: Would you like a copy of the transcript?
21     MR. HUNTER: Yeah. I'll take an
22   E-transcript.
23     THE REPORTER: Okay.
24     MR. HUNTER: I'll throw my e-mail in the
25   chat if you need it.

## Page 125

1     THE REPORTER: That would be great.
2     THE VIDEOGRAPHER: That's it. Okay. This
3   will conclude today's testimony given by Officer Mark
4   Garcia. The time on the monitor is 2:16. Thank you.
5     (Deposition concluded at 2:16 PM)
6     (Signature waived)
7
8
9   Reporter's Note: According to Federal Rule 30(e)(1),
10   the request for review of the deposition by the witness
11   is accomplished "on request by the deponent or a party
12   before the deposition completed." Since this was not
13   done, signature is considered waived for this
14   transcript.
15
16
17
18
19
20
21
22
23
24
25

Page 126

```
1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION
3    OCTEVIA WAGNER; et al,   )
                              )
4         Plaintiffs,        )
     v.                       )
5                             ) CIVIL ACTION NO:
     HARRIS COUNTY, TEXAS,     ) 4:23-cv-02886
6                             )
          Defendant.          )
7     v.                       )
                              )
8    ANA GARCIA AND CHANDRA    )
     JENKINS,                  )
9                             )
          Plaintiff-          )
10        Intervenors.         )
11           REPORTER'S CERTIFICATION
               ORAL DEPOSITION OF
12              OFFICER MARK GARCIA
               TAKEN MARCH 5TH, 2025
13
14        I, Sara T. Green, Certified Shorthand Reporter in
15   and for the State of Texas, hereby certify to the
16   following:
17        That the witness, OFFICER MARK GARCIA, was duly
18   sworn by the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by
20   the witness;
21        I further certify that pursuant to FRCP Rule
22   30(f)(1) that the signature of the deponent:
23   _____ was requested by the deponent or a party
24   before the completion of the deposition and returned
25   within 30 days from date of receipt of the transcript.
```

Page 127

```
1         If returned, the attached Changes and Signature Page
2    contains any changes and the reasons therefor;
3         ___X_ was not requested by the deponent or a party
4    before the completion of the deposition.
5         I further certify that I an neither attorney nor
6    counsel for, related to, nor employed by any of the
7    parties to the action in which this testimony was taken.
8    Further, I am not a relative or employee of any attorney
9    of record in this cause, nor am I financially or
10   otherwise interested in the outcome of the action.
11        Subscribed and sworn to on this the 14th day of
12   March, 2025.
13
14
15
16
         _____
17       SARA T. GREEN, Texas CSR #2436
         Certification expires: 04-30-2025
18       Usher Reporting Services
         Firm Registration No. 10278
19       1326 Lochness Drive
         Allen, Texas 75013
20       214.755.1612
21
22
23
24
25
```