EXHIBIT 78

Sergeant Quinton Sneed  *  April 14, 2025

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| OCTEVIA WAGNER; et. al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| HARRIS COUNTY, TEXAS ) | |
| ) CIVIL ACTION NO: | |
| Defendant, 4:23-cv-02886 | |
| ) | |
| v. ) | |
| ) | |
| ANA GARCIA AND CHANDRA ) | |
| JENKINS, ) | |
| ) | |
| Plaintiff-Intervenors. ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

SERGEANT Q. SNEED

APRIL 14, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Page 2

1  ORAL AND VIDEOTAPED DEPOSITION OF SERGEANT Q.
2  SNEED, produced as a witness at the instance of Mr. Paul
3  A. Grinke, counsel for Plaintiffs, was taken in the
4  above-styled and numbered cause on April 14, 2025, from
5  2:11 p.m. to 3:16 p.m., before Julie R. Borski,
6  Certified Shorthand Reporter, in and for the State of
7  Texas, reported by computerized stenotype machine at
8  Harris County Attorney's Office, 1019 Congress Street,
9  15th Floor, Houston, Texas, pursuant to the Federal
10 Rules of Civil Procedure and the provisions stated on
11 the record or attached hereto.

Page 3

1        APPEARANCES
2
3  FOR THE PLAINTIFFS:
4     MR. PAUL A. GRINKE
       Ben Crump Law, PLLC
5      5 Cowboys Way
       Suite 300
6      Frisco, Texas 75034
       Tel: 972.942.0494
7      Fax: 972.433.0111
       Email: paul@bencrump.com
8
   FOR THE DEFENDANT:
9
      MS. KELLY R. ALBIN
10    Denton Navarro Rodriguez Bernal Santee & Zech, P.C.
      549 N. Egret Bay
11    Suite 200
      League City, Texas 77573
12    Tel: 832.632.2102
      Email: kralbin@rampagelaw.com
13
14 ALSO PRESENT:
15    Ms. Cyndi Joseph, The Videographer

Page 4

1              INDEX
2
3                                PAGE
4  Stipulations........................2
5  Appearances.........................3
6
7  Testimony of SERGEANT Q. SNEED
8     Examination by Mr. Grinke.......5
9
10 Changes and Signature..............51
11 Reporter's Certificate.............53
12
13            EXHIBITS
14 EXHIBIT       DESCRIPTION         PAGE
15 Exhibit 20    Video AVI File (NO BATES NUMBER)   21
16
17        PREVIOUSLY MARKED EXHIBITS
18 EXHIBIT       DESCRIPTION         PAGE
19 Exhibit 1     Incident Report (000126-129)       18

Page 5

1            PROCEEDINGS
2         THE VIDEOGRAPHER:  Good afternoon.  We're
3  on the record today.  Today is April the 14th, 2025.
4  The time on the monitor is 2:11.  This is the video
5  recorded deposition of Sergeant Q. Sneed.
6         Will counsel please state their appearance
7  and agreements for the record.
8         MR. GRINKE:  Paul Grinke for the
9  plaintiffs.
10        MS. ALBIN:  Kelley Albin for Defendant,
11 Harris County.
12        THE VIDEOGRAPHER:  Thank you.
13        Will our court reporter please swear in our
14 witness.
15        QUINTON D. SNEED,
16 having been first duly sworn, testified as follows:
17        THE VIDEOGRAPHER:  Let's begin.
18            E X A M I N A T I O N
19 BY MR. GRINKE:
20    Q.  Could you state your name for the record,
21 please.
22    A.  My name is Quinton D. Sneed.
23    Q.  Okay.  May I call you Officer Sneed today?
24    A.  You can, but Deputy or Sergeant is preferred.
25    Q.  Okay.  All right.  Sergeant Sneed.

Page 6

1	A.  Yes, sir.
2	Q.  Okay.  How are you currently employed?
3	A.  I am the Watch Commander at EDC Harris County
4	Sheriff's Office.
5	Q.  Okay.  Watch Commander.  And how long have you
6	been -- and you work at the Harris County Jail?
7	A.  No, not anymore.
8	Q.  Not anymore.  Okay.  So where -- where do you
9	go to work every day now?
10	A.  Now I go to work at the Emergency Dispatch
11	Center, and I serve as the Watch Commander.
12	Q.  Okay.  All right.  My name is Paul Grinke.  I'm
13	a lawyer, and I have filed a lawsuit on behalf of
14	several individuals and/or their families with respect
15	to incidents that have occurred in the Harris County
16	Jail over the last few years.
17		Do you understand that?
18	A.  Yes, sir.
19	Q.  And we're taking your deposition today so that
20	I can ask you some questions about an incident that
21	involved an inmate at the time, Mr. Kenneth Richard.
22		Do you understand that?
23	A.  Okay.
24	Q.  And while we're in a conference room here
25	today, you understand that your testimony is under oath,

Page 7

1	that you're sworn in before your deposition started.  So
2	your testimony today has the same weight as it would if
3	we were in the courtroom in front of the judge and jury.
4		Do you understand that?
5	A.  Yes, sir.
6	Q.  Okay.  And have you given a deposition before
7	under testimony?
8	A.  I have not.
9	Q.  Okay.  All right.  Well, you're doing great so
10	far.  I'll go over a couple of quick ground rules.
11		The -- the court reporter to your left is
12	taking down everything we say in a written form.
13	A.  Okay.
14	Q.  And she will make a booklet of your testimony
15	that will go question, answer, question, answer.  And
16	because she is taking things down in a written form, it
17	will help if we don't talk over each other.
18	A.  Okay.
19	Q.  Okay.  And you're doing great.  In natural
20	conversation, it is very natural -- you're going to know
21	where I'm going with my question, it's very natural to
22	kind of jump in and just start giving the answer.
23	A.  Uh-huh.
24	Q.  But if you can do your best to let me finish my
25	question before you start your answer, I'll do my level

Page 8

1	best to do the same and let you finish your answer
2	before I move on.  Okay?
3	A.  Okay.
4	Q.  Okay.  And then, likewise, you're also doing
5	great, because this is in writing, it will help if you
6	give verbal answers, "yes" or "no," versus "uh-huh" or
7	"huh-uh" or shakes of the head because that's hard for
8	her to take down.
9	A.  Yes, sir.
10	Q.  All right.  Where did you grow up?
11	A.  I'm a Navy brat, so --
12	Q.  Okay.
13	A.  -- a little bit of everywhere.  I was born in
14	Houston, Texas; left here when I was ten years old to
15	move to San Diego, California.  I went to middle school
16	in San Diego, California, and then moved to Memphis,
17	Tennessee, where I went to high school and graduated.
18	Moved back to San Diego and joined the U.S. Navy.
19	Q.  Oh, wonderful.  Thank you for your service.
20	A.  Yeah.
21	Q.  What -- what year did you graduate from high
22	school?
23	A.  2002.
24	Q.  What was the name of your high school?
25	A.  Millington Central High School.

Page 9

1	Q.  And then right out of high school, did you
2	immediately join the Navy, or did you do any other type
3	of education?
4	A.  No.  Pretty much right after -- after Navy --
5	or right out of high school, I went to the Navy.
6	Q.  Okay.  And then how many years were you in
7	service in the Navy?
8	A.  Four years.
9	Q.  And then what was your area of service in the
10	Navy?
11	A.  I was a Cryptologic Technician Collections,
12	which is short for a spy.
13	Q.  Okay.  All right.  Okay.  And then so were you
14	stationed in San Diego for your four years, or did you
15	move around?
16	A.  I was in -- well, I went to boot camp at Great
17	Lakes, Illinois.  I went to my initial training in
18	Pensacola, Florida.  And then from there, I went for
19	additional training for my specialty in Fort Huachuca,
20	Arizona.
21	Q.  Okay.  All right.  And after that training in
22	Arizona, were you stationed anywhere else after that?
23	A.  San Diego on a -- on a destroyer.
24	Q.  And then did -- did you ever deploy?
25	A.  Oh, yes, more than I wanted to.

Page 10

1   Q. Okay.
2   A. I've been around the world before I was
3   21 years old.
4   Q. Wow. All right. And then I take it you had an
5   honorable discharge?
6   A. Yes.
7   Q. About when were you honorably discharged from
8   the Navy, month, year, if you can recall?
9   A. March 2008 -- 2007. I'm sorry.
10  Q. And then what did you do after you were
11  discharged from the Navy?
12  A. I came home, and I worked with my parents for a
13  little while. They have a FedEx -- they're FedEx
14  contractors. And then I joined the sheriff's office.
15  Q. Okay. And when you say you came home and
16  worked with your parents, was that in San Diego or
17  Houston?
18  A. In Houston.
19  Q. Houston.
20      So sometime in 2007, you joined the Harris
21  County Sheriff's Office?
22  A. It was late 2007, I started the application
23  process, and I hired on in March 2008.
24  Q. So in March of 2008, you say you hired on.
25      Is that when you began the academy and

Page 11

1   training process, or is that when you kind of became a
2   full-service detention officer?
3   A. That is when I became a detention officer. And
4   I believe it was a two-week orientation before you went
5   into the jail.
6       And I went to jail school maybe six months
7   later. That's where you become a certified jailer, and
8   you get your license.
9       And then I served in the jail for about a
10  year and a half before I got accepted to our peace
11  officers academy. That took about eight months.
12      Then I became a deputy, and I was a patrol
13  deputy in the Northwest Region for about nine years
14  before I promoted to sergeant.
15  Q. All right. So from the time that you began
16  working at the Harris County Jail in March of 2008, up
17  until the time that you moved to the peace officers
18  academy --
19  A. Uh-huh.
20  Q. -- was your only job working as a detention
21  officer in the Harris County Jail?
22  A. Yes.
23  Q. And was your title always detention officer, or
24  did you promote to something else?
25  A. No, it was just detention officer.

Page 12

1   Q. I've taken a few of these depositions now.
2   A. Okay.
3   Q. And so I think I have a pretty good idea of the
4   training process. I'll walk through it with you. Just
5   for brevity's sake, I'll kind of tell you my
6   understanding, and you tell me if I'm right or wrong.
7   Okay?
8   A. Okay.
9   Q. So you mentioned there's about a two-week
10  academy in order to come -- and I'm not talking about
11  peace officer now. I'm just talking about the Harris
12  County Jail.
13  A. Uh-huh.
14  Q. Okay. There's kind of a two-week academy
15  period before you move into the jail itself?
16  A. Well, that's the way it used to be almost
17  20 years ago. I'm not sure what they're doing now.
18  Q. Right. And I just want to know about where --
19  the parts that you -- you went through.
20  A. Yes, sir. It was about a two-week orientation.
21  Q. Okay. And then -- and that part is kind of
22  classroom?
23  A. Yes.
24  Q. And in the classroom, there may be written
25  materials, but there also may be also some demonstrative

Page 13

1   actions to learn how to do certain things?
2   A. Yes.
3   Q. And then after the two-week period, before you
4   moved into the jail itself, did you have to take a test?
5   A. No.
6   Q. Okay.
7   A. Before you went to the jail, no.
8   Q. All right. And then when you came -- after you
9   finished the two-week orientation process, classroom,
10  move into the jail.
11      And then for a period of time, were you
12  assigned to a field training officer?
13  A. In the jail? No, I was not.
14  Q. You don't remember that?
15  A. Huh-uh.
16  Q. Okay. So what -- what do you remember doing
17  immediately when you started working inside the jail?
18  A. It was -- back then, it was on-the-job
19  training. You were going to go sit in a pod and observe
20  and learn.
21      It was up to your floor supervisor who he
22  set you with, but there was no field training officers
23  back then, not for that.
24  Q. Okay. None back then. Fair enough.
25      And then so is it fair to say, then, that

Page 14

1  the bulk of your training at the Harris County Jail,
2  when you went through the process, was on-the-job
3  training?
4      A. It was.
5      Q. All right. And then remind me how long or how
6  many years you were a detention officer before you
7  joined the peace officer academy.
8      A. About a year and a half.
9      Q. So that gets us maybe into some where mid to
10 late 2009?
11     A. Yes.
12     Q. Did you continue working at the Harris County
13 Jail while you were attending the police -- the peace
14 officers academy?
15     A. No.
16     Q. Okay.
17     A. It's a full-time assignment to the academy.
18     Q. And then -- well, let me ask you this: So the
19 incident that we're here to talk about today is -- was
20 dated April 27, 2023, involving a -- an assault on
21 inmate Kenneth Richard.
22          Are you with me?
23     A. Okay.
24     Q. And then it lists you as the supervisor. Is
25 that accurate?

Page 15

1      A. I don't know. I don't recall Mr. Kenneth
2  Richard's case.
3      Q. Did you review any documents in preparation for
4  your deposition today?
5      A. No.
6      Q. Didn't review any incident report or anything?
7      A. No, sir.
8      Q. Okay. Were you a supervisor inside the Harris
9  County Jail in April of 2023?
10     A. Yes.
11     Q. And what time frame did you act as a supervisor
12 inside the Harris County Jail?
13     A. From approximately September 2018 to
14 September 2024.
15     Q. What were your roles and responsibilities as a
16 supervisor in the Harris County Jail, as opposed to
17 being a detention officer?
18     A. Well, as opposed to being a detention officer,
19 you are now responsible for your staff, which is
20 probably 20 people, detention officers.
21          You're responsible for giving them all the
22 tools they need to be successful, supervising, making
23 sure they're doing the right things and making sure they
24 have the knowledge to do their job.
25     Q. And then so do a certain number of detention

Page 16

1  officers report to you as their supervisor?
2      A. Yes.
3      Q. Okay.
4      A. I think in 2018, I had 34. But when they
5  started the new staffing, I think I had 15.
6      Q. Do you remember about when they started the new
7  staffing to where you moved to 15?
8      A. That may have been -- I don't want to... I
9  don't remember. It may have been in 2022.
10     Q. Okay. Do you feel like it was before April of
11 2023 that they changed the staffing to go where you had
12 15ish?
13     A. Yes.
14     Q. As part of your roles and responsibilities as a
15 supervisor at the Harris County Jail, were you required
16 to investigate events of assault, whether detainee on
17 detainee or uses of force by detention officers on
18 detainees?
19     A. Yes, sir.
20     Q. And what would you do to investigate -- we'll
21 just say a detainee-on-detainee assault. Describe what
22 you would do to investigate an incident like that.
23     A. I would speak with both involved parties, get
24 both their sides of the story, make sure that it was
25 properly documented, watch any video if it was

Page 17

1  available, and take any witness statements of anyone who
2  was willing to give -- give their account of the events,
3  and talk to the officers who witnessed it or were
4  involved in the incident.
5      Q. And so would you -- you would personally
6  interview the officers that may be involved?
7      A. Not for all.
8      Q. Okay.
9      A. But if I felt like it was an incident that
10 needed further investigation, I would.
11     Q. And what type of incident would be something
12 that you would feel like required further investigation?
13     A. If there was any outcry, or if there was any
14 allegations of misconduct, or anything that was odd
15 about the situation.
16     Q. And then you also mentioned interviewing
17 detainees or getting statements if they wanted to -- to
18 give one. And I have noticed that --
19     A. Uh-huh.
20     Q. -- they don't seem to want to give statements.
21     A. They don't like to talk to me, no.
22     Q. So then my question is: Likewise, in gathering
23 statements from detainees, if someone was willing to
24 talk, would it be you personally that would speak to the
25 detainee, or would you delegate that to someone else?

Page 18

1   A. That, too, was situational. Sometimes I would
2   talk to them personally, or sometimes the officer
3   responsible for writing the report would talk to them.
4   Q. I'm going to hand you what's previously been
5   marked as Richard Exhibit Number 1.
6       MR. GRINKE: I've got a copy.
7   Q. (BY MR. GRINKE) So, Sergeant, I understand you
8   did not review any documents in preparation for your
9   deposition today.
10  A. Yes, sir.
11  Q. I'll represent to you that this document was
12  produced to us by the Harris County lawyers in this
13  lawsuit with respect to an incident involving Kenneth
14  Richard on April 27, 2023.
15      And on the first page, near the top, under
16  Supervisor, it says Q. Sneed. Is that you?
17  A. Yes, sir.
18  Q. And if I could direct you to page 4 of that
19  document, there is a narrative under incident report.
20  It's near the bottom.
21  A. I see it.
22  Q. And since you hadn't had a chance to review it,
23  I'll ask you if you can just read it real quick. Take
24  your time.
25      And then my next question is just going to

Page 19

1   be: Does this prompt your memory at all about the
2   incident that we're here to talk about today?
3   A. Okay. (Witness reviews.)
4       Okay.
5   Q. So does this -- reading that narrative spark
6   any memory in your mind of this event?
7   A. No, sir.
8   Q. Fair enough.
9       After reading this narrative, does this
10  sound like, you know, something typical that would
11  happen on your watch in the Harris County Jail?
12      MS. ALBIN: Objection, form.
13  Q. (BY MR. GRINKE) You can answer.
14  A. It sounds like something that would happen.
15  ==Inmates will jump other inmates or -- or assault them.==
16  I don't know if it's a current -- a common occurrence,
17  depends on what your definition of "common" is, but it
18  is an incident that I've observed before.
19  Q. Back in your time as a sup- -- supervisor at
20  the Harris County Jail, would inmate-on-inmate assaults
21  occur on your watch on a daily basis?
22  A. No.
23  Q. Weekly basis?
24  A. It's not something that you could put a
25  timeline on. It's actually sporadic. It's not

Page 20

1   something that happens daily or weekly. You could go a
2   month without having any incidents; and then the next
3   month, it could be every day.
4   Q. Okay.
5   A. So there's timeline to put on that.
6   Q. Okay. Fair answer. Fair answer. Thank you
7   for that.
8       All right. Do you know or recall Detention
9   Officer J. Osteen?
10  A. Yes.
11  Q. Okay. Do you know or recall Detention Officer
12  D. Osborne?
13  A. Yes, sir.
14  Q. And those two were -- at least those two, they
15  were officers that reported to you as supervisor?
16  A. They were.
17  Q. Okay. I'm going to ask you some more questions
18  about this, but I think it might help first...
19      Sergeant, we were provided in this case
20  from Harris County lawyers one video related to
21  Mr. Kenneth Richard, and it's only 51 seconds long, so
22  if we could, I'm going to play it.
23  A. Okay.
24  Q. And then I'll ask you some questions about both
25  the video and this statement.

Page 21

1       Can you see this okay?
2   A. My eyesight is not great. I've got my glasses
3   on, but...
4   Q. All right. I'm with you.
5   A. Yes, sir.
6       MR. GRINKE: If I speak loud, can I take
7   this off?
8       You're okay if I stand next to him?
9       MS. ALBIN: Yeah, I just want to...
10  Q. (BY MR. GRINKE) All right. So I'm going to
11  hit play, and then I'm going to try to...
12      (Video played.)
13  Q. (BY MR. GRINKE) Let me push pause real quick.
14      Okay. So looking at this screenshot of the
15  video that we are looking at --
16      MR. GRINKE: And I will mark this video and
17  we'll send it to you, and we'll mark it as Exhibit
18  Number 20.
19      (Exhibit Number 20 marked.)
20      MR. GRINKE: Just to make sure we're clear
21  on numbers.
22      (Video played.)
23  Q. (BY MR. GRINKE) Are you able to tell -- I've
24  just -- just begun the video, and looking at this
25  screen, are you able to tell what cell block or location

## Page 22

1  within the Harris County Jail that this depicts?
2       A.  It looks like it's on the third floor in C pod
3  on the one side.
4       Q.  And how are you able to tell?
5       A.  Well, the -- the video is labeled in the corner
6  here, but also the layout of, I mean, the cell block.
7           There's only four cell blocks on that floor
8  that looks like that, and it looks to be like the one
9  side because of the configuration of the cell block.
10      Q.  Okay.  And so -- and you're referring to, for
11 the record, on the top, left-hand corner of the screen
12 is a stamp, I'll call it, that says 3C1-01.
13      A.  Yes, sir.
14      Q.  Is that correct?
15          All right.  Now, I'm just going to play it.
16 Like I said, it's 50 seconds so...
17          (Video played.)
18      Q.  (BY MR. GRINKE)  Okay.  So sitting here today,
19 it's been some time.  Are you able to -- do you
20 recognize any of the detainees that were depicted in
21 that video?
22      A.  I do not.
23      Q.  Did you recognize any of the detention officers
24 that were shown in that video?
25      A.  Yes.

## Page 23

1       Q.  Who did you recognize?
2       A.  Well, I recognize all of them.
3       Q.  You do?  Okay.
4       A.  All of them worked for me except for one.
5           MR. GRINKE:  Well, maybe I went too far.
6       Q.  (BY MR. GRINKE)  Okay.
7       A.  Shorter.
8       Q.  Okay.  So the first detention officer that
9  walked in --
10      A.  Is Daniel Shorter.
11      Q.  Okay.  And then this gentleman who just walked
12 in the door?
13      A.  He's the only one that was not on my roster.
14 He worked overtime with us from time to time.
15      Q.  Okay.
16      A.  Molina.
17      Q.  Okay.  We've just had two more officers walk in
18 the door.  Do you recognize them?
19      A.  The second one is Anteveros; and the first one
20 is -- his name is escaping me right now.
21      Q.  That's okay.  And then another officer just
22 walked in.  Do you recognize this gentleman?
23      A.  That's Brandon Brezik.
24      Q.  Okay.  All right.  So, Sergeant, like I said,
25 this video is the only video that has been produced to

## Page 24

1  us in this lawsuit with regard to Kenneth Richard.
2           Can you tell me, this camera angle that is
3  shown in the video that we've watched a couple of times
4  now, would this be the only camera in this cell black?
5       A.  At that time, yes.
6       Q.  And am I using the right term, "cell block,"
7  for this area right here (indicating)?
8       A.  That's what I would call it.
9       Q.  Okay.  All right.  So there's -- there's not
10 another camera maybe on the other -- the far end of the
11 room here?
12      A.  There may be one inside of the pod control
13 center that faces towards the day room, through the
14 glass, but that's -- that would be the best view and
15 angle of that cell block.
16      Q.  Okay.  So this general area is called a "cell
17 block;" and then there are some barred doors throughout.
18 Do those go into cells?
19      A.  Yes.
20      Q.  And then inside each cell, are there multiple
21 bunks?
22      A.  Yes.
23      Q.  So there are -- ==are there blind spots==, from a
24 camera angle at least, that cannot catch everything
25 that's going on inside the individual cells?

## Page 25

1       A.  ==Yes,== sir.
2       Q.  Can the person who is in the -- what did you
3  call it, the "pod"?
4       A.  Pod control center.
5       Q.  Pod control center.  Where in relation to this
6  screen is the pod control center?  Is it on the
7  right-hand side?
8       A.  It's on the right-hand side, right above that
9  first table.
10      Q.  Okay.  ==Do -- do you recall, can a person in the==
11 ==pod control center, do they have a line of sight into==
12 ==each of the cells?==
13          MS. ALBIN:  Objection, speculation.
14      A.  There -- ==there's a sight of -- a line of sight==
15 ==into each cell.  Y==ou can't see everything.
16      Q.  (BY MR. GRINKE)  That was going to be my next
17 question.
18          So while they may be able to see from the
19 pod control center into the cells, there are still going
20 to be blind spots from a visual line of sight from the
21 pod control center.
22          MS. ALBIN:  Objection, speculation.
23          THE WITNESS:  I'm not sure --
24          MR. GRINKE:  You can answer.
25          MS. ALBIN:  You can answer if you know.

Page 26

1    THE WITNESS: Okay.
2    A. Yeah, there's -- there's going to be blind
3 spots.
4    Q. (BY MR. GRINKE) In addition to having the pod
5 control center staffed -- well, let me ask this: Is the
6 pod control center staffed at all times?
7    A. Yes.
8    Q. Okay. How many people are typically staffed
9 inside the pod control center?
10    A. One or two.
11    Q. And is there any reason that you recall on
12 whether you would have one versus two?
13    MS. ALBIN: Objection, vague.
14    A. Depends on the supervisor and how he staffs the
15 floor. I always liked to have two in there.
16    Q. (BY MR. GRINKE) Okay. Why did you like to
17 have two in there?
18    A. Because we're vastly outnumbered in that jail,
19 and two eyes are -- two set of eyes are better than one.
20    Q. And then at times, if -- if a supervisor was
21 only able to man the pod control center with one
22 detention officer, would that be because they were
23 short-handed --
24    MS. ALBIN: Objection, speculation.
25    Q. (BY MR. GRINKE) -- just based on your

Page 27

1 experience.
2    A. That would be the supervisor's -- I'm not sure
3 why he would put one officer in there. It depends on
4 the task that needed to be completed at that night
5 probably, if there was visitation going on, or if there
6 were other areas that an officer was needed.
7    Q. (BY MR. GRINKE) All right. So just -- I'll
8 ask you just for you. You, at your time as a supervisor
9 at the Harris County Jail, what I'm hearing you say is
10 that you preferred to have two officers manning the pod
11 control center.
12    A. Yes, that was my preference.
13    Q. Okay. And you would like for that to be the
14 case at all times if you can?
15    A. Yes, sir.
16    Q. Okay. And then, but at times if you -- do you
17 recall there being times when you could only put one
18 person in the pod control center?
19    A. I do.
20    Q. Okay. And was that a -- a frequent event?
21    A. Well --
22    MS. ALBIN: Objection, vague.
23    A. -- no. That kind of depends on your definition
24 of "frequent," too, because it's not something that I
25 did all the time.

Page 28

1    Q. (BY MR. GRINKE) Okay. Well, you said you do
2 remember times that you were only able to have one
3 person in the pod control center. What do you recall
4 about the reasons for those times that you could only
5 have one person there?
6    A. Well, like I said, it depends on what was going
7 on on the floor that night. If there was visitation
8 going on, or if something needed to be cleaned, or there
9 were other tasks that needed to be completed to where
10 there couldn't be two people in there that night.
11    Q. All right. Tell me about patrols or checks.
12 Was a detention officer assigned to walk through this
13 cell block and visually check each cell throughout the
14 day or once a shift or --
15    A. Typically, that would be the task assigned to a
16 rover, and he would go through the floor and complete
17 rounds with the scanning device.
18    Q. Do you recall how frequently that was to be
19 done? Once an hour? Once a shift?
20    A. It changed several times when I was down there,
21 but I believe the requirement is once an hour.
22    Q. Once an hour.
23    What prompted you to decide to leave the
24 Harris County Jail and enter into the -- I think you
25 called it the peace officers academy?

Page 29

1    A. Well, that was always my intention when I
2 joined the sheriff's office, was to be a peace officer.
3 It wasn't to be a jailer.
4    Q. Okay. So it was just kind of the natural
5 progression in your career?
6    A. Yes, sir.
7    Q. So I -- I may have to ask some of the other
8 detention officers since you don't remember this event.
9 We watched in this video a detention officer put a
10 inmate in orange jumpsuit into restraints and then walk
11 him out. I believe that that was Mr. Kenneth Richard
12 after the assault occurred.
13    A. Okay.
14    Q. If that is the case, would that be -- after an
15 assault on an inmate, would the typical response be that
16 they would -- the person who was assaulted be put into
17 hand restraints and removed?
18    MS. ALBIN: I'm going to just object to the
19 description and compound question.
20    But go ahead, if you understand what he's
21 asking.
22    A. Typically, under -- after any physical assault
23 or altercation, yes, when somebody is removed from the
24 cell block, they are handcuffed, because we don't know
25 their temperament, or we had situations where inmates

**Page 30**

1  will try to fight us after being in a fight just because
2  they're mad, or they -- they feel like -- I don't know.
3  It's -- it's -- it's just a safety precaution to
4  handcuff anyone that we remove after a physical
5  altercation.
6      Q.  (BY MR. GRINKE)  All right.  And so this
7  incident report that we've been looking at, which is
8  Exhibit Number 2, I think, it says that Mr. Richard was
9  removed to the clinic.
10          And so I take it from your testimony, then,
11  that would just be the typical mode of operation if
12  you're going to remove Mr. Richard -- I'm sorry.  This
13  is like two first names.  It messes me up.
14          MS. ALBIN:  If it helps, he pronounces it
15  Rishard [phonetic].
16          MR. GRINKE:  Rishard [phonetic], okay, that
17  actually does help me.  Thank you.
18      Q.  (BY MR. GRINKE)  So if this Inmate Richard was
19  to be removed from the cell block to the clinic, for his
20  safety and the officer's safety, he would be put --
21  placed in the hand restraints?
22      A.  Yes, sir.
23      Q.  Okay.  If we're reading in this statement that
24  all other inmates involved that were identified as
25  assaulting Mr. Richard, that they were informed that

**Page 31**

1  they were in violation.  We don't get to see what
2  happened after Mr. Richard is removed from this cell
3  block.  But would those who had been involved in the
4  altercation also have been placed in hand restraints?
5      A.  If they're not being removed from the cell
6  block, no.
7      Q.  Would detainees who are involved in an assault
8  on the cell block typically be removed from the cell
9  block, under your watch?
10      A.  If they were involved in an assault?
11      Q.  Yes.
12      A.  That's situational.  It depends on where
13  they -- where they are, what time of day it was.  If --
14  if they weren't on lockdown, if they weren't in those
15  cells, if they were just in the day room and it was
16  daytime hours, then they would probably be removed.
17  It's -- it's all judgment calls.  It's situational.
18      Q.  Okay.  Situational judgment calls.
19          The incident report says that, "All
20  involved inmates were informed that they were in
21  violation of Harris County Inmate Handbook Code 1104,
22  which states, 'No inmate shall strike, kick, or cause
23  any unin- -- any unwanted contact with another inmate
24  that causes pain or injury, or make any legitimate
25  attempt to do so.'"

**Page 32**

1      Q.  My question is:  So these -- these inmates
2  were informed that they were in violation.  What, if
3  anything, else happens to inmates who are -- who assault
4  another inmate?
5          MS. ALBIN:  Objection, speculation.
6      A.  What happens to them?
7      Q.  (BY MR. GRINKE)  Yes.
8      A.  They are charged with the offense, and they
9  are -- a report is written and is referred to
10  discipline -- disciplinary court, and they would decide
11  if the accused are guilty or not guilty of the assault.
12      Q.  Okay.
13      A.  Based on the information provided in the report
14  and --
15      Q.  Okay.  And did you call it disciplinary court?
16      A.  Yes.
17      Q.  Okay.  Is there -- there's a separate tribunal
18  within the jail that reviews incidents like this, where
19  there may be an assault, to determine whether or not the
20  person is violate -- in violation of the Inmate
21  Handbook?
22      A.  Yes, sir.
23      Q.  And if the person is -- if a per- -- if a
24  detainee is determined to have violated the -- the
25  handbook by assaulting another inmate, are they then

**Page 33**

1  charged in normal court?
2      A.  Not typically.
3      Q.  Okay.  It's something that's just handled
4  within the jail?
5      A.  Yes, sir.
6      Q.  And -- and the -- the ramifications that may
7  come to an inmate for assaulting another inmate, can
8  that end up in being extended time in jail?
9      A.  Not to my knowledge.  I've seen people charged
10  when they -- in incidents where there is serious bodily
11  injury, or the inmate is transported -- the assaulted
12  inmate is transported to the hospital, then there
13  becomes another element where we have to contact a
14  deputy to come take a report, and the district
15  attorney's officer is contacted to see if they want to
16  pursue additional charges on the -- the inmate that
17  assaulted the other inmate.
18      Q.  Okay.  So there are some incidents which may
19  arise to the level in seriousness of injury or death --
20      A.  Yes, sir.
21      Q.  -- that you, as a supervisor, may elevate that
22  to a deputy, who make take it to a DA?
23      A.  Yes, sir.
24      Q.  Okay.  And so that would be in addition to
25  anything that was going on with the disciplinary

9 (Pages 30 to 33)

Usher Reporting Services
(214) 755-1612

Page 34

1  tribunal with inside -- within the jail?
2      A. It would.
3      Q. So it says on this incident report that,
4  "Inmate Richard was immediately removed from the tank
5  and escorted to the clinic."
6          Do you know or do you recall, based on your
7  time as supervisor at the Harris County Jail on the
8  third floor, are there cameras in the hallways between
9  this cell block and the clinic?
10      A. Yes, there are.
11     Q. Okay. And are there cameras in the area of the
12 clinic itself?
13     A. There are no cameras in the actual clinic area
14 where the inmates are treated.  There's cameras in the
15 entry and the hallways.
16     Q. Okay. All right. So if I wanted to track
17 Mr. Richard's movement from this cell block to the
18 clinic, there should be video recording of his movement
19 from point A to point B?
20         MS. ALBIN: Objection, speculation.
21     A. There are camera views available.
22     Q. (BY MR. GRINKE) Okay. But then there's not
23 cameras within the clinic itself, you said?
24     A. No.
25     Q. Okay. Likely for privacy concerns?

Page 35

1      A. Possibly.
2      Q. Okay. Are there holding cells within the
3  clinic area?
4      A. There are.
5      Q. And are there cameras that show either the
6  inside or the outside of those holding cells?
7      A. There are cameras showing the inside and
8  outside of the holding cells.
9      Q. Okay. So if Mr. Richard was transported to the
10 clinic and placed inside one of the holding cells
11 related to the clinic, there were cameras that would be
12 available to show when he was brought in and out of
13 those holding cells?
14     A. Yes, sir.
15     Q. The incident report states that the -- the
16 inmates who were notified they were being put under
17 violation of the Harris County Inmate Handbook stated
18 that Mr. Richard had -- was stealing from the
19 commissary.
20         Is that something a supervisor in the
21 Harris County Jail, or as a detention officer before
22 that, that you had heard would be a cause of a fight
23 inside the jail?
24     A. Yes, sir.
25     Q. Okay. How does someone steal from the

Page 36

1  commissary if they're inside a cell block?
2      A. Well, stealing from a commissary. Well,
3  everybody has their own individual commissary bags
4  within a cell block. So the commissary bags are
5  supposed to store all the inmate's personal belongings,
6  anything that they've purchased through commissary or
7  their toiletries or their -- their food, or any items
8  that they've purchased. It's possible that while they
9  were out of the cell block during the day or they were
10 asleep, he was going through commissary bags. It's kind
11 of a common occurrence.
12     Q. Okay. Thank you for that. That actually
13 helps -- helps my understanding.
14         I think I know the answer to this, but
15 we'll get it on the record.
16         I'm going to list the names of the inmates
17 that were listed as being involved and informed they
18 were in violation of the Harris County Inmate Handbook
19 Code 1104 with respect to an assault on Inmate Kenneth
20 Richard.
21         And the first one is Justin Carter. As
22 supervisor in April of 2023, do you remember Inmate
23 Justin Carter?
24     A. I do not.
25     Q. Okay. What about Claude Anthony Curry?

Page 37

1      A. I do not.
2      Q. I'm going to try to get this name right.
3  Olawale Majekodunmi?
4      A. No, sir.
5      Q. Juan A. Martinez?
6      A. No, sir.
7      Q. Javion McNeese?
8      A. No.
9      Q. Bab- -- Babajide Ogunnubi?
10     A. No.
11     Q. Daquarius Parker?
12     A. No, sir.
13     Q. Okay. And we've already established you did
14 not know Kenneth Richard. Correct?
15     A. No, sir.
16     Q. Rudolph Shelling?
17     A. No.
18     Q. When you were supervisor at the Harris County
19 Jail, during your -- your tenure in that position, what
20 were the general methods that you used in order to
21 prevent detainee-on-detainee violence?
22     A. To prevent detainee-on-detainee violence?
23     Q. Yes.
24     A. There's not much you can do. You can separate
25 anybody who's been threatened, but until that threat

Page 38

1  arrives, we don't -- there's no other preventive meta
2  [sic] -- measures we can take. We have to be aware of a
3  threat to prevent an assault.
4      Q. Okay. I take it from your testimony, just to
5  have it on the record since you're listed as the
6  supervisor at the time of this event, you do not know
7  the outcome of any investigation that involved these
8  detainee- -- detainees that I just listed off?
9      A. No, sir.
10     Q. And do you know whether or not Mr. Richard was
11 taken to the hospital as a result of this event?
12     A. I don't recall.
13     Q. If he had, if he was taken to the hospital as a
14 result of this event, would that have been something,
15 then, that you would want to escalate to a deputy?
16     A. Yes, sir.
17     Q. But you don't recall doing that in this case?
18     A. I don't.
19     Q. Do you recall -- I have to ask these questions
20 because I have to get my record, but I know you've
21 already said you don't remember Mr. Richard. Okay?
22         Mr. Richard has testified in this case, and
23 he testified about an incident where he was assaulted by
24 a detention officers in the clinic area while he was
25 cuffed to a yellow pole, I believe.

Page 39

1  Do you recall any such incident?
2      A. I am not aware of any yellow pole in medical.
3      Q. Okay.
4      A. And I have never heard that allegation.
5      Q. Okay. So yellow pole or no yellow pole, you do
6  not recall any allegation by Mr. Richard that he was
7  assaulted by detention officers?
8      A. No, sir.
9      Q. If he had been assaulted by detention officers
10 at the clinic on the third floor, is that something that
11 would have been reported to you?
12     A. At -- at the clinic on the third floor?
13     Q. Yes.
14     A. There's no clinic on the third floor.
15     Q. Oh, okay. Well, wait. Let me -- let me ask it
16 correctly, then.
17     A. The clinic is in the basement area.
18     Q. Is there only --
19     A. The first floor. I'm sorry. Yes, sir.
20     Q. So is there only one clinic?
21     A. Yes.
22     Q. Okay. So if detention officers assaulted or
23 used force --
24     A. Uh-huh.
25     Q. -- on Mr. Richard in the clinic --

Page 40

1      A. Uh-huh.
2      Q. -- is that something that would be reported to
3  you, as supervisor on the third floor?
4      A. It would.
5      Q. And would it be reported to you, as supervisor
6  on the third floor, even if detention officers that were
7  not assigned to the third floor were the ones that used
8  force?
9          MS. ALBIN: Objection, speculation.
10     Q. (BY MR. GRINKE) That may be a bad question.
11 Let me back up.
12     A. All right.
13     Q. When you're sup- -- when you were a supervisor
14 in April of 2023, are you supervisor of a certain floor,
15 or were you supervisor of the entire building or --
16     A. I was the third-floor supervisor.
17     Q. Okay. So my question, then, is: If -- if
18 Inmate Richard was transferred to the clinic --
19     A. Uh-huh.
20     Q. -- from the third floor, now he's down in the
21 basement, and if some other detention officers not under
22 your supervision on the third floor were involved in a
23 use-of-force event with Mr. Richard, is that something
24 that would even be reported to you, or would it be
25 reported to someone on that floor, a supervisor on that

Page 41

1  floor?
2      A. If the inmate was assigned to the third floor,
3  I should know about the incident.
4      Q. Okay. And then once you're notified of it, of
5  something happening to an inmate assigned to your floor,
6  that would be something that you would investigate?
7      A. Not necessarily. The detention officers that
8  use the force, their supervisor should initiate the Use
9  of Force Report.
10     Q. Okay. You would be notified of it, but the
11 supervisor over the detention officers involved in the
12 use of force would be the ones who would prepare the
13 incident report?
14     A. Yes, sir.
15     Q. Did you have typical work hours as supervisor
16 in April of 2023? First shift? Second shift?
17     A. I believe we were already on the 12-hour shifts
18 by then. So it's day or night; either it's 5:30 to 5:30
19 or 5:30 to 5:30.
20     Q. Okay. But do you recall whether -- were you
21 typically day or night back in April of 2019?
22     A. I was always 5:30 p.m. to 5:30 a.m.
23     Q. And, then, was there another supervisor that
24 had the day shift?
25     A. Yes.

Page 42

1  Q. So the incident involving Mr. Richard, on the
2  incident report, it says that occurred at approximately
3  04:59. I assume that's almost 5 o'clock in the morning?
4  A. Yes, sir.
5  Q. And so that would be -- you would be on shift?
6  A. I would.
7  Q. Okay. Have you seen within the last six months
8  a television interview that Sheriff Gonzalez gave
9  regarding conditions inside the Harris County Jail?
10  A. No.
11  Q. Let me find this so I read it right.
12      Okay. In that interview, Sheriff Gonzalez
13  made a statement that he -- he believed that "There has
14  been a culture inside the Harris County Jail that
15  quickly leads to physical altercation."
16      Only for the time that you were employed
17  inside the jail, either as a detention officer or a
18  supervisor, do you agree or disagree with Sheriff
19  Gonzalez's statement?
20      MS. ALBIN: Objection. I'm going to
21  object. This witness has just testified he's not --
22  hasn't heard that statement or seen that interview.
23      A. I don't know the context of which he made that
24  statement.
25      Q. (BY MR. GRINKE) He was giving an interview

Page 43

1  based upon the elevated numbers --
2      MS. ALBIN: Counsel, I'm going to ask that
3  you just ask a question and not...
4      MR. GRINKE: I'm giving a foundation for my
5  question. He said he doesn't have context. I'm giving
6  him context.
7      MS. ALBIN: You're testifying about what
8  happened in that interview. That's not a proper
9  question.
10      MR. GRINKE: Okay. You can make your
11  objection.
12      Q. (BY MR. GRINKE) I'll represent to you that
13  Sheriff Gonzalez was being interviewed by a local news
14  affiliate based upon the high number of use of force by
15  correctional officers and detainee-on-detainee violence;
16  and he, after being shown many videos of such violence,
17  made the statement. And the quote is, "There's a
18  culture that quickly leads to phys- -- physical
19  altercation and that we can do better."
20      Given my representation and without having
21  watched the interview yourself, that's a very short
22  quote, though, would you agree or disagree with Sheriff
23  Gonzalez's impression.
24      MS. ALBIN: Objection, calls for
25  speculation, leading, compound, vague.

Page 44

1      MR. GRINKE: That means she doesn't like my
2  question, but you can still answer it.
3      MS. ALBIN: If you know.
4      A. I don't agree or disagree. I agree that there
5  are a lot of violent inmates in Harris County Jail.
6      Q. (BY MR. GRINKE) Okay. As the ultimate
7  policy-maker inside or with respect to the Harris County
8  Jail, we should just listen to Sheriff Gonzalez on that
9  topic. Fair?
10      MS. ALBIN: Objection, speculation,
11  leading, requires the witness to testify about legal
12  conclusions.
13      A. That's an opinion.
14      Q. (BY MR. GRINKE) Well, if we talk to a jury in
15  this case about the culture inside the jail, should we
16  listen to Sergeant Sneed, or should we listen to Sheriff
17  Gonzalez's --
18      MS. ALBIN: Objection --
19      Q. (BY MR. GRINKE) -- statements about the
20  conditions inside the jail?
21      MS. ALBIN: Objection, argumentative,
22  leading, causes this witness to speculate about Sheriff
23  Gonzalez's statements.
24      A. Everybody has a different perspective, sir.
25  Mine may be different from Sheriff Gonzalez's.

Page 45

1      Q. (BY MR. GRINKE) Okay. As a supervisor in the
2  Harris County Jail and based upon your training and
3  experience that you had at that time, is it ever okay
4  for a correctional officer to strike a detainee with a
5  closed fist about the face or skull?
6      MS. ALBIN: Objection, speculation, vague.
7      A. Depends on the situation. Is it acceptable?
8  If the detention officer is in fear for his safety or
9  the safety of others, he is authorized to use the
10  necessary force to prevent seriously body harm to
11  himself or any others.
12      Q. (BY MR. GRINKE) Okay. And it's your testimony
13  that that force could include using a closed-fist strike
14  to a detainee's face or skull?
15      A. Depending on the level of force being
16  presented, yes, sir.
17      Q. Can you point me to any written training
18  material training, standard, SOPs, that says that it's
19  okay for a detention officer to strike a detainee with a
20  closed fist to the face or skull?
21      A. I cannot.
22      Q. Though you can't point to it in writing, it is
23  something that was an accepted use of force inside the
24  Harris County Jail while you were there?
25      MS. ALBIN: Objection, misstates the prior

Page 46

1  testimony.
2      A.  I don't know the policy word for word.  I would
3  have to go over the policy to point you in that
4  direction.
5      Q.  (BY MR. GRINKE)  If there is one in writing, I
6  would love to see it.  I have not found one in
7  everything y'all produced.
8          What about a knee kick to the face or
9  skull?  Is that -- is it ever acceptable for a detention
10 officer to use a knee kick to the face or skull on a
11 detainee?
12     A.  Every situation is different.  It depends on
13 the inmate, and it depends on the detention officer.  If
14 the inmate is 6-foot 2 and 280 pounds and the detention
15 officer is a 110-pound female, then I would say any use
16 of force is acceptable, depending on the level of
17 assault or the threat presented.
18     Q.  Can you, likewise, not point me to any written
19 training material or SOP or any other written jail
20 standard that says that it's okay to use a knee kick to
21 a detainee's face or skull?
22     A.  No, that's not going to be a specific policy.
23     Q.  What you described is something that a
24 detention officer would just learn on the job?
25         MS. ALBIN:  Objection, speculation.

Page 47

1      A.  It's not something that's learned, no.  It's
2  situational, depending on who the officer is and who the
3  inmate is.
4      Q.  (BY MR. GRINKE)  Did you ever see detention
5  officers strike a detainee in the face or skull with a
6  closed fist?
7      A.  Yes.
8      Q.  Okay.  Frequently?
9          MS. ALBIN:  Objection, vague.
10     A.  No, not frequently.
11     Q.  (BY MR. GRINKE)  Daily?
12     A.  No.
13     Q.  Weekly?
14     A.  No.
15     Q.  Is it the same as your answer earlier, where
16 you might go a whole month and you don't --
17         (Simultaneous speaking.)
18     A.  Yes, sir.
19     Q.  -- see one, and then you might -- the next
20 month, you might see it a lot?
21     A.  Possibly.
22     Q.  Did you ever use a closed-fist strike to a
23 detainee's face or skull?
24     A.  No.
25     Q.  Why not?

Page 48

1      A.  It's not my preferred method of use of force.
2      Q.  What's your preferred method?
3      A.  I like to create distance between me and the
4  person that I'm fighting or trying -- trying to survive
5  an attack from, and so I just -- I never used fists.
6  There's too many small bones in the hand and they break
7  easily.
8      Q.  Okay.  So a closed-fist strike can hurt a
9  detention officer's hand?
10     A.  Yes.
11     Q.  And, likewise, a closed-fist strike to the face
12 or skull could be considered deadly force?
13     A.  No.
14     Q.  You don't recall seeing any written training
15 materials or SOPs that say that using a closed-fist
16 strike to a detainee's face or skull can -- can be
17 considered deadly force?
18     A.  Deadly force is force, and its intended method
19 is to cause death or serious bodily injury.  A
20 closed-fist strike to the face is not commonly known to
21 cause death --
22     Q.  So if there are --
23     A.  -- deadly force.  I'm sorry.
24     Q.  No, I'm sorry.  I interrupted you.
25     A.  No, go ahead.

Page 49

1      Q.  And I told you I wouldn't do that.
2          So if there are written training materials
3  and SOPs for the Harris County Jail that say that using
4  a closed-fist strike to a detainee's face or skull can
5  be considered deadly force, that would be news to you?
6      A.  That would.
7      Q.  All right.  You've been very polite.  I thank
8  you for your service, and I thank you for your --
9      A.  Yes, sir.
10     Q.  -- time today.  I think a lot of these
11 questions, I'm going to have to wait and talk to the
12 officers.
13         THE WITNESS:  Okay.  I couldn't give you a
14 whole lot.  I'm sorry about that.
15         MR. GRINKE:  That's okay.  I thank you for
16 your time.
17         THE WITNESS:  I wasn't there.
18         MR. GRINKE:  Yeah.  I'll pass the witness.
19 But she may have some questions.
20         MS. ALBIN:  No, I think we'll reserve.
21 That's it.
22         THE VIDEOGRAPHER:  This will conclude
23 today's testimony.  Before we go off the record -- no,
24 nothing there.
25         Thank you so much for your time.  This

13 (Pages 46 to 49)

Page 50

1  conclude today's testimony given by Sergeant Q. Sneed.
2  The time on the monitor is 3:16.  Thank you.
3        (Proceedings concluded at 3:16 p.m.)

Page 51

1              CHANGES AND SIGNATURE
2  WITNESS NAME:  SERGEANT Q. SNEED
3  DATE OF DEPOSITION:  April 14, 2025
4  PAGE    LINE    CHANGE          REASON

Page 52

1       I, SERGEANT Q. SNEED, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
6              _____
7              SERGEANT Q. SNEED

Page 53

1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
2                 HOUSTON DIVISION

3  OCTEVIA WAGNER; et. al,   )
4                            )
     Plaintiffs,              )
5                            )
   v.                         )
6                            )
   HARRIS COUNTY, TEXAS       )
7                ) CIVIL ACTION NO:
     Defendant,   )       4:23-cv-02886
8                            )
   v.                         )
9                            )
   ANA GARCIA AND CHANDRA    )
10 JENKINS,                  )
                              )
11   Plaintiff-Intervenors.  )
12          REPORTER'S CERTIFICATION
13             DEPOSITION OF
14           SERGEANT Q. SNEED
15            APRIL 14, 2025

17      I, Julie R. Borski, Certified Shorthand
18 Reporter in and for the State of Texas, hereby certify
19 to the following:
20      That the witness, SERGEANT Q. SNEED, was
21 duly sworn by the officer and that the transcript of
22 the oral deposition is a true record of the testimony
23 given by the witness;
24      That the original deposition was delivered
25 to Mr. Paul A. Grinke, Custodial Attorney.

Page 54

```
 1         That a copy of this certificate was served
 2   on all parties shown herein on MAY 20, 2025.
 3         I further certify that pursuant to FRCP
 4   Rule 30(f)(i) that the signature of the deponent:
 5        _X_ was requested by the deponent or a
 6   party before the completion of the deposition and
 7   that signature is to be returned to Usher Reporting
 8   Services, within 30 days from the date of receipt
 9   of the transcript.  If returned, the attached Changes
10   and Signature Page contains any changes and the
11   reasons therefore.
12        ___ was not requested by the deponent or
13   party before the completion of the deposition.
14         I certify that I am neither attorney or
15   counsel for, related to, nor employed by any of the
16   parties or attorneys in the action in which this
17   proceeding was taken.  Further, I am not relative or
18   employee of any attorney of record in this cause,
19   nor am I financially or otherwise interested in the
20   outcome of this action.
```

Page 55

```
 1         Certified to by me this 1st day of May, 2025.

 6              _____
                Julie R. Borski, Texas CSR 9311
                Expiration Date:  7/31/26
 7              Usher Reporting Services
                Firm Registration No. 10278
 8              1326 Lochness Drive
                Allen, Texas 75013
 9              214.755.1612
```