REPORT OF INVESTIGATION

# TEXAS DEPARTMENT OF PUBLIC SAFETY
# TEXAS RANGERS

| | |
|---|---|
| **THIS REPORT IS THE PROPERTY OF THE TEXAS RANGERS. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED.** | |

| | | | |
|---|---|---|---|
| **LEAD INVESTIGATOR:** | SHANE ELLISON | **INVEST#:** | **2022I-TRA-50087422** |
| **SUPERVISOR:** | LOUIS J OWLES | **OPENED:** | 04/05/2022 |
| **TITLE:** | CUSTODIAL DEATH, HARRIS COUNTY, EVAN LEE, 03-22-2022 | **FILE STATUS:** | **CLOSED** |
| **TYPE:** | **CRIMINAL** | **DIVISION:** | **TEXAS RANGERS** |
| **SERVICE:** | | **REGION:** | **A** |
| **DISTRICT:** | | **AREA:** | **HOUSTON** |
| **SUBTYPE:** | **OTHER - CUSTODIAL DEATH** | **SPURS URN:** | **CMIV50087422** |
| **CATEGORY:** | | **REVIEW DATE:** | 06/19/2023 |
| **SPECIAL APPROVAL:** | | **LEGACY REF:** | |
| **PROGRAM:** | **CRIMES AGAINST PERSON** | **SUBPROGRAM:** | **FELONY** |
| **CASE#:** | | | |

## INVESTIGATION SYNOPSIS

On Tuesday, March 22, 2022, I, Texas Ranger Shane Ellison, responded to Ben Taub Hospital in Houston to begin the investigation into the custodial death of Harris County Sheriff's Office Inmate Evan Lee. Inmate Lee was pronounced deceased at 5:38 PM this date for no brain activity.

## SUPPLEMENTAL SYNOPSES

**S1 04/05/2022 Report Writer: Shane Ellison**
**04/08/2022 Approved by: Louis J Owles**
On Tuesday, March 22, 2022, I, Texas Ranger Shane Ellison, responded to Ben Taub Hospital in Houston to begin the investigation into the custodial death of Harris County Sheriff's Office Inmate Evan Lee. Inmate Lee was pronounced deceased at 5:38 PM this date for no brain activity. The following documents the initial investigative activities.

**S2 04/12/2022 Report Writer: Shane Ellison**
**05/23/2022 Approved by: Louis J Owles**
On Tuesday, March 22, 2022, I, Texas Ranger Shane Ellison, continued the investigation into the custodial death of Inmate Evan Lee at Ben Taub Hospital in Houston.

**S3 05/12/2022 Report Writer: Shane Ellison**
**07/21/2022 Approved by: Louis J Owles**
On Wednesday, March 23, 2022, I, Texas Ranger Shane Ellison, conducted multiple interviews in furtherance of this investigation.

**S4 07/19/2022 Report Writer: Shane Ellison**
**07/22/2022 Approved by: Louis J Owles**
On Thursday, March 24, 2022, I, Texas Ranger Shane Ellison conducted multiple interviews in furtherance of this investigation.

**S5 08/03/2022 Report Writer: Shane Ellison**

**08/29/2022 Approved by: Louis J Owles**
On Friday, March 25, 2022 and Thursday March 31, 2022, I, Texas Ranger Shane Ellison, conducted addtional inmate interviews in furtherance of this investigation.

**S6 08/24/2022 Report Writer: Shane Ellison**
**11/18/2022 Approved by: Louis J Owles**
On April 6, 2022, I, Texas Ranger Shane Ellison, conducted multiple inmate interviews in furtherance of this investigation. The following report documents these interviews.

**S7 11/09/2022 Report Writer: Shane Ellison**
**11/18/2022 Approved by: Louis J Owles**
On Thursday, April 7, 2022, I, Texas Ranger Shane Ellison, conducted multiple HCSO inmate interviews in furtherance of this investigation. The following report documents these interviews.

**S8 11/11/2022 Report Writer: Shane Ellison**
**11/18/2022 Approved by: Louis J Owles**
On August 2, 2022, I, Texas Ranger Shane Ellison, interviewed DO Jeremiah Adebola in furtherance of this investigation. The following report documents the interview.

**S9 11/11/2022 Report Writer: Shane Ellison**
**12/21/2022 Approved by: Louis J Owles**
This report serves to document the receipt of more documents received from the HCSO Jail. Addtionally, a copy of this case file will be turned over to the Harris County District Attorney's Office - Civil Rights Division.

**S10 05/09/2023 Report Writer: Shane Ellison**
**05/30/2023 Approved by: Louis J Owles**
On Tuesday, May 9, 2023, I, Texas Ranger Shane Ellison received the closure letter from the Harris County District Attorney's Office - Civil Rights Division indicating this investigation had been administratively closed. File closed.

## SUPPLEMENTAL DETAILS

**S1**    1.1    On Tuesday, March 22, 2022, I, Texas Ranger Shane Ellison, responded to Ben Taub Hospital in Houston to begin the investigation into the custodial death of Harris County Sheriff's Office (HCSO) Inmate Evan Lee, B/M, DOB: 11/09/1990.

1.2    I was notified of the death at approximately 9:20 PM by DPS - Houston Communications, who connected me to Sergeant Gomez at the HCSO Watch Command. I was then transferred to Sergeant R. Lomeli at Ben Taub. Sergeant Lomeli told me that Inmate Lee had been transferred from the 1200 Baker Street Jail Clinic to Saint Joseph's Hospital in Houston due to an "altered mental state" on March 17.

1.3     Sergeant Lomeli continued and stated that Inmate Lee was transferred to Ben Taub on the 18th. Per information received from Sergeant Lomeli, Inmate Lee had been involved in a fight on March 11th, was sent to the clinic to be checked, and then sent back to his cell. Sergeant Lomeli stated that Inmate Lee did not appear to have any visible injuries.

1.4     Sergeant Lomeli advised that the doctor who declared Inmate Lee deceased was Doctor John McGinnis. Sergeant Lomeli advised that Inmate Lee had been alert and talkative the first few days of his stay, but his condition worsened. Inmate Lee was pronounced deceased at 5:38 PM for no brain activity due to an apparent brain hemorrhage.

1.5     Additionally, I contacted the Harris County Institute of Forensic Sciences (medical examiner) to notify them of the death, and I was told an investigator would make the scene. I arrived at Ben Taub at approximately 10:40 PM and met and conferred with Sergeant Lomeli and the medical staff, who had been Inmate Lee's caregivers.

1.6     Investigation to continue.

S2  2.1     Upon arriving at Ben Taub Hospital, I met with Sergeant Lomeli and was escorted to the trauma room where Inmate Lee was. I observed that Inmate Lee was lying in a hospital bed with multiple signs of medical intervention about his body. Inmate Lee was wearing his orange Harris County Sheriff's Office Jail uniform and was covered by a white blanket.

2.2     I photographed Inmate Lee's remains and retained the photographs as Exhibit S2.P1 - Hospital Photos.

**REPORT OF INVESTIGATION**

2.3     Sergeant Lomeli told me that Lee's mother and father had been to the bedside prior to my arrival, and his mother was debating her son being a donor. I was also told that the mother was extremely upset that the Sheriff's Office did not notify her of her son's declining condition.

2.4     At approximately 11:00 PM, Registered Nurse (RN) Gilberto Vega came to the bedside and advised that he had taken care of Inmate Lee and was familiar with his condition leading up to his death.

2.5     Nurse Vega told me that Inmate Lee had a subdural hematoma (brain bleed), and there were no external injuries. Nurse Vega also stated there was no intervention for the subdural hematoma, meaning the medical staff did not use an external ventricular drain. Nurse Vega also stated that he was a possible donor, and the family would be meeting with Life Gift the following day.

2.6     Doctor McGinnis arrived a short time later and relayed the same information about the subdural hematoma to me as Nurse Vega had previously done.

2.7     After learning of the possibility of Inmate Lee's placement into the Life Gift program, I called the medical examiner investigator's office. I spoke with Investigator Julianne Young, who advised that she would call the charge nurse, identified as RN Karen Willatt, to make arrangements for Life Gift. Investigator Young stated that this case had been assigned case number ML22-1315.

2.8     Nurse Vega told me that Inmate Lee would remain on life support until a decision was made. With that, Inmate Lee's remains were released to the care and custody of Ben Taub Hospital. The Sheriff's Office personnel on scene and I left the hospital at approximately 12:10 AM.

2.9     Investigation to continue.

**S3** 3.1    On Wednesday, March 23, 2022, Texas Ranger Shane Ellison traveled to the Harris County Sheriff's Office (HCSO) Jail at 1200 Baker Street in Houston to continue investigating the custodial death of HCSO Inmate Evan Lee.

3.2    I learned the previous night at the hospital that Inmate Everett Charles Atkins, B/M, DOB:          was the inmate who was in a fight with Inmate Lee. I received an OMS report written by Detention Officer (DO) Angela McClain and learned that the fight occurred on Friday, March 11, 2022, on the 6th floor, H Pod of the 1200 Baker Street facility at approximately 3:10 PM.

3.3    I contacted DO McClain by telephone this date and briefly spoke with her about what she saw to set up an interview. DO McClain stated that she saw someone in what was later identified as 6H1E cell swing at Inmate Atkins, and it might have missed him. Inmate Atkins began swinging back, and at this point, DO McClain called for floor rovers to come to the pod for an inmate fight.

3.4    The fight was over quickly, and both Inmate Atkins and Inmate Lee were removed from the pod. DO McClain advised that DO R. Torrez may have taken Inmate Lee to the clinic. Do McClain agreed to be interviewed at a later date. Note that this conversation was not recorded.

3.5    At approximately 3:20 PM, I traveled to the 701 San Jacinto HCSO Jail facility to meet with Administrative Services Sergeant Melissa Ince to pick up the initial jail documents from her. Once all jail documents and video are compiled later, they will be documented in a subsequent report.

3.6    At approximately 4:20 PM, I returned to the HCSO Jail facility at 1200 Baker and met with night shift, Sergeant Lopez. Sergeant Lopez agreed to get his staff to bring Inmate Atkins to me for an interview. Note that the interviews documented in this report are summaries; as such, they do not reflect all comments made or the chronology of the discussion. Refer to the audio recording for a verbatim account of the interview.

REPORT OF INVESTIGATION

3.7     The interview of Inmate Atkins began at approximately 4:43 PM, and he advised the following: Inmate Atkins stated that he and Inmate Lee were in a previous fight in the dayroom over a food tray about a month and a half prior to the altercation on the 11th. Inmate Atkins stated that it was a really quick fight, and when it was over, they shook hands.

3.8     Inmate Atkins stated that on the 11th, he was walking back and forth in the dayroom exercising; a blood gang member, identified as "4-Way" confronted him about the previous fight with Inmate Lee, whose nickname was "Big Head", and they were near cell 6H1-E. Inmate Atkins stated that this cell was known as the fight cell because the cameras cannot see in.

3.9     Inmate Atkins stated that Inmate Lee, standing inside cell E, swung at him and missed. Inmate Atkins said that he backed up, and some other inmates pushed him into the cell. The two started fighting, and Inmate Atkins said he got hit in the lips and under his right eye. Inmate Atkins stated that he hit Inmate Lee in the face after he swung at him, knocked him off his feet, and Atkins then took off. Inmate Atkins stated that Officer McClain saw the whole thing, and the officers were already coming into the cell when he took off.

3.10   Inmate Atkins provided the nicknames of the inmates he knew that were there and also stated that Inmate Lee had been smoking what he called "tune" and said it was synthetic marihuana. When asked again, Inmate Atkins was unsure if Inmate Lee hit his head on anything because he ran out of the cell after hitting him. The interview ended at approximately 5:20 PM. Refer to the audio recording for full details - "Exhibit S3.P1 - Inmate Atkins Interview".

3.11   At approximately 6:25 PM, Inmate Barrow Oran Maxie, B/M, DOB: ⬛⬛⬛⬛⬛, SPN 01112887, was interviewed. Inmate Maxie said he witnessed the fight between Inmates Lee and Atkins and that it was over quickly. Inmate Maxie saw Inmate Lee get knocked down and said he jumped right back up and went back at Atkins fighting. Inmate Maxie stated that he did not see anyone hit their head. Inmate Maxie stated that Atkins did not start the fight and that the other Blood gang members put Inmate Lee up to it. The interview ended at approximately 6:40 PM. Refer to "Exhibit S3.P2 - Inmate Maxie Interview" for full details.

3.12   At approximately 6:45 PM, Inmate James Alan Coleman, W/M, DOB:

DPS SENSITIVE

**REPORT OF INVESTIGATION**

[REDACTED], SPN 03059853, was interviewed. Inmate Coleman stated that he did not see the fight between Inmates Lee and Atkins. The interview ended at approximately 6:55 PM. Refer to "Exhibit S3.P3 - Inmate Coleman Interview" for full details.

3.13  At approximately 7:10 PM, Inmate David Louis Watson, B/M, DOB: [REDACTED] SPN 01970314, was interviewed. Inmate Watson stated that he was in his bunk and heard the fight between Inmates Lee and Atkins. Inmate Watson stated that he saw Atkins punching Lee and saw Lee fall when Atkins hit him in the face.

3.14  Inmate Watson stated that it looked like Inmate Lee hit his head on a bunk and fell to the ground, but he could not see Lee's body's that well. Inmate Watson stated that Lee could have hit his head on the ground but added that he really couldn't see. He was positive that Lee fell more than once, and he got right back up and went back to fighting. Inmate Watson stated that it looked like Lee fell to the side when he fell. Inmate Watson stated he covered back up. The interview ended at approximately 7:35 PM. Refer to "Exhibit S3.P4 - Inmate Watson Interview" for full details.

3.15  Inmate Christopher Forkah, B/M, DOB: [REDACTED], SPN 02724693, was interviewed. Inmate Forkah stated that he knew there was a fight in E cell, and he saw and heard someone fall once towards the wall and get back up. Inmate Forkah stated that he lives in A cell; he sleeps on the floor and can see into E cell.

3.16  Inmate Forkah said that he could see into E cell, but not very clearly, and added that he did not see the fight. Inmate Forkah stated that he later found out the fight was between Inmate Lee and Atkin and heard that Lee fell twice. The interview ended at approximately 7:54 PM. Refer to "Exhibit S3.P5 - Inmate Forkah Interview" for full details.

3.17  Investigation to continue.

**S4** 4.1      On Thursday, March 24, 2022, I, Texas Ranger Shane Ellison, contacted HCSO Central Records to locate an inmate witness only identified as "Jo Jo" with a possible last name of Lucas. During the previous interview of Inmate Everett Atkins, he stated that this person witnessed the fight between him and Inmate Lee. Inmate Atkins advised that he had since been moved to a place identified as "YMAC" in preparation of being released.

4.2      I was told that YMAC was a drug treatment facility in the Humble, Texas area and that "Jo Jo" was Johannes Karl Lucas, W/M, DOB: _____, SPN 02802644. Per Central Records, Lucas was moved from cell block 6H1 to YMAC on March 16, 2022. I talked to the staff at YMAC to set up an interview with Lucas and arrived at approximately 1:17 PM.

4.3      At approximately 1:36 PM, Lucas agreed to be interviewed, and he stated the following: Lucas stated that he was familiar with both Inmate Atkins and Inmate Lee. Lucas stated that he was sitting in the dayroom, and he heard people punching and assumed Atkins was in the cell when he did not see him in the dayroom. Lucas looked up and stated the fight was already over.

4.4      Lucas believed the fight was over a food tray and their sexual preference and advised that Inmate Atkins told him the same thing. Lucas said that he witnessed Inmate Atkins walk out of the cell before the detention officers (DO) came on the cell block and advised that Inmate Atkins was walking around trying to relieve stress.

4.5      Lucas stated that he did not see any punches being thrown or anyone fall down; the fight was only a few seconds. Inmate Lucas stated that he did not see any injuries, and they looked OK. The interview ended at approximately 1:48 PM. Refer to the audio-recorded interview for full details (Exhibit S4.P1 - Inmate Lucas Interview).

4.6      I traveled to the HCSO Jail at 1200 Baker Street to interview DO Angela McClain, who witnessed the altercation between Inmate Atkins and Lee. The interview was conducted within the jail and began at approximately 3:05 PM.

4.7    DO McClain stated that she was assigned to H Pod in the 6th Floor Picket. She observed Inmate Atkins walking back and forth in the dayroom and touching the wall, presumably getting some exercise. She observed Atkins take off his shirt and enter E Cell. Another inmate threw a punch at Atkins but advised that it might have missed him.

4.8    DO McClain saw Inmate Atkins throw several punches, then they moved into the cell where she could not see them. She called for the Rovers, and they arrived at the cell block within a few seconds. DO McClain stated that her coworker was already out on the floor when the incident happened.

4.9    DO McClain stated that she saw a small scratch on the right side of Inmate Lee's neck and did not see any blood on either Lee or Atkins. Inmate Lee told her it was not him fighting, and he did not complain about any injuries.

4.10   DO McClain also stated that she caught Inmate Lee smoking K2 on multiple occasions. He was never written up for it and always complied when told to get rid of it.

4.11   DO McClain also provided the names of other inmates that could be candidates for an interview and identified several inmates that were left on the cell block. The interview ended at approximately 3:38 PM. Refer to Exhibit S4.P2 - DO McClain Interview for full details.

4.12   At approximately 5:03 PM, Inmate Joseph Knight, B/M, DOB: _____, SPN 01697255, was interviewed and stated the following: Inmate Knight stated that he lived in F cell and saw Inmate Lee swing at Inmate Atkins. Inmate Knight stated that he did not see or hear anyone fall and that Lee and Atkins walked out of the cell under their own power.

4.13   Inmate Knight stated that he was "half asleep," saw the fight, and then went back to sleep. Inmate Knight also advised that he saw Inmate Lee pass out from smoking K2 two to three weeks ago, and they had to take him out of the cell on a stretcher. The interview ended at approximately 5:22 PM. Refer to Exhibit S4.P3 - Inmate Knight Interview for full details.

4.14  At approximately 5:30 PM, Inmate Harold Wayne Smith, B/M, DOB: ⬛⬛⬛⬛, SPN 00949478, was interviewed and advised the following: Inmate Smith stated that a new guy to the cell block told Inmate Lee that he could not be in the same cell "with us" (in E cell) if he did not fight Inmate Atkins. Inmate Smith saw Lee swing at Atkins, and then he went into the dayroom. Inmate Smith stated that the fight was over quickly, and he did not see anyone fall down since it was over so fast. The interview ended at approximately 5:41 PM. Refer to Exhibit S4.P4 - Inmate Smith Interview for full details.

4.15  At approximately 5:51 PM, Inmate Darius Gilmore, DOB:⬛⬛⬛⬛, SPN 02835484, was interviewed and stated the following: Inmate Gilmore stated that he was not in the cell and did not see the fight when it happened. The interview ended at approximately 5:51 PM. Refer to Exhibit S4.P5 - Inmate Gilmore Interview for full details.

4.16  Investigation to continue.

S5

5.1      On Friday, March 25, 2022, and Thursday, March 31, 2022, I, Texas Ranger Shane Ellison, returned to the HCSO Jail at 1200 Baker Street in Houston to conduct additional interviews pursuant to the custodial death investigation of HCSO Inmate Evan Lee.

5.2      Note the interviews documented in this report are summaries; as such, they do not reflect all of the comments made or the chronology of the discussion. Refer to the audio recording for a verbatim account of the interview.

5.3      Inmate Michael Mosley, B/M, DOB: ▓▓▓▓▓ SPN: 01823024, was interviewed at approximately 2:00 PM on March 25, 2022. Inmate Mosley was housed on the 2nd floor and stated that when Inmate Lee moved into the pod, he had black eyes and looked like he had been in a fight. Inmate Mosley stated that the blood gang members in the "tank," or pod, were confronting Lee about not being in the blood gang.

5.4      Inmate Mosely stated that Lee would fight all the time in D cell and fight one gang member, finish that one and have to fight another. Inmate Mosley stated that Lee had his nose busted a few times, and he saw him with toilet paper in his nose. The whole pod knew about the fighting in the D cell. Inmate Mosely stated that he saw Lee throwing up about two days before he left the cell block.

5.5      Inmate Mosley additionally assisted with the identification of other inmates who might have been fighting with Inmate Lee. The interview ended at approximately 2:20 PM. Refer to Exhibit S5.P1 - Inmate Mosley Interview for full details.

5.6      Inmate Jaron Robertson, B/M, DOB: ▓▓▓▓▓, SPN: 02468355, was interviewed at approximately 2:22 PM on March 25, 2022. Inmate Robertson was housed on the 2nd floor and advised that he stay in the dayroom, not a cell. Inmate Robertson stated that he saw Inmate Lee fighting with an inmate with "dreads" and a five-point star on his face. He saw Inmate Lee fall to the floor and hit the back of his head.

5.7      Inmate Robertson stated that when Lee moved into the cell block, his eyes were swollen, and Lee told him that he had been in a fight. After a

**REPORT OF INVESTIGATION**

couple of days, other inmates in the cell started slapping and punching him (Lee) for nothing. Inmate Robertson stated that he observed Inmate Lee throwing up about two days before he left the cell block.

5.8    Inmate Robertson also stated that the blood gang members play around by slap boxing, which always occurred in the D cell. Inmate Robertson assisted with the identification of other inmates who had been fighting and slap boxing with Inmate Lee. The interview ended at 2:54 PM. Refer to Exhibit S5.P2 - Inmate Robertson Interview for full details.

5.9    Inmate Vicente Hernandez, H/M, DOB: ⬛⬛⬛⬛, SPN: 02935223, was interviewed at approximately 5:46 PM on March 31, 2022. Inmate Hernandez was housed on the 2nd floor and stayed in the E cell. Inmate Hernandez said he knew who Inmate Lee was and that he got into a fight with him once.

5.10    Inmate Hernandez said that the blood gang members in the pod told Inmate Lee to "slap that Mexican right there," talking about Hernandez, and they told him (Lee) that they would hit him if he didn't. Inmate Hernandez stated that it was slap fighting, and Inmate Lee slapped him, so he slapped him back. Inmate Hernandez said that he grabbed Lee's hands so he would stop slap fighting and told Lee not to let these other inmates "get in your head," meaning talking Lee into slap fighting. Inmate Hernandez stated that this was the only incident he had with Lee.

5.11    Inmate Hernandez stated that he and Inmate Lee never fought; it was slap fighting. Inmate Hernandez stated that Inmate Lee was "slapped to death," and he saw him on the floor one time and he offered him some food. Inmate Hernandez said that Lee laughed and told him he was good. Inmate Hernandez said that Lee seemed ok but would come back from getting his insulin stuttering and had witnessed him throwing up in the past. The interview ended at approximately 5:53 PM. Refer to Exhibit S5.P3 - Inmate Hernandez Interview for full details.

5.12    Inmate Juwan Brown, B/M, DOB: 03/04/1997, SPN: 02733730, was interviewed at approximately 6:18 PM. Inmate Brown stated that he was asleep and did not see anything. Inmate Brown had no pertinent information, and the interview ended at approximately 6:20 PM. (Exhibit S5.P4 - Inmate Brown Interview)

5.13    Investigation to continue.

**S6** 6.1    On April 6, 2022, I, Texas Ranger Shane Ellison, returned to the Harris County Jail at 1200 Baker Street to continue to conduct interviews in furtherance of this investigation. The interviews were conducted in an office within the HCSO Chaplain's Office on the 6th floor of the jail.

6.2    Note that I asked the jail staff to move and disperse the inmates who were said to have been interacting with Inmate Lee, including slap boxing and other suspected Blood gang members. The moved inmates were interviewed and documented in this report and the following (Report 7).

6.3    Note that the interviews documented in this report are summaries; as such, they do not reflect all of the comments made or the chronology of the discussion. Refer to the audio recording for a verbatim account of the interview.

6.4    Inmate Melvin Douglas, B/M, DOB:              , SPN 02578887 was interviewed at approximately 1:40 PM. Inmate Douglas stated that he knew Inmate Lee and that when he first came to the cell block, he had been jumped on by some "Blood dudes" on his old cell block. Inmate Lee explained to Douglas that he had been stomped on and hurt his hand; Inmate Lee said he wasn't feeling good. Inmate Douglas said that Lee had black eyes and was already feeling bad upon arriving.

6.5    Inmate Douglas said that he and other inmates tried to tell the DOs that Inmate Lee was not feeling good, and Douglas heard that Lee had been

throwing up and had blood in it. Inmate Douglas said that the DOs would not let him (Lee) go to the medical clinic. Inmate Lee got to go to the clinic eventually, and the second time he went, he did not return.

6.6     Inmate Douglas stated that many inmates slap box but nothing to the point of hurting anyone. Inmate Douglas at first stated that he did not see anyone assault Inmate Lee, and the only assault he knew about was the one that happened on the other floor that Lee told them about.

6.7     Inmate Douglas then stated that Inmate Lee got into a fight in E Cell after he (Lee) hit another inmate, it did not last long, and he (Douglas) broke it up. Inmate Douglas stated that neither inmate went to the floor, and no one hit their head. The fight lasted about a minute or less, and Douglas did not know the other inmate's name. The interview ended at approximately 2:00 PM. Refer to Exhibit "S6.P1 - Inmate Douglas Interview" for full details of the interview.

6.8     Inmate Jeremiah Brown, B/M, DOB:⬛⬛⬛⬛⬛, SPN 03031937, was interviewed at approximately 2:04 PM. Inmate Brown stated that he remembered Inmate Lee, and he stayed in D cell. Inmate Lee came to the cell block with black eyes; his face was swollen, but he did not know what had happened.

6.9     Inmate Brown stated that he saw Inmate Lee throw up. Brown stated that there was a lot of slap boxing, but he did not see anything happen to Inmate Lee that would cause a head injury. The interview ended at approximately 2:10 PM. Refer to Exhibit "S6.P2 - Inmate Brown Interview" for full details of the interview.

6.10    Inmate Dontel Carter, B/M, DOB:⬛⬛⬛⬛⬛, SPN 03120882 was interviewed at approximately 2:25 PM. Inmate Carter stated that when Inmate Lee came to the floor, he and Lee stayed in D cell. Inmate Lee had been "beat up" on the 6th floor, and it looked like his eyes were swollen; he had tissues in his nose and blood on his shirt when he arrived.

6.11    Some other inmates paid for Inmate Lee to have his hair braided the second day he came to the cell, and they paid with "three soups." Inmate Carter said they paid for this because he was a "Blood," and then Lee became

comfortable around them.

6.12    Inmate Carter stated that Lee was making statements that he wanted to fight another inmate, and another inmate told him to drop and give him 50 push-ups instead, and Lee did (this was presumably another gang member). This happened the second or third day Lee came to the cell.

6.13    The day after Inmate Lee was slap-boxing other inmates, he laid in bed all day and then threw up. Another inmate (unidentified) made the statement while Lee was throwing up at the toilet that it looked like he had a concussion. Inmate Carter stated that they did not notify the detention staff of his condition. Inmate Lee later left to get his insulin and never returned.

6.14    Inmate Carter stated that Inmate Lee was never in a serious fight after he arrived on the floor, but he did slap box, and he never fell or hit his head; it was all play. Inmate Lee never got "beat up" while he was there; no one physically punched him. Lee only threw up one day; it was the day he left and did not return.

6.15    Inmate Carter stated that Lee said he was in a fight on the 6th floor, and then he was jumped. Carter said that he thought Lee was lying about being jumped and that he looked "beat up." The interview ended at approximately 2:50 PM. Refer to Exhibit "S6.P3 - Inmate Carter Interview" for complete details.

6.16    Inmate Jaquan Benjamin. B/M, DOB:            SPN 03112540, was interviewed at approximately 3:01 PM. Inmate Benjamin stated that the first-day Inmate Lee was in the cell, the other Blood members "ran down on him," which was a gang knowledge check, and he was then involved in a fistfight. Inmate Lee swung first at an unidentified inmate, and they fought for about 30 seconds then stopped on their own.

6.17    Inmate Benjamin said that Lee went straight to D cell, where all the Blood gang members were, and that is where he stayed. Inmate Benjamin said that he heard that Lee was throwing up and that it was only for a day. Inmate Benjamin said that he did not see or hear anything that would have caused a head injury, and he never hit the floor. After the first fight, he slapped boxed all the time, but it was never a serious fight. The interview ended at

**REPORT OF INVESTIGATION**

approximately 3:16 PM. Refer to "Exhibit S6.P4 - Inmate Benjamin Interview" for complete details.

6.18    Inmate Charles Atkins was interviewed again at approximately 3:20 PM. Inmate Atkins stated that Inmate Lee was not "jumped" in the cell after he and Inmate Lee got into a fight on the 6th floor. Inmate Atkins did not know of any other fights involving Lee but advised that he smoked K2 and went to medical before smoking it.

6.19    Inmate Atkins stated that when he hit Inmate Lee and knocked him down, he landed on his "butt." Inmate Atkins stated that Lee did not hit his head and when he knocked him down, Lee came back at him, and Atkins got out of the cell at that point. The interview ended at approximately 3:32 PM. Refer to "S6.P5 - Inmate Atkins Interview 2" for complete details.

6.20    At approximately 5:00 PM this same date, I moved to the jail facility at 701 North San Jacinto to conduct interviews of the inmates who were moved to this facility. I arranged with the duty sergeants at this facility to facilitate conducting the interviews.

6.21    Inmate Quindarrion Zeno, B/M, DOB:                , SPN 02870975, was interviewed at approximately 5:14 PM. Inmate Zeno stated that he remembered Inmate Lee and that he stayed in E cell and Zeno stayed in B. Inmate Zeno stated that he saw the fight Lee was involved in on the 6th floor, but he did not see anything that would have caused a head injury. The fight did not last long, and he did not fall to the ground. The interview ended at approximately 5:19 PM. Refer to "Exhibit S6.P6 - Inmate Zeno Interview" for full details.

6.22    Inmate Devante Coleman, B/M, DOB:                , SPN 02841022, was interviewed at approximately 5:32 PM. Inmate Coleman stated that he remembered Inmate Lee and that he (Lee) stayed in E cell. Inmate Coleman said he did not see any of the fight on the 6th floor with Atkins since he stayed in A cell. Inmate Coleman did not know the fight's particulars but thought it lasted about 10 seconds. Inmate Coleman did not know of any other incident where Lee would have been hurt. The interview ended at approximately 5:41 PM. Refer to "Exhibit S6.P7 - Inmate Coleman Interview" for full details.

6.23    Inmate Abrium Davis, B/M, DOB: ████████, SPN 02730281, was
interviewed at approximately 5:54 PM. Inmate Davis stated that he knew
Inmate Lee and that he came into the cell "beat up" from his last cell. They
both stayed in D cell, and he saw the fight that occurred on 2H1 in E cell. The
fight was from gang activity.

6.24    Inmate Davis stated that Inmate Lee would slap fight a lot, and the
other gang members were trying to teach and "check him" since Lee was
claiming things he should not have been in the gang. Lee was slap boxing and
fell and hit his head on the toilet. Lee got up and said, "I'm good, I like that."
When he fell, Lee hit the toilet on the back of his head.

6.25    Inmate Davis continued and stated that Inmate Lee slap boxed about
three times, and he smoked K2. Inmate Davis stated that after the slap fight
where he hit his head, Lee laid down, smoked K2, started throwing up a
couple of hours later, and then laid back down. Lee did not go to the clinic,
and at 1:30 AM, Lee went to get his insulin and never came back.

6.26    Inmate Davis identified Inmate Devante Addison as the person he was
slap boxing with during this incident and Inmate Jeremiah Dorsey as the
person who tripped him and that it occurred in D cell, not E. Inmate Davis
stated the gang members Lee was associating with did not have a problem
with him and were trying to teach him "stuff" like how to fight.

6.27    When asked if the person who tripped Lee intentionally meant to hurt
him, Inmate Davis responded, "I doubt it." The interview ended at
approximately 6:17 PM. Refer to "Exhibit S6.P8 - Inmate Davis Interview" for
complete details.

6.28    Investigation to continue.

**S7**

7.1　　On Thursday, April 7, 2022, I, Texas Ranger Shane Ellison, traveled to the Harris County Sheriff's Office Jail facility at 701 North San Jacinto to continue to conduct inmate interviews in furtherance of this investigation. The interviews were conducted in a meeting room within the jail.

7.2　　Inmate Bobby Deshaun Ellison (no relation), B/M, DOB: ⬛⬛⬛⬛⬛, SPN 02665718, was interviewed at approximately 1:10 PM. Inmate Ellison stated that while he was at the 1200 Baker facility on the second floor, he was staying in E cell first, then he moved into D. Inmate Ellison stated that he remembered Inmate Lee.

7.3　　Inmate Ellison stated that he saw Lee smoking K-2 and said he was "on that bad." Inmate Ellison said that he saw Lee throwing up after he smoked K-2, and there was blood in it. Inmate Lee said that he could not see and laid back down, then threw up in his sleep. Lee said that his stomach was cramping, and he was not eating.

7.4　　Inmate Ellison stated that inmates use slap boxing for training and are open-handed, not closed fists. Ellison said everyone was "cool" with Lee and they were feeding him. Inmate Lee was slap boxing "a lot of people" but he had no knowledge of Lee getting hurt or hitting his head.

7.5　　Inmate Ellison stated that he thought Lee was sick from smoking K-2 all the time and witnessed him smoke three K-2 cigarettes back-to-back. Inmate Ellison also saw Lee sweep up K-2 butts, form another cigarette out of them, smoke it, and then pass out. Lee started throwing up blood later after doing this. Inmate Ellison stated that Lee had been throwing up for two days without going to the clinic. The interview ended at approximately 1:30 PM. Refer to "Exhibit S7.P1 - Inmate Ellison Interview."

7.6　　Inmate Jason Timothy Wells, B/M, DOB: ⬛⬛⬛⬛⬛ SPN 02865828, was interviewed at approximately 1:37 PM. Inmate Wells stated that he remembered Inmate Lee, and he stayed in D cell. Wells stayed in E cell. Inmate Wells stated that he sleeps all the time and explained that slap boxing was open-handed.

7.7      Inmate Wells said that when Lee first came to the cell block, he was throwing up and telling the DOs he was coughing and throwing up blood. He did not get to go to medical and slept all the time. Inmate Wells stated that the DO in the picket would not let him go to medical (the clinic).

7.8      Inmate Wells did not hear anything about Lee getting hurt, and he had not seen him slap-boxing. Inmate Wells stated that he heard Lee say he got beat up by some Blood gang members on the floor he came from. The interview ended at approximately 1:44 PM. Refer to "Exhibit S7.P2 - Inmate Wells Interview" for full details.

7.9      Inmate Lakorean Parker, B/M, DOB:        , SPN 02983999, was interviewed at approximately 2:04 PM. Inmate Parker stated that he stayed in D cell with Inmate Lee. Inmate Parker stated that slap boxing was play fighting with open hands and he slap boxed Lee once. Inmate Parker said that slap boxing is not intended to hurt anyone. Inmate Parker stated that he had no information regarding Lee sustaining a head injury and did not see him hit his head, nor had he heard about anything like that.

7.10    Inmate Parker saw Inmate Lee smoking Kush (K-2) every day and saw him throwing up three to four times about his second or third day on the cell block. Inmate Parker saw Lee smoke three to four K-2 "sticks" (cigarettes), and he then went to sleep. Inmate Parker saw Lee throw up in his sleep, and he told him to take a shower. Inmate Parker advised that he sees other inmates throw up every day from smoking K-2.

7.11    Inmate Parker stated that he was in the cell for about a day throwing up and then went to get his insulin later that night, around 1 to 2 AM. The interview ended at approximately 2:14 PM. Refer to "Exhibit S7.P3 - Inmate Parker Interview" for complete details.

7.12    Inmate Jeremiah Dorsey, B/M, DOB:       SPN 03077918, was interviewed at approximately 2:15 PM. Inmate Dorsey stated that he stayed in D cell with Inmate Lee. Inmate Dorsey explained that slap boxing was open-handed play and was not intended to hurt anyone.

7.13    Inmate Dorsey stated that he never slapped boxed with Inmate Lee but

saw him fall, nothing that would cause a head injury. Dorsey stated that when he fell, he landed on his "ass" and back, and he "guessed" that Lee hit his head on the floor; Dorsey later stated that he did not see or hear his head hit the floor. Inmate Dorsey stated that Lee jumped back up and went back to slap boxing.

7.14    Inmate Dorsey stated that he did not trip Lee while he was slap boxing, but he saw an inmate only identified as "Dog" pull his feet out from under him "a couple of times." Inmate Dorsey stated that Lee fell on his back when this happened and did not hit his head.

7.15    Inmate Dorsey stated that he did not trip Inmate Lee and did not see anyone throw him to the ground. The interview ended at approximately 2:28 PM. Refer to "Exhibit S7.P4 - Inmate Dorsey Interview" for complete details.

7.16    Inmate Devante Addison, B/M, DOB:████████, SPN 0305583, was interviewed at approximately 2:35 PM. Inmate Addison stated that he stayed in E cell, and Inmate Lee stayed in D cell. Inmate Addison stated that everyone was saying that Lee fell while slap boxing, but he did not see it; he was in his cell when this occurred. Inmate Addison said that after he fell, he heard everyone say that Lee got right back up and started slap boxing again. Inmate Addison said that he never slapped boxed with Lee. Inmate Addison stated that Lee was associated with the Bloods gang.

7.17    Inmate Addison stated that Inmate Lee was smoking "everyday" (presumably K-2), and he observed Lee throwing up. Inmate Addison stated that he did not have any information on Lee getting a head injury. Inmate Addison stated that Lee was "knowledge checked" the day he got on the cell block by a Blood gang member called "Blasay," and they fought twice. Lee walked out of the cell bleeding, seemed ok, and went back into the cell and fought him again. But after the fight, they were "rapping" and talking with each other in the cell.

7.18    Inmate Addison stated that Lee was throwing up the day before he went to his insulin. Additionally, the whole cell (D) would slap box every day, especially Inmate Lee. The interview ended at approximately 2:50 PM. Refer to "Exhibit S7.P5 - Inmate Addison Interview" for complete details.

7.19    Doctor Kelvin Shepard, the provider who treated Inmate Lee, was

REPORT OF INVESTIGATION

telephonically interviewed at approximately 9:55 PM. Doctor Shepard stated that Inmate Lee was alert and able to walk into the clinic; he was not making sense and talking like he was sleepy and out of it. Lee was not oriented and could not tell him where he was and had to think about his name when asked.

7.20   Doctor Shepard stated that Inmate Lee had several bruises that looked old, but as a precaution, he put him in a C-collar. Doctor Shepard stated that Inmate Lee's speech was slurred and again that he was disoriented. The interview ended at approximately 10:00 PM. Refer to "Exhibit S7.P6 - Doctor Shepard Interview" for complete details.

7.21   Investigation to continue.

**S8** 8.1   After conferring with Doctor Roger Milton of the Harris County Institute of Forensic Sciences (HCIFS)about this investigation, I, Texas Ranger Shane Ellison, was asked by Doctor Milton to verify that Inmate Lee was not assaulted the night he went to the clinic and then subsequently transported to the hospital for an altered mental state.

8.2   I recalled reading an OMS report written by DO J. Adebola, who reported that he was the DO who spoke with Lee about going to the clinic due to him feeling ill. DO Adebola reported that he thought Lee "probably had food poisoning" and wrote him a pass to the clinic.

8.3   Note that all of the OMS reports, video footage, and other documentation received from the HCSO Jail will be documented in a subsequent report.

8.4   On August 2, 2022, I spoke with Detention Officer (DO) Jeremiah

REPORT OF INVESTIGATION

Adebola about his interaction with Inmate Evan Lee the night he went to the jail clinic. This interview was conducted over the phone and was not recorded. The following is a summary of what DO Adebola stated: DO Adebola stated that he was assigned to the control picket on the 2nd Floor, H Pod, where Inmate Lee was being housed. DO Adebola stated that there were no fights that night and said that he had worked the pod long enough that he would have known if a fight had occurred based on how the inmates' act.

8.5      DO Adebola stated that Inmate Lee told him that he tried to get in the clinic earlier this date for a blood sugar issue, and he was turned away because he was not escorted. DO Adebola stated that Inmate Lee was diabetic. After getting his insulin (at approximately 1:25 AM, 03-18-22, per the video footage), he came to the picket and reminded DO Adebola that he was sick and needed to go to the clinic.

8.6      DO Adebola wrote Lee a pass and told him to lie down on the floor until someone saw him if they tried to send him back.  DO Adebola stated that he did not remember seeing any injuries on Lee and that Lee told him he was sick. DO Adebola stated that Lee did not go to the clinic due to an assault.

8.7      End of interview.

**S9** 9.1    On August 8, 2022, I, Texas Ranger Shane Ellison, received two flash drives from HCSO Administrative Services Sergeant Melissa Ince. The two drives contained video footage of Inmate Lee, housing and classification records, medical records, phone calls, OMS reports, and watch logs.

**REPORT OF INVESTIGATION**

9.2    These two drives were retained as Exhibit S9.P1 - HCSO Jail Documents.

9.3    A copy of this case file will be turned over to the Harris County District Attorney's Office - Civil Rights Division for review.

**S10** 10.1    On Monday, May 9, 2023, I, Texas Ranger Shane Ellison received the closure letter from the Harris County District Attorney's Office - Civil Rights Division indicating this investigation had been administratively closed.

10.2    I retain no evidence requiring final disposition and expect no further involvement in this matter.

10.3    File closed.

*DPS SENSITIVE*

REPORT OF INVESTIGATION

## INVESTIGATION REQUESTED BY

Harris Co So Houston (TX1010000)
1200 Baker St
Houston, Texas
77002

## SUSPECTS

**S3 Atkins, Everett Charles - Black/Male -**
DL State: TX

## VICTIMS

**S1 Lee, Evan - Black/Male - 11/09/1990**

Hair: Black        Eyes: Brown    Weight: 160    Height: 5' 08"
                                  lbs

SSN: 635-22-      DL State: TX
2171

## WITNESSES

**S3 Maxie, Barrown Oran - Black/Male -**
**Coleman, James Alan - White/Male**
**Watson, David Louis - Black/Male**
**McClain, Angela - Black/Female**
Work: (713) 221-
6000

**S5 Mosely, Michael - Black/Male -**
**Robertson, Jaron - Black/Male -**
**Hernandez, Vicente - Hispanic/Male**
**Brown, Juwan - Black/Male -**

**S6 Douglas, Melvin - Black/Male -**
**Brown, Jeremiah - Black/Male**
**Carter, Dontel - Black/Male -**
**Benjamin, Jaquan - Black/Male -**
**Zeno, Quindarrion - Black/Male -**
**Coleman, Devante - Black/Male -**
**Davis , Abrum - White/Male -**

**S7 Ellison, Bobby Deshaun - Black/Male -**
**Wells, Jason - Black/Male -**
**Parker, Lokorean - Black/Male -**

*DPS SENSITIVE*

**REPORT OF INVESTIGATION**

**Dorsey, Jeremiah - Black/Male -**
**Addison, Devante - Black/Male -**

**S8 Adebola, Jeremiah - Black/Male**
Work: 713-221-
6000

## OFFENSES

**S1 Custodial Death N/A N/A N/A**
Harris County, Houston, TX, US
03/22/2022 ( Tuesday )
*Victim: Lee, Evan*

## CHARGES

## PERSONNEL

**S1 Shane Ellison, Texas Rangers "A"**
Texas Dept of Public Safety
(281) 517-1424

**S2 Inv. Julianne Young,**
Other
(832) 927-5000

## EVIDENCE

**S3.P1 Evidence:**   Witness Statement Audio and/or Video recording
(statement)
**Seizure Date:** 03/23/2022
**Description:**   Inmate Atkins Interview
**Address:**   , TX
**By:**   Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2022 1720 |

**S3.P2 Evidence:**   Witness Statement Audio and/or Video recording
(statement)
**Seizure Date:** 03/23/2022
**Description:**   Inmate Maxie Interview
**Address:**   , TX

REPORT OF INVESTIGATION

**By:**         Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/15/2022 1840 |

**S3.P3 Evidence:**    Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/23/2022
**Description:**  Interview of David Watson
**Address:**      , TX
**By:**         Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 07/15/2022 1935 |

**S3.P4 Evidence:**    Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/23/2022
**Description:**  Inmate Forkah Interview
**Address:**      , TX
**By:**         Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/23/2022 1954 |

**S4.P1 Evidence:**    Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/24/2022
**Description:**  Inmate Lucas Interview
**Address:**      , TX
**By:**         Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/24/2022 1348 |

**S4.P2 Evidence:**    Witness Statement Audio and/or Video recording

**REPORT OF INVESTIGATION**

(statement)
**Seizure Date:** 03/24/2022
**Description:** DO McClain Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/24/2022 1538 |

**S4.P3 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/24/2022
**Description:** Inmate Knight Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/24/2022 1722 |

**S4.P4 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 07/19/2022
**Description:** Inmate Smith Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/24/2022 1741 |

**S4.P5 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/24/2022
**Description:** Inmate Gilmore Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition | | 03/24/2022 |

**REPORT OF INVESTIGATION**

| | | |
|---|---|---|
| Required | | 1751 |

**S5.P1 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/25/2022
**Description:** Inmate Mosley Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/25/2022 1420 |

**S5.P2 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/25/2022
**Description:** Inmate Robertson Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/25/2022 1454 |

**S5.P3 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/31/2022
**Description:** Inmate Hernandez Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/31/2022 1753 |

**S5.P4 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 03/31/2022
**Description:** Inmate Brown Interview
**Address:** , TX
**By:** Shane Ellison

**REPORT OF INVESTIGATION**

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 03/31/2022 1820 |

**S6.P1 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:** Inmate Douglas Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1400 |

**S6.P2 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:** Inmate Brown Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1410 |

**S6.P3 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:** Inmate Carter Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1450 |

**S6.P4 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:** Inmate Benjamin Interview

**Address:**     , TX
**By:**     Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1516 |

**S6.P5 Evidence:**   Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:**  Inmate Atkins Interview
**Address:**     , TX
**By:**     Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1532 |

**S6.P6 Evidence:**   Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:**  Inmate Zeno Interview
**Address:**     , TX
**By:**     Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1719 |

**S6.P7 Evidence:**   Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:**  Inmate Coleman Interview
**Address:**     , TX
**By:**     Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1741 |

**REPORT OF INVESTIGATION**

**S6.P8 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/06/2022
**Description:** Inmate Davis Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/06/2022 1817 |

**S7.P1 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/04/2022
**Description:** Inmate Ellison Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/07/2022 1330 |

**S7.P2 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/07/2022
**Description:** Inmate Wells Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/07/2022 1344 |

**S7.P3 Evidence:** Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/07/2022
**Description:** Inmate Parker Interview
**Address:** , TX
**By:** Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|

DPS SENSITIVE

| | | 04/07/2022 |
|---|---|---|
| No Final Disposition Required | | 1414 |

**S7.P4 Evidence:**    Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/07/2022
**Description:**    Inmate Dorsey Interview
**Address:**        , TX
**By:**             Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/07/2022 1428 |

**S7.P5 Evidence:**    Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/07/2022
**Description:**    Inmate Addison Interview
**Address:**        , TX
**By:**             Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/07/2022 1450 |

**S7.P6 Evidence:**    Witness Statement Audio and/or Video recording (statement)
**Seizure Date:** 04/07/2022
**Description:**    Doctor Shepard Interview
**Address:**        , TX
**By:**             Shane Ellison

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 04/07/2022 2200 |

**S9.P1 Evidence:**    Other
**Seizure Date:** 08/08/2022
**Description:**    HCSO Jail Documents
**Address:**        , TX
**By:**             Shane Ellison

**REPORT OF INVESTIGATION**

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 12/02/2022 1500 |

## ATTACHMENT NAME(S)

*END OF REPORT*

*DPS SENSITIVE*

# TEXAS DEPARTMENT OF PUBLIC SAFETY
# TEXAS RANGERS

**THIS REPORT IS THE PROPERTY OF THE TEXAS RANGERS. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED.**

| | | | |
|---|---|---|---|
| LEAD INVESTIGATOR: | DARON PARKER | INVEST#: | 2021I-TRA-50076115 |
| SUPERVISOR: | LOUIS J OWLES | OPENED: | 08/10/2021 |
| TITLE: | CUSTODIAL DEATH, HARRIS COUNTY, DEON PETERSON, 08-10-2021 | FILE STATUS: | CLOSED |
| TYPE: | CRIMINAL | DIVISION: | TEXAS RANGERS |
| SERVICE: | | REGION: | A |
| DISTRICT: | | AREA: | HOUSTON |
| SUBTYPE: | OTHER - CUSTODIAL DEATH | SPURS URN: | CMIV50076115 |
| CATEGORY: | | REVIEW DATE: | 07/11/2022 |
| SPECIAL APPROVAL: | | LEGACY REF: | |
| PROGRAM: | PUBLIC TRUST | SUBPROGRAM: | PUBLIC INTEGRITY |
| CASE#: | | | |

## INVESTIGATION SYNOPSIS

On 08-10-2021, I, Texas Ranger Daron Parker, was assigned to conduct an investigation into the death of Deon Peterson who was an inmate in the custody of the Harris County Jail Division. During the course of a medical episode, Peterson was transported to Ben Taub Hospital in Houston. Peterson was pronounced deceased a short time after his arrival at Ben Taub Hospital.

## SUPPLEMENTAL SYNOPSES

**S1 08/10/2021 Report Writer: Daron Parker**
**08/30/2021 Approved by: Louis J Owles**

On 08-10-2021, I, Texas Ranger Daron Parker, was assigned to investigate the death of Deon Lewis Peterson, who was an inmate in the custody of the Harris County Jail at 701 North San Jacinto. Peterson reported experiencing chest pains and vomiting to HCSO medical staff. While receiving treatment in the HCSO Clinic, Peterson entered into cardiac arrest. Peterson was transported by ambulance to Ben Taub Hospital in Houston. Peterson was pronounced deceased a short time after his arrival. I traveled to the Ben Taub and conducted an examination of the body and scene. I also interviewed Ben Taub Hospital staff. I traveled to the HCSO Jail, where I photographed and conducted an examination of the scene. Additionally, I interviewed HCSO Jail Division staff, and HCSO Clinic staff. This investigation will continue.

**S2 08/10/2021 Report Writer: Daron Parker**
**09/09/2021 Approved by: Louis J Owles**

On 08-10-2021, I, Texas Ranger Daron Parker, continued an investigation into the death of Deon Peterson who was an inmate in the custody of the Harris County Jail at 701 North San Jacinto. Peterson was transported to Ben Taub Hospital in Houston, where he was pronounced deceased. I traveled to the HCSO Jail, photographed, and conducted an examination of the clinic. I also interviewed HCSO Medical and Jail Division staff. This investigation will

**REPORT OF INVESTIGATION**

continue.

**S3 08/24/2021 Report Writer: Daron Parker**
**09/09/2021 Approved by: Louis J Owles**

On 08-20-2021, I, Texas Ranger Daron Parker, continued an investigation into the death of Deon Lewis Peterson who was an inmate in the custody of the Harris County Sheriff's Office. I interviewed HCSO Inmate Michael Guynes. Guynes was housed with Peterson at the time of his death on 08-10-2021. Additional details contained herein. This investigation will continue.

**S4 08/19/2021 Report Writer: Daron Parker**
**09/20/2021 Approved by: Louis J Owles**

On 06-13-2021, I, Texas Ranger Daron Parker, obtained Jail Division records from the Harris County Sheriff's Office regarding the custodial death of Deon Lewis Peterson. I also obtained Peterson's medical charts from the HCSO Medical Clinic. I reviewed the records and medical charts. Information obtained from the records and charts is detailed herein. This investigation will continue.

**S5 10/22/2021 Report Writer: Daron Parker**
**01/12/2022 Approved by: Louis J Owles**

On 10-22-2021, I, Texas Ranger Daron Parker continued a custodial death investigation regarding HCSO inmate Deon Lewis Peterson. I received and reviewed the Harris County Institute of Forensic Science report regarding to the autopsy performed on Peterson. The report indicated that Peterson's cause of death was listed as "acute thrombosis due to atherosclerotic cardiovascular disease." Furthermore, "Covid-19, and diabetes mellitus" were listed as "Contributory Conditions." The manner of death was listed as "Natural." This investigation will continue.

**S6 12/17/2021 Report Writer: Daron Parker**
**01/12/2022 Approved by: Louis J Owles**

On 12-16-2021, I, Texas Ranger Daron Parker, continued investigation into the custodial death of Deon Lewis Peterson. I obtained Peterson's medical chart from Ben Taub Hospital. I reviewed the medical charts. Information obtained from the chart is detailed herein. This investigation will be submitted to the Harris County District Attorney's Office. This investigation will remain open pending a response from the HCDA and/or a Harris County Grand Jury.

**S7 07/25/2022 Report Writer: Daron Parker**
**08/10/2022 Approved by: Louis J Owles**

In August 2021, I, Texas Ranger Daron Parker, initiated an investigation into the custodial death of HCSO inmate Deon Peterson. This investigation indicates that the nature of Robinson's death is consistent with that of a natural death. This investigation does not indicate the presence of any criminal conduct. On 03-01-2021, I received a memo from the Harris County District Attorney's Office that stated that the HCDA file into Robinson's death was administratively closed. In the event that new information, to the contrary with investigative value emerges, this investigation will be re-opened. This investigation is closed.

DPS SENSITIVE

REPORT OF INVESTIGATION

## SUPPLEMENTAL DETAILS

**S1** 1.1   On 08-10-2021, at approximately 1:58 pm, I, Texas Ranger Daron Parker, received a message from DPS Communications to contact Harris County Sheriff's Office (HCSO) Watch Command.  Watch Command reported the custodial death of an HCSO inmate.  Watch Command elaborated that the inmate was at Ben Taub Hospital in Houston.

1.2   HCSO requested assistance from the Texas Rangers to conduct a custodial death investigation.

1.3   At approximately 2:45 pm, I spoke with HCSO Jail Division Sergeant Bernard Kelly.  Kelly identified the inmate as Deon Lewis Peterson, B/M, DOB: 02/28/1979, SPN 1579098.

1.4   Kelly advised me that Peterson, was an inmate at the HCSO Jail at 701 San Jacinto Street, entered the HCSO medical clinic earlier that same day.  Kelly stated that Peterson reported to HCSO medical staff that he was experiencing chest pains and vomiting.  Kelly stated that Peterson entered into cardiac arrest while receiving treatment in the HCSO Clinic.

1.5   Kelly advised that Peterson was transported by HFD ambulance to the Ben Taub Hospital Emergency Room in Houston.

1.6   Kelly stated that Peterson was pronounced deceased by Dr. Erik Antonsen.

1.7   I then spoke with Antonsen on the phone.  Antonsen stated that he was the attending physician who provided care to Peterson upon his arrival at Ben Taub Hospital.

1.8   Antonsen stated that Peterson arrived via HFD Ambulance.  Antonsen advised that CPR was being performed on Peterson via a Lucas Machine.  A Lucas Machine is a device that provides chest compressions.  Antonsen stated that HFD Medics were providing breath via a laryngeal mask airways (LMA) device.

1.9   Antonsen advised that HFD Medics informed him that Peterson had been asystole (cessation of heart activity) for approximately fifty (50) minutes.

1.10  Antonsen stated that HFD administered epinephrine to Peterson prior to his arrival at Ben Taub.

1.11  Antonsen advised that he assessed Peterson's condition and deduced that the prognoses of continuing resuscitation were futile.

DPS SENSITIVE

**REPORT OF INVESTIGATION**

1.12  Antonsen stated that he consequently pronounced Peterson deceased at 12:56 pm.

1.13  I utilized a digital recorder during the aforementioned interview.  Audio captured during the course of the interview was stored on a media drive (Exhibit S1.P1) and will be retained with this investigative file.

1.14  At approximately 3:53 pm, I arrived at Ben Taub Hospital Emergency Room, located at 1504 Ben Taub Loop in Houston, where Kelly met me.

1.15  Kelly escorted me to Peterson's body, which was located in critical care room 3.  HCSO Deputy T Pierson was the assigned Deputy charged with keeping CCR 3 secured.  Also present was HCSO Sergeant R Lomeli.

1.16  I observed the body of a black male covered by a single white sheet.  Upon removing the sheet, I observed that the black male was wearing identifying bands on both wrists.  The bands identified the wearer as Deon Peterson, DOB: 02/28/1979.

1.17  I took photos of CCR 3, overall photos of Peterson's body, and of photos Peterson's face and hands.  I did not observe any noticeable signs of trauma to Peterson's body.  More specifically, I did not notice any visible signs of trauma to Peterson' head, face, neck, or hands.  The photos were placed on a media drive (Exhibit S1.P2) and will be retained with this investigative file.

1.18  At approximately 3:57 pm, I released the scene (CCR 3) as well as Peterson's body to HCSO Staff.  HCSO Staff secured Peterson's body and later released it to the Harris County Institute of Forensic Sciences Center (HCIFS).

1.19  Note: On 08-11-2021, HCIFS personnel performed an autopsy on Peterson (HCIFS Case# ML-21-3656).  HCIFS Staff advised me that preliminary autopsy findings indicate that Peterson's manner of death was most likely natural.  Autopsy results revealed that Peterson had coronary thrombosis, readily apparent cardiovascular disease, and tested positive for Covid 19.  Peterson did not test positive for any illegal drugs.  However, a more thorough toxicology report is forthcoming.

1.20  Upon receiving the final HCIFS autopsy report, the findings will be reported in this file.

1.21  This investigation will continue.

DPS SENSITIVE

REPORT OF INVESTIGATION

**S2** 2.1   On 08-10-2021, I, Texas Ranger Daron Parker, continued an investigation into the death of Deon Peterson, black male, date of birth 02-28-1979, SPN 1579098.  Peterson was an inmate in the custody of the Harris County Jail at 701 North San Jacinto in Houston Harris County, Texas.

2.2   Peterson entered the HCSO medical clinic earlier that day.  Peterson reported to HCSO medical staff that he was experiencing chest pains and vomiting.  Peterson entered into cardiac arrest while receiving treatment in the HCSO Clinic.  Peterson was transported to Ben Taub Hospital in Houston, where he was pronounced deceased.

2.3   I photographed and conducted an examination of the clinic.  Prior to my arrival HCSO Jail Sergeant L Jefferson had taken photos of Jail POD 4B4, where Peterson was housed.  Sergeant J Tyler placed the aforementioned photos onto a media drive (Exhibit SP2.P1).  Exhibit SP2.P1 will be retained with this investigative file.

2.4   I met with HCSO Medical Staff members Dr. George Griffin and LVN Ericka Johnson in the HCSO 701 North San Jacinto Medical Clinic.  I conducted interviews with Griffin and Johnson in the Physician's Office.

2.5   I began the interview with Johnson at approximately 5:16 pm.  Johnson stated that she had been employed with the HCSO Medical Clinic for seven years and ten months.

2.6   Johnson recalled that Peterson had been in the clinic on more than one occasion that day.

2.7   Johnson elaborated that she was assigned to a stretcher run earlier that same day, where she (Johnson) took the stretcher to the fourth floor, POD 4B4.  Johnson advised that upon her arrival, she approached Peterson, who was lying face down on his bed.  Peterson advised Johnson that he was experiencing chest pains.  Peterson subsequently got out of the bed and walked to the stretcher.  Johnson advised that she then took Peterson to the Clinic.

**REPORT OF INVESTIGATION**

2.8   Johnson advised that Peterson's responses became rude and aggressive when asked questions regarding his physiological circumstances.  Johnson stated that Peterson would not further elaborate on his medical condition aside from saying he (Johnson) had chest pains.

2.9   Johnson advised that at one point in the clinic, Johnson told her, "If yall don't want to be bothered with me, I'll get up and leave."  Johnson stated that Peterson subsequently removed the stretcher's emergency strap, got up from the stretcher, and left the clinic.

2.10 Johnson stated that she subsequently notified Sergeant L Jefferson that Peterson left the clinic.  Johnson advised that a short time later, Jefferson returned to the clinic with Peterson.

2.11 Johnson stated that she (Johnson) and Nurse Practitioner Esther Peters began standard physiological checks on Peterson.  Johnson advised that the checks included vital signs and blood sugar.  Johnson elaborated that the checks indicated that Peterson's health was normal.  Johnson advised that EKG testing was performed on Peterson and that he (Peterson) was subsequently released from the clinic.  Peterson returned to the fourth floor, POD 4B4.

2.12 Johnson advised that sometime later, she made an additional stretcher run to the fourth floor, POD 4B4.  Johnson advised that upon her arrival, she discovered that Peterson was lying on the floor, near the POD door, rolling around.  Johnson advised that she asked Peterson, "What's going on?" Peterson responded that his "chest hurt."  Johnson stated that she encouraged Peterson to elaborate more.  Johnson stated that Peterson did not elaborate.

2.13 Johnson advised that she took Peterson back to the clinic.

2.14 Johnson stated that she (Johnson) conducted the aforementioned standard physiological checks on Peterson again.  Johnson stated that Peterson's vital signs were stable.  Johnson advised that she continued to ask Peterson questions to assess his condition.  Johnson elaborated that Peterson became more evasive with his answers, with each question she asked.

2.15 Johnson advised, subsequent to the physiological checks, Peterson sat

**REPORT OF INVESTIGATION**

in a nearby chair. Johnson elaborated that Peterson was waiting for NP Peters to finish with another patient.

2.16 Johnson described, a short time later, Peterson fell forward out of the chair. Peterson stated that she and other clinic staff responded to Peterson and placed him back onto a stretcher. Peterson advised that when she grasped onto Peterson to lift him, he (Peterson) was sweaty. Johnson recalled that Peterson was not sweaty just a short time earlier. Johnson described that a rapid change in a person's physiological condition, such as sweating, is a sign of medical distress.

2.17 Johnson advised that Dr. Griffin also responded to Peterson's bedside and searched for a pulse. Johnson stated that Griffin could not detect a pulse on Peterson and that life-saving efforts (CPR) were initiated.

2.18 Johnson added that the AED instrument was placed onto Peterson. Johnson stated that she did not recall the AED instrument ever utilizing its defibrillation function.

2.19 Johnson stated that HFD EMS arrived a short time later and took Peterson to the Ben Taub Hospital Emergency Room.

2.20 I asked Johnson if there was any other information, she thought would be helpful to the investigation. Johnson stated that she suspected Peterson might have ingested a substance smuggled into the jail. Peterson advised that she is familiar with the effects of K2 and roach spray but that Peterson's reaction "seemed like something different."

2.21 Note: This Investigator is familiar with the method of smuggling contraband into jails via substances in the form of a liquid sprayed onto an inmate's mail by a third-party co-conspirator.

2.22 The interview was terminated at 5:30 pm.

2.23 I utilized a digital recorder during the interview with Johnson. Audio captured during the course of the interview with Johnson was stored on a media drive (Exhibit SP2.P2). Exhibit SP2.P2 will be retained with this investigative file.

2.24 I also conducted an interview with Griffin. Griffin stated that he had been employed with the HCSO Medical Clinic for eight years. Griffin's statement was consistent primarily with Johnson's version of events.

2.25 Griffin did, however, provide some additional information. Griffin advised that Peterson; had no carotid pulse, stopped breathing, fixed pupils, and was sweaty. Griffin advised that he (Griffin) then "Called a code."

2.26 Griffin recalled that Peterson entered the clinic for the final time, on a stretcher, at 11:42 am. Griffin also recalled seeing Peterson in the clinic on previous occasions.

2.27 One inconsistency in Griffin and Johnson's version of events was that Griffin recalled that the AED did deliver a shock at around 12:07 pm. Griffin added that he (Griffin) directed that the AED be utilized on Peterson.

2.28 Griffin stated the HFD EMS arrived a short time later and took Peterson to the Ben Taub Hospital Emergency Room.

2.29 Griffin recalled that Peterson had the following medical conditions: type 2 diabetes, asthma, and gastric reflux.

2.30 I utilized a digital recorder during the interview with Griffin. Audio captured during the course of the interview with Griffin was stored on a media drive (Exhibit S2.P3). S2.P3 will be retained with this investigative file.

2.31 Additional HCSO Medical Clinic personnel who had contact with Peterson during the course of Peterson's medical episode were identified as; Naomi Mack Lockett, Priscilla Madueke, Stella Namuwonge, Beena George, Vivean Johnson, Francisca Okrone, Juliet Agbogu, Shavon Harris, Itzayana Vences, Colette Fabien, and John Ziesemer.

2.32 HCSO Jail Division Detention Officers who had contact with Peterson during the course of Peterson's medical episode were identified as; Sergeant L Jefferson, DO Austen Blume, DO A Goodlow-Jones, DO D Guzman, DO D Martinez, DO T Newsome, DO D Ramirez, and Deputy T Pierson.

2.33 Supplement reports drafted by the aforementioned HCSO Staff were obtained and made a part of this investigative file.

**REPORT OF INVESTIGATION**

2.34 This investigation will continue.

**S3** 3.1    On 08-20-2021, I, Texas Ranger Daron Parker, continued an investigation into the death of Deon Lewis Peterson, black male, date of birth 02-28-1972, SPN 001579098, who was an inmate in the custody of the Harris County Jail.

3.2    Previously, on 08-19-2021, HCSO Deputy Sam Joseph contacted me regarding additional information that an Inmate provided him about Peterson's custodial death. Joseph identified the Inmate as Michael Jason Guynes, H/M, DOB:                  , SPN 01531056. Joseph elaborated that Guynes told him that Peterson had been smoking K2 prior to his death. Furthermore, Peterson had a small sheet of paper containing K2 on his person at the time of his death.

3.3    I contacted HCIFS Investigator Sam Davidson. Davidson recalled picking Peterson's body up from Ben Taub on 08-10-2021. Davidson recalled that Peterson had a small sheet of paper with a family photo printed on it. Davidson advised that the published photo was rolled up in Peterson's left pant leg hem. Davidson advised that he did not collect the printed photo.

3.4    I subsequently contacted HCSO Sergeant Bernard Kelly. Kelly told me that he did not collect the printed photo. To date, the aforementioned printed photo has not been located.

3.5    On 08-20-2021, I met with Guynes at the HCSO Jail at 701 San Jacinto in Houston Harris County, Texas. The interview was conducted in the first-floor interview room.

3.6    At approximately 3:00 pm, I began the interview with Guynes.

3.7    Guynes stated that on 08-10-2021, he was housed in POD 4B4 with Peterson. Guynes advised that he and Peterson had been housed in POD 4B4 for approximately two months. Furthermore, that he and Peterson's assigned bunks were directly beside one another.

**REPORT OF INVESTIGATION**

3.8   Guynes recalled that Peterson had begun complaining to him (Guynes) about significant headaches and arm pain sometime around the beginning of August.  Guynes advised that he informed Peterson that arm pain was a sign of a heart attack.  Guynes stated that Peterson began periodically going to the medical clinic around that time.  Later in the interview, Guynes advised that he periodically observed Peterson vomiting.

3.9   Guynes advised that on the morning of 08-10-2021, Peterson went to the medical clinic and returned a short time later.  Guynes stated that Peterson told him (Guynes), "Preacherman pray for me."  Guynes advised that he prayed over Peterson.

3.10 Guynes stated that a short time later, Peterson got up from his bunk and stumbled over to the doorway area of the POD.  Peterson notified the DO that he needed to go to the medical clinic.  Peterson was subsequently taken to the medical clinic.

3.11 Guynes advised that he heard that Peterson died from Covid.  Guynes then added that he thought Peterson's death was the result of "the K2 they were smoking."

3.12 I asked Guynes to elaborate.  Guynes stated that he (Guynes) had witnessed inmates smoking since his arrival.  Guynes elaborated that he had specifically observed Peterson smoking since the first day of his (Peterson's) arrival.

3.13 I asked Guynes how often he saw Peterson smoking.  Guynes replied, "all day long, they're in there doing it right now, the guards don't care."  I asked Guynes if Peterson smoked a lot of K2.  Guynes replied, "oh yeah, there's a guy in there that gets a lot of it."

3.14 I asked Guynes to elaborate more.  Guynes stated that inmates receive mail with K2 laced paper.  Guynes advised that a common way to smoke the K2 involves cutting small slivers of the K2 mail/paper with a razor blade.  The small sliver of the K2 is then wrapped in thin paper, which is usually a page from a bible.

3.15 Guynes elaborated that the K2 cigarette is lit with a burning piece of tightly twisted toilet paper that serves as a wick.  Guynes stated that toilet paper wicks can burn for an extended period of time.

REPORT OF INVESTIGATION

3.16 Guynes stated that the toilet paper wick is lit by breaking down a commissary purchased hot pot, purposed for heating water. Guynes advised that the hot pot wires, when exposed, can be placed together, thus creating sparks to light the toilet paper wick.

3.17 I asked Guynes to elaborate more on how frequently Peterson smoked K2. Guynes replied, "Sir, all day." Guynes added, "That's all they do, they pass out, they wake up, all of them." Guynes advised that he encouraged Peterson to stop smoking K2. Guynes stated that Peterson would not stop smoking K2.

3.18 I asked Guynes if he smoked K2. Guynes replied that he did not. Guynes added that he did not do drugs based on his Christian faith. Guynes stated that the other inmates recently assaulted him (Guynes) because he (Guynes) would not smoke K2. Guynes advised that HCSO staff consequently moved him to another POD. Guynes advised that the current safety conditions of the HCSO Jail are more dangerous than any incarceration he has ever experienced.

3.19 I asked Guynes how the K2 was getting into the jail. Guynes replied that two DO's, whom he identified as "Mrs Jones and a big fat guy just give them the mail without even opening it."

3.20 Guynes advised that he often saw Jones talking privately with Peterson and Inmate Charles Harris in the hallway. Guynes advised that he was not privy to the conversations and could not say what Jones, Peterson, and Harris were discussing.

3.21 Guynes stated that he (Guynes) frequently saw Harris with large amounts of mail/paper. Guynes advised that Harris is a K2 supplier in jail.

3.22 Guynes advised that he suspected other illegal drugs like methamphetamine and heroin were also regularly smuggled into the jail.

3.23 Note: I located an Inmate identified as Charles Amos Harris, DOB: ▮▮▮▮▮▮ SPN 02580948, on the 08-10-2021 HCSO Housing Occupancy History for POD 4B4.

**REPORT OF INVESTIGATION**

3.24 The interview was terminated at approximately 3:20 pm.

3.25 Audio was captured via a digital recorder during the interviews. The audio was placed onto a media drive (SP3.P1) and is included in this investigative file.

3.26 This investigation will continue.

**S4** 4.1   On 06-13-2021, I, Texas Ranger Daron Parker, requested and received information from Harris County Jail Division.  HCSO Staff provided me with documents generated on inmate Deon Lewis Peterson.

4.2   HCSO provided records that detailed Peterson's stint in the custody of the HCSO Jail Division.  I reviewed the aforementioned documents.

4.3   Further identifiers for Deon Lewis Peterson are B/M, DOB: 02/28/1979, SSN 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, Texas Driver's License 42197441, SPN 01579098. Peterson reported his address as 3333 Normandy Street, Apartment 1306 in Houston.

4.4  Peterson's criminal history contains charges of; Aggravated Robbery, Criminal Trespass, Evading Arrest x 3, Possession of a Controlled Substance x 3, and Tampering with Evidence.

4.5   On 02-23-2021, Peterson was taken into custody by the Houston Police Department, on the authority of a Harris County Warrant 234653201010-2, and booked into the Harris County Jail.

4.6   I reviewed Peterson's HCSO records during his time in the custody of the HCSO.

4.7   A review of the HCSO Jail Division medical screening report did not yield any indication that Peterson had "feelings of hopelessness" nor did he (Peterson) have any suicidal ideations at the time of his arrest.

4.8   A review of Peterson's HCSO jail division offense reports revealed the following incidents.  The following provides a brief description of the HCSO Jail Violation Code that Peterson violated; for additional details, see the HCSO Offense Reports attached to this investigative case file.

4.9   On 05-03-2021, DO Shaquita Horn reported that she observed Peterson and two other Inmates smoking a rolled-up brown paper bag.  Horn reported that she instructed Peterson and the other Inmates to stop.  Horn reported that the Inmates refused to stop.  Horn reported that Peterson and the other Inmates refused.  Peterson and the other inmates were charged with violating the HCSO Jail Code for Smoking and/or Possession of any Tobacco or Paraphernalia.

4.10  On 05-27-2021, DO Shaquita Horn reported that she observed Peterson and three other Inmates smoking.  Horn reported that she instructed Peterson and the other Inmates to stop.  Horn reported that the Inmates refused to stop.  Horn reported that Peterson and the other Inmates refused and yelled: "shut up bitch."  Peterson and the other inmates were charged with violating the HCSO Jail Code for Smoking and/or Possession of any Tobacco or Paraphernalia.

4.11  On 06-05-2021, Peterson was charged with violating the HCSO Jail Code for Fighting and Assault on Any Inmate.

4.12  On 06-09-2021, Peterson was charged with violating the HCSO Jail Code for Group Demonstration.

4.13  On 06-10-2021, Peterson was charged with violating the HCSO Jail Code for Failure to Wear Armband.

4.14  On 06-13-2021, Peterson was charged with violating the HCSO Jail Code for Refusing to Obey Order.

4.15  HCSO Jail Division reports also detailed Peterson's medical incidents.  The following provides a brief description regarding the reasons for Peterson's trips to the HCSO Medical Clinic; for additional details, see the HCSO Offense Reports attached to this investigative case file.

4.16  On 08-05-2021, an offense report was drafted by DO A Trevino.  Trevino detailed that Inmates advised him that Peterson could not get up via the POD

intercom system. Trevino detailed that DO J Stepro signaled him to contact the Medical Clinic for a stretcher. Peterson advised Stepro that his (Peterson's) blood sugar was low, as he (Peterson) had diabetes.

4.17 On 08-10-2021, DO A Goodlow-Jones detailed the following incident. "Detention Officer A. Jones (EIN 154489) was assigned to the first floor of the 701 N. San Jacinto Jail facility, in B- Pod, during first watch. At approximately 0930 an unknown inmate who was later identified by his Harris County armband as inmate Peterson, Deon (SPN 01579098), complained that he had been vomiting and had bad chest pains. I made a call to 701 clinic for a gurney and medical team. I also called Detention Sergeant Jefferson to Inform her of the situation. Sgt. Jefferson and rovers responded and found Inmate Peterson laying on his stomach. He was conscious and talking. When medical arrived, Inmate Peterson was escorted to the 701 Clinic on the gurney. He is currently being seen by a medical provider. While in the clinic, Inmate Peterson was very agitated at the nurse, so he got off the gurney and attempted return to the 4th floor. Sgt. Jefferson arrived in the basement and Inmate Peterson was on the floor, saying that his chest was still hurting. Sgt. Jefferson told Inmate Peterson to get up and go back to the clinic, he complied. Inmate Peterson went back to medical and is being seen by a provider at this time. All of his property was bagged and placed in storage. At approximately 1032 hours, Inmate Peterson was cleared by medical and returned to the 4th Floor and given his property and sent back to his assigned living area, 4B4."

4.18 08-10-2021, DO D Martinez detailed the following incident. "I, Detention Officer (EIN 156586), was assigned to Early Watch, as a rover on the Fourth Floor of the Harris County Jail Facility, located at 701 North San Jacinto, Houston, Texas, 77002. At approximately 0930 hours, I responded to a medical emergency floor page coming from 4B4. Detention Sergeant L. Jefferson (EIN 101432), and I were able to identify the inmate by his Harris County issued armband as Inmate Deon Peterson (SPN 01579098). After medical arrived, I began to pack his belongings. While I was placing his property into the plastic bag, I came across two razor blades. I removed the contraband from the cellblock and disposed of them. Inmate Peterson was informed, that they are being charged in violation of disciplinary infraction code #2306, "POSSESSION OF CONTRABAND," of the Harris County Sheriff's Office Inmate Handbook. Inmate Peterson was afforded an opportunity to write an individual statement, to which they declined an individual statement. Inmates Peterson was issued a Confirmation of Service form. Detention Sergeant L. Jefferson (EIN 101432), along with Classification Detention Officer A. Jackson (EIN 131137), were notified of this incident.

4.19 I also obtained and reviewed Peterson's HCSO Medical Clinic chart.

4.20　At the time of Peterson's intake process on 02-23-2021, Peterson did not report having any severe mental health conditions.　With regard to his physiological condition, Peterson reported having asthma, hypertension, and genital warts.

4.21　Peterson was asked a series of medical questions inquiring about; fever, cough, shortness of breath, fatigue, muscle aches, chills, diarrhea, vomiting, and loss of taste or smell.　Peterson denied having any of the aforementioned conditions.

4.22　On 07-19-2020, HCSO medical staff examined Peterson.　Medical Staff documented the following health issues; asthma, hypertension, dermatitis, stye on the eye.

4.23　HCSO medical records indicated that Peterson was prescribed an albuterol inhaler and tolnaftate cream.

4.24　HCSO medical records further indicated that Peterson's asthma and STD condition was regularly monitored.　During the course of the regular medical examinations, Peterson denied the presence of fever, cough, shortness of breath, chest pains, fatigue, muscle aches, chills, diarrhea, vomiting, and loss of taste or smell.

4.25　On 06-26-2021, Erika Johnson, LVN, documented that Peterson reported the presence of a cough that was producing green mucus.　Peterson told Johnson that the green mucus-producing cough had been occurring for about two weeks.　Records also indicate that Peterson began complaining of pain in his left shoulder around that same time.　Staff documented that the shoulder appeared intact and that no definitive evidence of acute injury was found. Peterson's medical chart later documented an additional clinic visit on 07-04-2021, where Peterson reported the green mucus-producing cough a second time.

4.26　On 07-01-2021, HCSO medical records indicated that a blood work analysis was completed.　Peterson was subsequently prescribed Amlodipine.

4.27　On 07-11-2021, Peterson entered the medical clinic complaining of arm pain.　During the medical examination, NP Viveen V Johnson documented that Peterson's fingertips were brown and that she told Peterson to stop smoking. Peterson was prescribed Naproxen, Zyrtec, Nasacort, and Robitussin cough

syrup. Peterson's chart also documented that Peterson had been to the medical clinic complaining of arm pain on other occasions.

4.28 On 07-17-2021, HCSO Mental Health Professional Angela Paz, LPHA, documented that she conducted a session with Peterson. Paz noted that Peterson did not manifest any suicidal or homicidal ideations.

4.29 Paz documented the following in the comments section of the chart. "Upon contact, Pt reported feeling "stressed" because he is worried about his case and wants to go home. Pt was informed of the purpose of the assessment. Pt stated he is supposed to be taking Wellbutrin and Benadryl but was unable to identify where he was rx'd these medications when probed. Pt requested to be seen by a MH prescriber. Pt denied current SI/HI/AVH. Pt reported he is tending to ADLs, eating 3/3 meals, and sleeping "rocky", about 3/24 hours. Pt reported he spends his time reading and "just dealing with it". Pt reported he plans to work upon release. Pt does not appear to be in acute psychological distress to warrant immediate MH intervention at this time. Clinician educated Pt on the process for accessing services within the jail."

4.30 On 07-21-2021, HCSO Medical Assistant Marianna Hernandez documented that Peterson told her that he had not been taking any of his prescribed medications.

4.31 On 08-03-2021, NP Johnson documented that Peterson entered the medical clinic complaining of body aches and vomiting. Johnson documented that Peterson's fingertips were brown. Johnson reported that Peterson told her that he had been smoking cigarettes.

4.32 On 08-05-2021, Olukemi I Ikwunze, LVN, reported the following. "Medical was called to the floor reporting emergency. Upon arrival, patient was found lying on right side in bed. patient got up with no assistance. Patient stated i woke up and started feeling nauseous. Patient stated" And I said go ahead and call medical. I feel better after i threw up." Patient denies any dizziness, SOB and in no acute distress at this time. Patient is referred to provider for further evaluation."

4.33 On 08-10-2021, NP Johnson documented the following. "Patient brought to clinic via stretcher, pt was found in bed lying on his stomach in no distress. pt uncooperative, pt refusing to put mask, once pt in clinic, pt refused all questions, then stated his chest pain started 20 mins ago, pt stated, if you ain't going to do anything for me , I'm going back to my bed, pt sat up took safety straps off , got off stretcher and lift clinic. v/ stable, Sgt on the floor

informed."

4.34  Later that same day, Johnson documented an additional encounter with Peterson.  "Pt is a 42 y/o AA male who presents to the clinic cc of chest pain. Pt denies sudden feeling of pressure, squeezing, tightness, or crushing under his breastbone. Pt denies pain that radiates to his jaw, left arm, or back at this time. Pt denies sob, confusion, excessive sweating, nausea, vomiting, dizziness, palpitation, or rapid breathing at this time. States the chest discomfort started after he finish eating this morning. Pt is clinically stable, A&O x3, able to make needs known, able to follow commands and not in acute distress at this time. Glasgow Coma: 15."

4.35  George Griffin, MD, detailed Peterson's final medical chart entry.  "This inmate was in the clinic complaining of chest pain. He shortly after arrival slumped to the floor and stopped breathing. Immediately he was lifted and placed on a bed. There was no pulse so CPR was started immediately. The AED was obtained and CPR was continued without breaks. The AED first shock was given at 1207. There was no pulse throughout the CPR. The Rebreather bag was used to administer Oxygen. HFD took over and placed the Thumper on the patient. This patient maintained normal vital signs on this visit until the cardiac Arrest. He stopped breathing and was found without a pulse. by Carotid check. CPR was begun immediately and continued until HFD arrival. The AED was used and oxygen was delivered by a rebreather mask. HFD took over."

4.36  This investigation indicates that Peterson was transported to Ben Taub Hospital via HFD ambulance.

4.37  Ben Taub Hospital records have been requested and will be reported in a subsequent report.

4.38  For additional details, see the HCSO Jail Division records and HCSO Medical Clinic Chart attached to this investigative file.

4.39  This investigation will continue.

S5 5.1  On 10-22-2021, I, Texas Ranger Daron Parker, continued a custodial death investigation regarding HCSO inmate Deon Lewis Peterson, B/M, DOB:

02/28/1979, Texas Driver's License 42197441, SPN 01579098.

5.2   I received and reviewed HCIFS postmortem report ML-21-3656 prepared by Doctor Pramod Gumpeni.

5.3   Previously, on 08-11-2021, Harris County Institute of Forensic Science staff performed an autopsy on Peterson at the HCIFS Building at 1861 Old Spanish Trail in Houston.

5.4   The report indicated that Peterson's cause of death was listed as "acute thrombosis due to atherosclerotic cardiovascular disease." Furthermore, "Covid-19, and diabetes mellitus" were listed as "Contributory Conditions." The manner of death was listed as "Natural."

5.5   I reviewed Dr. Gumpeni's autopsy report in its entirety.  The details of the autopsy report appear consistent with this investigation thus far.

5.6   Toxicology analysis was performed on blood drawn from Peterson. Peterson's toxicology analysis results were unremarkable.

5.7   For additional details regarding the postmortem examination on the body of Peterson, see Dr. Gumpeni's report.

5.8   This investigation will continue.

**S6** 6.1   On 12-16-2021, I, Texas Ranger Daron Parker, continued investigation into the custodial death of Deon Lewis Peterson.  I obtained Peterson's medical chart from Ben Taub Hospital.  I reviewed the medical charts.

6.2   Further identifiers for Deon Lewis Peterson are B/M, DOB: 02/28/1979, Texas Driver's License 42197441, SPN 01579098.

6.3   Peterson's Ben Taub Hospital medical chart yielded the following details.

6.4   Attending physician Doctor Eric Antonsen documented that Peterson arrived at the emergency room with CPR in progress.  Antonsen further reported that one shock was administered prior to the initiation of CPR and that five doses of epinephrine were administered prior to arrival.

6.5   Antonsen reported that life-saving efforts had been underway for fifty minutes at the time of Peterson's arrival at the emergency room.

6.6   Antonsen reported that Peterson had no pulse at 12:56 pm; thus, Peterson's time of death was documented at 12:56 pm.

6.7   For additional details, see the Ben Taub Hospital medical chart attached to this investigative file.

6.8   This investigation will be submitted to the Harris County District Attorney's Office.  This investigation will remain open pending a response from the HCDA and/or a Harris County Grand Jury.

**S7** 7.1   In August 2019, I, Texas Ranger Daron Parker, initiated an investigation into the custodial death of HCSO inmate Deon Peterson, B/M, DOB: 02/28/1979.

7.2   Based on witness interviews, scene review, review of HCSO jail videos, Robinson's medical history, and the Post Mortem examination conducted on Robinson.  This investigation indicates that the nature of Robinson's death is consistent with that of a natural death resulting from "COVID 19, diabetes mellitus."

7.3   This investigation was submitted to the Harris County District Attorney's Office for review.

7.4   On 03-01-2022, I received a memo from Harris County Civil Rights Division Assistant DA Michael Harrison.

7.5   Harrison's memo contained the following verbiage.  "I am in receipt of the Texas Department of Public Safety's Incident #2020I-TRA-50076115 regarding an incident which occurred on August 10, 2019.  Based on the available evidence I received, I have decided to administratively close this case by memo and take no further action."

**REPORT OF INVESTIGATION**

7.6  In the event that new information to the contrary, with investigative value emerges, this investigation will be re-opened.

7.7  This investigation is closed.

## INVESTIGATION REQUESTED BY

Harris County Sheriff's Office Ulw (TX1010012)
1301 Franklin St
Houston, Texas
77002

## WITNESSES

**S3 Guynes, Michael Jason - Hispanic/Male -** 

## INVOLVED

**S1 Peterson, Deon Lewis - Black/Male - 02/28/1979**

| | | | |
|---|---|---|---|
| Hair: Black | Eyes: Brown | Weight: 205 lbs | Height: 5' 07" |
| SSN: 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 | SID: TX05822943 | DL#: 42197441 | DL State: TX |

## OFFENSES

**S1 Custodial Death N/A N/A**
Harris County, Houston, TX, US
08/10/2021 ( Tuesday )
*Suspect: Peterson, Deon*

## CHARGES

## PERSONNEL

**S1 Daron Parker, Texas Rangers "A"**
Texas Dept of Public Safety
(281) 517-1400

**S5 Daron Parker, Texas Rangers "A"**
Texas Dept of Public Safety
(281) 517-1400

REPORT OF INVESTIGATION

**S6 Daron Parker, Texas Rangers "A"**
Texas Dept of Public Safety
(281) 517-1400

## EVIDENCE

**S1.P1 Evidence:** Witness Statement Audio and/or Video recording
(statement)
**Seizure Date:** 08/10/2021 1445
**Description:** media drive containing audio captured during interview
with Dr Erik Antonsen
**Address:** , TX
**By:** Daron Parker

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 08/11/2021 0000 |

**S1.P2 Evidence:** Photograph
**Seizure Date:** 08/10/2021
**Description:** media drive containing photos taken of Peterson
**Seized From:** Ben Taub Hospital ER
**Address:** , Houston, TX
**By:** Daron Parker

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 08/10/2021 0000 |

**S2.P1 Evidence:** Photograph
**Seizure Date:** 08/10/2021
**Description:** media drive containing HCSO photos
**Address:** , TX
**By:** Daron Parker

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 08/10/2021 0000 |

**S2.P2 Evidence:** Witness Statement Audio and/or Video recording
(statement)
**Seizure Date:** 08/10/2021

DPS SENSITIVE

**REPORT OF INVESTIGATION**

**Description:**  media drive containing audio captured during interview
with Johnson
**Address:**  , TX
**By:**  Daron Parker

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 08/10/2021 0000 |

**S2.P3 Evidence:**  Witness Statement Audio and/or Video recording
(statement)
**Seizure Date:** 08/10/2021
**Description:**  media drive containing audio captured during interview
with Griffin
**Address:**  , TX
**By:**  Daron Parker

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 08/10/2021 0000 |

**S3.P1 Evidence:**  Witness Statement Audio and/or Video recording
(statement)
**Seizure Date:** 08/20/2021
**Description:**  media drive containing audio captured during interview
with Guynes
**Address:**  , TX
**By:**  Daron Parker

**Disposition:**

| Status: | Requested/Authorized By: | Date/Time: |
|---|---|---|
| No Final Disposition Required | | 08/20/2021 0000 |

## ATTACHMENT NAME(S)

*END OF REPORT*

*DPS SENSITIVE*