# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| OCTEVIA WAGNER, et al. | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:23-CV-02886 |
| | § | |
| HARRIS COUNTY, TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

---

## PLAINTIFF RYAN TWEDT'S RESPONSE TO HARRIS COUNTY'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

**Paul A. Grinke**
State Bar No. 24032255
paul@bencrump.com
**Aaron Dekle**
State Bar No. 24100961
aaron@bencrump.com
BEN CRUMP LAW, PLLC
5 Cowboys Way, Ste. 300
Frisco, Texas 75034
(972) 942-0494 – Office
(800) 770-3444 – Facsimile

**Carl L. Evans**
State Bar No. 24056989
cevans@mccathernlaw.com
**Jordan A. Carter**
State Bar No. 24116174
jcarter@mccathernlaw.com
**Noah McCathern**
State Bar No.24118035
nmcathern@mccathernlaw.com
MCCATHERN PLLC
3710 Rawlins St., Suite 1600
Dallas, Texas 75219
(214) 532-2060 – Office

**Thad D. Spalding**
State Bar No. 00791708
tspalding@dpslawgroup.com
**Shelby J. White**
State Bar No. 24084086
swhite@dpslawgroup.com
DURHAM, PITTARD &
SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(214) 946-8000 - Office
(214) 946-8433 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iii

TABLE OF EXHIBITS ............................................................................................................... 1

I.     Introduction ..................................................................................................... 7

II.    Evidence & Exhibits ....................................................................................... 8

III.   Factual Background ........................................................................................ 9

IV.   Argument and Authorities ............................................................................ 12

     A.    Summary judgment standard ......................................................... 12

     B.    A genuine issue of material fact exists regarding whether Harris County violated Twedt's constitutional rights to adequate medical care and to be free from excessive force ......................... 13

           1.    A genuine issue of material fact exists regarding Twedt's conditions of confinement claim as it relates to his inadequate medical care ............................................... 16

           2.    A genuine issue of material fact exists regarding whether the use of excessive force against Twedt establishes a constitutional violation .................................... 19

     C.    There is sufficient evidence of a failure to train and failure to supervise claims ......................................................................... 25

     D.    Conditions of confinement and a failure to train or supervise can establish *Monell* liability even if there is no independent constitutional violation by an employee ....................................... 30

V.    Conclusion & Prayer ..................................................................................... 31

CERTIFICATE OF SERVICE ................................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

*Anderson v. City of Atlanta,*
    778 F.2d 678 (11th Cir. 1985) ........................................................................31

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................................................12

*Arrington-Bey v. City of Bedford Heights,*
    858 F.3d 988 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018)................30

*Barrett v. Orange County Human Rights Com'n,*
    194 F.3d 341 (2d Cir. 1999) ..........................................................................31

*Bell v. Wolfish,*
    441 U.S. 520 (1979)........................................................................................19

*Blackmore v. Kalamazoo County,*
    390 F.3d 890 (6th Cir. 2004) ..........................................................................31

*Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,*
    520 U.S. 397 (1997)........................................................................................26

*Bourne v. Gunnels,*
    921 F.3d 484 (5th Cir. 2019) ..........................................................................19

*Cadena v. El Paso County,*
    946 F.3d 717 (5th Cir. 2020) ..........................................................................22

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................................12

*Chew v. Gates,*
    27 F.3d 1432 (9th Cir. 1994) ..........................................................................30

*City of Canton, Ohio v. Harris,*
    489 U.S. 378 (1989)...................................................................................25, 27

*Cope v. Coleman Cnty.,*
    No. 23-10414, 2024 U.S. App. LEXIS 15549 (5th Cir. June 26, 2024)..............15

*Doe v. Taylor Indep. Sch. Dist.,*
    15 F.3d 443 (5th Cir. 1994) (en banc)............................................................29

*Duvall v. Dallas Cnty., Tex.,*
631 F.3d 203 (5th Cir. 2011) ............................................................15

*Dyer v. Houston,*
964 F.3d 374 (5th Cir. 2020) ............................................................13

*Fairchild v. Coryell Cnty., Tex.,*
40 F.4th 359 (5th Cir. 2022) ..........................................20, 22, 23, 24

*Garcia v. Salt Lake County,*
768 F.2d 303 (10th Cir. 1985) ..........................................................31

*Garner v. Memphis Police Dep't,*
8 F.3d 358 (6th Cir. 1993) ................................................................30

*Garza v. City of Donna,*
922 F.3d 626 (5th Cir. 2019) ..................................................14, 22, 26

*Gomez v. Galman,*
18 F.4th 769 (5th Cir. 2021) (per curiam) ........................................14

*Gros v. City of Grand Prairie, Tex.,*
34 F. App'x. 150 (5th Cir. 2002) (per curiam) ................................26

*Hare v. City of Corinth, Miss.,*
74 F.3d 633 (5th Cir. 1996) ........................................................14, 16

*Haverda v. Hays County,*
723 F.3d 586 (5th Cir. 2013) ......................................................12, 13

*Hovis v. Wichita Cnty., Tex.,*
No. 3:23-CV-2220-L, 2024 WL 3836559 (N.D. Tex. July 31, 2024)..................................31

*Joseph v. Bartlett,*
981 F.3d 319 (5th Cir. 2020)..............................................................24

*Kingsley v. Hendrickson,*
576 U.S. 389 (2015)........................................................... *passim*

*Lee v. Valdez,*
No. CIV.A.3:07-CV-1298-D, 2009 WL 1406244 (N.D. Tex. May 20, 2009) ....................17

*Monell v. Dep't of Soc. Servs. of the City of New York,*
436 U.S. 658 (1978)..................................................................................13, 14, 30, 31

*Morgan v. Fairfield Cty., Ohio,*
903 F.3d 553 (6th Cir. 2019) ...............................................................................30

*Newcomb v. City of Troy,*
719 F. Supp. 1408 (E.D. Mich. 1989) ..................................................................30

*Owen v. City of Independence,*
445 U.S. 622 (1980)..............................................................................................30

*Pembaur v. City of Cincinnati,*
475 U.S. 469 (1986)..............................................................................................30

*Rankin v. Klevenhagen,*
5 F.3d 103 (5th Cir. 1993) ....................................................................................20

*Roberts v. City of Shreveport,*
397 F.3d 287 (5th Cir. 2005) ................................................................................26

*Rogers v. Boatright,*
709 F.3d 403 (5th Cir. 2013) ................................................................................17

*Sanders–Burns v. City of Plano,*
594 F.3d 366 (5th Cir. 2010) ................................................................................26

*Scott v. Moore,*
114 F.3d 51 (5th Cir. 1997) ..................................................................................15

*Shepherd v. Dallas Cnty.,*
591 F.3d 445 (5th Cir. 2009) ...........................................................................15, 16

*Sims v. City of Jasper, Tex.,*
543 F. Supp. 3d 428 (E.D. Tex. 2021) .............................................................19, 31

*Snow v. City of El Paso, Tex.,*
501 F. Supp. 2d 826 (W.D. Tex. 2006) .................................................................26

*Tennyson v. Villarreal,*
801 Fed. Appx. 295 (5th Cir. 2020), *as revised* (Apr. 16, 2020)..............20, 21, 22

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Thomas v. Cook Cnty. Sheriff's Dep't,*
  604 F.3d 293 (7th Cir. 2010) ...........................................................................31

*Triple Tee Golf, Inc. v. Nike, Inc.,*
  485 F.3d 253 (5th Cir. 2007) ...........................................................................13

*Valencia v. Wiggins,*
  981 F.2d 1440 (5th Cir. 1993) ..........................................................................20

*Walker v. Sears, Roebuck & Co.,*
  853 F.2d 355 (5th Cir. 1988) ...........................................................................12

*Webster v. City of Houston,*
  735 F.2d 838 (5th Cir. 1984) ...........................................................................14

*West v. Atkins,*
  487 U.S. 42 (1988) ..........................................................................................14

*World Wide St. Preachers Fellowship v. Town of Columbia,*
  591 F.3d 747 (5th Cir. 2009) ...........................................................................25

*Zarnow v. City of Wichita Falls, Tex.,*
  614 F.3d 161 (5th Cir. 2010) ...........................................................................27

## Other Authorities

U.S. Const. amend XIV ........................................................................................13

Fed. R. Civ. P. 56(a) ...........................................................................................12

# TABLE OF EXHIBITS

Plaintiffs are providing an Omnibus Exhibit List due to the overlapping and intertwined nature of the claims and evidence for the various Motions for Summary Judgment. Plaintiffs incorporate each of these exhibits into the body of the Response as if fully set forth therein. Due to the exhibit size, Plaintiffs will attach an exhibit cover sheet with a link to the exhibit on a share file or similar device that will allow the Court and the parties to access the exhibit.

General

1. DOJ 2009 Report (Wagner 79-102)

2. TCJS Report May 2013-2017 (Wagner 103-183)

3. TCJS Report Dec 2017 (Wagner 184-186)

4. TCJS Report Aug 2018 (Wagner 187-189)

5. TCJS Report Dec 2020 (Wagner 201-207)

6. TCJS Report April 2021 (Wagner 208-210)

7. TCJS Report Nov 2021 (Wagner 211-217)

8. TCJS Report Sept. 2022 (Wagner 224-228)

9. TCJS Report Dec 2022 (Wagner 229-231)

10. TCJS Report April 2023 (Wagner 237-239)

11. TCJS Report Feb. 2023 (Wagner 240-248)

12. TCJS Report Aug. 23, 2023 (Wagner 249-251)

13. TCJS Report Aug 2023 (Wagner 252-261)

14. TCJS Report Feb 2024 (Wagner 263-268)

15. TCJS Report May 23 Remedial Order (Wagner 3246-3247)

16. TCJS Report May 2024 Amend Remedial Order (Wagner 3248-3250)

17. TCJS Report Jan. 2025

18. Harris County Comm. To TCJS Death In Custody (Observation)

19. TCJS Report May 6, 2025

20. TCJS Harris County Second Remedial Order

21. TCJS Report June 2025

22. Harris County's Updated 2024 UOF Policy

23. Eric Morales Personnel File and Investigation

24. KHOU Struck Documentary (Video)

25. KHOU Struck Article

26. TCJS SIR Total Count Files (Compiled)

27. KHOU UOF Incident Report Examples (Compiled)

28. SIR UOF Examples (Compiled)

29. SIR Assault Examples (Compiled)

30. KHOU Assault Examples (Compiled)

31. John Coote Assault Video

32. John Coote Assault Incident Report

33. Evan Lee Assault Texas Rangers Report

34. Zachary Zepeda Assault Video

35. Zachary Zepeda Assault Incident Report

36. Michael Griego Texas Ranger Report and Autopsy Report (Compiled)

37. Kenneth Richard Assault Incident Report

38. Jaquez Moore Assault Incident Report

39. Fred Harris Assault Video

40. Fred Harris Assault Incident Report

41. Rory Ward Assault Investigation Summary and Autopsy Report (Compiled)

42. Kareem Jefferson Assault Incident Report

43. Rory Ward Observation Round Videos Examples

44. Matthew Shelton Observation Round Videos Examples

45. Jacoby Pillow UOF Video

46. Jeremy Garrison UOF Videos and Incident Reports

47. John Coote UOF Video

48. Lenard Vare CV

49. Dr. David Mathis CV

50. Dr. Victor Weedn CV

51. Dr. Vinneth Carvalho CV

52. Officer Mark Garcia Deposition Transcript

53. Officer Mark Garcia Pews Report

54. Officer Mark Garcia Incident History Report

55. Officer Maxim Herman Deposition Transcript

56. Officer Maxim Herman Pews Report

57. Officer Maxim Herman Incident History Report

58. Officer Jin DeGuzman Deposition Transcript

59. Officer Jin DeGuzman Pews Report

60. Officer Jin DeGuzman Incident History Report

Lockhart

61. Lenard Vare Expert Report

62. Dr. David Mathis Expert Report

63. UOF Incident Report (Lockhart)

64. IAD Grievance (Lockhart)

65. Surveillance Footage Inside Pod (Lockhart)

66. Surveillance Footage Outside Pod UOF (Lockhart)

67. Surveillance Footage Entering Hallway (Lockhart)

68. Surveillance Footage Running Down Hallway (Lockhart)

69. Officer Alex Conrad Incident History Report

70. IAD Investigation Officer Alex Conrad

71. Officer Alex Conrad Observation Reprimand

72. Officer Alex Conrad PEWS and IAD Investigation

73. Officer Alex Conrad PEWS Report

74. Harris County Operational Records (Lockhart)

75. Officer Twitty IAD Investigation Report

76. Officer Twitty First Pews Report Notification

77. Officer Twitty Second Pews Report Notification

78. Officer Twitty PEWS Report

79. Officer Twitty Incident History Report

80. Officer Conrad Deposition Transcript

81. Officer Patrick Allen Deposition Transcript

82. Bernard Lockhart Medical Records

83. Officer Bruce Hayes Deposition Transcript

Radcliffe

84. Lenard Vare Expert Report

85. Dr. David Mathis Expert Report

86. Radcliffe Assault Video

87. Radcliffe Incident Report

88. Radcliffe Photo

89. Radcliffe Jail Medical Records

90. Officer Suzana Reskovic Incident Case History

91. Officer Chin Chiu Incident Case History

92. Antonio Radcliffe Deposition Transcript

93. Officer Suzana Reskovic Deposition Transcript

Morelle

94. Lenard Vare's Expert Report

95. Morelle's medical records and incident report

96. Morelle's Deposition Transcript

97. Officer Calyn Cutler Deposition Transcript

Zachery Johnson

98. Lenard Vare Expert Report

99. Dr. Carvalho Expert Report

100.      Zachery Johnson Incident Report and Jail Records

101.      Zachery Johnson Assault Video Footage

102.      Zachery Johnson Operation Records

103.      Zachery Johnson Clinic Records and medical records

Twedt

104.      Lenard Vare Expert Report

105.      Twedt UOF Incident Video Footage

106.      Twedt UOF Incident Report

107.      Twedt Deposition Transcript

108.      Officer Jimmy Poole Pews Report

109.      Officer Jimmy Poole Incident History Report

110.      Officer Andrew Pena Pews Report

111.      Officer Andrew Pena Incident History Report

112.      Officer Jon Vickers-Gilbreath Pews Report

113.      Officer Jon Vickers-Gilbreath Incident History Report

114.      Officer Tyree Simpson Pews Report

115.      Officer Tyree Simpson Incident History Report

116.      Officer Christopher Ortega Pews Report

117.      Officer Christopher Ortega Incident History Report

118.      Officer Thomas Muniz Pews Report

119.    Officer Thomas Muniz Incident History Report

120.    Twedt Medical Records

Kevin Smith

121.    Lenard Vare Expert Report

122.    Dr. Mathis Expert Report

123.    Dr. Weedn Expert Report

124.    Kevin Smith Incident Video Footage

125.    Kevin Smith Observation Rounds Video Footage

126.    Kevin Smith Autopsy Report

127.    Officer Wong Deposition Transcript

128.    Kevin Smith Investigation Summary and Incident Report

129.    Kevin Smith Medical Records

130.    Harris County Observation Records

131.    Harris County Operational Records

<u>**PLAINTIFF RYAN TWEDT'S RESPONSE TO HARRIS COUNTY'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**</u>

COMES NOW, Ryan Twedt in the above-referenced cause, and files this, his response to Defendant Harris County's Motion for Summary Judgment and Brief in Support [Doc. 255] and would show the Court as follows:

## I.  Introduction

On February 15, 2022, Ryan Twedt was booked into Harris County Jail. During his medical intake, Harris County personnel noted that he was diagnosed with Bipolar I disorder and post-traumatic stress disorder. To maintain control of his faculties, Twedt needed to receive certain medications twice a day. Harris County personnel repeatedly failed to ensure that he received both doses of the necessary medication which is consistent with issues identified by TCJS. The day before the incident, the Jail failed to provide four of Twedt's medications affecting his mental and physical condition.

After another incident, Twedt was taken to a holding cell by several officers who slammed him into a wall before placing him in the cell. Twedt's repeated requests for medical care were ignored. To get medical attention, Twedt tried covering the camera in the cell with a towel. In response, six officers – acting consistently with Jail policies and training – ignored his medical condition and threatened to use force if he covered the camera again. Because he still needed medical care, Twedt tried to cover the camera again. The officers returned, cleared the cell of other detainees, tackled Twedt and punched him in the head twelve times. Twedt, calmly sitting on the bench and attempting to request medical care, posed no threat. Twedt sustained bruised ribs, cuts to his face,

and a broken finger. Twedt's broken finger now requires surgery because Harris County failed to properly treat the wound. Twedt also suffers from short-term memory loss and lower cognitive function because of this altercation.

In its summary judgment motion, Harris County presents the Court with three primary arguments: (1) it could not have violated Twedt's constitutional right as a detainee to adequate medical care because Twedt would not have been receiving medicine but for his incarceration, and Harris County never outright refused to provide Twedt his prescription medicine; (2) the officers involved in Twedt's beating did not use excessive force; and (3) Twedt's failure to train and supervise claims must fail because (a) Twedt did not identify the defective training, the officers who were not supervised, which supervisor failed to supervise, and (b) Twedt failed to connect the allegedly defective training and supervision to a constitutional violation. However, the record evidence, especially when viewed—as this Court must—in the light most favorable to Twedt, raises a genuine issue of material fact regarding each of Twedt's claims. The Court should deny Harris County's motion for summary judgment.[1]

## II.    Evidence & Exhibits

Discovery in this case is ongoing. This case also contains unique circumstances impeding discovery such as: limited access to key witnesses, limited communications

---

[1] Defendant makes several arguments attacking the pleadings. At the time the Second Amended Complaint was filed, discovery was minimal and Plaintiffs did not have access to all of the information since revealed. Plaintiffs anticipate seeking leave to amend the pleadings to conform to the discovery to date, but due to the size of the complaint and to save the Court and the Parties' resources, anticipate filing one omnibus amended complaint once discovery is complete rather than a new one each time new evidence is disclosed.

with specific parties, and ongoing criminal and administrative investigations. Plaintiffs' exhibits and evidence, identified in the Table of Exhibits demonstrate a fact issue on all points raised by Defendant's arguments. Plaintiffs incorporate the evidence above as if fully stated herein. Nonetheless, Plaintiffs anticipate more probative evidence will be revealed by the upcoming inspection of the jail, the deposition of Sheriff Gonzalez, additional officer depositions, and additional Jail records, and will seek leave to supplement the records as appropriate.

### III.  Factual Background

On February 15, 2022, Plaintiff Ryan Twedt was booked in the Harris County Jail with known mental health diagnoses and medications. Ex. 104, 107, 120. Although he was prescribed four different medications, medical records show he did not receive them on a regular basis. Ex. 120 at 31-147.  He was required to take two of his medications twice daily, and the other two each evening. *Id.* Missed doses affect his ability to act and think straight. Although medical records claim Twedt "no show[ed]" several doses, they do not clarify what that means or why the medical staff did not ensure that he received his medications. According to Twedt's testimony, medications were passed out at the cell door, meaning the staff simply had to ensure that he picked up his medicine. Ex. 107. As Twedt testified, he occasionally missed medication because he was sleeping. Because the restrictions of incarceration strip detainees of their ability to fend for themselves, Jail staff must ensure that each detainee needing medication receives it, even if it requires waking the detainee. TCJS and the DOJ cited Harris County for failing to ensure detainees receive their medication and failing to explain why. Exs. 1, 5, 8, 9, 11, 14, 19-21. TCJS specifically

cited Harris County for documenting a missed medical visit as a "no show" when there was no documentation to explain it. Ex. 11. Twedt testified that medication passes only occurred once a day even though he needed medications twice a day, likely indicating that the jail was falsifying records. Ex. 107, 120.

The impact of missing medications is most notable in the circumstances preceding the incident involving Twedt. Records show that Twedt only received one dose of his twice-daily medications on April 8, 2022. Ex. 120 at 50, 90-91. The records do not show that the Jail attempted to pass out any of Twedt's medicines that evening. *Id.* at 50, 90-91, 122, 143. Because he did not receive his April 8 medications, Twedt was involved in an altercation with another detainee. Ex. 107. Officers moved Twedt to a holding cell. *Id.* En route, Twedt requested medical attention. In response, the officers slammed him against the wall before placing him in the cell, an incident the officers never reported. *Id.* While in the holding cell, Twedt used the intercom to ask for medical care. *Id.*; Ex. 105. The guards ignored him. Ex. 107. Because he needed medical care and was being ignored, Twedt used paper towels to try to cover up the cell's security camera. *Id.*; Ex. 105. Every time he tried to cover the cameras, the towels fell. Ex. 105.

In response, six guards entered the cell and instead of recognizing Twedt's need for medical attention, threatened him. Ex. 104, 105, 107. Still ignored and needing medical attention, Twedt covered the camera again. *Id.* The towel fell. *Id.* Despite his odd behavior, known mental condition, and lack of medicine, the officers deliberately ignored his mental state and failed to call for medical attention. *Id.*, Ex. 106. After trying to cover the cameras, Twedt calmly sat on the bench, waiting for help. Ex. 105. Twedt posed no

threat, was not physically resisting the officers, and was not attempting to injure himself or anyone else. Ex. 104, 105. The same officers re-entered the cell and removed the other detainees. *Id.* Because of the amount of time the officers needed to plan their course of action, this was a planned use of force. Ex. 104. The officers should have called a supervisor and a member of a crisis intervention team. *Id.* The officers' failure to do so shows that their actions were punishment and retaliation for Twedt's conduct. *Id.*

The video makes clear Twedt, at most, was only passively resisting by sitting on the bench talking with the officers when they entered. Ex. 104, 105. Unprovoked and without warning, the officers rushed and assaulted Twedt, slammed him against the wall, dragged him to the ground, sat on top of him, punched him in the head and body multiple times, and wrenched his hand, breaking his little finger while they restrained him. *Id.*, Ex. 107. Officer Poole punched Twedt at least a dozen times in the head and face even with the other officers sitting on top of him. Ex. 104, 105. The officers falsified their reports by claiming that they told Twedt to turn around and face the wall when the video clearly shows that they acted before there was time to issue instructions or warnings. Ex. 104, 105. The officers also falsely reported that Poole only punched Twedt twice. Ex. 104, 105, 106. Twedt's only response was to protect his head and cover vulnerable areas of his body – a reasonable and automatic response in the face of an ambush. Once he was restrained and placed back on the bench, one officer kicked Twedt's leg as they were leaving the room. Ex. 104, 105. The officers' actions caused Twedt's extensive injuries.

Then, instead of providing him medical care, the officers abandoned a restrained Twedt in the cell. Ex. 105. This is consistent with their pattern of refusing medical care.

When he was eventually taken to the clinic, the involved officers were with him, thus preventing him from providing an accurate description of the incident to clinic staff, and preventing adequate care for his injuries. Ex. 107; 99. Having the involved officers escort Twedt to the clinic is against policy, but is a by-product of understaffing. *See* Ex. 55 at 96. Following the incident, Twedt did not receive sufficient medical care. Ex. 107, 120. Likewise, records indicate that he still did not consistently receive most of his medications and the medical records do not address this inconsistency. Ex. 120. Because of the lack of medical care and the excessive force, Plaintiff still suffers mental and physical injuries. Ex. 107.

## IV.    Argument and Authorities

### A.    Summary judgment standard.

The primary purpose of summary judgment is to dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Granting a motion for summary judgment is only proper after the movant presents competent evidence showing "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see also Catrett*, 477 U.S. at 323; *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013). The Court must resolve all reasonable doubts, and draw all reasonable inferences, in favor of the nonmovant—*i.e.*, Mr. Twedt. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). If "reasonable minds could differ" on "the import of the evidence," the Court must deny summary judgment. *Anderson*, 477 U.S. at 250. The movant bears the burden of identifying for the Court the portions of the record

allegedly demonstrating the absence of a genuine issue of material fact. *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). A fact is material if its resolution could affect the outcome of the claims at issue. *See Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). At the summary judgment stage, courts cannot make credibility determinations or weigh the evidence. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013).

Harris County's motion fails to address all of Twedt's claims and is thus a motion for partial summary judgment. The County only alleges that there can be no *Monell* claim without an underlying constitutional violation, but it does not provide any evidence negating or disproving a pattern of misconduct. Moreover, the County does not move for summary judgment on Twedt's claim that he was denied proper medical treatment *after* he was attacked by the detention officers – it only addresses his claim that he did not receive timely and appropriate doses of his medication *before* he was attacked.

**B.    A genuine issue of material fact exists regarding whether Harris County violated Twedt's constitutional rights to adequate medical care and to be free from excessive force.**

Twedt claims that his Fourteenth Amendment Constitutional right to be free from excessive force and to receive adequate medical care while detained by a state actor have been violated by the conditions of his confinement in the Harris County Jail and by Harris County's failure to properly train and supervise its detention personnel. Doc. 122 at 51-53, 62-66, 194-196, 231-232. Harris County's known and pervasive jail policies fostered the circumstances leading to Twedt's injuries. *Id*. Consequently, Twedt has asserted *Monell* claims against Harris County under § 1983.

To state a valid § 1983 claim, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam). Harris County's motion for summary judgment attacks the first of these elements—*i.e.*, whether the conduct of its personnel (condition) violated Twedt's constitutional rights. It did. The City is liable "if it . . . causes a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). Ordinarily, official municipal policies are contained in duly promulgated policy statements, ordinances, or regulations. *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984). But a policy may also be evidenced by a custom, even if it has not received formal approval. *Id*. Therefore, municipal liability under Section 1983 requires proof of three elements: (1) a policy; (2) promulgated by a final policymaker; (3) that is a moving force behind the violation of the constitutional right. *Monell*, 436 U.S. at 694.

For *Monell* liability for constitutional violations against detainees, the cause of the constitutional violation is classified as either a condition of confinement or as an episodic act or omission. *Garza v. City of Donna,* 922 F.3d 626, 632 (5th Cir. 2019). Conditions of confinement claims involve "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644 (5th Cir. 1996). A condition of confinement "is usually the manifestation of an explicit policy or restriction," but it can be "an unstated or de facto policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or

pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare*, 74 F.3d at 645). For claims based on a particular act or omission of one or more officials, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

In a conditions-of-confinement claim, a plaintiff need not show deliberate indifference by the municipality. *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011). The plaintiff need only show that the unconstitutional conditions have no reasonable relationship to a legitimate governmental interest. *Id*. Defendant misstates the law that when an individual actor is involved, the case cannot be a condition of confinement. Doc. 255 at 8-9. This Court in its Order on the Motion to Dismiss already rejected this argument and that decision was subsequently reinforced by the Fifth Circuit. Doc. 51 at 17; *Cope v. Coleman Cnty.*, No. 23-10414, 2024 U.S. App. LEXIS 15549, at *12, 22 n.14 (5th Cir. June 26, 2024) ("One fundamental problem with that argument is that it assumes an otherwise valid conditions claim—i.e., one alleging that the conditions alone are sufficient to cause the harm—cannot survive if an individual's actions also contributed to the alleged harm. This court has never said that").

Defendant argues that overcrowding and understaffing cannot be an unconstitutional condition of confinement. Doc. 255 at 9. Their own argument and cited case cut against them as overcrowding and understaffing can be an unconstitutional condition of confinement and the case cited only requires causation between the

condition and the injury. *See Shepherd v. Dallas Cnty.*, 591 F.3d 445, 453 (5th Cir. 2009) (holding that understaffing was a condition of confinement). The Court also rejected this argument in the Order on the Motion to Dismiss finding that understaffing and overcrowding is a condition and policy. Doc. 51 at 24-26.

1. **A genuine issue of material fact exists regarding Twedt's conditions of confinement claim as it relates to his inadequate medical care.**

When the state incarcerates an individual, either as punishment after criminal conviction, or as a pre-trial detainee, it restricts his ability to fend for himself, thus entitling him to state provision of certain basic human needs regarding medical care and safety. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 638–39 (5th Cir. 1996). "[P]retrial detainees are entitled to protection from harm as well as needed medical care . . . ." *Id.* at 641.

Harris County appears to argue that Twedt's condition of confinement claim regarding inadequate medical treatment must fail because Twedt would not have received any Bipolar medication were he not incarcerated. *See* Doc. 255, at 10–11.[2] Harris County seems to contend that the fact that its personnel repeatedly failed to administer necessary Bipolar medication to Twedt cannot possibly amount to a constitutional injury. *See* Doc. 255, at 1. In other words, Harris County implies that Twedt should just feel grateful to have received *any* medication at all. *See* Doc. 255, at 10–11. However, Twedt's access to medicine outside of his confinement has no relevance to the standard that Harris

---

[2] The County does not address Twedt's second claim regarding medical care – that he did not receive adequate medical care *after* he was beaten by the detention officers, thus leading to the improper healing of his finger. *See* Doc. 20 at ¶242.

County is held to in providing medical care for its detainees. As a Harris County detainee, Twedt had a right to *adequate* medical care while detained. *Rogers v. Boatright*, 709 F.3d 403 (5th Cir. 2013) (citing *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006)). An inmate's right to adequate medical care is violated when jail staff engage in conduct that "evince[s] a wanton disregard for serious medical needs." *Id* at 410 (quoting *Easter*, 467 F.3d at 463).

In *Lee v. Valdez*, Sims, a woman suffering from paranoid schizophrenia, was awaiting trial at the Dallas Jail. *Lee v. Valdez*, No. CIV.A.3:07-CV-1298-D, 2009 WL 1406244, at *1–2 (N.D. Tex. May 20, 2009). Despite knowledge of her diagnosis, the jail placed her in the general population section, where she suffered a seizure. *Id.* at *2. After asking for the nurse, Sims collapsed on her bed and was unable to intelligibly respond to guard's verbal prompts. *Id.* Sims did not receive medical care and died a few hours later. *Id.* The Dallas Jail argued there was no evidence that Sims received inadequate medical care because of the conditions of her confinement. *Id.* at *7. In response, Simm's family submitted DOJ and HMA reports concluding that the jail violated inmates' constitutional rights to medical care. *Id.* at *9. Thus, a fact issue existed regarding whether Sims was deprived of adequate medical care due to the conditions of her confinement. *Id.*

Here, the evidence shows that Harris County knew of Twedt's diagnoses when he was booked into the Jail. Doc. 255-8, at 1. Despite these diagnoses and his known risks and mental health needs, Twedt was misclassified and placed with the Jail's general population, which placed him at an increased risk of harm. Ex. 104. Despite knowledge that Twedt needed to receive two of his medications twice a day and two other medications each evening to maintain control of his mental faculties, Harris County

personnel repeatedly failed to ensure he received both doses. Ex. 120, Ex. 107 at 18:15–17. Twedt would often receive one dose a day for the twice daily medications and missed every other dose for his nightly medications. Ex. 120. The Jail failed to ensure that he received his medication or properly document that he took the medication, which is consistent with its longstanding failure to provide medical care to detainees. Ex. 1, 5, 8, 11, 14, 19-21, 107, 120. The Jail has no excuse for only conducting one medical pass per day and for failing to ensure that the detainees needing medications actually received them. *Id.* This is an ongoing issue and the Texas Attorney General's Office issued a Second Remedial Order ordering Harris County to revise their policies and training to ensure that medications are being passed and taken by the detainees. Ex. 20.

The records show that Twedt was not offered his evening medications on April 8, explaining his behavior and need for medical care. Ex. 120 at 50, 90-91, 122, 143. Prior to April 8, several medications were missed with no explanation. Ex. 120. Defendant implies that as long as the medications are made available there can be no lack of medical care claim. This is not true. As shown, Harris County failed to ensure that detainees receive their medications as is its obligation regarding individuals within its custody. The evidence does not show that Twedt received proper follow-up visits to evaluate medication efficacy or dosage adjustments. Ex. 120. On the day of the incident, Twedt's actions indicated that he was suffering a mental episode and needed help; however, instead of checking to see if he had received his medications or if he needed different or more medications, the officers assaulted him, placed him in the holding cell, and ignored his requests for medical care. Exs. 104, 105, 107. By escalating the situation and using force

against a detainee in need of medical care, the officers were deliberately indifferent to his medical needs in accordance with the conditions and policies of the Harris County Jail. These same deficient policies and procedures have been the subject of reports issued by the DOJ and the Texas Commission on Jail Standards. Ex. 1, 5, 8, 11, 14, 19-21, 107. As in *Sims*, this evidence raises a genuine issue of material fact regarding whether Harris County deprived Twedt of adequate medical care due to the conditions of his confinement. Consequently, summary judgment is improper.

## 2. A genuine issue of material fact exists regarding whether the use of excessive force against Twedt establishes a constitutional violation.

Harris County also argues that this Court "must find that Twedt was not subjected to an unreasonable use of force." Doc. 255, at 13. A fact issue exists on this matter as well. Jail administrators do have a legitimate interest in managing detention facilities, and reasonable use of force can be used to see to that interest. *Bell v. Wolfish*, 441 U.S. 520, 540 (1979). However, "[t]he amount of force that is constitutionally permissible . . . must be judged by the context in which that force is deployed." *Bourne v. Gunnels*, 921 F.3d 484, 491 (5th Cir. 2019) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1998)). *Kingsley v. Hendrickson,* 576 U.S. 389, 396–97 (2015) guides the excessive force analysis, making clear that the following factors bear on the reasonableness inquiry: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (4) the threat reasonably perceived by the officer; and (5) whether the plaintiff was actively resisting. Harris County's own record evidence

raises a fact issue as to whether the force deployed against Twedt was reasonable under the circumstances.

In *Fairchild v. Coryell Cnty., Tex.*, 40 F.4th 359, 366 (5th Cir. 2022), the Fifth Circuit analyzed the *Kingsley* factors in the context of a pretrial detainee who offered only passive resistance - nearly identical to Twedt. In that case, the detainee continued tapping on her cell door after jailers asked her to stop. *Id. a*t 364. In response, the jailers pepper sprayed her through the door, entered her cell, pepper sprayed her again, and threw her to the floor. *Id.* The Fifth Circuit held that the detainee's initial passive resistance did not justify using force against her. *Id.* at 366*; see also Valencia v. Wiggins*, 981 F.2d 1440, 1443, 1447 (5th Cir. 1993) (holding that hitting detainee's head against the wall and applying chokehold was unreasonable response to detainee's passive refusal to leave his cell); *Rankin v. Klevenhagen*, 5 F.3d 103, 105, 108 (5th Cir. 1993) (finding a constitutional violation when guards "slammed" inmate to the floor, handcuffed him, and "stomped" on him in response to inmate's shouting at female prisoners). The Court held that punching the detainee and applying force on her body while restrained was excessive prohibiting a motion for summary judgment. *Id.* at 366–67. The Fifth Circuit found that the detainee refusing to comply with the officer's command, and even turning from the officer, was merely passive resistance that did not justify any use of force. *Id.* at 366 n.6.

Harris County cites *Tennyson v. Villareal* to support its argument that the beating administered to Twedt was not excessive, and that this Court should find the *Kinglsey* factors weigh in favor of Harris County. Doc. 255, at 13–14. However, *Tennyson* is easily distinguishable because there jail staff were "attempting to diffuse a disruptive situation

*involving at least eight non-compliant detainees.*" *Tennyson v. Villarreal*, 801 Fed. Appx. 295 (5th Cir. 2020), *as revised* (Apr. 16, 2020) (emphasis added). In *Tennyson*, the presence of seven other disruptive inmates was an added circumstance compelling the officers to escalate the level of force, to avoid widespread non-compliance. Moreover, the facts available to the Court to make the reasonableness determination was sparse. *Id.*

Defendant's analysis misstates the facts and asks the Court to ignore facts and to view them in the light most favorable to Defendant. When the evidence is analyzed properly, the *Kingsley* factors weigh in favor of Plaintiff. Here, after days of only receiving some of his medications - and without any medications the prior evening - Twedt was moved to a different cell after an altercation with another inmate, slammed into a wall, and roughed up by several officers before being placed in the holding cell. Ex. 104, 107, 120. Due to his mental disturbance and injuries from the use of force, Twedt asked for medical care. Ex. 107. The officers refused. *Id.* Once inside the holding cell, Twedt again sought medical help and was ignored *Id.* To get the officer's attention, Twedt covered the camera with wet towels that soon fell. Ex. 105, 107. Instead of responding to Twedt's apparent medical needs, officers came into the cell and threatened him with force . Ex. 104, 105, 107. Twedt never threatened the officers or resisted any of their commands. *Id.* Because the officers refused to listen to him, Twedt again unsuccessfully tried to cover the camera. *Id.*

Although Twedt's actions illustrated an obvious need for medical help and that he was not a threat - as confirmed by Plaintiff's correctional expert, Lenard Vare - the officers never called for medical assistance, never talked to a supervisor, and never attempted to

de-escalate the situation. Ex. 104, 105. Instead, despite the lack of threat from Twedt, the officers made good on their threats, cleared the room, and viciously attacked Twedt. Ex. 104, 105, 107. The video contradicts the officers' reports regarding the directions allegedly given to Twedt and the number of punches to Plaintiff's head. Ex. 104, 105, 106. The officers escalated the situation – not Twedt. Ex. 104, 105.

Unlike in *Tennyson*, Twedt was isolated when the guards used force. Ex. 104, 105. There was no danger that Twedt's conduct would incite his fellow inmates to disobedience, which was the justification for force in *Tennyson*. Further, as demonstrated Harris County's own Summary Judgment evidence, Twedt was seated and made no move towards the officers when they reentered his cell. *See* Doc. 255, at 5. Like the inmate in *Fairchild*, Twedt's resistance was, at most, passive. Twedt was beaten not as a form of inmate control, but as punishment for covering the security cameras and for allegedly not complying with orders. Because pretrial detainees have not been convicted of a crime, conditions of confinement that "amount to punishment" are unconstitutional. *Cadena v. El Paso County*, 946 F.3d 717, 727 (5th Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Punishment will be inferred "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless." *Garza*, 922 F.3d at 632 (quoting *Bell*, 441 U.S. at 539). Here, no use of force was necessary to subdue or control Twedt. Therefore, the use of force as punishment was unconstitutional.

As a result of the beating he received during this altercation, Twedt suffered a broken finger that now requires surgery, bruised ribs, and cuts to his head. Ex. 107, 120.

Twedt has also suffered long-term cognitive effects because of this altercation and now endures problems with decreased functionality and short-term memory loss. *Id.*

The *Kingsley* factors weigh in Plaintiff's favor as the evidence shows the force was excessive. Defendant's main argument about the need for the use of force was the officers' "knowledge" of a prior violent incident that occurred earlier in the day. Doc. 255 at 12. This argument is irrelevant. As stated in *Fairchild*, the use of force must relate to the threat actually present, and previous incidents are irrelevant for determining the need for force. 40 F.4th at 365-66. When the officers entered the cell, they observed Twedt's calm demeanor. Ex. 104, 105. Twedt was not a threat to himself, the officers, or the other detainees. Likewise, Twedt never made a threatening move or active resistance when the officers ambushed him. Rushing passively-resisting detainees is an approved Harris County policy, practice, and procedure and routinely taught in training. Ex. 55 at 70-71, 77, 79-80; Ex. 46. Plaintiff's expert states in his report that these tactics are unnecessary and are excessive because no force can be used in response to passive resistance. Ex. 104. In accordance with *Fairchild*, the officers had no need for force and the force used against Twedt was excessive, which weighs against Defendant. 40 F.4th at 365-67.

The officers failed to temper or limit the amount of force they used against Twedt. Ex. 104. As established through the evidence and Plaintiff's expert, the officers had no need to escalate the situation by laying hands on Twedt, tackling him to the ground, or punching him. *Id.* Officer Poole - who had a history of using excessive force - immediately began punching Twedt upon contact. Ex. 104, 105. With the number of officers on top of Twedt, he was effectively restrained well before the handcuffs were applied, however,

the officers continued to punch him, showing that the officers did not temper their actions. *Id.* Ex. 105; *Fairchild*, 40 F.4th at 365-67. Additionally, the videos do not establish that the officers ever tried to use verbal de-escalation as it was only seconds between clearing the cell to charging at Plaintiff. Ex. 104, 105. The officers did not need to rush him, they chose to do so to punish and prove a point. Ex. 104, 107. Because the officers used force against a passive detainee, their force was not limited or tempered.

Twedt did not pose any physical resistance even when attacked. Twedt did not retaliate or try to push them off. A reasonable jury could easily conclude that he was only responding to protect himself from the sudden onslaught. *See Joseph v. Bartlett*, 981 F.3d 319, 335–36 (5th Cir. 2020). It is illogical to argue that force was reasonable and necessary because the detainee began resisting or protecting himself *after* the officers initiated the use of force. Under Defendant's argument, officers would always be justified in using any level of force so long as they initiate it and the detainee tries to defend. Twedt did not pose a security threat. He was attempting to get medical attention. Ex. 104. The officers could have ended Twedt's fruitless attempts at covering cameras with paper towels by providing medicl care. *Id.* Instead, the officers decided the best course of action against a detainee in medical distress was to use force against him. The video shows Twedt was not a security threat and was in a holding cell with a window that an officer could have observed thus this factor weighs against Defendant. Ex. 105.

The severity of the injuries, broken fingers, head injury, bruising, was sufficiently severe in light of the non-existent threat that Twedt was posing. Ex. 104. As established by Plaintiff's Expert, Officer Poole punched Twedt over a dozen times in the few seconds

that the incident occurred. Ex. 104. Officer Poole and the officers with him only reported striking Twedt twice. Ex. 106. The officers also failed to report kicking Twedt after he ws restrained as they were leaving the cell. Ex. 104, 105, 106. This is another illustration of the false reporting by the officers. As admitted by Sheriff Gonzalez, punches to the head, face, or neck are a form of deadly force, yet the officers used it against Twedt despite the lack of threat. Ex. 24, 25, 104. Each of the *Kingsley* factors weigh against Defendant.

Defendant attempts to paint the picture that these actions are normal within the jail environment. These actions are not normal. Ex. 104. The evidence establishes that this is not a one-time event but is instead part of the policies, conditions, practice and training of the jail as seen by hundreds of examples of incidents. Ex. 104. The Garrison case illustrates that officers are trained and within the policy to rush at detainees who are at most providing passive resistance to gain "compliance." Ex. 46, 55 at 46, 69-71, 77-80. A jury could reasonably conclude that that the amount of force used was disproportionate to the need for the force, especially considering the extent of Twedt's injuries and the relatively slight security threat Twedt presented preceding the altercation. *See Kingsley*, 576 U.S. at 397. Thus, summary judgment is inappropriate.

**C.     There is sufficient evidence of a failure to train and failure to supervise claims.**

It is well-settled that "a municipality's failure to train its police officers can without question give rise to § 1983 liability." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989). To state a failure to train or supervise claim, a plaintiff must allege that (1) a municipality has adopted inadequate training and supervision policy procedures, (2)

acted with deliberate indifference in doing so, and (3) the inadequate policies directly caused the plaintiff's injury. *Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Snow v. City of El Paso, Tex.*, 501 F. Supp. 2d 826, 833 n. 5 (W.D. Tex. 2006).

A court infers deliberate indifference "either from (i) a pattern of constitutional violations or, absent proof of a pattern, from (ii) showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Garza*, 922 F.3d at 637-38 (internal quotation omitted); *see also Gros v. City of Grand Prairie, Tex.*, 34 F. App'x. 150, at *6 (5th Cir. 2002) (per curiam) (requiring a plaintiff to prove deliberate indifference for hiring, training, and supervision claims). A policymaker's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish . . . conscious disregard . . . ." *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997) (police may, "in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need."). This pattern may also show that the policymaker's conduct, and not "factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id*. at 407-408.

For liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective. *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Liability under a failure-to-train theory arises where the officers' assigned duties make "the need for more or different training [] so obvious, and the inadequacy so likely to result in the violation of constitutional rights,

that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S at 390. Even where a municipal training program exists, if it is inadequate, the municipality is subject to liability on a "failure to train" theory. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010).

Defendant makes the argument that Plaintiff "has made no effort to identify the particular training at issue here." Doc. 255 at 15. This is not a summary judgment argument. This is a pleading argument that has already been addressed by the Court in denying Defendant's Motion to Dismiss. The Court has held, "Plaintiffs allege several specific training deficiencies . . . . These allegations are suitably specific to identify what training failures exist." Doc. 51 at 29. Regarding Twedt, Plaintiffs allege that Harris County's failed to train their officers on the proper use of force, failed to train on proper medical care and proper observation and supervision of detainees and officers. Doc. 122; Doc. 51 at 29. This is more than enough for this stage of the litigation.

Outside of identifying the training policy attacked, Defendant does not make any additional arguments other than claiming that no constitutional violation occurred which is already addressed above. Doc. 255 at 15. Regardless, Plaintiff has more than enough evidence establishing a failure to train claim. As established through the hundreds of other incidents and the thousands of uses of force identified in the Serious Incident Reports, the KHOU *Struck* documentary, and with the other Plaintiffs, Harris County has a rampant failure in training their officers on the proper use of force and de-escalation techniques which results in officers resulting in use of force too quickly as far back as the 2009 DOJ Report. *See* Ex. 1, 7, 20, 24, 25, 26, 27, 28, 45, 46, 47, 61, 65, 104.

Harris County recognized that their use of force policies and training were inadequate in December 2024 after the KHOU documentary, so they changed their policy to clarify that strikes to the head should only be used in cases where deadly force is necessary. Exs. 22, 24-25. At the time of the incident, Harris County trained their officers to use force against detainees in response to the slightest inconvenience or provocation. Exs. 24, 27–28, 45–47, 61, 65–68, 104. In the video evidence for the incident of John Coote and Jeremy Garrison, officers resort to tackles, punches, and slamming heads into the ground and the walls because the detainees were allegedly verbally resisting the officer. Exs. 46, 47. Many of the officers involved in Twedt and other incidents have long histories of use of force incidents, often striking detainees for talking back or for not immediately complying with commands. *See* Exs. 23, 24, 53-54, 56-57, 61, 59-60, 69-74, 75-79, 108-119. For example, Officer Poole had 53 use of force incidents in a four year period, several on the same day as Twedt's incident, and never received any discipline with most investigations closed over time. Ex. 104, 108-109. The leaders of the Jail knew of the continued failure to provide medical care for detainees with known mental health conditions, but never changed their training or policies, resulting in the Attorney General issuing a Remedial Order requiring new policies and training in these areas. Ex. 1-21.

Harris County's own policymaker, Sheriff Gonzalez, admitted that its use of force training and policies – specifically regarding head, face, and neck strikes - were inadequate, resulted in officers using excessive force, and required Harris County to change their policies after Lockhart's incident. Exs. 24-25. Moreover, multiple officers involved in the Plaintiffs' cases admitted that their actions comport with their training

and Harris County Jail policies, even when they used excessive force. Ex. 52 at 23-25, 37-39, 49, 50, 53, 62-63, 91; Ex. 57 at 46-47, 54, 69-71, 77, 79-80, 93, 96, 106-107, 110; Ex. 58 at 18, 19, 40, 48, 72, 106-109, 99, 111; Ex. 80 at 17-18, 25:12-23. Officer Jin DeGuzman agreed with Sheriff Gonzalez that the Jail needed to do a better job of training their officers on de-escalation techniques prior to using force. Ex. 58 at 48:5-13. These admissions, combined with statistical data showing that from 2018-2024 Harris County had 2,922 uses of force resulting in serious bodily injury that far exceeded any other Texas county jail, establishes the existence of a policy despite the alleged existence of SOPs. Ex. 26, 61.

To state a claim for municipal liability on a theory of a failure to supervise, the plaintiff must allege facts showing that (1) the County failed to supervise the officers involved; (2) there is a causal connection between the failure to supervise and the violation of the plaintiff's rights; and (3) it was, or should have been, obvious to municipal policymakers that the "highly predictable consequence" of not supervising the officers was that the officers would violate the plaintiffs' constitutional rights. *See, e.g., Peterson*, 588 F.3d at 850; *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc).

The officers involved in Twedt's incident, along with medical staff, are not adequately supervised or disciplined. Plaintiff's expert points out in his report that officers are routinely permitted to act in any manner they see fit, including initiating use of force despite the ability to plan the use of force. Ex. 104. Officers go undisciplined and their supervisors approve their actions or confirm that such conduct comports with Jail policies and training. Ex. 24, 25, 52–61, 64, 69-81, 104, 108-119. This, combined with the failure to oversee medications disbursement raises a fact question for the jury.

**D. Conditions of confinement and a failure to train or supervise can establish *Monell* liability even if there is no independent constitutional violation by an employee.**

Even if the Harris County personnel directly involved did not violate the Constitution, the County is not automatically exonerated. Municipalities can be held liable in at least three circumstances: (1) harm is caused by direct actions of the governmental entity, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); (2) harm is caused by the entity's policies or customs, *see Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993); and (3) harm is caused by employees for whom the entity has failed to provide adequate training, *see Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018). When an act of the municipality causes the injury, "fault and causation obviously apply." *Id*. at 994. When an injury is caused by carrying out a municipal policy or custom, the determination of causation is easy. *See Garner*, 8 F.3d at 364–65. An employer is not relieved of its own constitutional violations merely because its employees are not liable. A determination that qualified immunity applies to individual actors does not *ipso facto* relieve the governmental entity for which they worked from liability. *See, e.g., Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 565-67 (6th Cir. 2019); *Chew v. Gates*, 27 F.3d 1432, 1439 (9th Cir. 1994); *Newcomb v. City of Troy*, 719 F. Supp. 1408, 1416–17 (E.D. Mich. 1989); *see also Owen v. City of Independence*, 445 U.S. 622, 652 (1980) (a "'systemic' injury" may "result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith." (citation omitted)).

The combined conduct of several local government employees acting pursuant to policy may be a constitutional violation even if none of the named defendants individually violated the Constitution. *See, e.g., Barrett v. Orange County Human Rights Com'n*, 194 F.3d 341, 350 (2d Cir. 1999); *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985). When multiple employees act in the same unconstitutional manner, that collective action is indicative of a de facto policy. *Hovis v. Wichita Cnty., Tex.*, No. 3:23-CV-2220-L, 2024 WL 3836559 (N.D. Tex. July 31, 2024), *report and recommendation adopted*, No. 3:23-CV-2220-L, 2024 WL 3841480, at *9 (N.D. Tex. Aug. 15, 2024); *Sims v. City of Jasper, Tex.*, 543 F. Supp. 3d 428, 450 (E.D. Tex. 2021). Further, a municipality's failure to provide adequate jail funding, staffing, or procedures may cause a Constitutional violation even if the staff members involved are doing their best under untenable circumstances. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985). Even if this Court finds that the individual officers' conduct did not violate Mr. Twedt's rights, that alone would not exonerate the County. Harris County cannot obtain summary judgment without addressing the existence of the *Monell* evidence presented here. It failed to do so, thus, summary judgment is improper.

## V.     **Conclusion & Prayer**

**WHEREFORE, PREMISES CONSIDERED**, Twedt requests this Court enter an Order **denying** Defendant Harris County's Motion for Summary Judgment for Claims by Plaintiff Ryan Twedt, and to all other relief in law or equity to which Twedt may show himself entitled.

Respectfully submitted,

By: /s/ Paul A. Grinke

**Paul A. Grinke**
State Bar No. 24032255
paul@bencrump.com
**Aaron Dekle**
State Bar No. 24100961
aaron@bencrump.com
BEN CRUMP LAW, PLLC
5 Cowboys Way, Suite 300
Frisco, Texas 75034
(972) 942-0494 – Office
(800) 770-3444 – Facsimile

**Carl L. Evans**
State Bar No. 24056989
cevans@mccathernlaw.com
**Jordan A. Carter**
State Bar No. 24116174
jcarter@mccathernlaw.com
**Noah McCathern**
State Bar No.24118035
nmcathern@mccathernlaw.com
MCCATHERN PLLC
3710 Rawlins St., Suite 1600
Dallas, Texas 75219
(214) 532-2060 – Office

**Thad D. Spalding**
State Bar No. 00791708
tspalding@dpslawgroup.com
**Shelby J. White**
State Bar No. 24084086
swhite@dpslawgroup.com
DURHAM, PITTARD & SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(888) 988-6688 - Office
(214) 807-1799 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on **January 16, 2026**, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to each attorney of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ Aaron Dekle*
**Aaron Dekle**