**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **OCTEVIA WAGNER, ET. AL.**<br>    **Plaintiffs** | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| **HARRIS COUNTY, TEXAS** | § | **Civil Action No. 4:23-CV-02886** |
|     **Defendant** | § | |
| | § | |
| **AND** | § | |
| | § | |
| **ANA GARCIA AND CHANDRA JENKINS,** | § | |
|     **Plaintiff – Intervenors** | § | |

**DEFENDANT HARRIS COUNTY'S
MOTION FOR SUMMARY JUDGMENT
ON ALL PLAINTIFFS' AND INTERVENORS' CLAIMS**
===============================================================

MAY IT PLEASE THE COURT:

NOW COMES DEFENDANT, HARRIS COUNTY, TEXAS, and files this comprehensive Rule 56 Motion for Summary Judgment against the Section 1983 claims urged by Plaintiffs and Intervenors. In support thereof, Harris County presents the following evidence and arguments:

### I. TABLE OF CONTENTS

I. TABLE OF CONTENTS ...................................................................................................... i

II. NATURE OF THE CASE AND SUMMARY OF ARGUMENTS .......................................... 1

III. OVERVIEW OF THE CLAIMS .................................................................................... 2

IV. UNDISPUTED FACTS ABOUT THE HARRIS COUNTY JAIL ........................................ 3

A.    Overview of the Harris County Jail. ...................................................................... 3

  1.  Harris County Jail Is One Of The Largest Jails In The United States. ......................... 3

  2. Harris County Jail's Population During The Relevant Time Period
      Changed Dramatically Due To Unforeseen And Uncontrollable
      Circumstances. ...................................................................................... 4

  3. The Jail Utilized A Complex System To Plan And Monitor Staffing On
      A Daily Basis. ........................................................................................ 6

  4. Daily Watch Schedules And Functional Capacity Reports Reflect
      Staffing And Population At The Jail On The Dates Of The

Particular Incidents At Issue. ................................................................................. 8

B.    Harris County Jail Is Subjected To Significant Oversight. ............................................. 14

C.    Detainees at the Harris County Jail. ............................................................................... 15

1. The Intake Process. ................................................................................................... 15

2. Harris Health and Harris Center's provision of medical care at the Jail. .................... 16

3. Observation of Inmates at the Jail. ............................................................................ 18

4. Grievance Process .................................................................................................... 20

5. Special Investigations within the Jail. ....................................................................... 20

D.    Detention Officers At The Harris County Jail. ............................................................... 20

1. Hiring Process .......................................................................................................... 20

2. Training. ................................................................................................................... 21

3. Detention Officers are required to adhere to Harris County policies,
including on use of force. .......................................................................................... 21

4. Supervision. ............................................................................................................. 22

5. Discipline. ................................................................................................................ 23

V. PROCEDURAL BACKGROUND ......................................................................................... 23

A.    Dissonance In The Related Litigation In The Southern District Of Texas,
Houston Division. .......................................................................................................... 23

B.    The Wagner Case ........................................................................................................... 24

VI. ARGUMENTS AND AUTHORITIES ................................................................................... 24

A.    Summary Judgment Standard. ........................................................................................ 24

B.    Conditions of Confinement Standard. ............................................................................. 25

C.    Episodic Acts Standard .................................................................................................. 27

D.    Staffing Management, Jail Population, And Observation Of Inmates At
The Harris County Jail Cannot Form Independent Constitutional
Violations. ..................................................................................................................... 28

E.    Staffing At The Harris County Jail Is Not Violative Of The Constitution. ...................... 29

1. The Jail has not adopted a *de facto* policy of understaffing. ...................................... 29

F.    Staffing Models Designed To Comply With State Law Serve A Legitimate
Government Interest And Is Not Arbitrary or Purposeless. .............................................. 31

G.    Staffing Did Not, Itself, Cause Any Of The Alleged Constitutional
Violations. ..................................................................................................................... 31

H.    There Is Not A Condition Of Overcrowding The Harris County Jail. ............................. 33

1. The Jail has not adopted a *de facto* policy of overcrowding. ..................................... 33

Defendant's Comprehensive Rule 56 Motion for Summary Judgment
Against Plaintiffs Section 1983 Claims

2. Maintaining a population that is at or below the capacity designated by TCJS serves a legitimate government interest. ...................................... 34

3. Overcrowding itself did not cause any of the alleged Constitutional violations........................................................................................................... 34

I.    There Is Not A Condition Of Not Observing Inmates At The Harris County Jail. ........................................................................................................ 34

J.    There Is No Condition Of Creating a Culture of Violence. ............................. 36

1. There is no evidence of encouraging inmate violence. ................................. 36

K.    There Is No Condition Of Institutionalize Excessive Force Or A Policy Of Same That Caused The Deprivation Of A Constitutional Right........................ 37

1. Episodic Acts/*Monell* claim ......................................................................... 37

L.    Use Of Force Conditions Of Confinement Claim Fails.................................... 41

M.    There Is No Unconstitutional Policy Of Denying Medical Care. .................... 43

1. No Evidence that there Exists a Conditions of Confinement Claims Pertaining to the Provision of Medical and Mental Health Care of the Plaintiffs and Intervenors in this Case. .......................................... 43

2. The Extant Evidence Contained In The Existing Summary Judgment Record Demonstrates That Each Plaintiff Who Needed Medical Care Received It, thus, the Episodic Acts Theory fails. ...................... 44

N.    The Evidence Does Not Show a Condition that Resulted in a Failure to Protect. .............................................................................................................. 49

O.    The Evidence Does Not Support A Failure To Train Or Supervise Claim. ..... 49

VII. CONCLUSION & PRAYER ...................................................................................... 51

EXHIBIT A - INDEX TO MSJ EXHIBITS ...................................................................... 54

EXHIBIT B – TABLE OF AUTHORITIES CITED................................................................ 56

==========================================

## II. NATURE OF THE CASE AND SUMMARY OF ARGUMENTS

1.      This is a Section 1983 civil rights case brought by and on behalf of 29 current and former Harris County Jail Inmates. Plaintiffs and Intervenors (collectively, "Plaintiffs" unless specified otherwise) contend in their live Complaint a number of Section 1983 claims and causes of action, which they assert under both conditions of confinement, as well as episodic act theories. *See* Docs. 42-43, 40, 122. A summary of the Plaintiffs' incidents is attached as an Exhibit to this dispositive motion to provide the Court with a high-level view of the composition of the parties in this case and distinctions between the underlying incidents. Ex. 1 Summary of Claims.

2.      Plaintiffs seek to impose liability on the County under *Monell*. They allege broadly that every manner of Constitutional injury, however disconnected in type, time, place, and people, may be brought together if paired with conclusory allegations that "the Jail is understaffed" or "the Jail is overcrowded." In this way, they urge the Court to ignore a fundamental underpinning of *Monell* liability: causation. Plaintiffs have neither alleged, nor can they prove, that staffing or the Jail population caused every malaise about which they complain—and so far, they have not been required to do so.

3.      By this Motion, Harris County moves the Court to put Plaintiffs to their proof.

4.      Harris County is entitled to summary judgment on each of the 29 separate cases because, if held to the summary judgment standard, the claims all falter. Some of the claims so obviously lack an underlying Constitutional injury that the County has already moved for summary judgment on that ground alone. Discovery materials, including deposition after deposition, revealed that the Plaintiffs themselves were without a basic understanding of why they were suing Harris County. Exs. 31, 32, 33 [Deposition Summaries]. Indeed, many denied outright some of their own claims with which they were clearly unfamiliar. Video evidence in some cases established that the claims were spun with threads of pure fiction. *See, e.g.* Doc. 361, Ex. C.

5.      Moreover, all claims fail because the evidence does not establish unconstitutional conditions at the Jail. That is the focus of this Motion.

6.      Organizationally, this Motion first addresses the claims under the conditions of confinement theory of liability even though these are largely episodic acts claims masquerading as the former. The Motion then addresses the episodic acts theory, which Plaintiffs allege as an afterthought, including application of the two-step requirement that first a constitutional

violation must be present, and, second, the requirement under *Monell* that the act is a cord in a larger fabric of unconstitutional policies and practices *attributable* to Harris County.

7.    At bottom, the evidence defeats Plaintiffs and Intervenors' claims that one or more suffered injuries because the Jail was "understaffed" or "overcrowded." Similarly, with respect to the Plaintiffs and Intervenors' alternative episodic acts theories, which under Section 1983 law require a showing of conscious and deliberate indifference to a known serious risk, there is no evidence of systemic *practices that are known and to which Harris County* policymakers are indifferent that would support an adverse factual finding against the County much less an adverse Judgment.

8.    Consequently, Harris County is entitled to judgment as a matter of law on all of Plaintiffs' and Intervenors' claims.

### III. OVERVIEW OF THE CLAIMS

9.    Plaintiffs bring this lawsuit as an amalgamated series of claims. This is not a class action. It is a grouping of discreet incidents pulled together largely by a single law firm. Outside of the fact that most are represented by a single law firm, the only other unifying characteristic is that all Plaintiffs were at various times held in custody of the Harris County Jail.

10.    The two Intervenors, for reasons of their own, elected to join this action, which the Court allowed. Significantly, each of the Plaintiffs' and the Intervenors' claims could have been brought as a stand-alone case.

11.    A review of the attached summary (Ex. 1), drawn from a breakdown of Plaintiffs' and Intervenors' live complaints reflects the following:

 - ➢ There are 27 Plaintiffs and 2 Intervenors for a total of 29 claimants. The 27 Plaintiffs, sometimes referred to as the "Wagner Plaintiffs" are represented by the Ben Crump law firm. The two Intervenors are each represented by other counsel of record.

 - ➢ The incidents at issue occurred between August 10, 2021 and September 29, 2023 in various location at the Jail and involved different inmates, different officers, separate locations, and wildly different circumstances.

 - ➢ Thirteen Plaintiffs claim they were subjected to an unconstitutional condition of encouraging violence amongst detainees, which includes Plaintiffs Evan Ermayne Lee, William Curtis Barrett, Zachery Johnson, Harrell Veal, John Coote, Antonio Radcliffe, Zachary Zepeda, Jaquez Moore, Ramon Thomas, Taylor Euell, Tramell Morelle, Michael Griego, and Christopher Young.

 - ➢ Eleven Plaintiffs claim they were subjected to an unconstitutional condition of excessive

Defendant Harris County's Comprehensive MSJ                                    -2-

force, which includes Plaintiffs Jacoby Pillow, Bryan Johnson, Jeremy Garrison, Zachery Johnson, Kenneth Richard, Jeremiah Anglin, Harrell Veal, John Coote, Ryan Twedt, Bernard Lockhart, and Taylor Euell.

➤ Twenty-Three Plaintiffs claim they were subjected to an unconstitutional condition of being denied medical care, which includes Plaintiffs Jacoby Pillow, Bryan Johnson, Evan Ermayne Lee, William Curtis Barrett, Kevin Smith Jr., Ramon Thomas, Nathan Henderson, Deon Peterson, Gary Wayne Smith, Zachery Johnson, Kenneth Richard, Jeremiah Anglin, Harrell Veal, John Coote, Ryan Twedt, Zachary Zepeda, Jaquez Moore, Taylor Euell, Kristan Smith, Robert Wayne Fore, Bernard Lockhart, and Dylan Perio, Dequon Buford, and Kevin Sanchez-Trejo.

➤ Twenty-Four Plaintiffs claim they were subjected to an unconstitutional condition of failure to properly observe and monitor detainees, which includes Plaintiffs Jacoby Pillow, Bryan Johnson, Evan Ermayne Lee, William Curtis Barrett, Kevin Smith Jr., Ramon Thomas, Nathan Henderson, Deon Peterson, Gary Wayne Smith, Zachery Johnson, Harrell Veal, John Coote, Antonio Radcliffe, Zachary Zepeda, Jaquez Moore, Taylor Euell, Kristan Smith, Michael Griego, Bernard Lockhart, Robert Wayne Fore, Tramell Morelle, and Christopher Young and Dequon Buford, and Kevin Sanchez Trejo.

➤ All Plaintiffs claim that they were subject to an unconstitutional condition of the Jail being understaffed.

Docs. 42, 43, 122.

## IV. UNDISPUTED FACTS ABOUT THE HARRIS COUNTY JAIL

**A.　　Overview of the Harris County Jail.**

### 1.　Harris County Jail Is One Of The Largest Jails In The United States.

12.　　The Harris County Jail is the third largest jails in the entire United States. Ex. 27 [BJS Data]. The massive Jail complex houses thousands of pretrial detainees[1] ("inmates") who are arrested by any one of approximately 80 different law enforcement agencies in a county of more than five million people. Ex. 29 [Ferguson Aff.]. The Jail spans across three central buildings: 1200 Baker Street, 701 N. San Jacinto St. and the Joint Processing Center at 700 N. San Jacinto St. Housing pretrial detainees is done primarily within 1200 Baker Street and 701 N. San Jacinto St. with each building having multiple floors and each floor having multiple pods and each pod having multiple cells. *Id*.

13.　　The functional capacity of the Jail, that is, how many inmates it may house, is determined by the Texas Commission on Jail Standards ("TCJS") based on such things as square footage, seating, plumbing, staffing, and available bunks. *Id*. The functional capacity of the Harris County

---

[1] The Jail also houses some convicted inmates, but on a much smaller scale.

Jail, as dictated by TCJS currently sits at approximately 10,500 beds. *See generally* https://www.tcjs.state.tx.us/population-reports/.

**2. Harris County Jail's Population During The Relevant Time Period Changed Dramatically Due To Unforeseen And Uncontrollable Circumstances.**

14. From 2019 to 2024, which includes the three years in which all Plaintiffs allege they were injured (2021-2023), the Jail's population changed rapidly. In 2019, the Jail received and booked 105,576 inmates who were arrested by various agencies throughout the County—the highest number in a six year period. Ex. 24 [Smith Aff.].



15. The spike in 2019 bookings was immediately followed by court shutdowns due to the COVID-19 pandemic. Ex. 26 [Executive Orders].

Defendant Harris County's Comprehensive MSJ                                                -4-

16.    The COVID-19 shutdowns exacerbated the existing lag caused by Harris County courts that were damaged and closed from flooding in Hurricane Harvey in 2017.[2.] Ex. 26 [Executive Orders].

17.    Delays caused by prolonged court closures resulted in the average length of stay for detainees similarly jumping from 157 days on average in 2019 to 212 days in 2021. Ex. 24 [Smith Aff.]; Deposition of Sheriff Gonzalez.[3]

18.    These factors culminated in an incredible swing in the average daily population at the Jail, which shot up from a low in April 2020 of 7,474 detainees to a high in September 2022 of 10,070 detainees—a 43% change in just two years, which is reflected by the chart below. Ex. 24 [Smith Aff.]



---

[2] It was not until March 17, 2026, that Harris County District Attorney Sean Teare announced that the "years-long criminal backlog has been eliminated." https://dao.harriscountytx.gov/Newsroom/News-Releases/harris-county-criminal-case-backlog-eliminated.

[3] Deposition testimony of Sheriff Ed Gonzalez is cited throughout this Motion. However, the Sheriff's deposition was taken just days ago, and the official transcript has not been available during the preparation of this Motion. Harris County will supplement the record with the Sheriff's deposition excerpts.

19. As a tool to help manage the population, Harris County has spent millions of dollars on outsourcing inmates to other facilities. For example, in fiscal year 2024–25, Harris County spent approximately $58 million to house more than 1,400 inmates in Louisiana and Mississippi jails. *See* Ex. 24 [Smith Aff]; Ex. 18, p. 55 [Expert Report of Sean Stewart].

**3. The Jail Utilized A Complex System To Plan And Monitor Staffing On A Daily Basis.**

20. While the courts were shut down, the Jail was not. Harris County continued to receive and house inmates and run Jail operations.

21. The Texas Commission on Jail Standards sets by statute the number of staff required for a jail, including the Harris County Jail, which is driven by the Jail's functional capacity. 37 Tex. Admin. C. § 275.4. ("One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision.").

22. In order to satisfy the requirements imposed by State law, the Harris County Sheriff's Office, which employs approximately 5,000 people, assigns approximately 2,000 of those employees to work in Detention Command. Ex. 29 [Ferguson Aff.]. Since 2017, Harris County has added *significant* detention positions to support the Jail.

23. Staffing within the Jail is monitored every single day by a dedicated team of officers assigned to the Centralized Staffing Office who are responsible for ensuring that every floor of every building has sufficient staff assigned to monitor inmates in conformance with State law. Ex. 29 [Ferguson Aff.]. The starting point is to determine the number of inmates each day on every single floor of each building. This verification is done twice daily. The number of inmates on each floor and, also, collectively throughout the Jail, informs both staffing needs and capacity utilization. Utilization is captured in functional capacity reports, where staffing is captured in detailed Daily Watch Schedules ("DWS"). Ex. 29 [Ferguson. Aff.]; Ex. 22 [Functional Capacity Reports]; Ex. 23 [DWS]. Daily Watch Schedules include a summary document that captures planned staffing and the floor rosters that reflect actual staffing for that day and shift.

24. Once the number of inmates on each floor has been determined, the Centralized Staffing personnel assign the necessary detention officers to each floor. Ex. 29 [Ferguson. Aff.]. In addition to the detention officers who are assigned in housing to perform the routine monitoring of inmates, each building in the Jail complex is also staffed daily with Watch Commanders who

are lieutenants and above, floor sergeants, and support sergeants. Auxiliary personnel who are also licensed detention officers, also work in the jail each day and can be redeployed to housing if needs arise. Ex. 29 [Ferguson Aff.]; Ex. 16 [Bosquez Aff.]; Sheriff Gonzalez Depo. The executive team, including Majors and Chiefs who are licensed jailers capable of providing assistance in housing, also work at the Jail complex. *Id*. Even Sheriff Gonzalez works from the Jail complex and testified that if ever needed he would assist with staffing a floor himself. Sheriff Gonzalez Dep.

25.    Daily Watch Schedules are reviewed by supervisors to ensure that staffing is appropriate and supervisors must sign off indicating that they have reviewed the DWS's for accuracy. Ex. 29 [Ferguson Aff.]. One component of the comprehensive DWS report compares the number of staff who are assigned to each floor with the number of inmates on each floor to ensure compliance with State standards. Below is an excerpt of the DWS summary document during the period relevant to Plaintiff Evan Ermayne Lee's death.

| SECTION VI: | | Staffing, Inmate Counts and Staff-to-Inmate Ratios ~ | | | | | |
|---|---|---|---|---|---|---|---|
| Floor | Sgts. | Deputy/ Det. Off. | Total On Duty | (- FCC ) | Total | Inmate Count | Staff : Inmate Ratio |
| MED | 1 | 16 | 17 | 1 | 16 | 68 | :1 4.25 |
| MHU | 1 | 15 | 16 | 1 | 15 | 355 | :1 23.67 |
| AD.SEP. | 1 | 15 | 16 | 1 | 15 | 321 | :1 21.40 |
| 3rd | 1 | 17 | 18 | 1 | 17 | 729 | :1 42.88 |
| 4th | 2 | 24 | 26 | 1 | 25 | 879 | :1 35.16 |
| 5th | 1 | 16 | 17 | 1 | 16 | 682 | :1 42.63 |
| 6th | 2 | 21 | 23 | 1 | 22 | 985 | :1 44.77 |
| Total | 9 | 124 | 133 | 7 | 126 | 4019 | 1: 31.90 |

Ex. 23 [DWS Reports].

26.    Notably, the Jail does not include supervisors and auxiliary staff who can provide additional support to the floors—in their total staff count for assessing staff to inmate ratios. Ex. 29 [Ferguson Aff.]. When necessary, the Jail utilizes overtime and staff reassignments in an effort to always ensure the State standard is satisfied. Ex. 16 [Bosquez Aff.].

27.    Sheriff Gonzalez has testified that his objective is to not just satisfy minimum standards but have sufficient staff to support added programs for inmates, including literacy programs, cognitive behavioral therapy, Brothers-in-Arms, and the women's empowerment center.  To support these efforts, which requires recruitment of additional detention officers, the County has increased the starting detention officer pay by 40% since 2017. Sheriff Gonzalez Depo.; Ex. 18, pp. 51-52 [Expert Report of Sean Stewart].

**4. Daily Watch Schedules And Functional Capacity Reports Reflect Staffing And Population At The Jail On The Dates Of The Particular Incidents At Issue.**

28.     Read together, the DWS and functional capacity reports reflect the state of staffing and population on a particular shift on a particulate date. Relevant here are the DWS and functional capacity reports for the dates that each incident involving the 29 Plaintiffs occurred, which is summarized below for ease of reference:

| |
|---|
| **1.   Harrell Veal**<br><br>Date and Location of Incident: January 23, 2022, 3rd Watch @ 1200 Baker Street, 6th Floor<br>**Jail Functional Capacity on January 23, 2022: 91.2%**<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br><br>Date and Location of Incident: December 24, 2022<br>**Functional Capacity on December 24, 2022: 93.3%** |
| **2.   Kevin Sanchez-Trejo**<br><br>Date and Location of Incident: February 12, 2022, Day Watch @ 701 N. San Jacinto, 7th Floor<br><br>**Planned Staffing Ratio at incident location on February 12, 2022: 1:28.59**<br>**Actual Staffing Ratio at incident location on February 12, 2022, Day Watch: 1:29.95**<br>**Jail Functional Capacity on February 12, 2022: 93.7%** |
| **3.   Evan Ermayne Lee**<br><br>Date and Location of Incident: March 11, 2022[4], Day Watch @ 1200 Baker Street, 6th Floor<br><br>**Planned Staffing Ratio at incident location on March 11, 2022, Day Watch: 1:44.77**<br>**Actual Staffing Ratio at incident location on March 11, 2022, Day Watch: 1:46.9**<br>**Jail Functional Capacity on March 11, 2022: 94.2%**<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>Date and Location of Incident: March 18, 2022, Night Watch (from March 17, 2022) @ 1200 Baker Street, 2nd Floor-MHU<br><br>**Planned Staffing Ratio at incident location on March 18, 2022, Night Watch (from March 17, 2024): 1:21.79**<br>**Actual Staffing Ratio at incident location on March 18, 2022, Night Watch (from March 17, 2024): 1:25.41**<br>**Jail Functional Capacity on March 18, 2022: 94.6%** |
| **4.   Ryan Twedt**<br><br>Date and Location of Incident: April 9, 2022[5], Night Watch (from April 8, 2022) @ 1200 Baker Street, 6th Floor |

---

[4] Alleged as March 9, 2022, but details match up with event that occurred on March 11, 2022.
[5] Alleged as April 8, 2022, but details match up with event that occurred on April 9, 2022.

Defendant Harris County's Comprehensive MSJ                                                          -8-

**Planned Staffing Ratio at incident location on April 9, 2022, Night Watch (from April 8, 2024): 1:45.64**
**Actual Staffing Ratio at incident location on April 9, 2022, Night Watch (from April 8, 2024): 1:47.8**
**Jail Functional Capacity on April 8, 2022: 94.9%**

5. **Kristan Smith**

Date and Location of Incident: May 20, 2022, Day Watch @ 1200 Baker Street, 4th Floor

**Planned Staffing Ratio at incident location on May 20, 2022, Day Watch: 1:37.48**
**Actual Staffing Ratio at incident location on May 20, 2022, Day Watch: 1:39.04**
**Jail Functional Capacity on May 20, 2022: 96.2%**

6. **Robert Wayne Fore**

Date and Location of Incident: May 24, 2022, Night Watch @ 701 N. San Jacinto, 6th Floor

**Planned Staffing Ratio at incident location on May 24, 2022, Night Watch: 1:34.3**
**Actual Staffing Ratio at incident location on May 24, 2022, Night Watch: 1:36.1**

7. **Bernard Lockhart**

Date and Location of Incident: June 28, 2022, Night Watch @ 701 N. San Jacinto, 3rd Floor

**Planned Staffing Ratio at incident location on June 28, 2022, Night Watch: 1:43.69**
**Actual Staffing Ratio at incident location on June 28, 2022, Night Watch: 1:46.6**
**Jail Functional Capacity on June 28, 2022: 98.6%**

8. **Taylor Euell**

Date and Location of Incident: September 29, 2022, Night Watch @ 1200 Baker Street, 3rd Floor

**Planned Staffing Ratio at incident location on September 29, 2022, Night Watch: 1:46.25**
**Actual Staffing Ratio at incident location on September 29, 2022, Night Watch: 1:49.33**
**Jail Functional Capacity on September 29, 2022: 99.3%**

9. **Michael Griego**

Date and Location of Incident: November 13, 2022, Night Watch @ 1200 Baker Street, 2nd Floor [AD. SEP.]

**Planned Staffing Ratio at incident location on November 13, 2022, Night Watch: 1:35**
**Actual Staffing Ratio at incident location on November 13, 2022, Night Watch: 1:35**
**Jail Functional Capacity on November 13, 2022: 95.3%**

**10. William Curtis Barrett**

Date and Location of Incident: November 20, 2022, Day Watch-Night Watch @ 1200 Baker Street, 2nd Floor, Admin Sep.

**Planned Staffing Ratio at incident location on November 20, 2022, Day Watch: 1:23.94**
**Actual Staffing Ratio at incident location on November 20, 2022, Day Watch: 1:23.94**
**Planned Staffing Ratio at incident location on November 20, 2022, Night Watch: 1:30.85**
**Actual Staffing Ratio at incident location on November 20, 2022, Night Watch: 1:30.85**
**Jail Functional Capacity on November 20, 2022: 94.4%**

**11. Jacoby Pillow**

Date and Location of Incident: January 3, 2023, Night Watch (of January 2, 2023) - Day Watch @ 1200 Baker, 6th Floor

**Planned Staffing Ratio at incident location on January 3, 2023, Night Watch (of January 2, 2023): 1:46.43**
**Actual Staffing Ratio at incident location on January 3, 2023, Night Watch (of January 2, 2023): 1:48.75**
**Planned Staffing Ratio at incident location on January 3, 2023, Day Watch: 1:45.95**
**Actual Staffing Ratio at incident location on January 3, 2023, Day Watch: 1:48.25**
**Jail Functional Capacity on January 3, 2023: 93.3%**

**12. Gary Wayne Smith**

Date and Location of Incident: January 10, 2023, Day Watch @ 1200 Baker Street, 1st Floor MED

**Planned Staffing Ratio at incident location on January 10, 2023: 1:7.73**
**Actual Staffing Ratio at incident location on January 10, 2023: 1:7.73**
**Jail Functional Capacity on January 10, 2023: 94.4%**

**13. Kevin Leon Smith, Jr.**

Date and Location of Incident: January 31, 2023, Day Watch @ 701 N. San Jacinto, 5th Floor

**Planned Staffing Ratio at incident location on January 31, 2023: 1:38**
**Actual Staffing Ratio at incident location on January 31, 2023: 1:40.37**
**Jail Functional Capacity on January 31, 2023: 94.5%**

**14. Jeremiah Anglin**

Date and Location of Incident: February 1, 2023
**Jail Functional Capacity on February 1, 2023: 94.2%**

**15. John Coote**

Date and Location of Incident: February 7, 2023, Day Watch @ 701 N. San Jacinto, 7th Floor

**Planned Staffing Ratio at incident location on February 7, 2023, Day Watch: 1:24.95**

**Actual Staffing Ratio at incident location on February 7, 2023, Day Watch: 1:25.95**

**Jail Functional Capacity on February 7, 2023: 93%**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Date and Location of Incident: February 10, 2023, Day Watch @ 1200 Baker Street, 2nd Floor [Admin. Sep.]

**Planned Staffing Ratio at incident location on February 10, 2023: 1:13.27**
**Actual Staffing Ratio at incident location on February 10, 2023: 1:13.27**

**Jail Functional Capacity on February 10, 2023: 91.4%**

16. **Christopher Young**

Date and Location of Incident: February 11, 2023, Day Watch @ 1200 Baker Street, 2nd Floor [MHU]

**Planned Staffing Ratio at incident location on February 11, 2023: 1:33.63**
**Actual Staffing Ratio at incident location on February 11, 2023: 1:35.86**
**Jail Functional Capacity on February 11, 2023: 89.9%**

17. **Jaquez Moore**

Date and Location of Incident: February 13, 2023, Night Watch (of February 12, 2023) @ 1200 Baker Street, 3rd Floor

**Planned Staffing Ratio at incident location on February 13, 2023, Night Watch (of February 12, 2023): 1:47.33**
**Actual Staffing Ratio at incident location on February 13, 2023, Night Watch (of February 12, 2023): 1:47.33**
**Jail Functional Capacity on February 13, 2023: 92%**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Date and Location of Incident: April 19, 2023, Day Watch @ 701 N. San Jacinto, 2nd Floor

**Planned Staffing Ratio at incident location on April 19, 2023, Day Watch: 1:46**
**Actual Staffing Ratio at incident location on April 19, 2023, Day Watch: 1:49.28**
**Jail Functional Capacity on April 19, 2023: 93.4%**

18. **Jeremy Garrison**

Date and Location of Incident: April 23, 2023, Day Watch @ 701 N. San Jacinto, 6th Floor

**Planned Staffing Ratio at incident location on April 23, 2023, Day Watch: 1:22.95**
**Actual Staffing Ratio at incident location on April 23, 2023, Day Watch: 1:22.95**
**Jail Functional Capacity on April 23, 2023: 91.5%**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Date and Location of Incident: May 20, 2023, Night Watch @ 701 N. San Jacinto, 6th Floor

| |
|---|
| **Planned Staffing Ratio at incident location on May 20, 2023, Night Watch: 1:26.42**<br>**Actual Staffing Ratio at incident location on May 20, 2023, Night Watch: 1:27.88**<br>**Jail Functional Capacity on May 20, 2023: 96.2%** |
| **19. Antonio Radcliffe**<br><br>Date and Location of Incident: May 18, 2023, Day Watch @ Joint Processing Center<br><br>*See Exhibit 1 – Bate Nos. ANTONIO RADCLIFFE OR000003-OR000021 and*<br>*See Exhibit 2 – Functional Capacity Reports for May 18, 2023.* |
| **20. Zachery Johnson**<br><br>Date and Location of Incident: June 6, 2023<br><br>**Jail Functional Capacity on June 6, 2023: 93%**<br>\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*<br>Date and Location of Incident: June 7, 2023<br><br>**Jail Functional Capacity on June 7, 2023: 91.3%** |
| **21. Zachary Zepeda**<br><br>Date and Location of Incident: June 11, 2023, Night Watch @ 1200 Baker Street, 6th Floor<br><br>**Jail Functional Capacity on June 11, 2023: 91.3%** |
| **22. Ramon Thomas**<br><br>Date and Location of Incident: July 1, 2023, Night Watch @ 1200 Baker Street, 6th Floor<br><br>**Planned Staffing Ratio at incident location on July 1, 2023: 1:47.85**<br>**Actual Staffing Ratio at incident location on July 1, 2023: 1:47.85**<br><br>**Jail Functional Capacity on July 1, 2023: 89.7%** |
| **23. Tramell Morelle**<br><br>Date and Location of Incident: July 30, 2023, Day Watch @ 1200 Baker Street, 3rd Floor<br><br>**Planned Staffing Ratio at incident location on July 30, 2023, Day Watch: 1:42.08**<br>**Actual Staffing Ratio at incident location on July 30, 2023, Day Watch: 1:42.08**<br><br>**Jail Functional Capacity on July 30, 2023: 90.6%** |
| **24. Nathan Henderson**<br><br>Date and Location of Incident: July 31, 2023, Day Watch-Night Watch @ 701 N. San Jacinto, 7th Floor<br><br>**Planned Staffing Ratio at incident location on July 31, 2023, Day Watch: 1:25.74** |

| |
|---|
| **Actual Staffing Ratio at incident location on July 31, 2023, Day Watch: 1:25.74**<br>**Planned Staffing Ratio at incident location on July 31, 2023, Night Watch: 1:34.9**<br>**Actual Staffing Ratio at incident location on July 31, 2023, Night Watch: 1:34.9**<br>**Jail Functional Capacity on July 31, 2023:91.2%** |
| **25. Bryan Johnson**<br><br>Date and Location of Incident: August 5, 2023, Day Watch @ 1200 Baker Street, 6th Floor<br><br>**Jail Functional Capacity on August 5, 2023: 89.6%**<br><br>**************************************************************************<br>Date and Location of Incident: October 1, 2023,[6] Day Watch @ 701 N. San Jacinto, 3rd Floor<br><br>**Planned Staffing Ratio at incident location on October 1, 2023, Day Watch: 1:46.4**<br>**Actual Staffing Ratio at incident location on October 1, 2023, Day Watch: 1:46.4**<br>**Jail Functional Capacity on October 1, 2023: 92.5%** |
| **26. Dequon Buford**<br><br>Date of Incident: September 25, 2023, Day Watch @ 1200 Baker, 3rd Floor;<br>September 27, 2023, Day Watch @ 1200 Baker, 3rd Floor<br><br>**Planned Staffing Ratio at incident location on September 25, 2023, Day Watch: 1:36.4**<br>**Actual Staffing Ratio at incident location on September 25, 2023, Day Watch: 1:36.4**<br>**Jail Functional Capacity on September 28, 2023:**<br><br>**Planned Staffing Ratio at incident location on September 27, 2023, Day Watch: 1:32.9**<br>**Actual Staffing Ratio at incident location on September 27, 2023, Day Watch: 1:32.9**<br>**Jail Functional Capacity on September 28, 2023: 93%**<br>**Jail Functional Capacity on September 29, 2023: 93%** |
| **27. Kenneth Richard**<br>Date and Location of Incident: April 27, 2023, Day Watch @ 1200 Baker, 6th Floor<br><br>**Planned Staffing Ratio at incident location on April 27, 2023, Day Watch: 1:41.4**<br>**Actual Staffing Ratio at incident location on April 27, 2023, Day Watch: 1:41.4**<br>**Jail Functional Capacity on April 27, 2023: 92%** |
| **28. Dylan Perio**<br><br>Date and Location of Incident: June 7, 2023; Night Watch @ 1200 Baker, 6th Floor<br>**Planned Staffing Ratio at incident location on June 7, 2023, Day Watch: 1:25.1**<br>**Actual Staffing Ratio at incident location on June 7, 2023, Day Watch: 1:25.1**<br>**Jail Functional Capacity on June 7, 2023: 91%** |

---

[6] Alleged as October 1, 2022—this appears to be a typo.

Defendant Harris County's Comprehensive MSJ                                        -13-

**29. Deon Peterson**
Date and Location of Incident: August 10, 2021, Day Watch @ 701 N. San Jacinto, 4th Floor

**Planned Staffing Ratio at incident location on August 10, 2021, Day Watch: 1:46.4**
**Actual Staffing Ratio at incident location on August 10, 2021, Day Watch: 1:46.4**
**Jail Functional Capacity on August 10, 2021: 96.12%**

Exs. 22 [Functional Capacity Reports] and 23 [DWS Reports].

**B.      Harris County Jail Is Subjected To Significant Oversight.**

29.      All jails in Texas counties are subject to the regulatory authority of the Texas Commission on Jail Standards (TCJS), including Harris County. *See generally* Tex. Gov't Code, Ch. 511. TCJS has adopted a comprehensive set of regulatory standards requiring that all county jail facilities conform to minimum standards of construction, maintenance, and operations. *See* Ex. 2 [TCJS Minimum Standards Handbook].

30.      TCJS standards are actively enforced. Through the use of audits, mandatory reporting requirements, grievances and complaints, there exists an active and ongoing enforcement and supervision of compliance with minimum jail standards. This is reflected in the regulatory framework that applies to all Texas County Jails. *Id.*

31.      Attached to this Motion is a binder containing a sample of TCJS Notices of Non-Compliance ("NONC's") and Responses that reflect the enforcement initiatives by the TCJS and how the Harris County Jail promptly responds. Ex. 15 [TCJS NONC & Responses]. Also submitted with this Motion are the certificates of compliance that were issued to Harris County during the relevant time period and beyond. Ex. 35 [TCJS Certificates of Compliance]. A TCJS certificate of compliance is evidence that Harris County's jail has met the minimum jail standards and is fully compliant with all requirements. Texas Administrative Code, Title 37, Part 9, §297.5.

32.      As explained by Assistant Chief of Detention Command Chief Phillip Bosquez, who has experience as a TCJS Investigator as well as Jail Administrator, inspections and Notices of Non-Compliance are not punitive, but rather an administrative tool that maintain a line of communication between the TCJS and the local jails to ensure TCJS rules are followed. Ex. 16 [Bosquez Aff].

33.      In the case of a custodial deaths, TCJS generally requires that it be provided notice within 24 hours of the death and that, with few exceptions, a custodial death is be investigated by an independent law enforcement investigation. *See* Tex. Gov't Code § 511.021; 37 TAC §269.1;

Defendant Harris County's Comprehensive MSJ                                      -14-

Ex. 2 [TCJS Handbook, p. 183]. Haris County follows this regulation. *See* Ex. 17 [TCJS Custodial Death Notices & Correspondence]. Finally, custodial deaths under Texas law undergo an autopsy by a medical examiner to determine the official cause of death and a report must be submitted to the Office of the Attorney General. Tex. Code. Crim. P. §49.18.

34.     Each of these administrative and investigative steps was fulfilled by the Harris County Sheriff's Office in the case of the thirteen custodial deaths in this case. The contents of the outside criminal investigators have been produced in discovery.

**C.     Detainees at the Harris County Jail.**

35.     Following an arrest by one of the dozens of law enforcement agencies in Harris County, detainees are processed, housed, and provided with numerous services while in custody.

**1. The Intake Process.**

36.     The intake process is a multi-layered system that includes medical screening, mental health screening, and classification assessment. In 2019 under Sheriff Gonzalez' leadership, the Jail opened the Joint Processing Center, which resulted from cross-agency collaboration and a total investment of approximately $100 million dollars. The JPC consist of a basement, three full floors, and a secure tunnel connection to other County facilities. The JPC facilitates the efficient intake and release processing of approximately 800 detainees daily and also includes 552 direct supervision housing beds. The facility was designed to optimize the flow of inbound and outbound detainees by reducing the need for officers to escort prisoners in and out of holding cells to perform the various processing functions.

37.     The JPC is where inmates are initially searched and immediately assessed to determine whether they need to be sent to a hospital before processing. They are then screened by Harris Health medical providers who work on site. Harris Health has a large footprint in the JPC and provides a range medical screening services. Detainees are then assessed by Harris Center mental health providers, who are also on site. Detainees then meet with various pretrial services staff who are able, at any time, to refer a detainee to Harris Health medical providers or Harris Center mental health providers. Ex. 29 [Ferguson Aff.].

38.     Used in conjunction with enhanced health screening, the JPC includes a front-door Diversion workstation to provide officers with alternatives to incarceration, such as the Ed Emmett Mental Health Center, the Neuro-Psychiatric Center (NPC) and the City of Houston Sobering Center.  The Diversion station can also expedite eligible detainees to post bond or pay

fines without entering the Harris County Jail housing areas. The JPC also includes a post-release area that allows people to meet with re-entry staff prior to exiting the JPC facility. *See* https://www.jointprocessingcenter.com/facility-overview; Ex. 29 [Ferguson Aff.].

39.     Within the JPC, inmates who will be assigned to housing go through a classification process. The Jail's classification system scores prisoner classification based on nationally recognized criteria and is paired with a staff interview so that subjective information may be included. This system allows for staff overrides and other adjustments to be made when necessary. The Jail's Classification System is dictated by TCJS and Harris County has internal policies requiring the officers assigned to Classification to account for the information required by State law. Ex. 2 [TCJS Minimum Standards Handbook]; Ex. 4 [HCSO Policy, 271.1]; Ex. 18, pp. 20-22, 38-43 [Expert Report of Sean Stewart].

40.     In 2023, Harris County utilized the Point Additive Classification Method, one of the two systems expressly authorized by TCJS. TCJS mandates that county jails use either the Decision Tree or Point Additive method and provides the standardized scoring instruments for each. TCJS also certifies the training required for all officers who perform inmate classification. Harris County's use of the Point Additive method in 2023 was fully compliant with TCJS requirements. Ex. 18, pp. 38-43 [Expert Report of Sean Stewart].

41.     The standardized form includes specific interview questions and observational criteria, including gang affiliation. If gang tattoos or indicators are identified, the appropriate notation is made, and the gang-related section of the form is completed. In Harris County, gang-related information is forwarded to the Gang Intelligence Unit for further review and documentation. *Id.*

42.     HCSO Standard Operating Procedure (SOP) 915, also contains a "Keep Separate" policy that provides an additional layer of protection by establishing alerts for individuals who may require separation from others due to gang concerns, prior assaults, disciplinary issues, or vulnerability factors. Once a keep-separate alert is placed on an inmate's record, it remains active during future incarcerations acting as an added safeguard within the Jail classification system. Ex. 18, p. 43 [Expert Report of Sean Stewart].

**2. Harris Health and Harris Center's provision of medical care at the Jail.**

43.     Within the regulatory framework, TCJS mandates development of operational plans submitted for review and approval by the TCJS on 17 categories pertaining to jail administration.

*See* Ex. 3 [TCJS Required Operational Plans]. Within the required Operational Plan is the Health Care Services Plan. *Id.*; *see also* 37 Tex. Admin. Code, Ch. 273.

44.     The Harris County Sheriffs' Office has a set of TCJS approved Operational System Plans that includes an Operational System Plan for provision of health care services. *See* Ex. 4 – HSCO Operational System Plans and 5 – HCSO Health Care Services Plan (TCJS Approved).

45.     In addition, the HCSO has had in place a set of Standard Operating Procedures (SOP) that pertain to the maintenance and operation of the Harris County Jail. *See* Ex. 6 – CJC SOPs Index to SOPs. The SOPS include policies and procedures that support and correspond to the Health Care System Plan mandated by TCJS to provide medical and mental health case. *See* Ex. 6 – CJC SOPs.

46.     By March 1, 2022, Harris County and the HCSO had transitioned all delivery of health care services to the inmate jail population to two outside agencies that specialize in medical and mental health care: Harris Health Systems and Harris Center for Behavioral Health. *See* Ex. 6 HCSO Health Services Manual (pre 3/1/2022); *see also* Ex. 7 HCSO Nursing Policies (pre 3/1/2022); Ex. 9 Interlocal Agreement (ILA) between Harris County and Harris Health Systems ("ILA w HHS); *see also* Ex. 10 Interlocal Agreement (ILA) between Harris County (ILA w Harris Center).

47.     The 2018 Final Report to the Harris Health System and the 2021 Memo from the Harris County Budget Management Department to the Commissioners Court regarding the status of transition of Jail Health Services offers insight into the reasons why local public officials contractually shifted responsibility for the provision of Inmate Care from the direct control of the HCSO to other public health care entities, that is, Harris Health Systems and Harris Center. *See* Ex. 11 Final Report by Health Management Associates to Harris Health System re Inmate Health Care (HMA Report) (Dec. 2018). By way of further context pertaining to the transition for the delivery of health care services, see the internal report by the Harris County Budget Management Department to the Commissioners Court. *See* Ex. 12 – Report from BMD to HC Commissioners Court (4/6/2021).

48.     Shortly after the transition was effectuated on March 1, 2022, the HHS adopted its own set of Health Care Correctional Health Guidelines. Ex. 13 Harris Health Correctional Health Guidelines (August 2022).

49.      In addition, since at least 2019, the Jail has pursued accreditation by the NCCHC. The NCCHC grew out of a program begun by the American Medical Association in the 1970's to set recommended requirements for "the proper management of a correctional health services delivery system." *See* Ex. 14 NCCHC Reports & Certificates (2020 to 2025).

50.      The surveys, reports, and recommendations of the NCCHC, an outside non-profit organization, has served as a sounding board for the continued monitoring and improvement for the delivery of health care for the Harris County Jail inmate population. *Id*.

51.      As reflected in the HMA Study to the Harris Health System, the contractual arrangement between the Harris County Jail and the existing organizations that already provide medical, mental, and behavioral health services to the general public expands and enhances the delivery of correctional health care to the jail inmate population.

52.      By treating the jail inmate population as a patient group with specific health care needs in a judicial law enforcement setting, this patient group in a custodial status is the beneficiary of a larger network of health care services. *See* Ex. 11 HMA Report; *see also* Ex. 12 – BMD Report to Commissioners Court; *see also* Ex. 14 NCCHC Accreditation History (2020 to 2025).

### 3. Observation of Inmates at the Jail.

53.      There are three basic facility designs used in the nation's jails and prisons. The facility designs determine the type of supervision system which will be used. Direct Management, Podular Remote Management and Linear Indirect Management. Harris County Jail System uses both Direct Management and Podular Remote Management due to facility construction at the time they were designed. Direct management design generally referred to as direct supervision enhances the intensity of supervision by posting one or more officers right inside the pod, instead of looking in from the outside. Ex. 18, pp. 19-22 [Expert Report of Sean Stewart].

54.      The Podular Remote Management design generally involves clustering cells into pods or living units and then arranging the pods around an elevated central control room with clear sight lines into the inmates' common areas (also referred to as day rooms). The amount of vision into individual cells from the control room is primarily dependent on factors such as the manner in which the cells are arranged and how much of the front of the cells is glazing. While inmates are locked in individual cells for the night or for other lockdown staff members make periodic rounds to observe the locked down inmates. Podular Remote Management is much more effective than Linear Remote Management for monitoring prisoners and provides a substantial

improvement in prisoner supervision. Podular Remote Management designs can provide improved observation with no increase in staffing. *Id.*

55.     A significant aspect of inmate supervision comes from officers performing observation rounds. In 2017, the Harris County Jail System began a 3-year process transitioning to a new Jail management system (Offender Management System) that included an electronic observation rounds system. Harris County purchased and implemented CorreTrak, which requires detention officers to use IPADS to scan a strategically placed QR code which brings up a form of drop-down messages to record the observation round. The location and time cannot be altered and the person logged in to the device will be the one identified for the round. This system, unlike the prior paper-based tracking where officers would simply write down where they went and when, ensures that an officer is physically present in the area where the round is being performed. *Id*.

56.     The system became fully deployed in 2022 and **recorded a staggering 5,901,494 rounds completed in 2022 and 6,567,794 rounds completed in 2023.** Ex. 24 [Smith Aff.].

57.     Additionally, Corre Trak provides a pop-up box advising when rounds are late. Users will always enter a comment documenting in detail why (fight, medical emergency, etc.) the round is late. If rounds are late a supervisor will be notified. Ex. 18, pp. 19-22 [Expert Report of Sean Stewart]. The frequency with which rounds must be performed is dictated by TCJS and codified within Harris County's policies. 37 Tex. Admin. Code § 275.1; Ex. 6 [CJC SOP 220 – Inmate Observation].

58.     Harris County's written policy dictates not just when observation rounds should be conducted but also, how (emphasis in original):

> Observation – Means to obtain a firsthand evaluation of the inmates' attitudes and temperament, while paying close attention to the physical, mental, and emotional condition of each inmate to detect signs of distress or need for medical, psychological or other special services. (See III, D, (1-12) for additional requirements.
> OBSERVATION REQUIRES THE STAFF MEMBER TO ACTUALLY LOOK AT AND EVALUATE EACH INMATE. IF YOU CANNOT SEE THE INMATE, YOU DID NOT COMPLY WITH REQUIREMENTS REGARDING INMATE OBSERVATION!

*See* Ex. 6 [CJC SOP 220 – Inmate Observation; *see also* CJC 235 – Suicide Prevention].

59.     Additionally, since 2017 the Harris County Jail has undergone a significant, multi-year modernization of its camera systems. The County replaced its analog system with a comprehensive digital platform, adding several hundred cameras throughout the jail system that

is now fully integrated allowing for better oversight. Currently, there are more than 4,000 cameras that allow for 24/7 monitoring of inmates, in addition to the interval rounds activities that are completed on every shift. Ex. 29 [Ferguson Aff.]; Ex. 18, pp 19-22 [Expert Report of Sean Stewart].

60.    Finally, officers are trained and expected to intervene in combative actions, remove inmates from housing where they have been in an altercation to avoid future altercations, and to take inmates to the medical clinic after any use of force incident and any other type of incident that results in injury. Ex. 25 [CJC Policy].

### 4. Grievance Process

61.    While at the Harris County Jail, inmates have access to kiosks on which they are able to make various requests and submit grievances for several different categories of complaints ranging from medical care to complaints against Detention Officers or concerns about safety. Ex. 29 [Ferguson Aff.]. *See* Ex. 36 Inmate Handbook; *see also* Ex. 6 CJC SOP re Grievances.

### 5. Special Investigations within the Jail

62.    In addition to provisions of basic needs, including access to medical care, and regular observation, the Jail also has a team of investigators whose role is to identify criminal activity within the facility as an additional safeguard. These officers detect and monitor serious criminal behavior like gang activity and contraband smuggling. They also take a preventative approach to criminal activity interdiction with the goal to stop criminal activity within the Jail before it begins. Ex. 29 [Ferguson Aff.].

**D.    Detention Officers At The Harris County Jail.**

**1. Hiring Process**

63.    The application process begins with an applicant submitting an online application through the HCSO Recruiting website. Applicants who meet the minimum standards, as defined by the Texas Commission on Law Enforcement, are scheduled for a battery of examinations, including physical ability tests, a psychological examination, a polygraph, a background investigation, a personal interview, a medical evaluation, and drug testing. Ex. 16 [HCSO Policy 201].

Defendant Harris County's Comprehensive MSJ                                                    -20-

**2. Training.**

64.     Newly hired detention officers are required to successfully complete the Basic County Corrections course in order to obtain a Texas county jailer's license. Ex. 25 [J. Gonzalez Aff.]. The training is prescribed by the Texas Commission on Law Enforcement. Harris County follows the State-mandated training *and* requires additional courses on de-escalation training, which covers force options scenarios, critical decision-making process and de-escalation from Police Executive Research Forum (PERF) and Active Bystandership in Law Enforcement (ABLE) from Georgetown Law. *Id*. The training covers important topics like use of force in the correctional setting, deescalation, and working with inmates who have mental health issues. *Id*.; Ex. 19 [Training Material].

65.     In addition to the classroom training, detention officers are required to work with a field training officer to demonstrate basic skills in order to be released to work independently. Ex. 25 [J. Gonzalez Aff.]. The Field Training includes instruction on how to use the OMS system, how to facilitate an inmate's access to medical care, and, importantly, how to track and properly conduct an observation round. Ex. 25 [J. Gonzalez Aff.]. A training officer is responsible for ensuring that a trainee has demonstrated proficiency in all required areas and then to sign off on the officer's proficiency before the officer can be released from training. *Id*.

66.     Also, in order to advance to become a supervisor, officers must successfully complete new supervisor orientation, which includes a phased of shadowing other supervisors and mastering content like use of force, emergency procedures, sexual assault PREA training. Ex. 25 [J. Gonzalez Aff.]; Ex. 20 [HCSO New Supervisor Orientation].

**3. Detention Officers are required to adhere to Harris County policies, including on use of force.**

67.     The HSCO has a Policy and Procedures Manual that spells out the expectations for detention officers and supervisors. The policies are wide-ranging and, particularly relevant here, include directives on observing inmates, providing inmates with access to care, and deescalation.

68.     With regard to use of force, the Policy states that detention officers are authorized to use only reasonable force that is necessary to protect themselves and others and accomplish legitimate law enforcement purposes or maintain security in detention facilities. Ex. 25 (UOF Policy binder).  HCSO policy also holds that the reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. The use of force

policy as described above has been in effect since prior to the allegations made by Plaintiffs and in during the time periods alleged. Exs. 25, 28 [UOF policy binder and Tschudy Aff.].

69.     Additionally, the policy calls for use of force documentation, investigation and discipline. All officers are required to fill out a Use of Force form for every single incident involving use of force. Ex. 28 [Tschudy Aff.]. Each of these uses of force is passed up in the chain of command and reviewed for policy compliance at several levels. Ex. 28 [Tschudy Aff.].

70.     If there is an issue involving a potentially incorrect use of force or potential policy violation with respect to the force used, the HCSO assigns it for Internal Affairs investigation and review. *Id.*

71.     Upon assignment, Internal Affairs then conducts an investigation into the use of force and whether it complied with policy. Ex. 28 [Tschudy Aff.]. Detainee complaints about use of force receive similar investigation. *Id*. Consequently, every use of force incident is thoroughly reviewed, and any alleged or potential violation of the use-of-force policy is thoroughly investigated, culminating in written reporting up the chain of command and ultimate policy determination and discipline determination with an Administrative Disciplinary Committee. Ex. 28 [Tschudy Aff.]. These policies and procedures as described above have been rigorously followed since at least 2015. *Id*.

72.     Also, Harris County provides its detention officers with various in-service training dealing with issues involving use of force. Ex. 25 [J. Gonzalez Aff.]. This is in addition to use of force training in the jailer academy all detention officers must receive before they become licensed. *Id*.   TCOLE has repeatedly audited and approved of the Jail's training, including on use of force. *Id*.

### 4. Supervision.

73.     The Harris County Sheriff's Office Detention Command is overseen by seasoned executives, including, but not limited to, Undersheriff Thomas Diaz, Assistant Chief of Detention Operations Command Phillip Bosquez, Jail Commander Ruth McClanahan, Major Matthew Ferguson, and Major Kimberly Smith.

74.     Within the Jail, there are also supervisors at the rank of Captain, Lieutenant, and Sergeant each of whom has a span of control and responsibility. Supervisors at the rank of Captain, Lieutenant, and Sergeant each have a span of control and responsibility, which is primarily to ensure that detention officers are adequately performing their job functions. In addition to daily

Defendant Harris County's Comprehensive MSJ                                                    -22-

monitoring of detention officers, supervisors are provided with tools like performance evaluations, random audits of functions like timeliness of observation rounds, mandatory review of all use of force incidents, and regular review of officers' PEWS records to ensure officers are being adequately supervised. Part of new supervisor training requires newly promoted employees to spend several weeks shadowing current supervisors at the Jail to ensure that they are familiar with all areas of supervision before working independently. Ex. 29 [Ferguson Aff.].

### 5. Discipline.

75.     In order to ensure compliance with policies, detention officers who fail to follow policies are subject to a disciplinary process. "The underlying purpose of corrective and disciplinary actions is to modify the employee's conduct or behavior so that it complies with the agency's policies and procedures and to ensure: HCSO work is handled professionally; Unprofessional conduct will not be tolerated; Employees who perform their assignments in a professional manner will not be adversely affected by the few who do not; A mechanism exists, through suspension or termination, to protect the operational integrity and high ideals of the HCSO from those few persons whose actions or omissions reflect they should no longer be associated with HCSO; and HCSO has an avenue for the exercise of accountability." Ex. 16 [CJC Policy 301].

76.     Disciplinary consequences range from verbal counseling to termination. The disciplinary process involves a multi-layered assessment of an officer's conduct to determine whether discipline is appropriate. Importantly, Harris County's policy is for all use of force incidents to be documented and reviewed by a supervisor. *Id*.; Ex. 28 [Tschudy Aff.].

77.     In just one of the relevant years, supervisors and Internal Affairs sustained 18 excessive force policy violations who were disciplined and referred the cases to the District Attorney's Office, which reflects HCSO's commitment to ensuring officers follow police or face consequences. Ex. 28  [Tschudy Aff.].

### V. PROCEDURAL BACKGROUND

**A.      Dissonance In The Related Litigation In The Southern District Of Texas, Houston Division.**

78.     In addition to summarizing the procedural history in the instant matter, Harris County also advises the Court of the posture of *Chavez-Sandoval, et al. v. Harris County*. *Chavez-Sandoval*, which is especially important because, there, the same counsel representing Plaintiffs

Defendant Harris County's Comprehensive MSJ                                                    -23-

in *Wagner* filed a lawsuit on behalf of multiple plaintiffs with virtually identical pleadings to those here.

79.     Despite virtually identical allegations and use of the same tactic of pulling together unrelated cases, Judge Rosenthall determined that those cases should proceed separately.

**B.      The Wagner Case**

80.     Here, the Court denied the County's Motion to Dismiss, along with its Motion to Severe and Motion to Reconsider Severance. Docs. 40, 51, 86, 120. However, the Court expressly permitted Harris County to renew its severance motion in advance of trial. Doc. 120. By this Motion, Harris County, again, requests that the Court severe the cases to harmonize the findings within the Division.

81.     Additionally, since the Motion to Severe and Motion to Reconsider were denied, Harris County has filed 16 summary judgment motions focusing on the absence of underlying Constitutional violations where clear evidence demonstrates that the Plaintiffs and Intervenors cannot make even the most basic showing in support of their Monell claims: that they actually suffered a Constitutional violation. All 16 Motions remain pending.[7]

## VI. ARGUMENTS AND AUTHORITIES

**A.      Summary Judgment Standard.**

82.     As a threshold matter, all 29 Plaintiffs allege that their claims are the result of unconstitutional conditions of confinement or, in the alternative, episodic acts.

83.     Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Parties seeking summary judgment bear the initial burden of informing the Court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, which the party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

---

[7] The County has pending Motions for Summary Judgment that are fact specific and in which the Timeline Summaries (custodial timeline and medical timeline) are central to the facts of each case. Both sets of Timeline Summaries are provided here in a condensed format. Ex. 20 [Medical Timeline Summaries]; *see also* Ex. 21 Custodial Timeline Summaries].

Defendant Harris County's Comprehensive MSJ                                                    -24-

84. To demonstrate the lack of evidence, the moving party without the burden of proof may demonstrate the lack of proof by submitting evidentiary proof in the form of documents, affidavits, deposition testimony in support of the Rule 56(a) argument that the plaintiff (i.e., the nonmoving party with the burden of proof) cannot, as a matter of law, provide evidence to satisfy each element of the claims asserted. *Nieto v. State Farm*, 722 F. Supp. 3d 653, 657 (S.D. Tex. 2024).

85. Once the movant fulfills the burden set forth under Celotex, the burden shifts to the non-movant to show that summary judgment should not be granted. FED. R. CIV. P. 56. The party opposing a properly support motion for summary judgment may not rest on mere allegation or denial of pleadings but must set forth specific fact showing the existence of a genuine issue as to each element of an alleged claim remaining for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986); *see also Celotex Corp.*, 477 U.S. at 322-323 (failure of non-movant to establish any essential element of a claim defeats the claim as a matter of law).

86. "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted). Unsubstantiated assertions that a fact issue exists will not suffice. *Krim v. Banc Texas Group, Inc.*, 989 F.3d 1435, 1442 (5th Cir. 1993).

87. The dispositive motion is also brought as a *Celotex* "no evidence" Motion for Summary Judgement. A moving party who does not bear the burden of proof at trial may move for summary judgment by pointing out that there is "no evidence" to support one or more elements of the non-movant's claim. *See* FRCP Rule 56(a); *see also Austin v Kroger Texas*, L.P., 864 F.3d 326, 335 & n.10 (5th Cir. 2017) and *Nieto*, 722 F.Supp. 3d at 653. The burden of production then shifts to the non-moving party, the party with the burden of proof, that there is sufficient evidence as to each element of an alleged claim to, at a minimum, create a material issue of fact for a jury. *Id.*; *see also Celotex Corp.,* 477 U.S. at 322-323 (1986) (failure of non-movant to establish any essential element of a claim defeats the claim as a matter of law).

88. Plaintiffs cannot meet either burden.

**B.     Conditions of Confinement Standard.**

89. The Fourteenth Amendment's Due Process Clause forbids holding pretrial detainees in conditions that "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Conditions amount to punishment when they are "imposed for the purpose of punishment." *Id*. at 538. That

the government's purpose for imposing the restriction or condition is to punish may permissibly be inferred only where the restriction or condition is not reasonably related to a legitimate goal— if it is arbitrary, purposeless, or senseless. *Garza v. City of Donna*, 922 F.3d 626, 632 (quoting *Bell*, 441 U.S. at 539).

90.    A conditions-of-confinement claim, therefore, should be read as "a constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996)). The harm is caused by the condition itself. *Hare*, 74 F.3d at 644.

91.    The condition of confinement that amount to punishment can arise from either an explicit policy or "an unstated or de facto policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare*, 74 F.3d at 645).

92.    Because the plaintiff in a conditions-of-confinement claim is challenging a policy or practice, he need not allege that an individual state actor acted knowingly or intentionally. *See Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 463 (5th Cir. 2015). Instead, the plaintiff must prove: (1) that a rule, restriction, custom, or practice was extensive or pervasive; (2) that the rule, restriction, custom, or practice was not reasonably related to a legitimate governmental objective; and (3) that the rule, restriction, custom, or practice was the moving force or actual cause of the violation of the detainee's constitutional rights. *See Cadena v. El Paso Cnty.*, 946 F.3d 717, 727 (5th Cir. 2020) (quoting *Duvall v. Dallas County, Tex.*, 631 F.3d 203, 207 (5th Cir. 2011) (per curiam)).

93.    To prove the causation element of a conditions-of-confinement claim, the plaintiff must allege facts showing that practice or custom was "closely related to the ultimate injury" and "actually caused the constitutional violation complained of." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 310 (5th Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)); *see also Spiller v. City of Texas City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (the plaintiff must allege facts showing that "the custom or policy served as the moving force behind the constitutional violation") (cleaned up).

Defendant Harris County's Comprehensive MSJ                                                                -26-

## C.    Episodic Acts Standard

94.    "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability….Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 415 (1997).

95.    Thus, to overcome summary judgment on their episodic claim against the County, Plaintiffs must raise a fact dispute as to whether (1) County officials, acting with subjective deliberate indifference, violated Plaintiffs' constitutional rights, and (2) the County employees' acts resulted from a municipal policy or custom adopted with objective indifference to Plaintiffs' constitutional rights. *Cope v. Coleman Cnty.*, No. 23-10414, 2024 WL 3177781, at \*5 (5th Cir. June 26, 2024). To exhibit subjective deliberate indifference, a County employee must have "had subjective knowledge of a substantial risk of serious harm" and "responded to that risk with deliberate indifference." *See Cope I*, 3 F.4th 198, 207 (5th Cir. 2021) (quotation omitted). "Deliberate indifference is an extremely high standard to meet but can be satisfied by a wanton disregard for an inmate's serious medical needs." *Id*. (alteration adopted) (internal quotation marks and citation omitted).

96.    As this Court has noted, "[t]he distinction between the two theories is of practical importance. An episodic act claim has a subjective deliberate indifference requirement, which means that the plaintiff must show that the officer had "actual knowledge of the substantial risk . . . and responded with deliberate indifference." *Hare*, 74 F.3d at 650; *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997). In contrast, conditions claims are adjudicated under the standard articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979), which allows courts to "assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Flores*, 124 F.3d at 738. Therefore, no showing of deliberate indifference is required. *See Hare*, 74 F.3d at 643.

97.    On this point, Judge Rosenthal has also succinctly explained that:

> The element of causation often distinguishes a conditions-of-confinement claim from an episodic-acts-or-omissions claim. *See Estate of Henson*, 795 F.3d at 464. Causation turns on whether the plaintiff was harmed by the allegedly unconstitutional conditions themselves or by the actions of a municipal employee. *Id.*
>
> The case of *Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) (en banc), provides an example.

The plaintiff in Scott sued the city, alleging that an officer sexually assaulted her while she was in pretrial detention. *Id*. at 52. In her conditions-of-confinement claim against the city, she alleged that understaffing at the jail led to the assault. *Id*.

In rejecting this claim, the court noted that while Scott alleged that inadequate staffing allowed the incident to occur, the actual harm she alleged was the sexual assault. *Id*. at 53. The court explained: In many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions. Here, however, Scott did not suffer from the mere existence of the alleged inadequate staffing, but only from Moore's specific sexual assaults committed on but one occasion. Consequently, this case does not fit well within the conditions-of-confinement category *Id*. at 53-54.

The Fifth Circuit has since identified a "rule" that when a particular municipal actor is interposed between the injured party and the municipal defendant, causation does not result from the policy itself and the case is properly treated as one based on an episodic act. *See Garza*, 922 F.3d at 633.

*Chavez-Sandoval v. Harris Cnty*., Civil Action No. H-24-3072, 2025 WL 2029931, at *5 (S.D. Tex. July 21, 2025).

98.    In previously denying the County's Motion to Dismiss, this Court read the County's argument to be that because there "were individual Jail employees involved in each of the alleged incidents, these claims must be brought under an episodic-acts-or-omission theory." Doc. 51. This is not the County's position. Rather, the County's position is that the incidents involve decision-making by individual actors and departures for the actual policies that precludes the necessary causal connection to a supposed condition at the Jail.

99.    Before the Court now is evidence that the alleged conditions do not actually exists and to the extent a Constitutional injury has occurred, it has, unfortunately resulted from independent acts by individual actors, not from a condition imposed by Harris County.

**D.    Staffing Management, Jail Population, And Observation Of Inmates At The Harris County Jail Cannot Form Independent Constitutional Violations.**

100.    Plaintiffs' sloppy and convoluted pleadings appear to aver that the Jail imposes conditions of understaffing, overcrowding, and not observing inmates that has caused each Plaintiff separate and independent Constitutional violations. As a starting point, it is critical to note that none of the supposed conditions alleged here are, themselves, Constitutional violations.

101.    In cases brought by the same cohort of lawyers, Judge Rosenthall has explained that "subjecting detainees to overcrowding or understaffing is not, by itself, a constitutional violation." *Chavez-Sandoval v. Harris Cnty*., CIVIL ACTION NO. H-24-3072, 2025 WL 2029931, at *6 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *see also Castillo v.*

*Cameron Cnty.*, Tex., 238 F.3d 339, 354 (5th Cir. 2001) ("overcrowding is not per se unconstitutional."). Nor is "the failure to observe and monitor detainees, standing alone, [] a constitutional violation, and a violation of state laws or standards cannot be the basis for imposing liability under § 1983." *Simon v. Harris Cnty.*, Civil Action No. H-25-2329, 2025 WL 2468871, at *4 (S.D. Tex. Aug. 27, 2025) (citing *Daniels v. Williams*, 474 U.S. 327, 332-33 (1986)).

102.    Instead, a detainee presenting a conditions-of-confinement claim based on understaffing, overcrowding, or not observing inmates must show that he had a specific basic human need that could not be met due to staffing levels, population levels, and/or periodic observation and monitoring by jail officials and that the jail's actions amounted to punishment and actually caused the violation of the detainee's rights. *Simon v. Harris Cnty.*, Civil Action No. H-25-2329, 2025 WL 2468871, at *4 (citing *Shepherd*, 591 F.3d at 454).

103.    Consequently, each of the 29 Plaintiffs must prove that at the time of the incident on which they base their claim, the alleged condition existed and amounted to punishment and that said condition caused their individual injuries.

**E.    Staffing At The Harris County Jail Is Not Violative Of The Constitution.**

104.    Initially, the inquiry is whether there is sufficient evidence proving that the Jail imposes understaffing as a condition of confinement. It does not.

**1. The Jail has not adopted a *de facto* policy of understaffing.**

105.    Plaintiffs allege that there is a pattern of understaffing sufficiently extended or pervasive such that it is the official policy of the Jail.

106.    On the contrary, the official policy of the Harris County Jail is to staff in accordance with State law, which requires a 1:48 ratio of detention officer to detainee staffing. 37 Tex. Admin. C. § 275.4. ("One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision.").

107.    In order to satisfy the requirements imposed by State law, the Harris County Sheriff's Office assigns approximately 2,000 employees to work in Detention Command. Ex. 29 [Ferguson Aff.]. Since 2017, Harris County has added significant detention positions to staff the Jail.

108.    Staffing within the Jail is monitored daily by an entire team of officers who focus on assessing, planning, and monitor staffing in the Centralized Staffing Office. Their purpose is to ensure  that every floor of every building has sufficient staff assigned to monitor inmates. Ex. 29 [Ferguson Aff.]. They verify the number of inmates twice a day.

109.    Once the number of inmates on each floor has been determined, the Centralized Staffing personnel assign the necessary detention officers to each floor. Ex. 29 [Ferguson. Aff.]. In addition to the detention officers who are assigned in housing to perform the routine monitoring of inmates, each building is also staffed daily with Watch Commanders, floor sergeants, and support sergeants. Auxiliary personnel who are also licensed detention officers, also work in the jail each day and can be redeployed to housing if needs arise. Ex. 29 [Ferguson Aff.]; Ex. 16 [Bosquez Aff.]; Sheriff Gonzalez Depo. Said another way, the Jail complex is, by design, *overstaffed*—resources just have to be properly directed by the staffing office or supervisors in case of unexpected events.

110.    And, indeed, supervisors are required to verify that staffing is appropriately assigned to their floor and they sign off indicating that they have reviewed the DWS for coverage and accuracy. Ex. 29 [Ferguson Aff.].

111.    Despite this complex system of staffing oversight, the number of both inmates and staff on a floor throughout a shift can fluctuate because of unexpected occurrences like movement of inmates, responses to emergencies, and unanticipated events with staff, like illness. Ex. 16 [Bosquez Aff.]. To account for this, supervisors have the authority to assign detention officers who are working auxiliary positions, like laundry, and redeploy them to housing. *Id*.

112.    Here, Plaintiffs rely almost exclusively on a handful of TCJS Reports to support their allegation that the County has a *de facto* policy of understaffing, overcrowding, and failing to observe inmates. They cite 14 reports spanning 13 years and reference one TCJS meeting. *See* SAC 122 at pp. 83-104. As an initial matter, Plaintiffs lack a cognizable Constitutional interest in the Jail's compliance with state laws or regulations, which cannot form the basis of a colorable claim. *See Taylor v. Cockrell*, 92 F. App'x 77, 78 (5th Cir. Feb. 12, 2004).

113.    To the extent Plaintiffs posit that because there are NONCs going back to 2016, this proves that the Jail has a practice of understaffing and is deliberately indifferent to same, the facts do not support their supposition.

114.    For one thing, the audits are a mere snapshot in time and do not reflect systemic issues, in part because they cannot account for the dynamic nature of the Jail, which gives critical context that is not captured on review of still records. Ex. 16 [Bosquez Dep.]. But more importantly, they do not capture the thousands of days in between audits when staffing levels have met or exceeded the standard. To be sure, during the relevant time, the Jail received annual passing audits by TCJS demonstrating full compliance. Ex. 35. Using Plaintiffs' logic, the fact that TCJS determined Harris County met standards during a particular inspection *must* evidence a systemic pattern of compliant staffing.

115.    Finally, the complex system used to manage staffing, the additional hiring and recruiting that was pursued to bridge any gaps caused by back-to-back disasters that dramatically increased the jail population, cannot be read as demonstrating indifference to this issue. Sheriff Gonzalez testified unequivocally about his commitment to not just meeting minimum staffing standards, but to ensuring the Jail exceeds the minimum standard and can facilitate programs to increase inmate safety and well-being, like the literacy program and women's empowerment center. This is reflected in the dedicated staffing managers an ongoing efforts to ensure staffing is appropriate.

**F.      Staffing Models Designed To Comply With State Law Serve A Legitimate Government Interest And Is Not Arbitrary or Purposeless.**

116.    Even if the minutia of TCJS reports was sufficient to show pervasive, unchecked staffing issues—which it is not—the evidence in the record demonstrates that Harris County staffing model is designed to ensure compliance with the state standards; it is not arbitrary or purposeless and, therefore, cannot be read as being a condition imposed for the purpose of punishment. *See Shepherd*, 591 F.3d at 452. To constitute impermissible punishment, the condition must be one that is "arbitrary or purposeless" or, put differently, "not reasonably related to a legitimate goal." Here, the evidence does not support such a finding.

**G.      Staffing Did Not, Itself, Cause Any Of The Alleged Constitutional Violations.**

117.    FInally, the evidence here simply does not support a finding that staffing was the cause of any of the Plaintiffs' injuries. Plaintiffs have the burden to prove not "the mere existence of the alleged inadequate staffing," but that the harm flowed from the alleged condition. *Scott*, at 53-54.

Defendant Harris County's Comprehensive MSJ                                              -31-

118. First, the Daily Watch Schedules demonstrate that **the planned staffing was never below the state minimum when any of the Plaintiffs' incidents occurred.** Ex. 23. The plan reflects the policy.

119. These documents also show that there were only three shifts when the actual staffing dipped below the state minimum. *Id*. It is axiomatic that the Jail would have to have been understaffed when the underlying incidents occurred in order for staffing to have been the moving force behind the injury.

120. As to the instances where the actual staffing dropped below the ratio, those are as follows:

- Jacoby Pillow, actual Staffing Ratio at incident location on January 3, 2023, Night Watch (of January 2, 2023): 1:48.75, Actual Staffing Ratio at incident location on January 3, 2023, Day Watch: 1:48.25;

- Jaquez Moore, actual Staffing Ratio at incident location on April 19, 2023, Day Watch: 1:49.28.

121. In Pillow's case, the allegation is that there were actually *too* many officers were involved with Pillow, not too few.

122. That leaves only Jaquez Moore.

123. Jaquez Moore did not die in custody—he died of a gunshot wound that he sustained *after* being released during a non-law enforcement encounter. While in Jail, Moore was documented as having been assaultive towards other inmates, which resulted in him being moved to multiple housing areas. Moore's file also indicates that he had a seizure: *On Sunday, February 12, 2023, I, Detention Officer J. Taiwo (EIN 159671), was assigned to 2nd Watch, 3rd Floor, E-Pod, of the Harris County Sheriffs Office Detention Facility located at 1200 Baker Street in Houston, Texas. At approximately 2340 hours, an unidentified inmate from 3E1A informed me (D.O Taiwo) that another inmate by the name Moore, Jaquez (SPN: 62959554) was having a seizure. I look through the 3E1A window and I saw an inmate on the floor shaking. I paged over the TOA system for available rovers to respond to a medical emergency at 3E1A and I called the clinic for stretcher. D.O Salazar (EIN: 159824), D.O Imouk, J (EIN: 160883), D.O Brezik, B (EIN: 154317) and Sergeant Sneed. Q (Badge# 542) responded. Two Agency nurses later came with stretcher and Inmate Moore was taken out of the pod on a stretcher to the 1200 Baker Clinic.* There is absolutely no indication that staffing played a role in this, or any other incident in which Moore was involved.

124.    In sum, Plaintiffs' central argument is constructed on smoke. They allege that a handful of notices from the TCJS translates to widespread policy of understaffing the Jail that went unaddressed by Sheriff Gonzalez. This is patently false. The TCJS notices are woefully insufficient in number to demonstrate a pattern of understaffing in a Jail the size of Harris County. And, in any event, were followed by certificates of compliance Additionally, the Harris County Jail has faced extraordinary challenges in its inmate population during the relevant time and respond with increased hiring, increased salaries, and by spending millions to outsource inmates—all while adding programing to increase inmate well-being and safety.

125.    There simply is no "condition" of understaffing that has been ignored at the Harris County Jail, as Plaintiffs claim. Indeed, in only two of the 29 claims at issue did staffing fall below the standard set by State law. This is insufficient. The Court must account for the overwhelming size of the Harris County Jail and the span of years over which the incidents occurred. *Peterson*, 588 F.3d at 851 (quoting McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir.1989)). Because Plaintiffs cannot show a de facto policy of understaffing used to punish detainees, nor can they connect staffing deficiencies with the underlying Constitutional violations alleged here, Harris County is entitled to judgment as a matter of law on all claims based on staffing.

## H.    There Is Not A Condition Of Overcrowding The Harris County Jail.

### 1. The Jail has not adopted a *de facto* policy of overcrowding

126.    The capacity of the Jail is monitored daily to ensure that the Jail does not exceed the capacity set forth by the TCJS. The overwhelming evidence, including the Jail's functional capacity reports and TCJS's population reports, show that during the relevant time period, the Jail stayed at or below its designated capacity. **In other words, the Jail was not overcrowded.**

127.    Of course, Harris County has no control over the number of arrested persons brought to the Harris County Jail by any of the 80 agencies in its jurisdiction. Yet, the burden to maintain capacity level is shouldered entirely by Harris County. To manage the burden, Harris County conducts twice daily inmate counts to ensure they are not exceeding capacity and spends millions of dollars to house inmates offsite to reduce the overall population at the Jail and stay within the capacity limits set forth by TCJS. Exs. 18, 29 [Expert Report of Sean Stewart and Ferguson Aff.]. The decision to spend millions of dollars to ensure the capacity was not exceeded was a

deliberate one demonstrating that Harris County does not impose overcrowding as a condition of the Jail to punish detainees. Exs. 18, 24 [Smith Aff. and Expert Report of Sean Stewart].

### 2. Maintaining a population that is at or below the capacity designated by TCJS serves a legitimate government interest.

128.    Further, as with staffing, Harris County has a legitimate interest in maintaining the population prescribed by State regulatory authorities, which is not an arbitrary or purposeless reason to institute particular policies, thus, the jail population management system cannot be read as being imposed for the purpose of punishment. *See Shepherd*, 591 F.3d at 452.

### 3. Overcrowding itself did not cause any of the alleged Constitutional violations.

129.    Finally, Plaintiffs bear the burden to prove a causal connection between any overcrowding and a Constitutional violation. They cannot because the Jail was not, in fact, overcrowded during any of the alleged incidents. *See* Ex. 6 Even if they could prove that the Jail had been overcrowded—which they cannot—there is no evidence connecting the non-existent crowding to any of the Plaintiffs' discreet and unconnected incidents.

130.    In sum, as with staffing Plaintiffs fictitious narrative must give way to the facts. Harris County monitors its Jail population and provides real-time data to the public about same. There is no evidence showing that the Jail was overcrowded during the entire three year period this lawsuit spans, much less on the date of an alleged incidents, and consequently, there can be no evidence that overpopulation was the cause of a specific injury. As a result, Harris County is entitled to judgment as a matter of law on all claims based on jail population.

## I.    There Is Not A Condition Of Not Observing Inmates At The Harris County Jail.

131.    Plaintiffs complain that the failure to observe/monitor caused a delay in providing medical care to Jacoby Pillow, Bryan Johnson, Evan Ermayne Lee, William Curtis Barrett, Kevin Smith Jr., Ramon Thomas, Nathan Henderson, Deon Peterson, Gary Wayne Smith, Kristan N. Smith, Christopher Young, and Kevin Sanchez Trejo; caused a failure to protect Plaintiffs Zachery Johnson, Harrell Veal, John Coote, Antonio Radcliffe, Zachary Zepeda, Jaquez Moore, Taylor Euell, Michael Griego, Bernard Lockhart, Tramell Morelle, and Dequon Buford from other detainees; and to protect Plaintiff Robert Wayne Fore from his own suicide.

132.    The failure to observe and monitor detainees, standing alone, is not a constitutional violation. *See Daniels*, 474 U.S. 327, 332-33 (1986). Instead, to defeat summary judgment on a conditions-of-confinement claim based on a failure to observe and monitor, the plaintiff must

show that the detainee had a specific basic human need that could not be met absent periodic observation and monitoring by jail officials and that the jail's pervasive pattern of "gross inattention" to providing for that need actually caused the violation of the detainee's rights. *See, e.g., Shepherd*, 591 F.3d at 454; *see, e.g., Estate of Bonilla ex rel. Bonilla v. Orange County, Tex.*, 982 F.3d 298, 308-09 (5th Cir. 2020).

**1. There is no widespread pattern of gross inattention to inmates.**

133.    Here, the evidence shows that during the relevant time, the Harris County Jail System transitioned to a new Jail management (Offender Management System) system that included an electronic observation rounds system. Harris County purchased and implemented CorreTrak, which requires detention officers to use IPADS to scan a strategically placed QR code which brings up a form of drop-down messages to record the observation round. The location and time cannot be altered and the person logged in to the device will be the one identified for the round. This system, unlike the prior paper-based tracking where officers would simply write down where they went and when, ensures that an officer is physically present in the area where the round is being performed. Ex. 18 [Expert Report of Sean Stewart].

134.    Corre Trak provides a pop-up box advising when rounds are late. Users will always enter a comment documenting in detail why (fight, medical emergency, etc.) the round is late. If rounds are late a supervisor will be notified. Ex. 18, pp. 19-22 [Expert Report of Sean Stewart]. The frequency with which rounds must be performed is dictated by TCJS and codified within Harris County's policies. 37 Tex. Admin. Code § 275.1; Ex. 6 [CJC SOP 220 – Inmate Observation].

135.    Moreover, Harris County's written policy dictates not just when observation rounds should be conducted but also, how (emphasis in original):

136.    **Observation – Means to obtain a firsthand evaluation of the inmates' attitudes and temperament, while paying close attention to the physical, mental, and emotional condition of each inmate to detect signs of distress or need for medical, psychological or other special services. (See III, D, (1-12) for additional requirements.**

137.    <span style="color:red">**OBSERVATION REQUIRES THE STAFF MEMBER TO ACTUALLY LOOK AT AND EVALUATE EACH INMATE. IF YOU CANNOT SEE THE INMATE, YOU DID NOT COMPLY WITH REQUIREMENTS REGARDING INMATE OBSERVATION!**</span> See Ex. 6 [CJC SOP 220 – Inmate Observation; see also CJC 235 – Suicide Prevention].

Defendant Harris County's Comprehensive MSJ                                                    -35-

138.    Under this policy and with the technology that Harris County invested in, more than **10 million rounds** in just two years were recorded, most timely and appropriately. Plaintiffs do not discuss those—instead they focus on the few done incorrectly.  Ex. 24 [Smith Aff.].  Given the context, Harris County cannot be said to have a widespread policy of not observing inmates when millions and millions of documented observations are done appropriately every single year.

139.    Additionally, since 2017 the Harris County Jail has added several hundred cameras throughout the jail system now totaling over 4,000 cameras that allow for 24/7 monitoring of inmates. Ex. 29 [Ferguson Aff.]; Ex. 18, pp 19-22 [Expert Report of Sean Stewart]. This, too, demonstrates that Harris County under Sheriff Gonzalez has made significant strides in ensuring constant monitoring of inmates, not tolerating a policy of inattentiveness, as Plaintiffs suggest.

### 2.   Observations are conducted in accordance with State regulations.

140.    As with staffing and population management, the policy of the Jail is to conduct rounds in accordance with TCJS regulations. The intervals of observations performed is not arbitrary, but done to ensure safety and compliance, and, consequently, cannot be read as imposed for the purpose of punishment. *See Shepherd*, 591 F.3d at 452.

### 3.   The evidence is insufficient to prove inadequate morning caused the underlying injuries.

141.    Plaintiffs must put on evidence in every single case to show that each of their varying injuries was caused by a lack of observation. They must prove, for instance, that Plaintiff Radcliffe would not have been sucker-punched but for gross inattentiveness, even though staff responded within three seconds of the assault. They must prove that other sudden attacks would have been avoided with different monitoring. They must prove that hidden medical conditions would not have persisted but for gross inattentiveness. They have not and cannot. Harris County is therefore, entitled to judgment as a matter of law on each of these claims.

### J.    There Is No Condition Of Creating a Culture of Violence.

### 1. There is no evidence of encouraging inmate violence.

142.    Plaintiffs allege that Harris County has a culture, pattern, practice, and policy of encouraging violence amongst detainees, which is belied by the testimony of several Plaintiffs themselves who denied ever observing detention officers encourage inmates to fight:

"Q: In the twelve months that you were at the Harris County jail, were you ever encouraged

by a guard to fight with another inmate?" "A: No."

"Q: Did you ever hear a guard encourage any other inmates to fight with you?" "A: No."

"Q: Did any of the detention officers that you encountered while you were in jail encourage you to fight with other detainees?

A Say it again. Did any – did you ask if any officers encouraged me to fight?

Q. Yes. With other inmates?

"A: No. Not officers, no.

Q: So my question was about whether officers – you had ever seen or heard officers encouraging inmates to fight with each other. "

A "Uhm, whether they –

Q. Whether you have ever seen or heard officers encouraging the inmates to fight amongst each other, that's my question. " "

A. Uhm, no, not that I have seen or heard, no, ma'am.

Exs. 31-34.

143. Only one Plaintiff, Harrell Veal, testified that detention officers encouraged fighting with inmates. Even if Veal's testimony were true, this is hardly sufficient to show a pattern of encouraging inmate violence that can be read as a condition of confinement at the Harris County Jail.

**K.     There Is No Condition Of Institutionalize Excessive Force Or A Policy Of Same That Caused The Deprivation Of A Constitutional Right.**

144.    With regard to encouraging violence among staff and inmates, Plaintiffs allege this claim as excessive force couched as both episodic acts and conditions of confinement. However, claims of unconstitutional excessive force are almost always analyzed in the context of episodic acts, rather than conditions of confinement. Regardless, both claims fail.

**1. Episodic Acts/*Monell* claim**

145.    Plaintiffs do not cite to the lack of an official written HCSO jail use of force policy, nor cite to an official written County UOF policy that they believe is unconstitutional or encourages or condones excessive force.  Dkt. 122. This is because the HCSO has at all times maintained a written UOF policy applicable to deputies and detention officers. Exh. 25, 25.1. The written policies are fully constitutionally compliant and Plaintiffs do not attack their sufficiency, but instead argue an unwritten practice/de facto policy of the use of excessive force in violation of

the written policies  In doing so, eleven (11) Plaintiffs refer to sixteen (16) incidents involving themselves as Plaintiffs[8], plus eight (8) "comparator incidents" that they allege demonstrate the existence of an unconstitutional de facto policy or practice of using and condoning unconstitutional excessive force in the Harris County jail under Sheriff Ed Gonzalez. Dkt. 122. Plaintiffs neither allege, nor have sufficient evidence of a pattern, practice or custom of the use of unlawful excessive force by HCSO detention officers sufficient to satisfy the *Monell* standard. As to the specific Plaintiffs alleging unconstitutional uses of force, they are:

-Jacoby Pillow- 1/1/23. Dkt. 122 ¶¶52-62, 964-968, 1117-1119
-Bryan Johnson- 10/1/22. Dkt. 122 ¶¶63-72, 959-963, 1114-1116
-Zachery Johnson – 6/23. Dkt. 122 ¶¶176-185, 1049-1053, 1168-1170
-Jeremy Garrison- 4/23/23; 5/20/23, Dkt. 122 ¶¶162-175, 1058-1062, 1174-1177
-Kenneth Richard- 4/27/23. Dkt. 122 ¶¶186-195, 1024-1028, 1153-1155
-Jeremiah Anglin- 2/1/23. Dkt. 122 ¶¶196-203, 1019-1023, 1150-1152
-Harrell Veal (T.K.Bolt) – 1/23/22; 12/24/22. Dkt. 122 ¶¶204-210, 1009-1013, 1144-1146
-John Coote- 2/7/23; 2/10/23. Dkt. 122 ¶¶211-224, 1004-1008, 1141-1143
-Bernard Lockhart- 6/28/22. Dkt. 122 ¶¶231-235, 999-1003, 1132-1134
-Ryan Twedt- 4/8/22; 4/9/22. Dkt. 122 ¶¶236-247, 1014-1018, 1147-1149
-Taylor Euell – 3/23/23; 1/14/23. Dkt. 122 ¶¶277-289, 984-988, 1135-1137

146.    Thus in terms of Plaintiffs' claims of excessive force by HCSO detention officers, eleven (11) Plaintiffs claim to have had excessive force used against them a total of sixteen (16) times over the entire two-year period covering Plaintiffs' lawsuit.

147.    In addition, Plaintiffs cite to eight (8) comparators, covering the period of 2015 to 2021, for the purposes of alleged incidents of excessive force. Dkt. 122 ¶¶616-652, 665-674, 692-707, 731-742, 754-764, 777-785, 874-890. These other incidents cited by Plaintiffs allegedly involved Jaquaree Simmons on 2/10/21 (Dkt. 122 ¶¶616-652); Adael Gonzalez Garcia on unknown date (Dkt 122, ¶¶665-674); Jerome Bartee on 9/4/16 (Dkt. 122 ¶¶692-707); Christopher Johnson on 7/25/15 (Dkt. 122 ¶¶731-742); Michael A. Alaniz on 10/23/15 (Dkt. 122 ¶¶754-764); Kareem Jefferson on 5/29/19 (Dkt. 122 ¶¶777-785); Kenneth Lucas on 2/17/15  (Dkt. 122 ¶¶874-883); and Rachel Hatton on 5/7/16 (Dkt. 122 ¶¶884-890).

---

[8] Although there are far more Plaintiffs, only 9 of them allege civil rights violations in the form of excessive use of force.

148. As a result, in support of a theory of a pattern, practice or custom of excessive force, Plaintiffs cite to 19 persons allegedly having excessive force used against them a total of 24 times over a period of almost 9 years (from February 2015 through June 2023). Although Defendant disputes that all of these incidents involved an excessive use of force or the condoning of an excessive use of force, and dispute that all of the incidents even occurred under policymaker Sheriff Gonzalez, regardless, even assuming Plaintiffs' claims in the aggregate, this is not sufficient for purposes of a *Monell* unofficial policy, practice, or custom.

149. As noted above, the HC jail, over the course of the time period of Plaintiffs' claims, has a large number of daily detainees. Considering the sheer volume of detainees and the overall size of the Harris County jail as one of the three largest jails in the entire country, an allegation of only 19 persons having improper force against them over 9 years, among what would amount to hundreds of thousands of detainees, does not meet the *Monell* test for numerosity. Plaintiffs' cited incidents do not legally support findings of detention officer misconduct sufficiently numerous to demonstrate any pattern of misconduct in a jail setting the size of the Harris County jail. *See Peterson*, 588 F.3d at 851–52 (5th Cir. 2009)("27 incidents of excessive force over a period of four years [in a City the size of Fort Worth] do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct."); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."); *Lewis v. Bd. of Sedgwick Cnty. Comm'rs*, 140 F. Supp. 2d 1125 (D. Kan. 2001), *aff'd sub nom*. *Lewis v. Bd. of Cnty. Comm'rs of Sedgwick Cnty*., KS, 56 F. App'x 873 (10th Cir. 2003) (Only 22 complaints of excessive force arising from approximately 90,000 detainees who passed through jail facility could not have put the county on notice of an alleged pattern of excessive force sufficient to render it liable under a deliberate indifference theory).

150. A closer examination of the Plaintiffs' pled incidents further does not show any pattern or practice of jailer misconduct sufficient to establish a pattern or practice of unconstitutional use of force.

151. First, on the issue of whether any HCSO jailer wrongfully used force against Plaintiffs, the HCSO has already filed several Motions for Summary Judgment challenging whether a use of force constitutional injury was even suffered as to several Individual Plaintiffs. These included

Plaintiffs Lockhart, Zachery Johnson, Twedt, Euell, and Bryan Johnson. Dkt. Nos. 196, 244, 255, 360, 363. The HCSO adopts by reference the entirety of those MSJs and incorporates them herein by reference for all purposes. See Dkt. Nos. 196, 244, 255, 360, 363.

152.    Additionally, at least 5 "incidents" of excessive force claimed by Plaintiffs occurred before policymaker Sheriff Ed Gonzalez took office as Harris County Sheriff in 2017. [9] Because Sheriff Gonzalez was not yet Sheriff, and because it is he as policymaker relevant for purposes of deliberate indifference, Plaintiffs cannot use these incidents for purposes of a pattern or practice of unconstitutional uses of force with Sheriff Gonzalez as policymaker. In fact, Plaintiffs go to great lengths to plead facts that Sheriff Gonzalez ran for office on the basis of reducing incidents of excessive force that occurred before his regime and improving force training. Dkt. 122.

153.    Further, in their Complaint, Plaintiffs make reference to a documentary put out by Channel 11 news called "Struck". Dkt. 122 ¶¶380-383. To the extent Plaintiffs urge that references to head strikes constitutes evidence in support of a *Monell* claim, Defendant urges they do not. Should Plaintiffs attempt to incorporate into the MSJ record the documentary video, Defendant will object because the content is strictly conclusory, hearsay allegations.

154.    "Mere 'improbable inferences' and 'unsupported speculation' are not proper summary judgment evidence." *Reynolds v. Wood Cnty., Texas*, No. 22-40381, 2023 WL 3175467, at *7 (5th Cir. May 1, 2023) c*iting Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) ) (unpublished) (holding that logs showing over 50 incidents in which restraint chair was used in the jail over 17-month period was not sufficient summary judgment evidence of a custom or practice of unconstitutional chair use because (1) the logs were lacking in factual detail concerning each incident and (2) there was no evidence of prior lawsuits or complaints involving the use of the restrain chair at the jail); *Williams v. Bexar Cnty.*, No. 22-50289, 2024 WL 3326082, at *6 (5th Cir. July 8, 2024) citing *Peterson*, 588 F.3d at 851–52 (Because a grievance log did not provide details regarding any of the 95 alleged incidents, Plaintiff has not identified evidence of "sufficiently numerous prior incidents" to establish a custom or practice).

155.    There is not sufficient evidence regarding the underlying factual basis of these alleged head strikes, including who used them, on who, when and in what specific factual context. This is important considering that the use of head strikes, per se, are not only not prohibited by the

---

[9] 2/17/15; 7/25/15; 10/23/15; 5/7/16; 9/4/16

County's use of force policy but are not constitutionally prohibited either. Head strikes can be acceptable methods of uses of force, dependent on the circumstance under which they are applied.[10]

156.    Further, as to the "comparator" incidents in the Complaint, Plaintiffs allegations are mostly conclusory. Vague references to document falsification and the "likelihood that more excessive use of force incidents took place because of this are not sufficient *Monell* evidence.

157.    Despite Plaintiffs' dramatic rhetoric in unsubstantiated, hearsay documentaries with snippets of quotes from Sheriff Gonzalez and pleadings attempting to twist statistics by simply referring to "uses of force" with no evidence supporting excessive force, the summary judgment evidence shows that the policymaker and command staff within the HCSO had in place, during the Plaintiffs' claimed incident period, a detailed, comprehensive written UOF policy and a system for documentation of uses of force, review of incidents of force for policy violations and discipline necessity. Ex. 28 (Tschudy affidavit). Consistent with this use of force appropriateness review policy, there have been determinations of policy violations, discipline imposed, as well as referrals to the District Attorney's office for criminal investigation and proceedings.  Further, findings of non-compliance have been determined and discipline imposed.  Exs. 18, 28 [Expert Report of Sean Stewart and Tschudy Aff.] 28, 18.

## L.    Use Of Force Conditions Of Confinement Claim Fails

158.    The Plaintiffs' conditions of confinement claims fails for the same lack of evidence sufficiency as the episodic acts claim. Courts distinguish conditions-of-confinement claims from episodic-acts-or-omissions claims: "conditions-of-confinement claims challenge the constitutionality of pervasive, systemic policies and customs themselves; episodic-acts-or-omissions claims challenge the constitutionality of the way in which a policy or custom was applied by a jail official in a particular instance." *Palmer v. Harris Cnty.*, No. CV H-25-2326, 2025 WL 2605406, at *3 (S.D. Tex. Sept. 5, 2025) (citing *Estate of Henson v. Wichita County, Tex.*, 795 F.3d 456, 466–67 (5th Cir. 2015)).

---

[10] It is well established that prison and jail officials may use physical force to restore or preserve order. *Whitley v. Albers,* 475 U.S. 312, 320, 326, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).  When attempting to maintain or restore discipline, "[prison officials] are entitled to wide-ranging deference." *Baldwin v. Stalder,* 137 F.3d 836, 840 (5th Cir.1998). The reasonableness of the force used must be assessed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time," and accounting for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained." *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (internal citations omitted).

Defendant Harris County's Comprehensive MSJ                                                    -41-

159.    As noted above, the Fifth Circuit has explained that jail-condition cases ordinarily involve durable restraints or impositions on inmates' lives—such as overcrowding, deprivation of phone or mail privileges, disciplinary segregation, or excessive heat—*rather than isolated uses of force. Garza*, 922 F.3d at 633–34. In such jail-condition cases, the challenged condition itself supplies the intent inquiry because "the perpetrator's state of mind is not at issue"; the constitutional wrong is the condition itself. *Nazerzadeh v. Harris Cnty.*, No. CIV A H-08-0499, 2010 WL 3817149, at *4 (S.D. Tex. Sept. 27, 2010). Similarly, failure to train claims are not conditions of confinement claims. *Sanchez v Young County*, 956 F.3d 785, 792 (5th Cir. 2020).

160.    Even if Plaintiffs' use of force claims are analyzed as conditions of confinement claims, they fail for the same reasons Plaintiffs' episodic acts claim fails under *Monell*.  The standards for a *Monell* claim and for a conditions of confinement claim are similar and frequently overlap. "Under *Monell,* a plaintiff must show either an official policy or persistent and widespread customs. Under [conditions of confinement], . . . the plaintiff must show an intended condition or practice or show that jail officials' acts are *'sufficiently extended or pervasive* . . . to prove an intended condition or practice.' We see no meaningful difference between these showings." *Est. of Bonilla v. Orange Cty*., 982 F.3d 298 at 308 (citations omitted). The Court has also emphasized that the standard of causation required to establish a *Monell* claim is no different than the causation requirement of a conditions of confinement claim. appears to be same: the policy or custom must have been "the moving force behind the violation." In that case the court held that the Plaintiffs' failure to establish a conditions of confinement claim was fatal to their *Monell* claim. *Id*.

161.    Similarly here, and as discussed in detail above, and through the evidentiary analysis, Plaintiffs cannot establish the necessary elements to prove a conditions of confinement claim regarding excessive force sufficient to overcome summary judgment. There were written uses of force policies in effect,, that, as shown, defeat the causation requirement. The "condition" as it relates to force, was that officers were expected to comply with the policy and use only that force required to do their jobs. As to the "de facto" practice side of this, given the limited number of incidents pled by Plaintiffs in relation to the large number of detainee population over a 10-year period, there is no showing of a "condition" of excessive force that is "sufficiently extended or pervasive" enough to provide evidentiary support of a conditions of confinement claim for summary judgment purposes.

162.    Plaintiffs' theory also fails because isolated examples of force, injury, or even death cannot, standing alone, prove constitutionally inadequate jail conditions. Although a de facto policy may be inferred in narrow circumstances from uniform evidence of a repeated practice, *Montano v. Orange Cnty., Texas*, 842 F.3d 865, 876 (5th Cir. 2016), courts have found sufficient patterns only where the proof reflects far more pervasive conduct—such as hundreds of excessive-force incidents or almost daily occurrences over a sustained period. *Seal v. Harrison Cnty., Miss. ex rel. Bd. of Sup'rs*, No. 1:08-CV-175-LG-RHW, 2010 WL 2545406, at *7 (S.D. Miss. June 18, 2010).

163.    Further, Plaintiffs cannot avoid the pattern requirement by characterizing ordinary or justified force as a condition of confinement.  This is because reasonable force is not only lawful but is reasonably related to a legitimate goal and is not arbitrary or purposeless. Even where a plaintiff alleged policies of "engaging in use of excessive force on pre-trial detainees" and "encouraging escalation rather than de-escalation," the Fifth Circuit has found insufficient evidence or pleadings that the plaintiff had shown a persistent, widespread practice or an obviously faulty official policy that would put policymakers on notice that a constitutional violation would be a 'highly predictable consequence' of the policy. *Acosta v. Williamson Cnty., Texas*, No. 23-50777, 2024 WL 3833303, at *13 (5th Cir. Aug. 15, 2024).

164.    Plaintiffs' limited and dissimilar incidents do not approach that level. Rather, the evidence does not support the existence of a sufficient number of alleged excessive force incidents to show a custom or pattern for purposes of showing a condition of confinement regarding use of force in place and intended to punish inmates. Further, the evidence shows that there was a meaningful investigation, review and disciplinary process in place throughout the period alleged by Plaintiffs to monitor, investigate and handle any policy violations with respect to the use of force. Lastly, there is no evidence of a sufficient number of alleged excessive force claims to show a custom or pattern for purposes of showing a condition of confinement regarding use of force in place and intended to punish inmates.

## M.    There Is No Unconstitutional Policy Of Denying Medical Care.

### 1. No Evidence that there Exists a Conditions of Confinement Claims Pertaining to the Provision of Medical and Mental Health Care of the Plaintiffs and Intervenors in this Case.

165.    Plaintiffs and Intervenors contend that they each have a conditions of confinement claim pertaining to their access to reasonable medical care as a matter of 14TH Amendment Due Process

*See SAC ECF #213.* DEFENDANT does not dispute that under Section 1983, a person in jail custody has a constitutional right of access to reasonable medical care. *See* Ford v Anderson County, 102 F.4th 292, 307 (5th Cir. 2024) (discussing scope of constitutional right to medical care under both 8th and 14th Amendments).

166.    As reflected in the Exhibits 1 through Exhibit expert reports of defense experts Sean Stewart and Dr. Phil Eskew, the HCJ inmate population is the recipient of a comprehensive network of regulatory requirements, as well as policies, procedures, and contracts designed to meet and exceed the minimum standards of medical care for the HCJ inmate population. *See Exhibits 2 through 13; see also Exhs 18 & 19 Expert Reports of Sean Stewart and Dr. Phil Eskew.*

### 2. The Extant Evidence Contained In The Existing Summary Judgment Record Demonstrates That Each Plaintiff Who Needed Medical Care Received It, thus, the Episodic Acts Theory fails.

167.    An episodic acts claim for denial of medical care requires two affirmative factual findings to provide the evidentiary basis for an adverse judgment against the Defendant County. First, the episodic act in issue performed by one or more local government officials responsible for the act must itself be found to have violated a constitutional right. Second, to hold the local government entity liable for the constitutional violation. the adverse fact finding must be found to have been a material component of a pattern or practice or policy under Monell proving the local government entity was responsible for the constitutional violation.

168.    More specifically, to establish liability under an episodic act or omission claim, a custodial plaintiff must first present evidence and secure a factual finding by a preponderance of the evidence that:

1.    the custodial plaintiff suffered an injury of constitutional magnitude;

2.    that a custodial officer or employee of the jail facility was subjectively aware that the plaintiff inmate was exposed to a substantial risk of harm and nevertheless acted with deliberate indifference to the risk of harm; and,

3.    the harm suffered was proximately caused by the deliberate indifference of one or more of the employees responsible for the misconduct.

*Hare,* 74 F.3d 633, 649 (5th Cir. 1996) (en banc)*; see also Scott,* 114 F.3d 51 (1997)(en banc)*.*

169.   In other words, the first question in this analysis is whether there was an actual constitutional injury. *See Baker v McCollan,* 443 U.S. 137, 140 (1979) (first inquiry in a Section 1983 case is always whether the plaintiff was deprived of a right secured by the Constitution).

170.   Although it is true that prison officials must take reasonable measures to assure the safety of inmates – *see Farmer v Brennan*, 511 U.S. 825, 838 (1994) – a necessary element of that duty request that the risk of harm to an inmate must be reasonably foreseeable. Moreover, to establish *Monell* liability, a plaintiff must show that the prison official was deliberately indifferent to the risk of serious harm. 511 U.S. at 832.

171.   Assuming a claimant secures an affirmative finding on the underlying incident itself, then the claimant must also demonstrate that the single incident was part of a larger pattern, practice, or policy attributable to the local government entity that sanctioned or tolerated the unconstitutional episodic act as per the standards set in *See Monell v New York, 436 U.S. 658 (1978); see also Johnson v San Antonio,* 2024 WL 50463 (5th Cir. 2024); and *Hicks-Fields v Harris County*, 860 F.3d 803, 808 (5th Cir. 2017)("every *Monell* claim against an entity requires an underlying constitutional violation to sustain it).

172.   It necessarily follows that if a fact finder (a jury or the Court) finds that there is no underlying constitutional violation, then there is no need to address the *Monell*  question of whether the local government entity is itself liable for a constitutional tort committed by one or more of its employees. This is because no constitutional tort was committed in the first place. *See Monell v New York, 436 U.S. 658 (1978); see also Johnson v San Antonio,* 2024 WL 50463 (5th Cir. 2024); and *Hicks-Fields v Harris County*, 860 F.3d 803, 808 (5th Cir. 2017)("every *Monell* claim against an entity requires an underlying constitutional violation to sustain it).

173.   Defendant has been filing with the Court Rule 56 dispositive motions that address the facts pertaining to each individual Plaintiff and the Intervenors with respect to the provision of medical care. *See* Docs. 131, 169, 182, 196, 203, 205, 244, 255, 260, 271, 280, 302, 342, 360, 363.

174.   Attached to this "conditions" MSJ and *Monell* based MSJ is a combined exhibit containing all of the medical summaries previously filed with the Court. *See Exh. 20 - Medical Summaries Binder*. This binder contains the statutory statement of the health care professional who reviewed the underlying medical records and who prepared the summary. This exhibits referenced in the Summary are contained in the summary judgment filings referenced above.

They are part of the Court's record already and are incorporated by reference. They need not be reproduced again here.

175.    A review of the Medical Record Summaries reveals that the named Plaintiffs and Intervenors all received medical care when it became apparent that they needed it. *See Exh. 20 Medical Summaries Binder*.

176.    A Review Of The Current Jail Operations As It Relates Correctional Health Care Demonstrates A Robust System of Health Care Delivery.*

177.    The utilization of the local public health care system established by the hospital district (Harris Health Systems) and by the mental health & behavior systems (the Harris Center is consistent is a legitimate use of resources by the HCSO to provide improved health care for the jail inmate population. See Exh. 18 – Expert Report of Sean T. Stewart, Part V Professional Opinions Nos. 01, 02, 03, 04.

178.    Stewart's professional opinions specifically state as follows:

> Opinion 01 - The responsibility and authority for diagnosing, treating and otherwise providing medical/menta health care for the inmates in the Harris County Jail System was at the time appropriately delegated to the Harris Health System and the Harris Center by contract. [Stewart Report at p. 16]

> Opinion 02 - Sheriff Gonzalez and/or the Harris County Jail System corrections officers did not dictate the medical /mental health treatment of the inmates, nor did they interfere with any medical/mental health treatment. The medical/mental health treatment and decisions were made by Harris Health System and The Harris Center's medical staff. [Stewart Report at p. 16]

> Opinion 03 - Harris County, Sheriff Gonzalez, and/or the Harris County Jail System corrections officers were not responsible for any alleged flaws or missteps made by Harris Health System and/or The Harris Center's medical/mental health staff assigned to provide medical/mental health care to the inmates. [Stewart Report at p. 16]

> Opinion 04 - It is my opinion Harris County and/or Sheriff Gonzalez met their duty to ensure detainees had access to medical/mental health care while housed in the Harris County Jail System. [Stewart Report at p. 19]

> *See Exh. 18 – Expert Report of Sean T. Stewart*, Part V Professional Opinions Nos. 01, 02, 03, 04.

179.    The expert report by Dr. Philip Eskew, an expert in correctional health medicine, rendered specific opinions about the system of correctional health care provided to Harris County Jail inmates. See Exh. 19 Expert Report re Correctional Health Care by Dr. Philip Eskew. More specifically, Dr. Eskew opined as follows:

OPINION NO. 1 – ACCESS TO CARE.

In my opinion the Harris county jail generally provides timely and appropriate care to incarcerated persons. The jail contracts services to Harris Health and maintains multiple optional accreditations to demonstrate their commitment to quality. This deliberate emphasis on quality is certainly not indifferent to the welfare of incarcerated persons.

OPINION NO. 2 – CHRONIC CARE

Harris health is tasked with enrolling patients in chronic care programs. The NCCHC audits regarding chronic care services resulted in a "pass" determination. Isolated allegations of one patient with missing HIV on the problem list or another patient's unmanaged type 1 diabetes should be litigated on their merits in a state based medical malpractice allegation against Harris health rather than a misplaced constitutional deliberate indifference allegation against the Harris County jail.

OPINION NO. 3 –OBSERVATION / FACE TO FACE

Whether appropriate face to face observations were conducted is not a medical question but rather a custody question. I am deferring to custody experts to answer this question and would recommend that Dr. Mathis do the same.

OPINION NO. 4. – MEDICATIONS

Medications are generally administered appropriately and when the volume of medications administered daily (denominator) is considered in light of the alleged medication errors (numerator) there is no pattern of deliberate indifference here. 2009 DOJ remedial measures have no bearing on any of these cases or allegations. Specific malpractice allegations from Dr. Mathis regarding insulin timing should be taken up as medical malpractice tort claims against Harris Health.

OPINION NO. 5 – CPR / EMERGENCY CARE

The first step in the American Heart Association's Adult Basic Life Support Algorithm states "verify scene safety." Whether a scene is safe for a correctional officer to intervene five seconds into an emergency or five minutes into an emergency is a question for correctional custody experts to answer. Dr. Mathis routinely argues that responses were not timely based solely on a video review which does not provide a complete picture to know whether it is safe for the officer to proceed.

https://cpr.heart.org/en/resuscitation-science/cpr-and-ecc-guidelines/algorithms

OPINION NO. 6. – MENTAL HEALTH

The Harris county jail attempts to classify and house patients safely in spite of their mental illness. The jail relies on Harris Health to treat, triage, diagnose and provide directions about when customized monitoring is appropriate. 2009 DOJ reports were written long before any of these current plaintiffs had complaints or concerns. Allegations of failure to recognize elevated suicide risk should be made against the entity tasked with assessing that risk – Harris Health.

OPINION NO. 7. – HEALTH RECORDS

The Harris County jail staff does not write, edit, complete, or control the content of medical

records. The Harris county jail is merely a custodian of the medical records. Any allegations of poor record keeping (made here by Dr. Mathis) should be made against the appropriate party that compiled the medical records (Harris Health).

OPINION NO. 8. – NURSING PRACTICING OUTSIDE OF SCOPE

The Harris County Jail does not employ Licensed vocational nurses (LVNs). Whether the LVNs performed beyond their scope would be relevant in a medical malpractice state tort action against Harris Health. It is not relevant to a constitutional deliberate indifference claim against the Harris County Jail.

OPINION NO. 9. – OFFICER TRAINING

Dr. Mathis admits that the training logs reflect appropriate training with TCOLE, BLS, suicide prevention and observation training requirements. He objects to the timeliness of their response (duplicating arguments in opinion #5 above) and I would again point out that establishing scene safety is best left up to correctional experts rather than a non-correctional officer reviewing video tape.

OPINION NO. 10. – GRIEVANCES

I will defer to other corrections experts here about whether non health related grievances were handled correctly and I would recommend that Dr. Mathis do the same.

OPINION NO. 11. – USE OF FORCE

I will defer to other corrections experts about whether particular uses of force were appropriate and whether the incarcerated person posed an imminent threat to custody staff. I would recommend that Dr. Mathis defer this to appropriate experts as well.

OPINION NO. 12. – INMATE ASSAULT

I will defer to other corrections experts about whether the Harris County jail failed to protect incarcerated persons. I would recommend that Dr. Mathis defer this to appropriate experts as well.

OPINION NO. 13. – QUALITY ASSURANCE & MORTALITY REVIEW

The NCCHC audited the Continuous quality improvement program and the facility passed and maintained NCCHC accreditation. Detailed mortality reviews are often protected from future legal discovery and a lack of clear records for plaintiffs experts to review here does not mean that reviews never took place.

*See Exh. 19 Expert Report re Correctional Health Care by Dr. Philip Eskew* at pp. 19 – 22 (emphasis added).

180.    Dr. Eskew also provided individualized review of Case Summaries and allegations from the amended Complaint. *See Exh. 19 Eskew Expert Report* at pp. re Correctional Health Care by Dr. Philip Eskew at pp. 13 – 16.  The Custodial Case Summaries are also attached to this Motion, as are the Medical Case Summaries. See Exh. 20 Medical Case Summaries (by Mills & Dimas). He also had access to the custodial case summaries generated by PLD Jail Consultants. See Exh. 21 Custodial Timeline Summaries by Plaintiff & Intervenors.

181.    At no point does Dr. Eskew opine that there is a common theme unifying the different case claim for denial of medical care. In his review of the individual cases, Dr. Eskew opines that:

> … These [cases highlighted in blue] state facts sufficient for a medical malpractice claim to proceed but do not appear to allege facts upon which a claim for Section 1983 liability for denial of medical care is supported by evidence. Exh. 21 Eskew Expert Report at p. 13.

**N.    The Evidence Does Not Show a Condition that Resulted in a Failure to Protect.**

182.    In order to prevail on a failure-to-protect claim, a plaintiff "must show that he [was] incarcerated under conditions posing a substantial risk of serious harm and that [jail] officials were deliberately indifferent to his need for protection." *Leal v. Wiles*, 734 F. App'x 905, 909 (5th Cir. 2018) (citing *Farmer*, 511 U.S. at 833–34, 114 S.Ct. 1970).

183.    Here, Plaintiffs broadly allege that the staffing, population, and observations at the Jail created a condition that caused their injuries. As demonstrated *supra*, the Jail does not impose conditions of understaffing, overcrowding, or failing to observe inmates, therefore, Plaintiffs' failure to protect claims based on the unsupported conditions necessarily fails.

184.    Further, the evidence in the record demonstrates repeated instances of officers responding to emergencies in accordance with their training and policies. There simply is no basis on which Plaintiffs' failure to protect claim can rest given that the premised conditions did not exist.

**O.    The Evidence Does Not Support A Failure To Train Or Supervise Claim.**

185.    n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* "). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*, at 389.

186.    "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520

Defendant Harris County's Comprehensive MSJ                                                    -49-

U.S., at 410. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407, 117 S.Ct. 1382. The city's "'policy of inaction'" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395. A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." Id., at 392, 109 S.Ct. 1197; see also Pembaur, supra, at 483, 106 S.Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where— a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ... ").

187.    A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*, at 407. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

188.    Here, Plaintiffs do not even bother to identify what specific training was deficient or how it caused a Constitutional violation. Rather, Plaintiffs' make a naked assertion that Sheriff's Office failed to train its employees, which resulted in Constitutional injury. The evidence, however, demonstrates that Harris County conducts training on every topic about which Plaintiffs complain, to include using force, providing medical care, and protecting inmates from harm. Even Plaintiffs' own experts have concluded that it was failure to adhere to policy or training that led to some of the injuries. For example, Plaintiffs' Dr. Mathis—whose opinions are largely meritless—asserted that officers received adequate emergency response training, but some simply did not follow the training.

189.    Turning to the failure to supervise claim, to state a claim for municipal liability on a theory of a failure to supervise, the plaintiff must allege facts showing that (1) the city failed to supervise the officers involved; (2) there is a causal connection between the failure to supervise

and the violation of the plaintiff's rights; and (3) it was, or should have been, obvious to municipal policymakers that the "highly predictable consequence" of not supervising the officers was that the officers would violate the plaintiffs' constitutional rights. *See, e.g., Peterson*, 588 F.3d at 850; *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc).

190.    As with a claim for failure to train, a plaintiff claiming a failure to supervise must allege facts showing a pattern of similar violations that would make the need for more supervision "obvious." *Canton*, 489 U.S. at 390. "Plaintiffs must show that in light of the duties assigned to specific officers or employees the need for more or different [supervision] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Murray v. LeBlanc*, 629 F. Supp. 3d 437, 457 (M.D. La. 2022) (cleaned up).

191.    Here, again, Plaintiffs failed to allege a single fact pertaining to failed supervision, instead, they improperly rested on insupportable statements that the Jail fails to supervise causing all of their injuries. Frankly, the claim should not have survived a challenge on the pleadings.

192.    Now, with evidence that every floor on every shift has a supervisor, and that supervisor has a supervisor, and that supervisor has a supervisor, and that supervisors who fail to adequately oversee staff may themselves be disciplined, Plaintiffs should not be able to rest on threadbare assertions. They must prove that there was a failure to supervise in a particular area and that Harris County was on notice and deliberately indifferent to the need, which caused injuries.

193.    Because they cannot meet this burden, Harris County is entitled to summary judgment motion on all 29 of Plaintiffs' failure to train and supervise claims.

## VII. CONCLUSION & PRAYER

WHEREFORE, in view of the foregoing evidence, arguments, and authorities, DEFENDANT HARRIS COUNTY requests and prays that the Court, after duly considering the content of this dispositive motion, including attached exhibits, and any responses, replies, or supplements thereto, grant this Motion for DEFENDANT HARRIS COUNTY against the claims and causes of action brought by and on behalf of all Plaintiffs and Intervenors be DISMISED with prejudice.

SIGNED on the 20TH day of JULY 2026.

Respectfully submitted,

By:     *Ricardo J. Navarro*
  RICARDO J. NAVARRO
  Attorney In Charge
  State Bar No. 14829100
  So. Dist. Id No. 5953
  rjnavarro@rampagelaw.com

By  *Kelly R. Albin*
  Kelly R. Albin
  State Bar No. 24086079
  So. Dist. ID No. 3792304
  kralbin@rampagelaw.com

By  *Robert L. Drinkard*
  Robert L. Drinkard
  State Bar No. 24007128
  So. Dist. ID No. 29288
  rldrinkard@rampagelaw.com

**DENTON NAVARRO RODRIGUEZ
 BERNAL SANTEE & ZECH**
A Professional Corporation
549 N. Egret Bay, Suite 200
League City, Texas 77573
Tel. 832.632.2102
Fax 832-632-2132

**COUNSEL FOR DEFENDANT
HARRIS COUNTY, TEXAS**

Defendant Harris County's Comprehensive MSJ     -52-

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been served in accordance with one or more of the authorized methods for service of process referenced in the Federal Rules of Civil Procedure on all attorneys of record in this case on the 20TH day of JULY 2026, to wit:

Aaron Dekle                                     Email: aaron@bencrump.com
Paul Ashley Grinke                              Email: paul@bencrump.com
BEN CRUMP LAW FIRM
ATTORNEYS FOR PLAINTIFFS

Carl Lenford Evans, Jr.                         Email: cevans@mccathernlaw.com
Noah L. McCathern                               Email: nmccathern@mccathernlaw.com
MCCATHERN LAW FIRM
ATTORNEYS FOR PLAINTIFFS

Thad D. Spalding                                Email: tspalding@WCBslawgroup.com
Shelby J. White                                 Email: swhite@WCBslawgroup.com
DURHAM, PITTARD & SPALDING, LLP
ATTORNEYS FOR PLAINTIFFS

Mohammed Obaid Shariff                          Email: mshariff@sharifflawfirm.com;
Russell Ross                                    Email: rross@sharifflawfirm.com
Shariff Law Firm                                Email: eservice@sharifflwfirm.com
SHARIFF LAW FIRM
ATTORNEY FOR INTERVENOR ANA GARCIA
  & KEVIN KST

Taylor McCray Hunter                            Email: taylor@thehunterlaw.com
Kevin Green                                     Email: kevin@consumerjusticecenter.com
Thomas Lyons Jr.                                Email: tommy@consumerjusticecenter.com
Andi Weber                                      Email: andi@consumerjusticecenter.com
HUNTER LAW FIRM
ATTORNEY FOR INTERVENOR
CHANDRA JENKINS & KST


*Ricardo J. Navarro*
RICARDO J. NAVARRO
KELLY R. ALBIN
ROBERT L. DRINKARD

**EXHIBIT A - INDEX TO MSJ EXHIBITS**

The following list of exhibits, all of which have been produced to all counsel of record, are hereby incorporated by reference into this dispositive motion for all purposes. They are hereby Indexed and tendered as follows:

EXH. 01 – SUMMARY OF PLAINTIFFS PROFILE & CLAIMS

EXH. 02 – TCJS MINIMUM STANDARDS HANDBOOK

EXH. 03 – TCJS REQUIRED SYSTEM PLANS [INFO SHEET]

EXH. 04 – HCSO OPERATIONAL SYSTEM PLANS

EXH. 05 - TCJS SYSTEM PLAN – HEALTH CARE SERVICES

EXH. 06 – CJC SOPS RE INMATE HEALTH CARE & WELLNESS

EXH. 07 – HCSO HEALTH SERVICES MANUAL (in effect thru 3/1/2022)

EXH. 08 – HCSO NURSING POLICIES (in effect thru 3/1/2022)

EXH. 09 - INTERLOCAL AGREEMENT (ILA) BETWEEN HARRIS COUNTY AND HARRIS HEALTH SYSTEMS REGARDING IMATE MEDICAL CARE (EFF. 3/1/2022; RENEWD 9/13/2022)

EXH. 10 – INTERLOCAL AGREEMENT (ILA) BETWEEN HARRIS COUNTY AND HARRIS CENTER FOR MENTAL HEALTH & DISABILITIES (HCMH&IBB) (EFF. 12/13/2019, AS AMENDED

EXH. 11 - HEALTH MANAGEMENT ASSOCIATION (HMA) FINAL REPORT TO HARRIS HEALTH SYSTEM RE INMATE CARE

EXH. 12 – REPORT FROM BUDGET MANAGEMENT DEPARTMENT TO HARRIS COUNTY COMMISSIONERS COURT RE JAIL HEALTH CARE TRANSITION

EXH. 13 - HARRIS HEALTH CORRECTIONAL HEALTH GUIDELINES (AUG. 2022)

EXH.14 –NCCHC ACCREDITATION REPORTS & HISTORY

EXH. 15 – TCJS NONC & RESPONSES RE CHAP 273 HEALTH ENFORCEMENT

EXH. 16 – AFFIDAVIT OF DETENTION COMMAND CHIEF PHILLIP BOSQUEZ

EXH. 17 – TCJS CUSTODIAL DEATH NOTICES & CORRESP (SAMPLING)

EXH. 18 – JAIL OPERATIONS EXPERT REPORT BY SEAN T. STEWART

EXH. 19 – CORRECTIONAL HEALTH EXPERT REPORT BY PHILIP ESKEW

EXH. 20 – MEDICAL SUMMARIES OF PLAINTIFFS / INERVENORS (MILLS / DIMAS)

EXH. 21 – CUSTODIAL STAY SUMMARIES OF PLAINTIFFS AND INTERVNORS (PLD JAIL CONSULTANTS)

EXH. 22 – FUNCTIONAL CAPACITY REPORTS [ALPHA ORDER]

Defendant Harris County's Comprehensive MSJ                                              -54-

EXH. 23 – JAIL POPULATION GRAPHS & TRENDLINES (OMS DATA)

EXH. 24 – STATEMENT BY JESSICA SMITH & EXHBITS JAIL DATA GRAPHS & TRENDS

EXH. 25 – STATEMENT BY LT. JORGE GONZALEZ

EXH. 25.1 – USE OF FORCE CONTENT

EXH. 26 – EXECUTIVE ORDERS RE COVID & HURRICANE HARVEY

EXH. 27 – BJS DATA

EXH. 28 – STATEMENT BY LT. BRIAN TSCHUDY

EXH 29 - STATEMENT OF MAJOR MATTHEW FERGUSON

EXH. 30 – DOJ CLOSING LETTER TO HARRIS COUNTY (dtd 2019-0607)

EXH. 31 – EUELL DEPO EXTRACT RE UNDERSTAFFING

EXH. 32 – LOCKHART DEPO EXTRACT RE INMATE VIOLENCE

EXH. 33 – RADCLIFFE DEPO EXTRACT RE INMATE VIOLENCE

EXH. 34 – TRAMMEL MORELLE DEPO EXTRACTS RE MEDICAL CARE

EXH. 35 – TCJS NONC & RESPONSES

EXH. 36 – HCSO INMATE HANDBOOK

**EXHIBIT B – TABLE OF AUTHORITIES CITED**

*Acosta v. Williamson Cnty., Texas*,
     No. 23-50777, 2024 WL 3833303, at *13 (5th Cir. Aug. 15, 2024)…………..

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986)……………….

*Austin v Kroger Texas, L.P.,* 864 F.3d 326, 335 & n.10 (5th Cir. 2017)…….

*Babino v. Harris Cnty.,*
     No. CV H-24-1870, 2024 WL 4340041, at *4 (S.D. Tex. Sept. 27, 2024)…….

*Baker v McCollan,* 443 U.S. 137, 140 (1979)……………………………………………

*Baldwin v. Stalder,* 137 F.3d 836, 840 (5th Cir.1998)……………………………..

*Barr v. City of San Antonio,* 2006 WL 2322861, at *4 (W.D. Tex. July 25, 2006)……

*Bartee v. Harris Cnty*., 2018 WL 8732519 (S.D. Tex. Mar. 5, 2018)…………………

*Bell v. Wolfish*, 441 U.S. 520, 535 (1979)…………………………………………

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 415 (1997)….

*Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 956 (5th Cir. 1993)

*Cadena*, 946 F.3d at 727
     (quoting *Duvall v. Dallas County, Tex*., 631 F.3d 203, 207
     (5th Cir. 2011) (per curiam)……………………………………………..

*Castillo v. Cameron Cnty., Tex*., 238 F.3d 339, 354 (5th Cir. 2001)……………..

*Celotex Corp. v Catrett,* 477 U.S. 317, 322-323 (1986)…………………………

*Chavez-Sandoval v. Harris Cnty*., CIVIL ACTION NO. H-24-3072, 2025 WL 2029931,
     at *6(S.D. Tex. July 21, 2025)
     (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981))…………………

*City of Canton v. Harris*, 489 U.S. 378, 391 (1989)……………………………….

*Covell v. Arpaio*, 662 F.Supp.2d 1146 (2009)……………………………………..

*Daniels v. Williams,* 474 U.S. 327, 332-33 (1986)…………………………

*Doe v. Taylor Indep. Sch. Dist*., 15 F.3d 443, 453 (5th Cir. 1994) (en banc)………

*Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011)……………..

*Edwards v. Oliver,* No. 3:17-CV-01208-M-BT, 2019 WL 4603794
    (N.D. Tex. Aug. 12, 2019), (*discussing Bartee v. Harris Cnty.*,
    2018 WL 8732519 (S.D. Tex. Mar. 5, 2018)……………………………

*Est. of Bonilla v. Orange Cty.*, 982 F.3d 298 at 308 (citations omitted)…………….

*Estate of Henson v. Wichita County, Tex.*, 795 F.3d 456, 466–67 (5th Cir. 2015)……..

*Farmer v Brennan*, 511 U.S. 825, 838 (1994)……………………………………….

*Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997)……………………..

*Ford v Anderson County, 102 F.4th 292, 307 (5th Cir. 2024)*………………………..

*Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019)
    (quoting *Bell*, 441 U.S. at 539)………………………………………….

*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996)……………………..

*Harvey v. Montgomery Cty.,* 881 F. Supp. 2d 785, 797-98 (S.D. Tex. 2012)…………..

*Hicks-Fields v Harris County*, 860 F.3d 803, 808 (5th Cir. 2017)……………………..

*Human Rights Defense Center v. Baxter County, Arkansas,*
    667 F.Supp.3d 959 (2023)………………………………………………….

*Johnson v San Antonio,* 2024 WL 50463 (5th Cir. 2024)…………………………….

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*,
    379 F.3d 293, 310 (5th Cir. 2004)
    (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)…………………

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (internal citations omitted)……………

*Krim v. Banc Texas Group, Inc.,* 989 F.3d 1435, 1442 (5th Cir. 1993)…………………

*Leal v. Wiles*, 734 F. App'x 905, 909 (5th Cir. 2018)
    (citing *Farmer*, 511 U.S. at 833–34, 114 S.Ct. 1970)………………………….

*Lewis v. Bd. of Cnty. Comm'rs of Sedgwick Cnty..*,
    KS, 56 F. App'x 873 (10th Cir. 2003)………………………………….

*Lewis v. Bd. of Sedgwick Cnty. Comm'rs*, 140 F. Supp. 2d 1125 (D. Kan. 2001)………….

*McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir.1989)……………………….

*Monell v New York, 436 U.S. 658 (1978)…………………………………………………*

*Montano v. Orange Cnty., Texas*, 842 F.3d 865, 876 (5th Cir. 2016)……………….

*Murray v. LeBlanc*, 629 F. Supp. 3d 437, 457 (M.D. La. 2022)……………………….

*Nazerzadeh v. Harris Cnty.*, No. CIV A H-08-0499,

2010 WL 3817149, at *4 (S.D. Tex. Sept. 27, 2010)…………………………

*Nieto v State Farm,* 722 F.Supp. 653 (S.D. Tex. – Brownsville Div. 2024)…………

*Oklahoma City v. Tuttle*,
471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)………………

*Oporto v. City of El Paso,* 2010 WL 3503457 at *5-6 (W.D. Tex. Sept. 2, 2010)………

*Palmer v. Harris Cnty.*, No. CV H-25-2326, 2025 WL 2605406, at *3
S.D. Tex. Sept. 5, 2025)(citing *Estate of Henson v. Wichita County, Tex.*,
795 F.3d 456, 466–67 (5th Cir. 2015))…………………………………………..

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)…………………………….

*Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009)…………………..

*Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)……………………

*Reynolds v. Wood Cnty., Texas*, No. 22-40381,
2023 WL 3175467, at *7 (5th Cir. May 1, 2023)
citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) )………………

*Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)…………………………………

*Rivera v. City of San Antonio,* 2006 WL 3340908, at *12 (W.D. Tex. Nov. 15, 2006)…….

*Saenz v. City of El Paso*, 637 F. App'x 828 (5th Cir. 2016)……………………..

*Sanchez v Young County*, 956 F.3d 785, 792 (5th Cir. 2020)…………………..

*Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)
(quoting *Hare*, 74 F.3d at 644)……………………………………..

*Seal v. Harrison Cnty., Miss. ex rel. Bd. of Sup'rs*,
No. 1:08-CV-175-LG-RHW, 2010 WL 2545406, at *7
(S.D. Miss. June 18, 2010)………………………………………………

*Shepherd v. Dallas Cnty*., 591 F.3d 445, 452, 454-55 (5th Cir. 2009)……………

Defendant Harris County's Comprehensive MSJ                                    -58-

*Simon v. Harris County*, 2025 WL 2468871, at *4 (S.D. Tex. Aug. 27, 2025)
(citing *Daniels v. Williams,* 474 U.S. 327, 332-33 (1986)…………………………..

*Spiller v. City of Texas City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)………..

*Whitley v. Albers,* 475 U.S. 312, 320, 326, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)…..

*Williams v. Bexar Cnty.*, No. 22-50289, 2024 WL 3326082,
at *6 (5th Cir. July 8, 2024) citing *Peterson*, 588 F.3d at 851–52……………………….

*Yates v. Collier*, 868 F.3d 354, 360 (5th Cir. 2017)………………………………….

*Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010)……………….

## STATUTES AND RULES

### STATUTES AND RULES

FED. R. CIV. P. 56………………………………………………………………….

37 Tex. Admin. C. § 275.4………………………………………………………….

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OCTEVIA WAGNER, ET. AL. **Plaintiffs** | § § § § | |
| v. | § § | Civil Action No. 4:23-CV-02886 |
| HARRIS COUNTY, TEXAS **Defendant** | § § § § | |
| AND | § § § | |
| ANA GARCIA AND CHANDRA JENKINS, **Plaintiff – Intervenors** | § § | |

**ORDER ON DEFENDANT HARRIS COUNTY'S COMPREHENSIVE
MOTION FOR SUMMARY JUDGMENT PERTAINING TO
PLAINTIFFS' AND INTERVENORS' CLAIMS AND
CAUSES OF ACTION UNDER SECTION 1983 AND THE 14TH AMENDMENT**
========================================================================

On this day, the Court considered the Motion for Summary Judgment submitted by Defendant Harris County with respect to the claims and causes of action brought by Plaintiffs and Intervenors in this case alleging constitutionally deficient denial of medical care to each named inmate. The claims are urged under Section 1983 and the Fourteenth Amendment as both conditions of confinement claims as well as episodic acts claims. *See Second Amended Complaint (ECF #122).*

After consideration of Defendant Harris County's dispositive motion on the medical care claims, the responses and replies thereto, as well as the arguments of respective counsel, the Court finds that Defendant's Rule 56 Motion for Summary Judgement has merit and should be GRANTED.

It is therefore Ordered that the denial of medical care claims urged by Plaintiffs and Intervenors in this case as conditions of confinement claim are hereby Dismissed as a Matter of law.

It is further Ordered that the individual episodic acts claims urged by Plaintiffs and Intervenors are conditionally Dismissed, subject to a showing by Plaintiffs and Intervenors

individually that under an episodic acts theory of liability there exist material fact disputes demonstrating that individual Plaintiffs or Intervenors were denied medical care and that such denial was the result of conscious or deliberate indifference to a serious medical need.

SIGNED on the _____ day of _____ 2025.


_____
HON. KEITH P. ELLISON
U.S. DISTRICT COURT

Order on Defendant Harris County's Rule 56 Motion for Summary Judgment
Re Denial of Medical Care Claims                                                    -2-