**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WAGNER et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY, TEXAS, | § | CIVIL ACTION NO: 4:23-CV-02886 |
| | § | |
| *Defendant,* | § | |
| | § | Jury Requested |
| and | § | |
| | § | |
| ANA GARCIA and CHANDRA JENKINS, | § | |
| | § | |
| | § | |
| *Plaintiff-Intervenors.* | § | |

**PLAINTIFF-INTERVENOR ANA GARCIA'S AMENDED RESPONSE TO DEFENDANT HARRIS COUNTY'S MOTION FOR SUMMARY JUDGMENT ON ALL PLAINTIFFS' AND INTERVENORS' CLAIMS [DOC. 406]**

M. OBAID SHARIFF
Federal I.D. No. 2827312
Texas Bar No. 24091135
**THE SHARIFF LAW FIRM, PLLC**
2500 West Loop South, Ste 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
mshariff@shariflawfirm.com

***Attorneys for Plaintiff-Intervenor Ana Garcia***

# I. TABLE OF CONTENTS


I. TABLE OF CONTENTS .......... ii
II. TABLE OF AUTHORITIES .......... iii
III. SUMMARY OF EXHIBITS .......... v
IV. NATURE AND STAGE OF PROCEEDING .......... 1
V. STATEMENT OF ISSUES .......... 1
VI. SUMMARY OF ARGUMENT .......... 1
VII. STATEMENT OF FACTS .......... 2

A. PRIOR TO THE KEVIN SANCHEZ EVENTS, DEFENDANT WAS ON NOTICE OF THE VERY CONDITIONS AND PRACTICES AT ISSUE IN THIS LAWSUIT BUT WAS DELIBERATELY INDIFFERENT .......... 2

B. SANCHEZ SUFFERED AND DIED FROM THOSE VERY CONDITIONS AND PRACTICES THAT DEFENDANT KNEW ABOUT .......... 10

VIII. RELEVANT STANDARD .......... 14

IX. LAW AND ARGUMENT .......... 14

A. DEFENDANT'S MOTION DOES NOT SATISFY FED. R. CIV. P. 56(A) . 14

B. A JURY COULD FIND CONSTITUTIONAL VIOLATIONS .......... 14

C. THE CONDITIONS OF CONFINEMENT CLAIM SURVIVES .......... 16

i. OVERCROWDING AND UNDERSTAFFING .......... 17
ii. THE FAILURE TO OBSERVE CONDITION .......... 19
iii. FAILURE TO PROVIDE MEDICAL CARE CONDITION .......... 21

D. THE ALTERNATIVE EPISODIC ACTS CLAIM SURVIVES .......... 22

E. THE *MONELL* CLAIM SURVIVES .......... 23

i. THE POLICY / CUSTOM ELEMENT .......... 24
ii. THE POLICYMAKER ELEMENT .......... 25
iii. MOVING FORCE .......... 26
iv. A DELIBERATELY INDIFFERENT DISPOSITION OF THE POLICYMAKER CAN BE INFERRED FROM ENSUING EVENTS .......... 26

F. THE FAILURE TO TRAIN / SUPERVISE CLAIMS SURVIVE .......... 33

X. CONCLUSION AND PRAYER .......... 35

# II. TABLE OF AUTHORITIES

**Cases**

*Austin v. City of Pasadena*, 74 F.4th 312 (5th Cir. 2023) ........ 15
*Austin v. Kroger Tex., L.P.*, 864 F.3d 326 (5th Cir. 2017) ........ 14
*Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 (S.D. Tex. 2018) (Ellison, K.) .... 24, 25, 26
*Bell v. Wolfish*, 441 U.S. 520 (1979) ........ 16
*Bennett v. Slidell*, 728 F.2d 762 (5th Cir. 1984) ........ 25
*Bishop v. Arcuri*, 674 F.3d 456 (5th Cir. 2012) ........ 23
*Carter v. Benavides*, 2007 U.S. Dist. LEXIS 14904 (S.D. Tex. 2007) ........ 15
*Chavez-Sandoval v. Harris Cnty.*, 2025 U.S. Dist. LEXIS 138452 (S.D. Tex., 2025) ........ 17
*Converse v. City of Kemah*, 961 F.3d 771 (5th Cir. 2020) ........ 15
*Cope v. Coleman Cnty.*, 2024 U.S. App. LEXIS 15549 *11 (5th Cir. 2024) ........ 15
*Dyer v. Houston*, 964 F.3d 314 (5th Cir. 2020) ........ 15
*Farmer v. Brennan*, 511 U.S. 825 (1994) ........ 15
*Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019) ........ 17
*Grandstaff v. City of Borger*, Tx. 767 F.2d 161 (5th Cir. 1985) ........ 25, 26
*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996) ........ 15
*Harris v. Cockrell*, 84 Fed. Appx. 438 (5th Cir. 2004) ........ 15
*Heckford v. City of Pasadena,* 2021 U.S. Dist. LEXIS 114573 (S.D. Tex. 2021) (Ellison, K.) .. 26
*Helling v. McKinney*, 509 U.S. 25 (1993) ........ 15
*Howell v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 137088 (S.D. Tex. 2024) (Ellison, K.) ....... 16, 25
*Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000) ........ 15
*Louzi v. Fort Bend Cty.*, 2020 U.S. Dist. LEXIS 154775 (S.D. Tex. 2020) (Ellison, K.) ...... 15, 24
*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ........ 2, 23, 25
*Montano v. Orange Cnty., Tex.*, 842 F.3d 865 (5th Cir. 2016) ........ 25
*Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493 (5th Cir. 2022) ........ 23, 24, 25
*Parker v. LeBlanc*, 73 F.4th 400 (5th Cir. 2023) ........ 25
*Releford v. City of Houston*, 2016 U.S. Dist. LEXIS 167749 (S.D. Tex. 2016) (Ellison, K.) ...... 24
*Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) ........ 17
*Shepherd v. Dallas County*, 591 F.3d 445 (5th Cir. 2009) ........ 16, 24
*Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022) ........ 15
*St. Maron Props., L.L.C. v. City of Houston*, 2023 U.S. App. LEXIS 22044 (5th Cir. 2023) ...... 24
*Taylor v. Cockrell*, 92 F. App'x 77 (5th Cir. 2004) ........ 19
*Turner v. Upton County*, 915 F.2d 133 (5th Cir. 1990) ........ 25
*United States v. Peterson*, 244 F.3d 385 (5th Cir. 2001) ........ 26
*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 182546 (S.D. Tex. 2024) (Ellison, K.) ("*Wagner III*") ........ 16, 24, 25
*Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 98779 (S. D. Tex. 2024) (Ellison, K.) ("*Wagner II*") ........ 16, 24, 25

*Wagner v. Harris Cnty.*, 2025 U.S. Dist. LEXIS 58331 (S.D. Tex. 2025) (Ellison, K.) ("*Wagner IV*") .......... 18

**Rules and Statutes**

Fed. R. Civ. P. 56(a) .......... 14
Fed. R. Civ. P. 56(d) .......... 1, 24
Fed. R. Civ. P. 8(d) .......... 23

## III. SUMMARY OF EXHIBITS

1. Garcia here incorporates her previously filed and specifically cited eighty-nine (89) summary judgment exhibits [Doc. 247, Pg. 6-10], in addition, Garcia adds:

Exhibit 90 – Hayden P. Smith Expert Declaration on Garcia's Claims, 2026-04-14[1];

Exhibit 91 – Hayden P. Smith Deposition, 2026-05-06;

Exhibit 92 – Ana Garcia Deposition Volume I, 2026-04-16;

Exhibit 93 – Ana Garcia Deposition Volume II, 2026-04-16;

Exhibit 94 – Theodore Stamatakos Deposition, 2026-05-08;

Exhibit 95 – Daniel E. Brooks Deposition, 2026-07-20;

Exhibit 96 – DO Bruce Hayes Deposition, 2025-10-29;

Exhibit 97 – Plaintiff Jacilet Griffin-Lee Deposition, 2026-03-31;

Exhibit 98 – Plaintiff Amanda Harris Deposition, 2026-03-13;

Exhibit 99 – DO Jacarlo Lemus Deposition, 2026-05-01;

Exhibit 100 – DO Sergeant Lori Jefferson Deposition, 2026-05-06;

Exhibit 101 – DO David Guzman Deposition, 2026-05-13;

Exhibit 102 – DO A. Goodlow-Jones Deposition, 2026-05-01;

Exhibit 103 – Plaintiff Jackie Luna Deposition, 2026-02-16;

Exhibit 104 – Plaintiff Zachery Johnson Deposition, 2026-06-24;

Exhibit 105 – Plaintiff Bernard Lockhart Deposition, 2026-02-12;

Exhibit 106 – DO Marquise Johnson Deposition, 2026-04-27;

Exhibit 107 – DO Shuntae Burton Deposition, 2026-04-29;

---

[1] Garcia's jail expert, Dr. Smith was provided the exact same documents and video evidence that Garcia used in her response to Defendants' initial summary judgment motion against her claims. *Compare* Doc. 301, Pg. 4-6 *to* Doc. 247, Pg. 6-10; *see also* Ex. 91, Pg. 50:11.

Exhibit 108 – DO Calyn Cutler Deposition, 2025-10-28;

Exhibit 109 – DO Franky Estrada Deposition, 2026-05-04;

Exhibit 110 – DO Angela McClain Deposition, 2026-04-29;

Exhibit 111 – DO Jose Delgado Deposition, 2025-10-22;

Exhibit 112 – Lt. Garrett DeMilia Deposition, 2026-06-08;

Exhibit 113 – Plaintiff Dianne Bailey-Rijsenburg Deposition, 2026-04-21;

Exhibit 114 – Plaintiff Fawnya Doiron Deposition, 2026-04-27;

Exhibit 115 – Plaintiff Timothy Lee Deposition, 2026-03-17;

Exhibit 116 – DO Donald Randell Deposition, 2026-04-27;

Exhibit 117 – Commander Ruth Janie McClanahan Deposition, 2026-06-05;

Exhibit 118 – Cadet Joseph Benavides Deposition, 2026-05-20;

Exhibit 119 – DO Clarissa Marie Orona Deposition, 2026-05-19;

Exhibit 120 – DO Brenda Pineda Deposition, 2026-05-21;

Exhibit 121 – DO Kevin Mose Deposition, 2026-05-18;

Exhibit 122 – DO Kaigan Lecompte Deposition, 2026-03-26;

Exhibit 123 – DO Aaron Martinez Deposition, 2026-05-20;

Exhibit 124 – DO Amber Bailey Deposition, 2026-05-21;

Exhibit 125 – Sheriff Ed Gonzalez Deposition, 2026-07-17;

Exhibit 126 – 2016 TCJS Notices of Noncompliance;

Exhibit 127 – 2017 TCJS Notices of Noncompliance;

Exhibit 128 – 2018 TCJS Notices of Noncompliance;

Exhibit 129 – 2019 TCJS Notices of Noncompliance;

Exhibit 130 – 2020 TCJS Notices of Noncompliance;

Exhibit 131 – 2021 TCJS Notices of Noncompliance;

Exhibit 132 – 2022 TCJS Notices of Noncompliance;

Exhibit 133 – 2023 TCJS Notices of Noncompliance;

Exhibit 134 – 2024 TCJS Notices of Noncompliance;

Exhibit 135 – 2025 TCJS Notices of Noncompliance;

Exhibit 136 – DO Michelle Rhem Case History;

Exhibit 137 – DO Jeremiah Adebola Case History;

Exhibit 138 – DO Emmanuel Oketunmbi Case History;

Exhibit 139 – DO Sergeant Addi Dariah Case History;

Exhibit 140 – DO Donald Randell Case History;

Exhibit 141 – DO Amber Bailey Case History;

Exhibit 142 – DO Darryell Murphy Case History;

Exhibit 143 – DO Francis Green Case History;

Exhibit 144 – DO Lieutenant Myron Jackson Case History;

Exhibit 145 – DO Bradley McCain Case History;

Exhibit 146 – DO Christopher Ortega Case History;

Exhibit 147 – DO Willie Gray Case History;

Exhibit 148 – DO Angela McClain Case History;

Exhibit 149 – DO Sergeant Jordan Hobson Case History;

Exhibit 150 – DO Jamael Farooq Case History;

Exhibit 151 – DO Oluseye Obalade Case History;

Exhibit 152 – DO Dante Martinez Case History;

Exhibit 153 – Harris County Settlement Agreements, 2020-2024;

Exhibit 154 – Jaquaree Simmons Internal Affairs File, IA2021-00104;

Exhibit 155 – Evan Lee Jail Records;

Exhibit 156 – Deon Peterson Operational Records;

Exhibit 157 – William Curtis Barrett Operational Records;

Exhibit 158 – Nathan Henderson Internal Affairs File, DIC2022-00021;

Exhibit 159 – Simon Peter Douglass Jail Records;

Exhibit 160 – Vincent Young Jail Records;

Exhibit 161 – Maytham Alsaedy Jail Records;

Exhibit 162 – Natividad Flores Jail Records;

Exhibit 163 – Wallace Harris Medical Examiner and Investigative File;

Exhibit 164 – David Perez Jail Records;

Exhibit 165 – Israel Lizano Iglesias Jail Records;

Exhibit 166 – Rory Ward, Jr. Medical Examiner and Investigative File;

Exhibit 167 – Gregory Barrett Medical Examiner and Investigative File;

Exhibit 168 – Fred Joseph Harris Jail Records;

Exhibit 169 – Matthew Shelton Jail Records;

Exhibit 170 – Gilbert Allen Nelson III Jail and Medical Records;

Exhibit 171 – Robert Wayne Fore, Jr. Texas Ranger Investigation;

Exhibit 172 – Kristan Nicole Smith Operational Records;

Exhibit 173 – Jim Franklin Lagrone Medical Examiner and Investigative File;

Exhibit 174 – James Earl Gamble Jail and Medical Records;

Exhibit 175 – Victoria Margaret Simon Medical Examiner and Investigative File;

Exhibit 176 – Alan Christopher Kerber Jail Records;

Exhibit 177 – Michael Griego Internal Affairs File, DIC2022-00038;

Exhibit 178 – Michael Griego Operational Records and Kiosk Request Log;

Exhibit 179 – Damien Lavon Johnson Jail Records;

Exhibit 180 – Dylan Perio Inmate Kiosk Requests;

Exhibit 181 – Dylan Perio Jail and Medical Records;

Exhibit 182 – Taylor Euell Jail and Medical Records;

Exhibit 183 – Ryan Twedt Jail and Medical Records;

Exhibit 184 – Michael Alaniz Internal Affairs File, IA2015-00971;

Exhibit 185 – Natividad Flores Federal Case Filings;

Exhibit 186 – Micahel Alaniz Federal Case Filings;

Exhibit 187 – DO Kadijah Wyrick Case History.

## IV. NATURE AND STAGE OF PROCEEDING

1. Without waiving her Motion to Strike [Doc. 415] and Fed. R. Civ. P. 56(d) Motions [Doc. 242, 425], **ANA GARCIA** ("Garcia"), mother of deceased **KEVIN SANCHEZ** ("Sanchez") here responds to Defendant **HARRIS COUNTY**'s ("Defendant") latest MSJ [Doc. 406] even though she already raised issues of fact on each claim in response to a prior one.[2]

## V. STATEMENT OF ISSUES

2. Has Defendant shown an entitlement to summary judgment? (No). Summary judgment is only proper if Defendant shows no genuine dispute of material fact and that it is entitled to judgment as a matter of law. To assess that, all facts are viewed in Garcia's favor.

## VI. SUMMARY OF ARGUMENT

3. Kevin Sanchez was a pretrial detainee, presumed innocent, who entered the Harris County Jail alive and left it dead. Defendant knew he was suicidal. It knew he was urinating blood and begging for medical care. But, it gave him one clinic visit, a fraction of the medication his infection required, and no follow-up. The infection spread to his kidneys. The pain became unbearable. And when Kevin finally ingested a substance Defendant had failed to keep out of its own jail, walked to the intercom, and said "*Hey, that's it for me*," he collapsed bleeding over the toilet of his cell and lay there dying for eight hours. Three officers passed his door more than ten times that night. They scanned barcodes. They did not look. By the time anyone did, forty minutes of lifesaving measures could not undo eight (8) hours of nobody checking whether he was alive.

4. That was not bad luck. It was the system working the way it had worked for years. Before Kevin died, several other detainees suffered or died in the Defendant's custody the same

[2] *Compare* Doc. 169 *to* Doc. 247, Pg. 31-35 ¶ 44-52 (constitutional violations), Pg. 35-40 ¶ 53-62 (conditions of confinement), Pg. 40-45 ¶ 63-72 (episodic acts), Pg. 45-47 ¶ 73-77 (*Monell* claims), Pg. 47-50 ¶ 78-83 (failure to train / supervise).

way: known risks ignored, medical care withheld, observation rounds rushed or faked, records corrected after the fact. And, the State warned the Defendant year after year. In fact, its Sheriff admits he has known of these conditions since 2016. Its own major, his delegate, admits the jail got into the practice of subpar observation. Its own officers testify they were forced onto overtime, told to hurry their rounds, and never disciplined for doing them wrong. Kevin was not an isolated incident. He was the pattern's next entry, and detainees kept dying after him.

5. That said, summary judgment is an extraordinary remedy, and the Defendant has not carried its very heavy burden to obtain it as a matter of law. To do so, it must show no reasonable jury could ever find for Garcia. But one could on Garcia's first MSJ Response [Doc. 247] alone. And, in the time since, the summary judgment record has only worsened for the Defendant with sworn testimony from its Sheriff, its commanders, its sergeants, and its detention officers which all confirm the understaffing, the overcrowding, the sham observation rounds, and the denials of medical care that killed Kevin and others. Where the Defendant's records say one thing, its own people, its video, detainees, their families and the many dead say another.

6. On this record, a jury could find for Garcia on her conditions of confinement claim, her episodic acts claim, her *Monell* claim, and her failure to train and supervise claims. And, a jury will. As such, the motion should be denied, and this case should go where it belongs: to trial.

## VII. STATEMENT OF FACTS

### A. PRIOR TO THE KEVIN SANCHEZ EVENTS, DEFENDANT WAS ON NOTICE OF THE VERY CONDITIONS AND PRACTICES AT ISSUE IN THIS LAWSUIT BUT WAS DELIBERATELY INDIFFERENT

7. The TCJS, a state-appointed oversight board that oversees county jails and periodically performs longitudinal jail inspections, has identified conditions that impacted detainee

safety, supervision, and medical care at the jail.[3] It has repeatedly put Defendant on notice it was denying medical and mental health care to detainees, failing to properly observe detainees, failing to properly identify suicidal detainees, understaffed, and overcrowded.[4]

8. In addition, there have been several flagrant and severe incidents demonstrating those same failures at Defendant's jail. First, in February 2017, detainees told Defendant Detainee Vincent Young was suicidal.[5] Despite that, Defendant only put him in a holding cell.[6] There, he tied a sheet around his neck, hanged himself from the bed, and died.[7] During this time, Defendant failed to make proper face to face observation of potentially suicidal detainees.[8] After this, Defendant tried to falsify its observation records.[9]

9. Second, from February 2015 to November 2017, Defendant knew Detainee Maytham Alsaedy was suicidal, would self-mutilate and/or injure himself.[10] On November 30, 2017, Alsaedy covered his cell windows with newspapers, hung himself, and died.[11] Following this, the TCJS put Defendant on notice that it had not properly observed this suicidal detainee.[12]

---

[3] Doc. 247, Pg. 11 ¶ 4; Ex. 90, Pg. 5 ¶ 2, 11 ¶ 3, 16 ¶ 6; Ex. 125, Pg. 110:24-111:5, 111:11-23; Ex. 91, Pg. 69:1-8

[4] Doc. 247, Pg. 11 ¶ 4; Ex. 117, Pg. 27:2-7; Ex. 125, Pg. 98:10:23, 232:20-236:14, 246:14-248:19, 281:16-20, 316:17-317:9, 321:10-14; Ex. 126, Pg. 4; Ex. 127, Pg. 3, 5-6, 8, 10-13, 15-16; Ex. 128, Pg. 11, 18, 25, 27; Ex. 129, Pg. 5; Ex. 130, Pg. 15-17, 28; Ex. 131, Pg. 13, 15-18, 21, 23, 25-26, 29, 31, 33-37; Ex. 132, Pg. 44-56, 61; Ex. 133, Pg. 4, 11-12, 15, 20-22, 27-29, 42, 44-47, 50, 53; Ex. 134, Pg. 3-6, 8, 11-12

[5] Ex. 160, Pg. 41, 47, 49, 115, 117, 120

[6] Ex. 160, Pg. 109

[7] Ex. 160, Pg. 2, 45, 111, 118, 122-123, 125, 151, 154, 161, 163, 167, 170-171, 174, 184- 185, 193

[8] Ex. 125, Pg. 232:20-236:14; Ex. 127, Pg. 3, 5-6

[9] Ex. 160, Pg. 113

[10] Ex. 161, Pg. 4, 24, 27, 29, 54, 56, 59, 74, 77, 120, 135, 141, 160, 162, 188, 257, 279

[11] Ex. 161, Pg. 2, 257, 260, 257-258, 261, 277, 284

[12] Ex. 127, Pg. 15-16

10. Third, on August 14, 2018, Defendant did not properly observe Detainee Deborah Lyons who hanged herself.[13] Fourth, on August 24, 2018, Defendant settled Michael Alaniz's claims he was denied medical care after excessive force was used.[14] Several other settlements have also put Defendant on notice of the same conditions / practices raised in this lawsuit.[15]

11. Fifth, two and a half years before Sanchez, on July 27, 2019, Detainee Natividad Flores disclosed his epilepsy to Defendant, yet Defendant ignored his requests for his seizure medication and never gave it to him.[16] Instead, Defendant assigned him to a top bunk, knowing he was at a foreseeable high risk of falling from a seizure, he suffered repeated seizures, and days later, fell from that bunk, bleeding excessively from a serious head injury.[17] Other detainees rushed to him and wrapped his head in towels, but the officer who saw them "*stood idly by and laughed at Mr. Flores for an unknown period of time*," and Flores next woke at the hospital.[18] Flores sued, and Defendant settled this medical care failure case for a considerable amount of money.[19]

12. Sixth, a little less than two years before Sanchez, on May 7, 2020, Detainee Wallace Harris was booked into Defendant's care with a history of seizures.[20] Despite that, Defendant did not properly observe him for an hour and twenty minutes.[21] And, he died.[22]

---

[13] Ex. 128, Pg. 18, 27.
[14] Ex. 184; Ex. 186, Pg. 6 # 53, 14 ¶ 39, 17 ¶ 48, 18 ¶ 51, 14 ¶ 59
[15] Ex. 153, Pg. 1-54
[16] Ex. 185, Pg. 30 ¶ 1, 2; Pg. 31 ¶ 3, 33-34 ¶ 18-24
[17] Ex. 185, Pg. 31 ¶ 4-8; 33-34 ¶ 22-27; 37 ¶ 50; 44 ¶ 83-84
[18] Ex. 185, Pg. 34 ¶ 28-30; Pg. 34-35 ¶ 32; Pg. 44 ¶ 88-89.
[19] Ex. 185, Pg. 6-7; Ex. 153, Pg. 35-41
[20] Ex. 163, Pg. 24, 38, 44, 49, 53, 58
[21] Ex. 163, Pg. 23
[22] Ex. 163, Pg2

13. Seventh, seventeen months before Sanchez, on September 9, 2020, Detainee David Perez was placed in Defendant's custody but he did not receive a current mental health screening.[23] Defendant, however, knew he had previously attempted suicide.[24] That same day, Defendant's nurse noted that he had mental health issues and had reported that he was "*King David and should be addressed as such*."[25] Over the next days, Defendant's chart does not record a single thirty-minute observation, though that same chart holds hundreds of them from his stay on that same unit the year before.[26] Given so, on September 13, 2020, he was discovered unresponsive and died.[27]

14. Eighth, just a year before Sanchez, on February 8, 2021, Detainee Israel Iglesias was identified as a mental health risk.[28] But, Defendant never actually classified him as such: his assessment forms are nameless, dateless, unscored, and contradictory.[29] He was placed in a holding cell with no recorded security level, classification date, or observation.[30] Almost eighteen (18) hours later, a detainee then had to yell, "*we need help in here*."[31] After which, Iglesias died.[32]

15. Ninth, just a year before Sanchez, in mid-February 2021, Defendant was short staffed, lacking manpower, and its DOs were without rest.[33] Under that stress, many DOs used excessive force on detainee Jaquaree Simmons and then failed to report it and/or falsified records

---

[23] Ex. 164, Pg. 6, 645
[24] Ex. 164, Pg. 8
[25] Ex. 164, Pg. 580, 601
[26] *Compare* Ex. 164, Pg. 323-481 *with* Ex. 164, Pg. 580-619 and Pg. 620-622
[27] Ex. 164, Pg. 4, 101, 103, 105, 108, 139, 173, 617, 622, 628, 641
[28] Ex. 165, Pg. 2, 11, 15, 17, 430, 441.
[29] Ex. 165, Pg. 1, 8-9.
[30] Ex. 165, Pg. 10, 18-22, 372-373.
[31] Ex. 165, Pg. 373, 441.
[32] Ex. 165, Pg. 11, 374.
[33] Ex. 154, Pg. 134-135, 151 ¶ 5, 195 ¶ 2, 197 ¶ 4, 311 ¶ 3, 315 ¶ 6

about it.[34] As a result, Simmons suffered physical injuries.[35] But, "*no one escorted [him] to the clinic*."[36] Instead, Simmons was stripped of his clothes and left in the cold to die.[37] During which time, 7th floor DOs did not conduct proper face to face observation rounds.[38] And, he died.[39]

16. Tenth, less than six months before Sanchez, on August 26, 2021, Detainee Gregory Bernard Barrett told his wife he was "*coughing up blood*," that he "*was going to die*," and was short of breath; he voiced the same complaints to Defendant's staff, but was not seen by a doctor.[40] Instead, Defendant just placed him in a cell.[41] And, it is unknown when he was last seen alive by Defendant.[42] Eventually, however, he was found unresponsive in his cell and he died.[43]

17. Eleventh, seven (7) months before Sanchez, Defendant booked Deon Peterson on February 23, 2021 with known heart disease, hypertension, asthma, and diabetes, and learned he had gone two weeks without his blood pressure medication.[44] It then ignored his complaints of left arm and chest pain in July, and two "*Abnormal*" EKGs.[45] On August 10, 2021, Peterson complained of chest pain at 9:30 a.m., and Defendant sent him back to his cell.[46] Thereafter, DOs found him "*passed out on the floor facedown*" outside the elevators, told the nurses nothing, and

---

[34] Ex. 154, Pg. 62, 78, 93, 108, 122, 136-137, 140, 156, 173, 187, 202, 217, 241, 267-268, 284, 300, 320, 345, 364, 383, 387, 389, 391, 393, 397, 399, 403, 405, 407, 409, 412-413, 415-416, 420, 422, 449 ¶ 8, 450 ¶ 2
[35] Ex. 154, Pg. 341 ¶ 2; 421 ¶ 3, 449 ¶ 6, 8
[36] Ex. 154, Pg. 413 ¶ 6
[37] Ex. 154, Pg. 414-415
[38] Ex. 154, Pg. 32, 49, 267-268
[39] Ex. 154, Pg. 6 ¶ 3, 45 ¶ 3, 421 ¶ 4, 450 ¶ 1
[40] Ex. 167, Pg. 18, 29 (handwritten), 31
[41] Ex. 167, Pg. 31-32
[42] Ex. 167, Pg. 32
[43] Ex. 167, Pg. 2, 13, 29, 31
[44] Doc. 332, Pg. 14 ¶ 2; Pg. 16 ¶ 3; Pg. 17 ¶ 1; Ex. 156, Pg. 2
[45] Doc. 332, Pg. 17-18
[46] Doc. 332, Pg. 18 ¶ 2-3

an LVN cleared him in under five minutes.[47] Not until he clutched his chest in agony, was sat upright in a chair, and passed out did Defendant send him to Ben Taub.[48] After which, he died.[49]

18. Twelfth, just two months before Sanchez, on December 29, 2021, DO Samuel Garcia highly recommended that Gilbert Nelson / David Davis be transferred to a handicap cellblock for hygiene purposes.[50] From intake and after, Defendant knew of Nelson / Davis's various medical conditions which included kidney failure.[51] And, though he obviously needed it, Defendant never drew another chemistry panel, never ordered a urinalysis or a urine culture, and never gave him an antibiotic.[52] Instead, Nelson / Davis grew incontinent of urine, vomited daily, could not swallow food, and became "*disheveled, thin, elderly, and frail looking*."[53] Twice, because he was not properly observed, a detainee had to report his medical emergencies.[54] But, by the time Defendant got to him, he was cold, unresponsive, and motionless.[55] Defendant had counted him just over an hour before, but a body does not go that cold that fast.[56] Like that, he died of sepsis due to a bacterial urinary cystitis and pyelonephritis.[57]

19. Thirteenth, just a month before Sanchez, on October 10, 2021, Defendant knew Detainee Fred Harris had mental health issues and was a known suicide risk.[58] In fact, Defendant's own vulnerability screening flagged him as a first-time detainee, under twenty-one, and of "*small*

---

[47] Doc. 332, Pg. 19 ¶ 1
[48] Doc. 332, Pg. 19 ¶ 2; 20 ¶ 1
[49] Doc. 332, Pg. 20 ¶ 1
[50] Ex. 170, Pg. 59.
[51] Ex. 170, Pg. 26, 94, 108, 122, 142, 149, 196, 1180.
[52] Ex. 170, Pg. 107, 193-198.
[53] Ex. 170, Pg. 94-96, 107.
[54] Ex. 170, Pg. 72, 78, 80.
[55] Ex. 170, Pg. 74, 77-78, 80, 96.
[56] Ex. 170, Pg. 80.
[57] *Compare* Ex. 170, Pg. 1179, 1184, 1191 *to* Doc. 247, Pg. 14-15 ¶ 9-11 (same body part)
[58] Ex. 168, Pg. 9-10, 16-17, 47, 49, 55, 63-64, 72, 126, 128

*physical stature*."[59] Despite that, the overcrowded Defendant put him into a holding tank with known violent offender Detainee Michael Ownby, who violently assaulted defenseless Harris on video, and it took the understaffed Defendant so long to respond that Harris died.[60] After this, Defendant paid Harris' family $1.25 million to settle the case they brought against it.[61]

20. Fourteenth, on December 22, 2021, both Evan Lee and Sanchez were detainees at Defendant's jail, and Lee was booked into it with known insulin-dependent diabetes, hypertension, bipolar 2 disorder, and schizophrenia.[62] But, Defendant never gave him his mental health medications, and it did not give him his insulin.[63] There, like Sanchez, he called his mother and said: "*Mama, let me outta here. They're gonna kill me in here," and "they're not checking my sugar. They're not giving me my insulin*."[64] And, he told Defendant the same thing in writing at least eight (8) times.[65] But, Defendant just ignored him for days.[66] Then, it housed him in a cell its own detainees called "*the fight cell because… cameras cannot see*," where he was beaten.[67] After which, DOs conducted no proper face-to-face observations, logging "*No rover on the floor, paged several times*."[68] Then, Lee "*tried to get in the clinic… for a blood sugar issue, and he was*

[59] Ex. 168, Pg. 4.
[60] Ex. 168, Pg. 20-21, 26, 69, 85, 87, 90, 97, 125-130; Doc. 278, Pg. 18 ¶ 1; Doc. 279, Pg. 19 ¶ 2
[61] https://abc13.com/post/fred-harris-case-125-million-settlement-family-19-year-old-intellectual-disabilities-killed-inside-jail/18654816/
[62] Doc. 410, Pg. 19 ¶ 1, 21 ¶ 1-2, Pg. 36 ¶ 2; Ex. 155, Pg. 35, 192;
[63] Doc. 410, Pg. 21 ¶ 1, 36 ¶ 2; Ex. 115, Pg. 49:3-4, 51:17-19; Ex. 97, Pg. 72:4-6, 73:9-10
[64] Ex. 97, Pg. 110:17 to 111:6; 125:4-7
[65] Ex. 155, Pg. 161, 171, 174, 179, 180, 181
[66] Doc. 409, Pg. 22 # III; Ex. 98, Pg. 51:25, 65:2-4, 114:1-5, 126:1, 127:14-16, 133:22-134:9, 169:16-18; Ex. 155, Pg. 165, 181
[67] Ex. 155, Pg. 7 ¶ 3.8, 184; Doc. 410, Pg. 22 ¶ 2
[68] Ex. 155, Pg. 153-157; Doc. 410, Pg. 24 ¶ 2

*turned away because he was not escorted*," and was told to "*lie down on the floor until someone saw him*."[69] And, by the time a provider saw him, Lee "*was not oriented*."[70] And, he died.[71]

21. Fifteenth, Defendant had Sanchez and the frail and elderly James Camble with elevated PSA and creatine levels in custody at the same time.[72] Nurses ordered referrals and tests, some "ASAP," but none were carried out, including a urinalysis dip stick which was later closed out by Gamble's death.[73] On the day he died, Defendant was not doing proper face-to-face observations, so another detainee had to tell a DO that Gamble was unresponsive.[74] Gamble died.[75] Even Defendant did not know if he was being treated for the thing that killed him.[76]

22. Sixteenth, just days before Sanchez died on February 10, 2022, Defendant noted Simon Peter slurred his speech, could not answer medical questions, and was "talking about his brother cause he thinks he is going to die."[77] Two hours later he tried to hang himself, and shouted "*I want to die*" as DOs handcuffed him.[78] Defendant then moved him, still handcuffed, into a padded suicide cell.[79] There, on camera, he "continually ran his head into the walls, door, and a metal grate on the floor," bleeding from his forehead and mouth.[80] But, Defendant did not open the door for ten minutes, and he died.[81] In all, several detainees housed either before or concurrently with Sanchez suffered from the very same unconstitutional confinement conditions.

---

[69] Ex. 155, Pg. 23 ¶ 8.5-8.6; Doc. 410, Pg. 20 ¶ 1
[70] Ex. 155, Pg. 21-22 ¶ 7.19- 7.20
[71] Ex. 155, Pg. 2; 193; Doc. 410, Pg. 25 ¶ 1
[72] Ex. 174, Pg. 188, 1119, 1199, 1212
[73] Ex. 174, Pg. 98-100, 106, 1199
[74] Ex. 174, Pg. 1200, 1216
[75] Ex. 174, Pg. 2, 1201, 1212, 1216
[76] Ex. 174, Pg. 1213
[77] Ex. 159, Pg. 8-10, 43, 44, 47
[78] Ex. 159, Pg. 22, 56, 57
[79] Ex. 159, Pg. 2, 17, 56
[80] Ex. 159, Pg. 16, 18, 49, 56
[81] Ex. 159, Pg. 2, 16, 49, 59

### B. SANCHEZ SUFFERED AND DIED FROM THOSE VERY CONDITIONS AND PRACTICES THAT DEFENDANT KNEW ABOUT

23. Defendant's own documents show that it ***knew*** Sanchez was suicidal, and that was brought to 7th Floor Supervisor Randall Williams' attention,[82] a supervisor who Defendant previously ***knew*** was "*incompetent*," because there was a "*pattern*" showing he was "*failing to provide… necessary supervision*," and who had raised alarm bells about staffing issues.[83]

24. Urinating blood and in extreme pain, Sanchez begged Defendant for medical attention and it took Defendant over a week to take him to a single clinic visit, with no follow-up whatsoever, at which he was given only a small, one-time dose of medication, one quarter of what he actually needed to treat his serious condition and pain.[84]

25. Recorded detainee phone calls during this period reflect Sanchez's continued complaints of pain and requests for assistance.[85] In those, Sanchez told Garcia, "*I'm unwell. I'm not well… when I urinate, I get a great pain after urinating… And… blood came out*."[86] In another, when Garcia's grandson Axel asked him "*What's wrong*," Sanchez responded, "***Dick infection. I'm pouring out blood, man. When I pee, I pour blood. I'm rotting from the male organ.***"[87]

---

[82] Doc. 247, Pg. 12 ¶ 5; Ex. 90, Pg. 1 ¶ 2, 20 ¶ 1-6; Ex. 92, Pg. 60:17-20; Ex. 94, Pg. 17:17-21; Ex. 95, Pg. 22:13-14, 23:23-24, 24:4, 35:4-5, 10, 41:5-6, 50:18; Ex. 100, Pg. 36:22-25; Ex. 118, Pg. 33:13-15; Ex. 124, Pg. 20:12-19; Ex. 125, Pg. 17:14-18

[83] Doc. 247, Pg. 12 ¶ 5; Ex. 90, Pg. 17 ¶ 5

[84] Ex. 90, Pg. 9 ¶ 4; Ex. 92, Pg. 76:23-24, 84:2-7; Ex. 93, Pg. 145:8-12; Ex. 94, Pg. 23:3-8, 27:2-7, 28:10-15, 36:4-7, 41:25-42:3; 49:22-23, 50:2-4, 50:14-15, 19-20, 52:7-11, 54:3-4, 14-20, 57:23-24, 59:21; 59:22-23, 60:7-21, 62:24-25, 63:10-12; 68:15-17, 76:5-6, 76:12-18, 78:3-11, 92:4-5; 102:15-104:6, 106:17-25, 107:1-24, 108:18-109:5; 109:11-6, 111:5-112:3, 112:11-22, 114:23-115:1, 119:1-5, 120:20-24; 121:5-8; 123:8-11, 13-16, 125:14-126:5, 132:16-21, 151:4-7; Ex. 95, Pg. 55:23-25; 58:1-4, 64:11-17

[85] Ex. 90, Pg. 9 ¶ 5; Ex. 92, Pg. 81:6-8, 104:23-24, 120:12-13, 18-20, 121, 8, 14-20; Ex. 93, Pg. 136:8-137:4, 11-14, 141:11-21

[86] Doc. 247, Pg. 5 ¶ 11; Ex. 92, Pg. 61:22-23, 69:5-6, 13, 69:14-15; Ex. 93, Pg. 137:15-18; Ex. 94, Pg. 62:23-24, 102:8-14, 142:8-9, 145:11-12

[87] Doc. 247, Pg. 16 ¶ 12; Ex. 92, Pg. 69:19-22; Ex. 93, Pg. 138:12-22, 140:1-6, 13-22

Untreated, Sanchez's urinary tract infection had progressed to the kidneys and caused him constant, unbearable pain, leaving him no choice but to self-medicate.[88]

26. Suffering, Sanchez ingested a substance that Defendant had failed to keep out of its jail. Sanchez then walked to the cell's PCC intercom and said, "*Hey, that's it for me*," and fell arched over the toilet, his head on the ground, bleeding for hours, begging for help so loudly that another detainee heard him, and moving his foot through the night.[89] From the video:




*See* Ex. 1K (Min. (23:21:48); Ex. 88, Pg. 3 # 9

DOs charged with observing him that day were working overtime, not working in their usual places because of understaffing, covering more ground on rounds than normal, and doing just the quick,

[88] Ex. 94, Pg. 18:1-6, 44:10-14, 23-24, 43:22-24, 50:5-9, 62:13-15, 21-23, 70:4-7, 24-25, 71:3-5, 76:19-21, 82:15-19, 82:15-19, 86:9-12, 94:6-8, 95:12-14, 96:4-13, 114:14-20, 115:7-15, 116:2-7, 116:8-23, 117:3-18, 117:19-21, 118:7-13, 119:24-25, 121:23-24, 123:1-2, 128:23-129:1, 131:19-24, 132:3-4, 134:2-6, 11-14, 134:25-135:5, 14-18, 136:7-10, 14-20, 141:24-142:4; Ex. 95, Pg. 52:23-53:1, 56:1-3, 73:3-5

[89] Doc. 247, Pg. 21-25 ¶ 25-35

improper face-to-face glances their sergeants told them to perform, a routine that even Defendant's own Major Collier confessed at his deposition the jail had gotten into the routine of doing.[90]

27. But within that, a jury at trial will need to decide between two versions of events from DO Jazmine Stewart, in the first of which she said she saw him but did nothing, and in the second of which she engaged in the custom of quickly scanning barcodes without actually performing face-to-face observations.[91] Upon that, CoreTrak rounds activity reports reflect specific time-stamped entries for observation rounds at 12:56 AM, 1:44-1:45 AM, 3:36 AM, 4:34 AM, 5:30 AM, 6:18 AM, and 7:14 AM.[92] But, as DO Jancarlo Lemus and Donald Randell testified and other records show such observation records are unreliable anyways.[93]

28. Indeed, corresponding video of the housing unit shows three (3) Detention Officers, namely Stewart, Lighten, and Andrew Ung, all walking past cell doors and exiting within brief periods of time, all failing to perform meaningful observations.[94] These entries generally ranged from several seconds to approximately one or two minutes for the entire unit.[95] During these, staff are not observed stopping at individual cells, pausing to look inside, or conducting observable welfare checks of inmates.[96] The synchronization of electronic logging data with video evidence provides an objective basis for evaluating whether the documented rounds were conducted in a manner consistent with required observation practices.[97]

---

[90] Doc. 247, Pg. 19-21 ¶ 18-22.
[91] Doc. 247, Pg. 24-25 ¶ 28-30
[92] Ex. 90, Pg. 10 ¶ 3, 26 # B
[93] Ex. 99, Pg. 25:15-25, 33:21-24, 34:4-10; Ex. 116, Pg. 24:5-20; Ex. 120, Pg. 17:24-18:9; Ex. 123, Pg. 43:9-15; Ex. 138, Pg. 1; Ex. 144, Pg. 1; Ex. 143, Pg. 3; ; Ex. 144, Pg. 1; Ex. 152, Pg. 1; Ex. 154, Pg. 108
[94] Ex. 90, Pg. 10 ¶ 4, 13 ¶ 1-4, 14 ¶ 1, 3, 15 ¶ 2-4, 21 ¶ 2, 26 # B; Ex. 91, Pg. 78:8; Ex. 96, Pg. 41:15-25, 42:25-42:5, 43:19-44:7, 62:13-14
[95] Ex. 90, Pg. 10 ¶ 4, 17 ¶ 3, 21 ¶ 2, 26 # B
[96] Ex. 90, Pg. 10 ¶ 4, 13 ¶ 5-6, 14 ¶ 4
[97] Ex. 90, Pg. 10 ¶ 4, 15 ¶ 1, 5, 17 ¶ 3; Ex. 116, Pg. 45:24-46:4

29. But, DO Lighten explained that he completed his rounds so quickly the night Sanchez died due to understaffed workload demands and time pressures.[98] In any case, Sanchez was only discovered eight (8) hours after the start of his emergency.[99] And, even then, several officers just briefly entered Sanchez's cell, each lasting only a few seconds with no physical assessment, repositioning, or direct intervention by correctional staff.[100] Indeed, during these sporadic entries, no observable assessment of airway, breathing, or circulation was performed, and no cardiopulmonary resuscitation was initiated by any correctional staff person.[101]

30. Despite that he had a recorded pulse and medical personnel thereafter engaged in forty-plus (40+) minutes of life-saving measures:[102]




*See* Doc. 247, Pg. 28 (citing its Ex. 1K at 7:42:56; Ex. 88, Pg. 8 # 19)

---

[98] Ex. 90, Pg. 14 ¶ 3, 15 ¶ 5, 16 ¶ 6
[99] Ex. 90, Pg. 14 ¶ 7
[100] Ex. 90, Pg. 10 ¶ 6, 18 ¶ 3, 19 ¶ 1
[101] Ex. 90, Pg. 19 ¶ 2, 27 # E, F
[102] Doc. 247, Pg. 27-29 ¶ 38-39

But Sanchez died, and Defendant laughed about it.[103] Then, it told his forever-sad mother, Ana Garcia: "*I'm sorry, ma'am. Your son, Kevin, has passed away*."[104] That said, as further detailed below several others would also die that same year from the same conditions.

## VIII. RELEVANT STANDARD

31. Garcia previously set forth the relevant legal standard, and incorporates that here.[105]

## IX. LAW AND ARGUMENT

### A. DEFENDANT'S MOTION DOES NOT SATISFY FED. R. CIV. P. 56(A)

32. A Federal Rule of Civil Procedure 56(a) summary judgment movant, as a matter of law, must specifically identify "each claim or defense— or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Moreover, in the Fifth Circuit, "a mere conclusory assertion that the nonmovant has no evidence" is insufficient to shift the summary judgment burden to the nonmovant.[106] Despite that, nowhere in Defendant's Motion [Doc. 406] does it specifically identify the specific parts of Garcia's pled and live claims upon which summary judgment is sought; it only mentions Sanchez in a list.[107] In addition, it cites its Sheriff's deposition "throughout" its Motion while not even including the transcript of that deposition. Doc. 406, Pg. 6 fn 3. Hence, Defendant has not shifted any response burden onto Garcia.

### B. A JURY COULD FIND CONSTITUTIONAL VIOLATIONS

33. The motion again challenges only the constitutional-injury elements of Garcia's claims, and Garcia again raises genuine issues of material fact on three violations, just as she did

---

[103] Doc. 247, Pg. 30 ¶ 41
[104] Doc. 247, Pg. 30 ¶ 42; Ex. 92, Pg. 74:2-75:12, 14-16; Ex. 93, Pg. 150:22-25, 151:4-18; 154:18-155:1-4, 7-8, 12-17, 157:7-8, 158:18, 159:5
[105] Doc. 247, Pg. 30-31 ¶ 43.
[106] *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 & fn 10 (5th Cir. 2017)
[107] Doc. 406, Pg. 5 ¶ 1-2

before.[108] First, as a pretrial detainee, Sanchez had a Fourteenth Amendment right to safety, general well-being, and basic humane conditions while the State held him unable to fend for himself, and a jury could find Defendant disregarded substantial risks of serious harm to him.[109]

34. Second, Defendant admits that "a person in jail custody has a constitutional right of access to reasonable medical care."[110] A serious medical need is one so apparent that even laypeople would recognize that care is required, like bloody stools or an inmate lying in a pool of blood, and a delay in care violates the Constitution when done with deliberate indifference resulting in substantial harm, including a failure to promptly call for help in a known emergency.[111] A jury could find both violations here: weeks of untreated, agonizing bloody urination met with one delayed clinic visit, a quarter dose, and no follow-up, and then a bleeding, hours-long emergency that three officers walked past. *Supra*.

35. Third, Sanchez had a Fourteenth Amendment right to be protected from a known risk of suicide, which jail officials violate when they gain actual knowledge of the substantial risk and respond with deliberate indifference.[112] Defendant's own records show it long knew Sanchez was a suicide risk, it was warned again in the days before his death, and it responded by placing him under a supervisor it knew was incompetent, with officers who never truly looked into his

---

[108] Doc. 406, Pg. 28-30 ¶ 128-133; Doc. 247, Pg. 31-35 ¶ 44-52.
[109] *Hare v. City of Corinth*, 74 F.3d 633, 639, 644 (5th Cir. 1996); *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *Farmer v. Brennan*, 511 U.S. 825, 848 (1994); Doc. 247, Pg. 31-32 ¶ 45-46.
[110] Doc. 169, Pg. 13 ¶ 58; see also Doc. 406, Pg. 28 ¶ 126; *Farmer*, 833.
[111] *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022); *Harris v. Cockrell*, 84 Fed. Appx. 438, 439 (5th Cir. 2004); *Carter v. Benavides*, 2007 U.S. Dist. LEXIS 14904 *9-10 (S.D. Tex. 2007); *Austin v. City of Pasadena*, 74 F.4th 312, 327-328 (5th Cir. 2023); *Dyer v. Houston*, 964 F.3d 374, 378 (5th Cir. 2020); *Cope v. Coleman Cnty.*, 2024 U.S. App. LEXIS 15549 *10 (5th Cir. 2024)
[112] *Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020) (citing *Hare* and *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000)); *Louzi v. Fort Bend Cty.*, 2020 U.S. Dist. LEXIS 154775 *15 (S.D. Tex. 2020) (Ellison, K.)

cell. *Supra*. Garcia incorporates her full showing on each of these violations from her prior response as if fully herein stated.[113]

**C. THE CONDITIONS OF CONFINEMENT CLAIM SURVIVES**

36. Garcia already showed that these conditions were unrelated to a legitimate government interest, and that they violated Sanchez's rights.[114] To do so, Garcia need only identify a rule, restriction, or intended condition or practice.[115] Such can be "an unstated de facto policy, as evidenced by a pattern of acts or omissions… to prove an intended condition or practice."[116] Here, the conditions at issue are: (1) overcrowding and understaffing, (2) failure to properly observe detainees, and (3) denials of medical care.[117] Such claims are adjudicated under the *Bell v. Wolfish*, 441 U.S. 520 (1979) standard, which lets courts "assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation."[118] The test is a reasonable relationship to a legitimate governmental interest.[119] Hence, Garcia need not show deliberate indifference.[120]

37. Defendant nonetheless resists this framework by suggesting that, because individual officers stood between Sanchez and the County, the claim must be treated as episodic

---

[113] Doc. 247, Pg. 31-35 ¶ 44-52 (with record citations).
[114] Doc. 247, Pg. 35-40 ¶ 53-62
[115] Doc. 247, Pg. 35 ¶ 53 (citing *Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 98779 *25 (S. D. Tex. 2024) (Ellison, K.) ("*Wagner II*"); *Wagner v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 182546 *8 (S.D. Tex. 2024) (Ellison, K.) ("*Wagner III*"); Doc. 51, Pg. 14 ¶ 4; Doc. 84, Pg. 4 ¶ 4)
[116] Doc. 247, Pg. 35 ¶ 53 (citing *Wagner II*, *25; *Wagner III*, *8; *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009)
[117] Doc. 247, Pg. 36 ¶ 54 (citing *Wagner III*, *7)
[118] Doc. 247, Pg. 35 ¶ 53 (citing *Wagner II*, *27 and *Wagner III*, *10)
[119] Doc. 247, Pg. 36 ¶ 53 (citing *Wagner II*, *30, *Wagner III*, *12, and *Howell v. Harris Cnty.*, 2024 U.S. Dist. LEXIS 137088 *18 (S.D. Tex. 2024) (Ellison, K.)
[120] Doc. 247, Pg. 36 ¶ 54 (citing *Wagner II*, 27 & 30)

rather than conditions-based.[121] Sure, that rule fits cases like *Scott v. Moore*, where the harm was one officer's isolated assault, not the jail's own operating conditions.[122] But, here, a reasonable jury could find Sanchez's harm was different: every officer on his floor performed the same barcode-scan rounds for over eight (8) hours, those officers were pulled out of position and onto overtime by understaffing, and the medical care system itself, not any single employee, had already failed him for weeks. *Supra*. Hence, the conditions themselves here constitute the harm.

### i. OVERCROWDING AND UNDERSTAFFING

38. Garcia already showed an overcrowding and understaffing condition, unrelated to any legitimate government interest, that violated Sanchez's rights.[123] In addition, now there is even more evidence. Indeed, Defendant's policymaker testified that he has known about the overcrowding and understaffing condition since as far back as 2016.[124] He admitted overcrowding hit his jail.[125] TCJS reports and notices show it too.[126] Just before Sanchez's death, Cpt. Croas put everybody on notice that the jail was failing on numerous state compliance issues, with Sgt. Williams publicly blaming widespread staffing issues.[127] DO A. Goodlow-Jones and Marquise Johnson testified Defendant was understaffed.[128] Moreover, DOs Bruce Hayes, Jancarlo Lemus

---

[121] Doc. 406, Pg. 14-15 ¶ 71 (quoting *Chavez-Sandoval v. Harris Cnty.*, 2025 U.S. Dist. LEXIS 138452 (S.D. Tex., 2025), and citing *Garza v. City of Donna*, 922 F.3d 626, 633 (5th Cir. 2019)).
[122] *Scott v. Moore*, 114 F.3d 51, 53-54 (5th Cir. 1997)
[123] Doc. 247, Pg. 36 ¶ 55-58 (the condition) and Pg. 31-35 ¶ 44-52 (the violation of rights)
[124] Ex. 125, Pg. 103:18-104:1
[125] Ex. 125, Pg. 168:15
[126] Ex. 90, Pg. 16 ¶ 6; Ex. 98, Pg. 146:7-13; Ex. 117, Pg. 27:2-7; Ex. 125, Pg. 246:14-248:19, 281:16-20, 321:10-14; Ex. 130, Pg. 15-16, Ex. 131, Pg. 13
[127] Doc. 247, Pg. 12 ¶ 5
[128] Ex. 102, Pg. 23:9-12, 50:9-13; Ex. 106, Pg. 29:16-21, 30:17-25

and David Guzman testified the place was so understaffed they had to work forced overtime.[129] And, DO Shuntae Burton testified it caused late rounds in 2022.[130]

39. Piling on, Detainees testified they slept on the floor for want of beds, like Plaintiffs Taylor Euell and Bernard Lockhart, and that no one was free to take them to the clinic, like Plaintiff Zachery Johnson.[131] Garcia's experts agreed.[132] This persistent, known condition is not reasonably related to any legitimate government interest and caused Sanchez's injuries.[133] It made even basic jail functions impossible to perform.[134] Causation is readily apparent, as minimal staffing has a direct impact on the ability to provide a safe environment.[135] And, here, for example, it forced abbreviated, ineffective face-to-face rover rounds.[136] Indeed, Lighten described completing rounds quickly due to workload demands and time pressure.[137] Hence, they led directly to the violations of rights Garcia showed in response to the other MSJ.[138]

40. Despite this, Defendant argues that there is no understaffing/ overcrowding custom, because on paper its functional capacity system met all required ratios.[139] But, this Court already rejected Defendant's evidence, for two reasons: TCJS reports and party-opponent admissions to the contrary.[140] Indeed, upon the first, the TCJS has found insufficient the very staffing Defendant

---

[129] Ex. 96, Pg. 8:14-19, 26:4-13, Ex. 99, Pg. 35:13-15, Ex. 101, Pg. 30:14-18, 31:14-19; *see also* Doc. 276, Pg. 16 ¶ 2; Doc. 279, Pg. 16
[130] Ex. 107, Pg. 26:4-5, 30:2-5, 34:15-17, 34:21-35:1, 35:15-25, 47:1-7
[131] Doc. 247, Pg. 14 ¶ 8, 17 ¶ 15, 37 ¶ 56; Ex. 98, Pg. 145:1-5; Ex. 104, Pg. 38:3-8, Ex. 105, Pg. 91:25-93:3, 93:10-94:6
[132] Doc. 247, Pg. 36 ¶ 55; Ex. 90, Pg. 16 ¶ 5, 17 ¶ 1-2
[133] Ex. 90, Pg. 17 ¶ 1-2
[134] Doc. 247, Pg. 21
[135] Ex. 125, Pg. 286:12-20.
[136] Ex. 90, Pg. 21 ¶ 2
[137] Ex. 90, Pg. 16 ¶ 5
[138] Doc. 247, Pg. 247, Pg. 31-35 ¶ 44-52
[139] Doc. 406, Pg. 7-8 ¶ 13-18, 19-23 ¶ 76-97
[140] Doc. 120, Pg. 7 ¶ 2; *Wagner v. Harris Cnty.*, 2025 U.S. Dist. LEXIS 58331 *13 (S.D. Tex. 2025) (Ellison, K.) ("*Wagner IV*")

claims was sufficient.[141] And, second, those party-opponent admissions include statements from the Defendant's sheriff, its captains, sergeants, and detention officers.[142] Separately, just three (3) months before Sanchez died, the TCJS told Defendant to stop using supervisors and essential personnel to work housing unit assignments to barely meet the ratios.[143] And, particularly, here the DOs charged with observing Sanchez that night were on overtime, out of their usual posts, and rushing to barely complete rounds on time; a ratio met that way exists on paper only, not in reality. And, to be clear, the TCJS notices are evidence of the conditions, of Defendant's knowledge of them, and of the absence of any legitimate governmental purpose.[144]

### ii. THE FAILURE TO OBSERVE CONDITION

41. Garcia already showed a failure to observe condition, unrelated to any legitimate government interest, that violated Sanchez's constitutional rights.[145] Defendant, however, says there is no such custom because of the number of recorded rounds it performs.[146] But, Defendant's own policymaker testified that those statistics cannot show whether those rounds were actually performed properly with face-to-face observations.[147] Moreover, considerable evidence shows those records to be inherently unreliable.[148] So much so that Defendant's own high-ranking delegate, Major Collier testified that the jail had gotten into the practice of doing subpar inmate

---

[141] Ex. 125, Pg. 317:23-318:10; Ex. 133, Pg. 5.
[142] Doc. 247, Pg. 12 ¶ 5; Ex. 102, Pg. 23:9-12, 50:9-13; Ex. 106, Pg. 29:16-21, 30:17-25; Ex. 125, Pg. 103:18-104:1, 168:15
[143] Ex. 131, Pg. 13
[144] Doc. 406, Pg. 16 ¶ 74 (citing _Taylor v. Cockrell_, 92 F. App'x 77, 78 (5th Cir. 2004)).
[145] Doc. 247, Pg. 37-39 ¶ 59-60 (the condition) and Pg. 31-35 ¶ 44-52 (the violation of rights)
[146] Doc. 406, Pg. 11 ¶ 37, 24 ¶ 102
[147] Ex. 125, Pg. 311:11-15.
[148] Ex. 99, Pg. 25:15-25, 33:21-24, 34:4-10; Ex. 116, Pg. 24:5-20; Ex. 120, Pg. 17:24-18:9; Ex. 123, Pg. 43:9-15; Ex. 138, Pg. 1; Ex. 144, Pg. 1; Ex. 143, Pg. 3; Ex. 144, Pg. 1; Ex. 152, Pg. 1; Ex. 154, Pg. 108

observations.[149] And, that pattern resulted in at least the following deaths: Vincent Young,[150] Maytham Alsaedy, Deborah Lyons, Natividad Flores, Wallace Harris, David Perez, Israel Iglesias, Jaquaree Simmons, Gregory Bernard Barrett, Deon Peterson, Gilbert Nelson / David Davis, Evan Lee, James Gamble, Simon Peter Douglas and Kevin Sanchez. *Supra*.

42. Piling on, as with staffing, the TCJS has reported widespread deficiencies in Defendant's observation practices.[151] Moreover, experts in this case have also noted widespread improper observation practices.[152] Other Plaintiffs have collected such evidence in response to MSJs against their claims.[153] Other new evidence shows observation problems stemming from as far back as 2014, 2015, and 2016.[154] And, in that last year, Defendant's policymaker became well aware of them.[155] Despite that, it continued.[156] Defendant's DOs would even observe detainees with contraband and do nothing.[157] Moreover, DOs Franky Estrada and Donald Randell testified that, in 2022 and 2023, some rounds were done without even leaving the PCC[158] which is improper.[159] And, two weeks before Sanchez died, 7th Floor DO Antonio Barrera fell asleep in the PCC, and the night Sanchez died, DO Lighten was not paying attention to the cell camera because he was on "*phone*" trying to keep other PCC officers who were having "*trouble staying awake*."[160]

---

[149] Doc. 247, Pg. 19-21 ¶ 18-22.
[150] Ex. 125, Pg. 3, 5-6, 232:20-236:9-14, 245:17-23
[151] Doc. 247, Pg. 11 ¶ 4, 38 ¶ 59; Ex. 90, Pg. 16 ¶ 6; Ex. 125, Pg. 3, 5-6, 8, 10-12, 14:248:19, 232:20-236:9-14, 245:17-23, 246:14-248:19, 249:18-272:3, 316:17-317:9, 321:10-14; Ex. 127, Pg. 3, 5-6, 8, 10-11, 13, 15-16; Ex. 131, Pg. 1, 4
[152] Doc. 247, Pg. 38 ¶ 59; Ex. 90, Pg. 16 ¶ 6; Ex. 91, Pg. 64:2-11
[153] Doc. 410, Pg. 22, 24 # III
[154] Ex. 137, Pg. 1-2; Ex. 138, Pg. 1; Ex. 139, Pg. 1; Ex. 140, Pg. 1; Ex. 142, Pg. 1; Ex. 137, Pg. 2-3; Ex. 138, Pg. 1; Ex. 139, Pg. 1; Ex. 130, Pg. 1; Ex. 142, Pg. 1
[155] Ex. 125, Pg. 109:15-17
[156] Ex. 136, Pg. 1, Ex. 141, Pg. 1; Ex. 137, Pg. 4 ; Ex. 141, Pg. 1
[157] Ex. 146, Pg. 1; Ex. 147, Pg. 2; Ex. 148, Pg. 1
[158] Ex. 109, Pg. 26:10, 34:18-35:2; Ex. 116, Pg. 37:13-23; Ex. 119:28:2-6; Ex. 121, Pg. 21:19-23
[159] Ex. 125, Pg. 321:2-9
[160] Doc. 247, Pg. 24-25 ¶ 30, 38 ¶ 59

Beyond just in PCC, on the ground level, rounds were not performed properly.[161] Of course, they are not, because detention officers are not disciplined for improper rounds.[162] In fact, on January 11, 2022, just thirty (30) days before Sanchez died, Defendant put a DO it knew had failed to properly conduct observation rounds on the floor Sanchez was housed back on duty.[163]

43. DOs, like Jancarlo Lemus and Donald Randell, have all also now testified that this mere scanning of barcodes is how the typical round is performed.[164] Even Sergeant Lori Jefferson, who has been with Defendant since 1991, testified that just scanning barcodes was typical as rounds were much more relaxed than today.[165] And, the video evidence in this case similarly shows Stewart moving rapidly through each cell without stopping.[166] The video shows every single 7th floor DO behaving the exact same way on the two days Sanchez died: not isolated lapses, but repetition across rounds and officers.[167] To be exact, all three (3) detention officers behaved this way over the entire eight-plus (8+) hours, across all ten-plus (10+) alleged observations.[168] Hence, the evidence shows a failure-to-observe condition and that it caused Sanchez's injuries.

### iii. FAILURE TO PROVIDE MEDICAL CARE CONDITION

44. Garcia already showed a medical-care-denial condition, unrelated to any government interest, that violated Sanchez's rights.[169] To argue otherwise, Defendant nonetheless points to a health care regime that only came into existence seventeen (17) days after Sanchez

---

[161] Ex. 107, Pg. 23:9-12, 43:23-44:3; Ex. 149, Pg. 2; Ex. 150, Pg. 2; Ex. 151, Pg. 1
[162] Ex. 118, Pg. 38:13-16; Ex. 120, Pg. 25:13-26:7
[163] Ex. 136, Pg. 1; Ex. 137, Pg. 4, Ex. 154, Pg. 49, 453
[164] Ex. 99, Pg. 19:11-14, 22:18-25, 23:21-25; Ex. 116, Pg. 28:12-22, 30:5-14, 41:2-8
[165] Ex. 100, Pg. 7:14-18, 19:11-12, 37:14-15, 40:4-41:5
[166] Ex. 90, Pg. 16 ¶ 5
[167] Ex. 90, Pg. 16 ¶ 5, 17 ¶ 3; Ex. 91, Pg. 64:2-11, 66:4-6; Ex. 91, Pg. 78:2-3
[168] Ex. 90, Pg. 10 ¶ 3-4, 13 ¶ 1-6, 14 ¶ 1-6, 17 ¶ 3
[169] Doc. 247, Pg. 32-35 ¶ 47-52 (serious medical needs such as bloody urine, medical emergency / bleeding head, known suicide risk) and Pg. 39-40 ¶ 61-62 (showing why claim should survive)

died.[170] But that regime also did no good for Michael Alaniz, Natividad Flores, Wallace Harris, Jaquaree Simmons, Gregory Bernard Barrett, Deon Peterson, Gilbert Nelson / David Davis, Evan Lee, and James Gamble who were all also denied medical care.

45. Defendant's medical-summaries binder fares no better: its claim that every detainee received care once the need became apparent is, as to Sanchez, itself a disputed fact, given the week of begging, the single delayed visit, the quarter dose, and the absence of any follow-up. *Supra*.[171] Beyond them, Plaintiffs Ryan Twedt, Jeremy Garrison, John Coote, and Tayler Euell have all testified in this very case to the existence of this condition.[172]

46. As have detention officers, like DOs Jazmine Stewart and Marquise Johnson.[173] Indeed, this has been a longstanding known problem that the policymaker knew about.[174] And, expert testimony has further established that Defendant's noncompliance with jail standards negatively impacted overall detainee medical care.[175] To that point, as to Sanchez, the evidence shows he was denied adequate, timely care for his bloody urine for weeks, and for the hours-long medical emergency on the day he died.[176] There is a direct causal connection between the jail's failure to provide medical care and Sanchez's pain and death.[177] And, it led directly to the violation of constitutional rights Garcia showed in her prior MSJ response.[178]

## D. THE ALTERNATIVE EPISODIC ACTS CLAIM SURVIVES

---

170 Doc. 406, Pg. 9 ¶ 29
171 Doc. 406, Pg. 30-31 ¶ 134-136 (citing its Ex. 20).
172 Doc. 247, Pg. 39 ¶ 61.
173 Doc. 247, Pg. 39 ¶ 61; Ex. 106, Pg. 35:11-17, 37:2-7
174 Ex. 125, Pg. 94:8-10; Ex. 145, Pg. 1
175 Doc. 247, Pg. 39 ¶ 61
176 Doc. 247, Pg. 40 ¶ 62
177 Ex. 94, pg. 118:17-22, 119:1-12, 24-25, 120:8-11, 20-24, 13:5-8, 23-24, 132:5-12
178 Doc. 247, Pg. 31-35 ¶ 44-52

47. Garcia pled an episodic acts claim in the Fed. R. Civ. P. 8(d) alternative.[179] She has already shown, with specific citations to evidence, issues of fact on it that a jury must decide.[180] Despite that, Defendant first argues that excessive force claims must be assessed under the episodic acts rubric.[181] But Garcia has not pled any such excessive force claims. Next, Defendant specifically argues that constitutional violation must be established.[182] But, Garcia already specifically showed those and incorporates that response as if fully here stated.[183] Finally, on the episodic theory's subjective deliberate indifference element, Garcia has also shown a set of facts from which a jury could find that DO Stewart saw Sanchez but did nothing, that Lighten watched Sanchez dying on the PCC camera all night, that Defendant put known incompetent Sgt. Williams in charge of them both, and that everybody laughed after Sanchez died.[184] Hence, Garcia's episodic acts claim, pled in the Fed. R. Civ. P. 8(d) alternative, must survive. And, the municipal half of the episodic test, a policy or custom adopted with objective deliberate indifference, is established in the *Monell* discussion below, which Garcia incorporates here.

**E. THE *MONELL* CLAIM SURVIVES**

48. Garcia already showed issues of material fact on her pled [Doc. 41, Pg. 9-66 ¶ 28-70] *Monell* claims.[185] Again, the elements for it are (1) an official policy, (2) promulgated by the municipal policymaker, and (3) that was the moving force behind a constitutional violation.[186]

---

[179] Doc. 247, Pg. 30 ¶ 63 (citing Doc. 41 Pg. 71-72 ¶ 81-83)
[180] Doc. 247, Pg. 40-45 ¶ 63-72
[181] Doc. 406, Pg. 29-35 ¶ 120-125
[182] Doc. 406, Pg. 28 ¶ 128
[183] Doc. 247, Pg. 31-32 ¶ 45-46 (inhumane conditions), 32-34 ¶ 47-51 (right to medical care for painful bloody urine and a bleeding head emergency), 34-35 ¶ 52 (known suicide risk ignored).
[184] Doc. 247, Pg. 12 ¶ 2, 21-24 ¶ 25, 28 ¶ 39, 30 ¶ 41, 44 ¶ 71
[185] Doc. 247, Pg. 45-57 ¶ 73-77
[186] Doc. 247, Pg. 45 ¶ 73 (citing Doc. 41, Pg. 9; *Moore*, 509; *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012); *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *7-8 (S.D. Tex. 2018)

### i. THE POLICY / CUSTOM ELEMENT

49. The customs/policies at issue are (1) insufficient detainee monitoring, (2) inadequate medical care, and (3) systemic understaffing/overcrowding.[187] There are at least three (3) ways to show such: (1) written policy statements, (2) a widespread practice so common and well-settled as to constitute a custom,[188] or (3) even a single decision may constitute municipal policy where the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim.[189]

50. In practice, as Garcia's jail expert explained, a jail's real policy lives in its daily activities, in how written policies are interpreted and applied, and in how supervisors actually direct others.[190] There is no golden number for the number of times something has to happen before it can be called a practice; rather it depends on context.[191] A widespread one can be shown in two (2) different ways. *Infra*. The first is the familiar pattern of incidents approach for which Garcia has two Fed. R. Civ. P. 56(d) pending motions [Doc. 242, 425], and the second is the Shepherd v. Dallas County, 591 F.3d 445, 452 (5th Cir. 2009) and Moore v. LaSalle Mgmt. Co., 41 F.4th 493, 509-15 (5th Cir. 2022) ways where reports and DO testimony could establish it.[192]

51. Upon the first, the similarity requirement should not be exaggerated. *See* Doc. 51, Pg. 20 ¶ 1; Doc. 84, Pg. 9 ¶ 3; Wagner II, *32; Wagner III, *15. Exact duplication, after all, is not

(Ellison, K.); Releford v. City of Houston, 2016 U.S. Dist. LEXIS 167749 *9 (S.D. Tex. 2016) (Ellison, K.); Wagner II, *30-31); Doc. 51, Pg. 19 ¶ 2

[187] Doc. 247, Pg. 45 ¶ 74 (citing Wagner III, *14); Doc. 59, Pg. 10 ¶ 13

[188] Doc. 247, Pg. 45 ¶ 74 (citing Louzi v. Fort Bend Cty., 2020 U.S. Dist. LEXIS 154775 *11 (S.D. Tex. 2020) (Ellison, K.))

[189] Doc. 247, Pg. 45 ¶ 74 (citing Doc. 43, Pg. 10 ¶ 30 (citing St. Maron Props., L.L.C. v. City of Houston, 2023 U.S. App. LEXIS 22044 *7 (5th Cir. 2023) and Bartee, *8)

[190] Ex. 91, Pg. 22:24-23:3

[191] Ex. 91, Pg. 23:10-12, 24:15-25:9, 25:14, 26:10-15

[192] Doc. 247, Pg. 45 ¶ 75 (citing the same cases)

required. Doc. 59, Pg. 15 ¶ 21 (citing _Parker v. LeBlanc_, 73 F.4th 400, 406 (5th Cir. 2023)). And, as far as numbers, where the violations are flagrant or severe, a shorter pattern can suffice. _Bennett v. Slidell_, 728 F.2d 762, 768 (5th Cir. 1984); _Wagner II_, *15-16; _Wagner III_, *15-16; Doc. 84, Pg. 10 ¶ 1; Doc. 51, Pg. 20 ¶ 2. Moreover, upon the second, specific examples are not needed. Doc. 59, Pg. 14 (citing _Montano v. Orange Cnty., Tex._, 842 F.3d 865, 876 (5th Cir. 2016)). Finally, subsequent events may be probative of a policymaker's disposition. Doc. 59, Pg. 14 ¶ 18 (citing _Grandstaff v. City of Borger_, Tx. 767 F.2d 161, 171 (5th Cir. 1985))

### ii. THE POLICYMAKER ELEMENT

52. Defendant has also not expressly contested this element.[193] But, even if it had, in Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, and here, that individual is Sheriff Ed Gonzalez.[194] He even testified so.[195] And, he testified that he has known, since 2016, that there were medical care, overcrowding, overtime, training, misclassification, and observation problems, and too many deaths occurring in the jail.[196]

53. Despite that, he delegated the ground-level running of the jail to others.[197] Including the areas of medical care for detainees and observation protocols of detainees.[198] And, just because he delegated it does not relieve him of responsibility over it.[199] Those delegees, like Major Collier, testified that the jail had gotten into the practice of doing subpar inmate observations. And, they put the known incompetent Sgt. Williams in charge of the 7th Floor.

[193] Doc. 247, Pg. 45 ¶ 76 (citing _Howell_, *12)
[194] Doc. 247, Pg. 46 ¶ 76 (citing _Howell_, *12 (citing _Turner v. Upton County_, 915 F.2d 133 (5th Cir. 1990)); _Bartee_, *9); Ex. 125, Pg. 89:10-18
[195] Ex. 125, Pg. 14:15-18
[196] Ex. 125, Pg. 94:8-10, 103:18-104:1, 105, 5-6, 107:9-21, 109:11-12, 15-17
[197] _Moore_, 510; Ex. 125, Pg. 14:21-15:5, 156:6-11
[198] Ex. 125, Pg. 68:23-69:7, 87:9-25
[199] Ex. 125, Pg. 90:15-25, 164:18-22

54. And, even Sgt. Williams himself confessed that the 7th Floor is chronically understaffed. He and the other sergeants emphasized timely rounds over proper rounds to newcomers like Stewart, who had not even been to jail school, and told Lighten just to take quick glances and barely do that. And, the denials of medical care, understaffing, and failure to observe customs are so widespread that Defendant's former detention officers have been more than happy to testify about the same, which means the policymaker had to know of them and acquiesced.

**iii. MOVING FORCE**

55. For moving force, a plaintiff need only show municipal action or inaction taken with the requisite culpability and a direct causal link to the deprivation, and culpability is met where the municipality acted with deliberate indifference to the "known or obvious consequences" that a constitutional violation would result.[200] Here, Garcia's theory of causation is glaringly obvious: she alleges and shows with evidence a failure to observe/monitor, failure to provide medical care, and systematic understaffing and overcrowding customs, and shows evidence that Sanchez was a victim of those specific customs or practices.[201]

**iv. A DELIBERATELY INDIFFERENT DISPOSITION OF THE POLICYMAKER CAN BE INFERRED FROM ENSUING EVENTS**

56. The Fifth Circuit has long held, when death is involved, a policymaker's deliberately indifferent disposition can also be inferred from events occurring after a death.[202] It has also held that subsequent conduct can be used to show intent.[203] Presumably, this is why Defendant's own MSJ tries to use an after-the-fact health care regime and 2023 training system

[200] Doc. 247, Pg. 46-47 (citing Doc. 41, Pg. 68 ¶ 31 and *Bartee*, *9)
[201] Doc. 247, Pg. 47 (citing *Heckford v. City of Pasadena,* 2021 U.S. Dist. LEXIS 114573 *15 (S.D. Tex. 2021) (Ellison, K.))
[202] *Grandstaff v. Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (offered for this, not ratification)
[203] *United States v. Peterson*, 244 F.3d 385, 393 (5th Cir. 2001)

that existed only ***after*** Sanchez died to argue that it was not deliberately indifferent.[204] But, if such ensuing events are considered, they show that the customs, policies, and practices at issue in this lawsuit were so widespread that they could not change overnight.

57. First, just three days after Sanchez died, on February 15, 2022, Detainee Ryan Twedt was booked into Defendant's jail with a known mental health diagnosis and medication, which he did not receive regularly.[205] Following this, another detainee assaulted him, he needed medical care, made an intercom request for it, but was ignored.[206] So he covered up the cameras to get attention, DOs used excessive force on him, thereafter again denied him immediate medical care, since Defendant was so understaffed no detention officers were available to take him there.[207]

58. Second, three weeks after Sanchez, on March 4, 2022, Detainee Michael Griego was booked into Defendant's custody with known mental health issues.[208] Thereafter, he made several non-sensical kiosk requests that showed that he was suffering from mental illness.[209] Among those, he warned that another detainee was verbally and physically assaulting him.[210] But, Defendant was so overcrowded that it had Griego housed with Detainee Chad Maydwell, who was in jail on a capital murder charge.[211] And, predictably, Maydwell murdered Griego.[212]

59. Third, a month after Sanchez died, Detainee Matthew Shelton was placed in Defendant's custody.[213] At intake, Defendant was on notice that he was diabetic.[214] But he did

[204] Doc. 406, Pg. 9 ¶ 24, 29
[205] Doc. 281, Pg. 15-16
[206] Doc. 281, Pg. 16 ¶ 2
[207] Doc. 281, Pg. 16-18.
[208] Ex. 177, Pg. 13, 21-22; Ex. 178, Pg. 42-44, 837
[209] Ex. 178, Pg. 98-836
[210] Ex. 178, Pg. 819; Ex. 177, Pg. 14-15.
[211] Ex. 177, Pg. 22; Ex. 178, Pg. 5 ¶ 4, 7 ¶ 4, 13 ¶ 2
[212] Ex. 177, Pg. 3, 15, 16; Ex. 178, Pg. 7, 25, 843
[213] Ex. 169, Pg. 6, 117
[214] Ex. 169, Pg. 5, 44, 50, 52.

not receive insulin for four and a half days so he died of diabetic ketoacidosis.[215] And Defendant did not properly do face-to-face observations of him.[216] Just the opposite, when DO Charley Lauder went to feed him at about 3:43 p.m., he did not get his food, so she went in his cell and touched him, and he was cold to the touch and unresponsive.[217] She then did nothing for half an hour: to "*not alert other inmates*" she "*continued to feed chow and conduct my rounds*," and only after she "*completed chow and my rounds in L2*" did she tell DO Garrett Woods, at 4:09 p.m., and call a sergeant, at 4:13 p.m.[218] When Woods and Sgt. B. Collins finally touched Shelton he was cold and stiff with no pulse, yet no one on that floor did CPR.[219] And, when medical staff arrived Shelton's body was stiff and rigid.[220] That means he had not been properly observed for hours.[221]

60. Fourth, just two and a half months after Sanchez, Detainee Kristan Nicole Smith was booked into Defendant's care on April 27, 2022.[222] The place was so overcrowded that Smith had to sleep on the floor even though she was a diabetic.[223] Yes, Defendant was on notice that Smith was a diabetic and had a UTI.[224] That meant her glucose had to be checked daily, but Defendant "did it only a handful of times during [Smith's] stay… and failed to do it for several days leading up to [Smith] going unresponsive."[225] Instead, Smith only sporadically received "life-sustaining medications," and told Defendant that "this is an emergency."[226] Despite that, on the

[215] Ex. 169, Pg. 47, 50, 52, 57-58, 60, 64-69, 107, 111, 121.
[216] Doc. 280, Pg. 18 ¶ 2; Ex. 169, Pg. 1, 29.
[217] Ex. 169, Pg. 26.
[218] Ex. 169, Pg. 26, 27, 28
[219] Ex. 169, Pg. 27, 28-29.
[220] Ex. 169, Pg. 25, 29, 49, 92, 108 117 and 121
[221] Ex. 169, Pg. 25, 29, 49, 92, 108 117 and 121
[222] Ex. 172, Pg. 18-19, 87-88; Doc. 287, Pg. 16 ¶ 2.
[223] Ex. 172, Pg. 58; Doc. 287, Pg. 14, 31.
[224] Ex. 172, Pg. 39, 42.
[225] Doc. 287, Pg. 16 ¶ 2.
[226] Doc. 287, Pg. 16 ¶ 3; Ex. 172, Pg. 42, 44, 52, 58, 64, 76.

day Smith went unresponsive, DOs "did not conduct a single observation" inside her cell.[227] In fact, another detainee called them because of observation failures.[228] Consequently, Smith died.[229]

61. Fifth, just three months after Sanchez, on May 21, 2022, DO Kadijah Wyrick failed to conduct proper observation rounds, as did the supervising sergeant, and Detainee Benjamin Pierce died; Defendant's response, a year later, was verbal counseling.[230]

62. Sixth, just three months after Sanchez, on May 23, 2022, Detainee Robert Wayne Fore was booked into Defendant's care. Ex. 171, Pg. 99. Following this, Plaintiff Jackie Luna warned that her husband, Fore, needed medical assistance for his suicidal issues.[231] The next day, detainees saw him climb up a door with string to hang himself.[232] They hit the intercom and told Defendant.[233] At the time, Defendant was so understaffed that it was using trainees to meet ratios with several on overtime or forced overtime.[234] That evening, DO Rasheed Hawkins did his round without looking into Fore's cell at all, so he could "complete the rounds in time."[235] Minutes later, DO Lekeatha Gonzalez did the same.[236] Not being properly observed, Fore hanged himself.[237]

63. Seventh, just four months after Sanchez, on June 8, 2022, Detainee Bryan Johnson was placed into Defendant's custody with known medical and mental health disabilities, including breathing problems.[238] The provided inhaler had no effect.[239] He begged for care, but those

[227] Doc. 287, Pg. 20 ¶ 3
[228] Ex. 172, Pg. 88; Doc. 287, Pg. 18 ¶ 2.
[229] Ex. 172, Pg. 10, 88; Doc. 287, Pg. 18
[230] Ex. 187, Pg. 1
[231] Ex. 103, Pg. 60:19-61:1, 65:18-25, 69:8-10, 76:19-25, 77:10-17
[232] Ex. 171, Pg. 24
[233] Ex. 171, Pg. 24
[234] Ex. 171, Pg. 163-16
[235] Ex. 171, Pg. 26; Doc. 280, Pg. 18 ¶ 2
[236] Ex. 171, Pg. 25 ¶ 4, 39; Doc. 280, Pg. 18 ¶ 2
[237] Ex. 171, Pg. 7, 20, 24, 34, 36-37, 41, 45, 101, 106, 179, 181, 182, 185, 198, 203, 205-207, 212
[238] Ex. 98:6-9; Doc. 409, Pg. 21 ¶ 2.
[239] Doc. 409, Pg. 21 ¶ 2

requests were not even looked at.[240] It took "months" for Defendant to even respond to his breathing problems.[241] After which, he died.[242] And, on that day, there no proper response.[243]

64. Eighth, five months after Sanchez died, on July 1, 2022, Detainee Kevin Leon Smith was put in Defendant's custody.[244] He later died in it.[245] While Defendant's documentation claims that rounds were done at 9:13 AM and 10:05 AM, video footage conclusively establishes that these reports were demonstrably false.[246] At no point did those DOs conduct proper face-to-face observations.[247] Instead, other detainees informed the Defendant of Smith's medical emergency.[248] And, instead of helping Smith, the officers just stood around for several minutes.[249]

65. Ninth, just five months after Sanchez's death, on July 23, 2022, Detainee Nathan Henderson was blind booked into Defendant's care, meaning no suicide risk screening.[250] This was immediately after surgery for a stab wound that twice lacerated his inferior vena cava, and he was still stapled closed.[251] That said, on July 31, 2022, Henderson entered the shower at 11:07 and collapsed at 11:21, striking the back of his head on the concrete floor.[252] He and another detainee tried to flag DOs for help, but none came, even once he was discovered.[253] He then died.[254]

---

[240] Doc. 409, Pg. 22-23
[241] Doc. 409, Pg. 23-24
[242] Doc. 409, Pg. 24-25
[243] Ex. 98, Pg. 51:25, 65:2-4, 126:1, 127:14-16, 133:22-134:9, 169:16-18; Doc. 409, Pg. 23 # III
[244] Doc. 280, Pg. 1 ¶ 2
[245] Doc. 280, Pg. 13 ¶ 1
[246] Doc. 280, Pg. 16 ¶ 2
[247] Doc. 280, Pg. 16 ¶ 2
[248] Doc. 280, Pg. 15 ¶ 2
[249] Doc. 280, Pg. 15-16
[250] Ex. 132, Pg. 17, 37-38; Ex. 158, Pg. 90, 208
[251] Ex. 158, Pg. 95
[252] Ex. 158, Pg. 80, 208
[253] Ex. 158, Pg. 65-66, 78, 230
[254] Ex. 158, Pg. 29

66. Tenth, also five months after Sanchez, on July 26, 2022, Detainee Damien Lavon Johnson was booked into Defendant's custody.[255] At intake, he put Defendant on notice that he had tried to kill himself two weeks earlier by taking pills, and he then told Defendant's clinic the same.[256] Despite that, Defendant recorded that he had no possible mental health issues.[257] Ignored, Johnson wrote a suicide note that read: "*Daniel 7:28… I wish to be remembered as a fallen angel. One that was called back to where I've come. Weathers will change, but this outcome won't. Look to the sky and pry its my destiny. If not let hell be sweet. Though I leave behind little I hoped for more. Maybe in the next one I make a score.*"[258] Following that, Johnson committed suicide in Defendant's custody with a white sheet off the top rung of a bunk.[259] He died as result.[260]

67. Eleventh, also just five months after Sanchez, on July 26, 2022, Detainee Jim Franklin Lagrone was placed into Defendant's care.[261] Two days later, Defendant's medical team diagnosed him with opiate withdrawal and severe malnutrition.[262] Three days later, detainees heard a noise in the night, and when DOs checked, they found him "*vomiting in the toilet*."[263] But Defendant's records do not show a clinic visit, and at the next round he was found unresponsive in his cell "after a night of vomiting."[264] Lagrone was pronounced dead that afternoon.[265]

---

[255] Ex. 179, Pg. 4-5, 10, 18, 24, 34, 37, 333
[256] Ex. 179, Pg. 13-14, 47-48, 75
[257] Ex. 179, Pg. 15, 19, 25, 34
[258] Ex. 179, Pg. 21
[259] Ex. 179, Pg. 28, 30, 62, 255, 257, 267, 315, 334, 337
[260] Ex. 179, Pg. 33, 48, 315, 333-334, 337
[261] Ex. 173, Pg. 28
[262] Ex. 173, Pg. 55, 58
[263] Ex. 173, Pg. 28.
[264] Ex. 173, Pg. 27-28
[265] Ex. 173, Pg. 2, 27

68. Twelfth, just six months after Sanchez died, on August 11, 2022, Detainee Dylan Perio was booked into Defendant's jail with a known HIV infection.[266] Knowing about this serious condition, Defendant did nothing, including failing to provide him medicine for months.[267] Among his desperate pleas, he wrote to the Defendant, "*im literally in here dying*."[268]

69. Thirteenth, just eight months after Sanchez died, on September 29, 2022, Detainee Victoria Margaret Simon was booked into Defendant's custody with a reported history of substance abuse, and was experiencing withdrawal.[269] There was no video surveillance in her cell, and DOs do not enter that cellblock to do face-to-face observations.[270] As such, it is unknown when she had her medical emergency, but she was cold to the touch when she was discovered and had rigor mortis when she arrived at the clinic, implying she was that way for quite a bit of time.[271]

70. Fourteenth, also just eight months after Sanchez, on September 27, 2022, Detainee Christopher Young was booked into Defendant's custody with a history of medical and mental health issues.[272] Each of these required increased observation to ensure his condition did not worsen, but Defendant failed to properly observe him and consistently failed to provide him his needed medications.[273] Predictably, he then had a medical emergency that resulted in him lying in a pool of his own blood for a long time without medical assistance until he regained consciousness and had another detainee take him to ask for care, only to be denied it.[274]

---

[266] Doc. 367, Pg. 19 ¶ 3; Ex. 180, Pg. 30, 41, 82, 86, 88-89; Ex. 181, Pg. 4, 16, 84, 93-96, 107, 142, 148, 374, 462, 465
[267] Doc. 367, Pg. 20-24; Ex. 180, Pg. 30, 41, 82, 86, 88-89; Ex. 181, Pg. 83, 93-96, 107, 142, 148, 374, 462, 465
[268] Ex. 181, Pg. 465
[269] Ex. 175, Pg. 34, 37, 45, 49, 55
[270] Ex. 175, Pg. 34-36
[271] Ex. 175, Pg. 35, 45
[272] Doc. 408, Pg. 20 ¶ 2
[273] Doc. 408, Pg. 20-22
[274] Doc. 408, Pg. 23-24.

71. Fifteenth, eight months after Sanchez, on September 29, 2022, Defendant failed to consistently provide Detainee Taylor Euell medical and mental health care for known conditions.[275] Moreover, during his stay, a DO used excessive force on him, and he was thereafter not immediately taken to the medical clinic for care.[276] Consequently, his injuries improperly healed.[277] Following this, a detainee assaulted Euell, medical care was not immediately provided, and his nose is now deformed.[278] Before this, he had warned DOs that he needed to be moved, but Defendant was so overcrowded, they laughed and did not move him.[279]

72. Sixteenth, nine months after Sanchez, on October 9, 2022, Detainee Alan Kerber was booked into with mental health issues into a cell with cameras.[280] It showed him talking to people not there, then sticking a foreign body into his mouth to kill himself, striking his face against the wall, falling face down with blood and his right hand in the toilet.[281] Despite that, Defendant did not properly make face-to-face observations of detainees with one expressly putting in writing that he did not "make visual contact with the inmate Kerber" while "conducting rounds."[282] In fact, a detainee floor worker found him while passing out breakfast.[283]

**F. THE FAILURE TO TRAIN / SUPERVISE CLAIMS SURVIVE**

73. Garcia has already shown fact issues on the failure to train and supervise claims.[284] Building on that, experts now testify that Defendant's officers were not properly trained or

[275] Doc. 407, Pg. 23 ¶ 1; Ex. 182, Pg. 4, Pg. 358, 412-413, 419, 428
[276] Doc. 407, Pg. 24 ¶ 1; Ex. 182, Pg. 363, 364, 370-371, 418
[277] Doc. 407, Pg. 24 ¶ 2
[278] Doc. 407, Pg. 25 ¶ 2; Ex. 182, Pg. 338-340
[279] Ex. 182, Pg. 341, 347, 375-381, 388-389, 396, 402
[280] Ex. 176, Pg. 4, 8, 13, 25, 32, 41, 108
[281] Ex. 176, Pg. 16, 22, 24, 26, 41, 50, 91
[282] Ex. 176, Pg. 21
[283] Ex. 176, Pg. 26, 112.
[284] Doc. 247, Pg. 47-50 ¶ 78-83

supervised.[285] The policymaker has known since 2016 that training needed to be improved.[286] Adding further, detention officers have testified that supervisors do not even care.[287] And, also that there was no training whatsoever on how to escalate an unmet medical request.[288]

74. Despite that, Defendant now points to a 2023 training system that came into existence only after Sanchez died.[289] But that cannot possibly show that its officers were sufficiently trained in 2022, when Sanchez was denied medical care, improperly observed, and died. That said, Defendant next points to its use of force and deescalation training protocols.[290] But Garcia pleads no such claims in this lawsuit. Nevertheless, Defendant says "Plaintiffs *do not even bother to identify what specific training was deficient*."[291] Garcia did: the shadowing training through which Lighten / Stewart learned to just scan barcodes instead of properly monitoring detainees.[292] Others were trained this way too.[293] And, this defective training approach has since been abandoned and replaced by Defendant.[294] Building on that, Defendants also maintained a supervision practice by which compliance was driven entirely by completion of CorreTrak rounds rather than performance of TCJS observation duties.[295] Officers were held accountable only for completing rounds on time, not for verifying inmate conditions.[296]

---

285 Ex. 90, Pg. 17-18, 21 ¶ 4, 22 ¶ 2
286 Ex. 125, Pg. 94:125, 107:9-12
287 Ex. 106, Pg. 23:20-24:6
288 Ex. 122, Pg. 18:14-24
289 Doc. 406, Pg. 9 ¶ 24
290 Doc. 406, Pg. 12 ¶ 41, 44, 14 ¶ 51
291 Doc. 406, Pg. 13 ¶ 46, 34 ¶ 145
292 Doc. 247, Pg. 20 ¶ 22, 38 ¶ 60, 48 ¶ 79, 50 ¶ 83
293 Ex. 110, Pg. 11:5-15
294 Ex. 112, Pg. 26:21-23
295 Ex. 90, Pg. 16 ¶ 4; Doc. 408, Pg. 21-22; Ex. 99, Pg. 19:11-14, 22:18-25, 23:21-25; Ex. 100, Pg. 19:11-12, 37:14-15, 40:4-41:5; Ex. 125, Pg. 18:5-9; Ex. 125, Pg. 279:17-18
296 Ex. 90, Pg. 16 ¶ 4; Ex. 91, Pg. 76:12-18, 77:8-10; Ex. 102, Pg. 43:23-24, 48:21-49:3

75. Just the opposite, detention officers, like DO A. Goodlow-Jones, would be punished for doing observation rounds correctly even if it took them longer to do so.[297] This, even though supervisors had widespread evidence that rounds were not being properly done.[298] And, Major Collier's silence on supervisory review, round audits, and monitoring evaluation reflects the same failure at the managerial level.[299] No evidence shows rounds were ever evaluated to ensure that their underlying safety function, verifying that inmates were alive and responsive, was actually performed.[300] The appearance of compliance replaced the performance of observation.[301]

76. Despite that, Defendant points to a document-driven PEWS record system to argue that officers are adequately supervised with regard to their uses of force.[302] But, again, Garcia pleads no excessive force claims, and Lighten / Stewart's superiors cared only about timely rounds, not proper ones, despite TCJS repeatedly stressing proper face-to-face rounds.[303] That said, Garcia also already showed just how lacking in training DO Lighten / Stewart were and how they were supervised by known incompetent Sgt. Williams.[304] And, that document literally said there was a "pattern."[305] Of course there is, because there are numerous serious and flagrant deaths.

## X. CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Garcia requests that Defendant Harris County's MSJ [Doc. 406] be denied, and that the Defendant take nothing from it.

[SIGNATURE BLOCK ON NEXT PAGE]

---

[297] Ex. 102, Pg. 43:23-24, 48:21-49:3
[298] Ex. 90, Pg. 17 ¶ 3, 5
[299] Ex. 90, Pg. 18 ¶ 1, 5; Ex. 91, Pg. 76:12-18
[300] Ex. 90, Pg. 1, 18 ¶ 2
[301] Ex. 90, Pg. 16 ¶ 4; Ex. 91, Pg. 76:12-18
[302] Doc. 406, Pg. 14 ¶ 53
[303] Doc. 247, Pg. 37-50 ¶ 78-83
[304] Doc. 247, Pg. 37-50 ¶ 78-83
[305] Doc. 247, Pg. 12 ¶ 5

Respectfully submitted,

**THE SHARIFF LAW FIRM**

By: ______________________________

**M. Obaid Shariff**
Federal I.D. No. 2827312
Texas Bar No. 24091135
2500 West Loop South, Ste 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
mshariff@shariflawfirm.com
**ELECTRONIC SERVICE VIA:**
eservice@shariflawfirm.com

**ATTORNEYS FOR PLAINTIFF INTERVENOR ANA GARCIA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WAGNER et al. | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | CIVIL ACTION NO: |
| v. | § | 4:23-cv-02886 |
| | § | |
| HARRIS COUNTY, TEXAS, | § | Jury Requested |
| | § | |
| *Defendant.* | § | |

**CERTIFICATE OF SERVICE**

-------------------------------------------------------------------X

TO: Clerk of the Court

I hereby certify that on the date of this filing, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and/or via email on all counsels of record.

______________________________
M. Obaid Shariff
*Attorney for the Intervenor*